KIRK B. LENHARD, ESQ., Nevada Bar No. 1437
NIKKI L. BAKER, ESQ., Nevada Bar No. 6562
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
Telephone:  702.382.2101
Facsimile:  702.382.8135
Email:  klenhard@bhfs.com
Email:  nbaker@bhfs.com

DENNIS H. HRANITZKY, ESQ. (will comply with
LR IA 10-2 within 14 days)
DECHERT LLP
1095 Avenue of the Americas
New York, NY  10036-6797
Telephone:    212.698.3500
Facsimile:    212.698.3599
Email:        dennis.hranitzky@dechert.com

*Attorneys for NML Capital Ltd.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| NML CAPITAL LTD.,<br><br>            Plaintiff,<br><br>v.<br><br>THE REPUBLIC OF ARGENTINA,<br><br>            Defendant. | **2:14-ms-00024**<br><br>**NML CAPITAL, LTD.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM  ENTITIES AFFILIATED WITH NON-PARTY LÁZARO BÁEZ** |

Plaintiff NML Capital, Ltd., by and through its attorneys of record, the law firm of Brownstein Hyatt Farber Schreck, LLP, hereby moves to compel the production of documents from entities affiliated with non-party Lázaro Báez.

. . .

. . .

. . .

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

FILED                    ENTERED
RECEIVED                 SERVED ON
COUNSEL/PARTIES OF RECORD

APR - 1 2014

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:                      DEPUTY

1    This Motion is made and based on the following Memorandum of Points and Authorities,

2    the Exhibits attached hereto, the Affidavit of Nikki L. Baker, Esq., submitted in compliance with

3    Local Rule 26-7 and filed concurrently herewith, and any oral argument requested by the Court.

4    DATED this 1st day of April, 2014.

5                                                          BROWNSTEIN HYATT FARBER
                                                           SCHRECK, LLP
6

7                                                          By: _Nikki L Baker_____

8                                                              Kirk B. Lenhard, Esq.
                                                              Nevada Bar No. 1437
9                                                              Nikki L. Baker, Esq.
                                                              Nevada Bar No. 6562
10                                                            100 North City Parkway, Suite 1600
                                                              Las Vegas, NV 89106-4614
11
                                                              Dennis H. Hranitzky (will comply with
12                                                            LR IA 10-2 within 14 days)
                                                              Dechert LLP
13                                                            1095 Avenue of the Americas
                                                              New York, NY  10036-6797
14
                                                           *Attorneys for NML Capital Ltd.*
15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                    ii

*Pham v. Wal-Mart Stores, Inc.*,
 2:11-CV-01148-KJD, 2012 WL 3730565 (D. Nev. Aug. 28, 2012) ................................ 13, 14

*Richmark Corp. v. Timber Falling Consultants*
 959 F.2d 1468 (9th Cir. 1992) ................................................................................................ 12

*Robinson v. Goldfield Merger Mines Co.*,
 206 P. 399 (Nev. 1922), *aff'd on re-hearing*, 213 P. 103 (Nev. 1923) .................................... 13

*Sullivan v. Ross Mech., Inc.*,
 No. 10 C 8069, 2012 WL 2254203 (N.D. Ill. June 15, 2012) ................................................... 8

*VFS Fin., Inc. v. Specialty Fin. Corp.*,
 3:09-CV-00266-RCJ, 2013 WL 1413024 (D. Nev. Apr. 4, 2013) .......................................... 12

*W. Bend Mut. Ins. Co. v. Belmont State Corp.*,
 No. 09 C 354, 2010 WL 3700834 (N.D. Ill. Sept. 9, 2010) ..................................................... 8

**STATUTES**

Argentine Criminal Code, art. 23 .............................................................................. 8, 13

Argentine Criminal Code, art. 303 ................................................................................. 13

N.R.S. 21.320 .................................................................................................................... 8

**OTHER AUTHORITIES**

12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3014 (2d ed. 2012) ................................................................................................................................ 13

Federal Rule of Civil Procedure 69(a)(2) ............................................................... passim

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

v

**PRELIMINARY STATEMENT**

Plaintiff NML Capital, Ltd. ("**NML**") holds judgments against the Republic of Argentina ("**Argentina**") totaling more than $1.7 billion that Argentina indisputably has the means to pay. In its contract to borrow money from private investors on which NML's judgments are based, Argentina "irrevocably waived" its sovereign immunity from attachment, execution, or "any other legal or judicial process or remedy" in the United States courts. *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 203 n.1 (2d Cir. 2012). Argentina thus has no excuse for refusing to pay its obligations. Yet it obdurately refuses to do so—engaging instead in a pattern of what the Second Circuit has described as "willful defiance of its obligations to honor the judgments of a federal court." *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 196 (2d Cir. 2011) (citation omitted).

Argentina has engaged in elaborate mechanisms to shield its assets. As the federal courts have recognized, Argentina has acted in "bad faith," seeking to work a "fraud" on its creditors, by hiding assets in corporate shells with which "there is no real separation" so long as Argentina "wishes to use the funds" but, when its creditors seek the assets, then "the situation shifts and a wall of separation suddenly appears." *EM Ltd. v. Republic of Argentina*, 720 F. Supp. 2d 273, 280 (S.D.N.Y. 2010), *vacated on other grounds*, 652 F.3d 172 (2d Cir. 2011). Argentina's bad faith behavior has left NML with little choice but to track Argentina's assets around the world and attempt to attach them as local laws permit. To aid these efforts, NML has pursued post-judgment discovery under Federal Rule of Civil Procedure 69(a)(2) seeking, among other things, information from entities that transact business with Argentina across the world.

By this motion, NML seeks an order compelling 123 companies in Nevada that are affiliated with Lázaro Báez (the "**Báez Entities**") to produce documents that may point to the location of Argentina's assets in the United States or abroad.[1] Báez's ties to Argentina and its current President are infamous. He is currently under investigation by Argentine prosecutors for embezzling over $65 million of state funds out of Argentina through his companies in Nevada

---

[1]     Appendix A lists the Báez Entities.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1    and elsewhere.  If Báez is convicted of embezzlement, any funds traceable to the embezzlement

2    scheme would be property of Argentina available to satisfy NML's judgments against Argentina.

3        Through subpoenas served on the Báez Entities on August 13, 2013 (the "**Subpoenas**"),

4    NML seeks information calculated to assist in tracing those funds.  The documents sought by

5    NML pursuant to the Subpoenas thus fall squarely within the scope of asset discovery

6    contemplated under Rule 69(a)(2) of the Federal Rules of Civil Procedure—which permits a

7    judgment creditor like NML to "obtain discovery from any person" "[i]n aid of the judgment or

8    execution." Fed. R. Civ. P. 69(a)(2).

9        As explained below, it is beyond question that each of the Báez Entities has possession,

10    custody, or control of documents responsive to the Subpoenas.  Yet none of the 123 entities

11    subpoenaed has produced any documents in response.  To make matters worse, NML's efforts to

12    meet and confer with the Báez Entities in the hope of resolving any disputes with respect to their

13    compliance with the Subpoenas have been utterly fruitless—as each of those entities has refused

14    even to identify counsel or any representative with whom NML can negotiate.  As set forth fully

15    below, NML therefore respectfully requests that this Court compel each of the Báez Entities to

16    comply with the Subpoenas.

17                             **STATEMENT OF FACTS**

18    **I.**     <u>**Argentina's Default And Willful Judgment Evasion**</u>

19        In the words of the Second Circuit Court of Appeals, "Argentina has made many

20    contributions to the law of foreign insolvency through its numerous defaults on its sovereign

21    obligations, as well as through what we might term a diplomacy of default." *EM Ltd. v. Republic*

22    *of Argentina*, 473 F.3d 463, 466 n.2 (2d Cir. 2007).  Its most recent round of contributions began

23    in December 2001, when it declared a moratorium on payments on its external debts in violation

24    of agreements with its creditors.  In 2004, Argentina announced a debt restructuring plan, on a

25    take-it-or-leave-it basis, that provided bondholders with a recovery of less than 30 cents on the

26    dollar.[2]  This unprecedentedly large 70%-plus "haircut" was twice the average discount of 36%

27

28    [2]     Hal S. Scott, *Sovereign Debt Default: Cry For the United States, Not Argentina,* at 3 (Wash. Legal Found., Working Paper No. 140) (2006) ("*Sovereign Debt Default*") (a copy of which is attached as

BROWNSTEIN HYATT FARBER SCHRECK, LLP

100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

on twenty other sovereign debt restructurings between 1990 and 2006, and was declared despite Argentina's ability to pay far more.[3]   Argentina's unreasonable unilateral offer is directly responsible for the litigation that has followed.[4]

Since its default, Argentina's economic fortunes have improved greatly.  It has enjoyed consistent and substantial fiscal and balance-of-payments surpluses, and it currently sits on tens of billions of dollars worth of foreign currency reserves.  *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 263 (2d Cir. 2012).  Yet Argentina has steadfastly refused to pay its creditors.  In the words of the court most familiar with its conduct, Argentina "has not acted honestly and in good faith to pay the debts which [it] has the ability to pay."  *EM Ltd.*, 720 F. Supp. 2d at 301.

In the months leading up to its default in 2001, Argentina transferred billions of dollars out of New York and into the Bank for International Settlements in Basel, Switzerland for the purpose of avoiding the future seizure of funds deposited there.[5]  Argentina then transferred most of its remaining assets outside the United States and elaborately structured its financial affairs to avoid the attachment of its assets under the Foreign Sovereign Immunities Act and the laws of foreign jurisdictions.

---

Exhibit A); Larry Rohter, *Argentina Announces Deal on its Debt Default*, N.Y. Times, Mar. 4, 2005, at C1. (a copy of which is attached as Exhibit B).
[3]      Scott, *Sovereign Debt Default, supra* note 1, at 3; Arturo C. Porzecanski, *From Rogue Creditors to Rogue Debtors: Implications of Argentina's Default*, 6 Chi. J. Int'l L. 311, 321 (2005) (a copy of which is attached as Exhibit C).
[4]      *Sovereign Defaults Series: The Role of Holdout Creditors and CACs in Sovereign Debt Restructurings*, Moody's Investors Service, April 10, 2013, at 5 (a copy of which is attached as Exhibit D).
[5]      *See* Central Bank of Argentina, 2002 Report to the National Congress, (a translated copy of which is attached as Exhibit E), at 52 ("[g]iven that the National Government had incurred financial non-payments and the possibility that some external creditor might initiate legal proceedings that lead to an embargo of the BCRA's reserves," BCRA began "moving its reserves to the Bank for International [Settlements] (BIS) as the bonds in the portfolio matured."); *The Government is Protecting Itself from Attachment*, LA NACION, Feb. 5, 2004 (a translated copy of which is attached as Exhibit F). (quoting the former Argentine Finance Secretary's boast that "[r]eserves . . . on deposit in New York banks have been withdrawn, funds on deposit in the New York branch of Banco Nación have been repatriated, and salaries of Argentine officials posted to other countries are being deposited in Argentina or paid in the form of cash sent via diplomatic pouch, which has immunity.")

3

Proceedings to enforce judgments awarded against NML (and other creditors) are currently pending as related actions in the United States District Court for the Southern District of New York (the "**New York Court**").  The district judge who presides over those actions, Judge Thomas P. Griesa, repeatedly has found that Argentina has acted in bad faith and engaged in willful judgment evasion.  To cite just one example, in an opinion finding Argentina's central bank to be the alter ego of Argentina (and thus liable for Argentina's debts), Judge Griesa observed:

> In all the years of litigation, the Republic has shown not the slightest recognition of [its] obligation to pay.  And it is clear beyond any question that the Republic, as it went on from the crisis of 2001, has at times had resources at its command to pay the judgments, or at least to make substantial part-payments.  But the Republic thus far pays ***nothing*** on these judgments.

*EM Ltd.*, 720 F. Supp. 2d at 279 (emphasis in original).  The Second Circuit has echoed this sentiment.  *See NML Capital*, 652 F.3d at 196 ("One need not have what Argentina's great gift to literature [Jorge Luis Borges] termed a 'case[] of prodigious memory' to recall the Republic's appalling record of keeping its promises to its creditors.").  And in perhaps the most egregious example of its contemptuous disregard for the federal courts, in a recent argument before the Second Circuit, Argentina's counsel informed the panel that Argentina would simply not comply with an order with which Argentina disagreed.  *See* Feb. 27, 2013 Hr'g Tr., *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105 (2d Cir. Oct. 26, 2012), at 12 (Counsel for Argentina: "I'm telling you [the order] wouldn't be voluntarily obeyed.").

## II.  NML's Judgments Against Argentina

NML owns beneficial interests in bonds on which Argentina defaulted in 2001, and has filed eleven actions in the Southern District of New York to recover on those bonds.  The New York Court has entered money judgments in favor of NML currently totaling (with interest) more than $1.7 billion.  *EM Ltd.*, 695 F.3d at 203.  Although the judgments are final, lawful, and enforceable, Argentina has defiantly declared that it will never pay them voluntarily.

As a consequence, NML has had no choice but to invoke the processes of the U.S. courts, as well as those in foreign jurisdictions, in a worldwide effort to identify and attempt to seize attachable assets.  NML has employed post-judgment discovery under Rule 69 of the Federal

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1  Rules of Civil Procedure—which the Second Circuit has expressly condoned—seeking to "locate

2  Argentina's assets and accounts, learn how Argentina moves its assets through New York and

3  around the world, and accurately identify the places and times when those assets might be subject

4  to attachment and execution (whether under [U.S. law] or the law of foreign jurisdictions)." *EM*

5  *Ltd.*, 695 F.3d at 203 (citation omitted).  NML's discovery efforts endorsed by the Second Circuit

6  have included service of subpoenas on various third-parties like the Báez Entities who NML

7  believes may have information relevant to locating Argentina's assets. *Id.* at 208.

8  **III.    Báez And His Relationship With The Kirchners**

9       NML has reason to believe that the illicit relationship between Báez and the Argentine

10  government may have allowed Báez to abscond with tens of millions of dollars in assets, now

11  hidden around the world in the Báez Entities or their affiliates, which could be used to help

12  satisfy NML's judgments against Argentina.  Báez is an Argentine national who has amassed a

13  personal fortune with the help of Argentine President Cristina Fernández de Kirchner, her now-

14  deceased husband, former Argentine President Néstor Kirchner, and other members of the

15  Kirchner clan.

16       The Kirchners helped Báez transform from his humble financial roots into a tycoon of the

17  Argentine construction industry.  In 1990, Báez was thirty-four years old, was employed as a

18  junior teller at a government-owned bank in Santa Cruz, and drove an eighteen-year-old car.[6]

19  Báez's fortunes shifted dramatically after Nestor Kirchner became the governor of the Argentine

20  province of Santa Cruz.  After Kirchner won the election, he elevated Báez from junior teller to

21  "Special Assistant" to the President of the bank—reportedly answerable only to Kirchner

22  himself.[7]

23       Báez's personal fortune ballooned even more spectacularly after Néstor Kirchner was

24  elected President of Argentina in 2003.[8]  Báez then formed a new company to obtain work on

---

[6]     Luis Majul, "The Boss: The Secret History of Nestor Kirchner, the Man Who Handles Argentina's Public and Private Business," Espejo de la Argentina Planeta 2009, pp. 19, 327 (the relevant excerpts of which are attached in translation as Exhibit G).

[7]     *Id.*

[8]     Encyclopedia Britannica, http://www.britannica.com/EBchecked/topic/914332/Nestor-Kirchner (a copy of which is attached as Exhibit H).

5

BROWNSTEIN HYATT FARBER SCHRECK, LLP

100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

large scale public works projects—including building roads and bridges—largely financed by the Argentine government.[9]   Between 2009 and 2013, Báez's companies collected between 70% and 75% of all public works spending in the Kirchners' home province, Santa Cruz.[10]   Báez now controls a diverse collection of companies that generate hundreds of millions of dollars in annual revenues—largely from public contracts and through financing from state-run banks.[11]

Báez's rapid accumulation of wealth and his ties to the Kirchners have not gone unnoticed.   In April 14, 2013, one of Argentina's top journalists began a series of televised reports presenting findings that Báez had engaged in illegal financial activity and political corruption.   The reports featured videotaped statements by two alleged associates of Báez who testified that they boarded Báez's corporate jets with sacks of cash to fly the money out of Argentina, and put it into dozens of anonymous companies scattered among tax havens around the world such as Panama and Belize.[12]   Tellingly, the Báez associates referred to the underground currency house where they worked as "La Rosadita"—in a reference to the presidential mansion, the "Casa Rosada," which the Kirchners have occupied since 2003.

Four days after the first of these reports were televised, Argentine prosecutors announced an investigation of Báez and his business operations, and launched a series of raids against Báez's operations.   The evidence uncovered in this investigation—and others—revealed extensive financial dealings between Báez and the Kirchners, including secret property deals between Báez and the Kirchners after Néstor Kirchner became President.[13]

---

[9]   *See* Official Gazette of the Republic of Argentina, May 16, 2003 (the relevant excerpt of which is attached in translation as Exhibit I) (Reflecting the award of contracts to Austral Construcciones, a company owned by Antonio Lázaro Báez); "De Vido Blessed Lázaro Báez with a Record Contract: $ 7,500,000 per KM," PERIÓDICO TRIBUNA, September 30, 2011 (a translated copy of which is attached as Exhibit J).

[10]   "Wire Transfers from la Nación to Lázaro Báez Revealed," LA VOZ, August 10, 2013(a translated copy of which is attached as Exhibit K).

[11]   Lucía Salinas, "Government Guarantees Further Millions in Funds for Báez," CLARIN, December 23, 2013(a translated copy of which is attached as Exhibit L); Florencia Donovan, "Multimillion Peso Bailout of Lázaro Báez by Banco Nácion," LA NACION, July 12, 2013(a translated copy of which is attached as Exhibit M).

[12]   "Jorge Lanata Unearths the Lázaro Báez's Money Trail," LA NACION, April 15, 2013, (a translated copy of which is attached as Exhibit N).

[13]   Hugo Alconada Mon, "Báez 'Rented' Three Hotels belonging to the Kirchners' for $14.5 Million," LA NACION, December 17, 2013, (a translated copy of which is attached as Exhibit O); Hugo

On June 19, 2013, the lead prosecutor, José María Campagnoli, submitted his findings to an Argentine court in a detailed report (the "**Campagnoli Report**").  The Campagnoli Report found that in 2010 and 2011 Báez transferred the equivalent of at least $65 million from Argentina to a network of shell companies based primarily in Nevada which, in turn, are controlled by a shady network of shell companies in the Republic of Seychelles—an obscure archipelago in the Indian Ocean known as a financial secrecy haven.[14]  After concluding that the $65 million is likely the product of diverted funds earmarked for public works projects, the prosecutors investigated the resulting money trail and found that the $65 million was converted into Argentina sovereign bonds which were moved to a Swiss bank account.  Báez then sold the bonds, and proceeds were ultimately deposited in an account maintained by one of Báez's construction firms.[15]

The Campagnoli Report earned Campagnoli the ire of the Kirchner government—and an effort was mounted to squelch the investigation and to remove Campagnoli from office.  In November 2013, in what was widely denounced as a retaliatory political move, the Attorney General removed Campagnoli from the Báez case.[16]  Shortly thereafter, Campagnoli was removed from his prosecutorial post altogether and replaced with a political appointee.[17]  And in February 2014, the investigative team Campagnoli had set up for the Báez case was dismantled.[18]

---

Alconada Mon, "Báez Secretly Promised Millions in Income to Kirchner," LA NACION, December 15, 2013 (a translated copy of which is attached as Exhibit P).

[14]   *See* Campagnoli Report, dated June 19, 2013 (a translated copy of which is attached as Exhibit Q) ("150 companies were established in the State of Nevada, USA, all having the same domicile in The City of Las Vegas, with Aldyne Ltd., a Seychelles Islands company, as director" and "we found no fewer than 150 companies managed from one and the same domicile and the common denominator of their management by the Seychelles Islands company Aldyne Ltd."); Bureau for International Narcotics and Law Enforcement Affairs, International Narcotics Control Strategy Report, http://www.state.gov/documents/organization/184329.pdf (a copy of which is attached as Exhibit R) at p. 41 (noting the Seychelles' status as a financial secrecy haven).

[15]   Campagnoli Report (attached as Exhibit Q).

[16]   Daniel Santoro, "Gils Carbó Now Removes a Prosecutor Involved in Báez Investigation," CLARIN, November 12, 2013, (a translated copy of which is attached as Exhibit S).

[17]   "José María Campagnoli Suspended, the Prosecutor Investigating the Lázaro Báez Case," LA NACION, December 12, 2013, (a translated copy of which is attached as Exhibit T).

[18]   Lucia Fernández Moores, "The Team That Investigated Alongside Campagnoli is Decommissioned", CLARIN, February 11, 2014, (a translated copy of which is attached as Exhibit U); "For the Prosecutor: 'What's Going on Is Typical of A Totalitarian State," CLARIN, February 11, 2014 (a translated copy of which is attached as Exhibit V).

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1  Nonetheless, Báez continues to face investigations into a number of different crimes, including

2  money laundering and extortion.[19]  If Báez is convicted of embezzlement, any funds traceable to

3  that activity will constitute property of Argentina that is potentially available to satisfy NML's

4  $1.7 billion in judgments.[20]  *See Sullivan v. Ross Mech., Inc.*, No. 10 C 8069, 2012 WL 2254203,

5  at *4 (N.D. Ill. June 15, 2012) (a judgment creditor "may recover assets of the judgment debtor

6  that a third party misappropriated, even where the third party does not possess the funds, because

7  the third party is 'indebted to the judgment debtor'") (quoting *W. Bend Mut. Ins. Co. v. Belmont*

8  *State Corp.*, No. 09 C 354, 2010 WL 3700834, at *5 (N.D. Ill. Sept. 9, 2010));  *Greene v. Eighth*

9  *Judicial Dist. Court of Nevada ex rel. Cnty. of Clark*, 990 P.2d 184, 186 (Nev. 1999) ("The judge

10  may order any property of the judgment debtor to be applied toward satisfaction of the judgment,

11  whether it is in the possession of the judgment debtor or a third party, as long as it is not exempt

12  from execution.") (citing NRS 21.320).

13  **IV.   NML's Subpoenas To The Báez Entities**

14  On August 13, 2013, NML served substantially identical subpoenas on 123 Nevada-based

15  entities that are either affiliated with or controlled by Báez (i.e. the Báez Entities).  The Báez

16  Entities are identified in the Campagnoli Report as performing a critical function in the operation

17  to launder the embezzled Argentine funds.[21]  Each of the Báez Entities has (or at some point had)

18  the same registered agent, M.F. Corporate Services (Nevada) Limited ("**M.F.**"), which NML also

19  subpoenaed.

20  The Subpoenas seek two categories of documents:

21        1.   Documents regarding the transfer of funds or property since
22        January 1, 2010, from or to any of the subpoenaed Báez Entities; and

22        2.   Documents produced in connection with any investigation of Báez.
23

24  *See, e.g.* Subpoena to Lake County LLC (a copy of which is attached as Exhibit Y).

25

26

27  ---

[19]   Sergio Farella, "Argentine judiciary requests details of investigation into Lázaro Báez in Uruguay," INFOBAE, March 28, 2014 (a translated copy of which is attached as Exhibit W).
[20]   Argentine Criminal Code, Art. 23 (a translated copy of which is attached as Exhibit X).
28  [21]   Campagnoli Report (a translated copy of which is attached as Exhibit Q).

The requested documents will assist NML in tracing any embezzled funds to their current location—either by providing a trail to the funds themselves, or revealing the identities of persons or entities likely to have more information about the funds' whereabouts.

## V. The Báez Entities' Refusal To Comply With The Subpoenas

The Báez Entities have utterly refused to comply with the Subpoenas. Each entity submitted an affidavit stating that it would not produce any responsive documents. Many of the reasons given by these entities for their refusal to comply with the subpoenas are highly dubious. For example, in the affidavit submitted for Báez Entity American Trade & Packing Ltd., it contends that it "has been continued to another jurisdiction as of the 30th of July 2013."[22] No explanation was given as to what exactly the suspicious statement "continued to another jurisdiction" means—or whether there had been any effort made to locate responsive documents. Similarly, the affidavit for Permanel Investment Limited states that entity had been "transferred to another Registered Agent as of the 6[th] of September 2012"—without identifying the new registered agent or explaining what happened to its documents in connection with the transfer.[23] But in any case, its suspiciously-timed decision to switch registered agents could not relieve it of its obligation to provide documents responsive to NML's subpoena. Other entities such as Ace Star International LLC self-servingly stated, without explanation, that a search "determined that it has no documents that are responsive to the subpoena."[24] But it is inconceivable that this last representation is accurate—considering that among the documents sought by the Subpoenas are financial records and similar documents that would be included in any legitimate company's records.

M.F., the registered agent for the Báez Entities, did make a limited production of a fraction of the items requested in NML's subpoena.[25] M.F.'s production revealed that the Báez

---

[22] Affidavit of Leticia Montoya, on behalf of Aldyne Ltd., manager of American Trade & Packing Ltd., a copy of which is attached as Exhibit Z.
[23] Affidavit of Leticia Montoya, on behalf of Aldyne Ltd., manager of Permanel Investment Limited, a copy of which is attached as Exhibit AA.
[24] Affidavit of Leticia Montoya, on behalf of Aldyne Ltd., manager of Ace Star International LLC, a copy of which is attached as Exhibit BB.
[25] NML is not at this time moving to compel against M.F., as discussions with counsel for M.F. regarding deficiencies in the document production and NML's request for a deposition of M.F. are

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1   Entities received millions of dollars in capital from shady Seychelles companies, including Gairns

2   Ltd., and that nearly all the Báez Entities are managed by the Seychelles-based entity, Aldyne

3   Ltd. ("**Aldyne**").  Despite this, not a single Báez Entity has produced any information regarding

4   the source or amount of capital contributed to it.  Such information goes to the very heart of the

5   embezzlement trail NML seeks to—and is entitled to—uncover.

6   **VI.    NML's Fruitless Efforts To Meet And Confer About The Subpoenas**

7   After reviewing and analyzing the production made by M.F., it became apparent to NML

8   that the complete failure of the Báez Entities to produce a single document required further

9   inquiry.  NML's counsel, Nikki Baker of Brownstein Hyatt Farber Schreck, LLP, contacted Kent

10   Woods, Esq.—who is counsel to M.F. and also the individual who had passed along the affidavits

11   from the Báez Entities—to determine whether there was an individual or individuals authorized to

12   meet and confer to discuss the deficiencies in the Báez Entities' responses to the Subpoenas.

13   Affidavit of Nikki L. Baker signed on April 1, 2014 ("Baker Aff.") at ¶ 6.  NML's efforts to meet

14   and confer with the Báez Entities have been met with a total lack of cooperation.  As of the filing

15   of this motion, in spite of NML's repeated requests, those entities have refused even to identify

16   counsel or some other representative with whom NML can discuss their compliance with the

17   Subpoenas.  Baker Aff. at ¶ 28.   NML's counsel even narrowed her request, and specifically

18   sought the contact person for Aldyne—which is (or was) the manager for a majority of the Báez

19   Entities.  *Id.*, at ¶¶ 11 & 13.  None of these efforts have yielded any results, and M.F.'s counsel

20   has never identified an individual authorized to speak for Aldyne—or indeed any entity other than

21   M.F.

22   Finally, as a last effort to resolve the discovery dispute without the Court's intervention,

23   NML's counsel informed M.F.'s counsel that NML would be filing a motion to compel

24   immediately if NML was not provided with a contact person for Aldyne.  *Id.* ¶ 22.  Despite

25   NML's counsel's efforts, M.F.'s counsel continued to report that either he has been unable to

26

27   ─────────────────────────────────────

28   ongoing.  NML reserves the right to file a motion to compel against M.F. if these issues are not fully
resolved in the coming weeks.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1    communicate with his contact person, or that he is hoping to hear from the contact person that day

2    or the next. *Id.* ¶ 26.

3        The afternoon of March 28th, M.F.'s counsel did report back to NML's counsel that he had

4    "some information/explanation from Aldyne" that he could share. *Id.* ¶ 27. This

5    "information/explanation" consisted of excuses that ring hollow: Alydne looked through its files,

6    determined that it did not possess any documents responsive to the Subpoenas, and then sent the

7    Subpoenas along to the last known address of the company contacts. *Id.* ¶ 27. Yet NML's

8    counsel was still not provided with a contact person for Aldyne or for any of the Báez Entities.

9    *Id.* ¶ 28. This fact, coupled with the Báez Entities' refusal to produce any documents in response

10   to the Subpoenas, demonstrates that any further meet and confer efforts with the Báez Entities

11   would be futile. *See Bond Mfg. Co. v. Xiamen Hwaart Composite Material Co., Ltd.*, 2014 U.S.

12   Dist. LEXIS 34102, at * 3-4 (D. Nev. Mar. 10, 2014) (court intervention is appropriate if "(1)

13   informal negotiations have reached an impasse on the substantive issue in dispute, or (2) one

14   party has acted in bad faith, either by refusing to engage in negotiations altogether or by refusing

15   to provide specific support for its claims of privilege.") (quoting *Nevada Power v. Monsanto*, 151

16   F.R.D. 118, 120 (D. Nev. 1993)).

17   **ARGUMENT**

18       Federal Rule of Civil Procedure 69(a)(2) authorizes a judgment creditor to serve broad

19   discovery in aid of execution—including discovery about the judgment debtor's assets located

20   outside of the jurisdiction of the court where the subpoena is served or the judgment is rendered.

21   Because NML has been awarded judgments against Argentina for over $1.7 billion, NML has a

22   right to any information that may help it trace funds that may have been embezzled from

23   Argentina and funneled through the Báez Entities.

24   **I.    The Court Has Broad Discretion Under Rule 69(a)(2) To Permit
         Third-Party Discovery Into A Judgment Debtor's Assets.**

25

26       Discovery in proceedings involving the enforcement of a judgment is governed by Rule

27   69(a)(2) of the Federal Rules of Civil Procedure. Under that rule, a judgment creditor is entitled

28   to obtain discovery from "***any person***" relating to the judgment debtor's assets "***wherever***

11

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1    *located*," including "outside the jurisdiction of the court where the discovery request is

2    made." *EM Ltd.*, 695 F.3d at 207-08 (emphasis added, internal citation omitted).  Rule 69(a)(2)

3    broadly provides for "discovery from any person," Fed. R. Civ. P. 69(a)(2), so as "to identify

4    assets that can be used to satisfy a judgment" and "to discover concealed or fraudulently

5    transferred assets." *VFS Fin., Inc. v. Specialty Fin. Corp.*, 3:09-CV-00266-RCJ, 2013 WL

6    1413024, at *3 (D. Nev. Apr. 4, 2013).

7        Applying these rules, courts in Nevada and elsewhere commonly allow judgment creditors

8    to conduct "very broad" discovery of "information from parties and non-parties alike—including

9    information about assets upon which execution can issue or about assets that have been

10   fraudulently transferred."   *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th

11   Cir. 1992) (permitting broad discovery regarding the assets of a sovereign judgment debtor, even

12   where the discovery is sought from the sovereign entity directly); *Henry v. Rizzolo*, 2:08-CV-

13   00635-PMP, 2012 WL 13725, at *3 (D. Nev. Jan. 4, 2012); *see also 1ST Tech., LLC v. Rational

14   Enterprises Ltda*, 2:06CV-01110-RLH-GWF, 2007 WL 5596692, at *4 (D. Nev. Nov. 13, 2007)

15   (post-judgment discovery has "broad scope").   Judge Griesa of the New York Court, before

16   whom the litigation between NML and Argentina has been pending for over a decade, has ruled

17   repeatedly that NML is entitled under the Federal Rules to broad discovery in aid of its judgment

18   enforcement efforts.  *See*, *e.g.*, Feb. 2, 2007 Tr. at 25 ("[P]laintiffs in these actions should be

19   allowed some liberality in exploring means of enforcing their judgments.").

20       The liberal standard for post-judgment discovery applies with equal force to discovery

21   sought from third parties.  Rule 69(a)(2) expressly permits discovery from "any person," and thus,

22   "[a] judgment creditor may obtain discovery from both parties and non-parties alike." *VFS Fin.,*

23   *Inc.*, 2013 WL 1413024, at *4 (quoting *Henry*, 2012 WL 13725, at *3); *see also EM Ltd.*, 695

24   F.3d at 207 ("It is not uncommon to seek asset discovery from third parties . . . that possess

25   information pertaining to the judgment debtor's assets.") (citing 12 Charles A. Wright & Arthur

26   R. Miller, Federal Practice and Procedure § 3014 (2d ed. 2012)); *NML Capital, Ltd. v. Excelerate*

27   *Energy LLC*, 2011 WL 10618710, at *3 (S.D. Tex. Feb. 8, 2011) ("There is no doubt that third

28

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1  parties can be examined in relation to the financial affairs of the judgment debtor.") (quotation

2  omitted).

3      The fact that the underlying case is pending in the New York Court does not matter for

4  purposes of this motion to compel.   Rule 69(a)(2) permits the judgment creditor to seek

5  information about "assets held outside the jurisdiction of the court where the discovery request is

6  made." *EM Ltd.*, 695 F.3d at 208.  Accordingly, "[a] judgment creditor is entitled to discover the

7  identity and location of any of the judgment debtor's assets, wherever located." *National Service*

8  *Indus., Inc. v. Vafla Corp.*, 694 F.2d 246, 250 (11th Cir. 1982).

9  **II.    The Court Should Compel The Báez Entities To Comply With The Subpoenas.**

10     If Báez is convicted of embezzlement, any funds traceable to the crime will be

11 Argentina's property under both Nevada and Argentine law.  *See Robinson v. Goldfield Merger*

12 *Mines Co.*, 206 P. 399, 401 (Nev. 1922) ("a thief acquires no title to the property which he

13 steals"), *aff'd on re-hearing*, 213 P. 103 (Nev. 1923); *see also Alamo Rent-A-Car, Inc. v.*

14 *Mendenhall*, 937 P.2d 69, 73-74 (Nev. 1997); Argentine Criminal Code, Art. 23, Art. 303.  NML

15 therefore has a right to seek discovery to determine information to help trace those assets to help

16 satisfy its judgments.

17                    **A.       The Báez Entities Have Failed To Provide Any**
                             **Production In Response To The Subpoenas.**
18

19     The Báez Entities certainly can be expected to have financial records and records of any

20 significant transactions in which they have engaged.  Furthermore, they can be expected either to

21 possess documents sought through the Subpoenas or to have the power to demand those

22 documents from the Seychelles entities from which they received millions of dollars in capital

23 injections. When requested documents are in the possession of a corporate affiliate, the federal

24 courts in Nevada will allow the discovery if the subpoenaed entity has control over the requested

25 materials.  *See Pham v. Wal-Mart Stores, Inc.*, 2:11-CV-01148-KJD, 2012 WL 3730565, at *2

26 (D. Nev. Aug. 28, 2012) ("Documents that are in the actual possession of a third person are

27 deemed to be in the responding party's control if [the responding party] has the legal right to

28 obtain them.") (insertion in original).  A party does not need to have actual possession of the

13

documents to have "control" over the documents. *See Estate of Young Through Young v. Holmes*, 134 F.R.D. 291, 294 (D. Nev. 1991). Instead, the central issue is the relationship between the subpoenaed entity and the corporate affiliate that has actual possession of the documents. *See Pham*, 2012 WL 3730565, at *2 (quoting *Estate of Young*, 134 F.R.D. at 294). The requisite relationship exists when the responding party is "able to command release" of the requested documents. *Clark v. Vega Wholesale Inc.*, 181 F.R.D. 470, 472 (D. Nev. 1998).

**B.    Alternatively, Each Of The Báez Entities Should Be Compelled To Produce A Witness For Deposition.**

In the alternative, the Court should order the Báez Entities to produce a witness for a deposition to explain, among other things, the efforts the Báez Entities made to obtain the requested information, the Báez Entities' document retention policies, and why they are unable to produce any documents. *See e.g., Henry v. Rizzolo*, 2012 WL 13725, at *5 (D. Nev. Jan. 4, 2012) (party asserted that she had no responsive documents, and the court held that "she must explain in reasonable factual detail the efforts that she has made to obtain the requested information and documents and why she is unable to provide them."). To the extent that those depositions indicated that the Báez Entities have possession, custody or control of additional documents not already produced in response to the Subpoenas, NML reserves the right to bring a renewed motion to compel the production of such documents.

. . .

. . .

. . .

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

14

1

## CONCLUSION

2

3       For the foregoing reasons, NML respectfully requests that the Court grant its Motion to

Compel the Báez Entities to comply with the Subpoenas in their entirety.

4

        DATED this 1st day of April, 2014.

5

6                                       BROWNSTEIN HYATT FARBER
                                        SCHRECK, LLP
7

8                                       By: _Nikki Baker_____
                                           Kirk B. Lenhard, Esq.
9                                          Nevada Bar No. 1437
                                           Nikki L. Baker, Esq.
10                                         Nevada Bar No. 6562
                                           100 North City Parkway, Suite 1600
11                                         Las Vegas, NV 89106-4614

12                                         Dennis H. Hranitzky (will comply with LR
                                           IA 10-2 within 14 days)
13                                         Dechert LLP
                                           1095 Avenue of the Americas
14                                         New York, NY  10036-6797

15                                      *Attorneys for NML Capital Ltd.*

16

17

18

19

20

21

22

23

24

25

26

27

28

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1

**Appendix A**
*List of Báez Entities that NML Subpoenaed*

2

3
   1.    Lake County LLC
   2.    Vaneggia Holdings Ltd.
   3.    Hallkyn Group LLC

4
   4.    Balmar Development LLC
   5.    Etco Holdings LLC

5
   6.    Banford Properties LLC
   7.    Mochica Enterprises LLC

6
   8.    Oceandrive Investments LLC.
   9.    Best World Supplies Ltd.

7
10.    Arisa Business LLC
11.    Phillips Group LLC

8
12.    Carvelle Group LLC
13.    Citrone Overseas LLC

9
14.    Haze Management LLC
15.    Alhambra LLC

10
16.    Trenton Properties Ltd.
17.    Balmont Holdings Ltd.

11
18.    Lacewood Investments LLC
19.    Lamberti Trading LLC

12
20.    Jet Trade Ltd.
21.    Ivy Lane Group LLC

13
22.    Huston Management Ltd.
23.    Quantum Bay Limited

14
24.    Buwan Marketing Ltd.
25.    Galway Scott Trading Ltd.

15
26.    Estival International Ltd.
27.    Izalco Trading LLC

16
28.    Gulf Support Services LLC
29.    Murriel Trading LLC

17
30.    Permanel Investment Limited
31.    Pennyroyal Associates LLC

18
32.    Gladstone Cosmetics LLC.
33.    Thunder Overseas Trading LLC

19
34.    Agrocomtra USA LLC
35.    Healy Holdings Ltd.

20
36.    Juniper Trading LLC
37.    Nexsa Trading Ltd.

21
38.    Hemingway Investments LLC
39.    Gudson Group LLC

22
40.    Polychem Group Ltd.
41.    Kumar Holdings LLC

23
42.    Butler Trading LLC
43.    Medinvest LLC

24
44.    Villette Associates LLC
45.    Ace Star International LLC

25
46.    Billbrook Properties LLC
47.    Itelco Holdings LLC

26
48.    Oceanis Group LLC
49.    Oldemar Trading LLC

27
50.    Integ Services LLC
51.    Nexton International LC

28
52.    Motiva Media LLC

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

53. Juno Group LLC
54. Balmain Trading Ltd.
55. Calypsso Group LLC
56. Little Bay LLC
57. Fintech Holdings LLC
58. Royal Games LLC
59. Ground LLC.
60. Ferretti Corporation Limited
61. Iser Holdings Ltd.
62. Jurdan Enterprises Ltd.
63. Justin Invest Ltd.
64. Woodstar Services LLC
65. Dillan Atlantic LLC
66. Bright Light Group LLC
67. Abilene Trade LLC
68. Falconwood Services LLC
69. Priemor Group LLC
70. Bio Health International Inc LLC.
71. Serena Trading LLC
72. Abehart Consultants LLC
73. Oville Group LLC
74. Exton International LLC
75. Everina Holdings Ltd.
76. Yale Holdings Ltd.
77. Sunglow Investment LLC
78. Ovano Group LLC
79. Neymar Investments LLC
80. Lynton Trading Ltd.
81. Stepney International LLC
82. Estridge Overseas LC
83. Cosmetech LC
84. Agroglobe Equity LLC
85. Multinvest LLC
86. Galdor Enterprises LLC
87. Dilmond Enterprises Ltd.
88. Ferrex Development LLC
89. Coreley Properties Inc. LLC
90. The Ingelec Group LLC
91. Abble Holding LLC
92. Pixi Incorporated LLC
93. Huta Holdings LLC
94. Nat Enterprises Ltd.
95. Butterfield Consultants LLC
96. Essex Holdings Group LLC
97. Mafinsa LLC
98. Rafina Trading LLC
99. Investment, Sport & Webs LLC.
100. Metal First LLC
101. Melco Maritime LLC
102. Korman International LLC
103. Nortex Trading LLC
104. Smart Steel LLC
105. Relcove Limited LLC
106. Eurogranit LLC
107. Steel Product Services LLC

17

108. Blue Dreams Real Estate Investments Ltd
109. Dynamic Fittness LLC
110. Ryder Management Services Ltd.
111. Trever Welding Industry LLC
112. Binder Chemicals LLC
113. Aychi Intertrading LLC
114. Mel Sea LLC
115. Global Steel Trading LLC
116. Dolfin Trading LLC
117. Mercury Consultants LLC
118. American Trade & Packing Ltd.
119. Cavalagh Commodities LLC
120. Net Maritime LLC
121. Eastfer International LLC
122. Angrain LLC
123. Estrivela LLC

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

# EXHIBIT "A"

# EXHIBIT "A"

WLF   Washington Legal Foundation
Advocate for freedom and justice®
2009 Massachusetts Avenue, NW
Washington, DC 20036
202.588.0302

Critical Legal Issues: **WORKING PAPER SERIES**

# SOVEREIGN DEBT DEFAULT:
## CRY FOR THE UNITED STATES,
## NOT ARGENTINA

by
Professor Hal S. Scott
Harvard Law School



Washington Legal Foundation
Critical Legal Issues
Working Paper Series No. 148
September 2006

# SOVEREIGN DEBT DEFAULT:
## CRY FOR THE UNITED STATES,
## NOT ARGENTINA

By
Professor Hal S. Scott
Harvard Law School

Washington Legal Foundation
Critical Legal Issues
WORKING PAPER Series No. 140
September 2006

Visit us on the Web at
www.wlf.org

Copyright ® 2006 Washington Legal Foundation

# TABLE OF CONTENTS

ABOUT WLF'S LEGAL STUDIES DIVISION .................................................. iii

ABOUT THE AUTHOR ........................................................................................iv

INTRODUCTION ................................................................................................. 1

I.     THE ARGENTINE DEFAULT................................................................ 2

II.    THE MARKET DISCIPLINE PROBLEM................................................ 5

      A.   The Lack of Future Consequences: For Markets the Past is Past ................ 5

      B.   The Lack of Present Consequences: Weak Creditor Rights ......................... 8

III.   THE ROLE OF THE U.S. GOVERNMENT IN UNDERMINING MARKET DISCIPLINE.............................................................................................17

      A.   Support of, or Acquiescence in, Ineffective Constraints on IMF Lending Rights ......................................................................................... 18

      B.   Court Interventions................................................................................ 21

            1.   *Allied: The Reagan Administration Supports the Creditors* ........ 22

            2.   *CIBC Bank and Pravin: The Clinton Administration on Both Sides*................................................................................... 23

            3.   *The Argentine Cases: The Bush Administration and the New York Federal Reserve Bank Support Argentina* .................... 25

      C.   Promoting Weak Collection Action Clauses .............................................. 31

IV.   THE MISTAKE OF SIDING WITH ARGENTINA................................. 37

V.    WHAT SHOULD THE UNITED STATES DO? ...................................... 39

Copyright ® 2006 Washington Legal Foundation

# ABOUT WLF'S LEGAL STUDIES DIVISION

The Washington Legal Foundation (WLF) established its Legal Studies Division to address cutting-edge legal issues by producing and distributing substantive, credible publications targeted at educating policy makers, the media, and other key legal policy outlets.

Washington is full of policy centers of one stripe or another. But WLF's Legal Studies Division has deliberately adopted a unique approach that sets it apart from other organizations.

First, the Division deals almost exclusively with legal policy questions as they relate to the principles of free enterprise, legal and judicial restraint, and America's economic and national security.

Second, its publications focus on a highly select legal policy-making audience. Legal Studies aggressively markets its publications to federal and state judges and their clerks; members of the United States Congress and their legal staffs; government attorneys; business leaders and corporate general counsel; law school professors and students; influential legal journalists; and major print and media commentators.

Third, Legal Studies possesses the flexibility and credibility to involve talented individuals from all walks of life - from law students and professors to sitting federal judges and senior partners in established law firms - in its work.

The key to WLF's Legal Studies publications is the timely production of a variety of readable and challenging commentaries with a distinctly common-sense viewpoint rarely reflected in academic law reviews or specialized legal trade journals. The publication formats include the provocative COUNSEL'S ADVISORY, topical LEGAL OPINION LETTERS, concise LEGAL BACKGROUNDERS on emerging issues, in-depth WORKING PAPERS, useful and practical CONTEMPORARY LEGAL NOTES, interactive CONVERSATIONS WITH, law review-length MONOGRAPHS, and occasional books.

WLF's LEGAL OPINION LETTERS and LEGAL BACKGROUNDERS appear on the LEXIS/NEXIS online information service under the filename "WLF" or by visiting the Washington Legal Foundation's website at www.wlf.org. All WLF publications are also available to Members of Congress and their staffs through the Library of Congress' SCORPIO system.

To receive information about previous WLF publications, contact Glenn Lammi, Chief Counsel, Legal Studies Division, Washington Legal Foundation, 2009 Massachusetts Avenue, NW, Washington, D.C. 20036, (202) 588-0302. Material concerning WLF's other legal activities may be obtained by contacting Daniel J. Popeo, Chairman.

Copyright © 2006 Washington Legal Foundation  ii

# ABOUT THE AUTHOR

**Hal S. Scott** is Nomura Professor and the Director of the Program on International Financial Systems at Harvard Law School.  He is the author of INTERNATIONAL FINANCE: TRANSACTIONS, POLICY AND REGULATION (13th ed. 2006), chapter 19 of which deals with sovereign debt.  He is also the author of *How Would a New Bankruptcy Regime Help?* Discussion Paper of "A Bankruptcy Court for Sovereign Debt," Brookings Panel on Economic Activity, April 4-5, 2002; *A Bankruptcy Procedure for Sovereign Debtors?*, 37 THE INTERNATIONAL LAWYER 103 (2003); and *Market Discipline for Financial Institutions and Sovereigns*, in MARKET DISCIPLINE ACROSS COUNTRIES AND INDUSTRIES, C. Borio, W. Hunter, G. Kaufman and K. Tsatsaronis (The MIT Press 2004).

*The views expressed here are those of the author and do not necessarily reflect those of the Washington Legal Foundation. They should not be construed as an attempt to aid or hinder the passage of legislation.*

Copyright ® 2006 Washington Legal Foundation  iii

# SOVEREIGN DEBT DEFAULT:
## CRY FOR THE UNITED STATES,
## NOT ARGENTINA

by
Professor Hal S. Scott
Harvard Law School

## INTRODUCTION

This WORKING PAPER argues that the United States policy of siding with sovereign defaulters against U.S. creditors is fundamentally misguided.  The root of the sovereign debt problem is that sovereigns overborrow, borrowing in excess of their institutional capacity to efficiently employ the borrowed capital.   Overborrowing results from the fact that sovereigns face few consequences as a result of default. Often they are bailed out by International Monetary Fund (IMF) loans, with the consent of the United States.  The default does not impede their access to future credit because creditors have short memories.  The only effective remedy against sovereign overborrowing is to allow creditors to enforce their contract rights effectively against sovereigns in default.  Any well functioning debt market depends on strong creditor rights.[1]

However, in recent years, the United States has attempted to block the ability of creditors to collect their debts.  This was done for foreign policy reasons, to curry favor with debtors in distress.  It has not worked, particularly in the case of the biggest defaulter of them all, Argentina.  By favoring the Argentine state over private U.S.

---

[1] A. Schleifer, "Will the Sovereign Debt Market Survive?," 93 AEA Papers and Proceedings 85 (May 2003).

creditors, the government has fostered Argentina's claim that it can defy the West with impunity, by offering poor restructuring terms, and walking away from $20 billion in debt still in default—with interest now $30 billion.  Today Presidents Néstor Kirchner of Argentina and Hugo Chávez of Venezuela have become anti-American economic allies.  If Kirchner had been subject to market discipline, his leftist antics would have carried a high price.

The United States must consider reversing its stand and back U.S. creditors against sovereign debtors, at least rogue ones like Argentina.  In addition, it should consider strengthening creditor rights by paring back the protections debtors are currently afforded under the Foreign Sovereign Immunities Act.

## I.    THE ARGENTINE DEFAULT

The Argentine debt default of December 2001 was the largest sovereign default in history.  By the time of the 2005 debt restructuring, the default involved more than $100 billion of privately held debt ($81.8 billion in principal plus $20 billion in past due interest) in the form of 152 different bonds.  Bondholders in Italy held $15.6 billion, the U.S. $9.1 billion, and Japan $3.1 billion.  A substantial portion of the Argentine debt was retail, by one estimate 44%, held principally by individuals in Italy and Germany.

Between 1997 and 2001, Argentina had been authorized to issue about $44 billion in registered bonds on the U.S. public markets.  Argentina reported that about $36 billion in bonds involved in the 2005 restructuring were issued under New York law.  This demonstrates that Argentina made very significant use of U.S. public

2

Copyright © 2006 Washington Legal Foundation

markets, where bonds were available for purchase by U.S. retail investors, and the U.S. legal system

During the years leading up to the crisis, the IMF had itself become a major lender to Argentina, beginning with a stand-by of $7 billion in March 2000 that had increased to $22 billion by September 2001. Of the total $106.2 billion in IMF credit outstanding as of the beginning of 2004, $15.8 billion or 16 percent, was owed by Argentina. Argentina had massively overborrowed. Its debt-to-GDP ratio rose to 53.7 percent by 2001 and then exploded to over 100 percent in the following years, following the devaluation of its currency in 2002.

Before the debt crisis was resolved, Argentina experienced widespread bankruptcies, increased unemployment, runs on banks and huge capital flight (conservatively estimated at $13 billion) and political instability. Several Presidents came and went beginning with Fernando De LaRua, a centrist from the Radical Party, elected in late 1999, followed by Adolfo Rodriguez Saá in December 2001 (who declared the default) and Eduardo Duhalde in January 2002, and ending with the election of Néstor Kirchner, a left wing candidate from the Peronist party. Argentine politics had clearly moved substantially leftward.

In December 2004, Argentina offered to swap its defaulted bonds for new bonds. When new bonds are worth less than old bonds, invariably the case in a restructuring, the market describes this as giving a haircut to the old bonds. Average haircuts (weighted by the face value of the original instruments tendered) were in the range of 71-75 percent. This compares with haircuts averaging just 36 percent on 20 other sovereign debt restructurings since 1990. The terms of the exchange were

3

Copyright © 2006 Washington Legal Foundation

basically dictated unilaterally by Argentina, without any good faith negotiations with creditors. Many believed that Argentina could have made a more generous offer, given that by the time of the exchange offer it had experienced two years of steady growth (GDP of 8.8% and 9% in 2003 and 2004 respectively) with relatively low inflation (3.7% in 2003 and 6.1% in 2004). By June 2004, Argentina's official reserves minus gold stood at $16.9 billion.

The December 2004 exchange offer was accepted by 76 percent of the old bondholders. This acceptance rate was quite low compared to the 90 percent acceptance rate that would normally be required for the IMF to regard a sovereign restructuring as successful. Recent acceptance rates have been much higher: Ecuador (2000) 97%; Pakistan (1999) 95%; Russia (1998-2000) 98%; Ukraine (1998-2000) 95%; and Uruguay (2003) 93%. The effective rate of acceptance by international creditors was in reality much lower than 76 percent given that domestic Argentine bondholders (including state-controlled entities like banks and pension funds) owned 46.9% of the debt and were subject to strong government pressure to enter the exchange. If one assumes that all the domestic creditors accepted the exchange, the acceptance rate for international creditors, who held 54.1% of the debt, would only have been about 53.4% [76.0 – 46.9 =29.1, 53.4% of 54.1%]. The acceptance rate was substantially below the effective rate of 75% required to trigger the collective action clauses in the new bonds Argentina issued, as that calculation excludes bonds held by state-controlled entities, a major portion of the Argentine domestic debt. The bondholders who accepted the exchange experienced huge losses, about $67 billion. As for the creditors who refused the deal, with close to $20 billion of defaulted debt

4

Copyright © 2006 Washington Legal Foundation

(now $30 billion with accrued and unpaid interest), they were told their bonds could "remain unpaid indefinitely." So, as matters now stand, creditors as a whole have lost about $97 billion.

## II.  THE MARKET DISCIPLINE PROBLEM

### A.  The Lack of Future Consequences: For Markets the Past is Past

It does not appear that Argentina paid a substantial economic price for its default. As we have already seen, GDP increased substantially after the default. And, amazingly, there has been no lasting effect on Argentine bond spreads as a result of default. The EMBI global index of JP Morgan Securities is a market-capitalization index that measures the yield on the sovereign debt of 27 emerging market countries including Argentina. Until the months leading up to the default of 2001, Argentine and the EMBI global index spreads over comparable maturities of U.S. treasuries were about the same, somewhat less than 1000 basis points. Just prior to the default in December 2001 the spread between Argentina and EMBI widened considerably, reflecting the significantly lower price the market put on Argentine bonds in anticipation of default. However, the spreads on bonds issued after default were about the same as the EMBI, around a 500 basis point spread from comparable U.S. treasuries. As of July 2006, the spread was only 380 basis points. Standard & Poors has twice upgraded Argentine debt, now at a B rating, based on its current economic performance, and Fitch made similar upgrades recently. Little if any account was taken of its default. Indeed, Argentina's massive reduction in debt may have made its new debt more attractive. Any possible pressure from the IMF was removed when in

5

Copyright © 2006 Washington Legal Foundation

January 2006 Argentina repaid its then outstanding debt of $9.6 billion.[2]

In the first seven months of 2006, Argentina has issued $3.9 billion in U.S. dollar-denominated debt in local markets to both domestic and international investors at low yields compared to Brazil.   Venezuela has become a major financier of Argentina, purchasing $3.6 billion in Argentine external bonds, so-called BODEN bonds, over the twelve months ending July 2006.   According to government announcements, the two countries are contemplating a joint bond issue under foreign law, initially for $2 billion, between late 2006 and early 2007, a so-called "Bond of the South".   The participation of Venezuela in Argentine bond issuance indicates further protection for Argentina from possible market consequences of default.   Unlike the IMF, Venezuela will not condition its lending on economic policies or fair treatment of other debt.

In addition, there is no evidence that foreign direct investment (FDI) was negatively affected by the default.  From 1994-2000, Argentina averaged $9.5 billion per year in FDI.[3]  According to IMF statistics, FDI in 2000, before default, had fallen to $2 billion, but in the years 2002-2005 was respectively $2.0, $2.8, $1.1, $3.9 and $3.2 billion (estimated).[4]   It is clear that the plunge in foreign direct investment occurred before the default and the recovery occurred after the default, a recovery that occurred despite price controls and pesofication.   This is not surprising due to Argentina's overall recovering economy and far lower burden of debt.   In fact,

---

[2]35 IMF Survey (Jan. 9, 2006), at 9.

[3]Economist Intelligence Unit, Argentina Risk Briefing (July 27, 2006).

[4]IMF, Country Report No. 05/236 (July 2005), Table 2, at 39.

6

Copyright © 2006 Washington Legal Foundation

reduction of debt may generally help improve FDI since the country can afford to offer higher returns to equity. Again, market discipline does not insure debt repayments.

It is not altogether surprising that markets have short memories of sovereign default, even with respect to countries like Argentina that have become serial defaulters—Argentina has defaulted on external debt five times since independence in the 1820s. Just as with corporate and personal bankruptcies in the United States, new lending is usually available if future prospects are good. What this means is that one cannot depend on the prospect of future adverse consequences to deter countries like Argentina from overborrowing and then defaulting.

As a theoretical matter, Bulow and Rogoff[5] proposed that lending to small countries (ones that cannot affect the world interest rate) must be supported by direct sanctions available to creditors (contractual remedies), and cannot be supported by a country's reputation for repayment. This is consistent with findings in the economic literature that defaults do not seem to influence future access of sovereigns to the capital market.[6] While there is some evidence that foreign credit to the *private* sector was affected between 2000-2004 by the Argentine default,[7] it is unlikely that this consequence will deter overborrowing by sovereigns.

---

[5]J. Bulow and K. Rogoff, *Sovereign Debt is to Forgive or Forget*, 79 AM. ECON. REVIEW 43 (1989).

[6]B. Eichengreen and P. Lindert,  The International Debt Crisis in Historical Perspective, Chapter 1 Overview (1989) and R. Gelos, R. Sahay and G. Sanderlis, "Sovereign Borrowing by Developing Countries: What Determines Market Access?," IMF Working Paper (2004).

[7]C. Areta and G. Hale, "Are Private Borrowers Hurt by Sovereign Debt Rescheduling?," Working Paper (2005).

7

Copyright © 2006 Washington Legal Foundation

## B.    The Lack of Present Consequences: Weak Creditor Rights

The markets could work to discipline Argentina but the discipline must come from existing not future creditors.  If Argentina were required to pay existing creditors 75% of the value of its debt, rather than the 25% it did pay, Argentina would be much less likely to overborrow and then default.  Default would not be a way out of pain but would result in the imposition of still more pain.  However, under the existing regime, Argentina is free to set unilateral terms for a restructuring without the fear of any real consequences.  How could this happen?

Most importantly it is the result of a legal regime that protects sovereign assets from seizure by its creditors, such as the Foreign Sovereign Immunities Act (FSIA) in the United States. Other countries have similar laws.  The U.S. FSIA starts with the premise that foreign sovereigns cannot be sued in U.S. courts and then creates some significant exceptions.  One exception arises if the action is based on commercial activity engaged in by the sovereign in the U.S.  The Supreme Court determined in 1992 in *Republic of Argentina v. Weltover,* 504 U.S. 607, that issuing bonds in the U.S. is a commercial activity in the U.S.  This means that creditors can sue sovereigns in the U.S. for defaulting on debt issued here.   Another exception is where the sovereign has by contract waived its immunity in the U.S.  Thus, because the bonds issued by Argentina contained waivers of immunity from suit, when Argentina defaulted on those bonds in 2001, the federal courts found that Argentina was not immune from suit and that the creditors were entitled to be paid.  For example, the Second Circuit decided, in *EM Ltd. v. The Republic of Argentina*, 382 F.2d 291 (2004), that Argentina was required to pay the plaintiff bondholder $740 million on

8

Copyright © 2006 Washington Legal Foundation

defaulted debt. However, it is one thing to get a judgment, it is another thing to enforce it. This is the heart of the problem—it has become exceedingly difficult for creditors to actually collect on their debts.

The difficulty begins, of course, with the fact that most of Argentina's assets are in Argentina. There was a time in history when this was not an insuperable obstacle, as U.S. gunboats were enlisted in the efforts to collect debt. Today, this is not a realistic alternative. However, there are two important types of assets that are outside the sovereign's territory: foreign currency accounts and interests in the assets of state-owned enterprises. In addition, there are payments and goods flows, as when a country pays dollars to a foreign creditor or receives dollars from a foreign obligor, or exports a state-owned commodity or imports a state-procured commodity. Also, particular assets outside the country may secure debt.

In 2000, it appeared that some creditor discipline might be introduced into the system. The government of Peru had restructured its debt by offering to issue so-called Brady bonds, bonds secured by U.S. Treasury zero-coupons, in exchange for existing government guaranteed syndicated bank debt, with a significant haircut. Elliott Associates, which had acquired some of this bank debt in the secondary market, refused to participate in the exchange and obtained a judgment of $55.7 million, the full face value of the loans. It attempted to satisfy this judgment by obtaining a restraining order with respect to funds Peru was going to transfer to its paying agent Chase Manhattan Bank. This would prevent Chase from paying interest on the new Brady bonds. When Peru evaded this restraint by instead transferring the funds to Euroclear, a major securities settlement system based in Brussels, Elliott Associates

9

Copyright © 2006 Washington Legal Foundation

obtained an order from the Brussels Court of Appeals that would have imposed a significant fine on financial institutions, clearing through Euroclear, if they accepted the interest payments.  Elliott successfully contended that under the *pari passu* clause in the loan agreement, it was entitled to share equally in any payments made to the Brady bondholders.  Peru then settled with Elliott to avoid payment disruptions for its new bondholders.

As it turns out, this 2000 decision was the high watermark of creditor rights, albeit in a case decided by a Belgian rather than a U.S. court.  But the Brussels decision was effectively reversed when in 2004 the Brussels Court of Appeals held, in a case of unpaid creditors against Nicaragua, that a restraint of incoming funds was an unwarranted interference with Euroclear's operations.  And then in 2005 Belgium enacted a statute protecting all settlement systems against third party orders.[8]

Central bank reserves are the most significant assets held outside the territory of the sovereign.  As of June 2006, Argentine central bank reserves were about $25 billion.  As of March 2006, the Federal Reserve Bank of New York held accounts for 171 central banks and monetary authorities totaling $1.6 trillion.  It appears that emerging market countries hold reserves far in excess of what they need for exchange rate or balance of payments purposes.  Excess reserves, those over the amount of one year's short-term debt (the so-called Guidotti-Greenspan requirements) are over $2 trillion today and growing.  While some like Lawrence Summers have argued that

---

[8]F. Sturzenegger and J. Zettelmeyer, "Has the Legal Threat to Sovereign Debt Restructuring Become Real," Working Paper (2005) argue, on the basis of *Elliott* that creditors can hinder access of defaulting countries to international capital markets.  This vastly overstates the real impact of that case, whose result has yet to be duplicated elsewhere, and has been effectively repealed in Belgium.  The fact is that creditors have been on the whole legally impotent with respect to all kinds of actions.

Copyright © 2006 Washington Legal Foundation

these excess reserves should be invested in longer-term projects rather than in liquid assets like deposit accounts or U.S. Treasury securities,[9] these excess reserves could also be made available to creditors in cases of default.

Early signs that creditors would be able to attach at least some of these central bank assets soon dissipated.  Section 1611(b)(1) of the FSIA provides that central bank property "held for its own account" shall be immune from attachment unless the bank has waived immunity "in aid of execution."  In *Birch Shipping Co. v. Embassy of United Republic of Tanzania,* 507 F. Supp. 311 (D.D.C. 1980), a federal District Court held in 1980 that Tanzania could not shelter commercial assets by commingling them in an immune embassy account, and then in 1993 another federal District Court held in *Weston Cie de Finance et D'Investissement, S.A. v, Ecuador,* 823 F. Supp. 1106 (S.D.N.Y. 1993), that funds in a central bank account used to finance commercial transactions of private parties would not be immune since these were not funds "held for its own account."

But the scope of these decisions was very limited.  First, only commercially commingled funds could be attached and secondly, as *Weston* itself and other lower federal courts held, only exposure to post-judgment attachments, those "in aid of execution," can be waived by central banks.  While the correctness of this construction of the statute is far from certain, if courts continue to give it this interpretation a central bank will have ample time to remove its funds from the jurisdiction of U.S. courts, between the time a creditor brings suit and the time a judgment is obtained.

---

[9]*"Reflections on Global Account Imbalances and Emerging Markets Reserve Accumulation,"* L.K. Jha Memorial Lecture, Reserve Bank of India, Mumbai, India (Mar. 24, 2006).

11

Copyright ® 2006 Washington Legal Foundation

Further, in *LNC Investments, Inc. v. Republic of Nicaragua*, 115 F. Supp. 2d 358 (S.D.N.Y. 2000), *aff'd* 228 F.3d 423 (2d Cir. 2000), the District Court held that even if there is an explicit waiver of central bank immunity, the central bank is only responsible for its own debts, not the debts of the sovereign. Thus, creditors may only attach assets held in the name of the central bank that actually belong to the sovereign.

The mere possibility that central bank accounts in the United States and elsewhere might be attachable has led sovereigns, including Argentina, to hold these accounts at the Bank for International Settlements (BIS). Article 10 of the Constituent Charter of the BIS provides: "The Bank, its property and assets and all deposits entrusted to it shall be immune in time of peace and in time of war from any measure such as expropriation, requisition, seizure, confiscation, prohibition or restrictions of gold or currency export or import, and any other similar measures." In addition, there is a so-called "Headquarters Agreement" between the BIS and the Swiss government entered into on February 10, 1987, which provides that BIS deposits are immune from attachment. So the major countries of the world through these agreements have provided a safe haven for central bank liquid assets. Argentina moved over $2 billion of its reserves to the BIS before and after its default. While the rates on BIS deposits tend to be quite low, the London Interbank Bid Rate (LIBID) minus 1/8th of a percent, complete protection is available.

The ability of creditors to attach or garnish flows of payments for goods has also not met with much success. Section 1610(a) of the FSIA provides that the "property in the United States" of a foreign state, "used for a commercial activity in the United States," shall not be immune from attachment if a foreign state has waived sovereign

12

Copyright © 2006 Washington Legal Foundation

immunity.  The difficulties with meeting these criteria have been a focus of extensive litigation by creditors of the Congo, which has generated three decisions of the 5th Circuit, *Connecticut Bank of Commerce v. The Republic of the Congo,* 309 F.3d 240 (2002), *Af-Cap Inc. v. Republic of the Congo*, 383 F.3d 361 (2004) (*Af-Cap*), and *FG Hemisphere Associates v. Republic of the Congo,* Docket Nos. 04-20965 and 05-20042 (July 10, 2006) (*FG Hemisphere*).

All of the creditors in these cases sought to garnish royalty and tax obligations owed to the Congo by oil companies.  While *Af-Cap* determined that payments by Texas oil companies were "used for a commercial activity" because they had been used by the Congo to repay commercial debt located in the United States because the garnishee oil companies were located in the United States, the result was different in *FG Hemisphere*.  The Court of Appeals reversed the issuance of garnishment writs by the District Court on two somewhat technical grounds—that the federal District Court had failed to determine whether the garnishment orders could be issued under Texas law and because the court had failed to make necessary findings required by the FSIA.

The court went on to determine whether the garnished property was located in the United States.  Although the garnishees in *FG Hemisphere* had been located in the United States at the time the creditors brought their lawsuit against the Congo, by the time the creditors sought to garnish the property the garnishees had no presence in the United States, as they had reorganized their operations outside the U.S. in the interim. The court found that the determination of whether property is in the United States should be made at the time when the creditors attempt to garnish, not at the time suit was brought.  This approach, of course, invites sovereign defendants to

13

Copyright © 2006 Washington Legal Foundation

protect their property once suit is brought, much as in the case of central bank reserves, thus offering little effective recourse for creditors.

With respect to attachment of property of state-wholly owned enterprises (SOEs), prospects are similarly bleak.  To begin with many sovereigns have shed themselves of SOEs through privatization—indeed Argentina was in the forefront of this effort.  But even where a sovereign continues to own enterprises, the sovereign's ownership interest—the shares of stock in the enterprise—is most often located out of the United States and thus not subject to attachment under the FSIA.  Indeed, the sovereign will keep the shares outside the U.S. for the principal purpose of avoiding attachment by U.S. creditors.  By way of comparison, this limitation on the jurisdiction of a U.S. court does not apply to private debtors, since if a court has jurisdiction over the private debtor, it has the power to compel the debtor to transfer its shares to the court.  If the debtor fails to do so, the court can assign claims to the assets of the enterprise, to the extent these assets are in the United States, to the creditor.  If other creditors of the enterprise have prior claims, the attaching creditor's claim will be junior (but still potentially valuable).  The same rules could be applied to sovereigns.

Creditors have been creative in trying to locate property in the United States, but their creativity has not paid off.  On March 21, 2005, in *EM Ltd* v. *The Republic of Argentina,* 131 Fed. Appx. 745 (2d Cir. 2005), creditors who refused to go along with the Argentine bond exchange, and who were owed approximately $1 billion (principal plus interest) on old bonds, obtained an ex-parte attachment of $7 billion of the old bonds that had been tendered to Argentina in the bond exchange. The creditors argued that these tendered bonds, held in what amounted to an escrow account of the Bank of

Copyright © 2006 Washington Legal Foundation

New York at the Depositary Trust Co., were the property of Argentina in the United States. Although Argentina did not yet have the bonds, they had the right to receive the bonds once the exchange was completed. Argentina's principal argument was that the attachment would frustrate the bond exchange, as they would not go through with the exchange if the tendered old bonds were attached and not able to be cancelled. Argentina also argued that the bonds were not their property, nor did they have any right to the bonds, until they gave the old bondholders new bonds, which they had not yet done. Of course, even if the plaintiffs got these old bonds, they could not compel Argentina to honor them. However, the increase by $7 billion of unsatisfied debt may have put additional pressure on Argentina to come to an accommodation with the holdouts.

After a hearing, the federal District Court dissolved the ex parte attachment order. The court appeared to accept the argument that Argentina had a property right in the bonds. The court believed, however, that part of Argentina's rights to the bonds included its right to cancel the bonds which the attaching creditors would obviously not do, and the failure of Argentina to achieve cancellation would lead them to pull out of the exchange entirely, which they may have had a right to do. The Second Circuit affirmed in a summary order holding that it was within the reasonable discretion of the District Court to deny the attachment, and further stated, quoting the lower court: "If these attachments [and restraints] are still in effect, we throw into doubt, to say the least, the conclusion of the exchange offer." It was left to conjecture as to why the courts should care whether the exchange was or was not completed.

Copyright © 2006 Washington Legal Foundation

One other attempt to obtain assets from the Argentine bond exchange bears mentioning. In *Capital Ventures International v. Republic of Argentina*, 443 F.3d 214 (2nd Cir. 2006), creditors sought to attach the collateral held for Brady bonds—U.S. Treasury zero coupon bonds and German government bonds held in a collateral account at the New York Federal Reserve Bank—that were part of the debt exchange. The collateral arrangements provided that if the Brady Bonds were redeemed prior to maturity, Argentina would be entitled to the return of the collateral. Argentina offered to pay the old Brady bondholders new bonds plus cash. It intended to obtain at least part of the cash by liquidating the collateral. The plaintiffs claimed that they were entitled to attach that part of the collateral that would not be used to pay bondholders and would, therefore, revert to Argentina. The District Court denied the attachment, on the assumption that no property would revert to Argentina and due to a possible concern that granting the attachment would disrupt the marketplace.

The creditors appealed to the Second Circuit. While their claims were moot with respect to the collateral used to pay the tendering bondholders, they asserted a right to attach the collateral still held by the New York Federal Reserve Bank to secure the claims of the non-tendering Brady bondholders. The Second Circuit reversed the District Court on the grounds that the plaintiffs had met all the requirements for attachment and that while the likelihood that any of the collateral might actually revert to Argentina was small, that interest was nonetheless attachable. In addition, since the exchange offer had been completed, there was no threat of confusion in the marketplace.

Copyright ® 2006 Washington Legal Foundation

Creditors did get a victory in this case but was it worth anything? If Argentina were to liquidate this collateral to satisfy the claims of non-tendering Brady bondholders, as part of a new offer in the future, and if it did not use all the collateral or its proceeds as part of this new offer, the Capital Ventures creditors would get some value. The likelihood of this happening is exceedingly small. If the default on the non-tendered Brady bonds were to continue to maturity of these bonds, the Brady bondholders would be entitled to all of the collateral, again leaving nothing for Capital Ventures.

The bottom line is that while creditors have been able to obtain judgments that sovereign defaulters must repay their debt, they have been unable—with a few notable exceptions—to attach assets in satisfaction of their judgments. Creditors have been largely rendered impotent by the FSIA and U.S. policies.

## III. THE ROLE OF THE U.S. GOVERNMENT IN UNDERMINING MARKET DISCIPLINE

The United States government has weakened market discipline in three ways: (1) by placing ineffective constraints on IMF lending; (2) by intervening in court cases on the side of defaulting sovereigns; and (3) by promoting weak collective action clauses. In addition, the U.S. has failed to update the FSIA to reflect the realities of how it works in the current world. The last section of the paper suggests some needed FSIA reforms.

Copyright ® 2006 Washington Legal Foundation

## A.    Support of, or Acquiescence in, Ineffective Constraints on IMF Lending

As a result of the Asian financial crisis, there was widespread concern that the easy availability of IMF money was inducing moral hazard on the part of both debtors and creditors.  Debtors would overborrow from private sources because the IMF would bail them out if the debtors got into difficulty, and creditors would continue to lend to poor credit risk countries since sovereigns would use IMF money to pay the creditors off.    This triggered various reform proposals, notably those of the U.S. Congress's 1998 International Financial Institutions Advisory Commission (dubbed the Meltzer Commission for its Chairman) and the 2000 Council of Foreign Relations Report. Both groups recommended constraints on IMF lending.

One justification often offered for IMF lending is that it gives the IMF leverage over a country's economic policies.  As the argument goes, the IMF would not be able to achieve reform without providing funds, and debtor governments would not be politically able to implement reforms without the justification of the need for funds. Put another way, if the IMF did not lend, the government would be unable to implement reforms. There are two major weaknesses in this argument. First, there is little evidence that IMF conditions, usually requiring contractionary fiscal and monetary policies, have worked.[10]  After all, Latin America has experienced repeated debt crises in the last two decades despite numerous IMF conditionality programs. Furthermore, as Morris Goldstein has argued, IMF conditionality has been extended substantially beyond traditional macro policy to a variety of micro issues, like

---

[10]J. Stiglitz, GLOBALIZATION AND ITS DISCONTENTS (2002).

18

Copyright © 2006 Washington Legal Foundation

bankruptcy law reform and corporate governance, with little proof of success in reducing debt crises.[11]  Despite the reform recommendations, in 1999, the IMF had made it even easier to lend to debtors, adopting a policy that permitted it to lend to sovereign debtors "in arrears" (a nice term for default) on a case-by-case basis where prompt Fund support is considered essential for the successful implementation of an adjustment program and where the country was pursuing appropriate policies and making a "good faith" effort to reach a collaborative agreement with its creditors.  The good faith criterion was elaborated on in September 2002.  The IMF Board stated that a debtor should engage in early and continuous discussion about restructuring with its creditors, should share on a timely basis relevant, non-confidential information, including "the broad outlines of a viable economic program to address the underlying problems and its implications on the broad financial parameters shaping the envelope of resources available for restructured claims [read, why it can only pay what it proposes]," and provide creditors with an early opportunity to give their input.

These policies on lending into arrears were then supplemented by a February 2003 statement of the IMF with respect to criteria that must be met before the IMF engages in large-scale lending or what it calls "exceptional access," loans in excess of 100 percent of quota on an annual basis, and in excess of 300 percent of quota on a cumulative basis.  The criteria for getting exceptional access are: (1) balance of payment pressures on the capital account; (2) high probability of debt sustainability;

---

[11]M. Goldstein, "IMF Structural Programs," paper prepared for the NBER Conference on "Economic and Financial Crises in Emerging Market Economies," Woodstock, Vermont (2000); IMF, Independent Evaluation Office, Evaluation of Structural Conditionality in IMF-Supported Programs (May 17, 2005).

19

Copyright © 2006 Washington Legal Foundation

(3) good prospects for regaining access to the private capital market within the maturity date of the IMF loan; and (4) good economic policies in place.

These requirements sound good but are they really effective?  Their real test was  Argentina when the IMF decided in September 2003 to extend exceptional access in the form  of a three-year stand-by of $12.5 billion (424 percent of quota)  and then in March 2004 to rollover a $3.1 billion payment then due from Argentina.   The rollover was accomplished by a fiscal dance in which Argentina repaid $3.1 billion owed to the IMF on March 9 in return for the IMF on March 22 disbursing $3.1 billion under the stand-by.

To begin with, the IMF should have denied Argentina any credit under its lending in arrears policy since there were, by any objective standard, no good faith negotiations with private creditors on the defaulted debt.  Instead, the IMF gave Argentina mega-exceptional access in September 2003 even though its own staff's analysis indicated that Argentina did not meet the exceptional access criteria.  Then, it shut its eyes to Argentina's continued inability to meet the exceptional access requirement when it rolled over the $3.1 billion in March 2004.  Then-Undersecretary of the Treasury John Taylor gave a somewhat startling explanation for the disbursement of funds to Argentina in an address on April 16, 2004, at the IMF Conference in honor of Guillermo Calvo:  "In both these cases [Argentina and Brazil], however, these countries were already in exceptional access territory and the goal is to exit from this exceptional access over time."  Translated, this means once you get exceptional access, rightly or wrongly, the access criteria are no longer applied.

Copyright © 2006 Washington Legal Foundation

It is clear that these new "limits" on IMF lending, sparked by the Asian crisis and widespread criticism, do not really apply in crunch time—when a large debtor like Argentina gets into trouble.  The willingness of the IMF (with the implicit backing of the United States) to bail out countries that have significantly overborrowed, and to engage in phony accounting when doing so, undermines market discipline.  More needs to be done to restrain IMF lending.

### B.    Court Interventions

There is a well-established tradition of the United States government filing *amicus curiae* (friend of the court) briefs in cases involving sovereign debt, and the courts have usually followed their advice.  It is not surprising that the courts follow the advice of the government.  As some commentators have remarked, this result is "supported both by considerations of institutional competence and by the distinctive position of the President in the domain of foreign affairs."[12]  In their view, the courts should defer to the executive in matters of foreign affairs when it comes to interpreting statutory ambiguities.

Unfortunately, the U.S. has moved from siding with its own creditors to siding with sovereign defaulters.  And far from weighing in to clarify ambiguities in the law, the U.S. has lately taken to urging courts to ignore the plain language of contracts in favor of making policy judgments.

---

[12]E. Posner and C. Sunstein, "Chevronizing Foreign Relations Law," Draft, May 25, 2006, abstract.

Copyright © 2006 Washington Legal Foundation

1.    *Allied: The Reagan Administration Supports the Creditors*

In the 1980s, during the Reagan Administration, the U.S. sided with creditors. In 1984, in *Allied Bank International v. Banco Credito Agricola deCartago*, 757 F.2d 516 (2d Cir.), *cert. denied*, 473 U.S. 934 (1985), the federal District Court ruled that the action of Costa Rica in blocking payment on promissory notes issued by Costa Rica to thirty-nine creditor banks was protected by the act of state doctrine because the action of Costa Rica did not involve commercial activity but rather the exercise of a governmental function.  The Court of Appeals for the Second Circuit initially affirmed on the understanding that Costa Rica's actions were fully supported by the U.S. government.  On a petition for rehearing, the United States joined the litigation as *amicus curiae* opposing the action of Costa Rica because it had "attempted [a] unilateral restructuring" outside the IMF framework which "encourages the cooperative adjustment of international debt problems."

The technical issue was whether under the act of state doctrine, which insulates from court review the validity of the taking of property by a sovereign within its own territory, the situs of the debts was in Costa Rica.  Based largely on the intervention of the U.S., on policy grounds, the court decided, as a technical matter, that the debt was located in the U.S. and thus not protected by the act of state doctrine.  This case demonstrated that the views of the U.S. government would be highly influential in sovereign debt cases.

22

Copyright © 2006 Washington Legal Foundation

>    2.    *CIBC Bank and Pravin: The Clinton Administration on Both
>          Sides*

In 1995, under the Clinton Administration, the United States filed an *amicus* brief supporting the position of Brazil in a case involving its default on a 1988 agreement restructuring its debt, *CIBC Bank and Trust Co. v. Banco Central do Brasil*, 886 F. Supp. 105 (S.D.N.Y 1995). A key issue in the case was whether one of the creditors, CIBC Bank, which held debt on behalf of the Dart family, could accelerate the entire debt owed based on the default. This depended on an interpretation of the acceleration clause that required consent of 50% of the creditors for exercise. Whether CIBC met this requirement depended on whether one counted the debt held by a Brazilian commercial bank, a majority of which was owned by Brazil.

The United States intervened as an *amicus curiae* opposing acceleration on the ground that this would upset the new restructuring. The government stated: "because the United States has a strong interest in encouraging the voluntary restructuring of sovereign debt. . . .[it] does not wish to see a creditor use United States courts as a means of amending the terms of sovereign debt contracts [on the grounds that such action] would harm the process that has evolved to deal with sovereign debt problems." The government was concerned that creditors, like the Darts, who had bought their debt in the secondary market, would not have the same interests as the bank lenders in achieving a restructuring. The government went on to state that its concern was the mirror image of its concern in the *Allied* case. Whereas in *Allied* it was concerned with the ability of sovereign debtors to extract better terms in courts

23

Copyright © 2006 Washington Legal Foundation

than they could through negotiations, in *CIBC* it was concerned that a judgment in favor of the Darts would encourage creditors to use the courts to gain unfair concessions from sovereign debtors.

The District Court sided with the creditors on all issues other than acceleration, basing its decision on that issue on technical grounds without mentioning the position of the United States—nonetheless, it could hardly have failed to take account of it. The U.S. continued to intervene in sovereign debt litigation but had now changed sides.

Two years after *CIBC*, the Second Circuit, in *Pravin Banker Associates v. Bancopopular del Peru*, 109 F.3d 850 (1997), was called on to decide whether Pravin, which had bought bank debt in the secondary market, could enforce its debt despite Peru's restrictions on repayment. The District Court had enjoined enforcement for six months on the basis of a claim of comity, to allow Peru to complete its efforts to restructure its foreign debt, but had refused to do so indefinitely. The United States did not intervene in the case, and the *Pravin* court affirmed the District Court, siding with the creditor. Indeed, the Second Circuit relied on the government's briefs in both *Allied and CIBC Bank* in concluding the result was consistent with U.S. policy, which it characterized as follows: "although the United States advocates negotiations to effect debt reduction and continued lending to defaulting sovereigns, it maintains that creditor participation in such negotiations should be on a strictly voluntary basis. It also requires that debts remain enforceable throughout the negotiations."

The United States did not, as in *Allied*, join in a petition for rehearing, thus accepting de facto the legitimacy of the Second Circuit's characterization of its position. The *Pravin* outcome underscores the continuing deference of the courts to

24

Copyright © 2006 Washington Legal Foundation

the views of the United States.  It also indicates that the U.S. can influence courts by remaining silent.

### 3. The Argentine Cases: The Bush Administration and the New York Federal Reserve Bank Support Argentina

The United States has most recently filed *amicus* briefs on the side of Argentina against the position of U.S. creditors in cases involving the 2001 debt default, and the Federal Reserve Bank of New York (NY Fed) has done so as well.  In *Macrotecnic International v. Republic of Argentina*, No. 02 CV 5932 (TPG) (Jan. 15, 2004), the District Court denied Argentina's motion to preclude the plaintiff creditors from using the *pari passu* clause to attach payments to other creditors, much as Elliott Associates had done with Peru, holding that the motion was premature since the creditors had not, in fact, moved for attachment.  Although the issue was not resolved, it is notable that the United States and the New York Federal Reserve bank sided with Argentina's position on the merits—arguing that the *pari passu* clause could not be used by creditors to attach payments to other creditors.

The United States contended that allowing holdout creditors to seize payments to other creditors, including creditors receiving payments on restructured debt, would undermine "consensual orderly sovereign debt restructuring."  The brief contended that if creditors knew that payments on their restructured debt could be attached, they would be less likely to agree to a restructuring.  The United States failed to state that all creditors in 2004 were in the process of being forced to accept the worst deal in recent memory in what was far from a consensual process.  The plaintiffs were not holding out on any deal—no deal had yet been reached in 2004.  And as we have seen,

25

Copyright © 2006 Washington Legal Foundation

substantially more than 25 percent of international creditors eventually rejected the deal. The idea that creditors generally would reject certain payment at a *reasonable* level for highly uncertain payment at par (one would have to find property to attach), with high legal fees, is very unlikely. More fundamentally, the United States should have been opposing the extortionate settlement offered by Argentina, not supporting it.

The second major reason advanced by the United States for supporting Argentina was that the interpretation of the *pari passu* clause advanced by the plaintiffs would unsettle "market understanding" of the *pari passu* clause. The authority for this understanding was papers written by Lee Buchheit of Cleary, Gottlieb, *the attorneys for Argentina*. In fact, neither the United States nor Mr. Buchheit could point to any cases siding with their view of the clause—and the Belgian decision in the earlier *Elliott* case had come out the other way. Under the Argentine view of *pari passu* the clause could only be used to protect a creditor's priority in a bankruptcy proceeding—the problem is that sovereign debtors never have such proceedings, so the clause would be rendered meaningless. One would think market understandings would be far more unsettled by a judgment debtor using specious arguments to avoid paying its debts.

The NY Fed's main argument was that use of the *pari passu* clause to intercept payments due to other creditors would disrupt the payment system. Why would this be so?

> ...[I]f an injunction of the type issue[d] in the *Elliott* case were served on a Reserve Bank, Fedwire operations staff would be required to search each individual Fedwire transfer received

26

Copyright ® 2006 Washington Legal Foundation

within some specified period of time. If the period of time were merely a single day, over 400,000 wire transfers would have to be searched for the data referenced in the injunction papers. It is impossible to know with certainty where the data will appear in the wire instruction or how it will be presented. Therefore, the search would require the operations staff to review the entire message not only for the originator's name but also for possible variations and abbreviations of the name.

While it might appear that, given the state of technology, such a search could be conducted electronically, in fact electronic searches raise significant problems affecting both the speed and certainty of the Fedwire process. The New York Fed has searched the records of completed funds transfers in response to law enforcement initiatives related to counter-terrorism...Each of these searches, which are conducted electronically, inevitably yields a substantial number of false positives. Of course these searches were conducted after the funds transfers were completed and, as a result, there was no impact on the parties to the transaction that were identified in error. A real-time Fedwire search would have a wholly unacceptable impact both on the speed of the system and the certainty it handles.

This parade of horribles argument is not persuasive. First, the only "data" that the Fed would be asked to search for would be wire transfers sent by Argentina—variations on "Argentina" could be easily specified, and this data could be entirely searched electronically. This is quite different than monitoring terrorist payments that could involve large numbers of potential originators and beneficiaries. Second, there would be no (or extremely rare) false positives since the plaintiffs' theory of the *pari passu* clause is that they are entitled to share in *any* payment made by Argentina. We are certainly not dealing with the scale of false positives involved in trying to identify terrorist payments. These are purely lawyer's arguments, not backed up by facts about real consequences. The real question is why the NY Fed felt compelled to side with Argentina. Were they pushed into the cause by Treasury and State?

Copyright © 2006 Washington Legal Foundation

The second set of Argentine cases in which the United States and the Federal Reserve Bank of New York intervened, *NML Capital, Ltd. v. The Republic of Argentina,* 06-0405 and 6-cv and *EM Ltd. v. Argentina,* 06-0403-cv (Central Bank cases), arose out of the efforts of creditors (EM already had obtained a judgment against Argentina, while NML had pending legal claims) to attach $105 million that the Central Bank of Argentina had on account with the Federal Reserve Bank of New York.  The Republic of Argentina had required that the Central Bank use these funds as part of a repayment of more than $9 billion of the Republic's debt to the International Monetary Fund.

The District Court vacated the attachment orders issued earlier by another federal judge, by a written order of January 24, 2006, but stayed the effect of its decision pending an appeal to the Second Circuit that is currently underway.  The court held that the funds in the Central Bank account were the property of the Central Bank and that the Central Bank had not explicitly waived sovereign immunity as required by Section 1611 of the FSIA.  If the funds were not being held for central bank purposes—if the Central Bank was just sheltering funds of the sovereign used for a commercial purpose—the funds could be attached under Section 1611 even without a waiver.  The court appears to have ruled that the funds were being used for central bank purposes.  The court further held that even if these were the funds of Argentina, they were not being used for a commercial activity, as required by FSIA section 1610(d), since repayment of an IMF loan was a "governmental financial activity and not a commercial activity."

28

Copyright © 2006 Washington Legal Foundation

The *amicus* brief of the United States is focused on two policy concerns: "protecting the catalytic role of the International Monetary Fund...in the world financial system, and in protecting the preeminence of the dollar as a reserve currency."  The brief states that the IMF has provided funding repeatedly in debt crises, and for the IMF to play this role it must be able to get timely and complete repayment.  It goes on to state that "[o]nly if the IMF can expect that it will be paid first and in full, ahead of other creditors, can it afford to lend in crisis situations, when no commercial lender is available."

The government also contends that if central bank accounts were exposed to attachment orders, foreign central banks might be led to withdraw their funds from the United States, resulting in a substantial deterioration of the United States' balance of payments, and possible heightening of U.S. interest rates and an unsettling effect on foreign exchange markets.

The NY Fed's brief focuses on operational concerns, as had its brief in *Macrotecnic*.  It contends that the funds in the Central Bank account at the NY Fed are the funds of the Central Bank because that was the name on the account.  Its brief states that central banks "look to the [NY Fed] for assurance that their accounts at the [NY Fed] are protected under U.S. law."  "The [NY Fed] also has an interest in protecting its reserves abroad by promoting international principles of sovereign immunity."   In addition, the NY Fed's argument echoes the government's concern about the strength of the dollar.  In a supplemental brief, it focuses on the operational concern that attachment orders of this type would interfere in the timely completion of

Copyright © 2006 Washington Legal Foundation

payments.  It is hard to see how the future of the payment system hangs on the disposition of one wire transfer from Argentina to the IMF.

The Bush Administration should, as already discussed, be trying to limit the role of IMF lending, not promoting its "catalytic" role.  In its  early years, this was the Bush Administration's  clear objective, but it now seems to have gotten off track.  The IMF has no official status as a preferred creditor—there is no provision to this effect in any legislation or regulation.  Indeed, one means of limiting IMF credit would be to subordinate their loans to those of private creditors, or at best make them of equal rank.  Further, the fact that creditors are able to attach $105 million of the $9 billion of reserves Argentina appropriated so it could pay its debt to the IMF would not mean all sovereign payments to the IMF were so exposed.  In most cases of IMF repayments, there are no holdout creditors pursuing court remedies.  Finally, most debtors facing holdouts can rearrange their payment methods to avoid this result.  In this case, Argentina was able to repay the rest of the $9 billion debt to the IMF without using funds that were the subject of attachment.  Fundamentally, the U.S. was siding with Argentina as much as it was protecting the IMF.

The argument that the value of the dollar would be threatened if creditors were able to attach $105 million in funds earmarked for payment to the IMF borders on the laughable.  The attachment was not aimed at central bank reserves generally, just funds that were to be used for debt repayment.  These funds were not being used to invest in U.S. Treasury bills or to support the Argentine currency.  They were in the process of being withdrawn—the question was who should have them, the IMF or private creditors.

30

Copyright ® 2006 Washington Legal Foundation

It is interesting that the U.S. government did not intervene in the cases involving the Argentine bond exchanges.  Unlike the case of *Pravin*, however, the courts did not interpret silence as indicating the government was siding with the creditors.  The Second Circuit was concerned that if it allowed the attachments, the restructuring would fail.  It had already become clear, through the position of the Bush Administration in *Macrotecnic*, that the government wanted to promote Argentine restructuring, and generally opposed creditors that attacked it.  The Second Circuit knew this without having to be told.

## C.    Promoting Weak Collective Action Clauses

The United States, through the G7, has promoted the use of collective action clauses (CACs) in sovereign bonds; this was a central objective of John Taylor during his service as Under Secretary of the Treasury for International Affairs.  These clauses provide that 75% of creditors can accept a restructuring plan with binding effect on all creditors, precluding holdout creditors from mounting subsequent court challenges. In addition, these bonds make use of an indenture trustee, thus eliminating the right of individual bondholders to bring suit.  Suit can only be brought if a certain percentage of bondholders, usually 25%, instruct and indemnify the trustee.   Trustees are very careful about the terms of their indemnification and don't make it easy.   Until 2003, when Mexico first issued bonds under U.S. law with CACs, these kind of CACs were only used in sovereign bonds issued under U.K. law; bonds issued under U.S. law provided that 100% of the creditors had to approve changes in bond payment terms.

Treasury got behind the CAC idea after the IMF had proposed a quasi-

31

Copyright © 2006 Washington Legal Foundation

bankruptcy procedure, called the Sovereign Debt Restructuring Mechanism (SDRM), that was widely opposed by influential international creditor groups, such as the Institute of International Finance, who did not want the IMF or a new bankruptcy court to control the process or terms of a restructuring. These international creditors preferred to work things out on their own with the sovereign debtors, in a "market" solution under which bonds would be restructured according to the covenants of the bonds themselves.

In reality, CACs were a way to kill off the more offensive SDRM. Creditors originally wanted a 90% agreement but eventually settled for 75%, as favored by the Treasury. However, the effective percentage required under the CACs was much higher than 75% because entities controlled by the sovereign were excluded from voting. Given that sovereigns can also control the votes of domestic private creditors— not only actually controlled entities—these domestic private creditors should also be excluded from voting in calculating whether the CAC percentage requirement is met. Indeed, it is conceivable that the voting results could be challenged in a U.S. court if the sovereign brought pressure on such private creditors to support its restructuring terms.

Private foreign creditors were concerned that too low a percentage would make it generally easier for the sovereign to make a deal. Requiring a higher percentage gives creditors more leverage to get better terms. Here is an example of a creditor negotiation line: 65% of us are willing to agree to a 35% discount but you are never going to get the other 25% to agree to this—they would rather take you to court. We

32

Copyright © 2006 Washington Legal Foundation

can only get a deal with less of a discount, say 20%.[13]

Higher CAC thresholds may also be in the interest of some sovereigns.  A 2004 analysis by Haldane et al. of the Bank of England suggests that risk-neutral debtors may prefer high CAC thresholds because the ex-post default benefit of getting away with a lower offer (facilitated by a low threshold) is more than outweighed by the ex-ante benefit of lower interest rates when the debt is issued.  Risk-averse debtors, more concerned with default (particularly when more risky) may prefer higher thresholds.[14]

When Mexico issued its CAC bonds in February 2003, in a $1 billion offering, an analysis of two Australian Reserve Bank economists indicated that the yield on the new bonds was consistent with previously issued bonds with similar maturities that did not contain CACs.[15]  This seemingly contradicted the Haldane analysis.  Perhaps the reason there was no additional cost to issuing bonds with the CACs was because the market believed the CACs would never be used, or because the effective voting percentage, while not 100%, was so close as to make no practical difference (Brazil used an 85% CAC in 2003 with the same controlled entity exclusions).  If these clauses would actually affect future restructurings, they should have some price effect.  If restructurings would be more expensive for creditors the bonds should have increased in price; if they would make future restructurings less expensive for creditors, they

---

[13]J. Fisch and C. Gentile, *Vultures or Vanguards? The Role of Litigation in Sovereign Debt Restructuring*, 53 EMORY L. J. 1043 (2004) argue that holdout creditors serve as a check on opportunistic defaults and unreasonable restructuring terms.

[14]A. Haldane, A. Penalver, V. Saporta, and H. Shin, "Optimal Collective Action Clause Thresholds," Bank of England Working Paper 248 (2004).

[15]*See* M. Gugiatti and A. Richards, "Do Collective Action Clauses Influence Bond Yield? New Evidence From Emerging Markets," Reserve Bank of Australia Research Discussion Paper 2003–02 (Mar. 2003).

Copyright © 2006 Washington Legal Foundation

should decrease in price.  The one thing that should not happen is no change in price. Of course, another possibility is that buyers of the bonds paid no attention to the covenants at all, regardless of their possible effect.

There are, in fact, several reasons to expect CACs will not have an appreciable effect on future restructurings, apart from the high effective percentage requirement. First, there will be a substantial transition issue since non-CAC bonds may not be fully replaced until 2013.  Second, the CAC clauses have not been tested in court.  It is possible that courts would intervene to prevent a majority of bondholders from abusing a minority—the avoidance of this possibility is one of the reasons bonds under U.S. law traditionally required a 100% consent for change in payment terms.  Third, as Anne Kreuger, the former First Deputy Managing Director of the IMF, who proposed the SDRM, repeatedly observed, the CAC solution will not work across different credit instruments. Even if the same CAC were inserted in all sovereign bonds, other major debt that would be simultaneously subject to restructuring negotiations, like syndicated bank debt or trade credit, would not have such clauses.  Nor is it clear that bonds issued by the same sovereign would all have the same collective action requirements.

In May 2003, Uruguay announced completion of the swap of $5.1 billion of old bonds for new ones with longer maturities. Uruguay provided a method for facilitating majority action across different bonds. The new bonds provide that the payment terms of multiple bonds in a "series" (ones issued under the same indenture) can be changed with a vote of 85% of the aggregate principal amount of all outstanding bonds (again subject to the exclusions of state controlled entities), and 66.6% of each issue. If an

Copyright © 2006 Washington Legal Foundation

issue falls short of 66.6%, it is not included in the aggregate deal.  The same type of provision is in the new Argentine bonds issued as part of the 2005 exchange.[16]  But current sovereign issuers cannot control the future.  This kind of "series control" can simply be avoided by starting a new series. Nor can bond aggregation rules solve the problem of the need to coordinate with other forms of debt.

On the other hand, if these CACs are actually used in future crises, they will help defaulting sovereigns achieve better terms than they were previously able to achieve.  As already observed, individual lawsuits will be curtailed, even before any restructuring agreement is reached—thus removing even the small threat creditors now have to pressure sovereigns for better terms. Further, given the aggregation feature, potential holdout creditors would have to muster a sufficient majority across all bonds subject to aggregation, not merely their own bonds, to block a deal. This will be a tall order for countries like Argentina and Brazil, with large debt stock outstanding.

CACs were not, despite the advertising, a market solution.  The market had been free to choose between CACs under U.K. law or non-CACs under U.S. law.  In fact, what happened is that the U.S. Treasury and the G7 imposed these new CACs on the marketplace to facilitate sovereign restructuring. Once again the U.S. government was siding with Argentina and undermining market discipline.

If the United States and the G7 are to mandate some form of CACs, in the author's view a mistake, the CACs should be stronger so as to insure that creditors have more leverage in the restructuring negotiations.  As originally proposed by

---

[16]G. Gomez-Giglio, *A New Chapter in the Argentine Saga: The Restructuring of the Argentine Sovereign Debt*, J. OF INT'L BANKING L. R. 345 (2005).

Copyright © 2006 Washington Legal Foundation

creditors, the threshold should be 90%, and this threshold should apply to aggregated as well as individual debt issues.  Private domestic creditors subject to sovereign pressure, as well as controlled entities, should be excluded from voting.  The sovereign should be required to disclose all information relevant to its ability to repay during the restructuring negotiations.[17]  Unless high CAC thresholds with required disclosures are required, future sovereigns will use the CACs to cram down what may now be called Argentine terms.

There is also the issue of the threshold required to bring suit.  One could argue that any creditor, before 90% of the creditors have accepted a restructuring, should be able to sue, just as they were able to do before the newly mandated CACs.  Indeed, if creditor rights remain weak, as they currently are, this should continue to be the case—otherwise there will be no pressure on the sovereign to reach a deal (recognizing that current creditor suits put little pressure on the sovereign anyway).

However, if creditor rights were to be strengthened along the lines advocated in this paper, there could be a need for some collective action mechanism to avoid a race to the courthouse.  Perhaps, bonds could incorporate an automatic stay on creditor actions after a default that would dissolve after the default had been outstanding for a fixed period of time, perhaps two months.  After that, the stay would continue only with consent of 90% of the creditors, using the same voting rules as for the CACs.

---

[17]Transparency and the timely flow of information is the first principle enunciated in the Institute of International Finance's Principles for Stable Capital Flows and Fair Debt Restructuring in Emerging Markets, Mar. 31, 2005.

36

Copyright © 2006 Washington Legal Foundation

## IV.   THE MISTAKE OF SIDING WITH ARGENTINA

The interest of the United States in Latin America is to promote democracy, strong economic growth and friendly relations with the United States.  The U.S. does not want Argentina or other Latin American countries to drift leftward toward Castro in Cuba or Chávez in Venezuela.  Although never articulated, it is this author's opinion that the Bush Administration sided with Argentina during the debt crisis, by refusing to support creditors attacking the restructuring, because it thought it would achieve these foreign policy objectives.  The court interventions were not about the meaning of *pari passu* clauses or the payments system—they were about currying favor with Argentina.  The United States was seeking to achieve headlines like this one in *Ambito Financiero* on July 17:  "Good News: Support from the United States in the Vulture Fund Lawsuit," referring to the U.S. brief submitted in the *Central Bank* cases.  The thinking was that if the United States supports the efforts of Argentina to restructure its debt, even on harsh terms for creditors, Argentina would be friendlier.  This has obviously not worked.  Indeed, it has backfired.

Néstor Kirchner in Argentina has increasingly made common cause with Hugo Chávez—as already discussed, Venezuela is now buying substantial portions of Argentine debt.  The two countries plan to jointly issue debt and have announced plans to establish a regional IMF.  The U.S. has certainly not stopped Argentina from moving leftward.  And China is now in the mix as well, romancing Argentina as part of its "south-south" strategy, to build a coalition of cooperating countries across Latin America and Africa.

Copyright © 2006 Washington Legal Foundation

Kirchner is wildly popular, with approval ratings over 80%. Much of his populist appeal is based on denunciation of the IMF, the U.S. and foreign creditors. Indeed, by backing Kirchner's draconian debt restructuring, the U.S. allowed him to demonstrate his power and ability to resist Western pressure. If the United States had opposed the restructuring and supported efforts of creditors to seize Argentine assets, Kirchner would not be able to claim the ability to snub the West without cost.

Two articles in *Foreign Affairs* in the last six months document the leftward movement in Latin America.[18] Castenada says of Kirchner: No one really knows "what Kirchner intends to do when his economic recovery runs out of steam. But it seems certain that the Peronist chromosomes in the country's DNA will remain dominant: Kirchner will hand out money, expropriate whatever is needed and available, and lash out at the United States and the IMF on every possible occasion. At the same time, he will worry little about the number of Argentines living under the poverty line and be as chummy with Chávez as he can." This is not someone the U.S. will get "brownie points" from for opposing the efforts of his U.S. creditors. He is probably laughing at us all the way to the bank.

Argentina was a rogue debtor, acting considerably outside the norms for debt restructuring. U.S. and foreign creditors lost billions of dollars that Argentina could have repaid. The way to deal with outrageous behavior of this kind is not to encourage or facilitate it but to oppose it. The U.S. will not win back Argentina or show its strength in Latin America by allowing Chávez and Kirchner to punish its creditors. In addition, the U.S. has a strong interest in discouraging overborrowing since this is

---

[18]Peter Hakim, *Is Washington Losing Latin America*, (Jan./Feb. 2006) and Jorge Castenada, *Latin America's Left Turn*, (May/June 2006).

Copyright © 2006 Washington Legal Foundation

what eventually produces fiscal and political instability, impoverishing people of the region and leading to the rise of anti-American populist leaders.   To prevent overborrowing, we must strengthen not weaken the hands of our creditors.

## V.   WHAT SHOULD THE UNITED STATES DO?

The United States must consider taking the following actions:

1. **Start intervening in court cases on the side of U.S. creditors, not on the side of defaulting sovereigns**.  Interventions supporting the debtors are particularly unjustified in the case of Argentina, which acted outside the boundaries of international norms in the restructuring, repudiated its debt contracts, evaded the effect of U.S. court judgments, and pursued openly hostile policies toward the United States by allying itself with the Latin American left.  Appeasement does not work and has not worked in the case of Argentina.  At the very least, the United States should stop intervening at all and let the courts decide the issues.

2. **Put more teeth in anti-bailout policies by creating more political barriers to sizeable IMF bailouts**.  Exceptional lending should require the explicit approval of the G7 and IMF loans should be junior, not senior, to private credit. Without effective restraints on IMF lending, sovereigns will continue to overborrow and look to the IMF honeypot when they get into trouble.  In addition, any IMF or official lending should be prohibited to a country, like Argentina, when a default lasts longer than a year until such time as a restructuring.  The restructuring plan should require a 90% acceptance rate by foreign creditors.

39

Copyright © 2006 Washington Legal Foundation

3.  **Stop pressuring countries to adopt CACs.  Let the market freely decide what kind of CACs it wants for a particular borrowing, as was the case before the Argentine default**.  If the United States and the G7 continue to insist on CACs, they should require a 90% threshold for creditor acceptance with respect to both individual bonds and overall debt, and that all domestic creditors, not just controlled entities, be excluded when determining whether the CAC threshold has been met.  Threshold requirements, e.g. 25% for bringing suits, should be abolished.  Consideration of a bond provision calling for an automatic stay for a limited period of two months should only occur after creditor rights have been considerably strengthened.

4.  **Take the lead internationally in removing safe havens for sovereign assets in cases of debt defaults, such as under the BIS rules**.  There should be complete disclosure of the assets held by the central banks of sovereigns in default on court judgments in a G7 jurisdiction.  In addition, protection of central bank foreign currency assets at BIS should not exceed assets reasonably required to conduct monetary and foreign exchange policy.  A method should be devised, however imperfect, to set this cap.

5.  **Exclude sovereigns in default on court judgments in G7 countries from selling their bonds in the United States**.  Satisfying U.S. judgments should be required for U.S. market access.  The SEC can currently exclude private issuers who have violated disclosure laws from using our securities markets.  The same result should follow if sovereigns fail to honor orders of U.S. courts.  The U.S. should attempt to get other G7 countries to follow the same policy.

Copyright © 2006 Washington Legal Foundation

6. **Change the FSIA to strengthen creditor rights**.  If creditors have stronger rights to seize sovereign debtor assets in cases of default, sovereigns will be much less likely to overborrow.[19]  Generally, the U.S. should endeavor to give creditors the same rights against sovereign borrowers that they have against private borrowers. The United States should advocate that other countries take a similar approach, in order to avoid international regulatory arbitrage.  The following reforms should be considered:

- Allow sovereigns and central banks to waive all FSIA protections, against pre- or post-judgment attachment, with respect to all property, whether commercial or not, and whether inside or outside the United States. Also, make clear that if a central bank waives sovereign immunity its assets are available to be attached in satisfaction of debts owed by the sovereign.  This would allow the rules of the marketplace to govern. Sovereigns are strong enough to protect themselves.  There is no reason to interfere in consensual activity.  For existing debt instruments, follow the BIS approach outlined above, by providing that central bank immunity only exists with respect to assets reasonably required to conduct monetary and foreign exchange policy.

- Broaden the key definitions of property and commercial activity. Property should include all trade and payment flows, including the right to receive something of value.  Commercial activity should include any activity, including those of a business or financial nature, other than an activity in which only a sovereign can engage.  Thus, any payments or goods flows involving a sovereign would be covered since private parties could also engage in such activities.  This would include any payment to the IMF.  While only a sovereign could actually make a payment to the IMF, the kind of activity involved, debt repayment, can also be engaged in by private parties.  An example of the kind of activity that only a sovereign can engage in is the collection of a tax.

---

[19]Interestingly, Jeremy Bulow, the Stanford economist, has advocated reducing overborrowing by cutting back on creditor rights, specifically by making debts only enforceable in the courts of borrowers, *First World Governments and Third World Debt*, I Brookings Papers on Economic Activity 229, 245 (2002), on the theory that this will cure creditor moral hazard, lending too much because of the expectation of being bailed out.  This ignores the fact that creditors have had no effective rights for some time and overborrowing has grown and persisted.

Copyright © 2006 Washington Legal Foundation

- Authorize creditors to attach stock of state wholly-owned enterprises, wherever the stock may be actually located.  The sovereign would be ordered to deliver the stock to the court.  Failing compliance, a lien would be granted to creditors on the U.S. assets of the state-owned enterprise.  The priority of the lien would be determined according to normal rules for private debtors.

- Provide by statute that, unless otherwise provided by the parties, that a creditor of a defaulting sovereign has a remedy under state law to attach all payments and good flows of the sovereign.  This includes goods shipped or being received, and payments made or being received.  This would clarify the current scope of attachment law.  It would also have the benefit of eliminating litigation over the *pari passu* clause, as the right to attach payment flows would be part of the remedies the state gives creditors against defaulting debtors, unless the contract provides otherwise.  The statute should further provide that no payment system or other operational objections, of the kind put forth in *Macrotecnic*, may be raised by parties subject to such attachments.

- Authorize courts to require a sovereign to bring assets into the U.S., to post security for costs and to incur monetary sanctions for discovery or other litigation abuses, again treating sovereigns the same as private borrowers.

- In the case of default, clarify that under the Federal Rules of Civil Procedure sovereigns must disclose details of all assets, wherever located, and expand these rules to permit creditors to depose sovereign officials.

## CONCLUSION

*Cry for the United States.*  It has pursued a failed foreign policy that has resulted in huge losses for U.S. creditors and allowed Argentina to thumb its nose at the United States, further strengthening the left in Latin America.  *Don't cry for Argentina.*  It was able to restructure $80 billion of debt with a massive haircut and ignore the $30 billion still owed to non-tendering bondholders—with impunity.  Argentina returned to the bond markets, continued to attract foreign investment, and

Copyright © 2006 Washington Legal Foundation

avoided creditor sanctions.   Under this scenario, why would any country repay its debt?

It is time for the United States to pursue a new policy of toughness with respect to sovereign defaulters.  It should start backing its creditors in court, credibly restrain IMF lending, abandon the pursuit of weak collective action clauses, oppose the use of international safe havens, like the BIS, to shelter sovereign assets, deny market access to sovereign debtors that are in default on G7 judgments and enact wholesale reforms of the FSIA to strengthen creditor rights, encouraging other G7 countries to do so as well.

43

Copyright © 2006 Washington Legal Foundation

EXHIBIT "B"

EXHIBIT "B"

 

**The New York Times**
nytimes.com

---

**March 4, 2005**

# Argentina Announces Deal on Its Debt Default

**By LARRY ROHTER**

**B**UENOS AIRES, March 3 - It took more than three years of stop-and-go negotiations, threats, political maneuvers and court battles, but the largest government debt default in history finally ended here Thursday, as the Argentine government announced that 76 percent of its creditors had accepted a proposal that will pay them at most 30 cents on each dollar.

President Néstor Kirchner, who ignored suggestions that he seek a quick settlement and took an overtly confrontational approach, this week gleefully described the restructuring of $102.6 billion in bonds held mostly by foreigners as "the greatest deal ever" for a country in negotiations with creditors. In comparison, Russia offered bondholders half their money back after a huge default in 1998.

"We know that we have to wage a battle internationally to rebuild confidence and credibility," Mr. Kirchner said Thursday evening in a televised speech from the Casa Rosada, the presidential palace. "But we know this prestige is not won by satisfying a few economic, financial or ideological powers."

The implications of a deal so highly favorable to Argentina extend far beyond the local economy, whose collapse in December 2001 led to the default and the long crisis from which the country is just now emerging. Lawyers, economists, underwriters and bond traders have all been speculating that Argentina's example may encourage other developing countries to act similarly.

"This is a watershed event, with great impact on the international financial system," Miguel Kiguel, a former Argentine under secretary of finance and debt negotiator, said in an interview Thursday. "The Argentine restructuring shows that in case of default, sovereigns have much more power than before, maybe even the upper hand. The rules of the game have changed."

At the presentation, Economy Minister Roberto Lavagna criticized the hundreds of banks, underwriters, fund managers, risk evaluators and experts from international institutions who "did not make a positive contribution" to the negotiations.

Mr. Lavagna, who will travel to Washington for talks early next week with Rodrigo Rato, managing director of the International Monetary Fund, added, "If we had followed the trodden path, we would not have reached any result like that which we are describing."

In fact, Argentina chose almost from the start to break with many of the customary procedures in a debt renegotiation. Not only did it not seek an accommodation with the I.M.F. and the Group of 7, it presented a unilateral proposal to creditors, avoided dealing with a steering committee and in the end largely imposed its terms on creditors, who were divided and fragmented.

"The creditors were tired," Claudio Loser, an Argentine economist who is a former director of the Western Hemisphere division of the I.M.F., said in a phone interview from Washington. "Argentina took what I would

call a T.L.C. approach: toughness, combined with luck in the international economic environment and conservatism in its fiscal and monetary policies."

At a news conference in Washington a few hours before the announcement here, a spokesman for the I.M.F., Thomas C. Dawson, described the debt renegotiation as "an important opportunity for Argentina to move forward, since there is a lot of work remaining."

The I.M.F. board, he added, is "looking forward to finding out the breakdown of participation and nonparticipation before making a final judgment and analysis."

According to Economy Ministry figures, Argentines make up the largest single group of bondholders, holding 38.4 percent of the 152 different types of bonds that went into default. Officials said that 97 percent of these local creditors accepted the proposal.

Investors in Italy, Switzerland, the United States, Germany and Japan, in that order, make up the bulk of the foreigners holding Argentine assets. They were much less enthusiastic about the proposal, especially the Italians, but in the end apparently concluded that with both the I.M.F. and the Bush administration on the sidelines, they had little choice but to accept.

"A lot of retail holders, especially older people, decided they didn't want to wait another two or three years to collect another 15 or 20 cents on the dollar," said an American lawyer involved in the negotiations, speaking on condition he not be identified. "The exchange is a bad one for bondholders, but a kind of herd instinct kicks in when people start to feel desperate."

Nicola Stock, co-president of the Global Committee of Argentine Bondholders, declined to comment on the settlement. Reached by telephone in Rome, a spokesman for Mr. Stock said only that fewer than 30 percent of 320,000 Italian bondholders had accepted the proposal and that as a result, "we are studying new steps for legal action."

But trying to get more money out of Argentina is likely to prove difficult and expensive for those who rejected its offer, especially since the Argentine Congress passed a law last month making it illegal to improve the existing terms. In addition, the high rate of acceptance by other creditors is likely to dissuade any court from accepting the argument that Argentina acted in bad faith.

Officials here said that with the renegotiation finally concluded, the government might return to the bond market as early as next month. Though they expect the market to be suspicious of initial offerings, improving economic conditions here may reduce concerns about the country's ability to pay new obligations as well as the consolidated existing debt.

After contracting by about 11 percent in 2002, the Argentine economy grew 8 percent in both 2003 and 2004. Exports, especially in agriculture, have been booming, tax revenues last month rose 30 percent over the period last year, and private foreign investment has begun flowing back into the country.

But several other hurdles lie ahead for Mr. Kirchner. He must not only begin a new set of negotiations with the I.M.F. and with private utilities that want rate increases but also, if the economy is to continue growing at a fast clip, attract capital, whether from purchasers of new bonds, other investors, or Argentines, who sent more than $100 billion abroad in the years preceding the collapse.

"I think the negotiations with the I.M.F. are going to be tough, very tough," especially since Mr. Kirchner feels fortified by his victory over bondholders, Mr. Kiguel predicted. "But both sides are interested in reaching an agreement, so it is mostly just a matter of time."

3/28/2014                         The New York Times > Business > World Business > Argentina Announces Deal on Its Debt Default

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

# EXHIBIT "C"

# EXHIBIT "C"

6 Chi. J. Int'l L. 311

**Chicago Journal of International Law**

Summer 2005

Articles

Symposium: Sovereign Debt Restructuring

FROM ROGUE CREDITORS TO ROGUE DEBTORS: IMPLICATIONS OF ARGENTINA'S DEFAULT

Arturo C. Porzecanski [a1]

Copyright (c) 2005 Chicago Journal of International Law, University of Chicago Law School; Arturo C. Porzecanski

The past three decades have witnessed the rapid globalization of stock, bond, and currency markets, which has been facilitated by advances in telecommunications and the liberalization of previously sheltered, and often repressed, domestic capital markets. The process has been spurred by the search for higher yields and undervalued assets, wherever they may be located, on the part of individual and institutional investors; and also by the desire to mitigate asset-concentration risks via diversified, uncorrelated portfolios. This globalization has also been accelerated by the mushrooming of trade linkages and the spread of multinational corporations, which have put pressure on banks and other intermediaries to deliver all kinds of financial services-- from old-fashioned trade credits to currency swaps and asset-backed finance-- everywhere and around the clock.

The birth of globalized capital markets has been painful, pockmarked by periodic crises spanning at times a multitude of countries: the industrialized nations in the 1970s, Latin America in the 1980s, and Asia in the 1990s. Governments have usually planted the seeds of those crises: first, by holding onto artificial exchange rate regimes even as their ability to control foreign exchange flows was fast diminishing; and second, by failing to set prudent limits on their own foreign indebtedness and on the mismatching of liabilities by their banks, even as the opportunities for financial mischief multiplied. [1]

Financial historians will recall Argentina in the 1990s as an extreme case: a country that pretended for a decade that its historically weak currency (the peso) could be as strong and stable as the US currency, at a fixed one-to-one exchange rate set by government fiat. To make matters worse, the authorities there literally **\*312** "bet the ranch" by borrowing almost exclusively in dollars and other foreign currencies to finance a string of budgetary deficits, even though their revenues were due and collected only in pesos. [2] Once an erosion of export competitiveness, aggravated by fiscal and political indiscipline, undermined the regime's credibility and led to a run on available dollars, bank deposits were frozen, capital controls were imposed, and soon after the peso had to be sharply devalued. A sinking currency rendered the government instantly insolvent: the net public debt, which at the one peso per dollar exchange rate was equivalent to nearly three times annual tax revenues and 50 percent of GDP, virtually tripled once the currency sank to around three pesos per dollar, becoming unaffordable to service.

## I. Differing Perspectives on Sovereign Financial Crises

Most academic economists, legal scholars, and policy gurus have focused their attention upon the alleged inefficiencies in international financial markets that supposedly lead to these periodic crises and complicate their resolution. [3] They have argued that globalization has spawned increasingly diverse, diffuse, and unmanageable creditor and debtor communities that pose coordination and collective action problems. Gone are the days when a relatively small syndicate of commercial banks could gather quickly in New York or London, spurred into action by urgent telephone calls from their supervisory authorities, to deal with whatever financial emergency had erupted in some distant corner of the world. Nowadays, everything can be and is securitized and distributed widely around the globe, such that a financial "hiccup" in some corner of the world can affect a huge constituency half a world away--everyone from naïve retail investors to savvy hedge funds. As a result, governments that

**FROM ROGUE CREDITORS TO ROGUE DEBTORS:..., 6 Chi. J. Int'l L. 311**

lose the confidence of their bank depositors, bondholders, or bank creditors, or fall victim to regional "contagion" effects, are claimed to be unable to work out constructive solutions prior to a major currency, banking, or debt crisis.

After a crisis erupts, it is said, financial stability can only be restored by obtaining a massive package of loans from the G-7 governments acting through **\*313** the International Monetary Fund ("IMF")--the now classic "bailout." And when sovereign liabilities need to be restructured or written down, the story goes, the absence of an orderly sovereign bankruptcy mechanism means workouts are delayed and their effectiveness is undermined by "free riders" and "rogue" (holdout) creditors. As Anne Krueger, the IMF's second-highest-ranking official, expressed it in amazingly hypothetical fashion:

> [I]n the current environment, it may be particularly difficult to secure high participation from creditors as a group, as individual creditors may consider that their best interests would be served by trying to free ride . . . . These difficulties may be amplified by the prevalence of complex financial instruments . . . which in some cases may provide investors with incentives to hold out . . . rather than participating in a restructuring. [4]

This focus upon the alleged shortcomings of financial globalization, and the seeming repetition of currency and debt crises, spawned various concrete proposals earlier this decade to reform the "international financial architecture." [5] The so-called statutory approach argued for the creation of a supranational bankruptcy authority that would adjudicate financial claims on troubled sovereigns in an expeditious manner, overriding contracts written in national jurisdictions. The "contractual approach" called for the modification of boilerplate bond clauses (especially under New York law) in ways that would facilitate communication among creditors and with the sovereign debtor, restrain disruptive litigation, and facilitate restructuring decisions by a qualified majority rather than unanimous consent.

Initially, consideration of both approaches was urged by several academic scribblers and favored by the G-7 governments; it was generally resisted by the financial industry and by many sovereign issuers in the emerging markets. In the end, however, the US Treasury sided with the contractual approach and persuaded the government of Mexico and its bankers to issue a bond, in early 2003, subject to New York law but incorporating innovative "collective action clauses." The transaction was successful because investors did not demand a premium for the contractual innovation, and ever since, a growing number of sovereign bond issues have incorporated the said clauses at no obvious additional cost. [6] The impetus to continue to reform the rules and practices of international finance has subsequently died down, especially since there has not been a major crisis in the past couple of years.

**\*314** Economists and lawyers working in the financial industry (on behalf of investors, issuers, and intermediaries) have looked mostly askance at this literature coming out of the universities and the G-7 policy gurus. [7] After all, the international capital markets are exceedingly transparent and competitive when compared with most other markets for goods and services. What may look like inefficiencies viewed from the ivory tower are regarded as short-lived, arbitrage opportunities when viewed from the trading floor. Moreover, there is no evidence to suggest that the absence of a supranational bankruptcy procedure, or the dearth of contracts with collective action clauses, have impeded or even delayed sovereign debt workouts. Governments that have sought massive emergency financial aid from the IMF and the G-7 have probably done so not because they were unable to work things out cooperatively with their creditors, but because they did not want to face them. They would rather engage in what the economics literature has termed "gambling for [financial] resurrection."

Indeed, experience demonstrates that neither the threat nor the act of litigation, nor isolated instances of "rogue creditor" behavior, have thwarted the debt restructurings that needed to be accomplished. The governments of Ecuador, Moldova, Pakistan, Russia, the Ukraine, and Uruguay have all been able to restructure their bonded debt in recent years, despite the fact that their investor base was quite diverse and scattered and the debts in question were denominated in different currencies and were bound by contracts from several jurisdictions. With the exception of the Russia debt restructuring, which took more than a year, these transactions were completed quite smoothly within a matter of months, and creditor holdouts were not a significant problem. Three of these restructurings were even concluded prior to an event of default (Moldova, Pakistan, and Uruguay), and three others only afterwards (Ecuador, Russia, and Ukraine)--although not because of a lack of creditor cooperation.

Three entailed the extension of maturities without any meaningful reduction in coupons (Moldova, Pakistan, and Uruguay); another involved the lengthening of maturities and cutting of interest payments (Ukraine); and the remaining two incorporated principal forgiveness plus debt service concessions (Ecuador and Russia). In earlier years, the bonded debt of Costa Rica (1985), Guatemala (1989), and Panama (1994) had likewise been successfully restructured. After examining the actual evidence, two international finance experts who are not on **\*315** Wall Street's payroll recently concluded: "Clearly, bond restructurings are possible in a wide range of circumstances." [8]

It turns out that it is the official creditor community, represented by the Paris Club of foreign aid and export credit agencies, and the multilateral organizations (the IMF, the World Bank, and the regional development banks), which has been far less responsive to the needs of governments with solvency problems. [9] The G-7 governments that have pointed an accusing finger in the direction of the private capital markets are the same ones that have dragged their feet again and again in terms of granting permanent debt relief even after the Highly Indebted Poor Countries (HIPC) initiative came into effect precisely for such purpose. [10] The principle of "comparable treatment," under which the Paris Club has often forced private creditors to grant debt relief, does not operate in reverse, as became clear during the Brady Plan era in the early 1990s, and again after the Ecuador and Russia workouts in the late 1990s. [11] In sum, while bankers and bondholders have resolved expeditiously and even generously the sovereign debt crises in which they have been involved in various parts of the world, especially in recent years, the official development community cannot make the same claim.

The prevailing view in the private capital markets is that, if anything, reforms should be aimed at facilitating the enforcement of claims against sovereigns, as well as the early and constructive involvement of private-sector creditors in addressing sovereign liquidity or solvency problems. [12] After all, despite the strong rights that creditors have on paper under New York, English, or other law, practical experience has long suggested that the enforcement of claims against sovereigns is a very difficult and protracted affair. Despite the usual surrender of sovereign immunity in standard loan and bond documentation, governments cannot, in fact, be compelled to deal with their underlying problems by changing management, restructuring operations, or **\*316** mobilizing resources; moreover, their hard-currency assets cannot in practice be attached.

## II. Enter the Rogue Debtor: Argentina

The vast literature on the alleged defects of the international financial architecture does not dwell upon the possibility that one or more sovereign debtors will take purposeful advantage of their de facto immunity to walk away from legal and financial obligations. In contrast to all the hand wringing about the potential dangers posed by "rogue creditors," nary a drop of ink has been spent discussing the risk to the integrity and efficiency of international capital markets posed by "rogue debtors." And yet, the world has definitely seen its share of deadbeats. Even preferred creditors such as the IMF and the World Bank have long had to provision against some sovereign nonperformers, and their write-off experience would be much heavier if it were not for the prospect of debt forgiveness dangled by the aforementioned HIPC initiative, which has encouraged many borderline-bankrupt governments to remain current. [13]

As concerns private creditors, their most meaningful encounter with a rogue debtor--before Argentina came along, that is--was Peru in the 1980s. The authorities there began to run arrears to banks and suppliers in 1984, but after President Alan García was inaugurated a year later, the running of payment arrears became an officially sanctioned policy. Negotiations with creditors were shunned, debt-service payments were capped at a certain level set in relation to export earnings, and the default soon widened to encompass obligations due to the multilateral agencies, including the IMF. Many of Peru's commercial lenders pursued claims in New York and other jurisdictions, but they were not able to attach assets and collect on outstanding debts. It took many years and a new and very different government (under President Alberto Fujimori) for Peru to regularize its financial situation. In late 1991, the government paid off its arrears to the multilateral agencies (mainly thanks to bridge loans from friendly governments including the US), but it would take until 1997 for the country to complete a debt reduction and restructuring process (under the aegis of the Brady Plan) and become current with all private creditors. It was only in 2000 that a lone "rogue" creditor

(Elliott Associates) was able to obtain full payment on a small amount of unrestructured obligations, on the basis of a New York ruling enforced in a somewhat unconventional way by a Brussels court, by threatening to attach payments to other creditors made through Euroclear. [14]

**\*317**  This brings us to the case of Argentina, by far the largest and potentially most complex default the world has ever known. It was declared unilaterally by an interim government to the cheers of legislators in the final days of December 2001. A unilateral restructuring offer was presented to bondholders three years later (January 2005), which was accepted by 76 percent of total bondholders. A settlement with the remaining bondholders, and with other creditors, including bilateral agencies represented by the Paris Club, will probably take several more years to achieve.

The extent of the default first began to be revealed in February 2002, when the government (then led by President Eduardo Duhalde) issued a decree that was refined in four subsequent resolutions. Those rulings made it clear that the government would continue to service more than half of the total public debt, excluding arrears: loans from multilateral official lenders; bonds held by creditors who agreed to have their obligations redenominated in pesos; and holders of new bonds issued since the default, mainly to banks and their depositors, as well as to those who had financial claims on provincial governments now taken over by the central government. By residual, the debts that would eventually be subject to a restructuring were all remaining bonds (152 of them, denominated in six currencies and subject to eight legal jurisdictions); debts to official bilateral agencies, including but not limited to the Paris Club; and loans from commercial banks and suppliers. At the time, the principal entangled in the default exceeded $60 billion, but it would grow to around $105 billion by the end of 2004, including some $14 billion of past-due interest (at contractual rates) that for the most part the government would refuse to recognize.

The government made one major executive decision that reduced the value of its debt obligations and two others that increased it, the net result of which was to augment the size of the performing debt to the detriment of its capacity to honor the nonperforming debt. The first decision decreed the forcible conversion of all government debt subject to Argentine law from foreign currencies into pesos at an exchange rate of 1.4 pesos per dollar--this at a time when the currency was free falling toward two pesos per dollar, and several weeks before it touched bottom at four pesos, before finally settling at around three pesos per dollar. This measure minimized the impact of currency devaluation upon a portion of the stock of public debt, but obviously at the cost of disadvantaging the bondholders, who were mostly domestic pension and mutual funds, and insurance companies and banks, which had purposely hedged  **\*318**  themselves by investing in dollar-denominated securities. [15]  Many of these investors then commenced litigation in Argentina against the government, so far without success.

The second decision pertained to the assets and liabilities of the banking system denominated in dollars, which constituted the bulk of their balance sheets. Dollar loans to the private sector were forcibly converted into pesos at a one-for-one exchange rate, whereas dollar deposits in banks were to be recognized at 1.4 pesos per dollar. The former move was intended to fully protect households and companies with dollar debts from the currency's devaluation, and the latter to limit the windfall that would have accrued to bank customers who had (by that time effectively frozen) dollar-denominated deposits. Understandably, this government decision was very popular among debtors but proved very unpopular among depositors, who staged loud protests and proceeded to jam the courts with lawsuits against the banks and the government. Thousands of these suits have resulted in lower court and appeals court decisions favorable to individual depositors, who have subsequently obtained restitution from their banks. The banks, however, have not obtained restitution from the government.

By introducing a costly exchange-rate mismatch into the balance sheets of banks, however, this government decision--so-called asymmetric pesification-- effectively rendered the banking system insolvent. Banks subsequently had to be recapitalized via the large-scale issuance of government bonds provided to them in compensation, thereby increasing the level of post-default public debt. A hefty amount of government bonds was also issued to compensate depositors for the freezing and subsequent rescheduling of their deposits, although at least these bonds generated an offsetting contingent asset for the government, because banks were obligated to gradually reimburse the government in lieu of meeting customer withdrawals.

FROM ROGUE CREDITORS TO ROGUE DEBTORS:..., 6 Chi. J. Int'l L. 311

The third decision involved the central government's takeover of liabilities incurred (including currencies issued) by provincial governments in prior years as part of a fiscal cleanup and consolidation process. This too led to a substantial postdefault increase in the public debt, and likewise to an offsetting asset, because the provinces agreed to reimburse the central government over time. In a related move, government bonds were also issued in 2002-03 to settle previously contingent liabilities with pensioners, civil servants, victims of human rights abuses, and the like.

**\*319  Figure 1: Evolution of Argentina's public debt during 2002-03 ($ billions)**

| | |
|---|---:|
| As of 31 Dec 2001 | 144.45 |
| Forced debt conversion to pesos | -22.09 |
| Bonds issued to banks | 8.30 |
| Bonds issued to bank depositors | 6.09 |
| Bonds issued on behalf of provinces | 12.11 |
| Inflation adjustment of new bonds | 7.33 |
| Other assorted bonds issued | 2.51 |
| Subtotal | 14.24 |
| Interest arrears on defaulted debt | 13.94 |
| Other transactions | 6.19 |
| As of 31 Dec 2003 | 178.82 |

Source: Ministry of Economy of Argentina

The end result of these government decisions was that the stock of performing public debt, which could have fallen by $22.1 billion during 2002-03 in the wake of the forced currency redenomination, ended up being increased by $14.2 billion--a $36.3 billion difference equivalent to about half of the postdefault performing public debt, and to a whopping 31 percent of the 2002-03 average GDP. In partial compensation, the government would accumulate $11 billion in financial assets by the end of 2003, derived from claims on banks and provincial governments on whose behalf the new debt had been issued. The banks and provincial governments are reimbursing the central government for these liabilities, and the provincial obligations are secured by a pledge of tax revenues that the provinces receive from the central government as part of the existing revenue-sharing scheme. The government's financial assets would reach $21 billion by late 2004, and come to include more than $6 billion in cash (in foreign currencies) held by the National Treasury. However, the authorities would never offer to mobilize these assets, via their liquidation or securitization, for the purpose of improving the treatment of defaulted debt.

In the aftermath of the devaluation and default, the authorities also made an important decision that would greatly enhance the government's ability to service debt obligations. They imposed taxes upon exports, justifying them because exporters would otherwise reap too large of a windfall from the currency's sharp devaluation--even though exporters had suffered financially throughout the 1990s, during the country's hard-peso policy. The standard tax  **\*320**  for most products has ranged from 5 percent to 20 percent of FOB export values, with a supplement of 3-5 percent for certain commodities. These taxes on exports ended up yielding much more than initially envisioned because export earnings in dollar terms increased 15 percent in 2003 and an additional 16 percent in 2004, spearheaded by higher prices for fuel and soybean exports. Export earnings in 2004 reached a record of $34.5 billion, up from $26.6 billion in 2001, a 30 percent gain that translated into a 380 percent taxable increase in peso terms. Taxes on exports, which yielded a mere 50 million pesos in 2001 (equivalent to $0.05 billion), consequently generated more than 10 billion pesos by 2004 ($3.5 billion).

The quantum increase in tax revenues from exports has been accompanied by a generalized recovery of tax collections in the wake of the economy's strong upturn, with real GDP growth of 8.8 percent in 2003, and another 9.0 percent in 2004, following a cumulative GDP decline of 18.4 percent during 1999-2002. Indeed, tax revenues in 2004 were more than double their 2001 level, measured in pesos, although they were still more than one-fourth lower when translated into dollars at the managed exchange rate of 2.94 pesos per dollar on average for 2004. Indeed, the authorities have been keeping the peso purposely undervalued during the past couple of years to encourage the influx of dollars via a sizable foreign trade surplus. They have ensured its artificial weakness by purchasing excess dollars from the foreign exchange market through daily interventions, and to such an extent that official international reserves rose to $20 billion by the end of 2004, a near doubling from their 2002 year end level ($10.5 billion). Had the central bank allowed the exchange rate to be set by market forces, the Argentine currency

would probably have traded closer to 2.50 pesos per dollar during 2004. Therefore, a less artificial currency regime would have allowed for swollen tax revenues in pesos to be worth almost 85 percent of their predefault levels, once translated into dollars at a realistic exchange rate.

**\*321  Figure 2: Evolution of Argentine tax revenues**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
\* At the likely market exchange rate of 2.50, rather than the managed average exchange rate of 2.94 pesos per dollar.

Source: Ministry of Economy of Argentina, author's calculations.

The very strong performance of Argentine tax revenues since the default means that the government's ability to meet its obligations to bondholders and other creditors, which had been so seriously compromised by the peso's devaluation, has been substantially restored. At the end of 2001, the public debt net of financial assets stood at $135 billion, and this was equivalent to about 270 percent of total revenues and 50 percent of GDP. One year later, it had declined to $130 billion, but because of the devaluation's impact upon peso-based revenues and GDP, the net public debt had now surged to the equivalent of nearly 725 percent of revenues and 130 percent of GDP. By the end of 2004, however, even though the net debt had increased to $168 billion as a result of the aforementioned decisions made by the government, the debt was now equivalent to around 400 percent of revenues and less than 100 percent of GDP (at the likely market exchange rate), with official and private forecasts pointing to still lower ratios in 2005. If the government had not issued all the new debt that it did after the default, the net debt-to-revenues ratio at the end of 2004 would already have dropped below 350 percent, and the net debt-to-GDP ratio would be close to 80 percent.

**\*322  Figure 3: Evolution of Argentina's net public debt\***

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
\* Including interest arrears at contracted rates.

\*\* At the likely market exchange rate of 2.50, rather than the managed average exchange rate of 2.94 pesos per dollar.

Source: Ministry of Economy of Argentina, author's calculations.

These are very high but not necessarily unmanageable ratios, depending upon the maturity structure and interest burden of the debt. For example, countries ranging from Egypt and Israel to India, Indonesia, and Pakistan, all have ratios of net public debt to revenues of around 200-450 percent, and ratios of net debt to GDP within the range of 80-95 percent. Moreover, one of Argentina's neighbors, Uruguay, faced a similar degree of overindebtedness in 2002-03, following a ruinous recession and currency devaluation--plus a massive run on its banks--and yet it refused to dishonor its obligations to creditors. After holding informal consultations with many of its bondholders in early 2003, the government of Uruguay put forth a debt exchange solely for the purpose of extending maturities, which was agreed upon by more than 90 percent of bondholders. In the wake of a strong recovery of government revenues and real GDP, Uruguay's net public debt has since dropped to the equivalent of 80 percent of GDP and 300 percent of revenues. [16]

**\*323**  The Argentine government's overall approach to its default has been uncooperative, to say the least. While other sovereigns in financial trouble, including Argentina itself in the past, have actively sought to avoid an event of default or have acted promptly to cure any default, in this case the government has dragged its feet for more than three years and, adding insult to injury, has largely refused to recognize the interest arrears that its own delay generated.

Traditionally, sovereigns needing debt relief have followed one of two paths. The first is the negotiated route, whereby governments sit down to hammer out a debt-restructuring deal with a representative committee of either bondholders or commercial bankers, depending upon which group holds a majority of the claims on the sovereign. This is the typical approach followed by dozens of governments in recent decades, from Argentina in the early 1980s to Vietnam in the late 1990s. They all negotiated with a Bank Advisory Committee ("BAC") or so-called London Club (because most of the negotiating sessions took place either in London or in New York), in contrast to the so-called Paris Club of official creditors (which meets under the aegis of the French Treasury). The BAC would then recommend to other private creditors that they accept the terms agreed upon with the government in question, and most would usually do so. [17] Those unwilling to participate (e.g., small regional banks) would generally be paid out but with the understanding that they would not be welcome to do new business in that country.

The second route is the unilateral exchange offer, whereby governments engage commercial or investment banks to consult privately with a critical mass of lenders or investors about the possible shape of an acceptable settlement, which is then crafted and presented to all creditors on a take-it-or-leave it basis. These exchange offers are often accompanied by exit consents that encourage the participation of as many investors as possible by leaving nonparticipants in a disadvantageous position-- for example, with less liquid securities. This approach has become more popular in recent years and was used successfully by Pakistan (1999), Ecuador (2000), Ukraine (2000), and Uruguay (2003). In recognition that the ideal should not become the enemy of the good, if necessary, governments will then quietly pay off any recalcitrant creditors when their original claims fall due.

Argentina has followed neither path. The government appointed a financial advisor (Lazard Frères) in early 2003, but charged him solely with the task of developing a database of bondholders, presumably to enable them to be contacted in the future. Keeping bondholders informed, never mind engaged for the sake of a mutually agreeable solution, apparently was not a priority. The  *324  government dropped that firm in early 2004 and retained the services of three major investment banks (Barclays Capital, Merrill Lynch, and UBS) to become the eventual joint deal managers of its January 2005 debt-restructuring offer. It quickly became apparent that these firms would likewise not be engaging in a dialogue with the investor base on behalf of the Argentine government.

The authorities also refused to follow the other, more historical approach of encouraging the formation of a bondholders' committee with which to consult and negotiate a debt restructuring. Moreover, the government failed to recognize-- never mind negotiate with--such a committee, the Global Committee of Argentina Bondholders ("GCAB"), once it was formed on the initiative of a large portion of disgruntled bondholders residing in Europe, Japan, and the United States. From time to time during 2003-04, the government held some perfunctory briefings for bondholders, but the outline of what would become its debt relief proposal, unveiled in Dubai in September 2003 (at the joint annual meeting of the IMF and World Bank), was developed unilaterally. This proposal, which called for what was estimated to be debt forgiveness equivalent to as much as 90 percent of contracted amounts on a net present value ("NPV") basis and which ignored all past due interest, was widely denounced by bondholder representatives. The government justified it by making reference to a debt sustainability model it had developed that quantified ability to pay over a long period on the basis of multiple economic assumptions, including the fiscal savings it was willing to generate. The model would never be updated to reflect the overperformance of fiscal revenues and other crucial economic parameters in 2004, or to incorporate the government's bulging financial assets, both at the National Treasury or at the Central Bank of Argentina. Indeed, it would never become part of its prospectus as filed with the Securities and Exchange Commission and its counterparts around the world.

The Dubai proposal served as the basis for the concrete debt restructuring proposal put forth, likewise unilaterally, 15 months later (January 2005), which was estimated to involve debt relief of about 70 percent on an NPV basis. The major improvement made on Argentina's part was the willingness to backdate to December 31, 2003 the new bonds to be issued in exchange for the defaulted ones, implicitly recognizing past due interest starting from that date, although recalculated at very low rates and capitalized in part. Interest arrears were not recognized at all for the preceding twenty-four months (2002-03), whether calculated at contractual or lower interest rates. The rest of the improvement was delivered exogenously by the financial markets, because

an intervening rally in high yield and emerging-market bonds greatly narrowed the discount applied to similar "junk bonds," thereby reducing the so-called exit yields used to calculate NPVs.

Specifically, the government proposed that bondholders tender their existing 152 bonds, no matter their original maturity date, coupon, or currency **\*325** denomination, for any of three new securities. The first choice was a limited amount of Par bonds payable in dollars, euros, or Argentine pesos, involving no "haircut" on principal but a very low interest rate (as little as 1.33 percent on US dollar bonds for the first six years, rising to 5.25 percent after 25 years, and correspondingly less on euro and peso-denominated bonds, although the latter are adjusted for inflation); a long grace period (26 years); and a final maturity in 2038 (35 years). The second choice was a limited amount of Cuasi-Par bonds, issued to those willing to accept a 30.6 percent "haircut" on principal, that are payable only in Argentine pesos adjusted for intervening inflation through final maturity. They come with a low coupon (3.31 percent) also payable in pesos, a very long grace period (33 years), and a final maturity in 2046. And the third choice was an unlimited amount of Discount bonds, denominated in dollars, euros, or pesos, issued to those accepting a 66.3 percent "haircut" on principal, but paying a higher interest rate (part of it capitalized, beginning at 4 percent and rising to 8.28 percent on dollar bonds, less on euros and pesos, although the latter are adjusted for inflation). They have a long grace period (21 years) and a final maturity in 2034. Bondholders were also offered a free option on Argentina's future growth outperformance via a security linked to the country's real GDP, such that economic growth exceeding 3 percent in any one year after 2004, and somewhat higher between 2006 and 2014, would trigger a small, additional interest payment.

Argentina's demand for such massive debt relief was without precedent in its own checkered financial history. It can only be compared with the relief obtained by much poorer countries (for example, Albania in 1995, Bolivia in 1992, Guyana in 1999, Niger in 1991, and Yemen in 2001), but in these cases the sums involved have been far smaller and the creditors involved have been commercial bank lenders rather than bondholders. The proposed transaction was also unparalleled in various other respects. First, it did not recognize interest arrears nor treat them preferentially, as has always been the custom. Second, it failed to include an upfront payment to clear a portion of the arrears, a common "sweetener" to ensure success. Third, it was not accompanied by the usual reassuring endorsement--never mind backed with financial support-- from the IMF or other multilateral agencies. Fourth, it did not aim for anywhere near 100 percent participation, which is the traditional objective, nor did it set a high level of participation (say, 85 percent or 90 percent) as a required minimum for the transaction to proceed.

In fact, when launching the debt restructuring proposal, Finance Minister Roberto Lavagna went so far as to say that the government would regard any participation rate above 50 percent as having effectively cured the country's default. The clear implication was that even if nearly half of all bondholders failed to accept the terms of the ruinous debt exchange, they would be ignored. To ensure the message was heard loud and clear, three weeks into the **\*326** transaction (in early February 2005) the government sent a draft law to the legislature forbidding the Executive from reopening the debt exchange in the future and engaging in any transaction with bondholders arising from any court order or otherwise. [18] The law was passed within one week.

### Figure 4: Comparison of recent sovereign debt restructurings

|  | ARGENTINA 2005 | ECUADOR 2000 | PAKISTAN 1999 | RUSSIA 1998-2000 | UKRAINE 1998-2000 | URUGUAY 2003 |
|---|---|---|---|---|---|---|
| Per Capita Income ($)* | 11,586 | 3,363 | 1,826 | 6,592 | 3,841 | 8,280 |
| Scope ($ Billions) | 81.8 | 6.8 | 0.6 | 31.8 | 3.3 | 5.4 |
| Number of Bonds | 152 | 5 | 3 | 3 | 5 | 65 |
| Jurisdictions Involved | 8 | 2 | 1 | 1 | 3 | 6 |
| Months in Default | 38+ | 10 | 2 | 18 | 3 | None |
| Minimum Participation Set | No | Yes | Yes | Yes | Yes | Yes |
| Recognition of Interest Arrears | Partial | Yes | Yes | Yes | Yes | N/A |
| Principal Forgiveness | Yes | Yes | No | Yes | No | No |
| 'Haircut' on Discount Bond (%) | 66.3 | 40 | 0 | 37.5 | 0 | 0 |
| Lowered Coupons | Yes | No | Yes | No | Yes | No |

FROM ROGUE CREDITORS TO ROGUE DEBTORS:..., 6 Chi. J. Int'l L. 311

| | | | | | | |
|---|---|---|---|---|---|---|
| Extended Maturities | Yes | Yes | Yes | Yes | Yes | Yes |
| Participation Rate (% of Eligible) | 76 | 97 | 95 | 98 | 95 | 93 |

Note: N/A stands for not applicable.

*Adjusted for purchasing power; latest (2003) data for Argentina, otherwise data corresponds to year(s) of debt restructuring as noted.

Source: IIF, IMF, World Bank, author's calculations.

### III. Dealing with a Rogue Debtor

What is to be done in the case of a sovereign debtor who refuses to honor its debt obligations, even though a strong case can be made that it has regained the financial wherewithal to do so? In line with experience in decades past, the bondholders that within the past couple of years have filed suit against **\*327** Argentina in various jurisdictions have found that seeking remedy in the courts against a sovereign is, for the most part, a fruitless endeavor.

By the close of 2004, nearly 40 individual lawsuits had been filed in New York (specifically, before Judge Thomas P. Griesa in the US District Court for the Southern District of New York) seeking repayment of Argentina's obligations, and judgments in favor of plaintiffs had been entered in seven cases entailing some $740 million. In addition, more than a dozen class action lawsuits had been filed against the Argentine government, and one of the plaintiffs had been granted the motion to certify its complaint involving two series of bonds with a face value of about $3.5 billion. The government, however, represented to the court that it had no assets in the United States used for a "commercial activity," such as would provide a legal basis for an attachment or execution under the Foreign Sovereign Immunities Act.

In Italy, there were a half dozen bondholder proceedings against Argentina pending in the courts, involving relatively small amounts, and while no final decisions had been rendered, some judges ordered payment and ordered the freezing of certain assets. However, the Argentine government was challenging these actions on the grounds that it enjoys sovereign immunity. In any case, under Italian law, any claims against Argentina would only be executable against assets not used for "public purposes." In Germany, by late 2004, more than 100 legal proceedings had commenced claiming the euro equivalent of less than $100 million, and several prejudgment "arrest" (attachment) orders had been rendered against the Argentine government. Argentina was disputing each payment order claiming a "state of necessity," and although some of the orders were enforceable, all cases had been suspended awaiting a decision by the German Constitutional Court on whether such a state indeed excused a deferral of debt service.

Dealing with a rogue sovereign debtor requires, in actual practice, the political willingness of other sovereign states to confront the errant nation, whether directly or through a supranational body such as the IMF. It is only the international community that can exercise the kind of diplomatic pressure and put forth the financial incentives and disincentives to motivate a rogue sovereign debtor to come to terms with its private creditors in a fair and responsible manner. It is unfortunate that in the case of Argentina the G-7 governments for the most part have not been willing to stand up and be counted.

To begin with, the international community has been providing a safe harbor for Argentina's hard currency assets. Indeed, a sizeable proportion of the government's and central bank's foreign exchange holdings reportedly have been deposited at the Bank for International Settlements ("BIS"), the Basle-based central banks' central bank, where they are out of attachment range. This is because the BIS has been granted various immunities in Switzerland and other jurisdictions, the main purpose of which, as the BIS itself proudly advertises in **\*328** its website, "is to protect central bank assets held with the BIS from measures of compulsory execution and sequestration, and particularly from attachment." [19] The welcome mat put out for a rogue sovereign debtor such as Argentina by the (exclusively sovereign) shareholders of the BIS thus stands in awkward contrast to

the contemporary willingness of the international community to trace and recover the ill-gotten gains of Third World despots--even when they are on deposit in numbered Swiss bank accounts.

Moreover, the international community has been supportive of Argentina via a series of new loans granted by the IMF, the World Bank and the Inter-American Development Bank, especially during 2003 and the first half of 2004. Indeed, in January 2003, the IMF agreed to extend a loan facility worth almost $3 billion to enable the Argentine government to cover debt service payments coming due to the Fund and, in September of that year, it opened another such window, but this time worth more than $13 billion, to help offset debt service payments during 2004-06. Simultaneously, the other multilateral development agencies opened up sizeable lines of credit for Argentina, and proceeded to disburse funds. All told, the multilateral agencies disbursed to the government of Argentina the sums of $600 million in 2002, $10.2 billion in 2003, and $4.1 billion in the first semester of 2004. [20]

This official financial support has been subject to a variety of conditions agreed to by the Argentine government, involving fiscal policy targets and structural reforms. [21] Blatant failure to make progress on these reforms eventually prompted the IMF to stop disbursing funds in August 2004, whereupon the government has nonetheless continued to make debt service payments to the Fund. Whatever tough message the IMF's halt to new lending was intended to deliver was blunted, however, by subsequent decisions on the part of the other **\*329** multilateral agencies to continue to support Argentina financially. For instance, in November 2004, the board of directors of the Inter-American Development Bank voted unanimously to approve a multi year, $5 billion package of loans to the government; in December, the World Bank approved a $200 million loan for the upgrading of infrastructure in Buenos Aires province--in other words, business as usual.

There are grounds for questioning the propriety, never mind the wisdom, of this postdefault multilateral lending to Argentina. The IMF, in particular, has had a policy of lending to a government in default of financial obligations to private creditors only when it is pursuing "appropriate policies" and when it is making "a good faith effort to reach a collaborative agreement with its creditors." Meeting in early September 2002 in the wake of Argentina's default, the board of directors of the IMF reiterated and elaborated on this "good faith criterion," spelling out that governments were expected to "provide creditors with an early opportunity to give input on the design of restructuring strategies and the design of individual instruments," and that when a representative committee of creditors has been formed, that they would "enter into good faith negotiations with this committee." [22] In its negotiations with the IMF, in fact, the Argentine government openly committed to engage in a "collaborative dialogue with its creditors" (September 2003) and to begin "meaningful and constructive negotiations" with creditor groups, including with GCAB (March 2004). However, the government never engaged in any such dialogue or negotiations, as detailed in a position paper by GCAB, and the government's eventual debt restructuring proposal did not reflect any input from this large bondholders' group. [23]

Argentina also won an important gesture of political support in the US courts--specifically, in the form of amicus curiae briefs filed by none other than the US government and the Federal Reserve Bank of New York, in January 2004. The Argentine government had sought a declaratory judgment from Judge Griesa (of the Southern District of New York) to the effect that several of its creditors in pending cases should not be permitted to use a broad interpretation of the pari passu clause to enforce their judgments, for instance, by preventing the country from making payments to creditors such as the IMF. The plaintiffs had countered, among other things, that they had not sought and did not intend **\*330** to seek such enforcement action, such that Argentina's request was premature. However, the authorities in Buenos Aires were evidently successful in persuading high-ranking US authorities that there was a clear and present danger to the international payments system from the potential application of this clause, which had been used by creditors against the governments of Peru and Nicaragua. [24] In any event, the plaintiffs prevailed on their procedural argument, but there is little doubt that the US and Federal Reserve "statements of interest" were interpreted in Buenos Aires as a green light to proceed with a hard line stance against bondholders.

The willingness of US authorities to accommodate Argentina in 2004 stands in marked contrast to their willingness to confront a defaulting sovereign two decades earlier. At the time, Costa Rica had experienced a financial crisis, and because of the

imposition of exchange controls prohibiting the servicing of obligations to foreign creditors, three state-owned banks had defaulted on a syndicated loan. A federal district court denied a motion for summary judgment against Costa Rica, and on appeal the Second Circuit initially agreed that the suit should not be heard on grounds of comity. [25] However, the Justice Department submitted an amicus brief explaining that the unilateral imposition of exchange controls by Costa Rica was inconsistent with US policy and that the underlying obligations to pay remained valid and enforceable. Upon rehearing, the Second Circuit reversed itself, [26] opening the door to limited creditor litigation against sovereigns and setting a standard that US courts would adhere to throughout the 1980s and 1990s. [27]

The most recent way that the G-7 governments have winked in Argentina's direction is by failing to insist, either from the start or even late in the game, upon overwhelming acceptance of whatever debt restructuring proposal the country would put forth to its creditors. That would have put pressure on Buenos Aires to come up with a less punishing proposal, or to have added some last minute "sweeteners" to maximize bondholder acceptance. The IMF, in particular, carefully avoided setting a minimum participation rate it would consider acceptable for its own purposes, although privately it had earlier signaled that acceptance "in the high 80s" would be desirable. Evidently, its major shareholders have wanted to retain the right to recognize a restructuring **\*331** that was far less successful than all prior ones, possibly in order to resume the Fund's lending program later this year and keep Argentina from defaulting on its obligations to the multilateral agencies. In so doing, however, the G-7 governments passed up an opportunity to show what Michael Mussa has called "principled leadership" in dealing with Argentina. [28]

### IV. Implications

The case of Argentina suggests that much of the academic and policy making literature has ignored the realistic possibility that rogue sovereign debtors, rather than rogue private creditors, are the ones that pose the greatest threat to the integrity and efficiency of the international financial architecture.

The country's actions in the wake of its gigantic default have also exposed the limitations of the customary Eurobond offering circulars, brimming as they are with legal clauses supposedly spelling out the enforceable rights of investors vis-à-vis sovereigns willing to waive their customary immunity. The fact remains that it is exceedingly difficult to collect from a sovereign deadbeat.

The sad truth is that only other governments, rather than even the best organized group of bondholders, can hope to rein in a wayward sovereign debtor and persuade it not to walk away from its lawful obligations. And yet, as has been made clear in various ways, the G-7 governments, and particularly the George W. Bush administration, have not been willing to confront the authorities in Buenos Aires.

The very harsh way that Argentina has dealt with its bondholders, despite the substantial recovery of its ability to service its contractual obligations, has set a troubling precedent for other sovereign debtors in future financial straits. While it is unlikely that emerging market governments will want to drive their economy into the ground any time soon in order to plead for debt relief on an Argentine scale, international financial conditions will not always be as benign as they are nowadays. There will surely be global liquidity and economic downturns in the future, and some governments will run out of cash. When they do, the precedent that Argentina is setting will surely come back to haunt the international financial community.

As concerns the implications of Argentina's stance for the country's own economic future, chances are that the losses that foreign portfolio and direct investors have incurred there will poison the business climate for many years to come. This does not mean that the pace of economic activity will grind to a halt. **\*332** Just like it took many years for the nationalist, populist policies of General Juan Domingo Perón to reveal their insidious economic and social downside, it will probably take many years for the current, neonationalist, neopopulist policies to bear rotten fruit. After all, the tens of billions of dollars that foreign investors poured into Argentina during the 1990s did allow for a major modernization of the country's infrastructure and productive base that will not be undone anytime soon.

Footnotes

a1    Written while the author was Head of Emerging Markets Sovereign Research, ABN AMRO; Visiting Professor of Economics, Williams College; and Adjunct Professor of Economics, New York University.

1    See Morris Goldstein and Philip Turner, Controlling Currency Mismatches in Emerging Markets 63-76 (Inst Intl Econ 2004) (arguing that currency mismatches lie at the heart of many financial crises).

2    By late 2001, only 3 percent of the total public debt, and a mere 2 percent of total government bonds, were denominated in Argentine pesos. See Arturo C. Porzecanski, Dealing with Sovereign Debt: Trends and Implications, in Chris Jochnick and Fraser Preston, eds, Sovereign Debt at the Crossroads (Oxford forthcoming).

3    Among the earliest contributors to the literature along this line (in the 1980s) were Christopher Oechsli, an attorney, and Jeffrey Sachs, the well-known economist. See Kenneth Rogoff and Jeromin Zettelmeyer, Bankruptcy Procedures for Sovereigns: A History of Ideas, 1976-2001, 49 IMF Staff Papers 470, 472-76 (2002) (describing the early literature, including the contributions of Christopher Oechsli and Jeffrey Sachs).

4    See Anne O. Krueger, A New Approach to Sovereign Debt Restructuring 8 (IMF 2002) (emphasis added).

5    See Barry Eichengreen, Restructuring Sovereign Debt, 17:4 J Econ Perspectives 75 (2003).

6    See IMF, Progress Report to the International Monetary and Financial Committee on Crisis Resolution (Sept 28, 2004), available online at <http:// www.imf.org/external/np/pdr/cr/2004/eng/092804.htm> (visited Mar 26, 2005) (explaining the history and usage of collective action clauses).

7    See, for example, Sergio J. Galvis, Sovereign Debt Restructurings-- The Market Knows Best, 6 Intl Finance 145 (2003) (providing the perspective of a practicing attorney); see also Arturo C. Porzecanski, A Critique of Sovereign Bankruptcy Initiatives, 38 Bus Econ 39 (2003) (providing the perspective of an economist in the financial industry).

8    See Nouriel Roubini and Brad Setser, Bailouts or Bail-ins?: Responding to Financial Crises in Emerging Economies 167 (Inst Intl Econ 2004).

9    See generally Arturo C. Porzecanski, The Constructive Role of Private Creditors, 17 Ethics & Intl Aff 18 (2003).

10    See HIPC Debt Relief: Which Way Forward?, Hearing before the Subcommittee on Domestic and International Monetary Policy, Trade and Technology of the House Committee on Financial Services, 108th Cong, 2d Sess (Apr 20, 2004).

11    For a perspective that puts the Paris Club in a more favorable light, see Roubini and Setser, Bailouts or Bail-ins? at 256-63 (cited in note 8).

12    See Institute of International Finance, Principles for Private Sector Involvement in Crisis Prevention and Resolution 4-5 (2001), available online at <http://www.iif.com/press/pdf/psi0101.pdf> (visited Mar 26, 2005) (discussing the importance of consultations with key investors and lenders).

13    As of June 30, 2004, four countries (Iraq, Liberia, Seychelles, and Zimbabwe) were in arrears to the World Bank; as of April 30, 2004, four countries (Iraq, Liberia, Somalia, and Sudan) were in arrears to the IMF.

14    See Porzecanski, Dealing with Sovereign Debt 18-19 (cited in note 2).

15    It also lowered the burden of debt-service payments, because the new peso-denominated bonds carried coupons of as low as 2 percent per annum, although principal was subject to adjustments for future inflation.

16    The above statistics were obtained from Standard & Poor's, Sovereign Risk Indicators: General Government Finance Data (Dec 30, 2004), available to subscribers of S&P's RatingsDirect service (on file with author).

17    See Lex Rieffel, Restructuring Sovereign Debt: The Case for Ad Hoc Machinery 95-131 (Brookings Inst 2003) (explaining the London Club process).

18 The law also mandated the government to do everything in its power to delist all bonds not tendered into the exchange, and to unilaterally exchange all bonds tied up in litigation against Argentina into new Par bonds denominated in pesos and maturing in 2038.

19 See BIS as a bank for central banks, available online at <http:// www.bis.org/banking/bisbank.htm> (visited Mar 26, 2005). In any case, under the US Foreign Sovereign Immunities Act, Pub L No 94-583, 90 Stat 2891 (1976), codified at 28 USC §§ 1330, 1332(a), 1391(f), 1441(d), 1602-1611, the property of a foreign central bank held for its own account is immune from attachment or execution in the absence of a waiver of immunity.

20 These disbursements totaling almost $15 billion did not fully offset some $18.7 billion in principal payments to the multilateral agencies, never mind interest payments worth $4.2 billion. However, prior to 2002, the agencies had already built up a loan exposure in excess of $32 billion to Argentina, and the IMF had become the government's single largest creditor, with $14 billion outstanding.

21 Among the reforms desired was the renegotiation of public utility rates, which for the most part remained frozen during 2002-04, causing financial damage to the foreign-owned companies that generate and distribute electricity, water, natural gas, and other essential services. By the end of 2004, these companies had filed about 30 claims before the International Center for the Settlement of Investment Disputes ("ICSID"), alleging that various government measures violated contracts and effectively expropriated their investments without adequate compensation, going against the standards set forth in investment treaties to which Argentina is a signatory.

22 IMF, IMF Board Discusses the Good-Faith Criterion under the Fund Policy on Lending into Arrears to Private Creditors, Public Information Notice No 02/107 (Sept 24, 2002), available online at <http:// www.imf.org/external/np/sec/pn/2002/pn02107.htm> (visited Mar 26, 2005).

23 See Global Committee of Argentina Bondholders (GCAB), The Importance of and the Potential for the Expeditious Negotiation of a Consensual and Equitable Restructuring of Argentina's Defaulted Debt (Aug 3, 2004), available online at <http://www.gcab.org/ images/GCAB_White_Paper_Final.pdf> (visited Mar 26, 2005).

24 For an exhaustive background on this clause, authored by two attorneys with the firm that has acted as counsel to the governments of Peru, Nicaragua, and Argentina, see Lee C. Buchheit and Jeremiah S. Pam, The Pari Passu Clause in Sovereign Debt Instruments, 53 Emory L J 869 (2004).

25 Allied Bank International v. Banco Crédito Agrícola de Cartago, 733 F2d 23, 27 (2d Cir 1984).

26 See Allied Bank International v Banco Crédito Agrícola de Cartago, 757 F2d 516, 523 (2d Cir 1985).

27 See Jill E. Fisch and Caroline M. Gentile, Vultures or Vanguards?: The Role of Litigation in Sovereign Debt Restructuring, 53 Emory L J 1043, 1075-88 (2004).

28 Michael Mussa, Statement to the Senate Banking Subcommittee on International Trade and Finance Hearing on the Argentine Financial Crisis (Mar 10, 2004, revised Mar 22, 2004), transcript available online at <http:// www.iie.com/publications/papers/ mussa0304.htm> (visited Mar 26, 2005).

6 CHIJIL 311

---

**End of Document**      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "D"

# EXHIBIT "D"

APRIL 10, 2013

CREDIT POLICY

# Moody's
## INVESTORS SERVICE

SPECIAL COMMENT

Rate this Research »

Sovereign Defaults Series:
# The Role of Holdout Creditors and CACs in Sovereign Debt Restructurings

Table of Contents:

I. SOVEREIGN BOND RESTRUCTURINGS
HAVE GENERALLY BEEN RESOLVED
QUICKLY                                    3
II. HOLDOUTS HAVE NOT PRESENTED
SIGNIFICANT PROBLEMS                       8
III. CACS AND EXIT CONSENTS HAVE
PLAYED A SIGNIFICANT ROLE IN BOND
EXCHANGES                                 11
IV. CONCLUSION                            13
REFERENCES                                14
MOODY'S RELATED RESEARCH                  16
APPENDIX: SOVEREIGN BOND
EXCHANGES SINCE 1997 - DEBT
EXCHANGE DETAILS AND INVESTOR
LOSSES                                    17

Analyst Contacts:

NEW YORK                    +1.212.553.1653

Elena Duggar              +1.212.553.1911
Group Credit Officer - Sovereign Risk
elena.duggar@moodys.com

Richard Cantor            +1.212.553.3628
Chief Credit Officer
richard.cantor@moodys.com

Bart Oosterveld           +1.212.553.7914
Managing Director - Sovereign Risk
bart.oosterveld@moodys.com

Creditor litigation in the case of Argentina is drawing attention to the role of holdout creditors in sovereign debt restructurings. At the same time, in order to facilitate sovereign debt exchanges, the European Stability Mechanism (ESM) Treaty is mandating that Collective Action Clauses (CACs) be introduced into euro area bond contracts. Despite the ongoing discussion in the capital markets and the extensive theoretical literature on the subject, empirical evidence on sovereign debt litigation and the effect of CACs is scarce. In this report, we survey the 34 sovereign bond exchanges since 1997 and examine the role of holdout creditors, CACs, and exit consent clauses in them.[1] Our findings include:

» Sovereign bond restructurings have generally been resolved quickly, without severe creditor coordination problems, and involving little litigation.

» On average, sovereign bond restructurings closed 10 months after the government had announced its intention to restructure and 7 months after the start of negotiations with creditors.

» Of the 34 sovereign bond exchanges since 1997, only two have been affected by holdout creditors – the exchanges of Argentina in 2005 and Dominica in 2004. Holdouts did not impact the recent large Greek debt exchanges.

» A high level of participation in sovereign bond restructuring offers has been the norm outcome: creditor participation averaged 95%. The only exchanges with lower participation rates were those of Argentina and Dominica, where the realized participation rates were 76% and 72% respectively immediately after the exchange. Later on, however, participation rates increased to 93% in Argentina and close to 100% in Dominica.

» About 35% of sovereign debt exchanges relied on using CACs or exit consents included in the bond contracts in order to bind a larger share of creditors in the restructuring.

The creditor coordination problem has been one of the most widespread concerns about sovereign debt restructurings in the modern era of bond finance, both in terms of coordinating potentially thousands of bondholders to agree on a restructuring proposal in a timely fashion, and in terms of free rider incentives. Creditor coordination problems have also motivated a large body of theoretical work in the sovereign debt literature.

---

[1] This comment does not represent a legal opinion or interpretation but summarizes our views on the potential credit implications in light of the structure of sovereign bond contracts and past experience with sovereign restructurings. The author would like to thank Rodrigo Olivares-Caminal and Lee Buchheit for valuable comments. The views in this report as well as remaining errors are responsibility of the author.

Our analysis of the 34 sovereign bond restructurings over the past decade and a half shows that concerns over coordination problems are exaggerated. In most cases, a bondholder committee was formed within a reasonably short time frame and negotiations over the restructuring were concluded relatively quickly, even though almost half of debt exchanges involved a dispersed creditor structure.

We find that concerns about free rider problems are exaggerated as well. Among the 34 sovereign bond exchanges, in only two cases did holdout creditors represent more than 10% of the value of outstanding bonds and only one case – that of Argentina – resulted in persistent litigation. Moreover, the case of Argentina was and remains unique in its unilateral and coercive approach to the debt restructuring.

Two strategies have been employed in order to bind non-participating investors in sovereign debt exchanges – the use of CACs in order to amend the payment terms of bonds and the use of exit consents to amend non-payment terms. In bonds issued under New York law, CACs became popular after 2003 as an alternative to the top-down administered mechanism for sovereign debt restructuring (SDRM) suggested by the IMF. They are currently commonly included in almost all New York law issuances. CACs originated in English law bonds in 1879. English law bonds at least since the 1990s have typically contained "modification clauses" that enable bondholders to approve a restructuring in a vote that binds even dissenting bondholders. The modification clause in English law bonds requires between 18.75% and 75% voting thresholds,[2] compared to the 75% threshold typical of New York law CACs.

Starting in January 2013, the euro area has mandated the inclusion of CACs in all euro area bond issuances, as part of the Treaty establishing the European Stability Mechanism (ESM). The euro area CAC clause applies a 66.6% majority threshold to individual bond series and also includes a novel feature – an aggregate CAC across all bond series with a 75% majority threshold. In principle, the inclusion of CACs represents a weakening of bondholder rights, and to the extent that CACs increase the likelihood of a debt restructuring to the detriment of bondholders, they are credit negative for bondholders. In practice, however, the impact is likely only marginal.

The majority of euro area debt is issued under domestic law. Domestic law bonds can be restructured with an act of legislature or CACs can be retroactively inserted in domestic law bonds by an act of legislature, as was done in Greece in early 2012. For English law bonds, the impact will depend on whether the new CAC clause replaces an existing modification clause, which could have a majority threshold higher or lower than 66.6%; in the latter case, the new CAC might actually make a debt restructuring more difficult.

---

[2]   The 18.75% threshold could be reached in the case where a bondholder meeting does not reach a quorum and after a second meeting the quorum is ratcheted down.

## I. Sovereign Bond Restructurings Have Generally Been Resolved Quickly

Creditor coordination problems have motivated a large body of theoretical work in the sovereign debt literature. Creditor coordination has been one of the most widespread concerns about sovereign debt restructurings, especially in the modern era of bond finance which substituted the concentrated creditor structure of bank lending of the 1970s and 1980s with the dispersed creditor structure of bond financing of the 1990s and 2000s. It was feared that the dispersed bond ownership would create problems both in terms of coordinating potentially thousands of bondholders to agree on a restructuring proposal in a timely fashion, and in terms of free rider incentives.

Despite the large body of theoretical literature, empirical evidence on the subject is scarce. In this study, we examine the role of creditor coordination problems by analyzing the sovereign bond exchanges that have occurred over the past decade and a half.

### On average, sovereign bond exchanges were negotiated in 7 months

There have been 34 exchanges of sovereign bonds since 1997, including both Moody's-rated and unrated debt instruments. The exchanges have involved 20 sovereign governments, 9 of which performed several debt exchanges in a row -- either one after the other, or with several years in between the exchanges. Most recent were the debt exchanges announced by Belize and by Jamaica in February 2013.[3] Belize's 2013 exchange follows a previous debt exchange in February 2007; similarly, Jamaica's exchange follows a previous bond exchange in February 2010.

In Exhibit 1, we measure the length of time it took to negotiate each bond exchange. For each one, we note the date of:

» The initial announcement of the intent to restructure by the government. In some cases, this coincided with the date of missed payment on the debt instrument; in other cases, this coincided with the announcement of the first debt offer.

» The start of negotiations with creditors. In some cases, this was the date of the first exchange offer by the government.

» The formal announcement of the final exchange offer.

» The distressed exchange date, which is generally the date of closing of the exchange.

We find that contrary to widespread concerns, sovereign bond restructurings have generally been resolved quickly and without severe creditor coordination problems. On average, the exchanges closed 10 months after the government announcement of the intention to restructure and 7 months after the start of negotiations with creditors. The average exchange closed within 2 months of the launching of the final exchange offer.[4]

---

[3]   See Belize Debt Restructuring Fails to Resolve Credit Challenges, Belize debt restructuring: 2007 vs 2012, and Moody's downgrades Jamaica's government debt rating to Caa3, outlook stable.

[4]   Evidence presented in Benjamin and Wright (2009) suggests that restructurings of commercial loans have taken much longer to resolve, almost 8 years on average in their sample of foreign debt restructurings over the 1980-2004 period. Further, evidence presented in Trebesch (2008) (covering a different sample over the 1980-2006 period) also suggests that the average restructuring time was the shortest for the post-1998 period, during which bond debt was the main lending vehicle. Our findings are in line with Bi, Chamon and Zettelmeyer (2011), who develop a theoretical model to show why coordination failures have been rare in the recent decade.

EXHIBIT 1

## Sovereign Bond Exchanges Since 1997

| Initial Default Date | Country (NR = not rated at the time) | Distressed Exchange Details | Announcement of Restructuring (or Missed Payment) | Start of Negotiations/ First Offer | Final Exchange Offer | Distressed Exchange Date | Time to Closing of Exchange (Months) | | | In Default During the Bond Exchange? |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | From Initial Default | From Announcement | From Start of Negotiations | |
| Aug-1998 | Russia | LC debt (GKO and OFZ) | Aug-98 | Aug-98 | Mar-99 | May-1999 | 10 | 10 | 10 | yes |
| | Russia | FC debt (MIN FIN III) | May-99 | Nov-99 | Jan-00 | Feb-2000 | 19 | 10 | 4 | yes |
| | Russia | FC debt (PRIN and IAN) | Dec-98 | May-99 | Feb-00 | Aug-2000 | 25 | 21 | 16 | yes |
| Sep-1998 | Ukraine | LC T-bills held domestically | Aug-98 | Aug-98 | Mar-99 | Sep-1998 | n.a. | 2 | 2 | no |
| | Ukraine | LC T-bills held by non-residents | Aug-98 | Sep-98 | Sep-98 | Sep-1998 | n.a. | 2 | 1 | no |
| | Ukraine | FC Chase-Manhattan loan | Aug-98 | Aug-98 | Sep-98 | Oct-1998 | 1 | 3 | 3 | no |
| | Ukraine | FC ING bond and Merrill Lynch bond | May-99 | May-99 | Jul-99 | Aug-1999 | 12 | 4 | 4 | yes |
| | Ukraine | FC Eurobonds | Jan-00 | Jan-00 | Feb-00 | Mar-2000 | 19 | 3 | 3 | yes |
| Dec-1999 | Pakistan | Eurobonds | Jan-99 | Nov-99 | Nov-99 | Dec-1999 | n.a. | 12 | 1 | no |
| Aug-1999 | Ecuador | External debt | Aug-99 | Jun-00 | Jul-00 | Aug-2000 | 13 | 13 | 3 | yes |
| | Ecuador | FC domestic bonds | Sep-99 | Aug-00 | Aug-00 | Aug-2000 | 13 | 12 | 1 | yes |
| Mar-2000 | Cote d'Ivoire (NR) | Brady bonds | Apr-08 | Apr-08 | Sep-09 | Apr-2010 | 122 | 25 | 25 | yes |
| Nov-2001 | Argentina | Domestic debt | Nov-01 | Nov-01 | Nov-01 | Nov-2001 | 1 | 1 | 1 | no |
| | Argentina | External debt | Nov-01 | Sep-03 | Jan-05 | Feb-2005 | 40 | 40 | 18 | yes |
| Jun-2002 | Moldova | Eurobond | Jun-02 | Jun-02 | Aug-02 | Oct-2002 | 5 | 5 | 5 | yes |
| Jan-2003 | Paraguay (NR) | Domestic debt due in 2003-06 | Oct-03 | Oct-03 | Nov-03 | Jul-2004 | 19 | 10 | 10 | yes |
| May-2003 | Uruguay | LT FC bonds (external and domestic) | Mar-03 | Mar-03 | Apr-03 | May-2003 | n.a. | 3 | 3 | no |
| Jul-2003 | Nicaragua | CENI bonds FC-denom. payable in LC | Jun-03 | Jun-03 | Jun-03 | Jul-2003 | n.a. | 2 | 2 | no |
| | Nicaragua | CENI bonds FC-denom. payable in LC | Apr-08 | Apr-08 | Jun-08 | Jun-2008 | 60 | 3 | 3 | (yes) [1] |
| Jul-2003 | Dominica (NR) | LC bonds (domestic and external) | Dec-03 | Dec-03 | Apr-04 | Jun-2004 | 12 | 7 | 7 | (yes) [2] |
| H2-2004 | Cameroon (NR) | Domestic debt | | | | H1-2005 | 12 | | | yes |
| Dec-2004 | Grenada (NR) | Global bond and domestic debt | Oct-04 | Dec-04 | Sep-05 | Nov-2005 | 12 | 14 | 12 | yes |
| May-2005 | Dominican Rep. | International bonds | Apr-04 | Apr-04 | Apr-05 | May-2005 | 1 | 14 | 14 | no [3] |
| Dec-2006 | Belize | Private external debt | Aug-06 | Aug-06 | Dec-06 | Feb-2007 | 3 | 7 | 7 | no |
| Jul-2008 | Seychelles (NR) | External debt | Oct-08 | Mar-09 | Dec-09 | Jan-2010 | 19 | 16 | 11 | yes |
| Dec-2008 | Ecuador | Global bonds | Nov-08 | no neg. | Apr-09 | May-2009 | 6 | 7 | no neg. | yes |
| Feb-2010 | Jamaica | Domestic debt | Jan-10 | Jan-10 | Jan-10 | Feb-2010 | n.a. | 2 | 2 | no |
| Jan-2011 | Cote d'Ivoire (NR) | Treasury bills (short-term) | Jan-11 | Oct-11 | Oct-11 | Dec-2011 | 12 | 12 | 3 | yes |
| | Cote d'Ivoire (NR) | Eurobond coupon | Jan-11 | Oct-12 | Nov-12 | Nov-12 | 23 | 23 | 1 | yes |
| Nov-2011 | St. Kitts and Nevis (NR) | Domestic bonds and external debt | Jun-11 | Jul-11 | Feb-12 | Mar-2012 | 5 | 10 | 9 | yes |
| | St. Kitts and Nevis (NR) | Domestic loans (debt-land swap) | Jun-11 | Jul-11 | Apr-12 | Apr-2012 | 6 | 11 | 10 | yes |
| Mar-2012 | Greece | Greek and foreign law bonds | Jul-11 | Jul-11 | Feb-12 | Mar-2012 | n.a. | 9 | 9 | no |
| Sep-2012 | Belize | 2029 Superbond | Aug-12 | Aug-12 | Feb-13 | Mar-13 | 7 | 8 | 8 | yes |
| Feb-2013 | Jamaica | Domestic debt | Feb-13 | Feb-13 | Feb-13 | Feb-13 | n.a. | 1 | 1 | no |
| *Exchange Average* | | | | | | | *18* | *10* | *7* | |

Sources: Moody's, IMF country reports, Sturzenegger and Zettelmeyer (2005), and Díaz-Cassou, Erce-Domínguez and Vazquez-Zamora (2008).

Notes: Time is rounded to the month. [1] Payments suspended due to legal investigation. [2] Bonds under legal dispute. [3] In default on loans.

Further, Exhibit 2 plots the distribution of the time it took to close debt exchanges. We see that 30% of debt exchanges were closed within 2 months of the start of negotiations and over half of exchanges were closed within 4 months. Over 80% of debt restructurings were negotiated in 10 months or less.

EXHIBIT 2
**Time from Start of Negotiations with Creditors to Closing of the Exchange**



Source: Moody's.
Note: Based on the data in Exhibit 1.

**Delays were related to parallel restructurings of official debt and commercial loans**

Only 4 out of the 34 debt exchanges since 1997 took longer than a year to negotiate: the Dominican Republic's international bonds exchange of 2005 took 14 months, the Russian 2000 foreign debt exchange took 16 months, the Argentinean external debt exchange of 2005 took 18 months, and the Cote d'Ivoire's Brady bonds exchange of 2010 took 25 months. Apart from the case of Argentina, these delays had to do with the restructuring strategy and the parallel restructuring of official sector and commercial loan debt along with the restructuring of the bond instruments.

The delays in the restructuring of Cote d'Ivoire's Brady bonds were related to the country's emergence from war, the parallel restructuring of Paris Club debt, and the need for the country to reach milestones for the enhanced HIPC Initiative that unlocked the forgiveness of official sector debt.

Argentina's debt restructuring was somewhat unique in its unilateral and coercive approach. Russia, on the other hand, took an approach of conducting a specific debt workout for each defaulted type of debt, in effect conducting three consecutive rounds of debt exchanges between May 1999 and August 2000. Both Argentina's 2005 debt exchange and Russia's August 2000 debt exchanges involved very large losses for investors – 71% and 90% respectively, as measured by trading prices.

The Dominican Republic's 2005 exchange of its international bonds proceeded in parallel with the country's restructuring of its official debt and commercial loans. Thus, between April 2004 and October 2005, the Dominican Republic renegotiated its bilateral official debt with Paris Club creditors (involving two agreements), two series of international bonds, and its commercial loans debt with the London Club. The authorities' approach to the debt restructuring was considered transparent and cooperative.

**Restructurings in default took longer to negotiate**

As Exhibit 3 shows, the majority of sovereign bond exchanges, 65%, followed a payment default – that is, there was a missed interest or principal payment before or during the debt negotiations. Only in 35% of exchanges was the sovereign current on its debt repayments.

Those debt exchanges accompanied by default took twice as long to negotiate as those not accompanied by default. On average, the time from the start of negotiations with creditors to the closing of the debt exchange was 8 months for exchanges in default and 4 months for exchanges without a payment default.[5]

Limiting the sample to the events of default, on average debt exchanges took 18 months from the initial default event to closing of the exchange.

EXHIBIT 3

**Was the Debt Instrument in Default During the Negotiations of the Debt Exchange?**



No default
35%

Default before negotiations
53%

Default during negotiations
12%

*Source: Moody's.*
Note: Based on the data in Exhibit 1

**Creditor structure appears weakly correlated with the length of negotiations**

The vast majority of sovereign bond exchanges were negotiated relatively quickly, despite the fact that half of debt exchanges involved dispersed creditor structures. The vast majority of sovereign bond exchanges included consultations with bondholders and, in most cases, a bondholder committee was formed within a reasonably short timeframe and negotiations over the restructuring were concluded relatively quickly.

In fact, creditor structure appears weakly correlated with the length of negotiations: as Exhibit 4 shows, conditional on creditor structure, debt negotiations took on average 7 months (with standard deviation of 5.5) for exchanges with a dispersed creditor structure and 6 months (with standard deviation of 5.9) for exchanges involving a concentrated creditor structure. Moreover, there were a number of debt exchanges that involved dispersed creditor structure but still closed within 3 months of the start of negotiations.

The number of debt instruments involved in the exchange does not appear to have been decisive either; in fact, the average length of exchanges involving 6 or fewer debt instruments was 8 months, while the average length of exchanges involving multiple debt instruments (from 16 to over 300) was 6 months (Exhibit 4). Sovereign bond exchanges generally aimed to consolidate the number of outstanding instruments, which improved the instruments' trading liquidity.

---

[5]   This result is consistent with findings in Schumacher, Trebesch and Enderlein (2012) that preemptive restructurings without a payment moratorium are associated with a lower risk of litigation.

MOODY'S INVESTORS SERVICE

CREDIT POLICY

EXHIBIT 4
**The Average Length of Debt Negotiations Conditional on Creditor Structure and on the Number of Debt Instruments Being Exchanged**



*Source: Moody's.*
Note: Based on the data in Exhibits 1 and 8 and the Appendix. Equal number of observations in each category of creditor structure. 15 exchanges involved 6 or fewer debt instruments and 19 exchanges involved multiple debt instruments.

**The length of negotiations was related to the losses imposed on investors**

About half of debt exchanges in our sample involved domestic law bonds and half involved bonds issued under foreign law. Domestic debt exchanges seem on average to have been negotiated more quickly than exchanges involving bonds issued under foreign law. As Exhibit 5 shows, the average length of negotiations for domestic debt exchanges was 5 months (with standard deviation of 3.9), while the average length of negotiations for bonds issued under foreign law was almost 9 months (standard deviation of 6.9).

EXHIBIT 5
**The Average Length of Debt Negotiations Conditional on the Governing Law of the Majority of Bond Instruments**

EXHIBIT 6
**The Time to Negotiate vs. the Loss Imposed on Investors**



*Source: Moody's.*
Note: Based on the data in Exhibits 1 and 8 and the Appendix. 18 exchanges involved local law instruments and 17 exchanges involved instruments issued under foreign law.

Finally, as Exhibit 6 illustrates, there is about 40% correlation between the time it took to negotiate a debt exchange and the losses imposed on investors.[6] Further, there appears to be also some correlation between the size of the debt exchange and the time it took to negotiate the restructuring, but this correlation is much weaker at only about 16% (when the size of the debt exchange is measured in terms of percent of country's GDP).

## II. Holdouts have not presented significant problems

Our analysis of the 34 sovereign bond restructurings over the past decade and a half shows that concerns about free rider problems prove exaggerated as well.

### The average creditor participation rate was 95%

Exhibits 7 and 8 show the creditor participation rates realized in each of the sovereign bond exchanges since 1997. The average participation rate was 95% (including the recent 2013 debt exchanges of Belize and Jamaica).

Further, Exhibit 7 plots a histogram of the distribution of participation rates achieved in the various sovereign debt exchanges. We see that all cases but two had a participation rate of 90% or higher. Moreover, 74% of exchanges had a creditor participation rate of 95% or higher.

EXHIBIT 7
**The Distribution of Participation Rates in Sovereign Bond Exchanges Since 1997**





*Source: Moody's.*
Note: Based on the data in Exhibit 8.

In only two cases did holdout creditors represent more than 10% of the value of outstanding bonds. Dominica's debt exchange of June 2004 achieved a 72% participation rate and the exchange offer had to be extended several times because of low participation. Dominica's two bonds had a highly complex structure and were stripped and sold as derivative zero coupon bonds to a wide variety of regional investors. However, discussions with non-participating creditors continued while interest payments at terms of the restructuring were deposited in an escrow account. By 2012, the participation rate in the exchange was close to 100%.

---

[6]  This result is consistent with evidence presented in Schumacher, Trebesch and Enderlein (2012) that larger creditor losses are associated with higher likelihood of litigation against sovereign debtors in US and UK courts.

EXHIBIT 8

## Creditor Participation Rates and Legal Features of Sovereign Bond Exchanges Since 1997

| Initial Default Date | Country (NR = not rated at the time) | Distressed Exchange Date | Governing Law (Main) | Creditor Structure | Participation Rate | Included in Original Bonds? | CACs Used in Exchange? | Included in New Bonds? | Exit Consents Used? |
|---|---|---|---|---|---|---|---|---|---|
| Aug-1998 | Russia | May-1999 | Local law | Dispersed | 95% for residents, 88.5% for non-residents | no | no | no | no |
|  | Russia | Feb-2000 | Local law | Dispersed | 90% | no | no | no | no |
|  | Russia | Aug-2000 | English law | Dispersed | 99% | yes | no | no | no |
| Sep-1998 | Ukraine | Sep-1998 | Local law | Dispersed | 99% |  | no |  | no |
|  | Ukraine | Oct-1998 | Local law | Dispersed | 100% |  | no |  | no |
|  | Ukraine | Aug-1999 | Luxembourg and German law | Conc. for ING bond; Disp. for other | 100% (ING bond) and 50% (other) | partly | no | yes | no |
|  | Ukraine | Mar-2000 |  | Concentrated for majority of bonds | 99% | partly | no | yes | no |
| Dec-1999 | Pakistan | Dec-1999 | English law | Concentrated | 99% | yes | no | yes | no |
| Aug-1999 | Ecuador | Aug-2000 | NY law | Concentrated | 97% | no | no | no | no |
|  | Ecuador | Aug-2000 | Local law |  | very high |  | no |  | yes |
| Mar-2000 | Cote d'Ivoire (NR) | Apr-2010 | NY law | Concentrated | 99.98% | no | no | yes | yes |
| Nov-2001 | Argentina | Nov-2001 | Local law | Dispersed | very high |  | no | no | no |
|  | Argentina | Feb-2005 | 8 governing laws | Dispersed | 76.2% in 2005, plus 69.5% in 2010, totaling 92.6% (96% for domestic bondholders) | partly | partly | yes | yes |
| Jun-2002 | Moldova | Oct-2002 | English law | Concentrated | 100% | yes | yes | yes | n.a. |
| Jan-2003 | Paraguay (NR) | Jul-2004 | Local law | Dispersed | 96% |  | no |  | no |
| May-2003 | Uruguay | May-2003 | Local law most, NY law, English law, and Japanese law | Dispersed | 93% (98.1% domestic and 89.2% non-resident) | partly | yes | yes | yes, voluntary |
| Jul-2003 | Nicaragua | Jul-2003 | Local law | Concentrated | very high |  | no |  |  |
|  | Nicaragua | Jun-2008 | Local law | Concentrated | very high |  | no |  | no [1] |
| Jun-2003 | Dominica (NR) | Jun-2004 | English law | Dispersed | 72% (by 2012, reached close to 100%) | partly (external bonds) | no | yes | no |
| H2-2004 | Cameroon (NR) | H1-2005 | Local law | Dispersed | 94% for external |  | no |  | no |
| Dec-2004 | Grenada (NR) | Nov-2005 | NY law and local law | Concentrated | 97% | no | no | yes | yes |
| May-2005 | Dominican Rep. | May-2005 | NY law | Concentrated | 98.1% | no | yes | yes | no |
| Dec-2006 | Belize | Feb-2007 | NY law | Concentrated | 100% | yes | yes | yes | no |
| Jul-2008 | Seychelles (NR) | Jan-2010 | English law | Dispersed | 91% | yes | no |  | no |
| Dec-2008 | Ecuador | May-2009 | NY law | Concentrated | 99% | no | no | n.a. | no [2] |
| Feb-2010 | Jamaica | Feb-2010 | Local law | Concentrated | 96% | no | no | no | no |
| Jan-2011 | Cote d'Ivoire (NR) | Dec-2011 | Local law | Concentrated | 100% |  | yes |  | no |
| Nov-2011 | Cote d'Ivoire (NR) | Nov-12 | Local law | Concentrated | 100% |  | n.a. | n.a. | n.a. |
| Mar-2012 | St. Kitts and Nevis (NR) | Mar-2012 | Local law | Concentrated | 96.9% (100% for domestic) | yes | yes | n.a. | no |
|  | St. Kitts and Nevis (NR) | Apr-2012 | Local law | Concentrated | almost universal | n.a. | n.a. | n.a. | n.a. |
| Mar-2012 | Greece | Mar-2012 | Local law and some Foreign law | Dispersed | 96.9% (100% for domestic) | retroactively inserted | yes | yes | no |
| Sep-2012 | Belize | Mar-13 | NY law | Concentrated | 100% (CAC triggered after 86.2% part.) | yes | yes | yes | no |
| Feb-2013 | Jamaica | Feb-13 | Local law | Concentrated | 99% | no | no | no | no |
| Exchange Average |  |  |  |  | 95% |  |  |  |  |

Source: Moody's, IMF country reports, Sturzenegger and Zettelmeyer (2005), Díaz-Cassou, Erce-Domínguez and Vazquez-Zamora (2008), and Andritzky (2006).
Notes: [1] Each series of new bonds carried a "mandatory debt management" feature that required Dominica to retire from the market a specified percentage of the original principal amount of that series in each year. [2] Early redemption clause triggered.

The Argentinean debt exchange of February 2005 also garnered a low participation rate initially, of 76.2%. The debt exchange was later re-opened in June 2010 and with the additional participation by investors in 2010, the overall participation rate reached 92.6%.

Further, in August 1999 Ukraine's restructuring of the ING bond gathered full participation but the restructuring of the Merrill Lynch bond drew about 50% participation. However, the remaining part of the Merrill Lynch bond was later restructured as part of the subsequent March 2000 debt exchange, so the cumulative participation rate was higher.

Across all debt exchanges, there appears to be no systematic difference in the creditor participation rates in domestic law versus foreign law exchanges.

### Only one of the 34 sovereign debt exchanges resulted in persistent litigation

From the 34 sovereign bond exchanges, only one case – that of Argentina – resulted in persistent litigation.[7] However, the case of Argentina was and remains unique in its unilateral and coercive approach to the debt restructuring. Only a few other court cases have been filed over the years and they have generally not represented an obstacle to the conclusion of debt exchanges.

In a comprehensive study of creditor litigation, Schumacher, Trebesch and Enderlein (2012) surveyed lawsuits filed against debtor governments in US and UK courts between 1976 and 2010. For our sample of bond defaults since 1997, the survey finds lawsuits filed by 47 different plaintiffs in the case of Argentina after the 2002 default, 1 lawsuit filed in the case of Dominica in 2005, 1 lawsuit filed in the case of Ecuador in 2001 and 1 lawsuit filed in the case of Grenada in 2006, by a commercial bank in the case of Ecuador and by the Export-Import Bank of Taiwan in the case of Dominica and Grenada.

Further, within the broader sample of foreign *bond and loan* defaults since 1976, the survey finds that "runs to the courthouse" are the exception rather than the rule in sovereign debt crises. Apart from Argentina and Peru (whose default involved commercial loans), each of which led to more than 10 lawsuits, the large majority of debt exchanges were implemented without a single legal conflict.[8]

### Approaches to holdout creditors have varied

Sovereigns have taken several approaches to deal with holdout creditors:

»   Holdout creditors have been paid in full, as in the cases of Russia, Greece and Ecuador (in 1999).

»   Holdout bonds have been exchanged at prevailing market value, as in the case of Cote d'Ivoire in 2011.

»   Debts which have not been restructured were no longer serviced, as in the cases of Argentina and Grenada.

»   In a few cases, for example in Dominica, holdout bonds were not serviced but as a sign of good faith, the government paid all interest falling due into an escrow account held at the central bank.

---

[7]   See Legal Ruling Raises Questions About Argentina's Debt Payments and US Court Ruling on Argentina's Debt Could Have Limited Implications for Sovereign Debt Restructurings.

[8]   Conclusions are also supported in Trebesch (2008). Additionally, IIF/EMTA (2009) reviews the experience with litigation in low-income countries, in the context of HIPC and MDRI debt relief initiatives. The review finds that incidents of litigation have been relatively few in number and covered a small share of the outstanding value of restructured sovereign debt. Further, the vast majority of lawsuits were brought by trade creditors, private creditors and state-owned enterprises from non-Paris-Club creditors, not by distressed debt funds.

Thus, countries have dealt with holdout investors in several different ways. Pakistan, for example, remained current on all original obligations up to the debt exchange in order to avoid litigation. Uruguay announced from the beginning that debt service on the old bonds would be continued. Ecuador managed threats of holdouts by settling accelerated claims and continuing to pay debt service. As we discuss below, in a number cases, for example Ukraine and Moldova, a holdout minority was bound into the agreement through majority voting legal clauses.

## III. CACs and Exit Consents Have Played a Significant Role in Bond Exchanges

One of the ways countries have achieved high participation rates in sovereign bond exchanges has been to use CACs and exit consents embedded in the bond contracts.

### CACs

CACs allow a supermajority of creditors to amend the instrument's payment terms and other essential provisions. Thus, CACs allow a supermajority of bondholders to agree to a debt restructuring that is legally binding on all holders of the bond, including those who vote against the restructuring.

In New York law bonds, CACs became popular after 2003, as an alternative to the top-down administered mechanism for sovereign debt restructuring (SDRM) proposed by the IMF at the time.[9] Currently, CACs are commonly included in almost all New York law issuances. The typical threshold for modification of payment terms is a supermajority of 75% of bondholders. CACs originated in English law bonds in 1879.[10] English law bonds at least since the 1990s typically contain "modification clauses", which enable bondholders to approve a restructuring in a vote that binds even dissenting bondholders. Modification clauses in English law bonds require between 18.75% and 75% voting thresholds.[11] Further, bonds issued under domestic law can be restructured by retroactively inserting CACs into the bonds by an act of legislation, as was done in Greece in early 2012.[12]

CACs do have a limitation as they apply to individual bond series. Thus, it is possible for non-participating investors to take blocking positions on individual bond series while a high overall participation rate in the restructuring process is still achieved. Aggregate CACs could address this problem in the future, but they are not yet widely used. Nevertheless, aggregate CAC was first introduced during the restructuring of Uruguay in 2003,[13] and subsequently was adopted by the Dominican Republic, Argentina, and Slovenia (in November 2012).

### Exit consents

An alternative way to impose a debt exchange offer on non-participating investors involves using exit consents.

---

[9]  For more details, see Weidemaier and Gulati (2012) and Bradley and Gulati (2012).

[10]  See Buchheit and Gulati (2002).

[11]  The 18.75% threshold could be reached in the case where a bondholder meeting does not reach a quorum and after a second meeting the quorum is ratcheted down. As Bradley and Gulati (2012) show, most English law bonds issued prior to 2003 have 18.75% voting threshold. Since 2003, while New York law bonds decreased the percentage requirement from 100% to 75%, English law bonds increased the percentage requirement from 18.75% to a range between 18.75% and 75%. The reasons for the change have not been explained.

[12]  See Greece's Successful Bond Exchange Removes Key Uncertainty, but Risk of Default Post-Exchange Remains High. Detailed studies of the Greek debt exchange include Zettelmeyer, Trebesch and Gulati (2012) and Georgakopoulos (2012).

[13]  For more details, see Buchheit and Pam (2004).

Exit consents use the modification clauses in the bond contract that allow a majority group of creditors to change the non-financial terms of the old bonds in an exchange, in a way that impairs the value of the old bonds. While amendments to financial terms may require unanimity, other terms may normally be amended by a majority or supermajority of creditors. Indeed, exit consents can be used in restructurings to create an incentive to all creditors to participate in the exchange through modifying bond provisions such as the waiver of sovereign immunity, financial covenants or listing requirements, or more generally by altering legal features that affect the bond's liquidity or the holder's ability to litigate.[14]

In other words, exit consent is the technique, by which bondholders grant their consent to amend certain terms of the bonds, at the moment of accepting the exchange offer. Because of these amendments, the defaulted bonds subject to the exchange become less attractive in legal and financial terms, forcing a greater number of bondholders to accept the exchange offer. Otherwise, bondholders not accepting the offer are left with bonds which are impaired and not featuring some of the original contractual enhancements.

### Use of CACs in past sovereign restructurings

As Exhibit 8 shows, over 35% of sovereign bond exchanges have used either CACs and/or exit consents as part of the debt exchange process. CACs have been triggered in nine restructurings and exit consents have been used in four exchanges.

CACs were used for the first time during Ukraine's Eurobonds exchange in 2000, then in Moldova in 2002, Uruguay in 2003, and in Belize in 2007. Pakistan did not use the CAC in its English law bonds during the 1999 restructuring. Ukraine took a hybrid approach to the March 2000 debt restructuring: it first invited investors – mainly investment banks and hedge funds – to tender their bonds by granting an irrevocable proxy vote for the restructuring offer; it then called a bondholder meeting, where the proxy votes were automatically cast in favor of modifying the terms of the old bonds.

Moldova used the CACs to amend the terms of payment according to the restructuring offer after an agreement was reached with its major bondholder, who held 78% of the outstanding bonds against a required 75% majority vote threshold in the CACs. Uruguay used the CACs contained in its Samurai bonds, the first use of CACs in Japan. Finally, Belize's government used the CAC embedded in one of its bonds to bind 1.3% of non-complying or non-responding creditors to accept the terms of the exchange, increasing the acceptance rate to 98%. Belize was the first country to use CACs in a debt restructuring under NY law in more than 70 years.[15] (Grenada did not use CACs in its 2005 exchange.)

Since 2007, CACs have been triggered in most bond exchanges that involved bonds with embedded CACs, including the restructurings of the Seychelles, Cote d'Ivoire and St. Kitts. Greece's March 2012 debt exchange incorporated a novel feature as an Act of Parliament retroactively inserted CACs into domestic law bonds prior to the announcement of the debt exchange offer. These CACs were subsequently triggered to achieve a 100% participation rate for domestic law bonds. More recently, Belize's February 2013 debt exchange triggered the CAC in the old bond instrument as 86% majority participation was reached.[16]

---

[14]   For more details, see Buchheit and Gulati (2000).

[15]   For more details, see Buchheit and Karpinski (2007).

[16]   See Belize Debt Restructuring Fails to Resolve Credit Challenges.

### Use of exit consents in sovereign restructurings

Exit consents were used for the first time in Ecuador's restructuring of external debt in August 2000, then in Uruguay in May 2003, the Dominican Republic in May 2005, and the Core d'Ivoire in April 2010. They have most commonly been used to remove the cross-default and cross-acceleration clauses from the old bonds and to lift the listing requirement.

For example, the use of exit consents in Ecuador's 2000 exchange involved an exchange offer that required participating bondholders to also agree to a number of amendments to non-payment terms. These amendments included the deletion of the cross-acceleration clause, the provision that restricted Ecuador from purchasing any of the Brady bonds while a payment default was in progress, the covenant prohibiting Ecuador to seek a further restructuring of Brady bonds, the negative pledge covenant, and the covenant to maintain listing of the defaulted bond on the Luxembourg Stock Exchange.[17]

The scope of exit consents in Uruguay's 2003 exchange was narrower than in Ecuador. Uruguay's exit consents were mainly aimed at avoiding litigation and limiting the possibility of attaching future payments on the new bonds via a court ruling (waiver of sovereign immunity), while also deleting the cross-default and cross-acceleration provisions. Unlike in Ecuador, in Uruguay the participating bondholders could opt out of the exit consents. Argentina's 2005 debt exchange did not use exit consents.[18]

Exit consents have often been used to remove cross-acceleration and cross-default clauses from the old bond contracts because once these clauses are removed, any non-payments or disputes related to the old bonds will no longer trigger default and acceleration on the new bonds. Thus, new bondholders are protected from legal remedies by non-participating creditors. Exit consents have generally withstood legal challenges under New York law as US courts have refused to invalidate exit consents that removed important bondholder rights and protections, including financial covenants, in several corporate restructurings.[19]

## IV. Conclusion

Our findings indicate that creditor coordination and holdouts have been less of a problem in sovereign bond restructurings than commonly believed. Sovereign bond restructurings have generally been resolved quickly, without severe creditor coordination problems and with little litigation, except for Argentina. Holdouts have not presented significant problems and very high levels of participation have been the norm outcome in sovereign bond restructuring offers.

---

[17]  See IMF (2001).

[18]  For more details, see Das, Papaioannou and Trebesch (2012) and Buchheit and Pam (2004).

[19]  Ibid.

## References

Andritzky, Jochen, 2006, Sovereign Default Risk Valuation, Springer, Berlin.

Benjamin, David and Mark L.J. Wright, 2009, Recovery Before Redemption: A Theory of Delays in Sovereign Debt Renegotiations, *State University of New York, Buffalo and University of California, Los Angeles, mimeo*, 8 April 2009.

Bi, Ran, Marcos Chamon and Jeromin Zettelmeyer, 2011, The Problem that Wasn't: Coordination Failures in Sovereign Debt Restructurings, *IMF Working Paper 11/265*, November 2011.

Bradley, Michael H., James D. Cox and Mitu Gulati, 2008, The Marker Reaction to Legal Shocks and Their Antidotes: Lessons from the Sovereign Debt Market, *Duke Law School Faculty Scholarship Series*, Paper 120.

Bradley, Michael and Mitu Gulati, 2012, Collective Action Clauses for the Eurozone: An Empirical Analysis, *Duke Law School Working Paper*, 7 May 2012.

Buchheit, Lee C. and Mitu Gulati, 2000, Exit Consents in Sovereign Bond Exchanges, *UCLA Law Review, vol. 48*, October 2000.

Buchheit, Lee C. and Mitu Gulati, 2002, Sovereign Bonds and the Collective Will, *Emory Law Journal, vol. 51, issue 4*, Fall 2002.

Buchheit, Lee C. and Elizabeth Karpinski, 2007, Belize's Innovations, *Butterworths Journal of International Banking and Financial Law*, May 2007.

Buchheit, Lee C. and Jeremiah S. Pam, 2004, Uruguay's Innovations, *Journal of International Banking Law and Regulation, vol. 19, issue 1.*

Das, Udaibir, Michael Papaioannou and Christoph Trebesch, 2012, Sovereign Debt Restructurings 1950–2010: Literature Survey, Data, and Stylized Facts, *IMF Working Paper 12/203*, August 2012.

Diaz-Cassou, Javier, Aitor Erce-Dominguez and Juan J. Vazquez-Zamora, 2008, Recent Episodes of Sovereign Debt Restructurings. A Case-Study Approach, *Banco de Espana Occasional Paper 0804.*

Georgakopoulos, Nicholas L., 2012, Pyres, Haircuts, and CACs: Lessons from Greco-Multilateralism for Creditors, *Indiana University, Robert H. McKinney School of Law, mimeo*, 16 May 2012.

International Monetary Fund, 2001, Involving the Private Sector in the Resolution of Financial Crises - Restructuring International Sovereign Bonds, Washington, DC, available at http://www.imf.org/external/pubs/ft/series/03/IPS.pdf, p. 8 and 35.

Institute of International Finance (IIF) / Emerging Markets Trading Association (EMTA), 2009, Creditor Litigation in Low-Income Countries Benefiting from the Enhanced-HIPC and MDRI, June 2009, *Preliminary Analysis.*

Olivares-Caminal, Rodrigo, 2009, Legal Aspects of Sovereign Debt Restructuring, Sweet & Maxwell, London.

Schumacher, Julian, Christoph Trebesch and Henrik Enderlein, 2012, Sovereign Defaults in Court: The Rise of Creditor Litigation 1976-2010, *mimeo*, 11 December 2012.

Sturzenegger, Federico and Jeromin Zettelmeyer, 2005, Haircuts: Estimating Investor Losses in Sovereign Debt Restructurings, 1998-2005, *IMF Working Paper 05/137*, July 2005.

Trebesch, Christoph, 2008, Delays in Sovereign Debt Restructurings. Should We Really Blame the Creditors?, *Free University of Berlin, mimeo*, July 2008.

Weidemaier, Mark C. and Gulati, Mitu, 2012, A People's History of Collective Action Clauses, *University of North Carolina Legal Studies Research Paper No. 2172302, 7 November 2012.*

Zettelmeyer, Jeromin, Trebesch, Christoph and Gulati, Mitu, 2012, The Greek Debt Exchange: An Autopsy, *EBRD and CERP, University of Munich and CESIfo, and Duke University, mimeo*, 11 September 2012.

## Moody's Related Research

Special Comments:

» US Court Ruling on Argentina's Debt Could Have Limited Implications for Sovereign Debt Restructurings, December 2012 (147881)

» Legal Ruling Raises Questions About Argentina's Debt Payments, November 2012 (147437)

» Sovereign Defaults Series: Sovereign Debt Restructurings Provide Liquidity Relief But Often Do Not Reduce Debt Levels, November 2012 (146909)

» Sovereign Defaults Series: Investor Losses in Modern-Era Sovereign Bond Restructurings, August 2012 (144129)

» Sovereign Default and Recovery Rates, 1983-2012H1, July 2012 (144320)

» The Causes of Sovereign Defaults: Ability to Manage Crises Not Merely Determined by Debt Levels, November 2010 (127952)

» Market Use of Sovereign Ratings, September 2010 (127353)

» Sovereign Defaults and Interference: Perspectives on Government Risks, August 2008 (110114)

» How To Sue A Sovereign: The Case Of Peru, November 2000 (61737)

» Sovereign Debt: What Happens If A Sovereign Defaults, July 2000 (57753)

Recent Sovereign Restructurings:

» Belize Debt Restructuring Fails to Resolve Credit Challenges, March 2013 (151586)

» Belize debt restructuring: 2007 vs 2012, October 2012 (145828)

» Moody's downgrades Jamaica's government debt rating to Caa3, outlook stable, March 2013

» Greece's Successful Bond Exchange Removes Key Uncertainty, but Risk of Default Post-Exchange Remains High, March 2012 (140541)

To access any of these reports, click on the entry above. Note that these references are current as of the date of publication of this report and that more recent reports may be available. All research may not be available to all clients.

Rate this Research »

MOODY'S INVESTORS SERVICE

CREDIT POLICY

## Appendix: Sovereign Bond Exchanges Since 1997 – Debt Exchange Details and Investor Losses

| Initial Default Date | Country (NR = not rated at the time) | Distressed Exchange Details | New Instruments | Old Instruments | Debt in Exchange In US$bn | Debt in Exchange In % of Total Debt | Debt in Exchange In % of GDP | Nominal Haircut [1] | Loss (%) Loss as Measured by Trading Prices or NPV of Cash Flows (*) |
|---|---|---|---|---|---|---|---|---|---|
| Aug-1998 | Russia | LC debt (GKO and OFZ) | multiple | multiple | 8.3 | 4.5 | 3.1 | 29 [2] | 46 res., 62 non-res., deval. 95* |
| | Russia | FC debt (MIN FIN III) | 2 | 1 | 1.3 | 0.7 | 0.7 | | 75 |
| | Russia | FC debt (PRIN and IAN) | 2 | 2 | 29.1 | 16.4 | 16.3 | 36 | 90 |
| Sep-1998 | Ukraine | LC T-bills held domestically | multiple | multiple | 4.5 | 30.0 | 9.0 | 34 | 18* |
| | Ukraine | LC T-bills held by non-residents | 2 | multiple | 0.4 | 2.8 | 0.8 | | 59* |
| | Ukraine | FC Chase-Manhattan loan | 1 | 1 | 0.1 | 0.7 | 0.2 | | 31* |
| | Ukraine | FC ING bond and Merrill Lynch bond | 1 | 2 | 0.4 | 2.0 | 1.0 | | 38* |
| | Ukraine | FC Eurobonds | 2 | 4 | 1.6 | 8.3 | 5.1 | 5 | 31 |
| Dec-1999 | Pakistan | Eurobonds | 1 | 3 | 0.6 | 1.2 | 0.9 | | 48 |
| Aug-1999 | Ecuador | External debt | 2 | 6 | 7.0 | 49.5 | 41.5 | 40 | 56 |
| | Ecuador | FC domestic bonds | multiple | multiple | | | | | 9* |
| Mar-2000 | Cote d'Ivoire (NR) | Brady bonds | 1 | 6 | 2.8 | 18.7 | 12.4 | 20 | 82 |
| Nov-2001 | Argentina | Domestic debt | multiple | 50 | 64.4 | 49.6 | 22.6 | | 83 |
| | Argentina | External debt | 11 | 152 | 79.7 | 41.7 | 52.0 | 66 | 71 |
| Jun-2002 | Moldova | Eurobond | 1 | 1 | 0.04 | 3.2 | 2.7 | | 40 |
| Jan-2003 | Paraguay (NR) | Domestic debt due in 2003-06 | 5 | multiple | 0.1 | 6.5 | 2.6 | | 8* |
| May-2003 | Uruguay | LT FC bonds (external and domestic) | 73 | 65 | 5.4 | 56.8 | 39.6 | | 34 |
| Jul-2003 | Nicaragua | CENI bonds FC-denom. payable in LC | multiple | multiple | 0.3 | 6.1 | 8.2 | | n.a. |
| | Nicaragua | CENI bonds FC-denom. payable in LC | multiple | multiple | 0.3 | 12.5 | 5.4 | | 51* |
| Jul-2003 | Dominica (NR) | LC bonds (domestic and external) | 3 | multiple, 2 external bonds | 0.1 | 44.5 | 42.4 | 30 | 53* |
| H2-2004 | Cameroon (NR) | Domestic debt | multiple | multiple | 1.0 | 10.5 | 6.5 | | n.a. |
| Dec-2004 | Grenada (NR) | Global bond and domestic debt | 2 | 16 bonds | 0.3 | 65.1 | 48.9 | | 35 |
| May-2005 | Dominican Rep. | International bonds | 2 | 2 | 1.1 | 16.7 | 5.1 | | 5 |
| Dec-2006 | Belize | Private external debt | 1 | 6 | 0.5 | 51.6 | 45.8 | | 24 |
| Jul-2008 | Seychelles (NR) | External debt | 1 | 2 | 0.3 | 29.6 | 36.8 | 50 | 70 |
| Dec-2008 | Ecuador | Global bonds | n.a. (cash buyback) | 2 | 3.2 | 25.3 | 5.9 | 65 | 72 |
| Feb-2010 | Jamaica | Domestic debt | 23 | 350 | 7.9 | 56.5 | 63.7 | | 10 |
| Jan-2011 | Cote d'Ivoire (NR) | Treasury bills (short-term) | 3 | multiple | 1.3 | 8.5 | 5.4 | | 5* |
| | Cote d'Ivoire (NR) | Eurobond coupon | n.a. (cash repayments) | 1 | 0.1 | 0.6 | 0.4 | | 25 |
| Nov-2011 | St. Kitts and Nevis (NR) | Domestic bonds and external debt | 2 | multiple | 0.1 | 12.8 | 19.7 | 50 | 62* |
| | St. Kitts and Nevis (NR) | Domestic loans (debt-land swap) | n.a. (debt-land swap) | multiple | 0.3 | 30.3 | 46.6 | | n.a. |
| Mar-2012 | Greece | Greek and foreign law bonds | 23 | multiple | 273.4 | 55.2 | 94.2 | 54 | 76 |
| Sep-2012 | Belize | 2029 Superbond | 1 | 1 | 0.5 | 47.3 | 35.3 | 10 | 35 |
| Feb-2013 | Jamaica | Domestic debt | multiple | multiple | 9.1 | 53.8 | 63.0 | | 12 |
| *Exchange Average* | | | | | *15* | *25* | *23* | | *44* |

Sources: Moody's, IMF country reports, and Sturzenegger and Zettelmeyer (2005).

Notes: [1] Largest nominal haircut shown if new instruments had different haircuts. [2] Holders of GKOs or OFZs had their scheduled payments discounted to 19 August 1998 at the rate of 50% per annum. Based on the resulting adjusted nominal claims, they then received a package of cash and new securities.

SOVEREIGN DEFAULTS SERIES: THE ROLE OF HOLDOUT CREDITORS AND CACS IN SOVEREIGN DEBT RESTRUCTURINGS

MOODY'S INVESTORS SERVICE

**CREDIT POLICY**

Report Number: 150162

Author
Elena Duggar

Editor
Robert Cox

**Production Specialist**

Wing Chan

© 2013 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

For Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail clients. It would be dangerous for retail clients to make any investment decision based on MOODY'S credit rating. If in doubt you should contact your financial or other professional adviser.



Moody's
**INVESTORS SERVICE**

# EXHIBIT "E"

# EXHIBIT "E"