# Report to the National Congress

**Central Bank of Argentina**

**2002**

# Table of contents

| | | |
|---|---|---|
| I. | The International Economy.................................................................... | 5 |
| II. | The Argentine Economy..................................................................... | 7 |
| III. | Policies and Prudential Regime............................................................ | 31 |
| IV. | Structure of the financial system......................................................... | 45 |
| V. | Administration of Reserves................................................................. | 31 |
| VI. | Instruments of Monetary Policy...........…….......................................... | 55 |
| VII. | Payments Systems............................................................................. | 63 |
| VIII. | Legal Proceedings of the Central Bank.................................................. | 69 |
| IX. | Other Central Bank Activities.............................................................. | 73 |

## I. The International Economy

The isolation of Argentina from international credit markets after the formal declaration of default on the public debt at the end of 2001 meant that during 2002 the progress of the world economy became a relatively less significant variable in terms of the definition of a scenario to analyze the local situation. Nevertheless, some developments in that field will continue to be relevant to the behavior of domestic monetary and financial variables.

The international scene was noted for a low rate of world economic growth at an annual 3%. There was a slight acceleration in the rate of growth in developed nations, basically driven by the United States, which after growing 0.3% in 2001, recorded an increase in GDP of 2.4%, while the countries in the euro zone and Japan recorded a slowdown in their rates of growth from 1.5% and 0.4% in 2001 to 0.9% and 0.2% in 2002. Developing economies grew on average by 4.6%, after growth of 4.1% in 2001. This dynamism was explained by the Asian economies and their exports of high technology, as Latin America recorded a drop in GDP of 0.1%.



**Gross domestic product
United States., Euro zone, Japan**
(real y.o.y. change)

The moderate recovery in world production took place unevenly over the course of 2002: it accelerated in the first months of the year, led by Asian countries, but slowed in the second half following a decline in the dynamism of the US economy. The United States had recorded a sound performance in the first quarter: spending on consumer goods remained firm, investment in inventory revived and private sector employment began to recover, leading to annualized growth rate of 5%. This auspicious start waned towards the middle of the year. Doubts on transparency in the administration of leading companies had a negative repercussion on investor confidence, and geopolitical tension (mainly the situation in Iraq) increased the uncertainty of the economic outlook. Share prices fell, while corporate debt markets became less liquid and risk margins increased. Companies once again demonstrated a reluctance to invest or hire workers, causing a drop in industrial production and employment. In this context the Federal Reserve lowered the reference rate by 0.5 p.p. in November (0.25 p.p. more than the market had expected) to a level of 1.25%. Even though concerns regarding the true net worth of companies appeared to fade, the economy remained

weak at the end of 2002. Furthermore, the situation in Iraq, the political destabilization in Venezuela and tension in relation to North Korea stoked investor uncertainty and boosted oil prices.



**Oil Prices**
US$ per barrel

From the point of view of the balance of payments, developed countries continued to attract funds to their economies. The current account deficit of this group of countries totaled US$217.2 billion in 2002, although the United States alone accounts for this behavior, having recorded a deficit of US$503.4 billion, of which 41% was financed by Europe and Japan.

Both the United States and the euro zone continued to apply expansive monetary policies in 2002, although their policies diverged during the year. The Federal Reserve again lowered its reference interest rates, taking them by the end of the year to the lowest level for the last four decades. The European Central Bank also kept its reference rate steady (at 3.25%) as inflation remained above its maximum target of 2%, but ended the year with a cut of 0.5 p.p. in December when the economy of the euro zone showed signs of settling on a plateau. Short term Japanese interest rates remained at levels of close to zero.

The US dollar maintained its upward trend during January, when it seemed that the US economy would lead a global recovery. It depreciated heavily as from the second quarter however, following concerns caused by the accounting problems experienced by listed companies and the drop in their earnings. In addition, market analysts began to worry about the growing current account deficit in the world's leading economy and its negative impact on the value of its currency. Nevertheless, the dollar bounced back in mid-year, when the situation in other leading economies, and the euro zone in particular, began to deteriorate. In the last quarter, the dollar began to lose ground as a result of the intensified geopolitical tension and the potential cost to the US economy of its military conflicts. As a result, given the differential that developed between the rates set by the FED and the ECB, the euro began to appreciate as from mid-year, gaining 18% against the dollar in 2002.

3

**Report to the National Congress 2002**      **Central Bank of Argentina**



**Real exchange rate**

— Euro   - - - Libra (2° eje)

Stock-markets were volatile in 2002, reflecting the fears caused by the collapse of Enron, and it was only at the end of the last quarter of the year that signs began to be seen of a recovery in equity values. US financial markets were characterized by a net drop in share prices and long-term interest rates, reflected in periods of high market volatility. Investor optimism regarding the expected development of the US economy pressured long-term interest rates upward in the first quarter of 2002. This optimism faded as insufficiently auspicious economic indicators began to be announced. Accounting scandals and the resurgence of tension in the Middle East also affected interest rate levels. In line with the stability of the reference rate over the year, short-term interest rates remained almost unchanged, except in November, when short-term rates declined slightly, keeping pace with the cut implemented by the Federal Reserve. Medium and long-term interest rates declined 1.5 percent during the year. As a result of the changing expectations regarding economic recovery, US equity markets recorded significant fluctuations. This high volatility was also influenced by falling company profits and the doubts that arose in relation to the quality and transparency of corporate balance sheets. The drop in equity values for the year was higher than that for the two previous years. The Standard and Poor's 500 lost 23.5% over the year, while the Dow Jones index fell 16.7% and the Nasdaq was down 31.5%.

The economy of Brazil, Argentina's main trading partner, performed poorly during the year, suffering the effects of the local crisis as well as the uncertainty generated by the impact of the change in government and the flow of capital away from emerging countries towards less risky assets. The Brazilian real lost 41%, falling from R$2.3 per dollar at the beginning of the year to R$3.9 at the peak of the crisis, ending the year at R$3.5 per dollar. At the same time, country risk increased by slightly over 580 basis points (b.p.) over the year, reaching 1,450 b.p. at the end of the period. The rise in the exchange rate was reflected in an increase in retail prices (the IPC-A index was up 12.5%), as well as in wholesale prices, leading to a further rise in interest rates until reaching an annual rate of 25% in December 2002. The devaluation of the real and the increase in rates led to the need to make a greater fiscal adjustment because of the increase in the amount of interest on the public debt, and a reduction in the current account deficit, driven by an increased trade surplus.

**Principal indicators of the world economy**

| Annual percentaje rate of change | | | | Forecast | |
|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 |
| **World output** | 3.8 | 2.4 | 3.0 | 3.2 | 4.1 |
| Principal industrialised countries | 3.9 | 1.0 | 1.8 | 1.8 | 2.9 |
| United States | 3.8 | 0.3 | 2.4 | 2.6 | 3.9 |
| Euro Zone | 3.5 | 1.5 | 0.9 | 0.5 | 1.9 |
| Japan | 2.8 | 0.4 | 0.2 | 2.0 | 1.4 |
| Developed countries | 5.7 | 4.1 | 4.6 | 5.0 | 5.6 |
| Brazil | 4.4 | 1.4 | 1.5 | 1.5 | 3.0 |
| **Consumer Prices** | | | | | |
| World | 4.6 | 4.3 | 3.5 | 3.9 | 3.2 |
| Principal industrialised countries | 2.2 | 2.2 | 1.5 | 1.8 | 1.3 |
| United States | 3.4 | 2.8 | 1.6 | 2.1 | 1.3 |
| Euro Zone | 2.1 | 2.4 | 2.3 | 2.0 | 1.6 |
| Japan | -0.9 | -0.7 | -0.9 | -0.3 | -0.6 |
| Developed countries | 5.8 | 5.8 | 5.9 | 5.9 | 4.9 |
| Brazil | 7.0 | 6.8 | 8.4 | 15.0 | 6.2 |
| **Fiscal Balance/PIB** | | | | | |
| World | -1.0 | -1.7 | -2.9 | -3.9 | -3.3 |
| Principal industrialised countries | 0.2 | -0.9 | -2.3 | -3.3 | -3.1 |
| United States | 2.1 | 0.7 | -2.2 | -4.3 | -4.2 |
| Euro Zone | -0.4 | -1.5 | -2.0 | -2.4 | -2.3 |
| Japan | -7.2 | -6.7 | -6.3 | -6.1 | -5.4 |
| Developed countries | -3.2 | -3.8 | -3.8 | -3.3 | -3.1 |
| Brazil | -3.6 | -3.5 | -4.4 | -3.5 | -3.3 |
| **Current Account/PBI** | | | | | |
| Principal industrialised countries | -0.9 | -0.8 | 0.7 | -0.9 | -0.8 |
| United States | -4.2 | -3.9 | -4.6 | -5.1 | -4.7 |
| Euro Zone | -0.5 | 0.2 | 0.9 | 0.8 | 0.8 |
| Japan | 2.5 | 2.1 | 2.8 | 2.9 | 2.9 |
| Developed countries | 1.2 | 0.5 | 1.4 | 1.1 | 0.4 |
| Brazil | -1.2 | -4.6 | -1.7 | -0.8 | -1.0 |
| **Interest Rates (% annual)** | | | | | |
| United States (Fed Funds) | 6.50 | 1.75 | 1.25 | 1.00 | - |
| Euro Zone (Main Refinancing Operation) | 4.75 | 3.25 | 2.75 | 2.00 | - |
| Brazil (Selic) | 15.75 | 19.00 | 25.00 | 20.00 | - |
| **Exchange rate** | | | | | |
| Euro Zone (/US$) | 1.1 | 1.1 | 1.0 | 0.9 | - |
| Japan (/US$) | 114.4 | 131.7 | 118.8 | 111.5 | - |
| Brazil (/US$) | 2.0 | 2.3 | 3.5 | 2.9 | - |
| **Commodity prices** | | | | | |
| Oil | 57.0 | -14.0 | 2.8 | 14.2 | -10.5 |
| Commodity prices (excluding oil) | 1.8 | -4.0 | 0.6 | 5.0 | 2.4 |

## II. The Argentine Economy

### 1. Introduction to change in the monetary and financial system[1]

Towards the last quarter of 2001, the quickening rate of deposit flight forced the Government to establish a system of restrictions on the withdrawal of cash from banks. Known as the «corralito»[2] these restrictions were complemented by a series of restrictions on capital movements. In a severely deteriorated economic environment and profound social malaise, these measures led to the resignation of the president, who was replaced by an interim administration, which decreed the suspension of payments on the external debt[3].

At the beginning of 2002, Congress sanctioned Law 25,561 on Public Emergency and reform of the Exchange System. This law marked the end of the currency board mechanism, empowering the Executive to establish a system to determine a new parity between the peso and foreign currencies, and authorizing the Central Bank to intervene in the exchange market, using either its own resources or issuing the necessary pesos, in addition to establishing that its reserves would at all times be allocated to back the monetary base.

This law as regulated by Decree 71/02 that announced the imminent setting up of  official and free exchange markets, both of which were to be regulated by the Central Bank. These two markets began operating as from January 11 (Com. «A»3425), after a succession of banking and exchange holidays. The parity on the official exchange market was fixed at $1.40 per dollar. This market was for the exclusive trading of certain transactions duly determined or authorized by the Central Bank.[4] All other transactions were to be processes through the free exchange market, in which the monetary authority was allowed to participate. This system changed as from February 8, when a single free exchange market was established (Decree 260/02).

Ministry of Economy Resolution 6/02, issued at the beginning of the year, presented a first version of the Regime for the Rescheduling of Deposits for time deposits in pesos and all deposits in foreign currency. Under these regulations, holders of sight deposits in dollars were granted the option of exchange their balances to an account in pesos at the rate of $1.40 per dollar, with a treatment that differed depending on whether holders were natural or legal persons. The possibility of setting up new freely-available deposits was also decreed, with the setting up of deposits in foreign currency being restricted to time deposits. These deposits were repeatedly modified until a definitive version was arrived at, and meanwhile the release of these deposits was allowed for various reasons.

At the end of January, Law 25,562 modified the Central Bank's Charter, reinforcing its powers to implement an independent monetary policy. As well as establishing new criteria for the granting of advances and rediscounts to assist financial institutions with temporary liquidity difficulties, limits were placed on the temporary advances that the Central Bank was able to grant Government. In addition, it was laid down

that the Central Bank was to publish its annual monetary program, including inflation targets and the total variation planned for money supply (section 3 of the Central Bank Charter). Quarterly, or each time significant deviation from the published targets was foreseen, the reasons for the deviation and the new  program were to be made public[5].

At the end of January, Law 25,563 on Creditor Protection and Bankruptcy was enacted, with an impact on the counter-part risk of financial institutions and the possibility of recovering private sector debt in arrears. After declaring a credit and production emergency until the end of 2003, section 16 of the law established a 180-day suspension of court and out-of-court foreclosures and the imposing of precautionary attachments on assets essential to the continuation of business by the debtor. In mid-May this law was modified by Law 25,589, and in September the suspension of these foreclosures was extended for a further 90 calendar days (Law 25,640).

At the beginning of February another fundamental regulation was introduced: Decree 214/02 and its regulation (320/02) established the conversion into pesos of all obligations to grant sums of money stated in foreign currency, with certain specific exceptions[6]. One feature of this conversion was its asymmetric nature: while debts were converted into pesos at $1 per dollar, deposits were converted at $1.40.

Once converted into pesos, both loans and deposits were to be restated by a Reference Stabilization Ratio (CER), reflecting the change in the Consumer Price Index (IPC). In mid-year Decrees 762 and 1242/02 excluded certain loans originally granted in dollars to individuals from CER adjustment, and these loans began to be restated according to changes in the Wage Variation Ratio (CVS). Furthermore, during the time Law 25,562 was to be in effect, Decree 214 authorized the Central Bank to grant liquidity assistance to banks facing solvency problems.

Another important aspect of Decree 214 and its modifications was the suspension for 180 days of compliance with court-ordered attachments and the enforcement of rulings in court cases arising from the regulations issued as a result of Decree 1570/01, with certain exceptions of a humanitarian nature being allowed. This point required strengthening by means of various regulations that in practice were of limited effectiveness in slowing the release of funds by means of  court orders, maintaining the uncertainty that banks faced as to the amount of disbursements they would be required to make. This situation was reflected in bank liquidity policy, and as a result of increased demands for assistance, on the effectiveness of the monetary policy of the Central Bank.

Lastly, in view of the conversion into pesos of deposits in the terms of Decree 214, on February 6 Ministry of Economy Resolution 46/02 established a definitive repayment schedule for reprogrammed deposits. Together with this new schedule, it was determined that the full  amount  deposited in wage and social security payment accounts could be taken out every month, a withdrawal limit being set for all other types of account. In addition, Resolution 46/02 allowed the setting up

5



of time deposits in pesos using funds derived from current accounts and savings accounts in pesos. The setting up of new deposits was further encouraged subsequently by other changes in regulations.

By means of Decree 471/02 the conversion into pesos was extended to include the debt in dollars of the National, Provincial and Municipal Public Sectors as long as the loans were governed by Argentine law. The loan amounts, converted to pesos at $1.40 per dollar of debt, were subsequently restated according to CER, with  maximum interest rates being set.

Once the conversion into pesos and the Regime for the Rescheduling of Deposits had been established, it became necessary to determine the exchange of rescheduled deposits for government securities. By enabling deposits to be exchanged for securities denominated in dollars, depositors would be able to recover their credits in their original currency, with the repayment schedule adapted to the possibilities of the Government in the context of the national public emergency. The exchange gained in significance as the flow of funds released under the terms of court orders continued at a high rate, despite the changes in legislation designed to restrict it. Progress towards the exchange was delayed until the end of May, when the definitive proposal was published in Decree 905/02.

Under the terms of this voluntary exchange, holders of rescheduled deposits were able to choose to redeem them in full or in part in exchange for national public debt in pesos with the principal restated by CER, or in dollars. Balances not exchanged were to be replaced by certificates known as CEDRO. Decree 905/02 also introduced a mechanism to compensate banks for the asymmetric conversion of assets and liabilities into local currency, by means of the same type of bond offered to savers[7].

Signs of a gradual stabilization of the system enabled progress to be made in the lifting of restrictions on the use of funds to help reinforce this incipient improvement and prevent large savers from gaining access to liquid assets by means of self-liquidating court orders. On September 19, Decree 1836/02 was to propose a second exchange of rescheduled deposits, broadening the range of alternatives to include possibilities such as access to cash and the delivery of Fixed Term Bills issued by banks with an option for the conversion into original currency issued by the Government.

Lastly, towards the end of the year it became possible to lift the restrictions that existed on the withdrawal of funds from sight accounts: Resolution 668/02 established the free availability of sight accounts as from December 2, 2002. The reduction in pressure on the financial system and the lack of negative effects on the exchange market from the release of such funds in this new scenario made it possible to progress with the relaxation of another group of controls imposed by Decree 1570/01: the restrictions on  transfers of capital abroad.

## 2. The Real Domestic Economy[6]

The local political social and financial crisis that was unleashed in December 2001 led to a slide in GDP and poverty levels of unprecedented magnitude during 2002. As mentioned in the previous point, this situation arose following almost three years during which successive attempts to improve the solvency of the state failed in reversing the negative phase of the cycle as planned, accelerating the collapse of the economy that had already recorded a fall of 15.6% since the maximum level reached in the second quarter of 2001. The intensified crisis of confidence at the end of 2001 became translated into a flight from domestic assets, leading the Government to impose important limitations on the withdrawal of cash from the banking system (the «corralito»), as well as to introduce controls on capital movements . Since then, the succession of measures adopted led to an increase in uncertainty that reinforced this abandoning of domestic assets and the drop in economic activity in the early months of 2002. Only in the third quarter of that year did financial variables begin to stabilise -as analysed in detail in the following sections- and economic activity levels began to recover.

### 2.1. Performance during the year

In general terms, the evolution of the real economy for the whole of 2002 can be summarised by the following developments:

a) a nominal devaluation of the peso of 70% and a transfer to prices of only 40.9% in the case of retail sales (CPI) and 117.9% in wholesale prices (WPI). This result led to a depreciation of the currency in real terms of 55% -on the basis of the multilateral rate of exchange determined from a basket of exports, deflated by consumer prices- and a reversal in relative prices in the economy of 50% -on the basis of the ratio between the basket of goods and services surveyed for the CPI as a proxy variable for the relationship between tradable and non-tradable goods. In this instance, the lack of any authorisation of public utility rate hikes reinforced the change in relative prices;

b) an unprecedented shrinking in real GDP of 10.9%, driven by a significant reduction in investment that totalled 36.1%, together with a fall in private sector consumption of 14.1% and in public sector consumption of 5.1% (see Graph 4). As a result of this behaviour, the rate of investment, which before the start of the recession stood at 20% of GDP, fell to only 12% of GDP in 2002. Nevertheless, the sound performance by net exports helped avoid an even greater collapse in activity levels. From the point of view of supply, the performance for the year by producers of goods and services has been similar, with falls of 11.4% and 9.2% respectively;

c) a current account surplus of 8.5 points of GDP, explained by a record balance of trade in goods and services that reached 16 GDP points, basically a result of the halving in imports of goods and services. It should be noted that the Balance of Payments methodology records interest on an accrual basis, so that interest due and unpaid on public and private sector debt is recorded in the current account as such, and its financing is booked as arrears in the financial

Case 2:14-cv-00492-RFB-VCF   Document 1-1   Filed 04/01/14   Page 7 of 118



account. In the last year interest accrued and unpaid has totalled US$4.333 billion, so that the «actual» current account surplus (that considers interest on a cash basis) would have been higher by 4.1 GDP points;



**GDP**

d) a capital outflow of 12.8 GDP points, 10.9 points through the capital and financial account of the balance of payments and another unidentified 1.9 points in the errors and omissions account, of which 4.3 points was financed directly out of the fall in international reserves. Almost the entire flight took place in the private sector financial account, which transferred US$12.097 billion abroad during the period, added to the US$12.817 billion transferred in 2001;

e) a significant recovery in public sector finance, both at national and provincial level, as explained below.

e.1. The deficit of the national public sector (on a cash basis, excluding privatisations) totalled $4.554 billion, 48% less than the deficit recorded in 2001 ($8.780 billion), and even 13% lower than the average deficit for 1995-2001 ($5.205 billion). Although most of the adjustment took place because of the $3.365 billion reduction in interest payments of the public sector debt, the national public sector succeeded in improving its primary surplus, which reached $2.256 billion for the year, an increase of $861 million compared to 2001. In real terms, measured as a percentage of GDP, the primary surplus also recorded a significant recovery, reaching 0.7% of GDP in 2002, a 0.6 percentage point improvement compared to 2001. This recovery in the primary result was driven mainly by growth in income, which went up by $4.627 billion, while primary spending increased by only $3.824 billion. To a large extent, the increase in nominal spending was a product of the rise in social spending, and in particular the introduction of the Unemployed Heads of Household welfare programme, for which $2.294 billion were allocated during the year. It should however be pointed out that in spite of the nominal increase in primary spending during 2002, there was an important adjustment in real terms amounting to 1.4 percentage points of GDP.

e.2. Provincial finances also recorded a significant improvement, and the deficit was cut by $4.723 billion (74%). As a result, the provincial deficit totalled only $1.641 billion,

the lowest level since 1992. This significant reduction in the provincial deficit has largely been explained by the good primary result, which improved by $3.775 billion (95.4%) compared to 2001, reaching a deficit of only $192 million. In terms of GDP, this improvement was 1.5 percentage points, as the provincial primary results in 2001 was a deficit of 1.6% of GDP. This shrinking of the deficit was caused by both an increase in total revenue (mainly because of improved hydrocarbon royalties and own tax resources) as well as because of the reduction in primary spending in nominal terms of $1.419 billion. This reduction took place mainly in wage costs ($635 million) and in items allocated to public sector investment ($509 million). This reduction in primary spending in nominal terms was the reason for the sharp adjustment in real terms to provincial spending, which fell 2.2 percentage points of GDP in 2002 to just 10.4% of GDP.



**National fiscal accounts**
acumulated over 4 quarters - % of GDP

f) a sharp deterioration in the social situation. The population with income below the poverty line in October 2002 was 57.5% of the total, worse even than during the hyperinflationary levels at the end of the 90s. This increase in poverty indicators took place as a result of the double effect of the increase in unemployment -which reached a level of 17.8% in October 2002 (21.2% if the beneficiaries of the Unemployed Heads of Household social programs are included), and the significant decline in real wages of 24% (31% if the prices of the Basic Food Basket used to measure poverty indicators is employed as a deflator).

**2.2.- Dynamics during the year**
It should be noted that in spite of the sudden contraction experienced during 2002, the dynamics of economic performance were not evenly spread over the year, which in fact can be divided into three clearly distinct stages. Particularly during the first quarter of the year the macro situation was characterised by a marked level of economic and financial instability. In the second quarter -as will be analysed in the following sections- the Central Bank worked on the design and implementation of a monetary policy intended to achieve a certain degree of financial stability, and only at the end of this period did the first signs appear of some of the positive effects of that package of measures. As a result, by the second half of the year there was a notable stability in the main economic variables, such as the rate of exchange, inflation and the rate of interest, and this improvement gained in



strength towards the end of 2002.

*First Stage*
In the first place, during the first three months of 2002 the behaviour of the economy continued to be subject to the major institutional changes that took place at around that time, some of them originating in the period at the end of 2001. Having defaulted on the public debt, and subsequently abandoned the currency board mechanism, and after a brief experiment with a dual exchange rate system, the government decided to implement a floating rate mechanism for the domestic currency. The considerable uncertainty that prevailed at the time -which ensured savers were inclined to dispose of their domestic assets- exerted strong pressure on the exchange market, leading to a significant depreciation of the nominal rate of exchange, which by March was at a level of 2.9 pesos per dollar.

Reflecting the magnitude of the devaluation of the peso, the economy quickly went from price deflation to a positive rate of inflation, which accelerated over the course of the first quarter in response to the evolution of the rate of exchange. The Consumer Price Index went up 9.7%, driven mainly by the prices of assets, while service price levels remained virtually unchanged. In addition, wholesale inflation recorded an increase of 34.3%.

In this context, economic activity -as measured by GDP- recorded the greatest year-on-year decline since the start of the recession, dropping 16.3% year-on-year, and by an annualised 5.8% compared to the fourth quarter. Consumption, imports and investment recorded falls of 20.1%, 57.4% and 45.4% respectively.

The decline in domestic spending was reflected in significant trade and balance of payments current account surpluses, which amounted to 11.5 p.p. and 4.3 p.p. of GDP, which partly financed capital outflows via the capital and financial account, in spite of the compulsory financing derived from the default on sovereign debt. In addition, the fall in tax revenue was in line with the decline in economic activity in the first quarter of 2002. As a result, the National Non-Financial Public Sector (SPNF) resulted in an operating deficit (excluding privatisations) of 4.2% of GDP, explained by a greater fall in income than in primary spending.

*Second Stage*
In the second quarter, the actions of the Banco Central de la República Argentina («BCRA» - the Central Bank) were decisive in stabilising the macroeconomic variables. As from the middle of March the monetary authority began to tender Central Bank Bills (LEBAC), with the aim of controlling the money supply at a time of strong growth because of the need to provide assistance to the financial system. The use of this instrument was complemented by a policy of intervention in the currency market that prevented it fully impacting on the rate of exchange, by means of the sale of international reserves. In addition, controls on capital movements were reinforced, contributing to stabilising the exchange market.

In spite of the measures adopted, the nominal rate of

exchange continued its upward trend, rising from an average of 2.9 pesos per dollar in April to 3.6 pesos per dollar in June, while inflation -as measured by the CPI- increased at almost twice the rate in the first quarter. This performance was accompanied by a sharp increase in interest rates -with the annualised rate for 14-day LEBAC in pesos reaching 107.1%.

In spite of this performance, after six consecutive monthly declines, GDP recorded a quarterly rise of 0.9% in deseasonalised terms. Once again, the balance of payments current account reflected the sharp reduction in domestic spending, and the capital account continued to indicate a large outflow of capital, with a corresponding fall in the level of reserves.

In the area of fiscal accounts, tax revenues slowed their year-on-year decline in nominal terms (-3.8%), thanks to the introduction of withholdings on exports, although the real decline in tax revenue accelerated (-22.3%) as a result of inflation. As a result, the Non-Financial Public Sector obtained a primary result (+0.4 p.p. of GDP), which after payment of interest became a financial deficit that amounted to –0.3 p.p. of GDP. Just as in the first quarter, the deficit was financed out of advances and the redistribution of Central Bank profits and the issue of LECOP.

As from the second half of the year there was a significant return to normality by the main financial variables and an incipient reversal in the negative phase of the cycle which gained in strength during the fourth quarter of 2002.

*Third Stage*
In the second half of the year Central Bank policy on intervention in the currency market and exchange controls, together with the development of the LEBAC market, helped stabilise the exchange rate and increase international reserves, which rose since the middle of July. As a direct consequence of these positive results, inflation continued to slow and rates of interest, both real and nominal evidenced a significant downward trend. Not even the succession of delays in reaching an agreement with the IMF served to take the shine off this recovery of confidence, which was reflected in a slow but steady increase in private sector deposits and a real appreciation of the currency, which grew stronger towards the last quarter of the year.

The results obtained in the fields of monetary and exchange policy had a positive repercussion on the real sector of the economy. In deseasonalised terms, GDP began to grow again in the third and fourth quarters of the year by 0.6% and 1.2% respectively, accumulating a 2.6% increase since the minimum levels reached in the first quarter of 2002. It should be noted that in the fourth quarter, unlike the situation recorded in the two previous quarters, when net exports explained the tenuous recovery, it was consumption and investment that were behind the improvement in activity levels.

One of the most notable events was the slowdown in capital outflows that began in mid-2002. The deficit in the balance



of payments financial account fell by almost 6 GDP points between the first half and the last quarter of the year. The dynamics of the private sector contributed with a lower capital outflow, with a reduction of 3 GDP points in the second half of the year. As a result, there was a slight fall in the level of international reserves.

As the economic recovery gained force and financial variables stabilised, public finances deepened the improvement that had begun in the second quarter of the year. In particular, the national government primary surplus (on a cash basis) reached $1.911 billion in the last quarter of the year (0.6% of GDP), a figure that represents 85% of the total primary surplus for 2002. This consolidation of public accounts was to a large extent due to the sound performance of tax revenues, driven by the additional resources from withholdings on exports and the growth in VAT and Income Tax receipts. This increase in income was partly offset by higher primary spending caused by a rise in social spending and an increase in automatic transfers deriving from federal tax revenues.

Lastly, the incipient economic recovery was reflected, if only very slightly, in social statistics. The unemployment rate, which had peaked in May 2002 at a level of 21.5%, dropped to 17.8% in October, mainly as a result of the introduction of the Unemployed Heads of Household subsidy program.

### 2.3 Exchange market result

The exchange surplus[9] recorded during the year was US$2.161 billion, explained by a favorable balance of US$8.745 billion in current operations and a deficit of US$6.554 billion in capital exchange transactions. Nevertheless, performance was uneven over the course of 2002.

The first six months of the year were noted for negative results from the exchange market, and the period ended with an exchange deficit of US$542 million. In the second part of the year however, an exchange surplus of US$2.701 billion was recorded, with a monthly average of approximately US$450 million.

The surplus from exchange transactions in the balance of payments current account[10] is explained basically by the balance of goods transactions in foreign currency, which totaled US$10.344 billion in 2002, a reflection of the large trade surplus. This balance was partly offset by the deficits recorded in the services account (US$885 million) and income account (US$954 million). It should be noted that the difference between the trade balance results published by the INDEC (US$16.72 billion) and that recorded in the exchange market (US$10.344 billion) is mainly due to the partial bringing in of currency by exporters of hydrocarbons and mining products, and other reasons that will discussed towards the end of this section.

On the matter of the collection of export proceeds, as from June 2002 a requirement was established for the ceding to the Central Bank of the currency paid for advances and export prefinance in excess of a given amount[11]. As a result, in the period from June to December the Central Bank absorbed on a monthly basis around 65% of the currency derived from

collections on exports, with an average absorption of US$1.188 billion per month, accumulating a total of US$8.318 billion of the US$12.917 billion that were negotiated in the seven months.

| Exchange Market | | | | | | | |
|---|---|---|---|---|---|---|---|
| million US$ | | | | | | | |
| | export charges | import payments | net services | net incomes | net capital | other net | Total |
| Jan | 373 | -35 | -4 | -14 | 193 | 1 | 513 |
| Feb. | 886 | -402 | -62 | -38 | -215 | 11 | 179 |
| Mar. | 1.544 | -1.019 | -65 | -80 | -1.084 | 13 | -691 |
| Apr. | 1.315 | -716 | -39 | -73 | -745 | 12 | -247 |
| May. | 2.121 | -1.032 | -174 | -127 | -1.025 | 30 | -207 |
| Jun. | 1.807 | -792 | -78 | -68 | -972 | 14 | -89 |
| Jul. | 2.158 | -891 | -112 | -124 | -923 | 20 | 128 |
| Aug | 1.875 | -806 | -103 | -57 | -480 | 36 | 465 |
| Sep. | 1.691 | -798 | -76 | -33 | -508 | 19 | 295 |
| Oct. | 1.864 | -825 | -66 | -138 | -256 | 21 | 600 |
| Nov. | 1.727 | -729 | -71 | -97 | -276 | 19 | 573 |
| Dec. | 1.794 | -766 | -34 | -106 | -263 | 15 | 640 |
| Total | 19.156 | -8.812 | -885 | -954 | -6.554 | 210 | 2.161 |

Investment income recorded a deficit of US$950 million during the year, while the net settlement of interest for around US$1 billion was partly offset by a flow from profits and dividends of US$60 million. When analyzing these figures it should be taken into account that the payment of financial interest to unsecured creditors (between the end of March and the end of the year) and the payment of profits and dividends over the whole year required the prior approval of the Central Bank. Interest payments totaled approximately US$1.1 billion, of which some US$750 million correspond to amounts approved by the Central Bank and the remainder to trade transactions or transactions with privileged creditors (international agencies, official lending agencies, etc.).



**Export Charges**

In the case of capital market exchange transactions, the deficit of US$6.554 billion is explained mainly by the net forming of external assets by the private non-financial sector, totaling US$7.4 billion from the start of operations by the Single Free Exchange Market (February 11, 2002) until December, offset by direct investment in the order of US$1 billion. The main instrument used to set up these external assets was the net purchase of dollar banknotes (91%), followed by other net



investments abroad, that include the setting up of deposits and other portfolio investments abroad (7%), and in third place, direct investments by residents abroad (2%).

| Net assets | | | | |
|---|---|---|---|---|
| million US$ | | | | |
| | Bills | direct investments by residents abroad | Other investments by residents abroad | Total |
| Feb. | 286 | 27 | 40 | 353 |
| Mar. | 1.083 | 24 | 103 | 1.209 |
| Apr. | 809 | 8 | -9 | 809 |
| May. | 953 | 31 | 108 | 1.091 |
| Jun. | 866 | 4 | 103 | 973 |
| Jul. | 873 | 4 | 126 | 1.002 |
| Aug | 447 | 1 | 136 | 585 |
| Sep. | 469 | 2 | 38 | 508 |
| Oct. | 322 | 6 | -51 | 277 |
| Nov. | 331 | 21 | -28 | 324 |
| Dec | 291 | 1 | -22 | 271 |
| Total | 6.730 | 128 | 545 | 7.403 |

To avoid distortions between the retail and wholesale markets, from the end of March until mid-December  a regime was established for the purchase and sale of US dollars for account and by order of the Central Bank. Over the whole period this mechanism was in force, a net amount of notes was placed on the retail market for approximately US$1.7 billion, covering around one quarter of the net demand for banknotes during the period[12].



**Net sale of bills**

mill. US$

Other net sale of bills
■ Net sale for account and by order of the BCRA

Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec

**2.3.1 Difference between the balance of foreign trade in goods recorded by the INDEC and the trade balance as per transactions on the exchange market.**

The difference between the trade balance published by the INDEC (US$16.72 billion) and that recorded by the exchange market (US$10.344 billion) in 2002 is mainly related to the partial bringing in of currency by exporters of hydrocarbons and mining products[13]. Other differences are due to the fact that the INDEC publishes imports of goods in CIF (cost, insurance and freight) terms, while on the exchange market payments of imports are in FOB terms (with freight being posted to the services account), in addition to changes in importer credit and other differences in collections on exports. The main discrepancy can be found in exports, where it can

be seen that in 2002, whereas collections recorded by exchange statistics amounted to US$19.156 billion, exports as published by the INDEC amounted to US$25.709 billion. The factors explaining why the inflow of currency is US$6.75 billion below exports shipped are as follows:

a) The partial or lack of bringing in of export proceeds from the sale of hydrocarbons and mineral products was estimated at around US$3.5 billion, accounting for 53% of the difference. These transactions cover 70% of external sales of oil and derivatives and 100% of the exports by the mining sector.

b) There are exports that are shown on INDEC statistics that do not represent a commercial sale, so that under exchange rules they are exempt from the follow-up of the bringing in of currency, as well as exports abroad from the special customs area established by Law 19,640, which were exempt from the control until November 21 of the year under review. Such exports total US$870 million (accounting for 13% of the gap).

c) Net settlement of foreign debt for approximately US$1 billion (15%), explained by the application of exports proceed to achieve a net reduction in advances and pre-finance for US$800 million, and the prepayment of structured loans for around US$200 million.

d) Unsettled shipments («unfulfilled») by exporters within the terms established by the Secretary of Industry, Trade and Mining totaled around US$960 million, 15% of the difference.

e) The net increase in trade credit by exporters was estimated at somewhat under US$250 million, explaining the remaining difference of 4%.



**Difference between export FOB and export charges**

2002

4% net increase in trade credit by exporters

9% other exports

4% special customs area

15% unfulfilled

15% net settlement of foreing debt

53%. (70% oil and derivatives; 100% mining sector)

**3. Capital Market**

As in 2001, during the course of 2002 the domestic capital market was conditioned by factors of a local nature. The isolation of the market from the international scene was a direct result of the suspension of payments on the public and private debt, the depreciation of the peso and the controls placed on capital outflows. In this context, the behavior of the local market was


influenced by the course of negotiations with the IMF, the gradual progress in the process of the reorganization of the financial system, and the signals being sent by the real economy. In addition, the influence of the incentives generated by the various regulatory changes that were introduced were of major importance in understanding the portfolio decisions of economic agents.

## 3.1 Overall market performance

Towards the end of 2001, the growing perception of the complications being faced by the National Government in its efforts to meet its debt payments, and the consequent expectations regarding the continuity of the currency board mechanism evolved into a confidence crisis that forced the government to establish a series of restrictions on the withdrawal of funds from banks (the «corralito»). From then on, the announcement of the temporary cessation of payments on the national public debt and the abandoning of the monetary and financial regime in force since the beginning of the previous decade led to a traumatic structural change that marked the beginning of 2002 as a period of high instability and great uncertainty.

In view of the controls placed on capital outflows, the impact of the suspension of payments on the quality of debt securities and public mistrust of the banking system as a result of the banking crisis, the forced conversion into pesos and the rescheduling of deposits, there was an evident lack of investment alternatives with an adequate yield to risk profile. This developed into a serious problem when, subsequent to the rescheduling of deposits, successive deposit releases and the proliferation of court-ordered releases led to a freeing of a significant mass of non-transactional balances. Faced by a lack of reliable investment alternatives, these balances placed pressure on the demand for foreign currency, increasing the sterilization effort required from the Central Bank while lowering its international reserves, at the same time as the intervention rate of exchange rose. As a result, the first half of the year was noted for a significant depreciation of the currency and a recovery in inflation expectations that provoked a deterioration in the demand for domestic assets.

This situation turned around at the start of the second half of the year, when signs began to be recorded of a reversal in the negative trend in the principal economic indicators. The stabilization of the exchange rate and the deceleration in inflation in the context of domestic demand that was still weak played a fundamental role. After a first half during which the Central Bank intervened heavily as a supplier of foreign currency for the exchange market, and given the increasingly significant complementing policy for the placing of LEBAC bills in pesos at attractive yields, added to the introduction of the requirement that exporters should cede to the Central Bank the currency earned on their export sales in excess of US$1 million[14], the switch in portfolios towards the dollar and the depreciation of the domestic currency were able to be halted. As a result, as from July the Central Bank began to act as a net buyer in the currency market[15]. This turning-point meant that during the second half of the year, when monthly rates of inflation were lower than expected and yields were still high, a

gradual recovery took place in the demand for domestic assets, with increased monetization and a partial rebuilding of the stock of time deposits, which translated into a reduction in the pressure on bank liquidity requirements and Central Bank assistance.

| Capital market indicators | | | | |
|---|---|---|---|---|
| end of period | | | | |
| | I '02 | II '02 | III '02 | IV '02 |
| **Stock market** | | | | |
| Number of companies | 116 | 115 | 114 | 114 |
| Market capitalisation (mill.$) | 385.240 | 399.387 | 343.682 | 348.055 |
| Trade volume (mill.$) | 1.312 | 815 | 835 | 1.191 |
| Merval Index | 403 | 303 | 381 | 506 |
| **Government bonds and securities (mill.$) (1)** | | | | |
| Par value | 142.674 | 193.812 | 243.895 | 225.818 |
| in local currency | 14.397 | 10.184 | 15.438 | 16.754 |
| in foreign currency | 128.277 | 183.629 | 228.457 | 209.064 |
| Market capitalisation | | | | |
| in local currency | s.d. | s.d. | s.d. | s.d. |
| in foreign currency | s.d. | s.d. | s.d. | s.d. |
| Trade volume | 3.352 | 18.857 | 25.111 | 13.101 |
| **Corporate bonds** | | | | |
| Number of companies | 136 | 138 | 133 | 134 |
| Market capitalisation (mill.$) | 9.176 | 10.847 | 9.436 | 8.430 |
| Trade volume (mill.$) | 55 | 20 | 56 | 143 |
| **Financial entities** | | | | |
| Assets (mill.$) | 172.491 | 188.767 | 195.408 | 187.630 |
| **Mutual investments funds (2)** | | | | |
| Number | 321 | 356 | 346 | 367 |
| Net worth (mill.$) | 2.453 | 2.278 | 2.365 | 2.603 |
| Shares | 751 | 27 | 460 | 433 |
| Fixed income | 300 | 322 | 290 | 286 |
| Time deposits | 1.211 | 1.152 | 1.347 | 1.623 |
| Other | 191 | 277 | 268 | 261 |
| **Pension funds** | | | | |
| Number of contributors (in million) | 2.706 | 2.859 | 2.971 | 3.027 |
| Value of portfolios (mill.$) | 23.232 | 34.317 | 7.096 | 38.191 |
| Stocks | 3.311 | 2.908 | 2.897 | 2.532 |
| Government bonds | 15.113 | 26.757 | 28.773 | 29.177 |
| Time deposits | 1.573 | 733 | 1.246 | 989 |
| Other | 3.235 | 3.919 | 4.180 | 5.493 |

(1) Corporate bonds authorised during the period
(2) Data corresponds only to funds registered with the Camara Argentina de Fondos Comunes de Inversión. Volumes traded correspond to annual trading on the BCRA and the MAE. In the case of the MAE they include total sales + own portfolio.
Source: Comisión Nacional de Valores, Cámara Argentina de Fondos Comunes de Inversión, Superintendencia de AFJP, Ministerio de Economía, BCRA.

During June and July the first voluntary exchange of rescheduled deposits for National Government bonds (BODEN) took place. Subsequently, a second voluntary exchange was able to be carried out, involving the release in cash as from October of rescheduled deposits with balances of up to $10,000. The stability of the exchange rate in the face of this release of



Case 2:14-cv-00492-RFB-VCF Document 1-1 Filed 04/01/14 Page 12 of 118

funds was interpreted as a clear sign of the reduction in the nervousness prevailing in the markets. By December it became possible to lift restrictions on the withdrawal of deposits from sight accounts, at the same time as controls on the exchange market were relaxed.

As will be seen in greater detail later in this section and in the chapter on Central Bank Monetary Policy Instruments, these achievements in relation to the process of improving of investor expectations was underpinned by the success with the issue of LEBAC, as these bills gained influence as a reference instrument, given their liquidity and low relative risk, providing the market with information as regards expected short-term yields and thus contributing to a reduction in uncertainty.

### 3.2 Bond and share market

Following the suspension of payment on the sovereign debt and the conversion into pesos of the national securities, the market price of government securities collapsed at the end of 2001. This clearly negative trend was to be maintained during the first half of 2002, reflecting the impact of the complex local financial situation and the difficult relations with multilateral credit agencies[16]. Subsequently, through to the end of the year, this decline was moderated, with some stability being recorded by these depressed prices, in anticipation of the reaching of an agreement with the IMF and the subsequent restructuring of public debt.

In terms of volumes, despite the suspension of payments, the secondary bond market began to partially recover its level of activity (up from minuscule levels in dollar terms compared with recent years) as from the second quarter of the years, as a result of the various possibilities for use of such securities during much of the year. Such possibilities included approval for the use of securities in default for the payment of federal taxes[17], a possibility that was restricted as from August by Decrees 1957/02 and 2243/02. In addition it was made possible to purchase securities denominated in foreign currency paid for in local currency for subsequent sale abroad by means of transactions against wire transfers, although they could only be performed through banks with accounts abroad. As part of the restrictions on the outflow of capital, this latter possibility was forbidden as from the issue in September of Communication «A» 3726.

**Evolution of Government bonds markets**

mill. $
1200
1000
800
600
400
200
0
1998
1999
2000
2001
2002
Traded volume

In addition, mention should be made of the effect of the regulation in force until May 2002[18] establishing the use of securities to settle bank debt with recognition of their technical value. Lastly, the new BODEN delivered in exchange for the rescheduled deposits could be used for the settlement of bank debt. Given the limited duration of most of the incentives mentioned for the purchase and sale of government securities, their influence on market activity can be determined when analyzing amounts trade monthly. In effect, as from September, when the most significant incentives were no longer in effect, the level of activity in this market dropped considerably. In the case of the new securities issued by the National Government that were not in default, the BODEN began to list on the stock exchange at the end of September, although transactions involving BODEN 2005 and 2007 only took place as from October. Until the end of the year the price of these securities remained fairly stable, with a slightly downward trend in the case of those denominated in foreign currency (BODEN 2005 and 2012). The BODEN 2005, 2007 and 2012 ended the period at a parity of approximately 71%, 69% and 43% respectively.

Despite the high volatility recorded, the share market was noted for a significant change in trend over 2002, driven by factors of a domestic nature, which led the local stock market to record an independent performance compared with that of foreign markets. Having recorded a marked downward trend until December 2001, the MERVAL then began to show a positive performance (in nominal terms), in view of expectations of a devaluation and the fact that it became an investment alternative at a time when there were restrictions on the withdrawal of funds from banks. This strong positive impulse lasted into January 2002, as changes to the financial system (including restrictions on capital outflows), added to expectations of high inflation and the restrictions that existed on the purchase of foreign currency, encouraged investors to protect the value of their funds by taking positions in shares of local companies that recorded income flows tied to international prices[19]. This was reflected in the average trading volumes, which in January reached the highest level for the year[20]. Subsequently, given the strong depreciation of the domestic currency in the context of a floating system, MERVAL recorded considerable volatility until mid-April. From then on, and until mid-June -when the index reached its lowest level of the year- the high yields on the exchange market marked a period of clear decline for the stock market.

**Evolution of stock markets**

points
700
600
500
400
300
200
100
0
1999
2000
2001
2002
Merval Index ($)
Merval Index (US$)

Report to the National Congress 2002     Central Bank of Argentina

Eventually, accompanied by relative improvements in the indicators of the real economy and benefiting from various factors (such as the gradual stabilization of exchange expectations, the downward trend in LEBAC cut-off rates and the uncertainty associated with the restructuring of the sovereign debt and the banking system), as from the end of the second quarter and through to the end of the year, this index recorded a steady increase. At the same time there was some recovery in average trading volumes, although they continued to stand well below the levels recorded prior to the crisis in Russia (1998).



**Trade volume in the domestic stock market**



By the end of the year the MERVAL measured in pesos stood at a level of 525, 77% above the close at the end of the previous year (based on the nominal amount in pesos[21]). However, if the comparison is made in nominal amounts in dollars, as a result of the change in the value of the domestic currency, a drop of 47% is recorded.

Although the rise in share prices was extremely selective, with the annual totals favoring the shares of companies manufacturing tradable goods[22], towards the end of the year some recovery began to be seen in the shares of companies in the financial sector and the service sector, the position of which had severely deteriorated in the first months after the devaluation.

### 3.3 Institutional investors

At the end of December 2002, total amounts invested in the pension funds (AFJPs) and the net worth of mutual investment funds (FCIs) totaled $40.794 billion. According to the latest available information, at September insurance companies recorded investments for $12.962 billion.

Because of the conversion into pesos and the indexation implemented, the portfolio of total assets of the AFJPs[23] totaled $38.676 billion at the end of 2002, an increase for the year of 86% in pesos[24], although when measured in dollars the decline is approximately 45%. Of the total annual increase of $18 billion, approximately $17 billion resulted from the yield recorded, which was concentrated in the first half of the year, when the conversion into pesos took place, and when the inflation rate was highest, with a positive impact on AFJP assets because of

the CER adjustment. Net income for the year amounted to slightly over $900 million, well below the average in recent years ($3 billion) because of the drop in funds received.

As a result of the rescheduling of deposits and the exchange for government bonds, the share of the total portfolio accounted for by government bonds[25] increased by 8 p.p. between December 2001 and December 2002, ending at 77% of AFJP assets. In the same period, the share accounted for by time deposits declined in a similar proportion, ending at a level of barely 3%.

The remaining categories of assets held include foreign securities, which as a result of the devaluation and subsequent depreciation of the local currency ended up accounting for 9% of the portfolio, whereas one year earlier they barely totaled 2%. Shares, on the other hand, ended the year accounting for 7% of total assets, 3 p.p. below their participation at December 2001.

Mutual fund net worth at the end of 2002 totaled $2.603 billion. In pesos[26] this amount represents a drop of 32%, while in dollars the fall amounts to 80%. The negative variation in net worth of FCIs measured in pesos has been strongly influenced by the loss of time deposits, which totaled $1.485 billion at the end of 2002, almost 45% below their level at December of the previous year. This reduction, caused by the sharp fall in FCI net worth caused by time deposits in dollars, had an impact on the proportion of FCI net worth in time deposits, which fell from 69% to 57%.

Fixed income, mixed income and money market funds recorded a fall during the year to December 2002, measured in current pesos, of 42%, 13% and 31% respectively[27]. variable income funds, on the other hand, ended the year with a net worth of close to $433 million, showing growth of 80% compared to the last month of the previous year and increasing their share in the total net worth of FCIs by 10 p.p., to a level of 17%.

**AFJP portfolio**
Figures at 31 dec, 2002



Lastly, investments recorded by insurance companies at the end of December 2002 have implied a nominal growth in pesos of 57% compared with those recorded in September of the previous year[28], although if measured in dollars, there has been a drop of 57%. The composition of the portfolio at the end of

13

Report to the National Congress 2002  Central Bank of Argentina

2002 shows the effects of the exchange of rescheduled deposits for government securities, as there has been an increased share accounted for by government securities -rising from 51% in September of the previous year to 65%- together with a drop in the proportion attributable to time deposits, which went from 30% to 16%. The rest of the portfolio (diversified into relatively small percentages of shares, corporate bonds, mutual funds, loans and other investments) has not shown major changes, except for a certain increase in the portion accounted for by shares and corporate bonds.

## 4. Principal monetary developments[29]

The behavior of the principal monetary variables during the year was marked by the changes in legislation in the opening months. The abandoning of the currency board system (in force since the 90s) and the setting up of a single free exchange market at the beginning of the year had a significant influence on the evolution of monetary indicators. In addition, the Central Bank recovered the possibility of exercising an active monetary policy, intervening in transactions with both the public and the private sector.

### 4.1 Broad monetary base and international reserves

During 2002 growth took place in the broad monetary base - defined as the sum of notes and coins in the hands of the public, bank reserves and provincial debt securities known as quasi-currencies- in an amount of close to $14.2 billion[30]. Almost half this increase was recorded during the fourth quarter of the year, especially in December. In annual variation terms, cash in the hands of the public increased slightly more than $7.4 billion.

The considerable issue of quasi-currencies -in particular during the first half of 2002- meant an increase of close to $5 billion. Lastly, the accumulation of bank reserves for over $1.8 billion -both in current accounts at the Central Bank and in the form of cash holdings at the banks themselves- complete the explanation of the growth seen in the broad monetary base over the course of the year.

The negotiation at the Central Bank of export foreign currency earnings gained strength as the principal broad monetary base expansion factor in 2002, with a rise of slightly under $30.1 billion (US$8.3 billion). This performance was closely related to the controls on capital that existed during the year. It will be recalled that it was made mandatory to trade balances generated by the sale of local products abroad through the Central Bank as from June. In addition, intervention by the monetary authority in the exchange market[31] had a decisive impact on the behavior of monetary variables. In the annual aggregate, net intervention by the governing authority had a contractive effect of slightly over $29.7 billion (US$8.8 billion). As a result, the net private sector contributed to a small expansion of the monetary base in the order of $400 million.

### Offer and demand of the Broad monetary base

In current pesos

| | I Q. | II Q. | IIIQ. | IVQ. | 2002 |
|---|---|---|---|---|---|
| I. Factors of expansion of the Broad monetary base | 2.916 | 1.330 | 3.305 | 6.642 | 14.193 |
| a. External net credit | -3.540 | -10.088 | -1.296 | 2.413 | -12.510 |
| Private Sector | -2.686 | -4.586 | 2.456 | 5.228 | 413 |
| Exports liquidation | 0 | 4.147 | 12.768 | 13.163 | 30.078 |
| Exchange intervention | -2.686 | -8.733 | -10.312 | -7.935 | -29.665 |
| Public Sector | -854 | -5.502 | -3.752 | -2.815 | -12.923 |
| b. Internal net credit | 6.455 | 11.418 | 4.601 | 4.229 | 26.703 |
| Public national sector | 1.458 | 5.842 | 3.879 | 3.909 | 15.088 |
| Temporary advances | 500 | 200 | 0 | 0 | 700 |
| Anticipations of utilities | 350 | 460 | 300 | 3.792 | 4.902 |
| Others (utilities in the National Government account) | 608 | 5.182 | 3.579 | 116 | 9.485 |
| Financial sector (assistance to entities) | 2.817 | 4.931 | 670 | -222 | 8.197 |
| LEBAC | -289 | -789 | -1.111 | -509 | -2.698 |
| Emission of quasi-currencies | 2.617 | 1.392 | 887 | 99 | 4.995 |
| Others | -148 | 41 | 276 | 953 | 1.122 |
| 2.Broad monetary base | 2.916 | 1.330 | 3.305 | 6.642 | 14.193 |
| a. External net credit | 3.080 | 877 | -116 | 3.567 | 7.408 |
| b.Bank reserves | -2.781 | -940 | 2.534 | 2.977 | 1.790 |
| Notes and coins in banks | -7 | -162 | 225 | 378 | 434 |
| Current accounts in Central Banks | -2.774 | -778 | 2.309 | 2.599 | 1.356 |
| c. Quasi-currencies | 2.617 | 1.392 | 887 | 99 | 4.995 |

The impacts of the private non-financial sector on the development of the broad monetary base were asymmetric over time, with a notable difference between halves. During the first half of the year, the private sector recorded a net purchase of dollars of close to $7.3 billion (US$2.6 billion), while in the second part of the year it made sales of close to $7.7 billion (US$2.2 billion). Lastly, it should be noted that the behavior of the monetary variables in the two distinctly different periods has been a reflection of a change in portfolios, with a reduction in assets denominated in local currency in favor of assets denominated in foreign currency in the first part of the year, and a partial reversal of this trend in the last six months.

Although the effect of internal transactions by the public sector caused monetary expansion of close to $15.1 billion, these transactions were partially offset by the activity of the public sector in the exchange market, ending the year with a net result of $2.2 billion approximately. These transactions included the expansive impact of the use of the National Government account and the advances on profits and temporary advances to the Treasury, and the contractive effects of the settlement of public debt maturities with international lending agencies.

Transactions involved in the settlement of public debt had no influence on the development of the broad monetary base, either in the first three quarters of 2002 -when the payment of these maturities, the only public debt obligations paid during the period, was made against the National Government account- or in the fourth quarter, when the transactions were performed using profit advances made by the Central Bank to



the National Government.

The financial sector, on the other hand, threatened by the massive drain of deposits in the first half of 2002, required liquidity assistance from the monetary authority -with an impact on the broad monetary base- for a total annual amount of close to $8.2 billion. The monetary growth implicit in these transactions was relatively high in the first six months of the year, declining towards the third quarter and negative in the last three months of the year, as a result of net settlements.

Lastly, during the year the Central Bank performed monetary sterilization by means of the placing of Lebac for approximately $2.7 billion. This monetary policy instrument gained in importance over 2002 as an efficient tool for intervention in the money market. This strengthening of Lebac, with rising trading volumes -as the need for sterilization increased- took place at the same time as improvements in their issue conditions, as it became possible to lower the interest rate paid and lengthen maturities.

During the first months of 2002, the impact of actions by the private sector -a massive flight from domestic currency- added to those of the public sector -payment of debt maturities- sharply lowered Central Bank international reserves. This process was reversed in the second half of the year: after reaching a low point of $8.8 billion (41% less than the total at the end of 2001), at the beginning of August a slow but steady process of recovery in international reserves began, driven by greater confidence in the domestic currency and an increase in exports. Both these factors helped overcome the negative impact from the payments made by the public sector. Since that time, reserves began to follow a path of continuous growth, ending December 2002 at $1.5 billion, 30% less than total reserves one year earlier.

Following the abandoning of the currency board system (Convertibility) on January 6, 2002 and the setting up of a single free exchange market as from February 8, the peso began to depreciate rapidly until reaching a maximum at the end of June of $3.87 per dollar, equivalent to a depreciation of 74% compared with the exchange rate in force during the year the Convertibility Law was in effect. Nevertheless, in recent months, the monetary authority's policy of intervention -complemented by its policy for the placing of Lebac bills- achieved the objective of initially holding the rate of exchange at levels compatible with low inflation scenarios. It also became possible to obtain currency on the market and lower the volatility of its price. As a result, in harmony with the behavior of the international reserves of the Central Bank, the rate of exchange stabilized, with a slight improvement in the final months of 2002, ending the year at $3.36 per dollar, a final fall of 70% in its purchasing power in dollars.

## 4.2 Monetary aggregates

The main monetary aggregates in the local economy were strongly influenced by the legal and regulatory changes for which the first months of 2002 in particular were noted. Private sector means of payment, as seen in broad M2 (defined as the sum of notes and coins in the hands of the public, quasi-currencies and deposits in savings accounts and current

accounts in pesos held by the private non-financial sector) went up by $22.1 billion during the year (101%), while in real terms -using the CPI as a deflator- the increase was $9.5 billion (43%).

The increase in notes and coins in the hands of the public and quasi-currencies in circulation -as a direct consequence of the considerable although declining provincial fiscal deficits[32]- was added to a substantial increase of almost $9.7 billion in sight deposits in pesos -savings accounts and current accounts- held by the local private non-financial sector. The behavior of this variable was marked in the first quarter by the effects of the conversion to pesos and the various alternatives for the release of restricted deposits[33]. In the second quarter, and part of the third, there was an outflow of deposits such as savings, time deposits that had originally been rescheduled and were then released[34] «mixed» with sight deposits, while in the fourth quarter a steady recovery began to gain strength. In terms of the composition of broad M2, the increase in quasi-currencies led to a 5 p.p. rise in their participation in the monetary aggregate, ending 2002 at 18%.



**M2 Real**
Monthly averages deflated for CPI

Cash in the hands of the public continued to record an increased demand for pesos that had not been seen in previous periods. Measured in real terms -deflated by the CPI- the average amount of money in circulation in 2002 was 12 p.p. higher than the average for 2000 and 22 p.p. above the average for 2001.

Various factors were reflected in the variation in the behavior of individuals. One of the main elements in play was the implicit risk perceived by economic agents in bank deposits, in so far as this risk was not offset by the interest rate offered by the system. In addition, particularly in the last quarter of the year, seasonal factors, added to the daily increase in the supply of foreign currency -accompanied by the continuous appreciation of the peso- discouraged the holding of dollars as an alternative investment to the holding of cash in local currency.



Report to the National Congress 2002                        Central Bank of Argentina



**Cash in the hands of the public**
Index base 100= january average

consequence of which was the boosting of sight account balances -which in practice was the first step on the way to their subsequent withdrawal.

From the middle of 2002 various elements accompanied the process of recovery by deposits held by the private non-financial sector. On the one hand, regulatory factors contributed to moderate the effect of the «leakage» of private sector deposits on the liquidity of financial institutions. At the end of May it was established that part of the currency brought into the country as a result of foreign trade transactions must be traded and ceded to the Central Bank.

In addition, the significant negative evolution of the quotient between transactional sight deposits and GDP in the first months of the year lowered this indicator to close to normal levels, considered to be the minimum level necessary to ensure the continued functioning of the payment chain.

Lastly, during most of the second half of the year certain exceptional factors contributed to an improvement in the level of bank deposits. The rate of exchange stabilized -the dollar being considered as an investment alternative to deposits by individuals with a low access to capital markets- and as will be seen later, high rates of interest made time deposits increasingly profitable compared to the purchase and sale of foreign currency.

As a result of this behavior, as from August 2002 bank deposit levels began a recovery that lasted until the end of the year. In general terms, the increase in deposits in pesos held by the private resident sector totaled $4.7 billion during that period (8.5%), led by increases in time deposits, which went up by slightly over $9.8 billion (127%).

Current account balances also evolved favorably, as the incipient pulling out of the domestic crisis -with higher levels of production, and as a consequence, an increased demand for means of payment- helped to increase current account balances by around $1.9 billion (20%). These effects were partially offset by releases of CEDRO rescheduled deposits for over $6.5 billion - including CER accrual. Savings accounts for their part fell by approximately $900 million.

During 2002 both the performance by deposits and the economy in general were determined by the changes made in the existing legal framework. One of the most notable consequences of the local crisis was the fall in the balance of total deposits[35], which in the period analyzed totaled approximately 16%[36]. Private domestic non financial sector deposits recorded a sharper decline, with a drop of close to 205, while public sector deposits recorded annual growth of approximately 72%.

As an overall framework for analysis, over the year two distinct periods can be identified in the behavior of private sector deposits. At the beginning of 2002, the performance of private sector deposits by residents was linked to the legal restrictions established in the previous year and the changes in the regulatory framework that took place during that period. A schedule was established for the return of deposits set up in foreign currency -time deposits, savings accounts and current accounts- and in addition a rescheduling was also established for time deposits local currency. Following the rescheduling, the conversion to pesos took place of deposits originally set up in foreign currency, at the rate of $1.4 per dollar. In this context, a persistent decline was recorded in private sector deposits in the system until approximately the end of July. The end of this first stage coincided with the conclusion of the First Exchange of rescheduled deposits for National Government bonds. Eventually, days after the exchange was concluded, an incipient flow of deposits by individuals began to return to the financial system, leading to a recovery in deposit levels, a behavior that gained in strength towards the end of the year.

The period between early January and the end of July was noted for a sharp loss of deposits by the financial system, reflecting the framework of uncertainty and the widespread flight away from local assets. Private non-financial sector deposits dropped by approximately $20.2 billion (26%). As part of this amount was withdrawn by means of the execution of court orders (around $2.6 billion) it can be seen that the speed of the deposit loss totaled some $2.5 billion per month. This high level of «leakage» reflected the impact of the filtering of deposits from the rescheduling scheme, the initial

### Evolution of the deposits to the private resident sector

Monthly flows in million current pesos

|  | Aug 2002 | Sep 2002 | Oct 2002 | Nov 2002 | Dec 2002 |  |
|---|---|---|---|---|---|---|
| **In Pesos** | 1.482 | 1.683 | 964 | 999 | -442 | 4.686 |
| Saving accounts | -248 | -327 | -58 | 119 | -391 | -905 |
| Current accounts | 160 | 555 | 106 | 770 | 327 | 1.918 |
| Others | -151 | 290 | -196 | 483 | -25 | 402 |
| Time Deposits | 1.862 | 2.250 | 3.100 | 1.567 | 1.035 | 9.814 |
| CEDRO (by CER) | -141 | -1.084 | -1.989 | -1.941 | -1.387 | -6.543 |
| **In Dollars** | -6 | 23 | 54 | 38 | 23 | 132 |

Source: Sistema Centralizado de Requerimientos Informativos.

In terms of the reordering of the financial system, the combined efforts of the Executive Branch and the Central Bank during 2002 focused on the design of numerous alternatives to be offered to savers to speed the return of deposits «trapped»



**Report to the National Congress 2002**   **Central Bank of Argentina**

in banks. Two proposals were made for the exchange of rescheduled deposits for government securities: one for the early advanced partial return of time deposits (the «corralón»), and another for the full release of sight deposits in the so-called «corralito».

As a result of these measures, the participation of residual deposits («corralito» plus «corralón») in total financial system deposits fell significantly in the last 7 months of 2002. While at the end of May residual deposits represented 86% of total deposits, by the end of that year the percentage had fallen to 54 p.p. to a level of only 32%. Of this fall, 20 p.p. can be explained by the reduction in the balance of rescheduled deposits (between May and December they fell 43%), and the remaining 34 p.p. was accounted for by the reduction in deposits in the «corralito» and their its subsequent elimination at the beginning of December.

Lastly, it should be noted that the impact of the high level of reinvestment in deposits in the «free» segment by savers that had been caught in the restrictions helped in the systematic reduction of the ratio recorded.

Showing a behavior with qualitative features similar to the development of deposits and the remainder of the domestic economic variables, the balance of loans[37] to the private non-financial sector in pesos fell 38%[38] in 2002. Once again, changes in the legal framework, the context of widespread uncertainty and the downward trend in the level of economic activity - which interacted to lower both the demand and the supply of loans- could be mentioned as among the principal causes of the extraordinary reduction in the balance of financial credit lines to the private sector.

**Corralito plus corralón / Total deposits**
Private non-financial sector in pesos - Includes update for CER



The recession of recent years -beginning with the crisis in Russia- has been largely reflected in the development of bank lending to the private non-financial sector. In 2000, the cumulative drop at the end of the year was 5%, while in the following year it reached 20%. Nevertheless, during the first half of 2001 lines of private sector loans performed in a manner similar to that seen in 2000, which shows the acceleration in the decline in private sector lending as the general crisis

unleashed in the final months of 2001 grew closer.

Consistently with the local crisis, the reduction in private sector loan balance deteriorated in the first quarter of 2002. Supply and demand factors were not responsible on their own for this drop. The possibility of settling private sector loans making use of rescheduled deposits generated an incentive for the settlement of debt with financial institutions.

**Development of bank lending**
Private non-financial sector
Index bases 100= 1 of January



If the drop in the balance of loans to the private sector related to banks that closed during the year is excluded, the reduction for the year drops to 33%. Commercial loans in particular fell heavily. Loans secured by promissory notes loans fell by the largest percentage, losing 41% compared to the balance at the beginning of the year. Although movements were uneven, overdrafts and other commercial loans lost 27% and 31% respectively. Overdraft lines recorded a slowing in the rate of decline since the end of August, while the remaining types of commercial lending slowed their rate of decline until that date.

**Evolution of the commercial lendings**
Private non-financial sector
With out documented interests
Index bases 100= 1 of January





Private sector consumer loans also recorded a systematic downward trend in 2002. In line with the behavior shown by companies, the uncertainty generated by the local crisis not only halted long-term investment by economic agents, it also affected their decisions regarding consumption. This was reflected in the evolution of loans granted by means of credit cards, which fell approximately 37% during the year.

The losses recorded by other consumer lines have been consistent with the average maturity of each lending line. Personal consumer loans and pledge-backed loans recorded strong falls of 42% and 40% respectively. The loans that were relatively less affected were loans with mortgage guarantees -due mainly to their longer term to maturity compared to other types of lending- losing 26%. Lastly, with the intra-month volatility for which they are noted, the decline in loans to holders of credit cards slowed in the final months of the year.

**Evolution of the lendings to the consumption**
Private non-financial sector
With out documented interests
Index bases 100= 1 of January



### 4.3 Interest rates

As in the case of the rest of the macroeconomic variables, the behavior of nominal interest rates in 2002 matched the ups and downs of the crisis. In general terms, they recorded extraordinary high levels in the early months of the year, to then begin a declining trend as from August. This trend could be seen in both borrowing and lending rates -with only a few exceptions- and in the call and Lebac markets. As has been indicated, from the end of July, the growing confidence in the financial system, the reduction in the rate of exchange, and the high -although declining- rates of interest on deposits, helped towards a recovery in financial system deposits, and with it, a reduction in the liquidity needs for which the first months of 2002 had been noted. Nominal interest rates charged on loans also recorded very high levels during the year, declining as from August.

In line with the evolution of private sector deposits, rates paid on deposits by banks recorded relatively high levels -particularly if measured in real terms- although with a strong downward trend towards the end of the year. From mid-2002, when new time deposits began to be made, interest rates paid to the private sector for deposits from 30 to 44 days were close to 50% -calculated as a weighted average on the basis of the daily total traded- while for time deposits of less than $100,000

they were close to a nominal annual 40%. Attracted by such yields, a recovery was noted in bank deposits, allowing banks to restore their liquidity. In practice, the development of the situation regarding liquidity was added to the definition of a new context that enabled banks to later lower nominal interest rates on deposits, with a sharp decline of around 20 p.p. since mid-October. Nevertheless, deposit rates ended the year at levels that in terms of a sustainable flow of results have been high (an annualized 26%).

**Nominal annual rate of time deposits in pesos 30- 44 days**
moving 5-days average



In view of the evolution of the general price level index in the final months of the year (August to December), deposit rates in real terms -in this case, deflated by the CPI- were lower (and more stable during the period) than the same rates of interest in nominal terms. The average between August and December 2002 for real interest rates reached 25%, whereas those stated in nominal terms recorded an average rate of 38%.

Growing systemic liquidity helped to explain the lower demand by financial institutions -reflected in a lower deposit rate. From its lowest level for the year -in mid-July- the total balance of the current accounts held by banks at the Central Bank increased by around 127%, increasing its ratio in terms of the deposits of the private sector in local currency by almost 10 p.p. towards the end of 2002. Subsequently, this liquidity ratio recorded a slight decline during December, consistent with the public's traditional year-end preference for cash.

Analysis of the variations in lending rates underscored the high levels recorded during 2002, in line with the almost non-existent granting of new loans during the year. Systemic liquidity problems at the beginning of the year led to a significant drop in the offer of credit by the system, with a repercussion in the form of rising interest rates on loans. In overall terms, interest rates on loans recorded a downward trend in the final months of the year. In the case of direct loans for production (including both overdrafts and promissory notes), there was a significant fall as from August. Consumer lines performed unevenly: while interest rates on personal loans and credit cards rose systematically, interest on loans secured by pledges remained relatively stable, and rates on mortgage-backed lines began a

Report to the National Congress 2002  Central Bank of Argentina

downward path as from August.

**Lending interest rates**



## 5. Banking system

The deepening of the economic and financial crisis at the end of 2001 led to implementation during 2002 of various measures with a direct impact on the balance sheets of financial institutions. The conversion into pesos and indexation -in an asymmetric manner- the rescheduling of deposits and the subsequent effect from their release as a result of court orders and the exchanges carried out, added to the compensation granted to banks, meant significant changes in the composition and evolution of their net worth. These changes, together with the deterioration recorded in the quality of their assets, led to a considerable negative impact on the profitability of the financial system.

The following analysis must be understood as a summary of the effects of the crisis as recorded through to the end of 2002, and it should be borne in mind that at that date the financial system was still in the process of returning to normal. It should not be forgotten that at that time there were still important matters to be resolved, such as the need for a definitive solution to the conflict of interest generated by the rescheduling of deposits, definition on compensation payable, and the finalizing of a regulatory framework for the institutions as they faced the new macroeconomic context.

### 5.1 Financial situation

The overall level of intermediation by the financial system recorded a severe decline as a consequence of the worsening of the crisis and the combined impact of the various measures implemented for the reorganization of the system. Although at the end of 2002 the netted assets[39] of the consolidated financial system were approximately 179.9 billion current pesos, an increase in nominal terms of approximately 70% compared to the same period of the previous year, the variation in constant currency -more appropriate in an inflationary context- recorded a drop of 22% [40]. This drop in netted assets measured in real terms was more severe in the case of private banks (27%) than it was for public banks (13%).

The drop in the level of intermediation in real terms can be corroborated by the fact that total system loans to the private

non-financial sector[41] fell 66% in constant currency in relation to the level at the end of 2001, whereas total deposits by the private sector -including adjusted CEDRO balances- recorded a drop of 55% in real terms.

Together with the changes in the level of intermediation, there were important changes in the net worth structure of banks. In terms of consolidated netted assets (NA), there was a significant gain by lending to the Public Sector[42] (government securities in portfolio and compensation to be received from the National Government and loans as such), which increased its share by 26 p.p. over 2002, until representing almost half the NA at the end of the period. This increase in the exposure of the financial system to public sector credit risk took place because of the combined effect of conversion to pesos at the rate of $1.40 per dollar -an amount subsequently adjusted according to the CER -and the addition to assets of Government securities granted in compensation for the conversion into pesos. In the case of this latter factor, it should be noted that much of the amount received in BODEN -the aggregate of which accounted for 35% of lending to the public sector at the end of 2002- is denominated in foreign currency, as they involve holdings of BODEN 2012 (for compensation or coverage) to cover the negative positions in that currency resulting from the conversion into pesos[43].

### Assets of the bank sector
Whole of the consolidated sector



■ Netted assets in current pesos
■ Netted assets in pesos December

This contributed to ensuring that the system was able to maintain a net asset position in foreign currency. In addition, as loans to the Public Sector accrued interest rates set at low levels -as they were assets restated according to the CER if they had been converted into pesos, or because they were dollar-denominated[44]- their strong weighting, as analyzed later, led to a notable deterioration in bank interest income in terms of total assets, a drop that was partially offset by the capital gains implicit in the accrued CER adjustment.

In contrast, there was a considerable decline in the share accounted for by loans to the private sector, which fell to 21% of NA, when one year earlier they represented the largest single asset heading (49%), as a result of which the weighting of this type of loan ended up being very low in terms of the recent history of the system[45], reflecting the effect of a drop



**Report to the National Congress 2002**   **Central Bank of Argentina**

in the nominal balance of approximately 26% for the year[46].

### Net assets components
Whole of the consolidated system



### Evolution of the lendings for line
Loans to the Private non-financial sector and resident in the exterior





The reduction in balances was widespread among the various lines of loans to the private non-financial sector[47]. Lines showing the larges drop in balances (including principal, CER and CVS adjustment and accrued compensating interest receivable) were personal loans and credit card lending, which fell 45% and 42% respectively. There was a significant level of repayment of long-term mortgage loans -which have the greatest weighting in the composition of loans to the private non-financial sector- as they dropped 25% in nominal terms. Advances and promissory notes ended the year with a fall of 28%. Lastly, lines grouped under «other loans» recorded nominal growth of close to 15%, explained mainly by the increase in the balance of letters of credit and the rise of lines exclusively for the granting of export pre-finance and exports.

Compared with the remaining asset components, the balances with the greatest liquidity (minimum cash and other liquid funds[48] saw a drop in their share of 3 p.p. equivalent to 9% of assets in December 2002, while both Other credits from financial intermediation and the remaining assets recorded an increase in their share, accounting for 11% and 8% respectively of netted assets in the consolidation for the financial system as a whole.

In the case of the funding of the consolidated financial system (liabilities plus net worth), there was a significant drop in the share accounted for by deposits, which amounted to 42% of the aggregate, whereas in the previous year their share had totaled 61%. Although there was a nominal increase of 13% in the balance of total deposits by the non-financial sector (including CER adjustment), given the increases in the rest of the components, deposits ended by recording a lower weight in the funding structure. The impact of the two exchanges that took place during the year should be taken into account. As a result, amounts due to the Central Bank (almost 25% of which at December 2002 corresponded to advances received for the subscription of BODEN) were equal to 15% of the sum of liabilities and net worth at the end of 2002, whereas their relative share one year earlier was 11 p.p. lower. A large part of the increase in this funding heading is explained by the liquidity assistance granted by the monetary authority in its role as a lender of last resort. With the aim of preventing a greater destabilization of the financial system as a result of the precarious liquidity being recorded in the sector, assistance was provided in the first half of the year, as the outflow of deposits from the partial lifting of restrictions and court-ordered releases intensified[49].

Among the remaining headings making up liabilities and net worth, there was a notable increase in the weighting of credit lines from abroad. As a result of the devaluation and subsequent

Report to the National Congress 2002  Central Bank of Argentina

depreciation of local currency, the relative weight of lines from abroad doubled to a level of 14% of total funding at the end of the year. Likewise, there was a 1 p.p. increase in the share accounted for by corporate and subordinated bonds, which ended the year at a level of 7% of the funding structure.

**Composition of the sum of the liabilities and net worth**
Loans to the Private non-financial sector and resident in the exterior
December 2001



December 2002



Several of the changes recorded between ends in the structure of the net worth of the system -the drop in the participation by liquid assets and loans to the non-financial public sector in total assets, the declining share accounted for by deposits, and the simultaneous increase in the weighting of amounts due to the Central Bank on the liabilities side- were linked to the development of bank liquidity during the year. In December 2002, liquid assets (minimum cash requirement compliance and other liquid funds) represented almost 23% of total deposits held by the non-financial sector; liquidity measured in terms of balance sheet totals thus recorded an improvement of 4 p.p. compared to the same month of the previous year and approximately 7 p.p. compared to its worst level during the year (March). If the liquidity indicator were to be based exclusively on the current accounts held by financial institutions at the Central Bank, a 5 p.p. increase was recorded between ends, totaling close to 14% at the end of the year. Recovery by these indicators took place gradually during the second half of

**Development of the liquidity**
Total system



In view of the end of the currency board mechanism and the conversion into pesos of a large part of bank assets and liabilities, the effect of these changes on the composition of the aggregate balance sheet for the financial system according to the currency in which the various headings are denominated should be analyzed[50]. Whereas in recent years there have been some gains by assets in foreign currency in the aggregate for financial system assets -rising as high as 71% of the total at December 2001- towards the end of 2002 their participation had declined to 33% of the total. A similar performance was recorded by liabilities; in this case the percentage in foreign currency went from 72% in the last month of 2001 to 31% one year later. As a result, if the system's foreign currency position indicator is taken to be assets less liabilities in such currency (both stated in pesos) as a percentage of net worth, it can be seen that between 2001 and 2002 there was a drop of close to 37 p.p. to a level of 47% of net worth.

**Structure of the balance for currency**
Total financial system



As a result, despite the conversion into pesos of a large portion of assets and liabilities, the system aggregate retained a net asset position in foreign currency of approximately US$ 3.2 billion, 25% of the total recorded at the end of 2001. This remnant in foreign currency on the assets side is largely explained by the compensation granted banks by the



**Report to the National Congress 2002**                    **Central Bank of Argentina**

Government. The total for holdings of BODEN US$ 2012 (received as compensation and coverage) and the amounts of compensation originally due stated in foreign currency represents almost half the segment of assets denominated in such currency. In the case of liabilities, this amount is explained mainly by foreign currency credit lines (51%), although the component linked to corporate and subordinated bonds (25%) was also significant. It should be noted that this net asset position in the system affects its profitability because of its links to the evolution of the exchange rate, so that at times when the currency is depreciating the aggregate for all institutions records gains from «exchange rate differences,» while the appreciation of the domestic currency implies the posting of book losses.

board mechanism (by means of the conversion into pesos at the rate of one peso per dollar and the setting of maximum rates, with special consideration for smaller debtors, whose debt principal was indexed by the CVS rather than the CER), the critical situation still had an impact on the quality of the assets in the banking system. In the case of the family household segment, it should be noted that there was a sharp drop in real wages, added to uncertainty on the employment situation.

In the business sector, note should be take in first place of the weakening of income flows in the different sectors as a result of the worsening recession[51], except for certain segments that recorded an improvement in their outlook as a result of their exporting profile or the possibility of benefiting from an incipient import substitution process. In addition, the repayment capacity of the business sector was affected by both the increase in its debt burden as a result of index-linking and the loss of value of the local currency, particularly significant in the case of large corporations with income flows in domestic currency and significant debt in foreign currency.

As an introduction to the analysis of date in relation to the situation of debtors, it should be pointed out that the extraordinary nature of the situation obliged the Central Bank to relax regulations on debtor classification and provision levels. Already at the beginning of January 2002, Communication «A» 3418 established that for December 2001 and January 2002, banks were to increase by one month the length of the period of payment arrears for loans to remain classified as performing (levels 1 and 2), a rule that also covered debtors classified as level 2 included in «Agreements to improve competitiveness and generate employment» (Decree 730/01), in relation to

**Items of the assets and passive in foreign currency**
Total system – December 2002



Assets in FC

- Availabilities
- Compensation granted banks by the Government
- Rest of titles
- Loans
- Rest OCFI
- Other assets



Passive in FC

- Deposits
- CO and SB
- Lines of credits from abroad
- Rest OOFI
- Other liabilities

| Credits portfolio quality | | | | | | |
|---|---|---|---|---|---|---|
| % | | | | | | |
|  | Dec '97 | Dec '98 | Dec '99 | Dec '00 | Dec '01 | Dec '02 |
| **Indicators of irregularity and exhibition** | | | | | | |
| Irregular portfolio / Lending | 11.6 | 10.3 | 11.5 | 12.9 | 13.1 | 18.3 |
| Unrecoverable and Irreg.portfolio / (lending Irreg.) | 7.4 | 6.5 | 7.1 | 7.7 | 7.9 | 12.4 |
| Irregular portfolio – Forecasts / Lending | 4.5 | 3.8 | 4.4 | 5.0 | 4.4 | 4.8 |
| Irregular portfolio – Forecasts / NW | 22.5 | 20.6 | 24.7 | 26.2 | 21.6 | 17.1 |
| **Irregularity for sector** | | | | | | |
| Not financial public | 0.4 | 0.1 | 0.1 | 0.8 | 0.5 | 0.7 |
| Financial | 2.9 | 2.1 | 4.5 | 1.8 | 1.6 | 4.4 |
| Not financial private | 13.8 | 12.2 | 14.8 | 16.0 | 19.1 | 35.6 |
| Preferred type «A» guarantees | 7.9 | 6.3 | 4.1 | 7.9 | 12.0 | 50.1 |
| Preferred type «B» guarantees | 19.8 | 17.9 | 21.0 | 22.2 | 20.3 | 34.6 |
| With out Preferred guarantees | 10.8 | 9.4 | 10.5 | 12.4 | 18.5 | 35.9 |
| **Irregularity for type** | | | | | | |
| Commercial portfolio | 9.0 | 7.5 | 7.9 | 9.3 | 10.4 | 14.5 |
| Commercial portfolio up to $ 200.000 | 18.9 | 14.4 | 21.2 | 22.8 | 17.3 | 26.7 |
| Portfolio of consumption and housing | 15.1 | 18.6 | 16.6 | 17.2 | 17.4 | 31.8 |

## 5.2. Lending and loan portfolio quality

One of the direct consequences of the crisis was its impact on the payment capacity of the various sectors of the economy, affecting the already deteriorated payments chain. Although various regulations issued during the year attempted to give due consideration to the situation of debtors as a result of the structural change implicit in the abandoning of the currency



Report to the National Congress 2002                    Central Bank of Argentina

Subsequently, by means of Communication «A» 3463, the arrears permitted in January for loans classified as levels 1 and 2 were extended by a further 31 days -as a result of which the arrears admitted for the commercial and consumer loan portfolios became 93 and 152 days respectively- while in February arrears of 62 and 121 days were allowed. For the months of March to June, Communication «A» 3630 established that for debtors classified in situations 2 and 3 in arrears for 62 and 121 days -for the commercial and consumer portfolio respectively- it would be allowed to adopt the provisions corresponding to the immediately preceding category, in addition to maintaining the additional term of 31 days for debtors in category 2 as a result of the competitiveness agreements[53].

Lastly, Communication «A» 3815 extended this relaxation to July and August 2002, establishing that as from September the general rules on minimum provisions would again be applicable. This report will concentrate on portfolio quality in the last month of 2002, using data from the same month of the previous year as a parameter for comparison purposes. It should be remembered that in December 2001 a relaxation was in force regarding the length of the arrears permitted for loans to be rated as performing.

Between December 2002 and December of the previous year, gross non-performance of the total loan portfolio for the financial system rose from 13.1% to 18.3%. The size of this deterioration was influenced by the increase in lending to the public sector, as such loans are generally classified as performing. At December 2002, loans to the public non-financial sector accounted for 47% of total financial system loans, whereas one year earlier, this total was 27%. This change in composition was due to that fact that whereas the totals for lending to the public non-financial sector almost doubled between the two months being considered, loans to the private non-financial sector on the debtor statement dropped almost 15%.

If analysis is made of the quality of lending to the private sector on its own, the deterioration in the quality of the loan portfolio held by the system is even more marked: towards the end of 2002 loans to this sector in an irregular situation totaled approximately $16.8 billion[54], so that the gross non-performing rate for these loans totaled 35.6%, an increase of almost 17 p.p. in comparison to December of the previous year.

This significant increase in arrears centered on categories 3 and 4, so that between ends of the period under review the ratio of the unrecoverable loan portfolio (in situations 5 and 6) to the total portfolio of non-performing loans to the private sector dropped from 42% to 36%. If non-performance is evaluated taking into account exclusively the portfolio considered to be recoverable -that is to say, without taking into account the unrecoverable portfolio in either the numerator or the denominator-the ratio recorded rises from 11.9% to 25.9% for the system as a whole.

A breakdown of total loans to the private sector according to the type of portfolio shows that the household segment - benefiting particularly from indexation on the basis of CVS rather than CER- recorded the lowest relative increase in its

delinquency level, despite the significant increase of 14 p.p. compared to December last year, ending 2002 at a level of 31.8% for the total system.
The portfolio of commercial loans to the private sector almost doubled its delinquency rate, ending the period analyzed with a non-performance rate of 37.5%.

Lastly, the portfolio of commercial loans for up to $200,000 - similar to consumer loans- was the sub-group of loans to the private non-financial sector most affected by the crisis: its non-performance rose from 17.3% at the end of 2001 to 46.7% one year later. It should be noted, however, that loans in this latter category represented only 4% of total loans to the private sector.

### Quality of the lending to the private non financial sector
Total system – December of every year



However, if financial system loans to the private sector are broken out by the type of guarantee backing them, the sub-group recording the greatest delinquency was that with self-liquidating preferred guarantees (preferred type «A» guarantees), for which non-performance rose from 1.0% at the end of 2001 to 50.1% at the end of 2002. Nevertheless, it should be noted that the effect of this latter increase on the total quality of the portfolio is minimal, as only a small volume of total loans to the private sector is secured by such guarantees.

Loans with other preferred guarantees, which in December 2001 showed the greatest delinquency (20.3%), ended 2002 with a non-performing portfolio of 34.6%. Unsecured loans by the financial system to the private sector recorded a similar portfolio quality ratio at that date (35.9%), an increase of almost 17 p.p. compared to the level they recorded at December 2001.

This marked increase in delinquency was accompanied by a significant rise in the volume of provisions. While the ratio of provisions over total loans increased almost 5 p.p. to a level of 13.5%, the exposure of net worth to credit risk in relation to loans granted to the private sector declined, as could be seen from the ratio of non-performing portfolio net of provisions as a percentage of net worth, which dropped from 21.6% to 17.1%.

23



In addition, given the drop in loans by the system as a whole to the private sector, if balance sheet provisions are expressed as a percentage of the total for such loans, the ratio obtained records an increase between ends of approximately 14 p.p., finishing the year at a level of 27%, while if provisions are calculated as a percentage of the non-performing portfolio of loans to that sector, the indicator rises from 67.5% to 75.7%.

While so far an analysis has been made of the increase in credit risk for the system as a whole, note should be taken of the fact that the deterioration in loan quality has been widespread, notwithstanding certain differences among the different sub-groups. While the total portfolio non-performance at December 2002 was 19.9% for private banks, the same ratio for public banks totaled 15.5%, given the greater proportion of its total loans granted to the non-financial public sector. The rate of non-performance in loans to the private sector totaled 37.4% for private banks, reaching 41.7% for the sub-group formed by the eight largest private banks, while in the case of public banks, this ratio was 32.3%. As far as cover by means of provisions is concerned, whereas in the case of private banks almost 75% of the irregular portfolio of loans to the private sector was covered by provisions (73% in the case of the 8 largest banks), in the case of public banks 77% of the non-performing portfolio was provided for. Nevertheless, while public banks recorded an increase of almost 19 p.p. in this latter ratio compared with the level recorded twelve months earlier, in the case of private banks there has been a drop of 1 p.p..

Lastly, and as will be seen in the following section, the difficulties experienced by the various groups of economic agents in honoring their financial commitments, and the consequent erosion in the quality of bank loan portfolios -in particular that part directed at the private sector- was matched by a notable deterioration in bank profitability. This took place because of the accounting effects of the delinquency related both with the stocks of assets -through their adjustment by means of provisions- and with the flows generated by them - given the lower accrual of interest income.

## 5.3 Profitability

As a result of the deepening of the recession, profitability for the aggregate financial system had been recording a clearly negative trend on recent years. Notwithstanding, the bank crisis unleashed at the end of 2001, the structural change caused by the subsequent collapse of the currency board system, and the series of measures adopted over the course of 2002 had an unusually significant negative impact on the level and structure of the income of all financial institutions.

In this context, system profitability over the course of 2002 was strongly conditioned by the performance of key variables such as deposit and lending rates, price levels (both wholesale and retail) and the rate of exchange. In turn, the quality of the results was affected by activity and employment levels, which have a direct impact on the repayment capacity of debtors and the possibilities of a recovery in the level of lending to the private sector, one of the traditional sources of income for the banking system.

To help understand the situation, before analyzing results for 2002, we will briefly detail the changes made to the presentation of accounting information as a result of the increase recorded in price levels at the beginning of the year.

Communication «A» 3702 established that as from January 2002 financial statements were to be presented in constant units of currency at closing date and not in current units of currency, as had been the case until then. It was laid down that the price index was to be used to restate the various items into uniform currency was the wholesale price index (IPIM) published by the INDEC.

This restatement of accounting information into closing rate currency implied the determination of a monetary result, as the various balance sheet items are made up of monetary and non-monetary items, and the former are not subject to inflation adjustment[55], so that in an inflationary environment a monetary result is generated. In the case of a standard bank with a monetary asset position (that is to say, monetary assets greater than monetary liabilities) this represented a loss directly proportional to the increase recorded in the price index[56]. These were accounting losses unrelated to cash flows. Such a monetary result does not represent a current deterioration in the net worth of institutions, as according to the procedure laid down, net worth increases by an amount equivalent to the loss recorded under this heading on the income statement.

| Profitability structure | | | | | | |
|---|---|---|---|---|---|---|
| Annualized indicators in % of the netted assets | | | | | | |
| | '97 | '98 | '99 | '00 | '01 | '02 |
| Net interest income | 4.1 | 4.6 | 4.3 | 4.0 | 3.8 | -1.7 |
| Restatement by CER and CVS | | | | | | 3.9 |
| Other financial income | 0.3 | 0.3 | 0.4 | 0.6 | 0.7 | 2.6 |
| Service income margin | 3.3 | 3.1 | 2.9 | 2.8 | 3.0 | 1.9 |
| Gains on securities | 1.0 | 0.7 | 0.9 | 1.2 | 1.2 | 1.7 |
| Operating cost | -4.4 | -6.2 | -5.9 | -5.8 | -6.1 | -4.4 |
| Loan loss provisions | -2.2 | -1.6 | -2.1 | -2.4 | -2.6 | -4.7 |
| Tax charges | -0.4 | -0.4 | -0.4 | -0.4 | -0.5 | -0.3 |
| Adjust. valuation of government securities | -0.3 | -0.3 | -0.3 | -0.3 | -0.2 | -0.2 |
| Other | 1.6 | 0.5 | 0.5 | 0.4 | 0.6 | -1.8 |
| Monetary result | . | . | . | . | . | -5.8 |
| Operative result | 0.6 | 1.0 | 0.9 | 0.6 | 0.2 | -4.6 |
| Financial result | 0.4 | 0.3 | 0.1 | -.01 | -0.4 | 1.3 |
| Result b/Adj. valuation of gov.securities | 1.2 | 0.8 | 0.6 | 0.4 | 0.2 | -8.7 |
| Total result | 1.0 | 0.5 | 0.2 | 0.0 | 0.0 | -8.9 |
| Total result before the monetary result | 1.0 | 0.5 | 0.2 | 0.0 | 0.0 | 3.1 |
| Total result/ NW | 6.3 | 4.0 | 1.7 | 0.0 | -0.2 | -59.2 |
| Total result before the monetary result/NW | 6.3 | 4.0 | 1.7 | 0.0 | -0.2 | -20.4 |

the financial system aggregate recorded a total book loss of approximately $19.2 billion, measured in currency as at December of that year. Almost 65% of the loss was accounted for by the monetary result. Whereas total losses recorded were equivalent to 8.2% of average netted assets (NA)[57] and 59.2% of average net worth, if the monetary result is excluded the negative ratios are 3.1% and 20.4% respectively.

As indicated, it is important to bear in mind that -in line with



the regulations then in force- the calculation of the monetary result was made based on the wholesale index, which recorded an exceptional rise during the year, given its connection to the price of tradable goods and the adjustment these experienced as from the devaluation. Between December 2001 and December 2002, the IPIM index went up 118.2%, whereas the CPI rose 40.9%[58].

As the accumulated monetary result in 2002 was a loss of 5.8% of on average NA, and given the impact of the structural changes on the IPIM index, the non-current nature of this loss should be stressed.

The difference between current results and extraordinary results is particularly relevant when analyzing the significance of the various profitability headings making up the unprecedented loss levels recorded during 2002.

Another of the leading profitability headings that help to explain the level of losses recorded also concerns adjustments of a transitory nature, in this case loan loss charges, which ended the year at a level of 4.7% of average NA, when in previous years -although showing a rising trend in reflection of the influence of the economic crisis on credit risk- they had been kept to a level of below 3% of NA.

In the face of the shock represented by the restrictions on the withdrawal of funds from banks and the abandoning of the currency board mechanism on the already deteriorated payment chain, and in view of the uncertain prospects regarding the future of the economy that had a direct effect on the expectations of financial institutions regarding the potential for recovery of their loan portfolios -the quality of which had deteriorated significantly- financial institutions were obliged to make exceptional loan loss provision efforts.

Certain large private institutions adopted a conservative provision policy that had a strong repercussion on aggregate loan loss provision amounts. In addition, it should be noted that this effort as regards provisions centered on the first half of the year, when prospects for the future evolution of the exchange rate and other key variables were seriously compromised. Subsequent stabilization of the exchange rate and price levels, added to certain positive signs of incipient recovery in economic activity allowed some banks to revise their provisions downward towards the end of the year[59].

Lastly, another of the negative impacts of an extraordinary nature has been the change recorded under the «sundry» heading[60]. Whereas since 1998 this heading had been recording a relatively minor weighting in the profitability structure -with annual gains equivalent to 0.5% of average NA- in 2002 it recorded a loss of 1.8% of NA.

This loss was linked to a significant increase in «sundry losses,» particularly from the results on long-term investments, charges for provisions not linked to uncollectibility and the charges for unrecoverability of sundry receivables[61]. The growth in the last two concepts mentioned is explained by two factors. On the one hand, the losses foreseen as a result of the return of deposits following the issue of court orders[62] because -as they

had been recorded on balance sheets according to the conversion rate of 1.4 pesos per US$1 plus the application of the CER index established at the time of their conversion into pesos- they were paid out in dollars or on the basis of the free market rate of exchange. In addition, account should be taken of the costs of the reorganization of the banking system, as certain large private banks that made major adjustments to their cost structure posted part of the expense foreseen for the process as sundry losses.

Current income headings, more closely linked to the future benefits expected by the financial system, also reflected the negative impact of the crisis. Net interest income, the most important bank income line, based on its principal activity -financial intermediation- was badly affected during the year, recording an accumulated loss of 1.7% of NA, when in previous years gains had been approximately 4% of NA. This item of profitability structure was particularly harmed by the changes in the composition of bank balance sheets, the regulation of certain rates of interest, and the performance of the exchange rate, factors that together ended by eroding the spread between the yield on assets and the cost of liabilities.

It should be recalled that as from the conversion into pesos, the asymmetric indexation and the compensation received in government securities (BODEN), a considerable proportion of bank assets began to be made up of public sector assets with limited yields, while the deterioration in the quality of the portfolio of loans to the private sector caused a fall in interest accrual. In the case of liabilities, there was a combined impact from the retaining of liabilities not converted into pesos (corporate bonds and foreign credit lines), with a weight in the funding structure that increased as a consequence of the depreciation of the peso, and the high cost of taking «free» time deposits and a considerable increase in Central Bank liabilities as a result of the liquidity assistance provided.

As rate regulation[63] was complemented by adjustment according to CER (and CVS in the case of a significant portion of loans), the loss recorded by interest should be considered together with the net result accrued from CER and CVS adjustment to gain a clearer idea of the result from traditional intermediation business[64]. As the result of CER and CVS adjustment amounted to 3.9% of NA during 2002, if these results are added to net interest a joint ratio of 2.2% of NA is arrived at, still considerably below historical interest income levels.

If «Other financial results» amounting to 2.6% of NA for the year are also added in (historically they had represented an amount of less than 1% of NA), a total of 4.8% of NA is arrived at, in line with the historical level for the sum of net interest income and other financial results (between 4.4% and 4.8% in the five previous year). Nevertheless, the non-recurring nature of much of the income accumulated in 2002 under the heading of «Other financial results» should be noted.

In particular, this increase was strongly linked to the gains derived from the restatements of items because of exchange rate differences. While the system aggregate recorded a net asset position in foreign currency (foreign currency assets

**Report to the National Congress 2002**  **Central Bank of Argentina**

greater than foreign currency liabilities), in a situation in which the local currency is depreciating banks record a gain as a result of the increased value of that asset position measured in pesos. Also added to these results thus calculated was the income from the purchase and sale of foreign currency and the positive result generated by the compensation arising from the asymmetric conversion into pesos (Communication «A» 3703).

The second leading source of current income, income from services, totaled 1.9% of average NA for the year, a significant drop in terms of its historical average (close to 3%). This drop is explained by a large increase in netted assets that could not be matched by income from services. Although the restrictions on the withdrawal of cash in force led to a rise in the demand for transactional services (electronic banking, debit cards), several of the more profitable services saw their growth halted. This was the case of commissions linked to loans, in a context of a sharp decline in the stock of loans to the private sector. A similar situation took place in relation to the commissions on capital market transactions (commissions on securities placements, advisory services, etc.).

Lastly, results on assets built up a gain equivalent to 1.7% of average NA, due mainly to the yield accrued on holdings of securities. These results, traditionally highly volatile, were higher than had been recorded in recent years (1.2% of NA in 2000 and 2001).

This weakening in the income base of financial entities was partly offset by a drop in operating costs in relation to netted assets. Although in recent years these costs had been declining in terms of NA, showing an average level of close to 6% during 2002, the weight of this heading dropped until it represented 4.4%. This drop was due both to the lack of wage inflation -in the context of a considerable increase in netted assets- and to the adjustments made by various entities (specially the largest private banks) to their costs structures to adapt them to the new business outlook.

To place the size of these adjustments in context, it should be noted that during the year banks cut the number of their branches by 7%, while the number of personnel employed by the system as a whole fell by close to 11% between December 2001 and December 2002[45]. Nevertheless, the effects of these adjustments were not fully carried over to the total amount accrued for administration costs, as in 2002 there was a significant increase in amortizations and compensation recorded, to a certain extent explained by the costs of the restructuring undertaken.

To deepen the analysis of the profitability structure, mention should be made of the differences that existed between the various bank sub-groups. The loss of approximately $19.2 billion in currency as at December 2002 that took place during the year corresponded almost entirely to the private bank sector (82%), while public banks and non-financial institutions accounted for 11% and 7% respectively. The profitability structure of private banks, although following the main trends described for the system as a whole, has had some specific features of its own.

In the case of income, although private banks recorded a severe erosion of their net interest income, the result was almost nil in terms of NA. Net adjustments for CER and CVS represent a lower level (1.1% of NA) than that for the entire system, while the weight of «Other financial results» is higher than for the aggregate (4.3%)[46].

The weight of income from services (2% of NA) and results on assets (2.5%) is in line with the levels for the system aggregate. In the case of outflows, operating costs (4.8% of NA) and uncollectibility charges (5%) were slightly above those for the system as a whole. Lastly, the sundry heading and the monetary result recorded a greater weighting than the aggregate, posting losses of 3% and 7.5% of NA respectively. As a result, private banks ended the year with a negative profitability of 11.3% in terms of NA and 79% in terms of net worth, although excluding the monetary result these rations showed losses of 3.8% and 26.3% respectively.

**Profitability structure - Private banks by type of operative**

Annualized indicators in % of the netted assets- 2002

| | Total | 8 grandes | Regionales | Resto minoristas | Mayoristas |
|---|---|---|---|---|---|
| Net interest income | -0.2 | -0.4 | 4.9 | -0.8 | -1.2 |
| Restatement by CER and CVS | 1.1 | 1.3 | 4.2 | -1.0 | 1.7 |
| Other financial income | 4.3 | 3.2 | 12.8 | 3.4 | 14.3 |
| Service income margin | 2.0 | 1.7 | 4.4 | 2.5 | 2.1 |
| Gains on securities | 2.5 | 1.9 | 3.2 | 4.1 | 3.4 |
| Operating cost | -4.8 | -4.1 | -9.8 | -5.8 | -5.8 |
| Loan loss provisions | -5.0 | -5.2 | -4.5 | -4.2 | -4.8 |
| Tax charges | -0.3 | -0.3 | -0.9 | -0.5 | -0.8 |
| Adj. valuation gov.securities | -0.2 | 0.0 | -1.6 | -0.2 | -2.4 |
| Other | -3.0 | -3.2 | -3.0 | -1.0 | -6.0 |
| Monetary result | -7.5 | -5.1 | -15.0 | -12.1 | -18.2 |
| Total result | -11.3 | -10.2 | -5.3 | -15.6 | -17.1 |
| Total result b/monetary result | -3.8 | -5.1 | 9.7 | -3.6 | 1.1 |
| Total result/ NW | -79.0 | -92.6 | -19.6 | -73.3 | -68.6 |
| Total result before the monetary result/ NW | -26.3 | -46.7 | 35.8 | -16.8 | 4.4 |

Given their weight in the sector, the group made up of the 8 largest banks recorded a profitability structure very similar to that commented on above -differing only in the lower weighting of operating costs and the increased importance of loan loss provisions. Nevertheless, the situation of regional banks and wholesale institutions should be mentioned, because as a group they recorded positive profitability before calculating the monetary result. Regional banks in particular recorded a lower impact on their income base: their net interest income was 4.9% of their average NA, while their income from services was 4.4% of the same aggregate.

Net income from interest has shown a lesser deterioration because of the balance sheet structure of these entities, which have a lower exposure to the public sector and an increased concentration of their loans on high-yielding loan categories (overdrafts and personal loans), while on the liabilities side they recorded a lower impact from non-pesified lines (foreign credit lines and corporate bonds) and liabilities to the Central


Bank. Nevertheless, this income base was largely offset by the historically heavy weight of their cost structure. The better profitability of wholesale banks before determining their monetary result was due to strong growth under «Other financial results» as a result of the re-evaluation of assets because of exchange rate differences.

## Notes

[1]   In view of the significance of the changes introduced at the start of 2002 to the monetary and financial system, and as their instrumentation was complemented by various changes to the legal and regulatory framework that help to explain the evolution of the financial system over the course of this year, there is a need to outline a summary of these changes to define the context for events analyzed in this Report. A detailed description of the various changes is provided in the section on regulatory changes (Section III.1), where special mention will be made of their application by the Central Bank. This section will not analyze the effects of the changes to the regulatory structure on the development of the financial system, as such analysis will be presented in Sections II.4 and II.5.

[2]   Decrees 1570/01 and 1606/01

[3]   The temporary cessation of payment on the servicing of the debt was formally introduced by section 6 of the 2002 Budget Bill

[4]   For further details on the exchange market regulations, see the section on this topic in Chapter III.

[5]   A summary of the features of the Monetary Program drawn up for 2002 is included in Section VI.I

[6]   Decrees 410/02, 704/02, 992/02 and 1267/02.

[7]   The alternatives offered, the procedure for subscribing to the bonds to be delivered by banks and the mechanism for compensation are detailed in Section III.I, and the results of the exchange are detailed in Section II.4.

[8]   Includes section 4 of the «Monetary and Financial Bulletin, 2002 Annual Edition

[9]   Includes transactions performed on the official and free markets in January 2002 and on the single free exchange market as from February 2002. Data is provisional and subject to revision. For further information on the participation of the Central Bank in the exchange market, see section VI.2 of this report.

[10]   Includes exchange operations for the purchase and sale of goods, collection and payment of services abroad, and collections or payments of foreign income (interest, remuneration, profits and dividends).

[11]   Communication «A» 3619 dated May 31, 2002 established the obligation to negotiate at the Central Bank the currency derived from export transactions in excess of US$1 million. Subsequently, this amount was cut to US$500,000 (Communication «A» 3638 dated June 18, and then US$200,000 (Communication «A» 3711, dated September 3). Currently, the effects of that Communication have been suspended (Communication «A» 3944 dated May 6, 2003).

[12]   Section VI.2 analyzes total intervention (wholesale and retail) by the Central Bank in the exchange market.

[13]   These are exports included in Decrees 2703/2002 (hydrocarbons) and 417/2003 (mining) issued by the Executive Branch, which were granted a special treatment for the bringing-in of their currency. Although Decree 2703/2002 was applicable to shipments for which payment was to fall due as from January 1, 2003, the companies that have not completed the full bringing in of the currency have filed court action on the grounds that they were covered by the exclusion from the requirement to bring in 70% of currency earnings established by Decree 1589/89.

[14]   Communication «A» 3619. Foreign currency was ceded to the monetary authority at the reference exchange rate.

[15]   On the basis of total purchases and sales of foreign currency as a result of intervention and net monthly exports ceded to the Central Bank. For further information, see the chapter on Central Bank Monetary Policy Instruments in this  Report.

[16]   Although the performance of the EMBI spread is commented here, it should be noted that as this indicator is based on the price of bonds currently in default it loses relevance as an indication of the perception of sovereign risk.

[17]   Decrees 424/01, 1615/01, 979/01, 1005/01 and 126/01.

[18]   This possibility was introduced by Decree 1387/01 and Communication

«A» 3398 in November 2001, later extended until the end of March (Communication «A» 3494) and later until still until May 15, 2002, although it never became operational. Subsequently investors were left in some doubt as to the eventual re-establishing of this alternative, which could have contributed to some bonds remaining relatively liquid. This alternative covered debtors rated in categories of less than 3 recording no fiscal debt at September 2001, acceptance of  settlement by debtors rated 1 to 3 being subject to the agreement of the corresponding bank.

[19]   The above conditions also encouraged investment in certificates of deposit in shares of foreign companies and other foreign securities (CEDEAR) that could be traded locally.

[20]   As a result of the large number of bank holidays in January, there were only 14 trading days.

[21]   If the change in real terms is analyzed in constant currency at the close, there has been an increase of 26% between December 2001 and 2002, using the CPI for the calculation. On the other hand if the evolution of the WPI is used, given the marked difference with the CPI, a difference of 18% between ends is recorded.

[22]   Such as Solvay Indupa (electrochemical and petrochemical industries), Atanor (manufacturer of chemical products), Acindar (steel and metalworking, smelting and sale of iron and steel), and Siderar (development, construction and exploitation of steep plants, manufacture and sale of steel, iron, raw materials and steel products).

[23]   Including cash.

[24]   If comparison is made in uniform currency using the CPI, real growth between ends is 32%. If the WPI is used, on the other hand, there has been a real decline of 15%.

[25]   These include national government bonds, bonds issued by state entities and provincial bonds.

[26]   The real annual variation is -69% if the calculation is performed using the WPI, and -52% if the CPI is used.

[27]   In the case of money market funds, the fall has been due to the fall in FCIs in dollars, whereas the funds in pesos have recorded an increase in nominal terms.

[28]   The National Insurance Superintendence has not published official figures for December 2002. If the calculation is performed using amounts measured in currency at December 2002 as per the WPI, the resulting real variation compared to September 2001 is negative (-26%). If, on the other hand, the real change is calculated using the CPI, there has been growth of 12% between September 2001 and December 2002.

[29]   For further details on the monetary matters examined in this section, see the chapter under the same heading in the 2002 Editions of the «Bulletin of Financial and Monetary Affairs»

[30]   With the aim of determining the variation in the monetary base in 2002, the increase derived from adjustment to the valuation caused by the conversion into pesos -at the rate of 1.4 pesos per dollar- of the current accounts in dollars held by banks at the Central Bank has been excluded from the flow.

[31]   Account should be taken of the restrictions imposed on the possibility of the private sector acquiring foreign currency. For further information on the intervention of the Central Bank in the exchange market, see section VI.2 of this same Report.

[32]   The amount of quasi-currencies issued during the first half of 2002 was equal to 80% of the total placed during the year.

[33]   During this period, the speed of the release was greater than the withdrawal of sight deposits, with a growth in the balance of the latter.

[34]   These were deposits that were rescheduled and later placed in sight accounts, mainly as a result of the granting of exceptions -for those over the age of 75, recording health problems, etc.- listed in the deposit rescheduling regulations.

[35]   Given the type of analysis being made, the source of the data has been the Centralized System for Information Requirements (SisCen).

[36]   To calculate this variation, the effects of the devaluation and the conversion into pesos at the beginning of 2002 were excluded, consideration was given to the adjustment for accrued CER, deposits in dollars were valued at the market exchange rate, and those deposits exchanged for government securities which were recorded under the heading of «Other deposits» on bank balance sheets were also excluded.

[37]   See footnote 9.

[38]   The figures mentioned in the section on «Monetary aggregates» on balances



of loans to the private non-financial sector -excluding interest and accrued CER and CVS adjustments- have not been «corrected» for those variations derived from accounting practices -such as loans classified as unrecoverable written off from the balance sheet-, nor for loans with a contra entry in the setting up of financial trusts. The source of the data used, given the type of analysis being made here, is the Centralized System for Information Requirements (SisCen). For the purpose of comparison over time, a series was used for which the effect of the depreciation of the currency has been eliminated. In these terms, without adjustment for the effect of the rate of exchange on foreign currency loans, the annual reduction recorded in the balance of loans to the private non-financial sector -excluding interest and accrued CER and CVS adjustment- totaled 30%.

[39] That is to say, net of accounting duplications caused by repo, term and unsettled spot transactions.

[40] Variation in constant currency calculated using the Wholesale price index, as established by Communication «A»3702. If the consumer price index is used, the variation is a positive 21%.

[41] For the purposes of this estimate, the stock of loans was considered to include those balances eliminated from assets as unrecoverable, and therefore recorded in memorandum accounts.

[42] Excluding Lebac holdings.

[43] Considering the total for BODEN received in compensation and compensation receivable from the Government (recorded as Other Credits for Financial Intermediation), of the total amount recorded in pesos, approximately 90% corresponds to assets in dollars recorded in domestic currency.

[44] According to the «pesification» conditions established by Decree 471/02, Public Sector loans and securities converted to domestic currency are to be adjusted according to the CER and earn interest at rates of between 2 and 5.5%. Loans and government securities originally in pesos retain their original rate (7% in the case of secured loans if at a fixed rate, and LIBOR plus 3% if they are at variable rate as established by Decree 1387/01). BODEN 2012 in dollars accrue interest at LIBOR, while holdings of BODEN 2007 -adjusted by the CER- earn interest at an annual rate of 2%.

[45] Although lending to the private sector had been showing a declining trend, in recent years it had remained within a band of between 50% and 60% of total system netted assets.

[46] If the effect of the depreciation of the local currency is excluded, the percentage change in loans to the private sector in the period analyzed totals -34%.

[47] Including loans to residents abroad.

[48] Minimum Liquidity Requirements are included at December 2001. For further information on the changes made to the system, see Section III.I on Prudential Regulations.

[49] For further information on liquidity assistance provided, see the section dealing with Central Bank Lending to Financial Institutions in this Report.

[50] This analysis has been performed using the information from the balance sheets in local currency. Unless otherwise indicated, for comparison purposes the peso equivalent of the amounts of assets and liabilities denominated in foreign currency, as disclosed on bank balance sheets, has been used.

[51] Through Laws 25,563, 25,589 and 25,640 modifying the Bankruptcy Law, a production and credit emergency was declared until December 2003, establishing among other matters the suspension of legal foreclosure. This had a notable impact on both total claimed filed in commercial venues in the city of Buenos Aires -almost 106,000 during 2002, a drop of 17% compared to the previous year- and the number of bankruptcies (approximately 1,700) and schemes of arrangement decreed (almost 1,050), 50% and 23% respectively lower than in the previous year.

[52] The Decree issued in June 2001 stipulated that in the case of the mentioned agreements, debtor companies in situations 3, 4 and 5 could negotiate refinancing, enabling them to be reclassified in a higher category as long as the full amount of their debt was refinanced. If arrears of more than 62 days were recorded in the payment of an installment after the re-categorization, the debtor was once again to be included in the classification granted originally.

[53] In addition, this Communication suspended the prohibition on classifying as normal those commercial portfolio debtors rated by risk rating agencies in a category lower than «BB.»

[54] Figures in absolute terms should be treated with caution, as at the time this report was written there was incomplete information on 11 banks, most of which were medium-size entities. In cases where information was unavailable, the latest information provided has been used.

[55] Only non-monetary items are restated on the basis of inflation.

[56] In March 2003, at a time when there was less uncertainty on medium-term price levels, this methodology was to be discontinued, with a return to presentation in current units of currency (Communication «A» 3921).

[57] To calculate the profitability ratios mentioned in this section, use was made of data in uniform units of currency at December 2002, for both income flows and the estimate of average stocks used in the denominator.

[58] As analyzed in this same section, the performance of the CPI was a direct determinant factor for profitability through the adjustment according to the CER index.

[59] It should be explained that part of this correction could have been related with the relaxation of the provisions required in the July-August period as per Communication «A» 3815 issued in November. This was a further step in the relaxation that had been granted for the March-June period by Communication «A» 3630.

[60] Among other items, sundry income includes income from rental, collection of penalty interest, loan recoveries and the release of provisions, while sundry losses include the depreciation of sundry assets, amortization of goodwill, loan loss charges in relation to sundry receivables and charges for other provisions, penalty interest and charges due to the Central Bank. In addition, this line includes the results (gains or losses) from long-term investments and those resulting from the sale (or loss of value) of fixed assets and transactions with sundry assets, in addition to the result from adjustments and interest on sundry credits and liabilities.

[61] These charges for the uncollectibility of sundry receivables are not included under uncollectibility charges in the profitability structure as they are not related to normal banking intermediation between the supply and demand for financial services.

[62] The criteria adopted by banks to disclose the impact of the payment of court orders varied widely. As from April 2003 these criteria were made uniform by the procedures established by Communication «A» 3916 and 3924. Under these regulations, the differences between the book value of the deposits and the amount paid under court orders was to be capitalized as an intangible asset to be amortized over a maximum of 60 equal consecutive monthly installments.

[63] As per Communications «A» 3507, 3561 and 3762.

[64] It should be noted that while net interest income approximates the cash flow concept, the results from CER and CVS adjustment are an unrealized capital gain (that is to say, an increase in stocks) with only an indirect repercussion on cash flows from an increase in the principal on which payments for interest received are calculated.

[65] Taking into account both public and private banks and non-bank financial institutions at December 2002, the total number of personnel employed was approximately 89,000. For further information on the number of branches, see the first section of the chapter on «Structure of the financial system».

[66] This difference with regard to the system total is due to the fact that the aggregate includes public banks, with significant losses from net interest offset by strong gains from CER and CVS adjustment.

# III. Policies and Prudential Regime

### 1.1. Regulatory Framework

At the beginning of 2002 the National Congress, through Law 25,561, declared a public emergency in social, economic, administrative, financial and exchange areas, delegating to the National Executive the task of restructuring the financial, banking and exchange markets, the recovery of the economy, improvements in the level of employment and distribution of income, with emphasis on a program for the development of regional economies and the restructuring of contracts in progress. Changes were also made to the Currency Board Law.

In these exceptional circumstances, the Argentine Central Bank (ACB) made changes to the regulatory framework to adapt it to the policies established by the Government through the issue of laws, decrees and resolutions. Temporary and exceptional changes were made, such as the conversion of debts in United States dollars into pesos, the rescheduling and exchange of deposits, as well as others of a more lasting nature, reflecting the new context.

Below is a detail of the various regulations, which in general can be found in chronological order. Nevertheless, when necessary, chronology has been disregarded in order to develop a specific topic.

### 1.1. Changes in financial institution asset and liability transactions laid down by the Government and Congress: adoption by the ACB

#### 1.1.1. Rescheduling of deposits: original terms, changes and releases

In the use of the powers granted to it by Law 25,561, the Executive issued Decree 71/02, enacted on January 9, empowering the Ministry of Economy (ME) to regulate the disposal by their holders of deposits subject to withdrawal in cash imposed by Decree 1570/01 (the so-called «corralito»). The Executive defined as the criteria to be taken into account when the regulations were to be issued the interests of savers and the solvency and liquidity of the financial system.

ME Resolution 6/02, also approved on January 9, established an initial schedule of «reprogrammed» deposit maturities (time deposits in pesos and all deposits in US dollars) existing at that date. Holders of sight accounts in dollars were able to convert their balances to pesos at the rate of 1.40 $/US$1 in the case of legal persons. Individuals holding current accounts and savings accounts in US dollars were allowed to convert a certain portion of their deposits at the mentioned rate, leaving the balance to be rescheduled (payable in installments, in their original currency, according to the schedule laid down).

In addition, limits were established for withdrawals from savings accounts of whatever type, which could not exceed $300 per week or the equivalent to $1,200 per month -per holder at each bank, and not per account- for accounts in pesos and in foreign currency, to which end the US dollar was valued at $1.40. Within those limits, cash withdrawals from foreign currency accounts could not exceed US$ 500 per calendar month. Cash withdrawals from accounts used to credit wages or pension benefits were allowed to total the amount of such credits, with a cap of $1,500 per calendar month, with no restriction as to the amount to be withdrawn per month. Amounts not withdrawn in a period or week were cumulative.

It was also established that new freely-available time deposits could be set up. This same resolution laid down that the ACB would issue the necessary exceptional measures. These regulations were contained in the resolution included in Communication «A» 3426.

Subsequently, through Communication «A» 3442, it was established that withdrawals in cash from current accounts in foreign currency were to be payable in pesos, converted at the official market rate of exchange ($1.40 =US$1), or the rate in force in the market according to current regulations at the time of withdrawal.

Subsequently, ME Resolution 23/02 modified the Deposit Rescheduling Regime, allowing certain «releases». Approval was given to the optional transfer of up to $7,000 of the total rescheduled to current accounts or savings accounts in pesos, without changing the schedule for the remaining balance. Release was allowed for the payment of dependent employees, the payment of liabilities due to the State or the settlement of loans (even if they had not been granted to the holders of the deposits). In addition, it was allowed to set up term deposits with funds derived from sight accounts in pesos, for a minimum term of 30 days, which upon maturity could only be renewed or deposited in such accounts (Communication «A» 3443). Other releases and exceptions to the rescheduling were also announced, making exceptions for those depositors aged 75 or older, persons who had received payment of severance indemnities or insurance on death, disability or accident, as well as those persons duly evidencing the need for medical treatment or urgent surgical attention, in Argentina or abroad (Communication «A» 3446). Consideration was also given to the case of those who had opted for exchange for National Government Bonds (Decree 214/02).

In addition, rescheduling exceptions were granted in the case of accounts held by: i) welfare funds registered with the National Welfare Fund Institute, for amounts not covered by regular revenue, to be applied to the payment of medical services; ii) reciprocal guarantee companies registered with the Secretariat of Financial and Exchange Institutions, and provincial funds set up for the same purpose as those companies; iii) insurance companies, for the amounts and in the terms to be established by the Insurance Superintendence, in order to meet obligations in relation to claims, and voluntary or social security annuities.

Released were regulated through Communications «A» 3467 and 3690.



### 1.1.2. Conversion of assets at $1/US$1 and deposits at $1.40/US$1. Adjustment according to CER

Decree 214/02 dated February 4 and Decree 320/02 dated February 15 established the conversion into local currency of all obligations to pay sums of money stated in foreign currency (with certain exceptions detailed subsequently). This conversion into pesos took place «asymmetrically», as loans were converted into pesos at the rate of one peso per dollar, while deposits in foreign currency were to be converted at the rate of $1.40/US$1.

Excepted from conversion into pesos were: (1) loans related to foreign trade granted by banks in the terms and conditions to be determined by the Central Bank; (2) credit card balances for expenses incurred abroad; (3) deposits in local banks made by foreign financial institutions, as long as they were converted into credit lines and were maintained and effectively applied for at least four years; (4) futures and options contracts and the accounts exclusively assigned to such operations, except for those future and options contracts entered into under Argentine law prior to January 5, 2002, where at least one of the parts were to have been an financial institution; (5) obligations of the public and private sector to pay sums of money stated in foreign currency subject to compliance under foreign law; and (6) the redemption of mutual fund units in the proportion of the equity invested in assets to be sold and liquidated in foreign currency abroad. (Decree 410/02 dated March 1).

The conversion into pesos of deposits in US dollars referred to by Decree 214/02 did not include time deposits in cash set up as from December 3, 200. It also did not extend to current or savings accounts or time deposits held by foreign diplomatic or consular missions, international agencies, special missions and commissions or bilateral or multilateral bodies, or the foreign employees of such bodies, as long as the accounts were related to the performance of their functions.

Furthermore, section 10 of Decree 214/02 established that financial institutions were to deposit with the Central Bank all their banknotes in US dollars and other foreign currencies that they held as cash, which were to be converted into pesos at the rate of $1.40=US$. All the balances in US dollars or other foreign currencies held at the Central Bank in favor of each financial institution were to be converted at the same rate.

Subsequently, Decree 410/02 modified the above section, establishing that only the closing balances at the close of operations on February 1, 2002 in the accounts of banks in US dollars and other foreign currencies kept for purposes of compliance with reserve requirements, except for holdings of cash, were to be converted into pesos at the rate of $1.40=US$1, including the balances of the accounts opened for that purpose at Deutsche Bank in New York, once they were transferred to the accounts indicated by the Central Bank.

The Central Bank was authorized to establish exceptions to this regulation when, and to the extent that, the balances of the accounts opened at that Institution were not related to the mentioned reserve requirements, or on the basis of the treatment corresponding to the liabilities computable when determining such requirements.

Section 4 of Decree 214/02, instrumented by Communication «A» 3507 issued by the Central Bank, established that both loans (whether or not granted within the financial system) and deposits converted into pesos, were to be restated according to the Benchmark Stabilization Index (CER)[67]. In the case of installment payments, in the period between February 4 and August 3, 2002, debtors were required to pay at the due date of each installment an amount in pesos equal to the last installment paid in US dollars prior to February 4 (at the rate of $1=US$1), to be considered as a payment on account.

In the case of remaining obligations -excluding credit card balances- during the mentioned period a delay of six months was established to allow payment of the amount due. In both cases, once the six-month delay was over, in August 2002[68] the amount due was to be recalculated as from February 4 on the basis of the CER. In the case of installment payments, in addition to the recalculation of the installments corresponding to the February-August period and the recognition of the corresponding payments on account, it was laid down that as from August 3 the restated debt should be rescheduled, at rates and terms such that the first installment to be paid as from that moment should not exceed the amount of the last installment paid according to the original conditions. Subsequent refinancing was to be subject to the terms freely agreed between the financial institution and the borrower.

In addition, the law contemplated the setting of minimum and maximum rates for deposits and loans converted into pesos. In the case of loans, the maximum rate was set at between 3.5% and 8% p.a., depending on whether the loan had been granted to individuals or legal persons, and whether or not they were secured by mortgages on property of with a registered security interest in the first degree.

### 1.1.3. Conversion into pesos of Public Sector debt and adjustment according to CER

On March 8 Decree 471/02 established the conversion at $1.40 per US dollar of all the obligations denominated in foreign currency of the National, Provincial and Municipal public sector in existence at February 3, 2002. The amounts thus converted into pesos were to be subsequently adjusted according to the CER, and in addition maximum interest rates were fixed for

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
67. This index is formed by the daily rate of change obtained on the basis of the monthly evolution of the Consumer Price Index (IPC) published by the INDEC (Resolution No. 47/02 issued by the ME).
68. Law 25,642, passed on August 15 and promulgated in a de facto manner on September 11, postponed the application of the CER until September 30, 2002 for those debtors with a debt to the financial system of less than $400,000 at December 31, 2001.



the various types of debt (within a range of between an annual 2 and 5.5%).

### 1.1.4. Further changes to the schedule of reprogramme deposits and new releases

On February 6 Resolution 46/02 issued by M.E. established the definitive timetable for the payment of rescheduled deposits, following the conversion into pesos of deposits in US dollars.

Deposits in pesos, including matured time deposits and those not yet due, were reprogrammed according to the schedule in the following table. The same table also details the rescheduling applied to deposits originally in foreign currency that were converted into pesos.

| Restructuring of deposits | | | |
|---|---|---|---|
| | Amount | cuotas | from |
| Deposits originally in pesos | From $400 up to $10,000 | 4 | March 2002 |
| | Upper $10,000 up to $30,000 | 12 | August 2002 |
| | up to $30,000 | 24 | December 2002 |
| Deposits originally in dollars | From $1,200 up to $7,000 | 12 | January 2003 |
| | Upper $7,000 up to $14,000 | 12 | March 2003 |
| | Upper $14,000 up to $42,000 | 18 | June 2003 |
| | up to $42,000 | 24 | September 2003 |

This new timetable planned for a gradual reduction in restrictions on cash withdrawals, particularly as regards payroll accounts. In the case of the remaining sight accounts in pesos, the withdrawal limit was $300 per week per account-holder, with the availability of funds accumulating if withdrawals were made for amounts lesser than the weekly limit. In the case of accounts in dollars, it was allowed to make transfers to sight accounts in pesos up to a certain limit; balances of the sight accounts in dollars were to be rescheduled as if they were a time deposit.

Also during February, new temporary reasons for release were approved, this time for the purchase of property or new vehicles, including agricultural, highway and industrial machinery and boats (Communications «A» 3467, 3481 and 3509).

Subsequently, rescheduled deposits were allowed to be released to pay medical expenses in the case of seriously ill patients whose lives were at risk (whether account-holders themselves or close relatives) and their spouses; and funds were allowed to be released from accounts making up the assets of mutual investment funds to meet the withdrawals by quota-holders (Communication «A»3572).

One of the last additions to the list of reasons for the release of rescheduled deposits was for the purchase of new cars for the personal use of the disabled, if the accounts were in the name of the disabled person or a close family member (Communication «A»3606).

### 1.1.5. Changes to regulations on liability transactions allowed - Normalization of deposits.

The resolution made known through Communication «A»3467 dated February 8 established that banks were unable to open deposit accounts in foreign currency, unless they were to be used to set up time deposits.

Subsequently, non-transferable time deposits were allowed to be set up for 7 days, in pesos or in foreign currency. Deposits in pesos for terms of less than 14 days were only able to be set up using cash or to the debit of current or savings accounts against the margin available in cash, or using transfers from abroad not related to foreign trade. The minimum term for time deposits in pesos set up with funds from current accounts and savings accounts (using funds not available in cash, or subject to cash withdrawal restrictions, was set at 14 days. At maturity, they could be renewed or deposited in those accounts. Another alternative introduced was the possibility of setting up of non-transferable time deposits in US dollars and euros for a minimum of 30 days, to be settled in the same currency or in pesos (Communication «A»3527 dated March 25).

In April 2002 the opening of «special sight accounts in foreign currency» and «special accounts for futures and options guarantees,» in US dollars or other currencies, were authorized. Only foreign currency deposits were able to be accepted by these accounts, or to set up «time deposits» (Communication «A»3583 dated April 26).

As from September 2002 it was allowed to transfer freely available funds within accounts subject to the «corralito» restrictions without their losing that status. The following types of account were created: i) freely-available savings accounts for individuals in pesos or in US dollars; ii) special freely-available current accounts for legal persons -set up in pesos or US dollars; iii) freely-available bank current accounts for individuals or legal persons, in pesos.

At the end of November 2002 all the restrictions arising from the «corralito» on banking operations affecting transactional accounts were eliminated (Communication «A»3827 dated November 19 and supplementary regulations).

### 1.1.6. First Exchange of rescheduled deposits

The optional exchange of rescheduled deposits for National Government bonds was announced as part of a series of measures aimed at progressing towards the definitive reorganization of the financial system. The mechanism was introduced at the end of May[49] by means of Decree 905/02 (Communications «A» 3637 and 3656).

This exchange enabled holders of rescheduled deposits were given the option to receive (in full or partial settlement) National Government bonds (BODEN) in pesos or in US dollars. For these bonds to be made attractive, they were granted certain particular attributes, such as their being authorized for public listing, so that they could count on a secondary market. Also, the residual principal was adjusted according to the CER in the case of the bond in pesos, and they could be used to repay certain financial system loans, (as

Report to the National Congress 2002  **Central Bank of Argentina**

well as for the payment of federal taxes if the State were ever to default on them), in addition to their being accepted for uses such as the purchase of certain assets.

| Options of the first swap for bonds of the national government | | | | |
|---|---|---|---|---|
| June and July, 2002 | | | | |
| Original deposits | Bond to delivering | Swap | Amortization | First quota |
| Deposits in US$ | BODEN USD LIBOR 2012 | VN US$ 100 per every 1401 Pesos give rescheduled remnant + accumulated interests | 8 annual quotes | August 3, 2005 |
| Deposits in $ | BODEN $ 2% 2007 with the capital Adjustment for CER | NV equal to the rescheduled remnant + accumulated interests | 8 half quotes | August 3, 2005 |
| Special situations | BODEN USD LIBOR 2005 | NV US$ 100 for every 140 of rescheduled remnant + accumulated interests | 3 annual quotes | May 3, 2005 |

was maintained, with the issue of a rescheduled deposit certificate (CEDRO) documenting the balance due.

To be able to deliver the bonds to savers, financial institutions had to subscribe to them in pesos at their technical value (BODEN in dollars were subscribed to at $1.40 per dollar[70]); to do so, the Central Bank provided institutions with advances in pesos (the principal of which was adjustable by the CER) with a structure similar to that of the bonds being subscribed to.

In order to receive these advances, the institutions were required to secure them in an amount of at least 100% using own assets (National Government Bonds and Public Sector Loans, portfolios of better-quality loans, or shares), recorded and selected on the basis of Central Bank standards.

### 1.1.7. Improvements to conditions for the return of rescheduled deposits

Towards the middle of June, as from Resolution 92/02 issued by the ME and Communication «A» 3644, it was established that institutions could offer improved conditions for the return of rescheduled deposits, including the bringing forward of the payment schedule, advance settlement or payment of a higher rate of interest, as long as such offers were public and applied to all holders of the same series, and as long as the financial institution were to determine that such an action would not affect its liquidity nor prevent it from complying with existing regulations.

As it was also a condition that the institution should not record any debt with the Central Bank from the granting of advances

or rediscounts, the proposals for improvement did not have a significant effect at system level.

### 1.1.8. Introduction of the Wage Variation Coefficient

In the context of Law 25,561, the Executive Branch issued Decrees 762/02 and 1242/02 –regulated by Communication «A» 3762 in October– excluding from CER adjustment certain loans to individuals (loans in foreign currency secured by a mortgage on sole family dwelling, personal loans with or without mortgage guarantee originally for up to US$ 12,000 and personal pledge loans for up to an original amount of US$ 30,000). As from October 1 the principal of these loans was to be restated according to a Salary Variation Coefficient (CVS) prepared by the INDEC.

### 1.1.9. Second exchange, and additional releases

Subsequently, in the context of greater relative stability, and seeking to continue with the lifting of restrictions, on September 19 Decree 1836/02 established that as from October the holders of rescheduled deposits with a balance - at May 31- of up to $7,000 without including adjustment according to CER would be able to opt, during a term of 30 days, to transfer these funds to a freely available account. This limit could be increased to $10,000 at the option of each individual bank.

In addition a second voluntary exchange was announced, this time increasing the options to include i) as a first option, National Government Bonds (BODEN in US$ due 2013 and 2006), delivered with an additional guarantee from the bank consisting of a sale option for the coupons at a value similar tot hat the depositor would receive for such an installment if the CEDRO were retained (the value of the original deposit converted into pesos at $1.40 per US dollar, adjusted according to the change in the CER since February 2002), ii) as a second option, bills in pesos issued by the banks themselves –with the option of conversion to the original currency issued by the National Government.

Access to this latest exchange was also granted to those who had opted for the bonds offered in the first exchange. In the case of both the first and second exchange, banks were authorized to subscribe to the bonds for depositors by exchanging them for the assets originally granted as security or for the National Government Bond at 9% due 2002, or by means of direct payment (as long as this took place without Central Bank assistance).

· · · · · · · · · · · · · · · · · ·
69. The original proposal, laid down by Decree 494/02 on March 13 and Decree 620/02 dated April 16, was replaced by Decree 905/02.

70. Resolution 238/02 issued by the ME established a rate of exchange of $2.60 per US$1 for the subscription of BODEN in US$ due 2005, if they were to be delivered to eligible depositors originally holding deposits in foreign currency rescheduled for an amount of less than $10,000, or $2.75 per dollar in the case of individuals with rescheduled deposits who had opted to tender for this bond).



Towards the end of October, Decree 2167/02 made certain changes to the proposed exchange, including an extension of fifteen banking days in the term for opting to transfer to a freely available account funds from rescheduled deposits for a balance below the limit originally set. This possibility was extended to those who had opted to receive bonds under the terms of Decree 905/02. Also, given the continued existence of a significant volume of rescheduled deposits subject to applications for injunctions in progress, and bearing in mind the unequal treatment for the different savers from the enforcement of court orders, it was decided to extend for 30 banking days the possibility of exchanging the rescheduled deposits originating in foreign currency deposits for BODEN 2013 or bank Fixed Term Bills. A further extension was to be granted in the middle of December, this time for 90 banking days (ME Res. 743/02 and Communication «A» 3833). In the case of both extensions, the subscription price of the instruments offered was maintained.

### 1.1.10. Lifting of the «corralito» restrictions

One of the most significant changes in regulations in the last quarter of the year was the release of sight deposits, made in response to the signs of stability in the financial system and intended to consolidate a return of confidence by savers and the economic recovery. Ministry of Economy Resolution 668/02 (instrumented by Communication «A» 3827) established the definitive lifting of the so-called «corralito» restrictions. As a result, as from December 2, all sight accounts became freely available.

### 1.1.11. Compensation for banks

Under the terms of Decrees 214/02 and 494/02, the distortion to bank balance sheets following the asymmetric conversion into pesos was to be compensated for by the issue of a bond payable out of National Treasury funds. This compensation, regulated by Communication «A» 3650 and supplementary regulations, was to be made using the same types of bonds offered to depositors. The proposed scheme contemplated a «compensation bond» (BODEN in $ due 2007) to offset the direct effect of the asymmetric conversion into pesos of assets and liabilities, and the possibility of banks gaining access to a BODEN bond in US dollars (BODEN in US$ due 2012) at a favorable rate of $1.40/US$1 to take into account the net negative position in foreign currency arising from financial statement balances at December 2001, applying the «pesification» that would have been due in each case. To be able to gain access to these bonds, it was laid down that banks would deliver first the BODEN in pesos due 2007. In those cases in which it were to be determined that this bond were to be insufficient to purchase the necessary number of BODEN in US dollars due 2012 to compensate for the net negative position in foreign currency from the conversion into pesos that had been ordered, banks were authorized to request an advance from the Central Bank.

Decree 2167/02 made changes to the system for compensation of financial institutions laid down in Decree 905/02, including

allowing the National Government Bond at 9% due 2002, the BODEN 2007 or the secured loans arising from loans converted into pesos to be used to subscribe to the BODEN 2012 in US dollars.

### 1.1.12. Suspension of injunctions

Another aspect of considerable importance contained in Decree 214/02 was the suspension for 180 days of compliance with injunctions and the enforcement of rulings in lawsuits arising out of the regulations issued subsequent to Decree 1570/01. This suspension included two major exceptions: cases in which the health or physical integrity of individuals was at risk and those in which the plaintiff was aged seventy-five or older. In view of the proliferation of court orders acted on in subsequent months -meeting the individual demands of depositors but damaging the public good by threatening the payment system- it became necessary to reinforce this point with further regulations (Decree 320/02).

Law 25,587, dated the end of April, established that as long as the public emergency persisted, injunctions would only be admitted in lawsuits «when there were to be a danger that if the situation in fact or in law were to be maintained or altered as the case may be, it could lead to interference with the ruling or make it impossible to be complied with or ineffective,» such measures being able to be obtained exclusively in Federal Courts. In addition, it was established that such remedies could not be obtained in relation to Central Bank funds, and that financial institutions would be able to appeal them.

Subsequently, at the end of July, Decree 1316/02 suspended for 120 working days compliance and enforcement with all injunctions and precautionary measures and firm rulings issued during such legal proceedings. Court ordered payments ruled in the meanwhile were to be recorded chronologically and complied with following that order once the term laid down had expired.

### 1.1.13. Exchange regulations during 2002

As a result of the crisis unleashed at the end of 2001, the Government adopted a series of exchange measures that substantially modified the rules that had been in force during the previous decade.[71] The requirement to bring in and trade on the exchange market the currency generated by the collection of export proceeds was re-imposed,[72] with the establishing of this currency trading as a condition precedent for access to any tax benefit or rebate that may be due on the exports (Decree 1606/01); in addition, transfers of funds abroad were subject to limitations, with the requirement for certain conditions to be fulfilled to be able to gain access to the exchange market (Decree 1570/01); and subsequently, during the first quarter of 2002, the Government decided to abandon the currency board mechanism, a step that was followed by a rapid and severe depreciation of the peso.

The decisions taken by the authorities on matters of exchange policy since early December 2001 have represented change of a structural nature. As mentioned earlier, after a period of



marked instability and severe restrictions in the period from December 2001 through January 2002, a stage was entered during which regulations were adjusted on the basis of the existence of a single exchange market with a floating exchange rate, with strong intervention by the Central Bank. The basic objective of the policies implemented was the reestablishing of macroeconomic stability in the context of the profound banking, financial and social crisis faced by the country.

The measures adopted over the course of 2002 enabled a substantial improvement in the overall macroeconomic situation and in the development of the exchange market in particular, leading to rapid progress in the direction of a relaxation of exchange restrictions as from the end of December of that year.

Over the course of 2003 restriction on access to the exchange market were to take place in relation to the minimum terms established for financing for imports of goods (including an extension to the terms for brining forward such payments), payments of financial interest, profits and dividends and other transfers in the balance of payments current account and payments of financial debt. In addition, the limits for the purchase of foreign currency for the building up of foreign assets by residents were to be increased, the terms for the trading of export proceeds were to be extended, and the system for the settlement and ceding of currency from export collections  to the Central Bank was to be eliminated.

### 1.1.14. Official and Free Exchange Markets

Following the issue of Decree 71/02, the Central Bank released Communication «A» 3425 (subsequently modified by Communication «A» 3444) regulating the operation of the Official and Free exchange markets. The regulations laid down the exchange purchase and sale transactions that were to be traded on the Official Market, all other transactions being covered by the Free Exchange Market. As a result, it was mandatory to negotiates on the Official Exchange market the foreign currency from the collection of export proceeds, advance payments, pre-financing and financing of exports, and certain services related to foreign trade transactions (insurance payments on claims related to foreign trade, freight charges collected by domestic vessels and aircraft, etc.). Exchange regulations permitted the automatic use of export proceeds to settle advances, export pre-finance and finance provided by or secured by domestic financial institutions or obtained directly abroad and brought into the country since December 6, 2001, and their use with the prior authorization of the Central Bank for the settlement of other advances and pre-financing from abroad, structured loans in force at November 30, 2001 and financial liabilities to persons abroad in force on the same date that have been restructured for terms of more than 3 years as from each maturity.

Disbursements in Argentina of loans from international agencies, official lending agencies and/or those guaranteed by them, and disbursements by foreign banks financing investment projects were also to be traded on the Official Market.

Sales of exchange on the Official Market were able to be made to pay for imports, with certain restrictions, other current account items (freight, insurance and costs of trading goods for which exchange has been made available on the Official market, insurance premiums for goods-carrying companies), servicing of principal of loans granted by international agencies (or with their guarantee) and foreign banks participating in the financing of investment projects[74] and settlement of financial liabilities abroad (principal and interest) incurred until December 31, 2001 and due at January 11, 2002 which were extended for at least one year, in this latter instance with the prior authorization of the Central Bank. The remaining transactions not falling within the above descriptions or lacking Central Bank approval for trading on the Official Market were to be traded on the Free Exchange Market.

### 1.1.15. Single Free Exchange Market (MULC)

Communications «A» 3471 and 3473, effective as from February 11, 2002, regulated the operation of the Single Free Exchange Market, including the trading of currency for foreign trade transactions. The regulations in force since that date, which evolved on the basis of the behavior of the exchange market, can be summarized on the basis of the regulations applicable to six main categories: 1) collections of proceeds from exports of goods and services; 2) payments for the imports of goods; 3) other current account payments (actual services, interest, profits and dividends); 4) servicing of debt principle; 5) setting up of foreign assets abroad by the private sector; and 6) repatriation of investments by non-residents.

#### a) Collection of Exports of Goods and Services

As from Communication «A» 3473 (February 9, 2002) the proceeds of exports of goods net of advances, pre-finance

. . . . . . . . . . . . . . . . . . . . . . . . . . .

71. Since 1991 there had been considerable freedom for funds movements to and from abroad, and exporters were able to freely dispose of all the currency obtained from their exports, with no type of control or register for transactions by carried out abroad by Argentine residents (for trade transactions, financial borrowings, investment, etc.).

72. The obligation to bring in export proceeds had been repealed at the beginning of the nineties by means of Decree 530/1991.

73. Before the currency board was abandoned, the Central Bank introduced a series of regulations on transfers and the settlement of export proceeds, to regulate the terms of Decrees 1570 and 1606 dated December 2001. These rules were contained in Communications «A» 3372, 3378 and 3382 (modified by Communication «A» 3394), through which it was made mandatory to bring into the financial system the funds derived from the settlement of export transactions corresponding to bills of lading executed as from December 6, 2001 within the terms established by the regulations adopted on the matter. Transfers abroad could be made automatically in the case of those related to foreign trade with the direct involvement of a bank and certain financial transfers with the automatic authorization of the Central Bank (for example, settlement of servicing on the national public debt, payment of dues to international organizations, costs incurred by Argentine embassies and consulates abroad). All other transactions were subject to the requirement for prior approval from the Central Bank. To this end an information system was implemented via financial institutions covering both automatic transfers and those requiring the approval of that institution.

74. In those cases where no international agency was in involved, prior Central Bank approval was required.

Report to the National Congress 2002  Central Bank of Argentina

loans and their interest were to be traded through the MULC at the market rate of exchange, within terms not exceeding those established by the Trade and Industry and Small Business Secretariat. In the case of exports of services, currency was to be traded within a term of no longer than 15 working days from the date of collection in Argentina or abroad or crediting in foreign accounts.

Initially, regulations granted an additional 10 working days to the terms established for complying with the mandatory trading of export collections. On March 23, 2002 (through Communication «A» 3534) this additional term was cut to 5 working days, and it was further determined that in no case could the settlement on the exchange market of the proceeds of exports of goods take place later than ten working days from the date of receipt of the transfer of the currency by a local financial institution, or from the date funds were placed at disposal abroad[75].

As from June 2002 (Communication «A»3619) it was established that certain export proceeds were to be ceded to the Central Bank. Initially, this measure covered currency from exports corresponding to bills of lading for over US$ 1 million and income for any amount for export advances and pre-finance. On June 18 (Communication «A»3638) the measure was extended to collections of exports under bills of lading for more than US$500 thousand, and in September to US$200 thousand (Communication «A»3711)[76].

During the time the «corralito» was in force, settlements of collections of exports of goods and services were to be credited in a restricted availability current or savings account in the name of the exporter.

*a.a) Aplicación de cobros de exportación a la cancelación de deudas.*

Use of proceeds from exports to settle debt

In line with the criteria established during the time the Official and Free Exchange Markets were in force, the use of export proceeds was allowed for the settlement of principal and interest on:

- Pre-finance, finance and advances on exports financed or guarantees by local financial institutions, whatever their funding.
- Pre-finance, finance and advances from abroad for exports, entering the financial system between December 6, 2001 and January 10, 2002, brought in on the Official Market as from January 11, 2002, and through the Single Free Exchange Market as from February 11, 2002.
- Loans under agreements in force at November 30, 2001, in conditions that contemplate the meeting of servicing requirements by means of the use of the flow of funds generated by exports. In this case, contracts and their eventual modifications should be duly documented and have been performed prior to November 30, 2001.
- Other pre-financing loans and advance collections of exports agreed prior to December 6, 2001.

- Principal of financial obligations abroad in existence at November 30, 2001, restructured over more than 3 years as from each maturity. This condition was later modified, requiring a restructuring with an average duration of at least 5 years (Communication «A» 3705).

In the case of the transactions covered by the first three points, the application required Central Bank approval. In order to inform the balances to be applied in those circumstances, an information regime system was introduced by Communication «A»3430. This regulation established that companies that were to have submitted the affidavit required by Exhibit A to Communication «A» 3430 in relation to advance collections and loans for the pre-financing of exports agreed prior to December 6, 2001, could apply the currency to the settlement of the pending balances declared under the headings involved, in an amount that should in total not be greater than the income -calculated in like manner- for pre-financing and advanced collection of exports that they recorded as from January 11, 2002.

Exporting companies opting for this alternative should record debt form the collection of advance payment ant export pre-finance an average balance at the end of each month in the period January-September 2002 of not less than 85% of the balance due abroad at December 31, 2001.

*a.b.) Transactions not negotiated within term laid down*

Communication «A» 3473 established that collections of exports due until February 1, 2002 are to be negotiated at the market rate of exchange in force on the date the term for bringing in the proceeds expired. The currency is to be ceded to the Central Bank at that rate of exchange. In addition, collections of exports for which the term for being brought in for trading on the Single Free Exchange Market has expired must be traded at the reference rate of exchange on the date of expiry, and the currency must be ceded to the Central Bank at that same rate of exchange (Communication «A» 3608). If the reference rate of exchange at the due date were to be higher than the rate on the Single Free Exchange Market on the date of actual trading, the rate of exchange on the Single Free Exchange Market on the trading date should be used.

*a.c) Follow-up of collection of export proceeds*

Communication «A» 3493 established a system for follow-up of compliance with the obligation to bring into the country the proceeds of the collection of exports of goods, to be carried out the financial institutions designated by the exporting

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

75. The additional term granted by the Central Bank was extended with the relaxation of the regulations that took place as from 2003. A summary of the various exchange policy measures adopted during the year can be consulted on the institution 's Internet site at www.bcra.gov.ar/ pdfscomytexord/P47794.pdf.

76. With the relaxation that took place in 2003, the amounts were increased, and the regime for the ceding of currency from export collections to the Central Bank introduced by Communication «A» 3619 was repealed.



companies at the time of shipment. Communications «A»3587, 3693, 3751 and 3813 subsequently informed the transactions excepted from the mentioned follow-up.

### b) Payments for imports of goods

*b.a)* Imports made since the setting up of the Single Free Exchange Market

Communication «A» 3473 established that new transactions for the import of goods with shipment date as from February 11, 2002 that were not backed by documentary letters of credit opened by local financial institutions prior to that date were to be financed according to the minimum terms established by the Industry, Trade and Mining Secretariat on the basis of type of product, it being possible to make payment up to 5 working days prior to due date or up to 20 working days in the case of exporters negotiating collections for amounts at least equivalent to the amount of the import being paid for.

Initially, advance payment was only allowed in the case of critical products and input and input and spares for nuclear power stations and off-shore platforms. Minimum financing terms were gradually relaxed, beginning with those for all other raw material and intermediate (non-critical) goods, and progressing to capital goods[77].

*b.b) Payments of debts for imports made prior to the setting up of the Single Free Exchange Market*

In the case of imports and their financing involving goods shipped prior to February 11, 2002 or backed by documentary letters of credit opened prior to that date, Communication «A» 3473 established that they could be processed through the Single Free Exchange Market when they fell due, under the regulations applicable to the terms for financing at the time the letter of credit was opened, or when shipment took place, as the case may be.

In the case of debts abroad from foreign supplier credit pending payment at January 10, 2002 and arising from goods imports, it will be necessary to have first complied with the information requirements established by Communication «A» 3430, which will be considered to have taken place when the participating bank receives conformation of the verification of the data submitted by the bank to the Central Bank. This confirmation shall consist exclusively of the reading of the information on the basis of the format required by the Central Bank, which will not take longer than 24 hours from the time the information is received.

### c) Other current account payments (real services, profits and dividends, interest)

*c.a) Real Services*

Since the Single Free Exchange Market began operating, exchange regulations have not imposed any type of restriction

on access to the market for the payment of services provided by non-residents.

*c.b.) Profits and dividends*

Communication «A» 3471 established a prior authorization requirement for a period of 90 calendar days for transfers abroad of profits and dividends from the private non-financial sector and public companies not depending for their budgets from their corresponding Administration. The validity of this requirement was extended first to August 12, 2002 (Communication «A»3584) and later until February 8, 2003 (Communication «A» 3688). Before this latter due date the rules on these transfers were eased (Communication «A» 3859), with banks being allowed to process payments abroad of profits and dividends corresponding to annual balance sheets that have been certified by external auditors.

*c.c) Interest*

Since the introduction of the Single Free Exchange Market, interest on trade debt has been able to be paid by means of unrestricted access to the exchange market. Initially there were also no restrictions on the payment of interest on financial debt.

On March 25, 2002 a requirement was established (by Communication «A» 3537) for prior approval for transfers abroad to settle interest rate servicing on debt abroad of the financial sector and the private non-financial sector, except that corresponding to new loans brought in via the exchange market as from February 11, 2002, and debts with privileged creditors, or those guaranteed by them (International Lending Agencies, Official Credit Agencies, Multilateral Banks, etc.). This requirement was extended to the interest on the financial debt of local governments at the beginning of September 2002 (Communication «A» 3715).

On December 26, 2002 restrictions on all payments of interest on financial debt were relaxed as from January 2003 (Communication «A» 3843).

### d) Servicing of principal of financial debt

Communication «A» 3471 dated February 2002 established a requirement for prior approval for transfers abroad by the private financial and non-financial sectors of principal servicing on financial loans for a term of 90 calendar days, with certain exceptions:

- debt due to International Agencies;
- debt with banks participating in the financing of investment projects co-financed by International Agencies;

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

77. These initial restrictions were gradually relaxed, and since January 2003 advance payments are allowed for all types of goods, as well as for the bringing forward of payments of debts for imports.



- debt with official credit agencies and export credit insurance companies that are members of the International Union of Credit and Investment Insurers (Berne Union), or which is guaranteed by them[78];
- debt with Multilateral Lending Agencies in which the National Government is a shareholders through the Central Bank or national public banks, or that is guaranteed by them[79], and
- debt with other Multilateral Lending Agencies with agreements that include treatment in terms no less favorable than those applied to the most favored international financial creditor agency, or that are guaranteed by such Agencies[80];
- repayment of new loans brought in by the Single Free Exchange market as from February 11, 2002 [81]

### d.a.) Servicing of principal of financial debt of companies filing for creditor protection

On September 3, 2002 (by Communication «A» 3709) prior Central Bank approval was waived in the case of servicing of principal and interest of liabilities abroad of a financial nature, granting automatic access to the exchange market in force at each moment for the remittance of such transactions, as long as the following five conditions were fulfilled:

- The financial debt should have been restructured and approved by the courts, using the mechanisms foreseen by Law 24,522 and its modifications.
- The agreements reached with creditors, on the basis of the majorities indicated in Sect.45 of the mentioned Law, should imply the refinancing of past due unpaid debt for terms of not less than four years as from the agreement, with a grace payment for principal repayments of not less than two years.
- Interest rate servicing should have a quarterly or greater frequency, and the annual interest rate agreed for the refinanced debt should not exceed in annualized terms that equivalent to the six-month LIBO rate plus 3%.
- The agreement in question should incorporate discounts, remissions, capitalization or other similar measures that reduce the outstanding principal at the date of the agreement by at least 40% of its nominal value, or 60% of that value in the case of capitalization.
- A receipt should be held from the Foreign and Exchange Management confirming delivery of the information on the refinanced liabilities in accordance with the corresponding information regime.

The enforcement of this requirement was extended first to August 12, 2002 (Communication «A»3584), then until February 8, 2003 (Communication «A» 3688), and lastly until August 8, 2003 (Communication «A» 3878)[82]. In September 2002 (Com «A» 3715) the prior approval requirement was extended to the financial debt of local governments.

### d.b.) New Borrowing Abroad

As from September 3, 2002 (Communication «A» 3712) it was established that loans taken abroad by the private non-

financial sector by means of bonds or financial loans -as long as not for the capitalization of interest- should include the trading of the currency on the single free exchange market, and be taken for terms of not less than 90 calendar days[83].

Subsequently, Communication «A» 3820 dated November 25 incorporated the requirement that issues of debt by the private financial and non-financial sector denominated in foreign currency, for which interest were not to be paid exclusively in pesos in Argentina, should be subscribed to in foreign currency, while funds obtained should be settled on the Single Free Exchange Market.

### d.c) Forwards and other financial derivatives

On March 15, 2002 (Communication «A»3515) a prior approval requirement was established for forward transactions abroad by financial institutions. On June 3 (Communication «A» 3622) the requirement was extended to transactions entered into locally. On March 22, a prior approval requirement was introduced for the settlement of forwards and other derivatives abroad (Communication «A» 3525), except for foreign currency hedges (Communication «A» 3586), and price hedges (Communication «A» 3626).

### e) Building up of External Assets by the Private Sector

Since the introduction of the Single Free Exchange Market, purchases of exchange for this purpose were allowed, as long as they were made using pesos in cash, in other words, not using funds covered by restrictions on the availability of deposits in the banking system.

In September 2002, Communication «A» 3722 introduced a requirement for prior Central Bank approval for purchases of exchange in excess of US$100 thousand per month in total, for items that included portfolio investments abroad by individuals and legal persons, other investments abroad by residents and purchases of foreign banknotes in Argentina for treasury purposes. In November, the following items were added: purchase of travelers checks, real estate investment abroad, contributions in the form of direct investments abroad by residents and loans granted to non-residents (Com. «A» 3826)[84].

· · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

78.Clause modified by Com. «A»3627. Originally the exception only covered debt with official credit agencies, or that guaranteed by them.
79.Clause added by Com. «A»3495 (errata Com.»C»34348)
80.Clause added by Com. «A»3570 (errata Com.»C»34802)
81.Clause added by Com. «A»3478.
82.As from January 2003 this requirement was gradually relaxed until it was fully lifted on May 6, 2003 (Com.»A»3944), except in the case of the debt of financial institutions that opted for the mechanism established by Decree 739/03.
83.In June 2003, following the signing of Decree 285/2003 by the executive, Com. «A»3972 increased this term from 90 to 180 days, including within its scope the financial sector for its issues of bonds, financial loans (including securities swaps), and foreign credit lines of a financial nature.
84.These limits were increased steadily with the relaxation of conditions for access to the exchange market that began in early 2003.



*e.a) General Exchange Position for institutions authorized to trade in exchange*

By means of Communication «A» 3511 issued on 14 March, it was established that as from the close of operations on 15 March the General Exchange Position (*Posición General de Cambios* -PCG) for financial institutions could not exceed 5% of the Adjusted Stockholders[85] Equity (*Responsabilidad Patrimonial Computable* - RPC) recorded at the close of November 2001[1]. If the limit established by Communication «A» 3511 were to be lower than US$500,000 for non-bank institutions (Com. «A» 3512) and US$1,000,000 for banking institutions (Com. «A» 3514), the institutions were authorized to hold daily positions up to the equivalent of these amounts. In June 2002, there was a redefinition of the assets to be included in the calculation of the PGC, with the establishing that all liquid external assets of the institutions were to be included[86]. At the end of December the maximum limit for PCG for financial institutions was increased by one percentage point as from January 2003. As a result, the maximum permitted rose to 6% of the RPC as at the end of November 2001.

### f) Repatriation of investments by non-residents

In July 2002, Communication «A» 3661 introduced a prior Central Bank approval requirement for the sales of exchange to non-residents in currency or notes for any purpose, for amounts in excess of US$5,000 per calendar month[87].

## 1.2. Changes in prudential regulations

### 1.2.1. Minimum cash and Minimum liquidity requirements

At the beginning of March the Central Bank decided to implement a new unified Minimum Cash regime (Com. «A» 3498), at the same time as it repealed the rules on Minimum Liquidity Requirements. The Minimum Cash regulation was to be adjusted on several occasions, with changes being made to the items to be included and the percentages required, in view of the unusual lack of liquidity in the financial system. At the beginning of May a new regime was introduced on «Minimum application of resources from sight liabilities in pesos», required in the case of deposits and other sight banking liabilities in pesos, which was subsequently extended to cover time deposits as from September (Com. «A» 3732).

In December 2002 the Minimum Cash requirement totaled 22% for sight deposits, while for the minimum use of resources derived from sight and term obligations in pesos it was set at 18%. In the case of time deposits, the minimum cash ratio was set at 14%, and that for the application of resources was fixed at 12%, while in the case of rescheduled deposits, the requirement was set at 0%.

With the aim of preventing transfers of deposits within financial institutions, from January to September 2002 an additional requirement of 75% was established on the average daily increase recorded by private sector deposits compared with the balance recorded at November 2001, with a further 25% requirement on the average increase recorded by deposits compared to the balance recorded at January 4, 2002.

Towards the end of November, temporary regulations were established that included the calculation of a two-month position for the period December 2002-January 2003 and changes in the rate of the requirement. If these changes had a negative impact on financial institutions, a schedule was established allowing a deduction from the minimum cash requirement in pesos.

### a) Bank liquidity Fund

To be able to make a more appropriate distribution of financial system liquidity, a Bank Liquidity Fund was created in December 2001. Initially, financial institutions were to contribute to the fund 6% of their private sector deposits in pesos and foreign currency as at November 2001. At the beginning of March 2002 this contribution was set at 1.90%, and in the middle of the same month it was increased to 3.5%. As from May, this contribution was set at 0% (Communication «A» 3487 and complementary resolutions).

### b) Mandatory application of deposits in US dollars

The resolution contained in Communication «A» 3528 dated 25 March established that the lending capacity derived from foreign currency deposits was to be applied to any of the following ends:

- Export pre-finance and finance
- Interbank loans
- Central Bank Bills (LEBAC) in US dollars, purchased at tenders or on the secondary market.

Surplus lending capacity not applied to the purposes indicated generated an equivalent increase in the foreign currency minimum cash requirement, making it necessary to hold US dollars in cash or in deposits in that currency at the Central Bank.

The intention of this regulation was confirmed by Decree 905/02, permitting the setting-up of deposits in foreign currency in sight accounts and time deposits, as long as they were allocated

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

85. In addition, this regulation explained the method for calculating the PGC.
86. These include available gold, foreign currency funds and banknotes in Argentina and abroad, holdings of deposits and investments for all terms in foreign banks, investment on private sector and public sector bonds, other liquid investments abroad and the debtor and creditor balances of correspondent accounts. They also include the purchase and sale of these assets that were to have been agreed and were pending settlement for the purchase and sale of exchange with customers in a term of no more than 48 working hours. External assets of third parties held in custody, correspondent balances for third party transfers pending settlement, term sales and purchases of currency or foreign securities and/or direct investments abroad do not form part of the PGC. In addition, points 2 to 5 of the Communication set minimum and maximum limits. These limits were relaxed as from January 2003.
87. As from 2003 certain items were to be excluded.



exclusively to the financing of foreign trade transactions and related activities.

### c) Debtor classification

During 2002 the policy for the temporary relaxation of debtor classification continued. In the case of classification levels, for the months of January and February 2002 the admitted arrears were increased (by 62 and 31 days respectively) for categories 1 (normal) and 2 (potential risk) in the case of both the commercial and consumer portfolio (Communication «A» 3463). In addition, financial institutions were allowed to observe the provisioning levels for the immediately higher category in the case of debtors in category 2 (potential risk) and 3 (problem) for the March-August 2002 period (Communications «A» 3630 and 3815). Communication «A» 3562 extended until May 2002 the terms for financial institution and financial trust debtors classified in categories 1 to 5 to settle their debts at November 2001 plus accessories until effective payment, using government securities under the mechanism introduced by Decree 1387/01 (Communication «A» 3398). This mechanism consisted in enabling the settlement of financial system debt by means of the use of national government bonds by debtors classified as non-performing, while debtors in situations 1, 2 and 3 could do so with the approval of the financial institution.

### d) Liquidity assistance

Law 25,562 was enacted on January 23, 2002, modifying the Central Bank Charter. The Institution was provided with greater flexibility to enable the introduction of an independent monetary policy, authorizing it to participate in the exchange market and regulating a series of instruments to provide assistance to financial institutions with temporary liquidity shortages. In this context, the conditions of clause c) of Article 17 of the Central Bank Charter were maintained, establishing that maximums per institution (equivalent to their net worth) may be exceeded if it is necessary to provide advances and discounts in exceptional circumstances or to ensure adequate liquidity for the financial system. In addition, the maximum terms established at 30 days for the settlement of advances and rediscounts were eliminated. Also, a clause f) was added to the same article establishing the granting of advances to financial institutions against securities issued or guaranteed by the Argentine State. Furthermore, Emergency Decree 214/2002 authorized «the Central Bank during the term of enforcement of Law 25,561 to grant the facilities foreseen by clauses b), c) and f) of section 17 of its Charter to institutions that have had their solvency affected.»

As from mid-March, the Central Bank linked the interest rate applied to assistance already granted to banks with liquidity problems to the cut-off rate for the issue of short-term LEBAC bills, furthermore forbidding banks with liquidity assistance debt from participating in the tenders for such assets.

At the end of September the Central Bank decided to postpone until the beginning of 2003 the maturity of the liquidity assistance granted, lowering the interest rate applicable to it.

In addition, as from October limits were placed on the growth of assets by banks recording Central Bank liquidity assistance. As well as setting quantitative limits, it was established that the assets of these banks could only be increased from a rise in lending to customers in the private non-financial sector unrelated to the financial institution. The percentage increase thus allowed -with a maximum limit- was calculated on the basis of the assistance provided, the growth in deposits by the private non-financial sector and the non-consolidated adjusted stockholders' equity, on the basis of a series of ratios that were established.

## 2. Banking sector monitoring policies

Banking supervision tasks were affected by the macroeconomic crisis during the year. In this context, each of the elements considered in the monitoring system known as BASIC had to be redefined on the basis of the unprecedented situation experienced by the country.
This system was originally designed on the basis of the joint action of traditional control mechanisms and the exercise of market discipline, and included the following elements:

- The letter B referred to the requirement that banks should issue bonds -or other long-term liabilities- on capital markets for an amount equivalent to 2 per cent of their deposits, with a duration of one year. To do so, banks should hold a favourable, published rating from institutional investors who will risk their capital in subscribing to such issues.
- The letter A referred to the External Auditors who ensure that the information provided by the institutions adequately reflects their situation.
- The letter S referred to the supervision carried out by the Superintendence -combining in-situ inspection and off-site monitoring- which is essential for the adequate control of financial institutions.
- Furthermore, adequate banking supervision can only be carried out efficiently if relevant, reliable and timely Information is available.
- The Central Bank has established that all financial institutions should obtain Classification from at least one rating agency duly approved and registered by the Central Bank.

The situation of each of these points during the year was as follows:

**B: Bonds**
As a result of the crisis that began to develop, impacting on the capital market and the placement of debt, the rule requiring banks to issue and place debt for an amount equivalent to 2% of their deposits was temporarily suspended, as the situation of the market transformed this instrument designed to assist in the supervision -through the use of market discipline- into an unnecessary burden on the regulated institutions.

The mechanism was suspended, but not scrapped, remaining in force together with the Rating Agency Control sector within the Superintendence and the register of Rating Agencies and their evaluation by the Central Bank. As indicated, the purpose



of the rule was to obtain a «market opinion» on the repayment capacity of banks by means of the subscription of bank debt issues requiring subscribers to commit their capital as well as their opinion. However, because of the lack of stability in financial markets, the placing of such debt (or the failure to do so) could not be seen as a reflection of investor opinion, but rather that of the financial market in general, as the situation developed into a crisis that was eminently systemic in nature. Once the financial system has returned to normal a decision will be take regarding the re-establishing of this and other market discipline measures.

## A: Audit
Audit tasks, both internal and external, play a significant role within the BASIC monitoring system. The main objective of the external auditors is to ensure that bank financial statements reasonably reflect their net worth and economic and financial situation. Internal audits are responsible for evaluating internal control, that is to say, promoting the effectiveness and efficiency of operations, the reliability of accounting information, and compliance with regulations.

Given the very particular situation experienced during the year, the Superintendence remained in constant communication with the internal auditors and audit committees to evaluate the various risks to which institutions were exposed as a consequence of the decisions by the general public and the impact of the various economic policy measures that were adopted. As part of this task, new procedures were developed to be complied with by internal auditors, including those related to restrictions on the withdrawal of deposits and the conversion into pesos of the various balance sheet headings, in order to ensure their compliance. External audit work was also not carried out according to usual guidelines. During the latter part of the year, this work centered on the review of the special report issued by the external auditors in relation to the calculation made by banks of the amount to be received in the form of National Compensation Bonds (Decree 905/02).

During 2002 external audits were carried out on systems -to confirm the quality and application of internal control procedures, security, management and administration as regards information technology- in those institutions rated as of high or very high risk in the area of IT, in order to evaluate the solutions applied in relation to the observations made previously. Audits were also performed at banks where the information technology structure had been modified as a result of a corporate merger or take-over.

Two tasks in particular were undertaken with a longer-term view in mind. Surveys were carried out prior to the preparation of a manual of sound practices related to conditions of information technology security and control and management to be observed in the case of electronic banking transactions. This manual is already being edited and printed, under the title of «Sound Practices in e-banking.» Another activity of note has been the setting up of various technical commissions to analyze specific aspects related to information technology audit and security, with the ultimate aim of issuing

documentation and new regulations that keep pace with the process of technological updating implicit in all IT-related activity.

## S: Supervisión
Within the BASIC system, on-site supervision at the premises of the institution being supervised forms the most traditional component of banking supervision, providing an evaluation of the supervised institution. The methodology currently applied is a system developed according to the most advanced standards on the matter, and is known as the CAMELBIG system. The CAMELBIG rating system, which began to be used towards the end of 2000, evaluates eight basic components. The main objective of the evaluation of these components consists in obtaining a composite evaluation that measures the exposure of each bank to the various types of risk. The system is based on the prior evaluation of internal controls in order to determine the critical cycles for each institution (loans, deposits, treasury, etc.) so as to design the appropriate audit procedures for each case. The components evaluated cover both business and management risks. The components corresponding to the evaluation of business risk are Capital, Assets, Market, Earnings, Liquidity, and Business. The components corresponding to management risks are Internal Control and Administration. An overall rating is assigned to each institution. The scale  runs from 1 to 5, with «1» representing the highest rating, and thus the lowest level of «supervisory concern», as it indicates a performance and risk management practices that are soundest in relation to the importance, complexity and risk profile of the institution; «5» on the other hand represents the lowest rating, corresponding to the most critical level of performance, with inadequate risk management in relation to the importance, complexity and risk profile of the institution, and thus the highest level of «supervisory concern».

## I: Information
The financial crisis made it necessary to adapt existing Information Regimes to standardize the information provided by financial institutions, as well as to meet the demand for new information required for decision-making purposes. Nevertheless, the changes made have placed greater emphasis on the current circumstances than on medium and long-term planning.

In the first place, as a result of the enactment of Law 25,561 and its decrees and regulations, it became necessary to adopt certain measures for the presentation of information at December 31, 2001. These included:

- Description in a note to the Financial Statements of events subsequent to closing, placing emphasis on the effects on the financial statements of the devaluation of the peso and other regulations relating to the transformation into pesos of receivables and liabilities in foreign currency.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

88. Como se analizara previamente, la política de intervención en el mercado de cambios también se complementó con una serie de regulaciones conducentes a la liquidación obligatoria de ciertos ingresos por exportaciones en el mercado de divisas doméstico.

89. Com. «A» 3498 del 1 de  marzo de 2002.



- Filing and publication of a Pro-forma Balance Sheet at December 2001 including the impact of the mentioned changes (Law 25,561, its decrees and regulations), together with an auditors' report.

In view of the difficulties that financial institutions faced in complying with information requirements as from January 2002, these filings were postponed, suspended or altered until such time as the system could be equipped with the tools necessary for their preparation. Among the most significant of the changes and regulations affecting the filing of information were the following:

- Trial Balance: This requirement was suspended, and only began to be reintroduced as from September 2002. In the meanwhile, monthly information was requested on a transitory basis. In addition, accounts were created to reflect (i) the incorporation of the National Government Bonds as Compensation and Coverage; (ii) new loans

adjusted according to CER and CVS and their respective accruals; and (iii) rescheduled deposits -CEDROs- and the corresponding adjustments from the application of the CER clause.

- Financial System Debtors and Composition of Economic Groups: Rules were issued to be taken into account when preparing the Financial System Debtors information as from June 2002, such as the breakdown of trade debtors in situation 2 into «2.a» and «2.b.» In addition, the requirements for the validation of the information were relaxed, in view of the prevailing economic and financial crisis, making it possible to obtain an increased volume of updated information. Filings under this system began to return to normal in November, on the basis of data at June 2002. Information for the January-May period was discarded as extempore (in those months the scope of the exclusion of the application of CER to loans granted by financial institutions had not yet been defined).

### System of Supervision adopted in 2002

The magnitude of the crisis in the National Government, which had a profound effect on the financial system, generated the need to implement specific measures to exercise effective banking supervision in the most complicated moments of the crisis. The «contagion» effect on financial institutions by the government measures taken in an effort to resolve the crisis in its fiscal equilibrium (wide exposure of banks to government securities as ordered by the government, default, conversion into pesos, etc.) implied a profound change in the reality of the financial system as a whole and certain banks in particular, and demanded specific measures to resolve various aspects arising from the crisis.

Measures were established pursuing clear objectives from a supervision perspective, to carry out a far more exhaustive control over financial institutions than under a normal supervision process. A system of specific inspections was established with the main purpose of performing a daily control of the development of financial institution liquidity, in view of the severe run on deposits that banks had been facing since the start of the crisis.

Although since 1995, following the crisis generated by the Tequila effect, the technical areas of the Superintendence and members of the Board performed a daily monitoring of the development of deposits and the liquidity available in banks, this procedure was extended in view of the particularities and needs generated by the latest crisis. As a result, in July 2001 a program was established for daily control by means of schedules that presented the main liquidity and deposit information for banks on both an individual basis and grouped by type of institution, as well as on a system-wide basis. Furthermore, according to this information, parameters were developed to be taken into account in defining the adoption of the different supervisory measures available.

In addition, other regular procedures forming part of the supervision cycle were deepened, in the context of off-site supervision (that is to say, supervision performed on a remote

basis from the superintendence through the information supplied under information regimes). For example, the Credit Analysis area of the superintendence deepened its tasks for the analysis of financial system large debtors and economic groups, focusing on specific aspects of the recovery potential of the respective loan portfolios by financial institutions. In this context 199 new evaluations were performed on non-multinational companies with borrowings in excess of $1 million, and the situation of 727 companies subject to previous reports was reviewed. A total of 151 economic groups made up by at least 4 companies with an overall indebtedness of over $3 million were evaluated. These analyses provided the basis for warning reports for evaluation by the supervision areas.

On the basis of the specific situation evaluated for each institution and its risk profile developed with the aim of measuring, monitoring and controlling such risks, and after applying the superintendence measures considered necessary and appropriate, the following work was performed:

- Oversight tasks
- Tasks for suspended institutions in the process of excluding assets and liabilities
- Analysis of the evolution of regularization and solvency recovery plans
- Verification of regulatory compliance: restrictions on the withdrawal of deposits, review of foreign trade and exchange operations, money-laundering prevention procedures, etc.



Lastly, it was necessary to create new information requirements covering information corresponding to (i) Compensation for Financial Institutions as established by the Law on Public Emergency and Reform of the Exchange System No.25,561 dated January 6, 2002; (ii) the exchanges of Rescheduled Deposits for National Government Bonds (the first of which was established by Emergency Decree 494/02, and the second by Decree 1836/02); (iii) the book value of the assets acting as guarantees of the advances for the compensation and exchange of bonds; and (iv) legal resolutions from demands by depositors that were to void or restrict the scope of the terms of Decree 1570/0, enabling them to redeem their deposits.

The Debtor Data Center: The Debtor Data Center is a product prepared on the basis of information received by the Central Bank on a monthly basis. It contains data related to financial institution debtors, «closed system» credit card issuing companies, and financial trusts. At September 2002 the data recorded on this database showed a total of $118.31 billion in loans and guarantees granted.

During 2002 a reduced information model was published showing only the identification and denomination of the debtor, the lending institution, the amount of the debt in thousands of pesos and the date (without indicating the status of the debtor). This publication mechanism was exceptional and temporary in nature, the intention being to return to the original publication structure during the first half of 2003.

The Returned Check Center: The Returned Check Center is a database that contains a list of individuals and companies in the public as well as the private sectors, responsible for the returns detailed and their corresponding settlement. It also includes current account blocking measures decreed by the courts as a result of violation of section 302 of the Criminal Code.

Returned documents recorded by the Returned Check

Center receive the following treatment:

• Checks honored within 15 calendar days of the rejection are deleted within 2 working days from the institution having notified payment.
• Checks paid within 16 and 90 from the date of return are deleted one year after payment date, as long as payment has been notified by the institution.
• Checks paid more than 91 days after the return date are deleted two years after payment date, as long as they have been informed by the institution.
• Checks not paid are deleted 5 years after the date of return.

Comparing the number of returned checks informed in 2002 with those of the previous year, there was a 25% reduction, while in terms of amount the drop was 31%. Approximately 43% of the checks returned in 2002 were paid, representing 47% of the total amount rejected, while in the previous year (2001), only 36% of the checks that had been rejected were paid, representing 41% of the total amount of rejections that year.

## C: Classification agencies

In view of the difficulties in exercising market discipline, the Regime for the Evaluation of Financial Institutions[1] was temporarily suspended. This measure will be in force until the situation of the financial system returns to normal.

Nevertheless, to comply with the regulations arising from Law 24,241, it was established that as long as the suspension remained in effect, financial institutions receiving deposits from retirement and pension funds were to obtain ratings from risk rating agencies authorized by the Regime for the Evaluation of Financial Institutions on the basis of their own methodology.

90. Com. «A» 3601 dated May 7, 2002.

# IV. Structure of the financial system

## 1. Evolution of the structure of the financial system

Towards the end of December 2002 there were 100 financial institutions operating in the system, 8 less than in December 2001. This reduction was due to the elimination of 12 institutions (11 revoked licenses and 1 takeover) and the addition of 4 institutions.

In three cases (Banco do Estado de Sao Paulo, Kookmin Bank, Sucursal Buenos Aires and Banco San Miguel de Tucumán S.A.), the licenses were ordered revoked after petition from the banks themselves pursuant to Article 44, clause a) of the Financial Institutions Act. In the eight remaining cases (Banco Bisel S.A., Banco de Entre Ríos S.A., Banco de la Edificadora de Olavarría S.A., Banco General de Negocios S.A., Banco Suquía S.A., Banco Velox S.A., Scotiabank Quilmes S.A. y Caja de Crédito «Floresta Luro Vélez» Cooperativa Limitada) licenses were revoked following application of Article 44, clause c) of that Law.

The elimination by takeover occurred due to the merger in the United States whereby The Chase Manhattan Bank took over Morgan Guaranty Trust Company of New York. For this reason the last institution's authorization to operate as a branch of a foreign institution was cancelled, while the absorbing institution continued its domestic branch activities under the bank's new name, JP Morgan Chase Bank.

The set of new institutions that came to integrate the financial system are composed of a financial company (PSA Finance Argentina Compañía Financiera S.A.) and three commercial banks: Nuevo Banco Bisel S.A., Nuevo Banco de Entre Ríos S.A. and Nuevo Banco Suquía S.A. These last three banks, with the Banco de la Nación Argentina holding a controlling interest (99%) in their respective capitals, were created in accordance with the National Executive Power's stipulations in Decree N° 838/02 as part of restructuring process of the Bisel S.A., de Entre Ríos S.A. and Suquía S.A banks.[91]

During the year there occurred the change in category of Columbia Compañía Financiera S.A., which began to operate as a commercial bank under the name of Columbia S.A.

During the same period, the Banco de la Provincia del Neuquén, an autonomous institution of the Provincial State, modified its legal nature by becoming a corporation with majority state participation under the name of Banco de la Provincia del Neuquén S.A., while Heller Financial Bank S.A. changed its firm's official name to Banco de Servicios y Transacciones S.A.

Finally, at December 2002 there were 3,972 branches in operation, while the total number of authorized automatic tellers stood at 5.641. These figures reflect less territorial expansion of the financial system in comparison with the preceding year, due to the declines registered, of 301 and 397 units, respectively, in the quantities mentioned.

**Evolution of the quantity of financial institutions**

| | | deletion | | | additions | | |
|---|---|---|---|---|---|---|---|
| | Jul/Dec | absorptions | licence revoked | transformation of class of entity | transformation of class of entity | new entities | Jul/Dec |
| **Public Banks** | 13 | | | | | 3 | 16 |
| National | 2 | | | | | 3 | 5 |
| Provincial | 8 | | | | | | 8 |
| Municipal | 3 | | | | | | 3 |
| **Private banks** | 73 | 10 | | | 1 | | 69 |
| Corporations | 53 | 8 | | | 1 | | 46 |
| Cooperative | 2 | | | | | | 2 |
| Branch of foreign entities | 18 | 1 | | 2 | | | 15 |
| **Private banks** | 86 | | | | | 3 | 79 |
| Finance house | 19 | 1 | | 1 | | 1 | 19 |
| Credit cooperatives | 3 | | 1 | | | | 2 |
| Saving and loans associations | | | | | | | 2 |
| **Total non banking entities** | 22 | 1 | | 1 | | | 21 |
| **Total financial system** | 108 | 11 | | | | 4 | 100 |

**Change in the composition of the financial system**

*December, 2001 - december, 2002*

| Renovation and cancellation of authorizations | |
|---|---|
| Banco Bisel S.A. | Banco Suquía S.A. |
| Banco de Entre Ríos S.A. | Banco Velox S.A. |
| Banco de la Edificadora de Olavarría S.A. | Caja de Crédito "Floresta Luro Vélez" Cooperativa Limitada |
| Banco de Estado de Sao Paulo | Kookmin Bank, Sucursal Buenos Aires |
| Banco General de Negocios S.A. | Morgan Guaranty Trust Company of New York |
| Banco San Miguel de Tucumán S.A. | Scotiabank Quilmes S.A. |

| New entities | |
|---|---|
| Nuevo Banco Bisel S.A. | Nuevo Banco Suquía S.A. |
| Nuevo Banco de Entre Ríos S.A. | PSA Finance Argentina Compañía Financiera S.A. |

| Transformations of class of entity | |
|---|---|
| New entity | Change entity |
| Banco Columbia S.A. | Columbia Compañía Financiera S.A. |

## 2. Restructuring of entities

### 2.1. Regulatory framework

The primary objective pursued in the process of restructuring banks consists in finding a solution for institutions undergoing difficulties without forcing depositors, particularly small accounts, to await the distribution of bankruptcy proceeds before recovering those deposits that are not covered by deposit insurance. contributions.

Similarly, this process seeks to preserve jobs and continuous provision of financial services. No less significant is the effort to avoid the sharp decline in the value of an institution's assets that results from bankruptcy proceedings.

To achieve this objective it is essential to assure the operational continuity of the bank, which in turn requires securing the preferential claims of employees during the process of bank restructuring.

To respond to banks in trouble a number of legal instruments are used:

a) Before an operating institution in trouble, the BCRA may require the presentation of a «Regularization and Reorganization Plan,« which must make explicit the institution's assumption of a commitment to comply with a schedule of measures aimed at eliminating the institution's non-observance

43



of regulations and at reducing its principal areas of vulnerability. On the basis of this plan the BCRA evaluates the feasibility of the commitment and later its actual fulfillment. In this framework, the Financial Institutions Act (FIA) authorizes the BCRA a to grant temporary exemptions to the fulfillment of technical ratios and the mitigation of charges and/or their cancellation, etc., i.e. exemptions.

b) If the measures the institution adopts as part of its regularization and reorganization plan are insufficient to revert its liquidity or solvency problems, or should these worsen, the BCRA may, by means of the measures as set forth in Article 35 Bis of the Financial Institutions Act, proceed to restructure the institution to defend depositors, workers, and continuous bank services.

c) If the institution's liquidity situation jeopardizes the continuity of its business, the superintendent, by virtue of Article 49 of the FIA, may, at its exclusive judgment, order that the financial institution suspend activities. This suspension implies the provisional freezing of payments of the institution's liabilities in order to halt further decline in its liquidity, to defend holders of preferential obligations as per the provisions of the FIA. Nevertheless, the collection of the current assets of the institution is excluded from the suspension. This is done precisely to improve the liquidity position of the institution. The suspension is a preventive measure that defends the continuity of the institution. If the institution manages to turn around its liquidity situation, the suspension is lifted and normal activities are resumed. Otherwise, if at the end of the term of suspension the institution is unable to resolve its liquidity problems, the Board of Directors of the BCRA must decide which of the possible courses of action – restructuring or revocation – it considers to be opportune, heeding its discretional power in view of reasons of appropriateness, merit and and advisability.

d) In handling banks with problems, the Bank also benefits from the support of Seguro de Depósitos S.A. (SEDESA) in facilitating mergers or takeovers among institutions and in collaborating in restructuring processes pursuant to the framework set forth in Article 35 of the FIA.

## 2.2. Article 35 bis of the Financial Institutions Act

When the conditions exist to revoke an institution's authorization to operate – for example, due to irreversible liquidity and/or solvency problems—Article 35 bis of the Financial Institutions Act grants the BCRA extraordinary powers to promote an institution's restructuring to protect credit and bank deposits.

These powers may consist in: stipulating the reduction, increase, or sale of the institution's equity or stockholders' equity; excluding assets and liabilities in favor of other institutions; and ordering the judicial intervention and control of the institution. The BCRA's chief objective in the restructuring process is to secure preferential liabilities; in other words, deposits, liabilities arising from labor relations, and the institution's debts with the BCRA.

Clause c) of Article 44 of the FIA establishes that one of the cases in which the BCRA may resolve to revoke a financial institution's authorization to operate is when the harm to the solvency and/or liquidity of the institution, in the judgment of the BCRA, is such that it cannot be resolved by means of a regularization and reorganization plan. Article 35 bis establishes that when it is the BCRA's exclusive judgment, backed by an absolute majority of its Board of Directors, that a financial institution is in any of the situations anticipated by Article 44, the Bank may authorize its restructuring in order to defend depositors, as a step prior to considering revoking the institution's license to conduct bank activity.

As will be mentioned, among the powers granted by the FIA to the BCRA are the options to reduce the equity of the institution by adjustments to its assets as the BCRA judges fit, revoke the participation of some or all of the shareholders, and to entrust or carry out the sale of a financial institution's capital.

If an institution records losses, the effected institution must reduce its capital or its reserves to cover losses, or it must increase its capital, even incorporating new partners. The implicit objective pursued by this mechanism is to produce a change in the administration and management of the institution through a change in stock ownership. If the stockholders oppose the share transfer, the BCRA cannot force it, but can only promote an alternative restructuring alternative or order the revocation of the financial institution's license to operate.

When an institution's liquidity and/or solvency are severely effected, each of the measures mentioned is very difficult to implement, since each of them aims at obtaining increased capital formation, something which stockholders themselves as well as third-parties are unlikely to be willing to support. Consequently, if it proves impossible to capitalize a problem institution, excluding its assets and liabilities becomes a very effective instrument for facilitating the institution's restructuring by allowing the Bank to select the assets and liabilities that betters the conditions for their transference. Within the framework of the restructuring an institution, the law authorizes the BCRA — after taking into consideration employee's claims— to order the exclusion of those assets that the Bank selects for an amount equivalent to the liabilities that are also excluded. As was mentioned previously, the liabilities that the BCRA may exclude (preferential claims) are the deposits and the debts owed the BCRA.

If assets are insufficient to cover all of the preferential claims, the legal framework in force provides a mechanism for the partial exclusion of said liabilities. This legal instrument grants the BCRA some flexibility insofar as it allows the Bank to avoid an «all or nothing» option when restructuring an institution in trouble.

In the circumstances anticipated in Article 44 of the FIA, and when it is determined necessary for the purposes of the procedures of exclusion and transfer of assets and liabilities, reduction, increase, and disposal of an institution's share capital, the BCRA is empowered to request the appointment of a judicial trustee, with or without the removal of the statutory



Report to the National Congress 2002                     Central Bank of Argentina

administrative and governance authorities. In contrast to the case of traditional legislation, the judicial trustee is designated at the proposal of the BCRA and bears those powers that the Bank requests for it. To facilitate the restructuring operations, the BCRA grants to the purchasing institutions certain facilities or flexibility in complying with its technical ratios, as these might be out of phase due to the acquisition of risk assets.

### 2.3. Deposit Insurance

Another important instrument for restructuring of institutions in trouble is the deposit insurance system. Law 24.485 created the Deposit Insurance Guarantee System – through Seguro de Depósitos S.A. (SEDESA) — and the Deposit Guarantee Fund. The system is mandatory, as every banking institution is required to join the deposit guarantee system, and onerous, since contributions from financial institutions make up the Deposit Guarantee Fund.

The implementation of the deposit insurance system sought to create a mechanism of incentives appropriate for depositors and institutions that would contribute to the efficient operation of the system. These incentives include the limited nature of the guarantee – currently this covers up to $30,000-, limits on interest rates for deposits covered by the guarantee, the exclusion from coverage of those who benefit from prizes or incentives, and differential contributions to the Deposit Guarantee Fund set according to the level of risk of each institution.

The limited nature of the guarantee, along with the fixing of reference interest rates which serve as the basis for setting limits on the deposits covered by the guarantees, aims at reducing problems of moral hazard. The limited nature provides depositors with an incentive to effectively monitor the institution's operations, while the limits on the interest rates of the insured deposits aims at breaking the framework of perverse incentives which allow poorly administered or insolvent institutions to continue operating by systematically renewing their deposits at the cost of high and increasing interest rates.

The contributions institutions make to the Deposit Guarantee Fund are set as a function of each institution's level of risk. Originally set in a range between $1.5 and $3 pesos monthly for every $10,000 pesos deposited, these contributions as of November 2001 were set in a range between $3 and $6.[92] This scheme generates incentives not only for institutions to lessen risk; it also creates incentives for the efficient operation of the deposit guarantee system, since it sets higher contributions  - a larger insurance premium – for those institutions that take the greatest risks in their operations, institutions who turn out to be most likely to use the funds.

Faced with the closure of an institution, if the amounts required for its transference or merger with another institution are less than those committed to guarantee deposits – net of the expectation of recovery during the bankruptcy proceeding — SEDESA is authorized to effect either operation. The «lowest cost solution,» as this alternative is called, has been a central legal tool, by means of which the deposit guarantee fund has

contributed to restructuring institutions, allowing solutions that are more effective for the depositor's interests insofar as they assure deposit refunds that are greater than the guaranteed amounts, with lower outlays from the Deposit Guarantee Fund. Nevertheless, the law authorizes the SEDESA to depart from the lowest cost rule, without exceeding the guarantee amount, in cases in which the stability of other institutions or the system as a whole may be effected.

### 2.4. Transference of fiduciary property (Law of Trusts)

A scheme of of financial trusts, in particular for the exclusion of assets, facilitates the exclusion of assets and liabilities during the restructuring procedure set in the framework of Article 35 Bis. The law stipulates that the exclusion of assets and liabilities must be equivalent. Given that assets have an average maturity greater than that of liabilities,  their evolution over time (above all during periods of crisis) makes more uncertain their economic appraisal, with the consequent difficulty in establishing equivalencies with the liabilities. Thus, the formation of a trust with the majority of the restructured institution's assets and the emission by the trust of    Certificates of Participation on the proceeds from the administration of the entrusted assets, facilitates the process of excluding assets in two ways.  First, when there is more than one beneficiary from the exclusion, the asset distribution is made equitable and proportional since the persons who assume the liabilities must not individualize assets in counterpart, rather they receive certificates of participation in the trust, simplifying the process. Second, the appraisal of the assets, as was said is uncertain, is facilitated since the value of the certificates of participations is determined by the liabilities assumed, and the extent which they can be recovered depends upon the conversion of the assets.  Since the beginning of 2002, in the cases of different institutions subject to restructuration under the terms of Article  35 bis of the FIA, financial trusts have been formed with nearly all of their assets that have economic value. These fiduciary structures emitted certificates of participation for amounts equivalent to the preferential liabilities to be assumed of the restructured institution. The certificates of participation thus constitution the principal asset of the restructured institution which the BCRA may exclude in counterpart to the deposits, under the terms of Article 35 bis heading II of the FIA.  Thereby the fiduciary structure is constituted as a suitable mechanism with a view towards the restructuration of a financial institution, under the legal terms previously noted.

In short, the formation of financial trusts, as well as the exclusion of the issued by them, conform a unique process that, at different stages, involved the exclusion and later transference of the assets with economic value as a counterpart to the exclusion and transference of the institution's preferential liabilities.

### 2.5. Institutions restructured or undergoing restructuring

During 2002, in use of the powers conferred by article 35 bis, heading II, of the FIA, seven institutions were restructured, as is discussed below.

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

92. Com.A. 3358



## Banco General de Negocios S.A.

This institution displayed important liquidity problems, which the institution could not overcome with a regularization and reorganization Plan; as a result, the institution fell under the terms of Article 44 clause c) of the FIA. Before this situation, on March 14, the BCRA order the restructuring of Banco General de Negocios S.A. in defense of its depositors, encompassing it under the terms of Article 35 bis of the FIA.

On 12 April it was decided to suspend the Banco General de Negocios S.A. in terms of Article 49 of the Organic Charter of the Central Bank. In addition to being requested by the institution itself, this measure was adopted with the objective of allowing the monetary authority to continue to evaluate the application of the restructuring measures, as well as the implementation of alternative proposals.

The suspended institution presented a restructuring proposal based on an offer from the Nuevo Banco de Santa Fe S.A., which envisaged that this bank would assume the preferred liabilities of the institution. Within the framework of the restructuring process, Banco General de Negocios S.A. noted that, given the difficulty in determining a fair market price for the institution's assets, the BCRA might consider the formation of a trust company to which the institution would transfer the trust property of certain assets.

In this manner, on April 18 Banco General de Negocios S.A., in the capacity of beneficiary, and ABN AMRO Bank N.V. (Sucursal Argentina), in the capacity of trustee, subscribed a Trust Fund contract. As counterpart to the assets transferred, the trust issued two Certificates of Participation – named «Bond A» and «Bond B». «Bond A» was issued in an amount equivalent to the nominal value of the deposits assumed by Nuevo Banco de Santa Fe S.A. (including those that could be generated after judicial rulings that had the effect of increasing the amount of the deposits transferred). The payment of «Bond B» was subordinate to «Bond A», and was issued in an amount equivalent to the outstanding entrusted assets.

After weighing different alternatives, on April 26 the Board of Directors of the BCRA ordered the exclusion of the preferential liabilities of the Banco General de Negocios S.A and of assets for an equivalent value (principally the «Bond A» issued by the Trust), authorizing their transference to Nuevo Banco de Santa Fe S.A. Later, on August 12, its license to function as a financial institution was revoked.

## Banco Bisel S.A., Banco Suquía S.A. y Banco de Entre Ríos S.A.

In April 2002, Banco Bisel S.A. – acting on its own behalf and in representation of its subsidiaries, the Banco Suquía S.A. and Banco de Entre Ríos S.A.- presented itself to the BCRA to request that the bank and its subsidiaries be incorporated under the terms of Article 35 of the FIA. The institution justified this request on the grounds that its controlling stockholder (Caisse Nationale de Crédit Agricole) had resolved to effect no new contributions of funds to these subsidiaries, which meant that the Bisel S.A. and Suquía S.A. bank were in no condition to be able to fulfill their obligations given the continuous withdrawal of deposits taking place and the impossibility of obtaining new assistance from the BCRA.

The monetary authority, taking into account that the Banco Bisel S.A. and its subsidiaries met the conditions described in Article 44 clause c) of the FIA, resolved to comprise these banks under the terms of Article 35 bis of said Law, in defense of its depositors. With the objective of tending towards the restructuring of these institutions, an effort was made to interest private financial institutions in this process. After a favorable response was not obtained, the National Government gave the Banco de la Nación Argentina authorization to participate in the above-mentioned process.

For its part, by means of Decree 838/02, the National Executive Power ordered the creation of three new financial institutions, corporately controlled by the Banco de la Nación Argentina, with the end that the same receive the preferential liabilities and the equivalent assets to be excluded from Banco Bisel S.A., Banco Suquía S.A. y Banco de Entre Ríos S.A..

Under this circumstance, on May 21, Banco Bisel S.A., Banco Suquía S.A. and Banco de Entre Ríos S.A. formed three financial trusts, for which the Banco de la Nación Argentina was designated trustee, to which were transferred the totality of their assets with economic value. These trusts were constituted as the sole beneficiaries of the same. On the same date, the BCRA ordered the exclusion of preferred liabilities and assets in an equivalent value  (principally the senior bond issued by each of the trusts) of these three banks, authorizing the transference of excluded assets and liabilities on behalf of the institutions created by Decree 838/02. The non-preferred liabilities and un-excluded assets conform the residual patrimony of the restructured institutions, whose administration and liquidation must take place in a judicial seat. Later, on September 16 the BCRA ordered the revocation of the authorizations to operate of Banco Bisel S.A., Banco Suquía S.A. and Banco de Entre Ríos S.A.

Finally, it is highlighted that the participation of the Banco de la Nación Argentina in the restructuration process is transitory, as the very norm by which the new institutions was created orders the  Banco Nación to sell its shares in the least time possible. Without detriment to this, by December 31, 2002 the sale of these three banks could not be materialized.

## Scotiabank Quilmes S.A.

Watchful of the difficult situation caused by Scotiabank Quilmes S.A.'s liquidity problems, evidenced by, among other aspects, a significant withdrawal of deposits and the banks failure to make payment on the maturity of Negotiable Debts, on January 31, 2002 the BCRA requested that the institution present a regularization and reorganization plan that would foresee the adoption of measures tending to restore its liquidity.
On April 18, the Board of Directors of the BCRA rejected the plan presented by the institution, since it was primarily based upon a request for assistance from the monetary authority. Given this rejection, the institution was informed that it could exercise its right to be heard and it was set within the terms of Article 35 bis of the FIA, in defense of the depositors and



the stability of the financial system. Also, due to the liquidity situation displayed by the institution, the Superintendent, on the same date, ordered the complete suspension of Scotiabank Quilmes S.A.'s operations, under the terms of Article 49 of the Organic Charter of the BCRA. This measure was successively extended by the Board of Directors until the maximum period anticipated by Law was completed. The measure of suspension mentioned was in response to the refusal by (Scotiabank Quilmes) shareholders to continue contributing funds to finance the exodus of deposits from the institution.

Significant support from Scotiabank Quilmes S.A. depositors for a swap of their deposits for National Government Bonds (75% of the total balance of deposits at April 18, 2002) made it possible to find a solution to restructure the institution. A bid was presented to acquire Scotiabank Quilmes S.A.'s the assets and liabilities. The BCRA invited a group of institutions from the local financial system to better the offer. From this process there arose a complementary proposal from Banco Comafi S.A. and Banco Bansud S.A. to acquire the Scotiabank Quilmes S.A.'s assets and its preferential liabilities in respective proportions of 65% and 35%. On August 20 the Board of Directors of the BCRA ordered the exclusion of assets and liabilities and authorized their transference to the mentioned financial institutions. Similarly, the offer contemplated the subscription of separate «Trust Fund» and «Transference» contracts, which were entered on August 19. In the case of the trust fund contract, the ABN AMRO Bank N.V. (Argentine Subsidiary) acted as trustee.

Once the restructuring of the Scotiabank Quilmes S.A. was arranged, on August 20 the BCRA ordered the revocation of the institution's authorization to function as a financial institution.

### Banco de la Edificadora de Olavarría S.A.

Banco de la Edificadora de Olavarría S.A. was highly affected in its solvency, which could not be reversed by the different plans presented before the BCRA. For this reason, the institution was comprised under the prescriptions of Article 44 clause c) of the FIA.

On June 18, 2002 Banco de la Edificadora de Olavarría S.A. expressed that it was impossible for it go forward with normal operations, requesting the suspension of its operations. As a result, on the 19th of the same month the Superintendent ordered the total suspension of the institution's operations, under the terms of Article 49 of the Organic Charter of the BCRA. This order was successively renewed by the Board of Directors of the BCRA until the maximum period anticipated by Law was reached.

On October 8 Banco de la Edificadora de Olavarría S.A. received a bid, whereby a financial institution proposed to assume its preferential liabilities and acquire assets for an equivalent value, within the framework of Article 35 bis of the FIA. By virtue of this and taking into account the interest displayed by other financial institutions, the BCRA invited different financial institutions to better the offer, with the

proposal presented by the Compañía Financiera S.A. (now Banco Columbia S.A.) being accepted.

On October 17 the Board of Directors of the BCRA ordered the exclusion of the assets and preferential liabilities of Banco de la Edificadora de Olavarría S.A. and, on the same date, revoked the institution's authorization to function. The excluded assets were primarily transferred in favor of Banco Columbia S.A. which, in compensation for the financial assistance received from the Seguro de Depósitos Sociedad Anónima (SEDESA), ceded most of them to said organization in accordance with the contract celebrated among the parties with the date of November 18. Within this framework, the excluded preferential liabilities were assumed by Banco Columbia S.A.

### Banco Velox S.A.

At the end of June 2002, given the liquidity problems facing Banco Velox S.A. as a consequence of the massive withdrawal of deposits and the existence of unpaid operations, the Superintendent ordered the suspension of the bank's operations under the terms of Article 49 of the Organic Charter of the BCRA.

With the objective of reestablishing the liquidity of the institution, the institution was required to present a regularization and reorganization plan. In accordance with this indication, the institution presented said plan, which turned out to be unsatisfactory, for which reason it was resolved that the bank should be comprised under the terms of Article 35 bis of the FIA, in defense of the depositors.

After the presentation on the part of Banco Velox S.A. of a series of offers that turned out to be unviable, on October 24 Nuevo Banco Industrial de Azul S.A. presented a proposal to assume the preferential liabilities of Banco Velox S.A. and the transference of assets in an amount equivalent to a trust.

In accordance with the terms of the offer presented by Nuevo Banco Industrial de Azul S.A., which was not bettered during a call for bids effected by the BCRA, on October 28 the BCRA ordered the exclusion of the preferential liabilities of Banco Velox S.A. and of assets for an equivalent amount (primarily two of the three bonds created on occasion of the formation of the trust of assets alluded to) under the terms of Article 35 bis, of the FIA, authorizing their transference in favor of Nuevo Banco Industrial de Azul S.A., which effectively assumed the liabilities indicated on February 23, 2003. Subsequently, the Board of Directors of the BCRA ordered the revocation of the bank's authorization to function as a financial institution.

To conclude, it should be noted that in all of the cases the restructuring of institutions favored the interests of savers and the preservation of jobs. In this manner, in almost all of the restructuring processes described, the solution chosen allowed the perfection of the option to swap the deposits for National Government Bonds foreseen in Decree 905/02, as well as the availability of the deposits, taking into account always the restrictions on withdrawing cash.

Report to the National Congress 2002  Central Bank of Argentina

| | | | | | | | Deposits taken over | |
|---|---|---|---|---|---|---|---|---|
| date | Restructured entity | Purchasing entity | Excl. assets | Excl. liabilities | Total liab. of entity | Deposits. excluded | - in percentage | |
| Apr | Banco General de Negocios S.A. | Nuevo Banco de Santa Fe S.A. | 203.2 | 203.2 | 963.7 | 147.4 | 100% | 0 |
| May | Banco Bisel S.A. | Nuevo Banco Bisel S.A. | 1.384.7 | 1.384.7 | 2.292.4 | 1.217.1 | 100% | 0 |
| | Banco Suquía S.A. | Nuevo Banco Suquía S.A. | 1.394.9 | 1.394.9 | 1.851.3 | 1.163.2 | 100% | 0 |
| | Banco de Entre Ríos S.A. | Nuevo Banco de Entre Ríos S.A. | 524.2 | 524.2 | 584.4 | 485.9 | 100% | 0 |
| Aug | Scotiabank Quilmes S.A. | Banco Comafi S.A. | 1.208.0 | 1.208.0 | 3.450.3 | 294.2 | 100% | 123.5 |
| | | Banco Bansud S.A. | 632.6 | 632.6 | | 160.1 | 100% | 66.5 |
| Oct. | Banco de la Edificadora de Olavarría S.A. | Banco Columbia S.A. | 69.3 | 96.1 | 110.6 | 90.5 | 100% | 27.0 (*) |
| | Banco Velox S.A. | Nuevo Banco Industrial de Azul S.A. | 201.6 | 201.6 | 346.5 | 183.5 | 100% | 60.0 |

(*) Incluye arreglo adecuación de 22 millones de pesos en diversos rubros públicos.

## 3. Control of Special Operations

The framework of policies and procedures developed by the BCRA includes the intervention in the analysis and monitoring of alleged «suspicious» financial operations that might constitute violations of norms on the prevention of money laundering. The procedures adopted on this matter are based in laws and regulations that include international best practices.

### 3.1. Normative Framework

The Norms on the Prevention of Money Laundering duly promulgated by the BCRA established the minimal precautions to be followed by financial institutions. Among these may mentioned aspects such as knowing the clientele, the maintenance of registries of national and international operations, the identification of suspicious operations, the design of policies and the elaboration of programs against money laundering, and the designation of a high level official in charge of anti-money-laundering, who centralizes all of the information that the BCRA itself or the competent authorities require.

The content of these norms is regularly adjusted to keep pace with international progress in the struggle against asset laundering. During 2002, a series of communications regarding this matter were issued, among which stand out modifications to the amended text of the Informational Regulations of Prevention of Money Laundering and Other Illicit Activities. Incorporated to this text were the sale of post-dated checks as an operation to be considered, as well as different specifications for the identification of residents abroad (Com. «A» 3779). By establishing that the attraction of funds destined to current accounts can only be effected in pesos, regulations related with the payment of checks over the counter were adapted (Com. «A» 3831).

Similarly, the list of non-cooperative jurisdictions was updated with the exclusion of the territories of Dominica, Hungary, Israel, Lebanon, the Marshall Islands, Niue, Russia and St. Kitts and Nevis, pursuant to the decision adopted by the Financial Action Task Force (FATF) and with the intended purpose that financial institutions pay special attention to transactions dispatched to and received from these areas, given their new status (Com. «A» 3834).

In regard to collaboration with the strategies pursued by international organizations in the struggle against financing terrorism, during the year the Bank issued a series of Communiques that broadened the reach of regulations that oblige institutions to freeze and report on funds or other financial assets of specific organizations and individuals allegedly tied to terrorist activities (Com. «B» 7085, 7114, 7163, 7176, 7499 y 7585).

Finally, in the framework of Law 25,246 on the «Concealment and Laundering of Assets,» the Unidad de Información Financiera (UIF, Financial Information Unit), by means of its Resolution N° 2/2002, approved and presented guidelines on the period and manner whereby information received by the UIF should be set aside, specifying the forms, timeliness, and limits of compliance with the obligation to report suspicious operations, modalities, for each obligatory category and type of activity. In this manner, the UIF approved the «Guide of unusual and suspicious transactions in the orbit of the financial and exchange system» and the Suspicious operation report.»

### 3.2. Investigaciones

To improve the quality of investigations realized on the basis of reports of unusual or suspicious operations, the Bank has developed and put into use the guide for Procedures «Prevention of money laundering and other illicit activities,» which sets guidelines to be followed in the analysis of the reports received.

Over the course of the year 183 reports of «unusual or suspicious operations» were received both from financial institutions as well as Supervisory groups of the BCRA itself. Over the year, the analysis of 31 dossiers were concluded, of which 16 cases were placed in the jurisdiction of the Federal Judiciary and 15 were reported to the Unit of Financial Information, once this organization was operative[95] under the terms of its Resolution N° 2/2002.

Similarly, the Bank continued to lend permanent technical collaboration on the terms being referred to outside of the institution. Worthy of mention are the assistance granted to the Federal Judiciary in cases which in its judgement needed the participation of the BCRA. Since early 2002 the BCRA provides technical assistance to the Special Commission Investigating the Flight of Foreign Exchange of the Honorable Chamber of Deputies of the Nation, at the request of the Commission itself. Information has been requested of the financial system and a number of working meetings have been held in the heard of the Commission with members of different official organs, such as the AFIP and the National Registry of Persons. In compliance with these activities the Commission has presented preliminary reports in its plenary sessions.

Finally, regarding collaboration in international activities related to the issue under reference, the following activities during 2002 stand out:

a) Review of the document submitted by FATF South to consider «Preventive measures for Financial Institutions» and their relation with the norms issued by this Governing Body on the matter. Comments were also elaborated on the



interpretation of Special Recommendation VII «Wire Transfers» developed by the FATF.

**b)** Participation in a seminar on Strategies of Anti-Money Laundering and Combating the Financing of Terrorism sponsored by the World Bank and the International Monetary Fund jointly with the Egmont Group and the OAS-CICAD, with the coordination of FATF South, held in Montevideo. The purpose of this seminar was to present the FIRST initiative.

**c)** Participation as a member of Subgroup No. 4 in the last meeting of the Subcommission on Money-Laundering in Brazil, at which the «Cooperation agreement  among the central banks of the states members of MERCOSUR» for the prevention and repression of actions aiming at legitimating assets arising from illicit activities, the internal Regulations for the «Task Force» Group  for the prevention and repression of money laundering in the MERCOSUR and the Guidelines of Minimal Regulation to be adopted by Central Banks for the prevention and repression of money laundering and the financing of terrorism.

**d)** Participation in the First FATF South –Regional Financial Sector Form, held in Uruguay.  Participants at this meeting addressed issues such as the intervention of Public Sector Organs as superintendent and supervisory organs, as well as private sector collaboration with the different UIFs during investigations, and relevant aspects related to the promulgation of the U.S.A. Patriot Act , the Review of the FATF 40 Recommendations, and the evaluation of new measures at the international level for the control and prevention of money laundering and the financing of terrorism.

## V. Administration of Reserves

The BCRA's international reserve policy has as its objective to maximize the return on reserves by investing them in low risk, highly liquid financial assets, to guarantee backing in dollars for the financial liabilities. The investment of the international reserves must seek to increase their purchasing power in terms of U.S. dollars, maintaining at the lowest possible levels credit, interest rate, and exchange rate risks.

### 1. Composition of the portfolio

As of December 31, 2002 the liquid assets of the BCRA reached U.S.$ 10,440.4 millions. Some 69.9% of this amount was made up of time deposits in non-resident institutions, 26.6% of bonds of the U.S. Treasury Department and of other Foreign Governments, 0.9% of sight deposits with the IMF in SDRs[96] and 2.5% in dollar bills at the BCRA itself.

**Compisition of reserves by types of financial instrument**



Tides of the United States Treasury and other foreign government bonds

Gold coin
0%

Deposits at sight with the FMI (DEG´s)

Fixed deposits in not resident institutions

Dollars bill in the bcra

### 2. Principal Reserve transactions realized in 2002

*Sale of modified high duration American bonds for U.S. 1,500 million and purchase of an equal value of modified low duration American bonds*

At the beginning of March 2002, analysts at the principal investment banks forecast that it was highly probable that the Federal Reserve would begin a period of interest rate increases if the North American economy began a cycle of recovery as appeared to be on the way at that moment. To avoid the eventual capital losses that surprise increases in the implicit in bonds with a greater maturity (a situation that tends to be confirmed when the market begins to discount that the Federal Reserve will imminently revert its cycle), the duration of the investment portfolio was shortened. It was further estimated that a position in short term bonds was a prudent policy for a period of change in the cycle of the reference rates, given that these phases are marked by high volatility and longer term bonds are more exposed to this volatility.

Consequently, the modified duration of the portfolio of American bonds was decreased – composed in great measure by American agencies with a modified duration that went from 2 a 3.79, of 2.01 to a range of between 0.6 and 0.8.

Unfortunately, the successive accounting scandals that took place in the second trimester in large North American and European firms caused a significant rise in the risk premium on corporate bonds, stimulating capital flows to move principally towards U.S. treasury bonds. As a result, these bonds appreciated and their implicit rate fell. The same effect was confirmed when the market began to discount the possibility of a military conflict between the U.S. and some country of the Middle East. In so far as this possibility turned certain, the assets considered to be the principal refuges of value, such as gold and Treasury bonds saw their current market prices rise. In the case of the bonds, while their implicit interest rates fell, the short term bonds obtained earnings, although these profits were bettered by earnings of the long term bonds.

*Sale of European bonds and purchase of American bonds for a price close to U.S. $ 1,000 millions in the middle of March 2002*

The position in Europe made up 29% of the entire portfolio of bonds and was made up of German and Dutch government securities of the 2 to 4 years sector of the yield. Until mid-2002 some 70% of this portfolio was covered by dollar forwards.

On this position there were two fundamental factors to take into account. On the one hand, the lack of lines of credit with investment banks made it impossible to cover the position in European monies, a situation which lead to exposure not only to interest rate risk but to exchange rate risk as well. On the other, the differential between the rates at 2 years of the American treasury bonds and those of the German government was at 70 basis points, while this differential in the 5 year sector was at 27 basis points. These rate spreads or differentials, in large measure, reflected the exchange rate risk -Euro against the Dollar – to which one was exposed if one continued investing in Europe. Given the high volatility that was being observed with the Euro, it was concluded that the spread in both sectors of the curve did not compensate the greater risk to which we would have been exposed in the case of continued investment in Europe without coverage of the exchange rate risk.

Lastly, the Bank took into consideration that this significant position in European bonds had been consolidated in tune with the extended convertibility law approved by Congress in mid-2001. Under this law, once the Euro reached or surpassed parity with the U.S. dollar, the BCRA should back the monetary base with equal parts of dollars and Euros. To deal with this eventuality, the Bank built an important position in Euro denominated bonds. The norm mentioned was repealed by Law 25,561, promulgated on January 6, 2002, while maintaining the BCRA's obligation to devote its reserves to backing the monetary base. Before this situation it was considered advantageous to unload the position in Euros.

Observing the subsequent evolution of the markets, the Euro reached parity against the dollar in the last trimester of the year and in December surpassed the dollar, closing 2002 at market prices of U.S. $ 1.05 per Euro. As already mentioned, the appreciation of the Euro was related with the bankruptcies or  sudden preventive bankruptcy proceedings of large



multinational forms which mainly affected the U.S. stock market and to a lesser extent the European markets. Before this panorama, the strong entry of capital that the United States had been receiving decreased by half in relation to the average of preceding years and, consequently, the dollar suffered a 10% depreciation before the Euro, given the lack of financing of the North American balance of trade deficit.

*Transference of reserves to the Bank of International Payments (BIS)*

Given that the National Government had incurred financial non-payments and the possibility that some external creditor might initiate legal proceedings that lead to an embargo of the BCRA's reserves, this institution took preventive measures gradually moving its reserves to the Bank of International Payments (BIS) as the bonds in the portfolio matured. This was done in accordance with the counsel of juridical advisors on international matters, in so far as Swiss law offered greater protection on the investment of reserves.

Initially, by Resolution N° 542/96, the Board of Directors of the BCRA had established U.S.$ 4,000 millions as the maximum limit that can be invested in the Bank of International Payments (BIS). Nevertheless, by Resolution N° 467 of November 15, 2001, the Board of Directors decided to increase the maximum limit allowed for operations effecting the deposit of foreign exchange in the BIS to U.S.$ 7,000 millions. Finally, by Resolution N° 130 of February 21, 2002, the Board of Directors increased the maximum amount to U.S.$ 10,000 millions. In this way, throughout the year, the policy begun the year before of moving reserves to the BIS was continued. At the end of 2002, the position in the BIS was situated at U.S.$ 6,100 millions.

*Extension of the duration before the prospect of military conflict*

Around November, the global economic recovery appeared to stagger. Worry with regard to a possible invasion of Iraq contributed to upset the capital markets and led to a rise in petroleum prices with negative implications for business confidence and investment decisions. In this context, the Bank decided to lengthen the duration of its portfolio by way of the sale of very short term bonds, for a value of U.S.$ 500 million, and purchase, with the proceeds of that sale, bonds with a two year maturity. This change in the portfolio made it possible to obtain greater returns, due to the drop in rates that later occurred as a result of the imminent military conflict between the allies and Iraq.

**3. Return for the reserves**

In a context of declining interest rates at the international level, the total return for the reserves was 1.9% annually, thus surpassing the rate for a 3 month U.S. bond – taking into account of the risk-free rate—which was 1.78% annually throughout 2002. Although the major portion of the reserves were invested in time deposits at the BIS (with an annual return of only 1.7%), the portion maintained in foreign government bonds made it possible to increase the average return on the total reserves.

# V. Instruments of Monetary Policy

## I. Monetary Programme for 2002

As from the reform of the exchange rate regime and the modification of the Central Bank's charter undertaken at the beginning of 2002, the Central Bank regained the possibility of carrying out an active monetary policy. In this context, the Monetary Programme was transformed into a key instrument of economic policy.

In overall terms, the design of this Programme was undertaken under the following guidelines: once certain political guidelines were fixed, and taking into account the changes expected in the demand and supply of the monetary base[93], the primary imbalances which were estimated as requiring correction in the future were defined. The Central Bank has various tools it can count upon in order to adjust the variation of the monetary mass and in order to establish the liquidity of the system; on one hand, its attributes as a regulator of the financial system, in particular, the policy of mandatory bank reserves —already mentioned in the section referring to changes in rules and regulations—and through the assistance to financial institutions.

On the other hand, the monetary authority has at its disposal two instruments with complementary characteristics: exchange rate intervention and the issue of bills (LEBAC). Due to the importance of these two instruments mentioned, a detailed analysis of their evolution during the year will be given in the following two sections. As regards assistance to financial institutions, the analysis will be deferred until the first section of Chapter IX.

In a context marked by a strong uncertainty, at the beginning of February certain monetary emission targets were defined for the rest of the year. These initial targets placed particular emphasis on three factors: the funding requirements of financial institutions, assistance foreseen for the National Treasury and the estimated placement of LEBAC. According to the projections that were carried out, targets were prepared that were consistent with the objective of avoiding a run towards the dollar that could unleash a hyperinflationary process. It should be borne in mind that these targets were carried out in accordance with the regulatory framework applicable at the beginning of the year, especially, the rescheduling of bank deposits.

Given the later evolution of different variables of the system, those initial targets would rapidly become unattainable in the face of the lack of definition about certain points that would become crucial in order to obtain them. The proliferation of court orders to refund in cash deposits subject to withdrawal restrictions turned out to be one of the principal causes that determined the rapid obsolescence of the original targets.

In fact, when these orders were paid in dollars or at a market exchange rate —and not according to the amount accounted for on the balance sheets of financial institutions in accordance with the schedule that reprogrammed bank deposits—, the court orders meant a larger than foreseen liberation of monetary mass. The leakage of funds was additionally accelerated by subsequent disbursements that were

permissible. In both cases, pressure was exerted on the liquidity of financial institutions that had repercussions in an increased demand for Central Bank assistance. Furthermore, as funds were released which to a large extent were non-transactional, the court orders to pay deposits and other disbursements had repercussions on the demand for foreign currency, the level of reserves of the monetary authority, and the intervention exchange rate. As a result of these factors, towards the end of April the stock of assistance to financial institutions which had accumulated already exceeded the amount forecast for all the year.

The Central Bank was then obliged to reformulate its monetary targets for the rest of 2002, by presenting a Monetary Programme for the July-December period (Communication «A» 3652). In order to interpret this restating of targets it should be borne in mind that the monetary authority tried to avoid a rediscount policy that would be too restrictive. This was so not only to avoid the increase in the cost of money that it would imply, but mainly to avoid the closure and liquidation of assisted financial institutions, due to the negative impact that the forced securitization of assets would have generated on the payments system, with a further consideration being the possible acceleration of the run on the remaining banks.

With the Monetary Programme for the July-December period an attempt was made to consolidate the objectives laid down for the first half of the year: the recomposition of the payments system and the restoration of confidence in the financial system. For this purpose, the aim was to avoid a massive closure of financial institutions, to stabilize the market for foreign exchange and to clear away the expectations of inflation that remained. Therefore, this version of the Monetary Programme laid an emphasis on the estimate of larger requirements of liquidity by financial institutions in accordance with future disbursements of funds that would be deprogrammed and court orders. A path was estimated for court orders and leakage out of the «corralito» (which had placed restrictions on withdrawals in cash from the banking system, in addition to the percentages that accepted the swap in July 2002, which had already been established.

Two stages were contemplated in this Programme. The first stage, from July to September, contemplated the definition of the outcome for deposits which had been reprogrammed and the progressive leakage of funds from the so-called «corralito» until the only deposits at sight would be those associated with the demand for transactions. Although it was estimated that once the amount of money in sight deposits reached the level associated with their demand for transactions as a percentage of nominal GDP maintaining restrictions on cash withdrawals would only have a marginal incidence on the evolution of monetary variables, the Programme assumed that these restrictions would not be lifted during 2002, and thus maintain a segmented market for money.

In addition, for this first stage the definition of an agreement with the IMF was expected. If this first stage turned out to be successful, it was expected that thereafter a gradual return of liquidity to the system would be seen. Thus, the financial

53



institutions would have at their disposal a level of liquidity that would be more than enough to face the first payments of rescheduled deposits.

The Programme estimated the persistence of a monthly leakage of deposits —without including court orders— of about $3.0 billion until the end of September, whereas as from that date until the end of the year a net inflow of funds was expected. Given the estimates of a net monthly cancellation of deposits —as a result of the expected evolution of the outflow from the «corralito» restrictions of those deposits linked to savings—, the outflow of funds as leakage for the June-December period was estimated at around $11.0 billion. For court orders a gradually diminishing trajectory was predicted, starting with monthly outflows of US$ 200 million. Added to the previous figure, a total outflow of deposits of almost US$ 14.6 billion was calculated up to the end of 2002.

Given that the variation of other net liquidity requirements until the end of the year was estimated at $150 million, and in as much as a net inflow of about $1.2 billion from the cancellation of loans was projected, the funding requirements of financial institutions until the end of the period would be almost $13.55 billion.

Considering the liquidity problems at the time, it was assumed that only half these estimated requirements would be covered with the remaining liquidity and by funding from the financial institutions' own shareholders. The balance that remained would be covered with Central Bank assistance, with assistance to the financial system forecast at $6.77 by the end of the year. In addition, it was estimated that there would be no deviations above the budget forecast, maintaining the target of financing for the Treasury at $1.0 billion for the full year[94]. Adding the estimated assistance to the Treasury and to financial institutions, an increase of the monetary basis of $7.07 was thus forecast for the June to December period.

In order to estimate the demand for base money, the «broad» demand for currency —including quasi-currencies—was calculated as a share of nominal GDP. In this respect, and despite the expected contraction of real GDP, the repercussion of inflation and the seasonal increase in activity in December determined a nominal increase of $4.1 billion in cash held by the public for the reference period. This would allow for compensation to a large extent for the expected drawing down of bank reserves, in such a manner that until the end of the year the demand for monetary base would fall not much more than $680 million.

Given the assumptions analyzed so far, from June until the end of the year the need to absorb monetary mass was estimated at $7.76 billion. Of this amount, coverage for 65% was expected through exchange rate intervention, and the remainder with the placement of LEBAC. The planned net emission —the increase in base money less issues of LEBAC—resulted in almost $4.2 billion. Furthermore, a decrease of almost US$380 million in international reserves was foreseen, so that at December 2002 these would stand at US$ 9.8 billion. Once the greatest efforts of sterilization had been overcome, the expected path for reserves and the exchange rate

contemplated an improvement during the final months of the year.

## 2. Foreign exchange market[95]

With the liberalization of the exchange rate and the adoption of a floating regime, it became necessary to develop a means for the negotiation of foreign currency to be transparent, dynamic and efficient. An on-line electronic system was therefore adopted, by which all authorized financial institutions and the Central Bank could carry out the foreign exchange transactions. The operating system that was put into place consisted in the placing of offers to buy or sell, which could be executed by any other financial institution or the Central Bank.

### 2.1. Central Bank operations on the foreign exchange market

Since mid-February, the Central Bank attempted to contain an abrupt and unwanted devaluation by implementing daily intervention on the foreign exchange market. In order to undertake these interventions the following mechanisms were used:

• Buying and selling foreign currency on the wholesale foreign exchange market (electronic).

• Buying and selling foreign currency from financial institutions to cater for the retail market, using the procedure established by Communication «B» 7174 to buy and sell for and on account of the Central Bank.



**Monthly result for operations of BCRA's change**
2002 - mill.US$

■ Interventions
■ Net exports yielded to the BCRA
░ Net result of the BCRA

As the foreign exchange market returned to normal and economic agents corrected their expectations, thus restoring confidence in the local currency, the Central Bank decreased its intervention in a gradual manner, as is evidenced by the monthly evolution of the aggregate amount of purchases and



Report to the National Congress 2002                                    Central Bank of Argentina

sales of foreign currency by the Central Bank in the wholesale foreign exchange market and purchases and sales to financial institutions to cater for the retail market. The latter wer carried out to reduce the volatility that existed on that marke In so far as the foreign exchange retail rate became mor stable, the amount of foreign currency aimed at that sectowas reduced, and as from December 26 2002 the mechanis was suspended. In this way, the peak of intervention was June 2002, and from that moment the intervention was fallinalmost permanently, until at the beginning of 2003 the CentrBank began to carry out net purchases of foreign currency.

### Intervention of the BCRA (2002)
Net daily merchanting
(mill. US$)



The smaller intervention during the second half of the year was made easier by the change in rules under which the exporters settle foreign currency. In fact, as was mentioned in the section dedicated to the analysis of rules for foreign exchange[36], by means of Communication «A» 3619 dated May 31 2002 it was established that foreign currency pertaining to settlements of exports for amounts of over one million US dollars must be ceded to the Central Bank at an exchange rate that was fixed according to the result of a daily survey that was used to determine the reference exchange rate[2]. This minimum amount was adjusted to increase the effectiveness of this measure, and first was reduced to US$ 500,000 on June 18 and then to US$ 200,000 on September 3. In parallel, it was established —by Communication «A» 3629 dated June 7— that the Central Bank would sell foreign currency to exporters that simultaneously carried out imports for a lesser or equal amount at the same exchange rate.

This measure was adopted to avoid injury to those exporters who had agreements with banking entities with which they had established identical —or very similar—exchange rates for the sale and purchase of foreign currency, due to these being simultaneous. In addition, by means of Communication «A» 3608 dated May 26 it was established that exporters who had not settled their foreign currency in due and timely manner would have to do so at the lower between the export price of the day of settlement or the reference exchange rate on the day the settlement should have been made.

### Net daily exports yielded to the BCRA
2002 - Mill. US$



If the net volumes ceded to the Central Bank for these concepts (exports less imports) are analyzed, as from June 2002 the monthly amounts may be seen to remain above one billion US dollars. In daily terms, the moving average of these amounts always remained above US$ 45 million.

When the combined effect of the measures adopted —direct intervention by the Central Bank and net cessions of foreign currency by exporters— is considered, one can see that until June 2002 the Central Bank had to draw down on reserves for its policy of intervention on the foreign exchange market. As from that date it was able to reverse the trend and end the year with a positive balance. This evolution was reflected in the behaviour of the exchange rate: until July the exchange rate grew permanently, to gradually stabilize at around $ 3.60 per US dollar and begin its descent towards the end of the year.

### Net daily result of the BCRA
2002



The foreign exchange and monetary policies put in place during 2002 generated a favourable context for the stabilization of the exchange rate, allowing for the subsequent intervention of the monetary authority to be limited to avoiding unwanted fluctuations in the exchange rate and to ensure the settlement of foreign currency between those financial institutions who, as a result of the severe financial crisis, had not yet established credit lines between themselves. This new scenario allowed

55

Report to the National Congress 2002  Central Bank of Argentina

for the adoption of different measures aiming at making activity on the foreign exchange market more flexible, starting to eliminate restrictions imposed during the crisis, and moving the system along a path towards a free flotation in a gradual manner.

## 3. Issues of Central Bank Bills

As from March 2002 and in the framework of a new monetary and exchange rate scheme that required the adaptation of policy instruments, the monetary authority offered Argentine Republic Central Bank Bills (LEBAC). These bills were offered through public tenders and their characteristics were zero coupon financial assets with total amortization on maturity; in other words, issued without an interest coupon, which means that when these bills are subscribed, the purchasers discount at a rate on account of interest.

The principal aims pursued through the issue of these bills were:
• To absorb excess liquidity from the money market and
• To establish a reference interest rate.

During the year the Central Bank issued LEBAC denominated in pesos, in US dollars[97], and in pesos adjustable by the CER stabilization coefficient. The variety of securities offered throughout all 2002, both in reference to the currency denomination as regards maturity terms, contributed to progressively strengthen the acceptability of these instruments of monetary regulation.

### 3.1. Procedures for LEBAC auctions

During 2002 the auctions of bills were carried out through an electronic system[98] twice a week, on Tuesdays and Thursdays. In each bid there are two tranches, the competitive segment and the non-competitive one. In the first tranche the cut-off price is defined, and this price is then also applied in the second tranche.

Each call for bids was announced through its respective «B» Communication which established the amounts and maturities of the issues to be auctioned. In all cases the rules applicable were announced by Communication «B» 7543, later modified by Communications «B» 7616 and 7621.

The offers in tenders for bills denominated in pesos and in pesos adjustable by CER are opened at 12 noon and bids are accepted until 3 pm. In the case of tenders for bills in U.S. dollars, these start at 2 pm and bids are accepted until 4 pm.

For all these tenders a quota of 70% was established for the competitive tranche and of 30% for the non-competitive segment, although if the full amount of the issue foreseen in one of the tranches is not placed, the monetary authority may extend the other tranche up to the amount not placed. The minimum amount for the competitive tranche was set at 1,000,000 nominal value for short-term bills in pesos and US dollars, plus multiples of 100,000. In the case of medium-term bills in pesos —at four, six and nine month maturity—the minimum bid for the competitive tranche was set at 500,000 nominal value, plus multiples of 100,000. For the non-

competitive tranche, the minimum amount was set at a value of 10,000 for legal persons and at 1,000 for physical persons. The respective multiples were established at 1,000.

It is worth noting that, because restrictions on cash withdrawals were applicable until December 2002, for these auctions the use of funds that were temporarily restricted or rescheduled under the measures adopted by National Executive Power Decree Nbr. 1570/2001 and complementary rules was not allowed[99]. Thus, the bills could only be subscribed with cash and/or funds originated in the maturity of term deposits set up after December 3 2001 by the deposit of cash, funds received from abroad or their subsequent renewals and/or funds converted on the foreign exchange market coming from transfers that were received from abroad after December 4 2001 and entitled to be paid in cash, not in connection with foreign trade; and/or by debits in current accounts or savings accounts attributed to the margin available as cash and/or debits in special accounts for cash deposits and/or with funds coming from the settlement of financial services of LEBAC. Funds which had originally met the characteristics mentioned above could not be applied to the subscription of bills, if they had been transferred or deposited in other accounts by issuing cheques.

Although the competitive tranche was aimed at financial institutions, exchange rate houses, pension funds (AFJPs), mutual funds, workplace accident insurers (ARTs) and insurance companies, both physical persons and legal entities whose bids were equal or larger than 1,000,000 nominal value had to take part in the competitive segment offering a price, and the multiples applicable in that segment were applicable. Physical persons and legal entities place their bids in the electronic system through financial institutions, stock exchange traders and stock exchanges throughout the country.

The adjudication system is by a Dutch auction (single price). Investors offered a price calculated in terms of an implicit interest rate calculated in nominal annual terms on a 365 days basis. The Central Bank could consider an auction vacant, or even increase the amounts to be placed.

The liquidator and registry agent is the Centre for Registry and Settlement of Public Debt Instruments (CRYL) that is part of the Central Bank. The scope for negotiation of the bills includes the Mercado Abierto Electronico S.A. (MAE) electronic over-the-counter market, bourses and stock exchanges in Argentina. Finally, the outcomes of each auction were announced by press release.

### 3.2. Evolution of the LEBAC portfolio

In a context in which the stark uncertainty forced investors to take shelter in the United States[100] currency, since the end of the first quarter of the year the auctions of LEBAC attempted to offer an alternative for investment with good yield and relatively low risk, expecting in this way to contribute to the absorption of monetary surpluses in a manner complementary to exchange rate intervention.



**Lebac in circulation**







therefore had to adjust the supply of money, which was reflected in auctions for increasingly significant amounts[102].

A further strong increase in the stock of LEBAC was seen during the month of October, while during the rest of the months until the end of the year –due to the smaller monetary surpluses to be sterilized—the amount in circulation showed a degree of stability. In this manner, at December 31 2002 there were bills in domestic currency in circulation with a nominal value of almost $3.05 billion and bills in foreign currency with a nominal value of about US$185 million. In terms of the relevance of this stock, it should be mentioned that towards the end of the period under analysis, they represented approximately 12% of the total amount of monetary liabilities.

**Total amount operated on the secondary market**



The initial progress in terms of monetary absorption through auctions of LEBAC was uneven, despite the aggressive interest rate policy, adopted with the purpose of these instruments becoming an attractive investment alternative vis-à-vis the high yields which could be obtained on the foreign exchange market. In fact, until the month of July the demand for LEBAC in pesos was unstable, which was evident in the amounts that were placed. Due to the scenario of marked uncertainty, the average maturity of placement could not be extended beyond two weeks, while yields for seven day bills attained peaks of 90%, 107% and 129% per year, on March 27, May 3 and July 10 respectively.

At the same time yields on bills in dollars showed important drops, falling from rates of 40% per year in April to 1% annually in July[103]. Nevertheless, to the extent that the exchange rate became more stable, the Central Bank managed to achieve progress in a process of notable reductions in the cut-off interest rates for auctions in pesos. For example, while at the end of August a 28-day bill had a cut-off rate of 69%, at the end of subsequent months instruments of similar characteristics would obtain a progressively lower rate: 48 % (September 26), 15% (October 31), 7.5% (November 28, for a bill at 34 day terms) and 6.9% (December 26, for a 33-day bill). As a complement, as from July the average cost of the LEBAC portfolio showed a declining trend, passing from an average cost of the LEBAC portfolio in pesos of almost 130% (measured as a nominal annual interest rate at 30 days) in the

Although the first LEBAC auctions were for limited volumes, with an important share denominated in U.S. dollars[101], for very short maturities and with high cut-off rates, to the extent that there were advances in stabilizing the exchange rate – and in so far as the bills obtained a degree of reputation in terms of low risk and high liquidity— it was possible to obtain improvements in the terms of the issues.

The stock of LEBAC in circulation started to grow in a notable manner during the month of July, showed a significant increase in August, while the total percentage of the portfolio denominated in pesos rose. In fact, to the extent that a greater stability of the exchange rate and the rate of inflation enabled domestic assets to gain a greater acceptance by the public, and given that as it moved to a net positive result due to its aggregate interventions on the foreign exchange market –thus acting as a net supplier of foreign currency—the Central Bank



middle of the month of July, to close to 46% at the end of the third quarter and to almost 34% at the close of the year.

The cutbacks in the interest rates of the auctions did not reduce the attractiveness of these issues, which can be ascertained by considering that for various of these issues in successive auctions –in particular for those with longer durations—the amounts offered continued to remain above those announced by the monetary authority.

**Structure of de rates of LEBAC's court without adjustment CER**
Last auctions of the months(2002)



**Structure of de rates of LEBAC's court**



Another noticeable characteristic of the stock of LEBAC during 2002 was the extension recorded in their average duration. While the first auctions, both in pesos and in US dollars, were carried out at seven-day terms, as from the third week of March bills in pesos began to be placed at 14 days, which was maintained as the sole option until mid-August, when one month bills in pesos were launched.

As from August LEBAC adjustable with the CER coefficient began to be placed at approximately three month terms[104]. In the following months the possibilities were broadened considerably when bills in pesos on terms of about two months term were introduced (from September), three and six months

(October), four months (November) and nine months (December). Due to the gradual reduction in the volatility of markets investors could begin to extend the horizon for timing their decisions, which thus made it possible to place these new bills for increasingly extended terms. On several opportunities, the launching of instruments with new terms coincided with substantial growth in the demand for these new securities, which ensured the placement of significant volumes. In this way, the average life of the LEBAC in circulation denominated in pesos was notably extended during the last quarter of the year: while at the end of September the average lifespan of the portfolio was 14 days, at the end of the following month it had already reached 41 days, rising to 65 days at the end of November and ending the year at 103 days on average. In the case of LEBAC in dollars, the maximum term negotiated throughout 2002 was 34 days, which meant that at the end of the year the average life of the portfolio in circulation was only eight days.

The above mentioned characteristics –extension of the average life and lowering of the cut-off rate—allowed for the risk of these bills to remain limited, despite the growth of the stock in circulation. In particular, it reduced the risk associated with renewals (roll-overs) of these securities: the short-term maturities of the initial auctions determined that the maintenance of the amounts absorbed would depend to a large extent on whether holders would decide to subscribe bills again on their maturities, whereas as terms were extended it required less effort to refinance the redemptions, with the possibility of reducing the amounts placed, or to launch new issues to absorb more cash from the market. In addition, the increasing reputation of these instruments and the larger variety of terms available contributed for the time structure of interest rates that resulted from each auction to become one of the key benchmarks in terms of setting market yields. This can be appreciated in an analysis of the evolution of call and term deposit rates, which to markedly tracked the behaviour of interest rates fixed in the monetary authority's auctions. In this manner it was possible to provide the market with information of great importance in the formation of expectations and in the reduction of uncertainty.

The establishment of LEBAC as a reference instrument was linked to the active role played by financial institutions in the successive auctions, due to the attraction of investment in these securities in a context in which the financial institutions needed to hold positions in liquid assets and in so far as credit to the private sector exhibited negative variations throughout the year albeit at a decreasing rate, with the exception of certain specific lines. As was mentioned already, in the competitive tranche of these auctions financial institutions could take part —with the exception of those owing debt to the Central Bank[105]—, exchange rate houses, pension funds (AFJP), mutual funds (FCI), workplace insurance companies (ART), insurance companies and physical persons or legal entities, while in the non-competitive tranche physical persons and legal entities, not including those mentioned above, took part through financial institutions. Towards the end of the year, 77% of the bills in circulation had been allotted to banks, while 21% had been assigned to other legal entities, and the remainder to physical persons, a mixture that was representative of what

Report to the National Congress 2002  Central Bank of Argentina

had been registered during the year. In addition, in terms of the importance of the cut-off rate of LEBAC as a reference interest rate, it is worth noting that as from Communication «A» 3524 it was ruled that the interest rate for assistance for illiquidity granted by the Central Bank would be equivalent to four fifths of the cut-off rate set in auctions for LEBAC with seven days maturity[106].

The LEBAC had a secondary market, which gave them more liquidity. The volume operated in this market was extremely volatile, with July and August being the months with most activity, with transactions for a total of almost $400 and $300 million respectively. In later months less activity was seen, with monthly amounts that were barely over $100 million. This smaller secondary trading during the last quarter of the year —despite the existence of new instruments with longer maturities—was probably due to the stabilization of the foreign exchange market and to smaller yields ratified by the market, which reduced the incentive to trade in these securities rather than to hold them in portfolios until their maturities.

## Notes

93. As regards the supply of base money, including primary expansion factors, such as the Central Bank
's assistance to the Treasury and financial institutions.
94. The stock of quasi-currencies was forecast to remain stable until the end of the year.
95. For more information about the foreign exchange market, consult Section II.2. On the other hand, in this section emphasis is placed on the participation of the monetary authority on the foreign exchange market.
96. At the end of Section III.1.
97. Communication «A» 3500 dated March 1 2002.
98. These are bills denominated in pesos with settlement and redemption in domestic currency adjustable according to the evolution of the exchange rate.
99. Mercado Abierto Electrónico S.A. 's SIOPEL system.
100. On maturity, the funds not reinvested as LEBAC were freely available to their owners.
101. At the end of June, the amounts offered for issues in dollars were equivalent to 65% of demand. At that date, 64% of the total stock of LEBAC (expressed in pesos) corresponded to instruments in dollars.
102. Only from the month of July were auctions were called with announcements for over $200 million. During August amounts announced that exceeded $450 million would be achieved.
103. Towards the second half of the year the stock of LEBAC in dollars would remain stable, interest rates in dollars were dropping and the exchange rate would be maintained in a range of $3.6-$3.7 per dollar. Eventually cut-off rates would become 0%, being used by holders as coverage for exchange rate risk.
104. LEBAC at 91-day terms adjustable with CER were launched in July, but during various auctions this segment was declared vacant. Only from the end of July, with Decree 1096/02, were the National Government and the Central Bank enabled to issue negotiable securities with indexation for terms not longer than three months. But the auctions for indexed LEBAC had little repercussion during 2002, with only five auctions with bids taken up in this segment.
105. According to Communication «A» 3524 financial institutions that registered debt with the Central Bank as assistance for illiquidity must abstain from placing bids for their own portfolios.
106. The ratio between the interest rate applicable for assistance and the cut-off rate of LEBAC would be restated repeatedly throughout the year (see Communications «A» 3565, 3623 and 3748).

# VII. Payments Systems

## I. Means of payment

Transactions in the National Payments System (SNP) are performed using various means of payment, including cash, checks, direct debit to account, transfers between accounts of customers of different banks, and debit and credit cards.

Electronic transfers, performed between banks using Electronic Clearing Houses (CEC), can be used to perform retail transactions for 1) payment of salaries to the credit of open accounts; 2) payment of debt to suppliers; and 3) transfers of funds between customer accounts for whatever reason. The CEC are responsible for the clearing of transactions involving checks, debits and transfers, as well as for settling resulting net balances through the bank current accounts opened at the Central Bank, via the Electronic Means of Payment (MEP) system.

At present the National Payments System is made up of four Electronic Clearing Houses («CECs»), administered by financial institutions and an on-line funds transfer system, the MEP, administered by the Central Bank. Through this latter system for the transfer of funds on line, and for gross balances, banks can carry out funds movements for themselves and their customers, with the CEC determining the net clearing balance.

During 2002 the tasks performed within the context of the National Payments System were intended to ensure the enforcement of rules and regulations issued regarding the use and availability of funds in cash or on deposit, as well as the use of rescheduled deposit certificates. The following procedures were established:

- An operating system for the conversion into pesos of transactions carried out in US dollars by means of the use of checks, direct debits and transfers cleared and settled through the Electronic Clearing Houses (CEC).
- Operating procedures for the use of rescheduled deposit certificates to purchase property of new vehicles, including agricultural, road-making and industrial machinery, by means of funds transfer transactions using the Electronic Means of Payment system (MEP).
- Opening of new current accounts, savings accounts and special current accounts to be able to make deposits and withdraw cash, perform debits and credits using «L»-type checks and electronic transfers, using freely-available funds.
- Operating instructions for the clearing and settlement of transactions with checks and transfers for freely-available funds through Electronic Clearing Houses (CEC).
- Design of the features -including format and security elements- for the new «L»-type check to be used in transactions involving current accounts holding feely-available funds. These checks were superseded as from the elimination of restrictions on the withdrawal of cash from sight current funds established by Ministry of Economy Resolution 668/02. Nevertheless, in view of the new security measures and the facilities for electronic scanning that had been incorporated to such checks, they were adapted for use as ordinary checks.

It is expected that the full exchange of all existing checks by these new checks will have taken place no later than the end of 2004.

- Operating instructions for the clearing and settlement of transfers between freely-available savings accounts and special accounts in US dollars, through Electronic Clearing Houses (CEC).

## I.I. Electronic means of payment

During 2002 there was a significant drop in the number of transactions performed through the MEP, both in terms of volume (number of transactions processed) and in amounts transferred. Volume traded fell 60% during the year, while the total value of transactions processed dropped by 62%.

The fall recorded in the number of transactions recorded on the MEP took place in transfers between banks, whether own or customer, which were down 58% compared to 2001; there was also a 73% reduction in CEC movements, explaining the rest of the variation, as they account for 11% of the total. The negative variation in the amount traded is explained by a reduction of 26.9% in transfers between banks and a decline of 30% in the settlement of net balances by the CEC.

### Transactions between entities via the Electronic Payments Means System

|  | Total General | Bank to bank | CEC | Transf. of currencies | Operations of turning | Operations on line | Management of treasury |
|---|---|---|---|---|---|---|---|
| Jan | 76.332 | 66.359 | 8.056 | 1.533 | 25 | 17 | 342 |
| Feb. | 66.051 | 58.720 | 6.522 | 371 | 31 | 0 | 407 |
| Mar. | 87.890 | 79.424 | 6.918 | 930 | 217 | 0 | 401 |
| Apr | 113.302 | 104.726 | 7.032 | 792 | 231 | 7 | 514 |
| May. | 104.504 | 93.386 | 8.795 | 1.461 | 236 | 3 | 623 |
| Jun. | 81.582 | 72.041 | 6.984 | 1.829 | 193 | 0 | 535 |
| Jul. | 90.443 | 79.858 | 7.723 | 1.928 | 260 | 0 | 674 |
| Aug | 84.328 | 74.132 | 7.841 | 1.415 | 220 | 1 | 719 |
| Sep. | 85.483 | 75.442 | 7.536 | 1.580 | 230 | 0 | 695 |
| Oct. | 87.710 | 79.593 | 5.657 | 1.506 | 224 | 0 | 730 |
| Nov. | 71.327 | 67.780 | 1.145 | 1.403 | 160 | 0 | 839 |
| Dec | 54.957 | 51.603 | 1.203 | 1.238 | 167 | 0 | 746 |
| Total | 1.003.909 | 903.064 | 75.412 | 15.986 | 2.194 | 28 | 7.225 |

### Amount of operations by MEP

mill. $

|  | Total General | Bank to bank | CEC | Transf. of currencies | Operations of turning | Operations on line | Management of treasury |
|---|---|---|---|---|---|---|---|
| Jan | 33.672 | 18.696 | 7.942 | 6.107 | 1 | 17 | 910 |
| Feb. | 26.207 | 16.237 | 6.134 | 1.834 | 1 | 0 | 2.002 |
| Mar. | 36.317 | 24.358 | 6.674 | 3.626 | 9 | 0 | 1.650 |
| Apr | 40.832 | 29.120 | 7.074 | 2.865 | 14 | 5 | 1.753 |
| May. | 58.606 | 40.687 | 11.263 | 4.468 | 32 | 0 | 2.155 |
| Jun. | 48.111 | 34.554 | 9.823 | 6.194 | 13 | 0 | 1.527 |
| Jul. | 53.725 | 34.105 | 10.880 | 6.595 | 16 | 0 | 2.128 |
| Aug | 49.283 | 32.586 | 10.431 | 4.480 | 19 | 0 | 1.767 |
| Sep. | 49.796 | 32.197 | 10.959 | 5.030 | 15 | 0 | 1.595 |
| Oct. | 52.684 | 37.349 | 8.923 | 4.744 | 12 | 0 | 1.657 |
| Nov. | 52.252 | 44.758 | 1.497 | 4.057 | 25 | 0 | 1.915 |
| Dec | 54.256 | 46.316 | 1.318 | 4.183 | 8 | 0 | 2.430 |
| Total | 555.740 | 386.964 | 92.917 | 54.183 | 166 | 22 | 21.489 |



Transfers between banks and CEC settlements fell more significantly in volume terms than in amounts. Transactions recorded by the CEC are in line with these variations in check clearing, with a sharp drop in volumes traded and a moderate decline in the corresponding amounts, reflecting an increase in the unit value of the checks cleared.

### 1.2. Other activities

#### Court orders in relation to the «Corralito»: Section Three of Decree 1316/02

Under the terms of Section 3 of Decree 1316 dated July 23, 2002, the Central Bank assumed responsibility for acting on the court orders and rulings on protection of constitutional rights handed down by judges, representing exceptions to the deposit restrictions as established by Section 1 of Law No. 25,587. These exceptions covered situations where there were sufficient grounds to consider that the life, health or physical integrity of persons was at stake, or where persons of over 75 years of age were concerned.

Court orders submitted to the Central Bank until December 31, 2002 totaled 7,195 cases, of which 3,507 -for an amount of $320 million- initially contained all the details necessary for payment (depositor bank, number of account, amount, etc.). The rest were returned to the corresponding court with a request for the missing information so they could be paid, a task that was still being carried out at the end of the year.

#### Purchase of vehicles using BODEN 2012

As laid down in clause c) of Decree 905/02, the Ministry of Economy regulated the use of BODEN 2012 National Government Bonds for the purchase of new vehicles. In accordance with the information submitted by the Ministry of Economy, the Central Bank assumed responsibility for the deposit of the corresponding amount in pesos in the accounts of the participating financial institutions. Transactions settled up until December 31, 2002 were for a total of 5,332 vehicles, for a total amount of $213 million.

### 2. Clearing of means of payment

During 2002 the low-value clearing houses handled approximately 91 million checks in pesos for a total amount of approximately $222.4 billion.

The monthly average for cleared checks totaled close to 7.6 million, for a monthly amount of $18.5 billion, so that the average unit value was approximately $2,400. The largest volume was processed in January, when a total of some 11 million checks were handled for a total amount of approximately $17.9 billion, with a unit value of close to $1,600. The lowest number of checks was cleared in December - almost 6 million- for a total amount of $17.1 billion and an average unit value of approximately $2,900. These figures reflect the reduction seen in the volume of checks cleared at the same time as their unit value increased, leading to the assumption that during 2002 checks were replaced by other means of payment, such as cash, debits to accounts and transfers for lower-value transactions.

In addition, since the beginning of the year the volume of returned checks declined, for a total of approximately 4.3 million documents in pesos for the whole of 2002, equivalent to 4.7% of all checks presented for payment. The maximum percentage of returns took place in January, when they totaled 10.5% of the total amount of checks presented in that month.



**Compensated and pushed back documents**
**2002**

### 3. Notes and coins

#### 3.1 Issue and monetary circulation

As indicated, 2002 was a particularly atypical year from an economic point of view. Following the repeal of the currency board mechanism[107] with the issue of Law 25,561 dated January 7, the devaluation of the peso and the increase in the Consumer Price Index, the amount of cash in the hands of the public and banks went up by 71.6% in relative terms[108] and $7.842 billion in absolute terms. The circulation of banknotes rose by $7.809 billion (75.0%), while coins increased by $33.0 million (6.0%). The volume in circulation -in units- increased both in notes (29.0%, equivalent to 112 million units) and in coins (6.4%, equivalent to 172 million units).

Stocks of banknotes dropped 17.6%, equivalent to 20.8 million units. As a result, at the end of December 2002 reserves - both new and used- totaled 97.4 million notes, covering 19.6% of the number of notes in circulation. On the basis of year-end figures, this is the lowest percentage recorded since the introduction of the peso line.

In view of the new scenario being faced, it was decided to implement a system to enable estimating future needs for notes and coins in an inflationary context, by designing a system for «Real value guidelines» detailing the units in circulation of all denominations of all monetary units subsequent to 1970 according to their real value.

#### 3.2 Treasury

As a result of the various changes in the economic scenario, the Central Bank intervened actively in the US dollar market, through implementation of various mechanisms, such as:



## Purchase and sale of US dollar banknotes

As from January 18, the Central Bank began to participate in the exchange market. To this end, foreign currency was delivered to banks and exchange houses through the SIOPEL system. Under this heading, the Central Bank carried out transactions for a total of US$3.748 billion.

## Currency In Custody of Financial Institutions

A new operating procedure was introduced as from March 25 for «Purchase and sale of dollar banknotes for account and by order of the Central Bank» through Communication «B» 7174 and subsequent instructions. This procedure involved the delivery of cash in custody to financial institutions, which were to inform their balance of purchases and sales on a daily basis to the Central Bank for purposes of replacement. Communication «B» 7657 put an end to this mechanism as from December 26. Under this system a total of US$1.707 billion was delivered.

## Bank for International Reconstruction and Development (BIRD) Loans

Since May US$186.6 million have been delivered to Banco Nacion by order of the Central Bank's Payments and Operations Systems Management.

## BODEN

The Board of the Central Bank approved the crediting to various institutions -in the form of an advance, in anticipation of the obligation corresponding to the National Treasury- of the amounts corresponding to the first interest services on BODEN 2007 and 2012 bonds. The maturity of these loans took place on August 3, 2002, as a result of which the Central Bank deposited pesos in both cases, and in the case of the BODEN 2012 it provided the right to acquire the dollars at a rate of exchange of $3.60 per dollar. As a result, payment was made of US$52.6 million.

## Other dollar transactions

During the year currency was imported from the Federal reserve Bank (US$4.704 billion) and from Banco de la Nacion Argentina (US$106.9 million).

## Value Items in custody pending outcome of summary proceedings

During the year under review the Control of Non-Financial Institutions Division deposited cash sequestered in procedures to determine possible violations of Law 19,359 (the Criminal Exchange Regime), detected either in raids carried out by the Division with a court order or in summary proceedings in police actions. The amounts were booked to the order of the mentioned Division in an account headed «Value items in custody pending outcome of summary proceedings,» being returned on application on the basis of determinations by the Contentious Affairs Division ruling in favor of the return, releasing the monies from the corresponding account.

## Sequestration orders

The Central Bank received 19 sequestration orders filed in various courts against different financial institutions, resulting

in the payment of 5.0 million pesos through debits to the current account that the banks involved held in this Institution.

## Cashiers' checks

As from January 7, in accordance with Communication «A» 3420 date January 4, transactions with Cheques Cancelatorios took place in pesos only. Documents negotiated previously were credited in the account of the beneficiary by the purchasing institutions in the same currency as that in which the purchaser had performed the deposit at the selling institution.

Subsequently, during June, in accordance with Resolution No.341/02 issued by the Board, financial institutions were instructed to proceed to return the documents originally consigned to them[109]. In turn, this resolution authorized their delivery to banks wanting to trade in such payment instruments, once the corresponding amount had been paid, although no requests were received for this purpose. As a result of this transaction 34,295 checks were received for a total of $1.634 billion.

## Means of payment

To be able to supply companies such as Telefónica de Argentina and Edesur, agreements with security carriers Maco S.A., Brink's S.A., Juncadella S.A. and Firme S.A. remained in effect. Through this service, performed at no cost to the Bank, 731.9 million coins were delivered, with a value of $539.8 million. In addition close to 14,400 operations were carried out with financial institutions corresponding to payments to banks, interbank clearing, reception of bank deposits with the Central Bank and other activities involving the handling of these deposits. Under the heading of large payments, over 4,000 operations were carried out for $11.741 billion in cash, while through clearing a total of 1,850 transactions were performed for $6.869 billion.   A total of 22 special operations were carried out for $225 million, and a total of 1,800 declarations of surpluses were made for $6.980 billion.

Deposits by banks, including both worn notes and those in good condition, totaled close to 6,700 transactions for $7.254 billion. Lastly, close to 21,800 forged banknotes were received, of which 80% were of the peso line, and the remainder were dollars. In the case of local currency, the largest number of forgeries (36%) detected were of the $20 bill.

## 3.3 Regional treasuries

A total of 71,950 cash movement transactions were performed using the Agencies and Regional treasuries, for a value of $6.876 billion. These transactions arose almost entirely from deposits and withdrawals of banknotes, as transactions for inter-bank clearing of notes accounted for only a marginal percentage.

Notes and coins were exchanged for a total amount of $309.2 million. Furthermore, currency was transferred to and from the Agencies and the regional Treasury in Rosario for $8.012 billion. Sales of coins to collectors amounted to $39,332, with the Neuquén Agency recording a notable 24.7% of the total.



An Executive Branch Decree created Provincial Obligation Settlement Bills («LECOP»). These began to be traded through the interbank clearing system for bills, deposits and payments at the 24 Agencies in the interior of the country and at the Central bank as from February 1, 2002. During the year close to 6,300 transactions were carried out for a total of $6.031 billion, representing withdrawals and deposits in almost equal proportions.

Lastly, during 2002 some 117 inspection visits were made to monitor the operations of the 23 Agencies and the Regional Treasury in Rosario.

### 3.4 Laboratory and classification and destruction of banknotes

During the year analyses were carried out on banknotes, coins, government securities and value items in general (legitimate, forged and adulterated), at the requirement of other sectors of the Bank, the Courts, police institutions, banks and other entities. Quality controls were also performed on the fiduciary material and other elements purchased by the Bank. In addition, controls and analyses were performed for the Banco de la Nación Argentina (medals for personnel) and Banco Ciudad de Buenos Aires (checks and deferred payment checks).

Various quality controls were introduced, including samples of the watermarks corresponding to the various denominations in the peso line submitted by the manufacturers of banknote paper, samples of checks submitted by 18 banks to confirm compliance with minimum requirements regarding paper and printing established in regulations on means of payment to be issued by financial institutions, and samples of the «Order for the delivery of sheets of government securities» form presented by different financial institutions to obtain their authorization, in compliance with the terms of Communication «A» 3519.

Lastly, the process of classification and destruction of banknotes continued both in the City of Buenos Aires and in the Agencies and the Rosario Regional treasury. A total of 212 million banknotes were classified and 264 million items were destroyed.

### 3.5 Numismatics

In commemoration of the 50th anniversary of the death of Maria Eva Duarte de Perón, in 2002 Congress passed Law No.25,657/02 ordering the issue of commemorative coins in gold, silver and cupro-nickel in honor of her memory. The Board therefore resolved to coin 1,000 gold pieces (in a denomination of $5), 5,000 silver coins (with a face value of $1) and 2,000,000 2-peso coins in cupro-nickel to be placed in circulation. As the time required by the various stages in the process exceeded the time available as from the passing of the law for the issue, it was unable to be carried out in 2002, so it is expected that these pieces will be launched in 2003.

During the year procedures continued for the launch during 2003 of the Fifth Ibero-American Series of Commemorative Coins.

The «José Evaristo Uriburu» Numismatic Museum held exhibitions in the interior of the country and at its headquarters, as well as participating at Congresses and Seminars related to the areas of its sphere of action. As in previous years, contingents of primary and secondary school students were provided with educational tours and material. Furthermore, there has been a significant communication of the Museum's patrimony by a terrestrial television station, and coverage in two mass circulation newspapers.

### Notes

107. In relation to the abandoning of Convertibility, it should be noted that after consulting with the Legal Studies and Rulings Division Management it was considered advisable to add the word «convertible» to the new banknotes printed by the National Mint, beginning with the 2 peso note.

108. Comparing cash in circulation at December 2002 to that at December of the previous year.

109. Except in the case of Banco de la Nación Argentina, which carried out the return during July and August.

## VIII. Legal Proceedings of the Central Bank

The BCRA has an area of Judicial Matters which, in the first place, has as its mission to handle all trials in which the Institution is a party as such or in those cases related with financial institutions. This area exercises its functions by way of sections that are specialized in both institutional and financial matters, as well as a section for judicial administrative assistance. Penal cases are handled by a group of lawyers who are specialists in this matter.  Next, is presented a summary of judicial proceedings, discriminating according to the type of matter involved.

### 1. Institutional Judicial matters

During the year different lawsuits for damages presented against this Institution by depositors of the Banco Integrado Departamental Coop. Ltdo. and the Banco de Crédito Provincial S.A. continued their legal course. These cases seek to hold the BCRA responsible for omission in the exercise of the policing functions that the Bank holds over these institutions.

Similarly, the handling of old cases for damages related with the settlements of the  Bancos Regional del Norte Argentino S.A. and Oddone S.A. These cases are at the stage of presenting evidence.  At the same procedural stage are the lawsuits that arose from claims of damages from the holders of negotiable subordinated debt issued by the Banco Patricios S.A..

Finally, the unusually high number of amparo actions against BCRA should be highlighted.  These actions arose as a consequence of the emergency legislation decreed in Decree N° 1570/01 and they petition that these norms be declared unconstitutional.

### 2. Financial judicial matters

*Attachment suits for the recovery of holdings granted in security for credit assistance provided by the BCRA to financial institutions.*

As a result of the financial assistance provided to various financial institutions,  BCRA received as security credit portfolios.  To recover these assets, 2.144 lawsuits have been initiated. These legal proceedings are taking place in courts in the jurisdictions of the Federal Capital and in twelve other provinces, as well as in the cities of La Plata, Azul, Bahía Blanca, Campana, Junín, Lomas de Zamora, Mar del Plata, San Martín, San Nicolás, Rosario, Venado Tuerto, Reconquista, Posadas, Paraná, Bariloche and Río Gallegos. In a significant number of these lawsuits rulings have been issued, and in 95 per cent of the cases the rulings have been in the Bank's interests.

*Lawsuits for bankruptcy proceedings and the judicial intervention of financial institutions*

The department of financial legal affairs intervenes on behalf of the BCRA in cases involving the revocation of operating licenses or the bankruptcy and settlement of financial institutions, in the framework of the reforms introduced to the Financial Institutions Act N° 21.526 by Laws 24,144, 24,485

and 24,627. These reforms effected a significant change establishing that the  BCRA no longer officiate as receiver during bankruptcy proceedings as it did under the prior legislation.

As a result, the department appears on behalf of BCRA before the different commercial courts that are handling the different cases in which the supervisory institution, among other matters, notifies the judges of the different resolutions taken within the legal framework just cited, intervenes in the different pleas that are instituted, and also participates in the credit verification stage and appeals that may eventually be filed. At the request of the different courts, the department provides technical assistance and on matters of its knowledge in regards to the superintendent functions it effected prior to the revoking of an institution's authorization to operate.

In the proceedings to restructure institutions to protect the credit and bank deposits, effected under Article 35 bis of the Financial Institutions Act, the department effects the legal advice and representation of the court-appointed trustees, at the proposal of the BCRA, with the goal of carrying out the transferences of excluded assets and liabilities to the purchasing institutions. To date 28 former institutions remain under court trusteeship: Banco Federal, Nuevo Banco de Azul SA, Banco Platense S.A., Banco Coopesur, BUCI, Banco Argencoop, Banco Crédito Provincial, Banco Caseros, Banco Medefin UNB S.A., Banco Feigin, Banco Almafuerte, Banco Israelita de Córdoba, Banco Patricios, Banco Mayo, Banco Mendoza, Cía. Financiera Luján Williams S.A., Banco Austral, Caja de Crédito Varela, Banco Balcarce, Caja de Crédito Floresta, Luro, Vélez Cooperativo, Mercobank S.A., Banco General de Negocios, Scotiabank Quilmes, Banco Bisel, Banco Suquía, Banco Entre Ríos, Banco Velox and Banco de la Edificadora de Olavarría.

It should be noted that by the application of Article 35 bis of the FIA all savers have collected their deposits, while a significant number of jobs of the former institutions have been retained by the purchasing institutions.

*Activity on creditor committees formed in the course of bankruptcy proceedings of former institutions*

In its capacity as majority creditor, the BCRA was designated as a member of the Creditor's Committee for two financial institutions currently in bankruptcy (the former Banco Austral S.A. and the former Banco Integrado Departamental Coop. Ltdo. S.A.).  In this context, it performs the functions foreseen in Article 260 of the Bankruptcy Act (Law N° 24,522), proposing measures and requesting information of the officers responsible for the proceedings in order to oversee and press for the conversion of the assets that constitute the bankruptcy assets, while ensuring speed and efficiency in the recovery of the asset portfolio of the bankruptcy, all in defense of the institution's interests.

### 3. Penal legal matters
*Filing of penal complaints*



During February 2002 a complaint was formalized in the National Federal Preliminary Court No. 10, the court at which other complaints filed by this Institution regarding Floresta Luro Vélez Coop. Ltda. were being heard, that had been presented by an individual against the same institution because of a shortfall in his personal account.

During the first days of July a complaint was filed before the National Prosecutor General regarding Banco Velox S.A., concerning operations involving the sale of foreign currency in the amount of U.S.$ 600,000 which the relevant Supervisor in the Institution had detected and which successively, between May and June of that year, with the intervention of different signatures, had reverted, as well as for the alleged misappropriation of reserves in the same currency which in June 2002 were used to pay the fees of members of the Board of Directors for a total of U.S.$ 842,000. A few days later this complaint before the National Prosecutor General was broadened once, in the course of its supervisory responsibilities, the Bank discovered a deficit of Patacones at the main branch, as well as deficits in other stocks of cash and dollars at different branches.

Subsequently, in September 2002, the complaint regarding Banco Velox S.A. was again extended once three other types of acts were detected, during the period of suspended operations, that resulted in equity damages in the amount of $35,000,000. These included: a) siphoning off of funds basically effected by recording as pending entries certain operations that clients had cancelled at the instruction of the institution by remittance of funds abroad, b) the arbitrage of Dollars against Euros without manifesting the existence of the resulting funds, and c) an investment in a money market fund in the Banca della Svizzera Nassau Branch for U.S.$ 5,000,000, which in reality had covered-up a diversion of funds to an associated firm abroad, effected in the form of a promissory note. Finally, at the end of December, the complaint was again broadened. This time in relation to to the bargain and sale of public securities to certain clients, in so far as these transactions lacked backing promissory notes but involved disbursements of funds by the institution, without the corresponding matching payment by the clients, which represented a loss for the institution on the order of approximately $2,399,000.

Similarly, during December 2002, in the framework of the lawsuit involving the Banco General de Negocios, the Bank supplied the National Federal Criminal and Correctional Court No.1 with various facts related to a group of consumer loans which had been made to residents abroad.

In the middle of the same month, charges were filed with the National Prosecutor General, concerning irregularities that the //Veeduría destacada// in the Banco Edificadora de Olavaria S.A. detected regarding an alleged remission of significant importance that had been extended to a debtor, as well as the irregular sale of beef cattle whose payment was not registered in the institution.

During the same month, charges were also filed – which later during the current year would be amplified – with the National Prosecutor General upon the discovery in some institutions

of a significant number of transactions in foreign currency (particularly U.S. dollars) in the name of concocted individuals and firms, a matter found in settings auspicious for a variety of types of illicit acts.

Also towards the end of December 2002, the bank filed charges at the Federal Justice of San Nicolás, Province of Buenos Aires, for irregularities that had been discovered in the behavior of a lawyer who had been hired by the Institution to handle in that jurisdiction the bankruptcies of Banco del Acuerdo S.A. and Río Paraná Compañía Financiera S.A..

At the same time, between February and December 2002, the Bank filed 82 complaints before the National Federal Chamber of Appeals in the Criminal and Corrections in the Federal Capital, as well as – the majority of the complaints—before the National Prosecutor General, for the detection of new variants of counterfeiting of both peso as well as U.S. dollar bills.

*Unusual and/or suspicious operations as defined by Law 25.246*

During the year being considered, before new regulations approved by the Financial Information Unit went into force, nine complaints were filed with the collaboration of penal lawyers, before the National Prosecutor General, at the request of the Office of Special Operations, with the goal of initiating preliminary investigations that would allow further inquiry into operations that had been reported as unusual and/or suspicious.

*Requests for searches for alleged infractions to the Exchange Criminal System*

Similarly, throughout 2002, with the involvement of penal lawyers and at the request of the Office for the Control of Non-Financial Institutions, the Bank presented to the competent courts 54 requests for searches within the framework of the norms contained in the Exchange Criminal System Law (Law 19,359). In relation with these requests, 43 searches were effected in all during the year. These searches were distributed as follows: 24 in the interior of the country, 5 in Greater Buenos Aires, and 14 in the Federal Capital.

*Court judgments*

In July 2002, the Federal Chamber revoked the conviction that had been imposed in August 2001 by the National Federal Criminal and Correctional Court No. 1 of this City, in regard to the double set of time deposit certificates that were discovered during an audit of the Sociedad Cooperativa de Crédito Limitada Gurruchaga, and which the appeals court in December of the same year declared inadmissible and rejected the extraordinary writ that the BCRA had filed against this ruling. These events during December of last year lead the Institution to resort directly to the Supreme Court of Justice of the Nation, filing a remedy of complaint, which still has not been resolved.

*Condemnatory judgments*

In the framework of the criminal proceeding brought by the Institution as plaintiff, the following convictions were handed down during 2002.



During the first months of 2002, proceeding according to the new Penal Procedural Code of 1992, public oral trial for the dispossession in December 1992 of a sum of $30,000,000 (in bills of the Austral series) of the Regional Treasury of Rosario the took place before the Federal Criminal Oral Court N° 5 of this City. As a result by a decision of April 2002, Gregorio Collia, Néstor Hugo Collia, Sergio Omar Turza Nocetti, Lorenzo Marino and Héctor Roberto Menna were convicted of fraud prejudicial to the public administration. This ruling is as yet final.

Under the provisions of the earlier Code of Procedure in Penal Matters (Law 2,372), during the month of April 2002, Federal Court N° 3 of the City of Córdoba rendered a final decision in the case regarding acts that were charged to have occurred in Centros Financieros S.A.. These acts concerned loans and account overdrafts. As a result, Omar Luis Bastos, Carlos Alberto Manuele and Antonio Ramón Bastos, were convicted for violating the Law of Economic Subversion (Law N° 20,840), To date this ruling is not final. Upon the repeal of this norm in the course of the approval of Law 25,602 in June 2002, the defense, in the course of its appeal, presented a plea for the prescription of the criminal action. To date this plea has not been resolved by the Federal Court of Córdoba.

Similarly, during May 2002, Federal Court N° 2 of the City of Santa Fe, in the Criminal Secretary N° 1, issued a final decision regarding irregularities concerning certificates of time deposit and accounting records that were discovered in then Banco Ceres Cooperativo Limitado. As a result, Domingo Juan Maranzana, Alberto Néstor Ferreyra y Alberto Oreste Muñoz were convicted for the crime fraud prejudicial to the public administration.

In June 2002, National Federal Criminal and Correctional Court No. 12, Secretary N° 24, broadened the conviction that it had rendered the year before for the crime of fraudulent administration prejudicial to the public administration regarding acts that had occurred in Carles Compañía S.A. As a result, Federico Ezequiel Carles and Roberto Marcelo Carles were ordered to redress material damages in a sum up to $8,500,000, .Bernardino Jorge Bagur for a sum of $300,000 and Oscar César Porrini and Norberto Camilo Rodríguez for $250,000. This ruling in not final and is being appealed before the Federal Court.

## 4. Administrative judicial assistance

### Administrative Sector
The tasks of the Administrative Sector, among others, comprised:

a) Centralization and receipt of requests for information submitted by judicial bodies and other authorities competent in the matter (legal matters).

b) Tracking of the requests for information from judicial bodies consigned to other dependencies; checking, when it is necessary, the legal aspects of the responses, or else drawing up the final response.

c) Preparing drafts of memorandum to respond to requests for reports from the Honorable Senate of the Nation's Commission Investigating Financial Institutions and the Honorable Chamber of Deputies of the Nations, Special Commission Investigating Exchange Flight, as well as the requests made by the Chief of the Cabinet of Ministers.

d) Preparation of responses to the // pliegos de absolución de posiciones// on the part of the President of the Institution, requesting the intervention of other areas of the Bank, according to the characteristics of the information required.

e) Administration of the trial legal information system, including the preparation of the data base that is remitted fortnightly to the Attorney of the Treasury of the Nation.

f) Handling and control of the requests for consolidation – Law 23,982 and 25,344- corresponding to debts derived from legal actions. To this date 2,047 enquiries have been processed under this regime.

g) Registry of the entry, state, and movement of judicial actions and the course of them through their different procedural stages. To this date there are 13,906 institutional lawsuits in course in which the BCRA stands as plaintiff or defendant. Additions, to the present, 52,290 cases for amparos regarding the so-called «corralito» are in process.

### Judicial Communication to the Financial System Sector
In 2002 STAFF effected 3,460 communications to the Financial System, arising from the Judicial Power of the Nation, of the Provinces, and from the AFIP.

### Expert Tasks and Technical Consultancy Sector
The Accounting Experts Sector intervenes in all sorts of lawsuits – in any court or jurisdiction – in which the BCRA acts as plaintiff or defendant., also lending advice to this institution's lawyers. In regards to the lawsuits in which the BCRA stands as plaintiff, the sector intervenes under the category of Expert Witness. During 2002 the sector intervened in 11 trials, among which were those related to the former institutions Banco Integrado Departamental Coop. Ltdo and Banco Austral S.A. Regarding contentious administrative and commercial cases, the sector acts in the capacity of Technical Consultant or Control Witness and during 2002 intervened in 69 lawsuits. Finally, in the proceedings for infractions in the Exchange and Financial areas, at the request of the Contentious Affairs Management, the sector served in 44 preliminary proceedings.

## 5. Liquidation of institutions

By virtue of art. 8 of Law 24,144, past on September 23, 1992, the BCRA acts in the capacity of Trustee and Liquidator of those financial institutions liquidated prior to the passage of this law. In the funds received by the BCRA for payment of credits arising from the realized in the different bankruptcies rose to $9,580,656. In turn, the settlements approved in favor of BCRA produce a total to be received of $35,103,930. Thus,



the overall total in favor of the Institution during 2002 was $44.684.587.

It is necessary to clarify that the approval of Law 25,561 and Decree 214/02 had effects upon the final distributions of funds approved by the courts as these distributions had to be reformulated since the capital assets of the bankruptcies rose because of the conversion into pesos of their investments in U.S. dollars. As a result the realization of these distributions of funds has been delayed, as have been the respective requests for closure. Similarly, the approval of Laws 25.563 and 25,589 entailed the suspension of the processes of judicial auctions, impeding the conversion of the assets and, therefore, delaying the finalization of each respective bankruptcy proceeding.

In conformity with the orders of the //Superiority//, the Ministry of Economics will intervene by way of its Juridical Service to effect the relevant defenses in those cases in which judges in the bankruptcies of former institutions resolve to maintain their original currency the investments effected in the Banco de la Nación Argentina of the funds belonging to those bankruptcies. The intervention of the Juridical Service was founded in the manifest conflict of interest that the BCRA bears in its character as creditor and liquidating trustee.

Finally, the Supreme Court of Justice of the Nation by means of a ruling on April 30, 2002, confirmed the judgment of bankruptcy of the former Banco Regional del Norte Argentino, bringing to a close an issue of great institutional importance.

# IX. Other Central Bank Activities

## 1. Central Bank lending to financial institutions

### Financial liquidity assistance

As laid down in its Charter, and in an effort to prevent the spread of conditions of financial instability such as were unleashed in mid-2001, causing a systemic crisis, the Central Bank provided assistance to financial institutions in its capacity as «lender of last resort.» During the course of the year, in accordance with current rules and procedures, requests for temporary liquidity assistance from 40 banks were approved for a net amount of $15.5373 billion.

**Debt by assistance for liquidity**
end of period



million $

| | |
|---|---|
| 25.000 | |
| 20.000 | 19.639 |
| 15.000 | |
| 10.000 | |
| 5.000 | 4.076 |
| 0 | 115  1.436  906  702  928  1.071  808 |
| | 1994 1995 1996 1997 1998 1999 2000 2001 2002 |

**Interest for advances and rediscount**
million $

| | | Interest received | | Capitalized interest | |
|---|---|---|---|---|---|
| | | monthly | cumulated | monthly | cumulated |
| January | 2002 | 26 | 26 | 0 | 0 |
| February | 2002 | 30 | 56 | 0 | 0 |
| March | 2002 | 55 | 111 | 0 | 0 |
| April | 2002 | 97 | 209 | 28 | 28 |
| May | 2002 | 165 | 374 | 338 | 366 |
| June | 2002 | 86 | 461 | 476 | 842 |
| July | 2002 | 112 | 573 | 460 | 1.302 |
| August | 2002 | 145 | 718 | 821 | 2.122 |
| September | 2002 | 35 | 753 | 760 | 2.882 |
| October | 2002 | 3 | 756 | 11 | 2.893 |
| November | 2002 | 6 | 762 | 67 | 2.960 |
| December | 2002 | 123 | 885 | 39 | 2.999 |

Interest received as a result of the assistance granted amounted to $885.1 million, while in the same period, capitalized interest totaled $2.845 billion.

The interest rate charged on liquidity assistance had been set at between 9% and 9.5% since 1998 (Communication «B»6414), being determined since the end of 2001 on the basis of a simple average of the rates on Central Bank reverse repos (Communications «B»6931 and 7059). This pattern was modified once again as from 2002, when it was established that the applicable rate would be a fraction of the cut-off rate set at the Central Bank tender for shortest-term bills in pesos (Communication «A» 3524). This fraction was to be modified on several occasions over the year (Communication «A» 3565, 3607, 3623, 3748 and 3856). Given the high volatility in the rates in the period under review, this resulted in the nominal level of the rediscount rate recording significant movement during 2002.

**Advances and rediscount**
million $

| | | monthly | cumulated |
|---|---|---|---|
| December | 2001 | | 4.077 |
| January | 2002 | 485 | 4.562 |
| February | 2002 | 1.433 | 5.996 |
| March | 2002 | 1.847 | 7.842 |
| April | 2002 | 3.084 | 10.926 |
| May | 2002 | 3.602 | 14.528 |
| June | 2002 | 1.926 | 16.454 |
| July | 2002 | 1.324 | 17.779 |
| August | 2002 | 1.220 | 18.999 |
| September | 2002 | 1.065 | 20.064 |
| October | 2002 | -187 | 19.876 |
| November | 2002 | -186 | 19.690 |
| December | 2002 | -51 | 19.639 |

Lastly, the total amount of the guarantees assigned -at the date of each granting- in support of the assistance provided, totaled $33.131 billion, equivalent on average to 169.1% of the total assistance.

### Advance for the subscription of National Government Bonds

In accordance with the terms of Emergency Decree 905/02, financial institutions requesting them were granted advances to be able to purchase National Government Bonds -Boden 2005, Boden 2007 and Boden 2012- to be delivered to their depositors. At December 31, 2002, the amount of assistance under this heading amounted to $1.3903 billion.

Under the terms of Section 15 of the mentioned Decree, banks were required to provide sureties for the assistance granted. The total amount of guarantees set up was $2.3833 billion, of which $2.144 billion secured the principal advanced and $239.3 million the interest servicing.

### Global program for lending to medium and small-size companies («MyPEs II)

During the year the National Ministry of Production, through the Secretariat for Small and Medium-size Companies and Regional Development, notified the Central Bank of its decision to reformulate the Global Program for Lending to Micro-undertakings and Small Companies, under the terms of Loan 1192/OC-AR signed on September 15, 1999 between the Republic of Argentina and the Inter-American Development Bank (IDB).



The National Executive, through the Ministry of Economy and the Secretariat for Small and Medium-size Companies and Regional Development at the Ministry of Production, decided to offer the resources pending disbursement and other available funds to financial institutions for the setting up of financial trusts for the granting of loans to companies in businesses that generate flows of hard currency, so as to minimize exchange risks and ensure repayment capacity in the original currency of the loan.

On the basis of this redesigned operating framework, the Ministry of Economy and the Ministry of Production will sign Trust Agreements with financial institutions still to be designated. These agreements will include details of the various aspects of the Program that will be the responsibility of the Central Bank.

The role of the monetary authority in these transactions can be summarized as follows:

(a) to continue in its role as the Financial Agent of the National Government,
(b) to collaborate in the selection process for the participating Private Financial Institution, and
(c) to perform control and inspections tasks in relation to the Trustees designated by the Government, on behalf of the Ministry of Economy as beneficiary and in accordance with the Trust Agreement to be signed.

In relation to this last control and inspection responsibility, the Secretariat for Small and Medium-size Companies and Regional Development at the Ministry of Production and the IDB have taken as a basis for the possible performance by the Central Bank the Rules and Control Procedures applied in those Trusts of which the Central Bank is Beneficiary as a result of the financial assistance for liquidity originally granted.

Lastly, it should be noted that foregoing was approved by the national Executive by means of Emergency Decree No.1118/2003.

*Other credit lines.*

Administration of other credit lines not included above, with a balance at December 31, 2002 of $817.8 million in principal and interest, continued during the year. The main amounts involved were as follows:

**a) Loans granted prior to the reform of the Charter of the Central Bank by means of Law No. 24,144.**

Debt of the Federal Trust Fund for Regional Infrastructure: In accordance with the terms of section 26 of Law 24,855 on Regional Development and Generation of Employment, the liability of the former Banco Hipotecario Nacional to the Central Bank was transferred to this Fund. At the end of 2002 the debt amounted to $623.9 million ($614.3 million for

Debt from the liquidation of assets of the former Banco Nacional de Desarrollo: By the end of fiscal 2002 the balance of this debt was $26.7 million ($18.5 million for principal and $8.2 million in interest). It should be noted that under the terms of Decree No. 532/97, the Office of Public Credit of the Treasury Secretariat at the then Ministry of Economy and Public Works and Services assumed control of the payments of external debt and the obligations of these assets with public banks. Actions by the Central Bank during the period have been intended to generate a framework under which the claim on the credit can be recovered, to which end the pertinent steps have been taken with the Department of Equity Regularisation at the Treasury Secretariat within the Ministry of Economy.

Debt taken on by provincial governments in relation to their former provincial banks. The balance of these debts amounted to $167.2 million for principal and interest. Of this amount, $106.9 million corresponds to the Government of the Province of La Rioja (with $90.7 million in principal and $16.2 million in interest), and $60.3million ($46.5 million in principal and $13.8 million in interest) corresponds to the Government of the Province of Corrientes. The amounts detailed were submitted by the Central Bank and included by the Ministry of Economy in the process of Provincial Public Sector Debt Conversion foreseen by Decree No. 1.387/01 and its complementary regulations, as a result of which no interest servicing was received in 2002.

**b) Financial liquidity assistance provided during 1995**
The debt of institutions that delivered government securities or credit rights in guarantee of their liabilities (Executive Decree No.1023/95) amounts to $1.2 million. Debt secured by funds from the Federal Shared Tax Revenue Regime totals $35.9 million, this being the amount assumed by the government of the Province of Mendoza in relation to the former Banco de Mendoza and Banco de Previsión Social. In 2002 the Central Bank received $1.7 million from the mentioned provincial government.

*Trust Agreements in which the Central Bank is a beneficiary*

As a result of the financial assistance for liquidity purposes granted to restructured institutions, the Central Bank became the holder of participation certificates and other equivalent instruments from various trusts. In 2002 the Central Bank held title to the following certificates:

- Class «B» certificate in the CorpBanca Trust Agreement (set up on May 13, 1997) for an original nominal value of $39 million.
- Class «B» certificate and Special Class One certificate in the ACEX Trust Agreement (set up on November 18, 1998) for original nominal values of $301 million and US$27.2 million respectively.
- Class «B» certificate in the NUES Trust Agreement (set up on November 27, 1998) for an original nominal value of US$11 million



- Class «A» certificate in the LUJÁN Trust Agreement (set up on May 26, 2000) for an original nominal value of $2.5 million.

These certificates were converted into pesos at the rate of one peso per US dollar, applying the Reference Stabilization Coefficient (CER) from the date of issue of Decree 214/02. In future they will continue to accrue the yield foresee in the corresponding Trust Agreement, taking into account the cap on the maximum nominal interest rate for debt balances of legal persons who do not hold acceptable preferred guarantees, as indicated in Communications «A»3507 and 3561.

On the matter of the control and follow-up of the Trust Agreements in force, during 2002 the procedures foreseen in the Central Bank's Regulations on Control were carried out, including the Work Program required from the External Auditors of the Trusts. These control and follow-up tasks will be essential to the evaluation of the performance of each Trustee in relation to: 1) analysis of the balance sheets and quarterly financial statements of the Trusts; 2) compliance with the Trust Agreement, Collections Management Guidelines and Procedures Manual; 3) the evaluation of the actions taken to recover loans in legal process; 4) general controls on information technology and Systems Audits; and 5) actions entrusted to the collection agents for each Trust.

During 2002 payments for $8.9 million were received in settlement of these Trust Certificates, as follows:

- ACEX Trust - General Class «B» Certificate: 5.5 million pesos
- LUJÁN Trust - General Class «A» Certificate: 0.2 million pesos
- NUES Trust - General Class «B» Certificate: 3.2 million pesos

*Loan recovery*

The scope of the task of supervision and control of performance in relation to the recovery of assets ceded in support of liquidity assistance provided by the Central Bank to former banks Integrado Departamental Coop. Ltdo, Basel S.A., Multicrédito SA and Austral SA, as well as the assets and rights incorporated to the assets of the Central Bank in settlement of assistance granted to the former banks Feigín SA and República SA, is detailed in the following table.

Administration of the loan recovery is in the hands of the following banks: Comafi SA (for former bank Banco República SA), Finansur SA (for former Banco Feigín SA), Banco de la Nación Argentina (for former banks Austral SA and Multicrédito SA), the receivers of the former Banco Integrado Departamental Coop. Ltdo., and the Legal Matters Management (for legal procedures in relation to the portfolio ceded by former Banco Basel SA).

The principal balance due from the assistance granted to former banks Austral SA, Multicrédito SA, Basel SA. and Integrado Departamental Coop.Ltdo. at December 31, 2002 amounted to $187.33 million. In the case of former banks Integrado Departamental Coop.Ltdo. and Basel SA, the matter of the Central Bank's privileged claim on the assets ceded in guarantee has not yet been resolved in court, preventing the application of the amounts of the collections received from being used to reduce the balance of the debt. As a result, as from the date of each declaration of insolvency, the funds received are invested in time deposits until such time as the matter has been resolved. At December 31, 2002, such funds amounted to $49.51 million (former BID CL) and $4.0 million (former Banco Basel S.A.).

The realization of the assets and rights incorporated to the assets of the Central Bank from the settlement of liquidity assistance granted to former banks República SA and Feigín SA totaled $82.86 million at the end of 2002, $58.91 million corresponding to Banco República and $23.95 million corresponding to Banco Feigín.

It should be noted that as from December 2001 numerous measures were issued that had a negative impact on the recoverability of the assets ceded in guarantee and in settlement of Central Bank financial assistance. These measures included restrictions on access to cash, Decree 1387/01 on the settlement of past due debt by means of the granting in payment of government securities, banking and exchange holidays, Law 25,561 on Public Emergency and Reform of the Exchange System, repeal of the convertibility of the peso and devaluation, Decrees 214, 260 and 905/02 on reorganization of the financial system and changes to the exchange system, and Laws 25,563 and 25,589 suspending court foreclosures and bankruptcy petitions. Lastly, at December 31, 2002, after recovering $9.4 million during the year, the recovery process has recorded an accumulated result of $109.2 million.

## 2. International relations

### 2.1 Mercosur

Fulfilling its role as a full member of the Common Market Group (GMC) and National Coordinator for Working Group No.4, which focuses on all aspects related to «Financial Matters,» the Central Bank has made progress on the following during 2002:



### National Coordinators

In the area of financial services, the Central Bank organized a Seminar on Financial Services, sponsored by the World Trade Organization (WTO), with the aim of discussing matters concerning the methodology used in recording the specific commitments arising from financial services. At this Seminar it was agreed in order to facilitate negotiations between Member States, that the WTO classification (W120) should be used, with the corresponding CPC (Central Product Classification) coding for external negotiations, and a specific classification within the Mercosur environment. In the field of technical cooperation, the final report on the «Integration of Financial systems in the MERCOSUR» project financed by the IDB was concluded. The overall intention of this Project was to support the process of deepening financial integration in the MERCOSUR by means of the diagnosis of Global Consolidated Supervision adopted by its members, obtaining recommendations in order to harmonize such procedures.

### Financial System Committee

Progress was achieved in gathering comparative information on the degree of compliance with the 25 Basic Principles for Effective Banking Supervision in accordance with the Basle Committee criteria. Progress was also made in adapting internal accounting regulations to international recommendations in relation to accounting for government securities, deferred taxation, portfolio sales, goodwill and intellectual property rights. In addition, an analysis was made of accounting information in constant currency: each country indicated the adjustment method followed for its financial statements (in the case of Brazil, such adjustment is forbidden). Discussions were held on the impact of inflation on the financial statements of financial institutions, and the resulting distortions.

### Money-Laundering Sub-Committee

Detailed presentations were made in the Member States on the operation of the Financial Intelligence Units (UIFs), highlighting the aspects related to the integration between such units and the Central Banks. In addition, an analysis was made of the need for this sub-Committee in the light of the creation of the Financial Action Group for South America (GAFISUD), concluding that although the forums are similar, there is a difference in approach to the topics dealt with. Lastly, it was agreed on the importance of the central banks of Argentina and Brazil encouraging the associations representing the financial system to draw up specific codes of ethics in relation to the prevention of money-laundering (Paraguay and Uruguay already have codes of ethics drawn up by the private sector).

### Capital Markets Committee

This committee analyzed the impact of the financial crisis on regional markets, underlining the importance of maintaining a constant exchange of experiences and information among the countries of the bloc.

### Insurance Committee

Work was carried out on changes to certain texts, with the aim of easing its regulations in the light of the structural differences that exist in the markets in the region. The papers on which work was carried out included: a) «A Framework Agreement on access terms for insurance companies, stressing access by means of a branch,» particularly as it concerns corporate control, entry capital, and the exchange of information between supervising agencies; b) «A Framework Agreement on basic operating requirements for insurance companies and their branches within the MERCOSUR,» with the aim of adapting its provisions to the Basic Principles of Insurance Supervision established by the International Association of Insurance Supervisors (IAIS). On the matter of external relations, the Central Bank has participated in the evaluation of proposals on financial services submitted in the context of the Argentina-Mexico, MERCOSUR-WTO, and EU-MERCOSUR negotiations.

### 2.2  Payment and reciprocal credit treaties

The Central Bank is a signatory to various payment and reciprocal credit treaties, the most important of which is that corresponding to the Latin American Integration Association (LAIA). The LAIA payment treaty was conceived with the aim of initiating formal multilateral co-operation among the region's central banks. Its basic objectives included encouraging financial relations between the countries of the region, facilitating the growth of reciprocal trade and the systematizing of consultations on monetary, exchange and payments matters.

In practice, the convention concentrated on the facilitation of trade between countries in the region, but its use has declined systematically since the 1990s, when its adoption became voluntary in most countries. As a result, the percentage of transactions processed via this mechanism compared to the total for intra-regional imports fell from 75% in 1990 to only 2.2% in 2002. Of all the countries participating in the convention, Argentina records the second largest volume - behind Brazil- with a 14.8% share of overall movement (debits plus credits). Central banks assume two types of risk in these transactions, when becoming guarantors of the transactions carried out under the terms of the treaty: country risk, given the guarantees on convertibility and transferability they grant, and a commercial or credit risk in view of the reimbursement guarantee, in their capacity as guarantors of the transactions carried out under the Treaty.

To lower the risk of reimbursement guarantee, both the Argentine and Brazilian Central Banks have introduced a requirement for banks issuing payment instruments to set up guarantees in favor of the central banks. An exception was granted in the case of transactions for less than US$100,000, so as not to harm small and medium-size traders, which are those that could encounter the greatest difficulties in obtaining trade finance. On July 5, 2002, the Governments of Argentina and Brazil signed an agreement establishing, among other matters, that their central banks would relax regulations in relation to the Treaty.  The Argentine and Brazilian Central Banks jointly issued new regulations on October 23 of that year raising the limit for operations not requiring guarantees to be issued by commercial banks to the central banks from US$100,000 to US$200,000 per transaction, with the aim of encouraging reciprocal trade.



## 2.3. International Monetary Fund

### Financial assistance

Although the 2000 Stand-by Agreement was in force, with a balance pending disbursement of SDR 7.1805 billion (equivalent to approximately US$9 billion at the rates of exchange in force at the beginning of 2002), during the year the IMF did not allow drawings to be made against the agreement. As a result, the financial assistance received by Argentina from the agency was limited to the one-year rollover of a series of repurchases for a value of SDR 3.7844 billion, which at the rates of exchange on the original payment dates, amounted to US$4.9677 billion.

*Co-operation in the Providing of Statistical, Financial and Economic Information.*

The Central Bank has continued to co-operate closely with the Agency in the providing of statistical, financial and economic information. These activities led to the information provided by the Central Bank being included in various IMF programs and publications. In some cases the tasks performed by the Central Bank have consisted not only of providing the Agency with information prepared within the Institution but also of coordinating with other Official Bureaus and Areas in the preparation and submission to the Agency of pertinent information.

*The main programs and activities performed by the Bank in this area are described below.*

The «Special Data Dissemination Standards» (SDDS) program consists of the application of standards on the matter of the supply of economic and statistical data based on certain requirements as to regularity and timeliness of publication, scope, integrity, quality and access by the public. The Central Bank provides information on the analytical accounts of the Central Bank, analytical accounts of the financial system, international reserves, rates of interest and exchange rates. During 2002 a significant updating took place of the Basic Information Pages, mainly because of the changes following the exit from the currency board mechanism and the fixed exchange rate. Given the complexity of the task, it will be continued in 2003.

With regard to the «International Financial Statistics» publication issued by the Fund, regular information has continued to be provided on the rate of exchange, international reserves, monetary base, financial system statistics and its component entities and interest rates. In addition, in its capacity as the Agency's correspondent for this publication regarding the National Institute for Statistics and Census (INDEC), the Ministry of Economy and the National Treasury, the Central Bank co-ordinates the monthly submission of statistical information on prices and output, wages and employment, international transactions, value and volume of imports and exports, national accounts and central government finances, etc.. Lastly, towards the end of 2002 the implementation took place of the ISC (Integrated System of Correspondence) designed by the IMF on the basis of a secure Internet site for the automating of the providing of data by each of the generators of relevant statistics for the IFS. The Central Bank, in its capacity as correspondent of the agency for this publication, coordinated the tasks necessary for the

implementation of the program, which is expected to be fully operational during 2003.

*Evaluation of Safeguards*

On March 23, 2000 the Executive Board of the IMF adopted a reference framework for the policies to safeguard the use of Fund resources, through the introduction of an «evaluation of safeguards of Central Banks.» The purpose of this evaluation is to identify weaknesses in central bank control, accounting structures, information, audit and legal systems that could deteriorate the integrity of the operations of central banks. The evaluation of safeguards allows the Executive Board to make informed decisions both when approving agreements and during reviews, identifying vulnerabilities, recommending appropriate corrective measures and indicating the progress of the member country in the implementation of such remedies. The aim is to provide the IMF with reasonable certainty regarding the identification of weaknesses, attempting to ensure that they have been or will be taken into account in order to correct the problem in question. In addition, the safeguards policy seeks to contribute to current efforts to promote the transparency and the initiatives on governance, including the establishing and monitoring of codes and standards. In this context, five main control and performance measurement areas have been identified within a central bank: external audit, legal structure and independence, financial information, internal audit mechanisms and internal control systems. The evaluation is applied to all the central banks of member countries holding agreements with the Fund for the use of IMF resources approved since June 2000. As Argentina is included in this scope, the mentioned evaluation took place in the second half of 2002, with the participation of a special IMF mission and collaboration from all the areas of the Central Bank involved. As a conclusion, a report was published under the heading of «Evaluation of Safeguards for Argentina,» with agreement on the results submitted and the recommendations for implementation of the corresponding corrective measures.

## 2.4 Other matters

*Memoranda of Understanding*

In the context of the actions on international co-operation being carried out by the Central Bank for the exchange of information on matters of financial supervision, the Central Bank signed a new agreement with Banca d'Italia on 14 January 2002. This agreement is additional to those already signed with supervisory bodies in various other countries: the Financial Services Authority in the U.K., the National Banking and Securities Commission in Mexico, the US Federal Reserve System -Office of Comptroller of Currency, Banco Central do Brasil, the Bank Superintendence in Chile, the Central Bank of Spain and Germany's Bundesaufsichtsamt Für das Kreditwesen.

These agreements are intended to improve transparency in the exchange of information, enabling a correct evaluation of the financial conditions and the performance of the institutions established in the territory of the signing countries. The Central Bank is currently in the process of negotiating with supervisory



agencies in various countries with the aim of expanding the scope of its international relations and exchanges.

Lastly, it should be noted that domestically, accords have also been entered into with the Pension Fund Superintendence and the National Securities Commission. These agreements have been intended to achieve increased understanding and cooperation internally.

### International visits

During the course of 2002, as a result of the changes that took place in Argentine monetary and financial policy, various countries and international organizations have expressed an interest in learning about these changes and their overall effects, as well as seeking to exchange ideas. For this reason, various visits and discussions were organized at the Central Bank, including those for the Finance Ministry of the Netherlands, the Development Bank of the People's Republic of China, the Ministry of Finance of China, the Organization for Economic Cooperation and Development (OECD), the Bank for International Settlements and the Bank of the Republic of Colombia.

## 3. Libraries

During 2002 the Prebisch and Tornquist Libraries continued with their task of providing bibliographic and documentary information to the Bank's internal and external users (both individuals and public and private institutions). Some 26,500 enquiries from almost 6500 users were handled, information requirements were dealt with in a remote manner from across the country and abroad via e-mail, and over 1500 items were provided on loan, 85% to bank personnel, while the rest were lent to libraries with which agreements have been signed for the exchange of information. To update their own collections and at the request of various Central Bank departments, the purchase was made of 346 books, 8 new titles of special materials a 4 new magazine titles, in addition to the renewal of 151 subscriptions and the contracting of 53 Internet information services. Including the material received in exchange or as a donation, during the year a total of 597 volumes of books and leaflets were added, 15 new titles of special material and 12 new titles of periodical publications.

Two important new Internet on-line resources were subscribed to for the use of Central Bank officials and for the bibliographic information of external users. The first of these, EBSCO Online, is a magazine database that enables the recovery of tables of contents, summaries and abstracts and full texts of over 5000 international publications. A subscription was also taken out for JSTOR, a web-accessed database that enables the recovery of the full text of the main academic publications since their first editions, many of which date back to the 19th Century.

To preserve bibliographic material of great value and collections of periodicals from past centuries, 59 items were sent for microfilming. Information was sent to the Center for Historical Studies and Information at Parque de España in Rosario on the documents on microfilm that exist in the Prebisch library, for its inclusion in the First Microfilm Documentation Census being carried out by that Institution, sponsored by the Argentine Antorchas Foundation. In addition, 254 rolls of microfilms of

the La Nación newspaper corresponding to the years 1887-1891 and 1975-1985 were acquired. Lastly, as part of the program for conservation of bibliographic material, 500 items were restored and rebound.

As part of the process of computerizing the records of the two libraries under the Micro Isis Program, 1896 bibliographic records were posted. In addition, 883 records were added to the «National Public Credit» Base of Historical Documents. Towards the end of the year new management software was purchased that will help speed bibliographic work and the accounting administration of the Libraries.

Lastly, the Central Bank participated in the Permanent Forum of Directors and those responsible for Documentary Information Units of the National Public Information, organized and coordinated by the National Institute of Public Administration (INAP), with the aim of setting up an environment for interchange among the representatives of the representatives of the Documentary Information Units.

# EXHIBIT

**Balance Sheet at December 31, 2002**



## Comments on Balance Sheet

Freely-available Reserves eligible under the terms of Sect.5 of Law 25,561 (modifying Laws 23,928and 25,445) at the end of 2002 totaled $35.173 billion. It should be noted that as from the introduction of Sect.12 of Law No.25,562, holdings of government securities issued in US dollars by the Argentine Government ceased to be considered as components of International Reserves, being included under the heading of Government Securities, ensuring the criterion for their definition is in line with international standards. Gross income from the investment of reserves was $711 million. With the addition of net interest earned on repos with the financial system for $585 million, and deducting interest expense of $114 million, net financial income totals $1.182 billion.

Loans to the Argentine Financial System, with a balance net of provisions of $17.602 billion, recorded an increase compared to the end of 2001 of $6.763 billion, basically reflecting the action of the Central Bank as a lender of last resort in the context of the liquidity crisis that began in fiscal 2001 and continued though the first half of fiscal 2002. The revere repo mechanism was replaced during fiscal 2002 by liquidity advances secured by instruments arising from Decree 1387/01.

The balance sheet position of the Central Bank in its relations with the International Monetary Fund continued to be neutral. Assets represented by the account «Bills on IMF Obligations» under the heading of «Government Securities» and the heading «Funds Transferred to the National Government from Placements with the IMF» have recorded an identical financial performance to the «International Monetary Fund» account under the liability heading «Obligations with International Agencies.»

A similar situation can be determined from the Statement of Income, where both interest paid on Obligations to International Agencies and interest collected on Bills Drawn on Obligations with the International Monetary Fund recorded a flow of $2.662 billion and $2.662 billion respectively, leading to a nil position.

The «Other Assets» heading totaling $7.261 billion includes a balance of $5.23 billion for the transfer of profits to the National Treasury (Sect.38 of the Charter). This amount includes $331 million advanced during 2001 and $4.899 million transferred during fiscal 2002. These funds were posted to Retained Earnings for 2002 as decided at the time of approval of the Financial Statements at December 31, 2002. Furthermore, this heading includes $596 million as secured loans derived from the exchange of public sector debt instrumented by means of Decree 1387/01, $415 million from rights derived from liquidity rediscounts, and $275 million for rights derived from the reverse repo positions with local financial institutions.

The «Monetary Base» liability account (Sects 5 and 6 of Law 25,561) is made up of the «Monetary Circulation» account and the «Current Accounts in Pesos,» the balances of which at December 31, 2002 amounted to $18.802 million and $10.349 million, respectively. It should be noted that by means of Communication «A»3582 dated April 26, 2002, the

contribution by financial institutions to the Banking Liquidity Fund was set at 0%, as the aim of facilitating the redistribution of liquidity among banks, which was the reason for setting up the Fund, was replaced by the broadening of the powers of the Central Bank as a lender of last resort introduced by the reform of the Bank's Charter in 2002.

With regard to the «Current Accounts in Other Currencies,» by means of Communication «A»3498 dated March 1, 2002, the Bank unified the minimum cash and minimum liquidity requirement regimes, allowing banks to calculate for compliance purposes the balances of the Minimum Cash Accounts opened at the Central Bank in US dollars or other foreign currencies. The balance recorded at the close of each business day in these accounts accrues interest for the term elapsed until the first subsequent working day, at a rate to be fixed daily. At December 31, 2002, this balance totaled $1.014 billion.

The heading «Deposits of the National Government and Others» includes the balance of the foreign currency accounts that the National Government keeps on deposit with this Institution to comply with its own operations, in an amount of $67 million. The balance of the «Funds for the Strengthening of Central Bank Reserves» accounts was released, on the basis of the applications submitted on various occasions by the National Treasury Secretariat, being credited to the account of «Deposits of the National Government.»

«Deposits in Special Accounts,» which at December 31, 2002 amounted to $662 million, include $267 million corresponding to deposits from the Fiduciary Trust for Assistance to Banks, set up with the aim of arranging for transfers of assets and liabilities of financial institutions. Furthermore, they include $271 million corresponding to deposits set up by the National Government under the terms of Sect.1 of Decree 1836/02 that qualify as unattachable and unavailable, serving exclusively as a guarantee of the various National Government Bond series intended to be used for the exchange of deposit certificates held by financial system savers.

As explained previously, one of the changes introduced to the Charter by Law 25,562 authorized the Central Bank to issue securities or bonds, as well as certificates of participation in such value items it may hold. This has enabled the Central Bank to count on a monetary absorption tool, with the issue during 2002 of bills (LEBAC) in pesos and dollars for $2.712 billion and $622 million respectively. These bills are traded at a discount, and are valued at their par value net of unearned interest at the end of the fiscal year.

The «Other Liabilities» heading includes $2.566 billion in loans granted by the Inter-American Development Bank and by the International Bank for Reconstruction and Development in the form of facilities for the support of the contingent repo program and their corresponding accrued interest payable, $1.757 billion as a Counterpart to Contributions by the National Government to International Agencies as from September 30, 1992 (the date on which the Institution's Charter was modified), $1.52 billion in liabilities due to the National Government to be paid once the acceptance of guarantees received for advances for the subscription of



BODEN granted to financial institutions has been completed, $419 million in obligations for the servicing of Secured Loans derived from the deposit of funds provided by the revenue from the tax on bank transfers allocated to the servicing of the mentioned loans, $415 million as obligations in relation to guarantees for liquidity rediscounts that represent the obligation of the Central Bank to return to the institutions receiving liquidity rediscounts the assets received in exchange for the funds granted to them, and $296 million for obligations derived from the position in reverse repos entered into with local financial institutions.

The «Provisions» heading includes a provision for $3.5 billion for the implementation of the Monetary Unification Program established by the Executive Branch with the aim of withdrawing from circulation the provincial and national bonds issued during the economic crisis of 2001 and early 2002. This figure reflects the estimated loss arising from the nominal value of the securities to be received compared to the estimated market value of similar securities at the date of issue of these financial statements.

Net Income for Fiscal 2002 totaled $11.831 billion. The most significant components giving rise to this result were $35.51 billion in «Exchange Differences», basically from the application of the change in the exchange regime established by Law 25,561 (the rate of exchange at the close was $3.363 = US$1, whereas the rate of exchange used at December 31, 2001 was $1 = US$1), $1.157 billion in Interest on Loans to Financial Institutions net of provisions, $1.182 billion in Financial Income from Interest on Deposits Abroad and Net Premiums Collected on Transactions with the Financial System, while leading Expenses included $6.601 billion in Provisions net of recoveries and $626 million in Interest on Securities Issued by the Central Bank. In addition, it should be noted that as the Financial Statements have been prepared in constant currency, the Net Negative Result generated by Exposure to Inflation was $18.686 billion, reflecting the change in the purchasing power of the currency in the period between December 31, 2001 and December 31, 2002. For purposes of restatement, use has been made of the adjustment coefficients arising from the Domestic Wholesale Price Index (IPIM), the variation of this index in fiscal 2002 amounting to 118.20%.

Retained Earnings were distributed as follows: $6.094 billion were allocated to the payment of advances on profits to the National Treasury in the context of Section 38 of the Central Bank's Charter made during 2001, 2002 and 2003, $3.61 billion were used for an increase in Capital, and $2.127 billion were added to the Bank's General Reserve.

Report to the National Congress 2002      **Central Bank of Argentina**

**BALANCE SHEET AT DECEMBER 31, 2002**
**COMPARATIVE WITH THE PREVIOUS YEAR**
- In Pesos -

### ASSETS

|  | 12/31/2002 | 12/31/2001 |
|---|---|---|
| **INTERNATIONAL RESERVES** | **35.173.395.183** | **32.611.059.996** |
| Gold (Net of allowances) (Note 4.1 and Exhibit II) | 10.635.126 | 5.697.962 |
| Foreign currency (Note 4.2. and Exhibit II) | 2.470.236.502 | 4.320.146.699 |
| Deposits to be realized in foreign currency (Note 4.3 and Exhibit II) | 32.754.876.750 | 28.297.187.050 |
| LESS | | |
| A.L.A.D.I. (Net) (Exhibit II) | 62.353.195 | 11.971.715 |
| | | |
| **GOVERNMENT SECURITIES** | **2.895.252.682** | **12.857.721.596** |
| GOVERNMENT SECURITIES IN FOREIGN CURRENCY | 2.595.957.533 | 1.889.561.500 |
| Bills issued in relation to I.M.F. loans (Note 4.4.1 and Exhibits II and III) | 1.483.825.678 | 1.019.197.443 |
| Other (Note 4.4.2 and Exhibits II y III) | 1.112.131.855 | 870.364.057 |
| GOVERNMENT SECURITIES IN LOCAL CURRENCY | 1.457.349.619 | 10.968.160.096 |
| 1990 National Treasury Consolidated Bond (Note 4.4.3 and Exhibit III) | 4.734.789.572 | 10.331.781.394 |
| Other (Note 4.4.4 and Exhibit III) | 575.885.934 | 9.044.718.734 |
| LESS: | | |
| Adjustment for accrual on 1990 Consolidated Bond | 3.853.325.887 | 8.408.340.032 |
| ALLOWANCE FOR GOVERNMENT SECURITIES IMPAIRMENT (Note 4.4 and 4.4.3 and Exhibits I and III) | 1.158.054.470 | 0 |
| | | |
| **TEMPORARY ADVANCE FUNDS TO GOVERNMENT (Note 4.5)** | **700.000.000** | **0** |
| | | |
| **LOANS TO THE ARGENTINE FINANCIAL SYSTEM** | **17.602.322.066** | **10.838.845.664** |
| Financial Entities (Net of allowances) (Note 4.6) | 17.602.322.066 | 10.838.845.664 |
| Financial Entities | 24.699.295.393 | 13.091.498.015 |
| LESS: | | |
| Loan loss allowance (Exhibit I) | 7.096.973.327 | 2.252.652.351 |
| | | |
| **CONTRIBUTIONS TO INTERNATIONAL AGENCIES ON BEHALF OF** | | |
| **NATIONAL GOVERNMENT   (Note 4.7 and Exhibit II)** | **5.674.685.110** | **3.509.804.912** |
| | | |
| **FUNDS TRANSFERRED TO THE NATIONAL GOVERNMENT FOR** | | |
| **PLACEMENTS OF THE I.M.F. (Note 4.8 and Exhibit II)** | **49.159.931.046** | **30.901.580.202** |
| | | |
| **OTHER ASSETS (Note 4.9)** | **7.260.675.733** | **20.389.403.276** |
| Miscellaneous Assets | 7.385.145.875 | 20.389.403.276 |
| LESS: | | |
| ALLOWANCE FOR OTHER ASSETS IMPAIRMENT | 124.470.142 | 0 |
| | | |
| **TOTAL ASSETS** | **118.466.261.820** | **111.108.415.646** |

79

Report to the National Congress 2002  **Central Bank of Argentina**

# LIABILITIES

|  | 12/31/2002 | 12/31/2001 |
|---|---|---|
| **MONETARY BASE** | **29.151.144.335** | **25.950.584.543** |
| Money in Circulation (Note 4.10.1) | 18.801.735.028 | 23.915.265.591 |
| Current Accounts in Pesos | 10.349.409.307 | 1.982.375.575 |
| Banking Liquidity Fund (Note 4.10.2) | 0 | 52.943.377 |
| **CURRENT ACCOUNTS IN OTHER CURRENCIES (Note 4.11 y Exhibit II)** | **1.014.072.669** | **12.822.004.581** |
| **NATIONAL GOV. DEPOSITS AND OTHER (Note 4.12 and Exhibit II )** | **66.819.524** | **9.528.036.515** |
| Deposits for the strengthening of International Reserves of Central Bank | 30.454 | 8.761.188.535 |
| Other Deposits | 66.789.070 | 766.847.980 |
| **OTHER DEPOSITS (Note 4.13)** | **662.328.273** | **63.778.946** |
| **DUE TO INTERNATIONAL AGENCIES** | **52.584.272.091** | **33.020.418.118** |
| International Monetary Fund (Note 4.14 and Exhibit II) | 52.387.978.097 | 32.966.141.213 |
| Interamerican Development Bank (Exhibit II) | 137.425.641 | 21.125.521 |
| Other (Exhibit II) | 58.868.353 | 33.151.384 |
| **SECURITIES ISSUED BY THE CENTRAL BANK (Note 4.15 and Exhibit V)** | **3.333.710.329** | **0** |
| Bills in Foreign Currency | 621.578.131 | 0 |
| Bills in Local Currency | 2.712.132.198 | 0 |
| **OTHER LIABILITIES (Note 4.16)** | **8.285.979.009** | **20.356.279.821** |
| **PROVISIONS  (Note 4.17 and Exhibit I)** | **4.681.871.451** | **2.512.106.443** |
| **TOTAL LIABILITIES** | **99.780.197.681** | **104.253.208.967** |
| **N E T   E Q U I T Y** | **18.686.064.139** | **6.855.206.679** |
| **TOTAL LIABILITIES PLUS NET EQUITY** | **118.466.261.820** | **111.108.415.646** |

*Notes 1 to 5 and Exhibits I to V are an integral part of these financial statements.*

Adriana Fischberg
MANAGER TO THE GENERAL
ACCOUNT DEPARTMENT

Alejandra G. Naughton
GENERAL ASSISTANT TO THE
CENTRALIZED SERVICES

Alfonso de Prat-Gay
PRESIDENT

Marcelo E. Griffi
SYNDIC
Signed for the identification of the report dated 04 / 24 / 03

Report to the National Congress 2002  **Central Bank of Argentina**

**INCOME STATEMENT**
**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2002,**
**COMPARATIVE WITH THE PREVIOUS YEAR**

- In Pesos -

|  | 12/31/2002 | 12/31/2001 |
|---|---|---|
| **FINANCIAL INCOME** |  |  |
| **ON INTERNATIONAL RESERVES** | 1.180.803.752 | 1.767.293.398 |
| **INTERESTS** | 1.180.803.752 | 1.767.293.398 |
| Deposits to be realized in foreign currency (Note 4.18) | 1.182.079.511 | 1.767.136.935 |
| Less: |  |  |
| A.L.A.D.I. Agreements | 1.275.759 | (156.463) |
| **ON OTHER ASSETS** | 1.356.378.498 | 569.959.931 |
| **INTERESES** | 1.356.378.498 | 551.395.258 |
| Loans to Financial Entities (Net of Allowances) (Note 4.18) | 1.156.970.686 | 206.144.596 |
| Government Securities in Foreign Currency | 190.875.916 | 293.865.464 |
| Other | 8.531.896 | 51.385.198 |
| **OTHER** | 0 | 18.564.673 |
| **FINANCIAL EXPENSES** |  |  |
| **ON OTHER ACCOUNTS** | 900.679.552 | 0 |
| **INTEREST** | 818.441.096 | 0 |
| Interest on  Central Bank Securities | 626.079.783 | 0 |
| Interest on Loans from  Other International Agencies | 192.361.313 |  |
| Interest on Loans from International Agencies (F.M.I.) | 2.662.201.382 | 1.274.460.943 |
| Less: |  |  |
| Bills issued in relation to I.M.F. Loans | 2.662.201.382 | 1.274.460.943 |
| **OTHER** | 82.238.456 | 0 |
| **NET FINANCIAL RESULT - INCOME** | 1.636.502.698 | 2.337.253.329 |
| **MONETARY ISSUANCE COSTS** | 43.847.020 | 20.639.771 |
| **ADMINISTRATIVE EXPENSES** | 152.775.284 | 274.220.933 |
| Personnel costs | 112.078.757 | 174.766.539 |
| Other expenses | 32.029.686 | 90.590.401 |
| Amortization | 8.666.841 | 8.863.993 |

|  | 12/31/2002 | 12/31/2001 |
|---|---|---|
| CONTRIBUTION TO GENERAL REVENUE AS PER NATIONAL BUDGET LAW | 81.176.689 | 130.925.963 |
| SUNDRY RESULTS - INCOME | 249.120.696 | 221.664.767 |
| DIFFERENCE IN MAKET PRICE OF GOLD, FOREIGN CURRENCY AND GOVERNMENT SECURITIES - INCOME (LOSS) (Note 4.18) | 35.509.581.977 | (2.368.520.148) |
| ORDINARY RESULT BEFORE PROVISIONS - INCOME (LOSS) | 37.117.406.378 | (235.388.719) |
| PROVISIONS NET OF RECOVERY - LOSS (Exhibit I) | 6.600.628.239 | 46.834.905 |
| For implementation of the Monetary Unification Program | 3.500.000.000 | 0 |
| For loans to Financial Entities - (GAIN) | 1.704.424.595 | (34.888.105) |
| For Government Securities Impairment | 1.158.054.470 | 0 |
| For Other Assets Impairment | 124.470.142 | 0 |
| For Lawsuits | 91.982.723 | 87.927.620 |
| Other - (INCOME) | 21.696.309 | (6.204.610) |
| PURCHASING POWER LOSS ON NET MONETARY ITEMS | (18.685.920.679) | 0 |
| NET INCOME (LOSS) | 11.830.857.460 | (282.223.624) |

*Notes 1 to 5 and Exhibits I to V are an integral part of these financial statements.*

STATEMENT OF CHANGES IN NET EQUITY FOR THE YEAR ENDED DECEMBER 31, 2002
COMPARATIVE WITH THE PREVIOUS YEAR
-IN PESOS-

| HEADING | CAPITAL | CAPITAL ADJUSTMENT | RESERVES | | UNAPPROPRIATED RETAINED EARNINGS | TOTAL 12.31.2002 | TOTAL 12.31.2001 |
|---|---|---|---|---|---|---|---|
|  |  |  | GENERAL RESERVE | TECHNICAL APPRAISAL |  |  |  |
| Balances at beginning of year | 2.117.205.307 | 75.610.869 | 1.052.066.828 | 25.370.576 | (128.688.836) | 3.141.564.834 | 9.209.012.920 |
| Adjustments to previous years |  |  |  |  |  |  | 1.411.795 |
| Balances at beginning of year restated as at 12.31.02 | 2.117.205.307 | 2.667.737.619 | 2.295.714.374 | 55.361.118 | (280.811.829) | 6.855.206.679 | 9.210.424.715 |
| General Reserve use according to Board Resolution No. 531./02 restated as at 12.31.02 |  |  | (280.811.829) |  | 280.811.829 | 0 | (2.072.994.412) |
| Net income |  |  |  |  | 11.830.857.460 | 11.830.857.460 | (282.223.624) |
| Balances at end of year | 2.117.205.307 | 2.667.737.619 | 2.014.902.545 | 55.361.118 | 11.830.857.460 | 18.686.064.139 | 6.855.206.679 |

*Notes 1 to 7 and Exhibits I to V are an integral part of these Financial Statements.*



# Notes to the Financial Statements

## Note 1 - Changes to the legal and financial framework during fiscal 2002

These financial statements reflect the financial position of the Banco Central de la República Argentina (B.C.R.A.) at the end of fiscal 2002. During the course of the previous year a situation developed that provoked an institutional crisis at the end of December 2001 and continued with the introduction of changes to legislation that have had a significant impact on the Institution. This process was highly complex in both its monetary and fiscal aspects. Although it began during 2001, it has grown more acute since the start of the 2002 fiscal year, with the introduction of fundamental changes to the monetary system, when it was resolved to abandon the currency convertibility scheme that had been introduced by Law 23,928 in 1991.

In order to facilitate the reading of these financial statements and enable a full understanding of the process of transformation that has taken place and its impact on the financial position of the Institution, the following paragraphs describe the most significant economic measures taken during 2002.

### 1.1 Law on Public Emergency and Reform of the Exchange System, and changes to Decrees 214/02, 410/02 and 905/02

January 6, 2002 saw the sanctioning of Law No. 25.561 on «Public Emergency and Reform of the Exchange System», subsequently partly modified by Decrees 214/02 and 410/02 published on February 4 and March 8, 2002, respectively. In addition, Ministry of Economy Resolution 47/02 established the definitive mechanism for the rescheduling of financial entity deposits, and Decree 905/02 determined the compensation to be paid to financial entities for the asymmetric conversion of loans and deposits into pesos.

These regulations have included the following measures with an impact on the net worth and financial position of the Institution:

a) Changes to the Convertibility Law, which had set the exchange rate for the US dollar at one Argentine peso. It should be noted that as from the introduction of Law 25,561 the B.C.R.A. is no longer obliged to maintain a ratio of Freely Available reserves equivalent to the Monetary Base, although the Institutions' reserves will at all times be allocated to support for the Monetary Base.

b) Creation of an official exchange market. Decree 71/02 dated January 9, 2002 set the exchange rate at 1.40 pesos per US dollar effective January 11, 2002 (for those transactions authorised by the B.C.R.A.). This market operated on the basis of that value for the settlement of certain import and export transactions through until February 1, 2002.

c) Establishing of a free exchange market which opened on January 11, 2002 for all those transactions not requiring or

not having been granted authorisation from the BCRA to be traded on the official exchange market. This market began trading with buying and selling rates of 1.60 pesos and 1.70 pesos respectively per US dollar.

d) Introduction by Decree 260/02 dated February 8, 2002 of a single, free exchange market for all exchange transactions as from February 11, 2002 .

e) Private sector non-financial debts outstanding with the financial system as at February 3, 2002, in US dollars and other foreign currencies, whatever their amount or nature, were transformed into pesos at the rate of exchange of $1 = US$1 or its equivalent in any other foreign currency.

f) The balances of accounts in US dollars or other foreign currencies deposited by financial entities with the BCRA at February 1, 2002, were converted into pesos at the rate of $1.40 per US dollar. A similar treatment was granted to the sums contributed by financial entities and deposited in this Institution in order to build up the Banking Liquidity Fund established by Decree 32/01.

g) Balances of foreign currency deposits in the financial system were converted into pesos at the rate of $1.40 per US$ 1 or its equivalent in other currencies.

h) Swap transactions in US dollars or other foreign currencies entered into up until the close of trading on February 1, 2002 between financial entities and the BCRA were converted into pesos at the same rate indicated in clause g).

i) Depositors were granted the option of exchanging their deposits originally set up in foreign currency for various classes of National Government Bonds, while deposits originally set up in pesos could be exchanged for National Government Bonds in pesos. In order to implement the exchange, the BCRA granted financial entities advances in pesos against the assigning of guarantees by them for the amounts necessary to purchase the mentioned bonds, in order to comply with the applications for exchange received from their depositors.

### 1.2 Exchange and conversion into pesos of public debt - Decree 471/02 and Ministry of Economy Resolution 55/02

Decree 471/02, published on March 13, 2002 laid down that the obligations of the federal, provincial and municipal sectors outstanding at February 3, 2002 denominated in US dollars or other foreign currencies, subject only to Argentine law, were to be converted at the rate of $1.40 per US$1 or its equivalent in any other foreign currency, and were to be restated according to the CER (reference stabilisation index).

In addition, it was ruled that the liabilities of the national public sector converted into pesos and documented in the form of secured loans as approved by Decree 1646/01 and Ministry of Economy Resolution 851/01, as from February 3, 2002 would accrue interest at rates of between 3% and 5% p.a. on those loans with an average life, calculated as from November 6, 2001, of up to five years and over ten years respectively, and



5.50% to be capitalised annually for those loans with a duration of at least five years.

Furthermore, an annual rate of interest as from February 3, 2002 of 4% was established for the obligations of the provincial and municipal public sectors.

In the case of the portfolios of government securities not presented for exchange, a category which includes the holdings of the BCRA, negotiations will continue to be carried out with the Treasury Secretariat within the framework of the so-called Phase II (Ministry of Economy Resolution 767/01) with the aim of restructuring the portfolio on the basis of the new instruments that the national Government will issue to replace them.

The carrying out of the rescheduling foreseen in Phase II will enable determining with greater certainty the degree of recoverability of these assets, as they are no longer listed on a representative market.

### 1.3. Conversion of provincial public debt – Decree 1579/02 and complementary regulations

The agreement between the State and the Provinces on their financial relationship and the basis for a federal tax-sharing regime that was signed by the Federal Government, the Provincial Governments and the Autonomous City of Buenos Aires on February 27, 2002, ratified by Law 25,570, includes among its purposes the establishing of basic guidelines on which the provincial debt will be refinanced.

Section 8 of the Agreement establishes that the Jurisdictions will be able to charge the Federal Government with the renegotiation of the provincial public debt that the latter accepts, thus transforming it into federal government securities, as long as those Jurisdictions guarantee the full amount of the issues by means of an increase in the appropriation of resources from the Federal Tax-sharing Regime, using the mechanisms laid down for eligible provincial debt.

In addition, the Trust Fund for Provincial Development has been instructed to take charge of all provincial debt in the form of Government Securities, Bonds, Treasury Bills or Loans that complies with the terms established in Decree 1579/02.

Bonds will be issued in pesos as at February 4, 2002 for a term of 16 years, adjusted according to the CER reference stabilisation index and bearing annual interest at 2% payable monthly, principal repayment taking place in rising monthly instalments as from March 4, 2005. These Secured Bonds will have as their principal guarantee the assigning of up to a maximum of 15% of the resources from the Federal Tax-sharing Regime corresponding to the province owning the converted public debt, and will carry a subsidiary guarantee from the Federal Government.

### 1.4. Changes to the Charter

As Law 25,561 repealed or modified the sections of the Convertibility Law establishing monetary regulations that governed the actions of the BCRA as the monopoly issuer of money, this new change to the Charter has introduced a tool to regulate such issue, establishing that the primary and fundamental mission of the BCRA, which is to preserve the value of the currency, is to be complied with in the context of a monetary program to be published prior to the start of each fiscal year, including information on inflation targets and variations in total money supply forecasted, with revisions to be prepared and made public quarterly or whenever deviations are foreseen, informing both the reasons for the deviations and the new monetary program resulting from them.

On the matter of international reserves, the new Charter establishes that the BCRA shall only be able to maintain part of its foreign assets in deposits or other interest earning placements in banks abroad or in paper of recognised solvency and liquidity payable in gold or foreign currency. In practice, this implies the exclusion of government securities from freely available reserves totals, aligning the components of Reserves to international standards.

In the case of mechanisms for financing the Federal Government, a system has been introduced for the granting of temporary advances as long as they do not exceed 10% of the cash resources obtained by the Government in the last 12 months, and as long as they are repaid within 12 months of having been granted.

On the matter of BCRA liabilities, the current Charter authorises it to issue securities or bonds, as well as certificates representing shares in the securities it holds. This possibility will allow the BCRA to make use of a tool for monetary absorption for inclusion in the Monetary Program, such as the Central Bank Bills (Lebac) issued during 2002.

## Note 2 - Nature and Purpose of BCRA

The BCRA is an autarchic entity of the State governed by the terms of its Charter (Sect. 1 of Law 24,144). The primary function of the Institution is to preserve the value of the currency. In addition, it is to implement monetary and financial policies aimed at safeguarding the role of the currency as a repository of value, the unit of account and an instrument of payment for the settlement of monetary obligations. The Bank is the Financial Agent of the State, the country's depository and its agent before international monetary, banking and financial institutions with which the Nation does business.

## Note 3 - Accounting and Standards Applied

### 3.1 - Basis for presentation of the Financial Statements

The Institution has prepared its Financial Statements in accordance with professional accounting standards and general valuation criteria established for entities in the Argentina financial system.

As from the passing of Law 25,561 on «Public Emergency and Reform of the Exchange Rate System» the BCRA is no longer required to maintain a ratio of Freely Available Reserves equivalent to the Monetary Base. Therefore, the Exhibit «International Reserves of the Financial system and monetary liabilities of the BCRA is no longer presented.



The specific features of the Institution and the mission and functions assigned to it by its Charter, in particular its power to issue notes and coins, added to the very specific nature of the transactions it performs, do not allow for the preparation of a Statement of Sources and Uses of Funds such as is prepared by other financial entities. A Statement of Cash Flows is submitted as Exhibit IV, showing evolution in comparative form in fiscal 2002 and 2001 of the indicators defined as funds, which include: International Reserves, Central Bank Monetary Liabilities and Deposits of the Federal Government - Other Deposits.

The financial statements are prepared in comparative form with those for the previous fiscal year. The financial statements are shown in Argentine pesos. Figures in the Notes and Exhibits to the financial statements are disclosed in thousands.

### 3.2 General criteria on valuation and recognition

#### 3.2.1 Consideration of the effects of inflation

The financial statements have been prepared in constant units of currency, recognising the effects of inflation as from January 1, 2002. The BCRA has adopted the adjustment method established for financial entities by regulation CONAU 1 - 484, which in general terms agrees with the requirements laid down by the Argentine Federation of Professional Councils in Economic Sciences (Technical Pronouncement No.6 modified by Technical Pronouncement No. 19 issued by the F.A.C.P.C.E.).

Professional accounting standards consider that there has been monetary stability in the period between August 31, 1995 and December 31, 2001, and therefore the transactions performed in that period are considered to have been stated in the currency of that latter date. Consequently, the financial statements include the effects of changes in the purchasing power of the currency through to August 31, 1995 and those that took place between December 31, 2001 and December 31, 2002.

For restatement purposes, use has been made of coefficients derived from the Wholesale Domestic Price Index (IPIM) published by the National Institute of Statistics and Census (Indec). The change in IPIM in fiscal 2002 was 118.2%.

Balances at December 31, 2001 disclosed in these financial statements arise from restating the amounts from the financial statements at that date in uniform currency at December 31, 2002.

#### 3.2.2 Assets and liabilities in local currency

Assets and liabilities are recorded at nominal value according to current accounting standards applicable to the financial sector as a whole.

#### 3.2.3 Assets and liabilities in foreign currency

In view of the change to the exchange rate regime established by Law 25,561 and the measures that were introduced as a consequence by the Executive Branch, and the terms of Sect. 34 of Law 24,144 indicating that the financial statements of the Institution should be prepared according to the same general principles established by the Superintendency of Financial and Exchange Entities for the financial system as a whole, the criterion for the valuation of assets and liabilities in foreign currency has been adjusted, taking as the reference rate of exchange for the US dollar the rate informed by this Institution in effect at the close of business on December 31, 2002, in replacement of the rate of exchange corresponding to the closing selling rate of Banco de la Nación Argentina. The reference exchange rate at the end of the year amounted to 3.363 pesos = 1 US dollar. The rate of exchange used at December 31, 2001 was 1 peso = 1 US dollar.

Solely for information purposes, we indicate that if the last closing rate of exchange published by Banco de la Nación Argentina, which at December 31, 2002 was 3.38 pesos = US dollar, were to have been applied to the balances of accounts in foreign currency, the assets of the BCRA would have amounted to $ 119,014,905, liabilities to $ 100,079,122 and net worth to $ 18,935,783.

### Note 4 - Composition and main valuation criteria for the principal financial statement headings

#### 4.1 Gold

|  | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Gold | 10,742 | 5,754 |
| 1% gold purity allowance (Exhibit) | (107) | (56) |
|  | 10,635 | 5,698 |

Gold coin stocks were valued at the end of the year in United States dollars at US$ 343.75 (US$ 277.9 at December 31, 2001) per troy ounce- stated in United States dollars and converted into pesos according to the criterion disclosed in Note 3.2.3.

#### 4.2 Foreign currency

|  | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Current accounts with foreign | 1,600,777 | 1,816,781 |
| correspondents and "overnight" accounts | 869,460 | 2,503,366 |
| Holdings in Treasury | 2,470,237 | 4,320,147 |

Current accounts with correspondent banks and «overnight» accounts have been valued following the criterion established in Note 3.2.3. The total for current accounts with correspondent banks abroad includes $ 1,410,425 (equivalent to US$ 419,395 thousand) deposited in foreign branches of Banco de la Nación Argentina ($ 769,187 and US$ 352,499 at December 31, 2001).

Treasury holdings have been valued as mentioned in the previous paragraph.



## 4.3 Deposits to be realised in foreign currency

This account includes the following investments made abroad:

| | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Term deposits in foreign currency | 20,054,062 | 15,732,229 |
| Short-term government securities | 9,354,004 | 7,999,484 |
| Repurchase Agreements | 3,030,063 | 2,313,462 |
| Sight Deposits | 316,748 | 23,259 |
| Custody Agreements | 0 | 1,786,118 |
| Certificates of Deposit | 0 | 365,742 |
| Others | 0 | 76,893 |
| | 32,754,877 | 28,297,187 |

Sight deposits and time deposits have been recorded at face value plus interest accrued until the end of the year. Short-term government securities and repurchase agreements have been marked to market at the closing date of the corresponding year.

Term Deposits in Foreign Currency include a deposit made with a branch abroad of Banco de la Nación Argentina for $ 518,832 (equivalent to thousands of US$ 154,275). At December 31, 2001 such deposits amounted to $ 328,559 (equivalent to thousands of US$ 150,570).

## 4.4 Government Securities

Following the passing of Law 25,562 and on the basis of its section 12, holdings of government securities issued in US dollars by the Argentine Government have ceased to be included as International Reserves of the Central Bank, and are now included under the heading of Government Securities.

This includes the portfolio of government securities for $ 1,112,132 and $ 870,364, at December 31, 2002 and December 31, 2001 respectively detailed in Exhibit III, which were marked to market at the closing dates of the respective years.

In order to reflect the market values of the holdings of government securities recorded at December 31, 2002, an impairment allowance of $1,158,054 has been booked (Exhibit I). This criterion has been adopted mainly because the State has not yet embarked on the so-called Phase II for the restructuring of Public Debt not presented for exchange (Ministry of Economy Resolution 767/01 and complementary resolutions) and because the servicing of public debt, originally suspended until December 31, 2002 by Ministry of Economy Resolutions 73/02 and 158/03, has not yet been renewed.

### 4.4.1 Bills issued in relation to I.M.F. loans

The balance at the end of fiscal 2002 and 2001 for $ 1,483,825 and $ 1,019,197 respectively represents the debt entered into by the Treasury Secretariat with the BCRA corresponding to the transfer of the funds received by this Institution from the I.M.F. until September 30, 1992. This asset stated in Special Drawing Rights (SDRs) has exactly the same financial features as the liability

abroad (Note 4.14). As a result, its servicing has been collected in synchronisation with the payments of principal and interest on the foreign liability.

### 4.4.2 Other securities in foreign currency

This line includes securities received in relation to asset swaps for $ 133,633 at December 31, 2002 and $ 1,700,584 at December 31, 2001 (Exhibit III).

### 4.4.3 1990 National Treasury Consolidated Bond

This Bond was issued on January 2, 1990 to consolidate obligations assumed by the National Government for advances of funds from the BCRA in accordance with National Executive Decree No. 335/91. This is a 99-year zero-coupon bond in pesos, the principal of which is restated according to changes in the quotation of the United States dollar on the basis of the Banco de la Nación Argentina buying rate of exchange. Repayments of restated principal will be made as from year ten. Re-statement has been accrued until March 31, 1991 in accordance with section 8 of the Law on Convertibility.

The original amount of the issue totals $ 881,464 and the adjusted amount according to the issue conditions is $ 4,734,790. As section 6 of Law 25,565 authorises the Ministry of Economy to undertake the restructuring of public debt, by means of Resolution 334/02 this Ministry has determined that the bond will be amortised in 80 equal annual instalments, the first falling due on January 2, 2010. In view of the special financial conditions of this Bond, basically its term, grace periods and lack of interest accrual, the balance adjusted according to the issue terms net of its regularising account has been fully provided for by means of calculation of its present value, applying a rate that reflects the evaluation of the time value of money and the specific risks of the asset.

### 4.4.4 Other Securities in Local Currency

At December 31, 2002 the balance of this account totalled $ 575,886 ($ 9,044,719 at December 31, 2001) - (Exhibit III).

This account is used to record federal and provincial government securities in pesos handed over by financial entities in repo transactions for $ 162,473 ($ 8,633,088 thousand at December 31, 2001) valued at the market rate at closing date. Provincial government securities were received under the conversion of provincial public debt, which at the present date is pending completion.

### 4.5 Temporary Advances to the Federal Government

These advances are granted under section 20 of the Charter, as modified by Law 25,562, which authorises this Institution to make advances to the Federal Government in amounts not exceeding 10% of the cash resources obtained by the latter in the previous twelve months, which should be repaid within twelve months of having been granted.

At December 31, 2002 the balance of the Temporary Advances to the Federal Government account was $ 700,000. This balance is made up of $ 500,000 to be repaid by December 27, 2003 and $ 200,000 due March 26, 2003, and both items had been repaid by the date of issue of these financial statements.



Report to the National Congress 2002 | Central Bank of Argentina

### 4.6 Loans to the Argentine Financial System

Detailed below are the balances of the accounts corresponding to loans to the Argentine financial system:

| | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Liquidity advances guaranteed by secured loans | 15,716,142 | 0 |
| Liquidity advances with other guarantees | 3,987,804 | 7,585,822 |
| Advances for the subscription of Federal Bonds | 2,038,611 | 0 |
| Financial entities with licenses revoked | 962,321 | 1,097,273 |
| Refinanced credit lines | 817,945 | 1,761,495 |
| Trust Participation Certificates | 671,398 | 1,077,920 |
| Liquidity rediscounts | 425,266 | 1,414,448 |
| Assets received for rediscount | 161,742 | 327,197 |
| Assets and rights received (Sect 35 bis Financial Entities Act | 34,436 | 75,450 |
| Others | 17,232 | 9,735 |
| Account regularising assets received for rediscounts | (133,602) | (257,841) |
| Sub-total | 24,699,295 | 13,091,499 |
| Less | | |
| Allowances on loans to the financial system | (7,096,973) | (2,252,653) |
| | 17,602,322 | 10,838,846 |

Rediscounts and liquidity advances to financial entities represent funds granted to attend to needs arising out of temporary liquidity shortages recorded by financial entities and other lines made available prior to the introduction of the new Charter for the Institution in force since 1992.

These rediscounts and advances to financial entities are valued at their face value plus interest accrued and are offset by a provision calculated on the basis of the estimated uncollectibility risk of the mentioned loans and evaluation of the security received.

The balance of the guarantees for liquidity advances and rediscounts covering the balance of the advance is made up as follows.

These loans are recorded in memorandum accounts, including the margin where appropriate. It should be noted that 85% of the securities received in guarantee at December 31, 2002 correspond to Federal Government debt paper (at December 31, 2001 this percentage was 92%).

The increase recorded between the end of fiscal 2002 and 2001 basically reflects the actions of the BCRA as a lender of last resort during the liquidity crisis that took place in 2001 and which continued during the first six months of fiscal 2002, with the granting of advances and rediscounts. Repo transactions were replaced during 2002 by liquidity advances secured by instruments created by Decree 1387/01.

As a result of the crisis, financial entities have experienced difficulties in returning the amounts due in the terms agreed without affecting their normal banking activities. In order to preserve the liquidity of the financial system, this Institution has authorised the optional capitalisation of 100% of the amount due on the transactions covered by section 17 of the Charter (Communication «A» 3607), while at the same time limiting the growth of lending by the financial institutions. The first of these measures is subject to review quarterly by the BCRA on the basis of the development of conditions in the financial system.

The changes to the Charter made by Decrees 1.523/01 and 1.526/01 authorised this Institution to grant liquidity rediscounts and advances secured by the public debt instruments created in accordance with Decree 1.387/01. The assistance secured by such instruments has not been taken into account when calculating allowances, as the guarantees received are not included within the suspension of payment on public debt servicing established by means of Ministry of Economy Resolution 73/02 and 158/03 and are being serviced regularly by the Federal Government.

Section 14 of Decree 905/02 established that the BCRA could grant secured advances in pesos to financial entities for the amounts needed for the purchase of Federal Government Bonds in Dollars due 2012, Federal Government Bonds in Pesos due 2007 at 2% and Federal Government Bonds in Dollars due 2005.

It should be noted that liquidity rediscounts and advances for the subscription of BODEN granted to financial entities in the public sector at December 31, 2002 amounted to $ 10,049,975 and $ 6,009,641 at the end of the previous year.

Refinanced Credit Lines includes the debt of the former BANADE amounting to $ 26,680 ($ 67,202 at December 31, 2001) which has been fully provided for. This is because no progress has been made in the proceedings that would allow the BCRA to collect the receivables. In addition, the debt for $ 623,956 at the end of 2002 ($ 1,352,153 at December 31, 2001) due from the Trust Fund for Regional Infrastructure (formerly Banco Hipotecario Nacional) has been provided for in the amount of $ 338,831 ($ 67,645 at December 31, 2001) as a result of the significant reduction in the net worth of the Trust because of the decline in value of the shares of Banco Hipotecario Sociedad Anónima.

Advances in relation to entities in liquidation represent advances made to return deposits and to meet the cost of the liquidation process for financial entities being wound up and equity released in liquidation processes for $ 20,921,240 ($ 45,672,889 at December 31, 2001) which have been fully provided for since 1990, without prejudice to such action as may be necessary to pursue their collection. (Exhibit I).

### 4.7 Contributions to international agencies on account of the Federal Government



Below are detailed the balances of the accounts corresponding to the contributions made by the BCRA on behalf of the Federal Government:

|  | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Contributions to the IDB, IBRD, AIF and others | 2,966,064 | 1,886,620 |
| Contributions to the IMF | 2,708,621 | 1,623,185 |
|  | 5,674,685 | 3,509,805 |

The IMF sets the so-called «Quota» that the Republic of Argentina should pay as a member, and this has been established at SDR 2,117,100 at December 31, 2001 (the same amount as was recorded at December 31, 2001). This quota has been recorded as follows:

|  | Amount in SDRs | Amount in pesos at 31-12-2002 | Amount in pesos at 31-12-2001 |
|---|---|---|---|
| Treasury Bills | 1,524,672 | 6,970,908 | 4,209,169 |
| Contributions to IMF in Foreign Currency | 529,275 | 2,419,883 | 1,450,153 |
| Contributions to IMF in Local Currency | 63,153 | 288,738 | 173,032 |
|  | 2,117,100 | 9,679,529 | 5,832,354 |

The Treasury Bills are issued by the BCRA for and on behalf of the Government of the Republic of Argentina in its capacity as the Government's Financial Agent, with a commitment to repay their amounts to the IMF on demand.

**4.8 Funds transferred to the Federal Government for placements with the IMF.**

This account (with a balance of $ 49,159,931 at December 31, 2002 and $ 30,901,580 at December 31, 2001) reflects the transfer to the Treasury Secretariat of funds received from the International Monetary Fund as from September 30, 1992. This account receives the same financial treatment as is given to the liability abroad.

**4.9 Other assets**

The main items included under this heading are as follows:

|  | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Transfer to Treasury Secretariat on account of profits as per Sect.38 of the Charter | 5,229,867 | 722,930 |
| Secured Loans - Decree 1387/01 | 595,831 | 1,166,620 |
| Rights under liquidity rediscounts | 415,246 | 1,331,958 |
| Debtors from reverse repo transactions | 274,679 | 11,240,208 |
| Fixed assets (net of accumulated depreciation) | 119,713 | 122,261 |
| Intangible assets (net of accumulated amortisation) | 3,877 | 3,819 |
| Debtors from contingent repo transactions | 0 | 4,243,819 |
| Rights to use funds from IDB/IBRD loan for contingent repo program | 0 | 277,805 |
| Federal Government 9% Bonds | 110,138 | 0 |
| Province of Entre Ríos Secured Bond | 14,332 |  |
| Sundry | 621,463 | 1,279,983 |
| Less: |  |  |
| Allowance for loss of value of other assets | (124,470) |  |
|  | 7,260,676 | 20,389,403 |

In accordance with the terms of section 38 of its Charter, the BCRA remitted advances on profits to the National Treasury for $ 5,229,867 ($ 722,930 at December 31, 2001). Of this amount, $ 4,898,567 corresponds to profit advances granted during fiscal 2002 and $ 331,300 to advances granted during fiscal 2001 which will be charged to income in 2002 as determined by Board Resolution No. 531/02 approving the financial statements at December 31, 2001.

National public sector obligations instrumented by means of secured loans (Decree 1387/01) in the portfolio of the Bank at December 31, 2002 amounted to $ 595,831 ($ 1,166,620 at December 31, 2001). These instruments had been accepted in settlement of liquidity assistance to entities that had their operating licences cancelled. The portfolio is valued at the value of incorporation to the equity of this Institution (book value recorded by the financial entity calculated according to regulations in force at the time). The positive difference between the technical value of the secured loans and the book value at the date of its incorporation is reflected in a regularising account and is accrued on a linear basis over the term of the loans, with a contra item under Financial Income.

The secured loan balance has not been provided for because the payment of debt servicing has not been affected by the suspension declared by the Ministry of Economy by means of Resolution 73/2 mentioned above or Resolution 158/03.

The balance of rights from liquidity rediscounts at December 31, 2002 for $ 415,246 ($ 1,331,958 at December 31, 2001) represents the funds to be received by the BCRA when the transactions fall due.

The reverse repo activity that increased in 2001 in order to assist financial entities in liquidity difficulty was gradually replaced during 2002 by advances and rediscounts. As a result, the balance of debtors from asset swaps amounts to $ 274,679 at December 31, 2002 ($ 11,240,208 at the end of the previous year).

Fixed assets have been valued at acquisition cost net of the corresponding accumulated depreciation. Depreciation is calculated by the straight-line method taking into account the estimated useful lives of the fixed assets. The residual book value of the assets as a whole does not exceed the value of their economic use, on the basis of information currently available.

The settlement of the balance of debtors from contingent repo transactions took place in January 2002 with the conclusion of the Contingent Repo Program agreed with foreign banks as one of the elements of the liquidity policy adopted by this Institution during fiscal 2001. The stock of Federal Government 9% Bonds and Province of Entre Ríos Secured Bonds unlisted at the end of the year has been provided for in full, as interest servicing was past due and unpaid at the end of fiscal 2002.

**4.10 Monetary Base**

**4.10.1 Monetary Circulation**



|  | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Notes | 18,221,086 | 22,720,196 |
| Coins | 580,649 | 1,195,070 |
|  | 18,801,735 | 23,915,266 |

The balance of the Monetary Circulation account at the end of each year corresponds to notes and coins held by the ublic and by banks.

The evolution of the bank-notes in circulation account has been as follows:

|  | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Balance at the beginning of the year | 22,720,196 | 31,594,617 |
| New notes and notes in good condition in the |  |  |
| Financial System | 14,082,027 | 11,042,763 |
| Notes withdrawn from circulation and destroyed |  |  |
| or in the process of destruction | (6.273.022) | (19.917.184) |
| Adjustment for restatement of opening balance | (12.308.115) | 0 |
| Balance at end of year | 18,221,086 | 22,720,196 |

### 4.10.2 Bank Liquidity Fund

Through the issue of Executive Branch Decree 32/01 the Government set up a Bank Liquidity Fund to be administered by Seguros de Depósitos S.A. (SEDESA), which acted as trustor, with the aim of facilitating the redistribution of the remaining liquidity among entities. This fund was to be formed by financial entities for an amount equivalent to 6% of average daily balances of private sector deposits in pesos and foreign currency for the month of November 2001. However, in view of the fact that the change to the Charter has increased the powers of the Central Bank to act as a lender of last resort for the financial system, this Fund has ceased to fulfil the role for which it was created, so that by means of Communication «A» 3582 dated April 26, 2002 the contribution by financial entities was set at 0% and the total amount that had been paid in to set up the Trust was returned to the banks that had made the deposits.

### 4.11 Current accounts in other currencies

By means of Communication «A» 3498 dated March 1, 2002, the Bank unified the minimum cash and minimum liquidity requirements, enabling financial entities to include for compliance purposes the balances held by financial entities in the Minimum Cash Reserve Accounts opened at the Central Bank in US dollars or other foreign currencies. The balance recorded in these accounts at the end of each business day accrues interest for the period through to the next working day, at a rate that is fixed daily. At December 31, 2002 the balance amounted to $ 1,014,073 ($ 12,822,005 at December 31, 2001), and has been valued as indicated in Note 3.2.3.

### 4.12 Deposits by the Federal Government and others

At the request of the Ministry of Economy, during 2001 a special account was opened at the BCRA in the name of the

National Treasury headed «Federal Government Deposits in Foreign Currency- Reinforcement of the International Reserves of the BCRA» This account was used to hold the funds representing the counterpart to the disbursements made by the IMF under the «Supplemental Reserve Facility» and «Stand By» for the equivalent to US dollars four thousand million (US$ 4,000,000,000). The balance of the Fund for the Reinforcement of the International Reserves of the BCRA account was released on the basis of the applications submitted on various occasions by the National Treasury Secretariat, and credited in the Deposits by the Federal Government account.

|  | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Deposits by the Federal Government | 33,298 | 745,824 |
| Provincial Funds | 28,319 | 18,375 |
| Federal Government Deposits - BODEN | 3,883 | 0 |
| Funds for Reinforcement of Reserves of B.C.R.A. | 0 | 8,728,398 |
| Yield transferred on deposits for the |  |  |
| Reinforcement of B.C.R.A. Reserves | 30 | 32,790 |
| Others | 1,290 | 2,650 |
|  | 66,820 | 9,528,037 |

### 4.13 Other deposits

|  | 31-12-2002 | 31-12-2001 |
|---|---|---|
| In special accounts | 558,660 | 44,467 |
| Sundry | 103,500 | 16,488 |
| Special "Micro Pyme" program | 168 | 2,824 |
|  | 662,328 | 63,779 |

Deposits in Special Accounts include $ 267,260 corresponding to deposits of the Trust Fund for Assistance to Entities set up with the aim of administering and transferring assets and liabilities belonging to financial entities. In addition, an amount of $ 270,725 is disclosed that corresponds to deposits set up by the Federal Government in the terms established by Sect. 1 of Decree 1836/02, which qualify as not subject to attachment and are not able to be disposed of, being used exclusively as a guarantee for the various series of Federal Government Bonds for use in the exchange of certificates of deposit held by savers in the financial system.

### 4.14 International Monetary Fund

Includes accounts from the heading «Due to International Agencies» corresponding to operations with the International Monetary Fund:

|  | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Offsetting item for funds transferred to Treasury |  |  |
| and bills drawn against Obligations | 50,643,756 | 31,920,778 |
| SDRs assigned | 1,455,610 | 872,296 |
| Other deposit accounts | 288,612 | 173,067 |
|  | 52,387,978 | 32,966,141 |



The contra entries for the funds transferred to the Treasury Secretariat are the currency amounts received in the form of credit assistance to the national public sector granted by the I.M.F. through the BCRA:

| | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Stand By 2000 and Supplementary Reserve Facility | 44,606,533 | 26,731,193 |
| 1992 Extended Facilities Fund | 3,617,268 | 3,519,554 |
| Utilisation of Reserve Tranche | 2,419,955 | 1,450,156 |
| 1996 Stand-by | 0 | 219,875 |
| | 50,643,756 | 31,920,778 |

### 4.15 Securities issued by the BCRA

One of the changes made to the Charter by Law 25,562 empowers the Central Bank to issue securities or bonds, as well as share certificates in the securities it holds. This provides the Central Bank with a monetary absorption tool, and during 2002 it issued Bills (Lebac) in pesos and dollars.

These bills are traded at a discount and are valued at their par value net of unearned interest at the end of the year. Bills in foreign currency are valued at par restated as mentioned in Note 3.2.3.

| | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Bills issued in local currency | 2,712,132 | 0 |
| Bills issued in foreign currency | 621,578 | 0 |
| | 3,333,710 | 0 |

Exhibit V shows the stock of Lebac at the end of the year broken down by currency and maturity.

### 4.16 Other liabilities
The composition of this heading is as follows:

| | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Other liabilities due to International Agencies | 2,505,385 | 2,171,189 |
| Offsetting item for Federal Government contributions to International agencies | 1,756,665 | 1,110,189 |
| Obligations in relation to subscription of BODEN | 1,519,609 | 0 |
| Obligation in relation to servicing of Secured Loans | 419,019 | 0 |
| Obligations from guarantees on liquidity rediscounts | 415,246 | 1,331,957 |
| Due to Federal Government | 379,823 | 324,249 |
| Obligations in relation to reverse repos | 296,104 | 11,500,292 |
| Interest accrual on IDB/IBRD loan | 61,490 | 25,177 |
| Creditors from contingent repos | 0 | 2,955,833 |
| Sundry | 932,638 | 937,394 |
| | 8,285,979 | 20,356,280 |

«Other liabilities due to International Agencies» includes the balances of loans granted by the Inter-American Development Bank and the Inter-American Bank for Reconstruction and Development as a support facility for the Contingent Repo facility. The balance at December 31, 2002 amounted to $ 2,505,385 for principal (equivalent to US$ 744,985) and at December 31, 2001 it totalled $ 2,171,189 (equivalent to US$ 995,000). Interest accrued at the end of the year amounted to $ 61,490 (equivalent to US$ 18,284), while at December 31, 2001 it totalled $ 25,177 (equivalent to US$ 11,538). At the closing date one principal and interest instalment on the IDB loan for $ 453,711 was pending settlement, as well as one principal and interest instalment on the IBRD loan for $424,629. Both these balances had been settled by the date of issue of these financial statements.

The Offsetting item for Federal Government contributions to International agency accounts includes the contributions made on account of the Federal Government as from September 30, 1992, the date on which the Institution's Charter was altered.

The Obligations for Subscription to BODEN are amounts due to the Federal Government to be settled once the acceptance of the security received for the advances for the subscription of BODEN bonds granted to financial entities has taken place.

Obligations in relation to Servicing of Secured Loans includes the funds deposited from the collection of the tax on bank transfers for use in the servicing of the mentioned loans.

The balance of Obligations from guarantees on liquidity rediscounts for $ 415,246 represents the BCRA's obligation to return to the entities benefiting from liquidity rediscounts the assets received in consideration for the funds granted to them. The settlement of the balance of Creditors for contingent repo transactions took place in January 2002, on conclusion of the Contingent Repo Program. (See Note 4.9)

### 4.17 Provisions

| | 31-12-2002 | 31-12-2001 |
|---|---|---|
| Provision for introduction of Monetary Unification Program (Exhibit I) | 3,500,000 | 0 |
| Provision for matters in litigation (Exhibit I) | 1,151,094 | 2,496,393 |
| Provision for guarantee fund under Law 22510 (Exhibit I) | 3,778 | 3,862 |
| Other provisions (Exhibit I) | 26,999 | 11,851 |
| | 4,681,871 | 2,512,106 |

In order to achieve monetary reunification and ensure the circulation of a single unit of legal tender nation-wide, the Executive has created a Monetary Unification Program with the aim of retiring provincial and federal scrip issued during the economic crisis in 2001 and the beginning of 2002.

Report to the National Congress 2002  Central Bank of Argentina

In view of the fact that proposed changes to the mentioned Program contained in a Bill dated April 7, 2003 contemplate the delivery to this Institution of government securities at par equivalent to the funds to be transferred to the provinces and the Federal Government, and as these provincial and federal bonds had already been issued prior to the end of fiscal 2002, and at that date the intention already existed for the BCRA to participate in their redemption, it was decided to set up in this present year a provision for $ 3,500,000  to reflect the estimated loss from the difference between the par value of the securities to be received compared to the estimated market values prevailing for similar securities at the date of issue of these present financial statements (see Note 5.2).

The criterion used by the entity to determine the «Provision for Matters in Litigation» has been as follows:

Lawsuits for which there is still no firm ruling have been classified according to their nature (lawsuits for the return of deposits, labour lawsuits, etc.) establishing a percentage of probable rulings unfavourable to the BCRA in each category on the basis of past experience and setting up a provision accordingly.

In the case of lawsuits prior to April 1, 1991, which will be settled by means of the delivery of Debt Consolidation Bonds, the amount estimated has been restated to December 31, 2002 on the basis of the interest paid on such bonds. In view of the requirements of the Economic and Financial Emergency Act (Law No.25,344), lawsuits subsequent to April 1, 1991 will also be settled in Debt Consolidation Bonds and have been restated using the rate of interest on ordinary savings accounts published by the BCRA as established by Communication «A» 1828.

In addition, there are lawsuits brought against the BCRA for loss and damages for undetermined amounts which at the date of issue of these financial statements are considered only remotely likely to have an outcome adverse to the BCRA, for which no provision has been set up.

The increase in Other Provisions has been due to the recording of claims for the collection of pesos recognised at an administrative stage and which have been submitted by this bank to the Treasury Secretariat for settlement under the terms of the Debt Consolidation Law by means of the delivery of Consolidation Bonds.

### 4.18. Income Statement – Main Headings

Below is a detail of the significant items making up this heading:

| | 31-12-2002 | 31-12-2001 |
|---|---|---|
| **FINANCIAL INCOME** | | |
| **Placements to be realised in foreign currency** | | |
| Time deposits | 387,443 | 562,078 |
| Foreign securities | 322,901 | 525,613 |
| Certificates of deposit | 1,032 | 409,183 |
| Net premiums for transactions with | | |
| Financial System | 585,073 | (324,561) |
| Sub-total | **1,296,449** | **1,172,313** |
| Agreements with Administrator Banks | (12,163) | 625,900 |
| Sundry | (102,206) | (31,076) |
| | **1,182,080** | **1,767,137** |
| **INCOME FROM OTHER ASSETS** | | |
| **INTEREST** | | |
| Loans to financial entities | | |
| Debts of Financial Entities | 5,361,203 | 323,095 |
| Trust Participation Certificates | 209,207 | 119,012 |
| **Less:** | | |
| Provisions | (4.413.439) | (235.962) |
| | **1,156,971** | **206,145** |
| **DIFFERENCE IN MARKET PRICE OF** | | |
| **GOLD, CURRENCY AND GOVT.** | | |
| **SECURITIES GAIN/(LOSS)** | | |
| On Gold, Currency and Placements Abroad | 42,996,800 | 25,094 |
| On Foreign Securities | 14,314,600 | 181,769 |
| Exchange differences from sale of currency and | | |
| placement of Lebac | 4,360,977 | 0 |
| On Argentine Government Securities | 3,478,900 | (2.304.437) |
| Adjustment to value of other assets and liabilities | | |
| in foreign currency | (9.624.395) | (270.946) |
| On current account deposits by entities | | |
| and Federal Government deposits | (20.017.300) | 0 |
| | **35,509,582** | **(2.368.520)** |

### Note 5 – Subsequent Events

A summary is provided below of measures taken by the Federal Government and events that have taken place subsequent to the end of the year which because of their significance require comment in these financial statements.

#### 5.1 Decree 739/03- Reordering of the Financial System

The Executive issued Decree 739/03 on March 28, 2003 concerning the repayment of liquidity assistance provided to financial entities at the height of the crisis that was unleashed in 2001.



So that the payment of such loans can be made without disturbing the normal operation of the financial entities and the fulfilment of their role as generators of credit, this regulation establishes that banks so requesting it may settle the balances of their advances and rediscounts as at the date of the Decree in the manner laid down. Repayment will be made in the same number of instalments as those of the assets that secure such assistance, up to a maximum of 70 consecutive monthly instalments.

Assistance under this regime will be restated according to the Reference Stabilisation Index (CER), and will bear interest at an annual 3.5%, payable monthly.

Advances granted must be secured in an amount of at least 125% of the principal by means of Federal Government Secured Loans (Decree 1387/01), Federal Government Secured Bonds (Decree 1579/02) or Federal Government Bonds in Dollars or Pesos (Decrees 905/02, 1836/02 and 739/03).

### 5.2  Monetary Unification Program

The creation of the Monetary Unification Program will be fundamental to ensure the reunification of the currency and guarantee the circulation of a single monetary unit of legal tender nation-wide, avoiding departures from the provisions of sect. 30 of the Central Bank Charter.

As a result, in compliance with the terms of title V –On the Exchange of Securities- of Law 25,561, the Executive issued Decree 743/03 creating the Program, with the aim of redeeming the national and provincial securities that had been issued in replacement of the national currency, to avoid a deepening of the crisis in 2001 and early 2002, for a par value equivalent to almost four thousand five hundred million pesos ($ 4,500,000,000) and its replacement by local currency legal tender.

Subsequently, the Executive, by means of Decree 957/03, expanded the Program to include the bills for the settlement of provincial obligations (LECOP), for a par value equivalent to seven thousand eight hundred million pesos ($ 7,800,000,000) with the aim of implementing the Monetary Unification Program.

### 5.3  Advance on Profits on account of Results for Fiscal 2002

As laid down in section 38 of the Bank's Charter, during 2003 profits were advanced to the Federal Government on account of the future distribution of profits at the end of fiscal 2002 for a total of $ 863,900. These funds  were used in full to repay Temporary Advances (a financing mechanism regulated by Sect. 20 of the Charter), so that such advances were included within the scope contemplated by the monetary program and in international practice applicable to central banks, which recommend making transfers of «realised» profits on the understanding that they should generate only the inverse monetary effect to that generated at the moment they are realised or collected.

### 5.4 Exchange Rate

Subsequent to the end of the year, the exchange rate began to show a downward trend in, with a relatively stable ratio to the peso as from the start of the second quarter, so that at April 23, 2003 the rate stood at $ 2.8378 per US$1. If such a rate were to have been applied to the balances of accounts in foreign currency shown on Exhibit II, the assets of the BCRA would have fallen to $ 104,008,539,  liabilities to $ 91,971,895 and net worth to $ 12,036,644.



Buenos Aires, April 24, 2003.

Board of Directors of the Central Bank of the Argentine Republic
The National Executive Power
The Congress of the Nation

As regular Comptroller for the Central Bank of the Argentine Republic (hereinafter called "the Central Bank") I have reviewed, as described below, the Balance Sheet of the Central Bank, the Income Statements, and the Net Worth Development as of December 31, 2002, and Notes 1 to 4 and Annexes I to V to such Statements. I have signed all such documents for identification purposes only.

On the one hand, this review has been carried out in accordance with the procedures described in the Annex attached hereto, which do not comprise all the tasks necessary to give an opinion on the financial statements as a whole pursuant to the auditing rules in force.

On the other hand, the said above review has been focused on the consistency of relevant information included in the documents described in the first paragraph with the steps adopted by the Board of Directors and management of the Central Bank, and the observance of the Central Bank Charter -Act No. 24,144, as amended- and other rules applicable as regards formal and documentary requirements by such officials.

The item "Public Securities" that appears in the audited financial statements comprises holdings of US Dollar-denominated public securities issued by the National Government. Such holdings are no longer part of international reserves as set forth in the Charter referred to in the foregoing paragraph which solely authorizes the Central Bank to keep a portion of its assets as deposits or other interest-bearing placements with banking entities abroad or in instruments of known creditworthiness and liquidity payable in gold or foreign currency.

The outstanding balance presented in the fiscal year under the item "Temporary Advances to the National Government" has been duly settled on the date of this opinion as required by the Central Bank Charter, which entitles the Central Bank to make temporary advances to the National Government for an amount of up to 10% of its resources in cash collected along the last twelve months, having such funds to be reimbursed in an identical period.

Even though this financial statements have been prepared according to the rules in force during 2002, which sets out inflation adjustment, after they were completed a number of rules have been issued, among which it is important to point out Decree No. 664 dated

1



March 20, 2003 that revoked the last paragraph of Article 10 of Convertibility Act No. 23928, previously introduced by Article 2 of Decree No. 1269 dated July 16, 2002, and replaced Article 4 of said Act, providing that those agencies reporting to the National Executive Power mentioned therein, including the Central Bank, shall provide, within their own jurisdictions, that balance sheets or financial statements submitted before them shall have to meet the requirements of Article 10 of the Act referred to above. The application of such decree has been issued by the General Bureau of Justice through the General Resolution No. 4 adopted on April 16, 2003.

Likewise, the financial statements under analysis include rediscounts and advances granted to financial entities on account of illiquidity at nominal value plus accrued interest. It is worth mentioning that Decree No. 739 dated March 28, 2003 set forth a procedure for the collection of such rediscounts and advances under special circumstances to be voluntarily followed by debtor financial entities.

Article 12 of Act No. 25,561 –Title V- laid out that the National Executive Power would take any necessary steps to exchange those national and provincial securities issued in lieu of our domestic currency. For that purpose, Decree No. 743 – issued on March 28, 2003 - provided for a "Monetary Unification Program" through which such securities will be redeemed and replaced for legal tender.

According to the decree mentioned hereinabove –as amended and further provided by Decree No. 957 issued on April 23, 2003- securities may be redeemed by two procedures (bid and direct redemption) and the Ministry of Economy is empowered to issue public bonds ("Bonos de Gobierno Nacional en Dólares Estadounidenses Libor 2012" or "Bonos del Gobierno Nacional en Pesos 2% 2007"), at nominal value of up to seven thousands and eight hundred million ($7,800,000,000).

As a result of the circulation of such bonds in place for legal tender, the Central Bank was forced to file complaints before the competent authorities (first in 2001 and latter several times along 2002) in accordance with the provisions set forth under Article 32 of the Central Bank Charter.

The provisions referred to in the decrees stated above will allow to assure monetary reunification, the circulation of domestic currency on an exclusive basis, full exercise of the Central Bank authorities as exclusive issuer of banknotes and coins within the Argentine Republic, and, therefore, the fulfillment of the provisions of the National Constitution (Article 75, Subparagraphs 6 and 11) and the relevant legal provisions (Central Bank Charter, Articles 30 and 31).

2



Based on the review performed and the statements made in the foregoing subparagraphs, I have no objections to raise as far as the financial statements described above are concerned, and consequently I advise the Board of Directors for the Central Bank to approve them.

I further inform that I have overseen the observance of the Central Bank Charter and other applicable rules  by the Central Bank, by monitoring the decisions adopted at the Board of Director's meetings I have regularly attended and where I have given my opinion and made recommendations when needed in line with the authorities and duties under Article 36 of said Charter.

Annex

3



ANNEX TO THE REPORT FROM THE CENTRAL BANK COMPTROLLER
DESCRIPTION OF THE MAIN PROCEDURES OF REVIEW
OF THE CENTRAL BANK FINANCIAL ESTATEMENTS
AS OF DECEMBER 31, 2002

1. Read draft opinions from KPMG Finsterbusch Pickenhayn Sibille and the General Audit of the Nation (A.G.N)

2. Have access to any papers from the KPMG Finsterbusch Pickenhayn Sibille and the General Audit of the Nation (A.G.N) corresponding to the External Audit of the referred to statements.

3. Read financial statements.

4. Verify the agreement between the figures appearing in the financial statements and those in the documents evidencing transactions.

5. Have access, as Regular Comptroller, to certain documents, books and evidences of transactions.

6. Attend Board of Director's meetings.

7. Participate in work force meetings between BCRA officials, KPMG Finsterbusch Pickenhayn Sibille and the General Audit Office of the Nation - AGN - on the progress of the work done by the external auditors.

8. Read and review the work programs and reports of the General Audit of BCRA area on financial statements accounts.

9. Read and compare Summary Statements for Assets and Liabilities, daily listings of Reserve and Monetary Liability developments and other accounting information.

10. Control files of debt consolidation under Acts No. 23,982 and 25,344 and take part in Payment Request Forms under Decrees No. 2140/91 and 1116/00, respectively.

11. Follow up and control the performance of the Monetary Program.

4



Translation from the original prepared in Spanish. The accounting principles referred to are those generally accepted in Argentina.

## AUDITOR'S REPORT

To the President and Directors of
Banco Central de la República Argentina
Reconquista 266
Buenos Aires

We have audited the balance sheet of Banco Central de la República Argentina (BCRA) as of December 31, 2002 and the related statements of income, changes in net equity, the notes 1 to 5 and Exhibits I to V for the year then ended, presented with comparatives for the prior year. The preparation of the financial statements is the responsibility of the Bank's Directors. Our responsibility is to express an opinion on the financial statements based on our audit.

Our audit was conducted in accordance with the auditing standards in force in the Republic of Argentina and, where applicable to the particular nature of the Bank's operations, with the "Minimum Auditing Standards for External Auditors" issued by the BCRA. Those standards require that we plan and perform our audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used, the significant estimates made by the Bank's Directors, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

On August 15, 2002, we issued a disclaimer of opinion based on our audit of the financial statements as of December 31, 2001, taken as a whole. The disclaimer was due to the unknown effects as of December 31, 2001 that might have derived from the economic and financial conditions prevailing as of the date the financial statements were issued, which originated from the significant withdrawal of deposits from the financial system and the subsequent restrictions over funds withdrawals imposed in December 2001, the default on the foreign public debt by the National Government and the subsequent devaluation of the Argentine peso, which affected the valuation of the government securities portfolio, the loans to the financial system and the exposure to the National Government as a result of the funds transferred to it for placements from the International Monetary Fund (IMF). However, we issued an unqualified opinion on the following captions: Contributions to International Agencies on behalf of National Government, Monetary Base, Current Accounts in other currencies, National Governments deposits and other, Other Deposits, Due to International Agencies and Provisions considered individually, included in the financial statements.



The events described above have continued generating effects on the financial position of the BCRA and the results of its operations for the year ended December 31, 2002, which cannot be estimated. This is particularly so as a result of the financial position of the National Government in its capacity as debtor of the foreign public debt, as well as that of the financial system, especially those institutions in debt resulting from rediscounts and advances granted during 2001 and early 2002. This situation generates the following uncertainties:

- As described in Notes 4.4.1 and 4.8, the BCRA acts as an intermediary between the National Government and the IMF, by transferring the funds received to the National Government. Based on this operation, there are assets with the National Government in the amount of $ 50,643,756,724 (caption Government Securities, sub-caption Bills issued in relation to the IMF loans of $ 1,483,825,678, and the caption Funds transferred to the National Government for placements from the IMF of $ 49,159,931,046), thus, the liabilities with the IMF amount to $ 52,387,978,097. Although these liabilities, as well as the receivables with the National Government are not overdue as of the date of issuance of these financial statements, the payment by the National Government of such obligations, which mostly become due during 2003, is subject to the future capacity of the National Government to meet its obligations.

- Additionally, as of December 31, 2002, the Bank accounts for loans to the financial system and other credit lines granted prior to the enactment of the BCRA's Charter effective 1992, amounting to $ 17,877,000,817 (captions Loans to the Argentine financial system of $ 17,602,322,066 and Other assets of $ 274,678,751 – Debtors from reverse repo transactions), affected in general by the economic measures described in Note 1. The recoverability of these assets will depend on the appropriate macroeconomic conditions to allow the financial system to repay the obligations as agreed or that such financial aid be settled with the assets delivered as security as indicated in Note 5.1. It should be noted that 85% of the financial aid is guaranteed by national public debt instruments, the recoverability of which, even considering the collateral security margin granted, is subject to the considerations expressed in prior paragraphs in connection with the public sector obligations. Although the Bank has set up allowances they considered necessary on loans to the financial system as indicated in Note 4.6, the uncertainties above do not allow us to conclude as to their reasonableness.

- Finally, at the year-end, the Bank records secured loans – Decree No. 1387/01, in the amount of $ 595,830,930 (caption Other Assets in the amount of $ 7,260,675,733), received from financial institutions as settlement for iliquidity assistance, stated at cost. Although as of the date of issue of these financial statements there are no obligations overdue, the final recovery of such receivables is subject to the future capacity of the National Government to meet its obligations as agreed.

Because of the significant effect that the uncertainties above may have on the financial statements, we are not able to express and, therefore, we do not express an opinion on the financial statements of the BCRA, taken as a whole, as of December 31, 2002.



**Report to the National Congress 2002**                                      **Central Bank of Argentina**

However, in our opinion, the captions included in the financial statements International Reserves in the amount of $ 35,173,395,183, Government securities (excluding Bills issued in relation to IFM loans) in the amount of $ 1,411,427,004, Temporary Advances to fund to Government in the amount of $ 700,000,000, Contributions to international agencies on behalf of the National Government in the amount of $ 5,674,685,110, Other Assets (excluding Secured loans - Decree No. 1387/01 in the amount of $ 595,830,930 and Debtors from reverse repo transactions in the amount of $ 274,678,751) in the amount of $ 6,390,166,052, Monetary Base in the amount of $ 29,151,144,335, Current accounts in other currencies amounting to $ 1,014,072,669, National Government deposits and other in the amount of $ 66,819,524, Other deposits amounting to $ 662,328,273, Due to international agencies  in the amount of $ 52,584,272,091, Securities issued by the BCRA in the amount of $ 3,333,710,329, Other liabilities in the amount of $ 8,285,979,009 and provisions   in   the   amount   of  $ 4,681,871,451, considered individually, included in the financial statements, are fairly valued and disclosed in accordance with Argentine GAAP.

In compliance with legal requirements in force, we report that:

a)   audited financial statements have been prepared based on the accounting records kept by the Bank, which given its legal nature, have not been registered with the Public Registry of Commerce; and

b)   as of December 31, 2002, the accrued liability for retirement and pension contributions arising from the accounting records amounts to $ 2,237,129, no amounts being due as of that date.

The accompanying financial statements are prepared in accordance with accounting principles and practices generally accepted in the Republic of Argentina and may differ in some material respects from financial statements prepared in accordance with accounting principles and practices of other jurisdictions. Accordingly, these financial statements should only be relied upon by those who are familiar with generally accepted accounting principles and practices in the Republic of Argentina.

Buenos Aires, April 24, 2003

FINSTERBUSCH PICKENHAYN SIBILLE

José Alberto Schuster
*Partner*



## NATIONAL AUDITOR'S OFFICE

### AUDIT REPORT

To the President and Directors
of the CENTRAL BANK OF THE ARGENTINE REPUBLIC
Reconquista 266
Buenos Aires

In compliance with the powers vested by Article 118, subparagraph f) of Act 24.156, the NATIONAL AUDITOR'S OFFICE has examined the Accounting Statements of the CENTRAL BANK OF THE ARGENTINE REPUBLIC (B.C.R.A) for the year ended as of December 31, 2002, detailed hereinafter under paragraph 1. Such accounting statements have been prepared and issued by the B.C.R.A's head officers in the exercise of their exclusive powers.

We are responsible for issuing an opinion on said accounting statements based upon our audit examination within the scope established under paragraph 2.

1.  **ACCOUNTING STATEMENTS SUBJECT TO AUDIT**

    **1.1.** General Balance Sheet as of December 31, 2002;
    **1.2.** Statement of Income for the year ended as of December 31, 2002;
    **1.3.** Statement of Net Worth Evolution for the year ended as of December 31, 2002.
    **1.4.** Note 1 through 45, and Annexes I through V that are an integral part of the accounting statements.

The second column contains the Accounting Statements for the year ended as of December 31, 2001 according to note 3.1 to such accounting statements. Our Audit Report dated August 15, 2002 bears a withholding of opinion as a result of substantial uncertainties about the final effects that may arise from the financial and economic crisis the country is undergoing, particularly those related to the possibility of redeeming public securities, and recovering public and private sector financings, regardless of the conversion of profit advances transferred to the National Treasury into assets, without complying with professional accounting standards.

2.  **SCOPE OF THE AUDIT**

Our examination was effected pursuant to audit rules approved by the NATIONAL AUDITOR' OFFICE through Resolution No. 156/93, issued under the powers vested under Article 119, subparagraph d) of Act 24.156, which are consistent with those issued by the ARGENTINE FEDERATION OF ECONOMIC SCIENCE PROFESSIONAL COUNCILS. The above mentioned rules require the auditor to plan and develop his/her task with the purpose of reasonably ensuring the non-existence of untrue statements or substantial mistakes in accounting statements.

1


An audit implies examining, on a selective basis, those elements of judgment that support the information disclosed in the Accounting Statements but it does not purport to find out crimes or intentional irregularities. Furthermore, it includes an assessment of the accounting rules used, the relevant estimations made by the BCRA's head officers and a submission of accounting statements as a whole. We consider that our audit provides us with a reasonable ground for our opinion.

### 3.    PRELIMINARY CLARIFICATIONS TO THE OPINION

3.1. The Argentine Republic is deep in a critical economic and institutional environment, the chief indicators whereof are a high level of external indebtedness, high interest rates, a substantial reduction of deposits, a country-risk which far exceeds usual average and a protracted economic recession, which implies a strong deterioration of debtor's payment capacity. In addition, there has been an important drop in the demand for goods and services and a substantial increase in unemployment.   Liquidity, soundness and profitability of the financial system as a whole has further been impaired.

Under the foregoing framework, and as it has been explained in note 1 to the accounting statements, as from the last few months of Year 2001, the Government took a series of measures that mainly included the exit from the Convertibility regime in force since 1991, a default on public debt services, a devaluation of the Argentine peso, and subsequent exchange rate floating, pesification of foreign currency-denominated assets and liabilities, and curtailment to the free availability of funds deposited with financial entities, and foreign exchange transfer abroad. Up to date, some aspects concerning economic activity, particularly the Financial System and the Public Sector are being defined and/or instrumented, whereas an important number of claims have been filed against the National State and/or financial entities, challenging some of the measures already adopted.

This context gives rise to uncertainties, affecting the balances displayed in the accounting statements as hereunder:

a)       BCRA holds national and provincial public debt securities for a total amount of pesos 1.411.427 net of provision for depreciation in value and Guaranteed Loans of the National state for a total amount of 595.831 thousand pesos as well. In addition, and related to the lending swap transactions made, BCRA has granted loans to domestic financial entities for 274.679 thousand pesos, and, in turn, it is bound to provide them with securities for 296.104 thousand pesos.  Net balances for pending reconciliation entries under Other Assets for an amount of 176.625 thousand pesos shall be added to Assets.

BCRA has extended loans for 17.602.322 thousand pesos to the Argentine financial system, net of bad debts provisioning,  mainly guaranteed with securities and loans issued by the National State. This amount includes a financial aid for illiquidity as rediscount, which, in turn, gives rise to rights and obligations for an amount of 415.246 thousand pesos.



Moreover, BCRA has set up a special provision for an amount for 3.500.000 thousand pesos, accounting for the difference between the nominal value of bonds it expects to receive under B.C.R.A's participation in the Monetary Unification Program, and the market value estimated for similar public securities as displayed in note 4.17. As regards Other Assets not covered by default on public debt services (securities, notes and note-backed loans to the financial sector), BCRA does not record provisions for securities' depreciation in value pursuant to notes 4.6 and 4.9 to the accounting statements.

The following chart displays the items and amounts referred to above, and the notes to the accounting statements disclosing them:

| ITEM AND CONCEPT | AMOUNT in $ (000) | NOTE |
|---|---|---|
| Public Securities net of provision for depreciation in value | 1.411.427 | 4.4; 4.4.2; 4.4.4 |
| Other Assets – Guaranteed Loans- Decree no. 1387/01 | 595.831 | 4.9 |
| Other Assets – Debtors for Lending Swap Transactions | 274.679 | 4.9 |
| Other Liabilities – Obligations for Lending Swap Transactions | 296.104 | 4.16 |
| Other Assets – Sundry Assets (including a thousand pesos 621.463 balance) | 176.625 | 4.9 |
| Loans to the Argentine Financial System (net of provision for bad debts) | 17.602.322 | 4.6 |
| Other Assets – Fees for Illiquidity Rediscounts | 415.246 | 4.9 |
| Other Liabilities – Obligations for guarantees on Illiquidity rediscounts | 415.246 | 4.16 |
| Provisions (Liabilities) | 3.500.000 | 4.17; 5.2 |

b)       As shown in notes 4.4.1, 4.8, and 4.14, BCRA records on the Asset side with a match on the Liability side, a total 50.643.756 thousand pesos as a transfer to the Secretary of Finance resorting to the financial aid granted by the International Monetary Fund to the National Public Sector through the B.C.R.A. as financial agent for the National State. Pursuant to its Charter, BCRA shall charge the amount of the services to be paid on the National Government's account on its behalf and through its orders, and the National Government shall make the necessary funds available to B.C.R.A. the funds required to honour such debt services. At the close of the year, the National Government held deposits with the BCRA for 66.820 thousand pesos – as shown in note 4.12.



As it is hardly possible to foresee either the economic impact of government measures, evolution of the national economy or of the financial system in particular, or its consequences over BCRA's economic and financial position, real final results may differ form assessments and estimations of the account statements detailed in 1, especially of the conditions under which the State shall face its commitments and of the valuation of loans extended to the financial sector. Hence, for the purposes of construing BCRA's accounting statements, it should be borne in mind that the same may not include all the adjustments and reclassifications required to solve the issues mentioned above.

3.2    Pursuant to note 4.9, within the item Other Assets, an amount of 331.300 thousand pesos is included at the end of the financial year as a profit advance transferred by the B.C.R.A to the National Treasury during the 2001 financial year. However, as BCRA's incomes for the fiscal year 2001 showed a negative result, BCRA's head officers decided to allocate said profit advancement to the fiscal year 2002. Along financial year 2002, B.C.R.A advanced profits to the National Treasury for 4.898.567 thousand pesos, allocating them under the item Other Assets at the close of the financial year. Considering the characteristics of the operation, said amounts are not assets under existing accounting rules; hence, the amounts mentioned above are overvalued in BCRA's Assets and Net Worth.

3.3    Annex IV – BCRA's Statement of Cash Flows prepared as described under note 3.1 to accounting statements, partially displays the effects of a change in the purchasing power of currency.

3.4    Accounting rules in force in the Argentine Republic implemented as a basis for the accounting statements audited may differ from the accounting rules existing in other jurisdiction where such accounting statements may be used.

4.    **OPINION**

On the basis of the task performed, and irrespective of the statements made under paragraphs 3.2 and 3.3, we are not in the position to issue, and thereby we do not issue an opinion on the accounting statements of the CENTRAL BANK OF THE ARGENTINE REPUBLIC as a whole, as mentioned under paragraph 1, due to the very substantial effects eventual adjustments and reclassifications required to solve 3.1 assumptions may have on accounting statements.

5    **SPECIAL    INFORMATION    REQUIRED    BY    EXISTING REGULATIONS**

For the purpose of complying with existing regulations, we report as follows:

5.1   The accounting statements mentioned under paragraph 1 arise from the accounting records which, considering the BCRA's juridical nature, are not required to be official approved by the Public Registry of Commerce.



5.2    As of December 31, 2002, debts accrued on behalf of the National Social Security System arising from said records amounted to S2.236.721,43 and are not payable as of that date.

Buenos Aires, April 24, 2003

NATIONAL AUDITOR'S OFFICE
Dr. OSCAR ROMULO FIGUEROA
Public Accountant (U.M)
C.P.C.E.C.F. T° 0109 F° 104

# EXHIBIT "F"

# EXHIBIT "F"

ISI EMERGING MARKETS
www.securities.com
A Euromoney Institutional Investor Company

Project Code: <u>None Selected</u>
Publication: *La Nación – Economía*
Provider: *La Nación*
Date: February 5, 2004

**The Government is protecting itself from attachment.**

It has withdrawn reserves and funds from Banco Nación in New York; is studying post-default payment of bonds by means of trusts.

Once again Argentines have been asked by their leaders to remain calm. This week Alberto Fernández, Cabinet chief, confirmed that the assets of the country are safe from the threat of attachments requested by foreign creditors, a risk that had been growing since the way was cleared last Saturday for claims in the United States.

Reserves of the Central Bank of the Argentine Republic on deposit in New York banks have been withdrawn, funds on deposit in the New York branch of Banco Nación have been repatriated, and salaries of Argentine officials posted to other countries are being deposited in Argentina or paid in the form of cash sent via diplomatic pouch, which has immunity. The presidential plane is avoiding landing in countries where bondholders have called for attachments, including Germany. The Frigate *"Libertad"* is also avoiding ports of these countries.

The Ministry of Economics is paying foreign bondholders of Boden bonds in Argentina. These payments are being made regularly because they concern debt issued after the default in December 2001. A number of measures implemented secretly by this government and its predecessors have already been discovered by bondholders who are suing the country in foreign courts.

A spokesperson for the Ministry of Economics stated that Argentina is not concealing its assets and is participating in the discovery proceeding with creditors in the United States in order to inform them of the assets subject to dispute. A Ministry technical expert declined to reveal how the Government is avoiding attachments, on the grounds that this would "stir up" the plaintiffs.

Argentina has been protecting assets since August 2001, when then-President Fernando de la Rúa and Economics Minister Domingo Cavallo denied the possibility of default. At that time Cavallo ordered Roque Maccarone, then president of the Central Bank, to transfer reserves from the New York branch of Deutsche Bank to the Bank for International Settlements in Basel, Switzerland.

Reserves are protected by sovereign immunity, in the United States and other countries, but Argentina preferred not to run the risk that a judge would attach them on the grounds that in fact they were funds belonging to the Executive Branch rather than to the Central Bank of the Argentina Republic. For this reason they were sent to the Bank for International Settlements, which holds only reserves of the central banks of the entire world, so that there would be no opportunity for confusion. "Our aim is to keep them from putting what is Government money into reserves," Central Bank sources admitted.

The monetary authority thus withdrew all its New York reserves in Deutsche Bank, Citibank, and the Federal Reserve (the central bank of the United States) before and for several months following the default, according to sources speaking for the creditors. Some of it was taken to Buenos Aires. "This is deliberate bankruptcy fraud," declared the attorney for U.S. bondholders. "For this reason we are going to ask Thomas Griesa (the New York judge who is hearing the cases against Argentina) to consider the assets that the country had before the default and to nullify the transfers to Basel," he added.

Some 80% of the Central Bank reserves have been concentrated in the Bank for International Settlements, but the operation has not been without its cost. The interest rate in Basel is 0.125 percentage points lower than the rate paid in private banks in the United States. This means a loss of 130 million pesos in interest in the past two years.

The Kirchner administration is depositing dollars for payments on National State bonds in the local Caja de Valores. Foreign bondholders prefer this system because it ensures payment. The Ministry of Economics is already thinking about how to pay creditors who agree to exchange defaulted debt for new bonds. One option is to send the money to a trust for creditors. "They say that the trust is a vehicle and is not part of the assets of the debtor," explains the attorney for the bondholders.

Multilateral agencies are being paid in Argentina or at the Bank for International Settlements. One of the few attachments has been executed in Italy on a small portion of the 75 million euro loan made to the Government for small and medium-sized companies.

By Alejandro Rebossio

*La Nación* Editorial Staff Member

**Eileen B. Hennessy**

Translator

551 Fifth Avenue, Suite 720                                    Tel. (212) 661-7445
New York, N.Y. 10176-0799                                    Fax (212) 661-7471

### AFFIDAVIT OF ACCURACY

STATE OF NEW YORK          )
CITY OF NEW YORK : ss:
COUNTY OF NEW YORK      )

EILEEN B. HENNESSY, being duly sworn, deposes and says:

That she is a professional translator of the English and Spanish languages and an Adjunct Associate Professor in the Translation Studies Program at New York University, and that she is fully conversant with said languages.

That on or about the 16th day of March 2005, she made the annexed English-language translation of an article on the Argentine debt crisis, published in the newspaper *La Nación* on 5 February 2004.

That to the best of her knowledge and belief, said translation is a true and correct English rendering of the original document in Spanish.

That her professional qualifications are as follows: University studies in both languages, practice of the translation profession since 1964; certification for translation from Spanish into English, granted to her by the American Translators Association after her successful completion of a qualifying examination.

Eileen B. Hennessy

Sworn to before me this
22 day of August 2008

Notary Public

NANCY CAMARGO
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN NEW YORK COUNTY
REG. #01CA6185216
MY COMM. EXP. 04/14/2012

# LANACION·COM
10 años de información confiable en Internet

| Economía
Jueves 5 de Febrero de 2004

La salida del default: estrategias para sortear las demandas contra el país

## El Gobierno se protege de los embargos

**Retiró de Nueva York reservas y fondos del Banco Nación; estudia pagar los bonos posdefault mediante fideicomisos**

A los funcionarios en el exterior se les paga en la Argentina o con valija diplomática El Tango 01 y la Fragata Libertad evitan países donde existen amenazas de embargos

<div style="float:right">

**Temas relacionados**

> Deuda: el G-7 exige al país que negocie "de buena fe"

> Lavagna cree que el FMI aprobará la segunda revisión

</div>

Una vez más los argentinos recibieron un llamado a la tranquilidad de parte de sus gobernantes. Esta semana, el jefe de Gabinete, Alberto Fernández, afirmó que los bienes del país están resguardados de la amenaza de embargos pedidos por acreedores extranjeros, un riesgo creciente desde que el sábado pasado se dio vía libre a los reclamos en Estados Unidos.

Se retiraron reservas del Banco Central (BCRA) que estaban depositadas en bancos de Nueva York, se repatriaron fondos del Banco Nación que estaban en su sucursal neoyorquina y están pagándose los sueldos de funcionarios en el exterior con depósitos en la Argentina o enviándoles el dinero en la llamada valija diplomática, que goza de inmunidad. El avión presidencial evita los aterrizajes en países donde los tenedores de bonos han pedido embargos, como Alemania. La Fragata Libertad también esquiva esos puertos.

El Ministerio de Economía les paga en la Argentina a los tenedores extranjeros de Boden, cuyos vencimientos se abonan con regularidad porque se trata de deuda emitida tras la cesación de pagos de diciembre de 2001. Se trata de una diversidad de medidas que este gobierno y los anteriores han practicado con sigilo, pero que ya han sido advertidas por los bonistas que demandan al país en tribunales foráneos.

Un vocero de Economía afirmó que la Argentina no oculta sus bienes y participa del proceso judicial de *discovery* (descubrimiento) con los acreedores en Estados Unidos para informarles de los bienes sujetos al litigio. Un técnico del ministerio se negó a revelar cómo el Gobierno esquiva los embargos porque "avivaría" a los demandantes.

La Argentina viene protegiendo activos desde agosto de 2001, cuando el entonces presidente, Fernando de la Rúa, y su ministro de Economía, Domingo Cavallo, negaban la posibilidad de default. En aquel entonces Cavallo le ordenó al entonces presidente del Banco Central, Roque Maccarone, que transfiriera reservas desde la sede neoyorquina del Deutsche Bank al Banco Internacional de Pagos (BIP) de Basilea, Suiza.

Las reservas están resguardadas por la inmunidad soberana, incluso en Estados Unidos, pero la Argentina prefirió abortar el riesgo de que un juez las embargara aduciendo que en realidad no pertenecían al BCRA, sino que eran recursos del Ejecutivo. Por eso, las envió al BIP, donde sólo hay reservas de los bancos centrales de todo el mundo y, de ese modo, no se dejó lugar a la confusión. "Nosotros tratamos de que no nos metan en reservas dinero que es del Gobierno", admitieron fuentes del Central.

Así fue cómo la autoridad monetaria retiró todas las reservas que tenía en Nueva York, en el Deutsche Bank, el Citibank y la Reserva Federal (banco central norteamericano), antes del default y en los primeros meses posteriores, según fuentes de los acreedores. Algo se trajo a Buenos Aires. "Es un fraude insolventarse a propósito", advirtió el abogado de tenedores de bonos en

Estados Unidos. "Por eso vamos a pedir a Thomas Griesa (el juez de Nueva York que atiende las demandas contra la Argentina) que considere los bienes que el país tenía antes del default y deje sin efecto las transferencias a Basilea", agregó.

En el BIP ha pasado a concentrarse alrededor del 80% de las reservas del Banco Central, pero la operación ha tenido su costo. En Basilea se paga un 0,125 punto porcentual menos de tasa de interés que en los bancos privados de Estados Unidos. Por lo tanto, se perdieron $ 130 millones de rendimiento en los últimos dos años.

La administración Kirchner está depositando en la Caja de Valores local los dólares por los vencimientos de los Boden y los tenedores del exterior así lo prefieren para asegurarse el cobro. Economía ya está pensando cómo les pagará a los acreedores que acepten el canje de la deuda en default por nuevos bonos. Una opción consiste en enviar el dinero a un fideicomiso de los acreedores. "Dicen que el fideicomiso es un vehículo y está fuera del patrimonio del deudor", explica el abogado de los tenedores.

A los organismos multilaterales se les paga en la Argentina o en el BIP. Uno de los pocos embargos se concretó en Italia contra una partida reducida del crédito de 75 millones de euros al Gobierno para las pymes.

**Por Alejandro Rebossio**
**De la Redacción de LA NACION**

http://www.lanacion.com.ar/04/02/05/de_570271.asp
LA NACION | 05.02.2004 | Página 02 | Economía

Copyright 2004 SA LA NACION | Todos los derechos reservados

# EXHIBIT "G"

# EXHIBIT "G"

Luis Majul

# THE BOSS

The secret history of Néstor Kirchner,
the man who handles
Argentina's
public and private business

Espejo de la Argentina [logo] Planeta

[...]

Lázaro Báez, the other participant in the Dique Seco scandal, was only an acting member of Banco de Santa Cruz's general management team, and did not report to its president, Eduardo Labolida. As a former office boy and cashier since 1991, when he assumed the office of governor, Lázaro enjoyed a fast-track career with the bank.

Báez "was" Kirchner.

Until then he drove a 1972 Ford Falcon. He was married and lived in a modest home located in a residential neighborhood called "499 Viviendas" (see Part Seven: Lázaro, Chapter 1: Lázaro is Kirchner).

As time went by he would become a multimillionaire, a public works entrepreneur, an oil man and, according to the judicial complaint, a member or alleged front man for Kirchner. Another chapter describes how both parties fixed their respective sworn affidavits in order to avoid being investigated by AFIP officers (see Part Three: The Richest President of Argentina, Chapter 1: The Arrangement).

[...]

19

# 2
## The Boss of Santa Cruz

The riddle has been tossed around for some time in the cafes of downtown Río Gallegos, Province of Santa Cruz.

"How does a middle-aged married man with children and without any special gift quickly become a millionaire?"

"There are only three possibilities: he wins the lottery, he receives an unexpected inheritance, or he becomes *Lupo's* friend."

Those who knew Lázaro Antonio Báez before his self-serving meeting with Kirchner placed him in the third category.

Former member of the Frente para la Victoria Santacruceña (FVS), Alejandro Pinto, can attest to the dizzying growth of his wealth.

He still remembers him from the first years of the nineties as a quiet man, weighing forty pounds less than now, with a mustache and clothing worn from use, driving a 1972 Ford Falcon, and not in the greatest physical condition.

Lázaro was born in the Province of Corrientes on February 1, 1956.

He arrived in Santa Cruz when he was six years old, when his father, a Peronista, was forced to leave the province where he was born, run off during the coup against president Arturo Frondizi.

His first job was that of office boy at the province's Banco Nación in 1980.

He wore his hair short like a non-commissioned officer in the Army.

In 1984 he married Norma Beatriz Calismonte, a teacher who worked in public schools.

That same year he purchased his first modest home on credit in the 499, a residential neighborhood developed by the Institute for Housing and Urban Development (IDUV), behind the cemetery and Barrio 366.

His second job was as a cashier with Banco de Santa Cruz, in 1985.

In 1987, Lázaro was still wandering around and Kirchner had already won the mayoralty of Río Gallegos by barely 110 votes. They had to tally them six times.

"Every time they were counted, Néstor would faint," recalled Pinto, because it turns out he was there.

327

Luis Majul

# EL DUEÑO

La historia secreta de Néstor Kirchner,
el hombre que maneja
los negocios públicos y privados
de la Argentina

Espejo de la Argentina ⊜ Planeta

El hombre que fue a visitarlos al hotel no es de las figuras más rutilantes del kirchnerismo, pero en Río Gallegos lo tienen bien registrado.

Se llama Vicente Mayeste y le dicen "Pelado". Con Documento Nacional de Identidad 7.819.361, figura como socio en SIMASA (Ingeniería Sima S.A.), empresa de servicios y transporte de cargas líquidas, incluido petróleo.

El día que Daniel "Mono" Varizat, ex secretario de Gobierno de Santa Cruz, embistió contra una manifestación de docentes lo hizo con una camioneta Grand Cherokee, patente DTX 280, propiedad de la empresa SIMASA. El otro socio en SIMASA es su hermano Miguel, vicepresidente ejecutivo de la Cámara de Comercio, Industrias y Afines de la ciudad. Miguel también corre en Turismo Carretera y se presentó como candidato a intendente en 2007, por uno de los sublemas del Frente para la Victoria (FV).

El Pelado Mayeste no tenía un puesto formal en el Banco de Santa Cruz pero, según Arnold, movía influencias.

Lázaro Báez, el otro participante en el escándalo de Dique Seco, era solo un adscripto a la gerencia general del Banco de Santa Cruz, y no reportaba a su presidente, Eduardo Labolida. Ex cadete y ex cajero desde 1991, cuando asumió como gobernador, Lázaro tuvo en el banco una carrera rápida.

Báez "era" Kirchner.

Hasta ese momento manejaba un Ford Falcon modelo 72, estaba casado y su humilde casa se encontraba en el barrio social llamado "499 viviendas" (véase Séptima Parte: Lázaro, Capítulo 1: Lázaro es Kirchner).

Con el paso del tiempo se transformaría en multimillonario, empresario de la obra pública, petrolero y, según una denuncia judicial, socio o presunto testaferro de Kirchner. En otro capítulo se verá cómo ambos arreglaron sus respectivas declaraciones juradas para evitar ser investigados por los funcionarios de la AFIP (véase Tercera Parte: El Presidente más rico de la Argentina, Capítulo 1: El arreglo).

Ahora volvamos al living del departamento de Cerrito al 1400.

En plena confesión, Torresín le contó a Arnold que su desesperación se debía a dos causas diferentes.

Una era el miedo a ir preso.

El empresario naval habría cometido la "imprudencia" de pagar la gestión de Mayeste con cheques de su cuenta personal. Entonces los agentes de la Dirección General Impositiva (DGI) le estaban pidiendo explicaciones, alertados por el monto de sus gastos particulares.

La otra causa de su zozobra era que le habían "cortado el chorro". Es decir que, de un día para el otro, y cuando llevaba el sesenta por ciento de la obra realizada, las cuotas del crédito dejaron de fluir.

19

## 2
## EL DUEÑO DE SANTA CRUZ

La adivinanza se escucha hace tiempo en los cafés del centro de Río Gallegos, provincia de Santa Cruz.

—¿Cómo hace un hombre maduro, casado, con hijos y sin ningún don especial para transformarse en millonario a toda velocidad?

—Solo hay tres posibilidades: se gana la lotería, recibe una herencia inesperada o se hace amigo de *Lupo*.

A Lázaro Antonio Báez, quienes lo conocieron antes de su encuentro interesado con Kirchner, lo ubican en la tercera categoría.

La ex militante del Frente para la Victoria Santacruceña (FVS) Alejandra Pinto puede dar fe de su vertiginoso crecimiento patrimonial.

Todavía lo recuerda a principios de la década de los noventa, callado, con veinte kilogramos menos que ahora, con bigotes y ropa gastada por el uso, manejando un Ford Falcon modelo 72 y no en excelente estado.

Lázaro nació en la provincia de Corrientes el 1º de febrero de 1956.

Llegó a Santa Cruz a los 6 años, cuando su padre, peronista, tuvo que salir de su provincia natal, corrido por el golpe contra el presidente Arturo Frondizi.

Su primer trabajo fue como cadete en el Banco Nación de la provincia, en 1980.

Usaba el pelo corto como un suboficial del Ejército.

En 1984 se casó con Norma Beatriz Calismonte, una preceptora que trabajaba en la escuela pública.

Ese mismo año se compró, a crédito, su primera y humilde casita en el 499, un barrio social levantado por el Instituto de Desarrollo Urbano y Vivienda (IDUV) detrás del cementerio y el Barrio 366.

Su segundo trabajo fue como cajero del Banco de Santa Cruz, en 1985.

En 1987, Lázaro todavía andaba dando vueltas y Kirchner ya había ganado la intendencia de Río Gallegos por apenas 110 votos. Los tuvieron que sumar seis veces.

—Cada vez que los contaban, Néstor se desmayaba —recordó Pinto, porque justamente estaba ahí.

327



March 28, 2014

I hereby certify that I am a professional translator, that I abide by the Code of Ethics and Professional Practice of the *American Translators Association*, that I am fluent in Spanish and English, that I have employed a team of professional translators, and that we have translated, to the best of our knowledge, the attached document entitled

**Book Excerpt**

From Spanish into English

Signed,

Cathleen Waters

Founder, New World Medium

Translator of French, Spanish, Italian, Portuguese and English

American Translator's Association Membership no. 257918