# EXHIBIT "R"

# EXHIBIT "R"



United States Department of State

*Bureau for International Narcotics and Law Enforcement Affairs*

# International Narcotics Control Strategy Report

## Volume II
## Money Laundering and Financial Crimes

March 2012

# Table of Contents
## Volume II

Common Abbreviations ...................................................................................................... iv
Legislative Basis for the INCSR ........................................................................................ 1
Introduction ........................................................................................................................ 2
**Bilateral Activities**....................................................................................................... 3
Training and Technical Assistance..................................................................................... 3
**Board of Governors of the Federal Reserve System (FRB)**............................... 3
**Department of Homeland Security (DHS)** ........................................................... 4
Immigration and Customs Enforcement (ICE) ................................................................. 4
**Department of Justice**............................................................................................... 6
Drug Enforcement Agency (DEA)...................................................................................... 6
Federal Bureau of Investigation (FBI), .............................................................................. 6
Office of Overseas Prosecutorial Development, Assistance and Training, the Asset Forfeiture and
Money Laundering Section, & Counterterrorism Section (OPDAT, AFMLS, and CTS) ....... 7
**Department of State**................................................................................................... 9
International Law Enforcement Academies (ILEAs).......................................................... 12
**Department of the Treasury**..................................................................................... 14
Financial Crimes Enforcement Network (FinCEN) ........................................................... 14
Internal Revenue Service (IRS), Criminal Investigative Division (CID)............................. 15
Office of the Comptroller of the Currency (OCC) ............................................................. 17
Office of Technical Assistance (OTA).................................................................................. 18
**Federal Deposit Insurance Corporation (FDIC)**................................................. 19
**Treaties and Agreements** ......................................................................................... 20
**Multi-Lateral Organizations & Programs** ........................................................... 22
The Financial Action Task Force (FATF) and FATF-Style Regional Bodies (FSRBs)......... 22
The Organization of American States Inter-American Drug Abuse Control Commission
(OAS/CICAD) Group of Experts to Control Money Laundering......................................... 23
United Nations Global Programme against Money Laundering, Proceeds of Crime, and the
Financing of Terrorism (GPML) ......................................................................................... 25
The Egmont Group of Financial Intelligence Units ........................................................... 27
**Major Money Laundering Countries** ..................................................................... 29
Countries and Jurisdictions Table ...................................................................................... 33
Comparative Table Key ....................................................................................................... 34
Comparative Table............................................................................................................... 36
INCSR Volume II Template Key .......................................................................................... 46
**Countries/Jurisdictions of Primary Concern** ..................................................... 49
Afghanistan .......................................................................................................................... 49
Antigua and Barbuda........................................................................................................... 51
Argentina.............................................................................................................................. 53
Australia................................................................................................................................ 56
Austria .................................................................................................................................. 58
Bahamas ............................................................................................................................... 59

INCSR 2012 Volume II                                    Table of Contents

Belize .................................................................................................................. 61
Bolivia ................................................................................................................ 62
Brazil .................................................................................................................. 64
British Virgin Islands ........................................................................................ 67
Burma ................................................................................................................ 68
Cambodia ........................................................................................................... 71
Canada ............................................................................................................... 73
Cayman Islands ................................................................................................. 75
China, People's Republic of .............................................................................. 77
Colombia ............................................................................................................ 79
Costa Rica ......................................................................................................... 82
Curacao .............................................................................................................. 84
Cyprus ............................................................................................................... 86
Dominican Republic .......................................................................................... 90
France ................................................................................................................ 92
Germany ............................................................................................................ 94
Greece ................................................................................................................ 95
Guatemala ......................................................................................................... 98
Guernsey .......................................................................................................... 100
Guinea-Bissau ................................................................................................. 102
Haiti ................................................................................................................. 104
Hong Kong ....................................................................................................... 105
India ................................................................................................................. 107
Indonesia ......................................................................................................... 110
Iran .................................................................................................................. 112
Iraq .................................................................................................................. 115
Isle of Man ....................................................................................................... 117
Israel ................................................................................................................ 119
Italy .................................................................................................................. 120
Japan ................................................................................................................ 122
Jersey ............................................................................................................... 124
Kenya ............................................................................................................... 127
Latvia ............................................................................................................... 129
Lebanon ........................................................................................................... 132
Liechtenstein ................................................................................................... 135
Luxembourg ..................................................................................................... 136
Macau .............................................................................................................. 138
Mexico .............................................................................................................. 140
Netherlands ..................................................................................................... 142
Nigeria ............................................................................................................. 145
Pakistan ........................................................................................................... 147
Panama ............................................................................................................ 149
Paraguay .......................................................................................................... 151
Philippines ....................................................................................................... 154
Russia .............................................................................................................. 155
Singapore ......................................................................................................... 158
Somalia ............................................................................................................ 160
Spain ................................................................................................................ 162
St. Maarten ...................................................................................................... 165
Switzerland ...................................................................................................... 166
Taiwan ............................................................................................................. 168
Thailand ........................................................................................................... 169
Turkey .............................................................................................................. 172
Ukraine ............................................................................................................ 174
United Arab Emirates ...................................................................................... 176
United Kingdom ............................................................................................... 178

INCSR 2012 Volume II                              Table of Contents

*Uruguay*.................................................................................................................................... *179*
*Venezuela*............................................................................................................................... *182*
*Zimbabwe*............................................................................................................................... *184*

# Common Abbreviations

| | |
|---|---|
| AML | Anti-Money Laundering |
| APG | Asia/Pacific Group on Money Laundering |
| ARS | Alternative Remittance System |
| BCS | Bulk Cash Smuggling |
| CFATF | Caribbean Financial Action Task Force |
| CFT | Counter-terrorist Financing |
| CTR | Currency Transaction Report |
| DEA | Drug Enforcement Administration |
| DHS | Department of Homeland Security |
| DNFBP | Designated Non-Financial Businesses and Professions |
| DOJ | Department of Justice |
| DOS | Department of State |
| EAG | Eurasian Group to Combat Money Laundering and Terrorist Financing |
| EC | European Commission |
| ECOWAS | Economic Community of West African States |
| EO | Executive Order |
| ESAAMLG | Eastern and Southern Africa Anti-Money Laundering Group |
| EU | European Union |
| FATF | Financial Action Task Force |
| FBI | Federal Bureau of Investigation |
| FI | Financial Institution |
| FinCEN | Financial Crimes Enforcement Network |
| FIU | Financial Intelligence Unit |
| FTZ | Free Trade Zone |
| FSRB | FATF-Style Regional Body |
| GABAC | Action Group against Money Laundering in Central Africa |
| GAFISUD | Financial Action Task Force on Money Laundering in South America |

## INCSR 2012 Volume II                    Common Abbreviations

| | |
|---|---|
| GIABA | Inter-Governmental Action Group against Money Laundering |
| IBC | International Business Company |
| ICE | U.S. Immigration and Customs Enforcement |
| ICRG | International Cooperation Review Group |
| IMF | International Monetary Fund |
| INCSR | International Narcotics Control Strategy Report |
| INL | Bureau for International Narcotics and Law Enforcement Affairs |
| IRS | Internal Revenue Service |
| IRS-CID | Internal Revenue Service Criminal Investigative Division |
| MENAFATF | Middle East and North Africa Financial Action Task Force |
| MER | Mutual Evaluation Report |
| MLAT | Mutual Legal Assistance Treaty |
| MONEYVAL | Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism |
| MOU | Memorandum of Understanding |
| NGO | Non-Governmental Organization |
| NPO | Non-Profit Organization |
| OAS | Organization of American States |
| OAS/CICAD | OAS Inter-American Drug Abuse Control Commission |
| OFAC | Office of Foreign Assets Control |
| OFC | Offshore Financial Center |
| OPDAT | Office of Overseas Prosecutorial Development, Assistance and Training |
| OTA | Office of Technical Assistance |
| SAR | Suspicious Activity Report |
| STR | Suspicious Transaction Report |
| TBML | Trade-Based Money Laundering |
| TTU | Trade Transparency Unit |
| UNCAC | United Nations Convention against Corruption |
| UN Drug Convention | 1988 United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances |

INCSR 2012 Volume II                    Common Abbreviations

| UNGPML | United Nations Global Programme against Money Laundering |
| UNODC | United Nations Office for Drug Control and Crime Prevention |
| UNSCR | United Nations Security Council Resolution |
| UNTOC | United Nations Convention against Transnational Organized Crime |
| USAID | Agency for International Development |
| USG | United States Government |

# MONEY LAUNDERING AND FINANCIAL CRIMES

# Legislative Basis for the INCSR

The Money Laundering and Financial Crimes section of the Department of State's International Narcotics Control Strategy Report (INCSR) has been prepared in accordance with section 489 of the Foreign Assistance Act of 1961, as amended (the "FAA," 22 U.S.C. § 2291). The 2012 INCSR is the 29th annual report prepared pursuant to the FAA.[1]

The FAA requires a report on the extent to which each country or entity that received assistance under chapter 8 of Part I of the Foreign Assistance Act in the past two fiscal years has "met the goals and objectives of the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances" ("1988 UN Drug Convention") (FAA § 489(a)(1)(A)).

Although the 1988 UN Drug Convention does not contain a list of goals and objectives, it does set forth a number of obligations that the parties agree to undertake. Generally speaking, it requires the parties to take legal measures to outlaw and punish all forms of illicit drug production, trafficking, and drug money laundering, to control chemicals that can be used to process illicit drugs, and to cooperate in international efforts to these ends. The statute lists action by foreign countries on the following issues as relevant to evaluating performance under the 1988 UN Drug Convention: illicit cultivation, production, distribution, sale, transport and financing, money laundering, asset seizure, extradition, mutual legal assistance, law enforcement and transit cooperation, precursor chemical control, and demand reduction.

In attempting to evaluate whether countries and certain entities are meeting the goals and objectives of the 1988 UN Drug Convention, the Department has used the best information it has available. The 20112 INCSR covers countries that range from major drug producing and drug-transit countries, where drug control is a critical element of national policy, to small countries or entities where drug issues or the capacity to deal with them are minimal. In addition to identifying countries as major sources of precursor chemicals used in the production of illicit narcotics, the INCSR is mandated to identify major money laundering countries (FAA §489(a)(3)(C)). The INCSR also is required to report findings on each country's adoption of laws and regulations to prevent narcotics-related money laundering (FAA §489(a)(7)(C)). This report is the section of the INCSR that reports on money laundering and financial crimes.

A major money laundering country is defined by statute as one "whose financial institutions engage in currency transactions involving significant amounts of proceeds from international narcotics trafficking" (FAA § 481(e)(7)). However, the complex nature of money laundering transactions today makes it difficult in many cases to distinguish the proceeds of narcotics trafficking from the proceeds of other serious crime. Moreover, financial institutions engaging in transactions involving significant amounts of proceeds of other serious crime are vulnerable to narcotics-related money laundering. Additionally, money laundering activity has moved beyond banks and traditional financial institutions to other non-financial businesses and professions and alternative money and value transfer systems. This year's list of major money laundering countries recognizes this relationship by including all countries and other jurisdictions whose

---

[1] The 2012 report on Money Laundering and Financial Crimes is a legislatively mandated section of the U.S. Department of State's annual International Narcotics Control Strategy Report. This 2012 report on Money Laundering and Financial Crimes is based upon the contributions of numerous U.S. Government agencies and international sources. Specifically, the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN), which, as a member of the international Egmont Group of Financial Intelligence Units, has unique strategic and tactical perspective on international anti-money laundering developments. Many other agencies also provided information on international training as well as technical and other assistance, including the following: Department of Homeland Security's Bureau of Immigration and Customs Enforcement; Department of Justice's Asset Forfeiture and Money Laundering Section (AFMLS) of Justice's Criminal Division, Drug Enforcement Administration, Federal Bureau of Investigation, and Office for Overseas Prosecutorial Development Assistance; and, Treasury's Internal Revenue Service, Office of the Comptroller of the Currency, and Office of Technical Assistance. Also providing information on training and technical assistance are the independent regulatory agencies, Federal Deposit Insurance Corporation and the Federal Reserve Board.

financial institutions and/or non-financial businesses and professions or other value transfer systems engage in transactions involving significant amounts of proceeds from all serious crime. A government (e.g., the United States or the United Kingdom) can have comprehensive anti-money laundering laws on its books and conduct aggressive anti-money laundering enforcement efforts but still be classified a major money laundering jurisdiction. In some cases, this classification may simply or largely be a function of the size of the jurisdiction's economy. In such jurisdictions, quick, continuous and effective anti-money laundering efforts by the government are critical. The following countries/jurisdictions have been identified this year in this category:

**Major Money Laundering Countries in 2011:**

**Afghanistan, Antigua and Barbuda, Argentina, Australia, Austria, Bahamas, Belize, Bolivia, Brazil, British Virgin Islands, Burma, Cambodia, Canada, Cayman Islands, China, Colombia, Costa Rica, Curacao, Cyprus, Dominican Republic, France, Germany, Greece, Guatemala, Guernsey, Guinea-Bissau, Haiti, Hong Kong, India, Indonesia, Iran, Iraq, Isle of Man, Israel, Italy, Japan, Jersey, Kenya, Latvia, Lebanon, Liechtenstein, Luxembourg, Macau, Mexico, Netherlands, Nigeria, Pakistan, Panama, Paraguay, Philippines, Russia, Singapore, Somalia, Spain, St. Maarten, Switzerland, Taiwan, Thailand, Turkey, Ukraine, United Arab Emirates, United Kingdom, United States, Uruguay, Venezuela, and Zimbabwe.**

The Money Laundering and Financial Crimes section provides further information on these countries/entities, as required by section 489 of the FAA.

# Introduction

The *2012 International Narcotics Control Strategy Report, Money Laundering and Financial Crimes,* highlights the most significant steps countries and jurisdictions categorized as "Major Money Laundering Countries" have taken to improve their anti-money laundering/counter-terrorist financing (AML/CFT) regimes. The report provides a snapshot of the AML/CFT legal infrastructure of each country or jurisdiction and its capacity to share information and cooperate in international investigations. For each country where they have been completed, the write-up also provides a link to the most recent mutual evaluation performed by or on behalf of the Financial Action Task Force (FATF) or the FATF-style regional body to which the country or jurisdiction belongs. When applicable, relevant country reports also provide links to the Department of State's "Country Reports on Terrorism" so the reader can learn more about issues specific to terrorism and terrorism financing. Providing these links will allow those interested readers to find detailed information on the country's AML/CFT capacity and the effectiveness of its programs.

In addition, the report contains details of United States Government efforts to provide technical assistance and training as well as information on the multilateral organizations we support, either monetarily and/or through participation in their programs. In 2010, USG personnel leveraged their expertise to share their experience and knowledge with over 100 countries. They worked independently and with other donor countries and organizations to provide training programs, mentoring and support for supervisory, law enforcement, prosecutorial, customs and financial intelligence unit personnel as well as private sector entities. We expect these efforts, over time,

will build capacity in jurisdictions that are lacking, strengthen the overall level of global compliance with international standards and contribute to an increase in prosecutions and convictions of those who launder money or finance terrorists or terrorist acts.

Money laundering continues to be a serious global threat. Jurisdictions flooded with illicit funds are vulnerable to the breakdown of the rule of law, the corruption of public officials and destabilization of their economies. The development of new technologies and the possibility of linkages among illegal activities that generate considerable proceeds, transnational criminal organizations, and the funding of terrorist groups only exacerbate the challenges faced by the financial, law enforcement, supervisory, legal and intelligence communities. The continued development of AML/CFT regimes, as reflected in this report, is vital to countering these threats. Political stability, democracy and free markets depend on solvent, stable, and honest financial, commercial, and trade systems. The Department of State's Bureau of International Narcotics and Law Enforcement Affairs looks forward to continuing to work with our U.S. and international partners in furthering this important work and strengthening capacities globally to combat money laundering and the funding of terrorists and terrorism.

# Bilateral Activities

## *Training and Technical Assistance*

During 2011, a number of U.S. law enforcement and regulatory agencies provided training and technical assistance on money laundering countermeasures and financial investigations to their counterparts around the globe. These courses have been designed to give financial investigators, regulators and supervisors, and prosecutors the necessary tools to recognize, investigate, and prosecute money laundering, financial crimes, terrorist financing, and related criminal activity. Courses have been provided in the United States as well as in the jurisdictions where the programs are targeted.

# Board of Governors of the Federal Reserve System (FRB)

An important component in the United States' efforts to combat and deter money laundering and terrorist financing is to verify that supervised financial organizations comply with the U.S. anti-money laundering/combating the financing of terrorism (AML/CFT) laws and have programs in place to comply with the Office of Foreign Assets Control (OFAC) sanctions.

Internationally, the FRB conducted training and provided technical assistance to banking supervisors in AML/CFT tactics in partnership with regional supervisory groups or multilateral institutions in Aruba, India, and Colombia, as well as in Washington, D.C. Countries participating in these FRB initiatives in 2011 were Argentina, Armenia, Aruba, Bahamas, Brazil, British Virgin Islands, Colombia, Curacao, Czech Republic, Ghana, Hong Kong, India, Indonesia, Jamaica, Kuwait, Lebanon, Malaysia, Mauritius, Mongolia, Nigeria, Paraguay, Philippines, Russia, Saudi Arabia, Singapore, Slovakia, Thailand, Trinidad, and Zambia.

INCSR 2012 Volume II        Money Laundering and Financial Crimes

Due to the importance the FRB places on international standards, the FRB's AML experts participate regularly in the U.S. delegation to the Financial Action Task Force (FATF) and the Basel Committee's AML/CFT expert group (AMLEG). The FRB is also an active participant in the U.S. Treasury Department's ongoing Private Sector Dialogue conferences. Staff also meets frequently with industry groups and foreign supervisors to communicate U.S. supervisory expectations and support industry best practices in this area.

# Department of Homeland Security (DHS)

## *Immigration and Customs Enforcement (ICE)*

During Fiscal Year 2011, Homeland Security Investigations (HSI), the investigative arm of the U.S. Department of Homeland Security (DHS), continued its commitment to providing financial investigative training to countries around the world. The HSI Illicit Finance and Proceeds of Crime Unit conducted and/or participated in training provided to over 900 members of foreign law enforcement, regulatory agencies, and bank and trade officials from over 25 nations around the world. Utilizing their broad experience and expertise in conducting international financial investigations, HSI designed the training to provide the attendees with the critical skills necessary to successfully identify and investigate financial crimes. The programs included such topics as an introduction to money laundering, investigating bulk cash smuggling, asset forfeiture, an overview of unlicensed money services business/informal value transfer systems, prepaid access devices, and interviewing techniques.

### *Cross Border Financial Investigations Training Seminar*

The Cross Border Financial Investigation Training (CBFIT) program provides specialized training, technical assistance and best practices related to cross-border financial investigations to foreign law enforcement personnel, intelligence and administrative agencies, and judicial authorities.

CBFIT provides foreign partners with the capability to effectively implement international standards, with special emphasis on new technologies, dissuasive actions, competent authorities, international cooperation, alternative remittance, and cash couriers, among others.

Using primarily U.S. Department of State funding, HSI provided to host nations bilateral and multilateral training and technical assistance which consisted of blocks of training detailing the various aspects of money laundering and sharing of best practices on how to initiate multi-jurisdictional investigations from interdiction incidents. These countries included: Afghanistan, Bolivia, Brazil, Colombia, Dominican Republic, Egypt, Ethiopia, Indonesia, Mexico, Morocco, Panama, Paraguay, Peru, and Saudi Arabia, among others.

Through the U.S. Department of State's International Law Enforcement Academy (ILEA) programs, HSI conducted financial investigations and anti-money laundering training programs at various ILEA Training Centers.

### *Resident Cross Border Financial Investigations Advisor*

HSI Special Agents and Intelligence Analysts have been deployed for extended periods of time to foreign posts to serve as Resident Cross Border Financial Investigations Advisors (R/CBFIA).

The R/CBFIA acts as the point of contact to host nation authorities for the coordination of training sessions. Once training is completed, the R/CBFIA remains available for in–person and/or telephone mentoring of host nation partners related to incidents involving the discovery/interdiction of currency or other financial instruments. This provides the host nation participants the opportunity to employ the material, tactics and technology learned in the classroom in a real world setting, while at the same time having the benefit of the experience, guidance and investigative resources of the R/CBFIA. The R/CBFIA utilizes this knowledge to update training aids/material by incorporating lessons learned from these incidents. In FY 2011, R/CBFIAs were deployed to the Philippines, Paraguay and Argentina.

***Trade Transparency Units***

Trade Transparency Units (TTUs) are designed to help identify significant disparities in import and export trade documentation and identify anomalies related to cross-border trade that are indicative of international trade-based money laundering. Trade is the common denominator in most of the world's alternative remittance systems and underground banking systems. Trade-based value transfer systems have also been used in terrorist financing. TTUs generate, initiate, and support investigations and prosecutions related to trade-based money laundering, the illegal movement of criminal proceeds across international borders, the abuse of alternative remittance systems, and other financial crimes. By sharing trade data, HSI and participating foreign governments are able to see both sides of import and export transactions for commodities entering or exiting their countries, thus assisting in the investigation of international money laundering organizations. The number of trade-based money laundering investigations emerging from TTU activity continues to grow.

The United States established a TTU within DHS/HSI that generates both domestic and international investigations. With funding from the U.S. Department of State, HSI worked to expand the network of operational TTUs beyond Colombia, Brazil, Argentina, Paraguay, Mexico and Panama. In 2011, Ecuador officially became the newest member of the TTU network. As part of this new TTU initiative, HSI provided IT equipment and training as well as increased support to this newly established TTU to ensure its successful development.

In 2011, HSI updated the technical capabilities of existing TTUs and trained new and existing TTU personnel from Brazil, Colombia, Paraguay, Argentina, Mexico, Panama and Ecuador, as well as members of their financial intelligence units. Additionally, HSI strengthened its relationship with the TTUs by deploying temporary and permanent personnel overseas to work onsite and provide hands-on training. These actions have continued to facilitate information sharing between the U.S. Government and foreign TTUs in furtherance of ongoing joint criminal investigations.

***USG and Non-USG Partners***

In FY11, HSI expanded its partnership and collaboration with a number of U.S. Government and non-U.S. Government agencies. HSI collaborated with the Department of Justice (DOJ) Asset Forfeiture and Money Laundering Section as well as DOJ Office of Overseas Prosecutorial Development and Training, the International Judicial Relations Committee, Treasury Office of Technical Assistance and the U.S. Army Western Hemisphere Institute for Security Cooperation. HSI contributed or partnered with these entities to deliver financial investigations best practices to members of the law enforcement community.

HSI maintains a robust relationship with international organizations like the Organization of American States, the United Nations Office on Drugs and Crime and the South America Financial Action Task Force.  HSI provided subject matter expertise during sub-regional workshops held in Costa Rica, Antigua, Ethiopia, Bolivia and Moldova.  The workshops addressed best practices in the implementation of anti-money laundering and counter-financing of terrorism regimes.

# Department of Justice

## *Drug Enforcement Agency (DEA)*

The Drug Enforcement Administration's (DEA's) Office of Financial Operations (FO) provides expert guidance to DEA's domestic and foreign offices as well as international law enforcement agencies regarding issues related to all aspects of financial investigations.  FO works with DEA offices, foreign counterparts and other agencies to identify the financial infrastructure supporting drug trafficking organizations and provides the financial expertise to fully dismantle and disrupt all aspects of these criminal organizations.  FO facilitates cooperation between countries, resulting in the identification and prosecution of drug money laundering organizations as well as the seizure of assets and the denial of revenue.  FO regularly briefs and educates United States diplomats, foreign governmental officials, military and law enforcement counterparts regarding the latest trends in money laundering, narco-terrorism financing, international banking, offshore corporations, international wire transfers of funds and financial investigations.

During 2011, FO conducted numerous international symposiums for hundreds of foreign law enforcement and military counterparts to strategize regarding effective techniques to be utilized in financial investigations.  Some of the foreign officials briefed by FO include representatives from Afghanistan, Australia, Brazil, Dominican Republic, Ecuador, El Salvador, Germany, Italy, Kazakhstan, Netherlands, Nicaragua, Paraguay, Peru, The Philippines, Romania, Saudi Arabia, Sierra Leone, Turkey, United Kingdom, and Uzbekistan.  During 2011, FO conducted seminars in Albania, Bahamas, Belgium, Colombia, Costa Rica, Dominican Republic, Guatemala, Iceland, Kazakhstan, Mexico, Paraguay, Poland, Qatar, Romania, Russia, Sweden, Thailand, Turkey, and Uzbekistan.  In 2011, FO and the Dutch National Police hosted an International Money Laundering Symposium in The Hague, Netherlands.  This symposium was attended by over 110 law enforcement money laundering investigators from 32 countries.  These investigators discussed the money laundering trends they were observing in their jurisdictions and effective law enforcement techniques to counter these trends.  There were also several presentations concerning emerging money laundering trends being used by criminal organizations around the world.

## *Federal Bureau of Investigation (FBI),*

During 2011, with the assistance of the Department of State funding, the U.S. Federal Bureau of Investigation (FBI) continued its extensive international training in combating terrorist financing, money laundering, financial fraud and complex financial crimes, as well as training in conducting racketeering enterprise investigations.  One such training program is the FBI's

INCSR 2012 Volume II        Money Laundering and Financial Crimes

International Training And Assistance Unit (ITAU), located at the FBI academy in Quantico, Virginia. ITAU coordinates with the terrorist financing and operations section of the FBI's counterterrorism division, as well as other divisions at FBI headquarters and in the field, to provide instructors for these international initiatives. FBI instructors, who are most often financial analysts, intelligence analysts, staff operation specialists, operational special agents or supervisory special agents, rely on their experience to relate to the international law enforcement students as peers and partners in the training courses.

The FBI regularly conducts training through the International Law Enforcement Academies (ILEA) in Bangkok, Thailand; Budapest, Hungary; Gaborone, Botswana; and San Salvador, El Salvador. In 2011, the FBI delivered training to 192 students from ten countries at ILEA Budapest. At ILEA Bangkok, the FBI provided training to 47 students from nine countries in the supervisory criminal investigators course. At ILEA Gaborone, the FBI provided training to 161 students from 18 African countries. At ILEA San Salvador, the FBI provided training to 137 students from 19 countries.

Also in 2011, the FBI conducted, jointly with the internal revenue service criminal investigative division, a one-week course on combating terrorist financing and money laundering for 135 international students from Algeria, Pakistan, and Yemen. In addition, the FBI did terrorism investigation training in Thailand, financial crimes training in Trinidad and Tobago, and money laundering training in Serbia and Mexico for 241 international students.

At the FBI academy, the FBI included blocks of instruction on combating terrorist financing and/or money laundering for 29 students participating in the Latin American Law Enforcement Executive Development Seminar; the students were from Chile, Colombia, Costa Rica, Dominican Republic, Guatemala, Nicaragua, Panama, Paraguay, Peru, Spain, Uruguay, and Venezuela. The FBI included similar blocks of instruction for 21 students participating in the Arabic Language Law Enforcement Executive Development Seminar; the students were from Algeria, Egypt, Iraq, Jordan, Kuwait, Morocco, Saudi Arabia, Tunisia and The United Arab Emirates.

In addition, as part of the FBI's pacific training initiative, the FBI included terrorist financing instruction for 50 participants from 13 countries; the students were from Australia, Cambodia, China, Hong Kong, India, Indonesia, Japan, Malaysia, Philippines, Singapore, South Korea, Thailand, and The United States.

## *Office of Overseas Prosecutorial Development, Assistance and Training, the Asset Forfeiture and Money Laundering Section, & Counterterrorism Section (OPDAT, AFMLS, and CTS)*

The U.S. Department of Justice's (DOJ) Asset Forfeiture and Money Laundering Section (AFMLS) of the Criminal Division and the Office of Overseas Prosecutorial Development, Assistance, and Training (OPDAT) continued to join forces in providing Financial Investigations and Prosecutions and Money Laundering and Asset Forfeiture technical assistance programs. The programs also draw upon expertise within DOJ, including from AFMLS, the Counterterrorism Section of the National Security Division (CTS), and U.S. Attorney's Offices. Much of the assistance provided by OPDAT and AFMLS is provided with funding from the U.S.

Department of State.  Funds are also provided by the U.S. Agency for International Development and the Millennium Challenge Corporation.

An important component in this cooperation is OPDAT's Resident Legal Assistance program. Resident Legal Advisors (RLAs) are federal prosecutors who provide in-country technical assistance to improve capacity, efficiency, and professionalism within foreign criminal justice systems.  RLAs are posted to U.S. embassies for a period of one or two years to work directly with counterparts in legal and law enforcement agencies, including ministries of justice, prosecutor's offices, and offices within the judiciary branch.  RLAs provide assistance in legislative drafting, modernizing policies and practices, and training law enforcement personnel, including prosecutors and judges.  RLAs also work with DOJ's International Criminal Investigative Training Assistance Program (ICITAP), other DOJ components, other donors, and multilateral organizations to provide assistance to police and other investigative officials.

In 2011, OPDAT, AFMLS, and CTS met with more than 195 international visitors from more than 17 countries and provided presentations on anti-money laundering (AML) and/or counter-terrorist finance (CFT) topics.  Presentations covered U.S. policies to combat terrorism, U.S. legislation and issues raised in implementing new legislative tools, and the changing relationship of criminal and intelligence investigations.  The meetings also covered money laundering and material support statutes, and the Classified Information Procedures Act.  Of great interest to visitors is the balancing of civil liberties and national security issues, which is also addressed.

*Money Laundering/Asset Forfeiture/Fraud*

In 2011, OPDAT and AFMLS provided training to foreign judges; prosecutors; other law enforcement officials; legislators; customs, supervisory, and financial intelligence unit (FIU) personnel, and private sector participants, and provided assistance in drafting AML statutes compliant with international standards.  Topics addressed include the investigation and prosecution of complex financial crimes, economic crimes, money laundering, and corruption; the use of asset forfeiture as a law enforcement tool; counterfeiting; health care fraud; international mutual legal assistance, and recovering and managing assets from crime and corruption.  Training programs addressing some or all of these topics were held for participants from Egypt, Indonesia, Jordan, Kenya, the Philippines, Turkey, and the United Arab Emirates. Additional programs include the following:

OPDAT and AFMLS co-sponsored the Second Southeast Asia Asset Forfeiture and Financial Investigations Conference, which had 125 participants from 20 countries.  In addition, OPDAT and AFMLS co-sponsored a seminar on the investigation and prosecution of financial crimes in Bangladesh that covered such topics as non-conviction based forfeiture, NGO/charities, hawala/hundi, cash bulk smuggling, and mobile banking.

In Indonesia, OPDAT co-sponsored training to familiarize law enforcement agencies with the provisions of the new anti-money laundering law.  With RLA support, the first of three anti-money laundering centers opened at the University of Indonesia in Jakarta.

In Kenya, the RLA formed an anti-money laundering roundtable to encourage the Kenyan government and its key partners to coordinate efforts among the various entities working on AML issues in Kenya.

OPDAT and AFMLS hosted training for Bosnian judges that provided instruction on Bosnian asset forfeiture law and procedure with a view to increasing the utilization of asset forfeiture by Bosnian judges in criminal proceedings. AFMLS also met with officials who are forming an asset recovery fund and will provide them an asset tracking software funded by AFMLS and developed in Thailand.

***Terrorism/Terrorist Financing***

OPDAT, AFMLS, and CTS, with the assistance of other DOJ components, play central roles in providing technical assistance to foreign counterparts to attack the financial underpinnings of terrorism and to build legal infrastructures to combat it. In this effort, OPDAT, CTS, and AFMLS work as integral parts of the interagency U.S. Terrorist Financing Working Group (TFWG), co-chaired by the State Department's INL Bureau and the Bureau for Counterterrorism.

In 2011, the TFWG supported five RLAs assigned overseas in Bangladesh, Iraq, Kenya, Turkey, and the UAE. The RLA for the UAE is also responsible for OPDAT program activities in Saudi Arabia, Kuwait, Qatar, Jordan, Yemen, Oman, and Bahrain. Working in countries deemed to be vulnerable to terrorist financing, RLAs focus on money laundering and financial crimes and developing counter-terrorism legislation that criminalizes terrorist acts, terrorist financing, and the provision of material support or resources to terrorist organizations. In 2011, OPDAT conducted CFT, counter-terrorism and designation training for participants from Indonesia and Thailand.

Additionally, OPDAT co-sponsored U.S.-based training for Turkish government officials on the benefits of interagency cooperation in counter-terrorism and counter-narcotics to lay the groundwork for a Department of Defense-sponsored, Joint Inter-Agency Counter-Trafficking Center (JICTC) in Turkey and to promote sharing of terrorist and law enforcement data among U.S., Turkish and international law enforcement partners. OPDAT also sponsored a conference in Turkey designed to promote cross-border cooperation between Turkey and Iraq that focused on counter-terror financing and money laundering.

# Department of State

The U.S. Department of State's Bureau of International Narcotics and Law Enforcement Affairs (INL) Office of Anti-Crime Programs helps strengthen criminal justice systems and the abilities of law enforcement agencies around the world to combat transnational criminal threats before they extend beyond their borders and impact our homeland. Through its international programs, as well as in coordination with other INL offices and U.S. Government agencies, the INL Office of Anti-Crime Programs addresses a broad cross-section of law enforcement and criminal justice sector areas including: counternarcotics; drug demand reduction; money laundering; financial crime; terrorist financing; transnational crime; smuggling of goods; illegal migration; trafficking in persons; domestic violence; border controls; document security; corruption; cyber-crime; intellectual property rights; law enforcement; police academy development; and assistance to judiciaries and prosecutors.

## INCSR 2012 Volume II      Money Laundering and Financial Crimes

INL and the State Department's Bureau for Counterterrorism (S/CT) co-chair the interagency Terrorist Finance Working Group (TFWG), and together are implementing a multi-million dollar training and technical assistance program designed to develop or enhance the capacity of a selected group of more than two dozen countries whose financial sectors have been used, or are vulnerable to being used, to finance terrorism.  As is the case with the more than 100 other countries to which INL-funded training was delivered in 2011, the capacity to thwart the funding of terrorism is dependent on the development of a robust anti-money laundering regime. Supported by and in coordination with the U.S. Department of State, U.S. Department of Justice (DOJ), U.S. Department of Homeland Security (DHS), U.S. Department of the Treasury, the Federal Deposit Insurance Corporation, and various nongovernmental organizations, the TFWG provided in 2011 a variety of law enforcement, regulatory and criminal justice programs worldwide.  This integrated approach includes assistance with the drafting of legislation and regulations that comport with international standards, the training of law enforcement, the judiciary and bank regulators, as well as the development of financial intelligence units (FIUs) capable of collecting, analyzing, and disseminating financial information to foreign analogs. Courses and training have been provided in the United States as well as in the jurisdictions where the programs are targeted.

Nearly every federal law enforcement agency assisted in this effort by providing basic and advanced training courses in all aspects of financial criminal investigation.  Likewise, bank regulatory agencies participated in providing advanced AML/CFT training to supervisory entities.  In addition, INL made funds available for the intermittent or full-time posting of legal and financial mentors at selected overseas locations.  These advisors work directly with host governments to assist in the creation, implementation, and enforcement of anti-money laundering, counter-terrorist financing and financial crime legislation.  INL also provided several federal agencies funding to conduct multi-agency financial crime training assessments and develop specialized training in specific jurisdictions to combat money laundering.

The State Department, in conjunction with DHS' Immigration and Customs Enforcement (ICE) and the Department of Treasury, supports seven trade transparency units (TTUs) in Latin America: three in the tri-border area of Brazil, Argentina and Paraguay, and others in Colombia, Ecuador, Mexico, and Panama.  TTUs are entities designed to help identify significant disparities in import and export trade documentation and continue to enjoy success in combating money laundering and other trade-related financial crimes.  Similar to the Egmont Group of FIUs that examines and exchanges information gathered through financial transparency reporting requirements, an international network of TTUs would foster the sharing of disparities in trade data between countries and be a potent weapon in combating customs fraud and trade-based money laundering.  Trade is the common denominator in most of the world's alternative remittance systems and underground banking systems.  Trade-based value transfer systems also have been used in terrorist finance.

The success of the Caribbean Anti-Money Laundering Program led INL to develop a similar type of program for small Pacific island jurisdictions.  Accordingly, INL funded the establishment of the Pacific Island Anti-Money Laundering Program (PALP) in 2005.  The objectives of PALP are to reduce the laundering of the proceeds of all serious crime and the financing of terrorists by facilitating the prevention, investigation, and prosecution of money laundering.  PALP's staff of resident mentors provides regional and bilateral AML/CFT mentoring, training and technical assistance to the 14 Pacific Islands Forum countries that are not members of the Financial Action Task Force (FATF).  The management of the program was transferred to the UN Global Program

against Money Laundering from the Pacific Islands Forum in September 2008, as the PALP began its third year of operation. The PALP completed its work in 2011, following its successful program, as evidenced by the new laws, increased capacity and successful investigations completed by participant jurisdictions.

INL also provided support to the UN Global Program against Money Laundering (GPML) in 2011. In addition to sponsoring money laundering conferences and providing short-term training courses, GPML instituted its mentoring program to provide advisors on a year-long basis to specific countries or regions. GPML mentors provided assistance to Horn of Africa countries targeted by the U.S. East Africa Counterterrorism Initiative as well as asset forfeiture assistance to Namibia, Botswana, and Zambia. The resident mentor based in Namibia initiated and monitored the Prosecutor Placement Program, an initiative aimed at placing prosecutors from the region for a certain period of time within the asset forfeiture unit of South Africa's national prosecuting authority. The GPML mentors in Central Asia and the Mekong Delta continued assisting the countries in those regions to develop viable AML/CFT regimes. GPML continues to develop interactive computer-based programs for distribution, translated into several languages.

INL continues to provide significant financial support for many of the anti-money laundering bodies around the globe. During 2011, INL supported FATF, the international AML/CFT standard setting organization. In addition to sharing mandatory membership dues to FATF and the Asia/Pacific Group on Money Laundering (APG) with the U.S. Department of the Treasury and DOJ, INL is a financial supporter of FATF-style regional bodies' secretariats and training programs, including the Council of Europe's MONEYVAL, the Caribbean Financial Action Task Force (CFATF), the Intergovernmental Action Group against Money-Laundering in West Africa (GIABA), the Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG) and the South American Financial Action Task Force (GAFISUD). In addition to providing funding to GPML to place a residential mentor in Dakar, Senegal, to assist those member states of GIABA that have enacted the necessary legislation to develop FIUs, INL worked with the mentor to determine priorities and develop opportunities and programs. INL also financially supported the Organization of American States (OAS) Inter-American Drug Abuse Control Commission (CICAD) Experts Group to Control Money Laundering and the OAS Counter-Terrorism Committee.

INL has supported anti-piracy efforts by substantively working with other bureaus within DOS as well as with international organizations and other countries, to look at the best way to address piracy through its financial levers – the assets assembled as a result of piracy activity, and the material support and instrumentalities of piracy – and the application of domestic and international instruments to thwart pirates as we do other criminals.

As in previous years, INL training programs continue to focus on both interagency bilateral and multilateral efforts. When possible, we seek participation with our partner countries' law enforcement, judicial and central bank authorities to design and provide training and technical assistance to countries with the political will to develop viable AML/CFT financing regimes. This allows for extensive synergistic dialogue and exchange of information. INL's approach has been used successfully in Africa, Asia, the Pacific, Central and South America, and Eastern Europe. INL also provides funding for many of the regional training and technical assistance programs offered by the various law enforcement agencies, including assistance to the International Law Enforcement Academies.

## *International Law Enforcement Academies (ILEAs)*

The mission of the regional International Law Enforcement Academies (ILEAs) is to support emerging democracies, help protect U.S. interests through international cooperation, and promote social, political and economic stability by combating crime.  To achieve these goals, the ILEA program provides high-quality training and technical assistance, supports institution building and enforcement capability development, and fosters relationships of American law enforcement agencies with their counterparts around the world.  ILEAs also encourage strong partnerships among regional countries to address common problems associated with criminal activity.

The regional ILEAs address regional law enforcement priorities to combat security threats.  The regional ILEAs offer three different types of programs: the core program, specialized courses, and seminars or workshops.  The core program is a six-week series of blocks of instruction tailored to region-specific needs and emerging global threats.  The core program typically includes 50 participants, normally from three or more countries.  The specialized courses are one or two-week courses for law enforcement or criminal justice officials on a specific topic, comprised of about 30 participants.  Lastly, regional seminars or workshops present various emerging law enforcement topics such as transnational crimes, financial crimes, and counter-terrorism.

The ILEAs help to develop an extensive network of alumni who exchange information with their regional and U.S. counterparts and assist in transnational investigations.  Many ILEA graduates become the leaders and decision-makers in their respective law enforcement organizations.  The Department of State coordinates with the Departments of Justice (DOJ), Homeland Security (DHS) and the Treasury, and with foreign government counterparts to implement the ILEA programs.  To date, the combined ILEAs have trained over 38,000 officials from over 85 countries in Africa, Asia, Europe and Latin America.

**Africa.**  ILEA Gaborone (Botswana) opened in 2001.  Its main feature is a six-week intensive professional development program – the Law Enforcement Executive Development Program (LEEDP) – designed for law enforcement mid-level managers.  The LEEDP brings together approximately 40 participants from several nations for instruction in areas such as combating transnational criminal activity, supporting democracy by stressing the rule of law in international and domestic police operations, and overall professional development through enhanced leadership and management techniques.  ILEA Gaborone also offers specialized courses for police and other criminal justice officials to boost their capacity to work with U.S. and regional counterparts.  These courses concentrate on specific methods and techniques in a variety of subjects, such as counter-terrorism, anti-corruption, financial crimes, border security, drug enforcement, and many others.  Instruction is provided to participants from Angola, Botswana, Burundi, Cameroon, Comoros, Djibouti, Ethiopia, Gabon, Ghana, Kenya, Lesotho, Malawi, Mauritius, Mozambique, Namibia, Nigeria, Republic of Congo, Rwanda, Senegal, Seychelles, Sierra Leone, South Africa, Swaziland, Tanzania, Uganda and Zambia.  Trainers from the United States and Botswana provide instruction.  ILEA Gaborone trains approximately 500 students annually.

**Asia.** ILEA Bangkok (Thailand) opened in 1999. ILEA Bangkok focuses on enhancing regional cooperation against transnational crime threats in Southeast Asia, primarily illicit drug trafficking, financial crimes, and human trafficking. The principal objectives of the ILEA are the development of effective law enforcement cooperation within the member countries of the Association of Southeast Asian Nations (ASEAN), Timor Leste and China (including the Special Administrative Regions of Hong Kong and Macau), and the strengthening of each jurisdiction's criminal justice institutions to increase its abilities to cooperate in the suppression of transnational crime. ILEA Bangkok provides a Core course - the Supervisory Criminal Investigator Course (SCIC) - designed to strengthen management and technical skills for supervisory criminal investigators and other criminal justice managers. In addition, it also provides over 20 specialized courses—each lasting one to two weeks—on a variety of criminal justice topics each year. ILEA Bangkok has offered specialized courses on narcotics trafficking, and terrorist financing-related topics such as Complex Financial Investigations (instructed by IRS). Instruction is provided to participants from Brunei, Cambodia, China, Hong Kong, Indonesia, Laos, Macau, Malaysia, Philippines, Singapore, Thailand, Timor Leste and Vietnam. Subject matter experts from the United States, Thailand, Japan, Philippines, Australia and Hong Kong provide course instruction. ILEA Bangkok trains approximately 1,400 students annually.

**Europe.** ILEA Budapest (Hungary) was the first ILEA, established in 1995. The mission of the ILEA has been to support the region's emerging democracies by combating an increase in criminal activity that emerged against the backdrop of economic and political restructuring following the collapse of the Soviet Union. The ILEA provides advanced training for law enforcement and criminal justice officials on regional threats such as organized crime, cybercrime, and anti-money-laundering topics. Instruction is provided to participants from Albania, Armenia, Azerbaijan, Bosnia and Herzegovina, Bulgaria, Croatia, Czech Republic, Georgia, Hungary, Kazakhstan, Kosovo, Macedonia, Moldova, Montenegro, Romania, Russia, Serbia, Slovakia, Slovenia, Tajikistan, Turkmenistan, Turkey, Ukraine and Uzbekistan. Trainers from over 17 federal agencies and local jurisdictions from the United States, Hungary, United Kingdom, Russia, INTERPOL and the Council of Europe provide instruction. ILEA Budapest trains approximately 950 students annually.

**Global.** ILEA Roswell (New Mexico) opened in September 2001. In 2011 INL revised and updated the Roswell program in an effort to address ever emerging global criminal threats. ILEA Roswell, through a combination of academic programs, senior policy forums and model law workshops provides the tools necessary to enable partner countries to formulate and execute effective and responsible criminal justice public policy. The Academic program will equip participants with the knowledge and skills necessary for successful criminal justice careers with a strong focus on constructing an international network of like minded U.S. and foreign counterparts. The Criminal Policy Forum proceedings will focus on familiarizing high-level officials with essential elements to counter emerging criminal threats and on encouraging partner country officials to work inter- and intra-regionally to establish cooperative means to counter criminal activity consistent with international standards. The Model Law programs will engage ILEA partner countries on enhancing their legal and regulatory frameworks, and instilling a deep-seated appreciation for the importance of implementing modern, effective criminal justice legislation. The participants are drawn from pools of ILEA graduates from the Academies in Bangkok, Budapest, Gaborone, San Salvador and the ILEA Regional Training Center (RTC) in Lima. ILEA Roswell trains approximately 350 students annually.

**Latin America.** ILEA San Salvador (El Salvador) opened in 2005. Its training program is similar to the ILEAs in Bangkok, Budapest and Gaborone. It offers a six-week Law Enforcement Management Development Program (LEMDP) for law enforcement and criminal justice officials as well as specialized courses for police, prosecutors, and judicial officials. ILEA San Salvador normally delivers four LEMDP sessions and approximately 20 specialized courses annually, concentrating on international terrorism, illegal trafficking in drugs, alien smuggling, terrorist financing and financial crimes investigations. Segments of the LEMDP focus on terrorist financing (presented by the FBI) and financial evidence/money laundering application (presented by DHS/Federal Law Enforcement Training Center and IRS). Instruction is provided to participants from: Antigua and Barbuda, Argentina, Bahamas, Barbados, Belize, Bolivia, Brazil, Chile, Colombia, Costa Rica, Dominica, Dominican Republic, Ecuador, El Salvador, Grenada, Guatemala, Guyana, Honduras, Jamaica, Mexico, Nicaragua, Panamá, Paraguay, Perú, St. Kitts and Nevis, St. Lucia, St. Vincent, Suriname, Trinidad and Tobago, Uruguay and Venezuela. ILEA San Salvador trains approximately 1,000 students per year.

The **ILEA Regional Training Center** in Lima (Peru) opened in 2007 to complement the mission of ILEA San Salvador. The RTC augments the delivery of region-specific training for Latin America and concentrates on specialized courses on critical topics for countries in the Southern Cone and Andean Regions. The RTC trains approximately 300 students per year.

# Department of the Treasury

## *Financial Crimes Enforcement Network (FinCEN)*

The Financial Crimes Enforcement Network (FinCEN) is a bureau of the U.S. Department of the Treasury and is the U.S. financial intelligence unit (FIU). In 2011, FinCEN hosted representatives from a variety of foreign government agencies, focusing on topics such as money laundering trends and patterns, the Bank Secrecy Act, the USA PATRIOT ACT, communications systems and databases, and case processing. A number of these visitors were participants in the U.S. Department of State's International Visitor Leadership Program.

FinCEN assists new or developing FIUs it is co-sponsoring for membership in the Egmont Group of FIUs. The Egmont Group is comprised of FIUs that cooperatively agree to share financial intelligence and has become a key standard-setting body for FIUs. FinCEN is currently co-sponsoring FIUs from nine jurisdictions for Egmont Group membership: China, Dominican Republic, Ghana, Jordan, Kuwait, Oman, Pakistan, Tanzania and Yemen. As a member of the Egmont Group, FinCEN also works multilaterally through its representative on the Egmont Training Working Group to design, implement, and instruct at Egmont-sponsored training programs for Egmont Group members as well as Egmont candidate FIUs.

FinCEN regularly engages with foreign FIUs to exchange information on operational practices and issues of mutual concern. The participants in these exchanges share ideas, innovations, and insights that lead to improvements in such areas as analysis, information flow, and information security at their home FIUs, in addition to deeper and more sustained operational collaboration. In 2011, FinCEN conducted analyst exchanges with the FIUs of Afghanistan, Brazil, Nigeria, Panama, Paraguay, the Philippines, Russia, and Tanzania.

## *Internal Revenue Service (IRS), Criminal Investigative Division (CID)*

In 2011, Internal Revenue Service, Criminal Investigation (IRS-CI) continued its involvement in international training and technical assistance efforts designed to assist international law enforcement officers in detecting tax, money laundering, and terrorist financing crimes. With funding provided by the U.S. Department of State and other sources, IRS-CI delivered training through agency and multi-agency technical assistance programs to international law enforcement agencies. IRS-CI partnered with several U.S. Government and multilateral organizations, including agencies and offices of the U.S. Departments of State, Justice, Treasury and Homeland Security; the Joint Interagency Task Force West; host country governments; and the IMF to deliver a variety of training.

### *Financial Investigative Techniques Training*

Training primarily consisted of Basic, Intermediate and Advanced Financial Investigative Techniques (FIT) courses which, depending on the venue, focused on indirect methods of proof, an overview of global and regional investigative issues, tax laws, bank records, interviewing, off-shore banking, and/or corporate fraud. In 2011, IRS-CI conducted FIT courses for law enforcement, customs, intelligence, and revenue officers; prosecutors; for the following countries: Albania, Algeria, Australia, Cambodia, Colombia, Denmark, Finland, Hungary, Iceland, Kosovo, New Zealand, Norway, Philippines, Senegal, South Korea, Sweden, and Thailand.

### *Other Training Initiatives*

Funded by the Korean National Tax Service, IRS-CI provided a one week Special Investigative Technique course to 49 participants in South Korea. Topics included investigative tools, undercover operations and forensic accounting.

In Indonesia, 30 participants received training in public corruption and complex financial investigation techniques. This course used various practical exercises to instruct participants in Indonesian case law dealing with money laundering, public corruption and asset recovery. IRS-CI also presented a one week Fraud and Public Corruption course in Thailand for 48 participants from Thailand's financial and anti-corruption units.

IRS-CI presented an organized crime seminar to approximately 40 - 50 Georgian investigators and prosecutors.

Multiple training seminars were presented to investigators, prosecutors and judges in Kosovo. These seminars were part of the ongoing United States Attorney's Office for the Eastern District of North Carolina - Kosovo initiative and their focus was to encourage aggressive investigations, case development, and the use of plea bargaining to develop evidence to resolve cases.

IRS-CI presented three workshops on financial investigations, with an emphasis on money laundering, to a total of 101 Canadian law enforcement officials. IRS-CI also participated in

delivering training to combat terrorism financing and money laundering in Islamabad, Pakistan; Cairo, Egypt; and Johannesburg, South Africa.

Sixty Mexican federal judges, prosecutors, financial intelligence analysts, and investigators attended a one week money laundering course. Another program titled "Using Financial Evidence in Criminal Prosecutions – Illicit Financing and Money Laundering" provided participants information on money laundering, financial investigations, asset forfeiture, and special investigative techniques, with an international scope. Other training included a one week casino gaming conference that assisted the Mexican government in developing best practices for regulating gaming activity and preventing money laundering. A three-day counter-terrorism and money laundering course was also presented to federal prosecutors, investigators, forensic criminalists and representatives from the Mexican financial intelligence unit.

### *International Law Enforcement Academy Training*

IRS-CI provided instructor support to the State Department International Law Enforcement Academies (ILEA).

ILEA Bangkok:  IRS-CI participated in one Supervisory Criminal Investigator Course which included participants from various law enforcement agencies. IRS-CI also conducted two FIT sessions for 93 participants from various law enforcement agencies from the following countries: Brunei, Cambodia, China, Hong Kong, Indonesia, Laos, Macau, Malaysia, Philippines, Singapore, Thailand, and Vietnam. Additionally, a one week Fraud and Public Corruption course was presented to 42 participants from ten countries. The training focused on recognizing methods of bribery and corruption and included two extensive practical exercises.

ILEA Budapest:  IRS-CI participated in delivering five sessions of the ILEA core program. Participating countries included Albania, Bosnia and Herzegovina, Bulgaria, Croatia, Hungary, Kazakhstan, Kosovo, Macedonia, Montenegro, Moldova, Romania, Serbia, Turkey, and Ukraine. IRS-CI also conducted a one week FIT course for 30 law enforcement officials from Croatia, Montenegro, and Serbia.

ILEA Gaborone:  IRS-CI provided instructor support for four Law Enforcement Executive Development (LEED) programs for participants from Botswana, Cameroon, Republic of the Congo, Gabon, Ghana, Kenya, Lesotho, Malawi, Namibia, Nigeria, Rwanda, Senegal, Seychelles, Sierra Leone, Swaziland, and Tanzania. IRS-CI supplied the class coordinator for LEED 39. The coordinator organized and supervised the participants' daily duties and activities.

ILEA San Salvador:  IRS-CI assisted in the delivery of four courses for the Law Enforcement Management Development Programs (LEMDP) that stress the importance of conducting a financial investigation to further develop a large scale criminal investigation. Participants were from Antigua, Argentina, Barbados, Belize, Brazil, Chile, Colombia, Costa Rica, Dominican Republic, El Salvador, Guatemala, Honduras, Jamaica, Panama, Paraguay, Peru, St Lucia, and Trinidad and Tobago. For LEMDP 20, IRS-CI provided the class coordinator. IRS-CI also led two one week FIT/Money Laundering courses. The 65 participants were members of their respective national police agencies and prosecutors' offices. The FIT course provided an overview of global and regional investigative issues using a highly interactive simulated investigation.

INCSR 2012 Volume II        Money Laundering and Financial Crimes

*Non-routine Training Events*

The International Training Team (ITT) hosted two foreign delegations.  Representatives from the Ugandan Revenue Authority and the Indian Central Board of Taxation toured the Federal Law Enforcement Training Center (FLETC).  The delegations received an overview of Special Agent Basic Training and law enforcement techniques, plus briefings from other divisions at the FLETC.

The ITT completed two course development projects.  Representatives from Norway and Denmark met at the FLETC to design and develop the Nordic Financial and Organized Crimes course.  In Cambodia, the ITT met with banking, financial, law enforcement and judicial officials to assist in the development of Cambodian-specific course material.

ITT also participated in various overseas activities.  At the Organization for Economic Cooperation and Development's Tax and Crime Conference, ITT provided a guest speaker on money laundering and bribery awareness.  In Budapest, Hungary, IRS-CI met with Hungarian tax and customs officials to discuss future training initiatives.

## *Office of the Comptroller of the Currency (OCC)*

The U.S. Department of the Treasury's (Treasury's) Office of the Comptroller of the Currency (OCC) charters, regulates and supervises all national banks and federal savings associations in the U.S.  Its goal is to ensure these institutions operate in a safe and sound manner and comply with all consumer protection and anti-money laundering laws and implementing regulations.  In 2011, the agency sponsored several initiatives to provide anti-money laundering/counter-financing of terrorism (AML/CFT) training to foreign banking supervisors.  These initiatives include its annual AML/CFT School, which is designed specifically for foreign banking supervisors to increase their knowledge of money laundering and terrorist financing typologies and improve their ability to examine for and enforce compliance with national laws.  The 2011 school was attended by foreign supervisors from Australia, Brazil, Canada, India, Indonesia, Italy, Korea, Malaysia, Netherlands, Philippines, Turkey, Taiwan and Zambia.  In addition to organizing and conducting the School, OCC officials also met individually, both in the U.S. and overseas, with representatives from foreign law enforcement authorities, financial intelligence units and AML/CFT supervisory agencies to discuss the U.S. AML/CFT regime, the agency's risk –based approach to AML/CFT supervision, examination techniques and procedures, and enforcement actions.

The OCC continued its industry outreach efforts to the international banking community during 2011 by participating with other federal banking agencies in regulator panels at the 10th Annual International Anti-Money Laundering Conference (ACAMS) which was attended by more than 1,000 AML professionals from 50 countries and the Institute of International Bankers Annual Anti-Money Laundering Seminar which hosted attendees from 30 countries.  The agency also participated in a similar panel at the Florida International Bankers Association (FIBA)'s Annual AML Compliance Conference.  FIBA draws its membership from 18 countries worldwide.

The OCC also participated in Treasury's 2011 Private Sector Dialog which brings together Latin American and U.S. bankers to discuss issues related to AML compliance and an AML/CFT

conference organized by the Asociación de Bancos de México (ABM). This discussion focused on the U.S AML regime and approach to conducting supervisory examinations.

## *Office of Technical Assistance (OTA)*

OTA is part of the Treasury Department and is comprised of five subject-matter teams focused on technical assistance to governments to promote financial sector reforms. The mission of the Economic Crimes Team (ECT) is to provide technical assistance in support of the development of anti-money laundering/counter-terrorist financing (AML/CFT) regimes. In that context, the ECT also addresses other financial and predicate crimes, including corruption and organized crime. The ECT mission entails a comprehensive approach to technical assistance, and its engagements are predicated on express requests from foreign government counterparts. ECT management conducts an on-site assessment of the jurisdiction, to consider not only non-compliance with international standards and the corresponding need for technical assistance, but also willingness by the counterpart to engage in a partnership with the ECT to address those deficiencies.

An engagement by the ECT is tailored to the specific conditions of the jurisdiction in which it is engaged. An ECT engagement may involve placement of a Resident Advisor or utilize Intermittent Advisors, under the coordination of a Team Leader. The nature of ECT technical assistance is broad and can include efforts to improve (i) the legal framework; (ii) technical competence of stakeholders; and (iii) awareness-raising aimed at the full range of AML/CFT stakeholders to include the public, legislative bodies and implementers. The range of training provided by the ECT is equally broad and includes financial investigative techniques; forensic accounting; financial analytic techniques; cross-border currency movement and trade-based money laundering; supervisory techniques; electronic evidence collection; the use of interagency task forces; and measures to address corruption as well as organized crime.

The ECT is divided along three regions -- Europe and Asia, Africa and the Middle East, and Latin America and the Caribbean -- each managed by a Regional Advisor. In 2011, the ECT delivered technical assistance programs in 25 jurisdictions. In the Western Hemisphere, the ECT operated Resident Advisor programs in Costa Rica, Guatemala, Haiti, Honduras, Mexico and Paraguay; an Intermittent Advisor program in Uruguay; and initiated programs in Guyana as well as Trinidad and Tobago. Highlights for 2011 include a successful, ongoing regional initiative in Central America aimed at international cooperation, particularly pertaining to asset forfeiture.

In Africa and the Middle East in 2011, the ECT operated Resident Advisor Programs in Botswana, Ghana, Iraq, Morocco and the Palestinian Authority; Intermittent Advisor programs in Saudi Arabia as well as Sao Tome and Principe; and conducted an assessment in Djibouti. Program highlights include support for the development of financial intelligence units (FIUs), particularly in Botswana, Ghana, Morocco and the Palestinian Authority. In Iraq, the ECT program focused its partnership on the Iraqi Commission on Integrity and the interplay among corruption, money laundering and asset recovery.

Likewise, in Europe and Asia in 2011, the ECT operated Resident Advisor programs in Afghanistan, Kosovo and the Mekong Region (Cambodia, Lao, Viet Nam); initiated an Intermittent Advisor program in Turkmenistan; and continued other Intermittent Advisor

programs in Armenia, Azerbaijan and Georgia. Particular attention was focused on FIU and financial investigative skills development.

OTA receives direct appropriations funding from the U.S. Congress. Additional funding sources include the U.S. State Department, Bureau of International Narcotics and Law Enforcement Affairs; the U.S. Agency for International Development; U.S. Embassies; and the Millennium Challenge Corporation, among others.

# Federal Deposit Insurance Corporation (FDIC)

In 2011, the Federal Deposit Insurance Corporation (FDIC) continued to work in partnership with several Federal agencies and international groups to combat money laundering and inhibit the flow of terrorist funding. These efforts were focused primarily on training and outreach initiatives. In partnership with the U.S. Department of State, the FDIC hosted an anti-money laundering and counter-terrorist financing (AML/CFT) training session for 27 representatives from Ethiopia, Ghana, Kenya, Nigeria, and Tanzania. The training session addressed current trends and methodologies, the AML examination process, suspicious activity monitoring, customer due diligence, and foreign correspondent banking risks and controls.

During the year, the FDIC met with 20 supervisory and law enforcement representatives from Pakistan and the United Arab Emirates to discuss AML issues. Topics included examination policies and procedures, the USA PATRIOT Act, suspicious activity reporting requirements, and government information sharing mechanisms.

# Treaties and Agreements

*Treaties*

Mutual Legal Assistance Treaties (MLATs) allow generally for the exchange of evidence and information in criminal and related matters. In money laundering cases, they can be extremely useful as a means of obtaining banking and other financial records from our treaty partners. MLATs, which are negotiated by the Department of State in cooperation with the Department of Justice to facilitate cooperation in criminal matters, are in force with the following countries: Antigua & Barbuda, Argentina, Australia, Austria, the Bahamas, Barbados, Belgium, Belize, Brazil, Canada, Cyprus, Czech Republic, Dominica, Egypt, Estonia, France, Germany, Greece, Grenada, Hong Kong, Hungary, India, Ireland, Israel, Italy, Jamaica, Japan, Latvia, Liechtenstein, Lithuania, Luxembourg, Malaysia, Mexico, Morocco, the Kingdom of the Netherlands (including Aruba, Bonaire, Curacao, Saba, St. Eustatius and St. Maarten), Nigeria, Panama, Philippines, Poland, Romania, Russia, St. Lucia, St. Kitts & Nevis, St. Vincent & the Grenadines, South Africa, South Korea, Spain, Sweden, Switzerland, Thailand, Trinidad & Tobago, Turkey, Ukraine, United Kingdom (including the Isle of Man, Cayman Islands, Anguilla, British Virgin Islands, Montserrat and Turks and Caicos), Uruguay, and Venezuela. In addition, on February 1, 2010, 27 U.S.-EU Instruments/Agreements/Protocols entered into force that either supplement existing MLATs or create new mutual legal assistance relationships between the United States and every member of the EU. Mutual legal assistance agreements have been signed by the United States but not yet brought into force with the following countries: Algeria, Bermuda, and Colombia. The United States is engaged in negotiating additional MLATs with countries around the world. The United States also has signed and ratified the Inter-American Convention on Mutual Legal Assistance of the Organization of American States, the United Nations Convention against Corruption, the United Nations Convention against Transnational Organized Crime, the International Convention for the Suppression of the Financing of Terrorism, and the 1988 UN Drug Convention.

*Agreements*

In addition to MLATs, the United States has a Mutual Legal Assistance Agreement (MLAA) with China, as well as a MLAA between the American Institute in Taiwan and the Taipei Economic and Cultural Representative Office in the United States. The United States also has entered into a few executive agreements on forfeiture cooperation, including: an agreement with the United Kingdom providing for forfeiture assistance and asset sharing in narcotics cases; a forfeiture cooperation and asset sharing agreement with the Kingdom of the Netherlands; and a drug forfeiture agreement with Singapore. The United States has asset sharing agreements with Canada, the Cayman Islands (which was extended to Anguilla, British Virgin Islands, Montserrat, and the Turks and Caicos Islands), Colombia, Ecuador, Jamaica, Mexico, and Monaco.

Treasury's Financial Crimes Enforcement Network (FinCEN) has either a Memorandum of Understanding (MOU) or an exchange of letters in place with the financial intelligence units (FIUs) of many countries to facilitate the exchange of information between FinCEN and the respective country's FIU. FinCEN has an MOU or an exchange of letters with the FIUs in Albania, Argentina, Aruba, Australia, Belgium, Bermuda, Brazil, Bulgaria, Canada, Cayman Islands, Chile, Croatia, Cyprus, Egypt, France, Fiji, Guatemala, Indonesia, Israel, Italy, Japan, Macedonia, Malaysia, Malawi, Mauritius, Mexico, Montenegro, Moldova, the Netherlands, Nigeria, Panama, Paraguay, Philippines, Poland, Romania, Russia, San Marino, Saudi Arabia,

Senegal, Serbia, Singapore, Slovenia, South Africa, South Korea, Spain, the Money Laundering Prevention Commission of Taiwan and the United Kingdom.

### Asset Sharing

Pursuant to the provisions of U.S. law, including 18 U.S.C. § 981(i), 21 U.S.C. § 881(e)(1)(E), and 31 U.S.C. § 9703(h)(2), the Departments of Justice, State, and Treasury have aggressively sought to encourage foreign governments to cooperate in joint investigations of narcotics trafficking and money laundering, offering the possibility of sharing in forfeited assets. A parallel goal has been to encourage spending of these assets to improve narcotics-related law enforcement. The long term goal has been to encourage governments to improve asset forfeiture laws and procedures so they will be able to conduct investigations and prosecutions of narcotics trafficking and money laundering that includes asset forfeiture. To date, Antigua, the Bahamas, Canada, Cayman Islands, Hong Kong, Jersey, Liechtenstein, Luxembourg, Singapore, Switzerland, and the United Kingdom have shared forfeited assets with the United States.

From 1989 through 2011, the international asset sharing program, administered by the Department of Justice, shared $235,925,145 with 38 foreign governments that cooperated and assisted in investigations. In 2011, the Department of Justice agreed to transfer $2,602,211 in forfeited proceeds to the Government of the Swiss Confederation, and $276,950 in forfeited proceeds to the Government of the Bahamas. Prior recipients of shared assets include: Anguilla, Antigua and Barbuda, Argentina, the Bahamas, Barbados, British Virgin Islands, Canada, Cayman Islands, Colombia, Costa Rica, Dominican Republic, Ecuador, Egypt, Germany, Greece, Guatemala, Guernsey, Honduras, Hong Kong, Hungary, Indonesia, Isle of Man, Israel, Jordan, Liechtenstein, Luxembourg, Mexico, Netherlands Antilles, Panama, Paraguay, Peru, Romania, South Africa, Switzerland, Thailand, Turkey, the United Kingdom, and Venezuela.

From Fiscal Year (FY) 1994 through FY 2011, the international asset-sharing program administered by the Department of Treasury shared $30,478,024 with foreign governments that cooperated and assisted in successful forfeiture investigations. In FY 2011, the Department of Treasury transferred $54,561 in forfeited proceeds to Canada, and $132,000 to the Philippines. Prior recipients of shared assets include: Aruba, Australia, the Bahamas, Brazil, Cayman Islands, China, Dominican Republic, Egypt, Guernsey, Honduras, Isle of Man, Japan, Jersey, Mexico, Netherlands, Nicaragua, Palau, Panama, Portugal, Qatar, St. Vincent & the Grenadines, Switzerland, the United Kingdom and Vietnam.

# Multi-Lateral Organizations & Programs

## *The Financial Action Task Force (FATF) and FATF-Style Regional Bodies (FSRBs)*

### *The Financial Action Task Force (FATF)*
The Financial Action Task Force (FATF), created in 1989, is an inter-governmental body whose purpose is the development and promotion of national and international policies to combat money laundering and terrorist financing. The FATF currently has 36 members, comprising 34 member countries and territories and two regional organizations, as follows: Argentina, Australia, Austria, Belgium, Brazil, Canada, China, Denmark, Finland, France, Germany, Greece, Hong Kong, Iceland, India, Ireland, Italy, Japan, Luxembourg, Mexico, The Kingdom of the Netherlands (includes the Netherlands, Aruba, Curacao and Saint Maarten), New Zealand, Norway, Portugal, Republic of Korea, Russian Federation, Singapore, South Africa, Spain, Sweden, Switzerland, Turkey, United Kingdom, the United States, the European Commission and the Gulf Cooperation Council.

There are also a number of FATF-style regional bodies that, in conjunction with the FATF, constitute an affiliated global network to combat money laundering and the financing of terrorism.

### *The Asia/Pacific Group on Money Laundering (APG)*
The Asia/Pacific Group on Money Laundering (APG) was officially established in February 1997. The 41 APG members are as follows: Afghanistan, Australia, Bangladesh, Bhutan, Brunei Darussalam, Burma, Cambodia, Canada, China, Cook Islands, Fiji, Hong Kong, India, Indonesia, Japan, Laos, Macau, Malaysia, Maldives, Marshall Islands, Mongolia, Nauru, Nepal, New Zealand, Niue, Pakistan, Palau, Papua New Guinea, Philippines, Samoa, Singapore, Solomon Islands, South Korea, Sri Lanka, Taiwan, Thailand, Timor Leste, Tonga, United States, Vanuatu, and Vietnam. Bhutan joined the APG in July 2011.

### *The Caribbean Financial Action Task Force (CFATF)*
The Caribbean Financial Action Task Force (CFATF) was established in 1992. CFATF has 29 members: Anguilla, Antigua & Barbuda, Aruba, The Bahamas, Barbados, Belize, Bermuda, British Virgin Islands, Cayman Islands, Curacao, Dominica, Dominican Republic, El Salvador, Grenada, Guatemala, Guyana, Haiti, Honduras, Jamaica, Montserrat, Nicaragua, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Vincent & the Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos Islands, and Venezuela.

### *The Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL)*
The Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL) was established in 1997 under the acronym PC-R-EV. MONEYVAL is comprised of 28 permanent members; two temporary, rotating FATF members; and two active observers. The permanent members are Albania, Andorra, Armenia, Azerbaijan,

Bosnia and Herzegovina, Bulgaria, Croatia, Cyprus, Czech Republic, Estonia, Georgia, Hungary, Latvia, Liechtenstein, Lithuania, Macedonia, Malta, Moldova, Monaco, Montenegro, Poland, Romania, Russian Federation, San Marino, Serbia, Slovak Republic, Slovenia, and Ukraine. The active observers are the Holy See and Israel. Temporary members, designated by the FATF for a two-year membership, are currently Austria and France. The Holy See became an active observer to MONEYVAL in April 2011.

### The Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG)
The Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG) was established in 1999. Fifteen countries comprise its membership: Botswana, Comoros, Kenya, Lesotho, Malawi, Mauritius, Mozambique, Namibia, Seychelles, South Africa, Swaziland, Tanzania, Uganda, Zambia, and Zimbabwe. Comoros joined ESAAMLG in 2011.

### The Eurasian Group on Combating Money Laundering and Financing of Terrorism (EAG)
The Eurasian Group on Combating Money Laundering and Financing of Terrorism (EAG) was established in 2004, and has nine members: Belarus, China, India, Kazakhstan, Kyrgyzstan, Russia, Tajikistan, Turkmenistan and Uzbekistan.

### The Financial Action Task Force on Money Laundering in South America (GAFISUD)
The Financial Action Task Force on Money Laundering in South America (GAFISUD) was formally established in 2000. The 12 GAFISUD members are: Argentina, Bolivia, Brazil, Chile, Colombia, Costa Rica, Ecuador, Mexico, Panama, Paraguay, Peru and Uruguay.

### Inter-Governmental Action Group against Money Laundering in West Africa (GIABA)
The Inter-Governmental Action Group against Money Laundering in West Africa (GIABA) was formally established in 1999. GIABA consists of 15 countries: Benin, Burkina Faso, Cape Verde, Côte d'Ivoire, The Gambia, Ghana, Guinea, Guinea-Bissau, Liberia, Mali, Niger, Nigeria, Senegal, Sierra Leone, and Togo.

### The Middle East and North Africa Financial Action Task Force (MENAFATF)
The Middle East and North Africa Financial Action Task Force (MENAFATF) was formally established in 2004. MENAFATF has 18 members: Algeria, Bahrain, Egypt, Iraq, Jordan, Kuwait, Lebanon, Libya, Mauritania, Morocco, Oman, Qatar, Saudi Arabia, Sudan, Syria, Tunisia, United Arab Emirates, and Yemen.

## The Organization of American States Inter-American Drug Abuse Control Commission (OAS/CICAD) Group of Experts to Control Money Laundering

The Organization of American States, through the Inter-American Drug Abuse Control Commission (CICAD/OAS) under the Secretariat for Multidimensional Security, is responsible for addressing illicit drug trafficking and related crimes, including money laundering. CICAD's training programs seek to improve and enhance the knowledge and capabilities of judges, prosecutors, public defenders, law enforcement agents, and financial intelligence unit (FIU) analysts to detect, investigate and prosecute these crimes. In 2011, CICAD continued its activities throughout Latin America and the Caribbean. The U.S. Department of State, through

INCSR 2012 Volume II      Money Laundering and Financial Crimes

its Bureau of International Narcotics and Law Enforcement Affairs (INL), provided full or partial funding for many CICAD training activities.

### Expert Group

The Expert Group on the Control of Money Laundering (the Expert Group), comprised of legal and law enforcement specialists appointed by member states, met twice in 2011. It has two working groups; the first, coordinated by Costa Rica, deals with the seizure, forfeiture, and management of assets. The second, coordinated by Chile, deals with the coordination and integration of law enforcement agencies and FIUs. In accordance with the 2010–2011 work plan, the first working group set two priority topics: developing internal guidelines for requesting mutual legal assistance, and asset location, identification and recovery; and preparing a study on the latest legislative and administrative developments on seizure and forfeiture systems in the Americas. The second working group focused on: compiling open-access information sources for preliminary financial identification of suspected money launderers; and developing a strategic planning process for the Expert Group.

### Seized and Forfeited Assets

Building on a two-year pilot phase in Argentina, Chile and Uruguay, CICAD's Seized and Forfeited Assets Management Program of Latin America (BIDAL, from the Spanish acronym) project shifted to a different regional focus, working with the governments of the Dominican Republic and El Salvador to implement asset recovery management programs by harmonizing and strengthening procedures for the administration of seized and forfeited assets. In August, the first national workshop took place in El Salvador.

The BIDAL project also developed reference documents, including "Best Practices Manual on the Management of Seized and Forfeited Assets" and "Asset Management Systems in Latin America," addressing the evolution of the legal concept of confiscation and asset recovery agencies in Europe, and the study of comparative law of property management systems in America. Additionally, working with the Expert Group, the BIDAL project team sponsored an amendment to Article 9 of the CICAD/OAS Model Regulations Concerning Laundering Offenses Connected to Drug Trafficking and Other Serious Offenses, with regard to the confiscation of abandoned or unclaimed property. These documents were collected in a publication that was distributed to member states.

CICAD's Anti-Money Laundering Section developed and implemented coursework on the maintenance, protection and disposition of seized and forfeited assets, which aims to improve the knowledge and technical capabilities of officials who conduct financial and capital investigations and take part in forfeiture proceedings, and management and allocation of assets of illicit origin. In the second half of 2011, CICAD held the first workshops in Argentina and Panama.

### Capacity Building

The Anti-Money Laundering Section organized 13 seminars and workshops in 12 countries in 2011, training 456 judges, prosecutors, public solicitors, law enforcement officers, FIU analysts and forfeited asset administration officers, among other participants. It collaborated with the United Nations Office on Drugs and Crime (UNODC), the Financial Action Task Force on Money Laundering in South America (GAFISUD), the Ministry of Interior of the Government of Spain and the U.S. Department of State, as well as the OAS' Inter-American Committee Against Terrorism (CICTE) and the governments of CICAD member states.

CICAD also coordinated with the UNODC Legal Assistance Program for Latin America and the Caribbean, INTERPOL, and GAFISUD in setting up GAFISUD's Asset Recovery Network as an instrument for exchanging information about the identification and recovery of assets or products of transnational illicit activities.

Backed by UNODC, the Government of Spain, the Inter-American Development Bank and INL, the Anti-Money Laundering Section continued using its methodology of mock investigations and trials to prepare judges, prosecutors, public solicitors, police investigators and financial analysts to handle complicated money laundering cases.  It organized events in Colombia, Dominican Republic, El Salvador, Panama, Paraguay, and Peru in 2011.

Funded by INL, among others, CICAD, CICTE and UNODC organized three regional counter-terrorism financing workshops for legislators, prosecutors, police and financial analysts in Costa Rica (participants from six countries), Colombia (five countries) and Uruguay (nine countries).  CICAD, CICTE and the United Nations conducted a legislative assistance mission to the Commonwealth of Dominica, which organized a one-day training workshop on combating the financing of terrorism and technical assistance to the Government of Dominica.

Throughout 2011, CICAD and the INL Narcotics Affairs Section in Lima continued a program to strengthen the main law enforcement agencies and courts that deal with money laundering in Peru (judges, prosecutors, public solicitors, law enforcement officers, banking regulators and FIU analysts, among others).  The program concentrated on developing an integrated curriculum for multiple agencies and reaching personnel posted outside the capital of Lima.  The training focused on mastering the latest techniques and tools for investigating and prosecuting cases (in particular, special investigative techniques, incriminating evidence, and financial links and relationships analysis).

## United Nations Global Programme against Money Laundering, Proceeds of Crime, and the Financing of Terrorism (GPML)

The United Nations Global Programme against Money Laundering, Proceeds of Crime and the Financing of Terrorism (GPML), part of the United Nations Office on Drugs and Crime (UNODC), was established to assist member states to comply with the UN Conventions and other instruments that deal with money laundering and terrorist financing.  Since 2001, GPML's technical assistance work on counter-terrorist financing (CFT) has also been a priority.  GPML now incorporates a focus on CFT in all its technical assistance work.  In 2011, GPML provided long-term assistance in the development of viable anti-money laundering/counter-terrorist financing (AML/CFT) programs to 30 countries.  GPML also delivered 39 training events worldwide and two international conferences, in partnership with other agencies and organizations where possible.  GPML trained 1,362 representatives of law enforcement agencies, financial intelligence units (FIUs), judicial authorities and reporting entities.

### The Mentoring Program
GPML's mentoring program is one of the most successful and well-known activities of international AML/CFT technical assistance and training.  By giving in-depth support upon request, the mentors have gained the confidence of the recipient institutions.  In many countries, GPML mentors are the only locally placed AML/CFT experts, hence they are heavily relied

upon by local offices of donor countries and organizations for advice in the creation and delivery of other donor AML/CFT projects. During 2011, GPML employed four mentors, two of which are shared with the World Bank. GPML mentors stationed in Central Asia, Hanoi, Namibia, and West Africa worked extensively on the development and implementation of a wide variety of AML/CFT programs and procedures in individual countries and surrounding regions.

### GPML Initiatives

**Illicit Financial Flows:** The tracking of illicit financial flows linked to piracy was a high priority for 2011, with the focus on Somalia and the Horn of Africa. GPML organized an international conference in Nairobi, Kenya to increase regional and international cooperation on combating financial flows from piracy. A second conference in Djibouti focused on improving cooperation between law enforcement agencies and alternative money remitters, i.e., hawala and mobile financial services providers.

**Asset Recovery:** UNODC and the World Bank lead the Stolen Asset Recovery (StAR) Initiative aimed at assisting developing countries to recover stolen assets that have been sent abroad by corrupt leaders. GPML also continued its partnership with the StAR initiative and Europol's Camden Asset Recovery Inter-agency Network (CARIN), and furthered its assistance to the operational development of other professional asset forfeiture networks, namely the ARINSA in Southern Africa and the Red de la Recuperation de Activos de GAFISUD (RRAG) in South America.

### Other GPML Tools and Services

**Financial Intelligence Unit Analyst Course:** The course focuses on analysis of suspicious transactions related to possible money laundering and terrorist financing; and addresses relationships between the FIU and agencies responsible for investigation of money laundering and terrorist financing. In 2011, the training was delivered in Rwanda, Ethiopia, and the Maghreb region for Mauritania, Morocco, Tunisia and Algeria.

**Financial Investigation Course:** This course has a practical focus and is designed upon legal and procedural processes in the country of training. It gives participants the opportunity to learn the legislative aspects of financial crime, understand their powers, conduct searches and undertake interviews. The training was delivered in Vietnam, Cambodia, Laos, and Rwanda in 2011.

**Countering Cash Couriers:** GPML's cash courier training provides an opportunity for border control, police and FIU staff to develop their knowledge and skills in the mechanisms for monitoring cross-border transportation of cash and bearer negotiable instruments as well as the identification and interdiction of cash couriers. The course was developed and piloted in 2011, jointly by GPML and the World Customs Organization, in Indonesia and the Philippines. In addition, GPML assists national border control agencies in the development of an operations manual to serve as a resource guide for border control officers.

**Development of AML/CFT Experts/Trainers:** This program, which can be customized for national law enforcement training institutions, involves the design and development of AML/CFT training modules and the development of national AML/CFT subject matter experts through a series of train–the–trainer and technical workshops. In 2011 GPML conducted workshops in Bangladesh and Morocco.

**Prosecutor Placement Program:** This is a sustainable capacity building program designed to give newly-appointed confiscation prosecutors a practical understanding of asset seizure and forfeiture practices by placing them in the office of an experienced and capable confiscation legal team. The Program operates in Southern Africa in conjunction with the South African National Prosecution Authority's Asset Forfeiture Unit.

**AML/CFT Advisory Services and Model Legislation:** GPML has developed a model law for civil law legal systems in collaboration with UNODC's Legal Advisory Program and the International Monetary Fund (IMF), and for common law legal systems, jointly with the Commonwealth Secretariat and the IMF, to assist countries in setting up their AML/CFT legislation. GPML provides legal advisory services to member states requesting assistance in modifying their domestic legislation.

**Training Leveraging AML systems to Combat Trafficking in Persons and Smuggling of Migrants:** The training for police, FIU staff, prosecutors, and specialists in investigation and victim counseling covers various aspects of financial investigation which can be used to identify and investigate organized crime groups involved in human trafficking and migrant smuggling. This training was piloted in Yemen.

**Computer Based Training:** GPML has produced and disseminated 13 computer-based training modules on AML-related topics aimed at law enforcement personnel and other key officials involved in combating money laundering. These particular modules provide an overview of AML issues and a basic understanding of the methods and practical measures required to address them. Since 2003 over 50,000 people have been trained in 20 countries.

*Information Technology Solutions for AML/CFT*
**goAML:** The program is an analytical and integrated database and intelligence analysis system for operational deployment in FIUs to assist them in managing their activities, particularly data collection, analysis, and dissemination. Version one of goAML has been installed in a range of countries, to include Namibia, Kosovo, Palestine, Nigeria, Tanzania, Bermuda, Denmark, Netherlands, Morocco and South Africa.

**IMoLIN/AMLID:** GPML has developed and continues to maintain the International Money laundering Information Network (http://www.imolin.org) on behalf of a partnership of eleven international organizations. IMoLIN provides a wide range of tools and key AML/CFT-related information for professionals, including the Anti-Money laundering International Database (AMLID), a compendium and analysis of AML/CFT legislation and regulations.

# *The Egmont Group of Financial Intelligence Units*

The Egmont Group began in 1995 as a small group of national entities—today referred to as financial intelligence units (FIUs)—seeking to explore ways to cooperate internationally among themselves. The goal of the Egmont Group is to provide a forum for FIUs around the world to improve support to their respective governments in the fight against money laundering, terrorist financing, and other financial crimes. This support includes expanding and systematizing the exchange of financial intelligence, improving expertise and capabilities of personnel employed by such organizations, and fostering better and more secure communication among FIUs through the application of technology.

INCSR 2012 Volume II        Money Laundering and Financial Crimes

To meet the standards of Egmont membership, an FIU must be a centralized unit within a nation or jurisdiction established to detect criminal financial activity and ensure adherence to laws against financial crimes, including terrorist financing and money laundering. Today the FIU concept is an important component of the international community's approach to combating money laundering and terrorist financing. The Egmont Group has grown dramatically from 14 units in 1995 to a recognized membership of 127 FIUs in 2011. The FIUs of Azerbaijan, Kazakhstan, Mali, Morocco, Samoa, Solomon Islands, and Uzbekistan joined the Egmont Group during the most recent annual plenary, held in July 2011.

The Egmont Group is organizationally structured to meet the challenges of the large membership and its workload. The Egmont Committee is an intermediary group between the 127 heads of member FIUs and the Egmont working groups. This Committee addresses the administrative and operational issues facing the Egmont Group. In addition to the Committee, there are five working groups: legal, operational, training, information technology, and outreach. The Egmont Group's secure Internet system permits members to communicate with one another via secure e-mail, requesting and sharing case information as well as posting and assessing information on typologies, analytical tools and technological developments.

As of 2011, the 127 members of the Egmont Group are the FIUs of Afghanistan, Albania, Andorra, Anguilla, Antigua and Barbuda, Argentina, Armenia, Aruba, Australia, Austria, Azerbaijan, Bahamas, Bahrain, Barbados, Belarus, Belgium, Belize, Bermuda, Bosnia and Herzegovina, Brazil, British Virgin Islands, Bulgaria, Cameroon, Canada, Cayman Islands, Chile, Colombia, Cook Islands, Costa Rica, Cote d'Ivoire, Croatia, Curacao, Cyprus, Czech Republic, Denmark, Dominica, Egypt, El Salvador, Estonia, Fiji, Finland, France, Georgia, Germany, Gibraltar, Greece, Grenada, Guatemala, Guernsey, Honduras, Hong Kong, Hungary, Iceland, India, Indonesia, Ireland, Isle of Man, Israel, Italy, Japan, Jersey, Kazakhstan, Kyrgyz Republic, Latvia, Lebanon, Liechtenstein, Lithuania, Luxembourg, Macao, Macedonia, Malawi, Malaysia, Mali, Malta, Marshall Islands, Mauritius, Mexico, Moldova, Monaco, Mongolia, Montenegro, Morocco, Netherlands, New Zealand, Nigeria, Niue, Norway, Panama, Paraguay, Peru, Philippines, Poland, Portugal, Qatar, Romania, Russia, Samoa, San Marino, Saudi Arabia, Senegal, Serbia, Singapore, Slovakia, Slovenia, Solomon Islands, South Africa, South Korea, Spain, Sri Lanka, St. Kitts and Nevis, St. Lucia, St. Vincent and the Grenadines, Sweden, Switzerland, Syria, Taiwan, Thailand, Turkey, Turks and Caicos, Ukraine, United Arab Emirates, United Kingdom, United States, Uruguay, Uzbekistan, Vanuatu, and Venezuela.

# Major Money Laundering Countries

Every year, U.S. officials from agencies with anti-money laundering responsibilities meet to assess the money laundering situations in 200 jurisdictions.  The review includes an assessment of the significance of financial transactions in the country's financial institutions involving proceeds of serious crime, steps taken or not taken to address financial crime and money laundering, each jurisdiction's vulnerability to money laundering, the conformance of its laws and policies to international standards, the effectiveness with which the government has acted, and the government's political will to take needed actions.

The 2012 INCSR identifies money laundering priority jurisdictions and countries using a classification system that consists of three different categories: Jurisdictions of Primary Concern, Jurisdictions of Concern, and Other Jurisdictions Monitored.

"Jurisdictions of Primary Concern" are those that are identified, pursuant to INCSR reporting requirements, as "major money laundering countries."  A major money laundering country is defined by statute as one "whose financial institutions engage in currency transactions involving significant amounts of proceeds from international narcotics trafficking."  However, the complex nature of money laundering transactions today makes it difficult in many cases to distinguish the proceeds of narcotics trafficking from the proceeds of other serious crime.  Moreover, financial institutions engaged in transactions that involve significant amounts of proceeds from other serious crimes are vulnerable to narcotics-related money laundering.  The category "Jurisdiction of Primary Concern" recognizes this relationship by including all countries and other jurisdictions whose financial institutions engage in transactions involving significant amounts of proceeds from all serious crimes or are particularly vulnerable to such activity because of weak or nonexistent supervisory or enforcement regimes or weak political will.  Thus, the focus in considering whether a country or jurisdiction should be included in this category is on the significance of the amount of proceeds laundered, not of the anti-money laundering measures taken.  This is a different approach taken than that of the Financial Action Task Force's International Cooperation Review Group (ICRG) exercise, which focuses on a jurisdiction's compliance with stated criteria regarding its legal and regulatory framework, international cooperation, and resource allocations.  A government (e.g., the United States or the United Kingdom) can have comprehensive anti-money laundering laws on its books and conduct aggressive anti-money laundering enforcement efforts but still be classified a "Primary Concern" jurisdiction.  In some cases, this classification may simply or largely be a function of the size of the jurisdiction's economy.  In such jurisdictions, quick, continuous and effective anti-money laundering efforts by the government are critical.

All other countries and jurisdictions evaluated in the INCSR are separated into the two remaining groups, "Jurisdictions of Concern" and "Other Jurisdictions Monitored," on the basis of several factors that may include: (1) whether the country's financial institutions engage in transactions involving significant amounts of proceeds from serious crimes; (2) the extent to which the jurisdiction is or remains vulnerable to money laundering, notwithstanding its money laundering countermeasures, if any (an illustrative list of factors that may indicate vulnerability is provided below); (3) the nature and extent of the money laundering situation in each jurisdiction (e.g., whether it involves drugs or other contraband); (4) the ways in which the U.S. Government (USG) regards the situation as having international ramifications; (5) the situation's impact on U.S. interests; (6) whether the jurisdiction has taken appropriate legislative actions to address

INCSR 2012 Volume II          Money Laundering and Financial Crimes

specific problems; (7) whether there is a lack of licensing and oversight of offshore financial centers and businesses; (8) whether the jurisdiction's laws are being effectively implemented; and (9) where U.S. interests are involved, the degree of cooperation between the foreign government and the USG. Additionally, given concerns about the increasing interrelationship between inadequate money laundering legislation and terrorist financing, terrorist financing is an additional factor considered in making a determination as to whether a country should be considered a "Jurisdiction of Concern" or an "Other Jurisdiction Monitored." While the actual money laundering problem in jurisdictions classified as "Jurisdictions of Concern" is not as acute as in those considered to be of "Primary Concern," they too must undertake efforts to develop or enhance their anti-money laundering regimes. Finally, while jurisdictions in the "Other Jurisdictions Monitored" category do not pose an immediate concern, it is nevertheless important to monitor their money laundering situations because, under certain circumstances, virtually any jurisdiction of any size can develop into a significant money laundering center.

**Vulnerability Factors**
The current ability of money launderers to penetrate virtually any financial system makes every jurisdiction a potential money laundering center. There is no precise measure of vulnerability for any financial system, and not every vulnerable financial system will, in fact, be host to large volumes of laundered proceeds. A checklist of factors that contribute to making a country or jurisdiction particularly vulnerable to money laundering or other illicit financial activity, however, provides a basic guide. The checklist includes:

- Failure to criminalize money laundering for all serious crimes or limiting the offense to narrow predicates.
- Rigid bank secrecy rules that obstruct law enforcement investigations or that prohibit or inhibit large value and/or suspicious or unusual transaction reporting by both banks and nonbank financial institutions.
- Lack of or inadequate "know your customer" requirements to open accounts or conduct financial transactions, including the permitted use of anonymous, nominee, numbered or trustee accounts.
- No requirement to disclose the beneficial owner of an account or the true beneficiary of a transaction.
- Lack of effective monitoring of cross-border currency movements.
- No reporting requirements for large cash transactions.
- No requirement to maintain financial records over a specific period of time.
- No mandatory requirement to report suspicious transactions or a pattern of inconsistent reporting under a voluntary system and a lack of uniform guidelines for identifying suspicious transactions.
- Use of bearer monetary instruments.
- Well-established non-bank financial systems, especially where regulation, supervision, and monitoring are absent or lax.
- Patterns of evasion of exchange controls by legitimate businesses.
- Ease of incorporation, in particular where ownership can be held through nominees or bearer shares, or where off-the-shelf corporations can be acquired.
- No central reporting unit for receiving, analyzing, and disseminating to the competent authorities information on large value, suspicious or unusual financial transactions that might identify possible money laundering activity.

- Lack of or weak bank regulatory controls, or failure to adopt or adhere to Basel Committee's "Core Principles for Effective Banking Supervision," especially in jurisdictions where the monetary or bank supervisory authority is understaffed, under-skilled or uncommitted.
- Well-established offshore financial centers or tax-haven banking systems, especially jurisdictions where such banks and accounts can be readily established with minimal background investigations.
- Extensive foreign banking operations, especially where there is significant wire transfer activity or multiple branches of foreign banks, or limited audit authority over foreign-owned banks or institutions.
- Jurisdictions where charitable organizations or alternative remittance systems, because of their unregulated and unsupervised nature, are used as avenues for money laundering or terrorist financing.
- Limited asset seizure or confiscation authority.
- Limited narcotics, money laundering, and financial crime enforcement, and lack of trained investigators or regulators.
- Jurisdictions with free trade zones where there is little government presence or other supervisory authority.
- Patterns of official corruption or a laissez-faire attitude toward business and banking communities.
- Jurisdictions where the U.S. dollar is readily accepted, especially jurisdictions where banks and other financial institutions allow dollar deposits.
- Well-established access to international bullion trading centers in New York, Istanbul, Zurich, Dubai, and Mumbai.
- Jurisdictions where there is significant trade in or export of gold, diamonds, and other gems.
- Jurisdictions with large parallel or black market economies.
- Limited or no ability to share financial information with foreign law enforcement authorities.

**Changes in INCSR Priorities for 2012**

Jurisdictions moving from the "Jurisdiction of Concern" column to the "Primary Concern" column:  Argentina, Curacao and St. Maarten

Jurisdictions moving from the "Other Jurisdictions Monitored" column to the "Jurisdiction of Concern" column:  Djibouti, Marshall Islands and Mongolia

New jurisdiction in "Jurisdiction of Concern" column (first time in report):  Holy See

Jurisdictions moving from the "Jurisdiction of Concern" column to the "Other Jurisdictions Monitored" column:  Palau and Samoa

New jurisdiction in "Other Jurisdictions Monitored" column (first time in report):  South Sudan

In the Country/Jurisdiction Table on the following page, "major money laundering countries" that are in the "Jurisdictions of Primary Concern" category are identified for purposes of INCSR statutory reporting requirements.  Identification as a "major money laundering country" is based on whether the country or jurisdiction's financial institutions engage in transactions involving significant amounts of proceeds from serious crime.  It is not based on an assessment of the country or jurisdiction's legal framework to combat money laundering; its role in the terrorist

INCSR 2012 Volume II        Money Laundering and Financial Crimes

financing problem; or the degree of its cooperation in the international fight against money laundering, including terrorist financing.  These factors, however, are included among the vulnerability factors when deciding whether to place a country or jurisdiction in the "Jurisdictions of Concern" or "Other Jurisdictions Monitored" category.

*Note: Country reports are provided for only those countries and jurisdictions listed in the "Primary Jurisdictions of Concern" category.*

## Countries and Jurisdictions Table

| Countries/Jurisdictions of Primary Concern | | Countries/Jurisdictions of Concern | | Other Countries/Jurisdictions Monitored | |
|---|---|---|---|---|---|
| Afghanistan | Latvia | Albania | Marshall Islands | Andorra | Maldives |
| Antigua and Barbuda | Lebanon | Algeria | Moldova | Anguilla | Mali |
| Argentina | Liechtenstein | Angola | Monaco | Armenia | Malta |
| Australia | Luxembourg | Aruba | Mongolia | Benin | Mauritania |
| Austria | Macau | Azerbaijan | Montenegro | Bermuda | Mauritius |
| Bahamas | Mexico | Bahrain | Morocco | Botswana | Micronesia FS |
| Belize | Netherlands | Bangladesh | Nicaragua | Brunei | Montserrat |
| Bolivia | Nigeria | Barbados | Peru | Burkina Faso | Mozambique |
| Brazil | Pakistan | Belarus | Poland | Burundi | Namibia |
| British Virgin Islands | Panama | Belgium | Portugal | Cameroon | Nauru |
| Burma | Paraguay | Bosnia and Herzegovina | Qatar | Cape Verde | Nepal |
| Cambodia | Philippines | Bulgaria | Romania | Central African Republic | New Zealand |
| Canada | Russia | Chile | Saudi Arabia | Chad | Niger |
| Cayman Islands | Singapore | Comoros | Senegal | Congo, Dem Rep of | Niue |
| China, People Rep | Somalia | Cook Islands | Serbia | Congo, Rep of | Norway |
| Colombia | Spain | Cote d'Ivoire | Seychelles | Croatia | Oman |
| Costa Rica | St. Maarten | Czech Republic | Sierra Leone | Cuba | Palau |
| Curacao | Switzerland | Djibouti | Slovakia | Denmark | Papua New Guinea |
| Cyprus | Taiwan | Ecuador | South Africa | Dominica | Rwanda |
| Dominican Republic | Thailand | Egypt | St. Kitts and Nevis | Equatorial Guinea | Samoa |
| France | Turkey | El Salvador | St. Lucia | Eritrea | San Marino |
| Germany | Ukraine | Ghana | St. Vincent | Estonia | Sao Tome & Principe |
| Greece | United Arab Emirates | Gibraltar | Suriname | Ethiopia | Slovenia |
| Guatemala | United Kingdom | Grenada | Syria | Fiji | Solomon Islands |
| Guernsey | United States | Guyana | Tanzania | Finland | South Sudan |
| Guinea Bissau | Uruguay | Holy See | Trinidad and Tobago | Gabon | Sri Lanka |
| Haiti | Venezuela | Honduras | Turks and Caicos | Gambia | Sudan |
| Hong Kong | Zimbabwe | Hungary | Vanuatu | Georgia | Swaziland |
| India | | Ireland | Vietnam | Guinea | Sweden |
| Indonesia | | Jamaica | Yemen | Iceland | Tajikistan |
| Iran | | Jordan | | Kyrgyz Republic | Timor-Leste |
| Iraq | | Kazakhstan | | Lesotho | Togo |
| Isle of Man | | Korea, North | | Liberia | Tonga |
| Israel | | Korea, South | | Libya | Tunisia |
| Italy | | Kosovo | | Lithuania | Turkmenistan |
| Japan | | Kuwait | | Macedonia | Uganda |
| Jersey | | Laos | | Madagascar | Uzbekistan |
| Kenya | | Malaysia | | Malawi | Zambia |

# *Comparative Table Key*

The comparative table that follows the Glossary of Terms below identifies the broad range of actions, effective as of December 31, 2011, that jurisdictions have, or have not, taken to combat money laundering.  This reference table provides a comparison of elements that include legislative activity and other identifying characteristics that can have a relationship to a jurisdiction's money laundering vulnerability.  With the exception of number 5, all items should be answered "Y" (yes) or "N" (no).  All answers indicating deficiencies within the country's/jurisdiction's AML/CFT regime should be explained in item 8 of the template ("Enforcement and Implementation Issues and Comments").

**Glossary of Terms**

- "Criminalized Drug Money Laundering": The jurisdiction has enacted laws criminalizing the offense of money laundering related to the drug trade.
- "Criminalized Beyond Drugs": The jurisdiction has enacted laws criminalizing the offense of money laundering related to crimes other than the drug trade.
- "Know Your Customer Provisions": By law or regulation, the government requires banks and/or other covered entities to adopt and implement Know Your Customer/Customer Due Diligence programs for their customers or clientele.
- "Report Large Transactions": By law or regulation, banks and/or other covered entities are required to report large transactions in currency or other monetary instruments to designated authorities.
- "Report Suspicious Transactions": By law or regulation, banks and/or other covered entities are required to report suspicious or unusual transactions to designated authorities. On the Comparative Table the letter "Y" signifies mandatory reporting; "P" signifies reporting is not required but rather is permissible or optional; "N" signifies no reporting regime.
- "Maintain Records over Time": By law or regulation, banks and/or other covered entities are required to keep records, especially of large or unusual transactions, for a specified period of time, e.g., five years.
- "Disclosure Protection - 'Safe Harbor'": By law, the jurisdiction provides a "safe harbor" defense against civil and criminal liability to banks and/or other covered entities and their employees who provide otherwise confidential banking data to authorities in pursuit of authorized investigations.
- "Criminalize "Tipping Off": By law, disclosure of the reporting of suspicious or unusual activity to an individual who is the subject of such a report, or to a third party, is a criminal offense.
- "Financial Intelligence Unit": The jurisdiction has established an operative central, national agency responsible for receiving (and, as permitted, requesting), analyzing, and disseminating to the competent authorities disclosures of financial information in order to counter money laundering.  An asterisk (*) reflects those jurisdictions that are not members of the Egmont Group.
- "Cross-Border Transportation of Currency": By law or regulation, the jurisdiction has established a declaration or disclosure system for persons transiting the jurisdiction's borders, either inbound or outbound, and carrying currency or monetary instruments above a specified threshold.

- "International Law Enforcement Cooperation": Jurisdiction cooperates with authorized investigations involving or initiated by third party jurisdictions, including sharing of records or other financial data, upon request. No known legal impediments to cooperation exist in current law.
- "System for Identifying and Forfeiting Assets": The jurisdiction has established a legally authorized system for the tracing, freezing, seizure, and forfeiture of assets identified as relating to or generated by money laundering activities.
- "Arrangements for Asset Sharing": By law, regulation or bilateral agreement, the jurisdiction permits sharing of seized assets with third party jurisdictions that assisted in the conduct of the underlying investigation.
- "Criminalized the Financing of Terrorism": The jurisdiction has criminalized the provision of material support to terrorists, terrorist activities, and/or terrorist organizations as required by the UN International Convention for the Suppression of the Financing of Terrorism and UN Security Council Resolution 1373.
- "Report Suspected Terrorist Financing": By law or regulation, banks and/or other covered entities are required to record and report transactions suspected to relate to the financing of terrorists, terrorist groups or terrorist activities to designated authorities.
- "Ability to Freeze Terrorist Assets w/o Delay": The government has an independent national system and mechanism for freezing terrorist assets in a timely manner (including but not limited to bank accounts, other financial assets, airplanes, autos, residences, and/or other property belonging to terrorists or terrorist organizations).
- "States Party to 1988 UN Drug Convention": States party to the 1988 United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, or a territorial entity to which the application of the Convention has been extended by a party to the Convention.
- "States Party to the UN International Convention for the Suppression of the Financing of Terrorism": States party to the International Convention for the Suppression of the Financing of Terrorism, or a territorial entity to which the application of the Convention has been extended by a party to the Convention.
- "States Party to the UN Convention against Transnational Organized Crime": States party to the United Nations Convention against Transnational Organized Crime (UNTOC), or a territorial entity to which the application of the Convention has been extended by a party to the Convention.
- "States Party to the UN Convention against Corruption": States party to the United Nations Convention against Corruption (UNCAC), or a territorial entity to which the application of the Convention has been extended by a party to the Convention.
- "US or International Sanctions/Penalties": The US, another jurisdiction and/or an international organization, e.g., the UN or FATF, has imposed sanctions or penalties against the jurisdiction. A country's inclusion in the FATF's International Cooperation Review Group exercise is not considered a sanction or penalty unless the FATF recommended counter-measures against the country/jurisdiction.

INCSR 2012 Volume II      Money Laundering and Financial Crimes

## *Comparative Table*

"Y" is meant to indicate that appropriate legislation has been enacted to address the captioned items.  It does not imply full compliance with international standards.  Please see the individual country reports for information on any deficiencies in the adopted laws/regulations.

| Actions by Governments | Criminalized Drug Money Laundering | Criminalized ML Beyond Drugs | Know-Your-Customer Provisions | Report Large Transactions | Report Suspicious Transactions (YPN) | Maintain Records Over Time | Disclosure Protection - "Safe Harbor" | Criminalize "Tipping Off" | Cross-Border Transportation of Currency | Financial Intelligence Unit (*) | Intl Law Enforcement Cooperation | System for Identifying/Forfeiting Assets | Arrangements for Asset Sharing | Criminalized Financing of Terrorism | Report Suspected Terrorist Financing | Ability to Freeze Terrorist Assets w/o Delay | States Party to 1988 UN Drug Convention | States Party to Intl. Terror Finance Conv. | States Party to UNTOC | States Party to UNCAC | US or Intl Org Sanctions/Penalties |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Country/ Jurisdiction** | | | | | | | | | | | | | | | | | | | | | |
| Afghanistan | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | N | Y | Y | Y | Y | N |
| Albania | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| Algeria | Y | Y | Y | N | Y | Y | Y | Y | Y | Y* | Y | Y | N | Y | N | Y | N | Y | Y | Y | N |
| Andorra | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| Angola | Y | Y | Y | Y | Y | Y | N | Y | Y | Y* | N | N | N | N | N | N | Y | Y | Y | Y | N |
| Anguilla[2] | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N | N | N | N |
| Antigua and Barbuda | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| Argentina | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | N | N | N | Y | N | Y | Y | Y | Y | N |
| Armenia | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N |
| Aruba[3] | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| Austria | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| Australia | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| Azerbaijan | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| Bahamas | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |

[2] The UK extended its application of the 1988 UN Drug Convention to Anguilla, Bermuda, British Virgin Islands, Cayman Islands, Gibraltar, Guernsey, Isle Of Man, Jersey, Montserrat, and Turks and Caicos.  The International Convention For The Suppression of Terrorism Financing has been extended to Guernsey, Isle Of Man, and Jersey.  The UNCAC has been extended to British Virgin Islands, Guernsey, Isle Of Man, and Jersey.  The UNTOC has been extended to Gibraltar.

[3] The Netherlands extended its application of the 1988 UN Drug Convention and the International Convention for the Suppression of Terrorism Financing to Aruba and Curacao.  The UNTOC has been extended to Aruba

INCSR 2012 Volume II       Money Laundering and Financial Crimes

| Actions by Governments | Criminalized Drug Money Laundering | Criminalized ML Beyond Drugs | Know-Your-Customer Provisions | Report Large Transactions | Report Suspicious Transactions (YPN) | Maintain Records Over Time | Disclosure Protection – "Safe Harbor" | Criminalize "Tipping Off" | Cross-Border Transportation of Currency | Financial Intelligence Unit (*) | Intl Law Enforcement Cooperation | System for Identifying/Forfeiting Assets | Arrangements for Asset Sharing | Criminalized Financing of Terrorism | Report Suspected Terrorist Financing | Ability to Freeze Terrorist Assets w/o Delay | States Party to 1988 UN Drug Convention | States Party to Intl. Terror Finance Conv. | States Party to UNTOC | States Party to UNCAC | US or Intl Org Sanctions/Penalties |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Country/ Jurisdiction** | | | | | | | | | | | | | | | | | | | | | |
| **Bahrain** | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Bangladesh** | Y | Y | Y | Y | Y | Y | N | N | Y | N | Y | Y | N | Y | Y | Y | Y | Y | N | Y | N |
| **Barbados** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Belarus** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | N | Y | Y | Y | Y | Y | Y |
| **Belgium** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Belize** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Benin** | Y | Y | N | N | Y | Y | Y | Y | Y | Y* | Y | Y | N | N | Y | Y | Y | Y | Y | Y | N |
| **Bermuda²** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N |
| **Bolivia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y |
| **Bosnia & Herzegovina** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Botswana** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | N | N | N | N | N | Y | Y | Y | N |
| **Brazil** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | N |
| **British Virgin Islands²** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N |
| **Brunei** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | N | N | N | N | N | Y | Y | Y | N |
| **Bulgaria** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Burkina Faso** | Y | Y | Y | Y | Y | Y | Y | Y | N | Y* | Y | Y | N | N | Y | Y | Y | Y | Y | Y | N |
| **Burma** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | N | Y | Y | Y | Y | Y | Y | N | Y |
| **Burundi** | Y | Y | Y | Y | Y | Y | N | N | N | Y* | Y | Y | N | N | Y | Y | Y | Y | Y | Y | N |
| **Cambodia** | Y | N | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | N | N | Y | Y | Y | Y | Y | Y | N |
| **Cameroon** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Canada** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Cape Verde** | Y | Y | Y | Y | Y | Y | N | Y | Y | Y* | Y | Y | N | N | Y | Y | Y | Y | Y | Y | N |
| **Cayman Islands²** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N |

37

INCSR 2012 Volume II      Money Laundering and Financial Crimes

| Actions by Governments | Criminalized Drug Money Laundering | Criminalized ML Beyond Drugs | Know-Your-Customer Provisions | Report Large Transactions | Report Suspicious Transactions (YPN) | Maintain Records Over Time | Disclosure Protection - "Safe Harbor" | Criminalize "Tipping Off" | Cross-Border Transportation of Currency | Financial Intelligence Unit (*) | Intl Law Enforcement Cooperation | System for Identifying/Forfeiting Assets | Arrangements for Asset Sharing | Criminalized Financing of Terrorism | Report Suspected Terrorist Financing | Ability to Freeze Terrorist Assets w/o Delay | States Party to 1988 UN Drug Convention | States Party to Intl. Terror Finance Conv. | States Party to UNTOC | States Party to UNCAC | US or Intl Org Sanctions/Penalties |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Country/ Jurisdiction** | | | | | | | | | | | | | | | | | | | | | |
| **Central African Rep.** | Y | Y | Y | N | Y | Y | Y | Y | N | N | Y | N | N | Y | Y | Y | Y | Y | Y | Y | N |
| **Chad** | Y | Y | Y | N | Y | Y | Y | Y | N | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Chile** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **China** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | N | N | N | Y | Y | Y | N | Y | Y | Y | N |
| **Colombia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | N |
| **Comoros** | Y | Y | N | N | N | N | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Congo, Dem Rep. of** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N |
| **Congo, Rep. of** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | N | N | Y | Y | Y | Y | Y | N | Y | N |
| **Cook Islands** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Costa Rica** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Cote d'Ivoire** | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Croatia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Cuba** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| **Curacao³** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N |
| **Cyprus⁴** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Czech Republic** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N | N |
| **Denmark** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Djibouti** | Y | Y | Y | Y | Y | Y | Y | N | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Dominica** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | N |

---
4

| ⁴ Area administered by Turkish Cypriots | Y | Y | Y | Y | Y | Y | N | N | Y | Y | N | Y | N | Y | Y | Y | N/A | N/A | N/A | N/A | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

INCSR 2012 Volume II      Money Laundering and Financial Crimes

| Actions by Governments | Criminalized Drug Money Laundering | Criminalized ML Beyond Drugs | Know-Your-Customer Provisions | Report Large Transactions | Report Suspicious Transactions (YPN) | Maintain Records Over Time | Disclosure Protection - "Safe Harbor" | Criminalize "Tipping Off" | Cross-Border Transportation of Currency | Financial Intelligence Unit (*) | Intl Law Enforcement Cooperation | System for Identifying/Forfeiting Assets | Arrangements for Asset Sharing | Criminalized Financing of Terrorism | Report Suspected Terrorist Financing | Ability to Freeze Terrorist Assets w/o Delay | States Party to 1988 UN Drug Convention | States Party to Intl. Terror Finance Conv. | States Party to UNTOC | States Party to UNCAC | US or Intl Org Sanctions/Penalties |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Country/ Jurisdiction** | | | | | | | | | | | | | | | | | | | | | |
| **Dominican Republic** | Y | Y | Y | Y | Y | Y | N | N | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Ecuador** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Egypt** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| **El Salvador** | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Equatorial Guinea** | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N | Y | N | Y | Y | Y | N | Y | Y | N | N |
| **Eritrea** | N | N | N | Y | Y | N | N | N | Y | Y* | N | N | N | N | N | N | N | Y | N | N | Y |
| **Estonia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Ethiopia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | N |
| **Fiji** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Finland** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **France** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Gabon** | Y | Y | Y | Y | Y | N | N | N | Y | Y* | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | N |
| **Gambia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Georgia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Germany** | Y | Y | Y | N | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Ghana** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Gibraltar[2]** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N | N |
| **Greece** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Grenada** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N |
| **Guatemala** | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Guernsey[2]** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Guinea** | Y | N | Y | N | N | N | N | N | N | N | N | N | N | N | N | N | N | Y | Y | Y | N |
| **Guinea-Bissau** | Y | Y | Y | N | Y | Y | Y | N | N | N | N | Y | N | Y | Y | Y | N | Y | N | N | Y |

## INCSR 2012 Volume II      Money Laundering and Financial Crimes

| Actions by Governments | Criminalized Drug Money Laundering | Criminalized ML Beyond Drugs | Know-Your-Customer Provisions | Report Large Transactions | Report Suspicious Transactions (YPN) | Maintain Records Over Time | Disclosure Protection – "Safe Harbor" | Criminalize "Tipping Off" | Cross-Border Transportation of Currency | Financial Intelligence Unit (*) | Intl Law Enforcement Cooperation | System for Identifying/Forfeiting Assets | Arrangements for Asset Sharing | Criminalized Financing of Terrorism | Report Suspected Terrorist Financing | Ability to Freeze Terrorist Assets w/o Delay | States Party to 1988 UN Drug Convention | States Party to Intl. Terror Finance Conv. | States Party to UNTOC | States Party to UNCAC | US or Intl Org Sanctions/Penalties |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Country/ Jurisdiction** | | | | | | | | | | | | | | | | | | | | | |
| Guyana | Y | Y | Y | Y | Y | Y | Y | N | Y | Y* | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N |
| Haiti | Y | Y | Y | Y | Y | Y | Y | Y | N | Y* | Y | Y | Y | N | N | N | Y | Y | Y | Y | N |
| Holy See | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | N | N | N | N | N |
| Honduras | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| Hong Kong[5] | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| Hungary | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| Iceland | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N |
| India | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N |
| Indonesia | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | N | Y | Y | Y | Y | N |
| Iran | Y | Y | Y | N | Y | Y | N | N | N | Y* | N | N | N | N | N | N | Y | N | Y | N | Y |
| Iraq | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | N |
| Ireland | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| Isle of Man[2] | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | N |
| Israel | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| Italy | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| Jamaica | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| Japan | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N |
| Jersey[2] | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | N |
| Jordan | Y | Y | Y | N | Y | Y | Y | Y | Y | Y* | Y | N | N | Y | Y | Y | Y | Y | Y | Y | N |
| Kazakhstan | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| Kenya | Y | Y | Y | N | Y | Y | Y | Y | Y | N | Y | Y | Y | N | N | Y | Y | Y | Y | Y | N |

[5] The People's Republic of China extended the 1988 UN Drug Convention, the International Convention for the Suppression of Terrorism Financing, the UNTOC and the UNCAC to the Special Administrative Regions of Hong Kong and Macau.

## INCSR 2012 Volume II     Money Laundering and Financial Crimes

| Actions by Governments | Criminalized Drug Money Laundering | Criminalized ML Beyond Drugs | Know-Your-Customer Provisions | Report Large Transactions | Report Suspicious Transactions (YPN) | Maintain Records Over Time | Disclosure Protection – "Safe Harbor" | Criminalize "Tipping Off" | Cross-Border Transportation of Currency | Financial Intelligence Unit (*) | Intl Law Enforcement Cooperation | System for Identifying/Forfeiting Assets | Arrangements for Asset Sharing | Criminalized Financing of Terrorism | Report Suspected Terrorist Financing | Ability to Freeze Terrorist Assets w/o Delay | States Party to 1988 UN Drug Convention | States Party to Intl. Terror Finance Conv. | States Party to UNTOC | States Party to UNCAC | US or Intl Org Sanctions/Penalties |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Country/ Jurisdiction** | | | | | | | | | | | | | | | | | | | | | |
| **Kosovo** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | N | N | N | N | N |
| **Kuwait** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | N | N | N | Y | N | Y | Y | N |
| **Kyrgyz Republic** | Y | Y | Y | Y | Y | Y | N | N | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N |
| **Laos** | Y | Y | Y | N | Y | Y | N | N | Y | Y* | Y | N | N | N | N | N | Y | Y | Y | Y | N |
| **Latvia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| **Lebanon** | Y | Y | Y | N | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | N |
| **Lesotho** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Liberia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N | N | N | N | N | N | Y | Y | Y | N |
| **Libya** | Y | Y | Y | N | Y | N | N | N | N | Y* | N | N | N | N | N | N | Y | N | Y | Y | Y |
| **Liechtenstein** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Lithuania** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N |
| **Luxembourg** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Macau[5]** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Macedonia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Madagascar** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y* | Y | Y | N | N | N | N | Y | Y | Y | Y | N |
| **Malawi** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Malaysia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N |
| **Maldives** | Y | N | Y | N | Y | N | N | N | N | Y* | Y | Y | N | Y | Y | Y | Y | Y | N | Y | N |
| **Mali** | Y | Y | Y | N | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Malta** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Marshall Islands** | Y | Y | N | N | Y | N | N | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Mauritania** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| **Mauritius** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N |

INCSR 2012 Volume II      Money Laundering and Financial Crimes

| Actions by Governments | Criminalized Drug Money Laundering | Criminalized ML Beyond Drugs | Know-Your-Customer Provisions | Report Large Transactions | Report Suspicious Transactions (YPN) | Maintain Records Over Time | Disclosure Protection – "Safe Harbor" | Criminalize "Tipping Off" | Cross-Border Transportation of Currency | Financial Intelligence Unit (*) | Intl Law Enforcement Cooperation | System for Identifying/Forfeiting Assets | Arrangements for Asset Sharing | Criminalized Financing of Terrorism | Report Suspected Terrorist Financing | Ability to Freeze Terrorist Assets w/o Delay | States Party to 1988 UN Drug Convention | States Party to Intl. Terror Finance Conv. | States Party to UNTOC | States Party to UNCAC | US or Intl Org Sanctions/Penalties |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Country/Jurisdiction** | | | | | | | | | | | | | | | | | | | | | |
| **Mexico** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | N |
| **Micronesia, FS** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y* | Y | Y | N | N | N | Y | Y | Y | Y | N | N |
| **Moldova** | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Monaco** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Mongolia** | Y | Y | Y | Y | Y | Y | N | N | Y | Y | Y | Y | N | N | N | Y | Y | Y | Y | Y | N |
| **Montenegro** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | N |
| **Montserrat²** | Y | Y | Y | N | Y | Y | Y | Y | N | Y* | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N |
| **Morocco** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Mozambique** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N |
| **Nauru** | Y | N | Y | Y | Y | Y | Y | Y | Y | Y* | N | N | N | Y | Y | N | Y | N | N | N | N |
| **Nepal** | Y | Y | Y | N | N | Y | Y | Y | Y | Y* | N | Y | Y | Y | Y | N | Y | Y | Y | Y | N |
| **Netherlands** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **New Zealand** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Nicaragua** | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | N |
| **Niger** | Y | Y | N | Y | N | Y | Y | Y | Y | Y* | N | Y | N | Y | Y | N | Y | Y | Y | Y | N |
| **Nigeria** | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | N | N | N | Y | Y | Y | Y | Y | N |
| **Niue** | Y | Y | Y | Y | Y | Y | Y | Y | N | N | Y | Y | N | N | N | N | N | N | N | N | N |
| **North Korea** | Y | Y | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N | N/A | N/A | N/A | N/A | N/A | Y | N | N | N | Y |
| **Norway** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Oman** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Pakistan** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y* | Y | N | N | Y | Y | Y | Y | Y | Y | Y | N |
| **Palau** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | N | N | Y | Y | Y | Y | N | Y | N | N |
| **Panama** | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | N | N | N | Y | Y | Y | Y | N |

## INCSR 2012 Volume II        Money Laundering and Financial Crimes

| Actions by Governments | Criminalized Drug Money Laundering | Criminalized ML Beyond Drugs | Know-Your-Customer Provisions | Report Large Transactions | Report Suspicious Transactions (YPN) | Maintain Records Over Time | Disclosure Protection – "Safe Harbor" | Criminalize "Tipping Off" | Cross-Border Transportation of Currency | Financial Intelligence Unit (*) | Intl Law Enforcement Cooperation | System for Identifying/Forfeiting Assets | Arrangements for Asset Sharing | Criminalized Financing of Terrorism | Report Suspected Terrorist Financing | Ability to Freeze Terrorist Assets w/o Delay | States Party to 1988 UN Drug Convention | States Party to Intl. Terror Finance Conv. | States Party to UNTOC | States Party to UNCAC | US or Intl Org Sanctions/Penalties |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Country/ Jurisdiction** | | | | | | | | | | | | | | | | | | | | | |
| **Papua New Guinea** | Y | Y | Y | Y | Y | Y | N | N | Y | Y* | Y | Y | N | N | N | N | N | Y | N | Y | N |
| **Paraguay** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y | N |
| **Peru** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | N |
| **Philippines** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | Y | N | Y | Y | Y | Y | Y | N |
| **Poland** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Portugal** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Qatar** | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Romania** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Russia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Rwanda** | Y | Y | Y | Y | Y | Y | N | N | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **St. Kitts & Nevis** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **St. Lucia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | N | N |
| **St. Maarten** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **St. Vincent & the Grenadines** | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Samoa** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | N | N | N |
| **San Marino** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Sao Tome & Principe** | Y | N | N | N | N | N | N | N | N | N | N | N | N | Y | Y | Y | Y | Y | Y | Y | N |
| **Saudi Arabia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Senegal** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Serbia** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | N |
| **Seychelles** | Y | Y | Y | N | Y | Y | Y | Y | N | Y* | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N |

## INCSR 2012 Volume II      Money Laundering and Financial Crimes

| Actions by Governments | Criminalized Drug Money Laundering | Criminalized ML Beyond Drugs | Know-Your-Customer Provisions | Report Large Transactions | Report Suspicious Transactions (YPN) | Maintain Records Over Time | Disclosure Protection – "Safe Harbor" | Criminalize "Tipping Off" | Cross-Border Transportation of Currency | Financial Intelligence Unit (*) | Intl Law Enforcement Cooperation | System for Identifying/Forfeiting Assets | Arrangements for Asset Sharing | Criminalized Financing of Terrorism | Report Suspected Terrorist Financing | Ability to Freeze Terrorist Assets w/o Delay | States Party to 1988 UN Drug Convention | States Party to Intl. Terror Finance Conv. | States Party to UNTOC | States Party to UNCAC | US or Intl Org Sanctions/Penalties |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Country/ Jurisdiction** | | | | | | | | | | | | | | | | | | | | | |
| **Sierra Leone** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | N | N | N | N | Y | Y | N | Y | Y |
| **Singapore** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Slovak Republic** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Slovenia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Solomon Islands** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | N | Y | N | N | N | N |
| **Somalia** | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N |
| **South Africa** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **South Korea** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N | N |
| **South Sudan** | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N |
| **Spain** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Sri Lanka** | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y | N |
| **Sudan** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y |
| **Suriname** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Swaziland** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Sweden** | Y | Y | Y | N | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Switzerland** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Syria** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | N | Y | N | Y | Y | N | Y | Y |
| **Taiwan** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N | N | N |
| **Tajikistan** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N |
| **Tanzania** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y* | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N |
| **Thailand** | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Timor-Leste** | N | N | N | N | Y | N | N | N | N | N | N | N | N | N | N | N | N | N | N | Y | Y |
| **Togo** | Y | Y | Y | Y | Y | N | N | Y | Y | Y* | Y | Y | N | N | Y | Y | Y | Y | Y | Y | N |

## INCSR 2012 Volume II        Money Laundering and Financial Crimes

| Actions by Governments | Criminalized Drug Money Laundering | Criminalized ML Beyond Drugs | Know-Your-Customer Provisions | Report Large Transactions | Report Suspicious Transactions (YPN) | Maintain Records Over Time | Disclosure Protection - "Safe Harbor" | Criminalize "Tipping Off" | Cross-Border Transportation of Currency | Financial Intelligence Unit (*) | Intl Law Enforcement Cooperation | System for Identifying/Forfeiting Assets | Arrangements for Asset Sharing | Criminalized Financing of Terrorism | Report Suspected Terrorist Financing | Ability to Freeze Terrorist Assets w/o Delay | States Party to 1988 UN Drug Convention | States Party to Intl. Terror Finance Conv. | States Party to UNTOC | States Party to UNCAC | US or Intl Org Sanctions/Penalties |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Country/Jurisdiction** | | | | | | | | | | | | | | | | | | | | | |
| **Tonga** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | N | Y | Y | Y | Y | Y | N | N | N |
| **Trinidad and Tobago** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Tunisia** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | N |
| **Turkey** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | N |
| **Turkmenistan** | Y | Y | Y | Y | Y | Y | N | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Turks & Caicos²** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N | N |
| **Uganda** | N | N | Y | Y | Y | Y | N | N | N | N | Y | N | N | Y | Y | N | Y | Y | Y | Y | N |
| **Ukraine** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **UAE** | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **United Kingdom** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Uruguay** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Uzbekistan** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N |
| **Vanuatu** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N |
| **Venezuela** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | N |
| **Vietnam** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y* | N | N | N | Y | N | N | Y | Y | Y | Y | N |
| **Yemen** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | N | N | Y | Y | Y | Y | Y | Y | Y | N |
| **Zambia** | Y | Y | N | N | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | N |
| **Zimbabwe** | Y | Y | Y | N | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y |

# *INCSR Volume II Template Key*

**1.** *INTRODUCTORY PARAGRAPH*

This section provides a historical and economic picture of the country or jurisdiction, particularly relating to the country's vulnerabilities to money laundering/terrorist financing (ML/TF). Information on the extent of organized criminal activity, corruption, drug-related money laundering, financial crimes, smuggling, black market activity and terrorist financing should be included.

This section should also include a brief summary of the scope of any offshore sector, free trade zones, the informal financial sector, alternative remittance systems or other prevalent area of concern or vulnerability. Discussion of deficiencies in any of these areas should be further discussed in item 8, below.

For countries which submitted reports for the Country Reports on Terrorism, the following paragraph should be included:

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

**2.** *DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* (Y/N)

This question addresses whether the jurisdiction's financial institutions engage in currency transactions involving international narcotics trafficking proceeds that include significant amounts of U.S. currency or currency derived from illegal drug sales in the United States or that otherwise significantly affect the United States.

**3.** *CRIMINALIZATION OF MONEY LAUNDERING:*

*All serious crimes approach or list approach to predicate crimes:*

*Legal persons covered: criminally:* (Y/N)      *civilly:* (Y/N)

In general, two methods of designating money laundering predicate crimes are in use. The response to this question indicates which method of designation the country uses - does the country list specific crimes as predicate crimes for money laundering in its penal code? Conversely, does it use an "all serious crimes" approach, stating that all crimes with penalties over a specified amount or that carry a threshold minimum sentence are money laundering predicate crimes?

Are legal persons, that is, corporations, partnerships, or any legal entity, liable for money laundering/terrorist financing activity by law? Are they subject to criminal penalties, such as fines? Are they subject to civil or administrative penalties, such as civil money penalties, or suspension or loss of license?

**4.** *KNOW-YOUR-CUSTOMER (KYC) RULES:*

46

**INCSR 2012 Volume II**      **Money Laundering and Financial Crimes**

*Enhanced due diligence procedures for PEPs: Foreign:* (Y/N)        *Domestic:* (Y/N)

*KYC covered entities:* A list of the types of financial institutions and designated non-financial businesses and professions covered by KYC rules

Customer due diligence (CDD) or know your customer (KYC) programs should apply not only to banks or financial institutions but also to designated non-financial businesses and professions (DNFBPs). Covered institutions should be required to know, record, and report the identity of customers engaging in significant transactions. Entities such as securities and insurance brokers, money exchanges or remitters, financial management firms, gaming establishments, lawyers, real estate brokers, high-value goods dealers and accountants, among others, should all be covered by such programs.

Countries should be using a risk-based approach to CDD or KYC. Using that approach, types of accounts or customers may be considered either less or more risky and be subject to varying degrees of due diligence. Politically exposed persons (PEPs) should be considered high risk and should be subject to enhanced due diligence and monitoring. PEPs are those individuals who are entrusted with prominent public functions in a country, for example, heads of state; senior politicians; senior government, judicial or military officials; senior executives of state-owned corporations; important political party officials. Does the country apply enhanced due diligence procedures to foreign and/or domestic PEPs?

**5. SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**

*Number of STRs received and time frame:*
*Number of CTRs received and time frame:*

*STR covered entities:* A list of the types of financial institutions and designated non-financial businesses and professions covered by reporting rules

Suspicious transaction reporting requirements should apply not only to banks or financial institutions but also to DNFBPs. Entities such as securities and insurance brokers, money exchanges or remitters, financial management firms, gaming establishments, lawyers, real estate brokers, high-value goods dealers and accountants, among others, should all be covered by such programs.

If available, the report will include the number of suspicious transaction reports (STRs) received by the designated government body and the time frame during which they were received. The most recent information available, preferably the activity in 2011, will be included.

Similarly, if the country has a large currency transaction reporting requirement, whereby all currency transactions over a threshold amount are reported to a designated government body, the report will include the number of currency transaction reports (CTRs) received by the designated government body and the time frame during which they were received. The most recent information available, preferably the activity in 2011, will be included. The report should not include information on CTRs not required to be forwarded to a designated government body but held in institutions for government review.

**6. MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**

*Prosecutions:* (Number and time frame)
*Convictions:* (Number and time frame)

If available, the report will include the numbers of prosecutions and convictions and the relevant time frames. The most recent information available, preferably the activity in 2011, will be included.

**INCSR 2012 Volume II      Money Laundering and Financial Crimes**

*7.  RECORDS EXCHANGE MECHANISM:*

**With U.S.:      MLAT:** (Y/N)      ***Other mechanism:*** (Y/N)
**With other governments/jurisdictions:** (Y/N)

Does the country/jurisdiction have in place treaties, a mutual legal assistance agreement (MLAT), memoranda of understanding or other agreements to share information related to financial crimes, money laundering, and terrorist financing with the United States?  With other governments?

The report will indicate if the country/jurisdiction is a member of the Financial Action Task Force (FATF) or a FATF-style regional body.  A link to the website with its most recent mutual evaluation will be shown.

*8.  ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

Information in this section should include:  changes in policy, law, and implementation of regulations occurring since January 1, 2011, and any issues or deficiencies noted in the country/jurisdiction's AML/CFT program.  These may include the following:  resource issues, legislative deficiencies, and/or implementation deficiencies; information on any U.S. or international sanctions against the country/jurisdiction; whether the country has cooperated on important cases with USG agencies or has refused to cooperate with foreign governments, as well as any actions taken by the USG or any international organization to address such obstacles, including the imposition of sanctions or penalties; any known issues with or abuse of non-profit organizations, alternative remittance systems, offshore sectors, free trade zones, bearer shares, or other specific sectors, or situations;  any other information which impacts on the country's/jurisdiction's ability to successfully implement a comprehensive AML/CFT regime or provides information on successful, innovative policies or procedures.

Case 2:14-cv-00492-RFB-VCF   Document 1-3   Filed 04/01/14   Page 58 of 86

# Countries/Jurisdictions of Primary Concern

## Afghanistan

Afghanistan is not a regional or offshore center.  Terrorist and insurgent financing, money laundering, cash smuggling, abuse of informal value transfer systems, and other illicit activities designed to finance organized criminal activity continue to pose serious threats to the security and development of Afghanistan.  Afghanistan remains a major drug trafficking and drug producing country, and is the world's largest opium producer and exporter.

The growth in Afghanistan's banking sector has slowed considerably in recent years; and traditional payment systems, particularly hawala networks, remain significant in their reach and scale.  The weaknesses of the banking sector, as demonstrated by the Kabul Bank crisis, further incentivize the use of informal mechanisms and exacerbate the difficulty of developing a transparent formal financial sector in Afghanistan.  The narcotics trade, corruption and contract fraud are major sources of illicit revenue and laundered funds.  The unlicensed and unregulated hawalas in major drug areas such as Helmand likely account for a substantial portion of the illicit proceeds being moved in the financial system, undetected by authorities.  There are estimates that hawaladars in Kandahar, the country's second largest city, and the opium producing province of Helmand handle $1 billion in drug money per year.  Despite ongoing efforts by the international community to build Afghanistan's capacity to regulate its financial sector and the capacity of law enforcement to investigate financial crimes, it is unable to consistently uncover and disrupt financial crimes because of limited resources, lack of expertise, corruption, and insufficient political will.  Proposed reforms and efforts to urge law enforcement and the judiciary to take action on financial crimes often conflict with established, traditional processes, which can delay compliance with international standards.

Corruption permeates all levels of Afghan government and society and has a direct impact on the willingness of authorities to investigate financial crimes.  Afghanistan ranked 180 out of 182 countries surveyed in Transparency International's 2011 Corruption Perception Index.  Afghanistan's laws related to terrorist financing are not in line with international standards and do not criminalize the full scope of the terrorist financing offense.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:***  YES

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:***  All serious crimes
   ***Legal persons covered:***       ***criminally:*** YES          ***civilly:*** NO

49

**INCSR 2012 Volume II      Money Laundering and Financial Crimes**

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs:  Foreign:* YES   *Domestic:* YES
   *KYC covered entities:* Central Bank of Afghanistan (DAB), banks, registered money service
   providers, insurance companies, dealers in precious metals and stones, lawyers, accountants,
   securities dealers, and real estate agents

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* 417 from January to October 2011
   *Number of CTRs received and time frame:* 1,744,169, from June 2006 to October 2010
   *STR covered entities:* Financial institutions and money service businesses including
   informal funds transfer providers such as hawaladars

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:* None
   *Convictions:* None

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:*      *MLAT:* NO      *Other mechanism:* YES
   *With other governments/jurisdictions:* YES

Afghanistan is a member of the Asia/Pacific Group on Money Laundering (APG), a Financial
Action Task Force (FATF)-style regional body.  Its most recent mutual evaluation can be found
here:  http://www.apgml.org/documents/docs/17/Afghanistan%20-%20published%20DAR.pdf .

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

Money laundering and terrorist financing investigations in Afghanistan are hampered by a lack
of political commitment by the Government of Afghanistan (GOA), and the limited capacity of
the regulatory regime and criminal justice system.

Less than 5% of the Afghan population uses banks, depending instead on the entrenched hawala
system, which provides a range of financial and non-financial business services in local,
regional, and international markets.  Approximately 90% of financial transactions run through
the hawala system, including foreign exchange transactions, funds transfers, micro and trade
finance, as well as some deposit-taking activities.  While the hawala system and formal financial
sector are distinct, hawaladars often keep accounts at banks and use wire transfer services to
settle their balances with other hawaladars abroad.  Due to limited bank branch networks, banks
occasionally use hawaladars to transmit funds to hard-to-reach areas within Afghanistan.
Licensed hawaladars and other money service providers submit few STRs, which does not reflect
their exposure to the risk of exploitation by money launderers and terrorist financiers.  The GOA
should create an outreach program to notify and educate hawaladars about the licensing and STR
filing processes.

Border security continues to be a major challenge throughout Afghanistan, with only 14 official
border crossings under central government control.  Most border areas are under-policed or not
policed at all, and are particularly susceptible to cross-border trafficking, trade-based money
laundering, and bulk cash smuggling.  Kabul International Airport lacks stringent inspection
controls for all passengers, and includes a VIP lane that does not require subjects to undergo any
inspections or controls.  The GOA should strengthen inspection controls for airport passengers.

Corruption continues to be an obstacle in the Customs service, although some improvements have been made with assistance from international partners. Approximately $1 billion a year of declared cash flows from Afghanistan into Gulf countries, with Dubai cited as the primary destination. The declared cash leaving Afghanistan, primarily from Kabul International Airport, exceeds Afghanistan's official revenue of about $900 million.

The GOA has no formal extradition or mutual legal assistance arrangements with the United States. Requests for extradition and mutual legal assistance are processed on an ad hoc basis, with assistance from the Afghan Attorney General's Office. Newly drafted extradition-related legislation is currently pending before the upper house of the Afghan parliament.

The GOA lacks a comprehensive structure for maintaining administrative freezes on seized terrorist assets, and there is no mechanism for asset sharing. The GOA should revise its asset seizure process to ensure its ability to seize and freeze terrorist assets, maintain these asset freezes, and establish a procedure for sharing seized assets with foreign partners. The GOA should increase the capacity of enforcement officers, prosecutors, and judges to provide them a better understanding of the basis for seizing and forfeiting assets.

# Antigua and Barbuda

Antigua and Barbuda is a significant offshore center that, despite recent improvements, remains susceptible to money laundering due to its offshore financial sector and Internet gaming industry. Illicit proceeds from the transshipment of narcotics and from financial crimes occurring in the U.S. also are laundered in Antigua and Barbuda.

Antigua and Barbuda uses the Eastern Caribbean (EC) dollar and its monetary authority is the Eastern Caribbean Central Bank (ECCB). Seven other island economies are also members of the ECCB: Anguilla, Dominica, Grenada, Montserrat, St Kitts and Nevis, St. Lucia, and St Vincent and the Grenadines. The existence of this common currency may raise the risk of money laundering, but there is little evidence that the EC dollar is a primary vehicle for money laundering.

As of 2011, Antigua and Barbuda has 15 international banks, two international trusts, 27 offshore insurance companies, 3,497 international business corporations (IBCs), ten interactive gaming companies, six interactive wagering companies, six money services businesses, and 22 corporate management and trust services providers. In addition, there are five casinos. Bearer shares are permitted for international companies but the names and addresses of directors (who must be natural persons), the activities the corporation intends to conduct, the names of shareholders, and the numbers of shares they will hold are required to be disclosed. Registered agents or service providers are required by law to know the names of beneficial owners. All licensed institutions are required to have a physical presence, which means presence of at least a full-time senior officer and availability of all files and records. Shell companies are not permitted. Internet gaming companies are required to incorporate as IBCs and to have a physical presence, meaning the primary servers and the key person are resident in Antigua and Barbuda.

A nominal free trade zone (FTZ) in the country seeks to attract investment in areas deemed as priority by the government. Casinos and sports book-wagering operations in Antigua and

**INCSR 2012 Volume II          Money Laundering and Financial Crimes**

Barbuda's FTZ are supervised by Antigua and Barbuda's Office of National Drug and Money Laundering Control Policy (ONDCP), and the Directorate of Offshore Gaming.

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** YES

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
   ***Legal persons covered:***    ***criminally:*** YES    ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs: Foreign:*** YES    ***Domestic:*** YES
   ***KYC covered entities:*** Banks, agricultural credit institutions, money exchangers, accountants, notaries, gaming centers, auto dealers and securities dealers

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   ***Number of STRs received and time frame:*** 93 in 2011
   ***Number of CTRs received and time frame:*** 48 in 2011
   ***STR covered entities:*** Banks, agricultural credit institutions, money exchangers, notaries, gaming centers, and securities dealers

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
   ***Prosecutions:*** Two in 2011
   ***Convictions:*** None in 2011

***RECORDS EXCHANGE MECHANISM:***
   ***With U.S.:***    ***MLAT:*** YES    ***Other mechanism:*** YES
   ***With other governments/jurisdictions:*** YES

Antigua and Barbuda is a member of Caribbean Financial Action Task Force (CFATF), a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation can be found here:
http://www.cfatf-gafic.org/downloadables/mer/Antigua_and_Barbuda_3rd_Round_MER_Final(Eng).pdf

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS**

The Government of Antigua and Barbuda (GOAB) has taken steps to combat money laundering and terrorist financing by passing relevant legislation that applies to both domestic and offshore financial institutions, and establishing a regulatory regime. The GOAB also should implement and enforce all provisions of its AML/CFT legislation, including the comprehensive supervision of its offshore sector and gaming industry. Continued efforts should be made to enhance the capacity of law enforcement and customs authorities to recognize money laundering typologies that fall outside the formal financial sector. Continued international cooperation, particularly with regard to the timely sharing of statistics and information related to offshore institutions, and enforcement of foreign civil asset forfeiture orders will likewise enhance Antigua and Barbuda's ability to combat money laundering.

Internet gaming companies are required to report all payouts over $25,000 to the ONDCP.  They also are required to submit quarterly and annual audited financial statements and maintain records relating to all gaming and financial transactions of each customer for six years.

In 2011, the Supervisory Authority more vigorously exercised its supervisory powers in relation to money remitters, having imposed administrative sanctions for inadequate implementation of AML/CFT due diligence measures, source of funds accountability and failure to provide statutorily required reports.  The Supervisory Authority also initiated comprehensive onsite examinations of financial institutions and designated non-financial businesses and professions, including entities engaged in real property business and car dealerships.

The GOAB says it has a "poor understanding" of certain foreign cash transactions taking place within the jurisdiction that have raised their concerns.  The possibility exists that they could be an indication of proceeds from human trafficking.  Separately, the police have instituted criminal charges for prostitution-related human trafficking and have traced alleged proceeds to accounts held in the domestic banking sector, and also suspect repatriation of proceeds through money remitters.

# Argentina

Argentine and international observers express the concern that money laundering related to narcotics trafficking, corruption, contraband, and tax evasion occurs throughout the financial system.  It is also believed that most money laundering operations in Argentina are conducted through transactions involving specific offshore centers.  The most common money laundering operations in the non-financial sector involve transactions made through attorneys, accountants, corporate structures, and in the real estate sector.  The widespread use of cash in the economy also leaves Argentina vulnerable to money laundering.  Tax evasion is the predicate crime in the majority of Argentine money laundering investigations.

Argentina has a long history of capital flight and tax evasion, and it is estimated that Argentines hold billions of dollars outside the formal financial system, both offshore and in-country, much of it legitimately earned money that was not taxed.  The general vulnerabilities in the system also expose Argentina to a risk of terrorist financing.  Despite these risks associated with money laundering and terrorist financing (ML/TF), there have been only two convictions for ML and only five prosecutions are ongoing.

Argentina is a source country for precursor chemicals and a transit country for cocaine produced in Bolivia, Peru, and Colombia, and for marijuana produced in Paraguay.  While most of the cocaine transiting Argentina is bound for the European market, virtually all of the marijuana is for domestic or regional consumption, and domestic drug consumption and production have increased.  Argentine officials also have identified smuggling, corruption and different types of fraud as major sources of illegal proceeds.

In addition to tax evasion and drugs, a substantial portion of illicit revenue comes from black market peso exchanges or informal value transfers.  Informal value transfers occur when unregistered importers, for example, use entities that move U.S. currency in bulk to neighboring countries where it is deposited and wired to U.S. accounts or to offshore destinations.  Products

from the U.S. are often smuggled into Argentina, or the shipping manifests are changed to disguise the importer and merchandise. The tri-border area (Argentina, Paraguay and Brazil) is considered a major source of smuggling, especially of pirated products. Through the Three Plus One Initiative, the Government of Argentina (GOA) authorities ostensibly cooperate with the two neighboring countries, as well as with the United States, to address security issues in this region; however, this mechanism has been largely ineffective in recent years due to GOA and USG political differences, among other reasons.

The Financial Action Task Force's (FATF) third-round mutual evaluation report of Argentina found Argentina partially compliant or non-compliant with 46 of the 49 FATF Recommendations. Argentina is subject to an enhanced follow-up procedure during which Argentina is expected to immediately address deficiencies relating to its criminalization of both money laundering and terrorist financing. Argentina is also publicly identified by the FATF for its strategic AML/CFT deficiencies, which Argentina has developed an action plan to address. The FATF expects Argentina to urgently address these deficiencies, and while some progress has been made, significant AML/CFT deficiencies remain.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** YES

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
   ***Legal persons covered:  criminally:*** YES        ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs:  Foreign:*** YES    ***Domestic:*** YES
   ***KYC Covered entities:*** Banks, financial companies, credit unions, tax authority, customs, currency exchange houses, casinos, securities dealers, insurance companies, accountants, notaries public, dealers in art and antiques, jewelers, real estate registries, money remitters, and postal services

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   ***Number of STRs received and time frame:*** 3,169 in 2010
   ***Number of CTRs received and time frame:*** Not available
   ***STR Covered entities:*** Banks, financial companies, credit unions, tax authority, customs, currency exchange houses, casinos, securities dealers, insurance companies, accountants, notaries public, dealers in art and antiques, jewelers, real estate registries, money remitters and postal services

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
   ***Prosecutions:***   Five (ongoing)
   ***Convictions:***    Two - in December 2010 and June 2011

***RECORDS EXCHANGE MECHANISM:***

***With U.S.:      MLAT:*** YES      ***Other mechanism:*** YES
***With other governments/jurisdiction:*** YES

Argentina is a member of the Financial Action Task Force (FATF) and the Financial Action Task Force against Money Laundering in South America (GAFISUD), a FATF-style regional body. Its most recent mutual evaluation can be found here: http://www.fatf-gafi.org/dataoecd/3/60/46695047.pdf

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

On June 21, 2011, Argentina passed Law 26683, which amends Law 25246, to modify the criminalization of ML as well as to implement other AML/CFT measures. While the new law addresses a number of important shortcomings, particularly with respect to the criminalization of ML, a large number of other previously identified deficiencies persist. Some of the key features of the June 2011 law include: new measures criminalizing ML as a stand-alone crime; provisions for confiscation of assets without conviction for ML or TF; provisions to allow a judge to suspend an arrest warrant or the seizure of instruments or effects, or postpone the adoption of other restraining or evidentiary measures in the context of a ML/TF investigation; broadening of the predicate offenses which the FIU is authorized to handle and disseminate; removing previous tax secrecy restrictions in the framework of an STR; increasing the entities covered by preventive measures, including mutual associations, cooperatives, and the real state sector; incorporating more detailed customer due diligence (CDD) and record keeping measures; improving record-keeping measures with a requirement that all CDD data be kept for at least five years and properly recorded for reconstruction purposes; and incorporating the FIU's role (previously in Decree 1936/2010) to establish supervision, control, and on-site inspection procedures to verify compliance with the law, and guidelines and instructions issued pursuant to the law.

Notwithstanding these improvements, technical deficiencies and challenges still remain in closing legal and regulatory loopholes and improving interagency cooperation. Most significantly, there is a general lack of prosecutions and penalties actually imposed for the offense of ML. Moreover, although financial regulators are empowered to audit and conduct on-site inspections, there are too few trained people with the expertise to carry them out rigorously.

In 2007, Argentina passed Law 26268 which criminalizes terrorist associations and the financing of these associations; however, the law is not in accordance with international standards. In October 2011, the executive branch presented a draft bill to the Congress which aims to modify the existing law to meet internationally accepted standards for countering the financing of terrorism.

In November 2011, the GOA published resolution 388/2011 announcing the creation of a new Financial Intelligence Unit (FIU) within AFIP, the government's federal tax agency. The creation of the FIU follows the implementation of a series of comprehensive government measures to monitor and control the FX market and stem capital flight. The new FIU's objectives are to monitor foreign currency transactions (FX) and to investigate infractions under the government's new foreign exchange restrictions. The resolution also notes that the new FIU will monitor and investigate the trading of stocks, bonds and other assets, as well as monitor all types of bank credit and loan transactions. It is presumed AFIP's new FIU will focus primarily on investigating FX transactions in order to reduce capital flight, which has been eroding Central

Bank reserves.  The FIU also is tasked with investigating criminal transactions related to money laundering and the financing of terrorism (ML/FT), although it is unclear how the new FIU will interface with the already existing Financial Intelligence Unit (UIF) within the Ministry of Justice, which has traditionally been responsible for probing financial crimes.

In 2009, FinCEN suspended information sharing with the UIF after information given to the UIF was leaked to the local press.  The UIF and Argentine government are working to reestablish the exchange of data.

To more fully meet international standards, Argentina's continuing priorities should be to address its systemic AML/CFT deficiencies,  including by:  implementing the new ML offense and criminalizing terrorist financing; establishing and implementing adequate procedures for the confiscation of funds related to money laundering, and identifying and freezing terrorist assets; enhancing financial transparency; ensuring a fully operational and effectively functioning FIU; improving and broadening CDD measures for non-banking and non-foreign exchange sectors, establishing appropriate channels for international co-operation; the effective sanctioning of officials and institutions that fail to comply with the requirements of the law; the pursuit of training programs for all levels of the financial, criminal justice, and judicial systems; and the provision of the necessary resources and incentives to financial regulators and law enforcement authorities to carry out their missions.  There is also a need for increased public awareness of the problem of money laundering and its connection to narcotics, corruption, and terrorism.

# Australia

Australia is a regional financial center.  The majority of illegal proceeds are derived from fraud-related offenses, though narcotics offenses provide a substantial source of crime proceeds.  The Government of Australia (GOA) maintains a comprehensive system to detect, prevent, and prosecute money laundering.  Australian law enforcement agencies investigate an increasing number of cases that directly involve offenses committed overseas.  Continuous consultation between government agencies and the private sector enables Australia to identify and address new money laundering and terrorist financing risks.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF U.S. CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
   *Legal persons covered: criminally:* YES     *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs: Foreign:* YES   *Domestic:* YES
   *KYC covered entities:* Banks; gaming and bookmaking establishments and casinos; bullion and cash dealers and money exchanges and remitters, including electronic funds transferors; insurers and insurance intermediaries; securities or derivatives dealers; registrars and

trustees; issuers, sellers or redeemers of travelers checks, money orders or similar instruments; preparers of payroll in whole or in part in currency on behalf of other persons; currency couriers

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
*Number of STRs received and time frame:* 44,775 from January 2010 to October 2011
*Number of CTRs received and time frame:* 30,342 from January 2010 to October 2011
*STR covered entities:* Banks, gaming and bookmaking establishments and casinos; bullion and cash dealers and money exchanges and remitters, including electronic funds transferors; insurers and insurance intermediaries; securities or derivatives dealers; registrars and trustees; issuers, sellers or redeemers of travelers checks, money orders or similar instruments; preparers of payroll in whole or in part in currency on behalf of other persons; currency couriers

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
*Prosecutions:* 224 from January 2010 to October 2011
*Convictions:* 104 from January 2010 to October 2011

**RECORDS EXCHANGE MECHANISM:**
*With U.S.:*       *MLAT:* YES       *Other mechanism:* YES
*With other governments/jurisdictions:* YES

Australia is a member of the Financial Action Task Force (FATF) and of the Asia/Pacific Group on Money Laundering (APG), a FATF-style regional body (FSRB). Its most recent mutual evaluation can be found here: http://www.fatf-gafi.org/dataoecd/60/33/35528955.pdf

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

Australia has a robust regime to detect and deter money laundering and terrorism financing. The Anti-Money Laundering and Counter-Terrorism Financing Act 2006 (AML/CTF Act) provides the legal framework and establishes obligations. The Attorney-General's Department is the policy agency responsible for the AML/CTF Act. The Australian Transaction Reports and Analysis Centre (AUSTRAC) administers the Act, is Australia's financial intelligence unit and also the country's anti-money laundering regulator.

As of November 2011, the GOA extended its AML/CFT regulation to cover non-financial businesses and professions such as lawyers, accountants, jewelers, and real estate agents. In comparison to the size of the Australian economy and the comprehensive anti-money laundering countermeasures in place, the number of convictions for money laundering remains very low.

Third-party deposits, which can be used as vehicles to facilitate money laundering, are legal in Australia. However, authorities are working to limit the associated risks in Australia's financial system. On October 1, 2011, additional AML/CFT provisions came into effect, which require banking institutions to identify third parties undertaking transactions of $10,000 or more. This obligation is in addition to reporting the details of the account holder involved in the transaction, and builds on existing customer due diligence and STR obligations.

The Australian government recently established a new Criminal Assets Confiscation Taskforce, which brings together agencies with key roles in the investigation and litigation of proceeds of

crime matters, to enhance the identification of potential asset confiscation matters and strengthen their pursuit.

# Austria

Austria is a major regional financial center, and Austrian banking groups control significant shares of the banking markets in Central, Eastern, and Southeastern Europe. Money laundering occurs within the Austrian banking system as well as in non-bank financial institutions and businesses. Money laundered by organized crime groups derives primarily from serious fraud, smuggling, corruption, narcotics trafficking, and trafficking in persons. Theft, drug trafficking and fraud are the main predicate crimes in Austria according to conviction and investigation statistics. Austria is not an offshore jurisdiction and has no free trade zones.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* Combination
   *Legal persons covered:      criminally:* YES        *civilly:* NO

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs:  Foreign:* YES   *Domestic:* NO
   *KYC covered entities:* Banks and credit institutions, financial institutions, leasing and exchange businesses, safe custody services, portfolio advisers, brokers, securities firms, money transmitters, insurance companies and intermediaries, casinos, all dealers including those in high value goods, auctioneers, real estate agents, lawyers, notaries, certified public accountants, and auditors

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* 2,211 in 2010
   *Number of CTRs received and time frame:* Not applicable
   *STR covered entities:* Banks and credit institutions, financial institutions, leasing and exchange businesses, safe custody services, portfolio advisers, brokers, securities firms, money transmitters, insurance companies and intermediaries, casinos, all dealers including those in high value goods, auctioneers, real estate agents, lawyers, notaries, certified public accountants, auditors, and customs officials

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:* 582 in 2010
   *Convictions:*   Six in 2010

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:     MLAT:* YES     *Other mechanism:* YES

*With other governments/jurisdictions:* YES

Austria is a member of the Financial Action Task Force (FATF). Its most recent mutual evaluation can be found here: http://www.fatf-gafi.org/dataoecd/22/50/44146250.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

Austria has a combination of both an "all serious crimes" approach plus a list of predicate offenses which do not fall under the domestic definition of serious crimes, but which Austria includes to comply with international legal obligations and standards.

Asset freezing authority applies to all economic resources including financial funds, real estate, companies, and vehicles. On March 15, 2011, a bilateral asset sharing agreement between the United States and Austria to share assets seized from convicted criminals went into effect.

On July 7, 2011, Parliament adopted an amendment to the Stock Corporation Act, which went into effect August 1, 2011 and sharply restricts the issuance and use of bearer shares. The new legislation eliminates bearer shares for all companies except those listed on a recognized stock exchange.

Even absent a specific suspicion, new regulations require tax authorities to inform the FIU of all cases where private foundations do not disclose the founding deed, including all appendices and supplementary documentation, as well as beneficial owners of hidden trusteeships.

# Bahamas

The Commonwealth of the Bahamas is an important regional and offshore financial center. The economy of the country is heavily reliant upon tourism, tourist-driven construction and the offshore sector. The Bahamas is a transshipment point for cocaine bound for the United States and Europe. Money laundering trends include the purchase of real estate, large vehicles and jewelry, as well as the processing of money through a complex web of legitimate businesses and international business companies (IBCs) registered in the offshore financial sector. Drug traffickers and other criminal organizations take advantage of the large number of IBCs and offshore banks registered in The Bahamas to launder significant sums of money despite strict know-your-customer (KYC) and transaction reporting requirements.

The country has one large free trade zone, Freeport Harbor. This zone is managed by a private entity, the Freeport Harbor Company, which is owned and operated through a joint venture between Hutchison Port Holdings (HPH) and The Port Group (The Grand Bahama Port Authority, the parastatal regulatory agency). Businesses at the harbor include private boat, ferry and cruise ship visits, roll-on/roll-off facilities for containerized cargo, and car transshipment. Freeport Harbor has the closest offshore port to the United States, and the entire country is relatively accessible by medium sized boats. This makes smuggling and bulk cash money laundering relatively easy. While it is illegal for citizens of The Bahamas to gamble, gambling is legal for tourists and there are three main casinos located on Grand Bahama and New Providence Islands.

**INCSR 2012 Volume II      Money Laundering and Financial Crimes**

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF U.S. CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* YES

*CRIMINALIZATION OF MONEY LAUNDERING:*
    *"All serious crimes" approach or "list" approach to predicate crime:*  List approach
    *Legal persons covered:*        *criminally:*  YES        *civilly:*  YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
    *Enhanced due diligence procedures for PEPs:  Foreign:* YES        *Domestic:*  YES
    *KYC Covered entities*: Banks and trust companies, insurance companies, securities firms and investment fund administrators, financial and corporate service providers, cooperatives, societies, casinos, lawyers, accountants, real estate agents, and company service providers

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
    *Number of STRs received for 2011:*  45 in 2010
    *Number of CTRs received for 2011:*  Not available
    *STR covered entities:* Banks and trust companies, insurance companies, securities firms and investment fund administrators, financial and corporate service providers, cooperatives, societies, casinos, lawyers, accountants, real estate agents, and company service providers

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
    *Number of Prosecutions for 2011:*  None
    *Number of Convictions for 2011:*  None

*RECORDS EXCHANGE MECHANISM:*
    *With U.S.:*      *MLAT:* YES      *Other mechanism:*  YES
    *With other governments/jurisdictions:*  YES

The Bahamas is a member of the Caribbean Financial Action Task Force, (CFATF), a Financial Action Task Force-style regional body.  Its most recent mutual evaluation can be found here:
http://www.cfatf-gafic.org/downloadables/mer/The_Bahamas_3rd_Round_MER_(Final)_English.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

The Government of the Commonwealth of the Bahamas should provide adequate resources to its law enforcement, judicial, and prosecutorial bodies in order to enforce existing legislation and safeguard the financial system from possible abuses.  The Bahamas should continue to enhance its anti-money laundering/counter-terrorist financing regime by implementing the National Strategy on the Prevention of Money Laundering; by ensuring full compliance with UNSCRs 1267 and 1373; criminalizing participation in an organized criminal group; tightening the currency transaction reporting system; and by implementing a system to collect and analyze information on the cross border transportation of currency.  It should also ensure there is a public registry of the beneficial owners of all entities licensed in its offshore financial center.

# Belize

Belize is not a major regional financial center but, in an attempt to diversify its economic activities, authorities have encouraged the growth of offshore financial activities that are vulnerable to money laundering, including offshore banks, insurance companies, trust service providers, mutual fund companies, and international business companies.  Belize has pegged the Belizean dollar to the U.S. dollar and continues to offer financial and corporate services to nonresidents in its offshore financial sector.

Belize is a transshipment point for marijuana, cocaine, and precursor chemicals for methamphetamines.  Money laundering proceeds are related to proceeds from the trafficking of illegal narcotics, psychotropic substances, and chemical precursors, and they are controlled by drug trafficking organizations and organized criminal groups.

Belizean officials suspect that money laundering occurs at a significant level in Belize.  Belizean officials believe the large Corozal Commercial Free Zone (CFZ) that operates at the border with Mexico is involved in trade based money laundering.  Casinos and on-line gaming are legal but authorities acknowledge they are under-regulated which may pose a money laundering risk.

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** Both
   ***Legal persons covered:***        ***criminally:*** YES        ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs:  Foreign:*** NO  ***Domestic:*** YES
   ***KYC covered entities:***  Domestic and offshore banks; venture risk capital; money broker, exchange and transmission services; moneylenders and pawnshops; insurance; real estate; credit unions and building societies; trust and safekeeping services; casinos; motor vehicle dealers; jewelers; international financial service providers; attorneys and notaries public; and accountants and auditors

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   ***Number of STRs received and time frame:*** 76, January 1 through October 24, 2011
   ***Number of CTRs received and time frame:*** Not applicable
   ***STR covered entities:***  Domestic and offshore banks; venture risk capital; money broker, exchange and transmission services; moneylenders and pawnshops; insurance; real estate; credit unions and building societies; trust and safekeeping services; casinos; motor vehicle dealers; jewelers; international financial service providers; attorneys, notaries public, accountants & auditors

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
   ***Prosecutions:*** Two - January 1 through October 24, 2011
   ***Convictions:***  Two - January 1 through October 24, 2011

INCSR 2012 Volume II        Money Laundering and Financial Crimes

---

***RECORDS EXCHANGE MECHANISM:***
   ***With U.S.:***        ***MLAT:*** YES        ***Other mechanism:*** YES
   ***With other governments/jurisdictions:*** YES

Belize is a member of the Caribbean Financial Action Task Force (CFATF), a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation can be found here: http://www.cfatf-gafic.org/downloadables/mer/Belize_3rd_Round_MER_(Final)_(English).pdf

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

Belize lacks the resources and political will to effectively enforce anti-money laundering rules. Belize's financial intelligence unit (FIU) has a broad mandate and a small staff. The FIU staff has limited training or experience in identifying, investigating, reviewing, and analyzing evidence in money laundering cases. There were credible reports of at least one investigation being halted because of political pressure on the FIU. Prosecutors and judges also need additional training on financial crimes, including money laundering. Belize should implement an arrangement for asset sharing to provide additional resources to the FIU.

Belize should significantly strengthen its laws and regulations on financial information systems, beneficial ownership, customer due diligence and wire transfers in line with international standards and recommendations. Belize should undertake a review of whether it is appropriate to implement a large currency transaction reporting regime.

While it is widely believed that abuse occurs within the offshore sector and in the free trade zones (FTZ), no one from these organizations has been charged with a financial crime. Belize should require the FTZ companies to be reporting entities.

The Government of Belize should become a party to the UN Convention against Corruption.

# Bolivia

Bolivia is not a regional financial center, but money laundering activities continue to take place. These illicit financial activities are related primarily to narcotics trafficking, corruption, tax evasion, and smuggling and trafficking of persons. Casinos, cash transporters, informal exchange houses, and wire transfer businesses are not subject to anti-money laundering controls. The Bolivian banking supervision entity has declared that any non-registered exchange houses will be shut down. The Bolivian financial system is highly dollarized, with approximately 40% of deposits and loans distributed in U.S. dollars rather than Bolivianos, the local currency (down from 90% in 2004). Bolivia has 13 free trade zones for commercial and industrial use located in El Alto, Cochabamba, Santa Cruz, Oruro, Puerto Aguirre, and Desaguadero.

In December 2008, the Egmont Group expelled the Financial Investigation Unit (UIF), Bolivia's financial intelligence unit (FIU), from its membership, due to a lack of terrorism financing legislation in Bolivian law. To regain Egmont membership, Bolivia must reapply and provide written evidence of its FIU's compliance with Egmont FIU definitions and requirements.

INCSR 2012 Volume II        Money Laundering and Financial Crimes

Bolivia is included in the October 2011 Financial Action Task Force (FATF) Public Statement because it has not made sufficient progress in implementing its action plan and continues to have certain strategic AML/CFT deficiencies, including inadequacies in its criminalization of both money laundering and terrorist financing.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
     *"All serious crimes" approach or "list" approach to predicate crimes:* List approach
     *Legal persons covered: criminally:* YES        *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
     *Enhanced due diligence procedures for PEPs: Foreign:* YES        *Domestic:* YES
     *KYC covered entities:* Banks, insurance companies, securities brokers and financial intermediaries

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
     *Number of STRs received and time frame:* Not available
     *Number of CTRs received and time frame:* Not available
     *STR covered entities:* Banks, insurance companies, securities brokers and financial intermediaries

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
     *Prosecutions:* 110 cases related to money laundering, corruption, and terrorist financing in 2011
     *Convictions:* Not available

*RECORDS EXCHANGE MECHANISM:*
     *With U.S.:     MLAT:* NO        *Other mechanism:* NO
     *With other governments/jurisdictions:* Not available

Bolivia is a member of the Financial Action Task Force on Money Laundering in South America (GAFISUD), a FATF-style regional body. Its most recent mutual evaluation can be found here: http://www.gafisud.info/pdf/InformeBolivia.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

The expulsion of the U.S. Drug Enforcement Administration from Bolivia in November 2008 has continued to diminish the effectiveness of several financial investigative groups operating in the country, including Bolivia's Financial Investigative Team, the Bolivian Special Counternarcotics Police, and the Bolivian Special Operations Force. Nevertheless, the Counternarcotics Police's Financial Intelligence and Analysis Group provided the investigative leads for three major cases in 2011, two related to investigations by regional counterparts. Most

money laundering investigations continue to be in the Department of Santa Cruz and are associated with narcotics trafficking organizations.

Bolivia's expulsion from the Egmont Group bars the UIF from participating in Egmont Group meetings or using the Egmont Secure Web (the primary means of information exchange among Egmont Group member FIUs). Bolivia is currently working toward rejoining the Egmont Group and the passage of its TF law in 2011 is a step in the right direction.

Bolivia's AML law does not include all offenses recommended in the international standards. Bolivia should seek to extend its laws to the widest range of predicate offenses.

In September 2011, the Government of Bolivia (GOB) passed new legislation criminalizing terrorist financing. Like the AML law, this law is not sufficiently broad to meet international standards. All terrorist activity must be connected to a group, and "terrorism" appears to be narrowly defined. The financing of an individual terrorist would be covered only if he/she also takes part in such a group. At present there is neither regulation nor guidance on the treatment of suspicious transactions potentially related to terrorist financing, though Bolivian authorities stated guidance will be issued in the last quarter of 2011 and workshops will be organized to communicate the guidelines to responsible entities. Some progress has been made with the new legislation criminalizing TF. However, Bolivia has still to demonstrate that its procedures for monitoring sanctions lists and taking freezing actions can occur in a matter of hours and that the freeze can be maintained indefinitely.

In 2011, the UIF investigated 395 cases involving 1,338 people for suspicious transactions and referred 39 cases to the prosecutor's office. Eleven entities doing banking transactions illegally were closed down. The continued lack of personnel, combined with inadequate resources and weaknesses in Bolivia's basic legal and regulatory framework, limits the UIF's reach and effectiveness. Given the UIF's limited resources relative to the size of Bolivia's financial sector, compliance with reporting requirements is extremely low. The exchange of information between the UIF and appropriate police investigative entities is also limited, although the UIF does maintain a database of suspect persons that financial entities must check before conducting business with clients.

# Brazil

As of 2011, Brazil is the world's seventh largest economy by nominal GDP. Brazil is considered a regional financial center for Latin America. It is a major drug-transit country, as well as one of the world's largest consumer countries. Money laundering in Brazil is primarily related to domestic crime, especially drug trafficking, corruption, organized crime, gambling, and trade in various types of contraband. Laundering channels include the use of banks, real estate investment, financial asset markets, luxury goods, remittance networks, informal financial networks, and trade-based money laundering.

Sao Paulo and the Tri-Border Area (TBA) of Brazil, Argentina, and Paraguay are particular areas that possess high risk factors for money laundering. In addition to weapons and narcotics, a wide variety of counterfeit goods, including CDs, DVDs, and computer software (much of it of Asian origin), are routinely smuggled across the border from Paraguay into Brazil. In addition to Sao

INCSR 2012 Volume II      Money Laundering and Financial Crimes

Paulo and the TBA, other areas of the country are also of growing concern.  The Government of Brazil (GOB) and local officials in the states of Mato Grosso do Sul, and Parana, for example, have reported increased involvement by Rio de Janeiro and Sao Paulo gangs in the already significant trafficking in weapons and drugs that plagues Brazil's western border states.

For additional information focusing on terrorist financing, p lease refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

**DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:** NO

**CRIMINALIZATION OF MONEY LAUNDERING:**
   *"All serious crimes" approach or "list" approach to predicate crimes:*  List approach
   *Legal persons covered:*       *criminally:* NO       *civilly:* NO

**KNOW-YOUR-CUSTOMER (KYC) RULES:**
   *Enhanced due diligence procedures for PEPs: Foreign:* YES        *Domestic:* YES
   *KYC covered entities:*  Commercial and savings banks and credit unions; insurance companies and brokers; securities, foreign exchange, and commodities brokers/traders; real estate brokers; credit card companies; money remittance businesses; factoring companies; gaming and lottery operators and bingo parlors; dealers in jewelry, precious metals, art and antiques

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
   *Number of STRs received and time frame:*
   *Number of CTRs received and time frame:*
   1,038,505 STRs/CTRs in 2010 (only combined figures are available)
   *STR covered entities:* Commercial and savings banks and credit unions; insurance companies and brokers; securities, foreign exchange, and commodities brokers/traders; real estate brokers; credit card companies; money remittance businesses; factoring companies; gaming and lottery operators and bingo parlors; dealers in jewelry, precious metals, art and antiques

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
   *Prosecutions:* Not available
   *Convictions:* Not available

**RECORDS EXCHANGE MECHANISM:**
   *With U.S.:*       *MLAT:* YES       *Other mechanism:* YES
   *With other governments/jurisdiction:* YES

Brazil is a member of the Financial Action Task Force (FATF) and the Financial Action Task Force on Money Laundering in South America (GAFISUD), a FATF-style regional body.  Its most recent mutual evaluation can be found here:   http://www.fatf-gafi.org/document/53/0,3746,en_32250379_32236963_45538741_1_1_1_1,00.html

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

The GOB has achieved visible results over the last few years from investments in border and law enforcement infrastructure that were executed with a view to gradually control the flow of goods, both legal and illegal across Brazil's land borders. Anti-smuggling and law enforcement efforts by state and federal agencies have increased. Brazilian Customs and the Brazilian Tax Authority (Receita Federal) continue to take effective action to suppress the smuggling of drugs, weapons, and contraband goods along the border with Paraguay. Because of the effective crackdown on the Friendship Bridge connecting Foz do Iguaçu, Brazil, and Ciudad del Este, Paraguay, most smuggling has migrated to other sections of the border. The Federal Police have Special Maritime Police Units that aggressively patrol the maritime border areas.

Legal persons are not subject to direct civil or administrative liability for committing money laundering (ML) offenses. Corporate criminal liability is not possible due to fundamental principles of domestic law. Natural and legal persons are not subject to effective sanctions for ML because systemic problems in the court system seriously hamper the ability to obtain final convictions and sentences. There are very few final convictions for ML, and convictions in the first instance are low given the level of ML risk and size of the financial sector. The GOB should take legislative action to establish direct civil or administrative corporate liability for ML and ensure that effective, proportionate and dissuasive sanctions may be applied to legal persons. Brazil also should continue to support the Specialized Federal Courts and other measures to ameliorate the negative impact of some of the systemic problems in the court system which are undermining the ability to effectively apply final sanctions for ML. The GOB should continue taking measures to ensure the overlapping jurisdiction among federal and state law enforcement authorities does not impede the effectiveness of their ability to investigate ML. Brazil also should continue the PNLD training program and extend it as widely as possible to ensure that police, prosecutors and judges at both the state and federal levels have sufficient training in the investigation and prosecution of ML cases.

Most high-priced goods in the TBA are paid for in U.S. dollars, and cross-border bulk cash smuggling is a major concern. Large sums of U.S. dollars generated from licit and suspected illicit commercial activity are transported physically from Paraguay through Uruguay and Brazil to banking centers in the United States. Brazil maintains some controls of capital flows and requires disclosure of the ownership of corporations.

U.S. Immigration and Customs Enforcement established a Brazil-based partner Trade Transparency Unit (TTU) to aggressively analyze, identify, and investigate companies and individuals involved in trade-based money laundering activities between Brazil and the United States. As a result of the TTU, Brazil has identified millions of dollars of lost revenue.

The GOB has generally responded to U.S. efforts to identify and block terrorist-related funds, although the GOB has consistently said there is no evidence of terrorist financing within Brazil despite arrests and designations related to terrorist financing activity within the country.

Although Brazil is a party to the United Nations International Convention for the Suppression of the Financing of Terrorism, it has not criminalized terrorist financing in a manner that is consistent with international standards. Terrorist financing is a predicate offense for money laundering but is not an autonomous offense in Brazil. A bill that has been pending legislative action for over two years contains language that could resolve this gap.

# British Virgin Islands

The British Virgin Islands (BVI) is a United Kingdom (UK) overseas territory with a population of approximately 22,000. The economy depends greatly on tourism and its offshore financial sector. BVI is a well-established financial center offering accounting; banking and legal services; captive insurance; company incorporations; mutual funds administration; trust formation; and shipping registration. The Financial Services Commission (FSC) is the sole supervisory authority responsible for the licensing and supervision of financial institutions under the relevant statutes. As of March 2011, there were 45,666 active companies, seven licensed banks, 216 other fiduciary companies and 2,627 investment businesses registered with the FSC. The banking sector has assets valued at $2.4 billion as of September 2011. Exploitation of its offshore financial services, BVI's unique share structure that does not require a statement of authorized capital, and the lack of mandatory filing of ownership information pose significant money laundering risks.

Tourism accounts for 45% of the economy and employs the majority of the workforce; however, financial services contribute over half of government revenues. BVI's proximity to the U.S. Virgin Islands and the use of the U.S. dollar for its currency pose additional risk factors for money laundering. The BVI are a major target for drug traffickers, who use the area as a gateway to the United States. Drug trafficking in general is a serious problem.

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** YES

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
   ***Legal persons covered:***      ***criminally:*** YES      ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs: Foreign:*** YES      ***Domestic:*** YES
   ***KYC covered entities:*** Banks; currency exchanges; charities and nonprofit associations; dealers in autos, yachts, and heavy machinery; dealers in precious metals and stones; and leasing companies

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   ***Number of STRs received and time frame:*** 191 in 2010
   ***Number of CTRs received and time frame:*** Not available
   ***STR covered entities:*** Banks; currency exchanges; charities and nonprofit associations; dealers in autos, yachts, and heavy machinery; dealers in precious metals and stones; and leasing companies

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
   ***Prosecutions:*** None in 2010
   ***Convictions:*** None in 2010

***RECORDS EXCHANGE MECHANISM:***

*With U.S.:*        *MLAT:* YES        *Other mechanism:* YES
*With other governments/jurisdictions:* YES

BVI is a member of the Caribbean Financial Action Task Force, (CFATF), a Financial Action Task Force-style regional body. Its most recent mutual evaluation can be found here: http://www.cfatf-gafic.org/downloadables/mer/Virgin_Islands_3rd_Round_MER_(Final)_English.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS*

The BVI has improved its international cooperation and information exchange regime and has concluded and enforced Tax Information Exchange Agreements with 20 countries, including the U.S., which all contain provisions sufficient to allow the BVI to exchange relevant information.

While BVI legislation has strengthened due diligence requirements where a representative is acting on another person's behalf, or when the customer is resident in another country, and has extended regulation to money value transfer service operators, these laws are too recent to be evaluated. The FSC has increased its staffing in order to meet the recommended inspection and reporting requirements, especially in light of the new entities covered under the law. The lack of prosecutions for money laundering and a reported decline in number of inspections suggests the FSC should work closely with law enforcement and other authorities.

BVI needs to urgently clarify its publication of data - no data was available for the number of STRs and prosecutions for 2011. In addition, while real estate agents, lawyers, other independent legal advisers, accountants, and dealers in precious metals and stones are covered by the AML/CFT regulations, there appears to be no effective mechanism (i.e., supervision) to ensure compliance with AML/CFT requirements.

The British Virgin Islands is a United Kingdom (UK) Caribbean overseas territory and cannot sign or ratify international conventions in its own right. Rather, the UK is responsible for the BVI's international affairs and may arrange for the ratification of any convention to be extended to the BVI. The 1988 Drug Convention was extended to the BVI in 1995. The UN Convention against Corruption was extended to the BVI in 2006. The International Convention for the Suppression of the Financing of Terrorism and the UN Convention against Transnational Organized Crime have not yet been extended to the BVI.

# Burma

Burma is not a regional or offshore financial center. Its economy is underdeveloped and largely isolated from the international financial system. However, Burma's prolific drug production and lack of transparency make it attractive for domestic money laundering. While its underdeveloped economy is not adequate as a destination to harbor funds, the low risk of enforcement and prosecution makes it appealing to the criminal underground. In addition to drug trafficking, trafficking in persons and public corruption are major sources of illicit proceeds. Money launderers also exploit the illegal trade in wildlife, gems, and timber; and trade-based money laundering is of increasing concern.

Burma is second only to Afghanistan in opium production and is increasingly a source of methamphetamine and amphetamine type substances. Its long, porous borders are poorly patrolled. In some remote regions where smuggling is active, ongoing ethnic tensions, and in some cases armed conflict, impede government territorial control. In other areas, political arrangements between traffickers and Burma's government allow organized crime groups to function with minimal risk of interdiction. The Government of Burma (GOB) considers drug enforcement secondary to security and is willing to allow narcotics trafficking in border areas in exchange for cooperation from ethnic armed groups.

The government dominates the economy. State-owned enterprises and military holding companies control a substantial portion of Burma's resources. A move toward privatization in 2010 transferred significant assets to private parties. This was followed in 2011 by sales of government buildings and plots of land, mostly in Rangoon; however, most new owners appear to be business associates of the former ruling generals or politicians in the current civilian government and some are allegedly connected to drug trafficking.

Corruption is endemic in both business and government. Transparency International's 2010 Corruption Perception Index ranks Burma 176 out of 178 countries. This extensive corruption, overall lack of governmental transparency, and an extremely weak financial regulatory system have stymied the GOB's recent, preliminary gestures toward financial reform. In the past several years, the GOB enacted several reforms intended to reduce vulnerability to drug money laundering in the banking sector. However, connections to powerful patrons still outweigh rule of law, and Burma continues to face significant risk of drug money being funneled into commercial ventures.

Since 1997, the United States has imposed economic sanctions on Burma due to large-scale repression of the country's democratic opposition. Executive Order 13047 (1997) prohibits U.S. persons from making or facilitating new investments in Burma. Subsequent measures expand the scope of economic sanctions. In 2003, the Burmese Freedom and Democracy Act and Executive Order 13310 added a ban on importing Burmese products and exporting financial services to Burma and blocked the assets of the former military government (SPDC) and three designated Burmese foreign trade financial institutions. A 2007 Executive Order (E.O. 13348) freezes the assets of additional designated individuals responsible for human rights abuses and public corruption. In July 2008, Congress enacted legislation that expands the categories of individuals and entities subject to asset freezes and travel restrictions and of Burmese products subject to import bans.

In 2003, the United States also designated Burma as a jurisdiction of primary money laundering concern and imposed countermeasures, pursuant to Section 311 of the USAPATRIOT Act, because of its extremely weak anti-money laundering /counter-terrorist financing (AML/CFT) regime.

In its October 2011 Public Statement, the Financial Action Task Force (FATF) notes concern that Burma continues to have significant strategic AML/CFT deficiencies and has not reported any progress in addressing these deficiencies in accordance with its action plan. In response to FATF Public Statements concerning Burma, the United States continues to issue advisories to financial institutions, alerting them of the risk posed by Burma's AML/CFT deficiencies and of the need to conduct enhanced due diligence with respect to financial transactions involving Burma.

**DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:** NO

**CRIMINALIZATION OF MONEY LAUNDERING:**
   *"All serious crimes" approach or "list" approach to predicate crimes:* List approach
   *Legal persons covered:*       *criminally:* YES      *civilly:* NO

**KNOW-YOUR-CUSTOMER (KYC) RULES:**
   *Enhanced due diligence procedures for PEPs: Foreign:* YES    *Domestic:* YES
   *KYC covered entities:* Banks

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
   *Number of STRs received and time frame:* 214 from January to October 2011
   *Number of CTRs received and time frame:* 137,910 from January to October 2011
   *STR covered entities:* Banks (including bank-operated money changing counters), customs officials, state-owned insurance company and small loans enterprise, securities exchange, accountants, the legal and real estate sectors, and dealers of precious metals and stones

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
   *Prosecutions:* Not available
   *Convictions:*   Not available

**RECORDS EXCHANGE MECHANISM:**
   *With U.S.:*      *MLAT:* NO      *Other mechanism:* NO
   *With other governments/jurisdictions:* YES

Burma is a member of the Asia/Pacific Group on Money Laundering (APG), a FATF-style regional body.  Its most recent mutual evaluation can be found here: http://www.apgml.org/documents/docs/17/Myanmar%202008.pdf

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

Burma's financial sector is extremely underdeveloped and most currency is held outside the formal banking system.  The informal economy generates few reliable records, and the GOB makes no meaningful efforts to ascertain the amount or source of income or value transfers. Regulation of financial institutions is likewise extremely weak.  While some Burmese financial institutions may engage in currency transactions related to international narcotics trafficking that include significant amounts of U.S. currency, the absence of publicly available GOB information precludes confirmation of such conduct.  Burmese law does not contain any customer due diligence (CDD) requirements, although the Central Bank (CB) issues guidelines for banks to follow and some entities implement CDD procedures under other, non-AML related legal provisions.

Burma does not specifically criminalize terrorist financing or designate it as a predicate offense for money laundering, nor is terrorist financing an extraditable offense.

Corruption is pervasive in every level of Burma's government. Senior military officials are essentially above the law and free to engage in a range of activities designed to enrich themselves and maintain their hold on power. Government workers do not receive a living wage and routinely seek bribes as additional "compensation." Any efforts to address the rampant corruption are impeded by the military's control over all civilian authority, including the police. The GOB should end all policies that facilitate corrupt practices and money laundering, including strengthening regulatory oversight of the formal financial sector and implementing a transparent transaction reporting regime. The FIU should become a fully funded independent agency that functions without interference, and the GOB should supply adequate resources to administrative and judicial authorities for their enforcement of government regulations. The GOB should also move the CB from under the operational control of the Ministry of Finance and make it an operationally independent entity.

The GOB should become a party to the UN Convention against Corruption.

# Cambodia

Cambodia is neither a regional nor an offshore financial center. Cambodia is at significant risk for money laundering due to its cash-based and dollarized economy, porous borders, rapidly growing formal banking sector, weak judicial system, and endemic corruption. The National Bank of Cambodia has limited capacity to oversee the growing financial and banking industries, and there is little monitoring of casinos.

Cambodia has a significant black market for smuggled goods, including drugs and imported precursors for local production of the methamphetamine ATS. Regardless of size, both licit and illicit transactions are frequently conducted outside formal financial institutions and are difficult to monitor. Cash proceeds from crime are readily channeled into land, housing, luxury goods, or other forms of property without passing through the formal banking sector.

For additional information focusing on terrorism financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
    *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
    *Legal persons covered:      criminally:* YES      *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
    *Enhanced due diligence procedures for PEPs: Foreign:* YES      *Domestic:* NO
    *KYC covered entities:* Banks; micro-finance institutions; credit cooperatives; security brokerage firms and insurance companies; leasing companies; exchange offices/money exchangers; real estate agents; money remittance services; dealers in precious metals, stones and gems; post offices performing payment transactions; lawyers, notaries, accountants,

auditors, investment advisors and asset managers; casinos and gambling institutions; and NGOs and foundations doing business and raising funds

### *SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*

*Number of STRs received and time frame:* 138 in 2011
*Number of CTRs received and time frame:* 611,976 in 2011
*STR covered entities:* Banks; micro-finance institutions; credit cooperatives; security brokerage firms and insurance companies; leasing companies; exchange offices/money exchangers; real estate agents; money remittance services; dealers in precious metals, stones and gems; post offices performing payment transactions; lawyers, notaries, accountants, auditors, investment advisors and asset managers; casinos and gambling institutions; and NGOs and foundations doing business and raising funds

### *MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*

*Prosecutions:* None
*Convictions:* None

### *RECORDS EXCHANGE MECHANISM:*

*With U.S.:*        *MLAT:* NO      *Other mechanism:* NO
*With other governments/jurisdiction:* YES

Cambodia is a member of the Asia/Pacific Group on Money Laundering, a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation can be found here: http://www.apgml.org/documents/docs/17/Cambodia%20World%20Bank%20DAR%20July%2007.pdf

### *ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

Cambodia's 2007 AML/CFT law defines money laundering, but does not adequately criminalize money laundering and terrorist financing due to the lack of penalty provisions for offenses other than those relating to reporting obligations. The existing penal code, amended in 2010, criminalizes money laundering, but only criminalizes the act of concealment, and does not meet international standards. Furthermore, the AML/CFT law only covers terrorist financing if it is related to a specific terrorist act, and does not cover material support of an individual terrorist or terrorist organization. The Government of Cambodia (GOC) is in the process of amending the AML/CFT law and should ensure the AML/CFT amendment comprehensively criminalizes money laundering and terrorist financing, consistent with international standards.

Cambodia lacks a clear legal or regulatory basis to identify and freeze terrorist assets. While the 2007 Counter Terrorism Law authorizes prosecutors to freeze terrorist assets, the AML/CFT regulations provide for an administrative freeze that places the obligation of identifying and freezing terrorist assets on the banks. Cambodia should address this inconsistency and provide clear measures in the law and regulation that allow for the implementation of international standards. In addition, procedures for the confiscation of funds related to money laundering are inadequate, and the GOC lacks effective controls for cross-border cash transactions. The GOC should establish enforceable instructions for freezing terrorist assets without delay and impose more stringent cross-border cash transaction controls.

Cambodia's nascent financial intelligence unit (FIU) lacks both the capacity and the authority to engage fully in AML/CFT efforts. While the FIU can raise concerns with law enforcement, it forwards CTRs and STRs to the Ministry of the Interior, which determines whether to pursue an investigation. The lack of a clear and coherent reporting and enforcement structure undermines FIU independence and compromises AML/CFT activities. Few covered entities follow STR reporting guidelines. The GOC should rationalize the STR and CTR reporting process to ensure law enforcement agencies have the data they need and covered entities understand the purpose of, and process for, filing STRs. The GOC should also provide training to commercial bank officers, law enforcement agencies, and regulatory bodies.

# Canada

Money laundering activities in Canada are primarily a product of illegal narcotics, psychotropic substances, or chemical precursors. In the UN's 2009 and 2011 World Drug Reports, Canada is cited as the leading supplier of ecstasy in North America as well as a major producer and shipper of methamphetamine for markets around the world. The criminal proceeds laundered in Canada derive primarily from domestic activity which is controlled by drug trafficking organizations and organized crime.

Canada does not have a significant black market for illicit or smuggled goods. Cigarettes are the most commonly smuggled good in the country. There are indications that trade-based money laundering occurs in the jurisdiction. There is no certainty that this activity is tied to terrorist financing activity.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
   *Legal persons covered:        criminally:* YES        *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs: Foreign:* YES        *Domestic:* YES
   *KYC covered entities:* Banks and credit unions; life insurance companies, brokers, and agents; securities dealers; casinos; real estate brokers/agents; agents of the Crown; money services businesses; accountants and accounting firms; lawyers; dealers in precious metals and stones; and notaries in Quebec and British Columbia

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* 1,616 in 2011
   *Number of CTRs received and time frame:* 3,049 in 2011

## INCSR 2012 Volume II      Money Laundering and Financial Crimes

*STR covered entities:*  Banks and credit unions; life insurance companies, brokers, and agents; securities dealers; casinos; real estate brokers/agents; agents of the Crown; foreign exchange and money services businesses; accountants and accounting firms; lawyers; dealers in precious metals and stones; and notaries in Quebec and British Columbia

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
  *Prosecutions:*  35 through 2010
  *Convictions:*   One

*RECORDS EXCHANGE MECHANISM:*
  *With U.S.:*      *MLAT:* YES      *Other mechanism:*  YES
  *With other governments/jurisdictions:*  YES

Canada is a member of the Financial Action Task (FATF) and the Asia/Pacific Group on Money Laundering (APG), a FATF-style regional body.  Its most recent mutual evaluation can be found here:  http://www.fatf-gafi.org/document/58/0,3746,en_32250379_32236963_40199098_1_1_1_1,00.html

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

Reported incidents involving money laundering have increased substantially in Canada over the last decade.  The vast majority of money laundering cases in Canada, however, have failed to lead to convictions.  Statistics Canada reported in 2011 that out of 29 cases involving money laundering in 2009 and 2010, only 34% resulted in a conviction.  The same report indicated that many cases of money laundering go unsolved in Canada.  Canadian law enforcement was able to identify a suspect in only 18% of reported money laundering cases in 2009.  Money laundering offenses have a higher threshold for prosecution and conviction than the offense of benefiting from the proceeds of crime.  Criminals appear willing to forfeit assets and plead guilty to lesser charges to avoid prosecution under AML and proceeds of crime statutes.

The Financial Transactions Reports Analysis Centre of Canada (FINTRAC) is Canada's financial intelligence unit.  FINTRAC plays a central role in Canada's fight against money laundering and terrorism.  The time between FINTRAC's initial receipt of STRs and the conclusion of an investigation can be quite lengthy, a noted criticism (average number of days for a report dropped from 68 to 56 from 2010-2011).

Lawyers in several provinces have successfully challenged the applicability of the AML law based upon common law attorney-client privileges; therefore, lawyers are not completely covered by the AML provisions.

Deficiencies have been identified in Canada's anti-money laundering/counter-terrorist financing regime relating to its customer due diligence obligations.  In 2011, the Canadian government proposed changes to the Proceeds of Crime (Money Laundering) and Terrorist Financing Regulations in order to address those deficiencies and to improve Canada's compliance with international standards.  The proposed changes would require reporting entities to better identify customers and understand their business, which will consequently enable them to identify transactions and activities that are at greater risk for money laundering or terrorist financing.

While the law provides sufficient powers to Canadian law enforcement to pursue money launderers, the budget for relevant law enforcement authorities has not increased; additional resources could increase the effectiveness of existing laws. Provincial and federal statistics should be tracked jointly. Appropriately tracking these cases could reveal a more robust rate of money laundering related convictions.

Canada should continue its work to strengthen its AML/CFT measures within the casino industry and reduce the length of time needed for FINTRAC to prepare reports used by law enforcement authorities. Canada also should continue to ensure its privacy laws do not excessively prohibit provision of information to domestic and foreign law enforcement that might lead to prosecutions and convictions.

# Cayman Islands

The Cayman Islands, a United Kingdom (UK) Caribbean overseas territory, is an offshore financial center. Most money laundering that occurs in the Cayman Islands is primarily related to fraud and drug trafficking. Due to its status as a zero-tax regime, the Cayman Islands is also considered attractive to those seeking to evade taxes in their home jurisdictions.

The Cayman Islands is home to a well-developed offshore financial center that provides a wide range of services, including banking, structured finance, investment funds, various types of trusts, and company formation and management. As of December 2010, the banking sector had $1.73 trillion in assets. There were approximately 250 banks, 150 active trust licenses, 730 captive insurance companies, nine money service businesses, and more than 85,000 companies licensed or registered in the Cayman Islands. According to the Cayman Islands Monetary Authority, at year end 2010, there were approximately 9,000 registered mutual funds, of which 435 were administered and 133 were licensed. Shell banks are prohibited, as are anonymous accounts. Bearer shares can only be issued by exempt companies and must be immobilized.

Gambling is illegal; and the Cayman Islands do not permit the registration of offshore gaming entities. There are no free trade zones, and the authorities do not see risks from bulk cash smuggling related to the large number of cruise ships that dock at the island.

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
   *Legal persons covered:*      *criminally:* YES      *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs: Foreign:* YES      *Domestic:* YES
   *KYC covered entities:* Banks, trust companies, investment funds, fund administrators, insurance companies and managers, money service businesses, corporate and trust service

INCSR 2012 Volume II      Money Laundering and Financial Crimes

providers, money transmitters, dealers of precious metals and stones, and the real estate industry

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
*Number of STRs received and time frame:* 353 between April 2010 and March 2011.
*Number of CTRs received and time frame:* Not applicable
*STR covered entities:* Banks, trust companies, investment funds, fund administrators, insurance companies and managers, money service businesses, corporate and trust service providers, money transmitters, dealers of precious metals and stones, and the real estate industry

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
*Prosecutions:* Eight between 2003 and 2010
*Convictions:* One since 2006

**RECORDS EXCHANGE MECHANISM:**
*With U.S.:*     *MLAT:* YES     *Other mechanism:* YES
*With other governments/jurisdictions:* YES

The Cayman Islands is a member of the Caribbean Financial Action Task Force (CFATF), a FATF-style regional body. Its most recent mutual evaluation can be found here: http://www.cfatf-gafic.org/downloadables/mer/Cayman_Islands_3rd_Round_MER_(Final)_English.pdf

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

While the Cayman Islands has increased both its regulatory and law enforcement staffing, the number of prosecutions and convictions is extremely low given the vast scale of the country's financial sector; only six successful prosecutions for money laundering, and only one conviction in the last four years.

International reporting suggests agents for private trust companies and individuals carrying on trust businesses may not consistently maintain identity and ownership information for all express trusts for which they act as trustees. In addition, there remains a lack of penalties for failing to report ownership and identity information, which undermines the effectiveness of identification obligations. This is a particular problem for an estimated 3,000 unregulated mutual funds resident in the Cayman Islands. There also is a need to pay greater attention to the risks and proper supervision of non-profit organizations.

The Cayman Islands continues to develop its network of exchange of information mechanisms. Since 2010, the Cayman Islands has signed a further five tax information exchange agreements, with Canada, Mexico, Japan, India and South Africa, which meet the international standard. It now has a network of 24 information exchange agreements, with 12 of those already in force.

The Cayman Islands is a United Kingdom (UK) Caribbean overseas territory and cannot sign or ratify international conventions in its own right. Rather, the UK is responsible for the Cayman Islands' international affairs and may arrange for the ratification of any Convention to be extended to the Cayman Islands. The 1988 Drug Convention was extended to the Cayman Islands in 1995 and is implemented through several laws. The UN Convention against

Corruption and the UN Convention against Transnational Organized Crime have not yet been extended to the Cayman Islands. However, the full implementation platform for the anti-corruption convention exists under current Cayman law. A 2002 request for extension of the International Convention for the Suppression of the Financing of Terrorism to the Cayman Islands has not yet been finalized by the UK, although the provisions of the Convention also are implemented by domestic laws.

# China, People's Republic of

China is swiftly becoming a major global financial center, with a rapidly growing economy and increased integration in the international market. The primary sources of criminal proceeds are corruption, narcotics and human trafficking, smuggling, economic crimes, intellectual property theft, counterfeit goods, crimes against property, and tax evasion. Money is generally laundered through bulk cash smuggling, trade-based fraud (over/under pricing of goods, falsified bills of lading and customs declarations, counterfeit import/export contracts), real estate, and both the formal and underground banking systems.

Most money laundering cases currently under investigation involve funds obtained from corruption and bribery. Proceeds of tax evasion, recycled through offshore companies, often return to China disguised as foreign investment and, as such, receive tax benefits. Chinese officials have noted that most acts of corruption in China are closely related to economic activities that accompany illegal money transfers.

Chinese authorities have observed that the increase in AML efforts by banks has been accompanied by increased laundering through the underground banking system and trade fraud. Value transfer via trade goods, including barter exchange, is a common component in Chinese underground finance. Many Chinese underground trading networks in Africa, Asia, the Middle East, and the Americas participate in the trade of Chinese-manufactured counterfeit goods.

China is not a major offshore financial center. China has multiple Special Economic Zones (SEZs) and other designated development zones at the national, regional, and local levels. SEZs include Shenzhen, Shantou, Zhuhai, Xiamen, and Hainan, along with 14 coastal cities and over 100 designated development zones.

For additional information focusing on terrorism financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* YES

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* List approach
   *Legal persons covered:      criminally:* YES    *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*