INCSR 2012 Volume II        Money Laundering and Financial Crimes

*Enhanced due diligence procedures for PEPs:  Foreign:* YES   *Domestic:* YES
*KYC covered entities:* Banks, securities dealers, insurance companies

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
*Number of STRs received and time frame:* 61,852,018 in 2010
*Number of CTRs received and time frame:* China does not separate STRs and CTRs
*STR covered entities:* Banks, securities dealers, and insurance companies

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
*Prosecutions:* Not available
*Convictions:* 11,456 in 2010

*RECORDS EXCHANGE MECHANISM:*
*With U.S.:*     *MLAT:* NO     *Other mechanism:* YES
*With other governments/jurisdictions:* YES

China is a member of the Financial Action Task Force (FATF), as well as the Asia/Pacific Group on Money Laundering (APG) and the Eurasian Group on Combating Money Laundering and Terrorist Financing (EAG), both of which are FATF-style regional bodies (FSRB).  Its most recent mutual evaluation can be found here:  http://www.fatf-gafi.org/dataoecd/33/11/39148196.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

In 2011, the Government of China (GOC) adopted special legislation that defines the legal scope of "terrorist activities" related to the crime of terrorist financing (among other crimes) and provides the legal basis for the establishment of a national, interagency terrorist asset freezing body that, if robustly implemented, should bring China into greater compliance with the requirements of UNSCRs 1267 and 1373.

The GOC should strengthen AML/CFT enforcement efforts to keep pace with the sophistication and reach of criminal and terrorist networks.  Although mandatory, the courts do not systematically pursue the confiscation of criminal proceeds, which undermines any disincentive to commit the crime.  The GOC should ensure that all courts are aware of and uniformly implement the mandatory confiscation laws.  China also should enhance coordination among its financial regulators and law enforcement bodies to better investigate and prosecute offenders. China's Ministry of Public Security should continue ongoing efforts to develop a better understanding of how AML/CFT tools can be used to support the investigation and prosecution of a wide range of criminal activity.

U.S. law enforcement agencies note that the GOC has not cooperated sufficiently on financial investigations and does not provide adequate responses to requests for financial investigation information.  In addition to the lack of law enforcement based cooperation, the GOC's inability to enforce U.S. court orders or judgments obtained as a result of non-conviction based forfeiture actions against China-based assets remains a significant barrier to enhanced U.S. - China cooperation in asset freezing and confiscation.

The GOC should expand cooperation with counterparts in the United States and other countries, and pursue international linkages in AML/CFT efforts more aggressively.  U.S. agencies

consistently seek to expand cooperation with Chinese counterparts on AML/CFT matters and to strengthen both policy- and operational-level cooperation in this critical area. While China continues to make significant improvements to its AML/CFT legal and regulatory framework and is gradually making progress toward meeting the international standards, implementation, particularly in the context of international cooperation, remains lacking.

# Colombia

The Government of Colombia (GOC) is a regional leader in the fight against money laundering and terrorist financing. The GOC has a forceful anti-money laundering/counter-terrorist financing (AML/CFT) regime; however, the laundering of money from Colombia's illicit cocaine and heroin trade continues to penetrate its economy and affect its financial institutions. Laundered funds also are derived from commercial smuggling for tax and import duty evasion; kidnapping; arms trafficking; and terrorism connected to violent, illegally-armed groups and guerrilla organizations, including U.S. Government-designated terrorist organizations.

Both drug and money laundering organizations use a variety of methods to repatriate their illicit proceeds to Colombia. These methods include the Black Market Peso Exchange (BMPE), bulk cash smuggling, wire transfers, remittances, smuggled merchandise (contraband) and more recent methods, such as through the securities markets (both U.S. and Colombian), casinos, electronic currency and prepaid debit cards as well as illegal mining. Criminal elements have used the banking sector, and Colombian money brokers, primarily concentrated in Bogota, but also in Medellin and Cali, are additional entities that facilitate money laundering activities. The trade of counterfeit items in violation of intellectual property rights is an ever increasing method to launder illicit proceeds. Casinos, free trade zones (FTZs) and the postal money order market in Colombia present opportunities for criminals to take advantage of inadequate regulation and transparency.

Money laundering also has occurred via trade and the non-bank financial system, especially transactions that support the informal or underground economy. Trade-based money laundering by Colombian organizations with connections to Mexico, China, Ecuador, Peru and Panama has grown exponentially in recent years. In the BMPE, or trade-based money laundering scheme, goods from abroad (China has replaced the United States) are bought with drug dollars. Many of the goods are either smuggled into Colombia or brought directly into Colombia's customs warehouses, thus avoiding various taxes, tariffs and legal customs duties. In other trade-based money laundering schemes, goods are over-or-under invoiced to transfer value. According to people who have worked for years in the BMPE industry, evasion of the normal customs charges is frequently facilitated through the corruption of Colombian oversight authorities by the drug and money laundering groups.

Official corruption has also aided money laundering and terrorist financing in geographic areas controlled by the Revolutionary Armed Forces of Colombia (FARC). Although corruption of government officials remains a problem, President Juan Manuel Santos has taken a hard line on corruption and has demonstrated that he is serious about punishing corrupt officials at the highest level. Since Santos entered office, four former ministers, three former security directors of the Administrative Department, and other government officials have been dismissed from office, taken to court, or jailed.

In 2005, Colombia's Congress passed a comprehensive FTZ modernization law that opens investment to international companies, allows one-company or stand-alone FTZs, and permits the designation of pre-existing plants as FTZs. As of September 2011, there are 91 FTZs in Colombia. Companies within FTZs enjoy a series of benefits such as a preferential corporate income tax rate and exemption from customs duties and value-added taxes on imported materials. The Ministry of Commerce administers requests for establishing FTZs, but the government does not participate in their operation. The DIAN (Colombia's Tax and Customs Authority), regulates activities and materials in FTZs, and there are identification requirements for companies and individuals who enter or work in the FTZs. The Santos Administration is revising the FTZ and tax exemption scheme in order to limit their use in the near future.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* YES

*CRIMINALIZATION OF MONEY LAUNDERING:*
    *"All serious crimes" approach or "list" approach to predicate crimes:* List approach
    *Legal persons covered:      criminally:* YES      *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
    *Enhanced due diligence procedures for PEPs: Foreign:* NO      *Domestic:* NO
    *KYC covered entities:* Banks, stock exchanges and brokers, mutual funds, investment funds, export and import intermediaries, credit unions, wire remitters, money exchange houses, public agencies, notaries, casinos, lottery operators, car dealers, and foreign currency traders

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
    *Number of STRs received and time frame:* 4,904 January through August 2011
    *Number of CTRs received and time frame:* 98,076 January through August 2011
    *STR covered entities:* Banks, securities broker/dealers, trust companies, pension funds, savings and credit cooperatives, depository and lending institutions, lotteries and casinos, vehicle dealers, currency dealers, importers/exporters and international gold traders

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
    *Prosecutions:* 115 in 2010
    *Convictions:* 95 in 2010

*RECORDS EXCHANGE MECHANISM:*
    *With U.S.:      MLAT:* YES      *Other mechanism:* YES
    *With other governments/jurisdictions:* YES

Colombia is a member of GAFISUD, a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation can be found here: http://www.gafisud.info/pdf/InformedeEvaluacinMutuaRepblicadeColombia_1.pdf

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

The Government of Colombia continues to make progress in the development of its financial intelligence unit, regulatory framework and interagency cooperation within the government. However, referrals from the Colombian UIAF (Financial Intelligence Unit) to the public ministry for ML/TF cases substantially decreased in 2011 and therefore prosecutions have decreased as well. Placing greater focus and priority on money laundering investigations, including increasing resources and training, will be necessary to ensure continued and improved progress. The GOC should take steps to foster better interagency cooperation, including coordination between the UIAF, Colombia's financial intelligence unit; National Police; Colombia's Trade Transparency Unit; and the tax and customs authority in order to combat the growth in contraband trade to launder illicit drug proceeds. Congestion in the court system, procedural impediments, and corruption remain problems that need to be addressed.

Colombian law lists specific predicate crimes upon which it bases money laundering violations. The included crimes generally involve illegal armed groups and criminal syndicates and their related activities.

The Colombian legal system has evolved with the introduction of the adversarial oral system. Related to this, the Prosecutor General's Office (Fiscalia), has undergone a transformation that has resulted in the loss of significant institutional knowledge and professional ability. This has been due, in large part, to a court decision requiring staffing changes whereby many experienced prosecutors were let go and new hires replaced them. The office is in the process of reconstructing its capabilities, but its effectiveness has been affected..

The Colombian Superintendency of Companies (SuperSociedades) has been working on new anti-money laundering regulations and know-your-customer regulations for the private sector that should be announced by the end of 2011.

While the Colombian financial system has banking controls and government regulatory processes in place, it is reported that drug and money laundering groups have influenced high level bank officials in order to circumvent both established anti-money laundering controls and government regulations.

Colombian law is unclear on the government's authority to block assets of individuals and entities on the UN 1267 Sanctions Committee's consolidated list. Banks are able to close accounts, but not to seize assets. Colombian law should be clarified to spell out the government's authority to block assets of individuals and entities on the UN 1267 Sanctions Committee's consolidated list.

The GOC should put in place streamlined procedures for the liquidation and sale of seized assets under state management and should revise procedures to permit expedited forfeiture of seized assets. A five to 15 year time frame for forfeiture opens opportunities for waste, fraud and abuse while limiting the deterrent effect that could result from rapid asset forfeiture. Colombian prosecutors could take steps to not only seize the physical assets (real property) of narcotics traffickers but also seize their bank accounts in Colombia. This element is frequently not a part of regular Colombian asset seizure operations. In addition, the GOC should increase the number of judges that oversee asset forfeiture and money laundering cases to expedite the judicial process.

The GOC works extensively with U.S. law enforcement agencies to identify, target and prosecute groups and individuals engaged in financial and drug crimes. The GOC should explore steps to foster increased cooperation between the UIAF and the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN) and Office of Foreign Assets Control (OFAC) as case exchanges substantially decreased in 2011.

# Costa Rica

While not a major regional financial center, Costa Rica remains vulnerable to money laundering and other financial crimes, including various schemes that target U.S.-based victims. Money laundering activities are primarily related to the foreign proceeds of international trafficking in cocaine. A sizeable internet gaming industry also launders millions of dollars in illicit proceeds through Costa Rica and offshore centers annually. To a lesser extent, proceeds are laundered in Costa Rica from domestic criminal activities, including trafficking narcotics, persons or arms; fraud; corruption; and contraband smuggling. A significant market exists in the smuggling of contraband liquors from bordering countries. The Government of Costa Rica (GOCR) reports that Costa Rica is primarily used as a bridge to send funds to and from other jurisdictions using, in many cases, companies or banks established in offshore financial centers.

Money laundering occurs across the formal financial sector; the non-financial sector, especially via both licensed and unlicensed money remitters; and within the free trade zones (FTZs). Nicaraguan nationals residing in Costa Rica send over $200 million in remittances annually to family members in their home country, much of which is sent via unlicensed money remitters. Both these unlicensed and licensed money services businesses are a significant risk for money laundering and a potential mechanism for terrorist financing. In addition, Costa Rica's 35 FTZs, used by approximately 284 companies, are susceptible to money laundering. The smuggling of bulk currency across borders with Panama and Nicaragua is also prevalent. Trade-based money laundering, while utilized, has not been detected with the same frequency as the other typologies described above. The GOCR has not reported investigations of terrorism financing in 2011.

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*  NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
  *"All serious crimes" approach or "list" approach to predicate crimes:*  All serious crimes
  *Legal persons covered:*        *criminally:* NO           *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
  *Enhanced due diligence procedures for PEPs: Foreign:* YES         *Domestic:* YES
  *KYC covered entities:* Banks, credit institutions, and savings and loan cooperatives; pension funds; insurance companies and agents; money exchangers and remitters; trust managers, investment fund and safekeeping companies; issuers, sellers or redeemers of travelers checks and postal money orders; and securities dealers

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
   *Number of STRs received and time frame:*  294 from January – September 2011
   *Number of CTRs received and time frame:*  Not available
   *STR covered entities:*  Banks, credit institutions, and savings and loan cooperatives; pension
   funds; insurance companies and agents, money exchangers and remitters; trust managers,
   investment fund and safekeeping companies; issuers, sellers or redeemers of travelers checks
   and postal money orders; and securities dealers

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
   *Prosecutions:*  Nine from December 2010 to October 2011
   *Convictions:*   Two from December 2010 to October 2011

**RECORDS EXCHANGE MECHANISM:**
   *With U.S.:*     *MLAT:*  NO     *Other mechanism:*  YES
   *With other governments/jurisdictions:*  YES

Costa Rica is a member of the Financial Action Task Force on Money Laundering in South
America (GAFISUD), a Financial Action Task Force-style regional body.  Its most recent mutual
evaluation can be found here:  http://www.cfatf-gafic.org/mutual-evaluation-reports.html

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

In October 2010, the Judicial Branch appointed a new Attorney General.  As part of a subsequent
restructuring, in December 2010, the Attorney General's Office (AGO) transferred the
prosecution of money laundering cases from the Organized Crime Bureau to the Economic
Crimes Bureau.  In addition, the Attorney General appointed a new bureau chief to the renamed
Economic Crimes, Taxation, and Money Laundering Bureau.  Based on these changes, beginning
in January 2011, there has been a significant emphasis placed on money laundering
investigations, including those involving advanced typologies and transnational crime.
Nevertheless, the AGO and the Judicial Police still lack adequate resources to effectively
investigate and prosecute many of the complex money laundering cases linked to Costa Rica.

Moreover, the legal doctrine of "self-laundering" (autolavado in Spanish) prevents prosecutors
from charging money laundering in many cases.  Under Costa Rican law, a person who commits
a predicate crime and who subsequently launders the proceeds of that crime cannot be charged
with money laundering as an additional offense (e.g., a drug dealer who is convicted on drug
charges cannot also be prosecuted for laundering the drug proceeds).  In Costa Rica, money
launderers oftentimes use legitimate businesses and shell corporations to launder illegal
proceeds.  However, criminal liability does not extend to legal persons.

Land-based casinos and internet gaming companies are effectively not regulated in Costa Rica
and represent a significant risk for money laundering.  The online gaming industry transacts
billions of dollars annually and employs thousands of Costa Rican nationals.  Most of its
proceeds are laundered in offshore centers but millions of dollars still circulate in Costa Rica.

The GOCR reports that Costa Rican attorneys oftentimes conduct large cash purchases of real
estate on behalf of persons located in the United States.  While many of these transactions appear
legal, the GOCR has concerns that some of the international wire transfers ostensibly for

legitimate real estate transactions are, in fact, the proceeds of illegal activities in the United States.

In 2011, the GOCR pursued its first case under the 2009 civil forfeiture law.  The presiding judge subsequently referred the case to the Costa Rican Supreme Court for an advisory opinion which has yet to be issued.  It is still unclear whether the GOCR will assist other countries in obtaining non-conviction-based forfeiture.

While it has demonstrated a genuine commitment to strengthening its anti-money laundering/counter-terrorist financing (AML/CFT) regulatory regime, the GOCR has not fully implemented recently enacted risk-based regulations.  The GOCR and its regulators have focused considerable attention on the formal financial sector; however, they have not adequately supervised money service businesses, especially money remitters, and issuers, sellers or redeemers of travelers checks and postal money orders.  While the FIU is tasked with oversight authority with respect to these entities, it lacks the resources, personnel, or capacity to comply with this mandate.  Additionally, designated non-financial businesses and professions (DNFBPs), such as dealers of precious stones and metals, accountants, real estate agents, lawyers and notaries, are not covered by the AML/CFT provisions.

# Curacao

In late 2010, Curacao became a new autonomous country within the Kingdom of the Netherlands.  Curacao enjoys a high degree of autonomy on most internal matters but defers to the Kingdom of the Netherlands (KON) in matters of defense, foreign policy, final judicial review, human rights, and good governance.  Curacao is a regional financial center and a transshipment point for drugs from South America bound for the United States and Europe.  Money laundering is primarily related to proceeds from illegal narcotics.  Money laundering organizations can take advantage of banking secrecy and use offshore banking and incorporation systems, economic zone areas, and resort/casino complexes to place, layer and launder drug proceeds.  Another possible area of money laundering activity may be through wire transfers between the island and the Netherlands.  Bulk cash smuggling is a continuing problem due to the close proximity of Curacao to South America.

Curacao has two free economic zones.  It is not known to what extent "contrabanding" (using bulk cash to buy actual products which are shipped to South America and sold, thus legitimizing the profits) occurs.  The worldwide financial recession has significantly slowed the economic activities of the zones.  Curacao has an active "e-zone" which provides potential e-commerce investors a variety of tax saving opportunities and could be vulnerable to illegal activities.

Curacao's offshore financial sector consists of trust service companies providing financial and administrative services to an international clientele, including offshore companies, mutual funds, and international finance companies.  The extent of this sector is not clear, but it has declined in scale due to the worldwide financial crisis.  Banking regulations require international banks to have a physical presence and maintain records on the island.  Bearer shares of international companies must be kept in custody and onshore companies are not allowed to have bearer shares.  Several casinos and Internet gaming companies operate.

**INCSR 2012 Volume II        Money Laundering and Financial Crimes**

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
 *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
 *Legal persons covered:        criminally:* YES        *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
 *Enhanced due diligence procedures for PEPs: Foreign:* YES        *Domestic:* YES
 *KYC covered entities:* Onshore and offshore banks, saving banks, money remitters, credit card companies, credit unions, life insurance companies and brokers, trust companies and other service providers, casinos, customs, lawyers, notaries, accountants, tax advisors, jewelers, car dealers, real estate agents, administration offices, tax advisors, lawyers, and accountants

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
 *Number of STRs received and time frame:* Not available
 *Number of CTRs received and time frame:* Not available
 *STR covered entities:* Local and international  banks, saving banks, money remitters, credit card companies, credit unions, life insurance companies, insurance brokers, company and other service providers , casinos, customs, lawyers, notaries, accountants, tax advisors, jewelers, car dealers, real estate agents, administration offices, and other tax, legal, and accountancy experts

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
 *Prosecutions:* 24  - January - May 2010
 *Convictions:*  23  - January - May 2010

*RECORDS EXCHANGE MECHANISM:*
 *With U.S.:        MLAT:* YES        *Other mechanism:* YES
 *With other governments/jurisdictions:* YES

Curacao is a member of the Caribbean Financial Action Task Force, (CFATF), a Financial Action Task Force-style regional body.  The first AML/CFT evaluation of Curacao occurred in August/September of 2011.  Once adopted, the mutual evaluation report will be found here: http://www.cfatf-gafic.org/mutual-evaluation-reports.html

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

A new penal code was passed by parliament and was to be published on November 15, 2011. Terrorism financing is now specifically criminalized and legal persons are subject to criminal and administrative penalties.

Curacao should ensure that it continues its regulation and supervision of the offshore sector and free trade zones, as well as pursuing money laundering investigations and prosecutions.  Curacao should work to fully develop its capacity to investigate and prosecute money laundering and terrorist financing cases.

The Mutual Legal Assistance Treaty between the KON and the U.S. applies to Curacao; however, the treaty is not applicable to requests for assistance relating to fiscal offenses addressed to the Netherlands Antilles.

Curacao is part of the Kingdom of the Netherlands and cannot sign or ratify international conventions in its own right. Rather, the Netherlands may arrange for the ratification of any convention to be extended to Curacao. The 1988 Drug Convention was extended to Curacao in 1999. The International Convention for the Suppression of the Financing of Terrorism was extended to the Netherlands Antilles, and as successor, to Curacao on March 22, 2010. The UN Convention against Transnational Organized Crime and the UN Convention against Corruption have not yet been extended to Curacao.

# Cyprus

Since 1974, Cyprus has been divided de facto into the government-controlled two-thirds of the island and the Turkish Cypriot-administered one-third. The Government of the Republic of Cyprus (ROC) has continued to be the only internationally recognized authority; in practice, its authority extends only to the government-controlled area. In 1983, the Turkish Cypriots declared an independent "Turkish Republic of Northern Cyprus" ("TRNC"). The United States does not recognize the "TRNC," nor does any country other than Turkey. This section of the report discusses the area controlled by the ROC. A separate section on the area administered by Turkish Cypriots follows.

Cyprus is a major regional financial center with a robust financial services industry and a significant amount of nonresident businesses. A number of factors have contributed to the development of Cyprus as a financial center: a preferential tax regime; double tax treaties with 44 countries (including the United States, several European Union (EU) nations, and former Soviet Union nations); well developed and modern legal, accounting and banking systems; a sophisticated telecommunications infrastructure; and EU membership. There are no legal or substantive distinctions between domestic and offshore companies. Cyprus has also lifted the prohibition from doing business domestically, and companies formerly classified as offshore are now free to engage in business locally. International business companies are allowed to be registered in Cyprus but their ultimate beneficial ownership must be disclosed to the authorities. There are over 240,000 companies registered in Cyprus, many of which belong to non-residents. The same disclosure, reporting, tax and other laws and regulations apply equally to all registered companies.

Like any financial center, Cyprus faces risks from money laundering and illicit finance activities. The Cypriot authorities are aware of those risks and take legislative and other measures to counter and suppress such activities. The biggest threats for money laundering are primarily from simple financial crime domestically and tax evasion internationally. There is no significant black market for smuggled goods in Cyprus. What little black market trade exists is usually related to small scale transactions, typically involving fake clothing, pirated CDs/DVDs and cigarettes moved across the UN-patrolled buffer zone separating the ROC from the "TRNC".

Cyprus has three free trade zones (FTZs). Two, located in the main seaports of Limassol and Larnaca, are used only for transit trade, while the third, located near the international airport in Larnaca, can also be used for repacking and reprocessing. These areas are treated as being outside normal EU customs territory. Consequently, non-EU goods placed in FTZs are not subject to any import duties, VAT or excise tax. FTZs are governed under the provisions of relevant EU and Cypriot legislation. The Department of Customs has jurisdiction over all three areas and can impose restrictions or prohibitions on certain activities, depending on the nature of the goods.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
   ***Legal persons covered:***        ***criminally:*** YES        ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs: Foreign:*** YES     ***Domestic:*** NO
   ***KYC covered entities:*** Banks, cooperative credit institutions, securities and insurance firms, payment institutions including money transfer businesses, trust and company service providers, auditors, tax advisors, accountants, real estate agents, dealers in precious stones and gems, and in certain cases, attorneys

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   ***Number of STRs received and time frame:*** 510 in 2010
   ***Number of CTRs received and time frame:*** Not available
   ***STR covered entities:*** Banks, cooperative credit institutions, securities and insurance firms, payment institutions including money transfer businesses, trust and company service providers, auditors, tax advisors, accountants, real estate agents, dealers in precious stones and gems, and in certain cases, attorneys, plus any person who in the course of his profession, business or employment knows or reasonably suspects that another person is engaged in money laundering or terrorist financing activities

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
   ***Prosecutions:*** 41 in 2010
   ***Convictions:*** 15 in 2010

***RECORDS EXCHANGE MECHANISM:***
   ***With U.S.:***     ***MLAT:*** YES     ***Other mechanism:*** YES
   ***With other governments/jurisdictions:*** YES

Cyprus is a member of the Council of Europe's Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a Financial

Action Task Force-style regional body (FSRB). Its most recent mutual evaluation report can be found here: http://www.coe.int/t/dghl/monitoring/moneyval/Countries/Cyprus_en.asp

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

There are no legal issues hampering Cyprus' ability to assist foreign governments in mutual legal assistance requests. Cypriot law allows MOKAS, the Cypriot financial intelligence unit (FIU) to share information with other FIUs without benefit of a memorandum of understanding (MOU).

Cyprus has enacted comprehensive legislation and established systems for identifying, tracing, freezing, seizing, and forfeiting narcotics-related assets and assets derived from other serious crimes. Like most EU countries, though, Cyprus has no provisions allowing civil forfeiture of assets without a criminal case. The police and the FIU are responsible for tracing, seizing and freezing assets and they fully enforce existing legislation. Cyprus has an independent national system and mechanism for freezing terrorist assets, and has also engaged in bilateral and multilateral negotiations with other governments to enhance its asset tracking and seizure system.

**Area Administered by Turkish Cypriots**

The Turkish Cypriot community continues to lack the legal and institutional framework necessary to provide effective protection against the risks of money laundering, although significant progress has been made in recent years with the passage of "laws" better regulating the onshore and offshore banking sectors and casinos. There are currently 21 domestic banks in the area administered by Turkish Cypriots and Internet banking is available.

The offshore banking sector remains a concern. The offshore sector consists of 11 banks and 90 companies. The offshore banks may not conduct business with residents of the area administered by Turkish Cypriots and may not deal in cash. The "Central Bank" provides the regulation and licensing of offshore banks and audits the offshore entities, which must submit an annual report on their activities. The "law" permits only banks previously licensed by Organization for Economic Co-operation and Development (OECD)-member nations or Turkey to operate an offshore branch in northern Cyprus.

The Turkish Cypriot community is not part of any FSRB and thus is not subject to normal peer evaluations. Turkish Cypriot authorities have taken steps to address the risk of financial crime, including enacting an "anti-money laundering law ("AMLL")" for the area and formally establishing an FIU equivalent. The "AMLL" aims to reduce the number of cash transactions in the area administered by Turkish Cypriots as well as improve the tracking of any transactions above 10,000 Euros (approximately $13,000).

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
   ***Legal persons covered:       criminally:*** YES          ***civilly:*** YES

**KNOW-YOUR-CUSTOMER (KYC) RULES:**
  *Enhanced due diligence procedures for PEPs:  Foreign:* NO    *Domestic:* NO
  *KYC covered entities:* Banks, cooperative credit societies, finance companies,
  leasing/factoring companies, portfolio management firms, investment firms, jewelers, foreign
  exchange bureaus, real estate agents, retailers of games of chance, lottery authority,
  accountants, insurance firms, cargo firms, antique dealers, auto dealers, lawyers

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
  *Number of STRs received and time frame:* 105 in 2011 (as of October 30, 2011)
  *Number of CTRs received and time frame:* Not available
  *STR covered entities:* Banks, cooperative credit societies, finance companies,
  leasing/factoring companies, portfolio management firms, investment firms, jewelers, foreign
  exchange bureaus, real estate agents, retailers of games of chance, lottery authority,
  accountants, insurance firms, cargo firms, antique dealers, auto dealers, lawyers

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
  *Prosecutions:* None
  *Convictions:*  None

**RECORDS EXCHANGE MECHANISM:**
  *With U.S.:     MLAT:* NO     *Other mechanism:* NO
  *With other governments/jurisdictions:* YES – with Turkey only

The area administered by Turkish Cypriots is not a member of any FSRB.

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

Despite the 2009 promulgation of more strict "laws," the 24 operating casinos (four in Nicosia,
five in Famagusta and 15 in Kyrenia) remain essentially unregulated due to the lack of an
enforcement or investigative mechanism by the casino regulatory body and efforts to de-
criminalize any failure by casinos to follow KYC regulations.

Banks and other designated entities must submit STRs to the "FIU". The "FIU" then will
forward any STRs to the five-member "Anti-Money Laundering Committee" which decides
whether to further refer suspicious cases to the "attorney general's office," and then if necessary,
to the "police" for further investigation. The five-member committee is composed of
representatives of the "Ministry of Economy," "Money and Exchange Bureau," "Central Bank,"
"police" and "customs".

The Turkish Cypriot "AMLL" provides better banking regulations than were in force previously,
but without ongoing enforcement its objectives cannot be met.  A major weakness continues to
be the many casinos, where a lack of resources and expertise leave the area essentially
unregulated, and therefore, especially vulnerable to money laundering abuse.  Amendments to a
"law" to regulate potential AML activity in casinos that would essentially decriminalize failure
to implement KYC rules have been pending for over one year.  The largely unregulated
consumer finance institutions and currency exchange houses are also of concern.  The Turkish
Cypriot authorities should continue efforts to enhance the "FIU," and adopt and implement a
strong licensing and regulatory environment for all obligated institutions, in particular casinos

and money exchange houses.  Turkish Cypriot authorities should stringently enforce the cross-border currency declaration requirements.  Turkish Cypriot authorities should continue steps to enhance the expertise of members of the enforcement, regulatory, and financial communities with an objective of better regulatory guidance, more efficient STR reporting, better analysis of reports, and enhanced use of legal tools available for prosecutions.

# Dominican Republic

The Dominican Republic (DR) is not a major regional financial center, despite having one of the largest economies in the Caribbean.  The DR continues to be a major transit point for the transshipment of illicit narcotics destined for the United States and Europe.  The six international airports, 16 seaports and a large porous frontier with Haiti present Dominican authorities with serious challenges.

Corruption within the government and the private sector, the presence of international illicit trafficking cartels, a large informal economy, and a fragile formal economy make the DR vulnerable to money laundering and terrorist financing threats.  The large informal economy is a significant market for illicit or smuggled goods.  The under-invoicing of imports and exports by DR businesses is a relatively common practice for those seeking to avoid taxes and customs fees.  U.S. law enforcement believes there is some evidence that arms smuggling across Dominican borders has reached systemic levels as there are identifiable networks smuggling weapons into the DR from the U.S.  The increase in drug related violence throughout the DR is partially attributable to arms trafficking as evidenced by the seizures of illicit weapons at ports of entry over the past year.  The major sources of laundered proceeds stem from illicit trafficking activities, tax evasion and fraudulent financial activities, particularly transactions with forged credit cards.

There are no reported hawala or other money or value transfer services operating in the DR.  A significant number of remittances are transferred through banks.  Casinos are legal in DR and unsupervised gaming activity represents a significant money laundering risk.  While the country has a law creating an international financial zone, implementing regulations will not be issued until the law is reformed to avoid perceptions that the zone will be left out of the DR's AML regulatory regime.

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** YES

***CRIMINALIZATION OF MONEY LAUNDERING:***
    ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
    ***Legal persons covered: criminally:*** YES        ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
    ***Enhanced due diligence procedures for PEPs: Foreign:*** YES        ***Domestic:*** YES
    ***KYC covered entities:*** Banks, currency exchange houses, securities brokers, cashers of checks or other types of negotiable instruments, issuers/sellers/cashers of travelers checks or

money orders, credit and debit card companies, remittance companies, offshore financial service providers, casinos, real estate agents, automobile dealerships, insurance companies, and dealers in firearms and precious metals

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
*Number of STRs received and time frame:* Not available
*Number of CTRs received and time frame:* Not available
*STR covered entities:* Banks, agricultural credit institutions, money exchangers, notaries, gaming centers, securities dealers, art or antiquity dealers, jewelers and precious metals vendors, attorneys, financial management firms and travel agencies

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
*Prosecutions:* 12 in 2011
*Convictions:* Seven in 2011

*RECORDS EXCHANGE MECHANISM:*
*With U.S.:*      *MLAT:* YES       *Other mechanism:* YES
*With other governments/jurisdictions:* YES

The Dominican Republic is a member of the Caribbean Financial Action Task Force (CFATF), a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation can be found here: http://www.cfatf-gafic.org/downloadables/mer/Dominican_Republic_3rd_Round_MER_%28Final%29_English.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

The DR has made progress on the functioning of its financial intelligence unit (FIU), but problems remain. Progress includes greater clarity on the areas covered by disclosure and reporting requirements; however, there remains a lack of publicly available information about the numbers of reports submitted by the various reporting sectors.

The DR also strengthened its laws on PEPs and correspondent relationships but international experts have outlined key weaknesses to address. In addition, the DR urgently needs to pass regulations to provide safe harbor protection for STR filers and criminalize tipping off. The government also should work to better regulate casinos and non-bank businesses and professions, in particular real estate companies, and strengthen regulations for financial cooperatives and insurance companies.

The DR's asset forfeiture regime is improving but has weaknesses because it does not cover confiscation of instrumentalities intended for use in the commission of a money laundering offense; property of corresponding value; and income, profits, or other benefits from the proceeds of crime. The DR should implement legislation to bring its asset forfeiture regime up to international standards.

In July 2011, Dominican authorities announced they had dismantled the core of a narcotics trafficking and money laundering organization based in the DR. The alleged profits from the narcotrafficking operation were laundered using banks and other financial instruments throughout the Western Hemisphere. The group allegedly had branches in Canada, Colombia,

91

Venezuela, Jamaica and elsewhere. The investigation was coordinated by agents from the DR, Central America, South America, North America, and Interpol.

The Egmont Group expelled the FIU in 2006 due to a lack of compliance with the definition of an FIU. To date, the FIU has not been reinstated into that worldwide organization. This seriously hinders U.S. law enforcement in the exchange of information with its Dominican counterparts through the two countries' FIUs. The Egmont Group has specified the formal steps the DR would need to take to re-apply for Egmont membership, thereby allowing the FIU to efficiently and securely share sensitive financial information with the Financial Crimes Enforcement Network (FinCEN), the U.S. FIU, as well as with the rest of the Egmont membership. However, there are still impediments in the Dominican law keeping the FIU from being considered for membership, such as Law 480/08 which enables the creation of another FIU-like organization to regulate international financial zones. The DR should modify the law to eliminate the possibility of a second FIU, and re-apply for membership in the Egmont Group.

# France

France remains an attractive venue for money laundering because of its sizable economy, political stability, and sophisticated financial system. Narcotics and human trafficking, smuggling, and other crimes associated with organized crime are among its vulnerabilities.

France can designate portions of its customs territory as free trade zones and free warehouses in return for commitments in favor of employment. France has taken advantage of these regulations in several specific instances. The French Customs Service administers these zones.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
   ***Legal persons covered:***    ***criminally:*** YES  ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs: Foreign:*** YES    ***Domestic:*** YES
   ***KYC covered entities:*** Banks, credit institutions, money-issuing institutions, investment firms, money exchangers, investment management companies, mutual insurers and benefit institutions, insurance brokers and intermediaries, notaries, receivers and trustees in bankruptcy, financial investment advisors, real estate brokers, chartered accountants, auditors, dealers in high-value goods, auctioneers and auction houses, bailiffs, lawyers, participants in stock exchange settlement and delivery, commercial registered office providers, gaming centers, and companies involved in sports bets and horse-racing tips

INCSR 2012 Volume II          Money Laundering and Financial Crimes

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
 *Number of STRs received and time frame:* 20,252 in 2010
 *Number of CTRs received and time frame:* Not available
 *STR covered entities:* Banks, credit institutions, money-issuing institutions, investment
 firms, money exchangers, investment management companies, mutual insurers and benefit
 institutions, insurance brokers and intermediaries, notaries, receivers and trustees in
 bankruptcy, financial investment advisors, real estate brokers, chartered accountants,
 auditors, dealers in high-value goods, auctioneers and auction houses, bailiffs, lawyers,
 participants in stock exchange settlement and delivery, commercial registered office
 providers, gaming centers, and companies involved in sports bets and horse-racing tips

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
 *Prosecutions:* 276 in 2010
 *Convictions:* 35 in 2010

*RECORDS EXCHANGE MECHANISM:*
 *With U.S.:* *MLAT:* YES *Other mechanism:* YES
 *With other governments/jurisdictions:* YES

France is a member of the Financial Action Task Force (FATF). France is also a Cooperating
and Supporting Nation to the Caribbean Financial Action Task Force (CFATF), a FATF-style
regional body. Its most recent mutual evaluation can be found here: http://www.fatf-gafi.org/dataoecd/3/18/47221568.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

The French government has a comprehensive anti-money laundering/counter-terrorist financing
(AML/CFT) regime and is an active partner in international efforts to control money laundering
and terrorist financing. France maintains the ability to designate individuals or entities under
French domestic authorities in addition to those designated by European Union (EU) regulations.
France and the Unites States have exchanged large amounts of data in connection with money
laundering and terrorist financing. France still does not have the capacity to share forfeited
assets with other jurisdictions.

France applies the 2006/70/CE European Union directive by which politically exposed persons
from the EU states may benefit from simplified vigilance procedures, but only in a limited
number of cases.

In September 2011 the Prudential Control Authority (ACP) took several measures to improve its
ability to fight money laundering and terrorism financing. The ACP has provided guidelines to
help financial institutions define and research "the effective beneficiary" of money laundering or
terrorism financing. The ACP also has defined new reporting obligations for money exchangers.

France should continue its active participation in international organizations and its outreach to
lower-capacity recipient countries to combat the domestic and global threats of money
laundering and terrorist financing.

# Germany

While not an offshore financial center, Germany is one of the largest financial centers in Europe. Although not a major drug producing country, Germany continues to be a consumer and a major transit hub for narcotics. Organized criminal groups involved in drug trafficking and other illegal activities are an additional source of laundered funds in Germany. Trends in money laundering include electronic payment systems; financial agents, i.e., persons who are solicited to make their private accounts available for money laundering transactions; and trade in $CO_2$ emission certificates. Free Zones of control type I exist in Bremerhaven, Cuxhaven, and Hamburg, i.e., freeports. Deggendorf and Duisburg are control type II Free Zones (unfenced inland ports).

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* Both
   *Legal persons covered:*      *criminally:* NO      *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs: Foreign:* YES      *Domestic:* NO
   *KYC covered entities:* Credit institutions, financial services institutions, payment institutions and e-money institutions as well as their agents; financial enterprises; insurance companies and intermediaries; investment companies; lawyers, legal advisers, auditors, chartered accountants, tax advisers and tax agents; trust or company service providers; real estate agents; casinos; and persons trading in goods

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* 11,042 in 2010
   *Number of CTRs received and time frame:* Not applicable
   *STR covered entities:* Credit institutions, financial services institutions, payment institutions and e-money institutions as well as their agents; financial enterprises; insurance companies and intermediaries; investment companies; lawyers, legal advisers, auditors, chartered accountants, tax advisers and tax agents; trust or company service providers; real estate agents; casinos; and persons trading in goods

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:* 684 in 2010
   *Convictions:* 606 in 2010

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:     MLAT:* YES      *Other mechanism:* YES
   *With other governments/jurisdictions:* YES

Germany is a member of the Financial Action Task Force. Its most recent mutual evaluation can be found here:  http://www.fatf-gafi.org/dataoecd/44/19/44886008.pdf

### ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:

Germany strengthened its AML/CFT regime in 2011, including by:  amending AML/CFT provisions governing the financial sector through the Act to Implement the Second E-Money Directive which entered into force at the end of April 2011; extending the list of predicate offenses to include market manipulation, product piracy and insider trading through the Act to Improve the Combating of Money Laundering and Tax Evasion, effective May 3, 2011; clarifying the powers - such as the right to obtain information and enter premises - of the supervisory authorities responsible for non-financial institutions; and submitting the draft Act to Optimize the Prevention of Money Laundering to the German parliament, with adoption envisaged before the end of 2011.  While Germany has no automatic CTR requirement, large currency transactions frequently trigger a STR.

Tipping off is a criminal offense only if it is committed with the intent to support money laundering or obstruct justice, and applies only to previously-filed STRs.  Otherwise, it is an administrative offense that carries a fine of up to € 50,000 (approximately $68,000) under the Money Laundering Act; draft legislation would increase the fine up to € 100,000 (approximately $133,000).  Legal persons are only covered by the Administrative Offenses Act, and are not criminally liable under the Criminal Code.

The numbers of prosecutions and convictions included in this report only reflect cases in which the money laundering violation carried the highest penalty of all the crimes of which the offender was convicted.

Notably, on March 10, 2011, a German-Lebanese criminal group was sentenced for laundering money from narcotics sales throughout Europe by transporting it to Lebanon.  Assets amounting to € 9.2 million (approximately $12.271 million) were forfeited.  Germany has no federal statistics on the amount of assets forfeited in criminal money laundering cases.  Assets can be forfeited as part of a criminal trial or through administrative procedures such as claiming back taxes.

Germany should become a party to the UN Convention against Corruption.

# Greece

Greece is considered to be a regional financial center in the developing Balkans, as well as a bridge between Europe and the Middle East.  Official corruption, the presence of organized crime, and a large shadow economy make the country vulnerable to money laundering and terrorist financing.  Greek law enforcement proceedings indicate that Greece is vulnerable to narcotics trafficking, trafficking in persons and illegal immigration, prostitution, smuggling of cigarettes and other contraband, serious fraud or theft, illicit gaming activities, and large scale tax evasion.  Anecdotal evidence of illicit transactions suggests an increase in financial crimes in the past few years and that criminal organizations (some with links to terrorist groups)

increasingly are trying to use the Greek banking system to launder illicit proceeds. Criminally-derived proceeds historically are most commonly invested in real estate, the lottery, and the stock market. Criminal organizations from southeastern Europe and the Balkan region are responsible for a large percentage of the crime that generates illicit funds. The widespread use of cash facilitates a gray economy as well as tax evasion, though as part of Greece's reform commitments under its European Union (EU)-IMF bailout program, the government is trying to crack down on both trends. Due to the large informal economy – estimated by the Organization for Economic Co-operation and Development and others to be between 25 and 37 percent of GDP – it is difficult to determine the value of goods smuggled into the country, including whether any of the smuggled goods are funded by narcotic or other illicit proceeds. There is increasing evidence that domestic terrorist groups are involved with drug trafficking.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** A combination of a list of predicate offenses and a threshold approach
   ***Legal persons covered:***        ***criminally:*** NO        ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs: Foreign:*** YES    ***Domestic:*** NO
   ***KYC covered entities:*** Banks, savings banks, and cooperative banks; credit companies, money remitters, financial leasing and factoring companies, *bureaux de change*, and postal companies; stock brokers, investment services firms, and collective and mutual funds; life insurance companies and insurance intermediaries; accountants, auditors, and audit firms; tax consultants, tax experts, and related firms; real estate agents and companies; casinos (including internet casinos) and entities engaging in gaming activities; auction houses, dealers in high value goods, auctioneers, and pawnbrokers; notaries, lawyers, and persons providing services to companies and trusts

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   ***Number of STRs received and time frame:*** 3,479 in 2011
   ***Number of CTRs received and time frame:*** Not available
   ***STR covered entities:*** Banks, savings banks, and cooperative banks; credit companies, money remitters, financial leasing and factoring companies, *bureaux de change*, and postal companies; stock brokers, investment services firms, and collective and mutual funds; life insurance companies and insurance intermediaries; accountants, auditors and audit firms; tax consultants, tax experts and related firms; real estate agents and companies; casinos (including internet casinos) and entities engaging in gaming activities; auction houses, dealers in high value goods, auctioneers, and pawnbrokers; notaries, lawyers, and persons providing services to companies and trusts

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***

*Prosecutions:* 134 in 2011
*Convictions:*   58 in the first half of 2011

*RECORDS EXCHANGE MECHANISM:*
    *With U.S.:*      *MLAT:*  YES     *Other mechanism:*  YES
    *With other governments/jurisdictions:*  YES

Greece is a member of the Financial Action Task Force (FATF). Its most recent mutual evaluation can be found here:  http://www.fatf-afi.org/document/23/0,3343,en_32250379_32236963_38916695_1_1_1_1,00.html

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

The Government of Greece (GOG) has been working to improve the effectiveness of the Greek financial intelligence unit (FIU). Greek authorities have hired sufficient staff to carry out the extensive functions with which the FIU is tasked. The GOG has also made available adequate financial resources to ensure the FIU is able to fulfill its responsibilities, ensure its powers are in line with the international standards related to a financial intelligence unit, and ensure its technical and data management systems and capacities support its functions.

Greece still needs to ensure that its confiscation regime is more effectively implemented and used. While the 2008 anti-money laundering/countering the financing of terrorism (AML/CFT) law contains provisions allowing civil asset forfeiture under special circumstances, Greek authorities advise it is not practical to launch civil procedures and currently do not do so. The government also should develop an arrangement for the sharing of seized assets with third party jurisdictions that assist in the conduct of investigations.

In March 2011, an amendment to the 2008 AML/CFT law (Law 3932/A49/10-3-2011) established a new entity, the Financial Sanctions Unit (FSU). The FSU is tasked with designating terrorists in accordance with UNSCR 1373, outside the EU listing system, and issuing executive orders to freeze the assets of internationally designated terrorists. It is unclear if the executive order procedure applies to suspected terrorists designated domestically. The GOG has provided guidance to financial institutions and designated non-financial businesses and professions on freezing assets without delay, and has begun to monitor for compliance, though the effectiveness of the monitoring is still undetermined. The GOG is authorized to impose sanctions on entities for noncompliance with freeze orders.

While Greece has made positive strides in the supervision area, particularly with its transfer of supervisory powers over the insurance sector to the Bank of Greece, a shortage of personnel at the Hellenic Capital Markets Commission (which supervises securities firms, brokers, other financial intermediaries, and clearing houses) remains, but is difficult to address in light of a general hiring freeze in the public sector due to Greece's debt crisis. It also remains unclear whether the Ministry of Justice has enough resources available to deal with money laundering or terrorist finance related cases.

The GOG has instituted regulatory measures requiring that transactions above €3,000 (approximately $3,850) be executed with credit cards, checks or cashiers' checks and that all business-to-business transactions in excess of €3,000 (approximately $3,850) be carried out through checks or bank account transfers. All credit and financial institutions, including

payment institutions, must also report on a monthly basis all transfers of funds abroad executed by credit card, check or wire transfer. Nevertheless, the GOG should adopt a system for reporting large currency transactions across all regulated sectors and explicitly abolish company-issued bearer shares. It should also continue to improve enforcement of its cross-border currency reporting requirements and improve efforts to deter the smuggling of currency across its borders. Greece also should ensure that companies operating within its free trade zones are subject to the same level of enforcement of AML/CFT controls as other sectors and work steadfastly to bring charitable and nonprofit organizations under the AML/CFT regime.

# Guatemala

Guatemala is not considered a regional financial center. It continues to be a transshipment route for South American cocaine and heroin destined for the United States and for returning cash to South America. Smuggling of the precursors to methamphetamine is also a problem. Reports suggest the narcotics trade is increasingly linked to arms trafficking.

Historically weak law enforcement and judiciary systems coupled with endemic corruption and increasing organized crime activity contribute to a favorable climate for significant money laundering in Guatemala. According to law enforcement agencies, narcotics trafficking and corruption are the primary sources of money laundered in Guatemala; however, the laundering of proceeds from other illicit activities, such as human trafficking, firearms, contraband, kidnapping, tax evasion, and vehicle theft, is substantial. There is no indication of terrorist financing activities.

Guatemala's geographic location makes it an ideal haven for transnational organized crime groups, including human and drug trafficking organizations. The Central America Four Agreement between El Salvador, Guatemala, Honduras, and Nicaragua allows for free movement of the citizens of these countries across their respective borders without passing through immigration or customs inspection. As such, the agreement represents a vulnerability to each country for the cross-border movement of contraband and illicit proceeds of crime.

There is a category of "offshore" banks in Guatemala in which the money of the customers (usually Guatemalans with average deposits of $100,000) is legally considered to be deposited in the foreign country where the bank's head office is based. In 2010, there were seven "offshore" entities, with head offices in Panama, the Bahamas and Puerto Rico. These "offshore" banks are subject to the same AML/CFT regulations as any local bank. Guatemala has 17 active free trade zones (FTZs) and six more are supposed to start operations soon. They are mainly used to import duty-free goods utilized in the production of products for exportation. There are no known cases or allegations that indicate the FTZs are hubs of money laundering or drug trafficking. There are no reported hawala or other money or value transfer services operating in Guatemala. A significant number of remittances are transferred through banks and appear to pose little risk for money laundering.

Casinos are not legal in Guatemala, however, a number of casinos, games of chance and video lotteries operate, both onshore and offshore. Unsupervised gaming activity represents a significant money laundering risk.

**INCSR 2012 Volume II       Money Laundering and Financial Crimes**

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* YES

*CRIMINALIZATION OF MONEY LAUNDERING:*
    *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
    *Legal persons covered:      criminally:* YES     *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
    *Enhanced due diligence procedures for PEPs:  Foreign:* YES     *Domestic:* YES
    *KYC covered entities:* Banks; finance and leasing companies; credit card cooperatives, issuers, or payment agents; stock brokers; insurance companies; money remitters and exchanges; pawnbrokers; notaries and accountants; tax advisors and lawyers; casinos, raffles and games of chance; dealers in precious metals and stones, motor vehicles, and art and antiquities; and real estate agents

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
    *Number of STRs received and time frame:* 421 in 2011 (as of October 31, 2011)
    *Number of CTRs received and time frame:* 5,502,434 in 2011 (as of September 30, 2011)
    *STR covered entities:* Banks; finance and leasing companies; credit card cooperatives, issuers, or payment agents; stock brokers; insurance companies; money remitters and exchanges; pawnbrokers; notaries and accountants; tax advisors and lawyers; casinos, raffles and games of chance; dealers in precious metals and stones, motor vehicles, and art and antiquities; and real estate agents

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
    *Prosecutions:*  59 in 2011
    *Convictions:*   Ten people in eight cases in 2011

*RECORDS EXCHANGE MECHANISM:*
    *With U.S.:       MLAT:* YES     *Other mechanism:* YES
    *With other governments/jurisdictions:* YES

Guatemala is a member of the Caribbean Financial Action Task Force (CFATF), a Financial Action Task Force (FATF)-style regional body.  Its most recent mutual evaluation can be found here: http://www.cfatf-gafic.org/downloadables/mer/Guatemala_3rd_Round_MER_(Final)_English.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

There are relatively few convictions for money laundering, most of which are for the illegal transport of cash.  The inadequate number of staff at the FIU and the limited capacity of law enforcement officials may hamper the ability of the authorities to prosecute more cases.

In December 2009, former President Alfonso Portillo was indicted on one count of conspiracy to commit money laundering in the United States.  On August 26, 2011, Guatemala's Constitutional Court unanimously upheld the U.S. request to extradite former President Portillo on that charge. The Public Ministry is still awaiting the outcome of its appeal of Portillo's May 9 acquittal on

embezzlement charges in Guatemala, and the extradition remains pending based on the outcome of that case.

Law enforcement agencies report that money laundering continued to increase during the year, especially by groups of air travelers heading to countries such as Panama with slightly less than the amount of the Guatemalan reporting requirement ($10,000), and a large number of small deposits in banks along the Guatemalan border with Mexico. A new law regarding asset forfeitures took effect in June 2011 and allows Guatemalan authorities to seize cash used in structuring transactions and transfer it to the state without first having to obtain a criminal conviction against the courier. The same law also prevents new businesses from issuing bearer shares of stock. The law requires any existing business with bearer shares to convert the shares to nominative by June 2013, but it is not clear what the consequences will be for failure to do so.

In October 2010, Guatemalan monetary authorities approved a regulation to establish limits for cash deposits in foreign currency, notably requiring more information and bank certification for transactions totaling over $3,000 per month. According to law enforcement authorities, purchases of foreign currency declined 34% during the first eight months of 2011, which they attribute to the new regulation.

The government should either enforce the law with regard to casinos or work to regulate them under the AML law, as are lotteries and raffles. Attempts by the government to enforce requirements have not been successful. Lotteries and raffles are subject to local jurisdiction licensing but are not subject to AML/CFT supervision.

# Guernsey

The Bailiwick of Guernsey (the Bailiwick) encompasses a number of the Channel Islands (Guernsey, Alderney, Sark, and Herm). As a Crown Dependency of the United Kingdom (UK), it relies on the UK for its defense and international relations. Alderney and Sark have their own separate parliaments and civil law systems. Guernsey's parliament legislates in matters of criminal justice for all of the islands in the Bailiwick. The Bailiwick is a sophisticated financial center, and authorities undertake efforts to reduce vulnerability to money laundering.

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
   *Legal persons covered:      criminally:* YES   *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs: Foreign:* YES          *Domestic:* NO
   *KYC covered entities:* Banks, lending firms, financial instrument issuers and managers, and money service businesses; insurance companies and intermediaries; investment firms and funds, safekeeping and portfolio management services; trust and company service providers;

INCSR 2012 Volume II        Money Laundering and Financial Crimes

lawyers, accountants, notaries, and estate agents; dealers of precious metals and stones; and eGambling services

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:*  1,136 in 2011
   *Number of CTRs received and time frame:*  Not applicable
   *STR covered entities:* All businesses

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:* Two in 2010
   *Convictions:*  Two in 2010

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:*     *MLAT:* NO     *Other mechanism:* YES
   *With other governments/jurisdictions:* YES

The IMF's December 2010 "Detailed Assessment Report on Anti-Money Laundering and Combating the Financing of Terrorism" for the Bailiwick of Guernsey can be found at: http://www.imf.org/external/pubs/ft/scr/2011/cr1112.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

The Bailiwick has been actively involved in the provision of formal mutual legal assistance for many years.  The authorities consider themselves able to provide assistance without the need to enter into mutual legal assistance treaties, and this has enabled compliance with requests from a wide range of jurisdictions, including the US, using the full range of investigatory powers in the law.  The legal framework provides an ability to freeze and confiscate assets in appropriate circumstances.

Guernsey's comprehensive AML/CFT legal framework provides a sound basis for an effective AML/CFT regime, and remaining shortcomings are technical in nature.  While no shortcomings have been identified in the legal framework, concerns remain with respect to the implementation of the money laundering provisions.  Given the size of the Bailiwick's financial sector and its status as an international financial center, the modest number of cases involving money laundering by financial sector participants and the small number of money laundering cases resulting in convictions raises questions concerning the effective application of money laundering provisions.

Guernsey is a Crown Dependency and cannot sign or ratify international conventions in its own right unless entrusted to do so.  Rather, the UK is responsible for the Bailiwick's international affairs and, at Guernsey's request, may arrange for the ratification of any Convention to be extended to the Bailiwick.  The UK's ratification of the 1988 UN Drug Convention was extended to include the Bailiwick on April 3, 2002; its ratification of the UN Convention against Corruption was extended to include Guernsey on November 9, 2009; and its ratification of the International Convention for the Suppression of the Financing of Terrorism was extended to Guernsey on September 25, 2008.  The UK has not extended the UN Convention against Transnational Organized Crime to the Bailiwick.

# Guinea-Bissau

Guinea-Bissau has repeatedly, over the past few years, been called a 'narco-state'. Although President Sanha has declared the problem a top priority for his administration, the Government of Guinea-Bissau (GOGB) is not in full compliance with international conventions against money laundering and terrorist financing because of inadequate resources, weak border controls, and competing national priorities. The multitude of small offshore islands and a military able to sidestep government with impunity has made it a favorite trans-shipment point for drugs. Drug barons from Latin America and their collaborators from the region and other parts of the world have taken advantage of the extreme poverty, unemployment, political instability, lack of effective customs and law enforcement, and general insecurity to make the country a major transit point for cocaine destined to consumer markets, mainly in Europe. Of all West African countries, none has been so thoroughly penetrated and corrupted by Latin American drug cartels as Guinea-Bissau. One of the poorest countries in the world, the value of the illicit narcotics trade in Guinea-Bissau is much greater than its national income. Using threats and bribes, drug traffickers infiltrate state structures and operate with impunity.

The police have seized a number of major drug shipments in past years, and representatives of the state have been linked to drug trafficking networks. Some of the arrested traffickers and seized drugs later vanished from the state's prisons and coffers, with no explanation forthcoming from the Bissau-Guinean authorities. A major bank operating in Guinea-Bissau reportedly had significant involvement in the laundering of proceeds from drug trafficking between South America and Europe/the Middle East via Guinea-Bissau.

The formal financial sector in Guinea-Bissau is undeveloped and badly supervised. It is also dwarfed by the size of the informal and cash sectors in addition to the underground economy. The cohesion and effectiveness of the state itself is very poor: the police are under-resourced and understaffed; corruption is a major problem; and the judiciary has reportedly demonstrated a lack of integrity on a number of occasions. Many government offices, including the justice ministry, lack basic resources, such as electricity, to function.

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
    *"All serious crimes" approach or "list" approach to predicate crimes:* All crimes approach
    *Legal persons covered: criminally:* YES   *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
    *Enhanced due diligence procedures for PEPs: Foreign:* YES      *Domestic:* YES
    *KYC covered entities:* Banks, microfinance institutions, exchange houses, securities firms, insurance companies, casinos, brokerages, charities, nongovernmental organizations (NGOs), and intermediaries such as lawyers, accountants, notaries and broker/dealers

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
    *Number of STRs received and time frame:* Not available

*Number of CTRs received and time frame:*  Not available
*STR covered entities:* Banks, microfinance institutions, exchange houses, securities firms, insurance companies, casinos, brokerages, charities, nongovernmental organizations (NGOs), and intermediaries such as lawyers, accountants, notaries and broker/dealers

## MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:
*Prosecutions:* None
*Convictions:* None

## RECORDS EXCHANGE MECHANISM:
*With U.S.:*      *MLAT:*  NO      *Other mechanism:*  NO
*With other governments/jurisdictions:*  NO

Guinea-Bissau is a member of the Intergovernmental Action Group against Money Laundering in West Africa (GIABA), a Financial Action Task Force-style regional body.  Its most recent mutual evaluation can be found here:
http://www.giaba.org/index.php?type=c&id=45&mod=2&men=2

## ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:

The Anti-Money Laundering Uniform Law, a required law for members of the Economic Community of West African States (ECOWAS), is not implemented effectively.  There is still no financial intelligence unit (FIU) in operation, making much of the legislation unable to be implemented.

GOGB authorities expect to establish an FIU soon.  The GOGB should ensure resources are available to sustain the FIU's capacity and should put in place and train its staff.  It also should work to improve the training and capacity of its police and judiciary to combat financial crimes. Guinea-Bissau needs assistance to finance, staff, train and equip its justice and police departments.  Although the law establishes asset forfeiture authorities and provides for the sharing of confiscated assets, a lack of coordination mechanisms to seize assets and facilitate requests for cooperation in freezing and confiscation from other countries hampers cooperation.

Article 26 of National Assembly Resolution No. 4 of 2004 stipulates that if a bank suspects money laundering it must obtain a declaration of all properties and assets from the subject and notify the Attorney General, who must then appoint a judge to investigate.  The bank's solicitation of an asset list from its client could also amount to tipping off the subject. Reportedly, banks are reluctant to file STRs because of the fear of tipping off by an allegedly indiscrete judiciary.

Guinea-Bissau needs to improve the coordination of efforts at the national, sub-regional, regional and international levels, reforming the country's institutions.  The GOGB should continue to work with its partners in GIABA, ECOWAS and other organizations to establish and implement an effective anti-money laundering/counter-terrorist financing (AML/CFT) regime.  The government needs urgent help to restore sovereignty, administer justice and regain control of its borders.  The GOGB should ensure the sectors covered by its AML law have implementing regulations and competent authorities to ensure compliance with the law's requirements.  It should also amend its terrorist financing law to comport with international standards.  Guinea-Bissau should undertake efforts to eradicate systemic corruption.

The GOGB should become a party to the UN Convention for the Suppression of the Financing of Terrorism, and the UN Conventions against Corruption and Transnational Organized Crime.

# Haiti

Haiti is the poorest country in the Western Hemisphere and relies heavily on remittances from abroad. Haitian organized crime groups are engaged in drug trafficking and other criminal and fraudulent activity, but do not at this time appear to be involved in terrorist financing. While not a major financial center itself, regional money laundering enterprises utilize Haitian couriers, especially via air hub routes to Central America.

The weakness of the Haitian judicial system and prosecutorial mechanism continues to leave the country vulnerable to corruption and money laundering despite improving financial intelligence and enforcement capacity. A positive development in this regard was the naming of a President of Haiti's Supreme Court in October.

Haiti has one operational free trade zone in Ouanaminthe and two under development in Port-au-Prince. It is believed "contrabanding" (using smuggled bulk cash to buy products which are shipped to South America and sold) could be a problem. There are at least 62 casinos in Haiti, the majority unlicensed; however, online gaming is illegal.

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* YES

*CRIMINALIZATION OF MONEY LAUNDERING:*
    *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
    *Legal persons covered:    criminally:* YES    *civilly:* NO

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
    *Enhanced due diligence procedures for PEPs: Foreign:* NO    *Domestic:* NO
    *KYC covered entities:* All natural and legal persons who, as part of their profession, perform, oversee, or advise operations involving deposits, trading, investments, conversions, or any other movement of capital

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
    *Number of STRs received and time frame:* 49 from January 1 to October 19, 2011
    *Number of CTRs received and time frame:* 244,297 from January 1 to October 19, 2011
    *STR covered entities:* All natural and legal persons who, as part of their profession, perform, oversee, or advise operations involving deposits, trading, investments, conversions, or any other movement of capital

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
    *Prosecutions:* None
    *Convictions:* None

***RECORDS EXCHANGE MECHANISM:***
   ***With U.S.:***        ***MLAT:*** YES    ***Other mechanism:*** NO
   ***With other governments/jurisdictions:*** YES

Haiti is a member of the Caribbean Financial Action Task Force (CFATF), a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation can be found here: http://www.cfatf-gafic.org/downloadables/mer/Haiti_3rd_Round_MER_(Final)_English.pdf

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

In the spring of 2011, concerns were raised on the effectiveness of law enforcement and customs in the wake of a U.S.-Panamanian law enforcement operation which traced over $100 million in cash arriving annually from Haiti to Panama via scheduled commercial airline flights. Neither the Haitian banking sector nor customs officials at Port-au-Prince's international airport were aware of these transfers that averaged $25,000 per passenger and over $1 million per flight.

The Government of Haiti (GOH) remains hampered by ineffective and outdated criminal and criminal procedural codes, and by the inability of judges and courts to address cases referred for prosecution. The government should move ahead on the proposed new criminal and criminal procedural codes that would address these problems. The GOH should pass the anti-terrorist legislation that has been submitted to Parliament which would criminalize terrorist financing and allow the immediate freezing of terrorist assets without delay.

Haiti's AML law is written quite broadly and does not explicitly cover the types of entities addressed in the international standards. Implementation of the current law appears to cover only the banking industry. Financial entities not supervised by the Central Bank and designated non-financial businesses and professions are not subject to supervisory oversight and/or have not received appropriate training regarding their AML/CFT responsibilities. Haiti's AML law should be rewritten or amended to explicitly detail the types of entities subject to the law, as proscribed in the international standards.

The amount of STRs is extremely low and only the banking sector submits reports. The Central Financial Intelligence Unit (UCREF) is ineffective due to its limited budget, lack of staff training and integrity, broad interpretation of the law, lack of autonomy, and limited access to foreign counterparts' information. The government should fully fund UCREF and other anti-money laundering entities. UCREF should become fully operational and should seek membership in the Egmont Group of FIUs so that it can effectively share sensitive financial information with its foreign counterparts.

The Haitian government's assistance to the U.S. Government was instrumental in obtaining, among other charges, money laundering and bribery convictions against several U.S. residents in a scheme involving the use of shell companies and false records to attempt to provide over $890,000 in bribes to Haitian officials.

# Hong Kong

Hong Kong, a Special Administrative Region (SAR) of the People's Republic of China, is a major international financial and trading center. As of September 2011, Hong Kong's stock market was the world's seventh largest and Asia's third largest, with $2.08 trillion in market capitalization. Already the world's tenth largest banking center in terms of external transactions and the sixth largest foreign exchange trading center, Hong Kong has continued its expansion as an offshore Renminbi (RMB) financing center, accumulating as of September 2011 over $98 billion in RMB-denominated deposits at authorized institutions. Hong Kong does not differentiate between offshore and onshore entities for licensing and supervisory purposes.

Hong Kong's low tax rates and simplified tax regime, coupled with its sophisticated banking system, shell company formation agents, free port status, and the absence of currency and exchange controls, present vulnerabilities for money laundering, including trade-based money laundering. Primary sources of laundered funds, derived from local and overseas criminal activity, are: illegal gambling, fraud, financial crimes, loan sharking, goods smuggling activities and vice. Hong Kong law enforcement authorities attribute only a small percentage of laundered funds to drug trafficking organizations.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
   ***Legal persons covered:       criminally:*** YES       ***civilly:*** NO

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs: Foreign:*** YES   ***Domestic:*** YES
   ***KYC covered entities:*** Banks, securities and insurance entities, money exchangers

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   ***Number of STRs received and time frame:*** 14,751 from January to September 2011
   ***Number of CTRs received and time frame:*** Not applicable
   ***STR covered entities:*** All persons, irrespective of entity or amount of transaction involved

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
   ***Prosecutions:*** 223 from January to September 2011
   ***Convictions:*** 158 from January to September 2011

***RECORDS EXCHANGE MECHANISM:***
   ***With U.S.:      MLAT:*** YES      ***Other mechanism:*** YES
   ***With other governments/jurisdictions:*** YES

Hong Kong is a member of the Financial Action Task Force (FATF) and the Asia/Pacific Group on Money Laundering (APG), a FATF-style regional body. Its most recent mutual evaluation can be found here:  http://www.fatf-gafi.org/dataoecd/19/38/41032809.pdf

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

Hong Kong enacted legislation in July 2011 (AML/CFT Ordinance) that will go into effect in April 2012 and better align its financial sector with prevailing international standards. The legislation provides statutory backing to existing financial regulatory guidelines on preventive AML measures, including customer due diligence and record keeping requirements for financial institutions, and puts in place a licensing and regulatory regime for remittance agents and money changers. It also grants authority for administrative and criminal sanctions.

In April 2010, the Government of Hong Kong initiated an ongoing study for the implementation of a cross-border currency reporting system. The government's work plan calls for an evaluation of the feasibility of tracking and monitoring currency movements in/out of its borders, including necessary legislative and resource requirements.

Hong Kong should institute mandatory oversight for designated non-financial businesses and professions, and implement mandatory cross-border currency reporting requirements, both potential loopholes for money launderers and terrorist financiers. Hong Kong should also establish threshold reporting requirements for currency transactions and put in place "structuring" provisions to counter evasion efforts. As a major trading hub, Hong Kong should also closely examine trade-based money laundering.

As a SAR of China, Hong Kong cannot sign or ratify international conventions in its own right. Rather, China is responsible for Hong Kong's international affairs and may arrange for the ratification of any convention to be extended to Hong Kong. The 1988 Drug Convention was extended to Hong Kong in 1997. The UN Convention against Corruption, the International Convention for the Suppression of the Financing of Terrorism, and the UN Convention against Transnational Organized Crime were extended to Hong Kong in 2006.

# India

India is a regional financial center, with a rapidly growing economy and well-developed formal and informal financial systems. India's extensive informal economy and remittance systems, porous borders, persistent corruption, and onerous tax administration and currency controls contribute to its vulnerability to economic crimes (including fraud, cyber crime, and identity theft), money laundering, and terrorist financing. Tax avoidance and the proceeds of economic crimes are the mainstays of money launderers in India, but laundered funds are also derived from narcotics trafficking and trafficking in persons, transnational organized crime, illegal trade, and corruption. Transnational criminal organizations use offshore corporations and trade-based money laundering to conceal the proceeds of crime. Criminal networks exchange high-quality counterfeit currency for genuine notes, which facilitates money laundering.

India's porous borders and location between heroin-producing countries in the Golden Triangle and Golden Crescent make it a frequent transit point for drug trafficking. Proceeds from Indian-based heroin traffickers re-enter the country via bank accounts, the hawala system, and money transfer companies.

India is also a significant target for both domestic and foreign terrorist groups. Several indigenous terrorist organizations coexist in various parts of the country; many are linked to external terrorist groups with global ambitions. Terrorist groups often use hawaladars and currency smuggling to move funds from external sources to finance their activities in India. Indian authorities also report they have seized drugs sold by India-based insurgents to production and/or trafficking groups in neighboring countries.

High-level corruption both generates and conceals criminal proceeds. Illicit funds are often laundered through real estate, educational programs, charities, and election campaigns. Companies use trade-based money laundering to evade capital controls.

India licenses seven offshore banking units (OBUs) to operate in Special Economic Zones (SEZs), which were established to promote export-oriented commercial businesses, including manufacturing, trading, and services (mostly information technology). As of November 2011, there were 143 SEZs in operation, with another 582 SEZs formally approved. Customs officers control access to the SEZs. OBUs essentially function as foreign branches of Indian banks, but with defined physical boundaries and functional limits. OBUs are prohibited from engaging in cash transactions, can only lend to the SEZ wholesale commercial sector, and are subject to the same anti-money laundering/counter-terrorist financing (AML/CFT) provisions as the domestic sector.

For additional information focusing on terrorism financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
    ***All serious crimes approach or list approach to predicate crimes:*** List approach
    ***Legal persons covered:***     ***criminally:*** YES     ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
    ***Enhanced due diligence procedures for PEPs: Foreign:*** YES     ***Domestic:*** YES
    ***KYC covered entities:*** Banks and merchant banks; insurance companies; housing and non-banking finance companies; casinos; payment system operators; authorized money changers and remitters; chit fund companies; charitable trusts that include temples, churches and non-profit organizations; intermediaries; stock brokers; sub-brokers; share transfer agents; trustees, underwriters, portfolio managers and custodians; investment advisors; depositories and depository participants; foreign institutional investors; credit rating agencies; venture capital funds; collective schemes including mutual funds; and the post office

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
    ***Number of STRs received and time frame:*** 20,698 from April 2010 to March 2011
    ***Number of CTRs received and time frame:*** 8,687,107 from April 2010 to March 2011
    ***STR covered entities:*** Banks and merchant banks; insurance companies; housing and non-banking finance companies; casinos; payment system operators; authorized money changers and remitters; chit fund companies; charitable trusts that include temples, churches and non-

profit organizations; intermediaries; stock brokers; sub-brokers; share transfer agents; trustees, underwriters, portfolio managers and custodians; investment advisors; depositories and depository participants; foreign institutional investors; credit rating agencies; venture capital funds; collective schemes including mutual funds; and the post office

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:*  36 from April 2006 to March 2011
   *Convictions:*  Zero

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:*   *MLAT:* YES   *Other mechanism:* YES
   *With other governments/jurisdictions:* YES

India is a member of the Financial Action Task Force (FATF), as well as two FATF-style regional bodies, the Asia/Pacific Group on Money Laundering (APG) and the Eurasian Group on Combating Money Laundering and Terrorist Financing (EAG). Its most recent mutual evaluation can be found here: www.fatf-gafi.org/dataoecd/60/56/45746143.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

India is strongly committed to implementing an effective AML/CFT framework and has taken numerous steps to improve its AML/CFT regime and bring it into compliance with international standards. In 2011, the Government of India (GOI) drafted amendments to the Prevention of Money Laundering Act (PMLA) and the Unlawful Activities (Prevention) Act that would expand the scope of India's AML/CFT regime to cover several designated non-financial businesses and professions, including jewelers and real estate firms. The draft amendments also would address deficiencies with respect to the criminalization of money laundering and terrorist financing and to confiscation and provisional measures, including by making money laundering a stand-alone offense and allowing authorities to attach property even if the predicate offense is not proven.

In 2011, the financial services regulators issued an extensive range of enforceable circulars improving customer due diligence requirements, including with respect to customers and transactions involving countries with "strategic AML/CTF deficiencies." In addition, the FIU enhanced outreach to the financial sector on suspicious transaction reporting, revised the cash and suspicious transaction reporting format for non-banking financial companies, and streamlined an electronic reporting format for CTRs and STRs, resulting in a significant increase in the number of STRs filed with respect to both money laundering and terrorist financing.

Despite these important steps, deficiencies remain. Since Parliament has not yet approved the draft PMLA amendments, India lacks both effective criminal asset forfeiture provisions and conspiracy laws. Moreover, effective implementation of the current law remains a significant concern. Despite increased law enforcement resources, as of April 2011, there were still no money laundering convictions or confiscations. Law enforcement typically opens substantive criminal investigations reactively, after an offense is discovered, and seldom initiates proactive analysis and long-term investigations. At the prosecutorial level, there is an appropriate focus on terrorist financing; however, this effort has yet to be followed up convincingly by convictions and firm case law. Furthermore, while the GOI has taken action against certain hawala activities, these successes generally stem from prosecuting primarily non-financial businesses that conduct hawala transactions on the side.

Levels of training and expertise in financial investigations involving transnational crime or terrorist-affiliated groups vary widely among the federal, state, and local levels and depend on the particular jurisdiction's financial capabilities and perceived necessities. U.S. investigators have had limited success in coordinating the seizure of illicit proceeds with their GOI counterparts. While intelligence and investigative information supplied by U.S. investigators have led to numerous money seizures, a lack of follow-through on investigational leads has prevented a more comprehensive offensive against offenders and related groups.

The GOI is taking steps to increase financial inclusion through "small [banking] accounts", but should consider further facilitating the development and expansion of alternative money transfer services, including mobile banking, domestic funds transfer, and foreign remittances. Such an increase in lawful, accessible services would allow broader financial inclusion of legitimate individuals and entities and reduce overall AML/CFT vulnerabilities, particularly in the rural sector, by shrinking the informal network. The GOI also should establish a clear safe harbor provision for those filing STRs in good faith.

In May 2011, India ratified both the United Nations Convention against Corruption and the United Nations Convention against Transnational Organized Crime.

# Indonesia

While Indonesia is neither a regional financial center nor an offshore financial haven, the country remains vulnerable to money laundering and terrorist financing due to its weak anti-money laundering/counter-terrorist financing (AML/CFT) regime, cash-based economy, weak rule-of-law and ineffective law enforcement institutions, and the presence of major indigenous terrorist groups, such as Jemaah Islamiyah (JI), a loose network of JI spin-off groups, and Jemaah Anshorut Tauhid, which obtain financial support from both domestic and foreign sources. Most money laundering in the country is connected to non-drug criminal activity such as corruption, illegal logging, theft, bank fraud, credit card fraud, maritime piracy, sale of counterfeit goods, gambling and prostitution.

Indonesia has a long history of smuggling of illicit goods and bulk cash, facilitated by thousands of miles of unpatrolled coastline, sporadic law enforcement, and poor customs infrastructure. Proceeds from illicit activities are easily moved offshore and repatriated as needed for commercial and personal use. While Indonesia has made some progress in combating official corruption via a strong yet embattled Corruption Eradication Commission, endemic corruption remains a significant concern and poses a challenge for AML/CFT regime implementation.

In an October 2011 report, the Financial Action Task Force (FATF) noted that Indonesia continues to have certain strategic AML/CFT deficiencies, including a lack of progress on the implementation of its action plan. Of particular concern is Indonesia's failure to pass terrorist financing and asset forfeiture legislation.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

**CRIMINALIZATION OF MONEY LAUNDERING:**
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** Combination approach
   ***Legal persons covered:***      ***criminally:*** YES      ***civilly:*** YES

**KNOW-YOUR-CUSTOMER (KYC) RULES:**
   ***Enhanced due diligence procedures for PEPs: Foreign:*** YES      ***Domestic:*** YES
   ***KYC covered entities:*** Banks, finance companies, insurance companies and insurance brokerage companies, pension fund financial institutions, securities companies, investment managers, providers of money remittance, and foreign currency traders

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
   ***Number of STRs received and time frame:*** 16,054 from January through October 2011
   ***Number of CTRs received and time frame:*** 1,412,769 from January through October 2011
   ***STR covered entities:*** Banks, financing companies, insurance companies and insurance brokerage companies, pension fund financial institutions, securities companies, investment managers, custodians, trustees, postal services as providers of fund transfer services, foreign currency changers (money traders), providers of payment card services, providers of e-money or e-wallet services, cooperatives doing business as savings and loan institutions, pawnshops, commodity futures traders, money remitters, property companies and agents, car dealers, dealers of precious stones and jewelry/precious metals, art and antique dealers, and auction houses

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
   ***Prosecutions:*** Not available
   ***Convictions:***   Four from January through October 2011

**RECORDS EXCHANGE MECHANISM:**
   ***With U.S.:***      ***MLAT:*** NO      ***Other mechanism:*** YES
   ***With other governments/jurisdictions:*** YES

Indonesia is a member of the Asia/Pacific Group on Money Laundering (APG), a Financial Action Task Force (FATF)-style regional body.  Its most recent mutual evaluation can be found here:  http://www.apgml.org/documents/docs/17/Indonesia%20MER2_FINAL.pdf

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

In October 2010, the Government of Indonesia (GOI) enacted a new AML law that partially complies with international standards.  Among other improvements, the law expands the list of agencies permitted to conduct money laundering investigations, gives the independent financial intelligence unit (FIU), PPATK, more authority to examine suspicious financial transactions, and increases some criminal penalties for money laundering offenses.  Personnel in both the executive and judicial branches should receive more training to effectively implement and enforce the expanded provisions of the AML law.

Indonesia's PPATK is a dynamic and effective FIU that works closely with the Central Bank to oversee and implement Indonesia's anti-money laundering regime. PPATK is well-funded and has an experienced and effective leadership team in place. The October 2010 AML legislation, however, has taxed the institution's capacity and PPATK will need a significant increase in staff to meet its responsibilities under the law. In an effort to place some of the legal burden on industry and bank partners, PPATK will open three anti-money laundering centers in different regions of Indonesia to serve as resource centers for organizations that must comply with the new regulations.

Despite a stated high-level commitment to the action plan developed to address some of the persistent gaps in its AML/CFT legislation, the GOI has not met its projected timeframes. Essential draft CFT legislation will not be submitted to parliament until at least early 2012, more than a year later than originally expected. Passage may be further delayed by disagreements over various provisions, including those addressing forfeiture of unexplained wealth and new reporting requirements for religious institutions.

Indonesia continues to lack an effective mechanism to implement UNSCRs 1267 and 1373. The October 2010 AML legislation only provides for the temporary suspension of terrorist assets linked to the UN list of designated terrorists and terrorist organizations and does not allow for an immediate and ongoing freeze. Corruption, particularly within the police ranks, impedes effective investigations and prosecutions. Prosecutors and judges should be given additional training on tracing and documenting financial flows and presenting this evidence convincingly in court.

# Iran

Although not considered a financial hub, Iran has a large underground economy, spurred by restrictive taxation, widespread smuggling, currency exchange controls, capital flight, and a large Iranian expatriate community. Iran is a major transit route for opiates smuggled from Afghanistan through Pakistan to the Persian Gulf, Turkey, Russia, and Europe. At least 40% of opiates leaving Afghanistan enters or transits Iran for domestic consumption or for consumers in Russia and Europe. Illicit proceeds from narcotics trafficking are used to purchase goods in the domestic Iranian market; those goods are often exported and sold in Dubai. Iran's merchant community makes active use of money and value transfer systems, including hawala and moneylenders. Counter-valuation in hawala transactions is often accomplished via trade, thus trade-based transactions are likely a prevalent form of money laundering. Many hawaladars and traditional bazaari are linked directly to the regional hawala hub in Dubai. Over 300,000 Iranians reside in Dubai, with approximately 8,200 Iranian-owned companies based there. Iran's real estate market is also used to launder money. There also are reports that billions of dollars in Iranian capital have been invested in the United Arab Emirates, particularly in Dubai real estate.

On November 21, 2011, Iran was identified by the U.S. Government as a state of primary money laundering concern pursuant to section 311 of the USA PATRIOT Act. Widespread corruption and economic sanctions, as well as evasion of those sanctions, have undermined the potential for private sector growth and facilitated money laundering. The Financial Action Task Force (FATF) has repeatedly warned of Iran's failure to address the risks of terrorist financing. The

FATF urges jurisdictions around the world to impose countermeasures to protect their financial sectors from illicit finance emanating from Iran.  In October 2011, the FATF urged all members and jurisdictions to advise their financial institutions to give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions.

In 1984, the Department of State designated Iran as a state sponsor of terrorism.  Iran continues to provide material support, including resources and guidance, to multiple terrorist organizations and other groups that undermine the stability of the Middle East and Central Asia.  Hamas, Hizballah, and the Palestinian Islamic Jihad (PIJ) maintain representative offices in Tehran in part to help coordinate Iranian financing and training.

Although Iran has established an international banking network, with many large state-owned banks that have foreign branches and subsidiaries in Europe, the Middle East, Asia, and the Western Hemisphere, Iranian banks have a diminishing international presence in these regions as a growing number of governments move to sanction Iranian financial institutions in response to UN, U.S., and autonomous sanctions regimes as well as the FATF statements on Iran's lack of adequate anti-money laundering/counter-terrorist financing (AML/CFT) controls.  Iran is known to use its state-owned banks to channel funds to terrorist organizations and finance its nuclear and ballistic missile programs.  The United States has designated at least 20 banks and subsidiaries under counter-proliferation and terrorism authorities.

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF U.S. CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* Not available

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
   *Legal persons covered:    criminally:* YES      *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs:  Foreign:* Not available   *Domestic:* Not available
   *KYC covered entities:* Central Bank, banks, financial and credit institutions, insurance companies (including the state regulator and reinsurance provider), interest-free funds, charity organizations and institutions, municipalities, notaries, lawyers, accountants, auditors, authorized specialists of the Justice Ministry, and official inspectors

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* Not available
   *Number of CTRs received and time frame:* Not available
   *STR covered entities:* Central Bank, banks, financial and credit institutions, insurance companies (including the state regulator and reinsurance provider), interest-free funds, charity organizations and institutions, municipalities, notaries, lawyers, accountants, auditors, authorized specialists of the Justice Ministry, and official inspectors

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:* Not available
   *Convictions:* None

***RECORDS EXCHANGE MECHANISM:***
　　***With U.S.:      MLAT:*** NO     ***Other:***  NO
　　***With other governments/jurisdictions:***  Not available

Iran is not a member of any Financial Action Task Force (FATF)-style regional body.

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

Since 2006, the U.S. has taken a number of targeted financial actions against key Iranian financial institutions, entities, and individuals under non-proliferation, counter-terrorism, human rights, and Iraq-related authorities, i.e., Executive Order 13382, Executive Order 13224, Executive Order 13553, and Executive Order 13438, respectively.  To date, the Departments of Treasury and State have designated over 300 Iranian entities and individuals for proliferation-related activity under Executive Order 13382.  Additionally, the United Nations Security Council (UNSC) has passed numerous resolutions that impose sanctions on Iran.  The most recent of these, UNSCR 1929, was adopted in June 2010.

UNSCR 1929 recognizes the potential connection between Iran's revenues derived from its energy sector and the funding of its proliferation of sensitive nuclear activities.  In 2010, in recognition of that connection, the United States adopted the Comprehensive Iran Sanctions, Accountability, and Divestment Act (CISADA), which makes sanctionable certain activities in Iran's energy sector, including the provision of refined petroleum products to Iran.

On December 31, 2011, the National Defense Authorization Act for Fiscal Year 2012 was signed into law.  Under Section 1245 of the Act, foreign financial institutions that knowingly facilitate significant financial transactions with the Central Bank of Iran or with Iranian financial institutions designated by Treasury risk being cut off from direct access to the U.S. financial system.  This legislation builds upon the sanctions from previous U.S. legislation and UNSC resolutions.

The following are some examples of notable designations under Executive Orders:  20 Iranian-linked banks (including Bank Refah in 2011), located in Iran and overseas, have been designated in connection with Iran's proliferation activities; one state-owned Iranian bank (Bank Saderat and its foreign operations) was designated for funneling money to terrorist organizations; the Qods Force, a branch of the Iranian Revolutionary Guard Corps (IRGC), was designated for providing material support to the Taliban, Lebanese Hizballah, and Palestinian Islamic Jihad; and, the Martyrs Foundation (also known as Bonyad Shahid), an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hizballah, Hamas, and the PIJ, has been designated along with Lebanon- and U.S.-based affiliates.

In October 2007, the FATF issued its first public statement expressing concern over Iran's lack of a comprehensive AML/CFT framework.  In February 2009, the FATF urged all jurisdictions to apply effective countermeasures to protect their financial sectors from the money laundering/terrorist financing risks emanating from Iran and also stated that jurisdictions should protect against correspondent relationships being used to bypass or evade countermeasures or risk mitigation practices.  In October 2011, the FATF reiterated its call for countermeasures.  The FATF urges Iran to immediately and meaningfully address its AML/CFT deficiencies, in

particular by criminalizing terrorist financing and effectively implementing suspicious transaction reporting requirements.

Since February 2007, the European Union (EU) has also adopted numerous measures to implement the UNSCRs on Iran and further protect the EU from Iranian threats. For example, in 2010, the EU adopted significant new measures against Iran, including new sanctions on several Iranian banks and the IRGC; enhanced vigilance by way of additional reporting and prior authorization for any funds transfers to and from an Iranian person, entity, or body above a certain threshold amount; a prohibition on the establishment of new Iranian bank branches, subsidiaries, joint ventures, and correspondent accounts; and other restrictions on insurance, bonds, energy, and trade.

Numerous countries around the world also have restricted their financial and business dealings with Iran in response to both the UNSC measures on Iran as well as the FATF statements on Iran's lack of adequate AML/CFT controls. A growing number of governments have moved to designate Iranian banks, and many of the world's leading financial institutions have voluntarily chosen to reduce or cut ties with Iranian banks.

Iran is ranked 120 out of 183 countries listed in Transparency International's 2011 Corruption Perception Index. There is pervasive corruption within the ruling and religious elite, government ministries, and government-controlled business enterprises.

In 2010, the Government of Iran teamed with United Nations Office on Drugs and Crime to establish a financial intelligence unit (FIU). The Iranian FIU reportedly will focus on suspicious financial transactions linked to illicit narcotics proceeds. No entity has been able to assess whether Iran's FIU meets international standards.

# Iraq

Iraq's economy is primarily cash-based, and there is little data available on the extent of money laundering in the country. Smuggling is endemic, often involving consumer goods, cigarettes, and petroleum products. Bulk cash smuggling, counterfeit currency, trafficking in persons, and intellectual property rights violations are major problems. Ransoms from kidnappings and extortion are often used to finance terrorist networks. Credible reports of counterfeiting abound. Trade-based money laundering, customs fraud, and various means of value transfer are found in the underground economy. Hawala networks, both licensed and unlicensed, are widely used for legitimate and illicit purposes. Corruption is a major challenge and is exacerbated by weak financial controls in the banking sector and weak links to the international law enforcement community. U.S. dollars are widely accepted and are used for many payments made by the U.S. government, as well as foreign assistance agencies and their contractors.

Iraq has four free trade zones (FTZs): the Basra/Khor al-Zubair seaport; Ninewa/Falafel area; Sulaymaniyah; and al-Qaim, located in western Al Anbar province. Under the Free Trade Zone Authority Law, goods imported or exported from the FTZs are generally exempt from all taxes and duties, unless the goods are to be imported for use in Iraq. Additionally, capital, profits, and investment income from projects in the FTZs are exempt from taxes and fees throughout the life of the project, including the foundation and construction phases. Value transfer via trade goods

is a significant problem in Iraq and the surrounding region.  Iraq is investigating the application of a new customs tariff regime.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** YES

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
   ***Legal persons covered:  criminally:*** YES        ***civilly:*** NO

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs:   Foreign:*** NO      ***Domestic:*** NO
   ***KYC covered entities:***  Banks; investment fund managers; life insurance companies and those which offer or distribute shares in investment funds; securities dealers; money transmitters, hawaladars, and issuers or managers of credit cards and travelers checks; foreign currency exchange houses; asset managers, transfer agents, investment advisers, securities dealers; and, dealers in precious metals and stones

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   ***Number of STRs received and time frame:***  43 in 2011
   ***Number of CTRs received and time frame:***  1,320 in 2011
   ***STR covered entities:***  Banks; investment fund managers; life insurance companies and those which offer or distribute shares in investment funds; securities dealers; money transmitters, hawaladars, and issuers or managers of credit cards and travelers checks; foreign currency exchange houses; asset managers, transfer agents, investment advisers, securities dealers; and, dealers in precious metals and stones

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
   ***Prosecutions:***  None
   ***Convictions:***  None

***RECORDS EXCHANGE MECHANISM:***
   ***With U.S.:     MLAT:*** NO      ***Other mechanism:*** YES
   ***With other governments/jurisdictions:*** YES

Iraq is a member of the Middle East and North Africa Financial Action Task Force (MENAFATF), a Financial Action Task Force (FATF)-style regional body.  Iraq's first mutual evaluation is scheduled for late 2012.

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

Although the only anti-money laundering statute in Iraq, CPA Law 93, AML Act of 2004, is broad enough to reach even beyond serious crime, the criminalization under CPA Law 93 is only

that of a misdemeanor.  Iraq does not prosecute cases under this law because the law does not effectively criminalize money laundering.

Iraq's legal framework needs to be strengthened, either by amendment or by drafting of new AML/CFT legislation.  Iraqi ministries need to support a viable AML/CFT regime with cooperation across ministries.  Investigators, prosecutors, and judges all need support from their leadership to move more aggressively in pursuing AML/CFT cases.  Prosecutors and investigators are frustrated when judges do not pursue their cases; similarly, judges claim the cases they receive are of poor quality and not prosecutable.  Senior-level support and increased capacity for all parties are necessary to ensure AML/CFT cases can be successfully prosecuted in Iraq.  In addition, the lack of implementing legislation, weak compliance enforcement by the Central Bank of Iraq (CBI), and the lack of support to the Money Laundering Reporting Office (MLRO), Iraq's financial intelligence unit, undermine Iraq's ability to counter terrorist financing and money laundering.

The CBI generally does not support the MLRO.  The MLRO has adequate staffing but lacks training, computer equipment, and software to receive, store, retrieve, and analyze data from the reporting institutions.  Without a database, the MLRO staff must process the data received manually.  The MLRO is empowered to exchange information with other Iraqi and foreign government agencies.  Historically the MLRO received little support from Iraqi law enforcement, but that changed in 2011 because the MLRO has added value to many of their investigations.  The Government of Iraq should ensure the MLRO has the capacity, resources, and authorities to serve as the central point for collection, analysis, and dissemination of financial intelligence to law enforcement and to serve as a platform for international cooperation.

Regulation and supervision of the formal and informal financial sectors are still quite limited and enforcement is subject to political constraints, resulting in weak private sector controls.  In practice, despite customer due diligence requirements, most banks open accounts based on the referral of existing customers and/or verification of a person's employment.  Actual application of the rules varies widely across Iraq's 45 state-owned and private banks.  Also, rather than file STRs in accordance with the law, most banks either conduct internal investigations or contact the MLRO, which executes an account review to resolve any questionable transactions.  In practice, very few STRs are filed.

Iraq should become a party to the UN Convention for the Suppression of the Financing of Terrorism.

# Isle of Man

Isle of Man (IOM) is a British crown dependency, and while it has its own parliament, government, and laws, the United Kingdom (UK) remains constitutionally responsible for its defense and international representation.  Offshore banking, manufacturing, and tourism are key sectors of the economy, and the government offers incentives to high-technology companies and financial institutions to locate on the island.  Its large and sophisticated financial center is potentially vulnerable to money laundering.  Most of the illicit funds in the IOM are from fraud schemes and narcotics trafficking in other jurisdictions, including the UK.  Identity theft and Internet abuse are growing segments of financial crime activity.

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
   ***Legal persons covered:      criminally:*** YES    ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs: Foreign:*** YES         ***Domestic:*** YES
   ***KYC covered entities:*** Banks; building societies; credit issuers; financial leasing companies; money exchanges and remitters; issuers of checks, traveler's checks, money orders, electronic money, or payment cards; guarantors; securities and commodities futures brokers; safekeeping, portfolio and asset managers; estate agents; auditors, accountants, lawyers and notaries; insurance companies and intermediaries; casinos and bookmakers; high-value goods dealers and auctioneers

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   ***Number of STRs received and time frame:*** 1,435 in 2010
   ***Number of CTRs received and time frame:*** Not applicable
   ***STR covered entities:*** All businesses

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
   ***Prosecutions:*** 15 in 2010
   ***Convictions:*** 13 in 2010

***RECORDS EXCHANGE MECHANISM:***
   ***With U.S.:      MLAT:*** YES    ***Other mechanism:*** YES
   ***With other governments/jurisdictions:*** YES

Compliance with international standards was evaluated in a report prepared by the International Monetary Fund's Financial Sector Assessment Program. The report can be found here: http://www.imf.org/external/pubs/ft/scr/2009/cr09275.pdf

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

IOM legislation provides powers to constables, including customs officers, to investigate whether a person has benefited from any criminal conduct. These powers allow information to be obtained about that person's financial affairs. These powers can be used to assist in criminal investigations abroad as well as in the IOM. In 2003, the U.S. and the UK agreed to extend to the IOM the U.S.-UK Treaty on Mutual Legal Assistance in Criminal Matters.

The Terrorism (Finance) Act 2009 allows the IOM authorities to compile their own list of suspects subject to sanctions when appropriate.

IOM is a Crown Dependency and cannot sign or ratify international conventions in its own right unless entrusted to do so. Rather, the UK is responsible for IOM's international affairs and, at

IOM's request, may arrange for the ratification of any convention to be extended to the Isle of Man. The UK's ratification of the 1988 UN Drug Convention was extended to include IOM on December 2, 1993; its ratification of the UN Convention against Corruption was extended to include the IOM on November 9, 2009; and its ratification of the International Convention for the Suppression of the Financing of Terrorism was extended to IOM on September 25, 2008. The UK has not extended the UN Convention against Transnational Organized Crime to the IOM.

# Israel

Israel is not regarded as a regional financial center. It primarily conducts financial activity with the markets of the United States and Europe, and to a lesser extent with the Far East. Criminal groups in Israel, either home-grown or with ties to the former Soviet Union, United States, and European Union often utilize a maze of offshore shell companies and bearer shares to obscure beneficial owners. Law enforcement continues to focus on human trafficking and public corruption.

Israel's illicit drug trade is regionally focused, with Israel as more of a transit country than a stand-alone significant market. The authorities continue to be concerned with illegal pharmaceutical sales, retail businesses which are suspected money-laundering enterprises, and corruption accusations against public officials. Bilateral cooperation between United States and Israeli law enforcement authorities is significant, including joint repatriations, training exercises and sharing of information where relevant.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***

***"All serious crimes" approach or "list" approach to predicate crimes:*** List approach
***Legal persons covered: criminally:*** YES ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***

***Enhanced due diligence procedures for PEPs: Foreign:*** YES ***Domestic:*** NO
***KYC covered entities:*** Banking corporations, credit card companies, trust companies, stock exchange members, portfolio managers, and the Postal Bank

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***

***Number of STRs received and time frame:*** 27,922 (January 1 - October 12, 2011)
***Number of CTRs received and time frame:*** 922,583 (January 1 - October 12, 2011)
***STR covered entities:*** Banking corporations, credit card companies, trust companies, members of the Tel Aviv Stock Exchange, portfolio managers, insurers and insurance agents,

provident funds and the companies who manage them, providers of currency services, money services businesses and the Postal Bank

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
   ***Prosecutions:*** 52  from January - August 2011
   ***Convictions:***  12  from January - August 2011

***RECORDS EXCHANGE MECHANISM:***
   ***With U.S.:    MLAT:*** YES       ***Other mechanism:*** YES
   ***With other governments/jurisdictions:*** YES

Israel has observer status with the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation can be found here: http://www.coe.int/t/dghl/monitoring/moneyval/Countries/Israel_en.asp

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

Israel's "right of return" laws for citizenship have meant that crime figures can, and have continued to, operate in their home countries while having easy access into and out of Israel. Israeli citizenship for those "making aliyah" does not require strong ties to Israel such as proof of continuous residency. Therefore it is not uncommon for some crime figures suspected of money laundering to hold passports in a home country, a third country for business, and Israel, without necessarily having established ties here.

U.S. law enforcement has a robust relationship with the Israel Tax Authority's (ITA) Anti Drug and Money Laundering Unit. U.S. customs authorities and the ITA routinely coordinate to target illicit finance and bulk cash smuggling between the two countries. In 2011, the Israel Money Laundering and Terror Financing Prohibition Authority signed an MOU with the U.S.'s Financial Crimes Enforcement Network to further cooperation on money laundering and terrorist financing issues. In addition, U.S. and Israeli law enforcement officials cooperate on extradition requests for individuals accused of crimes such as money laundering. For example, Itzhak Abergil, a U.S.-designated Consolidated Priority Organization Target (CPOT), and several other Israeli nationals were extradited to the United States in 2011 where they now face a host of charges including money laundering and drug trafficking.

# Italy

The proceeds of domestic organized crime groups (especially the Mafia, Camorra, and 'Ndrangheta) operating across numerous economic sectors in Italy and abroad compose the main source of laundered funds. A report from the Italian confederation of trade, tourism, and service-company operators declared domestic organized crime as Italy's largest enterprise. Other major sources of laundered money are proceeds from tax crimes, smuggling and sale of counterfeit goods, extortion, and usury. Based on limited evidence, the major sources of money for financing terrorism seem to be petty crime, document counterfeiting, and smuggling and sale of various legal and contraband goods. Italy's total black market is estimated to generate as much as 15% of GDP ($310 billion). A sizeable portion of this black market is for smuggled goods.

**INCSR 2012 Volume II        Money Laundering and Financial Crimes**

The proceeds of these sales are often laundered, and some may be used to finance terrorism. However, the largest portion of this black market is for tax evasion by otherwise legitimate commerce. Money laundering and terrorist financing in Italy occurs in both the formal and the informal financial system, as well as offshore.

Italy continues to combat the sources of money laundering and terrorist financing. For example, in his first speech to Parliament, new Prime Minister Monti announced that fighting tax evasion, which he said deprives Italy of one-fifth of its GDP, and fighting organized crime will be high priorities for the new government.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
   *Legal persons covered:*      *criminally:* YES      *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs:   Foreign:* YES     *Domestic:* NO
   *KYC covered entities:* Banks, Italian post office, electronic money transfer institutions, payment institutions, agents, investment firms, asset management companies, insurance companies, agencies providing tax collection services, stock brokers, financial intermediaries, trust companies, lawyers, accountants, auditors, and casinos

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* 23,816 for January through June 2011
   *Number of CTRs received and time frame:* Not applicable
   *STR covered entities:* Banks, Italian post office, electronic money transfer institutions, investment firms, asset management companies, insurance companies, agencies providing tax collection services, stock brokers, financial intermediaries, trust companies, lawyers, accountants, commercial assessors, notaries, auditors, real estate agents, casinos, and high-value goods dealers

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:* 21 in 2011
   *Convictions:* Not available

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:     MLAT:* YES     *Other mechanism:* YES
   *With other governments/jurisdictions:* YES

Italy is a member of the Financial Action Task Force (FATF). Its most recent mutual evaluation can be found here: http://www.fatf-gafi.org/infobycountry/0,3380,en_32250379_32236963_1_70522_43383847_1_1,00.html

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

In 2011, Italy made the following key legal, regulatory, and policy changes related to money laundering and terrorist financing: Parliament passed a law reducing from 5,000 euros to 2,500 euros the threshold above which cash transactions, cash bank deposits, and cash payments for bearer bonds are illegal; the Ministry of Interior issued a regulation establishing anomaly indicators for financial transactions, to facilitate the reporting of suspicious transactions by several categories of non-financial businesses and professions; the Bank of Italy, the Italian central bank, strengthened the required procedures and internal controls for financial intermediaries, to prevent their involvement in money laundering and terrorist financing. The Bank of Italy also raised the standards for data required in STRs, to increase the likelihood of detecting money laundering and terrorist financing transactions.

Although several of the above actions were intended to increase the number of STRs filed by non-financial businesses and professions, since these entities now file less than 1% of the STRs, Italy must continue to implement measures that will significantly increase the quality of STRs from all these entities and the number of STRs from selected categories of these entities. Italy also must continue to implement measures to increase the quality and timeliness of the data reported by all types of entities. In 2010, 37,047 STRs were filed for money laundering and 274 for terrorist financing.

Although Italy requires that large transactions be reported, these transactions are reported only in the aggregate.

As in previous years, in 2011 the Guardia di Finanza cooperated on a number of occasions with various U.S. authorities in investigations of money laundering, bankruptcy crimes, and terrorist financing (the Guardia di Finanza is the primary Italian law enforcement agency responsible for combating financial crime and smuggling, and is Italy's primary agency for interdicting drugs, along with the Carabinieri and the Italian National Police). The Direzione Centrale per i Servizi Antidroga, a task force comprised of the Guardia di Finanza, Carabinieri, and the Italian National Police, also plays a central role in these efforts.

# Japan

Japan is a regional financial center. It has one free-trade zone, the Okinawa Special Free Trade Zone, established in 1999 in Naha, to promote industry and trade in Okinawa. The zone is regulated by the Department of Okinawa Affairs in the Cabinet Office. Japan also has two free ports, Nagasaki and Niigata. Customs authorities allow the bonding of warehousing and processing facilities adjacent to these ports on a case-by-case basis. It is not an offshore financial center.

Japan continues to face substantial risk of money laundering by organized crime (including Boryokudan, Japan's organized crime groups, and Iranian drug trafficking organizations), extremist religious groups, and other domestic and international criminal elements. The major sources of money laundering proceeds include drug trafficking, fraud, loan-sharking (illegal money lending), remittance frauds, the black market economy, prostitution, and illicit gambling.

## INCSR 2012 Volume II        Money Laundering and Financial Crimes

In the past year, there has been an increase in financial crimes by citizens of West African countries, such as Nigeria and Ghana, who are resident in Japan. There is not a significant black market for smuggled goods, and the existence of alternative remittance systems is believed to be very limited in Japan.

For additional information focusing on terrorism financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
    ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
    ***Legal persons covered:      criminally:*** YES      ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
    ***Enhanced due diligence procedures for PEPs:   Foreign:*** NO      ***Domestic:*** NO
    ***KYC covered entities:*** Financial institutions, real estate agents and professionals, precious metals and stones dealers, antique dealers, postal service providers, lawyers, judicial scriveners, certified administrative procedures specialists, certified public accountants, certified public tax accountants, trust companies

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
    ***Number of STRs received and time frame:*** 337,341 in 2011
    ***Number of CTRs received and time frame:*** Not applicable
    ***STR covered entities:*** Financial institutions, real estate agents and professionals, precious metals and stones dealers

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
    ***Prosecutions:*** 191 in 2010
    ***Convictions:*** Not available

***RECORDS EXCHANGE MECHANISM:***
    ***With U.S.:      MLAT:*** YES      ***Other mechanism:*** YES
    ***With other governments/jurisdictions:*** YES

Japan is a member of the Financial Action Task Force (FATF) and the Asia/Pacific Group on Money Laundering (APG), a FATF-style regional body. Its most recent mutual evaluation can be found here:
http://www.fatf-gafi.org/document/61/0,3746,en_32250379_32236963_41684733_1_1_1_1,00.html

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

Although the Japanese government continues to strengthen legal institutions to permit more effective enforcement of anti-money laundering/counter-terrorist financing (AML/CFT) laws,

Japan's compliance with international standards specific to financial institutions is notably deficient. In April 2011, Japan amended its basic AML law, the Criminal Proceeds Act, to improve customer due diligence (CDD) requirements, including by requiring financial institutions to identify the customer's name, address, and date of birth, and to verify the purpose of transaction, business activities and beneficial owners. However, while the government is in the process of formulating the subordinate decrees, these requirements do not come into effect until April 28, 2013.

The Government of Japan (GOJ) has not implemented a risk-based approach to AML/CFT, and there is currently no mandate for enhanced due diligence for higher-risk customers, business relationships, and transactions. While the April 2011 amendments to the Criminal Proceeds Act call for financial institutions to verify a customer's assets and income in certain higher risk situations, they delineate those situations as those where it is suspected that false identity is being used, rather than by increased risks presented by such factors as business type, customer location, or type of transaction. The current regulations also do not authorize simplified due diligence, though there are exemptions to the identification obligation on the grounds that the customer or transaction poses no or little risk of money laundering or terrorist financing. Japan should implement a risk-based approach to its AML/CFT regime.

The GOJ's number of investigations, prosecutions, and convictions for money laundering in relation to the number of drug and other predicate offenses is low, despite the GOJ's many legal tools and programs to combat these crimes. The National Police Agency (NPA) provides limited cooperation with other GOJ agencies, and most foreign governments, on nearly all criminal, terrorism, or counter-intelligence-related matters. The GOJ should develop a robust program to investigate and prosecute money laundering offenses, and require enhanced cooperation by the NPA with its counterparts in the GOJ and foreign missions.

The GOJ's system does not allow the freezing of terrorist assets without delay, and in practice the Ministry of Finance has frozen terrorist assets in only a few cases. Japan's system does not cover assets raised by a non-terrorist for use by a terrorist or terrorist organization, and reaches only funds, not other kinds of assets. The GOJ should enact legislation to allow terrorist assets to be frozen without delay, and to expand the scope of assets to include non-financial holdings.

Japan should provide more training and investigatory resources for AML/CFT law enforcement authorities. As Japan is a major trading power, the GOJ should take steps to identify and combat trade-based money laundering.

Japan should become a party to the UN Convention against Transnational Organized Crime and the UN Convention against Corruption, and should fully implement the freezing obligations for terrorist funds, according to the UN Convention for the Suppression of the Financing of Terrorism.

# Jersey

The Island of Jersey, the largest of the Channel Islands, is an international financial center offering a sophisticated array of offshore services. Jersey is a British crown dependency but has its own parliament, government, and laws. The United Kingdom (UK) remains constitutionally

INCSR 2012 Volume II        Money Laundering and Financial Crimes

responsible for its defense and international representation but has entrusted Jersey to regulate its own financial service sector and to negotiate and sign tax information exchange agreements directly with other jurisdictions. The financial services industry is a key sector, with banking, investment services, and trust and company services accounting for approximately half of Jersey's total economic activity. As a substantial proportion of customer relationships are with nonresidents, adherence to know-your-customer rules is an area of focus for efforts to limit illicit money from foreign criminal activity. Jersey also requires that beneficial ownership information be obtained and held by its company registrar. Island authorities undertake efforts to protect the financial services industry against the laundering of the proceeds of foreign political corruption deriving from industries such as oil, gas, and transportation.

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
   ***Legal persons covered:       criminally:*** YES      ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs: Foreign:*** YES     ***Domestic:*** NO
   ***KYC covered entities:*** Banks; money exchanges and foreign exchange dealers; financial leasing companies; issuers of credit and debit cards, travelers checks, money orders and electronic money; securities brokers and dealers; safekeeping, trust, and portfolio managers; insurance companies and brokers; fund products and operators; casinos; company service providers; real estate agents; dealers in precious metals and stones and other high-value goods; notaries, accountants, lawyers and legal professionals

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   ***Number of STRs received and time frame:*** 1,854 in 2009
   ***Number of CTRs received and time frame:*** Not applicable
   ***STR covered entities:*** Banks; money exchanges and foreign exchange dealers; financial leasing companies; issuers of credit and debit cards, travelers checks, money orders and electronic money; securities brokers and dealers; safekeeping, trust, and portfolio managers; insurance companies and brokers; fund products and operators; casinos; company service providers; real estate agents; dealers in precious metals and stones and other high-value goods; notaries, accountants, lawyers and legal professionals

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
   ***Prosecutions:*** One prosecuted to judgment in 2010
   ***Convictions:*** One in 2010

***RECORDS EXCHANGE MECHANISM:***
   ***With U.S.:      MLAT:*** NO      ***Other mechanism:*** YES
   ***With other governments/jurisdictions:*** YES

In lieu of a mutual evaluation, a report was prepared by the International Monetary Fund's Financial Sector Assessment Program. The report can be found here: http://www.imf.org/external/pubs/ft/scr/2009/cr09280.pdf

### ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:

Jersey does not enter into bilateral mutual legal assistance treaties. Instead it is able to provide mutual legal assistance to any jurisdiction, including the US, in accordance with the Criminal Justice (International Co-operation) (Jersey) Law 2001 and the Civil Asset Recovery (International Co-operation (Jersey) Law 2007. Jersey has granted U.S. requests for assistance in criminal matters. Jersey signed a Tax Information Exchange Agreement with the United States in 2002. In 2009, the Jersey Financial Services Commission (JFSC) signed a statement of cooperation with the Board of Governors of the Federal Reserve System, Office of the Comptroller of Currency, Federal Deposit Insurance Corporation, and Office of Thrift Supervision. This statement is in addition to existing memoranda of understanding with the Securities and Exchange Commission and Commodity Futures Trading Commission.

Although not yet used in practice, Jersey has an ability to designate persons and freeze their assets in conformity with UNSCR 1373; however, no formal procedure is in place to receive and assess requirements based on a foreign request. Additionally, the definition of "funds" subject to freezing does not expressly refer to assets "jointly" or "indirectly" owned or controlled by designated or listed persons. The JFSC website contains a link to the United Kingdom Consolidated List of asset freeze targets, as designated by the United Nations, European Union and United Kingdom. It does not use other means to distribute UN lists of designated terrorists or terrorist entities.

Jersey is a Crown Dependency and cannot sign or ratify international conventions in its own right unless entrusted to do so, as is the case with tax information exchange agreements. Rather, the UK is responsible for Jersey's international affairs and, at Jersey's request, may arrange for the ratification of any Convention to be extended to Jersey. The UK's ratification of the 1988 UN Drug Convention was extended to include Jersey in July 1998; its ratification of the UN Convention against Corruption was extended to include Jersey in November 2009; and its ratification of the International Convention for the Suppression of the Financing of Terrorism was extended to Jersey in September 2008. The UK has not extended the UN Convention against Transnational Organized Crime to Jersey.

Jersey authorities have a continuing concern regarding the increasing incidence of domestic drug related crimes. The customs and law enforcement authorities devote considerable resources to countering drug-related crime. Jersey should continue to maintain and enhance its level of compliance with international standards to assist those efforts. The JFSC should ensure its AML Unit has enough resources to continue to function effectively, and to provide outreach and guidance to the sectors it regulates.

Jersey authorities should explicitly require that a relevant obliged entity obtain all necessary customer due diligence (CDD) information from the intermediary or introducer immediately at the beginning of a relationship and should consider requiring relevant persons to perform spot-testing of an intermediary or introducer's performance of CDD obligations.

# Kenya

Kenya is the largest financial center in East Africa, and its banking and financial sectors are growing in sophistication.  As a regional financial and trade center for Eastern, Central, and the Horn of Africa, Kenya's economy has large formal and informal sectors; and it remains vulnerable to money laundering and other financial fraud.  Reportedly, Kenya's financial system may be laundering over $100 million each year, although lack of regulation and limited records make quantifying the value difficult.

Money laundering/terrorist financing activity derives from both domestic and foreign criminal activity.  Kenya is a transit point for international drug traffickers.  The laundering of funds derived from corruption, smuggling, and other financial crimes is a substantial problem.  Its proximity to Somalia makes Kenya an attractive and likely destination for the laundering of piracy-related proceeds and a conduit for terrorism-related funds.  There is a black market for smuggled goods in Kenya, which serves as a major transit country for Uganda, Tanzania, Rwanda, Burundi, eastern Democratic Republic of Congo, Somalia, and South Sudan.  Goods marked for transit to these northern corridor countries avoid Kenyan customs duties, but authorities acknowledge they are often sold in Kenya.  Many entities in Kenya are involved in exporting and importing goods, including nonprofit entities.  Trade-based money laundering is a problem in Kenya, and traded commodities are often used to provide counter-valuation in regional hawala networks.

In addition to banks, wire services, and other formal channels that act as depository institutions and execute funds transfers, Kenya also houses money/value transfer systems (MVTS) catering to those who conduct cash-based business.  Kenyan Somalis and Somali expatriates, in particular the large Somali refugee population, primarily use hawalas to send and receive remittances internationally.  Mobile money, using telecom networks for cash and value transfers, called M-Pesa, is an increasingly large component of the Kenyan financial sector.

There are questions concerning Kenya's political will to address money laundering and terrorist financing.  In June and October 2011, Kenya was included in the Financial Action Task Force (FATF) Public Statement for its lack of progress on adopting/implementing its action plan to improve its AML/CFT regime despite over a year of targeted engagement by the FATF.

For additional information focusing on terrorism financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*  YES

*CRIMINALIZATION OF MONEY LAUNDERING:*
    *"All serious crimes" approach or "list" approach to predicate crimes:*  All crimes
    *Legal persons covered:*    *criminally:* YES    *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
    *Enhanced due diligence procedures for PEPs:*   *Foreign:* NO    *Domestic:* NO

*KYC covered entities:* Banks and institutions accepting repayable funds from the public; lending institutions, factors, and commercial financiers; financial leasing firms; transferors of funds or value, by any means, including both formal and informal channels; issuers and managers of credit and debit cards, checks, traveler's checks, money orders and banker's drafts, and electronic money; financial guarantors; traders of money market instruments, including derivatives, foreign exchange, currency exchange, interest rate and index funds, transferable securities, and commodity futures; participation in securities issues and the provision of financial services related to such issues; portfolio managers; safekeeping, management, and administration of cash or liquid securities; underwriting and placement of life insurance and other investment related insurance; casinos; real estate agencies; accountants; and dealers in precious metals and stones

### SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:
*Number of STRs received and time frame:* 37 – January through October 2011
*Number of CTRs received and time frame:* None
*STR covered entities:* Banks and institutions accepting repayable funds from the public; lending institutions, factors, and commercial financiers; financial leasing firms; transferors of funds or value, by any means, including both formal and informal channels; issuers and managers of credit and debit cards, checks, traveler's checks, money orders and banker's drafts, and electronic money; financial guarantors; traders of money market instruments, including derivatives, foreign exchange, currency exchange, interest rate and index funds, transferable securities, and commodity futures; participation in securities issues and the provision of financial services related to such issues; portfolio managers; safekeeping, management, and administration of cash or liquid securities; underwriting and placement of life insurance and other investment related insurance; casinos; real estate agencies; accountants; and dealers in precious metals and stones

### MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:
*Prosecutions:* None
*Convictions:* None

### RECORDS EXCHANGE MECHANISM:
*With U.S.:* MLAT: NO     *Other mechanism:* YES
*With other governments/jurisdictions:* YES

Kenya is a member of the Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG), a Financial Action Task Force (FATF)-style regional body. Kenya's most recent mutual evaluation report can be found here: www.esaamlg.org

### ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:

The Proceeds of Crime and Anti-Money Laundering Act (POCAMLA), which came into force in June 2010, provides a legal framework for regulation and enforcement as well as a framework for compliance among most of Kenya's financial and some of its non-financial sectors; however, the law has not been implemented, and authorities such as the Financial Reporting Center (FRC), Kenya's FIU, have yet to be established. Due to Kenya's lack of implementation, POCAMLA has never been used to prosecute any crimes, nor have any charges been filed under the POCAMLA, so the law remains untested.

The future FRC will issue official implementing regulations. In the interim, the Central Bank of Kenya (CBK) has issued guidance notes to commercial banks, non-bank financial institutions, and mortgage finance companies about their responsibilities under POCAMLA. In July 2011, guidance was issued on suspicious transaction reporting. In September 2011, the CBK issued guidance on combating terrorist financing, but as neither terrorism nor terrorist financing is criminalized, this guidance is not binding. In 2011, the CBK closed several foreign exchange bureaus for failing to comply with new, more stringent standards.

The POCAMLA does not adequately address KYC measures related to PEPs. With Kenya's new constitution, PEPs are now subject, for the first time, to financial disclosure requirements and enhanced vetting procedures. Kenya does not actively collect CTRs, though banks provide this data if asked.

The Government of Kenya cannot track transactions by MVTS entities. The lack of regulation/supervision of this sector, coupled with a lack of reporting from the obliged entities, contribute to the vulnerability posed by this sector. Tracking, reporting, and investigating suspicious transactions related to the MVTS are more difficult for the Kenyan authorities than those using the formal financial sector.

Kenyan law enforcement authorities lack the institutional capacity, investigative skill, and resources to conduct complex financial investigations, and a number of bureaucratic impediments present challenges. To demand bank account records or to seize an account, the police must present evidence linking the deposits to a criminal violation and obtain a court warrant. The confidentiality of this process is difficult to maintain, and because of leaks, account holders are tipped off about the investigations and then move their accounts or contest the warrants. However, the Kenya Revenue Authority has made recent strides in increasing its internal monitoring and collection procedures. With the implementation of Kenya's constitution, there are significant judicial reforms underway. The Office of the Public Prosecutor is organizing a special unit to address financial crimes and is collaborating with the Ethics and Anti-Corruption Commission to investigate illicit financial flows.

The POCAMLA does not criminalize terrorist financing; the draft anti-terrorism bill addressing terrorist financing languishes in Parliament, where it has been for years. POCAMLA provides for legal mechanisms to freeze or seize criminal accounts; however, the law has not yet been used to do this. Kenya does not have a mechanism or legal authority to freeze or seize accounts used for terrorist financing. In November 2011, the President signed the Mutual Legal Assistance Act. This Act will allow increased cooperation with its international partners. Although it had languished for a number of years, the Act became operational on December 2 and was gazetted on December 9, 2011.

# Latvia

Latvia is a regional financial center that has a large number of commercial banks with a sizeable non-resident deposit base. Total bank deposits have increased in the past year, with non-residential deposits increasing by 17% and comprising 41% of total bank deposits (as of August 2011).

In August 2006, the United States issued a Final Rule under Section 311 of the USA PATRIOT Act, imposing a special measure against the VEF Banka, as a financial institution of primary money laundering concern. The bank was found to lack adequate AML/CFT controls and was used by criminal elements to facilitate money laundering, particularly through shell companies. The Latvian authorities subsequently closed the bank, and on August 1, 2011, the Final Rule was rescinded.

Local officials do not consider proceeds from illegal narcotics to be a major source of laundered funds in Latvia, despite the interception of a record 80 kilograms of hashish at the Latvian-Russian border in early September. Authorities report that the primary sources of money laundered in Latvia are tax evasion; organized criminal activities, such as prostitution, tax evasion, and fraud, perpetrated by Russian and Latvian groups; as well as other forms of financial fraud. Officials report that questionable transactions and the overall value of money laundering have remained below pre-financial crisis levels. Latvian regulatory agencies closely monitor financial transactions to identify instances of terrorist financing.

Public corruption remains a problem in Latvia. This year, the Corruption Prevention and Combating Bureau (KNAB) initiated proceedings against several public officials for financial fraud, including money laundering. For example, an official of the Ministry of Finance was charged with bribing an official of the State Revenue Service (SRS) to allow illegal activities. In another instance, an assistant head of a Latvian-owned bank was arrested for allegedly demanding a 50,000 LVL (approximately $100,000) bribe in return for a favorable loan. There is a black market for smuggled goods (primarily cigarettes, alcohol and gasoline); however, contraband smuggling does not generate significant funds that are laundered through the financial system. In the first nine months of 2011, confiscation of smuggled goods has increased several fold over 2010 figures (494% more fuel has been seized so far).

Four special economic zones provide a variety of significant tax incentives for manufacturing, outsourcing, logistics centers, and the transshipment of goods to other free trade zones. These zones are located at the free ports of Ventspils, Riga, and Liepaja, and in the inland city of Rezekne near the Russian and Belarusian borders. The zones are covered by the same regulatory oversight and enterprise registration regulations that exist for other areas. In 2011, the SRS uncovered the largest fraud case in the history of the Riga Free Port; the criminal investigation into tax evasion and smuggling is ongoing.

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF U.S. CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All crimes approach
   ***Legal persons covered: criminally:*** YES        ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs: Foreign:*** YES     ***Domestic:*** NO
   ***KYC covered entities:*** Banks, credit institutions, life insurance companies, intermediaries, private pension fund administrators, investment brokerage firms and management companies, currency exchange offices, and money transmission or remittance offices; tax

advisors, external accountants, and sworn auditors; sworn notaries, advocates, and other independent legal professionals; trust and company service providers; real estate agents or intermediaries; organizers of lotteries or other gambling activities; persons providing money collection services; EU-owned entities; and any merchant, intermediary or service provider, where payment for goods or services is accepted in cash in an amount equivalent to or exceeding 15,000 EUR (approximately $20,000)

### SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:
*Number of STRs received and time frame:* 15,467 from January 1 through October 31
*Number of CTRs received and time frame:* 10,961 from January 1 through October 31
NOTE: Number of CTRs includes both cash transactions and other unusual transactions, as per the Latvian Law.
*STR covered entities:* Banks, credit institutions, life insurance companies, intermediaries, private pension fund administrators, investment brokerage firms and management companies, currency exchange offices, and money transmission or remittance offices; tax advisors, external accountants, and sworn auditors; sworn notaries, advocates, and other independent legal professionals; trust and company service providers; real estate agents or intermediaries; organizers of lotteries or other gambling activities; persons providing money collection services; any merchant, intermediary or service provider, where payment for goods or services is accepted in cash in an amount equivalent to or exceeding 15,000 EUR (approximately $20,000); and public institutions

### MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:
*Prosecutions:* 39 persons prosecuted for 85 crimes from January 1 through October 31, 2011
*Convictions:* Six cases with final court judgments and eight convicted persons from January 1 through October 31, 2011

### RECORDS EXCHANGE MECHANISM:
*With U.S.:*      *MLAT:*  YES      *Other mechanism:* YES
*With other governments/jurisdictions:*  YES

Latvia is a member of the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation report can be found here: http://www.coe.int/t/dghl/monitoring/moneyval/Countries/Latvia_en.asp

### ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:

In 2011, Latvia adopted beneficial ownership disclosure amendments which require shareholders owning 25% of shares or more to submit data identifying the natural person behind the shareholder. The latest amendments of the AML/CFT Law simplify customer due diligence, add payment services providers and electronic money institutions to the list of entities subject to the Law, and clarify the definition of "financial institutions." Finally, the AML/CFT Law now extends to EU-owned entities and requires their compliance with the Latvian laws related to customer identification, due diligence, and record keeping.

Under Latvian law, foreign politically exposed persons (PEPs) are always subject to enhanced due diligence procedures. Current laws do not require enhanced due diligence procedures for

domestic PEPs, however they allow discretion to any institution or professional covered by KYC rules to apply enhanced due diligence, based on its risk assessment for a particular customer.

Latvian officials have cooperated with USG law enforcement agencies to investigate numerous financial narcotics-related crimes. The Latvian Financial and Capital Market Commission (FCMC) regularly exchanges information with the U.S. Securities and Exchange Commission. More broadly, officials in Latvia are also able to provide assistance outside of the formal mutual legal assistance process in accordance with the current AML/CFT laws. Total assets seized by law enforcement officials in money laundering cases was approximately 177,000 LVL (approximately $347,000), a decrease from 2010.

"Internet phishing" crimes have increased from 67 in 2010 to 223 in the first ten months of 2011. The value of these transactions remains small and does not significantly contribute to money laundering. However, authorities are concerned that Latvian youth are allegedly used by the German and Dutch phishing hackers as "money mules," allowing their bank accounts to serve as conduits for illicit money.

Latvia has comprehensive AML/CFT laws and regulations. The scope of the "shadow" (untaxed) economy (estimated at around 40% of the overall economy), geographic location, and public corruption make it challenging to combat money laundering. Despite these difficulties, Latvian law enforcement officials and regulators are making progress. FCMC reports that Latvian banks have substantially invested in their IT systems to design programs for identifying suspicious activities, especially with regard to high-risk clients. FCMC is committed to strengthen its capacity by increasing its human and financial resources, specifically for AML purposes. FCMC has also drafted a memorandum of understanding for cooperation with U.S. Commodity Futures Trading Commission and is awaiting the Commission's reply.

# Lebanon

Lebanon is a financial hub for banking activities in the Middle East and eastern Mediterranean and has one of the more sophisticated banking sectors in the region. Lebanon faces significant money laundering and terrorist financing challenges; for example, Lebanon has a substantial influx of remittances from expatriate workers and family members, estimated by the World Bank at $8.4 billion in 2010. It has been reported that a number of Lebanese abroad are involved in underground finance and trade-based money laundering (TBML) activities. In 2011, Lebanese Canadian Bank was designated as a financial institution of primary money laundering concern under Section 311 of the USA PATRIOT Act.

Laundered proceeds come primarily from foreign criminal activity and organized crime, and Hizballah, which the United States has designated as a terrorist organization; though the Government of Lebanon (GOL) does not recognize this designation. Domestically, there is a black market for cigarettes, cars, counterfeit consumer goods, and pirated software, CDs and DVDs. However, the sale of these goods does not generate significant proceeds that are laundered through the formal banking system. In addition, the domestic illicit narcotics trade is not a principal source of laundered proceeds.

Lebanese expatriates in Africa and South America have established financial systems outside the formal financial sector, and some are reportedly involved in TBML schemes. Lebanese diamond brokers and purchasing agents are reportedly part of an international network of traders who participate in underground activities including the trafficking of conflict diamonds, diamond trade fraud (the circumvention of the Kimberly process) and TBML.

Exchange houses are reportedly used to facilitate money laundering and terrorism financing, including by Hizballah. Although offshore banking, trust and insurance companies are not permitted in Lebanon, the government has provisions regarding activities of offshore companies and transactions conducted outside Lebanon or in the Lebanese Customs Free Zone. Offshore companies can issue bearer shares. There are also two free trade zones (FTZ) operating in Lebanon: the Port of Beirut and the Port of Tripoli. FTZs fall under the supervision of the Customs Authority.

For additional information focusing on terrorism financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** YES

***CRIMINALIZATION OF MONEY LAUNDERING:***
  ***"All serious crimes" approach or "list" approach to predicate crimes:*** List approach
  ***Legal persons covered:     criminally:*** YES    ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
  ***Enhanced due diligence procedures for PEPs: Foreign:*** YES    ***Domestic:*** NO
  ***KYC covered entities:*** Banks, lending institutions, money dealers, financial brokerage firms, leasing companies, mutual funds, insurance companies, real estate developers, promotion and sale companies, high-value goods merchants (jewelry, precious stones, gold, works of art, archeological artifacts)

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
  ***Number of STRs received and time frame:*** 151 from December 2010 until October 2011
  ***Number of CTRs received and time frame:*** Not applicable
  ***STR covered entities:  :*** Banks, lending institutions, money dealers, financial brokerage firms, leasing companies, mutual funds, insurance companies, real estate developers, promotion and sale companies, high-value goods merchants

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
  ***Prosecutions:*** Seven - December 2010 through October 2011
  ***Convictions:*** None

***RECORDS EXCHANGE MECHANISM:***
  ***With U.S.:     MLAT:*** YES    ***Other mechanism:*** YES
  ***With other governments/jurisdictions:*** YES

Lebanon is a member of Middle East and North Africa Financial Action Task Force (MENAFATF), a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation can be found here: http://www.menafatf.org/MER/MutualEvaluationReportoftheLebaneseRepublic-English.pdf

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

Lebanon is seeking to finalize a regulation which would add predicate offenses to the existing money laundering law 318/2001. The draft legislation would also impose financial penalties on obliged entities for reporting violations, and oblige lawyers and accountants to report suspicious transactions.

A December 2010 amendment to circular 83 provides for enhanced due diligence procedures for foreign PEPs. Lebanon's financial intelligence unit, the Special Investigations Commission (SIC), has issued a number of circulars amending the regulations on the control of financial and banking operations for fighting money laundering and terrorism financing; all address exchange institutions and/or transactions with exchange institutions, or the cross-border transportation of cash, metal coins and bullion. The trading of bearer shares of unlisted companies remains a vulnerability, and the GOL should take action to immobilize those shares.

Although the number of filed STRs and subsequent money laundering investigations coordinated by the SIC has steadily increased over the years, prosecutions and convictions are still lacking. In addition, there should be more emphasis on proactive targeting and not simply a reliance on STRs filed by financial institutions to initiate investigations. This could be attributable to a lack of political will to effectively prosecute cases or a lack of resources and familiarity with AML/CFT standards. Corruption also touches all aspects of Lebanese society, which may impede prosecution efforts.

Lebanon's Internal Security Forces (ISF) received 49 SIC referrals and 22 Interpol notices to investigate money laundering and terrorist financing activities but there were no subsequent arrests or prosecutions. The ISF Money Laundering Department staff lacks the training and skill set to conduct effective money laundering investigations, as well as equipment and software programs to effectively track cases. Additionally, there is lackluster coordination among law enforcement entities. Linking the efforts of all concerned authorities and monitoring the effectiveness and efficiency of the AML/CFT system in general might improve the system's effectiveness. The GOL should encourage more efficient cooperation, including the development of task forces, between financial investigators and other relevant agencies such as Customs, the ISF, the SIC, and the judiciary. The GOL also should consider amending its legislation to allow a greater ability to provide forfeiture cooperation internationally and also provide authority for the return of fraudulent proceeds.

Customs is required to inform the FIU of suspected TBML or terrorist financing; however, high levels of corruption within Customs create the potential to compromise effectiveness on measures addressing vulnerabilities for TBML and other threats. The GOL should enforce cross-border currency reporting. Existing safeguards also do not address the issue of the laundering of diamonds. Law enforcement authorities should examine domestic ties to the international network of Lebanese brokers and traders.

Lebanon should increase efforts to disrupt and dismantle terrorist financing efforts, including those carried out by Hizballah. Finally, the GOL should become a party to the UN International Convention for the Suppression of the Financing of Terrorism.

# Liechtenstein

The Principality of Liechtenstein has a well-developed offshore financial services sector, liberal incorporation and corporate governance rules, relatively low tax rates, and a tradition of strict bank secrecy. All of these conditions significantly contribute to the ability of financial intermediaries in Liechtenstein to attract both licit and illicit funds from abroad. Liechtenstein's financial services sector includes 17 banks, 107 asset management companies, 40 insurance companies and 71 insurance intermediaries, 33 pension schemes and six pension funds, 392 trust companies and 21 fund management companies with approximately 469 investment undertakings (funds), and 637 other financial intermediaries. The three largest banks control 85% of the market.

In recent years the Principality has made continued progress in its efforts against money laundering as banking secrecy has been softened to allow for greater cooperation with other countries to identify tax evasion. The Liechtenstein Government has recognized the OECD standard as the global standard in tax cooperation and has renegotiated a series of double taxation agreements to include administrative assistance on tax evasion cases.

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
   ***Legal persons covered: criminally:*** YES      ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs: Foreign:*** YES      ***Domestic:*** YES
   ***KYC covered entities:*** Banks, securities and insurance brokers; money exchangers or remitters; financial management firms, investment companies, and real estate companies; dealers in high value goods; insurance companies; lawyers; money exchangers or remitters; casinos; the Liechtenstein Post Ltd.; and individuals acting as intermediaries in bank lending, money transactions, trading of currencies, or dealing in matters of wealth management and investment advice

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   ***Number of STRs received and time frame:*** 328 in 2010
   ***Number of CTRs received and time frame:*** Not applicable
   ***STR covered entities:*** Banks, securities and insurance brokers; money exchangers or remitters; financial management firms, investment companies, and real estate companies; dealers in high value goods; insurance companies; lawyers; money exchangers or remitters; casinos; the Liechtenstein Post Ltd.; and individuals acting as intermediaries in bank lending,

money transactions, trading of currencies, or dealing in matters of wealth management and investment advice

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
    ***Prosecutions:*** Seven from October 19, 2010 to October 31, 2011
    ***Convictions:*** None from October 19, 2010 to October 31, 2011

***RECORDS EXCHANGE MECHANISM:***
    ***With U.S.:***   ***MLAT:*** YES   ***Other mechanisms:*** YES
    ***With other governments/jurisdictions:*** YES

Liechtenstein is a member of the Council of Europe Select Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a Financial Action Task Force-style regional body. Its most recent mutual evaluation can be found here:
http://www.coe.int/t/dghl/monitoring/moneyval/Countries/Liechtenstein_en.asp

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

Because there are no laws for declaration of currency and monetary instruments, Liechtenstein's authorities cannot effectively conduct bulk cash investigations.

Liechtenstein has shown an important effort to improve deficiencies in combating money laundering. The 2010 reporting year saw a new record high number of suspicious activity reports (SARs), an increase of 39.6% over 2009. Nearly half (47.6%) of the SARs were based on fraud concerns; 8.8% on money laundering; and 30.6% on the other enumerated offense categories. In 2010, 83.8% of Liechtenstein's SARs were forwarded to the Office of the Public Prosecutor. No SARs were submitted for suspected terrorist financing. The present SAR reporting requirements do not clearly indicate whether attempted transactions relating to funds used in connection with terrorism are covered.

In practice, many of the customer characteristics often considered high-risk in other locales, including non-resident and trust or asset management accounts, are considered routine in Liechtenstein, subject only to normal customer due diligence procedures. Liechtenstein also decided not to include entities with bearer shares, trusts and foundations, or entities registered in privately-held databases in the high-risk category. Liechtenstein should consider reviewing whether this decision makes its financial system more vulnerable to illegal activities.

There are reportedly no abuses of non-profit organizations, alternative remittance systems, offshore sectors, free trade zones, bearer shares, or other specific sectors.

# Luxembourg

Despite its standing as the second-smallest member of the European Union (EU), Luxembourg is one of the largest financial centers in the world. It operates as an offshore financial center. Although there are a handful of domestic banks operating in the country, the majority of banks registered in Luxembourg are foreign subsidiaries of banks in Germany, Belgium, France, Italy,

and Switzerland. While Luxembourg is not a major hub for illicit narcotics distribution, the size and sophistication of its financial sector create opportunities for money laundering, tax evasion, and other financial crimes.

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
    ***"All serious crimes" approach or "list" approach to predicate crimes:*** Combination of listed crimes and a penalty threshold
    ***Legal persons covered:***     ***criminally:*** YES     ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
    ***Enhanced due diligence procedures for PEPs:***   ***Foreign:*** YES     ***Domestic:*** NO
    ***KYC covered entities:*** Banks and payment institutions; investment, tax, and economic advisers; brokers, custodians, and underwriters of financial instruments; commission agents, private portfolio managers, and market makers; managers and distributors of units/shares in undertakings for collective investments (UCIs); financial intermediation firms, registrar agents, management companies, trust and company service providers, and operators of a regulated market authorized in Luxembourg; foreign exchange cash operations; debt recovery and lending operations; pension funds and mutual savings fund administrators; corporate domiciliation agents, company formation and management services, client communication agents, and financial sector administrative agents; primary and secondary financial sector IT systems and communication networks operators; insurance brokers and providers; auditors, accountants, notaries, and lawyers; casinos and gaming establishments; real estate agents; and high value a goods dealers

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
    ***Number of STRs received and time frame:*** 7,741 as of November 2011
    ***Number of CTRs received and time frame:*** Not applicable
    ***STR covered entities:*** Banks and payment institutions; investment, tax, and economic advisers; brokers, custodians, and underwriters of financial instruments; commission agents, private portfolio managers, and market makers; managers and distributors of units/shares in undertakings for collective investments (UCIs); financial intermediation firms, registrar agents, management companies, trust and company service providers, and operators of a regulated market authorized in Luxembourg; foreign exchange cash operations; debt recovery and lending operations; pension funds and mutual savings fund administrators; corporate domiciliation agents, company formation and management services, client communication agents, and financial sector administrative agents; primary and secondary financial sector IT systems and communication networks operators; insurance brokers and providers; auditors, accountants, notaries, and lawyers; casinos and gaming establishments; real estate agents; and high value goods dealers

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
    ***Prosecutions:*** 127 as of November 2011
    ***Convictions:*** 77 as of November 2011

***RECORDS EXCHANGE MECHANISM:***
   ***With U.S.:***   ***MLAT:*** YES   ***Other mechanism:*** YES
   ***With other governments/jurisdictions:*** YES

Luxembourg is a member of the Financial Action Task Force (FATF).  Its most recent mutual evaluation can be found here:  http://www.fatf-gafi.org/infobycountry/0,3380,en_32250379_32236963_1_70591_43383847_1_1,00.html

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

During 2011, competent authorities were busy implementing the comprehensive package of legislative and administrative actions that were put in place in 2010, notably the Law of October 27, 2010.  This law introduces important changes to AML/CFT provisions and prescribes changes to 20 existing pieces of legislation.  Most visibly, the financial intelligence unit (FIU) expanded its capabilities through the hiring of additional analysts and continued preparations for an enlargement of the FIU premises.  Nevertheless, state prosecution officials have called publicly for further resources, notably more analysts.  In response to these requests, the Ministry of Justice has pledged to continue supporting the state prosecution, and the FIU in particular, with the level of resources needed to fulfill its responsibilities.  In terms of quantitative data, the number of transaction reports, money laundering criminal prosecutions, and convictions has risen in comparison to 2010 following the systematic implementation of the new legislation.

# Macau

Macau, a Special Administrative Region (SAR) of the People's Republic of China, is not a significant regional financial center.  However, with reported gaming revenues of $30.5 billion from January to November 2011, Macau is the world's largest gaming market by revenue.  Macau's gaming industry relies heavily on loosely-regulated gaming promoters, known as junket operators, for the supply of gamblers mostly from nearby mainland China.  Increasingly popular among gamblers seeking inscrutability and alternatives to China's currency movement restrictions, junket operators are also popular among casinos aiming to reduce credit default risk and unable to legally collect gambling debts in China.  This inherent conflict of interest, together with the anonymity gained through the use of the junket operator in the transfer and commingling of funds, as well as the absence of currency and exchange controls, present vulnerabilities for money laundering.  Primary sources of criminal proceeds in Macau, attributed to criminal networks spanning across Macau's boundary with mainland China, are:  gaming-related crimes, robbery offenses, corruption, organized crime, and narcotics crimes.

For additional information focusing on terrorism financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***

*"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
*Legal persons covered:*        *criminally:* YES        *civilly:* NO

**KNOW-YOUR-CUSTOMER (KYC) RULES:**
*Enhanced due diligence procedures for PEPs: Foreign:* YES        *Domestic:* YES
*KYC covered entities:* Banks, credit and insurance entities, casinos, gaming intermediaries,
remittance agents and money changers, cash couriers, trust and company service providers,
realty services, pawn shops, traders in high-value goods, notaries, registrars, commercial
offshore service institutions, lawyers, auditors, accountants, and tax consultants

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
*Number of STRs received and time frame:* 1,190 from January to September 2011
*Number of CTRs received and time frame:* Not applicable
*STR covered entities:* All persons, irrespective of entity or amount of transaction involved

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
*Prosecutions:* None from January to June 2011
*Convictions:*   One from January to June 2011

**RECORDS EXCHANGE MECHANISM:**
*With U.S.:*      *MLAT:* NO      *Other mechanism:* YES
*With other governments/jurisdictions:* YES

Macau is a member of the Asia/Pacific Group on Money Laundering (APG), a Financial Action
Task Force-style regional body.  Its most recent mutual evaluation can be found here:
http://www.apgml.org/documents/docs/17/Macao%20ME2%20-%20FINAL.pdf

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

Although Macau has no formal law enforcement cooperation agreements with the United States,
informal cooperation between the two routinely takes place.  U.S. government agencies work
closely with Macau counterparts in capacity building measures, information exchange, and
investigations.  Macau's financial intelligence unit (FIU) has been an essential component in
coordinating AML/CFT efforts and collaborates with other FIUs. The Government of Macau
(GOM) established the FIU in 2006 as a non-permanent government entity in order to avoid
having to seek legislative approval.  The FIU's current term expires in August 2012.  The GOM
should permanently institutionalize its FIU without term limits given its crucial role in sustaining
a long-term AML/CFT infrastructure.

The AML law does not require currency transaction reporting (CTR).  However, gaming entities
are subject to threshold reporting (over MOP 500,000, approximately $62,450) under the
supplementary guidelines of the Gaming Inspection and Coordination Bureau (DICJ).  Currently,
the DICJ only shares statistical data on CTR filings with the FIU.  To enhance the FIU's ability
to detect and deter illicit activity, the FIU should have full access to CTR reports collected by
DICJ.

Under current regulatory guidelines, financial institutions are obligated and do identify and
freeze suspect bank accounts or transactions.  However, the GOM cannot provide mutual legal
assistance on AML/CFT under existing legislation.  Macau should enhance its ability to support

international efforts by developing its legal framework to facilitate the freezing and seizure of assets. The GOM can provide mutual legal assistance on criminal matters, even without a formal agreement, and cooperation between the GOM and the United States routinely takes place.

Macau continues making considerable efforts to develop an AML/CFT framework that meets international standards. It should continue to strengthen interagency coordination to prevent money laundering in the gaming industry, especially by introducing robust oversight of junket operators. It also should implement mandatory cross-border currency reporting requirements.

As a SAR of China, Macau cannot sign or ratify international conventions in its own right. Rather, China is responsible for Macau's international affairs and may arrange for the ratification of any convention to be extended to Macau. The 1988 Drug Convention was extended to Macau in 1999. The UN Convention against Transnational Organized Crime was extended to Macau in 2003. The UN Convention against Corruption and the International Convention for the Suppression of the Financing of Terrorism were extended to Macau in 2006.

# Mexico

Mexico is a major drug-producing and drug-transit country. Proceeds from the illicit drug trade leaving the United States are the principal source of funds laundered through the Mexican financial system. Other significant sources of laundered proceeds include corruption, kidnapping, and trafficking in firearms and persons. Sophisticated and well-organized drug trafficking organizations based in Mexico take advantage of the extensive U.S.-Mexico border, the large flow of legitimate remittances, and the high volume of legal commerce to conceal transfers to Mexico. The smuggling of bulk shipments of U.S. currency into Mexico and the repatriation of the funds into the United States via couriers, armored vehicles, and wire transfers remain favored methods for laundering drug proceeds. The combination of a sophisticated financial sector and a large cash-based informal sector complicates the problem. According to U.S. authorities, drug trafficking organizations send between $19 and $39 billion annually to Mexico from the United States, although the Government of Mexico (GOM) disputes this figure. Mexico has seized over $500 million in bulk currency shipments since 2002.

For additional information focusing on terrorism financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* YES

*CRIMINALIZATION OF MONEY LAUNDERING:*
    *"All serious crimes" approach or "list" approach to predicate crimes:* All crimes
    *Legal persons covered:*      *criminally:* NO         *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
    *Enhanced due diligence procedures for PEPs: Foreign:* YES   *Domestic:* YES

*KYC covered entities:* Banks, mutual savings companies, insurance companies, securities brokers, retirement and investment funds, financial leasing and factoring funds, casas de cambio, centros cambiarios (unlicensed foreign exchange centers), savings and loans institutions, money remitters, SOFOMES (multiple purpose corporate entity), SOFOLES (limited purpose corporate entity), and general deposit warehouses

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
*Number of STRs received and time frame:* 36,040 - January through September 2011
*Number of CTRs received and time frame:* 4.1 million - January through September 2011
*STR covered entities:* Banks, mutual savings companies, insurance companies, securities brokers, retirement and investment funds, financial leasing and factoring funds, casas de cambio, centros cambiarios (unlicensed foreign exchange centers), savings and loans institutions, money remitters, SOFOMES (multiple purpose corporate entity), SOFOLES (limited purpose corporate entity), and general deposit warehouses

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
*Prosecutions:* 54 from January to October 2011
*Convictions:* 13 from January to July 2011

**RECORDS EXCHANGE MECHANISM:**
*With U.S.:*      *MLAT:* YES      *Other mechanism:* YES
*With other governments/jurisdictions:* YES

Mexico is a member of the Financial Action Task Force (FATF) and the Financial Action Task Force on Money Laundering in South America (GAFISUD), a FATF-style regional body. Its most recent mutual evaluation can be found here: http://www.fatf-gafi.org/document/20/0,3343,en_32250379_32236963_41911956_1_1_1_1,00.html

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

The GOM has taken some important steps to reduce the use of cash in the economy and prevent the laundering of illicit drugs proceeds in U.S. dollars (USD); however, the package of bills submitted in August 2010 to further enhance anti-money laundering regulations remains in limbo in the Mexican Congress. In June 2010, the Finance Ministry implemented regulations imposing limits on USD transactions in Mexico. The caps, which later were eased for border areas, are applicable to cash transactions from dollars to pesos, including deposits, credit payments, and service fees. In addition to limiting transaction amounts for individuals, all USD transactions are prohibited by the regulation for corporate entities and trusts (including account and non-account holding entities), except for those which are accountholders located in border or tourist areas, for which transactions are limited. The impact of the restrictions has been dramatic, with USD cash repatriation to the U.S. from the Mexican formal financial sector dropping by 50%, or $7 billion. The new destination for the USD cash no longer entering the Mexican financial system remains an open question. Recent data does not support the hypothesis that the flows would be redirected to Central America and/or the Caribbean. U.S. and Mexican authorities have agreed to continue studying the flow of U.S. currency.

In 2010, the GOM announced the National Strategy for the Prevention and Elimination of Money Laundering and Financing for Terrorism. On April 14, 2011, the Federal Executive sent to Congress a Bill of Decree by which the Federal Criminal Code and the Federal Criminal

Procedures Code are to be amended.  The bill includes a modification to the Federal Criminal Code in order to expressly establish that a legal person is liable for any money laundering/terrorist financing crimes, among others, committed by any of its legal representatives acting on its behalf.  The bill is currently under review by the Senate.  The government also submitted a federal law for the Prevention and Identification of Transactions with Criminal Proceeds, which was approved by the Senate on April 28, 2011, and is currently under review by the Congress.  The bill includes, among other important aspects, restrictions on the use of cash in certain transactions (i.e., real estate, jewelry, precious stones and metals, games and lotteries, accounting and legal services).

On August 3, 2011, amendments were issued to the General Law of Auxiliary Credit Organizations and Activities to establish the National Banking and Securities Commission (CNBV) as the supervisory authority for AML/CFT with regard to centros cambiarios, money remitters and non-regulated SOFOMES.  This authority will be transferred from the Tax Administration System (SAT) to CNBV.  The change was made in recognition that the broad experience of CNBV on AML/CFT issues and its risk-based approach to supervision will allow for better oversight of these entities.  The amendment provides for a transition period of 240 days.  The existing centros cambiarios and money remitters that registered prior to August 4, 2011, or that requested their registration prior to November 1, 2011, may continue with their operations if SAT approves their registration.  If the registration is denied, they must suspend their operations.  Any new centros cambiarios or money remitters which did not request registration prior to November 1, 2011 are prohibited from initiating operations until receipt of confirmation of registration by SAT.  After March 30, 2012, all requests for registration shall be reviewed by CNBV.  The general rule establishes that centros cambiaros may only provide the services of buying, selling or exchanging currency, within certain company formation restrictions and with prior authorization from the Ministry of Finance and Public Credit.  An exception to the need for prior authorization is established for centros cambiarios that provide the aforementioned services and do not exceed the threshold of $10,000 per client per day.

In 2011, the GOM also issued a number of AML/CFT regulations covering financial entities; specifically: General Provisions applicable to Auxiliary Credit Organizations (issued on 5/31/11); General Provisions applicable to SOFOLES (issued on 3/17/11); and General Provisions applicable to SOFOMES (issued on 3/17/11).  These regulations strengthen reporting requirements and expand the range of entities covered under AML/CFT provisions.  The regulations represent concrete steps forward, though until the final passage by the Senate of the 2010 package of anti-money laundering bills Mexico's regulatory framework will remain incomplete.

Mexico should amend its terrorist financing legislation to fully comport with the UN Convention for the Suppression of the Financing of Terrorism; and enact legislation and procedures to freeze without delay terrorist assets of those designated by the UN 1267Sanctions Committee.

# Netherlands

The Netherlands is a major financial center and consequently an attractive venue for laundering funds generated from illicit activities, including activities often related to the sale of cocaine, cannabis, or synthetic and designer drugs, such as ecstasy.  Financial fraud, especially tax-

**INCSR 2012 Volume II      Money Laundering and Financial Crimes**

evasion, is believed to generate a considerable portion of domestic money laundering.  There are a few indications of syndicate-type structures in organized crime or money laundering, but there is virtually no black market for smuggled goods in the Netherlands.  Although under the Schengen Accord there are no formal controls on national borders within the European Union (EU), the Dutch authorities run special operations in the border areas with Germany and Belgium to keep smuggling to a minimum.

Six islands in the Caribbean fall under the jurisdiction of the Netherlands.  Bonaire, St. Eustasius, and Saba are special municipalities of the country the Netherlands.  Aruba, Curacao, and St. Maarten are countries within the Kingdom of the Netherlands.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*  NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:*  All serious crimes
   *Legal persons covered:*        *criminally:* YES        *civilly:* NO

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs:  Foreign:* YES   *Domestic:*  NO
   *KYC covered entities:* Banks, credit institutions, securities and investment institutions, providers of money transaction services, life insurers and insurance brokers, credit card companies, casinos, traders in high-value goods, other traders, accountants, lawyers and independent legal consultants, business economic consultants, tax consultants, real estate brokers, estate agents, civil-law notaries, trust and asset administrative companies

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:*  117,000 in 2010
   *Number of CTRs received and time frame:*  66,000 in 2010
   *STR covered entities:* Banks, credit institutions, securities and investment institutions, providers of money transaction services, life insurers and insurance brokers, credit card companies, casinos, traders in high-value goods, other traders, accountants, lawyers and independent legal consultants, business economic consultants, tax consultants, real estate brokers, estate agents, civil-law notaries, trust and asset administrative companies

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:*     1,300 in 2010
   *Convictions:*      812 in 2010

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:      MLAT:* YES     *Other mechanism:* YES
   *With other governments/jurisdictions:* YES

The Netherlands is a member of the Financial Action Task Force (FATF). Its most recent mutual evaluation can be found here: http://www.fatf-gafi.org/document/50/0,3746,en_32250379_32236963_47221490_1_1_1_1,00.html

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

In June 2008, the Netherlands Court of Audit published its investigation of the Government of the Netherlands' policy for combating money laundering and terrorist financing. The report criticizes the Ministries of Interior, Finance, and Justice for: lack of information sharing among them; too little use of asset seizure powers; limited financial crime expertise and capacity within law enforcement; and light supervision of notaries, lawyers, and accountants. Similar deficiencies were seen during the more recent mutual evaluation of the Netherlands. The ministries agreed in large part with these conclusions and have taken steps to address them, including hiring financial crime experts in law enforcement and introducing new laws to strengthen the ability of law enforcement to tackle money laundering.

The Netherlands has established an "unusual transaction" reporting system. Designated entities are required to file unusual transaction reports (UTRs) with the FIU on any transaction that appears unusual (applying a broader standard than "suspicious") or when there is reason to believe that a transaction is connected with money laundering or terrorist financing. The FIU investigates UTRs and forwards them to law enforcement for criminal investigation; once the FIU forwards the report, the report is then classified as a STR. Draft legislation is pending to strengthen the reporting regime and enact stronger KYC rules.

In response to criticisms concerning the operational independence and effectiveness of the Dutch financial intelligence unit (FIU), a discussion on how to ensure FIU operational independence is underway. The FIU is currently part of the police, which itself is undergoing reforms.

In September 2011 the Dutch parliament passed a bill modernizing the supervision of notaries. Comprehensive supervision will be conducted by an independent supervisory body with investigative powers, with the use of confidential information about clients strictly limited to action against notaries. A similar legislative proposal is being prepared concerning the supervision of lawyers and is expected to be introduced in parliament in 2012.

The United States enjoys strong cooperation with the Netherlands in fighting international crime, including money laundering. One provision included in the U.S.-EU mutual legal assistance agreement, which the Netherlands has ratified, will facilitate the exchange of information on bank accounts. The Dutch Ministry of Security and Justice and the National Police work together with U.S. law enforcement authorities in the Netherlands on operational money laundering initiatives.

Due to legal and political changes, asset seizure has become a priority in money laundering cases. The assignment of dedicated money laundering prosecutors is bringing change to historically low asset seizure rates. A Steering Committee has been created to discuss and assign cases to the appropriate investigative unit. To further increase the confiscation of criminal assets, the Dutch Minister of Security and Justice introduced a new law including confiscation as a standard procedure of any money-driven criminal case, aimed at increasing law enforcement agencies' capacity to take such action.

A Rotterdam Court sentenced seven people in February 2011 for involvement in international drug trafficking and money laundering. The main suspect was sentenced to three years and nine months, and €4.5 million (approximately $5.927 million) cash was forfeited. The convicted group had direct connections with Colombian drug cartels. In April 2011, a court in The Hague sentenced a Dutch man to six years and four months for money laundering, blackmailing, violent robbery, and other serious crimes. Eleven other people in the same case received sentences of from 30 months to five years.

# Nigeria

Nigeria remains a major drug trans-shipment point and a significant center for criminal financial activity. Individuals and criminal and terrorist organizations take advantage of the country's location, porous borders, weak laws, corruption, lack of enforcement, and poor socio-economic conditions to launder the proceeds of crime. The proceeds of illicit drugs in Nigeria derive largely from foreign criminal activity rather than domestic activities. One of the schemes used by drug traffickers to repatriate and launder their proceeds involves the importation of various commodities, predominantly luxury cars and other items such as textiles, computers, and mobile telephone units. Drug traffickers reportedly also use Nigerian financial institutions for currency transactions involving U.S. dollars derived from illicit drugs.

Proceeds from drug trafficking, illegal oil bunkering, bribery and embezzlement, contraband smuggling, theft, and financial crimes, such as bank fraud, real estate fraud, and identity theft, constitute major sources of illicit proceeds in Nigeria. Advance fee fraud, also known as "419 fraud" in reference to the fraud section in Nigeria's criminal code, remains a lucrative financial crime that generates hundreds of millions of illicit dollars annually. Money laundering in Nigeria takes many forms, including: investment in real estate; wire transfers to offshore banks; political party financing; deposits in foreign bank accounts; use of professional services, such as lawyers, accountants, and investment advisers; and cash smuggling. Nigerian criminal enterprises adeptly devise ways to subvert international and domestic law enforcement efforts and evade detection.

Nigeria's AML/CFT progress in 2011 relative to its action plan was not considered sufficient by the Financial Action Task Force (FATF), which highlighted Nigeria's lack of adequate progress by adding Nigeria to its October 2011 Public Statement.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* YES

*CRIMINALIZATION OF MONEY LAUNDERING:*
     *"All serious crimes" approach or "list" approach to predicate crimes:* List approach
     *Legal persons covered:*          *criminally:* YES          *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
    ***Enhanced due diligence procedures for PEPs: Foreign:*** YES   ***Domestic:*** YES
    ***KYC covered entities:*** Banks, investment and securities dealers/brokers, and discount
houses; insurance institutions; debt factorization and conversion firms, bureau de change, and
finance companies; money brokerage firms whose principal business includes factoring,
project financing, equipment leasing, debt administration, fund management, private ledger
service, investment management, local purchase order financing, export finance, project
consultancy, financial consultancy, or pension funds management; dealers in jewelry, cars
and luxury goods; chartered accountants, audit firms, and tax consultants; clearing and
settlement companies and legal practitioners; hotels, casinos, and supermarkets

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
    ***Number of STRs received and time frame:*** 2,306 from October 1, 2010 – September 30,
2011
    ***Number of CTRs received and time frame:*** 11,580,836 from October 1, 2010 – September
30, 2011
    ***STR covered entities:*** Banks, investment and securities dealers/brokers, and discount
houses; insurance institutions; debt factorization and conversion firms, bureau de change, and
finance companies; money brokerage firms whose principal business includes factoring,
project financing, equipment leasing, debt administration, fund management, private ledger
service, investment management, local purchase order financing, export finance, project
consultancy, financial consultancy, or pension funds management; dealers in jewelry, cars
and luxury goods; chartered accountants, audit firms, and tax consultants; clearing and
settlement companies and legal practitioners; hotels, casinos, and supermarkets

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
    ***Prosecutions:*** 639 from October 1, 2010 – September 30, 2011
    ***Convictions:*** 73 from October 1, 2010 – September 30, 2011

*RECORDS EXCHANGE MECHANISM:*
    ***With U.S.:*** ***MLAT:*** YES   ***Other mechanism:*** YES
    ***With other governments/jurisdiction:*** YES

Nigeria is a member of the Inter Governmental Action Group against Money Laundering in West
Africa (GIABA), a FATF-style regional body. Its most recent mutual evaluation can be found
here: http://www.giaba.org/index.php?type=c&id=49&mod=2&men=2

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

Nigerian authorities should work toward full implementation of a regime capable of thwarting
money laundering and terrorist financing. In 2011, Nigeria enacted a new Money Laundering
(Prohibition) Act (MLPA), which introduces the concept of corporate criminal liability
("offenses of a body corporate"), and a new Terrorism (Prevention) Act (TPA), which includes
some new provisions on terrorist financing and the freezing and seizure of assets. The
Government of Nigeria (GON) should ensure its anti-money laundering legislation comports
with international standards and covers all the recommended predicate offenses, including
terrorist financing. Currently, terrorist financing is not listed as a predicate offense for money
laundering. The new TPA represents progress toward criminalizing terrorist financing, but it

may not do so consistent with international standards. The GON should amend the law as needed to bring it into compliance.

Weak law enforcement and justice sector issues have hindered the progress of and thwarted many prosecutions and investigations. The GON should ensure the autonomy and independence of the Economic and Financial Crimes Commission (EFCC) and the Nigerian Financial Intelligence Unit (NFIU) from political pressures. The GON also should strengthen its supervision of designated non-financial businesses and professions. Moreover, the GON should ensure the range of agencies that pursue money laundering cases, including the EFCC, Nigerian Drug Law Enforcement Agency, Independent Corrupt Practices and Other Related Offences Commission, Nigerian Agency for the Prevention of Trafficking in Persons, and National Police Force have the capacity to function as investigative partners in financial crimes cases, as well as work to eradicate any corruption existing within law enforcement bodies. The National Assembly should amend the 2011 MLPA to provide for increased autonomy of the NFIU and adopt safe harbor provisions to protect STR reporting entities. The GON should consider developing a cadre of specially trained judges with dedicated portfolios in order to handle financial crime cases effectively, and the National Assembly also should adopt a non-conviction based asset forfeiture bill.

# Pakistan

Pakistan continues to suffer from financial crimes related to narcotics trafficking, terrorism, smuggling, tax evasion, corruption, counterfeit goods and fraud. Pakistani criminal networks play a central role in the transshipment of narcotics and smuggled goods from Afghanistan to international markets. The abuse of the charitable sector, trade-based money laundering, money exchange companies, hawala/hundi, and bulk cash smuggling are common methods used to launder money in Pakistan and the region. Pakistan's real estate sector is also a popular destination for illicit funds, as many real estate transactions are poorly documented. Pakistan does not have firm control of its borders with Afghanistan, Iran or China, which facilitates the flow of smuggled goods to and from the Federally Administered Tribal Areas and Baluchistan.

Money laundering often occurs in Pakistan in both the formal and informal systems. Fraudulent invoicing is typical in hawala/hundi counter-valuation schemes. Legitimate remittances from Pakistani expatriates residing abroad flow through the formal banking sector, licensed money exchange businesses, and hawalas. Since the start of the calendar year through October remittances totaled $14 billion, and since March have averaged roughly $1 billion per month. The authorities do not provide an estimate of remittances that flowed through informal channels.

Pakistan was first publicly identified by the Financial Action Task Force (FATF) in February 2008 for deficiencies in its anti-money laundering/counter terrorist financing (AML/CFT) regime. While Pakistan has taken some steps to improve its AML regime, the FATF continues to note Pakistan's failure to adequately implement its action plan and correct AML/CFT deficiencies, particularly its terrorism finance law.

For additional information focusing on terrorism financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* YES

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* List approach
   *Legal persons covered:       criminally:* YES       *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs:  Foreign:* YES   *Domestic:* YES
   *KYC covered entities:* Banks, agricultural credit institutions, money exchangers, accountants, notaries, gaming centers, auto dealers and securities dealers

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* 535 from July 2010 to May 31, 2011
   *Number of CTRs received and time frame:* 138 from January 2009 through December 2010
   *STR covered entities:* Banks, agricultural credit institutions, money exchangers, notaries, gaming centers, and securities dealers

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:* Four from January 2009 to October 2010
   *Convictions:* None in 2010

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:        MLAT:* YES       *Other mechanism:* NO
   *With other governments/jurisdictions:* YES

Pakistan is a member of the Asia/Pacific Group on Money Laundering (APG), a Financial Action Task Force (FATF)-style regional body.  Its most recent mutual evaluation can be found here:  http://www.apgml.org/documents/docs/17/Pakistan%20MER%20-%20final%20version.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

To gain more oversight of the informal money transfer sector, the State Bank of Pakistan (SBP) requires all money exchange companies to obtain licenses and meet minimum capital requirements.  As a result, it is illegal for money exchange companies, referred to as hawala/hundi, to operate without a license; however, few hawalas have been registered by the authorities, and unlicensed hawaladars continue to operate illegally throughout Pakistan (particularly in Peshawar and Karachi).  While the SBP has implemented the licensing of all money exchange companies and hawalas, the enforcement environment is not commensurate with SBP's regulations.  Shortcomings in the enforcement of the regulations, particularly in the movement of cash, makes Pakistan's informal financial sector consistently vulnerable to abuse by illicit actors.

Pakistan continues to have serious deficiencies in its AML regime.  To address these it must: remove remaining inadequacies with regard to the criminalization of money laundering; demonstrate effective regulation of money service providers, including an appropriate sanctions

regime and increasing the range of ML preventive measures for these services; and improve and implement effective controls for cross-border cash transactions.  Pakistan needs to demonstrate that not only does it have AML laws on the books, but that these laws are enforced.  To date, Pakistan has a poor track record.  Between January 2009 and October 2010 there have been only four prosecutions and zero convictions under the AML law due to limited resources and lack of capacity.

# Panama

Panama's strategic geographic location and status as a regional financial center make it an attractive jurisdiction for money launderers.  Panama's success in establishing itself as a regional business and logistics hub, based on the success of its ports, airport and the Colon Free Zone – the second largest free trade zone in the world – have enhanced its attractiveness for organizations engaged in illicit financial activities.  Money laundering in Panama is believed to be primarily related to the laundering of the proceeds of drug trafficking, and the country sits along major drug trafficking routes.  The work of launderers is facilitated by weaknesses in the regulatory framework, notably the existence of bearer share corporations, but more importantly by uneven enforcement of anti-money laundering measures and the weak judicial system, which is susceptible to corruption and favoritism.

After negotiating and signing 13 Double Taxation Treaties with OECD members, and ratifying the Tax Information Exchange Agreement with the United States in 2010, Panama achieved removal from the OECD's gray list of tax havens in July 2011.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*  YES

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:*  List approach
   *Legal persons covered:*      *criminally:* YES      *civilly:* NO

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs:  Foreign:*  NO      *Domestic:*  NO
   *KYC covered entities:* Banks, savings cooperatives, savings and mortgage banks, and money exchanges; investment houses and brokerage firms; insurance and reinsurance companies; fiduciaries; casinos; free trade zone companies; finance companies; real estate brokers; and lawyers

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:*  563 in 2010
   *Number of CTRs received and time frame:*  495,546 in 2010

*STR covered entities:* Banks, cooperatives, and money exchanges; casinos; fiduciaries; insurance companies; government entities focused on the lottery: and investment houses

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
    *Prosecutions:* Not available
    *Convictions:* 22 in 2010

**RECORDS EXCHANGE MECHANISM:**
    *With U.S.:*    *MLAT:* YES    *Other mechanism:* YES
    *With other governments/jurisdictions:* YES

Panama is a member of the Financial Action Task Force on Money Laundering in South America (GAFISUD), a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation can be found here: http://www.cfatf-gafic.org/downloadables/mer/Panama_3rd_Round_MER_(Final)_English.pdf

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

Panama cooperates well with U.S. law enforcement agencies. However, the notable successes the Government of Panama (GOP) has had in interdicting flows of illegal drugs have not been matched by similar success in addressing money laundering concerns. The various government agencies tasked with addressing money laundering remain fractured and under-resourced, and communicate poorly with one another. Panama's financial intelligence unit, the UAF, in particular, lacks the resources to process and investigate, let alone enforce, reporting requirements on suspicious transactions. The judicial branch's capacity to successfully try and convict money launderers remains weak, and judges remain susceptible to corruption. Although the GOP took a step forward with the introduction of know-your-client legislation requiring lawyers to conduct due diligence into the beneficial owners of the companies they incorporate, the continued existence of bearer shares corporations remains a vulnerability of the anti-money laundering regulatory framework.

Panama, through its Customs Authority, is taking steps to reduce the use of Tocumen Airport as an artery for cash couriers to move cash into Panama. More targeted enforcement action, in collaboration with U.S. law enforcement agencies, has led to increased scrutiny of passengers and notable seizures of undeclared cash at the airport.

Customs also has been effective in disrupting trade-based money laundering through the partnership of the Panamanian and U.S. trade transparency units (TTU). Established in 2010 by U.S. Immigration and Customs Enforcement and Panama's Customs authority, the Panamanian TTU has had significant success. Despite these advances, Customs lacks sufficient resources to fulfill its mandate.

The Colon Free Trade Zone (CFZ) continues to be vulnerable to abuse by criminal groups through illicit financial activities, due primarily to insufficient enforcement of existing controls. The new electronic transaction recording information system, when fully implemented, will improve capacity to trace transactions. Bulk cash is relatively easily introduced into the country by declaring it is for use in the CFZ. A new resolution, published December 14, 2011, improves the AML/CFT framework in the CFZ. The resolution has 25 articles that supersede and include all the provisions of law 42 of 2000 and Decree JD-008 of 2008. It will enter into force 60 days

after publication.  Among the items addressed are the requirement to have a compliance officer in each company; implementation of preventative measures, supervision, inspection and sanctions; STR and CTR reporting; and know your customer policies.

During 2011, the GOP took steps to continue to improve the legislative framework governing anti-money laundering and financial sector transparency.  In 2011, Panama passed legislation (Law 2 of 2011) requiring lawyers to know their clients, conduct due diligence on the beneficial ownership of corporations they establish and share that information with the authorities upon request.  These steps have strengthened Panama's regulatory framework.  Panama also is drafting new anti-money laundering legislation, which would strengthen the UAF's authority and increase the number of sectors required to report suspicious transactions.

If the GOP continues its efforts to improve its anti-money laundering legal framework, particularly eliminating bearer shares, criminalizing "tipping off," improving the strength of the prosecutor's office and the judicial system, and creating a more transparent financial network, money laundering will become more difficult within Panama's borders.

# Paraguay

Paraguay is a major drug transit country and money laundering center.  A multi-billion dollar contraband trade, fed in part by endemic, institutional corruption, occurs in the border region shared with Argentina and Brazil (the tri-border area, or TBA) and facilitates much of the money laundering in Paraguay.  While the Government of Paraguay (GOP) suspects proceeds from narcotics trafficking are often laundered in the country, it is difficult to determine what percentage of the total amount of laundered funds is generated from narcotics sales or is controlled by domestic and/or international drug trafficking organizations, organized crime, or terrorist groups.  Weak controls in the financial sector, open borders, bearer shares, casinos, a surfeit of unregulated exchange houses, lax or non-enforcement of cross-border transportation of currency and negotiable instruments, ineffective and/or corrupt customs inspectors and police, and minimal enforcement activity for financial crimes allows money launderers, transnational criminal syndicates, and possible terrorist financiers to take advantage of Paraguay's financial system.

Ciudad del Este, on Paraguay's border with Brazil and Argentina, represents the heart of Paraguay's "informal" economy, estimated to be double Paraguay's $18 billion GDP.  The area is well known for arms and narcotics trafficking, document forging, smuggling, counterfeiting, and violations of intellectual property rights, with the illicit proceeds from these crimes a source of laundered funds.  Some proceeds of these illicit activities have been supplied to terrorist organizations, and trade-based money laundering occurs in the region.

As a land-locked nation, Paraguay does not have an offshore sector.  Paraguay's port authority manages free trade ports and warehouses in Argentina (Buenos Aires and Rosario); Brazil (Paranagua, Santos, and Rio Grande do Sul); Chile (Antofagasta and Mejillones); and Uruguay (Montevideo and Nueva Palmira).

Money laundering likely occurs in the formal financial sector and definitely occurs in the non-bank financial sector, particularly exchange houses, which are often used to move illicit proceeds

INCSR 2012 Volume II        Money Laundering and Financial Crimes

both from within and outside Paraguay into the U.S. banking system. Large sums of dollars generated from normal commercial activity and suspected illicit commercial activity are also transported physically from Paraguay to Uruguay and Brazil, with onward transfers likely to destinations including banking centers in the United States

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

**DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:**  YES

**CRIMINALIZATION OF MONEY LAUNDERING:**
   *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
   *Legal persons covered:*        *criminally:* YES        *civilly:* YES

**KNOW-YOUR-CUSTOMER (KYC) RULES:**
   *Enhanced due diligence procedures for PEPs:  Foreign:* NO  *Domestic:* YES
   *KYC covered entities:* Banks, finance companies, insurance companies, exchange houses, stock exchanges and securities dealers, investment companies, trust companies, mutual and pension fund administrators, credit and consumer cooperatives, gaming entities, real estate brokers, nongovernmental organizations, pawn shops, and dealers in precious stones, metals, art, and antiques

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
   *Number of STRs received and time frame:* 279 - January 2011 to November 2011
   *Number of CTRs received and time frame:* 1,341,162 in 2010
   *STR covered entities:* Banks, finance companies, insurance companies, exchange houses, stock exchanges and securities dealers, investment companies, trust companies, mutual and pension fund administrators, credit and consumer cooperatives, gaming entities, real estate brokers, nongovernmental organizations, pawn shops, and dealers in precious stones, metals, art, and antiques

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
   *Prosecutions:* Five in 2011
   *Convictions:*   None in 2011

**RECORDS EXCHANGE MECHANISM:**
   *With U.S.:  MLAT:* NO    *Other mechanism:* YES
   *With other governments/jurisdictions:* YES

Paraguay is a member of the Financial Action Task Force (FATF) against Money Laundering in South America (GAFISUD), a FATF-style regional body. Its most recent evaluation, conducted by the IMF, can be found here: http://www.imf.org/external/pubs/ft/scr/2009/cr09235.pdf

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

For reporting entities that do not have a natural supervisory authority, the Secretariat for the Prevention of Laundering of Money or Assets (SEPRELAD) is the competent supervisor. SEPRELAD's budget has increased by 166% from 2008 to 2011. SEPRELAD increased its staff approximately 20% in 2011 and has made considerable investment in infrastructure, software updates and equipment. The 2011 STR numbers dropped significantly from the 812 reported in 2010 due to the implementation of new software at SEPRELAD that better establishes the requirements for an STR for obligated institutions.

The GOP took a welcomed step forward in regard to implementation of UNSCR 1267 in October 2011 when it passed a long-awaited asset freezing law that enables SEPRELAD to freeze the assets of designated terrorist financiers, or those conducting transactions with UN designated terrorists or terrorist financiers, indefinitely in as little as 36 hours once notification of UN designation is sent or a request from a foreign country relating to UNSCR 1373 is received. The new law complements the June 2010 anti-terrorism legislation criminalizing terrorist financing.

Prosecutors handling financial crimes have limited resources to investigate and prosecute. In addition, the selection of judges, prosecutors and public defenders is largely based on politics, nepotism, and influence peddling. The lack of interagency cooperation throughout Paraguay, and particularly within law enforcement, is an impediment to effective enforcement, prosecution, and reporting efforts.

Asset forfeiture legislation is desperately needed in Paraguay. Apart from the new asset freezing law, Paraguayan law does not provide for freezing or seizure of many criminally derived assets. Law enforcement can only freeze assets of persons under investigation for a crime in which the state risks loss of revenue from furtherance of a criminal act, such as tax evasion. Enforcement agencies have limited authority to seize or forfeit assets of suspected money launderers and do not include bank accounts. When a seizure does occur, law enforcement authorities cannot dispose of these assets until a defendant is convicted, which frequently takes years.

The non-bank financial sector operates in a weak regulatory environment with limited supervision. The organization responsible for regulating and supervising credit unions, the National Institute of Cooperatives, lacks the capacity to enforce compliance. Exchange houses are another non-bank sector where enforcement of compliance requirements remains limited, though following the implementation of additional supervisory measures two currency exchange houses were closed in 2011.

People entering or leaving the country must declare to customs values exceeding $10,000 or its equivalent in other currencies. However, required customs declaration reports are seldom checked. Customs operations at the airports or overland entry points provide little control of cross-border cash movements.

Although Paraguay has made overall progress to improve its AML/CFT regime, and Paraguay's efforts and political commitment have been reflected in the issuance of proper legislation, the authorities' broader coordination capacity and the strengthening of their institutional frameworks need work. Paraguayan authorities will have to demonstrate the effectiveness of the legislation in force and of several mechanisms put in place.