# Philippines

The Republic of the Philippines is not a regional financial center. The Philippines continues to experience an increase in foreign organized criminal activity from China, Hong Kong, and Taiwan. Insurgency groups operating in the Philippines partially fund their activities through local crime, kidnapping for ransom and the trafficking of narcotics and arms, and engage in money laundering through ties to organized crime. The proceeds of corruption are also a source of laundered funds. Smuggling, including bulk cash smuggling, continues to be a major problem. The Philippines has a large expatriate community, and remittances are also channels for money laundering. There are free trade zones and four offshore banking units (OBUs). The Central Bank exercises regulatory supervision over OBUs and requires them to meet reporting provisions and other banking rules and regulations.

For additional information focusing on terrorism financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* List approach
   *Legal persons covered: criminally:* YES          *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs:   Foreign:* NO     *Domestic:* NO
   *KYC covered entities:* Banks, non-bank institutions acting as quasi banks, and trust entities; insurance companies and pre-need companies; securities dealers, brokers/sales representatives, investment houses, mutual funds, and other entities managing securities as agent/consultant; foreign exchange dealers, money changers, remittance/transfer agents; pawnshops and entities dealing in valuable objects, currency, financial derivatives, cash substitutes,  and similar monetary instruments

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* 38,478 as of August 31, 2011
   *Number of CTRs received and time frame:* 253,583,611 as of August 31, 2011
   *STR covered entities:* Banks, non-bank institutions acting as quasi banks, trust entities; insurance companies and pre-need companies; securities dealers, brokers/sales representatives, investment houses, mutual funds, and other entities managing securities as agent/consultant; foreign exchange dealers, money changers, remittance/transfer agents; entities dealing in valuable objects, currency, financial derivatives, cash substitutes,  and similar monetary instruments

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:* 50 as of August 31, 2011
   *Convictions:*  One as of August 31, 2011

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:      MLAT:* YES      *Other mechanism:*  YES
   *With other governments/jurisdictions:*  YES

The Philippines is a member of the Asia/Pacific Group on Money Laundering, a Financial Action Task Force (FATF)-style regional body.  Its most recent mutual evaluation can be found here:  http://www.apgml.org/documents/docs/17/The%20Philippines%20DAR%20-%20Final%20%20210809.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

Investigations by the financial intelligence unit (FIU) continue to be constrained by limited authority to access bank information.  Except in instances of serious offenses such as kidnapping for ransom, drugs and terrorism-related activities, the FIU is required to secure a court order to examine bank deposit accounts related to unlawful activities enumerated in the Anti-Money Laundering Act.  In addition, a Supreme Court ruling prevents ex parte inquiry into bank accounts.  The FIU can, however, seek an ex parte freeze order from the Court of Appeals before seeking authorization to inquire into bank deposits.  The FIU also must obtain a court order to freeze assets, including those of terrorists and terrorist organizations placed on the UN 1267 Sanctions Committee's consolidated list and the lists of foreign governments.  This requirement is inconsistent with the international standard, which calls for the preventative freezing of terrorist assets "without delay" from the time of designation.  The Government of the Philippines (GOP) should enhance the FIU's access to financial records, and ensure it can rapidly freeze terrorist assets.  The Philippines has a Customs Mutual Assistance Agreement with US Customs.

Terrorist financing is not a stand-alone offense under Philippine law and therefore not a predicate crime under the Anti-Money Laundering Act.  A person who finances the commission of terrorism may be prosecuted as a terrorist either as a principal by inducement pursuant to Article 17 of the Revised Penal Code or as an accomplice pursuant to Section 5 of the Human Security Act.  However, this approach requires a terrorist act to have occurred and does not encompass general financial support to terrorist entities for other purposes (recruiting, training, social welfare projects, etc.).  Limited human and financial resources also constrain tighter monitoring and enforcement.  The GOP should criminalize terrorist financing as a stand-alone offense.

The Philippines has developed an action plan to address its strategic anti-money laundering/counter-terrorist financing (AML/CFT) deficiencies.  The strategic deficiencies that The Philippines has committed to address include adequately criminalizing money laundering and terrorist financing; implementing adequate procedures to identify and freeze terrorist assets; enhancing financial transparency; and extending suspicious activity reporting requirements to additional entities.  Legislation pending in the Philippine Congress would address cited deficiencies.  The Philippine Government committed to pass this legislation that would address the deficiencies with respect to terrorist financing, freezing of terrorist assets and bank secrecy by December 2011.

# Russia

The current Russian administration aspires to establish Moscow as one of the key international financial centers. However, despite significant progress in improving the legal and enforcement framework, the prevalence of money laundering (ML) in Russia, where there is a high level of organized crime and corruption, stands out as one of the major obstacles to this goal. Domestic sources of laundered funds include organized crime, evasion of tax and customs duties, fraud, public corruption, and smuggling operations. Criminal elements from Russia and neighboring countries continue to use Russia's financial system and foreign legal entities to launder money. Criminals invest and launder their proceeds in securities instruments, real estate, and luxury consumer goods. Despite making progress in combating financial crimes, Russia remains vulnerable to such activities. Russia's risk factors include the many large-scale financial transactions associated with its vast natural resources; the state's major role in the economy; the country's porous borders and its role as a geographic gateway between Europe and Asia; and chronic under-funding and lack of capacity of regulatory and law enforcement agencies. These factors help create an environment in which corruption and financial crimes flourish.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* YES

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* All crimes
   *Legal persons covered:*         *criminally:* NO       *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs: Foreign:* YES   *Domestic:* NO
   *KYC covered entities:* Banks and credit institutions; Russian Post; payment acceptance and money transfer services; securities, insurance and leasing companies; investment and non-state pension funds; casinos and gambling outlets; dealers in precious metals and stones; real estate agents; pawnshops, microfinance organizations, and consumer credit cooperatives; and persons providing legal or accounting services

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* 2,508,718 in the first half of 2011
   *Number of CTRs received and time frame:* 1,242,459 in the first half of 2011
   *STR covered entities:* Banks and credit institutions; securities markets, investment and pension funds; Russian Post; insurance sector; leasing companies; dealers in precious metals and stones; casinos; real estate agents; lawyers, notaries, and persons providing legal or accounting services; microfinance organizations; and consumer credit cooperatives

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:* 141 in the first half of 2011
   *Convictions:* 113 in the first half of 2011

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:   MLAT:* YES      *Other mechanism:* YES

INCSR 2012 Volume II        Money Laundering and Financial Crimes

*With other governments/jurisdictions:* YES

Russia is a member of the Financial Action Task Force (FATF) and two FATF-style regional bodies: the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), and the Eurasian Group on Combating Money Laundering and the Financing of Terrorism (EAG). Its most recent mutual evaluation can be found here: http://www.fatf-gafi.org/dataoecd/31/6/41415981.pdf?bcsi_scan_E6B5D3DA0AAC65B7=0&bcsi_scan_filename=41415981.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

Through aggressive enactment and implementation of comprehensive anti-money laundering (AML) legislation, Russia has established a legal and enforcement framework to deal with money laundering and terrorist financing. In 2010, Russia adopted amendments to expand AML coverage to subsidiary branches, representative offices, and affiliates of financial institutions located outside the Russian Federation; make microfinance and short-term loans, which have grown significantly in Russia, subject to AML laws; and clarify definitions critical to enforcement. Amendments to the Code of Administrative Infringements improve regulatory oversight related to AML legislation and broaden the authority of Rosfinmonitoring, Russia's financial intelligence unit (FIU), and the Central Bank of Russia to conduct investigations of ML violations. AML law now makes it clear that identification is defined as the entirety of measures whereby the information about clients, their representatives and beneficiaries is established and the reliability of such information is confirmed. Order 59, issued by Rosfinmonitoring on February 17, 2011, requires customer due diligence where there are doubts about the veracity of previous identification.

While the Russian Federation has made steady progress overall in its AML/CFT implementation, some important issues remain. Russia needs to make sure that obligated entities are able to report every type of suspicious activity related to money laundering. Though the overall STR regime is working well in practice, presently there is no legal basis for reporting attempted occasional transactions. Furthermore, implementing regulations have not been issued for critical components of the 2010 amendments, such as monitoring of affiliates' operations outside the Russian Federation. For years Russian banks did not properly understand the concept of beneficial owner, partly due to a lack of clarity in the law. While the term has now been better defined, private sector entities are still incorporating clarified definitions of beneficial owner into their AML practices.

While most international standards are applied in Russian legislation, several important discrepancies remain between the standards of international and local domestic banks. Some identification requirements are absent. Also, Russian AML law lacks more specific requirements pertaining to sanctions screening (like frequency of updates, screening of fields of transactions, transliterations, requirement for certain logic, etc). In addition, banks still are not able to refuse to carry out a transaction or to open an account when they have strong AML concerns regarding the transaction or prospective clients. Further attempts should be made to bring the AML efforts of all Russian banks to a more sophisticated level, including continued enhancement of the compliance training and certification process.

Current Russian law does not include insider trading as a predicate offense to money laundering. To address this deficiency, Law 224-FZ was adopted by the Russian Parliament in July 2010. Included in this law is an amendment to the Criminal Code to criminalize the deliberate use of insider information when carrying out transactions and giving recommendations to third persons; however, this provision will not take effect until 2014.

Russia also has made some recent progress regarding new technologies and non-face-to-face financial transactions. On June 27, 2011, Federal Laws No. 161-FZ and No. 162-FZ "On the National Payment System" and its amendments were adopted, which among other issues address the regulation of new technologies used by financial institutions. Transactions under 15,000 rubles (approximately $500) are not subject to client identification requirements. Thus non-bank payment service providers can act as payment agents or bank payment agents and are exempt from AML/CFT identification requirements provided the payment amount is 15,000 rubles (approximately $500) or less. In other words, money can be remitted under this amount without opening a bank account, and non-face-to-face electronic payment facilities are permitted, provided the monthly sum total of remittances does not exceed 40,000 rubles (approximately $1,650). According to Rosfinmonitoring Order No. 103, which applies only to non-credit institutions, such client transactions executed remotely by payment service providers, as well as the issuance of orders to execute transactions requiring no personal contact with an institution, constitute a basis for submitting an STR to the FIU.

Although Russia continues to establish and develop anti-corruption measures, corruption continues to be a problem. The Government of Russia should continue to aggressively pursue corruption; similarly, it should continue to pursue increased transparency in the financial sector and ensure that domestic PEPs are monitored with the same scrutiny as foreign PEPs.

Russia hosts and funds the Secretariat of the EAG, and through this effort has contributed to improving the region's AML/CFT capacity. Russia should continue to play a leadership role through sustained involvement in regional and international bodies focusing on AML regime implementation.

# Singapore

Singapore is a major international financial and investment center as well as a major offshore financial center. Secrecy protections, a lack of routine large currency reporting requirements, and the size and growth of Singapore's private banking and assets management sector pose significant money laundering (ML) risks and make the jurisdiction a potentially attractive money laundering/terrorist financing destination for drug traffickers, transnational criminals, foreign corrupt officials, terrorist organizations and their supporters. Authorities have taken action against Jemaah Islamiyah and its members and have identified and frozen terrorist assets held in Singapore. Terrorist financing in general remains a risk.

As of December 5, 2011, there were 39 offshore banks in operation, all foreign-owned. Singapore is a center for offshore private banking and asset management. Assets under management in Singapore total approximately S$1.4 trillion (approximately $1.09 trillion). As of June 2010, Singapore had at least $300 billion in foreign funds under management. Singapore does not permit shell banks or anonymous accounts.

Singapore has nine free trade zones (FTZs), six for seaborne cargo and three for airfreight, regulated under the Free Trade Zone Act. The FTZs may be used for storage, repackaging of import and export cargo, assembly and other manufacturing activities approved by the Director General of Customs in conjunction with the Ministry of Finance.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* List approach
   *Legal persons covered: criminally:* YES      *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs: Foreign:* YES     *Domestic:* YES
   *KYC covered entities:* Banks, financial institutions, finance companies, merchant banks, life insurers, brokers, securities dealers, investment advisors, futures brokers and advisors, trust companies, approved trustees, and money changers and remitters

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* 11,934 in 2010
   *Number of CTRs received and time frame:* Not applicable
   *STR covered entities:* Banks, auditors, financial advisors, capital market service licensees and exempt persons, finance companies, lawyers, notaries, merchant banks, life insurers, trust companies, approved trustees, real estate agents and money changers and remitters

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:* 14 in 2010
   *Convictions:* 18 in 2010

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:   MLAT:* NO      *Other mechanism:* YES
   *With other governments/jurisdictions:* YES

Singapore is a member of the Financial Action Task Force (FATF) and the Asia/Pacific Group on Money Laundering, a FATF-style regional body. Its most recent mutual evaluation can be found here:  http://www.fatf-gafi.org/dataoecd/36/42/40453164.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

Singapore has a comprehensive suspicious transaction reporting regime and applies AML/CFT requirements to a broad range of financial institutions. Currently, there is no requirement for reporting large transactions, which limits the ability to track significant financial movements. Singapore should consider the adoption of such reporting.

Singapore's legal system generally provides for the investigation and prosecution of money laundering offenses. However, the implementation of these laws is uneven, particularly in prosecuting money laundering as a stand-alone offense, and investigating foreign-sourced cases. Singaporean police are fairly successful at identifying domestic predicate offenses, and include ancillary money laundering charges as appropriate. Singapore should more aggressively pursue domestic stand-alone money laundering offenses as well.

Singapore's large, stable, and sophisticated financial center may be attractive as a conduit for laundering proceeds generated by foreign criminal activities, including official corruption. The Suspicious Transaction Reporting Office (STRO) and criminal investigators are encouraged to identify money laundering that originates from foreign predicate offenses, and use stand-alone money laundering charges to prosecute third-party offenders in Singapore.

# Somalia

Somalia has essentially been without a functioning central government since 1991 and continues to be viewed as the world's quintessential failed state. The Transitional Federal Government (TFG) now largely controls almost all of the country's capital as well as pockets of some regions. Many ministries exist in name only or have non-functioning, mostly unpaid staff. Due to its lack of a public regulatory system and its inaccessibility, little is known about money laundering in Somalia. No anti-money laundering/counter-terrorist financing (AML/CFT) laws exist. There is some evidence that piracy proceeds from Somalia make their way to Dubai and Nairobi. Piracy ransoms, much of which reportedly remains as cash, are delivered through cash drops to pirates off Somalia's coast. Anecdotal reports indicate ransom payments finance real estate, luxury goods and businesses.

Public corruption is rampant and significantly facilitates money laundering. For example, some government officials in Somalia's northern region of Puntland are reportedly benefiting from pirate ransoms. They may facilitate ransom laundering or the transfer of ransom money to neighboring countries or globally.

The financial system in Somalia operates almost completely outside of government oversight, either on the black market or via money/value transfer services (MVTS), particularly hawalas. Smuggling is rampant. Somalia has one of the longest land borders as well as the longest coastline in Africa. The TFG and local officials are unable to maintain control over these points of entry, and goods flow in and out of Somalia unchecked.

Somalia is also a center for terrorist financing. Al-Shabaab, a U.S.-designated international terrorist organization, maintains headquarters in the country. Its insurgency against the TFG is financed externally, including by the global Somali diaspora and business community. Some funds enter as cash, but a significant portion reportedly passes through hawalas and other MVTS. There are also occasional reports of U.S. dollar counterfeiting in al-Shabaab-controlled areas as well as reports of al-Shabaab extorting ransom payments from pirates. Al-Shabaab operations are also financed through extortion schemes targeting private citizens, local businesses, seaports under the group's control, and diversion of development and humanitarian assistance funds.

**INCSR 2012 Volume II      Money Laundering and Financial Crimes**

For additional information focusing on terrorism financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* Not criminalized
   *Legal persons covered:      criminally:* Not applicable     *civilly:* Not applicable

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs: Foreign:* NO   *Domestic:* NO
   *KYC covered entities:* Not applicable

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* Not applicable
   *Number of CTRs received and time frame:* Not applicable
   *STR covered entities:* Not applicable

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:* None
   *Convictions:* None

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:      MLAT: NO      Other mechanism:* NO
   *With other governments/jurisdictions:* NO

Somalia is not a member of any Financial Action Task Force (FATF)-style regional body.

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

The legal system in Somalia is composed of traditional courts ("xeer"), a variety of local and regional court systems as well as a system with both civilian and military courts under the TFG. There are no AML/CFT laws, and the financial regulations that do exist are unenforceable given the lack of policing and investigative capacity and Somalia's insecurity.

Somalia essentially lacks a formal financial sector, and there are no functioning government regulatory agencies. Consequently, formal financial institutions and the MVTS sector in Somalia are not subject to KYC programs under Somali law. There are virtually no financial record keeping requirements enforced by the Somali government, nor are there suspicious transaction or large currency transaction reporting requirements. International standards, to the extent they exist, are self-imposed in Somalia by hawalas and other financial entities that must meet international rules and regulations to do business elsewhere in the world.

The Ministry of Finance and Treasury lacks the capacity, including financial, technical and human resources, to investigate money laundering and terrorist financing. There were no arrests for money laundering in 2011. In one 2010 case, a suspected terrorist financier bringing bulk

cash into Somalia was interdicted; in another, incoming counterfeit U.S. dollars were seized at Mogadishu International Airport. It is not clear what happened to the perpetrators; either indefinite detentions or quick releases are endemic, given Somalia's inadequate judicial system.

Somalia has no laws requiring forfeiture of criminal proceeds or terrorist funds. No government entities are charged with, or capable of tracking, seizing, or freezing illegal assets. Somali businesses do not coordinate with the government with regard to illegal transactions. The TFG has called on regional governments to help stem the flow of terrorist financing, including requesting local governments to trace, freeze, and seize funds and finances related to and in support of al-Shabaab.

Somalia does not have any mechanisms in place under which to share information related to financial crimes, money laundering, and terrorist financing with the U.S. or with other developed countries. The lack of AML/CFT laws, regulatory bodies, and enforcement mechanisms to counter money laundering and financial crimes is due to a lack of capacity within the TFG, and not the lack of political will. Obstacles to enacting and implementing AML/CFT laws include the TFG's limited territorial control, threats to the government by the al-Shabaab insurgency, lack of capacity at all levels of government, and insufficient policing and investigative capacity.

# Spain

Spain is a major European center of money laundering activities as well as an important gateway for illicit narcotics entering Europe, although the serious focus of Spanish law enforcement on combating organized crime, drug trafficking, and money laundering during the past five years has reduced the country's attractiveness as an entry point. Drug proceeds from other regions enter Spain as well, particularly proceeds from hashish from Morocco and cocaine from Latin America. Passengers traveling from Spain to Latin America reportedly smuggle sizeable sums of bulk cash. Informal money transfer services facilitate cash transfers between Latin America, particularly Colombia, and Spain. Spanish security forces reportedly discovered at least 119 organized crime groups (including Russian, Eurasian, Chinese, and Italian groups) operating in the country that were engaging in money laundering during 2010. Of the 175 police investigations against money laundering in 2010, 58% were linked to drug trafficking, particularly of cocaine, heroin, and hashish; 17% involved political corruption; while 12% were related to value added tax fraud, mainly involving vehicle trafficking. Tax evasion in internal markets also continues to be a source of illicit funds in Spain.

An unknown percentage of drug trafficking proceeds are invested in Spanish real estate, particularly in the once-booming coastal areas in the south and east of the country, though less so since the speculative real estate bubble burst in 2008. Criminal groups also place money in other sectors, including services, communications, automobiles, art work, and the financial sector.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT*

***AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN
THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** YES

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
   ***Legal persons covered: criminally:*** YES      ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs: Foreign:*** YES      ***Domestic:*** YES
   ***KYC covered entities:*** Banks; mutual savings associations; credit companies; insurance
   companies; financial advisers; brokerage and securities firms; pension fund managers;
   collective investment schemes; postal services; currency exchange outlets; individuals and
   unofficial financial institutions exchanging or transmitting money; realty agents; dealers in
   precious metals, stones, antiques and art; legal advisors and lawyers; accountants; auditors;
   notaries; and casinos

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   ***Number of STRs received and time frame:*** 3,172 in 2010
   ***Number of CTRs received and time frame:*** 707,968 in 2010
   ***STR covered entities:*** Banks, professional money changers, credit intermediaries, payment
   systems and managers, and lending firms; life insurance entities and insurance companies
   that provide investment services; securities and investment service companies, collective
   investment, pension fund, and risk capital managers; mutual guarantee companies; postal
   wire services; real estate brokers, agents and developers; auditors, accountants, and tax
   advisors; notaries and registrars of commercial and personal property; lawyers, attorneys, or
   other independent professionals when acting on behalf of clients in financial or real estate
   transactions; company formation and business agents; trustees; casinos, gaming and lottery
   enterprises; dealers of jewelry, precious stones and metals, art, and antiques; safekeeping or
   guaranty services; and foundations and associations

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
   ***Prosecutions:*** Not available
   ***Convictions:*** Not available

***RECORDS EXCHANGE MECHANISM:***
   ***With U.S.:      MLAT:*** NO      ***Other mechanism:*** YES
   ***With other governments/jurisdictions:*** YES

Spain is a member of the Financial Action Task Force (FATF) and a cooperating and supporting
nation to the Caribbean Financial Action Task Force, a FATF-style regional body.  Its most
recent mutual evaluation can be found here:  http://www.fatf-
gafi.org/dataoecd/59/15/46253063.pdf

***ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:***

Spain has long been dedicated to fighting terrorist organizations, including ETA, GRAPO, and
more recently, al-Qaida.  Spanish law enforcement entities have identified several methods of
terrorist financing: donations to finance nonprofit organizations (including ETA and Islamic
groups); establishment of publishing companies that print and distribute books or periodicals for

the purposes of propaganda, which then serve as a means for depositing funds obtained through kidnapping or extortion; fraudulent tax and financial assistance collections; the establishment of "cultural associations" used to facilitate the opening of accounts and provide a cover for terrorist financing activity; and alternative remittance system transfers.

Spanish authorities recognize the presence of alternative remittance systems. Informal non-bank outlets such as "*locutorios*" (communication centers that often offer wire transfer services) are used to move money in and out of Spain by making small international transfers for members of the immigrant community. Spanish regulators also note the presence of hawala networks in the Islamic community.

Spanish law does not allow civil forfeiture. The Finance Ministry, as the sanctioning organ, opened 580 investigations in 2010 for cash movements. Forty million euros (approximately $52.7 million) were initially confiscated; 20 million euros (approximately $26.3 million) were ultimately retained as fines. During the first half of 2011, 250 cases were opened and over 10 million euros (approximately $13.2 million) were confiscated. Carrying more than 100,000 euros (approximately $131,700) in cash within the country is not allowed. If the authorities discover an amount larger than that, they can seize and hold it until proof of legal origin is provided. According to press reports, the police and civil guard opened 175 investigations in 2010.

On April 29, 2010, Spain enacted Law 10/2010, on preventing money laundering and terrorist financing. The law introduces a risk-based approach to preventing money laundering and terrorist financing and imposes stringent requirements on financial institutions as well as designated non-financial businesses and professionals. Additionally, the law greatly enhances authorities' capacity to combat terrorist financing by placing greater requirements on financial institutions and other businesses, and by strengthening penalties and monitoring and oversight. The new law entered into force immediately; however, implementing regulations will not be approved until 2012; until then, many of its provisions are not being implemented. The Spanish government is waiting for the approval of the new FATF Recommendations to develop the implementing regulations in conformity with international standards. In the interim, the implementing regulations for Law 19/1993, updated in 2005, remain in force.

In 2010, the Financial Crimes Enforcement Network (FinCEN), the financial intelligence unit of the U.S., suspended information sharing with its Spanish counterpart, the Executive Service for the Prevention of Money Laundering (SEPBLAC) due to an apparent unauthorized disclosure of FinCEN information by SEPBLAC. SEPBLAC has addressed the improper disclosure issues and has taken steps to ensure the protection of FinCEN's information, including negotiating an updated version of a memorandum of understanding (MOU) with FinCEN. FinCEN will resume information exchange with SEPBLAC after signing the MOU. The security forces and the judiciary exchange information with the U.S. related to money laundering.

A working group has been created within the Commission for the Prevention of Money Laundering to promote the collection of statistics. Currently this information is not centrally collected. Spain should maintain and disseminate statistics on investigations and prosecutions.

## St. Maarten

In late 2010, Sint Maarten (St. Maarten) became an autonomous entity within the Kingdom of the Netherlands (KON). St. Maarten enjoys autonomy on most internal matters and defers to the Kingdom of the Netherlands in matters of defense, foreign policy, final judicial review, human rights, and good governance.

The combating of drug trafficking is an ongoing concern for St. Maarten. Money laundering is primarily related to proceeds from illegal narcotics. Bulk cash smuggling and trade based money laundering may be a problem due to the close proximity of other Caribbean islands and the French part of the island, Saint Martin, which is a free trade zone.

The scale of the offshore banking and business sector is unknown. There are several casinos on the island and online gambling is legal.

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
   ***Legal persons covered:***        ***criminally:*** YES       ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs:***  ***Foreign:*** YES       ***Domestic:*** YES
   ***KYC covered entities:*** Not available

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   ***Number of STRs received and time frame:*** 5095 – January - October 2011
   ***Number of CTRs received and time frame:*** Not available
   ***STR covered entities:*** Banks, law offices, insurance companies, casinos, Customs, money remitters, Central Bank, trust companies, accountants, car dealers, administrative offices, Tax Office, jewelers, credit unions, real estate businesses, notaries, exchange offices (Change point), effects agents

***MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:***
   ***Prosecutions:*** Not available
   ***Convictions:*** Not available

***RECORDS EXCHANGE MECHANISM:***
   ***With U.S.:***   ***MLAT:*** YES     ***Other mechanism:*** YES
   ***With other governments/jurisdictions:*** YES

St. Maarten is a member of the Caribbean Financial Action Task Force, a Financial Action Task Force (FATF)-style regional body. No evaluations have taken place since it became an autonomous entity.

INCSR 2012 Volume II        Money Laundering and Financial Crimes

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

Until a mutual evaluation is completed, it is difficult to evaluate the effectiveness of St. Maarten's anti-money laundering/counter- terrorist financing regime.

Under the former Netherlands Antilles jurisdiction, most governmental organizations were based in Curacao. Following the dissolution of the Netherlands Antilles, Sint Maarten created its own FIU under the Ministry of Justice. The FIU has begun to seek out international partners who would be willing to sign memoranda of understanding for information exchange and is pursuing membership in the Egmont Group of FIUs. St. Maarten is in the process of establishing new organizations such as a Central Bank, Tax Office Criminal Investigation Unit, and Financial Investigation Department. The St. Maarten government has begun the process of setting up these institutions.

The previous Government of the Netherlands Antilles demonstrated a commitment to combating money laundering. The new St. Maarten Government should ensure it follows up on that commitment. It therefore should see to the continuous enforcement of regulations and supervision of the off-shore sector and casinos, as well as pursuing money laundering investigations and prosecutions. The Government should work to improve the local police force (e.g., including financial specialists), the Intelligence Service and the FIU to provide them the capacity to investigate and successfully prosecute money laundering and terrorist financing cases.

The Mutual Legal Assistance Treaty between the KON and the U.S. applies to St. Maarten.

St. Maarten is part of the Kingdom of the Netherlands and cannot sign or ratify international conventions in its own right. Rather, the Netherlands may arrange for the ratification of any convention to be extended to St. Maarten. The 1988 Drug Convention was extended to St. Maarten in 1999. The International Convention for the Suppression of the Financing of Terrorism was extended to the Netherlands Antilles, and as successor, to St. Maarten in 2010. The UN Convention against Transnational Organized Crime and the UN Convention against Corruption have not yet been extended to St. Maarten.

# Switzerland

Switzerland is a major international financial center. Reporting indicates that criminals attempt to launder illegal proceeds in Switzerland from a wide range of criminal activities conducted worldwide. These illegal activities include, but are not limited to, financial crimes, narcotics trafficking, arms trafficking, organized crime, terrorist financing and corruption. Although both Swiss and foreign individuals or entities launder money in Switzerland, foreign narcotics trafficking organizations, often based in Russia, the Balkans, Eastern Europe, South America and West Africa, dominate the narcotics-related money laundering operations in Switzerland.

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
   *Legal persons covered:*       *criminally:* YES       *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs:  Foreign:* YES        *Domestic:*  YES
   *KYC covered entities:* Banks; securities and insurance brokers; money exchangers or
   remitters; financial management firms; investment companies; insurance companies; casinos;
   and individuals acting as intermediaries in bank lending, money transactions, or trading of
   currencies, or providing wealth management and investment advice services

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:*  1,159 in 2010
   *Number of CTRs received and time frame:*  Not applicable
   *STR covered entities:*  Banks; securities and insurance brokers; money exchangers or
   remitters; financial management firms; casinos; and individuals acting as intermediaries in
   bank lending, money transactions, trading of currencies or  providing wealth management
   and investment advice services

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:*  360 in 2010
   *Convictions:*   219 in 2010

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:     MLAT:* YES       *Other mechanism:*  YES
   *With other governments/jurisdictions:*  YES

Switzerland is a member of the Financial Action Task Force (FATF).  Its most recent mutual
evaluation can be found here: http://www.fatf-gafi.org/dataoecd/53/52/43959966.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

Because there are no laws for declaration of currency and monetary instruments, Swiss
authorities cannot effectively conduct bulk cash investigations.

The number of suspicious activity reports increased by 29% from 2009 to 2010, to 1,159 reports
encompassing a total of CHF 850 million (approximately $962 million), compared to CHF 2.2
billion (approximately $2.3 billion) in 2009.  In 2010, 13 reports were related to terrorism
finance, amounting to CHF 23 million (approximately $26 million).

The country's central geographic location, relative political, social, and monetary stability, the
range and sophistication of financial services it provides, and its long tradition of bank secrecy
not only contribute to Switzerland's success as a major international financial center, but also
continue to expose Switzerland to potential money laundering abuse.  This potential is
exacerbated by the current lack of adequate regulation of some potential means of facilitating
money laundering, such as real estate, jewelry, luxury cars, works of art, and commodities like
oil and gas.

# Taiwan

Taiwan is a regional financial center. Its modern financial sector, strategic location on international shipping lanes, expertise in high-tech sectors, and role as an international trade hub make it vulnerable to transnational crimes, including money laundering, drug trafficking, telecom fraud, and trade fraud. Though illegal in Taiwan, a significant volume of informal financial activity takes place through unregulated non-bank channels. Taiwan has five free trade zones and a growing offshore banking sector. There is no significant black market for smuggled goods in Taiwan.

Domestic money laundering is generally related to tax evasion, drug trafficking, public corruption, and a range of economic crimes. Jewelry stores increasingly are being used as a type of underground remittance system. Jewelers convert illicit proceeds into precious metals, stones, and foreign currency, and generally move them using cross-border couriers. The tradition of secrecy in the precious metals and stones trade makes it difficult for law enforcement to detect and deter money laundering in this sector, even though dealers in precious metals and stones are required to implement know-your-customer rules.

*DO FINANCIAL INSTITUIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or" list" approach to predicate crimes:* List approach
   *Legal persons covered:*        *criminally:* YES        *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs: Foreign:* YES        *Domestic:* YES
   *KYC covered entities:* banks, credit co-operative associations, credit departments of Farmers' Associations and Fishermen's Association, Department of Savings & Remittances of Chunghwa Post Co., securities firms, life insurance companies, and dealers in precious metals and stones

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* 5,379 from January to September 2011
   *Number of CTRs received and time frame:* 65,054 from January to September 2011
   *STR covered entities:* Banks, credit co-operative associations, credit departments of Farmers' Association and Fishermen's Association, Department of Savings & Remittances of Chunghwa Post. Co., securities firms, life insurance companies, jewelry stores, and members of the National Real Estate Brokering Agencies Association

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
   *Prosecutions:* 20 from January to September 2011
   *Convictions:* Eight from January to September 2011

*RECORDS EXCHANGE MECHANISM:*
   *With U.S.:*    *MLAT:* YES    *Other mechanism:* YES

Thailand is a centrally located, upper-middle-income Southeast Asian country with an extremely porous border. Thailand is vulnerable to money laundering within its own underground economy as well as to many categories of cross-border crime, including illicit narcotics and other contraband smuggling. The Thai black market includes a wide range of pirated and smuggled goods, from counterfeit medicines to luxury automobiles. Money launderers and traffickers use banks, as well as non-bank financial institutions and businesses, to move the profits of narcotics trafficking and other criminal enterprises. In the informal money-changing sector, there is an increasing presence of hawalas - a remittance system that uses relationship-based networks via money shops that service Middle Eastern travelers in Thailand. Thai banking regulations cover financial institutions adequately, but struggle to achieve effective oversight over less formal operations.

Thailand is a source, transit, and destination country for international migrant smuggling and trafficking in persons, a production and distribution center for counterfeit consumer goods and, increasingly, a center for the production and sale of fraudulent travel documents. Illegal gaming, corruption, underground lotteries, and prostitution are all problems. Thailand's criminal justice system has low capacity to deal with these challenges but is improving.

Thailand was publicly identified by the Financial Action Task Force (FATF) in February 2010 for its strategic anti-money laundering/counter-terrorist financing (AML/CFT) deficiencies, for which it has developed an action plan. Thailand's action plan includes adequately criminalizing terrorist financing and establishing and implementing adequate procedures to identify and freeze terrorist assets. In October 2011, the FATF determined that Thailand's progress against the agreed action plan's timeline has been insufficient and the Government of Thailand (GOT) needs to take adequate action to address its main deficiencies or risk further action from the FATF.

For additional information focusing on terrorism financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   ***"All serious crimes" approach or "list" approach to predicate crimes:*** List approach
   ***Legal persons covered:     criminally:*** YES     ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   ***Enhanced due diligence procedures for PEPs: Foreign:*** YES  ***Domestic:*** YES
   ***KYC covered entities:*** Banks (including state banks), finance companies, mortgage finance companies, securities dealers, insurance companies, money exchangers and remitters, asset management companies, jewelry and gold shops, automotive hire-purchase businesses or car dealers, real estate agents/brokers, antiques shops, personal loan businesses, electronic card businesses, credit card businesses, and electronic payment businesses, as well as deposit/lending cooperatives with total operating capital exceeding $67,000

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***

INCSR 2012 Volume II      Money Laundering and Financial Crimes

*Number of STRs received and time frame:* 166,578 from October 1, 2010 to September 30, 2011
*Number of CTRs received and time frame:* 933,485 from October 1, 2010 to September 30, 2011
*STR covered entities:* Private and state-owned banks, finance companies, insurance companies, savings cooperatives, securities firms, asset management companies, and mortgage finance companies; land registration offices, moneychangers, remittance agents, jewelry and gold shops, automotive hire-purchase businesses and car dealerships, real estate agents and brokers, antique shops, personal loan companies, electronic and credit card companies, and electronic payment companies

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
*Prosecutions:* Two in 2011
*Convictions:* One in 2011

*RECORDS EXCHANGE MECHANISM:*
*With U.S.:*    *MLAT:* YES     *Other mechanism:*   YES
*With other governments/jurisdiction:* YES

Thailand is a member of the Asia/Pacific Group on Money Laundering, a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation can be found here: http://www.apgml.org/documents/docs/17/Thailand%20DAR.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

Political and civil unrest in Thailand in mid-2010, followed by catastrophic flooding, the dissolution of Parliament and subsequent general election in July 2011, have impeded Thailand's implementation of its AML/CFT action plan. Despite high-level political commitment to address strategic AML/CFT deficiencies, Thailand's legislative framework still does not adequately criminalize terrorist financing and does not establish adequate procedures for identifying and freezing terrorist assets.

Despite these significant deficiencies, Thailand has made some progress in improving its FIU and its regulatory framework. The Anti-Money Laundering Office (AMLO) now has a full staff and is operational. The AMLO issued memoranda of understanding with two financial supervisors, the Office of Insurance Commission, signed April 26, and the Bank of Thailand, signed May 25. The memoranda establish the role of the AMLO in monitoring compliance with AML/CFT requirements, coordinating information sharing and ensuring that financial supervisors carry out their responsibilities effectively. Thailand has also made progress in the training and supervision of reporting entities, particularly money changers and transfer businesses. Ministerial regulations for cash threshold transactions and customer identification were endorsed and legalized via Cabinet resolution, and came into force in August.

Thai law does not adequately prohibit tipping off, leaving financial institutions and their employees subject to potential liability for filing STRs. The GOT should amend its legislation as necessary to ensure this deficiency is corrected.

On March 1, 2011, Thailand became a party to the UN Convention against Corruption. Thailand should become a party to the UN Convention against Transnational Organized Crime.

# Turkey

Turkey is an important regional financial center, particularly for Central Asia and the Caucasus, as well as for the Middle East and Eastern Europe. It continues to be a major transit route for Southwest Asian opiates moving to Europe. However, narcotics trafficking is only one source of the funds laundered in Turkey. Other significant sources include invoice fraud and tax evasion, and to a lesser extent, smuggling, counterfeit goods, and forgery. Terrorist financing and terrorist organizations with suspected involvement in narcotics trafficking and other illicit activities are also present in Turkey. Money laundering takes place in banks, non-bank financial institutions, and the underground economy. Informed observers estimate as much as half of the economic activity is derived from unregistered businesses. Money laundering methods in Turkey include: the large-scale cross-border smuggling of currency; bank transfers into and out of the country; trade fraud; and the purchase of high-value items such as real estate, gold, and luxury automobiles. Turkish-based traffickers transfer money and sometimes gold via couriers, the underground banking system, and bank transfers to pay narcotics suppliers in Pakistan or Afghanistan. Funds are often transferred to accounts in the United Arab Emirates, Pakistan, and other Middle Eastern countries.

In June 2011, the Financial Action Task Force (FATF) added Turkey to its list of "Jurisdictions with strategic AML/CFT deficiencies that have not made sufficient progress in addressing the deficiencies." As such, FATF called on its members to consider the risks arising from the deficiencies associated with Turkey's anti-money laundering/counter-terrorist financing (AML/CFT) enforcement and implementation when conducting business within the country. Turkey was included in the FATF Public Statement for failure to adequately criminalize terrorist financing and implement an adequate legal framework to identify and freeze terrorist assets. The FATF action does not call for any countermeasures against Turkey as a result of its status.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
   *Legal persons covered:*      *criminally:* YES      *civilly:* YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   *Enhanced due diligence procedures for PEPs: Foreign:* NO   *Domestic:* NO
   *KYC covered entities:* Banks, the Central Bank, post office banks, and money exchanges; issuers of payment and credit cards; lending, financial leasing, custody, settlement, and factoring companies; securities brokers, investment partnerships, and fund and asset managers; insurance, reinsurance and pension companies, and insurance and reinsurance brokers; Islamic financial houses; Directorate General of the Turkish Mint and precious

metals exchange intermediaries; auctioneers, and dealers of precious metals, stones, jewelry, all types of transportation vehicles, art and antiquities; lawyers, accountants, auditors, and notaries; sports clubs; lottery and betting operators; and post and cargo companies

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
    *Number of STRs received and time frame:* 6,500 from January - October 2011
    *Number of CTRs received and time frame:* Not applicable
    *STR covered entities:* Banks, the Central Bank, post office banks, and money exchanges; issuers of payment and credit cards; lending, financial leasing, custody, settlement, and factoring companies; securities brokers, investment partnerships, and fund and asset managers; insurance, reinsurance and pension companies, and insurance and reinsurance brokers; Islamic financial houses; Directorate General of the Turkish Mint and precious metals exchange intermediaries; auctioneers, and dealers of precious metals, stones, jewelry, all types of transportation vehicles, art and antiquities; lawyers, accountants, auditors, and notaries; sports clubs; lottery and betting operators; and post and cargo companies

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
    *Prosecutions:* 15 in 2009
    *Convictions:* Three in 2009
    MASAK no longer keeps statistics on prosecutions and convictions (2009 was the last year it maintained these statistics).

**RECORDS EXCHANGE MECHANISM:**
    *With U.S.:*     *MLAT:* YES     *Other mechanism:* YES
    *With other governments/jurisdictions:* YES

Turkey is a member of the Financial Action Task Force (FATF). Its most recent mutual evaluation can be found here: http://www.fatf-gafi.org/dataoecd/14/7/38341173.pdf

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

MASAK, the Financial Crimes Investigation Board, Turkey's financial intelligence unit, receives, analyzes, and refers STRs for investigation. In 2010, 354 individuals were referred to the public prosecutor's office as a result of MASAK investigations into terrorism finance.

For the past year, a draft terrorism finance law has been under consideration by the Turkish Parliament and is scheduled to be discussed by the Parliament's Internal Affairs Commission in late November 2011. It is not, however, clear when or if the draft would reach the General Assembly. Concerns remain, that the draft does not sufficiently address the above enumerated deficiencies outlined by the FATF. Turkey should insure any new legislation meets the FATF standards.

The non-profit sector is vulnerable to terrorist financing. Turkey's investigative powers, law enforcement capability, and supervisory oversight are weak and lacking in all the necessary tools and expertise to effectively counter this threat through a comprehensive approach; all these areas need to be strengthened. The nonprofit sector is not audited on a regular basis for terrorist finance vulnerabilities and does not receive adequate AML/CFT outreach or guidance from the authorities. The General Director of Foundations issues licenses for charitable foundations and

oversees them.  However, there are a limited number of auditors to cover more than 70,000 institutions.

# Ukraine

In Ukraine, high risks of money laundering have been identified in foreign economic activities, credit and finance, the fuel and energy industry, and the metal and mineral resources market. Illicit proceeds are primarily generated through corruption; fictitious entrepreneurship and fraud; trafficking in drugs, arms or persons; organized crime; prostitution; and tax evasion.  Various laundering methodologies are used, including the use of real estate, insurance, bulk cash smuggling, and financial institutions.  There are a significant market for smuggled goods and a large informal financial sector in the country.  These activities are linked to evasion of taxes and customs duties.

In October 2011, the Financial Action Task Force (FATF) removed Ukraine from its list of countries with "strategic deficiencies" following Ukraine's enactment of amendments to its anti-money laundering/counter-terrorist financing (AML/CFT) legislation.  Ukraine continues to work to further strengthen its AML/CFT regime.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*  NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
   *Legal persons covered:*         *criminally:* NO         *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs:  Foreign:* YES   *Domestic:* NO
   *KYC covered entities:*  Banks, non-banking institutions, insurance companies, gambling institutions, credit unions, depositories, securities traders, registers, pawn shops, mail service operators and other operators conducting money transfers, real estate traders, certain traders of precious metals and stones, notaries, auditors, independent lawyers and leasing providers

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* 778,907  January - September 2011
   *Number of CTRs received and time frame:*  Not available
   Ukraine combines STRs and CTRs in its reporting.
   *STR covered entities:*  Banks, non-banking institutions, insurance companies, gambling institutions, credit unions, depositories, securities traders, registers, pawn shops, mail service operators and other operators conducting money transfers, real estate traders, certain traders of precious metals and stones, notaries, auditors, independent lawyers, and leasing providers

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
    *Prosecutions:* 13 in the first half of 2011
    *Convictions:* One in the first half of 2011

*RECORDS EXCHANGE MECHANISM:*
    *With U.S.:*    *MLAT:* YES    *Other mechanism:* YES
    *With other governments/jurisdiction:* YES

Ukraine is a member of the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism (MONEYVAL), a FATF-style regional body.  Its most recent mutual evaluation can be found here:
http://www.coe.int/t/dghl/monitoring/moneyval/Countries/Ukraine_en.asp

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

While it does not appear that significant narcotics proceeds are laundered through Ukraine's financial institutions, the rise of cybercrime and related transnational organized crime would suggest that significant amounts of U.S. currency are diverted to this region outside financial institutions.

In April 2011, Ukraine adopted amendments to its AML/CFT legislation, making insider trading and stock market manipulation predicate crimes for money laundering and improving the procedures for administrative seizure related to terrorist assets.  There is no corporate criminal liability because the Law on Corporate Liability has not taken effect yet.  Most importantly, while Ukraine's legislation has been significantly modernized, Ukraine lacks examples of successful prosecutions of money laundering.  This is due to the lack of specialized expertise among prosecutors in handling complex financial cases and corruption within law enforcement and the courts.  In order to correct these problems, Ukraine needs to reform its Prosecutor General's Office to allow for greater specialization of prosecutors and improved coordination among prosecutors, investigators, and the FIU.  Additionally, although the current legislation provides for autonomous prosecution of money laundering, in practice a link is often sought between a specific predicate offense and money laundering.  Ukrainian authorities are unable to break out prosecutions for autonomous money laundering, or cases where the money laundering offense is added to another predicate offense, as well as to differentiate between self- or third-party laundering.

Amendments to the AML law in 2010 require enhanced due diligence procedures for PEPs.  However, the procedure of informing primary financial monitoring agencies about the list of PEPs of foreign countries is yet to be developed.

While Ukraine has the necessary treaties signed and ratified, in many instances they are not applied or applied poorly.  This is particularly true in the area of international law enforcement cooperation, mutual legal assistance and asset forfeiture.  Furthermore, while Ukraine is a party to UNCAC and UNTOC, the provisions of these conventions are not implemented or are not working properly in Ukraine.

# United Arab Emirates

The United Arab Emirates (UAE) is the primary transportation and trading hub for the Persian Gulf States, East Africa, and South Asia. Its robust economic development, political stability, and liberal business environment have attracted a massive influx of people, goods, and capital which may leave the country vulnerable to money laundering activity. Dubai, especially, is a major international banking and trading center. The potential for money laundering is exacerbated by the large number of resident expatriates (roughly 80% – 85% of total population) who send remittances to their homelands.

A significant portion of the money laundering/terrorist financing (ML/TF) activity in the UAE is likely related primarily to proceeds from illegal narcotics produced in South West Asia. Narcotics traffickers from Afghanistan, where most of the world's opium is produced, are increasingly reported to be attracted to the UAE's financial and trade centers. Groups operating primarily outside the country almost certainly control the funds. Domestic public corruption contributes little to money laundering or terrorist financing.

Regional hawalas and associated trading companies in various expatriate communities, most notably the Somalis, have established clearinghouses, the vast majority of which are not registered with the UAE government. Likewise, the UAE's proximity to Somalia has generated anecdotal reports suggesting some influx and/or transit of funds derived from piracy. There is no significant black market for smuggled goods in the UAE, but contraband smuggling (alcohol) probably generates some funds that are laundered through the system. There are some indications that trade based money laundering occurs in the UAE and that such activity might support terrorist groups in Afghanistan, Pakistan and Somalia.

Other money laundering vulnerabilities in the UAE include exploitation of cash couriers, the real estate sector, and the misuse of the international gold and diamond trade. The country also has an extensive offshore financial center and 38 free trade zones (FTZs). There are over 5,000 multinational companies located in the FTZs, and thousands more individual trading companies. Companies located in the free trade zones are considered offshore or foreign entities for legal purposes. However, UAE law prohibits the establishment of shell companies and trusts.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:*** NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
  ***"All serious crimes" approach or "list" approach to predicate crimes:*** All serious crimes
  ***Legal persons covered:     criminally:*** YES     ***civilly:*** YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
  ***Enhanced due diligence procedures for PEPs: Foreign:*** YES     ***Domestic:*** YES

INCSR 2012 Volume II       Money Laundering and Financial Crimes

*KYC covered entities:* Banks, hawalas, money exchange houses, finance companies, securities brokers, and insurance companies

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
*Number of STRs received and time frame:* 479 in the first quarter of 2011
*Number of CTRs received and time frame:* Not available
*STR covered entities:* Banks, hawalas, money exchange houses, finance companies, securities brokers, and insurance companies

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
*Prosecutions:* Not available
*Convictions:* Not available

**RECORDS EXCHANGE MECHANISM:**
*With U.S.:*     *MLAT:* NO     *Other mechanism:* YES
*With other governments/jurisdictions:* YES

The United Arab Emirates is a member of the Middle East and North Africa Financial Action Task Force (MENAFATF), a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation can be found here:
http://www.menafatf.org/images/UploadFiles/UAEoptimized.pdf

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

The Government of the UAE has shown some progress in enhancing its AML/CFT program; however, several areas requiring further action by the UAE Government (UAEG) remain. The UAEG should increase the capacity and resources it devotes to investigation of ML/TF both federally at the Anti-Money Laundering/Suspicious Cases Unit (AMLSCU) and at emirate-level law enforcement. AMLSCU needs to improve its timely financial information sharing capability to conform to international standards. The AMLSCU also needs additional resources to be able to execute its mandate of hawala supervision – currently it is not capable of supervising the vast number of hawalas in the country or enforcing hawala compliance.

Although UAE legislation includes a provision prohibiting tipping off, the provision is very narrow and does not appear to address the disclosure of STR filings to third parties. Additionally, the Central Bank regulations appear to require institutions to notify customers of suspicions regarding their accounts. This would appear to contradict any tipping off prohibitions.

Although firms operating in the Dubai International Financial Center (DIFC) are subject to the AML law, the Dubai Financial Services Authority (DFSA) has issued its own anti-money laundering regulations and supervisory regime, which has caused some ambiguity about the Central Bank's and the FIU's respective authorities within the DIFC.

In September 2011 the UAEG enacted an inbound and outbound cash declaration regulation covering financial instruments valued at more than DHS 100,000 (approximately $27,000), an amount above the desired standard but consistent with the traditional cash-based economy. Law enforcement and customs officials should conduct more thorough inquiries into large declared

and undeclared cash imports into the country, as well as enforce outbound declarations of cash and gold utilizing existing smuggling laws.

Law enforcement and customs officials should proactively develop cases based on investigations, rather than wait for STR-based case referrals from the AMLSCU. All facets of trade-based money laundering should be given greater scrutiny by UAE customs and law enforcement officials, including customs fraud, the trade in gold and precious gems, commodities used as counter-valuation in hawala transactions, and the abuse of trade to launder narcotics proceeds. The UAEG should expand follow-up with financial institutions and the Ministry of Social Affairs regarding regulations on charities to ensure their registration at the federal level. The UAE should also continue its regional efforts to promote sound charitable oversight. The cooperation between the Central Bank and the DFSA needs improvement, with lines of authority clarified. Moreover, the absence of meaningful statistics across all sectors is a significant hindrance to the assessment of the effectiveness of the AML/CFT program.

# United Kingdom

The United Kingdom (UK) plays a leading role in European and world finance and remains attractive to money launderers because of the size, sophistication, and reputation of its financial markets. Although narcotics are still a major source of illegal proceeds for money laundering, the proceeds of other offenses, such as financial fraud and the smuggling of people and goods, have become increasingly important. The past few years have seen an increase in the movement of cash via the non-bank financial system, as banks and mainstream financial institutions have tightened their controls and increased their vigilance. The use of *bureau de change*, cash smugglers (into and out of the UK), and traditional gatekeepers (including solicitors and accountants) to move and launder criminal proceeds has been increasing. Also on the rise are credit/debit card fraud, use of the internet for fraud, and the purchase of high-value assets to disguise illegally obtained money.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
    *"All serious crimes" approach or "list" approach to predicate crimes:* All crimes approach
    *Legal persons covered:    criminally:* YES        *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
    *Enhanced due diligence procedures for PEPs:  Foreign:* YES      *Domestic:* NO
    *KYC covered entities:* Banks, credit unions, building societies, emoney issuers, and credit institutions; insurance companies; securities and investment service providers and firms; independent legal professionals, auditors, accountants, tax advisors,  and insolvency

INCSR 2012 Volume II        Money Laundering and Financial Crimes

practitioners; estate agents; casinos; high value goods dealers; and trust or company service providers

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
   ***Number of STRs received and time frame:*** 240,582  October 1, 2009 – September 30, 2010
   ***Number of CTRs received and time frame:*** Not applicable
   ***STR covered entities:*** Banks, credit unions, building societies, emoney issuers, and credit institutions; insurance companies; securities and investment service providers and firms; independent legal professionals, auditors, accountants, tax advisors, and insolvency practitioners; estate agents; casinos; high value goods dealers; and trust or company service providers

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
   ***Prosecutions:*** 2,439 in 2009
   ***Convictions:*** 1,411 in 2009

**RECORDS EXCHANGE MECHANISM:**
   ***With U.S.:***     ***MLAT:*** YES     ***Other mechanism:*** YES
   ***With other governments/jurisdictions:*** YES

The United Kingdom is a member of the Financial Action Task Force (FATF).  Its most recent mutual evaluation can be found here:  http://www.fatf-gafi.org/infobycountry/0,3380,en_32250379_32236963_1_70432_1_1_1,00.html

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

The United Kingdom has a comprehensive range of anti-money laundering/countering the financing of terrorism (AML/CFT) laws.  It is an active participant in multilateral efforts to meet AML/CFT threats.  The UK engages in efforts to freeze the assets of persons who commit terrorist acts, and its legislative framework relies on "reasonable belief" rather than "reasonable suspicion" as the burden of proof for freezing assets.  The UK continuously reviews and assesses the effectiveness and proportionality of its AML/CFT regime – including through the approval of updated and more accessible industry guidance.  In order to improve the regime further, and based on the responses in a recent industry consultation, the UK plans to announce proposals to improve guidance and will publish these towards the end of the year.

The Financial Services Authority, which supervises firms for compliance with their legal and regulatory obligations, including those related to politically exposed persons (PEPs), will be merged with the Bank of England at the end of 2012.  Also, the Serious Organized Crime Agency, which includes the UK financial intelligence unit, will transition to the National Crime Agency by 2013.  It is important that these changes not impede the UK's AML/CFT efforts.

# Uruguay

Uruguay remains vulnerable to the threats of money laundering (ML) and terrorist financing (TF).  Uruguay has a highly dollarized economy, with the U.S. dollar often used as a business currency; about 75% of deposits and 50% of credits are denominated in U.S. dollars.  Officials

from the Uruguayan police and judiciary assess that there is a growing presence of Mexican and Colombian criminal organizations in the region and are concerned they could begin operating in Uruguay. Drug dealers are increasingly participating in other illicit activities like car theft and trafficking in persons.

The vast majority of money laundering cases that have become public have been related to drugs and/or involve the real estate sector. Uruguay has porous borders with Argentina and Brazil and, despite its small size, there is a market for smuggled goods that is greatly determined by price differentials between Uruguay and its neighbors. Regular trade-based money laundering is likely to occur but specialists do not identify it as a major source of risk, and there is no indication it is tied to terrorist financing. However, bulk cash smuggling is likely to occur. Public corruption does not seem to be a significant factor behind money laundering or terrorist financing. To the extent known, laundered criminal proceeds derive primarily from foreign activities related to drug-trafficking organizations.

Given the longstanding free mobility of capital in Uruguay, the informal financial sector is practically non-existent. Money is therefore likely to be laundered via the formal financial sector (onshore or offshore). The six offshore banks operating in Uruguay are subject to the same laws, regulations, and controls as local banks, with the Government of Uruguay (GOU) requiring they be licensed through a formal process that includes a background investigation of the principals. Offshore trusts are not allowed. Bearer shares may not be used in banks and institutions under the authority of the Central Bank, and any share transactions must be authorized by the Central Bank. There are 13 free trade zones (FTZs) located throughout the country. While most are dedicated solely to warehousing, two were created exclusively for the development of the paper and pulp industry, and three accommodate a wide variety of tenants offering a wide range of services, including financial services. Some of the warehouse-style FTZs have been used as transit points for containers of counterfeit goods bound for Brazil and Paraguay. A decree passed in November 2010 discourages shell companies from establishing a presence in FTZs.

***DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:***  NO

***CRIMINALIZATION OF MONEY LAUNDERING:***
   *"All serious crimes" approach or "list" approach to predicate crimes:*  List approach
   *Legal persons covered:   criminally:* NO      *civilly:* YES

***KNOW-YOUR-CUSTOMER (KYC) RULES:***
   *Enhanced due diligence procedures for PEPs: Foreign:* YES        *Domestic:* YES
   *KYC covered entities:* Banks, currency exchange houses, stockbrokers, pension funds, insurance companies, casinos, art dealers, real estate and fiduciary companies, lawyers, accountants, and other non-banking professionals that carry out financial transactions or manage commercial companies on behalf of third parties

***SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:***
   *Number of STRs received and time frame:*  150 - January 1–November 4, 2011
   *Number of CTRs received and time frame:*  Not available

INCSR 2012 Volume II       Money Laundering and Financial Crimes

*STR covered entities:* Banks; currency exchange houses; stockbrokers and pension funds; insurance companies; businesses that perform safekeeping, courier or asset transfer services; professional trust managers; investment advisory services; casinos; real estate brokers and intermediaries; notaries; auctioneers; dealers in antiques, fine art and precious metals or stones; FTZ operators; and other persons who carry out transactions or administer corporations on behalf of third parties

*MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:*
    *Prosecutions:* Four in 2009
    *Convictions:* Four in 2009

*RECORDS EXCHANGE MECHANISM:*
    *With U.S.: MLAT:* YES    *Other mechanism:* YES
    *With other governments/jurisdictions:* YES

Uruguay is a member of the Financial Action Task Force on Money Laundering in South America (GAFISUD), a Financial Action Task Force-style regional body. Its most recent mutual evaluation can be found here: http://www.gafisud.info/pdf/InformeEMUruguay09.pdf

*ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:*

Uruguay continued making progress in 2011. The main development was the design of a new National Strategy against money laundering put together with the technical support of the IMF. The project, expected to be a major improvement from the previous 2007 strategy, was developed in two stages: identification of the most vulnerable areas (2010) and design of a strategy to address those (2011). The strategy will be implemented in 2012-2015.

The GOU is also strengthening its Anti-Money Laundering Secretariat (AMLS) that will grow in scope and staff. In addition to developing the new strategy, in 2011, the AMLS continued working with non-financial sector entities obliged to report suspicious transactions, mainly notaries, real estate agents and casinos. The AMLS has made substantial progress in the design of standardized forms with the local association of notaries. A group of large bureaus that administer corporations are also developing auto-regulatory standards. The AMLS also is very focused on financial investigations and seeks to create awareness about the importance of seizing assets as well as imprisoning criminals.

Another positive development is the signing of an MOU under which the Financial Intelligence Unit (UIAF) is granted immediate online access to the database of the tax administration authority (DGI). In turn, DGI is working to open an international division to work on AML cases that are reported from abroad.

Other UIAF-related developments in 2011 include the design of a set of early-warning indicators that will allow it to leverage its comprehensive database of currency transaction reports, and the upgrading of regulations for firms that wire funds in order to level the playing field vis-à-vis financial services firms (a structure that stemmed from some large exchange houses).

The Superintendency of Financial Services, which oversees the UIAF, is also in the process of redesigning and upgrading management requirements for financial companies. This process entails the extension to insurance and capital market institutions of strong management practices

already established for banks. In 2011, the Superintendency made significant progress with insurance companies and moderate progress with capital market institutions. The UIAF also emphasized onsite inspections of capital market institutions that previously received less attention than banking firms.

Prosecutions and convictions dropped in 2010 and 2011. In 2009 alone the GOU had frozen assets totaling $17 million. In 2011, it did not freeze any funds except for one safe-deposit box.

The GOU should amend its legislation to provide for criminal liability for legal persons.

# Venezuela

Venezuela is a major cocaine-transit country. The country's proximity to drug producing countries, weaknesses in its anti-money laundering regime, limited bilateral cooperation, and substantial corruption in law enforcement and other relevant sectors continue to make Venezuela vulnerable to money laundering. The main sources of money laundering are proceeds generated by drug trafficking organizations and illegal transactions that exploit Venezuela's currency controls and its various exchange rates. The current regime of price and foreign exchange controls has provided opportunities for corruption; and corruption continues to be a very serious problem in Venezuela.

Money laundering occurs through commercial banks, exchange houses, gambling sites, fraudulently invoiced foreign trade transactions, smuggling, real estate, agriculture and livestock businesses, securities transactions, and trade in precious metals. Venezuela's multiple exchange rates allow launderers to profit from arbitrage conditions while using the black market. Trade-based money laundering, such as the black market peso exchange, through which money launderers furnish narcotics-generated dollars in the United States to commercial smugglers, travel agents, investors, and others in exchange for Colombian pesos, remains a prominent method for laundering regional narcotics proceeds. It is reported that many black market traders ship their goods through Margarita Island's free port.

For additional information focusing on terrorist financing, please refer to the Department of State's Country Reports on Terrorism, which can be found here: http://www.state.gov/j/ct/rls/crt/

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* YES

*CRIMINALIZATION OF MONEY LAUNDERING:*
  *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
  *Legal persons covered:        criminally:* YES        *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
  *Enhanced due diligence procedures for PEPs: Foreign:* YES        *Domestic:* YES
  *KYC covered entities:* Banks, leasing companies, money market and risk capital funds, savings and loans, foreign exchange operators, regulated financial groups, and credit card

**INCSR 2012 Volume II      Money Laundering and Financial Crimes**

operators; hotels and tourist institutions that provide foreign exchange; general warehouses or storage companies; regulated securities entities; regulated insurance entities; casinos, bingo halls, and slot machine operators; and regulated notaries and public registration offices

**SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:**
*Number of STRs received and time frame:* 582 through June 30, 2011
*Number of CTRs received and time frame:* Not available
*STR covered entities:* Banks, leasing companies, money market funds, savings and loans, foreign exchange operators, regulated financial groups, and credit card operators; hotels and tourist institutions that provide foreign exchange; general warehouses or storage companies; regulated securities entities; regulated insurance entities; casinos, bingo halls, and slot machine operators; and regulated notaries and public registration offices

**MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:**
*Prosecutions:* 13 from July 2010 - January 2011
*Convictions:* Two cases, involving seven persons from July 2010 - January 2011

**RECORDS EXCHANGE MECHANISM:**
*With U.S.:      MLAT:* YES      *Other mechanism:* YES
*With other governments/jurisdictions:* YES

Venezuela is a member of the Caribbean Financial Action Task Force (CFATF), a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation can be found here: http://www.cfatf-gafic.org/downloadables/mer/Venezuela_3rd_Round_MER_(Final)_English.pdf

**ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:**

The Financial Crimes Enforcement Network (FinCEN) suspended the exchange of information with Venezuela's National Financial Intelligence Unit (UNIF) in January 2007 due to the unauthorized disclosure of information provided by FinCEN, and the relationship has not resumed to date. In 2009 - 2011, there was no financial intelligence information exchange between Venezuela and the United States.

In 2010, the country was identified as having strategic anti-money laundering and counter-terrorist financing deficiencies and developed an action plan to address the following issues: criminalizing terrorist financing; establishing and implementing adequate procedures to identify and freeze terrorist assets; ensuring a fully operational and effectively functioning financial intelligence unit; implementing adequate customer due diligence guidelines for all sectors; and establishing adequate STR reporting obligations for money laundering and terrorist financing. The country has approved new regulations and improved the supervision of banks and securities intermediaries/brokers.

The judicial system has been ineffective and is politicized. During the year, legislation to strengthen supervision of insurance, securities, notaries and operators of casinos, bingo halls and slot machines was passed. Venezuela must increase its institutional infrastructure and technical capacity so it can effectively implement these new regulations. The government should adopt the amendments to incorporate anti-money laundering reforms into the organic law as recommended by international experts.

183

# Zimbabwe

Zimbabwe is not a regional financial center, but it faces problems related to money laundering and official corruption. Regulation and enforcement in the financial sector is weak, mainly due to a lack of trained regulators and investigators and limited asset-seizure authority. These deficiencies expose the country to money-laundering abuses, but there are no data on the extent of money laundering in Zimbabwe. The exposure is greatest within the financial sector, which includes both formal and informal institutions. Commercial banks, building societies, moneylenders, insurance brokers, realtors, and lawyers in Zimbabwe are all vulnerable to exploitation by money launderers. Financial crime may also be magnified by opportunities to smuggle diamonds from alluvial deposits in the Marange area of eastern Zimbabwe.

Nearly all transactions in Zimbabwe are now carried out with either the U.S. dollar or the South African rand. The Government of Zimbabwe's (GOZ) switch to this "multi-currency regime" dramatically reduced opportunities for money laundering and financial crime arising from the multiple exchange rates and opaque foreign-exchange controls that were in place until 2009. Legislators from all parties in the coalition government have increased scrutiny of government activities, and ministers from former opposition parties have pushed for further reforms. For example, the parliamentary committee on mining has held officials to account for GOZ actions in the Marange diamond fields, and the minister of finance has implemented a new law to improve accountability at the Reserve Bank of Zimbabwe (RBZ).

The United States, Canada, Australia, and the European Union have imposed targeted financial sanctions and travel restrictions on political leaders and others believed to have been complicit in human rights abuses.

*DO FINANCIAL INSTITUTIONS ENGAGE IN CURRENCY TRANSACTIONS RELATED TO INTERNATIONAL NARCOTICS TRAFFICKING THAT INCLUDE SIGNIFICANT AMOUNTS OF US CURRENCY; CURRENCY DERIVED FROM ILLEGAL SALES IN THE U.S.; OR THAT OTHERWISE SIGNIFICANTLY AFFECT THE U.S.:* NO

*CRIMINALIZATION OF MONEY LAUNDERING:*
   *"All serious crimes" approach or "list" approach to predicate crimes:* All serious crimes
   *Legal persons covered:*         *criminally:* YES         *civilly:* YES

*KNOW-YOUR-CUSTOMER (KYC) RULES:*
   *Enhanced due diligence procedures for PEPs: Foreign:* NO  *Domestic:* NO
   *KYC covered entities:* Commercial banks, acceptance houses, discount houses, money transfer agencies, *bureaux de change*, legal practitioners, accounting firms, pension funds, real estate agents, cash dealers, and finance houses

*SUSPICIOUS TRANSACTION REPORTING (STR) REQUIREMENTS:*
   *Number of STRs received and time frame:* None in 2011
   *Number of CTRs received and time frame:* Not applicable

INCSR 2012 Volume II        Money Laundering and Financial Crimes

*STR covered entities:* Commercial banks, acceptance houses, discount houses, money transfer agencies, *bureaux de change*, legal practitioners, accounting firms, pension funds, real estate agents, cash dealers, and finance houses

### MONEY LAUNDERING CRIMINAL PROSECUTIONS/CONVICTIONS:
*Prosecutions:* None in 2011
*Convictions:* None in 2011

### RECORDS EXCHANGE MECHANISM:
*With U.S.:    MLAT:* NO            *Other Mechanism:* NO
*With other governments/jurisdiction:* YES

Zimbabwe is a member of the Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG), a Financial Action Task Force (FATF)-style regional body. Its most recent mutual evaluation can be found here:
http://www.esaamlg.org/userfiles/Zimbabwe_detailed_report.pdf

### ENFORCEMENT AND IMPLEMENTATION ISSUES AND COMMENTS:

Zimbabwe has developed an action plan to address its strategic AML/CFT deficiencies. Zimbabwe needs to adequately criminalize money laundering and terrorist financing; establish and implement adequate procedures to identify and freeze terrorist assets; ensure a fully operational and effectively functioning financial intelligence unit; and ensure financial institutions are aware of and comply with their obligations to file suspicious transaction reports.

Law enforcement and regulatory agencies lack the resources to combat money laundering vigorously. Anti-money laundering (AML) legislation is sometimes abused for political purposes. More broadly, corruption sometimes impedes application of Zimbabwe's AML mechanisms. Zimbabwe has criminalized money laundering and put in place mechanisms for freezing and forfeiting assets; however, deficiencies remain in being able to do so in a timely manner. The banking system can quickly freeze accounts, but financial institutions typically receive information related to designations from private sources and not government agencies. Zimbabwe has broad legislation on mutual legal assistance in both civil and criminal cases. In general, there are no legal or practical impediments to rendering assistance, providing both Zimbabwe and the requesting country criminalize the conduct underlying the offense.

The GOZ should become a party to the International Convention for the Suppression of the Financing of Terrorism.