# EXHIBIT M

Office of the National Public Prosecutor


PLEADINGS CONCERNING EVIDENCE PRODUCED. FUNDS PLACED BY LÁZARO BÁEZ IN SGI/HELVETIC SERVICES GROUP RETURNED TO ARGENTINA BETWEEN DECEMBER 2012 AND APRIL 2013 AND WERE DEPOSITED IN AN ACCOUNT OF AUSTRAL CONSTRUCCIONES S.A.


To the Honorable Judge:

**José María Campagnoli**, head of Investigation Proceeding No. 19, in respect of indictment registered under number 26131/2013 in the computer register of the National Supreme Court of Justice and assigned to Office No. 106 of the Court under your supervision, respectfully appears before you and sets forth:

The evidence received, all of which is in the possession of the Court, has made it possible to reconstruct a series of circumstances that are extremely relevant for the accusations made in this national court, and which are certainly useful for the resolution of the accusations made in the federal court.

I refer to a remarkable finding: **Between 24 December 2012 and 8 April 2013, approximately US$65,000,000 was brought into the country, which the accused extortionists negotiated in hectic transactions of sovereign debt instruments of the Argentine Republic.**

As we have recently noted,[1] **the sum in question is equivalent to approximately EUR 50,000,000.** This represents a new correspondence between the events evidenced in the action and the complaint made in public by Federico Elaskar to journalist Jorge Lanata. It should be kept in mind that in the filmed and recorded testimony aired in the broadcasts of the program "Periodismo Para Todos" [Journalism for Everyone] on 14 and 21 April 2013, Elaskar talked about the handling and placement, in various transactions and for account of Lázaro Báez, of a sum ranging between EUR 50,000,000 and 55,000,000.

Research done by the Department of Criminal Investigation revealed the return to Argentina (whatever the intermediate transformation and the contingencies of the route taken by the money) of a sum close to EUR 50,000,000 and originating, beyond reasonable doubt, in the circuit of money-handling and companies organized after the dismissal of Elaskar.

It must be kept in mind that between the end of 2010 and the beginning of 2011, Lázaro Báez and his collaborators needed to channel funds via SGI, a company owned and managed by Federico Elaskar, who also held 95% of the stock shares. For reasons that we set forth in our report dated 22 May 2013, the group in question soon decided to take possession via various actions by the finance company, initially by dismissing supervisors and auditors, and ultimately by taking complete control of the company between July and October 2011, dismissing Elaskar

---

[1] Pages 844-859 of supplemental proceedings of section II of the report of 22 May, information furnished by the Central Securities Depository on 29 May 2013,

from his position and taking over his stock shares. This process ended with an epilog that we discovered and have documented all too well; it concerns the appearance of HELVETIC SERVICES GROUP S.A., represented by its manager and shareholder Néstor Marcelo Ramos.

We also explained that the company, and Ramos himself, seemed to be resuming or continuing a project begun years earlier. Helvetic Service Group is one of the common denominators of two clearly distinguished periods. In the first period, 150 companies were established in the State of Nevada, USA, all having the same domicile in the city of Las Vegas, with Aldyne Ltd., a Seychelles Islands company, as director. This structure coincided with various changes or laundering of money in operations in Argentina, including the purchase of the stock shares (now attached) of Continental Urbana S.A. The second period was characterized by the sudden breakup of this chain of companies and the operation of Aldyne Ltd. at the end of 2010 and the reviewed history of the use and appropriation of SGI. However, the end of this period involves a return to the previous period, with control of the money and the companies once again in the hands of Helvetic Service Group and Néstor Marcelo Ramos after 21 October 2011.

Ramos and his immediate collaborators very probably spent the subsequent months reorganizing and imposing order on the apparent disorder in the handling of the money brought in for SGI. Moreover, we also find it logical (and it will be confirmed by the evidence and indications to which we shall refer later) that the use and purpose of these funds, totaling around EUR 50,000,000 according to the calculation by Federico Elaskar, were supposed to be concealed from him.

It is important to note that at the end of his forced one-year absence, Elaskar returned to Argentina in October 2012. Based on what he said in front of the journalists' cameras and recorders, and because of the amount involved in the complaints filed by his previous partners with investigating courts numbers 19 and 42,[2] we know that he did not accept the situation and that he was ready to report the criminal maneuvers that he had witnessed and allowed. According to statements made by Jorge Lanata, and the rest of the information uncovered in his television program broadcasts, Elaskar had contacted or was preparing to contact journalists. Very probably this picture can be expanded with other possibilities not yet fully known to us, such as the

---

[2] The complaint of Investigation Court Number 19 was filed on 8 November 2011; that of Investigation Court Number 42, in which these pleadings are presented, was filed on 27 September 2012, the beginning and ending points of the forced exile of Elaskar, on the one hand, and his disturbing (for the parties concerned) return. The events to which we refer in these pleadings begin immediately thereafter, with the first statements and consultations connected with the opening of the account with Financial Net Sociedad de Bolsa dating from 4 and 5 December 2012. In his testimony, journalist Jorge Lanata positions the first meetings between his staff and Elaskar at the start of 2013. The contact was a lawyer, probably the one supposedly consulted by Elaskar, who identifies him as "Mariano Cuneo," as reported in the contacts revealed in the last broadcasts of the television program. In our pleadings dated 11 June, we asked the court to include the media used for these communications—e-mails and "whatsapp" system messages—since they were presented publically by the journalists. The reference to the lawyer in question is related to the information in the proceeding before the Corrections Court, where Elaskar was charged with the offense of unlawful actions. According to the police official who questions and transcribes phonetically in his documents, Elaskar stated that his attorney is "Julio Libarona," which appears to be a reference to the family name of the Cuneo Libarona attorneys, whose firm did in fact defend him, pursuant to retainer of Dr. Mariano Cuneo Libarona, on pp. 51-67 of the supplementary proceedings. This is yet another demonstration of the truthfulness and spontaneity of the statements made by Federico Elaskar and recorded and filmed by the journalist of the program Journalism for Everyone.

warnings that the victim was able to transmit to Lázaro Báez, Pérez Gadín, Fernández and company concerning the steps that he was prepared to take in order to recover what he had lost.

In sum, it cannot be denied that the news was alarming for both the persons concerned with the fate of the EUR 50,000,000 and the persons who were supposed to be keeping this fortune intact. **These events constitute a perfect explanation and the logical meaning of the events that we shall now describe.**

According to the information provided by the Central Securities Depository,[3] the purchase of Continental Urbana stock shares and their subsequent transfer to Huston Management Ltd. was not the only transaction recorded for account of Helvetic Services Group S.A. Thanks to the new findings uncovered, we were able to show that the said company was involved in another series of transactions, this time as principal of the agent Financial Net Sociedad de Bolsa S.A., for a total negotiated value of **US$65,794,950 in Argentine public debt instruments**. As can be seen in the table included in this report, the credit entries (that is, the entry or recording of the instruments in principal account 1255 of Helvetic Services Group, deposit account 650 of the securities agent) were executed on 13, 18, 19, 21, 26, 27, 28, and 31 December 2012 and 2 January, 13, 14, and 15 February, and 26 March 2013. The debits, that is, the negotiation, transfer, or liquidation of the bonds correspond in all cases with transactions executed immediately thereafter. Thus, after the last transfers of securities on 5 and 8 April 2013, and the collection in cash of dividends for the remaining instruments on 3 April 2013, the account of Helvetic Services Group showed a balance of zero.

[Pages 1 and 2 of Statement of Transactions, 12 December 2012-27 May 2013]

It was not difficult to associate this sum of US$65,794,950 with the EUR 50,000,000 said to have been placed by Lázaro Báez in SGI. When we looked at one of the public websites showing current dollar/euro exchange rates, we obtained the following result:

[The Money Converter table, showing US$65,794,950 = Euro 50,724,616.70]

This approximate calculation can be adjusted for the date of each transaction, but it will not change substantially, and nothing needs to be added to the evidence of this new correspondence between the evidence collected and the public complaint that triggered this section of our investigation.

But the comparison with the other elements collected does not end with the total amount involved. Among other evidence that we have to cite, the movements of securities and cash coincide with the information about the arrival of Néstor Marcelo Ramos in Argentina. According to the records provided by the Migrations Office,[4] his stay in our country coincides

---

[3] Memorandum and documents filed on 29 May 2013, annexed on pages 844-858 of the supplementary proceedings submitted to the Court.

[4] Pp. 3037-3060.

exactly with the transfer by Elaskar of his stock shares on 21 October 2011 and the trips related to the transactions during the intervening period, to which we shall refer later.[5]   Ramos reappears as arriving from the United States on 17 December 2012,  then vanishes, possibly in Uruguay (not shown in the migrations record, as happened between April and May of 2012, see preceding footnote), and returns on 4 January 2013 from Uruguay to spend only six hours on Argentine soil, after which he returns to Uruguay. Thereafter, the record omission corresponds to his entry, because the migrations table shows him once again departing for a return to the United States on 7 January 2013. Still in genuine correspondence with the movements of securities and especially with their liquidation and payment by means of checks issued by the securities agent, as we shall later see in detail, Ramos returned to Argentina from Italy on 21 March 2013 and stayed until 7 April 2013, with the usual visits to Uruguay (on 21 and 31 March). This correlates precisely with the last bond sales or liquidation transactions. Since then, more than two months have gone by and he has not returned to Argentina.

| Family & given names | Departure or arrival | Departure/arrival date recorded | Time recorded | Origination point/destination | Border crossing point | Company | Vehicle |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

---

[5] Elaskar left on 23 October 2011, and Ramos left on the following date on one of his usual flights to France. Ramos returned on 21 April 2012, on the flight in the opposite direction from  Germany; then, at the end of one of the ghostly departures that are not recorded, he certainly went to Uruguay, from which he returned n 16 May, via Jorge Newbery Airfield. He left for Germany on 19 May 2013, returning to Argentina from Colombia on 23 August 2012. On that same day he departed by ferry for Uruguay, where he remained for less than 24 hours. He again crossed the river on 27 August and 6 September, staying for 2 and 7 days, respectively, in Uruguay. He flew to Germany on a return trip on 16 September 2012. It was precisely between April and May, on the one hand, and between August and September of last year, on the other hand, that **Martín Antonio Báez**, son of **Lázaro Báez**, made his trips to Switzerland in the company of **Daniel Rodolfo Pérez Gadín, Jorge Oscar Chueco**, and, as we recently discovered, **Julio Enrique Mendoza**, president of Austral Construcciones S.A. We shall have more to say on this subject later, but it is worth noting here that the first trip was made by Báez and Mendoza via France between 5 and 12 May; that is, they coincide with Ramos, who left four days later for Argentina. The second trip was made between 26 May and 5 June via Spain; this time. Martín Antonio Báez, Pérez Gadín, and Chueco traveled together (migrations sequence 225, 226, and 227 of Aerolíneas Argentinas flight 1132) for Switzerland one week after Ramos return to Europe. The third trip by Báez to Europe in 2012, this time with Pérez Gadín and Mendoza and again via France, was made between 23 September and 10 October, that is, once again it began one week after the return of Ramos to his center of business operations on 16 September 2012, and at the end of two extensive parallel trips to various places in South America (Ramos arrived from Colombia and visited Uruguay three times, while Báez, practically on the same dates, traveled to Chile between 11 and 30 July and to Panama on 5 August, returning from Paraguay on 8 August. Lastly, he flew to Paraguay on 28 August, one day after the second visit by Ramos to Uruguay, returning on 31 August. He left for Bolivia on 01 September, and returned to Argentina on 5 September 2012, one day before the third and last visit by Ramos to Uruguay. Thereafter, as we said earlier, Ramos left for Europe on 16 September , and was followed one week later by Báez, Pérez Gadín, and Mendoza, all seated together in the same plane.

In addition, all these hectic transactions for the total of the funds that we are tracking in turn accord with and occur during the time frame of the production and broadcast on 14 April 2013 of "Journalism for Everyone." Only one week earlier, the parties involved completed the laundering of the money that rendered inoperative the inconvenient knowledge Federico Elaskar had had of it until then. They thus maintained their impunity and the slowness of the judicial investigations that could have begun after the public report, by then practically irreversible.

Paradoxically, they made our work easier. Once we had the key (concealed behind straw men and clandestine transfers), the activity of Helvetic Services Group and the ubiquitous Néstor Marcelo Ramos, we did not need to complete the information about the entire intermediate framework of accounts opened and established by SGI—on average, hundreds of companies in Panama and Belize. Instead, we needed only to determine the identity of the ultimate recipients of the stock shares of SGI and the consequent handling of the funds it negotiated. It also was not necessary to trace the movements of funds of the equally vast range of companies established by the managers of Helvetic Services Group to serve as recipients of the funds recovered and used for Lázaro Báez and Company. The parties themselves, **certainly in obedience to an order to repatriate the funds and avoid the inconvenient revelations by Elaskar,** provided us with the tracks and the evidence of what they did with the money, at least until a few months ago.

As we said earlier, once Elaskar returned from his exile, between November and December 2012, events appeared to accelerate. The information furnished by securities agent Financial Net S.A. shows that the only reason for the bond business was to eliminate the traces of the transactions executed with the participation of Federico Elaskar, secure the money, and conceal the responsibility of Lázaro Báez and his accomplices in the extortion and unlawful handling of assets. Ultimately, the application for opening or registration of principal account 1255 in the name of "Helvetic Services Group S.A." was filed on 10 December 2012. It bore the signatures of Néstor Marcelo Ramos and Jorge Oscar Chueco as "holders or legal representatives." Full authorization by the Swiss company in favor of Chueco for operation of the account was issued on 4 December 2012.[6] Here we can indicate the first of a lengthy series of irregularities that emphasize the need for speed by the parties involved and the complicity of the parties assisting them. First, because on 10 December 2012 Néstor Marcelo Ramos was not in Argentina; we have seen that he flew to Germany on 16 September 2012 and returned on 17 December 2012. Second, because power of attorney had not yet been granted to Chueco. Written power of attorney was issued (Notarial Instrument of the Swiss Confederation, Republic and Canton of

---

[6] On the following day, 5 December 2012, consultations were held by the stock exchange company concerning the financial and business activity of Jorge Chueco. The last part of the Documentation of Helvetic Services Group, submitted by the stock exchange agent , was certified on 3 December 2012; this documentation includes copies of the corporate articles and bylaws that bear the seal of the trade register of the Canton of Ticino and, constituting the ultimate factor in the sudden repatriation of funds, **they were closed on 22 October 2012, one day after the return of Federico Elaskar to Argentina**. This confirms yet again the fact that the parties concerned began to carry out the transactions that we are outlining immediately after the imminent return of the victim of their extortion (see memo and annexed documentation of Financialnet S.A. dated 4 June 2013).

Ticino) on 12 December 2012. This document, aside from its strangeness[7] and based on the date of the accompanying consular certifications, could not be filed in Argentina until the beginning of January 2013. This is very probably the reason why the first five checks issued by Financial Net Sociedad de Bolsa in favor of Helvetic Services Group S.A. for the liquidation of the bonds (that is, issued on 28 December 2012 and paid on 2 January 2013) were delivered against a receipt signed by both Jorge Oscar Chueco and Néstor Marcelo Ramos. It also emphasizes, on the other hand, the curious acceptance by the banks of the deposit endorsements of the nine checks, signed by Chueco alone.

To illustrate what has been said to date, we insert a table showing that the information about the status of the account of Helvetic Services Group, furnished by the Central Securities Depository, is systematized and arranged chronologically. We see that the sequence of deposits and subsequent debits consists in nine links of successive credits, which shows the intelligent division –including the alternating negotiation of three different types of bonds--of what constitutes only a single transaction of liquidation of securities and consequent laundering of assets. We have also inserted information about the nine checks issued by the securities agent in payment of the liquidations in favor of Helvetic Services Group.

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

---

[7] All the powers of attorney that we have seen issued by Helvetic Services Group pursuant to Swiss law, as is the case of those incorporated into the proceeding and issued in favor of Claudio Giovanni Fontana, Néstor Marcelo Ramos, or Horacio De Bonis and Javier Martín Vanella, copies of which are in the documentation produced by Financialnet, are always issued pursuant to resolution of the general meeting of partners. In the case of the special power of attorney issued to Chueco, it was executed by Ramos himself, as "member of management." The instrument bears certifications dated 2 January 2013, and the supplementary documentation, such as financial statements and balance sheets, bears apostilles (The Hague Convention) dated 4 March and certification by the Argentine *notario* dated 21 March 2013. The sworn statement by Jorge Chueco on the condition (non-existent in his case) of "person exposed politically" dates from 26 March.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Up to this point we have created a summary recapitulation and advanced the discovery of the entrance into the country of money and securities that would be close to the total amount indicated in the complaints voiced by Federico Elaskar. The next phase of the investigation having been completed, this is the time to reveal that **the proceeds from the liquidation of the bonds on the local market by Helvetic Services Group between December 2012 and April 2013 was deposited in the account of** <u>**Austral Construcciones S.A.**</u> **with Banco Nación, Plaza de Mayo Branch.** As we have said, this involves nine checks for a total of ARD 208,840,276.65, issued by Financial Net Sociedad de Bolsa in favor of Helvetic Services Group S.A. Five checks were issued against its current account No. 3003-40629-5 with HSBC Bank, and four checks were issued against account number 3-302-094091784-1 with Banco Macro. The nine checks were endorsed by lawyer Jorge Chueco, representing the Swiss company, and were deposited by Austral Construcciones in Banco Nación.[8]

We reproduce the checks below, in the order in which they were issued and deposited.

[Screen shots of nine checks, front and back]

As can be seen from the endorsements, while the nine checks were deposited in Banco Nación by Austral Construcciones, represented by its authorized representatives Claudio Bustos and Eduardo C. Larrea—only the instruments issued in the HSBC account of Financial Net show the current account number, 3003-40629-5. Banco Nación has not yet furnished additional information.[9]

As we said earlier, the sequence that appears complex in the Central Securities Depository summary becomes clear if we establish a chronological order to replace the individual security or "type" postings, to use stock-exchange terminology. This case concerns three types of bonds (BODEN 2015, BONAR X, and BONAR VII) used in nine transactions or sequences that start with one or more credits and end with liquidation in the Rosario local securities market, and the payment made by the stock market agent to Helvetic Services Group S.A. via one or more

---

[8] Memorandum and documentation produced by Banco Macro and HSBC Bank on 6 and 7 June 2013.

[9] Requested on 11 June and on various other occasions by telephone.

checks. There are nine of these checks; however, one individual check does not necessarily cover one individual liquidation of each delivery of securities is not necessarily issued, because, as we shall see, on some occasions more than one check is issued to cover the final liquidation of a single bond credit, or, conversely, a single check covers several credits or deposits of securities. Appendix II annexed to this opinion contains an expanded version of the above record of credits and debits of securities and their counterparty in the liquidation and the issuance of the checks. We have also included information about the involvement of and payments by the three presumed counterparties, indicated by Financial Net S.A. to be Global Equity Sociedad de Bolsa S.A., Mariva Bursátil Sociedad de Bolsa S.A., and Facimex Bursátil Sociedad de Bolsa S.A.[10] Respectively, the three of them supposedly issued in favor of Financial Net S.A. checks for ARD 31,630,516.40, ARD 40,604,900, and ARD 153,173,727, for a difference of ARD 13,173,090 above the gross amount reported by Financial Net S.A. With respect to this difference, we must analyze the features of the simulation that we suspect underlies these purchases of securities.

| | Counterparty payments | Gross according to Financial Net | Difference |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | 225,409,144 | 212,236,054 | 13,173,090 |

As we have learned from the Central Securities Depository,[11] **at the end of the time-frame we find a single origin for all these securities whose liquidation ended in the accounts of**

---

[10] According to the said information furnished by Financial Net S.A., Global Equity Sociedad de Bolsa S.A. purchased for its principal number 2601; Mariva Bursátil Sociedad de Bolsa S.A. for its principal number 2164; and Facimex Bursátil Sociedad S.A. for its principal 2577. We are awaiting additional information of the Central Securities Depository, requested by memo dated 6 June 2013.

[11] We are awaiting additional information concerning the deposit account in the Euro Clear system (the account in the name of J. Safra Bank of Geneva, Switzerland,. The principal is unknown, but is believed to be Helvetic Services Group S.A., seen in the account shown in the initial list as depositor 13305, principal 808347. In the memorandum of the Central Securities Depository dated 3 June, the account is shown as "Citibank N.A. Account N2/Euroclearbank," and is used by that bank as local agent of the Euroclear clearing house. *This accords with what we deduced and explained in the reports on pp. 990-991 and 1011 of the supplementary proceedings, in which we*

**Austral Construcciones S.A.** It concerns transactions initiated with the transfer to the account of Helvetic Services Group S.A. (in its role as principal number 1255 of depository account number 695, Financial Net) of securities originating in another country. As can be seen from the table inserted at the beginning, this is done through the Euroclear clearing system, which in Argentina is used by an account managed by Citibank, as we explain in the footnote. This allowed us to determine the origin and the identity of the depositor of the bonds, that is, the entity that operated through Euroclear to transfer the bonds to Helvetic Services Group in Argentina, although the system of global deposit of securities and instruments that governs in Europe prevents us from determining, from our country, the identity of the client or principal.

In any case, this preliminary information, which can be expanded by the Argentine judges via Letters Rogatory, speaks volumes. Because **the depositor in all cases was J. SAFRA BANK of Geneva, Switzerland.** Here is the information contained on one of its official websites.

[Screen shot of English-language page from website of J. Safra Sarasin Bank Ltd., Geneva, Switzerland]

The bank is thus in the same jurisdiction where Helvetic Services Group S.A. was legally established. Without prejudice to the aim of the Letters Rogatory, it will not be difficult for the prosecutor contacted by *Diputada* [Representative] Graciela Ocaña[12] to complete his investigation of the Swiss end of the matter. But it can be guessed that the bonds come from one or more accounts of that company, one of its controlled companies, or the companies that it manages under the attentive eye of its concealed Argentine shareholders. In other respects, we have seen that with the goal of this repatriation or ultimate laundering of the funds, in December 2012 lawyer Jorge Oscar Chueco was named authorized representative of Helvetic Services Group S.A. This reinforces the indications already existing in the case with respect to responsibility for events, as in the case of Ramos, of the two other shareholders and executives of the company, all of them acting as necessary participants in the extortion under investigation. I am referring to **Úrsula Verena Fontana and Claudio Giovanni Fontana.**[13] We base this

---

include and document information about proceedings initiated by the National Securities Commission because of irregularities in this of transactions that involved the use of that account and the activity of several stock exchange agents, including Global Equity S.A.

[12] I indicated this in the various charges that we added to the indictment and in its formal presentation on 3 May in the proceeding requesting data from the companies involved.

[13] Incorporated into the proceeding are various copies of the articles and bylaws and the charter of Helvetic Services Group S.A., as well as other corporate documents including financial statements, balance sheets, powers of attorney, and minutes of general meetings of members of the company and the Board, certificates issued at the request of this Office of the Public Prosecutor by Continental Urbana S.A., its President Isaac Kipersmidt, and Amriante Galitis S.A. and Financial Net S.A.
[Screen shot of Extract from Trade Register]
All this information, especially the most recent version (extract above) of the Trade Register entries, shows the shareholder role of Ramos and the two Fontanas at the start of the history of the company, subsequently maintained alone by Néstor Marcelo Ramos and Verena Fontana, while Claudio Giovanni Fontana continued to perform in such executive function serving as president since at least 22 October 2012.

contention not only on their actual and positive involvement in the management acts and the general meeting of shareholders produced in the proceeding, but also on the obvious consensus and acceptance that existed among these visible members of Helvetic Services Group S.A.with respect to the activities carried out in its name, although in general Néstor Marcel Ramos appears as executing party. This indicator presupposes another link: I am referring to the necessary knowledge of the unlawful machinery used to conceal and launder funds originating in the activities of Lázaro Báez, his group, and his partners, as well as the violence in which they engaged when they found it appropriate, as is the case of the dispossession suffered by Federico Elaskar, and the analogous pressures experienced by Alejandro Maximiliano Acosta.[14]

This is why in this report we are requesting, in addition to a series of supplementary measures, investigatory testimony by Verena Fontana and Claudio Giovanni Fontana. This being said, I am taking advantage of the reference to the abundant information previously furnished by Helvetic Services Group to open the stock market account used in this new scheme of the funds of Báez and company in order to call attention to the information contained in the financial statements and other account statements produced in the proceeding. In addition to confirming some of the transactions detected in Argentina on the part of companies established in other countries,[15] they include the statement that most of their assets outside our country **were based in or consisted in investments in private financial institutions or companies in Panama.**[16]

This is one more confirmation of the information disclosed by Elaskar before the cameras and recorders of journalist Jorge Lanata and his collaborators. Helvetic Services Group S.A. itself, or—what is the same thing—Lázaro Báez and his partners, facilitated, with their own acknowledgment, our search for and laborious evidencing of the opening and management from Switzerland of the companies established in Panama and other tax havens, to which Elaskar alluded. It is clear that, as we have pointed out as the central claim of this report, they also engaged in facilitating proof of the exchange or ultimate laundering of these funds.

Let us return to the explanation of the sequence of transfer and liquidation of securities. The bonds thus originate with one or more accounts of J. Safra Bank of Geneva, Switzerland. This movement triggers two different sequences in the records of the Central Securities Depository: one consisting in the Euroclear statement of account or the reflection of the European clearing house in its Argentine counterpart (last series of statements of the Central Securities Depository, where the bonds are indicated as types 44524, 44565, and 44586), although this "Euroclear credit" ultimately concerns the first movement recorded in our country, as can be seen in the

---

[14] This is why we commenced the criminal proceeding and called for investigatory statements is our report dated 13 June 2013.

[15] Including the business activities of Vansomatic Suisse S.A., Swisswer AG, Wodson International S.A., Continental Urbana S.A.—although with omission of the use of Houston Management Ltd., one of the 150 Nevada companies, used as vehicle—Empros Inversiones S.A., Lavalle and Agüero S.A.—composed, as we state in the report on page 1011 of the supplementary proceedings, of Jorge Antonio Galitis, one of the partners of Amirante Galitis S.A.—including its interest recognized in the study by J.P. Damiani & Asociados of Montevideo, Uruguay.

[16] Assets reported in 2005 totaled ARD 23,833,560.69, cited in the financial statements at 31 December 2011 and 2012, respectively, as financial investments (*investimenti finanziari*), in the amounts of FRS 107.871,888.77 and 135,019.475.71. See documentation furnished by Financialnet S.A. and previously by Continental Urbana S.A. and Amirante Galitis S.A., commented on and cited in the report dated 22 May 2013.

complete version in Appendix I of this report. **So it is not difficult to see that the sum total of US$65,794,950 is composed of two mirror account postings[17] of US$32,800,000[18] each** in nominal value of the securities. Thus the first three series of statements reflect the credits and debits in order of deposits and liquidation of the bonds received by Financial Net for account of Helvetic Services Group.

When the Central Securities Depository was asked for information pertaining to the principals' accounts recorded there, it reported that what appears in the creditor columns is always the Euroclear Account in which Helvetic Services Group briefly participates, while the debits columns show three accounts belonging to the Stock Market Agent, 695/999999, 695/1001, and 695/3.[19] This would reflect the processing of the securities by Financial Net up to the time of their negotiation on the Rosario Securities Market immediately after each credit. We shall look more closely at this aspect of the affair at another time, after we received additional information from the Central Securities Depository.[20]

But we can say here and now that **there is one case in which the principal's account that appears in the debits is not one of the three accounts allocated to Financial Net internal management. I am referring to principal's account number 695/1251, which, according to the information reported by the Central Securities Depository, belongs to Roberto Porcaro and his wife Patricia Sirvente.[21] The following extract shows the transfer on 27 December 2012 of US$1,000,000 in BONAR VII bonds.**

[Screen shot of excerpt from account statement]

In the annexed report, the Department of Criminal Investigations has collected various data and references pertaining to Roberto Porcaro, most of them pertaining to associations and party activities about which nothing need be said here. On the other hand, because of its temporal correspondence with the transfer in question and the investigations that will certainly have to be undertaken with respect to this party in connection with the investigation under way in federal court, it calls attention to reports of an alleged purchase, early in 2013, of a piece of property in Necochea, Province of Buenos Aires, for the reported amount of US$600,000.

---

[17] The total sum should include the portion representing the US$194,950 paid on 3 April 2013 as dividends.

[18] US$22,295,000 in Boden 2015, type 5433 or, in Euroclear, type 44524; US$7,665,000 in Bonar VII, type 5435 or, in Euroclear, type 44565; and US$2,840,000 in Bonar X, type 5436 or, in Euroclear, 44586.

[19] Memorandum of the Central Securities Depository dated 3 June 2013.

[20] See footnote number 10.

[21] See table inserted on page 9 of this report and information furnished by the Central Securities Depository in its memo dated 3 June 2013. The ID number 5.524.549 shown in the Central Securities Depository information is in fact that of **Roberto Florentino Porcaro**; other information about him and preliminary investigations have been included in Report number 21 of the S.I.P.E. annexed hereto with this request. We shall return to some of this information later.

This transfer was reported only by the Central Securities Depository, and is absent from the documentation and information furnished by the securities agent, where the same debit of US$1,000,000 on 27 December 2012 is ascribed to other purchasers.[22] It is yet another proof of the concealment of the nine series of transactions and the activity of Financial Net in the matter. The same can said about the participation of its three supposed counterparties, that is, the counterparties that the securities company itself has indicated as purchasers of the bonds of Helvetic Services Group S.A. I am referring to Global Equity Sociedad de Bolsa S.A., Mariva Bursátil Sociedad de Bolsa S.A., and, to a greater extent since payment of ARD 153,173,727 is attributed to it on a gross total of ARD 225,409,144,[23] Facimex Bursátil S.A.

With respect to Global Equity, it can be said that the relationship with or proximity to Financial Net that we have seen so far is physical, because the company is installed on the upper floor of a building on Calle Reconquista 144, where both entities are located, even though this operation was formalized, by name, in the Rosario securities market. The case of Facimex Bursátil S.A. is similar. We have reported on its possible ownership or purchase, like Global Equity, by economic groups named in various publications as being related to Lázaro Báez and his partners, including the owner of Banco Macro, Jorge Brito, and the entrepreneur Cristóbal López.[24] Other indications of concealment include the precise division of the operation, with an artistic alternation of securities that begins with a delivery of Bonar X bonds followed seven times by the Boden 2015 and Bonar VII bond deliveries, always for total amounts that never reach US$6,000,000 and in general total slightly less than US$3,000,000. These indicators are mentioned as general guidelines by the rules that govern the activity of the Financial Information Unit (FIU),[25] whose activity in this matter, like that of the Report of Suspect Transaction

---

[22] As can be seen in the breakdown of the list annexed as Appendix I, the debit in question seems to be covered in duplication, in another irregularity and indicator of simulation, by the counterparties Mariva Bursátil and Facimex, without any reference to Porcaro and the account shown only in the summaries of the Central Securities Depository.

[23] See table on page 15 of this report and the last part of the list in Annex I.

[24] See report on pp. 990-991 of the supplementary proceedings.

[25] Resolution 121/2011 of the Financial Information Unit (executive order of Law No. 25.246, amended by Laws Nos. 26.087, 26.119, 26.268, and 26.683, and Decree No. 290/07 and its amendments and supplements of UIF Resolution No. 37/2011):
"**Article 29.**-Report of Suspect Transactions. Obligated Parties must report to the FINANCIAL INFORMATION UNIT, pursuant to the provisions established in Articles 20 *bis*, 21 b). and 21 *bis* of Law No. 25.246 and amending laws, unusual transactions that according to the suitability required on the basis of the activities they perform and the analysis performed said Obligated Parties suspect constitute Laundering of Assets or Financing of Terrorism.
**"The following circumstances, indicated merely by way of illustration, must be evaluated in particular:**
"a) Amounts, rates, frequency, and nature of the transactions executed by clients that have no relationship with the previous transactions and economic activity of said clients;
"b) **Unusually large amounts**, complexity, and unusual modalities of the transactions executed by clients;
"c) When transactions of similar nature, amount, modality, or simultaneous execution **lead to a presumption that it is a transaction divided for the purpose of avoiding application of detection procedures and/or reporting of transactions;**
"d) Continuous profits or losses in transactions executed repeatedly between the same parties;
"e) When clients refuse to provide data or documents required by entities, or when changes in the information supplied by clients has visibly been changed;
"f) **When the client is not in compliance with this Resolution or other pertinent applicable rules;**

(R.O.S.) required of the parties involved, are striking because of their absence. Added to this is the fact that the rate at which the bonds are liquidated, always very close to the historical value of the unofficial or free-market dollar, is indicated by Financial Net in most of the cases as "individual rate," while the counterparties always refer to "continuous range" transactions and to transactions agreed upon within the customary range of the Rosario securities market.

Moreover, in the case of the successive debits and supposed purchases of bonds, the division multiples the sequence and breaks up the transaction into sums that barely exceed US$2,500,000 in nominal value. The investment of the counterparties thereby becomes impossibly precise, at least as transactions supposedly executed on the stock market. Including the fact that, as we have indicated at the end of the table that we are annexing as Appendix I, the amounts paid by the three counterparties exceed by ARD 13,173,090 the sum total of the gross amounts of the transactions. In the case of the debit indicated as 4.2 above, dated 27 December 2011, for the nominal amount of US$1,000,000, the duplicate payment by Mariva Bursátil and Facimex Bursátil is recorded. And to make matters worse, this concerns securities that the Central Securities Depository does not record as having been transferred, not to any of the three supposed counterparties but rather to the personal account of Roberto Florentino Porcaro and his wife. With respect to the documentation of the payments of the counterparties, the norm is the complete absence of data. This is yet another evidence of the concealment of these transactions. It should be noted that the supposed payment by Facimex of a total of ARD 153,173,727 is documented as having been made by means of nine checks, all designated as "number 1. Banco de Valores."

As we have said, in addition to the cases in which the liquidation checks appear to have been issued even before the transfer of the securities, as is the case for the bonds covered by credit number 7 for ARD 2,480,000 in Bonar VII bonds, another major indication of the concealed nature of these liquidations is provided by the precise assembly and artificial correspondence between the acts ascribed to the various protagonists. All this tends to support, like the obvious and objective information about the nominal laundering of US$32,800,000 or about EUR 22,000,000, the strong suspicion of a self-sale or self-purchase of securities. According to this hypothesis, the same group of persons that transferred the bonds from Switzerland may also have acted to conceal their purchase in the local market, using for these transactions unlawful funds in Argentina or sums brought into the country outside the lawful channels, as reported by Federico Elaskar, and it has been proven that this was done by Lázaro Báez and his partners on other

---

"g) When there are indications concerning source, handling, or unlawful purpose of the funds used in the transactions for which the obligated party **does not have an explanation;**
"h) **When the client shown an unusual lack of concern with respect to the risks that he is assuming,** and/or the costs of the transactions are incompatible with the economic profile of the client;
"i) **When the transactions involve countries or jurisdictions that are considered to be "tax havens" or which are identified as not cooperative with the International Financial Action Group;**
"j) **When there is a single domicile for several legal entities, or when the same individuals appear as authorized parties in different legal entities,** and there is no economic or legal reason for this situation, **with special attention being paid when some of the companies or organizations are located in tax havens and their principal activity involves off-shore transactions.**
"Article 30. – Duty to provide background information for the Report. The Report of Suspect Transactions must provide detailed information and must contain a description of the circumstances constituting grounds for the transaction to be considered suspect."

occasions.[26] This accounts for the sum of US$65,600,000 that in the statement inserted at the beginning results from double recording of the same US$32,800,000 transferred from Switzerland, could also be recovered because of a double channel for laundering of assets, the first channel being the ARD 208,840,000 deposited in the account of Austral Construcciones S.A. under cover of liquidation of the securities brought in the name of Helvetic Services Group S.A., and the other change, in the same value as these bonds, in the event that they may have remained in the possession of the parties involved thanks to the pretense of their purchase.

This is not the jurisdiction in which to study this phase in depth. We shall in any case pay attention to what may result from the information about the three clients or principals who were indicated by Global Equity, Mariva Bursátil, and Facimex as presumed purchasers.[27] In the meantime we can add, as yet another indication of the artificial appearance of these purchases, the discovery that Financial Net closed its account with HSBC on 5 February 2013, slightly more than one month after the last transactions connected with this liquidation of bonds.[28]

While these parallel transactions have not been verified, in any case it is suggestive that the considerable sum of money actually liquidated and deposited in the accounts of the flagship company of Lázaro Báez accords with the almost surgically precise one-half of the funds at one time entrusted to Federico Elaskar. Another hypothesis that we suggested at the time to the parties investigating the offense of money-laundering **could be a possible divorce among long-time partners**, reflected in a partial exchange of one-half of the money and its laundering in the name of Lázaro Báez. Or the joint company may have remained intact, that is, with Lázaro de Báez and his people acting as figureheads for the portion belonging to their concealed partners,

---

[26] See previous reports produced in the proceeding, including references to the investigations of the entrance into Argentina and the depositing to accounts of Badial S.A. of US$1,800,000 originating in Uruguay and brought into Argentina in suitcases. This was acknowledged by Lázaro Báez himself in his statements to the AFIP, reproduced in the memoranda incorporated into the report on pp. 1057-1077.

[27] See footnote number 10.

[28] Memorandum of HSBC dated 7 June, which includes a summary of the account for the preceding six months. The account was opened on 12 September 2007, and the deposit of ARD 16,566,400, compatible with the gross amount of the fifth check in the series, a purchase ascribed in Facimex, dated 2 January 2013, is the last pertinent credit. **The investigation by the federal court officials will be able to include, among other aspects, the source of the transfers and deposits shown in this account summary**, in which it is easy to identify the amounts that accord with the gross amounts involved in the transactions liquidated with the five HSBC checks. See the following table, which can be used in a search for the source of the funds deposited in the Financial Net account.

Data of summary of account No. 3003-40629-5

| DATE | REFERENCE | ACCOUNT No. | COUNTERPARTY | AMOUNT |
|------|-----------|-------------|--------------|--------|
|      |           |             |              |        |
|      |           |             |              |        |
|      |           |             |              |        |
|      |           |             |              |        |
|      |           |             |              |        |
|      |           |             |              |        |

that is, the sums deposited in the accounts of Austral Construcciones S.A. or the one-half that may have remained in one of the networks of companies and accounts outside the country. This latter possibility includes the more recent phase of the seeming "reorganization" with which Daniel Rodolfo Pérez Gadín, Jorge Oscar Chueco, Martín Antonio Báez, Julio Enrique Mendoza, and Néstor Marcelo Ramos may have been occupied continuously and without interruption, once Elaskar was expelled from SGI.

Returning to the general evaluation of the events and the evidence collected to date, it should be kept in mind what was said in the report of 22 May 2013 on the reflection that the drastic break in the management of SGI had on the company documents. Elaskar changed from promoting a prosperous and promising business to suddenly resigning from his position and disposing of his stock shares.[29] Based on this evidence of a situation that does not in any way resemble peaceful negotiation of stock shares that was emphasized in those days,[30] we must evaluate the analogous trackings of the movements and the deployment of the parties involved. With this objective, we prepared Appendix I, in which we compare the records of migrations and flights of all these persons with the dates of the bond negotiations that we have described. The first thing that we see is a virtual disappearance of Federico Elaskar, similar to his disappearance from the corporate records, with a sequence of movements drastically interrupted in June 2011. At the same time, there is an increase in the travel undertaken by Daniel Rodolfo Pérez Gadín, Jorge Oscar Chueco, Fabián Virgilio Rossi, César Gustavo Fernández, Alejandro Ons Costa, and Juan Ignacio Pisano Costa; their trips become more frequent with the approach of the time of return and the contacts of Elaskar with the journalists.

Already at the beginning of 2011, and still more after the arrival of Pérez Gadín in the offices in Calle Juana Manso at the end of February 2011, the parties involved travel ceaselessly in all the countries in which we have discovered the network of companies and accounts, including Panama, Uruguay, Spain, the United States, and Switzerland, the latter reflected in flights via France, Germany, and Italy. There is also an obvious correspondence between the trips taken by the individuals of greater importance and responsibility, including Pérez Gadín, Chueco, and Martín Antonio Báez, and the establishment of companies that indicate these persons as executives or of which they are certainly concealed shareholders. This can be said, at least as a very probable hypothesis, in the case of Martín Antonio Báez, whose trips multiply; in addition, in yet another confirmation of his father's link with all these persons and transactions, he begins to make these trips in the company of Chueco, Pérez Gadín, and, in one of our more recent discoveries, the president of Austral Construcciones S.A., **Julio Enrique Mendoza**.[31]

[Flow chart – translation of boxes (in alphabetical order of Spanish text):]

---

[29] See the pertinent statements made by SGI personnel before Federal Court Number 7, in S.I.P.E. report number 20, filed with the court in pleadings dated 13 June 2013.

[30] In the pleadings of 22 (request for investigation) and 24 and 28 May (requests for telephone activities), we discussed an extortion situation that continues to date. Its reflection can also be seen in the behavior of Federico Elaskar and in the violence suffered a short time ago by Alejandro Maximiliano Acosta.

[31] See the statements made in footnote number 5, explaining the concordance between the movements of Néstor Marcelo Ramos and Martín Antonio Báez.

| Bonos: USD... | Bonds: USD 32,800,000 |
|---|---|
| Cheques librados... | Checks issued in favor of Helvetic Services Group for $208,840,276.65 |
| Cuenta de ... Financial Net | Account of Helvetic Services Group with Financial Sociedad de Bolsa |
| Depósito en la cuenta... | Deposit to account of AUSTRAL CONSTRUCCIONES S.A. with Banco Nación: $208,840,276.65 |
| Dinero ingresado... | Money received by Lázaro Báez in SGI late in 2010/beginning of 2011: approx. €50,000.00 |
| Euroclear | Euroclear |
| HELVETIC SERVICES GROUP S.A. | HELVETIC SERVICES GROUP S.A. |
| J. Safra Bank de Ginebra, Suiza | J. Safra Bank of Geneva, Switzerland |
| Octubre 2012 a Abril 2013... | October 2012 to April 2013: assembly of funds (approx. EUR 25,000,000) and purchase of Argentine debt instruments |
| Pago bruto... | Gross payment: $225,409,144 |
| Posible auto-compra... | Possible proprietary purchase of bonds (approx. EUR 25,000,000) entering or existing in Argentina |
| Posible simulación... | Possible simulation: Global Equity, Mariva Bursátil, Facimex Bursátil |
| Sociedades y cuentas... | Companies and accounts known to Federico Elaskar |
| Transferencias fraccionadas... | Fractional transfers to Euroclear/Argentina account; total, USD 32,800,000 |

To demonstrate to a greater extent the eloquence of the travel records, always with consideration of the information assembled in Appendix II, we have made several calculations and comparisons. In 2010 the persons in question recorded a total of 70 trips, which increased to 141 in 2011 and to 179 in 2012. If we arrange and analyze them in order of destination, we find, first, ten trips to Germany: four by Ramos, who usually traveled via Lufthansa to Frankfurt; four by Lázaro Báez and his son Martín Antonio, and two by Fernández, the latter in the final, crucial phases late in March and at the beginning of April of 2013, when this group appeared to maximize its efforts with respect to the ninth and last deposit of bonds from Switzerland and the possible obtaining of funds to procure these securities or, as we have maintained in this report, to purchase them themselves in the simulated purchases on the Rosario market.

A trip from Australia is recorded for the return of Chueco on 24 April 2011, although he had started this trip in South Africa on 16 April. These destinations are remote, but on the other hand each one is close to two of the places where we have located corporate networks, including the Seychelles Islands and New Zealand. Based on his credit-card statements, we have shown that between the departure and arrival dates Jorge Oscar Chueco was in fact in New Zealand,[32] where he is shown making purchases between 19 and 23 April 2011. When pertinent, we have to return

---

[32] The company MAPLE VIEW LIMITED was established in New Zealand in February 2011, two months before Chueco's visit to that country, with Javier Martín Vanella as manager. The company SWISSER AG TRUSTEE NZ LIMITED was established by the group in November 2012, with the same domicile: Office 2, Level 3, 56 Victoria Street, Wellington, with Javier Martín Vanella and Marcelo Néstor Ramos as managers.

to this credit-card information for Chueco and also for Pérez Gadín,[33] since this information has allowed us to confirm that the passage via Switzerland is a necessary stop and the reason for practically all the trips to Europe made by the group, although the immediate destination of the list of migrations was Spain, France, Germany, or Italy. This evidence, which also covers the trips made in their role as concealed shareholders by Martín Antonio Báez, his father Lázaro Báez, his brother Leandro Báez, and the president of Austral Construcciones S.A., Julio Enrique Mendiza, accords precisely with the public report by Federico Elaskar and the other indicators collected concerning the handling of corporate structures and bank accounts by Helvetic Services Group S.A.

|  |  |  |  |  |
|--|--|--|--|--|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Martín Antonio Báez travelled to Bolivia in 2012. He also made frequent trips to Chile. On the other hand, most of the thirteen trips to Brazil were made by Jorge Oscar Chueco starting in 2010, with a trip in August 2011 in the company of Pérez Gradín. In November 2011 Gustavo César Fernández and Fabián Rossi also traveled together to Brazil. In total, thirteen trips were recorded with Chile as point of origination or destination. Practically all of them were made by the Báez family, including one of the only two departures by Lázaro since 2010. Among these movements it is interesting to note the coincidence of the trip to Chile on 11 July 2012 by auditor Eduardo Guillermo Castro—installed by Lázaro Báez and Pérez Gadín in SGI—and Martín Antonio Báez. Martín Antonio Báez went to Chile again in March 2013, a few days before flying together with his father to Germany—their destination very probably being Switzerland—during the time when the parties involved appeared desperate to bring back a large part of the money that had left during the tenure and with the knowledge of Federico Elaskar.

Only two persons in the group traveled to Colombia, Rossi, in February 2012, and the mysterious Néstor Marcelo Ramos, who often went to various places in South America. One trip to Cuba is recorded, made by Jorge Norberto Cerrota, coinciding with the start of the "Journalism For Everyone" program broadcasts; he left on 13 April and returned on 27 April 213, **when the ninth and last checks was issued and close to be paid and the principal parties appeared to have agreed to spend a few days out of the country.** The first person to return on the morning of 14 April was Lázaro Báez, accompanied by his son. This is related to the imputation

---

[33] Expenditures outside the country were reported. For Martín Antonio Báez: Visa S.A./Banco Macros, entries on 11 and 13 June. By Daniel Rodolfo Pérez Gadín, Banco de Galicia/Mastercard, entry and documentation dated 10 June, and American Express, documentation and entry 10 June. For Jorge Oscar Chueco: Visa/Santander Río, documentation and entry 10 June, and American Express, documentation and entry 10 June.

concerning removal of the contents of the safe deposit boxes of one of his residences. Here is an excerpt from Appendix II covering the trips around the time of the program broadcast of 14 April.

|  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

Spain, with more than thirty migration records, is one of the principal destinations of the group in this analysis of movements of the past three years. The "mother country" became a necessary site for them, as did Uruguay, Panama, the United States, and Switzerland, in exact concordance with the information collected on the management of companies[34] that began to be used to hold the funds once Elaskar was out of the picture and control of SGI had been transferred to Pérez Gadín, Chueco, and Ramos. It should be noted that in 2010 none of the persons who would later become protagonists traveled to Spain; the only record indicates an early entry from Spain into Argentina by the nephew of Ramos and the representative of Helvetic Services Group, Javier Marín Vanella, between August and November 2010. But as soon as Pérez Gadín and his people arrived at SGI in March of 2011, most of these agents of Lázaro Báez traveled via Spain, a practice inaugurated by his sons Martín Antonio and Leandro between March and April of 2011. This trip, which we now know also included Julio Enrique Mendoza, president of Austral Construcciones S.A.,[35] is a symbol of a time that was then coming to an end. We are saying this because Federico Elaskar had not yet been dismissed from SGI and, as indicated by the sequence of migrations, it coincides with this move toward Europe, the destination definitely being Switzerland, with Leonardo Fariña, Néstor Marcelo Ramos, Martín Báez, and Mendoza.

---

[34] See the reports in the proceeding on the companies established in Spain, including Mirabilia LS, Felsan Global Investment, and Tusaleta Servicios y Gestiones. Chueco and Pérez Gadín appear as managers in all three, in the first two said companies effective from 7 December 2011 and in the third company on 9 December 2011. Serbel Trade SL and Wodson International SL , with the same domicile as these three companies, belong to Helvetic Services Group, as sole member.

[35] We did not include Leandro Báez in Appendix II because the information about his participation in this trip became known only after a review study following receipt of the information about the Air France flights.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Between 8 and 15 July 2011, Chueco and Pérez Gadín traveled together to Spain. We have not received from Iberia any information about intermediate stop-overs, the above-mentioned American Express credit-card charges of Chueco constitute credible evidence of the passage of these agents of Lázaro Báez through Switzerland and, logically, the registered office of Helvetic Services Group S.A.

The following trip to Spain inaugurates an entire series of records that add up to numerous proofs of the close relationship and obvious complicity of Lázaro Báez and his son Martín Antonio Báez with Jorge Oscar Chueco and Daniel Rodolfo Pérez Gadín in everything done since early 2011 around the offices at Calle Juana Manso 555. Pérez Gadín and Chueco departed together on 11 September 2011; they were followed by Martín Antonio Báez on 24 September. The three men returned to Argentina barely one day apart, between 21 and 22 September.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

As can be seen in the excerpt of the record, within a few days of the return of Chueco, Pérez Gadín, and Báez from Europe, Néstor Marcelo Ramos arrived in Argentina from Peru. At the beginning of this report[36] I pointed out the exact correspondences between the movements and trips of Martín Báez and Ramos, Martín Báez as principal agent of his father and evasive holder of cash and securities, and Ramos as manager, operating from Helvetic Services Group, of the business affairs that Lázaro Báez and his partners had long since transferred to another country. Here I need only add that, once again, the Mastercard charges of Pérez Gadín and the American Express credit-card charges of Chueco confirm the passage of the group through Switzerland and the meetings that may have preceded the trip by Ramos to Argentina.

In the next trip to Spain, nothing is concealed and the three men, Chueco, Pérez Gadín, and Martín Antonio Báez left and returned for the first time at the same plane on an eleven-day trip between 29 November and 10 December 2011.

---

[36] Footnote number 5.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

As in the case of the two earlier trips, here it is the charges on the two credit cards of Pérez Gadín that confirm the obligatory stop-over of the group in Switzerland. The conviction that all these proofs made possible with respect to the role ascribed by Federico Elaskar in his public report to Helvetic Services Group[37] is largely confirmed when we show that the management by the executives of the companies spread throughout the world enabled them in a few days to assemble, transfer to Argentina, and liquidate in the accounts of Austral Construcciones a large part of the securities delivered.

Chueco, Pérez Gadín and Martín Antonio Báez once again traveled to Spain between 26 May and 5 June 2012. The stop-over in Switzerland is again evidenced by the Mastercard charges of Pérez Gadín and the fact that the Aerolíneas Argentinas ticket shows a stop-over in that country.[38]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

In addition, aside from Chueco, Pérez Gadín, and Martín Antonio Báez, of the dozen or so individuals whose movements we have monitored, the most recent trip to Spain occurred in July 2012 and was made by Gustavo César Fernández, certainly to complete in Spain or in Switzerland one of the prior actions taken by his new bosses.

What has been said in relation to Spain applies even more to the United States, with some sixty trips to or from the USA. Once again, this striking number accords exactly with the pertinence that we have seen in our earlier presentations of the role placed by the USA in the corporate network and their corresponding bank accounts. It must be kept in mind that in the US we found no fewer than 150 companies managed from one and the same domicile and the common denominator of their management by the Seychelles Islands company Aldyne Ltd. and the interest held by Helvetic Services Group. This is in addition to a multitude of other business

---

[37] Apparently the party referred to in the reference to the group of "consultants" in Switzerland, with a "greased" structure that included the management of the companies and the handling of their accounts.

[38] To date, Aerolíneas Argentinas has not responded to the request for reports on these flights. The investigations into the Switzerland stop-over included in these tickets became publicly known, including with displays of the tickets in the broadcast of the "Journalism for Everyone" program on Sunday, 16 June.

activities and transactions already referred to and including more recent companies established since the end of 2010, for example companies held by Ramos, Elaskar himself, Pérez Gadín, SGI Argentina, Matías Molinari, and various other persons in this network. This is why, in contrast to Spain, in 2011 business trips by the group to the USA did not start, they accelerated. Only three or six trips were recorded in 2010, and another in 2012, plus the eight segments that include the trips made by Néstor Marcelo Ramos, Jorge Oscar Chueco, Daniel Rodolfo Pérez Gadín, and Juan Ignacio Pisano Costa in the hectic days between the last transfers of securities and the possible assembly of the funds with which they allegedly repurchased the bonds in this market, and the days immediately following the broadcast of Jorge Lanata's program on 14 April 2013.

In this system of destinations chosen to create a logical sequence and facilitate the understanding of the results of the study of the migratory movements and flights, trips to France were the next step. As in the case of Spain, Germany, and Italy, a large number of the records reflect travel with stop-overs in Switzerland, in all cases via Air France flights AF-4147 and AF-418. This is why throughout 2010, only Néstor Marcelo Ramos and Javier Vanella used this service, depending precisely on their individual or work domiciles.

The first of the other parties to take this route to France and Switzerland is Federico Elaskar. This again reveals the exact correspondence between his public complaint and the information we have collected from a beginning in our case. He traveled this route in the time frame indicated in his report, between the beginning and middle of 2011, before his dismissal from SGI. The first trip took place between 31 March and 5 April, and the second between 23 May and 5 June 2011. This was to be his last trip to France; the regular general meeting of shareholders of SGI that sealed his fate was held only one week later. Elaskar disappeared from the scene and was replaced by Fabian Virgilio Rossi, who traveled to France and possibly to Switzerland between 3 and 14 August 2011. After Rossi, the travel via France for the payments of Helvetic Services Group was done by Martín Antonio Báez, for the first time between 5 and 12 May 2012, in the company of his brother Leandro and Julio Enrique Mendoza.

We should note parenthetically here that it is only from information provided by Air France[39] that we know of the participation in these strips by Mendoza. The airline reported that the trips by Julio Mendoza and the Báez brothers had been paid for in cash at the Escalatur Agency, located at Calle Alberdi No. 3 in Río Gallegos. Based on this information, we prove that **he has the President of Austral Construcciones S.A. since 2005**, as can be seen in the following notices published in the Official Gazette of the Argentine Republic.

30 March 2012

AUSTRAL CONSTRUCCIONES S.A. The Regular General Meeting of Shareholders held on 28 May 2011 resolved to appoint **Julio Enrique Mendoza** for one business year as Regular Manager and President, and as alternate Leandro Antonio Báez, Both appointees constituted special domicile at Pasaje Carabelas 241, 5th floor, Autonomous City of Buenos Aires. Ceased to be alternate manager because of expiration of appointment: Emilio Carlos Martín. Matías José Hierro Oderigo. Notary, authorized by Document No. 39 dated 29 March 2012, page 207, Notarial Register 2485 of the Autonomous City of Buenos Aires. Attorney at Law. Matías J. Hierro Oderigo. Notary authorized by Document No. 39 of 29

---

[39] Documentation and memo of 12 June 2013.

March 2012, page 1070, Notarial Register 1485 of the Autonomous City of Buenos Aires. Attorney at Law. Matías J. Hierro Oderigo 30 August 2012 No. 38721/12 v. 30 August 2012.


## 2 December 2010

AUSTRAL CONSTRUCCIONES S.A. The Regular General Meeting of Shareholders held on 04 May 2010 resolved to appoint **Julio Enrique Mendoza** for one business year as Regular Manager and President, and as alternate Emilio Carlos Martín. Both appointees constituted special domicile at Pasaje Carabelas 241, 5th floor, Autonomous City of Buenos Aires. Matías José Hierro Oderigo. Notary, authorized by Document No. 39 dated 29 March 2012, page 207, Notarial Register 2485 of the Autonomous City of Buenos Aires. Attorney at Law. Matías J. Hierro Oderigo. Notary authorized by Document No. 181 of 30 November 2010, page 438, Notarial Register 1485 of the Autonomous City of Buenos Aires. Notary. Matías J. Hierro Oderigo 02 December 2010 No. 149969/10 v. 02 December 2010.


## 6 September 2005

AUSTRAL CONSTRUCCIONES SOCIEDAD ANONIMA. At the Regular and Special General Meeting of Shareholders held on 26 August 2005, the company unanimously: (1) Appointed a director for one business year, the sole regular manager and President being **Julio Enrique Mendoza**, the alternate being Silvia Mónica Davis. Special domicile: Both managers constitute domicile at Pasaje Carabelas 241, 5th Floor, Autonomous City of Buenos Aires. (2) Change in corporate purpose: 1. Construction of buildings; engineering work and private roads. Purchase and sale, marketing, brokering, management, and operation of real properties whether company-owned or owned by third parties, and machinery, replacement parts, and accessories intended for the performance of its corporate purpose or connected therewith. 2, Import and export. 3. Financing with company funds of the operations included in this article, with or without real guarantee, whether short-term or long-term; contributions of funds for business activities realized or under way; investment in companies of any kind in the form of establishment of stock companies, entrepreneurial collaboration groups, joint ventures, temporary association of companies, consortia, and any type of association permitted by pertinent current law and in which the company can participate; secured and unsecured cash loans, with or without establishment and transfer of real rights; and in general the purchase and sale of securities, stock shares, chattels, and credit instruments of any system or modality established or to be established. Transactions subject to the Financial Entities Law are excluded. Claudio Moreyra, ID No. 27.279.201, authorized pursuant to power of attorney embodied in instrument No. 369 dated 30 August 2005, page 1,048, Notarial Register No. 289 of the Autonomous City of Buenos Aires. Claudio Moreyra. Certificate issued by María Cecilia Zucchino. Registration No. 289. Matric. No. 2445. Date: 5 September 2005. Certificate No. 65. Book No. 85. No. 73,250.

In the notice published in the Official Gazette of 29 October 2007, Julio Enrique Mendoza appears together with Lázaro Báez and Fernando Javier Butti in Austral Atlántica S.A., which has the same domicile as Austral Construcciones S.A., at Pasaje Carabelas 241, 5th floor, in the Federal Capital.


[Screen shot of notice published in Official Gazette]

Various notices published and newspaper stories describe him as the "right-hand man" of Lázaro Báez, to the point that some automobiles found in a recent search ordered by Federal Court in a building in Río Gallegos, Province of Santa Cruz, are apparently registered in his name.[40] Mendoza's participation in these trips, along with Daniel Rodolfo Pérez Gadín, constitutes an extremely relevant milestone in the common denominator of the appearance of Austral Construcciones S.A. in the events under investigation. This company had been named by Federico Elaskar in his public statements. Leonardo Fariña himself did the same in most of his testimony in open court after the broadcast of the program of Journalism for Everyone on 14 April 2013. He also stated that the link with Lázaro Báez began with organizing the accounts and transactions of Austral Construcciones S.A. If we add to this the direct involvement of its president, and lastly, the return to his accounts of the millions obtained with the liquidation of the bonds of Helvetic Services Group, there can be no reasonable doubt about the source of at least part of the funds brought into SGI between the end of 2010 and the beginning of 2011.

These items of evidence also confirm the nature of the criminal maneuvers that could constitute the source of the money, as well as the possible payments for rigging of public works contracting, or tax evasion or "creative accounting" recently alluded to,[41] all under investigation by the special court.

Let us now return to the Air France trip of 5-12 May 2012, which provides an interesting piece of information. The airline informed us that the code number for the BUE-PAR-BUS-PAR-BUE tickets indicates as final destination the city of Beijing, China. Probably this news of the visit to China by the Báez brothers and the president of Austral Construcciones is connected with the reports of a partnership of the entrepreneur Lázaro Báez with a view to a bid under way for the construction of a large dam on the Santa Cruz river. With an explicit stop this time in Geneva, Switzerland, China ends up being the most distant point of the trip taken via Air France in September 2012 by Martín Báez, Julio Enrique Mendoza, and Daniel Rodolfo Pérez Gadín.[42]

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

---

[40] Newspaper *La Nación*, print edition of 2 June 2013, item entitled: "The business activities of power. The 'black fleet' of Lázaro Báez is estimated at more than $2,000,000. The entrepreneur has five top-of-the-line automobiles imported between 2006 and 2012."

[41] See item in *La Nación* for 28 June 2013 headed "Business activities and power: Lázaro Báez accused of tax evasion in a proceeding paralleling that of money-laundering; targets Austral accounts." The indictment in question is being proceeding before the Court of Criminal Economic Affairs, under Judge Ezequiel Berón de Astrada.

[42] The tickets, including the ticket for Pérez Gadín, were paid by the Escalatur Agency in Río Gallegos.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |

As can be seen in this excerpt from Appendix I, the trip by Báez, Pérez Gadín, and Mendoza to Switzerland and China coincides with the start of numerous trips by the parties to Europe, beginning with the return of Néstor Marcelo Ramos to the European continent. These are the trips that preceded the return of Federico Elaskar from his exile on 21 October 2012, an event that in view of the records that we are studying caused a one-month halt in the flights. The lack of movement continues practically until the organization and execution, pursuant to a decision made by some executive, of the laundering of funds through the transfers and liquidations of securities that continued until 8 April 2013.

The trips to France by this armada of travelers and front-men ended with the return of Rossi to France during the hectic days of mid-January and end of February 2013, when they all seem to have left to get the securities and cash for the final bond liquidations. During this period Lázaro Báez himself had to fly to Germany with his sons,[43] perhaps as a last recourse to execute the final transactions for some 30 million pesos,[44] when only six days remained for the first edition of the television program Journalism for Everyone.

After the few entries and exits from Great Britain, dominated by the Europeanized Javier Martín Vanella, member in the United Kingdom of a large number of companies together with Ramos, this study of travel by destination leads us to Italy. Almost absolute take-over of AZ-680 and A2-681, usually used by Néstor Marcelo Ramos, reveals the reason common to all these trips, which include stop-overs n Switzerland, for which we have provided irrefutable proof. After the eight records in the name of Ramos in 2010, Jorge Chueco began the trips to Italy, starting on 21 May 2011 and returning on 3 June 2011. This took place a few days before his appearance as recipient–through the straw company SER NORTE S.A.—of half of Elaskar's stock shares in SGI. Chueco is believed to have returned to Italy, and very probably in both cases to Switzerland as well,[45] in September 2012 and in May 2013. By then the repatriation of funds channeled through SGI during the time of Elaskar had been completed, and the public scandal surrounding these criminal maneuvers had occurred. It is very probable that Chueco took advantage of this subsequent trip to agree with Marcelo Ramos and his partners in Helvetic Services Group SA. on common strategies for dealing with the investigations under way in Argentina.

---

[43] Lufthansa, in a memo dated 6 June 2013, and on 10 June 2013 the travel agency Tije Travel, both reported by the tickets for Lázaro Antonio Báez, his children Martín, Leandro, and Melina, and several individuals (about whom we have no pertinent information) by the names of Marcelo Mariano Nieto, Carlos Agustín Laplace, Gustavo Rubio, and Jorge Salgado were paid for with VISA credit card No. 49376301096526060 ARD 60,593), VISA card No. 4937638001310272 (ARD 31,328), and AMEX card No. 376457783901000 (ARD 31,927), against invoice issued I the name of Patricio Palmero S.A., CUIT [Taxpayer ID] No. 30-531489086, client number 23726, with domicile at Ruta Panamericana Kilómetro 3 (1615), Grand Bourg, Province of Buenos Aires.

[44] Check No. 9 for $29,918,618.40, ultimately issued by Financial Net against its account with Banco Marco , for payment on 8 April 2013.

[45] At least in the second trip, in May 2013, the Switzerland stop-over  is completely proven by the expenditures on his AMEX credit card. See table in this report.

With thirty-five records, Panama occupies in this system of trips and migratory records a role similar to that noted by Federico Elaskar in his public complaint, another aspect of which here again has been confirmed. In addition to the confirmation achieved thanks to access to the corporate documentation of Helvetic Services Group and the discovery that the bulk of its capital is reports as consisting of corporate investments in Panama,[46] the story of the hundreds of companies established in that jurisdiction and managed from the office in Switzerland is confirmed by the data analyzed here. In 2010 Panama was a destination known in the history of SGI before the arrival of Lázaro Báez, as was also stated by Federico Elaskar in his revelations to the journalists. During this time we see five trips in 2010 by Fabián Virgilio Rossi, a monopoly that was to continue in the following year. However, the first person to travel in 2011, once he assumed his position as auditor of SGI, was Eduardo Guillermo Castro, between 23 and 31 July, immediately after the dismissal of Elaskar from the financial position.

After completion of the crime that we are investigating, after the final dismissal of their former boss in November 2011, Rossi and Gustavo César Fernández returned to Panama eight more times, twice in November and December 2012, when the parties involved appeared to be collecting money from the four directions of the earth. Martín Antonio Báez himself traveled to Panama on 5 August 2012 and returned via Paraguay three days later, certainly after completion of his work as evasive shareholder. This reference indicates that Martín Antonio Báez was the only member of the group who made trips to Paraguay, where he remained for a large part of August 2012. The only travel recorded in Peru was done by Ramos, in connection with the companies that we found to be connected with him in that country. Our protagonists also occasionally went to the Dominican Republic, limited to one trip there, at the end of June 2012, by Fabián Vigilio Rossi, Gustavo César Fernández, and Daniel Rodolfo Pérez Gadín.

**Uruguay, with one hundred fifty records for seventy-four trips, more than dominates the locations where the business dealings of the group are concentrated, and seems to be the place where they spent most of their time**. This is another of the convincing supports for the public complaint by Federico Elaskar, where our neighbor country plays a role analogous to the proportion of trips by the persons involved . There is no doubt that here is where most of their funds and resources are located, not so much with respect to corporate networks but especially with respect to funds and securities. It must be kept in mind that the story told by Federico Elaskar concerning the transfer and inflow of funds from or to that country, always involving people who have confessed that they engaged in such tasks, accords completely with the constant coming and going of the parties concerned, via air, over bridges, or across the river. We emphasis once again that Lázaro Báez supposedly admitted to the Federal Administration of Public Income (AFI) the existence of this inflow of money from Uruguay, in bags or in bulk, outside the law.

In light of all these new elements, we believe that these illegal movements have been proven. **At least in part, these funds may have been used to launder more than ARD 208,000,000 deposited in the accounts of Austral Construcciones S.A.** Thanks to this ingenious resource, and still within the hypothesis that must be looked at in greater depth by the Federal Court, the parties concerned are believed to have succeeded in repatriating half of the EUR 50,000,000 in Argentine debt instruments, while the other hand is believed to have laundered by using for the

---

[46] See footnote number 16.

purchase of these securities funds brought into the country in a clandestine manner, or the unreported funds existing in Argentina.

**In any case, it is an objective fact that at least one-half of the funds that Lázaro Báez and his partners removed from Argentina with the participation of Federico Elaskar returned and were laundered via transfers of securities from Switzerland and their subsequent liquidation and deposit of the resulting sums in accounts of Lázaro Báez or, what is the same thing, the accounts of Austral Construcciones S.A.**

By reason of the foregoing,

I PRAY THIS HONORABLE COURT TO:

1. Deem the within pleadings to have been filed in relation to the evidence produced and incorporate into the proceeding the annexed reports and tables, of all of which we have to submit official copies to the office of the Public Prosecutor in Federal Criminal and Corrections Court No. 9, hearing indictment 300000000017/2013;

2. Order that investigation testimony be taken from Verena Úrsula Fontana, Claudio Giovanni Fontana, and Martín Antonio Báez concerning their participation in the extortion under investigation;

3. Order sequestration of the nine checks issued by Financial Net in favor of Helvetic Services Group S.A. against its accounts with HSBC and Macro Bank, all deposited in the accounts of Austral Construcciones S.A. with Banco Nación;

4. Order Banco Nación to furnish all data for the accounts in which the said checks were deposited, and a summary of their movements from 01 November 2012 to date;

5. Identify the destination and application of the ARD 208,840,276.65 liquidated, and order a preventive attachment of said sum of the bank and stock accounts of Austral Construcciones S.A.;

6. Order precautionary attachment of the securities transferred by the parties involved from Switzerland, or order attachment of the same nominal amount from the global accounts which they may have been deposited.

Investigation Office No. 10, 19 June 2013.



Juris Services International
Translation Studio
23 Normandy Terrace
Bronxville, NY 10708
Tel: 212 759-5400 Fax: 212 401-8125

CERTIFICATE OF ACCURACY

State of New York            )
Village of Bronxville    : ss.:
County of Westchester     )

This is to certify that the attached translation from SPANISH into ENGLISH of the
document entitled/described below is a true and accurate rendition of the original Spanish
document:

Ministerio Público Fiscal de la Nación.

ALEGA SOBRE LA PRUEBA PRODUCIDA. LOS DINEROS INTRODUCIDOS POR LAZARO BÁEZ EN
...............................................................................................
...............................................................................................
6. Se decrete el embargo preventivo de los títulos transferidos por los imputados

desde Suiza, o bien se decrete el embargo, por el mismo monto nominal, sobre las

cuentas globales en los que pudieran hallarse depositados.

Fiscalía de Instrucción número 10. 19 de junio de 2013.

John E. Considine
President

Date: 2d July 2013