# EXHIBIT A

# EXHIBIT A


 (/)

# The Law Firm That Works with Oligarchs, Money Launderers, and Dictators

December 3, 2014



*Illustrations by Ole Tillmann*

One purpose of a so-called shell company is that the money put in it can't be traced to its owner. Say, for example, you're a dictator who wants to finance terrorism, take a bribe, or pilfer your nation's treasury. A shell company is a bogus entity that allows you to hold and move cash under a corporate name without international law enforcement or tax authorities knowing it's yours. Once the money is disguised as the assets of this enterprise—which would typically be set up by a

trusted lawyer or crony in an offshore secrecy haven to further obscure ownership—you can spend it or use it for new nefarious purposes. This is the very definition of money laundering—taking dirty money and making it clean—and shell companies make it possible. They're "getaway vehicles," says former US Customs investigator Keith Prager, "for bank robbers."

Sometimes, however, international investigators are able to follow the money. Take the case of Rami Makhlouf, the richest and most powerful businessman in Syria. Makhlouf is widely believed to be the "bagman"—a person who collects and manages ill-gotten loot—for President Bashar al Assad, who during the past three years has helped cause the deaths of more than 200,000 of his citizens in the country's civil war.

Besides Assad, there are few people more hated in Syria than Makhlouf. He's the president's cousin and the brother of the chief of Syrian intelligence. Using these connections, Makhlouf built a business network that spanned from telecommunications to energy to banking, and by the time he reached 40 he had accumulated a fortune estimated to be in the billions. When the uprising against the regime began in early 2011, protesters torched a branch of his mobile-phone company and chanted, "Makhlouf is a thief!"

In 2006 the British magazine the *New Statesmen* said "no foreign company can do business in Syria without Makhlouf's approval and involvement," and a classified 2008 cable from the American embassy in Damascus released by WikiLeaks described him as the "poster boy of corruption in Syria." In that same year, the US Treasury Department banned US companies from doing business with Makhlouf, saying that he'd "amassed his commercial empire by exploiting his relationships with Syrian regime members" and "used Syrian intelligence officials to intimidate his business rivals."

When the Syrian civil war kicked off in 2011 and state security forces began gunning down Assad's opponents, the US and the European Union put Makhlouf on a list of regime cronies whose international assets should be traced and seized, because, as the Treasury Department put it, he'd grown rich by bribing and "aiding the public corruption of Syrian regime officials."

If Makhlouf was a bank robber, his getaway car was a company called Drex Technologies SA. In July 2012, the Treasury Department identified Drex—a dummy entity with a British Virgin Islands address—as the corporate vehicle Makhlouf secretly controlled and used "to facilitate and manage his international financial holdings." In other words, say Makhlouf had skimmed a few million dollars

off the top of a secret business deal with a crooked Syrian official. He wouldn't put it into a bank account that he could be linked to; instead, he'd funnel it through Drex so the money couldn't be connected to him.

In late October, I obtained several documents about Drex from the British Virgin Islands business-registration office. The records reveal very little—Makhlouf's name, for example, is nowhere on them. It was only because the Syrian civil war had prompted international investigations to try to track down and freeze the assets of Makhlouf and other Assad regime bandits that the US Treasury discovered that he controlled the company and was its owner, officer, and shareholder. But by the time the Treasury Department did it was too late, as Drex had by then disappeared from the British Virgin Islands' corporate registry. In other words, Drex Technologies SA was a vehicle that hid Makhlouf's shadowy financial activities, and before that was discovered Makhlouf had had plenty of time to move its operations and assets to another offshore jurisdiction.

> **Across the globe, there are vast numbers of competing firms, and many of them register shells that are every bit as shady as Drex.**

Yet who makes these fictitious entities possible? To conduct business, shell companies like Drex need a registered agent, sometimes an attorney, who files the required incorporation papers and whose office usually serves as the shell's address. This process creates a layer between the shell and its owner, especially if the dummy company is filed in a secrecy haven where ownership information is guarded behind an impenetrable wall of laws and regulations. In Makhlouf's case—and, I discovered, in the case of various other crooked businessmen and international gangsters—the organization that helped incorporate his shell company and shield it from international scrutiny was a law firm called Mossack Fonseca, which had served as Drex's registered agent from July 4, 2000, to late 2011.

Founded in Panama in 1977 by German-born Jurgen Mossack and a Panamanian man named Ramón Fonseca, a vice president of the country's current ruling party, it later added a third director, Swiss lawyer Christoph Zollinger. Since the 70s the law firm has expanded operations and now works with affiliated offices in 44 countries, including the Bahamas, Cyprus, Hong Kong, Switzerland, Brazil, Jersey, Luxembourg, the British Virgin Islands, and—perhaps most troubling—the US, specifically the states of Wyoming, Florida, and Nevada.

Mossack Fonseca, of course, is not alone in setting up shell companies used by the world's crooks and tax evaders. Across the globe, there are vast numbers of competing firms, and many of them register shells that are every bit as shady as Drex. Proof of this includes the case of Viktor Bout, who, in the 1990s, peddled arms to the Taliban through a Delaware-registered shell. More recently, in 2010, a man named Khalid Ouazzani pleaded guilty to using a Kansas City, Missouri, firm called Truman Used Auto Parts to move money for Al Qaeda.

Scattered news accounts and international investigations have pointed to Mossack Fonseca as one of the widest-reaching creators of shell companies in the world, but it has, until now, used an array of legal and accounting tricks that have allowed it and its clients to mostly fly under the radar.

(The company disputes this claim and asserted in an email that "there is no court or government record that has ever identified Mossack Fonseca as the creator of 'shell' companies. Anything tying our group to 'criminal activity' is unfounded, inasmuch as we have not actually been notified of the existence of any legal proceeding... thus far.")

But a yearlong investigation reveals that Mossack Fonseca—which the *Economist* has described as a remarkably "tight-lipped" industry leader in offshore finance—has served as the registered agent for front companies tied to an array of notorious gangsters and thieves that, in addition to Makhlouf, includes associates of Muammar Gaddafi and Robert Mugabe, as well as an Israeli billionaire who has plundered one of Africa's poorest countries, and a business oligarch named Lázaro Báez, who, according to US court records and reports by a federal prosecutor in Argentina, allegedly laundered tens of millions of dollars through a network of shell firms, some which Mossack Fonseca had helped register in Las Vegas.

Documents and interviews I've conducted also show that Mossack Fonseca is happy to help clients set up so-called shelf companies—which are the vintage wines of the money-laundering business, hated by law enforcement and beloved by crooks because they are "aged" for years before being sold, so that they appear to be established corporations with solid track records—including in Las Vegas. One international asset manager who talked to Mossack Fonseca about doing business with them told me that the firm offered to sell a 50-year-old shelf company for $100,000.

If shell companies are getaway cars for bank robbers, then Mossack Fonseca may be the world's shadiest car dealership.

**RECOMMENDED**

A Woman in Japan Was Arrested for Distributing a 3-D Mold of Her Vagina (/read/a-woman-in-japan-was-arrested-for-distributing-a-3d-mold-of-her-vagina-123)

I Was an Insider Trader, and You Can Be One Too (/read/everybodys-doing-it-0000518-v21n12)

More Needs to Be Done to Help Male Rape Survivors (/read/male-rape-sexual-abuse-uk-495)

British Men Need to Stop Resolving Their Problems with Violence (/read/vendettas-fights-and-growing-up-292)



Last March, I flew to Panama City, home to Mossack Fonseca's headquarters. Victor, a local journalist, drove me around town, past the lush golf courses and mansions in the old US-run Canal Zone, by dingy apartment buildings in the shantytown of El Chorrillo, and through the skyscraper-lined central business district. At the time of my visit Panama was preparing for national elections, and campaign posters plastered every telephone pole and whitewashed wall. Victor offered a running commentary as we drove. "That guy's an asshole," he said, pointing to a billboard for a candidate for the national assembly who, he claimed, was linked to the local drug trade. "Well, they're all assholes. But he's a *real* asshole."

Panama has been run by assholes for more than a century. In 1903, the administration of Theodore Roosevelt created the country after bullying Colombia to hand over what was then the province of Panama. Roosevelt acted at the behest of various banking groups, among them J. P. Morgan & Co., which was appointed as the country's official "fiscal agent," in charge of managing $10 million in aid that the US rushed down to the new nation.

American banks helped turn Panama into a financial center, and the country emerged as a tax and money-laundering haven in the 1970s after the government passed some of the world's strictest financial-secrecy rules. That likely encouraged Mossack Fonseca to establish itself here in 1977. The financial-secrecy rules didn't just promise foreign investors confidentiality—they made it a crime for banks to disclose any information about clients unless they were ordered to by a court in a case that involved terrorism, drug trafficking, or another serious offense (tax evasion was specifically excluded from that category). These laws attracted a long line of dirtbags and dictators who used Panama to hide their stolen loot, including Ferdinand Marcos, "Baby Doc" Duvalier, and Augusto Pinochet.

When Manuel Noriega, commander of the Panama Defense Forces, took power in 1983, he essentially nationalized the money-laundering business by partnering with the Medellín drug cartel and giving it free rein to operate in the country. Noriega reliably supported American foreign policy in the region—and for years the CIA had him on its payroll—but the US lost patience when he opposed American efforts to topple the leftist Sandinista government in neighboring Nicaragua. That helped lead to the 1989 invasion of Panama that ousted Noriega and returned to power the old banking elites, heirs of the J.P. Morgan legacy.

The new government of President Guillermo Endara, a corporate lawyer who was sworn in on an American military base a few hours after the invasion began on December 20, 1989, offered a kinder, gentler face than Noriega's regime. But since then he and his democratically elected successors have done little to address the country's most obvious problems: corruption and poverty. A recent US government report said that Panama is "plagued" by fraud and international tax evasion, all of which are "major sources of illicit funds."

## "You can go to any law firm in the city, from the smallest to the biggest, and open up a shell company with no questions asked."

Today, Panama's financial laws remain extraordinarily lax. Foreign firms can bring unlimited amounts of money into the country without paying taxes, and an International Monetary Fund report earlier this year said that of 40 recommended steps countries should take to combat money laundering and terrorism financing, Panama had fully implemented only one. In September, the *New York Times* reported that cronies of Russian president Vladimir Putin had funneled money offshore through shell ventures in Panama. "When it comes to money laundering, we offer full service, clean, press, and dry," said Miguel Antonio Bernal, a prominent local lawyer and political analyst. "You can go to any law firm in the city, from the smallest to the biggest, and open up a shell company with no questions asked."

In Panama City I was comfortably shacked up in a mammoth 16th-floor studio suite at the Waldorf Astoria hotel, a glittering tower with a panoramic view of Panama Bay. I'd timed my arrival to coincide with a two-day conference at the hotel of about 70 international financial consultants to the über-rich—high-net-worth individuals, in financial-industry parlance—and I'd discovered that one of the featured speakers was Ramses Owens, a lawyer and financial expert who had worked for Mossack Fonseca.

On the second morning after I arrived, I awoke and lifted my head from one of the fluffy feather pillows on my king-size bed, climbed out from under the 300-thread-count sheets, dressed, and took the elevator down to the conference locale: the hotel's Diamond Ballroom.

Although the affair was private, I was able to snoop on the proceedings and get a list of participants and copies of talks and presentations. Seated at tables topped with pitchers of ice water and flower-filled vases, the attendees were overwhelmingly middle-aged men with graying hair and thickening waistlines, dressed in dark wool business suits that would have induced immediate heat stroke on the sweltering streets of Panama City but were just right in the Diamond Ballroom, which was chilled to about 65 degrees.

There were corporate tax attorneys, accountants, bankers, and trust administrators, and they faced a small stage with a podium for speakers and a screen to show PowerPoint presentations. About half the attendees were Panamanians; a quarter had flown in from the United States, Europe, and South America; and another quarter had come from traditional offshore havens like the Turks and Caicos Islands, the Bahamas, St. Lucia, and Belize. These are "really bad people," Jack Blum, a former US Senate investigator and Washington lawyer specializing in money laundering, had told me before my trip. "And they want to learn how to become even worse people."

"I see you're playing the Lone Ranger," ruddy-faced Edward Brendan Lynch, a Bahamas-based financial adviser, said to me during a break in the proceedings. I sat at the bar spying on attendees, and he waited for a Scotch on the rocks. "Where are you from?"

When I told him I hailed from Washington, DC, Lynch, who looked like Thurston Howell III from *Gilligan's Island*, said he'd visited the city many years ago. "Saw the cherry blossoms," he reminisced. "Lunched at the Jockey Club. Lovely place."

> **Americans are believed to hold more than $1 trillion secreted in offshore havens, with annual losses to the IRS alone coming to some $100 billion.**

Back in the Diamond Ballroom, Ramses Owens took to the podium. Immaculately dressed and groomed with hair that was perfectly trimmed and parted, he embodied the banality of modern financial evil. Owens, who was billed in the conference program as a master of "tax planning," joked with the audience that he preferred to describe his work for clients as "asset optimization."

When he worked at Mossack Fonseca, Owens drew on his expertise about the competitive advantages of incorporating companies on the South Pacific island of Niue. In 1996 the firm won exclusive rights to set up shell firms on the island, and within four years, 6,000 shell firms were registered there, some reportedly controlled by Eastern European crime syndicates and international drug cartels, according to international investigations and news accounts. The findings led to the imposition of international sanctions in 2001 that forced the island to shut down its corporate-registration business five years later. Mossack Fonseca turned lemons into lemonade for its clients by moving their accounts out of Niue and into other secrecy havens, including Samoa and, as revealed in court records that Mossack Fonseca was ordered to turn over, Nevada. (There is no proof that the firms they moved were engaged in criminal activity, though the identities of the owners of those companies remain unknown.)

The crackdown on Niue was part of a broader international effort led by the US, Britain, and other Western nations. Originally prompted by concerns about terrorism and organized crime, the initiative has intensified recently due to hemorrhaging budget deficits, which have swelled in no small part because of widespread tax evasion. Americans are believed to hold more than $1 trillion secreted in offshore havens, with annual losses to the IRS alone coming to some $100 billion. In

2010, the US government passed the Foreign Account Tax Compliance Act after hitting Swiss giant UBS with a $780 million fine for helping thousands of American account holders hide their assets (in one case, a UBS banker smuggled a client's diamonds across borders in a toothpaste tube). FATCA, which is being rolled out in stages and whose full implementation has been delayed due to fierce opposition from the financial industry, already requires foreign banks to notify the IRS about accounts held by US taxpayers.

Naturally, FATCA was worrying to those seated in the Diamond Ballroom—among them Marie Fucci, an adviser to American and European clients who righteously denounced the act as a form of financial "apartheid"—but Owens sought to calm their fears. As he clicked through PowerPoint slides with images of bank vaults, piles of hundred-dollar bills, and other financial-porn shots, Owens outlined ways to evade onerous and annoying international regulations. FATCA, he confidently averred, wouldn't bring down the offshore system, and it certainly wouldn't do so in Panama, where lawyers, accountants, and other shell-firm enablers have powerful political allies (like the country's then finance minister, who also spoke at the event). Owens estimated that nine out of every ten business entities registered in the country were foreign-owned and said that Panamanian private foundations—a local creation that in the offshore world is as beloved as traditional favorites like the Swiss bank account—would still be able to hold money anonymously, even when FATCA is fully implemented. Audience members wagged their heads in approval.