UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\*\*\*

NML CAPITAL LTD.,

          Plaintiff,

vs.

THE REPUBLIC OF ARGENTINA,

          Defendant.

Case No. 2:14–cv–492–RFB–VCF

**ORDER**

This matter involves NML Capital, Ltd.'s post-judgment execution proceeding against the Republic of Argentina. Before the court is Intervenor Jorge Lanata's Motion to Unseal (#79).[1] Nonparties Patricia Amunategui and M.F. Corporate Services opposed (#80); and Mr. Lanata replied (#81). For the reasons stated below, Mr. Lanata's motion is granted in part and denied in part.

### BACKGROUND

In 2001, the Republic of Argentina underwent a depression and sovereign-default crisis. The majority of Argentina's bondholders voluntarily restructured their investments and suffered a 70% loss. However, one bondholder, NML Capital Ltd. ("NML"), refused. Beginning in 2003, NML commenced eleven collection actions against Argentina in the Southern District of New York. NML argued that its debt—which totals $1.7 billion—should be repaid in full. The court agreed. *See EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 203 n.1 (2d Cir. 2012) *aff'd Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2251 (2014).

---

[1] Parenthetical citations refer to the court's docket.

1

To date, Argentina has failed to satisfy NML's judgments.[2] This has caused NML to travel the globe in search of property owned by Argentina, which NML may attach to execute its judgments. *See NML Capital, Ltd. v. Republic of Argentina*, No. 03–cv–8845–TPG, 2011, WL 3897828, at *1 (S.D.N.Y. Sept. 2, 2011) (affirmances omitted). This search brought NML to Las Vegas, Nevada. NML suspects that hundreds of Nevada shell corporations were used to launder $65 million in embezzled Argentine pesos.

In addition to suffering a sovereign-default crisis, Argentina has been plagued by allegations of political corruption. In 2013, an investigative journalist named Jorge Lanata reported that Former President Néstor Kirchner and his wife, current President Cristina Fernández de Kirchner, awarded lucrative state-controlled projects to various political insiders. The scandal became known as *La Ruta Del Dinero K* (*i.e.*, "the K Money Trail"). The financial dealings of two Kirchner insiders, Lázaro Báez and Cristobal López, are relevant here. NML suspects that Báez and López used hundreds of Nevada shell corporations to launder state funds, which NML intends to attach because a "thief acquires no title to the property which he steals."[3]

One company—M.F. Corporate Services (a/k/a "MF Nevada")—is at the center of NML's investigation. M.F. Corporate Services has one employee, Patricia Amunategui, and one client, the Panamanian law firm, Mossack & Fonseca. M.F. Corporate Services is Mossack & Fonseca's Nevada-based independent contractor. It uses M.F. Corporate Services in connection with its company-formation practice, which provides clients with the opportunity to form corporate entities in various jurisdictions worldwide to reduce their client's tax and regulatory exposure. In this capacity, Ms. Amunategui assisted

---

[2] *See, e.g.*, *NML Capital, Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 196 (2d Cir. 2011) (recalling Argentina's appalling record of keeping its promises to its creditors).

[3] *Robinson v. Goldfield Merger Mines Co.*, 46 Nev. 291, 206 P. 399, 401 (1922) *aff'd*, 46 Nev. 291, 213 P. 103 (1923); *accord* CÓDIGO PENAL art. 23, 303 (Arg.).

with the formation of hundreds of business entities, including the Nevada shell corporations that were allegedly used by Báez and López.

NML alleges that M.F. Corporate Services is Mossack & Fonseca's alter ego and that Mossack & Fonseca is the operational hub of Argentina's money-laundering scheme. This has caused Ms. Amunategui considerable stress. She has been subjected to a deposition, which remains under seal, and "has attracted substantial media attention, both domestically and abroad." (Amunategui Decl. (#80-2) at ¶ 6). Ms. Amunategui "vehemently" disputes these allegations, but requests anonymity. (*Id.* at ¶ 2).

These events attracted the attention of Mr. Lanata, the journalist who first reported on *La Ruta Del Dinero K*. On December 5, 2014, he asserted the public's common-law right of access to judicial documents and moved to unseal Ms. Amunategui's deposition testimony. (*See* Doc. #67 at 1:17–19; Doc. #79). Ms. Amunategui opposes the motion, in part because she agreed to testify on the condition of confidentiality.

She complains that the litigation "has already subjected MF Nevada's relationship with Mossack & Fonseca to substantial strain [and has] become a dramatic drain on MF Nevada's limited resources, as well as [her] own health and wellbeing." (Amunategui Decl. (#80-2) at ¶ 5). Ms. Amunategui asks the court to keep her deposition under seal in order to stop the "seemingly endless inquiry into MF Nevada's business and its relationship with Mossack Fonseca" about which she "routinely receive[s] telephone calls from both domestic and foreign journalists." (*Id.* at ¶¶ 5–6).

The difficulties Ms. Amunategui face are appreciable. She is not a public figure and not a party to the underlying lawsuit. Nonetheless, she finds herself at the center of dispute involving $1.7 billion, a hedge fund, and a foreign nation's sovereign-default crisis and a political scandal.

## LEGAL STANDARD

"The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1).

There are three types of protective orders in federal practice. The first protects parties from producing information in response to a discovery request. *See, e.g.*, FED. R. CIV. P. 26(b)(2), (c)(1)(A), (C)–(E). The second, called sealing orders, protects a person's privacy interests by preventing the public from accessing court records. *See, e.g.*, FED. R. CIV. P. 26(c)(1)(F)–(H). The third, called umbrella or blanket orders, are negotiated agreements that generally require discovery to be conducted in a certain manner or be kept confidential. *See, e.g.*, FED. R. CIV. P. 26(c)(1)(B).

The court has "broad discretion" to enter any of these orders. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984). But, the decision to enter a sealing order must be balanced against the public's right to access judicial records. *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 424 (9th Cir. 2011). The public's right to access judicial records is "a precious common law right, one that predates the Constitution." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 612 (1978) (Marshall, J., dissenting) (citation omitted). Enforcement of this right does not require a propriety interest in any document. *Id.* at 597. Standing to enforce the right derives from our republican system of limited government: it is rooted "in the citizen's desire to keep a watchful eye on the workings of public agencies," *see id.* at 598, which protects "the integrity and quality" of the administration of justice. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 578 (1980).[4]

---

[4] *See also* JAMES MADISON, THE FEDERALIST NO. 51 ("If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself."). This right only extends to documents filed with the court. "[T]he public has no right to demand access to discovery materials which are solely in the hands of private party litigants." *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 780 (1st Cir. 1988).

Two inquiries must be made when a member of the public moves to unseal court records. First, the court must conduct an analysis under Rule 26(c) to determine if "particularized harm will result from disclosure of information to the public." *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1214 (citing *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995)). This analysis begins with a "strong presumption in favor of access to court records." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). If the documents in controversy involve a non-dispositive motion, then the presumption can be rebutted by showing good cause.[5] *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179–80 (9th Cir. 2006). If, however, the documents in controversy involve a dispositive motion, then the presumption can only be rebutted by showing compelling reasons. *Id.*

Rebutting the presumption requires a "particularized showing." *Foltz*, 331 F.3d at 1138. "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 475 (9th Cir. 1992) (citing *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3rd Cir. 1986)). "To justify a protective order, one of Rule 26(c)(1)'s enumerated harms must be illustrated 'with a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.'" *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012) (citation omitted). Courts also consider whether the disclosing party reasonably relied on a protective order when producing discovery. *Foltz*, 331 F.3d at 1137; *Beckman*, 966 F.2d at 475.

---

[5] The rationale underlying the good-cause standard is that the public has less of a need for access to non-dispositive records because those records are "only tangentially related to the underlying cause of action." *Oliner v. Kontrabecki*, 745 F.3d 1024, 1026 (9th Cir. 2014) (citing *Kamakana*, 447 F.3d at 1179). Here, Ms. Amunategui and M.F. Corporate Services argue that good cause exists to seal the information in controversy because the information is "tangential" to the merits of NML's claim. (Opp'n (#80) at 8:15). This argument is inapposite. If information is only tangentially related to the merits of the action, then the good-cause standard applies. *Kontrabecki*, 745 F.3d at 1026. However, being tangentially related does not, without more, satisfy the Rule 26(c) test. *See id.*

If a particularized showing is not made, then the court records must "be distributed to the public pursuant to its presumptive right of access. Case closed." *Phillips*, 56 F.3d at 1214. If, however, a particularized showing is made, then the public's right of access has been rebutted and the court must engage in a second inquiry: whether "the party seeking disclosure [] present[ed] sufficiently compelling reasons why the sealed discovery document should be released." *Id.*

Here, the court balances public and private interests. *In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (per curiam) (citing *Phillips*, 307 F.3d at 1213). Relevant factors include (1) whether disclosure will violate any privacy interests, (2) whether the information is being sought for a legitimate purpose or for an improper purpose, (3) whether disclosure of the information will cause a party embarrassment, (4) whether confidentiality is being sought over information important to public health and safety, (5) whether the sharing of information among litigants will promote fairness and efficiency, (6) whether a party benefiting from the order of confidentiality is a public entity or official, and (7) whether the case involves issues important to the public. *In re Roman Catholic*, 661 F.3d at 424 n. 5 (citing *Glenmede*, 56 F.3d at 483).

If, after engaging in these two inquiries, the court concludes that disclosure is inappropriate, the court must determine "whether redacting portions of the discovery material will nevertheless allow disclosure." *In re Roman Catholic*, 661 F.3d at 425 (citing *Foltz*, 331 F.3d at 1136–37). The court's final decision is discretionary. *Rhinehart*, 467 U.S. at 36.

## DISCUSSION

Mr. Lanata's dispute with Ms. Amunategui and M.F. Corporate Services presents three questions: (1) whether Ms. Amunategui and M.F. Corporate Services demonstrated that "particularized harm" will result from disclosing her deposition testimony; (2) whether, on balance, the public's interest in disclosure or Ms. Amunategui and M.F. Corporate Services' interest in privacy predominates; and (3) whether

portions of Ms. Amunategui's testimony can be redacted in order to permit disclosure.

## I. Whether "Particularized Harm" Exists

The court begins by considering whether "particularized harm" will result from disclosing Ms. Amunategui's deposition testimony. *Phillips*, 307 F.3d at 1214. She alleges that several types of harm—(*viz.*, harm to her reputation and the loss of privacy, a business relationship, and trade secrets)—will result from different kinds of information being disclosed. (*See generally* Amunategui Decl. (#80-2) at ¶¶ 2–7). This information includes her travel plans, employment history, immigration status, social-security number, salary, employment contract, contact information, and detailed information regarding M.F. Corporate Services' business operations, customer agreements, and corporate structure. (Opp'n #80 at 1).

The court agrees, as the parties assert, that the likelihood of harm is a product of the nature of the information in controversy. In certain circumstances, information is harmful each and every time it is disclosed. A defamatory statement, for example, is equally harmful and actionable the twentieth time it is uttered as the first time it is uttered, *see Flowers v. Carville*, 310 F.3d 1118, 1128 (9th Cir. 2002), because repeated publication may cause one's name, reputation, and integrity additional damage. *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).

In other circumstances, however, information loses its ability to cause harm if it has been previously disclosed. For instance, the attorney-client privilege affords no protection to communications disclosed to a third party. *Matter of Fischel*, 557 F.2d 209, 211 (9th Cir. 1977). Trade secrets and other confidential information similarly lose protection once they enter the public domain. *See Gal-Or v. United States*, 113 Fed. Cl. 540, 554 (2013) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984). These rules exist because the value of this information depends upon secrecy. *Ruckelshaus*, 467 U.S. at 1002; *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

These two poles establish a sliding scale that governs a claim that disclosure will cause particularized harm under Rule 26(c). On the one hand, there is information that is inherently harmful anytime it is released, *see, e.g., Flowers*, 310 F.3d at 1128, and on the other hand, there is information whose release is potentially harmful only if it has never been publically disclosed, *see, e.g., Upjohn Co.*, 449 U.S. at 389. With this standard in mind, the court makes the following five findings.

First, some of the information that concerns Ms. Amunategui is not subject to disclosure as a matter of law. Federal Rule of Civil Procedure 5.2 requires attorneys to redact social-security numbers, taxpayer-identification numbers, birth dates, and financial-account numbers from all court filings. The court orders counsel to comply with Rule 5.2 and redact the applicable information from her deposition transcript.

Second, the court finds that under the circumstances of this case, additional information—(*viz.*, Ms. Amunategui's personal contact information, including her home and personal email addresses, and her future travel plans)—falls under the penumbra of Rule 5.2 because it raises the "privacy and security concerns" Rule 5.2 protects. *See* FED. R. CIV. P. 5.2, Advisory Comm. Note (2007). Redacting this information from the public record will not infringe the quality or integrity of the judicial process, which the public right of access protects, because the information is irrelevant to the merits of NML's action. *See Richmond Newspapers*, 448 U.S. at 578; *see also In re Roman Catholic*, 661 F.3d at 425 (requiring redacting to permit disclosure).[6]

Third, the court finds that disclosing information regarding Ms. Amunategui's immigration status would be inherently harmful. Immigrants are a politically powerless "discrete and insular minority." *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (citing *United States v. Carolene Products Co.*, 304

---

[6] With regard to Ms. Amunategui's future travel plans, the parties are directed to redact only those portions of her deposition testimony that discuss definitive plans that Ms. Amunategui has made to travel in the future, if any. General statements—(*e.g.*, "I plan to visit Panama in July" or "I usually visit in August")—should not be redacted because the plan is not definitive and, therefore, presents no serious privacy or security concern.

U.S. 144, 153, n. 4 (1938)). The Ninth Circuit has held that publically releasing information regarding a person's immigration status risks compromising protected rights. *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1065 (2004).

Disclosing an undocumented person's immigration status exacerbates that person's vulnerability to exploitation. *See id.* (citation omitted) ("The aliens themselves are vulnerable to exploitation because they cannot complain of substandard working conditions without risking deportation."). Even documented workers, new legal residents, and citizens may be harmed by disclosure: "[d]ocumented workers may fear that their immigration status would be changed, or that their status would reveal the immigration problems of their family or friends; similarly, new legal residents or citizens may feel intimidated by the prospect of having their immigration history examined in a public proceeding." *Id.*

Redacting information regarding Ms. Amunategui's immigration status is appropriate. *In re Roman Catholic*, 661 F.3d at 425. It will not substantially infringe on the public's right of access because Ms. Amunategui's immigration status is irrelevant to the merits of NML's action. Additionally, redaction enhances "the integrity and quality" of the judicial process, *see Richmond Newspapers, Inc.*, 448 U.S. at 578, by ensuring that the court's docket does not become a source of intimidation.

Fourth, the court finds that Ms. Amunategui's concerns regarding her general privacy, "personal name[,] and reputation," (Amunategui Decl. (#80-2) at ¶¶ 2, 6, 7), do not support a finding of particularized harm. Ms. Amunategui seeks protection because her name and reputation "have been seriously damaged" by allegations that she is "personally involved in money laundering efforts." (*Id.* at ¶ 6). These concerns evoke defamation; but it is Ms. Amunategui's own testimony that is in controversy and a person cannot defame herself. *See, e.g., Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 718, 57 P.3d 82, 90 (Nev. 2002).

Additionally, Ms. Amunategui's name, profession, and affiliation with Mossack & Fonseca have been public for months, if not years. Ms. Amunategui has advertised herself as "the Vice President of the Nevada office of Mossack & Fonseca, an international law firm specializing in international trusts and corporate services with 44 offices worldwide." (*See* Doc. #59 at Ex. M). Ms. Amunategui's email signature box also identifies her as the "Head of Nevada Office" for Mossack & Fonseca's Nevada branch. (*Id.* at Ex. N). Indeed, her affiliation with Mossack & Fonseca has been a matter of public record in this court since July 10, 2014, when she appeared in this action and moved to quash NML's subpoena. (*See* Mot. to Quash (#14) at 9:1). A protective order cannot undo these disclosures.

Certainly, disclosing Ms. Amunategui's deposition testimony may reveal additional information that may increase public scrutiny. But public scrutiny is insufficient to seal court records. *See Richmond Newspapers*, 448 U.S. at 578. Particularized harm must result. *Foltz*, 331 F.3d at 1138. Ms. Amunategui failed to show particularized harm; her allegations are "stereotyped and conclusory." *Serrano*, 699 F.3d at 901.

Additionally, under the circumstances of this case, sealing may also increase public scrutiny, which Ms. Amunategui hopes to avoid. When information is removed from the public's view, the court risks creating false impressions about the contents of the sealed documents. If, for instance, the court sealed the entirety of Ms. Amunategui's deposition testimony, as she requests, the public may suspect that her testimony contains sensitive or scandalous details regarding the alleged money laundering scheme. This would not provide Ms. Amunategui with the shield that she seeks. Ms. Amunategui "vehemently" disputes "many of the characterizations of [her] business." (Amunategui Decl. (#80-2) at ¶ 2). Sealing her testimony would similarly obstruct her ability to correct the misconceptions she perceives.

Fifth, the court finds that disclosing M.F. Corporate Services' trade secrets and other propriety information—(*viz.*, Ms. Amunategui's salary, employment contract, contact information, and M.F.

Corporate Services' business operations, customer agreements, and corporate structure)—may cause "particularized harm." The information is secret and has not been previously disclosed. Additionally, M.F. Corporate Services' business depends on confidentiality, (*see* Amunategui Decl. (#80-2) at ¶ 4), which is why Ms. Amunategui agreed to testify only after negotiating a stipulated confidentiality agreement. (*Id.*)

These facts satisfy Rule 26(c)'s test. *See, e.g., Beckman*, 966 F.2d at 475 (discussing the reliance interest of the party opposing disclosure); *Kamakana*, 447 F.3d at 1179 (citing *Nixon*, 435 U.S. at 598) (stating that preventing the disclosure of trade secrets may satisfy the compelling-reasons standard).

## II. Whether the Public's Interest in Disclosure of M.F. Corporate Services' Trade Secrets Outweighs the Private Interests in Nondisclosure

Because Ms. Amunategui and M.F. Corporate Services satisfied the Rule 26(c) test with regard to M.F. Corporate Services' trade secrets,[7] the court must engage in a second inquiry: whether "the party seeking disclosure [] present[ed] sufficiently compelling reasons why the sealed discovery document should be released." *Phillips*, 56 F.3d at 1214.

Here, the court balances public and private interests and considers (1) whether the case involves issues important to the public, (2) whether the information is being sought for a legitimate purpose or for an improper purpose, (3) whether disclosure of the information will cause a party embarrassment, (4) whether confidentiality is being sought over information important to public health and safety, (5) whether the sharing of information among litigants will promote fairness and efficiency, (6) whether a party benefiting from the order of confidentiality is a public entity or official, and (7) whether disclosure

---

[7] The court's inquiry here is limited to M.F. Corporate Services' trade secrets and other proprietary information. As discussed above, Rule 5.2 and Ninth Circuit law prohibit the court from releasing information regarding Ms. Amunategui's social security number, personal contact information, future travel plans, and immigration status. Accordingly, that information must be redacted in order to permit disclosure. *In re Roman Catholic*, 661 F.3d at 425.

will violate any privacy interests. *In re Roman Catholic*, 661 F.3d at 424 n. 5 (citing *Glenmede*, 56 F.3d at 483).

These factors militate in favor of disclosure. The court first considers "whether the case involves issues important to the public." *In re Roman Catholic*, 661 F.3d at 424 n. 5. This factor weighs heavily in favor of disclosure because NML's action is significantly important to the public. For years, the Republic of Argentina has refused to satisfy NML's judgments. *See NML Capital, Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 196 (2d Cir. 2011). This has affronted the Constitution, which exists to finalize cases and controversies, *see Peacock v. Thomas*, 516 U.S. 349, 356 (1996), damaged "the global bond market," *see NML Capital*, 652 F.3d at 196, sent Argentina through its second sovereign-default crisis in thirteen years, *see NML Capital Ltd. v. Republic of Argentina*, No. 14–cv–492–RFB–VCF, 2014 WL 3898021, at *1 (D. Nev. Aug. 11, 2014), and cost the people of Argentina an untold amount in lost economic opportunities.

These matters cannot be litigated in secret. Doing so would limit the public's understanding of the court's final decision and, therefore, risk weakening the judicial power, which depends upon public access and trust. *See Richmond Newspapers*, 448 U.S. at 591 (citing *In re Oliver*, 333 U.S. 257, 273, (1948)).

The second factor considers "whether the information is being sought for a legitimate purpose or for an improper purpose." *In re Roman Catholic*, 661 F.3d at 424 n. 5. M.F. Corporate Services and Ms. Amunategui contend that this factor militates in favor of nondisclosure because disclosure will "gratify private spite" and "promote public scandal." (Opp'n (#80) at 9:20–21) (citing *Kamakana*, 447 F.3d at 1179). They assert that Mr. Lanata moved to unseal, not to report on international affairs, which is his job, but to defend against defamation actions that are pending in other jurisdictions. (Opp'n (#80) at 9:12–13).

These arguments are unpersuasive. There is no evidence that Mr. Lanata moved to unseal for the purpose of defending against an unrelated defamation action. Mr. Lanata is an Argentine journalist and has extensively reported on *La Ruta Del Dinero K*. The issues raised by NML's post-judgment execution proceeding are directly relevant to Mr. Lanata's business as a reporter. Gaining access to documents related to those issues—(*i.e.*, whether Argentine officials embezzled and laundered public funds to defraud creditors)—for the purpose of reporting is "legitimate purpose" as a matter of law. *See, e.g., Globe Newspaper Co. v. Superior Court for Norfolk Cnty.*, 457 U.S. 596, 606 (1982).

The third factor considers "whether disclosure of the information will cause a party embarrassment." *In re Roman Catholic*, 661 F.3d at 424 n. 5. This factor also favors disclosure. Neither M.F. Corporate Services nor Ms. Amunategui argued that disclosure of their trade secrets and other propriety information—(*viz.*, Ms. Amunategui's salary, employment contract, contact information, and M.F. Corporate Services' business operations, customer agreements, and corporate structure)—would cause embarrassment. As discussed above, the gravamen of Ms. Amunategui's opposition is that unsealing will increase public scrutiny. This assertion is speculative. As noted above, sealing may equally increase public scrutiny. Additionally, it will obstruct what Ms. Amunategui desires: to correct the public's alleged misconceptions regarding M.F. Corporate Services' business practices. (Amunategui Decl. (#80-2) at ¶ 2).

The fourth factor considers "whether confidentiality is being sought over information important to public health and safety." *In re Roman Catholic*, 661 F.3d at 424 n. 5. This factor strongly militates in favor of disclosure. It requires no citation to authority to recognize that transparent credit markets are integral to public health and safety. Here, the Second Circuit has already stated that the Argentina's refusal to satisfy its obligations has damaged the health global bond market. *See NML Capital*, 652 F.3d at 196.

The public's interest in maintaining a healthy and transparent bond market, therefore, strongly outweighs M.F. Corporate Services and Ms. Amunategui's private interests.

The fifth factor considers "whether the sharing of information among litigants will promote fairness and efficiency." *In re Roman Catholic*, 661 F.3d at 424 n. 5. This factor is not implicated here. Each litigant already has access to Ms. Amunategui's deposition testimony and the trade secrets it allegedly contains.

The sixth factor considers "whether a party benefiting from the order of confidentiality is a public entity or official." *In re Roman Catholic*, 661 F.3d at 424 n. 5. This factor militates in M.F. Corporate Services and Ms. Amunategui's favor. M.F. Corporate Services' business depends on confidentiality and Ms. Amunategui is not a public person. (Amunategui Decl. (#80-2) at ¶¶ 4, 7). Indeed, Ms. Amunategui fears that if her deposition testimony is disclosed M.F. Corporate Services will lose its only client: Mossack & Fonseca.

The final factor considers "whether disclosure will violate any privacy interests." *In re Roman Catholic*, 661 F.3d at 424 n. 5. This factor does not militates in either litigant's favor. On the one hand, M.F. Corporate Services claims a property interest in various trade secrets related to its business practices and relied on a confidentiality agreement before offering testimony on those trade secrets.[8] If these trade secrets are released, M.F. Corporate Services may lose its only client and cease to exist. On the other hand, however, NML has made a substantial showing, *see NML Capital Ltd.*, 2014 WL 3898021, at *5, that M.F. Corporate Services' assurances of confidentiality may have been used to conceal illegal activity.

---

[8] However, the court does not find that Ms. Amunategui's reliance on the confidentiality agreement was reasonable under the circumstances. The confidentiality agreement was negotiated by NML Capital and Ms. Amunategui and expressly provides that the parties must comply with Local Rule 10-5(b), which preserves the public's right of access to judicial records. (*See* Doc. #38 at ¶ 5).

Therefore, the court finds that compelling reasons exist to grant Mr. Lanata's motion and unseal Ms. Amunategui's deposition testimony.

## CONCLUSION

The difficulty Ms. Amunategui and M.F. Corporate Services face are appreciable. Ms. Amunategui operates a small business in Henderson, Nevada. Her business has one employee, one client, and is dependent on strict confidentiality. However, Ms. Amunategui's business practices have placed her in the middle of a dispute involving $1.7 billion, a large hedge fund, and a foreign nation's sovereign-default crises and a presidential scandal.

The court is sensitive to Ms. Amunategui's privacy concerns. It recognizes that disclosing her deposition testimony may cause harm. But, the court is bound by its obligation to the public, which has a strong presumptive right to access judicial records. *Foltz*, 331 F.3d at 1138. This right is "a precious common law right." *Nixon*, 435 U.S. at 612. It protects "the integrity and quality" of the administration of justice by ensuring that the courtroom, "even more than city streets, sidewalks, and parks," remain "a place public place" where "representatives of the press and of the public are not only free to be, but where their presence serves to assure the integrity of what goes on." *Richmond Newspapers*, 448 U.S. at 578, 599–600.

The court cannot adjudicate this matter in secret. The public interests are too significant. They involve the health of the global bond market, the court's constitutional role in finalizing cases and controversies, and credible allegations of fraud involving hundreds of Nevada corporations and a sovereign nation. Under these circumstances, Ms. Amunategui private interests do not outweigh the public's countervailing interests.

ACCORDINGLY, and for good cause shown,

IT IS ORDERED that Jorge Lanata's Motion to Unseal (#79) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that counsel for Mr. Lanata, Mr. Marc J. Randazza, PREPARE a redacted copy of Ms. Amunategui's deposition testimony with the following information redacted: (1) Ms. Amunategui's social-security number and other information protected by Federal Rule of Civil Procedure 5.2; (2) Ms. Amunategui's future travel plans and her personal contact information, including her home and personal email addresses; and (3) information regarding Ms. Amunategui's immigration status.

IT IS FURTHER ORDERED that Mr. Randazza SUBMIT the redacted version of Ms. Amunategui's deposition testimony to Ms. Amunategui's attorney, Mr. Kent P. Woods, by February 25, 2015 for Mr. Wood's approval that all redactions have been made as ordered.

IT IS FURTHER ORDERED that Mr. Randazza and Mr. Woods MEET AND CONFER regarding the redacted version of Ms. Amunategui's deposition testimony and either (1) file the redacted version by March 4, 2015 or (2) file a sealed joint statement detailing the parties' disagreement by March 5, 2015. If the parties are unable to resolve potential disagreements through the meet-and-confer process, the court will hear oral argument on the dispute during the March 9, 2015 hearing.

IT IS SO ORDERED.

DATED this 19th day of February, 2015.

CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE