KIRK B. LENHARD, ESQ., Nevada Bar No. 1437
NIKKI L. BAKER, ESQ., Nevada Bar No. 6562
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV  89106-4614
Telephone:  702.382.2101
Facsimile:  702.382.8135
Email:  klenhard@bhfs.com
Email:  nbaker@bhfs.com

DENNIS H. HRANITZKY, ESQ.
   (admitted *pro hac vice*)
DECHERT LLP
1095 Avenue of the Americas
New York, NY  10036-6797
Telephone:     212.698.3500
Facsimile:     212.698.3599
Email:         dennis.hranitzky@dechert.com

*Attorneys for NML Capital, Ltd.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| NML CAPITAL, LTD.,<br><br>Plaintiff,<br><br>v.<br><br>THE REPUBLIC OF ARGENTINA,<br><br>Defendant. | CASE NO.:  2:14-cv-00492-JAD-VCF<br><br>**NML CAPITAL, LTD.'S MEMORANDUM IN RESPONSE TO NON-PARTY MF CORPORATE SERVICES (NEVADA) LIMITED'S MOTION TO QUASH SUBPOENA AND/OR FOR PROTECTIVE ORDER; AND IN SUPPORT OF NML'S CROSS MOTION TO COMPEL** |

Plaintiff NML Capital, Ltd. ("**NML**"), by and through its attorneys of record Brownstein Hyatt Farber Schreck, LLP and Dechert LLP, hereby responds to the Motion to Quash Subpoena and/or for Protective Order (the "**Motion**") brought by Non-Party M.F. Corporate Services (Nevada) Limited ("**MF Nevada**") and moves to compel MF Nevada to comply fully with the subpoena served on it by NML on or about June 20, 2014 (the "**Subpoena**").

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND & PROCEDURAL HISTORY ........................................ 3

    I.    The Alleged Báez Embezzlement Scheme ................................................ 3

    II.    NML's Previous Efforts To Obtain Discovery  Relating To The Báez Scheme. ....................................................................................................... 5

        A.    NML's August 13, 2013 Subpoena To MF Nevada  And MF Nevada's Document Production. ........................................................ 5

        B.    NML's Subpoena To The Báez Entities And The Court's  Order Granting NML's Motion To Compel. ............................................. 5

        C.    NML's Subpoena to Patricia Amunategui ................................. 7

        D.    The Subpoena At Issue ............................................................... 10

ARGUMENT ............................................................................................................. 11

    I.    NML Is Entitled To Discover Information That May Lead To Assets Embezzled Through The Báez  Entities ..................................................... 11

        A.    The Legal Standard Under Rule 69(a)(2) ................................... 11

        B.    Post-Judgment Discovery Is Warranted As Long As The Judgment Creditor Can Make A Threshold Showing That Connects The Third Party With Discoverable Information ......................................... 12

        C.    The Discovery Sought Through The Subpoena Is Directly Relevant To NML's Judgment Enforcement Efforts. ................................. 12

        D.    Complying With The Subpoena Will Not Unduly  Burden Mossack Fonseca Or MF Nevada. .......................................................... 13

        E.    The Unsupported Assertion That The Mossack Subpoena  Seeks "Personal And Confidential Material" Is Unavailing ............................... 14

    II.    The Subpoena Is Enforceable Against Mossack Fonseca ....................... 15

        A.    MF Nevada Is The Alter Ego of Mossack Fonseca ................... 16

        B.    MF Nevada Is A Mere Department of Mossack Fonseca ......................... 17

        C.    The Court Should Conduct An Evidentiary Hearing If It Finds Ms. Amunategui's Testimony to be Inconclusive. ................................ 19

    III.    NML Was Not Required To Seek Discovery Through  The Inter-American Convention On Letters Rogatory ......................................................... 19

    IV.    This Court Can Compel Mossack Fonseca To Designate A Person Within the Court's Jurisdiction To Appear For Deposition. ............................. 20

CONCLUSION ........................................................................................................... 22

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

## TABLE OF AUTHORITIES

**CASES**

*1ˢᵗ Tech., LLC v. Rational Enter. LTDA*,
   2007 WL 5596692 (D. Nev. Nov. 13, 2007) ........................................................................ 12

*Aerotel, Ltd. v. Sprint Corp.*,
   100 F. Supp. 2d 189 (S.D.N.Y. 2000) ........................................................................ 15, 18

*Ado Fin., AG v. McDonnell Douglas Corp.*,
   931 F. Supp. 711 (C.D. Cal. 1996) ........................................................................ 16, 17

*Alamo Rent-A-Car, Inc. v. Mendenhall*,
   937 P.2d 69 (Nev. 1997) ........................................................................ 13

*Convolve, Inc. v. Dell, Inc.*,
   2011 WL 1766486 (N.D. Cal. May 9, 2011) ........................................................................ 14

*Collins v. NDOC*,
   2014 WL 4656232 (D. Nev. Sept. 17, 2014) ........................................................................ 15

*Diamond State Ins. Co. v. Rebel Oil Co.*,
   157 F.R.D. 691 (D.Nev. 1994) ........................................................................ 15

*Doe, I v. Unocal Corp.*,
   248 F.3d 915 (9th Cir. 2001) ........................................................................ 16

*Eitzen Bulk A/S v. Bank of India*,
   827 F. Supp. 234 (S.D.N.Y. 2011) ........................................................................ 11

*EM Ltd. v. Republic of Argentina*,
   720 F. Supp. 2d 273 (S.D.N.Y. 2010), *vacated on other grounds*, 652 F.3d 172 (2d
   Cir. 2011) ........................................................................ 1, 11

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   131 S.Ct. 2846 (2011) ........................................................................ 16

*Great Am. Ins. Co. of N.Y. v. Vegas Const. Co., Inc.*,
   251 F.R.D. 534 (D. Nev. 2008) ........................................................................ 20

*Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*,
   328 F.3d 1122 (9th Cir. 2003) ........................................................................ 15, 17

*Illinois Bell Tel. Co., Inc. v. Global NAPs Illinois, Inc.*,
   551 F.3d 587 (7th Cir. 2008) ........................................................................ 6

*Henry v. Rizzolo*,
   2012 WL 13725 (D. Nev. Jan. 4, 2012) ........................................................................ 12

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

*Kreimerman v. Casa Veerkamp, S.A. de C.V.*,
   22 F.3d 634 (5th Cir. 1994)......................................................................................... 20

*Mayatextil, S.A. v. Liztex U.S.A., Inc.*,
   994 WL 198696 (S.D.N.Y. May 19, 1994)................................................................. 20

*Medeco Sec. Locks, Inc. v. Swiderek*
   680 F.2d 37 (7th Cir. 1981)........................................................................................ 19

*Mount Hope Church v. Bash Back!*,
   705 F.3d 418 (9th Cir. 2012)...................................................................................... 14

*NML Capital Ltd. v. Republic of Argentina*,
   2014 WL 3898021 (D. Nev. Aug. 11, 2014) ................................................... passim

*Platinum Air Charters, LLC v. Aviation Ventures, Inc.*,
   2007 WL 121674 (D. Nev. Jan. 10, 2007).................................................................. 13

*Premium Service Corp. v. Sperry & Hutchinson Co.*,
   511 F.2d 225 (9th Cir. 1975)...................................................................................... 14

*PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*,
   598 F.3d 802 (11th Cir. 2010).................................................................................... 19

*Republic of Argentina v. NML Capital, Ltd.*,
   134 S. Ct. 2250 (2014) ............................................................................................... 11

*Robinson v. Goldfield Merger Mines Co.*,
   46 Nev. 291, 206 P. 399 (1922) *aff'd*, 46 Nev. 291, 213 P. 103 (1923) ................ 13

*Rock Bay, LLC v. Dist. Ct.*,
   129 Nev. Adv. Op. 21, 298 P.3d 441 (2013) ......................................................... 12

*State v. Cantsee*,
   130 Nev. Adv. Op. 24, 321 P.3d 888 (2014). ......................................................... 12

*VFS Fin., Inc. v. Specialty Fin. Corp.*,
   2013 WL 1413024 (D. Nev. Apr. 4, 2013) ............................................................... 11

*Wells Fargo & Co. v. Wells Fargo Exp. Co.*,
   556 F.2d 406 (9th Cir. 1977)...................................................................................... 15

*Wultz v. Bank of China Ltd.*
   298 F.R.D. 91 (S.D.N.Y. 2014) ................................................................................ 21

STATUTES

Argentine Criminal Code ...................................................................................................... 13

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iii

OTHER AUTHORITIES

4A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure:
    Civil 3d § 1069.................................................................................................. 16, 19

8A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure:
    Civil 3d § 3014.................................................................................................. 11, 12

Federal Rule of Civil Procedure 30.................................................................... 1, 20, 21

Federal Rule of Civil Procedure 69.................................................................... 3, 11, 12

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PRELIMINARY STATEMENT**

NML currently holds judgments against Argentina totaling more than $1.7 billion.  To avoid its payment obligations, Argentina has engaged in elaborate schemes to shield and hide its assets from creditors.  *EM Ltd. v. Republic of Argentina*, 720 F. Supp. 2d 273, 279-80 (S.D.N.Y. 2010), *vacated on other grounds*, 652 F.3d 172 (2d Cir. 2011).  As a result of Argentina's misconduct, NML and other similarly-situated creditors have been forced to resort to unconventional means to identify, trace, and seize Argentina's assets wherever they may be located around the world.  *Id.*

Since August of 2013, NML has been actively seeking to trace funds that appear to have been misappropriated and embezzled by Lázaro Báez—an Argentine national tied to the current President of Argentina and her late husband and predecessor.  As the Court already knows, Báez is under investigation by Argentine prosecutors for embezzling over $65 million of funds misappropriated from the state through a web of shell corporations.  Among these shell corporations are 123 Nevada entities linked to Báez by Argentine prosecutors (the "**Báez Entities**"), which NML subpoenaed in August 2013.

Following extensive motion practice, the Court compelled the Báez Entities to provide the information sought by NML through those subpoenas.  *NML Capital Ltd. v. Republic of Argentina*, 2014 WL 3898021, at \*\*12-13 (D.  Nev. Aug. 11, 2014).  In the same decision, the Court found that Mossack Fonseca & Co. ("**Mossack Fonseca**")—a Panamanian law firm notorious for its alleged role in assisting kleptocrats and other scofflaws in channeling funds to international tax havens—played an integral role in the establishment of the Báez Entities.  *Id.* at \*5.

Motivated by the Báez Entities' intransigence in complying with NML's subpoenas, on or about June 20, 2014, NML served a subpoena on Mossack Fonseca seeking, among other things, information about asset flows in connection with Báez's embezzlement scheme (the "**Mossack Subpoena**").  More specifically, in addition to seeking to depose a Rule 30(b)(6) witness, the Mossack Subpoena seeks information relating to the formation and operation of the Báez Entities,

1

the transfer of funds into or out of those entities, and the true nature of the relationship between Mossack Fonseca and MF Nevada.   Because Mossack Fonseca maintains no officially acknowledged branch office in Nevada, NML served MF Nevada as Mossack Fonseca's agent. As was apparent to NML at the time it served the Mossack Subpoena—and as subsequently confirmed by the deposition testimony of MF Nevada's only employee—MF Nevada is an alter ego of Mossack Fonseca.   Consequently, MF Nevada's jurisdictional contacts with Nevada are attributable to Mossack Fonseca, and NML's service of the Mossack Subpoena on MF Nevada constituted effective service on Mossack Fonseca.

As NML demonstrates below, MF Nevada's alter ego status is readily apparent from the evidence already available to NML.   Mossack Fonseca exercises unilateral control over the conduct of MF Nevada.   Mossack Fonseca is MF Nevada's only client, and MF Nevada cannot perform services for any other client without the express consent of Mossack Fonseca.[1]   MF Nevada's only employee, Patricia Amunategui, takes all of her instructions from Mossack Fonseca personnel in carrying out MF Nevada's business.   Mossack Fonseca prepares almost all of the paperwork filed by MF Nevada with the Nevada Secretary of State.[2]   Mossack Fonseca exercises exclusive control over MF Nevada's finances, as well as MF Nevada's back office operations such as IT and human resources support.[3]   And Ms. Amunategui's employment contract with MF Nevada was counter-signed by Messrs. Mossack and Fonseca.   In short, MF Nevada is the Nevada outpost of Mossack Fonseca.[4]

MF Nevada's motion to quash the Mossack Subpoena ignores all of these facts.   It also ignores the Court's prior determination that information about the movement of funds in

---

[1]  Deposition of Patricia Amunategui, dated September 11, 2014 ("**Amunategui Dep.**") at 138:19-139:22.  (Relevant excerpts of the Amunategui Deposition are attached as Exhibit A).
[2]  *Id*. at 53:5-54:15, 55:22-25, 56:10-12.
[3]  *Id*. at 27:8-16, 28:16-25, 65:8-16, 133:18-134:10.
[4]  In the event that the Court finds Ms. Amunategui's deposition testimony inconclusive on the issue of MF Nevada's alter ego status, NML respectfully requests that the Court conduct an evidentiary hearing at which Ms. Amunategui can be cross-examined under oath.  As NML demonstrates below, at various points during her deposition Ms. Amunategui was extraordinarily evasive and overtly obfuscated the facts regarding MF Nevada's relationship with Mossack Fonseca.  NML believes that rather than crediting the evasive portions of Ms. Amunategui's testimony the Court may benefit from the opportunity to observe her demeanor, and possibly pose its own questions to her, in open court.

2

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

connection with the Báez scheme is the proper subject of discovery under Federal Rule of Civil Procedure 69(a)(2) and Nevada law. Finally, MF Nevada's objections that complying with the Mossack Subpoena would be unduly burdensome and would require it to divulge confidential information are easily addressed. As it has done in the past, NML is willing to cover the reasonable costs of compliance. And NML is willing to agree to extend the confidentiality stipulation and order in effect in the related action, *NML Capital, Ltd. v. Republic of Argentina*, 2:14-cv-00492 (D. Nev. 2014), to any production made in response to the Mossack Subpoena. There is therefore simply no basis for Mossack Fonseca to refuse compliance with the Mossack Subpoena, it should be compelled to do so, and MF Nevada's motion to quash should be denied.

## FACTUAL BACKGROUND & PROCEDURAL HISTORY

### I.   The Alleged Báez Embezzlement Scheme.

Lázaro Báez is an Argentine national who, according to the findings of Argentine prosecutors and journalists, amassed a personal fortune with the help of Argentine President Cristina Fernández de Kirchner, her now-deceased husband, former Argentine President Néstor Kirchner, and others associated with the Kirchners. As the Court has previously found, Báez and the Kirchners "allegedly embezzled millions of pesos from public-infrastructure projects and laundered the proceeds and other embezzled funds through Panama and various international shell corporations." *NML Capital Ltd. v. Republic of Argentina*, 2014 WL 3898021, at *1 (D. Nev. Aug. 11, 2014).[5] Beginning in April 2013, one of Argentina's top journalists, Jorge Lanata, ran a series of televised reports presenting findings that Báez was involved in illegal financial activity and rampant political corruption. Lanata's reports featured videotaped statements by two alleged associates of Báez who testified that they boarded Báez's corporate jets with sacks filled with cash, embezzled the cash out of Argentina, and placed it in dozens of anonymous companies scattered among tax havens around the world, including Panama.[6]

---

[5]  *Accord* Hugo Alconada Mon, "Báez 'Rented' Three Hotels belonging to the Kirchners' for $14.5 Million," LA NACION, December 17, 2013 (a copy of which is attached as Exhibit B); Hugo Alconada Mon, "Báez Secretly Promised Millions in Income to Kirchner," LA NACION, December 15, 2013 (a copy of which is attached as Exhibit C).
[6]  "Jorge Lanata Unearths the Lázaro Báez's Money Trail," LA NACION, April 15, 2013 (a copy of which is attached as Exhibit D).

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

3

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1    Shortly after the first of these reports was televised, Argentine prosecutors launched a

2   series of raids on Báez's operations in Argentina.  The evidence uncovered revealed extensive

3   financial dealings between Báez and the Kirchners—including secret property deals entered into

4   after Néstor Kirchner became President—as well as other "sordid financial affairs."  *NML*

5   *Capital*, 2014 WL 3898021, at *1.[7]  José María Campagnoli, the lead Argentine prosecutor

6   investigating Báez's dealings with the Kirchners, submitted these findings (and others) to an

7   Argentine court in two detailed reports on May 22, 2013 (the "**Campagnoli Dictamen**") and June

8   19, 2013 (the "**Campagnoli Report**").  *Id*.  The Campagnoli Dictamen linked Báez's illicit

9   financial flows to the Báez Entities—which are controlled by a network of shell companies in the

10   Republic of Seychelles.[8]  Campagnoli further found that the Báez Entities were set up by

11   Mossack Fonseca.[9]

12    Operating through a network of offices in tax havens and remote islands, Mossack

13   Fonseca is a Panamanian law firm notorious for allegedly assisting wealthy individuals—many of

14   whom are known criminals—in channeling funds to off-shore accounts without detection.  For

15   example, in 2012, Mossack Fonseca attracted attention when it was found to have orchestrated

16   the illicit financial network through which Muammar Qaddafi laundered hundreds of millions of

17   dollars worth of assets misappropriated from the Libyan state.[10] As The Economist observed in a

18   2012 article:

19    The [Mossack Fonseca] customer need only click on the company desired,
20    perhaps adding some optional extras such as a bank account, an offshore
     credit card, mail-forwarding or letterhead, and then heads to the checkout.
21    Just £349 ($560) buys you a company in the Seychelles, with no local
     taxation, no public disclosure of directors or shareholders and no
22    requirement to file accounts.[11]

23
   ---
   [7]  *Accord* Hugo Alconada Mon, "Báez 'Rented' the Three Hotels belonging to the Kirchners' for $14.5 Million," LA
24   NACION, December 17, 2013 (Exhibit B); Hugo Alconada Mon, "Báez Secretly Promised Millions in Income to
     Kirchner," LA NACION, December 15, 2013 (Exhibit C).
25   [8]  Campagnoli Report, dated June 19, 2013; Bureau for International Narcotics and Law Enforcement Affairs,
     International Narcotics Control Strategy Report, http://www.state.gov/documents/organization/184329.pdf,  at p. 41
     (last visited Nov. 5, 2014) (a copy of which is attached as Exhibit E).
26   [9]  *Id*.
     [10]  "Tracing the Riches of Former Dictator Gaddafi in Panama," http://www.eleconomista.net/component/content/
27   article/139775-rastrean-riquezas-de-gaddafi-en-panama (a copy of which is attached as Exhibit G).
     [11]  Shells and Shelves, THE ECONOMIST, April 7, 2012, http://www.economist.com/node/21552196 (last visited Nov.
28   5, 2014 (a copy of which is attached as Exhibit F).

MF Nevada's only employee testified at her deposition that Mossack Fonseca uses MF Nevada to assist in this process by creating "on the shelf" LLCs that can be sold to a client upon request, with little to no due diligence.[12]  When clients come to Mossack Fonseca seeking a Nevada LLC, Mossack Fonseca sells one of these "on the shelf" LLCs that MF Nevada has already incorporated and is simply waiting to be sold.[13]

## II.   NML's Previous Efforts To Obtain Discovery Relating To The Báez Scheme.

In an attempt to trace (and eventually seize) the funds Campagnoli found to have been embezzled by Báez, beginning mid-2013, NML has actively sought information about the flow of funds through the Báez Entities and the formation and operation of those Entities.

### A.   NML's August 13, 2013 Subpoena To MF Nevada And MF Nevada's Document Production.

On August 13, 2013, NML served a subpoena seeking information about the Báez scheme on MF Nevada.  In response, MF Nevada made a limited production, including "mirror-image" operating agreements for most of the 123 Báez Entities.  *NML Capital*, 2014 WL 3898021, at *12.  Documents from that production revealed, among other things, that the Báez Entities received capital transfers totaling millions of dollars—most of which came from a Seychelles entity called Gairns, Ltd.—and that nearly all the Báez Entities are managed by another Seychelles entity called Aldyne Ltd.  Campagnoli has connected both Gairns and Aldyne to Mossack Fonseca.[14]

### B.   NML's Subpoena To The Báez Entities And The Court's Order Granting NML's Motion To Compel.

On August 13, 2013, NML also served subpoenas on each of the Báez Entities.  The Báez Entities refused to comply, and instead submitted affidavits from Leticia Montoya, a Panamanian national employed by Mossack Fonseca who identified herself as an "agent" of the Mossack

---

[12]  Amunategui Dep. at 109:4-112:3 (Exhibit A).
[13]  *Id.* at 39:3-10.
[14]  Campagnoli Report (Exhibit E).

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

Fonseca-affiliated Seychelles entity Aldyne, Ltd.   In each of her affidavits, Ms. Montoya contended, implausibly, that the Báez Entities had no responsive documents.   Based on documents produced by MF Nevada, NML concluded that Ms. Montoya's statements were untrue and that the Báez Entities were withholding documents.   NML thus moved to compel the Báez Entities to comply fully with the subpoenas.[15]

On August 11, 2014, after several rounds of briefing and three hearings, the Court granted NML's motion to compel in its entirety—ordering the Báez Entities to produce documents and a witness to testify about their response to NML's subpoenas.   *NML Capital*, 2014 WL 3898021, at *13. In support of this ruling, the Court first found that "NML made a substantial showing that Báez[] laundered money [through] the [Báez Entities] and that Mossack [] Fonseca controls the [Báez Entities] and Aldyne." *Id.* at *12.  As the Court explained:

> A company cannot purposefully avail itself of the law's benefits by incorporating in this jurisdiction and then excuse itself from the court's subpoena power by abusing the corporate form.   This would allow a corporation to exploit the benefits created by the law without shouldering the concomitant burdens and responsibilities imposed by the law.   By incorporating in the State of Nevada, the [Báez Entities] assented to this court's power to impose a burden. . . on Nevada residents to testify. . . . Abuse of the corporate form cannot render this burden surplusage. . .

*Id.* at *11.  The Court went on to find that "[t]here is no doubt that the [Báez Entities] are shell corporations. . . .  Similarly, there is no doubt that shell corporations are routinely formed to commit fraud." *Id.* (citing *Illinois Bell Tel. Co., Inc. v. Global NAPs Illinois, Inc.*, 551 F.3d 587, 598 (7th Cir. 2008) (Posner, J.) ("It is hard to imagine why, except to commit such a fraud, a businessman would create shell corporations.")).

Most importantly for purposes of this motion, with regard to Mossack Fonseca's role in the Báez scheme, the Court observed:

> In the amount of time it takes a jury to return a verdict, a standard wireless device enables a prospective judgment debtor to incorporate shell companies in far-off lands [through Mossack Fonseca] and transfer their assets beyond discovery's reach—all while sitting at counsel's table. As a result, if the judgment creditor returns to court, and requests

---

[15] Declaration of Dennis H. Hranitzky, dated November 7, 2014, ("**Hranitzky Decl.)** ¶ 2.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

> discoverable information regarding those assets, the Federal Rules of Civil Procedure permit the shell corporations to submit evidence in opposition to a meritorious motion to compel—all while purporting to be beyond the court's subpoena power.  This frustrates court process and weakens the judicial power bestowed by the Constitution, which exists to finalize cases and controversies. . . .  Conduct that "exalt[s] artifice above reality," *see Abramski*, 134 S. Ct. at 2270, should not free a deponent from the burdens of complying with an otherwise valid subpoena.

*NML Capital*, 2014 WL 3898021 at *12.  Accordingly, the Court compelled the Báez Entities to produce documents and a deponent in response to NML's subpoenas, and directed counsel for the Báez Entities to certify the accuracy of the Báez Entities' responses to the subpoenas.  *Id*. at *13.

Finally, the Court determined that Mossack Fonseca has "control over" the Báez Entities for several reasons:

(1)     MF Nevada acts as the Báez Entities' registered agent;

(2)     MF Nevada is Mossack Fonseca's Nevada-based independent contractor;

(3)     Ms. Montoya is simultaneously employed by Mossack Fonseca as an attorney, Aldyne as an officer, and some of the Báez Entities as a custodian of records;

(4)     Documents produced by MF Nevada relating to the Báez Entities state that Mossack & Fonseca and Aldyne share the same office; and

(5)     "[Ms.] Montoya, an attorney with Mossack & Fonseca, speaks on behalf of the 123 corporations and Aldyne in the same breath."

*Id*. at *5.

## C.     NML's Subpoena to Patricia Amunategui.

On June 24, 2014, NML subpoenaed MF Nevada's sole employee, Patricia Amunategui, seeking information regarding (1) MF Nevada's relationship to Mossack Fonseca, (2) funds transferred by or to the Báez Entities, (3) the identity of the owners and organizational structure of the Báez Entities, and (4) the flow of funds into and out of accounts maintained by the Báez Entities that were set up by Mossack Fonseca through MF Nevada.  NML's subpoena also called for Ms. Amunategui's deposition.[16]

In response to that subpoena, Ms. Amunategui made two document productions—largely

---

[16]   Hranitzky Decl. ¶ 3.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

consisting of corporate formation documents for the Báez Entities.  These included documents from the Nevada Secretary of State, Nevada state business licenses, annual lists of managers or managing members and registered agents, articles of organization, limited liability company charters, operating agreements, and membership certificates.  The documents produced by Amunategui also confirmed that Aldyne Ltd. is the current or former manager for over 100 of the Báez Entities.[17]

On September 11, 2014, Ms. Amunategui was deposed by NML's counsel.  A significant focus of that deposition was the relationship between MF Nevada and Mossack Fonseca.  Ms. Amunategui testified that Mossack Fonseca is the sole client of MF Nevada, and that MF Nevada cannot take on additional clients without the express permission of Mossack Fonseca.[18]  Ms. Amunategui also discussed Mossack Fonseca's control over the administrative operations of MF Nevada.  As she explained, Mossack Fonseca handles all of MF Nevada's accounting, human resources, and IT support.[19]  And Mossack Fonseca controls the inflow of funds to MF Nevada by depositing funds directly into MF Nevada's accounts to pay MF Nevada's operating expenses, including Amunategui's salary.[20]

Amunategui also testified about her employment relationship with MF Nevada.  The employment agreement governing that relationship—which was signed by both Jurgen Mossack and Ramon Fonseca on behalf of MF Nevada—provides that "[t]he employer shall direct and control all of the details of [Ms. Amunatergui's] work." [21]  During her deposition, Ms. Amunategui confirmed that she receives all of her instructions relating to the operation of MF Nevada directly from Mossack Fonseca personnel.[22]  The employment agreement also states that Ms. Amunategui "shall have all of her communication solely with the employer and its representatives."  Amunategui testified that in performing her responsibilities at MF Nevada, she

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

---

[17]  *Id.* ¶ 3.
[18]  Amunategui Dep. at 138:19-139:22 (Exhibit A).
[19]  *Id.* at 27:8-16, 28:16-25, 65:8-16, 133:18-134:14.
[20]  *Id.* at 27:8-16, 28:16-25.
[21]  Employment Agreement between MF Nevada and Patricia Amunategui, dated May 16, 2001 ("**Amunategui Employment Contract**") (a copy of which is attached as Exhibit H).
[22]  Amunategui Dep. at 53:5-54:15, 55:22-25, 56:10-12 (Exhibit A).

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1  communicates almost exclusively with Mossack Fonseca employees.[23]

2      Finally, Ms. Amunategui described the relationship between MF Nevada and Mossack

3  Fonseca in setting up Nevada corporations on behalf of Mossack Fonseca's clients—which is MF

4  Nevada's principal function.[24]  Amunategui testified that Mossack Fonseca is responsible for

5  preparing the "corporate kits," which contain all of the documentation necessary for a

6  corporation's formation, for the Nevada LLCs MF Nevada sets up.  These "corporate kits"

7  include the operating agreements for the Nevada corporations, all of which are drafted by

8  Mossack Fonseca.[25]

9      At various points during her deposition Ms. Amunategui was obstinate and evasive—

10  refusing to answer many straightforward questions, denying knowledge of even the most basic

11  information relating to MF Nevada (even though she is its sole employee and manager), and

12  providing facially questionable testimony on other issues.  For example, despite having been the

13  Secretary of MF Nevada for thirteen years, she could not identify who the partners of MF Nevada

14  are—or indeed, whether any partners even exist.[26]  She also claimed not to know whether there

15  were any confidentiality provisions of her employment agreement that prevented her from

16  disclosing the fact that Mossack Fonseca is a "client" of MF Nevada.[27]  She claimed she could

17  not provide simple information about the accounting services Mossack Fonseca provides for MF

18  Nevada.  Even after acknowledging that Mossack Fonseca's accounting department is solely

19  responsible for depositing funds into MF Nevada's Panama account, and that MF Nevada could

20  not operate without those funds, Amunategui could not identify a single person that she interacts

21  or corresponds with in that department, nor could she provide the name of anyone at Mossack

22  Fonseca she could contact if and when MF Nevada needs additional funds to pay its expenses.[28]

23  And though she receives bank statements for MF Nevada's Panama bank account every month,

24  Amunategui inexplicably could not recall the name of that bank.[29]

25  _____
   [23] *Id.* at 57:7-58:6.

26  [24] *Id.* at 39:3-10.
   [25] *Id.* at 129:23-131:16.

27  [26] *Id.* at 67:7-72:1.
   [27] *Id.* at 52:21-53:3.

28  [28] *Id.* at 33:20-34:16, 36:7-36:19.
   [29] *Id.* at 45:24-46:18.

9

**D.**   **The Subpoena At Issue.**

On or about June 20, 2014, NML served the Mossack Subpoena on MF Nevada as the agent for Mossack Fonseca.  Like the subpoena NML served on MF Nevada itself, the Mossack Subpoena seeks information about (1) funds transferred by or to the Báez Entities, (2) the identity of the owners and organizational structure of the Báez Entities, and (3) the flow of funds into and out of accounts maintained by the Báez Entities.[30]  In addition, the Mossack Subpoena seeks information about the relationship between MF Nevada and Mossack Fonseca and MF Nevada.[31]

Mossak Fonseca never responded to the Mossack Subpoena.  However, MF Nevada objected and responded to it on July 7, 2014.[32]  NML and MF Nevada met and conferred recording MF Nevada's compliance with the Mossack Subpoena.  But those discussions ended on an impasse.[33]  On July 10, 2014, MF Nevada moved to quash the Mossack Subpoena, citing three grounds:  (1) it imposes undue burden and expense on MF Nevada, (2) the information sought is "personal and confidential," and (3) it is improper to the extent that it asserts jurisdiction over Mossack Fonseca based on its relationship with MF Nevada.[34]  Because MF Nevada brought its motion before the Court issued its decision granting NML's motion to compel compliance with the subpoenas served on the Báez Entities, its motion does not address the fact that the Court has already ruled that those subpoenas—which sought information similar to that sought by the Mossack Subpoena—were proper.  MF Nevada's motion also fails to address the evidence elicited through Ms. Amunategui's deposition and document production that demonstrates that MF Nevada is an alter ego of Mossack Fonseca.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

---

[30]   Mossack Subpoena (a copy of which is attached as Exhibit I)
[31]   *Id.*
[32]   MF Nevada's Objections and Responses to the Mossack Subpoena, dated July 7, 2014 (a copy of which is attached as Exhibit J).
[33]   Decl. of Kent Woods in Support of MF Nevada and Amuntageui's Motion to Quash, ¶¶ 24-28.
[34]   MF Nevada also moved to quash the Mossack Subpoena on the grounds that it did not provide a reasonable time to respond.  As this response date has now come and gone, that objection is moot.

**ARGUMENT**

**I.      NML Is Entitled To Discover Information That May Lead To Assets Embezzled Through The Báez  Entities.**

**A.      The Legal Standard Under Rule 69(a)(2).**

The legal standard governing discovery in proceedings such as these where the discovery sought is intended to assist in the enforcement of a judgment is set forth in Rule 69(a)(2) of the Federal Rules of Civil Procedure.  Rule 69(a)(2) entitles a judgment creditor to discovery from "any person" relating to the judgment debtor's assets "wherever located"—including "outside the jurisdiction of the court where the discovery request is made."  *EM Ltd.*, 695 F.3d at 207-08 (internal citation omitted); *see also VFS Fin., Inc. v. Specialty Fin. Corp.*, 2013 WL 1413024, at *3 (D. Nev. Apr. 4, 2013) (Rule 69(a)(2) entitles a judgment creditor "to identify assets that can be used to satisfy a judgment" and "to discover concealed or fraudulently transferred assets.") (internal citations omitted).  Discovery under Rule 69 is therefore "quite permissive."  *NML Capital*, 2014 WL 3898012, at *4 (citing *Republic of Argentina v. NML Capital, Ltd.,* 134 S. Ct. 2250, 2254 (2014); 8A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 3d § 3014, p. 160-62).

The liberal standard for post-judgment discovery applies with equal force to discovery sought from third-parties.  Rule 69(a)(2) expressly permits discovery from "any person." Thus, "[a] judgment creditor may obtain discovery from both parties and non-parties alike."  *VFS Fin., Inc.*, 2013 WL 1413024, at *4 (internal quotations omitted); *see also NML Capital*, 2014 WL 3898012, at *4 ("There is no question that Rule 69(a)(2) permits a judgment creditor to propound discovery on third parties.").   A subpoena "reaches all responsive materials within the corporation's control, even if those materials are located outside" the court's jurisdiction.  *NML Capital*, 2014 WL 3898012, at *4 (quoting *Eitzen Bulk A/S v. Bank of India*, 827 F. Supp. 234, 238-39 (S.D.N.Y. 2011)).

Applying these rules, courts in Nevada and elsewhere commonly allow judgment creditors to conduct "broad" discovery of "information from parties and nonparties alike—including information about assets upon which execution can issue or about assets that have been

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

11

fraudulently transferred." *Henry v. Rizzolo*, 2012 WL 13725 (D. Nev. Jan. 4, 2012), at *3; *see also 1*[st] *Tech., LLC v. Rational Enter. LTDA*, 2:06-cv-01110-RLH-GWF, 2007 WL 5596692, at *4 (D. Nev. Nov. 13, 2007) (post-judgment discovery has "broad scope").

**B.     Post-Judgment Discovery Is Warranted As Long As The Judgment Creditor Can Make A Threshold Showing That Connects The Third Party With Discoverable Information.**

When seeking discovery from third parties, the "judgment creditor must make a threshold showing connecting the third party with discoverable information before propounding discovery on the third party." *NML Capital*, 2014 WL 3898012, at *4.  To do so "[u]nder federal common law, the judgment creditor must show either (1) 'the necessity and relevance of [the] discovery sought' or (2) that 'the relationship between the judgment debtor and the nonparty is sufficient to raise a reasonable doubt about the bona fides of the transfer of assets.'" *Id.* (quoting WRIGHT & MILLER, *supra*, p. 162).

"Under Nevada law, the judgment creditor must show that 'the relationship between the judgment debtor and nonparty raises reasonable suspicion as to the good faith of asset transfers between the two.'" *Id.* (quoting *Rock Bay, LLC v. Dist. Ct.*, 129 Nev. Adv. Op. 21, 298 P.3d 441, 443 (2013)).  "Reasonable suspicion exists 'if there are specific, articulable facts' in support of the inference that the asset transfers were not made in good faith." *Id.* (quoting *State v. Cantsee*, 130 Nev. Adv. Op. 24, 321 P.3d 888, 893 (2014)).  As the Court explained in its recent August 11, 2014 Opinion, "[i]f the judgment creditor satisfies either [the common law or Nevada] standard, Rule 69 opens the doors of discovery and permits the judgment creditor to use any discovery device afforded by the Federal Rules." *Id.*

**C.     The Discovery Sought Through The Subpoena Is Directly Relevant To NML's Judgment Enforcement Efforts.**

On the basis of the Court's own findings, NML has made its threshold showing under Rule 69.  The funds allegedly trafficked through the Báez Entities are potential assets that could be attached by NML in satisfaction of its judgments, and NML is therefore entitled to information that may assist in tracing them.  Báez embezzled funds through the Báez Entities, which were set

12

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1   up by Mossack Fonseca through MF Nevada.  *NML Capital*, 2014 WL 3898012, at *11.  And the

2   Court has already held that NML's allegations of Báez's embezzlement scheme using the Báez

3   Entities are sufficient to show the requisite "specific, articulable facts" that the asset transfers

4   were not made in good faith.  *NML Capital*, 2014 WL 3898012, at *5.

5        The Mossack Subpoena seeks nothing more than documents and deposition testimony that

6   would further assist NML in tracing the funds embezzled through the Báez scheme.  As the Court

7   has previously found, "there is no dispute that Báez embezzled Argentine funds and that an

8   embezzler or "thief acquires no title to the property which he steals."  *Id.* (citing *Robinson v.*

9   *Goldfield Merger Mines Co.*, 46 Nev. 291, 206 P. 399, 401 (1922) *aff'd*, 46 Nev. 291, 213 P. 103

10  (1923)).   If the investigations into embezzlement by Baéz result in convictions, any funds

11  traceable to the crime may become Argentina's property under both Nevada and Argentine law.

12  *Alamo Rent-A-Car, Inc. v. Mendenhall*, 937 P.2d 69, 73-74 (Nev. 1997).[35]  NML therefore has a

13  right to seek discovery to find information that may assist it in tracing those assets.

14       Moreover, NML made a "substantial showing" that this embezzlement scheme involved

15  the Báez Entities set up by MF Nevada at the request of Mossack Fonseca, and that Mossack

16  Fonseca exercises "control over" over them.  *NML Capital*, 2014 WL 3898012, at *5.  Where the

17  Court has already held that discovery related to the Báez Entities is relevant, *id.* at **5-6, there

18  can be no doubt that information regarding the formation and operation of those entities is not

19  likewise relevant.

20           **D.      Complying With The Subpoena Will Not Unduly
                        Burden Mossack Fonseca Or MF Nevada.**

21

22       Even if, as MF Nevada claims, it will take time and expense to respond to the Mossack

23  Subpoena, that would not justify quashing it.  "The mere fact that discovery requires work and

24  may be time consuming is not sufficient to establish undue burden."  *Platinum Air Charters, LLC*

25  *v. Aviation Ventures, Inc.*, 2007 WL 121674, at *6 (D. Nev. Jan. 10, 2007); *see also NML*

26  *Capital*, 2014 WL 3898021, at *6-7 (rejecting the Baéz Entities' argument that responding to

27

28  ---
    [35]  *See also* Argentine Criminal Code, Art. 23 (a copy of which is attached as Exhibit K).

NML's subpoenas would be unduly burdensome).  NML's good faith belief that Mossack Fonseca is in possession of information that could lead to attachable assets in satisfaction of its judgments against Argentina is sufficient to compel its compliance with the Mossack Subpoena. *See Mount Hope Church v. Bash Back!*, 705 F.3d 418, 429 (9th Cir. 2012) ("[W]e do not think that the mere need to respond to an opponent's advocacy in our civil justice system should be viewed as unduly burdensome when legal arguments are advanced in good faith.").

The cases relied on by MF Nevada in making this objection are inapposite.  In *Convolve, Inc. v. Dell, Inc.*, a non-party in that case had already responded to an initial subpoena and provided over 22,000 pages of documents.  *Convolve*, 2011 WL 1766486, at *1 (N.D. Cal. May 9, 2011).  Unsatisfied, the requesting party then served multiple subpoenas seeking additional documents.  *Id.*  By contrast, Mossack Fonseca has failed to produce any documents, and the Báez Entities have consistently stonewalled discovery relating to its embezzlement schemes.  And in *Premium Service Corp. v. Sperry & Hutchinson Co.*, the subpoena at issue requested documents relating "in any way, to any dealing, transaction, agreement or understanding" between the parties—without any demonstration that those documents were relevant to the litigation, let alone a showing that the need for those documents outweighed the burden to the nonparty.  511 F.2d 225, 227 (9th Cir. 1975).  Yet here, the Court has already determined that information relating to the Báez embezzlement scheme is relevant to its judgment enforcement efforts, and that NML is therefore entitled to that discovery.  *NML Capital*, 2014 WL 3898021.

Finally, just as it has to every other third party it has subpoenaed for information relating to the Báez embezzlement scheme, NML is willing to compensate Mossack Fonseca for the reasonable cost of complying with the Mossack Subpoena in order to resolve any resulting financial burden.

### E. The Unsupported Assertion That The Mossack Subpoena Seeks "Personal And Confidential Material" Is Unavailing.

MF Nevada's objection to the Mossack Subpoena on the grounds that it demands "personal and confidential material" is equally unavailing.  There is no privilege against discovery of a party's allegedly confidential information.  Rather, any confidentiality concerns

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

14

raised by compliance with a subpoena are generally addressed through entry of a confidentiality order such as the order already entered by the Court in a related proceeding.  Stipulated Protective Order, *NML Capital, Ltd. v. Republic of Argentina*, 2:14-cv-00492 (D. Nev. Aug. 14, 2014); *see also Collins v. NDOC*, 2014 WL 4656232, at *3 (D. Nev. Sept. 17, 2014) ("Typically, any assertion of a document's confidentiality is resolved via a protective order.").  NML would have no objection to extension of the confidentiality order already in place in the related proceeding to the information sought through the Mossack Subpoena.

Furthermore, any confidentiality designation made pursuant to such an order should be "expressly made and supported by a sufficient description of the nature of the documents, communications, or things not produced so as to enable the demanding party to contest the claim." *Diamond State Ins. Co. v. Rebel Oil Co.*, 157 F.R.D. 691, 697-98 (D. Nev. 1994).  MF Nevada (and by extension, Mossack Fonseca) have utterly failed to meet this burden.  MF Nevada's motion fails to set forth *any* description of the nature of the documents or the confidential information they allegedly contain.  Instead, MF Nevada simply makes the assertion, without any supporting evidence, that the documents sought contain confidential information pertaining to Mossack Fonseca's downstream clients.  Mot. at 11.

## II.     The Subpoena Is Enforceable Against Mossack Fonseca.

Mossack Fonseca is subject to this Court's subpoena power by virtue of its relationship with MF Nevada.  As shown below, MF Nevada is a mere alter ego and "department" of Mossack Fonseca.  MF Nevada's jurisdictional contracts can therefore be attributed to MF Nevada. *Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134 (9th Cir. 2003) (jurisdictional contacts may be imputed where one company is the "alter ego" of another); *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 425 (9th Cir. 1977) (jurisdictional contacts may be imputed where domestic entity is "mere 'division[]' or 'branch[]'" of the foreign entity); *Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189, 193 (S.D.N.Y. 2000) (Where an affiliate is "essentially a separately incorporated department or instrumentality of a foreign corporation," the activities of the affiliate will be "attributed" to the foreign company for purposes

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

15

of determining the foreign company's "amenability to personal jurisdiction.") (internal quotations omitted); 4A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 3d § 1069 1(personal jurisdiction over corporate defendants appropriate where subsidiary is "acting as merely one of [parent's] departments").

The collaborative role played by MF Nevada and Mossack Fonseca in setting up the Baéz Entities in Nevada to aid Baéz in his embezzlement scheme makes the exercise of jurisdiction over Mossack Fonseca is entirely proper. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011) (exercise of specific jurisdiction proper where there is some "affiliation between the forum and the underlying controversy"). The focus of the Mossack Subpoena is the formation and operation of the Baéz Entities, through the "on the shelf" Nevada LLC formation process instituted by Mossack Fonseca. It was the formation of those entities which allowed Baéz to perpetuate his scheme and abscond with misappropriated Argentine state property. Furthermore, Ms. Amunategui concedes that MF Nevada is the registered agent for at least some of the Baéz Entities, and MF Nevada's document production confirms the same.[36] Thus, the claim in this post-judgment proceeding that the Baéz Entities may have been used to embezzle funds is entirely related to Mossack Fonseca's activities in Nevada through its alter ego, MF Nevada.

### A.   MF Nevada Is The Alter Ego of Mossack Fonseca.

An entity is the alter ego of another where "(1) [] there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) [] failure to disregard their separate identities would result in fraud or injustice." *Doe, I v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (internal quotations omitted). Based on the evidence adduced from MF Nevada's document production and the document production and deposition of Patricia Amunategui, it is readily apparent that MF Nevada is Mossack Fonseca's alter ego.

In *Ado Fin., AG v. McDonnell Douglas Corp.*, the court held that "unity of interest" existed between a domestic affiliate and foreign entity so as to render the domestic affiliate the

---

[36] Amunategui Dep. at 119:19-120:21.

16

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1   alter ego of foreign entity where the domestic affiliate's affairs were "managed and controlled"

2   by the foreign entity. 931 F. Supp. 711, 717-18 (C.D. Cal. 1996). The court based this on the

3   deposition testimony of the domestic affiliate's "sole employee," in which he stated that the

4   foreign parties directed the domestic affiliate's business decisions and managed its daily

5   operations. *Id.* at 718. Similarly, Ms. Amunategui, MF Nevada's sole employee, testified that

6   she receives all of her instructions as to the business operations of MF Nevada from Mossack

7   Fonseca, and that Mossack Fonseca controls all of the day-to-day operations of MF Nevada,

8   including its accounting, human resources and IT support.[37]

9         Mossack Fonseca's complete control over MF Nevada's core function—the LLC filing

10  process—also establishes MF Nevada's alter ego status. The Ninth Circuit has held that where a

11  foreign parent is responsible for drafting agreements at issue in the litigation, this indicates the

12  necessary "control over day-to-day activities" of the domestic affiliate that would be required to

13  make a finding of alter ego status. *Harris Rutsky & Co. Ins. Services, Inc.*, 328 F.3d at 1135.[38]

14  This is precisely the case with Mossack Fonseca and MF Nevada. Mossack Fonseca is

15  responsible for preparing the "corporate kits" that contain all of the necessary documentation for

16  the Nevada corporations created for its clients through MF Nevada. Indeed, Mossack Fonseca

17  drafts the operating agreements for the LLCs contained in those corporate kits itself.[39] Apart

18  from serving as a service agent for the Nevada LLCs it forms, forming those Nevada LLCs and

19  making the filings necessary to maintain them in good standing is the sole purpose for MF

20  Nevada's existence.[40]

21        **B.    MF Nevada Is A Mere Department of Mossack Fonseca.**

22        The evidence also establishes that MF Nevada is nothing more than a "department" of

23  Mossack Fonseca. Four factors often considered by courts in determining whether an affiliate is a

24  "mere department" of a foreign entity: (1) the "financial dependency" of the affiliate on the

---

25  [37] Amuntagui Dep. at 27:8-16, 28:16-25, 53:5-54:15, 55:22-25, 56:10-12, 65:8-16, 133:18-134:10 (Exhibit A).

26  [38] The court in *Harris Rutsky* ultimately concluded that it did not have sufficient information to determine whether the alter ego test was met, and ordered jurisdictional discovery in part on the basis that the evidence set forth

27  suggested that further discovery would "demonstrate facts sufficient to constitute a basis for jurisdiction." *Harris Rutsky*, 328 F.3d at 1135.

    [39] Amunategui Dep. at 129:23-131:16 (Exhibit A).

28  [40] *Id.* at 39:3-10.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

foreign company; (2) the degree to which the foreign company "interferes with the selection and assignment of the [affiliate's] executive personnel and fails to observe corporate formalities;" (3) the degree of control exercised by the foreign company over "the marketing and operational policies" of the affiliate; and (4) common ownership. *Aerotel, Ltd.*, 100 F.Supp.2d at 194. The evidence collected by NML to date conclusively establishes the first three of these factors, and suggests that the fourth is present as well.

First, MF Nevada is financially dependent on Mossack Fonseca. Indeed, Ms. Amunategui's testimony revealed that MF Nevada could neither operate nor even exist without Mossack Fonseca. Mossack Fonseca is MF Nevada's sole client, and MF Nevada would need permission from Mossack Fonseca to take on any other client.[41] Without Mossack Fonseca, MF Nevada would have no business and no source of revenue. Furthermore, Mossack Fonseca handles MF Nevada's accounting and directs the flow of all funds necessary for MF Nevada's operation.[42]

Second, Mossack Fonseca exercises complete control over MF Nevada's employees. Ms. Amunategui, who is MF Nevada's only employee, conceded at her deposition that she receives all of her instructions from Mossack Fonseca,[43] and that she communicates almost exclusively with Mossack Fonseca employees.[44]

Third, Mossack Fonseca controls the marketing and operational policies of MF Nevada. As discussed, MF Nevada can act only as instructed from Mossack Fonseca,[45] Mossack Fonseca is MF Nevada's only source of business; and indeed, Mossack Fonseca's website specifically advertises MF Nevada's ability to obtain Nevada limited liability companies as a client service for ***Mossack Fonseca's clients***.[46] In an advertisement for UNLV, Amunategui is identified as "the Vice President of the Nevada office of Mossack Fonseca,"[47] and even Amunategui's email

---

[41] *Id*. at 138:19-139:22.
[42] *Id*. at 27:8-16, 28:16-25.
[43] *Id*. at 53:5-54:15, 55:22-25, 56:10-12.
[44] *Id*. at 57:7-58:6.
[45] *Id*. at 53:5-54:15, 55:22-25, 56:10-12.
[46] *Id*. at 115:18-116:7; Mossack Fonseca webpage "Nevada, USA" (a copy of which is attached as Exhibit L).
[47] UNLV Advertisement, "Go Back to Get Ahead" (a copy of which is attached as Exhibit M).

18

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1    signature identifies her as "Head of Nevada Office."[48]

2        Fourth, the evidence indicates that MF Nevada and Mossack Fonseca share a

3    parent/subsidiary relationship.  Specifically, Ms. Amunategui's employment contract was signed

4    on behalf of MF Nevada by Mossack Fonseca's founding partners:  Jurgen Mossack and Ramon

5    Fonseca.[49]  While the existence of a parent/subsidiary relationship does not in and of itself give

6    rise to jurisdictional veil piercing, when taken together with the control exercised by Mossack

7    Fonseca over MF Nevada, it is clear that the requisite "semblance of independence" does not

8    exist between MF Nevada and Mossack Fonseca, and MF Nevada is "merely one of its

9    departments."  WRIGHT & MILLER § 1069.

10   ### C.    The Court Should Conduct An Evidentiary Hearing If It
     ###       Finds Ms. Amunategui's Testimony to be Inconclusive.

11       NML submits it is evident the current record that MF Nevada is the alter ego and a mere

12   department of Mossack Fonseca.  However, if the Court finds Ms. Amunategui's testimony on

13   this issue to be inconclusive, NML respectfully requests that the Court hold an evidentiary

14   hearing at which the Court can ask questions of Ms. Amunategui and observe her demeanor under

15   cross examination.  *See PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 598 F.3d 802, 810

16   (11th Cir. 2010) (court may hold evidentiary hearing on jurisdictional issues so, among other

17   things, it can "determine[] the credibility of witness testimony"); *Medeco Sec. Locks, Inc. v.*

18   *Swiderek*, 680 F.2d 37, 39 (7th Cir. 1981) ("The trial court's reading of such a deposition is an

19   inadequate substitute for the hearing of oral testimony and the observing of a witness' demeanor

20   in these highly contested cases where the proper characterization of the factual occurrences is

21   crucial and where credibility is a major determinative factor.").

22

23   ### III.    NML Was Not Required To Seek Discovery Through
     ###         The Inter-American Convention On Letters Rogatory.

24       In its Motion to Quash, MF Nevada erroneously argues that NML may only obtain

25   discovery from Mossack Fonseca pursuant to the Inter-American Convention on Letters Rogatory

26

27   ───────────────
     [48]  Email from Patricia Amunategui to "Nevada office," dated January 17, 2014 (a copy of which is attached as
     Exhibit N).
28   [49]  Amunategui Employment Contract (Exhibit H).

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

(the "**Convention**").  However, courts routinely hold that the Convention does not provide the exclusive means of service within the jurisdictions of parties to the Convention.  *See, e.g., Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634 (5th Cir. 1994) ("the Inter-American Convention on Letters Rogatory does not foreclose other methods of service among parties residing in different signatory nations").  As then Judge, now Justice Sotomayor declared over 20 years ago, "[t]he [Inter-American] Convention merely provides one possible method of service . . . . It is neither mandatory nor exclusive."  *Mayatextil, S.A. v. Liztex U.S.A., Inc.*, 994 WL 198696, at *5 (S.D.N.Y. May 19, 1994).

In *Kreimerman,* the Fifth Circuit conducted an exhaustive exegesis of the Convention to determine whether it provides the exclusive means of serving process on parties residing in a signatory country.  Following this review, the court concluded:

> The convention 'states that it shall apply to letters rogatory . . . [but it] does not state that letters rogatory are the only means of serving process in the signatory countries' . . . .  As rogatory letters (or letters of request) are – by definition –merely one of many procedural mechanisms by which a court in one country may request authorities in another country to assist the initiating court in its administration of justice, the Conventions scope appears to be limited to regulating that one procedural mechanism.

*Id.* at 639-640 [internal citations omitted].  The Convention was not an attempt to "supplant all alternative methods of service" but rather controlled "the delivery of letters rogatory among the signatory states."  *Id.* at 640.

**IV.    The Court Can Compel Mossack Fonseca To Designate A Person Within the Court's Jurisdiction To Appear For Deposition.**

Finally, MF Nevada's contention that Mossack Fonseca is beyond the Court's subpoena power because it is located more than 100 miles away is without merit.  Rule 30(b)(6) requires a subpoenaed entity to "produce one or more witnesses knowledgeable about the subject matter" in the subpoena.  *Great Am. Ins. Co. of N.Y. v. Vegas Const. Co., Inc.*, 251 F.R.D. 534, 538 (D. Nev. 2008).  The Federal Rules of Civil Procedure, however, do not require the witness to "have personal knowledge on the designated subject matter."  *Id.*  Instead, a subpoenaed entity has "a duty to make a conscientious, good-faith effort to designate knowledgeable persons for Rule

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter." *Id*. at 539 (internal quotation marks omitted). If no employee, representative, or agent of Mossack Fonseca with knowledge of the matters contained in the subpoena resides or regularly conducts business within a 100-mile radius of Las Vegas, the Court has the power to compel Mossack Fonseca under Rule 30(b)(6) to designate a representative within 100 miles of Las Vegas and to educate that person concerning the subjects set forth in the subpoena. As an employee of MF Nevada—which, as shown above is an alter ego and/or a mere department of Mossack Fonseca—Ms. Amunategui, could be instructed to perform this role.

Indeed, the Court resolved this very issue when it ordered the Báez Entities to produce a witness for deposition in response to NML's subpoenas. *NML Capital*, 2014 WL 3898021, at *13 ("[T]he unique status of the corporate person permits a federal court to compel a non-party resident corporation to designate a nonresident employee to 'thoroughly educate' an in forum employee to testify on the corporation's behalf."). As the Court went on to note in that decision, other courts have granted similar relief against third parties served with a Rule 45 subpoena. For example, in *Wultz v. Bank of China Ltd.*, 298 F.R.D. 91 (S.D.N.Y. 2014), a bank in Israel moved to quash a third-party subpoena seeking deposition testimony under Rule 30(b)(6), arguing that it employed no knowledgeable employees in the forum and that educating an in-forum employee was "simply not reasonable or practicable." *Id.* at 99. The court denied the bank's motion to quash, reasoning that "[e]ven if [the Israeli bank] is a non-party witness and all of the documents or knowledgeable persons are in Jerusalem, compliance with the 30(b)(6) subpoena is not an undue burden when weighed against" the parties' need for the testimony. *Id.* An in-forum representative could "easily be educated" by a person knowledgeable about the topics by "telephone, email or videoconference," and the bank could "avoid the burden of educating a[n] [in-forum] employee altogether by agreeing to a deposition by video." *Id.*

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

**CONCLUSION**

For the foregoing reasons, NML respectfully requests that this Court deny MF Nevada's Motion and grant NML's cross-motion to compel.  If the Court finds that the evidence that MF Nevada is the alter ego and a mere department of Mossack Fonseca is inconclusive, NML respectfully requests that the Court hold an evidentiary hearing at which the Court can ask questions of Ms. Amunategui and observe her demeanor under cross examination.

DATED this 7th day of November 2014.

BROWNSTEIN HYATT FARBER
SCHRECK, LLP


By:    /s/ Kirk B. Lenhard
    Kirk B. Lenhard, Esq.
    Nevada Bar No. 1437
    Nikki L. Baker, Esq.
    Nevada Bar No. 6562
    100 North City Parkway, Suite 1600
    Las Vegas, NV 89106-4614

    Dennis H. Hranitzky
      (admitted *pro hac vice*)
    Dechert LLP
    1095 Avenue of the Americas
    New York, NY  10036-6797

*Attorneys for NML Capital Ltd.*

# EXHIBIT A

# EXHIBIT A

Page 1

```
 1
 2                   UNITED STATES DISTRICT COURT

 3                        DISTRICT OF NEVADA

 4
 5   NML CAPITAL LTD.,              )
                                    )
 6                                  )
              Plaintiff,            )
 7                                  )
         vs.                        )   Case No.
 8                                  )   2:14-CV-492-RFB-VCF
     THE REPUBLIC OF ARGENTINA,     )
 9                                  )
              Defendant.            )
10   _____)
11
12
13
14       VIDEOGRAPHED DEPOSITION OF PATRICIA AMUNATEGUI

15            Taken on Thursday, September 11, 2014

16                 By a Certified Court Reporter

17                        At 8:51 a.m.

18           Held at Woods Erickson & Whitaker

19                     1349 Galleria Drive

20                         Suite 200

21                      Henderson, Nevada

22

23

24

25       Reported by:  Ellen A. Goldstein, CCR 829
```

CERTIFIED COPY

Text

Page 2

```
 1   APPEARANCES:
 2
 3           For the Plaintiff NML CAPITAL, LTD.:
 4                DENNIS H. HRANITZKY, ESQ.
 5                DECHERT, LLP
                  1095 Avenue of the Americas
 6                New York, New York 10036
                  Phone:  (212)698-3500
 7                Fax:    (212)698-3599
                  dennis.hranitzky@dechert.com
 8
 9           For the Defendant MF CORPORATE SERVICES, LTD.:
10                KENT P. WOODS, ESQ.
                  WOODS ERICKSON & WHITAKER, LLP
11                1349 Galleria Drive
                  Suite 200
12                Henderson, Nevada 89014
                  Phone:  (702)433-9696
13                Fax:    (702)434-0615
                  kwoods@woodserickson.com
14
15           For the 123 NONPARTY CORPORATIONS:
16                JASON M. WILEY, ESQ.
                  KOLESAR & LEATHAM
17                400 South Rampart Boulevard
                  Suite 400
18                Las Vegas, Nevada 89145
                  Phone:  (702)362-7800
19                Fax:    (702)362-9472
                  jwiley@klnevada.com
20
21      Also Present:
22           John Johnson, Videographer
                  Gracia M. Feldman, Spanish interpreter
23                Patrick Corcoran
24
25
```

Page 3

INDEX

| WITNESS | | PAGE |
|---|---|---|
| PATRICIA AMUNATEGUI | | |
| Examination by MR. HRANITZKY | | 7 |

EXHIBITS

| NUMBER | DESCRIPTION | INTRODUCED |
|---|---|---|
| 0 | Subpoena for Patricia Amunategui (18 pages) | 14 |
| 1 | Employment Agreement between MF Corporate Services and Patricia Amunategui (PSA 000051 - PSA 000063; 13 pages) | 14 |
| 2 | Go Back to Get Ahead (no Bates; 1 page) | 79 |
| 3 | 1-16-14 E-mail chain (PSA 000001; 1 page) | 86 |
| 4 | The MF Group Web page (no Bates; 2 pages) | 92 |
| 5 | Trust Services Web page (no Bates; 2 pages) | 95 |
| 6 | Administrative Services Web page (no Bates; 1 page) | 99 |
| 7 | Mossack Fonseca marketing literature (no Bates; 36 pages) | 103 |
| 8 | MF Corporate Services International Web page (no Bates; 2 pages) | 114 |

Page 4

(I N D E X Continued)

| NUMBER | DESCRIPTION | INTRODUCED |
|---|---|---|
| 11 | Nevada USA Web page (no Bates; 2 pages) | 115 |
| 12 | Mossack Fonseca marketing of Nevada limited-liability companies (no Bates; 4 pages) | 116 |
| 13 | Declaration of Patricia Amunategui (6 pages) | 141 |
| 14 | September 2008 E-mail chain (misc. Bates numbers; 9 pages) | 147 |
| 15 | 11-11-05 E-mail (TRANSLATION MFCS 005535; 1 page) | 150 |
| 16 | 5-22-06 E-mail chain (TRANSLATION MFCS 000311 - TRANSLATION MFCS 000313; 3 pages) | 152 |
| 17 | Miscellaneous E-mails (TRANSLATION MFCS 000899 - TRANSLATION MFCS 000904; 6 pages) | 163 |
| 18 | 6-12-13 E-mail chain (MFCS 002223 - MFCS 002229; 7 pages) | 168 |
| 19 | October 2007 E-mail chain (TRANSLATION MFCS 006580 - TRANSLATION MFCS 006584; 5 pages) | 172 |
| 20 | 8-4-06 E-mail chain (TRANSLATION MFCS 004065) | 180 |
| 21 | Miscellaneous E-mails (MFCS 005308 - MFCS 005322; 15 pages) | 182 |
| 22 | Miscellaneous E-mails (TRANSLATION MFCS 006487 - TRANSLATION MFCS 006490; 4 pages) | 187 |
| 23 | 11-13-04 E-mail chain (TRANSLATION MFCS 005025; 1 PAGE) | 190 |

Page 5

(I N D E X Continued)

| NUMBER | DESCRIPTION | INTRODUCED |
|---|---|---|
| 26 | 6-10-08 E-mail with attachment (TRANSLATION MFCS 004533 and TRANSLATION MFCS 004525 - TRANSLATION MFCS 004538; 15 pages) | 192 |
| 27 | 4-5-06 E-mail chain (TRANSLATION MFCS 001932; 1 page) | 195 |
| 31 | 9-29-05 E-mail chain (TRANSLATION MFCS 002842 - MFCS 002843; 2 pages) | 200 |
| 32 | 6-5-13 letter from Patricia Amunategui to Aldyne board of directors (PSA 000005; 1 page) | 201 |
| 33 | 6-5-13 letter from Patricia Amunategui to Fergus International board of directors (PSA 000006; 1 page) | 201 |
| 34 | 6-5-13 letter from Patricia Amunategui to Plascot Limited board of directors (PSA 000007; 1 page) | 201 |

Page 6

1    THURSDAY, SEPTEMBER 11, 2014 - HENDERSON, NEVADA

2                          8:51 A.M.

3

4           (Plaintiff's Exhibits 0 and 1 were pre-marked

5    for identification by the Certified Court Reporter)

6           (All answers by the witness were given in

7    English unless otherwise indicated.)

8

9           THE VIDEOGRAPHER:  This begins the deposition of

10   Patricia Amunategui.  Today's date is September 11, 2014.

11   The time is 8:51 a.m.  We are at the law offices of Woods

12   Erickson & Whitaker, 1349 West Galleria Drive, Suite 200,

13   Henderson, Nevada.  This case is in the United States

14   District Court, District of Nevada, entitled "NML Capital

15   Limited versus The Republic of Argentina," case

16   No. 2:14-cv-492-RFB-VCF.  My name is John Johnson.  The

17   court reporter is Ellen Goldstein.  We're with Oasis

18   Reporting Services.

19           Will counsel, please identify yourselves and then

20   the reporter will administer the oath.

21           MR. HRANITZKY:  I'm Dennis Hranitzky from Dechert,

22   LLP in New York.  I'll be examining the witness on behalf

23   of NML Capital Limited.

24           MR. WOODS:  Kent Woods, Woods Erickson Whitaker, and

25   I represent Patricia Amunategui and MF Corporate Services

Page 7

```
 1    Nevada, Limited.

 2         MR. WILEY:  Jason Wiley on behalf of the 123 entities

 3    that are interested parties in this litigation.

 4

 5         GRACIA M. FELDMAN,

 6    an interpreter of the Spanish language, was duly sworn to

 7    translate the following proceedings from English into

 8    Spanish and from Spanish into English.

 9

10         PATRICIA AMUNATEGUI,

11    called as a witness by and on behalf of the Plaintiff,

12    was first duly sworn by the Certified Court Reporter

13    and testified as follows:

14

15              EXAMINATION

16    BY MR. HRANITZKY:

17    Q     Good morning, Miss Amunategui.

18    A     Good morning.

19    Q     My name is Dennis Hranitzky.  I'm an attorney

20    with a law firm in New York called Dechert, LLP.  I

21    represent NML Capital Limited and I'm going to be asking

22    you some questions this morning regarding the matters set

23    forth in the subpoena that I'll show you in a moment.

24    I'm going to ask you that if there's anything in the

25    questions I ask that doesn't make sense to you, that you
```

Page 8

```
 1    please say so so that I can make my questions more clear

 2    to you.  Does that make sense?

 3    A     Yes.

 4    Q     Okay, thanks.

 5         First, could you state your name for the record.

 6    A     Patricia Amunategui.

 7         (Through the interpreter) Patricia Amunategui.

 8    Q     And you were born in Chile; is that right?

 9    A     Yes.

10    Q     And you moved to the United States at some

11    point, yes?

12    A     Yes.

13    Q     In fact you've come to the United States twice;

14    is that right?

15    A     Yes.
```

Page 9

6  Q  Okay.
7  A  And I always come back here periodically.
8  Q  To the United States?
9  A  To the United States, yes, because my husband
10  still was here at that time.
11  Q  I see. Were you working during that period?
12  A  During the period of -- with my first arrived,
13  no. I don't speak English, so I didn't work; but I work
14  from 2005 probably or 2006 part time in different casino.
15  I work with -- my first job was here at the casino, at
16  Bally's.
17  Q  Okay. Can you just very briefly take us through
18  your employment history up through the time you went to
19  work for Bally's around 2005.
20  A  In this country, not what I do in Chile?
21  Q  In Chile and in this country.
22  A  Okay. In Chile I work for Bank Santander, was
23  my last job when I moved here. I worked as a secretary
24  of one of the vice president. And when I move here I
25  don't work right away. I wait two year or something

Page 10

1  because, one thing, my document of the legal residence
2  take longer for work, but at the same time I don't have
3  English enough. So I went to school. I went to a
4  college to learn English during that period of time.
5  Q  Was that at UNLV?
6  A  No. It was a community college in
7  San Francisco. I lived in San Francisco at that time.
8  Q  I see. Before you worked at Santander in Chile,
9  did you have other jobs?
10  A  Oh, yeah, many. I try to give you the short
11  way. I work for a radio station, insurance company, and
12  then I had my own business too.
13  Q  What was your business?
14  A  I have a tanning-bed salon in Chile and I bring
15  machine from this country. That was my second period
16  when I went to Chile. I bought some tanning bed here
17  from California and I start a -- I was the first one open
18  a tanning-bed salon in Chile. It was very fun.
19  Q  An innovator.
20  A  Very innovator, very fun.
21  Q  All right. And that was sometime between --
22  A  Between 2005 and 2007. In between the time I
23  moved I open a business there, when I was living here and
24  then moving back.
25  Q  Do you mean 1995?

Page 11

```
1    A.   Oh, yeah, nineties.  Before probably I'm not
2  exist.
3    Q.   It's okay.  And in Chile did you have -- did you
4  go to university or college in Chile?
5    A.   No.  I went for private school for secretary,
6  business secretary, assistant.
7    Q.   And in your jobs before Santander, you mentioned
8  an insurance company?
9    A.   Uh-huh.
10   Q.   And another position?
11   A.   Yes.
12   Q.   Were those secretarial or --
13   A.   Yeah, all secretarial.
14       MR. WOODS:  Let him finish his questions before you
15  answer.  It will make it easier for the court reporter.
16       THE WITNESS:  Okay.
17       MR. WOODS:  Hopefully, as things progress -- you
18  know, wait for him to finish his question so the
19  translator can do her job --
20       THE WITNESS:  Okay.
21       MR. WOODS:  -- and translate before so she makes sure
22  you understand.
23       THE WITNESS:  Okay.
24  BY MR. HRANITZKY:
25   Q.   Your counsel has asked that we have the
```

Page 12

```
1  translator's assistance for all of the questions --
2    A.   Okay.
3    Q.   -- so we should do it that way.
4    A.   Okay.
5    Q.   So you said you came back to the United States
6  in around 1997.  Is that right?
7    A.   Yes, the second time.
8    Q.   Okay.  And when you returned, at some point
9  following your return, you went to work for a casino here
10 in Las Vegas; is that right?
11   A.   (Through the translator)  Yes, the second time.
12   Q.   Okay.  And for how long did you work in the
13 casino?
14   A.   Eleven year maybe.
15   Q.   Okay.  So until when?
16   A.   2006.
17   Q.   I see.  At one point did you obtain an education
18 at UNLV?
19   A.   Yes.
20   Q.   And when was that?
21   A.   I don't remember exactly the years 'cause I
22 started different --
23       THE REPORTER:  Started what?
24       THE WITNESS:  Different other stuff, I mean English a
25 second language, and then I went to UNLV for the
```

Page 13

1 paralegal course; but I don't remember when I started. I
2 remember when I finished. It was a long way.
3 BY MR. HRANITZKY:
4 Q    And when did you finish?
5 A    I think I finish in 2000, 2000 probably.
6 Q    In 2000?
7 A    I can't give you sure, but I think it was 2000.
8 Q    And do you have a degree from UNLV?
9 A    I have a certification of paralegal from UNLV,
10 yeah.
11 Q    Other than paralegal studies, did you study
12 anything else at UNLV?
13 A    I went for more classes of paralegal and I take
14 corporate law, I think they offer, and I take that class.
15 I think so.  I take classes.  I don't remember exactly
16 which ones, but I take more classes after.
17 Q    Okay.  And how -- approximately how long did you
18 study at UNLV?
19 A    I will say I was in and out for two year
20 probably.  Yeah, probably, yeah.
21 Q    Okay.  So and you say you graduated from UNLV in
22 2000?
23 A    Uh-huh.
24 Q    And you said you worked in the casino until
25 2006?

Page 14

1 A    Yes.
2 Q    Between 2000 and 2006, did you have any other
3 employment besides the casino?
4 A    Can you repeat again.  Sorry.
5 Q    Yes.  Between 2000 and 2006 did you have any
6 other employment --
7 A    Yes.
8 Q    -- besides the casino?
9 A    Yes, yes.  I worked two job for six -- for more
10 than six years.
11 Q    Okay.  What was the other job?
12 A    I work for MF Corporate Service and I work for
13 the casino.
14 Q    I see.  When did you start to work for
15 MF Corporate Services?
16 A    2001 I believe, 2001 probably.
17 Q    Okay.  I'm going to ask the court reporter to
18 hand you two documents.  One has been marked as Exhibit 0
19 and one has been marked as Exhibit 1.  I'd ask you to
20 look at them and let me know if you recognize them.
21 A    Can I take my glasses?
22 Q    Of course.
23        (Discussion held off the stenographic record in
24 Spanish.)
25        THE WITNESS:  I recognize this one, like the subpoena

Page 15

```
 1   I receive, and I believe it is mine.
 2   BY MR. HRANITZKY:
 3   Q    Okay.  So you recognize Exhibit Q as a subpoena
 4   that you received?
 5   A    I'm looking for my name.
 6   Q    Look on the first page.  Your name should be
 7   there.  Do you see on the first page it says NMI Capital,
 8   Republic of Argentina?
 9   A    Yeah, yeah, I see -- oh, I see my name, yes.
10   Okay.  I was looking for my name.
11   Q    Okay.  You can put that aside.
12   A    I don't want to get that confused with the other
13   one.
14   Q    Exhibit 1, do you recognize Exhibit 1?
15   A    Well, I believe it's my contract agreement, my
16   employee contract agreement.
17   Q    So you recognize this as your employment
18   contract with MF Corporate Services Nevada Limited?
19   A    Yes.  I want to be sure.  Yeah.
20   Q    Could I ask you to look on the last page.
21   A    Uh-huh.
22   Q    Actually it's not the last page of the contract.
23   It's the last page of the contract.
24   A    Okay.
25   Q    Sorry.  It is the last page of the exhibit.
```

Page 16

```
 1   A    You're talking this page (indicating)?
 2   Q    Yes.
 3   A    Okay.
 4   Q    Do you recognize your signature?
 5   A    Yes, I do.
 6   Q    All right.  And you recognize the signatures of
 7   Mr. Mossack and Mr. Fonseca?
 8   A    I never see the signature before, so I assume.
 9   Q    Okay.
10   A    I can't recognize the signature.  This is the
11   only time I see the signature.
12   Q    Okay.  So if we could turn to the first page of
13   Exhibit 1 --
14   A    This (indicating)?
15   Q    Yes, yes.  In the first paragraph it lists a
16   Social Security number and U.S. Certificate of
17   Citizenship number.
18   A    Yes.
19
20
21
22
23
24
25
```

Page 17

```
 1
 2
 3    Q    Okay.  So how did you become aware of this
 4    potential position with MF Corporate Services Nevada that
 5    you were later hired for?
 6         A    I don't remember where.  Was a person my son
 7    know I think, something meet, and people from
 8    MF Corporate Service was here and introduce me and called
 9    me for an interview; and I have to be -- meet them in a
10    restaurant for -- with my resume.  I think they went to
11    UNLV for ask people they speak Spanish.
12         Q    Okay.  So --
13         A    And the paralegal service, sometime they put
14    potential offer job for the student that are ready to
15    graduate.
16         Q    So you think you learned about the opportunity
17    through UNLV?
18         A    I don't learn about opportunity.  They have the
19    list probably of the students speak Spanish.  They give
20    it to them because I get called.
21         Q    I see.  So you were contacted --
22         A    I get contacted, yeah.  I get contact.  I
23    never -- in fact I never was looking for the second job.
24    I was very tired at that time finish my school, but I
25    thought it was a good opportunity.  I say yes.
```

Page 18

```
 1         Q    All right.  And I think you mentioned that your
 2    son may have had some role in this.  What was his role?
 3         A    Well, no.  My son got married, and one of the
 4    invited person for the wedding was in the same
 5    restaurant/hotel where these people stay; and because
 6    they speak Spanish -- in fact they are from Argentina I
 7    think, so they -- you know, they asked if they know
 8    somebody with Spanish language in this town.  That's what
 9    the first information I know about it.
10         Q    I see.  So people from the -- people from
11    MF Corporate Services asked people at the hotel --
12         A    At the hotel if they --
13         Q    -- if they knew of people --
14         A    Somebody.
15         Q    If you would, just let me finish my question so
16    we have a clear record.
17              So you think that people from MF Corporate
18    Services asked people from the hotel if they knew of
19    anyone in the area who spoke Spanish and who might be
20    suitable for a job with MF Corporate Services Nevada?
21         A    Yes.
22         Q    Is that right?
23         A    Yes.
24         Q    Do you recall who from MF Corporate Services
25    Nevada made these inquiries?
```

Page 19

1  A  Yes, the lady I meet after.
2  Q  Who -- what was her name?
3  A  Her name was Nancy, but I don't remember the
4  last name. Was a long time ago.
5  Q  And did Nancy work for MF Corporate Services
6  Nevada?
7  A  Nancy worked for MF Corp., yeah.
8  Q  For MF Corporate Services Nevada?
9  A  Yes.
10 Q  Do you know if Nancy worked for any other
11 company at that time?
12 A  Probably. I don't know. I meet her. She do my
13 training and she hire me. She sign this contract.
14 That's the person was here. I don't know if she worked
15 for another company. Probably. I don't know.
16 Q  I see. And how long did Nancy work at
17 MF Corporate Services Nevada after you started there?
18 A  She work up here -- she work a long time after.
19 She take vacation and then come back, and I always was in
20 touch with her in case I need something when she was not
21 here.
22 Q  Does she still work for MF Corporate Services
23 Nevada?
24 A  I don't know. I don't know. It's not in the
25 payroll, so no.

Page 20

1  Q  Do you ever hear from Nancy nowadays?
2  A  No. I hear long time ago because she had a
3  surgery. Probably she get retired, but -- because she
4  was not a young person, but I don't know anything about
5  her.
6  Q  I see. Did you meet or speak with anyone else
7  about the job at MF Corporate Services Nevada before you
8  were hired?
9  A  No. Only with Nancy.
10 Q  Only with Nancy, all right.
11 Did you speak with Mr. Mossack or Mr. Fonseca?
12 A  Never.
13 Q  Did you meet with them?
14 A  Not in that time. Later, very later.
15 Q  Okay. At what time have you met Mr. Mossack or
16 Mr. Fonseca?
17 A  During my period of work I learn a lot about the
18 Nevada jurisdiction and I have to market this Nevada, and
19 one -- couple time I have to be in some event where you
20 do PowerPoint presentation about what is your product and
21 how it's -- so I meet them in one of my trip to Panama --
22 Q  Okay.
23 A  -- explaining and offer the product and give a
24 presentation about the jurisdiction.
25 Q  So you met them in connection with

Page 21

```
1   presentations --
2   A    I met with them --
3   Q       -- like that?
4   A       -- with many other people.  I can't remember
5   names, but I meet at that time.
6   Q    I see.  Just if you would, let me finish my
7   question before you answer so the court reporter can get
8   everything down.
9        Have you met Mr. Mossack and Mr. Fonseca on more
10  than one occasion?
11  A    Yes, yes.
12  Q    Approximately how many times?
13  A    I will say three time.
14  Q    Was it always in the same kind of setting?
15  A    Uh-huh, yes, siempre in the same kind of setting
16  and marketing event.
17       MR. WOODS:  She said "siempre in the same kind of
18  setting."  Can you translate so the court reporter can --
19       THE INTERPRETER:  Oh, she said in Spanish, "always in
20  the same type of setting."
21       MR. HRANITZKY:  Well, I think this is still -- it's
22  working.
23  Q    And always in Panama?
24  A    Yes.
25  Q    How often do you go to Panama?
```

Page 22

```
1   A    Well, don't depend on me.  Depend on if they
2   have this -- how they call it -- marketing event or
3   summit.
4   Q    Summit?
5   A    Summit so we can learn about different --
6   everybody bring -- myself, I bring whatever is new here
7   about any new change of product.  Normally it's one a
8   year, but it's all depend when is the event, I don't
9   recall when is the last time, but I think my last time
10  was last February probably when I went.
11       MR. WOODS:  If I can, Patricia, like happened before,
12  if there's a word that you don't quite know what it is,
13  that's what the translator is for.  You can say it in
14  Spanish, if you don't know what it is, and she'll
15  translate it.
16       THE WITNESS:  Oh, okay, okay.
17       BY MR. HRANITZKY:
18  Q    In fact, if your counsel doesn't mind, there may
19  be times when I actually suggest that perhaps you answer
20  the question in Spanish --
21  A    Yeah.
22  Q       -- and the translator translates it.
23  A    Okay.
24  Q    For the short answers and the easy answers, I
25  think English is working, but for the more complicated
```

Page 23

```
 1    answers --
 2    A    Okay.
 3    Q    -- it may be best if we go through the
 4    interpreter.
 5    A    Okay.
 6    Q    Okay?
 7    A    Okay.
 8         (Through the interpreter)  So is it something
 9    that I didn't understand?
10    Q    I think we're fine.  Just going forward.
11    A    Okay.
12    Q    Do you go to Panama for any purpose other than
13    to attend these kinds of symposiums?
14    A    I like Panama.
15
16         MR. WOODS:  So is that a "no" or is that a "yes"?
17         THE WITNESS:  I will say yes.  I like to go for other
18    purpose if I would.
19
20    BY MR. HRANITZKY:
21    Q    But in the past, have you gone for business
22    purposes other than to attend the kinds of symposiums you
23    described?
24    A    I don't remember,
25
```

Page 24

```
 1    Q    They have nice beaches in Panama.
 2    A    Very, and I'm a beach person so -- and the warm
 3    water.
 4    Q    Me too, especially in the winter.
 5    A    So do you know why Mr. Mossack and Mr. Fonseca
 6    signed the employment contract on behalf of MF Corporate
 7    Services Nevada?
 8    A    No, I don't know.
 9    Q    All right.  Do you know if they have any
10    position with MF Corporate Services Nevada?
11    A    No.
12    Q    You didn't ask anyone that question?
13    A    No, I didn't ask.
14    Q    In your history working for MF Corporate
15    Services Nevada, have there been other instances where
16    Mr. Mossack and Mr. Fonseca -- or Mr. Fonseca -- acted on
17    behalf of MF Corporate Services Nevada?
18    A    No.
19    Q    None that you --
20    A    Not that I see it, no.
21    Q    Other than signing employment contracts?
22    A    Uh-huh.
23    Q    Have you seen any corporate formation documents
24    or things of that nature for MF Corporate Services
25
```

Page 25

1   Nevada?
2   A   No, no. I don't have any document of corporate
3   formation, just only the Article of Organization and the
4   initial list what I have in the office.
5   Q   In the Articles of Organization, are Mr. Mossack
6   or Mr. Fonseca identified in any capacity?
7   A   No.
8   Q   Their names appear nowhere?
9   A   No, nowhere.
10  Q   So -- strike that.
11      What is your title at MF Corporate Services
12  Nevada, if you have one?
13  A   I'm a secretary of the director.
14  THE REPORTER:   Of the what?
15  THE WITNESS:   Secretary.
16  THE INTERPRETER:   "I'm a secretary of the director."
17  BY MR. WOODS:
18  Q   Of the board?
19  A   Of the board, and also I'm running the office by
20  myself, so --
21      (Through the interpreter)   I'm the only
22  administrator.
23      (In English)   And the only employee.
24      (Through the interpreter)   And the only
25  employee.

Page 26

1   Q   Let me start with the second part.
2   A   Okay.
3   Q   So MF Nevada -- MF Corporate Services Nevada,
4   which I'm going to call "MF Nevada" if that's okay --
5   A   Yeah, okay.
6   Q   -- just to make it easier.
7   A   Okay.
8   Q   MF Nevada has no other employees as far as you
9   know?
10  A   No.
11  Q   Is that what you're saying?
12  A   As far as I know, no.
13  Q   As secretary to the board, would you know if
14  MF Nevada had other employees?
15  A   No, no. I don't do anything on the payroll
16  here, but I don't know anything if they have, no.
17  Q   Who handles the payroll for MF Nevada?
18  A   Myself.
19  Q   You do, okay.
20  A   I pay the payroll taxes and I pay the payroll.
21  Q   Do you sign your own salary checks?
22  A   Yes, sir.
23  Q   Do you sign salary checks for anyone else?
24  A   Yes.
25      (Through the interpreter)   Just for the

www.oasisreporting.com
Electronically signed by Ellen Goldstein (001-341-878-7457)
OASIS REPORTING SERVICES, LLC
702-476-4500
dc74d275-a377-447e-be82-b4d6d92d880

Page 27

```
 1    services, the services.
 2    Q    So you sign your own salary checks; but you do
 3    not sign salary checks for anybody else?
 4    A    No, no.
 5    Q    So as far as you know, you're the only employee
 6    of MF Nevada?
 7    A    Yes.
 8    Q    How does MF Nevada receive the money that is
 9    used to pay your salary and other expenses?
10    A    Every month myself or my secretary, if I use
11    one, a temp, we do a spreadsheet with our work and we
12    send it to our client, Mossack Fonseca, and they need to
13    deposit the money of our work, and that's the way it
14    work.  So I have my wire transfer on the money I charge
15    for MF -- it's not myself, but MF Nevada, like you
16    call -- charge and we get the money every month.
17    Q    So the money to pay your salary and the other
18    expenses --
19    A    Is in --
20    Q    If you would just let me finish.
21    A    Yeah, sorry.
22    Q    That's okay.  The deposition is funny because in
23    conversation people interrupt each other, but in -- it's
24    hard for the court reporter.
25    A    Yeah, yeah, I understand.
```

Electronically signed by Ellen Goldstein (001-341-678-7457)
dc74a275-4d77-447e-ba82-fc4e6692d880
www.oasisreporting.com     OASIS REPORTING SERVICES, LLC     702-476-4500

Page 28

```
 1    Q    So the money to pay your salary and the other
 2    expenses of MF Nevada comes from Mossack Fonseca is that
 3    right?
 4    A    Come from the client.  They pay Mossack Fonseca
 5    for the service we provide for them.
 6    Q    Okay.  But does the wire that you mentioned a
 7    moment ago to MF Nevada -- does the wire come from the
 8    clients or did it come from Mossack Fonseca?
 9    A    No.  We -- MF Nevada have in a bank account in
10    Panama, so they deposit the sales every month to the same
11    account and we reconciliate the account every end of the
12    month.
13    Q    I see.  So who deposits the money every month?
14    A    We pay a collection company to do that in
15    Panama, to collect company -- to collect the money.
16    Q    Okay.  So a collection company collects money
17    from clients?
18    A    No, collect money from Mossack Fonseca.
19    Q    I see.
20    A    And deposit in the account of MF Nevada in
21    Panama.
22    Q    Okay.  So the money goes from Mossack Fonseca to
23    the collection company and then from the collection
24    company into MF Nevada's bank account in Panama?
25    A    Yes.
```

Electronically signed by Ellen Goldstein (001-341-678-7457)
dc74a275-4d77-447e-ba82-fc4e6692d880
www.oasisreporting.com     OASIS REPORTING SERVICES, LLC     702-476-4500

Page 29

```
 1    Q    I mean what is the name of the collection
 2  company?
 3    A    I don't know.  I don't know the name of the
 4  collection company because it's a service we pay, but I
 5  don't know the name of the collection company.
 6    Q    But you said that it's the collection company
 7  that deposits the money in MF Nevada's bank account in
 8  Panama, yes?
 9    A    Yes.
10    Q    So do you have access to the records of the bank
11  account --
12    A    No.
13        -- in Panama?
14    A    No, I don't have any -- no.  I have the record
15  of the balance in the money, yes, because I get my
16  statement.  I get the bank statement every month on the
17  mail, but I don't -- I don't know the company.  It's a
18  service.  At this point I don't know.  Probably is in the
19  list of the people we pay services, but I don't remember
20  the name.
21    Q    So the bank statements you receive don't reflect
22  who the collection service --
23    A    Probably do, but I don't see that because all
24  these document I send it to the accounting here.
25    Q    So you never look at that?
```

Page 30

```
 1    A    No.
 2    Q    You're the secretary of MF Nevada though; right?
 3    A    Uh-huh.
 4    Q    And you report to the board of directors of
 5  MF Nevada with respect to certain matters, yes?
 6    A    Uh-huh.
 7    Q    Do you understand that part of your
 8  responsibility as secretary is to be familiar with the
 9  finances of MF Nevada?
10        MR. WOODS:  Object to that question.  I think that
11  mischaracterizes the -- mischaracterizes what she said.
12  You haven't laid a foundation about what her duties are.
13        You can answer the question.
14  BY MR. HRANITZKY:
15    Q    You can answer the question.
16    A    Oh, I didn't know he finished talking.
17        MR. WOODS:  Yes, if you understand it.
18        THE WITNESS:  (Through the interpreter)  Yes, I
19  understood it.
20        The job does not include the finances for MF.
21  I'm not good at finances.
22        (in English)  I give everything to a CPA who
23  work for us when we started.  He prepare everything.  I
24  give all the expense for every month and she prepare the
25  report for me to send it to the president of the company.
```

Page 31

```
1    Q   So if something is an error or something, they will find

2        out and they ask me probably; but the moment, so far so

3        good.

4        BY MR. HRANITZKY:

5    Q   You mentioned the president of the company. Who

6        was that?

7    A   Mrs. Imogene Wilson.

8    Q   Imogene?

9    A   Imogene Wilson.

10   Q   Wilson?

11   A   Yes.

12   Q   And where is Imogene Wilson located?

13   A   In Panama office.

14   Q   In the Panama office? The Panama office of

15       Mossack Fonseca?

16   A   I don't know. The address is Panama office,

17       where it is, but I don't know if she work for Panama

18       office.

19   Q   When you send documents to Imogene Wilson, do

20       you send it to --

21   A   I send it by E-mail.

22   Q   You send them by E-mail?

23   A   Yeah.

24   Q   What is Ms. Wilson's E-mail address?

25   A   I don't remember at this point.
```

Page 32

```
1    Q   How often do you send E-mails to Miss Wilson?

2    A   Probably once a month.

3    Q   But you don't remember her E-mail address?

4    A   I don't remember the E-mail address, no. I have

5        many E-mail address I send it to her.

6    Q   And she's the president of MF Nevada?

7    A   Uh-huh.

8    Q   Is that reflected in the Articles of

9        Incorporation of MF Nevada?

10   A   Yes. She's the person.

11   Q   And that appears in the Articles of

12       Incorporation?

13   A   In the list I believe. I don't know the

14       articles. In the list I believe she's the president.

15   Q   What list are you --

16   A   The annual list, the annual list.

17       (Through the interpreter) Annual list.

18   Q   The annual list provided to the Nevada Secretary

19       of State?

20   A   Uh-huh.

21   Q   Before when I was asking you about the bank

22       statements for MF Nevada's bank account in Panama --

23   A   Uh-huh.

24   Q   -- you said that you receive them but you don't

25       look at them and then you send them to somebody else. Is
```

Page 33

1 that right?
2 A The CPA.
3 Q You send them to the CPA. Who is the CPA?
4 A Sharples & Associates, Sharples & Associates.
5 Q Sharples?
6 A Sharples & Associates.
7 Q Sharpless?
8 A And Associates.
9 Q Are they based here in Nevada?
10 A Yes.
11 Q Do you send them to anybody else?
12 A I think it's more people in the E-mail. They
13 are part of the accounting or collection, but I don't
14 remember how many they are, but they are a part of people
15 they need to receive it.
16 Q Who are those people?
17 A They have the name of the company more
18 collection, collection, bookkeeper, another person work
19 for Sharples & Associates who is the bookkeeper for us.
20 Q I see. So collections and bookkeeping, are they
21 at Mossack Fonseca or the accounting?
22 A My accounting here and Mossack Fonseca in
23 Panama, yes, someone.
24 Q Okay. So you send the bank statements to
25 various people at your Nevada accountant and also --

Page 34

1 A Yes.
2 Q -- there's various people at Mossack Fonseca; is
3 that right?
4 A Yes.
5 Q Okay. Who are those people at Mossack Fonseca?
6 A They are different department. They're
7 accounting or something accounting.
8 Q I see. But you don't remember any of their
9 names?
10 A Well, the names I don't remember because I only
11 see the E-mail; and the E-mail, they are always not the
12 name. You know, it's some -- so I don't remember
13 exactly.
14 Q So it's like accounting@Mossack.com?
15 A Yeah, or collection and another company. So I
16 can't -- yeah, I don't remember exactly, yeah.
17 Q I see. But it doesn't list any person?
18 A Yeah, yeah, not person specific, yeah.
19 Q I see.
20 A Controller or something.
21 Q So you said that -- I asked you what your
22 position or positions are at MF Nevada and you said
23 you're the secretary to the board, you're the only
24 administrator, and you're the only employee; right?
25 A Uh-huh.

Page 35

```
 1   Q   But you mentioned before a woman named Imogene
 2   who's the president of MF Nevada?
 3   A   Uh-huh.
 4   Q   You don't consider Imogene to be an employee of
 5   MF Nevada?
 6   A   I don't know if she's employee.  She's not in my
 7   payroll.
 8   Q   I see.  So you're in charge of the payroll?
 9   A   Yes, here in this place.  I don't know anything
10   about more than here.
11   Q   Do payroll checks get paid out of the account in
12   Panama --
13   A   No.
14   Q   -- or do they get paid out of an account here in
15   Nevada?
16   A   No.  All our business coming in a bank account
17   here.  All the bank account, they're running here.
18   Q   I see.  So is money transferred from the bank
19   account in Panama to the bank account in Nevada
20   periodically?
21   A   Yes.
22   Q   And who is responsible for transferring that
23   money?
24   A   The collection department we pay because they
25   collect our invoices.
```

Page 36

```
 1   Q   The collection department at Mossack Fonseca?
 2   A   I don't know.  I don't know if it's Mossack
 3   Fonseca or a private company.  I never speak with them.
 4   Q   I see.  So when --
 5   A   The reason I know is because I get a bill from
 6   them.
 7   Q   I see.  So if, as the person in charge of
 8   payroll in Nevada, you see that MF Nevada needs to
 9   meet its expenses, who do you call or E-mail to ask that
10   funds be transferred?
11   A   I send an E-mail --
12           (Through the interpreter)  I send an E-mail to
13   the person of the collection asking for payment of the
14   invoice for the jobs that we have done during that time.
15   Q   And who do you send that E-mail to?
16   A   To the collection department.
17   Q   All right.  And who is that?
18   A   I think it's a name -- I don't know exactly the
19   name.  I can give you wrong name.  I don't know the name.
20   Q   But how often do you send E-mails of that
21   nature?
22   A   Normally I don't have to send much E-mail of
23   that because the sale and the payment of invoices is very
24   on time, but when we have to pay an extra something, we
25   request they go more straight to collect the money with
```

Page 37

1 the people they don't pay on time; like, you know,
2 sometime take later, pay after 30 days.
3 Q But even though you said before that paying this
4 service is one of the expenses of MF Nevada that you're
5 responsible for and that you have to communicate with
6 them periodically to see that funds get transferred to
7 MF Nevada's account, you don't remember the name of that
8 collection service?
9 A (Through the interpreter) Okay. What happens
10 is you speak to different people --
11 THE REPORTER: Start again. I didn't understand you.
12 THE INTERPRETER: "What happens is you speak to
13 whoever is there, whoever happens to answer the phone."
14 THE WITNESS: (In English) Or I send an E-mail.
15 BY MR. HRANITZKY:
16 Q Well, and I'm asking, when you send the E-mail,
17 who do you send the E-mail to?
18 A Collection department or -- what is their name?
19 Can be accounting, but I don't -- I'm not sure. I'm not
20 sure. I need to -- I --
21 Q Is that accounting and collections at Mossack
22 Fonseca or someplace else?
23 A No. It's -- I don't know. I don't know. It's
24 probably in Mossack Fonseca, but I don't know if they are
25 at Mossack Fonseca.

Page 38

1 Q When you call, understanding that different
2 people answer the phone, are you calling to the Panama
3 country?
4 A Yeah, I call the Panama country, yeah.
5 Q Okay. Do you recall the name of any of the
6 people that you speak to?
7 A I have the feeling I speak more often with one
8 name they call Jodeli. Jodeli, I think that's the name
9 of the person I been speaking, Jodeli. I don't know even
10 how to spell it, Jodeli.
11 Q Jodeli?
12 A Jodeli.
13 Q Is that a man or a woman?
14 A A woman.
15 Q A woman.
16 A And I don't know her E-mail because it's in the
17 department.
18 A Her proper name doesn't appear when you send the
19 E-mail?
20 A Yeah. The only thing I know is Jodeli, because
21 when I can -- it's the person I speak in the phone.
22 Q I see, okay. What are your responsibilities
23 with MF Nevada, your job responsibilities?
24 A Since open the door in the morning --
25 (Through the interpreter) Since I open the door

Page 39

```
 1   in the morning --
 2   Q    (In English) -- be in charge of all --
 3        (Through the interpreter) I'm in charge of the
 4   office operations, bring all the documents in front of
 5   the Secretary of State of all the documents that we
 6   receive.
 7        (In English)  We request, to incorporate
 8   company, service of process for companies we're having
 9   and comply with the regulation for the office in Nevada
10   and learn about jurisdiction of Nevada.
11        (Through the interpreter)  If there has been any
12   change.  If a change has been made, I have to make a
13   change so the business can run.
14   Q    So when you refer to "changes," you mean changes
15   in the laws and regulations --
16   A    Changes to the law and regulations.
17   Q    Just allow me to finish.
18   A    Yeah.
19   Q    Changes to the laws and regulations governing --
20        Governing.
21   Q    -- Nevada corporations?
22   A    (Through the interpreter)  Yes.
23   Q    So you can make sure that all of the Nevada
24   corporations that you're overseeing are in full
25   compliance with Nevada law?
```

Page 40

```
 1   A    Correct, correct.
 2   Q    And how do you learn about those changes?
 3   A    (Through the interpreter)  I'm involved with the
 4   Secretary of State.
 5        (In English)  We are a commercial registered
 6   agent, so we get mail every week or every month if
 7   something is changed, and also --
 8        (Through the interpreter)  I participate as a
 9   member of the associated agents of the state of Nevada,
10   registered agents association of the state of Nevada.
11   Q    And that organization provides some educational
12   functions?
13   A    They provide some education and they advise you
14   if there any change coming and they give you ahead of
15   time to prepare yourself and prepare your client.  The
16   more important is to -- I need to inform Mossack Fonseca
17   what's going to change in order to prepare the document.
18   Q    Okay.  So you mentioned your job
19   responsibilities are to open the door in the morning, you
20   manage the office operations, you handle filing of
21   documents with the Nevada Secretary of State, sometimes
22   you arrange for service of process of documents.
23   A    Uh-huh.
24   Q    You're generally responsible for staying
25   informed of changes to Nevada laws and complying with
```

Page 41

1    those Nevada laws.  Is there anything else?

2        A    (Through the interpreter)  Yes.  We have a

3    service between Mossack Fonseca and MF Nevada that in

4    some cases we must sign documents for the purpose to

5    legalize them in the state of Nevada, acting as a nominee

6    service.

7        Q    So if I understand correctly, in some instances

8    you're granted Powers of Attorney to sign documents on

9    behalf of various entities.  Is that right?

10       A    If the client requests signature to have

11   legalized in Nevada, they authorize me and they put on --

12   I act on behalf to sign it as nominee service.

13       Q    They authorize you by granting you a Power of

14   Attorney?

15       A    They grant me a Power of Attorney to sign this

16   specific document here when they need to legalize,

17   because otherwise it's no way to legalize document in

18   this country or by consulate.

19            THE REPORTER:  Or by?

20            THE INTERPRETER:  Consulate.

21   BY MR. HRANITZKY:

22       Q    Is part of your job to hold the position of

23   assistant secretary, deputy secretary, or some other

24   position in entities other than MF Nevada?

25       A    I was -- I was --

Page 42

1            (Through the interpreter)  I was assigned to

2    have the position of assistant secretary to other -- with

3    other corporations, nominee corporations, nominee

4    services, with the purpose to accelerate the process of

5    an incorporation or a legalization, but not anymore, but

6    I'm not doing that anymore.

7        Q    On behalf of what entities did you perform that

8    role at one time?

9        A    In the past I sign a document.  I was -- signed

10   for Aldyne.

11            MR. HRANITZKY:  A-l-d-y-n-e.  You're going to hear

12   that one a lot.

13            THE WITNESS:  Plascot.

14   BY MR. HRANITZKY:

15       Q    Sorry.  What was that?

16       A    Plascot.

17       Q    Plascot?

18       A    I think I give you some paper in that.  I don't

19   remember right now.  You need to have --

20       Q    Plascot, P-l-a-s-c-o-t?

21       A    Uh-huh.

22       Q    Okay.  Any others?

23       A    I don't remember any other ones, but normally if

24   they need some specific on that company, they mention or

25   they change -- they put me as the secretary just to sign.

Page 43

```
1    but in the past I don't do it.  I resign it.
2         Q    Okay.  Who asked you to take on that
3    responsibility?
4         A    Well, Mossack Fonseca have agreement with
5    MF Corporate Service we need to provide the service.
6    It's part of the service we need to provide to them.
7         Q    I see.  So but --
8         A    They can sign, anybody in my office.  Because
9    the only one I am I have to sign it; but if I have
10   another one, they will sign it too.
11        Q    So where does the request come from?
12        A    (Through the interpreter)  Usually it comes from
13   the client.
14        Q    All right.  So it was the client that requested
15   that you be made assistant secretary to Aldyne in order
16   to sign documents on behalf of Aldyne?
17        A    (Through the interpreter)  The customer request
18   Mossack Fonseca, and Mossack Fonseca uses the service
19   that is requested.
20        Q    So how did you learn that it was requested that
21   you become assistant secretary for Aldyne?
22        A    Since the beginning they told me I need to sign
23   document because this is part of the service, the
24   contract service they have in --
25   ///
```

Page 44

```
1         THE REPORTER:  In what?
2         THE INTERPRETER:  "In some occasions."
3         BY MR. HRANITZKY:
4         Q    When did you become assistant secretary to
5    Aldyne?
6         A    I have no idea.  I don't know because I never
7    have the document with me.
8         Q    Did you have to sign any document in order to
9    become assistant secretary to Aldyne?
10        A    I don't remember.  No, I don't remember.
11        Q    But you've signed documents as assistant
12   secretary to Aldyne?
13        A    Uh-huh, in the past, yeah.
14        Q    How frequently?
15        A    Depend how they need it.
16        Q    But approximately, to the best of your
17   recollection, how often did that happen?
18        A    In the past was more often than in the last
19   three or four year because they use this nominee more
20   often.
21        Q    They used Aldyne more often?
22        A    Uh-huh, for nominee services.
23        Q    When you say "they," you mean Mossack Fonseca?
24        A    The client or Mossack Fonseca.  I don't know
25   because I don't know who.  That's the instruction I
```