Page 145

```
 1   documents?  Are they on a --

 2      A    In the past?

 3      Q    Currently.

 4      A    Current?  Current electronic going on -- how

 5   they call the name I explain to you -- platform from

 6   Mossack Fonseca, platform.  When they open the case, we

 7   attach to that platform.  So some document -- with my

 8   keep it in my office.  Some other document, they are not

 9   mine anymore, like the Operating Agreement and that kind

10   of stuff, so I don't keep it.

11      Q    Okay.  But you said that you --

12      A    The document I prepare, I keep it all the time.

13   I do copies.

14      Q    So you keep hard copies, right, and you said

15   that you have --

16      A    Physical and hard.

17      Q    You have some electronic --

18      A    Uh-huh.

19      Q      -- copies?

20      A    Uh-huh.

21      Q    Are the electronic copies that you just referred

22   to looking through, are they stored on CD?

23      A    Some one they stored on CD.  Some one they

24   stored in the computer.

25      Q    But is it on the Mossack Fonseca platform or
```

Page 146

```
 1   someplace else?

 2      A    On the Mossack Fonseca platform, most of them,

 3   because I told you, when they open the instruction, it's

 4   like a platform instruction.  So we put everything there,

 5   the instruction and everything; and after the company is

 6   incorporated and it's gone, no more access to that

 7   platform anymore on that particular company for me.  I

 8   don't know how they call.  It's a system.  It's a

 9   computer, you know.

10      Q    So did you search the Mossack Fonseca

11   platform --

12      A    I searched my --

13      Q    Hold on.

14            Did you search the Mossack Fonseca platform for

15   any documents when you were collecting documents to

16   respond to this subpoena?

17      A    I search my access, my access what I have, and

18   my access what I have was also the same I have in my

19   file, physical file.

20      Q    Okay.  So you searched the documents on the

21   Mossack Fonseca platform that you have access to?

22      A    Yes.

23      Q    I see.  And they were the same --

24      A    Same, exactly the same.

25      Q      -- as the documents in the file?
```

Page 147

```
1    A    Uh-huh.

2    Q    Okay.  And then there are other documents in the

3    Mossack Fonseca platform that you don't have access to?

4    A    I can't have access, yeah.

5    Q    I understand.

6    A    Do you know if the Mossack Fonseca platform is

7    shared with all the Mossack Fonseca affiliates?

8    A    I don't know.  I don't know.  The only thing I

9    know is my access.

10   Q    Do you know where the platform is maintained?

11   A    Is it on the server in Panama or --

12   A    No idea.

13   Q    No idea?

14   A    I don't know.

15   Q    Is the platform that you're talking about, is

16   that the same thing as the electronic filing cabinet

17   that's referred to in some -- take that back.

18        Have you ever heard the term "electronic filing

     cabinet"?

19   A    No.  My first time.  Sorry.

20   Q    Now could you please turn to Exhibit 14.

21   A    Turn to first page?

22   Q    Exhibit 14.

23   A    Uh-huh.

24   Q    Oh, sorry.

25   A    So on the first page do you see this is an
```

Page 148

```
1    E-mail from World Compliance Corporations to Suzy Ramos

2    Corporations?

3    A    Uh-huh.

4    Q    Do you know what World Compliance Corporations

     is?

5    A    No.

6    Q    Never heard of that?

7    A    No -- well, no, I heard but probably I don't

8    have no idea what it is in a long time.

9    Q    Do you know who Suzy Ramos is?

10   A    Yes.

11   Q    Who is Suzy Ramos?

12   A    She work in the same place as Iris Vergara.

13   Q    Iris Vergara, is she in the corporations group

14   at Mossack Fonseca?

15   A    Yeah, the same as Suzy Ramos.

16   Q    I see.  Okay.  So could you turn to the fourth

17   page of Exhibit 14, which confusingly has the number 1 at

18   the bottom.

19   A    Oh, yeah, okay.

20   Q    And it has the -- in the lower right corner it

21   says TRANSLATION MFCS 002132.  Do you see that?

22   A    Uh-huh.

23   Q    Okay.  You see at the top the E-mail is from

24   Mossack Fonseca & Company (corporations Nevada)?
```

Page 149

```
 1    A   Uh-huh.
 2    Q   And it's to MF Corporate Services Nevada.  See
 3   that?
 4    A   Yeah.
 5    Q   MF Corporate Services Nevada, that's your, right?
 6    A   Yes.  MF Corporate Service Nevada is me.
 7    Q   So what is Mossack Fonseca & Company
 8   (corporations Nevada)?
 9    A   This is the department of selling Nevada.  This
10   is where Iris is.
11    Q   That's where Iris is?
12    A   Yeah.  It's the department of sale of Mossack
13   Fonseca Nevada.
14    Q   I see.  So this is the sales group that sells
15   Nevada LLCs?
16    A   Yes, sell Nevada.  We only offer Nevada LLC, but
17   that's what they sell.  They are in touch with me because
18   that's what they -- they are in charge to do.
19    Q   That group may do other things too --
20    A   Yeah, I don't know.
21    Q   Let me finish.
22        One of the things they do is sell Nevada LLCs?
23    A   Yes.
24    Q   And that's where Iris --
25    A   Vergara --
```

Page 150

```
 1    Q   -- Vergara works?
 2    A   -- Suzy Ramos and somebody else maybe.  I don't
 3   know.
 4    Q   Is Suzy Ramos still at Mossack Fonseca?
 5    A   Yes.
 6    Q   So in addition to getting requests from Iris
 7   Vergara, you also sometimes get requests from Suzy Ramos?
 8    A   Yeah, because they help each other, one or the
 9   other one.
10    Q   Okay.  You can go to Exhibit 15 now.
11    A   So I keep going?
12    Q   Yes.  It's the next exhibit.
13    A   So we're done with this one?
14    Q   Yes.
15    A   15, here it is.
16    Q   Do you recognize Exhibit 15?
17    A   I don't see it before, but here it is.  Okay,
18   maybe I see it.  I don't remember.  Okay.
19        MR. WOODS:  Is that a "yes" or a "no"?
20        THE WITNESS:  No.  I mean I don't understand the
21   question.  If I recognize this document?
22        BY MR. HRANITZKY:
23    Q   Have you seen this document before?
24    A   I don't remember.
25    Q   You don't remember.
```

Page 151

```
 1          Q    Do you know if MF Nevada produced this document
 2    in response to the subpoena?
 3          A    Probably.
 4          Q    You don't know as you sit here now?
 5          A    I produce so many documents, I don't remember
 6    each one.
 7          Q    Okay.  You see it's from a woman named Monica
 8    Ycaza?
 9          A    Uh-huh.
10          Q    Did I pronounce that right, Ycaza?
11          A    Yeah.
12          Q    Do you know Monica Ycaza?
13          A    I don't, but I see her name.
14          Q    I see.  Have you ever interacted with Monica
15    Ycaza?
16          A    No.
17          Q    No?  Have you ever E-mailed with Monica Ycaza?
18          A    Maybe.  I don't know.  Maybe.
19          Q    Maybe?
20          A    She work in Peru.
21          Q    Okay.  You say -- you see at the bottom it's
22    signed "Monica, Mossfon Peru"?
23          A    Uh-huh.
24          Q    Do you know what Mossfon Peru is?
25          A    No.
```

Page 152

```
 1          Q    No?
 2          A    No.
 3          Q    But you've heard of it before?
 4          A    I heard, yeah, the name.  I heard but I don't
 5    know what it is.
 6          Q    You don't know what it is, okay.
 7          A    Exhibit 16, do you recognize Exhibit 16?
 8          Q    Same thing on the other one.  I see a document.
 9    Probably it's in the document I produced, but --
10          A    You don't have a specific memory?
11          Q    Specific memory, no.
12          A    Do you see at the top it's an E-mail from Jost
13    Dex in the Luxembourg rep office to you?  Do you see
14    that?
15          Q    Oh, to me, yeah.
16          A    Dated May 22nd, 2006?
17          Q    Uh-huh.
18          A    Who is Jost Dex?
19          Q    Was the person work at the Luxembourg office for
20    a long time, but in the beginning I don't know.
21          A    Did you communicate from time to time with Jost
22    Dex when he was at the Luxembourg --
23          Q    Not very often.
24          A    But sometimes?
25          Q    Sometime when he need something.
```

Page 153

```
 1   Q    So sometimes you would get requests from Jost
 2   Dex?
 3   A    Sometime in the past.
 4   Q    And were the requests for -- to set up Nevada
 5   LLCs?
 6   A    Uh-huh.
 7   Q    For clients of the Mossack Fonseca Luxembourg
 8   office?
 9   A    I believe so.  I don't know.  He request -- he's
10   part of the same like the Panama office.  They requested
11   the name or something, yeah.
12   Q    So you're saying that he's part --
13   A    I don't know for which client, but I believe
14   it's for the same client.  He's part of the same office.
15   Q    So you mean he's part of Mossack Fonseca you're
16   saying?
17   A    Yeah.  Otherwise I can't answer.
18   Q    Okay.  But he's in the Luxembourg representative
19   office of Mossack Fonseca?
20   A    Uh-huh, I believe so.
21   Q    That's your understanding?
22   A    That's what I understand.  I'm not sure.
23   Q    Okay.  Do you see towards the bottom of this
24   first page it says, "Dear Patricia, please proceed with
25   the incorporation of a new LLC named Agroglob Equity,
```

Page 154

```
 1   LLC"?
 2   A    Yeah.
 3        MR. WOODS:  Great name.
 4   BY MR. HRANITZKY:
 5   Q    Do you know how the clients choose these names?
 6   A    No idea, trust me, which I know they are very
 7   crazy names.  Don't make sense to me many time, yeah.
 8   Q    Okay.  And then you see below it says they'd
 9   like it with the following features:  Speedy
10   incorporation service?
11   A    That mean expedite service, like I need to pay
12   extra money at the Secretary of State for expedite
13   service.
14   Q    And then does MF Nevada get paid an extra fee
15   for doing expedition?
16   A    No, I don't think so.  We only charge the
17   expedite fee for Secretary of State.  I don't know.
18   Myself, no, we don't.  We just charge an extra of the
19   Secretary of State.  That's what I understand what they
20   say.
21   Q    Then it says the manager is Aldyne?
22   A    Uh-huh.
23   Q    And then the member is Gairns?
24   A    Uh-huh.
25   Q    So Aldyne serves as the manager for many --
```

www.oasisreporting.com
OASIS REPORTING SERVICES, LLC
702-476-4500
Electronically signed by Ellen Goldstein (001-341-678-7457)
dc74d275-4a77-447a-ba82-64a6d02d680

www.oasisreporting.com
OASIS REPORTING SERVICES, LLC
702-476-4500
Electronically signed by Ellen Goldstein (001-341-678-7457)
dc74d275-4a77-447a-ba82-64a6d02d680

Page 155

```
 1        A.    Yeah.
 2        Q.    -- many Nevada LLCs for which MF Nevada is the
 3  registered agent; right?
 4        A.    Uh-huh.
 5        Q.    Do you know why?
 6        A.    I don't know why, but I have a common sense.
 7  It's a nominee service, so they use it for many company
 8  with no -- no specific reason.
 9        Q.    When you say it's nominee services, can you
10  explain what you mean by that?
11        A.    Yeah.  They use a nominee service in order to
12  expedite the document to be sign here or incorporate.  I
13  told you in the past I was director of one these, and
14  that's the only reason they use nominee service.
15        Q.    I'm sorry.  I'm just -- you probably did answer
16  this before.  I'm just not completely understanding.
17        So you say that they use Aldyne --
18        A.    Aldyne.
19        Q.    -- as a manager because you were the assistant
20  secretary for Aldyne?
21        A.    No, no.  They use a nominee services,
22  MF Corporate.  Mossack Fonseca offer to the client, and
23  in our contract we supposed to serve it as a signature.
24  I sign for them in order to expedite the process, and I
25  think at that time was the nominee service for many
```

Page 156

```
 1  entities.
 2        Q.    I see.  So it was just a --
 3        A.    It's not like because Aldyne is a beautiful
 4  name, no.  Aldyne was the manager for many entities.
 5        Q.    When you say "nominee services," just explain to
 6  me again what you mean by that.
 7        A.    Nominee service is a service that you use in
 8  order to expedite the documentation.  If I'm a director
 9  or secretary of this, I can sign document here quickly
10  and legalize and I can send the company more quick then.
11        Q.    So if I understand what you're saying, by making
12  Aldyne the member, because you used to be the secretary
13  for Aldyne --
14        A.    Uh-huh, yes.
15        Q.    -- you could then sign documents on behalf of
16  Aldyne?
17        A.    Yeah, like the annual list.
18        Q.    So that made the process of setting up the
19  Nevada LLC --
20        Q.    Quick.
21        Q.    -- smoother and quicker?
22        A.    Uh-huh.
23        Q.    Is it your understanding that that's the only
24  reason Aldyne was designated as --
25        A.    That's what I get explained.
```

Page 157

```
 1   Q    Just let me finish.

 2        Is it your understanding --

 3   A    Yeah.

 4   Q    -- that that's the only reason why Aldyne was

 5   chosen as the manager for many of these Nevada LLCs?

 6   A    (Nods head.)

 7        MR. WOODS:  Is that a "yes"?

 8        THE WITNESS:  Yes, that's a yes.

 9   BY MR. HRANITZKY:

10   Q    You're no longer the assistant secretary for

11   Aldyne?

12   A    No, I'm not.

13   Q    Do you have any position with Aldyne now?

14   A    No.

15   Q    Is Aldyne used as the manager for new Nevada

16   LLCs that you set up through MF Nevada?

17   A    No.

18   Q    No?

19   A    That I see, no.

20   Q    Is there a new entity that you're the secretary

21   of --

22   A    No.

23   Q    -- that does that?

24   A    No.

25   Q    No?
```

www.oasisreporting.com          702-476-4500
OASIS REPORTING SERVICES, LLC
Electronically signed by Ellen Goldstein (001-341-878-7457)          dc74e275-a477-447e-be82-f64e66f2d860

Page 158

```
 1   A    No.

 2   Q    Is there any entity that frequently is

 3   designated as the manager for new Nevada LLCs that you

 4   set up?

 5   A    No, I'm not sure.  They're all different kind,

 6   no.  In the present you're asking; now?

 7   Q    In the present, yes.

 8   A    No.  Different kind.

 9   Q    It's always different names?

10   A    Different name.

11   Q    Never -- the same name is never used --

12   A    No.

13   Q    -- twice?

14   A    No.

15   Q    As far as you know?

16   A    Well, maybe twice if it's the same client, but I

17   don't remember that.

18   Q    I see.  But the practice of sort of using a

19   placeholder manager --

20   A    For many companies?

21   Q    Yes.

22   A    No.

23   Q    That's not done anymore?

24   A    No.

25   Q    What is Gairns Limited?
```

www.oasisreporting.com          702-476-4500
OASIS REPORTING SERVICES, LLC
Electronically signed by Ellen Goldstein (001-341-878-7457)          dc74e275-a477-447e-be82-f64e66f2d860

Page 159

```
 1   A   I think -- I don't know.  It's another company,
 2   but I don't know anything about it.
 3   Q   Did you -- have you ever had any position with
 4   Gairns Limited?
 5   A   I don't remember.  I don't know.  Maybe, but I'm
 6   not sure.
 7   Q   How long were you assistant secretary of Aldyne
 8   Limited?
 9   A   I don't know.  The only thing I remember is my
10   resignation was in 2013, June; so that's all I remember.
11   Q   Okay.  Did you ever interact with anyone else at
12   Aldyne --
13   A   No.
14   Q   -- when you were the assistant -- just let me
15   finish.
16       When you were the assistant secretary, you never
17   interacted with anyone else at Aldyne?
18   A   No.
19   Q   No?
20   A   No.
21   Q   Did that seem strange to you at all?
22   A   No, they don't sound strange because I don't
23   have to interact with anybody.
24   Q   All you do is just sign on behalf of Aldyne?
25   A   That's the contract of MF.  I have to just sign
```

Page 160

```
 1   the document.  There are -- that's the service we
 2   provide.
 3   Q   Did you ever -- so you never undertook any kind
 4   of investigation to satisfy yourself that Aldyne wasn't
 5   involved in some kind of criminal activity or wrongdoing?
 6   A   Well, the only thing I know about Aldyne, it
 7   wasn't a company incorporated as a shell, because I see
 8   the address and I never thought it will be in any bad
 9   activity.
10   Q   You've never heard of Aldyne being investigated
11   criminally by criminal prosecutors in Argentina or
12   elsewhere?
13   A   No, not until now, not until -- I will say until
14   I received the subpoena in August 2013.
15   Q   So it's only because of the litigation --
16   A   Yeah.
17   Q   -- involving -- just let me finish.
18       It wasn't until the litigation involving my
19   client that you became aware --
20   A   Uh-huh.
21   Q   -- that Aldyne was being investigated --
22   A   Yeah.
23   Q   -- by prosecutors in Argentina?
24   A   Yes.
25   Q   Okay.  And have you ever interacted or
```

Page 161

1    communicated with anyone else at Gairns?
2    A    No.
3    Q    Could you go to the second page of Exhibit 16.
4    Do you see in the middle there's an E-mail to Mr. Dex and
5    it's signed Gabor Kacsoh, K-a-c-s-o-h, from Experta
6    Corporate and Trust Services?
7    A    Uh-huh.
8    Q    Have you ever heard of Experta Corporate and
9    Trust Services?
10   A    Never.  I just pay attention this moment.
11   Never.
12   Q    Do they appear to be a client of Mossack
13   Fonseca?
14   A    Look like it's a client there.
15   Q    Okay.  Now, read down below.  You see at the
16   bottom of the page it says, "Please be advised that we do
17   not have any company available in our office at this
18   time.  However, the following companies are from the
19   stock of our Nevada office," right, and this is an E-mail
20   from Jost Dex.
21   A    "Please be advised" -- okay, I get it.
22   Q    This is an E-mail from Jost Dex to this person
23   at Experta-Lux.
24   A    Uh-huh.
25   Q    And he says they don't have any companies

Page 162

1    available in their office but the following companies are
2    available from the stock in the Nevada office and it
3    lists two, Exton International, LLC and Everina --
4    A    Everina.
5    Q    -- Everina Holdings Limited?
6    A    Uh-huh.
7    Q    Does this mean that Exton International and
8    Everina Holdings were on the shelf at MF Nevada?
9    A    Probably.
10   Q    Okay.  Just waiting for somebody to buy them?
11   A    Uh-huh.
12   Q    Do you know who chooses the names for the
13   entities that are sitting on the shelf at MF Nevada?
14   A    No.  I only check the request, what is the name
15   available and how they look.  Some one I try to make it
16   more make sense, but no, nothing is specific.  I think go
17   by the ABC, like mix name.  Nothing is special.
18   Q    Okay.  So I'm just -- I'm not sure I understand
19   your answer.
20   Are you saying you don't choose the names --
21   A    No, I don't choose.
22   Q    Let me just finish.
23   You don't choose the names of the companies that
24   you keep on the shelf at MF Nevada?
25   A    Uh-huh.

Page 163

1    Q    Do you know who chooses those names?

2    A    Probably the sale department.

3    Q    At Mossack Fonseca?

4    A    The Iris and Suzy, they propose some name and I

5    fix it because sometimes the name is too long and nobody

6    can see it in their document, so I recommend shorter.

7    Q    But you never say, "Oh, come on, Iris. This is

8    a stupid name"?

9    A    Well, I say every day this is a stupid long

10   name, but -- well, but if the client like it --

11   Q    Well, but this is before the client buys it;

12   right?

13   A    Well, but I think the marketing department, they

14   study what name they like it more, like E, B. Myself, I

15   check the people with double Y. They like it more than

16   other letters, so it's interesting.

17   Q    Do they do focus groups and ask people what

18   company names they like best?

19   A    Maybe. You know, marketing is for everything.

20   You never know.

21   Q    It's a big business.

22        Okay. Let's move to Exhibit No. 17.

23   A    Oh, I'm lost.

24   Q    17.

25   A    Oh, 17, here.

www.oasisreporting.com
Electronically signed by Ellen Goldstein (001-341-878-7457)
OASIS REPORTING SERVICES, LLC
702-476-4500
dc74d275-4a77-447e-ba82-fc4e6692d880

Page 164

1    Q    Have you seen Exhibit 17 before?

2    A    Uh-huh.

3    Q    Okay. At the top, this is an E-mail from

4    Mossack Fonseca & Company (corporations Nevada) to

5    Mossack Fonseca & Company Uruguay and there's a copy to

6    you. Do you see that?

7    A    Uh-huh.

8    Q    And it's signed by Iris Vergara?

9    A    Vergara.

10   Q    Do you know what Mossack Fonseca Uruguay is?

11   A    I believe it's an office there, but that's all I

12   know.

13   Q    An office of Mossack Fonseca in Uruguay?

14   A    Uh-huh.

15   Q    Do you sometimes receive E-mails from Mossack

16   Fonseca Uruguay?

17   A    No, not very often.

18   Q    But occasionally?

19   A    Well, like you say this one, this one is like a

20   copy for some.  I get copy of the E-mail, not directly

21   from them.

22   Q    But do you ever get requests to set up Nevada

23   LLCs for clients of the Mossack Fonseca Uruguay office?

24   A    Not direct to me.

25   Q    But this is a request that's coming through Iris

www.oasisreporting.com
Electronically signed by Ellen Goldstein (001-341-878-7457)
OASIS REPORTING SERVICES, LLC
702-476-4500
dc74d275-4a77-447e-ba82-fc4e6692d880

Page 165

```
 1   for a Mossack Fonseca Uruguay client; right?
 2   A    Uh-huh.
 3   Q    Is that "yes"?
 4   A    Yes.
 5   Q    You agree?
 6   A    I believe so.
 7   Q    So occasionally you do get these kinds of
 8   requests for clients of Uruguay; right?
 9   A    Indirectly, yeah.
10   Q    Indirectly through Iris?
11   A    Uh-huh, through Iris.
12   Q    You see that there's a number of fees listed?
13   A    Uh-huh.
14   Q    For example, under the paragraph numbered 1, you
15   see "The cost is as follows," and then the first item is
16   "our fee" --
17   A    Uh-huh.
18   Q    -- $175?
19   A    Uh-huh.
20   Q    Does that go to MF Nevada or does that go to
21   Mossack Fonseca?
22   A    Mossack Fonseca.  We don't touch any of this.
23   That's completely different amount that we charge.  This
24   is different.
25   Q    I see.
```

Page 166

```
 1   A    We don't deal with the quote to them, no.
 2   Q    Now go to the second page.  Do you see this is
 3   an E-mail from Lorena Miranda?
 4   A    Uh-huh.
 5   Q    And she appears to be a lawyer; right?
 6   A    I don't know.
 7   Q    Well, it says "lida."
 8   A    Licenciada.
 9   Q    Licenciada, doesn't that mean lawyer?
10   A    Yeah, probably.  Don't mean -- it could be a
11   lawyer, but it's a -- I don't know.  In Latin American I
12   think they call licenciada any people who are from
13   university I believe.  I don't know.
14   Q    Okay.  So you don't know?
15   A    Yeah.
16   Q    You don't know if Lorena is a lawyer?
17   A    No, I don't have no idea.
18   Q    But this is an E-mail that she is sending to you
19   and to Iris --
20   A    Uh-huh.
21   Q    -- right?
22   A    Uh-huh.
23   Q    Saying, "Please address the client's question
24   and send your comments.  Thank you.  You see that?
25   A    Yes.
```

Page 167

```
1    Q    So this is a request that's coming to you from
2    Uruguay.  It's going to Iris at the same time, but
3    Uruguay is making a request to you directly to address
4    the client's question; right?
5    A    Uh-huh.
6    Q    Did you address the client's question?
7    A    Probably not, because I don't allow to respond
8    directly.  Probably I give whatever answer is to Iris and
9    Iris respond.  It's all depend on request.
10   Q    Okay.  Now could you go two pages -- two more
11   pages.  Now we're on the page TRANSLATION MFCS 000902.
12   A    Oh, 902.
13   Q    See that?
14   A    Uh-huh.
15   Q    This is an E-mail from Mossack Fonseca
16   Corporations Nevada to Mossack Fonseca Uruguay.
17   A    Uh-huh.
18   Q    Do you see that?
19   A    Uh-huh.
20   Q    All right.  And it's signed by someone named
21   Edison Teano.
22   A    Tee-an-o.
23   Q    Teano.  Who is Edison Teano?
24   A    It's a lawyer in Panama.
25   Q    He works at Mossack & Fonseca in Panama?
```

Page 168

```
1    A    I don't know.  I think so.
2    Q    Okay.  And then do you know who Odile is?  This
3    E-mail says at the top, "Dear Odile."  Do you see that?
4    A    No, I don't know.  Probably he work at the
5    Uruguay office, but I don't know either.
6    Q    Okay.  Go to Exhibit -- did we mark 18?
7    A    So we're going to -- yes, okay.
8    Q    Now I'd like you to turn to the very last page
9    of Exhibit 18.  It has the number MFCS 002229 at the
10   bottom.  Do you see that?
11   A    You're saying the last page?
12   Q    The last page.
13   A    Of the 18?
14   Q    Of 18.  It has MFCS --
15   A    Yeah, 2229.
16   Q    -- 002229.  Do you see that?
17   A    Uh-huh.
18   Q    This is an E-mail from Miguel Diaz at Mossfon
19   Geneva to you.  Do you see that?
20   A    Uh-huh.
21   Q    Who is Miguel Diaz?
22   A    I don't know.  Like I say, they have so many
23   names I don't recall, but --
24   Q    But here Miguel Diaz is sending you an E-mail.
25   A    Yeah.
```

Page 169

1    Q    He appears to work at Mossack Fonseca in Geneva.
2    A    Uh-huh.
3    Q    And he's asking you about setting up a Nevada
4    company called Eastier International for a client of
5    Mossack Fonseca's Geneva office; correct?
6    A    Well, they ask me to identify the validity,
7    authenticity, of the business license.
8    Q    So it's not -- this isn't to set up the company;
9    it's to --
10   A    No.
11   Q    You're being asked to look for some information
12   about this company?
13   A    No.  I understand was checking the business
14   license, if the business license -- they can be legalized
15   or something from official company -- from official
16   registration, meaning Secretary of State.
17   Q    So can you explain, what does that mean, the
18   validity of the business license?  What does that mean?
19        They want to know probably that the business
20   license -- what year is this, 2013?
21   Q    '13.
22   A    They probably need to prove that the business
23   license at Secretary of State extend for each company;
24   they can be legalized, yeah.
25   Q    Is this --

Page 170

1    A    Authenticity, if you can authenticate the
2    document, ask for apostille.  Authentication of document
3    is when you get any paper from here and I want to show
4    you in another country, validate; and the only way you do
5    it is to go to Secretary of State and apostille to
6    certify for that.  That's what I understand here what is
7    they try to say.
8    Q    I see.  So they're asking you to go to the
9    Secretary of State and --
10   A    And --
11   Q    Hold on.  Just let me finish.
12        -- and get an apostilled copy of the business
13   license of this company?
14   A    I don't know if they say.  They ask me if it's
15   possible to authentication of this document.  That's what
16   I understand.
17   Q    They're asking you if it's possible to obtain --
18   A    To obtain.
19   Q    -- an authenticated document?
20   A    Of the business license.
21   Q    Is Eastier International a Nevada LLC for which
22   MF Nevada serves as registered agent?
23   A    At this time I can't answer it because I don't
24   know.  Maybe, yes, but I don't know.  I need to go and
25   check my list.

Page 171

```
 1    Q   If it wasn't, do you know why Miguel Diaz would
 2   have been asking you this question?
 3    A   Because probably say it's the way it go to me;
 4   but if it's not, probably I don't do it.
 5    Q   Well, do you remember if you did or not?
 6    A   No, I don't remember.  I just remember -- I mean
 7   I just see this now.  I don't have no idea about it
 8   before.  Probably I don't recollect memory to this
 9   question.
10    Q   So you don't remember, as you sit here now,
11   being asked by Miguel Diaz the question in this E-mail?
12    A   Yes, I don't.
13    Q   And you also don't remember what you did --
14    A   I don't remember if I did it or I did it,
15   if I answer or I don't answer, no.
16    Q   Okay.  And you don't remember whether Eastfer
17   International, LLC is a company for which MF Nevada is a
18   registered agent?
19    A   I have many companies, okay?  I don't remember
20   if this one is in my list.  Probably was and now it's
21   not, so I don't remember.
22    Q   Okay.  If it was, just assuming that it was,
23   would you have -- do you think you would have given
24   Miguel Diaz the information that he was asking for?
25    A   Of course I will give the information and I will
```

Page 172

```
 1   check if the company is in good standing before.
 2    Q   So is that part of your responsibility?
 3    A   My work, yeah, because the business license --
 4   you can't obtain a business license if the company is not
 5   good standing.  Secretary of State is not going to give
 6   me a copy if the company don't have current.
 7    Q   But for companies where MF Nevada is the
 8   registered agent, is responding to inquiries like this
 9   part of what MF Nevada is contractually obligated to
10   do --
11    A   Yes.
12    Q   -- for Mossack Fonseca?
13    A   Yes.  That's part of the service.
14    Q   Okay.  So now if you could go to Exhibit 19, so
15   could you take a look at Exhibit 19.
16    A   Uh-huh.
17    Q   Have you seen Exhibit 19 before?
18    A   Not until now.  It's a long-time document, so I
19   don't know.
20    Q   You see in the second -- towards the bottom of
21   the first page --
22    A   Uh-huh.
23    Q   -- there's an E-mail from Monica Vraza from the
24   Peru representative office --
25    A   Uh-huh.
```

Page 173

```
 1    Q      -- to MF Corporate Services Nevada and to
 2    Mossack Fonseca & Company (corporations Nevada)?  Do you
 3    see that?
 4    A      Uh-huh.  Let me see where -- oh, yeah, copy to
 5    me, yeah, MF Corporate Services.  I see it, copy to me.
 6    Q      Actually I'm asking you -- I'm not asking you to
 7    look at the E-mail at the top of the page.
 8    A      Oh.
 9    Q      I'm asking you to look at the E-mail towards the
10    bottom of the page.  You see it's an E-mail from Monica
11    Ycaza to MF Corporate Services Nevada and to Mossack
12    Fonseca & Company (corporations Nevada) dated
13    October 29th, 2007 at 12:30 p.m.?
14    A      Okay.
15    Q      You see that?
16    A      Uh-huh.
17    Q      So this is an E-mail that Monica Ycaza from the
18    Peru representative office is sending to you and to the
19    Nevada marketing department at Mossack Fonseca.
20    A      Uh-huh.
21    Q      Right?
22    A      Yes.
23    Q      And in this E-mail Ms. Ycaza is telling you that
24    a client wants to incorporate a company called Permanel
25    Investment Limited.  Do you see that?
```

Page 174

```
 1    A      Uh-huh.
 2    Q      And it's an expedited request.  Do you see that?
 3    They want it ASAP?
 4    A      Yeah.
 5    Q      Okay.  So you said before during your deposition
 6    that you didn't recall ever getting any requests from
 7    Monica Ycaza in the Peru representative office.  Does
 8    this refresh your recollection that sometimes you did?
 9    A      Sometime I did, but sometime I -- like you see,
10    I get copy from the E-mails, from the back E-mails, and I
11    don't supposed to respond because the sale department
12    need to deal with that so it's only one hand go to
13    answer, but I received sometime, yes.
14    Q      Okay.  So you wouldn't respond to Ms. Ycaza, but
15    sometimes you'd get requests like this from Ms. Ycaza?
16    A      Uh-huh.
17    Q      Is that -- sorry -- just "yes"?
18    A      Yes.
19    Q      All right.  Do you see again in that E-mail
20    towards the bottom of the first page it says -- Ms. Ycaza
21    says, "Can we also make Muriel with Aldyne and the other
22    two with Plascot"?  Do you see that?
23    A      Yes.
24    Q      Do you know why she would want to do that?
25    A      I don't know.
```

Page 175

```
 1   Q    No idea?
 2   A    No idea.
 3   Q    Okay.  Could you go to the page that at the
 4   bottom says TRANSLATION MFCS 006582.
 5   A    Uh-huh.
 6   Q    Are you there?
 7   A    6582?
 8   Q    Yes.
 9   A    Okay, I am.
10   Q    You see the E-mail that begins in the middle
11   from Mossack & Fonseca (corporations Nevada) to Ms. Ycaza
12   at Peru representative office with a copy to Mossack &
13   Fonseca Peru representative and to you?  Do you see that?
14   A    Yeah.  I'm in the copy of the E-mail.
15   Q    Okay.  And in this E-mail Iris Vergara asks
16   Monica Ycaza -- or tells Monica Ycaza that, first, that
17   there's two companies, two LLCs, on the shelf at Mossack
18   Fonseca Peru; right?
19   A    Uh-huh.
20   Q    Okay.  And then in the next paragraph it says
21   there's another company which was incorporated for Peru
22   but was sent to Panama.  Do you see that?
23   A    Uh-huh.
24   Q    What does that mean, it was incorporated for
25   Peru but it was sent to Panama?
```

Page 176

```
 1   A    I don't manage the shelf stock.  I incorporate
 2   my shelf stock, but the client do it; Mossack Fonseca do
 3   it.  So I don't have no control about that, so I can't
 4   answer that question.
 5   Q    You don't know?
 6   A    I don't have no control of that.
 7   Q    And then in the next paragraph it says, "I am
 8   also attaching our listing of available LLCs in
 9   Panama" -- strike that.  Forget I asked that.
10   When an LLC is created to be put on the shelf,
11   does it have a manager or member?
12   A    (Nods head.)
13   Q    "Yes"?
14   A    Manager.
15   Q    It has a manager.  Does it have any member?
16   A    No.  I mean I don't do the document.  Probably
17   they have, but I don't do the document.  I incorporate it
18   with a manager and I pack it and I send it to Panama.  I
19   keep copies on my shelf, but I send all the companies to
20   Panama.  They can sell it at any time.  I don't sell
21   anything here myself.
22   Q    I see.  So it has a -- you know it has a
23   manager --
24   A    Yeah.  Otherwise I can't incorporate.
25   Q    -- when you incorporate it.  You send it to
```

Page 177

1    Panama. Maybe Panama designates a member. You don't

2    know?

3        A    I don't know.

4        Q    But it sits on the shelf of stock until it gets

5    sold?

6        A    Until it gets sold, yeah.

7        Q    Okay. Now if you could turn to the page that

8    says at the bottom TRANSLATION MFCS 006583.

9        A    Oh, 83, okay.

10       Q    83. Do you see the last E-mail on that page is

11   from Monica Ycaza to MF Corp. and there's a copy to

12   Nevada-Panama office and Peru@Mossfon.com? Do you see

13   that?

14       A    You're talking the last E-mail?

15       Q    The last E-mail, yes.

16       A    From Monica Ycaza to MF Corp., me, and copy to

17   Nevada-Panama.

18       Q    And MF Corp. is you, right?

19       A    Yes.

20       Q    And Nevada-PanamaOffice@Mossfon.com, that's

21   Iris; right?

22       A    Yes.

23       Q    And then Peru@Mossfon.com, that's the Peru

24   representative office?

25       A    Uh-huh, I believe so. I don't know.

Page 178

1        Q    Okay. So MF Nevada doesn't use the Mossfon.com

2    domain name; right? It does not?

3        A    No. We don't have -- no. We're a different

4    company.

5        Q    Right. But the Peru representative office does

6    and the Florida representative office does. Do you know

7    if there's any other Mossack Fonseca representative

8    offices that have their own domain name besides Nevada?

9        A    I don't know. I don't have any idea about it.

10       Q    I only have about my domain name, MF Corporate Services.

11       Q    Do you know why Nevada has its own domain name

12   and the others don't?

13       A    Because we are a different company.

14       Q    Whereas the others are not separately

15   incorporated?

16       A    Probably not.

17       Q    Does Wyoming have its own domain name?

18       A    No. They have the same us because it's part of

19   us, like mfcorpserv.com. It's Wyoming mfcorpserv.com.

20       Q    So MF Nevada and MF Wyoming are the same

21   company?

22       A    No, not the same.

23       Q    No?

24       A    They are -- I don't know how it's called.

25       MR. WOODS:    Use the translator.

Page 179

```
 1         THE WITNESS:  (Through the interpreter)  A
 2    subsidiary.
 3    BY MR. HRANITZKY:
 4         Q    So MF Wyoming is a subsidiary of MF Nevada?
 5         A    Yes.
 6         Q    Is MF Wyoming a wholly owned subsidiary of
 7    MF Nevada, if you know?
 8         MR. WOODS:  Do you understand the question?
 9         THE WITNESS:  No, I don't understand the question.
10         THE INTERPRETER:  Could you repeat the question.
11         MR. HRANITZKY:  Wholly owned subsidiary, a hundred
12    percent owned by.
13         Q    Is MF Wyoming 100 percent owned by MF Nevada?
14         A    I understand, yes, but I'm not sure.  So I don't
15    know.
16         Q    Okay.  Have you ever seen any of the corporate
17    documents from MF Wyoming, the organization documents?
18         A    The Article of Incorporation only, the signed
19    corporate, but I don't know the rest.
20         Q    Who is the manager of MF Wyoming?
21         A    MF Nevada.
22         Q    Okay.  And --
23         A    And I sign in behalf.
24         Q    And who are the members of MF Wyoming?
25         MR. WOODS:  You went over that; right?
```

Page 180

```
 1         MR. HRANITZKY:  No.  Wyoming we're talking about.
 2         MR. WOODS:  Right.  You asked if it's a hundred
 3    percent subsidiary.
 4         MR. HRANITZKY:  Well, maybe it wasn't obvious to me
 5    that --
 6         MR. WOODS:  That it's not the same thing?
 7         Q    Okay.  Well, if you know the answer, you can
 8    answer.
 9         THE WITNESS:  I believe -- I'm not sure --
10    MF Corporate Service Nevada is the manager and I can sign
11    on behalf and MF Corporate Services Nevada is the member.
12    I'm not sure.
13         MR. HRANITZKY:  Okay.  Why don't we take a short
14    break.
15         (Brief recess taken.)
16         (Plaintiff's Exhibits 22 through 27 were marked
17    for identification by the Certified Court Reporter.)
18    BY MR. HRANITZKY:
19         Q    So, Miss Amunategui, I'd like you to look at the
20    document that's been marked as Exhibit 22.
21         A    Uh-huh.
22         Q    Do you recognize this document?
23         A    I recognize the E-mail.
24         Q    Okay.  So do you see your signature on one of
25    the E-mails here?
```

Page 181

```
1        A    Uh-huh.
2        Q    It's an E-mail from you to Odile Frederick?
3        A    Uh-huh.
4        Q    And to Mossack & Fonseca (corporations Nevada),
5   which is Iris?
6        A    Iris Vergara, yes.
7        Q    Do you recall I asked you before if you ever
8   communicated with Odile in the Uruguay office?  Do you
9   recall that?
10       A    No, but I see the E-mail, and sometimes happen
11  with the company, when they looking for a package that I
12  send it, the office would call me to give me again the
13  number, and I'm hundred percent get it in the mail
14  because they don't receive it right away.  So that happen
15  sometime.  They contact to refer to the DHL number,
16  whatever it is.
17       Q    But this was a DHL package you would have --
18  would you have sent this to Panama or to Uruguay?
19       A    To send it to -- I don't remember.
20       Q    You don't remember, but sometimes do you send
21  DHL packages to Uruguay?
22       A    Yes.  I say, I think in the beginning, sometime
23  I send the package straight to Panama or whatever address
24  Panama indicates to send it.  If I send it to Uruguay,
25  it's because Panama want the package go there and then
```

www.oasisreporting.com
OASIS REPORTING SERVICES, LLC
702-476-4500
Electronically signed by Ellen Goldstein (001-341-678-7457)
dc74d275-a477-447e-ba82-fc4e6d02d860

Page 182

```
1   they go back again.  Some document need to be rush that
2   place.
3        Q    When you send it to Uruguay, do you send it to
4   the Mossack Fonseca Uruguay office or do you --
5        A    Normally, yes.  That's the only address I have.
6        Q    Sometimes do you send packages directly to the
7   Mossack Fonseca Peru office?
8        A    Sometime, yeah, if they request it.
9        Q    Have you ever sent packages to the Mossack
10  Fonseca Miami office?
11       A    No.
12       Q    No.  I don't remember, no.
13       A    So Exhibit 23, so the next document --
14       Q    Oh, okay.
15       A    -- this is an E-mail from Edison Teano.
16       Q    Tee-an-o.
17       A    Teano, sorry.
18       Q    It's okay.
19       A    And he's in the marketing office at Mossack
20  Fonseca; is that right?
21       Q    I don't know where he is.  I know he's an
22  attorney, but I don't know where he is.
23       A    He's an attorney?
24       Q    Uh-huh.
```

www.oasisreporting.com
OASIS REPORTING SERVICES, LLC
702-476-4500
Electronically signed by Ellen Goldstein (001-341-678-7457)
dc74d275-a477-447e-ba82-fc4e6d02d860

Page 183

```
 1   Q   But you see at the top it says it's from MF &
 2   Company - Corporations (Nevada).  Do you see that?
 3   Q   From in the top?
 4   A   Yes.
 5   A   Yeah.
 6   Q   Okay.
 7   A   At that time --
 8   Q   That's the E-mail you sometimes use for Iris
 9   too; right?
10   A   Sometime he work in that section I believe.
11   Q   But he's a lawyer?
12   A   He's a lawyer, yes.  I know he's a lawyer.
13   Q   Okay.  Do you know if the E-mail address
14   Nevada-PanamaOffice@Mossfon.com -- is that an E-mail that
15   goes to several people or is it just -- does it just go
16   to one person?
17   A   I don't know.  That's the only E-mail I use, but
18   I don't know if it go to several people or only one.
19   That's something I don't know.
20   Q   But we've seen from the documents that several
21   people use that E-mail address; right?
22   A   Right, but I don't know.
23   Q   But we've seen from the documents that several
24   people do?
25   A   Uh-huh.
```

Page 184

```
 1   Q   "Yes"?
 2   A   Yes.
 3   Q   Do you get E-mail when it goes to that E-mail
 4   address?  Are you copied when it goes to that E-mail
 5   address?
 6   A   No, I don't copy.  Maybe somebody copy from that
 7   E-mail address, yeah, but I don't copy.
 8   Q   If that's a shared E-mail address, you're not
 9   one of the people that it's shared with.  That's what
10   you're saying?
11   A   Okay.  If I have to communicate with Iris, I use
12   that E-mail.
13   Q   Okay.  But if somebody sends an E-mail to that
14   E-mail address, you don't get --
15   A   Not always get.  If they put me there --
16   something they copy something -- I can't control.
17   Q   I see, okay.  Could you go in the same exhibit
18   to the page MFCS 005311.
19   A   Okay.
20   Q   Do you see at the top this is an E-mail from
21   Jost Dex to you?  Do you see that?
22   A   Uh-huh.
23   Q   So is this another instance where Jost Dex is
24   asking you a question, on behalf of one of his clients,
25   about Nevada LLCs?
```

www.oasisreporting.com    OASIS REPORTING SERVICES, LLC    702-476-4500
Electronically signed by Ellen Goldstein (001-341-878-7457)
dc744275-a377-447e-be82-5c4dd052d680

Page 185

```
 1        A    Yes.  Sometime I get this E-mail when they don't
 2   have the answer right away from the other office.
 3        Q    And when you get an E-mail like this from Jost
 4   Dex, do you usually respond to it?
 5        A    Normally not.
 6        Q    You just ignore it?
 7        A    No, not ignore.  Probably I forward or I make a
 8   phone call and I call Iris, somebody in the department,
 9   and say, "Please taking care.  This person needs some
10   help or need respond to E-mail."
11        Q    Okay.  Because you're not supposed to respond
12   directly to Jost?
13        A    I'm not involved on the entire rest of the
14   marketing thing.  I don't have to deal with them; but
15   sometime for better services I answer, I will respond
16   right away, but I call the people to respond.
17        Q    Okay.
18        A    It's not my job to respond though.
19        Q    It's not your job to respond to Jost?
20        A    Yes.
21        Q    Could you now in the same exhibit go to the page
22   MFCS 005316.
23        A    Okay.
24        Q    Do you see at the top it's an E-mail from Jost
25   Dex --
```

Page 186

```
 1        A    Yes.
 2        Q    -- to you and cc: PA Nevada department?  Do you
 3   see that?
 4        A    In the beginning you say?
 5        Q    At the top.
 6        A    Yeah.
 7        Q    It's an E-mail dated Monday November 22, 2004 at
 8   6:46 a.m. from Jost Dex to you with a cc to PA Nevada
 9   department.  Do you see that?
10        A    Uh-huh.
11        Q    Who is PA Nevada department?
12        A    I don't know.  This is the first time I see that
13   E-mail.
14        Q    Well, it's not the first time you've seen it,
15   but it's the first time you've seen it in a long time?
16        A    Yeah, it's a long time.  I didn't pay attention
17   to the cc copy; but "PA," I don't know what it is.
18        Q    Could it be Power of Attorney?
19        A    No.  I think sounds like a more Panama-Nevada
20   department or something.
21        Q    It's my name but it's not my E-mail, so --
22        A    Well, it was sent to you though; right?
23        Q    The only address I have it for many years is
24   MF Corporate Service Nevada.  I don't have any other.  I
25   don't have any other.
```

Electronically signed by Ellen Goldstein (001-341-878-7457)

Page 187

```
 1         Q    But this was sent to you, right, because it
 2   says --
 3         A    Yeah, but they sent --
 4         Q    -- "Dear Patricia."
 5         A    But the top is for something else.
 6         Q    Right.  I'm just talking about "to," the "to,"
 7         A    Oh, I thought you were talking about the top.
 8         Q    So this went to you and it was copied to
 9   PA Nevada department, whatever that is?
10         A    Yeah, uh-huh.
11         Q    Okay.  We can go to Exhibit 24.  We're
12   MR. WOODS:  It's the next document, Patricia.  We're
13   done with that one.
14   THE WITNESS:  Okay.  We're done with this one?
15   MR. HRANITZKY:  Yes.
16         Q    On this one I'd like you to go to the page that
17   says at the bottom TRANSLATION MFCS 006689.
18         A    Okay.
19         Q    Now, you see at the bottom there's an E-mail
20   from Edison Teano?
21         A    The bottom or the beginning?
22         Q    No.  This is at the bottom of the page called
23   TRANSLATION MFCS 006689, the E-mail that begins at the
24   bottom of that page.  See that?
25   MR. WOODS:  But it continues to the next page.
```

Page 188

```
 1   MR. HRANITZKY:  And continues to the next page.
 2   THE WITNESS:  Oh, okay.  I see that, okay.
 3   BY MR. HRANITZKY:
 4         Q    See what I'm talking about?
 5         A    Yeah.
 6         Q    And it's an E-mail from Edison Teano to Odile in
 7   the Uruguay office.
 8         A    Uh-huh.
 9         Q    See that?
10         A    Uh-huh.
11         Q    And it begins, "Dear Odile, as we do each year,
12   we are organizing the incorporation of reserves for our
13   various jurisdictions.  We are pleased to inform you that
14   the partners have approved the following stock for your
15   office for 2006 as listed below," and then you see
16   there's a little chart?
17         A    Uh-huh.
18         Q    It says -- it lists the jurisdiction, the stock
19   approved, and the stock for the beginning of the year.
20   Do you see that?
21         A    Uh-huh.
22         Q    And then it lists -- first it lists Samoa and
23   there's one -- the stock approved is 1 and the stock for
24   the beginning of the year is 1; and then it lists Bahamas
25   and then Seychelles, Panama, Nevada and Uruguay.  Do
```

Electronically signed by Ellen Goldstein (001-341-678-7457)

Page 189

1  see that?

2    A  Uh-huh.

3    Q  And you see for Nevada -- which is MF Nevada;

4  right?

5    A  Uh-huh.

6    Q  It lists -- was that a "yes"?

7    A  Yes.

8    Q  Okay.  It lists stock approved, 3, and stock for

9  the beginning of the year, 2.  Do you see that?

10    A  (Nods head.)

11    Q  What does that mean?

12    A  I don't have no idea what it can mean because I

13  don't handle this.  I never understand this.  No, I don't

14  know.

15    Q  Is it a reference to the number of companies

16  that you have on the shelf?

17    A  Probably but, no, I don't think it's -- I don't

18  know what it is.  I don't know.  It's some language they

19  talking about I don't understand.

20    Q  All right.  Well, see, it says -- let's go back

21  to the beginning again.  "As we do each year, we are

22  organizing corporation reserves for our various

23  jurisdictions.  We are pleased to inform you that the

24  partners have approved the following stock for your

25  office for 2006 as listed below."

---

Page 190

1    A  This is from me to Odile?  No.

2    Q  No, I realize this is not an E-mail to you.

3    A  Yeah.  This is a conversation for them.

4    Q  I'm asking you if this helps you to understand

5  what Edison is talking about when he refers to the stock

6  of reserves.

7    A  I don't know.  It's hard to understand.  I don't

8  know if they talking about all these jurisdictions that

9  incorporate in that jurisdiction or a company they want

10  to have.  I don't have no idea.  I don't know.  Very

11  confusing.

12    Q  If you don't know, then we can just move on.

13    A  Yeah, I don't know.

14    Q  Let's move on.

15    So Exhibit 25, you see Exhibit 25?  In the

16  middle there's an E-mail from Morelia Jaspe in the

17  Venezuela office to MF & Company -- Corporations (Panama).

18  Do you see that?

19    A  Uh-huh.

20    Q  And in this Ms. Jaspe asks Verna at MF &

21  Company - Corporations, "Please, we urgently need two

22  Panamanian companies for the year 2003.  A client needs

23  them with utmost urgency."  Do you see that?

24    A  Uh-huh.

25    Q  And the E-mail is dated November 2004.

Page 191

```
1           Do you ever receive requests from Panama for
2    companies that were created some year in the past?
3        A   Say it again.  I'm sorry, I don't understand the
4    question.
5        Q   Sure.
6           Do you ever receive requests from Mossack
7    Fonseca in Panama for a Nevada LLC that was created in
8    some specific year in the past?
9        A   Not that I know of.
10       Q   You don't recall that ever happening?
11       A   When we get requests company for shell, they
12   only ask for the name and how many we have and we inform
13   information, but not actually looking for company on
14   specific date.  That's what you try to tell me, no, date?
15       Q   Yes, that's what I'm asking.
16       A   No, not can I recall.
17       Q   You get requests for a particular company on the
18   shelf?
19       A   Yes.
20       Q   But you don't get requests for a company on the
21   shelf that was created in a specific year?
22       A   No.
23       Q   That's what you're saying?
24       A   That I cannot recall.
25       Q   So you don't recall ever getting any requests --
```

Page 192

```
1        A   Maybe, but I don't remember.
2        Q   You don't recall getting any requests like this?
3        A   This is the first time I saw this name.
4        Q   Well, you weren't copied on it, so it didn't go
5    to you.  I'm just asking if you ever got a request like
6    this.
7        A   No.
8        Q   Okay.  Let's move to Exhibit 26.  Exhibit 26,
9    you see this is an E-mail from Iris Vergara to you dated
10   June 10th, 2008 and it attaches a Power of Attorney and
11   Resolution.  Do you see that?
12       A   Attached -- yeah, okay.
13       Q   Okay.  And then you see -- if you flip past
14   this, do you see that there's a --
15       A   Oh, here it is.
16       Q   -- Power of Attorney that's attached?
17       A   Uh-huh, uh-huh.
18       Q   And at the end of the Power of Attorney it says
19   signed by you, deputy secretary on behalf of Aldyne.
20       A   Uh-huh.
21       Q   Do you see that?
22       A   Yes.
23       Q   While you were secretary of -- assistant
24   secretary or deputy secretary of Aldyne, did you get
25   requests like this from time to time?
```

Page 193

```
1    A    Yes.

2    Q    So this was fairly common?

3    A    Yes, very common because I need to legalize the

4    document here.  Do you see the apostille in the bottom?

5    Q    Uh-huh.

6    A    That's what this is.

7    Q    And you said that you're no longer assistant

8    secretary --

9    A    Yeah.

10   Q    -- of Aldyne?

11   A    No.

12   Q    Why did you cease to be assistant secretary of

13   Aldyne?

14   Q    Why I was?

15   Q    Why did you stop being assistant secretary of

16   Aldyne?

17   A    In the past couple years, three or four years

18   ago, the law on United States changing a little bit.

19   It's coming with new regulation, and I feel like I need

20   to check with the attorneys here about if it will be any

21   concern for me, and I was recommended to don't do it

22   anymore.

23   Q    So you were advised to request that you no

24   longer be assistant secretary --

25   A    Yeah.
```

Page 194

```
1    Q    -- to Aldyne?

2    A    Yeah.  I feel more confident I don't do it

3    because there are FBR, what they call Foreign Bank

4    Report --

5    Q    Regulation?

6    A    -- and regulation and FATCA is coming in effect

7    July 1st this year for any U.S. person; and I don't have

8    nothing to do with this client, so I don't want to, you

9    know, have any concern about it.  So I decided to resign.

10   Q    You referred to FATCA.  What is that?

11   A    FATCA.

12   Q    FATCA?

13   A    I don't know exactly what that mean, but it's a

14   request -- I think it's coming in July 1st, 2015 -- that

15   any U.S. person need to report whatever is involved

16   outside the country, so I don't feel comfortable to sign

17   on this document.

18   Q    Okay.

19   A    I'm a U.S. person and I want to follow the law.

20   Q    Right.  Well, I won't ask you what you were

21   advised by your lawyers.

22   A    But I get advice from my lawyer to don't sign it

23   anymore.  It will be better.

24   Q    Okay.

25   A    I didn't study a lot about this one.  Sorry, I
```

Page 195

1  don't know the site, but it's --

2  Q    So you're talking about the F.A.T.C.A.?

3  A    Yes, FATCA.

4  Q    The Foreign Account Tax Compliance Act.  I see,

5  okay.

6       Now could you turn to Exhibit 27.  It's the next

7  document.

8  A    Oh, okay.

9  Q    You see Exhibit 27 is an E-mail from Susana Kam

10  at Mossfon Peru to you and to Iris or whoever was --

11  A    Iris Vergara.

12  Q    -- in her job at that time?

13  A    Uh-huh.

14  Q    Do you see that?

15  A    Uh-huh.

16  Q    Oh, it is to Iris, right.

17       Who is Susana Kam?

18  A    I think she work in Peru office, but I don't

19  know what she do.

20  Q    Okay.  Do you recall getting --

21  A    E-mail with her, yeah.  I see this name in the

22  E-mail before.

23  Q    So you recall getting E-mails from her from time

24  to time?

25  A    Yeah.

Page 196

1  Q    Okay.  Now, do you see the E-mail reads, "Dear

2  Iris, the client has confirmed he wants the company.

3  Please move forward with the incorporation," and then the

4  first line reads, "The company will have a capital of

5  $500,000."  Do you see that?

6  A    Uh-huh.

7  Q    Why is that information relevant to you or to

8  Iris?

9  A    Nothing to me.  To Iris, yes, because Iris in

10  charge to collect all this information to make the

11  document, to prepare the document, the Operating

12  Agreement and all the rest.  So it's not related to me,

13  but it's related to her.

14  Q    So that's information for --

15  A    Iris.

16  Q    That's information that Iris will use to prepare

17  the Operating Agreement?

18  A    Uh-huh.

19  Q    Do you have any role in deciding what the

20  capital of the company will be?

21  A    Oh, no.

22  Q    Okay.  And then if you go down to the E-mail at

23  the bottom of the page, at the bottom of the page is an

24  E-mail from Iris to you.  Do you see that?

25  A    Uh-huh.

Page 197

1    Q    It says, "I would appreciate it if you can
2  confirm that the name Cosmetech, LC is still available in
3  Nevada."
4    A    Yes.
5    Q    "Please refer to case No. 1314907." What is she
6  talking about when she refers to case No. 1314907?
7    A    Normally what happen, the client jump with a
8  name and they call name check, and you check the name and
9  then nobody answered.  In the next six months, the client
10  come back to Iris and say, "Oh, now we want Cosmetech,
11  LLC." So she's asked me if the name is still available
12  because probably I check six months before.
13    Q    So that number refers to the check that you did
14  six months before?
15    A    Yes.
16    Q    I see.  So there's a number --
17    A    Name availability can be six months before the
18  person decide to really go forward to incorporation.
19    Q    I see.  But so you assign a number to the names
20  you check?
21    A    No.  They assign a case number.  They assign a
22  case number on any request; and probably that case number
23  is a name check I already answered long time ago
24  probably, because when they say still available, it mean
25  I already answered but I need to check it again.  But who

Page 198

1  knows if somebody incorporate a company with that name
2  two months after I check.
3    Q    Okay.  Well, so she gave you the case number, so
4  what do you --
5    A    She opens the case.
6    Q    I don't.
7    A    When she opens the case?
8    Q    Is the case number how you find the file for the
9  request?
10    A    It's the platform number.
11    Q    I see.
12    A    So we talking about this previous request that
13  probably is still open because the request is still open
14  until a period of time they decide, "Well, the client
15  never asked it again, so we close it."  But that put me
16  as a reference.
17    Q    So if you go to the Mossack Fonseca platform and
18  you put in that number, it will take you to --
19    A    It will take me to name-check availability and I
20  will say, "Oh, I check this name in May" or "two weeks
21  ago."
22    Q    So it gives you -- it's basically the file --
23    A    Yes.
24    Q    -- on that particular matter?
25    A    That particular request.

Page 199

1  Q   And the way you find it is by going to the
2  platform and typing in that number --
3  A   Correct.
4  Q   -- essentially?
5  A   Uh-huh.
6  Q   Okay.  When you want to access the platform to
7  get information about an LLC, is there a matter number
8  that's assigned to the LLC that you go to or is it -- do
9  you search a different way?
10 A   Say it -- please repeat it again.
11     (Through the interpreter)  Could you please
12 repeat it again.
13 Q   When you want to access the platform to get
14 information about an LLC, do you input a matter number in
15 order to access the information on the LLC or do you find
16 it some other way?
17 A   The only way I can find it is by the name of the
18 LLC or by the number they give it to me.
19 Q   So you could do either of those two things?
20 A   Yeah.  If I don't find it, it's because they
21 already -- I don't have access anymore myself.
22 Q   I see.
23 A   It's only at the time that the case is current.
24 Q   But when you do have access, the information is
25 accessible either by the company name or by the matter

Page 200

1  number; is that right?
2  A   By the number that they assign it; yeah.
3  Q   The matter number they assign it?
4  A   Yeah.
5  MR. HRANITZKY:  Why don't we break for a minute, my
6  last round of exhibits.
7       (Brief recess taken.)
8       (Plaintiff's Exhibits 31 through 34 were marked
9  for identification by the Certified Court Reporter.)
10 BY MR. HRANITZKY:
11 Q   So, Ms. Amunategui, could you look at the
12 document that's been marked as Exhibit 31.
13 A   Uh-huh.
14 Q   Exhibit 31 is an E-mail from Mayka Villarreal --
15 A   Uh-huh.
16 Q   -- at Mossack & Fonseca (corporations Nevada) to
17 you; correct?
18 A   Yes.
19 Q   And Mayka works in the group that Iris Vergara
20 works in now; is that right?
21 A   Not anymore.
22 Q   Not anymore.  But she did at that time?
23 A   Uh-huh.
24 Q   And you see she asks, "Please find out and let
25 us know the requirements and the cost for obtaining a

Page 201

1    license plate in the state of Nevada. The owner of the

2    car will be the LLC." Do you see that?

3       A.    Yes.

4       Q.    Do you get requests like this from time to time?

5       A.    This is the only one I get that crazy request.

6       Q.    So this is the only time you recall ever getting

7    a request like this?

8       A.    Uh-huh.

9       Q.    Do you know anything about why they were asking

10   this information?

11      A.    I don't -- I barely remember this case, but I

12   think was not possible in some case, I think i answer.

13      Q.    So you think you responded that you can't do

14   this?

15      A.    I assume that, yeah.  I think so.

16      Q.    Can a Nevada LLC be the -- can a Nevada LLC

17   obtain a license plate in Nevada?

18      A.    If you own a car.  If they don't own a car, they

19   can't have a license plate and the plate have to be --

20   the car have to be here.

21      Q.    Okay.  And in this case -- never mind.

22      A.    I'm reading more, but that's what I believe I

23   respond to them.

24      Q.    Okay.  Now looking at Exhibits 32, 33 --

25      A.    So we're done with that?

---

Page 202

1       Q.    Yeah, we're done with that.

2           So I'm looking at 32, 33 and 34.  These are all

3    letters dated June 5, 2013 where you notify the boards of

4    directors of Aldyne, Fergus and Plascot that you are

5    resigning as assistant secretary of those entities.

6      A.    Yes.

7      Q.    Is that right?

8      A.    Yes.

9      Q.    Each of them is directed to the -- each letter

10   is sent to the board of directors of the entity.  So

11   starting with Aldyne, who were the board of directors of

12   Aldyne?

13      A.    I don't have no idea.  That's the reason I put

14   "board of directors," because I don't know them; but I

15   assume they have a board of director and they need to

16   receive my letter.

17      Q.    You're sending this letter to the board of

18   directors and you don't know who the board of directors

19   is?

20      A.    I don't know.

21      Q.    Did you prepare this or was it prepared for you

22   by counsel?

23      A.    Was prepared by counsel.

24      Q.    Okay.  Do you know who the board of directors of

25   Fergus was?

Page 203

1    A.   No.

2    Q.   Do you know who the board of directors of

3    Plascot was?

4    A.   No.

5    Q.   Okay.  Done with that.

6    A.   Done with this?

7    Q.   You're done.  I have a few more questions, but

8    we're done with the documents.

9         So going back to MF Nevada and MF Wyoming, do

10   MF Nevada and MF Wyoming share a computer network?

11   A.   MF Nevada and MF Wyoming computer network, what

12   do you mean with "computer network"?

13   Q.   Let me ask it a different way.

14        Can you access MF Wyoming documents and

15   MF Nevada documents from the same computer?

16   A.   No.

17   Q.   No?

18   A.   No.

19   Q.   You have to go to a different computer?

20   A.   Yeah, different computer, different password.

21   Q.   Okay.  But is it -- when you want to access

22   MF Wyoming documents --

23   A.   Uh-huh.

24   Q.   -- do you log into the Internet and access it

25   through the Internet or do you have to go to a specific

Page 204

1    computer to do it?

2    A.   I need to go to a specific computer for Wyoming.

3    Q.   And is the computer in Wyoming?

4    A.   One is in Wyoming, one is here.

5    Q.   Okay.  So you have one computer here in

6    Las Vegas that's specifically for MF Wyoming?

7    A.   Yes.

8    Q.   And a different computer or computers here in

9    Las Vegas for MF Nevada?

10   A.   Correct.

11   Q.   Okay.  Other than accessing MF Wyoming and

12   MF Nevada documents, do you have a way of accessing any

13   other documents from your offices in Las Vegas?

14   A.   Okay.  I'm confused.  Say it again, please.

15   Q.   Sure.

16        So you said that there's a computer from which

17   you can access MF Wyoming documents; correct?

18   A.   Uh-huh.

19   Q.   And there's a computer or computers here in

20   Las Vegas from which you can access MF Nevada documents;

21   correct?

22   A.   From the same computer?  Not --

23   Q.   No, a different computer.

24   A.   Oh, different computer.

25   Q.   But same office.

Page 205

1    A    Yes.

2    Q    Computers in the same office, okay.

3         Other than MF Wyoming documents and MF Nevada

4    documents, are there other kinds of documents that you're

5    able to access from your office in Las Vegas

6    electronically?

7    A    No.   I can do to Secretary of State, get all

8    this, but I can access only of the platform case if I

9    have authorization to do it.

10   Q    Okay.   So --

11   A    But I only work with Nevada and Wyoming on

12   different computer in different location inside the

13   office.

14   Q    Okay.   I see.   So you can access the Mossack

15   Fonseca platform from any computer as long as you are

16   granted access to the file?

17   A    But not from any computer.   I don't know to do

18   it from another computer.   I mean like a family computer

19   I don't know how to do it.

20   Q    So you couldn't do it from home?

21   A    No.

22   Q    Does MF Nevada have a Web site?

23   A    You ask me too, and we are in the process to

24   improve it but we didn't.

25   Q    So if I wanted to go to the MF Nevada Web site,

Page 206

1    I could find it on the internet and --

2    A    Yeah, you can find it and it's very not updated.

3         We need to work on that.

4    Q    Do you have a person or an i.t. department

5    that's in charge of maintaining the Web site?

6    A    Well, we pay the first time a person to develop

7    and do it, but then the person do our network -- how you

8    call -- that help you on your E-mail address, your

9    server, that person offer us to do it for -- you know, we

10   need to be ready when they're ready and they will help

11   us.

12   Q    So the company that helps maintain your

13   server --

14   A    Yeah.

15   Q    -- at MF Nevada offered to help you with the Web

16   site?

17   A    Yeah.   Well, we need to pay them.   They do the

18   job for us.

19   Q    So you have a server at MF Nevada?

20   A    Yes, we have a server.

21   Q    Okay.   Is there a separate server for

22   MF Wyoming?

23   A    No.   The same server.

24   Q    Same server for the two?

25   A    Yes.

Page 207

1    Q    Is it just for MF Nevada and MF Wyoming or --
2    A    Yes, just for MF Nevada and MF Wyoming.
3    Q    Okay.  What is the job or the role of registered
4    agent for an LLC?  What does it involve?
5    A    You need to represent the entity in the state of
6    Nevada and be due process of service in case the entity
7    have a subpoena like we have.
8    Q    Okay.  So a registered agent is someone who
9    could receive service of process?
10   A    Yes, service of process of entity in the state
11   of Nevada.
12   Q    In Nevada?
13   A    Or in another state depending where the
14   registered agent is.
15   Q    I see.  And we talked before, a registered agent
16   is required to maintain some information?
17   A    Yeah, some record, yeah.  Every state is
18   different.
19   Q    But in Nevada -- we talked about it before.  We
20   don't need to talk about it again.
21        What else -- what other responsibilities does a
22   registered agent have?
23   A    Well, keep the company in good standing if the
24   client pay the fee.
25   Q    Any other responsibilities?

Page 208

1    A    What I know, I don't think there's other one.
2    Q    Okay.  With respect to any of the LLCs that
3    MF Nevada is registered agent of, are you ever asked to
4    take on additional responsibilities specific to that LLC?
5    A    Additional to be a registered agent you said?
6    Q    Right.  In addition to the standard
7    registered-agent responsibilities, are you ever asked to
8    do additional things with -- for specific LLCs?
9    A    The only thing I do additional is sign a
10   Certificate of Incumbency, who is a -- certification of
11   registered agent who say where is the company
12   incorporate, what is the date, under what law, what is
13   the name, what is the number, and sign.  That's the only
14   additional we have to do.
15   Q    But for some of the LLCs, you -- until you
16   resigned, you were the assistant secretary of the
17   manager --
18   A    Yes.
19   Q    -- right?  So that's an additional function you
20   performed?
21   A    Yeah.  The Certificate of Incumbency, it's an
22   additional service.  Some client, they like to have from
23   the registered agent a Certificate of Incumbency so they
24   can legalize, also say what is the name, what is the
25   company, what is the day it was incorporated, what is the

Page 209

1 number, and they provide the rest of the information they
2 wanted in the certificate.
3 Q. I see. Have you ever been granted Powers of
4 Attorney on behalf of any of the LLCs that you serve --
5 that MF Nevada serves as registered agent for?
6 A. Power of Attorney in behalf of Aldyne but not in
7 behalf of an LLC that I remember. I don't think so. I
8 don't remember.
9 Q. Okay. So going back to the 123 entities that
10 the subpoena asks for information about, do you know if
11 some of those entities are no longer Nevada LLCs?
12 A. I can check at the Secretary of State, and they
13 are active, revoke or dissolved or they go to some other
14 registered agent. They don't inform you. They can leave
15 without inform you.
16 Q. Okay. So they could cease to be a Nevada LLC
17 and you would never learn about it? Is that what you're
18 saying?
19 A. What I say, a Nevada LLC under us as a
20 registered agent can change over a period of time without
21 tell us as the registered agent.
22 Q. I see.
23 A. The only way I find out, if I go every month to
24 the Secretary of State Web site and check the name and
25 if that company left me without tell me, move to another

Page 210

1 registered agent or move to another state and I don't
2 know, I don't have control of that.
3 Q. Does that happen sometimes, that a company --
4 A. Yes. That happen very often.
5 Q. But you would find out -- if you didn't find out
6 about it before, you would find out about it when it
7 became time to renew the registration; correct?
8 A. That's the only time when I find out; or the
9 time when I was working on the subpoena, I check all one
10 by one.
11 Q. Okay.
12 A. And I didn't check it again. Try to do it at
13 least two or three times a year to see how many companies
14 still have it.
15 MR. HRANITZKY. Why don't we take just a short break
16 and I may be done.
17 (Brief recess taken.)
18 MR. HRANITZKY. I have no further questions.
19 MR. WOODS: I'll ask a couple questions. No, never
20 mind. Don't worry about it. I changed my mind.
21 We'll read and sign.
22 (Deposition concluded at 3:39 p.m.)
23
24
25

Page 211

## CERTIFICATE OF DEPONENT

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|

1
2
3
4
5
6
7
8
9
10
11
12
13
14  * * * * *

I, PATRICIA AMUNATEGUI, deponent herein, do hereby certify and declare under penalty of perjury the within and foregoing transcription to be my deposition in said action; that I have read, corrected and do hereby affix my signature to said deposition.

_____
PATRICIA AMUNATEGUI, Deponent

Subscribed and sworn to before me this _____ day of _____, 2014.

_____
NOTARY PUBLIC

---

Page 212

## REPORTER'S CERTIFICATE

I, Ellen A. Goldstein, a duly certified court reporter in and for the County of Clark, State of Nevada, do hereby certify:

That I reported the taking of the deposition of PATRICIA AMUNATEGUI at the time and place aforesaid;

That prior to being examined, the witness was by me duly sworn to testify to the truth, the whole truth and nothing but the truth;

That the witness requested, or it was requested on her behalf, to read and sign the transcript herewith;

That I thereafter transcribed my shorthand notes into typewriting and that the typed transcript of said deposition is a complete, true and accurate transcription of my shorthand notes taken down at the proceedings.

I further certify that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel involved in said action, nor a person financially interested in the action.

IN WITNESS THEREOF, I have hereunto set my hand in the County of Clark, State of Nevada, this 15th day of September 2014.

_____
Ellen A. Goldstein, CCR No. 829

Exhibits

UNITED STATES DISTRICT COURT
for the
Southern District of New York

NML CAPITAL, LTD.,
Plaintiff
v.
THE REPUBLIC OF ARGENTINA,
Defendant

Civil Action No.

(If the action is pending in another district, state where: )

**SUBPOENA TO TESTIFY AT A DEPOSITION OR TO PRODUCE DOCUMENTS IN A CIVIL ACTION**

To: Patricia Amunategui, 5555 S. Pecos Rd., Ste. 100, Las Vegas, NV 89120

☐ *Testimony:* YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is not a party to this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Silverstein Hyatt Farber Schreck<br>100 N. City Parkway, Suite 1600<br>Las Vegas, NV 89106 | Date and Time:<br>07/29/2014 10:00 a.m. |
|---|---|

The deposition will be recorded by this method: Stenographically

☑ *Production:* You, or your representative, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

Attachment A

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: 06/30/2014

CLERK OF COURT

_____          OR          _____
Signature of Clerk or Deputy Clerk                    Attorney's signature

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* NML CAPITAL, LTD.
_____, who issues or requests this subpoena, are:

DENNIS H. HRANITZKY, ESQ., of DECHERT LLP,
1095 Avenue of the Americas, New York, NY 10036-6797
Telephone: 212.698.3500 Email: dennis.hranitzky@dechert.com

Civil Action No. S.D.N.Y. 03 Civ. 3845 (TGP), et al.

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

☐ I personally served the subpoena on the individual at *(place)* _____
on *(date)* _____ ; or

☐ I left the subpoena at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the subpoena on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because _____ ; or

☐ Other *(specify)*:
_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of
$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                          Server's signature

                                          _____
                                          Printed name and title

                                          _____
                                          Server's address

Additional information regarding attempted service, etc:

---

### Federal Rules of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

## ATTACHMENT A

1   You are commanded, pursuant to Rule 34(c) and Rule 45 of the Federal Rules of Civil

2   Procedure (the "Rules"), to produce for inspection and copying to the offices of Brownstein Hyatt

3   Farber Schreck, LLP, 100 North City Parkway, Ste 1600, Las Vegas, NV 89106-4614,

4   attention: Kirk B. Lenhard, within 30 days of service hereof, all Documents specified in this

5   Attachment A, in accordance with the Definitions and Instructions set forth herein.

6   **DEFINITIONS**

7   1.   The term **"Argentina"** means the Republic of Argentina, as well as its

8   ministries, political subdivisions (including without limitation all provinces, cities, municipalities,

9   and the like), representatives, and assigns, and all other Persons acting or purporting to act for or

10   on Argentina's behalf, whether or not authorized to do so.

11   2.   The term **"Communication"** means the transmittal of information in the form of

12   facts, ideas, inquiries or otherwise.

13   3.   The term **"Concerning"** means relating to, referring to, describing, evidencing

14   or constituting.

15   4.   The term **"Document"** (or **"Documents"**) is defined to be synonymous in

16   meaning and equal in scope to the usage of the term "Documents or electronically stored

17   information" in Fed. R. Civ. P. 34(a)(1)(A), and includes writings, drawings, graphs, charts,

18   photographs, sound recordings, images, and other data or data compilation, stored in any medium

19   from which information can be obtained either directly or, if necessary, after translation by the

20   responding party into a reasonably usable form. A draft or non-identical copy is a separate

21   Document within the meaning of this term. Fed. R. Civ. P. 34(a).

22   5.   The term **"Mossack Fonseca"** means the law firm Mossack Fonseca, its

23   subsidiaries, and affiliates, as well as its partners, members, agents, representatives, and all other

24   Persons acting or purporting to act for or on its behalf, whether or not authorized to do so.

25   6.   The term **"MF (Nevada)"** shall mean M.F. Corporate Services (Nevada)

26   Limited, located at 5838 S. Pecos Road, Suite 100, Las Vegas, NV 89120, United States of

27   America and its parents, subsidiaries, and affiliates, as well as its employees, agents,

1

---

1   representatives, and all other Persons acting or purporting to act for or on its behalf, whether or

2   not authorized to do so.

3   7.   The term **"Person"** means any natural Person, or any business, legal, or

4   governmental entity, or association.

5   8.   The term **"You"** (or **"Your"**) means Patricia Amunategui.

6   **INSTRUCTIONS**

7   1.   Documents called for by this subpoena are to include all portions, or pages of

8   each Document, and all attachments, enclosures, appendices, and supporting documentation,

9   including, without limitation, originals, copies, non-identical copies (that may contain

10   handwritten notes, markings, stamps, interlineations or electronic information), draft, working

11   papers, routing slips, and similar materials.

12   2.   A Document is deemed to be in your actual or constructive possession, custody, or

13   control if it is in your physical custody, or if it is in the physical custody of any other Person and

14   you (a) own such Document in whole or in part; (b) have a right, by control, contract, statute,

15   order, or otherwise, to use inspect, examine or copy such Document on any terms; (c) have an

16   understanding, express or implied, that you may use, inspect, examine, or copy such Document

17   upon any terms; or (d) have, as a practical matter, been able to use, inspect, examine, or copy

18   such Document when you sought to do so. For the avoidance of doubt, a Document is deemed in

19   your actual or constructive possession, custody, or control if it is accessible on a network or

20   server that you maintain.

21   3.   The specifications of this subpoena are to be construed as being inclusive rather

22   than exclusive. Thus, use of the singular form of any word includes the plural and vice versa;

23   words importing one gender include both genders; the connectives "and" and "or" shall be

24   construed either disjunctively or conjunctively as necessary or is being within the scope of this

25   subpoena all Documents that might otherwise be construed to be outside of its scope; the words

26   "all," "any," and "each" shall each be construed as encompassing "any and all".

27   4.   In producing responsive Documents, you should furnish all Documents in your

28   possession, custody, or control, regardless of whether such Documents are possessed directly by

2

you or by your principal, employers, directors, officers, partners, members, agents, employees, representatives, subsidiaries, managing agents, affiliates, investigators, or by your attorneys or their agents, employees, representatives or investigators.

5. You are to produce any and all drafts and copies of each such Document that is responsive to any specification of this subpoena and all copies of each such Document that are not identical in any respect, including but not limited to handwritten notes, markings, interps, interlineations, and electronic information.

6. With respect to Electronically Stored Information ("ESI"):

a) All electronic mail and spreadsheets responsive to this subpoena that are maintained in the usual course of business in electronic format are to be produced in their native format along with the software necessary to interpret such files if such software is not readily available.

b) All other Documents responsive to this subpoena that are maintained in the usual course of business in electronic format are to be produced in properly utilized, multi-page TIFF Group IV format complete with full text extracts and all associated metadata.

c) All Documents responsive to this subpoena are to be produced with the metadata normally contained within such Documents, and the necessary Concordance, Introtext or other database load files. If such metadata is not available, such Document is to be accompanied by a listing of all file properties relating to such Documents, including, but not limited to, all information relating to the date(s) the Documents was last accessed, created, modified or distributed, and the author(s) and recipient(s) of the Documents.

d) Under no circumstances should ESI be converted from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome to use. ESI should not be produced in a form that removes or significantly degrades the ability to search for ESI by electronic means where the ESI is ordinarily maintained in a way that makes it searchable by electronic means. Databases or underlying data should not be produced without first discussing production format issues with Plaintiff's counsel. If you choose to break or produce ESI on the ground that such ESI is not reasonably accessible because of undue burden or cost, identify such information by category or source and provide detailed information regarding the burden or cost you claim is associated with the search or production of such ESI.

---

7. All Documents that are physically attached to each other when located for production are to be left so attached when produced. Documents that are segregated or separated from other Documents, whether by inclusion in binders, files, subfiles, or by use of dividers, tabs or any other method, are to be left so segregated or separated when produced. Documents are to be produced in the order in which they were maintained and in the file in which they were found.

8. If any Document, or any part of a Document, called for by this subpoena has been destroyed, discarded, lost, or otherwise disposed of or placed beyond your custody or control, you are to furnish a list identifying each such Document by: (a) date; (b) author; (c) recipient(s); (d) type of Document (e.g., letter, memorandum, chart, e-mail, etc.); (e) general subject matter; (f) the Document's present or last-known location or custodian; (g) the date of the Document's destruction or other disposition, and (i) the reason for such destruction or other disposition; and (i) the Person authorizing such destruction or other disposition.

9. Each specification of this subpoena requires production in full, without abbreviation, redaction, or expurgation, of any responsive Documents. If any responsive Document is not or cannot be produced in full, produce it to the extent possible, indicating which Document, or portion of that Document is being withheld, and the reason(s) it is being withheld.

10. Documents not otherwise responsive to this subpoena are to be produced if such Documents mention, discuss, refer to, or explain the Documents that are responsive to this subpoena, or if such Documents are attached to Documents responsive to this subpoena and constitute routing slips, transmittal memoranda, or letters, comments, evaluations or similar materials.

11. If in responding to this subpoena, you encounter any ambiguity in construing it or any definitions and instructions relevant to it, set forth the matter or term deemed "ambiguous" and the construction used in responding to the subpoena.

12. If a privilege is claimed as the basis for not producing any Documents, you are to furnish a privilege log setting forth, for each such Document: (i) nature of the privilege (including work product) which is being claimed and, if the privilege is governed by state law, indicate the state's privilege rule being invoked, (ii) the type of Documents (e.g., letter,

1  memorandum, etc.); (c) the general subject matter of the Documents; (d) the date of the

2  Documents; and (e) the author of the Documents, the relationship of the author and any other recipients of the

3  Documents and, where not apparent, the relationship of the author, addressees, and recipients to

4  each other.

5      13.   The specifications of this subpoena are submitted for the purposes of discovery

6  and are not to be taken as waiving any objections to the introduction of evidence on subjects

7  covered by this subpoena, or as an admission of the relevance or materiality of any of the matters

8  covered by this subpoena.

9      14.   This subpoena does not require you to produce Documents responsive in response

10  to the subpoena to M.F. (Nevada) dated August 13, 2013. To the extent Documents responsive to

11  this request were previously provided by M.F. (Nevada), your response should so indicate.

12                    **DOCUMENTS TO BE PRODUCED**

13      1.   All Documents Concerning the nature of Your affiliation or relationship with each

14  of Mensck Fonnca and MF (Nevada).

15      2.   All Documents Concerning funds or other property transferred either by one of the

16  following Persons to another Person (including any of the following entities), or to one of the

17  following Persons by another Person (including any of the following entities) since January 1,

18  2016:

1. A&I Payments Corp. LLC;
2. Abile Holding LLC;
3. Abskart Consultants LLC;
4. Abline Trade LLC;
5. Ace Star International LLC;
6. Agropoint USA LLC;
7. Agroglobe Equity LLC;
8. Algsys LLC;
9. Allianfon LLC;
10. American Holding Corp. LLC;
11. American Trade & Parking LLC;
12. Anthesop Group Ltd.;
13. Angora LLC;
14. Arinsa Company LLC;
15. Ariss Business LLC;
16. Ariskie Trading Ltd.;
17. Aristdin Investment LLC;

5

18. Arktik Ltd.;
19. Ayola Interesting LLC;
20. Azportise International Ltd.;
21. Balmain Trading Ltd.;
22. Balmor Development LLC;
23. Balmorol Properties Ltd.;
24. Banford Holdings Ltd.;
25. Banford Properties LLC;
26. Barkley Marketing LLC;
27. Barkgate Properties Ltd.;
28. Baru World Supplies Ltd.;
29. Billowsk Properties LLC;
30. Binder Chemicals LLC;
31. Bio Health International Inc LLC;
32. Blue Dreams Real Estate Investments Ltd.;
33. Bright Light Group LLC;
34. Bufood Development LLC;
35. Butler Trading LLC;
36. Butterfield Consultants LLC;
37. Brown Marketing Ltd.;
38. Buzard Holdings Ltd.;
39. Calypso Group LLC;
40. Cambridge House LLC;
41. Carmil Enterprises LLC; and
42. Cavendi Group LLC;
43. Cavnab Commodities LLC;
44. Cineaux Overseas LLC;
45. Cematholic Trader of America Ltd.;
46. Cematho Investment LLC;
47. Construction & Mining Solutions Ltd.;
48. Centry Finances Inc. LLC;
49. Cernetan Trading LLC;
50. Cenromek LLC;
51. Chereqed Enterprises LLC;
52. Choul Properties LLC;
53. Bilim Atlantic LLC;
54. Bilumd Enterprises Ltd.;
55. Delfin Trading LLC;
56. Dennoe Trading LLC;
57. Dynamic Finances LLC;
58. Bastler International LLC;
59. Barwood Holdings International Ltd.;
60. Biff Aviation LLC;
61. Environmental Bio Technologies Ltd.;
62. Bintm Holdings Group LLC;
63. Bitrust International LLC;
64. Enox Trading Ltd.;
65. Entolge Overseas LLC;

6



1 | 66. Esbriela LLC;
2 | 67. Eno Holding LLC;
3 | 68. Eurodenominated.com Ltd.;
4 | 69. Eurogmail LLC;
5 | 70. Eweson Holdings Ltd.;
6 | 71. Exeter Invest LLC;
7 | 72. Eaton International LLC;
8 | 73. Eyden Group LLC;
9 | 74. F.O.S. Consulting LLC;
10 | 75. F.O.S. Consulting LLC;
11 | 76. Fairland International Ltd.;
12 | 77. Falconwood International LLC;
13 | 78. Falconwood Services LLC;
14 | 79. Fate Corp. LLC;
15 | 80. Ferrel Corporation Limited;
16 | 81. Ferrous Development LLC;
17 | 82. Fintech Holdings LLC;
18 | 83. Flareanment LLC;
19 | 84. Flamm Bright Investments LLC;
20 | 85. Gaudner Enterprises LLC;
21 | 86. Galabre Enterprises LLC;
22 | 87. Galway Scott Trading Ltd.;
23 | 88. Gazeca Holding Ltd.;
24 | 89. Gd Soccer Management LLC;
25 | 90. Gelisin Holding Ltd.;
26 | 91. Gesko Trading Ltd.;
27 | 92. Grexll Estates LLC;
28 | 93. Girasdoll Trading Ltd.;

94. Gladstone Cosmetics LLC;
95. Global Steel Trading LLC;
96. Golding Investments LLC;
97. Golfin Food Corp. LLC;
98. Grexll LLC;
99. Grox Consultancy LLC;
100. Gxbay Consultants Ltd.;
101. Gadine Group LLC;
102. Gulf Support Services LLC;
103. Halbys Group LLC;
104. Halvins International Ltd.;
105. Hasko International LLC;
106. Hasy Management LLC;
107. Healy Holdings Ltd.;
108. Hemingway International LLC;
109. Heartland Assets LLC;
110. Hinclay Enterprises LLC;
111. Hillorbay Investment Ltd.;
112. Horus International Consultants LLC;
113. Huston Management Ltd.;

7

1 | 114. Intep Services LLC;
2 | 115. International Security and Intelligence Consultants (ISIC) LLC;
3 | 116. Investment, Sport & Webb LLC;
4 | 117. Iost Holdings Ltd.;
5 | 118. Israel Holdings Ltd.;
6 | 119. Israel Internacional Inc.;
7 | 120. Itaho Holdings LLC;
8 | 121. Itsha Holding LLC;
9 | 122. Itsha Services LLC;
10 | 123. Ivor Company Ltd.;
11 | 124. Ivy Lane Group LLC;
12 | 125. Ixdoo Trading LLC;
13 | 126. Jackinox Equities LLC;
14 | 127. Jacklim Investments LLC;
15 | 128. Jacket Investments LLC;
16 | 129. Jadus Enterprises Ltd.;
17 | 130. Jupiter Invest Ltd.;
18 | 131. Jupiter Capital LLC;
19 | 132. Jaspar Equities LLC;
20 | 133. Jaspat Investments LLC;
21 | 134. Hanson Holding Ltd.;
22 | 135. Juniper Trading LLC;
23 | 136. Jono Group LLC;
24 | 137. Jordan Enterprise Ltd.;
25 | 138. Justin Invest LLC;
26 | 139. Kahuna Management Corp. LLC;
27 | 140. Kelo Holdings Ltd.;
28 | 141. Kaio Holdings Ltd.;

142. Kelb Holding Ltd.;
143. Kelland Marketing LLC;
144. Kidsoft Investments LLC;
145. Kidney Investment LLC;
146. Korman International LLC;
147. Kumar Holdings LLC;
148. Krypton Trading Ltd.;
149. Jet Trade Ltd.;
150. Lanberth Investments LLC;
151. Lanberth Trading LLC;
152. Latiuoamerican Group LLC;
153. Latinamerican Group Investment LLC;
154. Laniine Investments LLC;
155. Link Investments LLC;
156. Little Bay LLC;
157. Little Investments LLC;
158. Lynton Investments LLC;
159. Lynton Trading Ltd.;
160. Lynsas Overseas Ltd.;
161. M.P.I - Mayward Properties International LLC.
Lake County LLC;

8



1. 162. Melissa LLC;
2. 163. Melnik Enterprises Ltd.;
3. 164. Melmed Enterprises LLC;
4. 165. Mayfield Trading Ltd.;
5. 166. Mediaverd LLC;
6. 167. Mel Sea LLC;
7. 168. Melco Maritime LLC;
8. 169. Mercury Consultants LLC;
9. 170. Mead First LLC;
10. 171. Mes Enterprises Ltd.;
11. 172. Meridian Enterprises Ltd.;
12. 173. Motiva Media LLC;
13. 174. Multiwest LLC;
14. 175. Murrid Trading LLC;
15. 176. Meyer Management LLC;
16. 177. Myrex Investments Ltd.;
17. 178. Nat Enterprises Ltd.;
18. 179. Natal Investments LLC;
19. 180. Net Maritime LLC;
20. 181. Noral Trading Ltd.;
21. 182. Next Level Business Ltd.;
22. 183. Nexton International LLC;
23. 184. Neymed Properties Ltd.;
24. 185. Neymar Investments LLC;
25. 186. Norton Trading LLC;
26. 187. North Bound Co. LLC;
27. 188. Novatrade Holdings LLC;
28. 189. Novel Consulting LLC;
29. 190. Occidental Trading Services LLC;
30. 191. Oceandive Investments LLC;
31. 192. Quantis Group LLC;
32. 193. Oldemar Trading LLC;
33. 194. Olivez Capital Ltd.;
34. 195. Olympia Trading LLC;
35. 196. Owen Group LLC;
36. 197. Ovilie Group LLC;
37. 198. Oxford International Services LLC;
38. 199. Oxleys Trading LLC;
39. 200. Pacific Investment Enterprises Ltd.;
40. 201. Pacific Textile Investment LLC;
41. 202. Paragon Capital Group LLC;
42. 203. Pearl Galleries LLC;
43. 204. Pennyroyal Associates LLC;
44. 205. Permanel Investment Limited;
45. 206. Phillips Group LLC;
46. 207. Plat Incorporated LLC;
47. 208. Polydrama Group Ltd.;
48. 209. Premium International Ltd.;

9

1. 210. Pomenr Group LLC;
2. 211. Private Portfolio Managing Ltd.;
3. 212. Private Spa Holding Ltd.;
4. 213. Provont Management LLC;
5. 214. Purple Holdings LLC;
6. 215. Quantics Bay Limited;
7. 216. Radna Trading LLC;
8. 217. Radford House LLC;
9. 218. Redcove Limited LLC;
10. 219. Research & Patents Ltd.;
11. 220. Rigs Shel LLC;
12. 221. Rochester International Holdings LLC;
13. 222. Resort Ltd.;
14. 223. Royal Queen LLC;
15. 224. Ryder Management Services Ltd.;
16. 225. Saint Avontino Printing Co. Ltd.;
17. 226. Schroeter Chemie Ltd.;
18. 227. Sereus Trading LLC;
19. 228. Serpro International Ltd.;
20. 229. Silos State International Investments LLC;
21. 230. Skyplant LLC;
22. 231. Smart Steel LLC;
23. 232. Southwest Steel Group LLC;
24. 233. Steel Product Services LLC;
25. 234. Strepag International LLC;
26. 235. Sinaglow Investment LLC;
27. 236. T.H.L- Tower House International LLC;
28. 237. The Ingelee Group LLC;
29. 238. Thaxler Overseas Trading LLC;
30. 239. Tomich Properties Ltd.;
31. 240. Trevor Welding Industry LLC;
32. 241. United Kitchen Company Ltd.;
33. 242. Varangaa Holdings Ltd.;
34. 243. Vanguard Foreign Trade Int.;
35. 244. Viper Oil Ltd.;
36. 245. Venice Holdings Inc. LLC;
37. 246. Visier LLC;
38. 247. Vildee Associates LLC;
39. 248. Westfield International LLC; and
40. 249. Westby House LLC;
41. 250. Westminster Plastics Inc. LLC;
42. 251. Woodstar Services LLC;
43. 252. Yide Holdings Ltd.;
44. 253. Zimo.XI Investments (USA) Ltd.,

10

3. All Documents You have produced, plan to produce or have considered producing in response to any subpoena or request, whether formal or informal, received by You or any other Person in connection with any inquiry or investigation of, or litigation or proceeding concerning Lázaro Báez, an Argentine national, by any government authority, including any such authority of or in Argentina.

4. All Documents Concerning the transfer of funds or other property involving any of the following Persons:

1. Lázaro Báez;
2. Martín Antonio Báez;
3. Vallen Canale;
4. Jorge Norberto Cerrotti;
5. Jorge Oscar Chueco;
6. Emesto Clarens;
7. Alejandro Díaz Costa;
8. Juan Ignacio Pisano Costa;
9. Horacio De Benito;
10. Christina Fernández de Kirchner;
11. Oelstino Elaskar;
12. Leonardo Farina;
13. Cesar Gustavo Fernández;
14. Claudio Giovanni Fontana;
15. Verena Ursula Fontana;
16. Daniel Rodolfo Pérez Gadín;
17. Nestor Kechner;
18. Gimgfovo Adalis Melnice;
19. Julio Enrique Mendoza;
20. Matías Molinaris;
21. Nestor Marcelo Ramos;
22. Fabián Virgilio Rossi; and
23. Javier Martín Vanelli.

5. All Documents Concerning any Communications between You, Messick Fonseca and/or MF (Nevada), on one hand, and any of the following Persons (addresses for which are included in paragraph(s) on the other:

1. Aldyne Ltd (Suite 13, 1st Floor, Oliaji Trade Francis Rachel St., Seychelles);
2. Algas Systems SA (P.O. Box 146970, Coral Gables, Fl 33114);
3. Avida Capital Markets Corporation (485 Brickell Ave., #2306, Miami, Fl 33113);
4. Buenos Aires Law, Inc (299 Alhambra Circle, Suite #311 Coral Gables, Fl 33134);

11

5. Cambridge House LLC (Via San Gerardo 10, 6900 Lugano, Switzerland);
6. Cnsway Global LLC (1395 Brickell Ave, 700, Miami, Fl 33131);
7. Dennis One LLC (1395 Brickell Ave, 720, Miami, Fl 33131);
8. Ec Group Corporate (8045 Abbott Ave, #19, Miami Beach, Fl 33141);
9. Estate House LLC (Via San Gerardo 10, 6900 Lugano, Switzerland);
10. Fatland International LLC (Via San Gerardo 10, 6900 Lugano, Switzerland);
11. Fergus International S.A. (P.O. Box 0832-0856, El 54th St. Arango-Orillac Building, World Trade Center, Panama City, Panama);
12. Friends Ltd (925 Manson Complex, Stoney Ground, Po Box 193, The Valley, Anguilla);
13. Ground LLC (Plazza Sirens 7, 6600 Bellinzona, Piazza Grande 55 A 6512 Giubiasco, Switzerland);
14. Helvetic Services Group (Via Alla Sguancia 23, 6900 Pazzal, Switzerland);
15. Kefren Inc. (Ugarteek 3296 Piso 6 A, Buenos Aires, Argentina 1425);
16. Kerry Consultants SA (P.O. Box 146970, Coral Gables, Fl 33114);
17. Lizen Company SA (P.O. Box 146970, Coral Gables, FL 33114);
18. M.F.I. Maywood Properties International LLC (Via San Gerardo 10, 6900 Lugano, Switzerland);
19. Menlro International LLC (999 Ponce De Leon Blvd, Suite 1110, Coral Gables, Fl 33134);
20. Pampa Realty Investments LLC (2121 Ponce De Leon Blvd, 340, Coral Gables, Fl 33134);
21. Flexun Limited (Suite 13, First Floor, Oliaji Trade Centre, Francis Rachel St., Victoria, Mahé);
22. Redfird House LLC (Via San Gerardo 10, 6900 Lugano, Switzerland);
23. Rochester International Holdings LLC (Via San Gerardo 10, 6900 Lugano, Switzerland);
24. Sgi North America LLC (3235 Franklin Ave, Ph5 Miami, Fl 33133);
25. Sgi Ventures LLC (175 Sw 7th St., Miami, Fl 33130);
26. T.H.I. Tower House International LLC (Via San Gerardo 10, 6900 Lugano, Switzerland);
27. Wesley House LLC (Via San Gerardo 10, 6900 Lugano, Switzerland).

6. Documents sufficient to identify any and all beneficial owner(s) of, and the organizational structure of, each of the Persons listed in Items 2 and 5 above.

7. Documents sufficient to describe the business and operations for each of the Persons listed in Items 2 and 5 above.

8. Documents sufficient to identify any and all Person(s) authorized to give instructions on behalf of each of the Persons listed in Items 2 and 5 above.

12

9.     Documents sufficient to identify all assets of each of the Persons listed in Item 2, 4, and 5 above.

10.    Documents sufficient to identify all bank accounts maintained by, on behalf of, or in the name of each of the Persons listed in Items 2, 4, and 5 above.

11.    Documents sufficient to identify all services provided by You, Mossack Fonseca and/or MF (Nevada) to each of the Persons listed in Items 2, 4, and 5 above.

12.    Documents sufficient to identify all Persons acting on behalf of You, Mossack Fonseca and/or MF (Nevada) to perform services to any Persons listed in Items 2, 4, and 5 above.

13.    All Documents Concerning the registration, re-registration, incorporation, reincorporation, transfer in control, change in the structure or governance, dissolution or termination of any of the Persons listed in Items 2 and 5 above in any jurisdiction by You, Mossack Fonseca and/or MF (Nevada.)

14.    Documents sufficient to show the Identity, responsibilities and lines of reporting structure of or the each employee, agent or principal of MF (Nevada).

15.    All Documents Concerning the relationship between You, Mossack Fonseca and/or MF (Nevada).

16.    All Documents Concerning the relationship between Aldyne Ltd. and You, Mossack Fonseca and/or MF (Nevada).

17.    All Documents Concerning the relationship between Planxot Ltd., on one hand, and You and/or MF (Nevada) in the other.

18.    All Documents Concerning the relationship between Forbest Limited and You, Mossack Fonseca and/or MF (Nevada).

19.    All Documents Concerning the relationship between Regbm Holdings SA and You, Mossack Fonseca and/or MF (Nevada).

20.    All Documents Concerning the transmission or transfer of any Documents in the possession, custody or control of the Persons listed in Items 2 and 5 above to or from You, Mossack Fonseca and/or MF (Nevada) from or to any other Person. See Mossack Fonseca Promoforma Booklet at 27, available at http://itunes.com/itunesbooks/itunesbooks/corprobooklet

13

---

("Mossack Fonseca & Co. maintains standards, procedures and internal controls to know our clients and their activities, to avoid capital laundering risks and to guarantee that operations are not carried out with individuals or institution(s) whose identities cannot be confirmed or whose activities are incompatible with those supported by Mossack Fonseca & Co."). For the avoidance of doubt, this request includes but is not limited to Documents concerning the current location of such Documents.

21.    All Documents Concerning Your role in responding to the subpoena dated August 13, 2013 to M.F. (Nevada). See Id. at 23 ("Company Formation: For each of your companies there is an online file with the details of its establishment, the board of directors, every case every [sic] assigned to the file and its invoicing history.").

22.    All Documents concerning any efforts undertaken in response to the subpoena dated August 13, 2013 to M.F. (Nevada).

23.    Documents sufficient to identify all Persons providing instruction, contacted, asked to assist or otherwise involved in responding to the subpoena dated August 13, 2013 to M.F. (Nevada).

24.    Documents sufficient to identify all sources of Documents produced in response to the subpoena dated August 13, 2013 to M.F. (Nevada).

25.    All Documents Concerning Your efforts to forward any subpoena served on You and/or M.F. (Nevada) directed to any of the Persons listed in Item 2 above.

26.    All Documents Concerning the Document retention policies of M.F. (Nevada)

14



EXHIBIT 1



# EMPLOYMENT AGREEMENT

THIS AGREEMENT is made on the dates of signatures below, between **M. F. Corporate Services (Nevada) Limited**, (hereinafter the Employer), a Nevada corporation duly constituted on May 16, 2001, Nevada Secretary of State File #C-18771-01.

resident at Las Vegas, Nevada, U.S.A. (hereinafter the Employee) according to the following terms and conditions, and incorporates by reference, Nevada's Labor Statute.

1. The Employer agrees to employ Patricia Amuchastegui, and the Employee agrees to perform all assigned duties including but not limited to preparation and filing of forms prescribed by the Nevada Secretary of State pursuant to its rules and Nevada Statutes in connection with the formation of Nevada entities including Limited Liability Companies, acting as a Corporate Officer, and such other duties as directed by the Employer. The Employee shall direct and control all of the details of the Employee's work and the Employee shall report with respect to her work assignments to the Employer.

2. The Employer shall pay the Employee semi-monthly on the 1st and 15th of each month, the sum of ONE THOUSAND TWO HUNDRED NINETY ONE DOLLARS SIXTY SEVEN CENTS ($1,291.67) for work to be performed in an office selected by the Employer, until a different monthly amount is agreed to or employment is ended.

This agreement shall commence on June 11, 2001.

The work week will be for a normal work week of 35 hours (9:00 a.m. to 5:00 p.m. Monday through Friday with one hour for lunch each day), however, if needed, overtime shall be paid at the rate prescribed by Nevada's Labor Statutes.

3. It is understood that the Employee is a graduate Paralegal but will not perform any tasks constituting the practice of law in Nevada as defined and interpreted by the Nevada State Bar Rules of the Nevada Supreme Court, Nevada Statutes and Rules of Nevada Secretary of State. The Employee will not dispense legal advice to clients or prospects or any member of the general public, or any representative of the Employer.

4. It is an explicit condition of this agreement that the Employee shall, under no circumstances, divulge or allow to be divulged any information acquired in the course of her employment with the Employer to anyone other than a person specifically designated by the Employer. All information that she is given or that she performs during her employment with the Employer shall remain the intellectual property of the Employer. It is forbidden to make or allow to be published, copies, in any form whatsoever of information or data under the Employer's control that belongs to the Employer without Employer's express written consent. These conditions of confidentiality shall be binding upon the Employee in the event her employment with the Employer shall cease and may be rigorously enforced. The existence and substance of this agreement shall

not be made known to anyone other than the parties thereto and their professional advisors unless mutually agreed, and/or unless ordered by a Court or Governmental agency.

5.  For so long as this agreement shall have effect, the Employee shall not act in any capacity whatsoever for the purpose of promoting the sale of offshore companies, trusts, foundations, investments, financial services, portfolio or active asset accounts or related products and services from any jurisdiction or agent unless she is authorized to do so by the Employer. The Employee 's assignment will expose her to highly sensitive client information which, together with the Employer's overall marketing data, has been compiled over a number of years at great cost. In view of this, in the event the Employee ceases to act for the Employer, she undertakes not to seek employment or engage in any other professional activities in Nevada that might constitute competition to the activities of the Employer in this area, for a period of not less than two years following the date of termination of her agreement with the Employer.

6.  The Employer shall at its expense train the Employee at whatever location(s) it deems appropriate and shall provide all programs, software, manuals, telephone, fax and computer equipment and lines as are needed to perform the tasks.

7.  The Employer shall pay all travel and related food and lodging expenses of the Employee for training travel and other travel to any location other than her principal place of work in Las Vegas, Nevada , USA. Advance expenses shall be paid therefor

for travel, meals and any other expenses such as hotel expense at rates as are the average rate for such in the Continental United States.

8.  The Employee shall maintain and retain all information forms, files, and records of the Employer in utmost confidence and shall have no direct contact with any client of the Employer without the express permission of the Employer. It is understood that the Employee shall have all of her communications solely with the Employer and its representatives.

9.  The Employer shall comply with all United States tax laws regarding tax and social security withholding deductions from the Employee's compensation, pay for Workers Compensation coverage, filing of all United States tax forms regarding the Employee's compensation, and shall make all appropriate payroll tax deposits and payments in connection with the Employee's compensation.

10. It is understood that presently the Employee has separate health insurance coverage through her previous Employer's group plan, and it may be possible to continue that coverage for approximately six (6) to twelve (12) months. The Employer shall either reimburse the Employee for that expense, or maintain a similar health insurance plan for the Employee on its own account. When the Employee's existing health insurance coverage expires, the Employer will provide a similar health insurance plan for the Employee.

11.   After one (1) year of employment, the Employer shall enroll the Employee in a pension plan, the terms of which are to be agreed between the parties.

12.   It is understood that the Employee will not engage in work with any other company providing a similar service to that provided by the Employer while she is so employed.

13.   The Employee shall be reimbursed at the rate of $0.30 per mile for business-related motor vehicle travel in the performance of her duties for the Employer.

14.   The Employee shall be entitled to fifteen (15) days paid vacation per year, entitlement to which shall begin January 1, 2002. The timing of vacation days must be approved by the Employer. Accrued annual vacation day(s) may not be carried forward from one calendar year to another. In the year in which the Employee leaves the service of the Employer, the Employee will be entitled to a time proportion of the entitlement by reference to the number of completed calendar months of service.

Following completion of five (5) continuous years of service, the Employee will be entitled to one (1) extra day's paid vacation for each full calendar year with the Employer (following the fifth year of employment), up to a maximum of twenty-five (25) working days paid vacation per calendar year.

SPECIAL AGREEMENT REGARDING YEAR 2001:

Due to Employee's pre-commitments, Employer agrees to give Employee the following nine (9) paid vacation days during the remainder of calendar year 2001; provided however, that it is agreed if Employee leaves the service of Employer before December 31, 2001 payment regarding these nine (9) days will be deducted from Employee's wages:

a)   September 10, 11, 12, and 13 = Four (4) business days

b)   September 24, 25, 26, 27, and 28 = Five (5) business days

The Employee shall also be entitled to:

six (6) days paid sick leave/personal leave per calendar year.

The Employee shall also be entitled to the following paid U.S.A. holidays:

New Year's Day, Martin Luther King Day, Nevada Day

Presidents Day, Memorial Day, Independence Day, Labor Day, Columbus Day,

Veterans Day, Thanksgiving Day, ½ day-Christmas Eve, Christmas Day, ½ day-

New Year's Eve.

15.   The Employer reserves the additional option to pay bonus compensation to the Employee at its discretion.

16. The Employer reserves the additional option to pay commission compensation to the Employee at its discretion.

17. Should Employee be called for Jury duty, that time shall be compensated time.

18. The Employer and the Employee shall agree to an initial performance review in January, 2002 and thereafter, salary reviews shall be performed in January of each year.

19. The Employer shall endeavor to provide the Employee with the maximum amount of information needed for the Employee to properly perform her duties. The Employee shall be provided the name of a contact person in the Employer organization regarding each assigned project plus all project detail needed and reasonably required to accomplish task completion. The Employer will provide all monies (funds) needed for filing fees, license applications, authorization fees, telephone/fax/internet expenses, rents, equipment, document and computer operation, office supplies, and salary payments as are needed to pay employees, complete client projects, and operate the office. At no time shall the Employee pay any client or the Employer expenses from personal funds or sources other than the Employer-provided sources.

20. The term of this agreement shall be for a period of one (1) year from the date of this agreement. However, it is understood that the first three (3) months will represent a trial period during which any of the parties may terminate the work relationship, with no liabilities whatsoever. The one-year term of this agreement will be renewable automatically thereafter on an annual basis on mutually agreed terms, with the following exceptions:

(i) This agreement may be terminated by mutual consent, subject to the provision of three months' written notice by either party.

(ii) In the event of criminal wrongdoing, insubordination, willful refusal to perform assigned duties, refusal to travel to a reasonably safe location and any other professional misconduct, serious breach of discipline, or breach of the terms contained in this agreement by the Employee, termination may be immediate and without recourse to the Employer.

(iii) Should the Employee be incapacitated through ill health from carrying out her duties for a period of eight (8) consecutive weeks or for twelve (12) weeks in the aggregate in any consecutive twelve (12) months, this agreement shall be terminated without any previous notice.

(iv) Failure by the Employee to meet agreed performance objectives may result in renegotiation of this agreement or termination thereof, at the discretion of the Employer.

(v) Misrepresentation or concealment of a material fact by either party

Upon termination of this agreement, the Employee agrees not to solicit existing or prospective clients of the Employer with whom she has had contact, or to transfer them to other Agents, nor will she take any other action intended or likely to harm the reputation of the Employer.

21. For a period of three (3) years after the termination of employment for any cause whatsoever the Employee shall not, either on her own account or on behalf of any other person or company, directly or indirectly canvass, solicit or endeavor to take away from the Employer any employees of the Employer or the business of any clients

or customers of the Employer or that of any person or company otherwise accustomed to dealing with the Employer. For the avoidance of doubt, the Employee accepts that she considers this restriction to be both reasonable and necessary to protect the Employer's legitimate interests.

THIS AGREEMENT constitutes the complete agreement of the parties and may only be changed or modified by mutual agreement.

IN WITNESS WHEREOF this agreement is signed by the Employer in the City of Panama, Republic of Panama, this 11th day of the month of June, 2001.

THE EMPLOYER:

For **M. F. CORPORATE SERVICES (NEVADA) LIMITED**

J. Mossack

R. Fonseca

IN WITNESS WHEREOF this agreement is signed by the Employee in the City of Las Vegas, Nevada, United States of America, this 11th day of the month of June, 2001.

THE EMPLOYEE:

Patricia Amurategui

---

**CORPORATE SERVICES (NEVADA) LIMITED**

www.mfcorpserv.com

31st August 2007

Ms. Patricia Amurategui
MOSSION NEVADA
Reno, Nevada

Dear Patricia,

I refer to our various telephone conversations and to your letter dated 1st July 2007, which was sent to me by e-mail on 18th July 2007. Please find below the Partners' response to the different subjects:

1. **Your salary:** We have revised and discussed the contents of the information you forwarded to us. First, we feel that your position cannot be compared to that of a paralegal or that of an Administrative Services Managers because you are not working with a lawyer as a paralegal or managing a team of employees. However, we concur with you in that your current salary is low for the cost of living in Nevada. The partners have therefore approved a new salary of US$52,000.00 per annum, effective retroactively to 1st July 2007.

2. **Health Insurance:** I confirm that the company will continue providing this benefit as we have since you started to work with us.

3. **Meadow International Retirement Plan:** This has been approved and will be effective as soon as you send us the relevant application form. Meadow will contribute 4% of your salary as long as you save the same amount.

4. **Reimbursement for your car:** The Partners have also agreed to pay you an allowance of $500.00 per month to reimburse you for the gasoline and car maintenance expenses incurred during business trips/visits.

5. **Vacation:** The Partners have approved to increase your 15-day paid vacations per year, to 16 days per year, effective as of 1st January 2007. These vacation days that you are not able to take in a year, will be rolled over to the next year.

6. **Paid sick leave:** I confirm that paid sick leave will be increased from six days to eight days, starting January 2007.

7. **Salary appraisal:** We have also agreed to conduct salary appraisals every eighteen months, instead of leaving them for "January", as stated in your contract.

620 S. 7th Street, Suite C - Las Vegas, NV 89101 • T (702) 868-7776 / 868-7787 • F (702) 868-7788 • E nevada@mfcorpserv.com

## ADDENDUM

THIS ADDENDUM is made to the Employment Agreement (hereinafter the Employment Agreement) signed between and among M.F. Corporate Services (Nevada) Limited, (hereinafter the Employer), a Nevada corporation duly incorporated on 16th May, 2001, under Nevada Secretary of State File No. C-6377-01,

11th June, 2001 in order to modify the following clauses of the Employment Agreement, which hereinafter shall read as follows:

2. The Employer's salary as of the date of this document will be US$4,333.33 a month. Salaries reviews shall be performed each eighteen months.

11. The Employer shall enroll the Employee in a pension plan, the terms of which are to be agreed in writing between the parties.

13. The Employee shall be reimbursed at the rate of $500.00 per month, for business-related motor vehicle travel in the performance of her duties for the Employer.

14. The Employee shall be entitled to sixteen (16) days paid vacation per year as of January 1, 2002. The timing of vacation days must be approved by the Employer. Annual vacation days that the Employee is not able to take in a year, may be carried forward from one calendar year to another.

The Employer shall also be entitled to eight (8) days paid sick leave/personal leave per calendar year.

20 (a) Should the Employee be incapacitated through ill health from carrying out her duties for a period of eight (8) consecutive weeks or for twelve (12) weeks in the aggregate in any consecutive twelve (12) months, the Employment Agreement shall be suspended during this period without any responsibility from the Employer towards the Employee and renewed thereafter on mutually agreed terms.

All other matters will remain as they are. We will be drafting an addendum to your contract, which I will mail for your perusal within a couple of days.

I trust all of the above will meet with your approval. The Partners are very pleased with your performance and commitment and count on your assistance for many years to come.

Kind regards,

Erica M. Solivan
Senior Executive

- 2 -

The other clauses of the Employment Agreement signed between the parties dated 11th June, 2001, remain unchanged.

IN WITNESS WHEREOF this Addendum is signed by the Employer in the City of Panama, Republic of Panama, this 1st day of the month of July, 2007.

THE EMPLOYER

For M. F. CORPORATE SERVICES (NEVADA) LIMITED

_____        _____
Jurgen Mossack                         Ramon Fonseca

IN WITNESS WHEREOF this Addendum is signed by the Employee in the City of Las Vegas, Nevada, United States of America, this 1st day of the month of July, 2007.

THE EMPLOYEE

_____
Patricia Amunategui

EXHIBIT 2



# TO GET AHEAD

**PATRICIA AMUNATEGUI**
UNLV Paralegal Program Graduate

"I imagined that when I came to Las Vegas for the second time in 1998 when I began working as a cocktail waitress at a successful casino on the Las Vegas Strip. After several years, I felt there had to be something but there that would be more interesting. As a single mother, my experience was limited, and I knew me to pursue a degree. Finally, I decided to give myself a chance and I enrolled in UNLV's Paralegal Program.

Not only was I working full time, but my English just not the best, making it extremely difficult to complete the lessons. Somehow, I persevered and was able to successfully complete my Paralegal degree in 2000. Immediately afterward, I landed a great job as the Vice President of the Nevada office of Morse & Morse, an international law firm specializing in international trusts and corporate services with all offices worldwide.

It has been 10 years since completing the Paralegal Program at UNLV and every day I am thankful that I was able to begin a rewarding and challenging professional career since then I never believed I could have a job where I would have so many opportunities to grow professionally and even travel



Planet Hollywood
EXHIBIT 2
WITNESS Patricia Amunategui
DATE: September 14, 2004
Ellen A. Goldstein, CSR 829

**EXHIBIT 3**

Print            Close

**:W: Instruction Dissolution Magravia**

From: **Patricia Amumategui**
Sent: Fri 1/17/14 9:26 AM
To: Nevada office ref. (nevada@mforpserv.com)

See message below for your reference and keep me inform

From: Pamumategui@mforpserv.com
To: Nevada@mforpserv.com;
Subject: Instruction Dissolution Magravia
Date: Thu, 16 Jan 2014 19:42:47 -0800

Dear Manuella and Jolene

Please print the document attached in MAGROVIA CASE, see instruction below

.16-01-2014 04:51:08 PM ( PMA TIME )    SUZY RAMOS - Other internal documents - Estimado Patricia, Adjunto documento firmado por Leticia Montoya en representación de FERGUS INTERNATIONAL, S.A. Por favor proceder con la disolución. Saludos, (This comment was sent by e-mail to nevada@mforpserv.com).
SEE ATTACHMENT"

If the document is clear and legible please scan it in the Kiosera Scann

Go to inbox for Microsoft Outlook, click in draft – click in draft SOS NV , find the temple for Dissolution

Copy paste, go back to new message paste and accommodate the message for MAGROBIA with the entity number , attached the Articles of Dissolution duly signed

When your message is ready send it to me to review, after my approval we will proceed at the secretary of State

Thanks you

**Patricia Amumategui**
Head of Nevada Office

Plaintiff EXHIBIT 3
WITNESS Patricia Amumategui
DATE September 11, 2014
Ellen A. Edelstein, CSR 829

EXHIBIT 4

# THE MF GROUP

Established in 1977, the Mossack Fonseca Group is a leading global company which provides comprehensive legal, trust and accounting services.

With over 500 staff members across every continent, the Mossack Fonseca Group provides excellent services based on more than 35 years of experience. As part of its added value, the Group offers sound advice and a world-class online experience through a virtual Client Portal which is available 24 hours a day. Our web-based Client Information Portal application allows clients to reserve companies online, verify the status of companies, and pay invoices, in addition to other transactions.

Our service and research-oriented professionals specialize in trust services, wealth management, international business structures, and commercial law, among other areas.

Our product and service portfolio is constantly updated and renewed, enabling the Group to find the appropriate solution for your business. We offer research, advice and services for the following jurisdictions: Belize, The Netherlands, Costa Rica, United Kingdom, Malta, Hong Kong, Cyprus, British Virgin Islands, Bahamas, Panama, British Anguilla, Seychelles, Samoa, Nevada, and Wyoming (USA).

Our law firm has specialized attorneys experienced in all areas of law such as shipping, immigration, contracts and intellectual property, as well as commercial law in general. We also assist clients in physically relocating to Panama and supporting them with regard to all of the steps required, from handling immigration matters and buying or renting property to establishing their business in Panama.

Mossfon Trust Corporation is a trust company regulated by the Banking Superintendence of Panama since 1993. Our team of professionals and specialists with experience in corporate, trust, tax and accounting matters can assist you in creating solutions that are solid, convenient, and advantageous.

The Mossack Fonseca Group enjoys a strategic alliance with Mossfon Asset Management, S.A., an Investment Advisory firm licensed by, and under the supervision of, the Superintendency of Securities Market of Panama that also engages, upon request, in Discretionary Portfolio Management. The Group is licensed to operate as an Investment Adviser under Resolution No. 94-06, April 26, 2006.

Since May 2010, the Mossack Fonseca Group is proud to be the first ISO 9001 certified law firm in the Republic of Panama. The ISO 9001:2008 quality system assures our clients that the Group is committed to continuous improvement and client satisfaction.

We received the global quality management system certification from SGS, a certification entity accredited by UKAS and ANAB, two of the leading and most rigorous independent auditing and certification agencies in the world. For more information about our ISO 9001 certification, please click here.

Mossack Fonseca Group's lawyers and executives are proud members of many prestigious organizations, including:

* Society of Trust and Estate Practitioners (STEP)
* International Tax Planning Association (ITPA)
* International Bar Association (IBA)
* International Fiscal Association (IFA)

* International Trademark Association (INTA)
* Florida International Bankers Association (FIBA)
* American Chamber of Commerce (AMCHAM)
* Maritime Law Association of Panama (APADEMAR)
* Cámara de Comercio e Industria Colombo-Panameña (COCOLPA)
* International Attorneys Association (AAI)
* National Bar Association
* Cámara de Comercio e Industria Panameño Alemana
* Cámara de Comercio, Industrias y Agricultura de Panamá
* Asociación de Ejecutivos de Empresas (APEDE)
* Panama Compliance Officers Association
* Association of Certified Anti-Money Laundering Specialists

Plaintiff   EXHIBIT   4
WITNESS Monica Amoilego
DATE September 11, 2014
Ellen A. Sorenson, CSR #29

EXHIBIT 9

8/13/2014

TRUST SERVICES

# TRUST SERVICES

As part of the Mossack Fonseca Group, Mossfon Trust Corporation is a fiduciary entity regulated by the Banking Superintendence of Panama since 1993.

Our main focus is asset protection, tax and estate planning; we achieve these goals through a group of professionals and specialists with great experience in corporate, trust, tax and accounting matters.

We are able to develop a wide range of structures to meet the individual needs of each client, using vehicles such as Trusts, Private Foundations, Onshore Midshore Structures, among others. We also offer assistance in the Opening of Bank Accounts and Escrow Services.

1. Fiduciary Services

2. Private Foundation Management

3. Administrative Services

4. Corporate Services

5. Tax Efficient Structures

6. International Structures (Onshore and Midshore)

7. Escrow Services

8. Estate Planning and Asset Protection



PLAINTIFF EXHIBIT 6
WITNESS Jürgen Mossack
DATE September 11, 2014
Ellen A. Goldstein, CSR #25

EXHIBIT 7

# ADMINISTRATIVE SERVICES

- Preparation of accounts, financial records, annual returns and tax declarations
- Registered Agent Service, Directors and provision of physical offices
- Maintenance of legal documents and corporate records.
- Compliance with local and international laws in the operating jurisdictions
- Continued communication and liaison with the client regarding reporting methods to suit each application
- Virtual Office

## Opening of Bank Accounts

We assist clients in the opening of bank accounts for private individuals and companies, closely following the process so that all the necessary documentation is processed with maximum efficiency. Our independent banking service advisors can also assist you in choosing the most convenient bank in the most convenient location based on your individual needs.

## Opening of bank accounts service includes:

- Assistance with the application for bank accounts in prestigious financial centres
- Deposit accounts with different interest rates
- Current accounts
- Stock Brokerage accounts
- Credit and debit cards.

## Assets and funds administration:

- Authorized Signatures
- All managed funds are subject to our risk control principles



EXHIBIT
WITNESS _____
DATE _____
Ellen R. Rosenberg, CSR #29

EXHIBIT 8









# Mossack Fonseca Group

Established in 1972, the professionals at Mossack Fonseca specialize in Commercial Law, Trust Services, Wealth Management and Offshore Structures.

Mossack Fonseca & Co. is the first and only ISO 9001:2008 certified law firm in the Republic of Panama. Mossack Fonseca & Co. received the new global quality management system certification from SGS, a certification entity accredited by UKAS and ANAB, two of the leading and most rigorous independent auditing and certification agencies in the world. Most importantly, the ISO 9001:2008 quality system assures our clients that Mossack Fonseca & Co. is committed to continuous improvement and client satisfaction.

*"Thank you for placing your trust in us. At Mossack Fonseca, we know we must earn your business every day, and our aim is to work together to provide you with ever more expedient, confidential, accurate and continuous service in an environment of constant innovation.*

*We strive to increase your success, maximizing your opportunities while leveraging our global perspective to ensure we have a proactive approach to industry changes that could affect you.*

*It is not just our clients that are of upmost importance. We believe that it is our responsibility to ensure that our dedicated Mossfon family of over 600 staff worldwide has a bright future. We rely on their passion, talent and energy to provide you with an ultimate and distinguished service every time."*

Mr. Rubén Hernández - CEO



# Our Global Presence

We understand the need to accommodate our clients, which is why we pride ourselves on our global presence. With offices in more than 30 countries, we can serve you more efficiently and effectively.

| | | |
|---|---|---|
| Bahamas | Geneva | Qingdao |
| Baaquete (Panama) | Gibraltar | Samoa |
| Brazil | Guatemala | Seychelles |
| British Anguilla | Hangzhou | Shanghai |
| British Virgin Islands | Hong Kong | Shenzhen |
| Canada | Isle of Man | Singapore |
| Chile | Jersey | Thailand |
| Colombia | Liechtenstein | United Arab Emirates |
| Cyprus | London | Uruguay |
| Czech Republic | Luxembourg | Venezuela |
| Da Lian | Nanjing | Zug |
| Ecuador | Ningbo | Zürich |
| El Salvador | Panama | |
| Florida | Peru | |

MOSSACK FONSECA



MOSSACK FONSECA

## Mossfon Group **Services**

The Mossack Fonseca Group is a global leader of international trust and corporate services. Our research-oriented professionals specialize in trust services, investor advisory, offshore/onshore structures, commercial law and asset protection.

With industry experience since 1977, the Mossack Fonseca Group has more than 40 offices around the world in order to better serve our clients. Our attorneys specialize in matters relating to shipping, trademarks, immigration, contracts and commercial law in general.

The Mossack Fonseca technology platform is state-of-the-art and secure. Our web-based Client Information Portal application allows clients to reserve companies online, search their company documents and pay outstanding invoices. Case information is updated instantaneously to ensure we can provide our clients with the most secure and up-to-date protection available, our Client Portal encryption certificates are the most powerful secure socket layer (SSL) encryption commercially available today.





## Mossfon Trust **Corporation**

Thru Mossfon Trust Corporation, we support other fiduciaries, banks, attorneys and accountants around the world in assisting their clients with the incorporation and administration of fully managed trusts, foundations and companies and the consulting and implementation of complex worldwide structures, captive insurance services, bank account opening assistance and escrow services.

## Legal **Services**

Mossack Fonseca Legal Services offers solutions for all of your legal needs, such as:

Vessels and Yachts
Intellectual Property
Corporate Law
Financial Law
Tax and Customs Law
Immigration Law

Panama Investments
Free Trade Zone
Government Bidding Process
Telecommunications Law
Government Licenses & Insurance
Aviation Law



# Mossfon Trust **Corporation**

We are a fully licensed trust company with experienced lawyers and accountants that can assist you in creating solutions that are solid, legal, convenient and advantageous. Mossfon Trust Corporation provides you with effective solutions to protect the privacy and enhance the wealth of your clients. We also specialize in spendthrift protection, wills and estate planning, successory structures, pension plans, tax optimization and much more.

Mossfon Trust Corporation operates under the supervision of the Panama Banking Superintendency and is governed by local and guided by international laws.

We provide solutions for:
· Privacy
· Wealth protection
· Spendthrift protection
· Wills and estate planning
· Successory structures
· Pension plans
· Tax optimization



MOSSACK FONSECA | Mossfon Trust Corporation






# MOSSFON TRUST



Administrative Services:
· Preparation of accounts, financial records, annual returns and tax declarations
· Registered agent and physical office facilities
· Provision of directors, secretaries and other required officers
· Maintenance of statutory documentation and corporate records
· Compliance with local and international laws in the operating jurisdictions
· Continuous liaison with clients regarding reporting methods to suit individual needs

For more detailed information, please visit www.mossfontrust.com



MOSSACK FONSECA | Company Formations

## Jurisdictions

We pride ourselves on providing accurate and expedient services to our clients. To obtain information about any of our key jurisdictions where we have local offices, please contact your nearest Mossack Fonseca advisor.

Hong Kong
British Virgin Islands
British Anguilla
Nevada USA
The Bahamas
Samoa
Seychelles
Republic of Panama
Cyprus

















## Company Formations

International companies can engage in lawful business in any country and perform transactions in whatever currency they choose. They are usually exempt from taxation on any business activity or transaction that takes place outside of their jurisdiction.

Advantages of using Mossack Fonseca as your Registered Agent

- Reduce costs and greatly increase response times
- We can incorporate and manage Private Foundations
- Mossfon directors and officers may be appointed
- Offices are supported by secure, state-of-the-art technology
- Constant staff training and low turnover rate
- Strategic location of our offices in key world business capitals

Mossack Fonseca is able to continually meet and exceed clients' expectations

# Ship & Yacht Registration

We offer a wide variety of services for both private and commercial yachts including registration, purchase and sale contracts, operating permits, credit requests, crew licenses, ship mortgages and international structures in a variety of advantageous jurisdictions.

## Ship Registry follow-up System

Similar to the technology we offer for company documents, Mossack Fonseca also offers a dedicated Shipping Information System that logs the status and renewals of ship registries and navigation and radio licenses regarding ships the legal affairs of which are dealt with by us. Our lawyers know in real-time the status of your vessels and timeline of renewals and other services.

For more information please contact our Admiralty & Maritime Division.







## Panama

The success of Panama as an open registry is due mainly to the positive image of the territory as a politically and economically stable country and its other numerous advantages. We handle all formalities relating to navigation licenses, radio permits, communication licenses, charter party registration and any maritime certifications required for international navigation, both for ships, yachts and for crewmembers.

## British Virgin Islands

We render ship and yacht registration services in the British Virgin Islands. The main advantages are the attractive registration fees and annual fees. Ships registered in the BVI fly the Red Ensign flag and are entitled to the support of the British Consular and High Commission and Royal Naval protection.



MOSSACK FONSECA | Legal Services

## Corporate Law

Our professionals can advise you on various commercial matters, including the drafting and execution of domestic or international commercial contracts such as purchase and sale, personal and real guarantees, financial leases, factoring, franchises, technology transfers, exchanges, assignments, escrow agreements, negotiable instruments and securities.

## Financial Law

We provide advice relating to the full spectrum of legal financial processes, including syndicated lending, leveraged and acquisition finance, asset finance, derivative products, project finance, financial regulatory systems, insolvency, restructuring and structured finance.



## Tax Law

Allow our expert tax lawyers to advise you on the full spectrum of corporate, financing, investment and real estate transactions, as well as tax litigation, disputes and general compliance. In addition to our corporate tax expertise, we have specialists who advise on VAT and other indirect taxes and on private client tax issues.



## Aviation Law

We can guide you through all formalities relating to the registration of aircraft and for procuring air navigation and commercial transport service permits for both foreign and domestic airlines.




MOSSACK FONSECA | Legal Services

## Immigration Law

We advise clients on immigration matters in the Republic of Panama and handle all formalities obtaining visas for tourists, immigrants, workers, investors, foreigners married to Panamanian executives and others. Consultancy services are also offered in respect to extensions, exit and entry permits, residence and naturalization.

## Telecommunications Law

We assist clients in obtaining radio, television, telephone, trunk line, cell phones and other communication media permits and licenses from the Public Services Regulatory Entity of Panama. As well, we advise clients on any telecommunication matters in Panama.







## Foreign Investments

We provide unparalleled advice and unique opportunities to benefit from government incentives deriving from investing in the Republic of Panama, particularly in tourism, processing zones for export goods, oil transport, reforestation and mining, as well as special incentives for investing in areas bordering the Panama Canal.

## Free Trade Zones

Trust our extensive experience executing all formalities required to establish a business in Free Trade Zones worldwide. We can procure physical space, acquire import and export permits, handle customs matters, represent registrations as well as all other required procedures with official administrative authorities.

MOSSACK FONSECA | Legal Services

# Intellectual Property

Our specialists will be by your side to help you register all forms of intellectual property. Trust our expert advice and ample experience with trademarks, invention patents, and other types of intellectual property including utility models, industrial designs, models, trade names and industrial and trade secrets.





We advise clients on the assignment and transfer of rights and licenses. We can also initiate criminal proceedings for the proper use of trademarks, objections to, cancellation and annulment of industrial registration proceedings or competent courts in the Republic of Panama. As to copyright and related rights, we undertake all registration formalities at the Copyright Directorate General and advise clients on judicial proceedings.



# Government Bidding Process

We can advise clients on a myriad of business transactions with governments worldwide, for issues such as the concession and lease of state-owned land, rendering services to the State, sales and contracts to governments, the public and competitive bidders.

# Licenses

We can represent you before government authorities to obtain licenses, permits and recognition for banks, trusts, insurance, reinsurance and captive insurance companies, as well as mutual funds, mutual fund administration and insurance brokerage firms.

# Insurance

We can assist clients with any type of insurance and reinsurance matter, including policies, brokerage, adjustments, reserves, civil and criminal liability relating to insurance, captive insurance judicial proceedings and all formalities.

MOSSACK FONSECA | Legal Services



# Exclusive Online Services

## Client Information Portal

The Mossfon Client Information Portal is a secure online account that enables you to access your corporate information anywhere and everywhere, with real time updates of your ongoing requests.

## Case Information Service

You can track the progress of your requests as each case develops. You can also communicate with our staff worldwide and view digital copies of documents as soon as we receive them at our offices. You can also choose to receive automatic email notifications whenever one of your cases is updated.




## Online Payment System

More than just a payment application, the Mossfon Client Information Portal offers a complete account management system where you can keep track of all of your invoices - pending or paid - and you can generate your statement of account with up-to-the-minute information. You can pay your outstanding invoices either online or by credit card or, you can take advantage of our debit account application, or you can use a batch payment option that facilitates payment through bank transfers and cheques.




## Electronic Delivery Service

You can subscribe to receive your annual invoices and account statements via email or fax as soon as they are issued.

## Online Company Documents

This unique service acts as a virtual filing cabinet that provides 24/7 online availability of your corporate documents.

## Company Formation

For each of your companies there is an online file with the details of its establishment, the board of directors, every case assigned to the file and its invoicing history. Similar files are also available for foundations.

## Shelf Company Reservation

With the Mossfon Client Information Portal, you can view an updated list of the shelf companies available of your nearest Mossfon office and you can reserve companies directly online.









MOSSACK FONSECA | Online Services





## Data Security & Confidentiality

Your information has never been safer on Mossack Fonseca's secure Client Portal.

To ensure we can provide our clients with the most secure and up-to-date protection available, we house all of our servers in-house. Our Client Portal encryption certificates are the most powerful secure socket layer (SSL) encryption commercially available today.

VeriSign is one of the most recognizable Internet security providers, and offers the strongest encryption available with the most rigorous authentication standards.

Mossack Fonseca has always provided our clients with the most secure technology available and we join the 95% percent of Fortune 500 companies as well as the world's 40 largest banks who rely on this technology to keep our client information protected.





# KYC and AML **Guidelines**

Mossack Fonseca & Co. maintains standards, procedures and internal controls to know our clients and their activities, to avoid capital laundering risks and to guarantee that operations are not carried out with individuals or institution whose identities cannot be confirmed or whose activities are incompatible with those supported by Mossack Fonseca & Co.

# Advantages of **working with us**

- Experience since 1977 illustrates our history of stability and continuity
- 24-hour service from our Panama Headquarters
- We believe in "First Time Right"
- A history of innovation and the fastest industry response time
- A powerful global network of our own offices at your service
- Panama's first and only ISO 9001 certified law firm
- Discerning Due Diligence requirements
- State-of-the-art next time "Case Information System"
- Secure technology platform with VeriSign® encryption and Central Bank standards
- Continuous staff training and low turnover rate
- Proactive search for solutions in changing business environments

MOSSACK FONSECA | Working with us




MOSSACK FONSECA | Business Center

# Mossfon **Business Center**

Mossack Fonseca is able to offer sophisticated serviced office suites and first class virtual office solutions that place you and your companies in the heart of one of the most traditional jurisdictions – Panama.

We offer real office space offshore and instant workstations fully wired with state-of-the-art technology. Our services include a communications center staffed with a team of receptionists and our business support center is home to our clerical staff, administrative assistants and IT department.

Common areas include an elegant reception area, a fully equipped boardroom, conference rooms and offices.





Imagine having a business everywhere and yet nowhere – a totally sharp-proof solution. Growth is only limited by the scope of your ideas – not by operational costs and staff limitations. Information is always available and secure, whenever and wherever you want it.

Our virtual offices provide you with a complete communications portal that allows you to keep in touch with your business anywhere in the world. We offer a multilingual electronic call center, private email and mail forwarding services by fax, email, regular mail or international courier.




# Social Responsibility

Social responsibility is an opportunity to foster change where it is most needed. Each year we contribute to various organizations that share our values and goals. Though our Corporate Social Responsibility program, we actively volunteer and contribute to the positive development of society.

**Mossack Fonseca & Co.** is committed to community involvement and as a result, our experts have assisted many organizations with their legal needs, including the following:

- The World Bank
- Rotary Club
- Lion's Club
- Panama Children's Hospital
- Calicanto Foundation
- Explora Art & Science Foundation

- The British Aid Society
- Citizens Alliance for Justice
- Club Activo 20-30
- Casa Esperanza
- Aeroclub of Panama
- Fundación del Club Carino

## Social Aid Committee

The aim of the Social Aid Committee is to develop social and welfare activities to ensure more citizens have access to training, health services, recreation, culture and sport. The Social Aid Committee also raises funds for social and community projects targeting areas and people most in need.

## Mossfon Green Committee

Mossack Fonseca has created a committee composed of employees volunteering to encourage the use of environmentally friendly practices within and outside the firm, and to help preserve the planet and reduce consumption of materials depleting our supply of natural resources.




MOSSFON
GREEN·COMMITTEE

MOSSFON
Charity Committee









# Our Partners



**Jurgen Mossack**

Born in Fuerth, Bayern, Germany on March 20, 1948, he studied law at Santa Maria La Antigua University in Panama City where he was awarded a B.A. in Law in 1973. He worked as an attorney in London from 1975 to 1977 and thereafter started what has today become Mossack Fonseca & Co.

He is a member of the International Bar Association, the Society of Trust and Estate Practitioners (STEP), the Panama Bar Association and the International Maritime Association. He has been an active member of the Panamanian Rotary Club for 17 years.

**Ramon Fonseca Mora**

Born in Panama on July 14th, 1952, he studied law at the University of Panama and the London School of Economics. His professional experience includes the United Nations Conference for Trade and Development in Geneva as legal advisor from 1977 to 1982.

He is a writer and has twice been granted Panama's Miro National Literary Award. Other endeavors include Founding director of MI Banco (micro-credit bank) since 1997, director - Children's Hospital 1995/2005, Advising Minister to the President of the Republic of Panama Sept 2009 - May 2011).

**Christoph Zollinger**

Born in St Gallen, Switzerland on April 3rd, 1969, he studied law at the University of Zurich where he graduated from the School of Law in 1995 (Lic. iur, LLM 1995). He joined Mossack Fonseca in 1997 and became partner of the Mossfon Group in 2004. As Head of Operations he has been directly involved in the modernization of our internal processes and in the creation of our new technology and communications platform.

He is a member of the Society of Trust and Estate Practitioners (STEP - Panama Chapter. He also serves as the Ambassador for Special Missions to the Ministry of Foreign Affairs of the Republic of Panama.

