KIRK B. LENHARD, ESQ., Nevada Bar No. 1437
NIKKI L. BAKER, ESQ., Nevada Bar No. 6562
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV  89106-4614
Telephone:  702.382.2101
Facsimile:  702.382.8135
Email:  klenhard@bhfs.com
Email:  nbaker@bhfs.com


*Attorneys for NML Capital Ltd.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| NML CAPITAL LTD.,<br><br>                    Plaintiff,<br><br>v.<br><br>THE REPUBLIC OF ARGENTINA,<br><br>                    Defendant. | CASE NO.:  2:14-cv-01573-LDG-PAL<br><br>**NML CAPITAL, LTD.'S MEMORANDUM IN RESPONSE TO NONPARTY VAL DE LOIRE LLC'S MOTION TO QUASH SUBPOENA OR, IN THE ALTERNATIVE, FOR PROTECTIVE ORDER; AND IN SUPPORT OF NML'S CROSS MOTION TO COMPEL** |

Plaintiff NML Capital, Ltd., by and through its attorneys of record Brownstein Hyatt Farber Schreck, LLP and Dechert LLP, hereby responds to Non-party Val de Loire LLC's ("**Val de Loire**") Motion to Quash Subpoena or, in the Alternative, for Protective Order (the "**Motion**") and moves to compel Val de Loire to comply fully with the subpoena NML served on it on August 27, 2014 (the "**Subpoena**").

. . .

. . .

. . .

. . .

. . .

016887\0001\11621913.1

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1

**TABLE OF CONTENTS**

2                                                                                              **Page**

3   TABLE OF AUTHORITIES ....................................................................................... ii

4   PRELIMINARY STATEMENT.................................................................................. 1

    STATEMENT OF FACTS AND PROCEDURAL HISTORY...................................... 4
5
    I.      THE ALLEGED EMBEZZLEMENT SCHEME. ............................................ 4
6
            A.      Cristobal López ..................................................................................... 4
7
            B.      Lázaro Baéz ........................................................................................... 5

            C.      Val de Loire's Connections To López, Baéz, And The Baéz Entities.................. 6
8
    II.     THE SUBPOENA AND VAL DE LOIRE'S REFUSAL TO MEET AND
9           CONFER IN GOOD FAITH. ......................................................................... 8

    ARGUMENT ......................................................................................................... 8
10
    I.      NML IS ENTITLED TO DISCOVER INFORMATION THAT MAY LEAD TO
11          MISAPPROPRIATED ASSETS EMBEZZLED FROM ARGENTINA AND
            SUBJECT TO EXECUTION IN SATISFACTION OF NML'S JUDGMENTS,
12          VAL DE LOIRE'S MOTION SHOULD BE DENIED........................................ 9

13          A.      This Court Has Broad Discretion Under Rule 69(a)(2) To Permit Third-
                    Party Discovery That May Reveal The Identity and Location Of Potentially
                    Attachable Assets. ................................................................................. 9
14
            B.      Post-judgment Discovery Is Warranted As Long As The Judgment Creditor
15                  Can Make A Threshold Showing That Connects The Third-Party With
                    Discoverable Information. ..................................................................... 10
16
            C.      NML Seeks Information That Is Relevant To Its Ongoing Post-Judgment
                    Execution Efforts. ................................................................................ 11
17
                    1.      Suspected embezzlement of Argentine property by Cristobal López. ...... 11
18
                    2.      Val de Loire is a shell company affiliated with López. ........................ 12
19
                    3.      Val de Loire and López are both linked to Lázaro Baéz......................... 12
20                  4.      NML is Entitled to Discovery to Investigate Any Property That
                            May Have Been Embezzled by López, Baéz, or shell entities like
21                          Val de Loire. ................................................................................ 13

22          D.      Val de Loire Argues For a Strict Standard For Third-Party Discovery  That
                    Is Not Contemplated By The Federal Rules of Civil Procedure. ......................... 14

            E.      Producing Responsive Documents Would Not Impose Any Undue Burden
23                  On Val de Loire..................................................................................... 16

24          F.      Any Concerns By Val de Loire Concerning The Need To Protect
                    Privileged Or Confidential Information Can Be Addressed With An
25                  Appropriate Confidentiality Agreement And The Use Of A Privilege Log. ........ 17

    II.     THIS COURT HAS THE AUTHORITY TO ORDER VAL DE LOIRE TO
26          IDENTIFY AND DESIGNATE INDIVIDUALS WITHIN THE COURT'S
            JURISDICTION TO APPEAR FOR A DEPOSITION OR EDUCATE A
27          WITNESS TO APPEAR.............................................................................. 17

28  CONCLUSION ...................................................................................................... 21

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1

## TABLE OF AUTHORITIES

2

**CASES**

3

*1st Tech., LLC v. Rational Enter. LTDA,*
4
    2:06-cv-01110-RLH-GWF, 2007 WL 5596692 (D. Nev. Nov. 13, 2007) ............................ 10

5

*Alamo Rent-A-Car, Inc. v. Mendenhall,*
    937 P.2d 69 (Nev. 1997) ................................................................................................. 13
6

*Couturier v. Am. Invsco Corp.,*
7
    No. 2:12-cv-01104-APG-NJK, 2013 WL 4499008 (D. Nev. Aug. 20, 2013) ...................... 19

8

*Dexia Credit Local v. Rogan,*
9
    629 F.3d 612 (7th Cir. 2010)........................................................................................... 20

10

*Diamond State Ins. Co. v. Rebel Oil. Co., Inc.,*
    157 F.R.D. 691 (D. Nev. 1994)........................................................................................ 16
11

*Eitzen Bulk A/S v. Bank of India,*
12
    827 F. Supp. 234 (S.D.N.Y. 2011)................................................................................... 10

13

*EM Ltd. v. Republic of Argentina,*
    720 F. Supp. 2d 273 (S.D.N.Y. 2010), *vacated on other grounds,* 652 F.3d 172 (2d
14
    Cir. 2011) ................................................................................................................ 1, 9, 10

15

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,*
16
    462 U.S. 611 (1983)....................................................................................................... 15

17

*Great Am. Ins. Co. of N.Y. v. Vegas Const. Co., Inc.,*
    251 F.R.D. 534 (D. Nev. 2008)............................................................................ 17, 18, 19
18

*Henry v. Rizzolo,*
19
    No. 2:08-cv-00635-PMP-GWF 2012 WL 13725 (D. Nev. Jan. 4, 2012) ............................ 10

20

*Illinois Bell Tel. Co., Inc. v. Global NAPs Illinois, Inc.,*
21
    551 F.3d 587 (7th Cir. 2008)........................................................................................... 14

22

*Less v. Taber Instrument Corp.,*
    53 F.R.D. 645 (W.D.N.Y. 1971)...................................................................................... 19
23

*LT Int'l Ltd. v. Shuffle Master, Inc.,*
24
    2:12-CV-1216-JAD-GWF, 2014 WL 3734270 (D. Nev. July 29, 2014) ............................ 20

25

*Matthias Jans & Associates, Ltd. v. Dropic,*
26
    No. 01-MC026, 2001 WL 1661473 (W.D. Mich. 2001) ...................................................... 20

27

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,*
    218 F.R.D. 423 (D. Del. 2003).......................................................................................... 20

28

ii

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

*Mount Hope Church v. Bash Back!*,
  705 F.3d 418 (9th Cir. 2012)................................................................................ 16

*Nat'l Serv. Indus., Inc. v. Vafla Corp.*,
  694 F.2d 246 (11th Cir. 1982)............................................................................... 9

*NML Capital, Ltd. v. Republic of Argentina*,
  C 12-80185 JSW (MEJ), 2013 WL 655211 (N.D. Cal. Feb. 21, 2013)...................... 3, 14, 15

*NML Capital Ltd. v. Republic of Argentina*,
  No. 2:14-cv-492-RFB-VCF, 2014 WL 3898021 (D. Nev. Aug. 11, 2014).................... passim

*Nordotek Enviro. Inc. v. RDP Tech. Inc.*,
  No. MC410-24, 2010 WL 3070196 (S.D. Ga. Aug. 5, 2010)..................................... 20

*Pham v. Wal-Mart Stores, Inc.*,
  2:11-cv-01148-KJD-GWF, 2012 WL 3730565 (D. Nev. Aug. 28, 2012) ...................... 15

*Platinum Air Charters, LLC v. Aviation Ventures, Inc.*,
  No. 2:05-cv-01451-RCJ-LRL, 2007 WL 121674 (D. Nev. Jan. 10, 2007) .................. 16

*Price Waterhouse LLP v. First Am. Corp.*,
  182 F.R.D. 56 (S.D.N.Y. 1998) ............................................................................ 20

*Regents of Univ. of California v. Kohne*,
  166 F.R.D. 463 (S.D. Cal. 1996)........................................................................... 20

*Relational, LLC v. Hodges*,
  627 F.3d 668 (7th Cir. 2010)................................................................................ 20

*Republic of Argentina v. NML Capital, Ltd.*,
  134 S. Ct. 2250 (2014) ......................................................................................... 9

*Robinson v. Goldfield Merger Mines Co.*,
  206 P. 399 (Nev. 1922), *aff'd on re-hearing*, 213 P. 103 (Nev. 1923)................... 13

*Rock Bay, LLC v. Dist. Ct.*,
  129 Nev. Adv. Op. ............................................................................................... 11

*Ryan Inv. Corp. v. Pedregal de Cabo San Lucas*,
  No. C. 06-3219 JW (RS), 2009 WL 5114077 (N.D. Cal. Dec. 18, 2009) ................... 3

*S.E.C. v. Banc de Binary*,
  Case No. 2:13-cv-00993-RCJ-VCF, 2014 WL 1030862 (D. Nev. Mar. 14, 2014)........ 19

*Shelton v. Am. Motor Corp.*,
  805 F.2d 1323 (8th Cir. 1986)............................................................................... 19

*State v. Cantsee*,
  130 Nev. Adv. Op. ............................................................................................... 11

iii

*Strick Corp. v. Thai Teak Prod. Co., Ltd.*,
    493 F. Supp. 1210 (E.D. Pa. 1980) ................................................................ 11

*Tr. of N. Florida Operating Eng'g Health & Welfare Fund v. Lane Crane Serv., Inc.*,
    148 F.R.D. 662 (M.D. Fla. 1993) .................................................................. 11

*U-Haul Co. of Nevada, Inc. v. Gregory J. Kamer, Ltd.*,
    No. 2:12-cv-00231-KJD-CWH, 2013 WL 5278523 (D. Nev. Sept. 17, 2013) ........................ 8

*VFS Fin., Inc. v. Specialty Fin. Corp.*,
    No. 3:09-cv-00266-RCJ-VPC, 2013 WL 1413024 (D. Nev. Apr. 4, 2013) ...................... 9, 10

*Wells Fargo Bank, N.A. v. Iny*,
    No. 2:13-cv-01561-MMD, 2014 WL 1391055 (D. Nev. Apr. 9, 2014) .................................. 8

*Wultz v. Bank of China Ltd.*,
    298 F.R.D. 91 (S.D.N.Y. 2014) ........................................................... 18, 19

**STATUTES**

Argentine Criminal Code ............................................................................. 13

**OTHER AUTHORITIES**

8A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure:
    Civil 3d § 3014.................................................................................. 9, 11

Federal Rules of Civil Procedure 1 ......................................................................... 18

Federal Rule of Civil Procedure 30(b)(6) .......................................................... 17, 18

Federal Rule of Civil Procedure 45.......................................................................... 20

Federal Rule of Civil Procedure 69(a)(2).......................................................... passim

Local Rule 26-7(b) ...................................................................................... 8, 9

"Insight: in syrian sanctions, some gains but much uncertainty", REUTERS, Nov. 2, 2012 ........... 7

"Shells and Shelves", THE ECONOMIST, APR. 7, 2012 ................................................ 7

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PRELIMINARY STATEMENT**

Plaintiff NML Capital, Ltd. ("**NML**") holds judgments against the Republic of Argentina ("**Argentina**") totaling more than $1.7 billion.  To avoid its payment obligations, Argentina has engaged in elaborate mechanisms to shield its assets from creditors.  *EM Ltd. v. Republic of Argentina*, 720 F. Supp. 2d 273, 279-80 (S.D.N.Y. 2010), *vacated on other grounds*, 652 F.3d 172 (2d Cir. 2011).  Argentina's bad faith towards its creditors and disrespect for the authority of the United States courts has left NML with little choice but to track Argentina's assets around the world and attempt to execute on them as local laws permit.  *Id.*

To be sure, many of NML's post-judgment enforcement and discovery efforts have not been run-of-the-mill.  But that is purely the consequence of Argentina's extraneous behavior. Recognizing this fact, the federal district judge in Manhattan who has presided over Argentina's debt default litigation for the last 12 years has endorsed NML's broad and sometimes unconventional discovery initiatives as fully consistent with Federal Rule of Civil Procedure 69(a)(2) in which governs post-judgment discovery.  In the words of that Court, "plaintiffs in these actions should be allowed some liberality in exploring means of enforcing their judgments … [a]nd I do not intend to take a narrow view when it comes to dealing with attempts to enforce the judgments."[1]  The information sought through the Subpoena easily meets that standard.  Val de Loire's motion should thus be denied, and it should be compelled to comply fully with the Subpoena.

In this matter, NML served the Subpoena on Val de Loire, a Nevada LLC, by service upon Val de Loire's registered agent, M.F. Corporate Services (Nevada) Limited ("**MF Nevada**").[2]  As explained in the "Background Information" in Attachment A of the Subpoena, NML targeted Val de Loire due to its connections to two Argentine nationals—Cristobal López ("**López**") and Lázaro Baéz ("**Baéz**")—who are confidantes of Argentine President Cristina Fernández de Kirchner and her late husband Néstor Kirchner.

---

[1]      Transcript of *EM Ltd. & NML Capital Ltd. v. Republic of Argentina*, Feb. 2, 2007 (a copy of which his attached as Exhibit A).

[2]      Subpoena to Val de Loire LLC, Aug. 27, 2014 (a copy of which is attached as Exhibit B).

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

NML has reason to believe that both López and Baéz may have misappropriated and embezzled tens of millions (if not more) of Argentine state funds in part, through shell companies like Val de Loire.  López and Baéz have both been the subject of multiple criminal and journalistic investigations within Argentina examining indications that they unlawfully exploited their close relationship with the Kirchners, the President and former President of Argentina, to enrich themselves.  If convicted, any funds traceable to such behavior could become the property of Argentina and therefore potentially available to satisfy NML's judgments against Argentina.

Val de Loire is a shell corporation established under Nevada law that is affiliated with López and his gaming interests—interests that he owes the Kirchner regime.  Val de Loire and López appear to be linked to both Baéz and to an array of shell companies established for Baéz's benefit—123 of which are Nevada companies that have already been the subject of discovery (the "**Baéz Entities**").  In discovery proceedings earlier this year, this Court held that NML had valid grounds for subpoenaing the Baéz Entities due to the suggestion of those entities' ties to the alleged embezzlement scheme.  *NML Capital Ltd. v. Republic of Argentina*, No. 2:14-cv-492-RFB-VCF, 2014 WL 3898021, at *4-8 (D. Nev. Aug. 11, 2014) ("***NML Capital***").

 Having learned of Val de Loire's connections to López, Baéz, the Kirchners, their associates, and the Baéz entities, NML subpoenaed Val de Loire for documents concerning those entities.  The Subpoena does not, as Val de Loire suggests, seek every Val de Loire document that relates to "every individual or entity whose name pops up on a Google search for 'Argentina' and 'Kirchner.'"  Mot. at 7.  Instead, the Subpoena asks for information relating to just 18 individuals (López, Baéz, the Kirchners, and a handful of their family members and business associates) and 6 companies (all connected to López or Baéz).  *See* Ex. B at 14-15.   For those persons and entities, the Subpoena seeks discrete types of information—principally information about funds transfers, business operations, and assets.  *Id.* at 10-11.

Val de Loire's Motion grossly mischaracterizes both the law and the facts.  Val de Loire fails to even to ***mention***—much less distinguish—Magistrate Judge Ferenbach's Order or the numerous cases on which Magistrate Judge Ferenbach rightly relied in determining that NML was entitled to discovery from third-party shell companies in very similar circumstances.  Instead,

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

Val de Loire rehashes the same erroneous arguments this Court has already rejected.  Val de Loire relies upon a single case—a two-page California magistrate judge discovery order—that arose in the context of discovery from a third-party concerning the assets and activities a sovereign instrumentality.  Val de Loire misconstrues that order and suggests that it held that Rule 69 imposes a stringent standard for discovery sought from third-parties (which is not the law), when in fact the California magistrate judge denied the requested discovery only to the extent NML sought information about the assets of presumptively separate instrumentalities of Argentina without first showing that those instrumentalities were alter egos of Argentina.  What Val de Loire leaves out is that the same Court interpreting the same subpoena ruled that NML is entitled to broad discovery of potential assets of Argentina itself—and that order was subsequently affirmed by the District Court Judge Jeffrey S. White.[3]  The order Val de Loire misleadingly cites is inapposite to the Subpoena at issue here, in which NML seeks to trace the fruits of criminal activity that, if such activity results in a conviction, would revert directly to Argentina—not any Argentine instrumentality.

Val de Loire also mischaracterizes the facts.  Val de Loire protests that NML has not established a direct relationship between it and the judgment debtor Argentina, but it largely ignores NML's fundamental contention:  that it is investigating the assets, transactions, and structure of Val de Loire and its connections to López, Baéz, and other shell companies established to facilitate the potential misappropriation and embezzlement of Argentine state funds.

Val de Loire accuses NML of engaging in a "grand fishing expedition," but the law is clear that while "Rule 69 discovery can indeed resemble the proverbial fishing expedition, . . . a judgment creditor is ***entitled*** to fish for assets of the judgment debtor."  *Ryan Inv. Corp. v. Pedregal de Cabo San Lucas*, No. C. 06-3219 JW (RS), 2009 WL 5114077, at *4 (N.D. Cal. Dec. 18, 2009) (internal quotation and omitted) (emphasis retained).  No doubt Val de Loire (and the

---

[3]     Order *NML Capital Ltd. v. Republic of Argentina*, No. C 12-80185 JSW (MEJ) (Dkt. 9) (a copy of which is attached as Exhibit C); Order, *NML Capital Ltd. v. Republic of Argentina*, No. C 12-80185 JSW (MEJ) (Dkt. 24) (a copy of which is attached as Exhibit D).

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

people behind it) have their own reasons for wishing that NML not fish through its structure, assets, and transactions related to the alleged embezzlement network.  But the desire to keep secrets does not immunize Val de Loire from the broad, permissive post-judgment discovery allowed under Rule 69.  If Val de Loire has no documents that relate to any such embezzlement, then complying with the Subpoena will do it no harm.  Indeed, even though compliance with the Subpoena would not be unduly burdensome for Val de Loire, NML is willing to resolve any conceivable burden by paying Val de Loire's reasonable costs of producing responsive documents.

NML has no interest in wasting its time or resources with discovery aimed at persons or entities with no suspected connection to Argentina or its assets.  NML only pursues discovery when, as here, it has a reasonable belief that the information sought may assist in its post-judgment discovery efforts.  The information sought through the Subpoena easily meets that standard.  Val de Loire's motion should thus be denied, and it should be compelled to comply fully with the Subpoena.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I.     The Alleged Embezzlement Scheme.

Val de Loire is part of a web of shell companies associated with a suspected scheme to embezzle misappropriated Argentine state assets.  Val de Loire's ties to Cristobal López, Lázaro Baéz, and the Baéz Entities all suggest Val de Loire's involvement in the scheme and indicate that Val de Loire may possess information that could help NML further develop its understanding of where the funds in question are currently located.

### A.     Cristobal López

Cristobal López is an Argentine national who has amassed a controversial fortune in the gambling and hydrocarbon industries, among others, during the Presidencies of Néstor and Cristina Kirchner.  López has been the subject of multiple criminal and journalistic investigations within Argentina since Néstor Kirchner became President of Argentina in 2003.  Virtually all of these investigations involve allegations that he improperly benefitted from his relationship with

former Argentine President Néstor Kirchner to enrich himself at the expense of the Argentine state.[4]  The accusations center on López's improper and potentially illegal acquisition of lucrative hydrocarbon and gambling concessions.[5]  López appears to hold many of his assets through his Nevada shell corporation, Centenary International Corp.[6]

More recently, Argentine Judge Rodolfo Canicoba Corrál opened a formal investigation into two of López's casino operations for defrauding the government, colluding with public officials to violate the requirements of their positions, and tax evasion.[7]  Judge Canicoba Corrál assigned prosecutor Guillermo Marijuan, who also worked with Argentine prosecutor José María Campagnoli on an intensive investigation into alleged misappropriation of state funds and embezzlement activity by Lázaro Baéz.[8]

**B.     Lázaro Baéz**

In the *NML Capital* proceedings before this Court, NML has already shown the connections between Lázaro Baéz, the 123 Nevada shell companies (*i.e.*, the Baéz Entities), and the widely reported embezzlement of Argentine assets.  *See generally NML Capital*, 2014 WL 3898012, at *1-2.  As summarized in *NML Capital*:

> [I]n April 2013, the Argentine government initiated an investigation, dubbed La Ruta Del Dinero K (*i.e.,* "the K Money Trail"), into Argentina's former president, Néstor Kirchner, his wife, current Argentine President Cristina Fernández de Kirchner, their confident Lázaro Baéz, and the trios' sordid financial affairs.  All

---

[4]     *See* Criminal Complaint against Nestor Kirchner (a translated copy of which is attached as Exhibit E); Amended Criminal Complaint with Proposal of Evidence (a translated copy of which is attached as Exhibit F); Amended Criminal Complaint against Nestor Kirchner (a translated copy of which is attached as Exhibit G).

[5]     *Id.*

[6]     Centenary International Corporation SEC Form 10-K (a copy of which is attached as Exhibit H).

[7]     "Courts Launch Investigation of Cristóbal López Slot Machines", La Nación, May 6, 2014 (a translated copy of which his attached as Exhibit I); "Complaint Filed Against Board of Directors of Lotéria Naciónal for Lack of Controls", La Nación, Apr. 7, 2014 (a translated copy of which his attached as Exhibit J ).   Val de Loire's parent company, Correon SA, is a spinoff of one of the companies now under investigation and appears to have extensive and continuing commercial dealings with it.  *See* Amended Criminal Complaint with Proposal of Evidence against Nestor Kirchner (a translated copy of which is attached as Exhibit F); Official Gazette of the Argentine Republic (a translated copy of which is attached as Exhibit K ).

[8]     "Judicial Green Light to Investigate Cristóbal López's Slot Machines", El Cronista  Comercial, May 6, 2013 (a translated copy of which his attached as Exhibit L ).

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1
2
3
4
5

three allegedly embezzled millions of pesos from public-infrastructure projects and laundered the proceeds and other embezzled funds through Panama and various international shell corporations.  The investigation's lead prosecutor, José María Compagnoli, authored a report stating that Baéz laundered $65 million through 150 Nevada corporations.  The report also states that all 150 Nevada corporations have the same director, Aldyne, Ltd., a Seychellois corporation.  After submitting the report to Argentina's National Supreme Court of Justice, the Kirchner government retaliated and removed Compagnoli from office.

6   *Id.* at *1.[9]  NML possesses documents that connect the Baéz Entities to Aldyne and the

7   Seychellois entities and that indicate the involvement of other entities:  MF Nevada, Gairns Ltd.,

8   and Mossack & Fonseca.  *Id.* at *2.[10]  These Documents indicate that Baéz Entities have received

9   capital transfers totaling millions of dollars—most of which came from a mysterious entities in

10  the Seychelles.  *Id.*

11          **C.       Val de Loire's Connections To López, Baéz, And The Baéz Entities**

12          Through discovery obtained from the Baéz Entities' registered agent, MF Nevada, NML

13  has learned of an apparent connection between Val de Loire, López, Baéz, and the Baéz Entities.

14  Val de Loire is a holding company that is named in a 2010 supplemental criminal complaint filed

15  in Argentina against Néstor Kirchner.[11]  According to the complaint, Val de Loire is a 35% owner

16  of Correon SA; an entity that partners with López's company Casino Club SA in gambling

17  projects that have been tainted by widespread allegations of political corruption.[12]  Correon SA is

18  also identified in SEC filings as an investor-partner of the López-controlled vehicle Casino Club

19  S.A.[13]

20

21

22  [9]      Campagnoli Report (a translated copy of which is attached as Exhibit M); Campagnoli Dictamen (a translated copy of which is attached as Exhibit N).

23
24  [10]     Operating Agreements of Agrocomtra USA LLC, Best World Supplies Ltd, Cosmetech LLC, Dolfin Trading LLC, Mercury Consultants LLC, Thunder Overseas Trading LLC, and Steel Product Services LLC (copies of which are attached as Exhibit O).

25
26  [11]     Amended Criminal Complaint with Proposal of Evidence against Nestor Kirchner (a translated copy of which is attached as Exhibit F).

27  [12]     *Id.*

28  [13]     Pinnacle Entertainment, Inc. SEC Form 8-K (a copy of which is attached as Exhibit P).

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1    Documents produced to NML in response to its August 23, 2013 subpoena to MF Nevada

2    have linked Val de Loire to transactions with two of the Baéz Entities; Fintech Holdings and

3    Balmont Holdings.[14]  MF Nevada, the Baéz Entities' registered agent for service of process, also

4    serves as the registered agent for Val de Loire.  Further, the Panamanian law firm Mossack

5    Fonseca & Co. appears to represent either Val de Loire itself or the individuals and entities

6    behind it. [15]  To cite just one example from the MF Nevada production, MF Nevada produced a

7    letter from MF Nevada's Patricia Amunategui to the Uruguayan law firm of Juan Pedro Damiani,

8    which appears to have represented the beneficial owner of the Baéz Entity Balmont Holdings.[16]

9    In the letter, Amunategui refers to a number of enclosed documents and describes one of the

10   enclosures as:  "Originals of the mutual contracts with the assignment of collateral signed by Mr.

11   Edmund Ward, one of which carries the corresponding certificate of the resident agent and the

12   apostil, and by *Val de Loire*."[17]  Thus, the document indicates that one of the firms in the Baéz

13

14   [14]     *See* Excerpt from Production Balmont Holdings Ltd. (a copy of which is attached as Exhibit Q); Excerpt
       from Production of Fintech Holdings LLC (a copy of which is attached as Exhibit R).

15
       [15]     The relationship between MF Nevada and Mossack Fonseca & Co. was explored in length at the September
16     11, 2014 deposition of Patricia Amunateugi in connection with NML's pursuit of discovery from the Baez Entities.
       Based on the deposition, NML has learned that: (1) Mossack Fonseca & Co. is MF Nevada's sole client; (2) MF
17     Nevada's has only one employee, and her employment contract was signed by the two founders of Mossack &
       Fonseca; (3) MF Nevada's sole employee travels yearly to Panama to give presentations to attorneys at Mossack &
18     Fonseca concerning her "products"—meaning ready-to-go Nevada entities that are sold by the sales department at
       Mossack & Fonseca; (4) customers come to Mossack & Fonseca in Panama seeking a Nevada LLC that is "on the
19     shelf" (*i.e.*, MF Nevada has already incorporated the entity and it is ready to be "sold" to customers wishing to own a
       Nevada LLC ); (5) MF Nevada maintains a bank account in Panama to which its sole employee apparently does not
20     have access; (6) MF Nevada's sole employee was instructed by Mossack & Fonseca to sign documents on behalf of
       Aldyne—a mysterious entity based in the Seychelles at the center of the Baez money laundering scheme; (7)
21     Mossack & Fonseca provides back-office services to MF Nevada including HR, IT, accounting, payroll, etc.; (8) in
       order to respond to NML's subpoena on the Baez Entities, MF Nevada had to search for the documents on Mossack
22     & Fonseca's platform in Panama.  *See* Transcript of Deposition of Patricia Amunategui, Sept. 11, 2014 (a copy of
       which will be filed under seal as Exhibit S).  It is not at all surprising that Mossack & Fonseca is well known for its
23     money laundering activities. "Shells and Shelves", THE ECONOMIST, Apr. 7, 2012 (a copy of which his attached as
       Exhibit T); "Insight: In Syrian Sanctions, Some Gains but Much Uncertainty", REUTERS, Nov. 2, 2012 (a copy of
24     which is attached as Exhibit U).  Mossack & Fonseca appears to use MF Nevada to assist in this process by creating
       "on the shelf" LLCs that are ready to sell to a customer at a moment's notice and with little to no due diligence.  *See*
25     Exhibit S at 109:4 – 112:3.

26     [16]     The Damiani firm is well-known for its involvement in Argentine money laundering schemes.  *See* "A
       Uruguayan Law Firm Played a Key Role in the Route of the K Money", CLARÍN, July 27, 2014 (a translated copy of
27     which is attached as Exhibit V).

       [17]     The contracts in question were not included in MF Nevada's production to NML; nor was there any
28     indication of what collateral was assigned, so the exact relationship between Val de Loire and Balmont Holdings

network suspected of money laundering (Balmont Holdings) had business dealings with Val de Loire.

## II.   The Subpoena And Val de Loire's Refusal To Meet And Confer In Good Faith.

On August 27, 2014, NML served the Subpoena on Val de Loire through its registered agent, MF Nevada.  The Subpoena includes sixteen reasonably focused requests.  The Subpoena asks Val de Loire for information relating specifically to 18 individuals (López, Baéz, the Kirchners, and a handful of their family members and business associates) and 6 companies (all connected to López or Baéz).  Ex. B (Subpoena at 14-15).  For those persons and entities, the Subpoena seeks discrete types of information:  principally, information about funds transfers, business operations and assets.  *Id.* at 10-11.

On September 24, 2014, through the same counsel who represents the Baéz Entities, Val de Loire moved to quash.  It did so without making any effort at all to meet and confer in good faith with NML, as required by Local Rule 26-7(b).  When NML raised that concern after receiving the Motion, Val de Loire agreed to a belated meet and confer with NML on October 1, 2014.  In that discussion, however, Val de Loire's counsel refused to withdraw the Motion pending further discussions, declined to engage in any substantive discussion of the context of the Subpoena or the authority on which NML relies, and was unwilling to consider any *compromise* to avoid burdening this Court.

## ARGUMENT[18]

Federal Rule of Civil Procedure 69(a)(2) authorizes a judgment creditor to serve broad discovery in aid of execution—including discovery about the judgment debtor's assets located outside of the jurisdiction of the court where the subpoena is served or the judgment is rendered.

---

remains unknown.

[18]   Despite the requirement under Local Rule 26-7(b), counsel for Val de Loire failed to meet and confer with NML prior to filing the Motion.  The Court could deny Val de Loire's Motion on that basis alone.  *See Wells Fargo Bank, N.A. v. Iny*, No. 2:13-cv-01561-MMD, 2014 WL 1391055, at *2 (D. Nev. Apr. 9, 2014) (denying non-party's motion to quash because the "pending motions suffer from a threshold defect in that they do not contain a proper meet and confer certification."); *see also U-Haul Co. of Nevada, Inc. v. Gregory J. Kamer, Ltd.*, No. 2:12-cv-00231-KJD-CWH, 2013 WL 5278523, at *3 (D. Nev. Sept. 17, 2013) (denying moving party's discovery motion because they "did not satisfy the meet and confer requirements prior to filing this motion.").

016887\0001\11621913.1

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

NML has been awarded judgments against Argentina for over $1.7 billion, and NML has a right to any information that may help it trace funds that may have been embezzled from Argentina by López, Baéz, or other Kirchner associates utilizing the Baéz Entities or Val de Loire itself.

**I.** **NML Is Entitled To Discover Information That May Lead To Misappropriated Assets Embezzled From Argentina And Subject To Execution In Satisfaction Of NML's Judgments, Val de Loire's Motion Should Be Denied.**

    **A.** **This Court Has Broad Discretion Under Rule 69(a)(2) To Permit Third-Party Discovery That May Reveal The Identity and Location Of Potentially Attachable Assets.**

Rule 69(a)(2) of the Federal Rules of Civil Procedure governs discovery in proceedings involving the enforcement of a judgment. Under that rule, a judgment creditor is entitled to obtain discovery from "any person" relating to the judgment debtor's assets "wherever located," including "outside the jurisdiction of the court where the discovery request is made." *EM Ltd.*, 695 F.3d at 207-08 (internal citation omitted); *see also NML Capital Ltd. v. Republic of Argentina*, No. 2:14-cv-492-RFB-VCF, 2014 WL 3898021, at *3 (D. Nev. Aug. 11, 2014) ("***NML Capital***"). Rule 69(a)(2) entitles a judgment creditor "to identify assets that can be used to satisfy a judgment" and "to discover concealed or fraudulently transferred assets." *VFS Fin., Inc. v. Specialty Fin. Corp.*, No. 3:09-cv-00266-RCJ-VPC, 2013 WL 1413024, at *3 (D. Nev. Apr. 4, 2013 (internal citations omitted); *see also Nat'l Serv. Indus., Inc. v. Vafla Corp.*, 694 F.2d 246, 250 (11th Cir. 1982) ("judgment creditor is entitled to discover the identity and location of any of the judgment debtor's assets, wherever located."). As a result, discovery under Rule 69 is "quite permissive." *NML Capital*, 2014 WL 3898012, at *4 (citing *Republic of Argentina v. NML Capital, Ltd.,* 134 S. Ct. 2250, 2254 (2014)); 8A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 3d § 3014, p. 160-62 ("The scope of examination is very broad, as it must be if the procedure is to be of any value.").

    The liberal standard for post-judgment discovery applies with equal force to discovery sought from third-parties. Rule 69(a)(2) expressly permits discovery from "any person," and thus, "[a] judgment creditor may obtain discovery from both parties and non-parties alike." *VFS*

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1    *Fin., Inc.*, 2013 WL 1413024, at *4 (quoting *Henry v. Rizzolo*, No. 2:08-cv-00635-PMP-GWF

2    2012 WL 13725, at *3 (D. Nev. Jan. 4, 2012)); *see also NML Capital*, 2014 WL 3898012, at *4;

3    *EM Ltd.*, 695 F.3d at 207 ("It is not uncommon to seek asset discovery from third parties . . . that

4    possess information pertaining to the judgment debtor's assets.") (citation omitted).   A subpoena

5    "reaches all responsive materials within the corporation's control, even if those materials are

6    located outside" the court's jurisdiction.  *NML Capital*, 2014 WL 3898012, at *4 (quoting *Eitzen*

7    *Bulk A/S v. Bank of India*, 827 F. Supp. 234, 238-39 (S.D.N.Y. 2011)).

8          Applying these rules, courts in Nevada and elsewhere commonly allow judgment creditors

9    to conduct "very broad" discovery of "information from parties and non-parties alike—including

10   information about assets upon which execution can issue or about assets that have been

11   fraudulently transferred."   *Henry*, 2012 WL 13725, at *3; *see also 1st Tech., LLC v. Rational*

12   *Enter. LTDA*, 2:06-cv-01110-RLH-GWF, 2007 WL 5596692, at *4 (D. Nev. Nov. 13, 2007)

13   (post-judgment discovery has "broad scope").   Judge Griesa of the Southern District of New

14   York, before whom the litigation between NML and Argentina has been pending for over twelve

15   years, has ruled repeatedly that NML is entitled under the Federal Rules to broad discovery in aid

16   of its judgment enforcement efforts.[19]

17         **B.      Post-judgment Discovery Is Warranted As Long As The**
18                   **Judgment Creditor Can Make A Threshold Showing That**
                     **Connects The Third-Party With Discoverable Information.**

19         Under Rule 69, a judgment creditor can follow either of "two paths for propounding

20   discovery on third-parties:   federal law or the state law in which the district court sits."  *NML*

21   *Capital*, 2014 WL 3898012, at *4.   "In both cases, the judgment creditor must make a threshold

22   showing connecting the third party with discoverable information before propounding discovery

23   on the third party."  *Id.*

24         To do so "[u]nder federal common law, the judgment creditor must show either (1) 'the

25   necessity and relevance of [the] discovery sought' or (2) that 'the relationship between the

26

---

[19]      Transcript of *EM Ltd. & NML Capital Ltd. v. Republic of Argentina*, Feb. 2, 2007 (a copy of which his
27   attached as Exhibit A)  ("[P]laintiffs in these actions should be allowed some liberality in exploring means of
     enforcing their judgments.").

28

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

judgment debtor and the nonparty is sufficient to raise a reasonable doubt about the bona fides of the transfer of assets.'" *Id.* (quoting Wright & Miller, *supra*, p. 162 (citing *Tr. of N. Florida Operating Eng'g Health & Welfare Fund v. Lane Crane Serv., Inc.*, 148 F.R.D. 662, 664 (M.D. Fla. 1993); *Strick Corp. v. Thai Teak Prod. Co., Ltd.*, 493 F. Supp. 1210, 1218 (E.D. Pa. 1980)).

"Under Nevada law, the judgment creditor must show that 'the relationship between the judgment debtor and nonparty raises reasonable suspicion as to the good faith of asset transfers between the two.'" *Id.* (quoting *Rock Bay, LLC v. Dist. Ct.*, 129 Nev. Adv. Op. 21, 298 P.3d 441, 443 (2013)). "Reasonable suspicion exists 'if there are specific, articulable facts' in support of the inference that the asset transfers were not made in good faith." *Id.* (quoting *State v. Cantsee*, 130 Nev. Adv. Op. 24, 321 P.3d 888, 893 (2014)).

As this Court explained in an August 11, 2014 Opinion resolving a related discovery dispute: "[i]f the judgment creditor satisfies either standard, Rule 69 opens the doors of discovery and permits the judgment creditor to use any discovery device afforded by the Federal Rules." *Id.*

### C.   NML Seeks Information That Is Relevant To Its Ongoing Post-Judgment Execution Efforts.

NML is entitled to discovery because it has made a threshold showing that connects Val de Loire to a web of shell companies associated with a suspected scheme to embezzle Argentine assets—assets that NML could potentially attach in satisfaction of its judgments. NML meets that threshold under either federal common law (showing the relevance of asset transfers involving Val de Loire) or Nevada law (asserting "specific, articulable facts" supporting the inference of how Val de Loire has information concerning the embezzlement scheme).

### 1.   Suspected embezzlement of Argentine property by Cristobal López.

As detailed above, *see supra* at Part I, and in the "Background Information" to the Subpoena, NML has reason to believe that an illicit relationship among López and the Kirchners may have allowed López to misappropriate millions of dollars in Argentine state assets—assets that are now hidden around the world. Numerous Argentine criminal and journalistic investigations have targeted López's activities and his allegedly improper benefits from his

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1  relationship with the Kirchners since Néstor Kirchner became Argentina's president in 2003.

2  Accusations have centered on López's improper and potentially illegal acquisition of lucrative

3  hydrocarbon and gambling concessions.  For example, Argentine judge Rodolfo Canicoba Corral

4  recently opened a formal investigation into two of López's casino operations for defrauding the

5  government, tax evasion, and colluding with public officials to violate the requirements of their

6  positions.

7

8            **2.**       <u>Val de Loire is a shell company affiliated with López.</u>

9        Val de Loire is a holding company that owns 35% of Correon SA, which partners with a

10 López-owned company, Casino Club SA, in gambling projects that have been tainted by

11 widespread allegations of political corruption.  U.S. Securities and Exchange Commission records

12 identify Correon SA as an investor-partner of the López-controlled vehicle Casino Club SA.[20]

13

14           **3.**       <u>Val de Loire and López are both linked to Lázaro Baéz.</u>

15       Baéz is currently under investigation by Argentine prosecutors for embezzling over $65

16 million of state funds out of Argentina through companies in Nevada and elsewhere.  In the Baéz

17 proceedings, this Court has already held that NML had valid grounds for subpoenaing Nevada

18 entities concerning the Baéz Entities.

19       In response to a subpoena served by NML last year, MF Nevada (the registered agent for

20 both Val de Loire and the Baéz Entities) produced documents that reveal that the López-linked

21 Val de Loire at least periodically does business with some of the Baéz Entities.[21]  Further,

22 documents produced by MF Nevada suggest that the Panamanian law firm Mossack Fonseca &

23 Co. represents either Val de Loire or the individuals and entities behind it.  Mossack Fonseca is

24 known for incorporating shell companies.  *NML Capital*, 2014 WL 3898021, at *2.[22]

---

25    [20]     *See* Pinnacle Entertainment, Inc. SEC Form 8-K (a copy of which is attached as Exhibit P).

26    [21]     *See* Excerpt from Production Balmont Holdings Ltd. (a translated copy of which is attached as Exhibit Q);

27 Excerpt from Production of Fintech Holdings LLC (a translated copy of which is attached as Exhibit R).

28    [22]     As this Court discussed, there are ample facts that suggest that Mossack & Fonseca controls the 123 Báez Entities, and those same connections suggest its control of Val de Loire.  Most obviously, MF Nevada (an affiliate of

4.     NML is Entitled to Discovery to Investigate Any Property That May
Have Been Embezzled by López, Baéz, or shell entities like Val de Loire.

If the investigations into embezzlement by López and Baéz result in convictions, any funds traceable to the crime may become Argentina's property under both Nevada and Argentine law.  *See Robinson v. Goldfield Merger Mines Co.*, 206 P. 399, 401 (Nev. 1922) ("a thief acquires no title to the property which he steals"), *aff'd on re-hearing*, 213 P. 103 (Nev. 1923); *see also Alamo Rent-A-Car, Inc. v. Mendenhall*, 937 P.2d 69, 73-74 (Nev. 1997); Argentine Criminal Code, Art. 23, Art. 303[23]; *see also NML Capital*, 2014 WL 3898021, at \*5.  NML therefore has a right to seek discovery to find information that helps trace those assets.  It has done so by issuing a Subpoena asking Val de Loire for its documents (whether few or many) that relate to 18 individuals (López, Baéz, the Kirchners, and a handful of their family members and business associates) and 6 companies (all connected to López or Baéz).

Just as in *NML Capital*, in which this Court found that NML had met the requisite threshold showing with respect to the Baéz Entities (*see id.*), NML has shown here:  (1) that López's alleged money laundering activities involved a Nevada shell company (in this case, Val de Loire); (2) that the shell company at issue concededly has no offices, businesses, or personnel in Nevada (*see* Sept. 25, 2014 Decl. of Edmund Ward for Use in Support of Nonparty Val de Loire, LLC's Mot. to Quash Subpoena or, in the Alternative, for Protective Order); and (3) that MF Nevada and Val de Loire are shell companies controlled by Mossack & Fonseca, which is based in Panama, where Argentine investigators have alleged that Baéz hid embezzled funds (*see id.* at \*13 n.12).[24]  This Court also noted that "there is no doubt that shell corporations are

---

Mossack & Fonseca, *see* Mossack & Fonseca Co., Nevada Website Printout (a copy of which is attached as Exhibit W), is the registered agent for Val de Loire—just as it is for the Báez Entities.  *NML Capital*, 2014 WL 3898021, at \*5.  MF Nevada is apparently Mossack & Fonseca's Nevada-based independent contractor.  *Id.*  However, it is evident that the relationship between MF Nevada and Mossack & Fonseca involves a large degree of control by the Panamanian law firm.  *See* Exhibit S.

[23]     Argentine Criminal Code, Art. 23 (a translated copy of which is attached as Exhibit X).

[24]     This Court also noted that the Báez Entities had the same managers who shared an office in Seychelles.  *Id.* at \*5.  NML only had that information because in the Báez proceedings, MF Nevada produced some documents responsive to the subpoena served upon it.  NML now seeks the same type of information, which would further NML's investigation, would help complete NML's factual understanding of the embezzlement scheme and the

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1  routinely formed to commit fraud." *Id.* at *11 (citing *Illinois Bell Tel. Co., Inc. v. Global NAPs*

2  *Illinois, Inc.*, 551 F.3d 587, 598 (7th Cir. 2008)).  Based on such a showing, this Court held that

3  NML had satisfied its threshold showing under Nevada law. *Id.* at *5.[25]

4  Notably, Val de Loire has not claimed that it has no responsive documents.  Although Val

5  de Loire argues that there is no connection between it and Argentina directly, Val de Loire never

6  denies that it possesses documents concerning the 18 persons and 6 entities associated with

7  López, Baéz, the Kirchners, and the Baéz Entities.  Val de Loire's non-denial suggests that it ***does***

8  have possession, custody, or control of such documents.[26]

9  ### D.  Val de Loire Argues For a Strict Standard For Third-Party Discovery That Is Not Contemplated By The Federal Rules of Civil Procedure.

10

11  Tellingly, Val de Loire does not even attempt to distinguish *NML Capital*.  Instead, Val de

12  Loire chooses to entirely ignore Magistrate Judge Ferenbach's thoughtful order—despite its

13  obvious relationship to the Subpoena at issue here.[27]

14  Rather than addressing *NML Capital* and the numerous cases upon which it relied, Val de

15  Loire relies entirely on a two-page magistrate judge discovery order from a different

16  jurisdiction—a decision that arose in the context of discovery served concerning the assets and

17  activities a sovereign instrumentality that the magistrate judge there determined warranted a

18  heightened threshold for discovery.  *See NML Capital, Ltd. v. Republic of Argentina*, C 12-80185

19  JSW (MEJ), 2013 WL 655211, at *1-2 (N.D. Cal. Feb. 21, 2013) (the "***California Magistrate***

20  ***Order***").[28]  In that case, NML sought to compel Chevron to produce documents relating to a

21

22  companies used to further it, and in turn might lead to the discovery of attachable assets.

23  [25]  *NML Capital* did not address whether NML had met the threshold showing under federal common law.  *Id.*

24  [26]  *See Pham v. Wal-Mart Stores, Inc.*, 2:11-cv-01148-KJD-GWF, 2012 WL 3730565, at *2 (D. Nev. Aug. 28, 2012) ("Documents that are in the actual possession of a third person are deemed to be in the responding party's control if [the responding party] has the legal right to obtain them.") (citations omitted) (insertion in original).

25  [27]  Val de Loire's failure to mention Magistrate Judge Ferenbach's order is an omission of choice—not of mere oversight—because counsel for Val de Loire was also counsel for the objecting Baez Entities who appeared before Magistrate Judge Ferenbach.

26

27  [28]  Val de Loire fails to mention that the California Magistrate Order is on appeal to the District Court for the Northern District of California.  Regardless, even in the unlikely event that the opinion is upheld on appeal, the California Magistrate Order does not apply outside of the context of discovery served concerning a sovereign instrumentality, and it certainly does not bind this Court.

28

016887\0001\11621913.1                                    14

BROWNSTEIN HYATT FARBER SCHRECK, LLP

100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1   sovereign instrumentality of Argentina.  *Id.* at *1.  The magistrate judge held not only that NML

2   had to make a "threshold showing" that those entities were alter egos of Argentina, but also that

3   NML had to "overcome the presumption" that a foreign state instrumentality is independent from

4   the state.  *Id.* at *2 (citing *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462

5   U.S. 611, 627 (1983) ("*Bancec*")).  The California Magistrate Order did ***not*** hold, as Val de Loire

6   misrepresents (*see* Motion at 4-5), that NML had failed to make a showing that the

7   instrumentality and Argentina were related.  Rather, it held that NML had not "overcome the

8   presumption that [the instrumentality] is a separate juridicial entity for purposes of asset

9   discovery."  2013 WL 655211, at *2.

10          While the California Magistrate Order denied discovery based on NML's failure to

11   "overcome the presumption" that a foreign state instrumentality is independent from the State, it

12   *granted* NML's other discovery requests.  In granting NML's post-judgment discovery seeking

13   information concerning Chevron's dealings with Argentina, the Court noted that "[i]t is not

14   uncommon to seek asset discovery from third parties that possess information pertaining to the

15   judgment debtor's assets … [n]or is it unusual for the judgment creditor to seek disclosure related

16   to assets held outside the jurisdiction of the court where the discovery request is made."[29]

17   Therefore, "NML may properly seek disclosure from Chevron related to [Argentina's] assets."

18   *Id*. at 3.  District Court Judge Jeffrey S. White for the Northern District of California subsequently

19   affirmed the order permitting NML to obtain discovery from Chevron.[30]

20          In addition to misconstruing the California Magistrate Order and ignoring the applicable

21   law concerning judgment creditors' rights to broad post-judgment discovery, Val de Loire

22   selectively quotes and attacks NML's Subpoena and Background Information while failing to

23   mention the most critical aspect of NML's claims:  Val de Loire's connections to embezzled

24   Argentine funds.  The Motion criticizes NML's inability to demonstrate a direct connection

25   between Val de Loire and the Republic of Argentina (*see generally* Mot. at 5-13 (stressing that

26   ─────────────────
[29]      Order at 2, *NML Capital Ltd. v. Republic of Argentina*, No. C 12-80185 JSW (MEJ) (Dkt. 9) (a copy of
27   which is attached as Exhibit C).

28   [30]      Order at 2, *NML Capital Ltd. v. Republic of Argentina*, No. C 12-80185 JSW (MEJ) (Dkt. 24) (a copy of
     which is attached as Exhibit D).

"there is not a single request regarding the actual judgment debtor—Argentina.")), but Val de Loire either misunderstands or misconstrues NML's rationale for seeking discovery. NML is not claiming that Argentina directly funds or transacts business with Val de Loire; NML contends— and cites evidence suggesting—that Val de Loire is one of numerous shell companies (in Nevada and elsewhere) linked to an embezzlement scheme designed to misappropriate *Argentine* state funds and shelter those assets around the world. If Baéz or López is convicted of misappropriation of state funds, *Argentina's* property—not the property of any presumptively separate Argentine instrumentality, will be potentially subject to seizure by NML. NML has made a threshold showing that Val de Loire is connected to this scheme, and it is entitled to explore whether Val de Loire has information that would further inform its enforcement efforts.

### E.   Producing Responsive Documents Would Not Impose Any Undue Burden On Val de Loire.

NML is willing to pay Val de Loire's reasonable costs of complying with the Subpoena— and would have offered to do so if Val de Loire had been willing to meet and confer in good faith. That willingness resolves any conceivable burden on Val de Loire for producing documents to NML.

Even if that were not the case, NML's subpoena does not impose an undue burden on Val de Loire. "The mere fact that discovery requires work and may be time consuming is not sufficient to establish undue burden." *Platinum Air Charters, LLC v. Aviation Ventures, Inc.*, No. 2:05-cv-01451-RCJ-LRL, 2007 WL 121674, at *6 (D. Nev. Jan. 10, 2007); *see also NML Capital*, 2014 WL 3898021, at *6-7 (rejecting the Baéz Entities' argument that responding to NML's subpoenas would be unduly burdensome). NML has a good faith basis to believe that Val de Loire is in possession of information that could lead to attachable assets in satisfaction of its judgments against Argentina. This is sufficient to require Val de Loire to comply with the Subpoena.[31] *See Mount Hope Church v. Bash Back!*, 705 F.3d 418, 429 (9th Cir. 2012) ("[W]e

---

[31]        In addition, Val de Loire only makes generalized objections and does not specify exactly how complying with NML's subpoena would impose an undue burden. *See Diamond State Ins. Co. v. Rebel Oil Co., Inc.*, 157 F.R.D. 691, 694 (D. Nev. 1994) ("[G]eneralized and unsupported allegation of undue burden is not sufficient to prevent enforcement of the subpoenas.").

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1  do not think that the mere need to respond to an opponent's advocacy in our civil justice system

2  should be viewed as unduly burdensome when legal arguments are advanced in good faith.").

3       Finally, although Val de Loire complains that NML's requests are not limited to a

4  particular time frame and in some instances cover an overly broad subject matter (*see* Motion at

5  15-16), Val de Loire has refused to suggest what it would view as a more reasonable scope for

6  responsive documents.  That is precisely the type of discussion that the parties could have had (if

7  Val de Loire had been willing) during a meet and confer, and NML remains willing to discuss

8  reasonable suggestions to narrow any remaining disputes with Val de Loire.

9  **F.      Any Concerns By Val de Loire Concerning The Need To Protect**
10        **Privileged Or Confidential Information Can Be Addressed With An**
          <u>**Appropriate Confidentiality Agreement And The Use Of A Privilege Log**</u>.

11      NML is perfectly willing to enter an appropriate confidentially agreement to protect

12 against the dissemination of Val de Loire's confidential information.  *See* Mot. at 2.  Again, that

13 is precisely the type of concern that Val de Loire could have discussed in a meet and confer rather

14 than raising it with this Court.

15      Any concerns Val de Loire may have about protecting privileged documents (*see* Motion

16 at 2, 17) can of course be addressed by Val de Loire's production of an appropriate privilege

17 log—a routine practice that, again, need not have been raised as part of a motion to quash.

18

19 **II.     This Court Has the Authority to Order Val de Loire to Identify**
20        **and Designate Individuals Within the Court's Jurisdiction to**
          <u>**Appear for a Deposition or Educate a Witness to Appear.**</u>

21      Rule 30(b)(6) requires a subpoenaed entity to "produce one or more witnesses

22 knowledgeable about the subject matter" in the subpoena.  *Great Am. Ins. Co. of N.Y. v. Vegas*

23 *Const. Co., Inc.*, 251 F.R.D. 534, 538 (D. Nev. 2008).  The Federal Rules of Civil Procedure,

24 however, do not require the witness to "have personal knowledge on the designated subject

25 matter."  *Id.*  Instead, a subpoenaed entity has "a duty to make a conscientious, good-faith effort

26 to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully

27 and unevasively answer questions about the designated subject matter."   *Id.* at 539 (internal

28

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1    quotation marks omitted).  "The fact that [the subpoenaed organization] may no longer employ a

2    person with knowledge on the designated topics did not relieve it of the duty to prepare a properly

3    educated Rule 30(b)(6) designee."  *Great Am. Ins. Co. of N.Y.*, 251 F.R.D. at 541.

4         If no employee, representative, or agent of Val de Loire with knowledge of the matters

5    contained in the deposition notice resides or regularly conducts business within a 100-mile radius

6    of Las Vegas, then the Court has the power to compel Val de Loire under Rule 30(b)(6) to

7    designate a representative within 100 miles of Las Vegas and to educate that person concerning

8    the subjects set forth in the deposition notice.

9         This Court has already analyzed this precise issue and held that third-party shell

10   companies established under Nevada law with a registered agent located in Nevada through

11   which they can be served with process (like Val de Loire) can be ordered to sit for a deposition in

12   Nevada.  *NML Capital*, 2014 WL 3898021, at *11-12 (acting pursuant to its inherent power to

13   enforce judgments under Rule 1 of the Federal Rules of Civil Procedure and ordering the Baéz

14   Entities to produce a witness for a deposition despite having no persons within a 100-mile radius

15   of the district court).  Once again, Val de Loire fails to distinguish or to even ***mention*** Magistrate

16   Judge Ferenbach's order.

17        Similarly, the United States District Court for the Southern District of New York recently

18   addressed the requirement that a subpoenaed non-party must educate a witness to testify on its

19   behalf at a deposition.  In *Wultz v. Bank of China Ltd.*, 298 F.R.D. 91 (S.D.N.Y. 2014), a bank in

20   Israel moved to quash a third-party subpoena seeking deposition testimony under Rule 30(b)(6),

21   arguing that it employed no knowledgeable employees in the forum and that educating an in-

22   forum employee was "simply not reasonable or practicable."  *Id.* at 99.  The court denied the

23   bank's motion to quash, reasoning that "[e]ven if [the Israeli bank] is a non-party witness and all

24   of the documents or knowledgeable persons are in Jerusalem, compliance with the 30(b)(6)

25   subpoena is not an undue burden when weighed against" the parties' need for the testimony.  *Id.*

26   An in-forum representative could "easily be educated" by a person knowledgeable about the

27   topics by "telephone, email or videoconference," and the bank could "avoid the burden of

28   educating a[n] [in-forum] employee altogether by agreeing to a deposition by video."  *Id.*

As in *NML Capital* and *Wultz*, this Court may require Val de Loire to designate a representative to testify at a deposition concerning the subjects of the subpoena. *Wultz*, 298 F.R.D. at 99. If Val de Loire has no employees, representatives or other agents within the district who are knowledgeable about the subjects of the subpoena, Val de Loire has a duty to educate a representative to appear for a deposition. *Id.*

Although Val de Loire (an entity organized under the laws of Nevada) claims that no authorized representative resides, is employed, or regularly conducts business in person within 100 miles of Las Vegas (Ward Decl. ¶¶ 5-7), several individuals and entities affiliated with Val de Loire may satisfy the geographic limitations for a deposition. For example, MF Nevada is located in Las Vegas and serves as the registered agent for Val de Loire. In addition, Mossack Fonseca & Co. markets its Nevada SPV-creation services on its corporate website, which suggests that representatives from Mossack Fonseca may visit Nevada to conduct business on a regular basis. Moreover, counsel for Val de Loire may be an appropriate deponent, should no other suitable representative exist. *See Shelton v. Am. Motor Corp.*, 805 F.2d 1323 (8th Cir. 1986) (a court may order counsel to appear as a witness upon a showing of no other means to obtain the requested information, and that the information is crucial to the requesting party's case); *Couturier v. Am. Invsco Corp.*, No. 2:12-cv-01104-APG-NJK, 2013 WL 4499008, at *1 (D. Nev. Aug. 20, 2013) (same).

Regardless of whom Val de Loire chooses as its representative, requiring Val de Loire to educate a witness within the Court's jurisdiction does not impose an undue burden. It "is merely the result of the concomitant obligation from the privilege of being able to use the [organizational] form in order to conduct business." *See Great Am. Ins. Co. of N.Y.*, 251 F.R.D. at 540; *see also S.E.C. v. Banc de Binary*, Case No. 2:13-cv-00993-RCJ-VCF, 2014 WL 1030862, at *7 (D. Nev. Mar. 14, 2014) (stating that permitting a defendant to "benefit from its status as a foreign corporation after it has exploited its appearance as an American company would be fundamentally inequitable."); *Less v. Taber Instrument Corp.*, 53 F.R.D. 645, 646 (W.D.N.Y. 1971) ("[B]y doing business in a particular judicial district, a corporation submits itself fully to the jurisdiction of the court of the district."); *Metro-Goldwyn-Mayer Studios, Inc. v.*

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

*Grokster, Ltd.*, 218 F.R.D. 423, 424-25 (D. Del. 2003) (requiring an entity to bring a witness into the state to be deposed "is not an unreasonable requirement . . . given [the entity's] decision to establish corporate residency here.").

Finally, the cases that Val de Loire cites for the proposition that Rule 45 requires this Court to quash NML's subpoena are inapposite. In those cases, either: (a) the subpoenaed non-party did not reside in the forum state; or (b) there was another jurisdiction within the United States where the subpoenaed person could comply.[32] In contrast, Val de Loire—an entity incorporated under Nevada law—resides in Nevada. *See NML Capital*, 2014 WL 3898012, at *10 (citing *Dexia Credit Local v. Rogan*, 629 F.3d 612, 620 (7th Cir. 2010)).

Consistent with the overwhelming authority and with the prior determination by Magistrate Judge Ferenbach, NML respectfully requests that the Court order Val de Loire to designate a representative to testify in response to NML's subpoena.

---

[32]     *See Relational, LLC v. Hodges*, 627 F.3d 668, 673 (7th Cir. 2010) (U.K. resident); *LT Int'l Ltd. v. Shuffle Master, Inc.*, 2:12-CV-1216-JAD-GWF, 2014 WL 3734270 (D. Nev. July 29, 2014) (non-resident Canadian corporation); *Nordotek Enviro. Inc. v. RDP Tech. Inc.*, No. MC410-24, 2010 WL 3070196 at *1 (S.D. Ga. Aug. 5, 2010) (Norwegian corporation that did no business in Georgia); *Matthias Jans & Associates, Ltd. v. Dropic*, No. 01-MC026, 2001 WL 1661473, at *1 (W.D. Mich. 2001) (non-party could comply with subpoena issued from Ohio in Michigan, where she resided); *Price Waterhouse LLP v. First Am. Corp.*, 182 F.R.D. 56 (S.D.N.Y. 1998) (non-resident British partnership); *Regents of Univ. of California v. Kohne*, 166 F.R.D. 463 (S.D. Cal. 1996) (non-party subpoenaed in California could comply with subpoena in Illinois).

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1

**CONCLUSION**

2          For the foregoing reasons, NML respectfully requests that this Court deny Val de Loire's

3   Motion and grant NML's cross-motion to compel.

4          DATED this 9th day of October 2014.

5                                                 BROWNSTEIN HYATT FARBER
                                                  SCHRECK, LLP
6

7                                                 By: */s/ Nikki L. Baker*
                                                     Kirk B. Lenhard, Esq.
8                                                    Nevada Bar No. 1437
                                                     Nikki L. Baker, Esq.
9                                                    Nevada Bar No. 6562
                                                     100 North City Parkway, Suite 1600
10                                                   Las Vegas, NV 89106-4614

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

# EXHIBIT S

# EXHIBIT S

Page 1

```
 1
 2
 3                   UNITED STATES DISTRICT COURT
 4                        DISTRICT OF NEVADA
 5   NML CAPITAL LTD.,            )
                                  )
 6                  Plaintiff,    )
                                  )
 7        vs.                     )    Case No.
                                  )    2:14-CV-492-RFB-VCF
 8   THE REPUBLIC OF ARGENTINA,   )
                                  )
 9                  Defendant.    )
                                  )
10   _____)
11
12
13
14        VIDEOGRAPHED DEPOSITION OF PATRICIA AMUNATEGUI
15              Taken on Thursday, September 11, 2014
16                   By a Certified Court Reporter
17                         At 8:51 a.m.
18              Held at Woods Erickson & Whitaker
19                       1349 Galleria Drive
20                          Suite 200
21                       Henderson, Nevada
22
23
24
25   Reported by:  Ellen A. Goldstein, CCR 829
```

CERTIFIED COPY

---

Page 2

```
 1   APPEARANCES:
 2
 3        For the Plaintiff NML CAPITAL, LTD.:
 4        DENNIS H. HRANITZKY, ESQ.
          DECHERT, LLP
 5             1095 Avenue of the Americas
               New York, New York  10036
 6             Phone:  (212)698-3500
               Fax:    (212)698-3599
 7             dennis.hranitzky@dechert.com
 8
 9        For the Defendant MF CORPORATE SERVICES, LTD.:
10        KENT P. WOODS, ESQ.
          WOODS ERICKSON & WHITAKER, LLP
11             1349 Galleria Drive
               Suite 200
12             Henderson, Nevada  89014
               Phone:  (702)433-9696
13             Fax:    (702)434-0615
               kwoods@woodserickson.com
14
15        For the 123 NONPARTY CORPORATIONS:
16        JASON M. WILEY, ESQ.
          KOLESAR & LEATHAM
17             400 South Rampart Boulevard
               Suite 400
18             Las Vegas, Nevada  89145
               Phone:  (702)362-7800
19             Fax:    (702)362-9472
               jwiley@klnevada.com
20
21   Also Present:
22        John Johnson, Videographer
          Gracia M. Feldman, Spanish Interpreter
23        Patrick Corcoran
24
25
```

## Page 3

I N D E X

WITNESS

PATRICIA AMUNATEGUI                                           PAGE

Examination by MR. HRANITZKY                                    7

E X H I B I T S

| NUMBER | DESCRIPTION | INTRODUCED |
|---|---|---|
| 0 | Subpoena for Patricia Amunategui (18 pages) | 14 |
| 1 | Employment Agreement between MF Corporate Services and Patricia Amunategui (PSA 000051 - PSA 000063; 13 pages) | 14 |
| 2 | Go Back to Get Ahead (no Bates; 1 page) | 79 |
| 3 | 1-16-14 E-mail chain (PSA 000001; 1 page) | 86 |
| 4 | The MF Group Web page (no Bates; 2 pages) | 92 |
| 6 | Trust Services Web page (no Bates; 1 page) | 95 |
| 7 | Administrative Services Web page (no Bates; 1 page) | 99 |
| 8 | Mossack Fonseca marketing literature (no Bates; 36 pages) | 103 |
| 9 | MF Corporate Services International Web page (no Bates; 2 pages) | 114 |

## Page 4

(I N D E X Continued)

| NUMBER | DESCRIPTION | INTRODUCED |
|---|---|---|
| 11 | Nevada USA Web page (no Bates; 2 pages) | 115 |
| 12 | Mossack Fonseca marketing of Nevada limited-liability companies (no Bates; 4 pages) | 116 |
| 13 | Declaration of Patricia Amunategui (6 pages) | 141 |
| 14 | September 2008 E-mail chain (misc. Bates numbers 9 pages) | 147 |
| 15 | 11-11-05 E-mail (TRANSLATION MFCS 005535; 1 page) | 150 |
| 16 | 5-22-06 E-mail chain (TRANSLATION MFCS 000311 - TRANSLATION MFCS 000313; 3 pages) | 152 |
| 17 | Miscellaneous E-mails (TRANSLATION MFCS 000899 - TRANSLATION MFCS 000904; 6 pages) | 163 |
| 18 | 6-12-13 E-mail chain (MFCS 002223 - MFCS 002229; 7 pages) | 168 |
| 19 | October 2007 E-mail chain (TRANSLATION MFCS 006580 - TRANSLATION MFCS 006584; 5 pages) | 172 |
| 22 | 8-4-06 E-mail chain (TRANSLATION MFCS 004065) | 180 |
| 23 | Miscellaneous E-mails (MFCS 005308 - MFCS 005322; 15 pages) | 182 |
| 24 | Miscellaneous E-mails (TRANSLATION MFCS 006487 - TRANSLATION MFCS 006490; 4 pages) | 187 |
| 25 | 11-13-04 E-mail chain (TRANSLATION MFCS 005025; 1 PAGE) | 190 |

www.oasisreporting.com
OASIS REPORTING SERVICES, LLC    702-476-4500
Electronically signed by Ellen Goldstein (001-341-878-7457)    dc74e275-a477-441e-be82-fc4e60920800

Page 5

| NUMBER | (I N D E X   Continued) DESCRIPTION | INTRODUCED |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | 26 | 6-10-08 E-mail with attachment | 192 |
| 4 | | (TRANSLATION MFCS 004533 and |
| | | TRANSLATION MFCS 004525 - |
| 5 | | TRANSLATION MFCS 004538; 15 pages) |
| 6 | 27 | 4-5-06 E-mail chain (TRANSLATION | 195 |
| 7 | | MFCS 001932; 1 page) |
| 8 | 31 | 9-29-05 E-mail chain (TRANSLATION | 200 |
| 9 | | MFCS 002842 - MFCS 002843; 2 pages) |
| 10 | 32 | 6-5-13 letter from Patricia | 201 |
| 11 | | Amunategui to Aldyne board of |
| | | directors (FSA 000005; 1 page) |
| 12 | 33 | 6-5-13 letter from Patricia | 201 |
| 13 | | Amunategui to Fergus International |
| | | board of directors (FSA 000006; |
| 14 | | 1 page) |
| 15 | 34 | 6-5-13 letter from Patricia | 201 |
| | | Amunategui to Plascot Limited board |
| 16 | | of directors (FSA 000007; 1 page) |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 6

```
 1          THURSDAY, SEPTEMBER 11, 2014 - HENDERSON, NEVADA
 2                          8:51 A.M.
 3
 4              (Plaintiff's Exhibits 0 and 1 were pre-marked
 5       for identification by the Certified Court Reporter)
 6              (All answers by the witness were given in
 7       English unless otherwise indicated.)
 8
 9              THE VIDEOGRAPHER:  This begins the deposition of
10       Patricia Amunategui.  Today's date is September 11, 2014.
11       The time is 8:51 a.m.  We are at the law offices of Woods
12       Erickson & Whitaker, 1349 West Galleria Drive, Suite 200,
13       Henderson, Nevada.  This case is in the United States
14       District Court, District of Nevada, entitled "NML Capital
15       Limited versus The Republic of Argentina," case
16       No. 2:14-cv-492-RFB-VCF.  My name is John Johnson.  The
17       court reporter is Ellen Goldstein.  We're with Oasis
18       Reporting Services.
19              Will counsel, please identify yourselves and then
20       the reporter will administer the oath.
21              MR. HRANITZKY:  I'm Dennis Hranitzky from Dechert,
22       LLP in New York.  I'll be examining the witness on behalf
23       of NML Capital Limited.
24              MR. WOODS:  Kent Woods, Woods Erickson Whitaker, and
25       I represent Patricia Amunategui and MF Corporate Services
```

www.oasisreporting.com          OASIS REPORTING SERVICES, LLC          702-476-4500
Electronically signed by Ellen Goldstein (001-341-678-7457)                dc74d275-a477-447e-ba82-fc4a6b02d860

www.oasisreporting.com          OASIS REPORTING SERVICES, LLC          702-476-4500
Electronically signed by Ellen Goldstein (001-341-678-7457)                dc74d275-a477-447e-ba82-fc4a6b02d860

Page 7

```
 1   Nevada, Limited.
 2        MR. WILEY:  Jason Wiley on behalf of the 123 entities
 3   that are interested parties in this litigation.
 4
 5                     GRACIA M. FELDMAN,
 6   an interpreter of the Spanish language, was duly sworn to
 7   translate the following proceedings from English into
 8   Spanish and from Spanish into English.
 9
10                     PATRICIA AMUNATEGUI,
11   called as a witness by and on behalf of the Plaintiff,
12   was first duly sworn by the Certified Court Reporter
13   and testified as follows:
14
15                        EXAMINATION
16   BY MR. HRANITZKY:
17        Q    Good morning, Miss Amunategui.
18        A    Good morning.
19        Q    My name is Dennis Hranitzky.  I'm an attorney
20   with a law firm in New York called Dechert, LLP.  I
21   represent NML Capital Limited and I'm going to be asking
22   you some questions this morning regarding the matters set
23   forth in the subpoena that I'll show you in a moment.
24   I'm going to ask you that if there's anything in the
25   questions I ask that doesn't make sense to you, that you
```

Page 8

```
 1   please say so so that I can make my questions more clear
 2   to you.  Does that make sense?
 3        A    Yes.
 4        Q    Okay, thanks.
 5             First, could you state your name for the record.
 6        A    Patricia Amunategui.
 7             (Through the interpreter) Patricia Amunategui.
 8        Q    And you were born in Chile; is that right?
 9        A    Yes.
10        Q    And you moved to the United States at some
11   point, yes?
12        A    Yes.
13        Q    In fact you've come to the United States twice;
14   is that right?
15        A    Yes.
```

Page 9

```
 1
 2
 3
 4
 5
 6   Q   Okay.
 7   A   And I always come back here periodically.
 8   Q   To the United States?
 9   A   To the United States, yes, because my husband
10   still was here at that time.
11   Q   I see.  Were you working during that period?
12   A   During the period of -- with my first arrived,
13   no.  I don't speak English, so I didn't work; but I work
14   from 2005 probably or 2006 part time in different casino.
15   I work with -- my first job was here at the casino, at
16   Bally's.
17   Q   Okay.  Can you just very briefly take us through
18   your employment history up through the time you went to
19   work for Bally's around 2005.
20   A   In this country, not what I do in Chile?
21   Q   In Chile and in this country.
22   A   Okay.  In Chile I work for Bank Santander, was
23   my last job when I moved here.  I worked as a secretary
24   of one of the vice president.  And when I move here I
25   don't work right away.  I wait two year or something
```

Page 10

```
 1   because, one thing, my document of the legal residence
 2   take longer for work, but at the same time I don't have
 3   English enough.  So I went to school.  I went to a
 4   college to learn English during that period of time.
 5   Q   Was that at UNLV?
 6   A   No.  It was a community college in
 7   San Francisco.  I lived in San Francisco at that time.
 8   Q   I see.  Before you worked at Santander in Chile,
 9   did you have other jobs?
10   A   Oh, yeah, many.  I try to give you the short
11   way.  I work for a radio station, insurance company, and
12   then I had my own business too.
13   Q   What was your business?
14   A   I have a tanning-bed salon in Chile and I bring
15   machine from this country.  That was my second period
16   when I went to Chile.  I bought some tanning bed here
17   from California and I start a -- I was the first one open
18   a tanning-bed salon in Chile.  It was very fun.
19   Q   An innovator.
20   A   Very innovator, very fun.
21   Q   All right.  And that was sometime between --
22   A   Between 2005 and 2007.  In between the time I
23   moved I open a business there, when I was living here and
24   then moving back.
25   Q   Do you mean 1995?
```

Page 11

```
1     A    Oh, yeah, nineties. Before probably I'm not
2  exist.
3     Q    It's okay. And in Chile did you -- did you
4  go to university or college in Chile?
5     A    No. I went for private school for secretary,
6  business secretary, assistant.
7     Q    And in your jobs before Santander, you mentioned
8  an insurance company?
9     A    Uh-huh.
10    Q    And another position?
11    A    Yes.
12    Q    Were those secretarial or --
13    A    Yeah, all secretarial.
14    MR. WOODS:  Let him finish his questions before you
15  answer. It will make it easier for the court reporter.
16    THE WITNESS:  Okay.
17    MR. WOODS:  Hopefully, as things progress -- you
18  know, wait for him to finish his question so the
19  translator can do her job --
20    THE WITNESS:  Okay.
21    MR. WOODS:  -- and translate before so she makes sure
22  you understand.
23    THE WITNESS:  Okay.
24    BY MR. HRANITZKY:
25    Q    Your counsel has asked that we have the
```

Page 12

```
1  translator's assistance for all of the questions --
2     Q    Okay.
3     A    -- so we should do it that way.
4     Q    Okay.
5     Q    So you said you came back to the United States
6  in around 1997. Is that right?
7     A    Yes, the second time.
8     Q    Okay. And when you returned, at some point
9  following your return, you went to work for a casino here
10 in Las Vegas; is that right?
11    A    (Through the translator)  Yes, the second time.
12    Q    Okay. And for how long did you work in the
13 casino?
14    A    Eleven year maybe.
15    Q    Okay. So until when?
16    A    2006.
17    Q    I see. At one point did you obtain an education
18 at UNLV?
19    A    Yes.
20    Q    And when was that?
21    A    I don't remember exactly the years 'cause I
22 started different --
23    THE REPORTER:  Started what?
24    THE WITNESS:  Different other stuff, I mean English a
25 second language, and then I went to UNLV for the
```

Page 13

```
 1    paralegal course; but I don't remember when I started.  I
 2    remember when I finished.  It was a long way.
 3    BY MR. HRANITZKY:
 4         Q    And when did you finish?
 5         A    I think I finish in 2000, 2000 probably.
 6         Q    In 2000?
 7         A    I can't give you sure, but I think it was 2000.
 8         Q    And do you have a degree from UNLV?
 9         A    I have a certification of paralegal from UNLV,
10    yeah.
11         Q    Other than paralegal studies, did you study
12    anything else at UNLV?
13         A    I went for more classes of paralegal and I take
14    corporate law, I think they offer, and I take that class.
15    I think so.  I take classes.  I don't remember exactly
16    which ones, but I take more classes after.
17         Q    Okay.  And how -- approximately how long did you
18    study at UNLV?
19         A    I will say I was in and out for two year
20    probably.  Yeah, probably, yeah.
21         Q    Okay.  So and you say you graduated from UNLV in
22    2000?
23         A    Uh-huh.
24         Q    And you said you worked in the casino until
25    2006?
```

Page 14

```
 1         A    Yes.
 2         Q    Between 2000 and 2006, did you have any other
 3    employment besides the casino?
 4         A    Can you repeat again.  Sorry.
 5         Q    Yes.  Between 2000 and 2006 did you have any
 6    other employment --
 7         A    Yes.
 8         Q    -- besides the casino?
 9         A    Yes, yes.  I worked two job for six -- for more
10    than six years.
11         Q    Okay.  What was the other job?
12         A    I work for MF Corporate Service and I work for
13    the casino.
14         Q    I see.  When did you start to work for
15    MF Corporate Services?
16         A    2001 I believe, 2001 probably.
17         Q    Okay.  I'm going to ask the court reporter to
18    hand you two documents.  One has been marked as Exhibit 0
19    and one has been marked as Exhibit 1.  I'd ask you to
20    look at them and let me know if you recognize them.
21         A    Can I take my glasses?
22         Q    Of course.
23              (Discussion held off the stenographic record in
24    Spanish.)
25              THE WITNESS:    I recognize this one, like the subpoena
```

Page 15

```
1    I receive, and I believe it is mine.
2  BY MR. HRANITZKY:
3    Q   Okay.  So you recognize Exhibit Q as a subpoena
4  that you received?
5    A   I'm looking for my name.
6    Q   Look on the first page.  Your name should be
7  there.  Do you see on the first page it says NMI Capital,
8  Republic of Argentina?
9    A   Yeah, yeah, I see -- oh, I see my name, yes.
10 Okay.  I was looking for my name.
11   Q   Okay.  You can put that aside.
12   A   I don't want to get that confused with the other
13 one.
14   Q   Exhibit 1, do you recognize Exhibit 1?
15   A   Well, I believe it's my contract agreement, my
16 employee contract agreement.
17   Q   So you recognize this as your employment
18 contract with MF Corporate Services Nevada Limited?
19   A   Yes.  I want to be sure.  Yeah.
20   Q   Could I ask you to look on the last page.
21   A   Uh-huh.
22   Q   Actually it's not the last page of the exhibit.
23 It's the last page of the contract.
24   A   Okay.
25   Q   Sorry.  It is the last page of the exhibit.
```

Page 16

```
1    A   You're talking this page (indicating)?
2    Q   Yes.
3    A   Okay.
4    Q   Do you recognize your signature?
5    A   Yes, I do.
6    Q   All right.  And you recognize the signatures of
7  Mr. Mossack and Mr. Fonseca?
8    A   I never see the signature before, so I assume.
9    Q   Okay.
10   A   I can't recognize the signature.  This is the
11 only time I see the signature.
12   Q   Okay.  So if we could turn to the first page of
13 Exhibit 1 --
14   A   This (indicating)?
15   Q   Yes, yes.  In the first paragraph it lists a
16 Social Security number and U.S. Certificate of
17 Citizenship number.
18   A   Yes.
```

Electronically signed by Ellen Goldman (001-341-679-7457)

Page 17

1

2

3  Q    Okay.  So how did you become aware of this

4  potential position with MF Corporate Services Nevada that

5  you were later hired for?

6  A    I don't remember where.  Was a person my son

7  know I think, something meet, and people from

8  MF Corporate Service was here and introduce me and called

9  me for an interview; and I have to be -- meet them in a

10 restaurant for -- with my resume.  I think they went to

11 UNLV for ask people they speak Spanish.

12 Q    Okay.  So --

13 A    And the paralegal service, sometime they put

14 potential offer job for the student that are ready to

15 graduate.

16 Q    So you think you learned about the opportunity

17 through UNLV?

18 A    I don't learn about opportunity.  They have the

19 list probably of the students speak Spanish.  They give

20 it to them because I get called.

21 Q    I see.  So you were contacted --

22 A    I get contacted, yeah.  I get contact.  I

23 never -- in fact I never was looking for the second job.

24 I was very tired at that time finish my school, but I

25 thought it was a good opportunity.  I say yes.

Page 18

1  Q    All right.  And I think you mentioned that your

2  son may have had some role in this.  What was his role?

3  A    Well, no.  My son got married, and one of the

4  invited person for the wedding was in the same

5  restaurant/hotel where these people stay; and because

6  they speak Spanish -- in fact they are from Argentina I

7  think, so they -- you know, they asked if they know

8  somebody with Spanish language in this town.  That's what

9  the first information I know about it.

10 Q    I see.  So people from the -- people from

11 MF Corporate Services asked people at the hotel --

12 A    At the hotel if they --

13 Q    -- if they knew of people --

14 A    Somebody.

15 Q    If you would, just let me finish my question so

16 we have a clear record.

17       So you think that people from MF Corporate

18 Services asked people from the hotel if they knew of

19 anyone in the area who spoke Spanish and who might be

20 suitable for a job with MF Corporate Services Nevada?

21 A    Yes.

22 Q    Is that right?

23 A    Yes.

24 Q    Do you recall who from MF Corporate Services

25 Nevada made these inquiries?

Electronically signed by Ellen Goldman (001-341-679-7457)

Page 19

```
 1     A     Yes, the lady I meet after.
 2     Q     Who -- what was her name?
 3     A     Her name was Nancy, but I don't remember the
 4  last name.  Was a long time ago.
 5     Q     And did Nancy work for MF Corporate Services
 6  Nevada?
 7     A     Nancy worked for MF Corp., yeah.
 8     Q     For MF Corporate Services Nevada?
 9     A     Yes.
10     Q     Do you know if Nancy worked for any other
11  company at that time?
12     A     Probably.  I don't know.  I meet her.  She do my
13  training and she hire me.  She sign this contract.
14  That's the person was here.  I don't know if she worked
15  for another company.  Probably.  I don't know.
16     Q     I see.  And how long did Nancy work at
17  MF Corporate Services Nevada after you started there?
18     A     She work up here -- she work a long time after.
19  She take vacation and then come back, and I always was in
20  touch with her in case I need something when she was not
21  here.
22     Q     Does she still work for MF Corporate Services
23  Nevada?
24     A     I don't know.  I don't know.  It's not in the
25  payroll, so no.
```

Page 20

```
 1     Q     Do you ever hear from Nancy nowadays?
 2     A     No.  I hear long time ago because she had a
 3  surgery.  Probably she get retired, but -- because she
 4  was not a young person, but I don't know anything about
 5  her.
 6     Q     I see.  Did you meet or speak with anyone else
 7  about the job at MF Corporate Services Nevada before you
 8  were hired?
 9     A     No.  Only with Nancy.
10     Q     Only with Nancy, all right.
11           Did you speak with Mr. Mossack or Mr. Fonseca?
12     A     Never.
13     Q     Did you meet with them?
14     A     Not in that time.  Later, very later.
15     Q     Okay.  At what time have you met Mr. Mossack or
16  Mr. Fonseca?
17     A     During my period of work I learn a lot about the
18  Nevada jurisdiction and I have to market this Nevada, and
19  one -- couple time I have to be in some event where you
20  do PowerPoint presentation about what is your product and
21  how it's -- so I meet them in one of my trip to Panama --
22     Q     Okay.
23     A     -- explaining and offer the product and give a
24  presentation about the jurisdiction.
25     Q     So you met them in connection with
```

Page 21

```
 1   presentations --
 2   A     I met with them --
 3   Q     -- like that?
 4   A     -- with many other people.  I can't remember
 5   names, but I meet at that time.
 6   Q     I see.  Just if you would, let me finish my
 7   question before you answer so the court reporter can get
 8   everything down.
 9         Have you met Mr. Mossack and Mr. Fonseca on more
10   than one occasion?
11   A     Yes, yes.
12   Q     Approximately how many times?
13   A     I will say three time.
14   Q     Was it always in the same kind of setting?
15   A     Uh-huh, yes, siempre in the same kind of setting
16   and marketing event.
17         MR. WOODS:  She said "siempre in the same kind of
18   setting."  Can you translate so the court reporter can --
19         THE INTERPRETER:  Oh, she said in Spanish, "always in
20   the same type of setting."
21         MR. HRANITZKY:  Well, I think this is still -- it's
22   working.
23   Q     And always in Panama?
24   A     Yes.
25   Q     How often do you go to Panama?
```

Page 22

```
 1   A     Well, don't depend on me.  Depend on if they
 2   have this -- how they call it -- marketing event or
 3   summit.
 4   Q     Summit?
 5   A     Summit so we can learn about different --
 6   everybody bring -- myself, I bring whatever is new here
 7   about any new change of product.  Normally it's one a
 8   year, but it's all depend when is the event.  I don't
 9   recall when is the last time, but I think my last time
10   was last February probably when I went.
11         MR. WOODS:  If I can, Patricia, like happened before,
12   if there's a word that you don't quite know what it is,
13   that's what the translator is for.  You can say it in
14   Spanish, if you don't know what it is, and she'll
15   translate it.
16         THE WITNESS:  Oh, okay, okay.
17   BY MR. HRANITZKY:
18   Q     In fact, if your counsel doesn't mind, there may
19   be times when I actually suggest that perhaps you answer
20   the question in Spanish --
21   A     Yeah.
22   Q     -- and the translator translates it.
23   A     Okay.
24   Q     For the short answers and the easy answers, I
25   think English is working, but for the more complicated
```

Page 23

```
 1   answers --
 2        A.   Okay.
 3        Q.   -- it may be best if we go through the
 4   interpreter.
 5        A.   Okay.
 6        Q.   Okay?
 7        A.   Okay.
 8             (Through the interpreter)   So is it something
 9   that I didn't understand?
10        Q.   I think we're fine.  Just going forward.
11        A.   Okay.
12        Q.   Do you go to Panama for any purpose other than
13   to attend these kinds of symposiums?
14        A.   I like Panama.
15        Q.   In your history working for MF Corporate
16   Services Nevada, have there been other instances where
17   MR. WOODS:   So is that a "no" or is that a "yes"?
18   THE WITNESS:   I will say yes.   I like to go for other
19   purpose if I would.
20   BY MR. HRANITZKY:
21        Q.   But in the past, have you gone for business
22   purposes other than to attend the kinds of symposiums you
23   described?
24        A.   I don't remember,
25
```

Page 24

```
 1        Q.   They have nice beaches in Panama.
 2        A.   Very, and I'm a beach person so -- and the warm
 3   water.
 4        Q.   Me too, especially in the winter.
 5        A.   So do you know why Mr. Mossack and Mr. Fonseca
 6        Q.   signed the employment contract on behalf of MF Corporate
 7   Services Nevada?
 8        A.   No, I don't know.
 9        Q.   All right.  Do you know if they have any
10   position with MF Corporate Services Nevada?
11        A.   No.
12        Q.   You didn't ask anyone that question?
13        A.   No, I didn't ask.
14        Q.   Uh-huh.
15        Q.   Mr. Mossack and Mr. Fonseca -- or Mr. Fonseca -- acted on
16   behalf of MF Corporate Services Nevada?
17        A.   No.
18        Q.   None that you --
19        A.   Not that I see it, no.
20        Q.   Other than signing employment contracts?
21        A.   Uh-huh.
22        Q.   Have you seen any corporate formation documents
23   or things of that nature for MF Corporate Services
24
25
```

## Page 25

```
 1   Nevada?
 2        A   No, no.  I don't have any document of corporate
 3   formation, just only the Article of Organization and the
 4   initial list what I have in the office.
 5        Q   In the Articles of Organization, are Mr. Mossack
 6   or Mr. Fonseca identified in any capacity?
 7        A   No.
 8        Q   Their names appear nowhere?
 9        A   No, nowhere.
10        Q   So -- strike that.
11            What is your title at MF Corporate Services
12   Nevada, if you have one?
13        A   I'm a secretary of the director.
14            THE REPORTER:  Of the what?
15            THE WITNESS:  Secretary.
16            THE INTERPRETER:  "I'm a secretary of the director."
17   BY MR. WOODS:
18        Q   Of the board?
19        A   Of the board; and also I'm running the office by
20   myself, so --
21            (Through the interpreter)  I'm the only
22   administrator.
23            (In English)  And the only employee.
24            (Through the interpreter)  And the only
25   employee.
```

## Page 26

```
 1        Q   let me just start with the second part.
 2        A   Okay.
 3        Q   So MF Nevada -- MF Corporate Services Nevada,
 4   which I'm going to call "MF Nevada" if that's okay --
 5        A   Yeah, okay.
 6        Q   -- just to make it easier.
 7        A   Okay.
 8        Q   MF Nevada has no other employees as far as you
 9   know?
10        A   No.
11        Q   Is that what you're saying?
12        A   As far as I know, no.
13        Q   As secretary to the board, would you know if
14   MF Nevada had other employees?
15        A   No, no.  I don't do anything on the payroll
16   here, but I don't know anything if they have, no.
17        Q   Who handles the payroll for MF Nevada?
18        A   Myself.
19        Q   You do, okay.
20        A   I pay the payroll taxes and I pay the payroll.
21        Q   Do you sign your own salary checks?
22        A   Yes, sir.
23        Q   Do you sign salary checks for anyone else?
24        A   Yes.
25            (Through the interpreter)  Just for the
```

www.oasisreporting.com
Electronically signed by Ellen Goldstein (001-341-878-7457)
OASIS REPORTING SERVICES, LLC
702-476-4500
dc74a275-a371-447a-be82-b4de65f02880

Page 27

```
 1   services, the services.
 2        Q   So you sign your own salary checks; but you do
 3   not sign salary checks for anybody else?
 4        A   No, no.
 5        Q   So as far as you know, you're the only employee
 6   of MF Nevada?
 7        A   Yes.
 8        Q   How does MF Nevada receive the money that is
 9   used to pay your salary and other expenses?
10        A   Every month myself or my secretary, if I use
11   one, a temp, we do a spreadsheet with our work and we
12   send it to our client, Mossack Fonseca, and they need to
13   deposit the money of our work, and that's the way it
14   work.  So I have my wire transfer on the money I charge
15   for MF -- it's not myself, but MF Nevada, like you
16   call -- charge and we get the money every month.
17        Q   So the money to pay your salary and the other
18   expenses --
19        A   Is in --
20        Q   If you would just let me finish.
21        A   Yeah, sorry.
22        Q   That's okay.  The deposition is funny because in
23   conversation people interrupt each other, but in -- it's
24   hard for the court reporter.
25        A   Yeah, yeah, I understand.
```

Page 28

```
 1        Q   So the money to pay your salary and the other
 2   expenses of MF Nevada comes from Mossack Fonseca is that
 3   right?
 4        A   Come from the client.  They pay Mossack Fonseca
 5   for the service we provide for them.
 6        Q   Okay.  But does the wire that you mentioned a
 7   moment ago to MF Nevada -- does the wire come from the
 8   clients or did it come from Mossack Fonseca?
 9        A   No.  We -- MF Nevada have in a bank account in
10   Panama, so they deposit the sales every month to the same
11   account and we reconciliate the account every end of the
12   month.
13        Q   I see.  So who deposits the money every month?
14        A   We pay a collection company to do that in
15   Panama, to collect company -- to collect the money.
16        Q   Okay.  So a collection company collects money
17   from clients?
18        A   No, collect money from Mossack Fonseca.
19        Q   I see.
20        A   And deposit in the account of MF Nevada in
21   Panama.
22        Q   Okay.  So the money goes from Mossack Fonseca to
23   the collection company and then from the collection
24   company into MF Nevada's bank account in Panama?
25        A   Yes.
```

Electronically signed by Ellen Goldstein (001-341-678-7457)
www.oasisreporting.com        OASIS REPORTING SERVICES, LLC        702-476-4500
dc74a275-4d77-447e-ba82-fc4e6602d080

Page 29

```
1    Q    I mean what is the name of the collection
2    company?
3    A    I don't know.  I don't know the name of the
4    collection company because it's a service we pay, but I
5    don't know the name of the collection company.
6    Q    But you said that it's the collection company
7    that deposits the money in MF Nevada's bank account in
8    Panama, yes?
9    A    Yes.
10   Q    So do you have access to the records of the bank
11   account --
12   A    No.
13        -- in Panama?
14   A    No, I don't have any -- no.  I have the record
15   of the balance in the money, yes, because I get my
16   statement.  I get the bank statement every month on the
17   mail, but I don't -- I don't know the company.  It's a
18   service.  At this point I don't know.  Probably is in the
19   list of the people we pay services, but I don't remember
20   the name.
21   Q    So the bank statements you receive don't reflect
22   who the collection service --
23   A    Probably do, but I don't see that because all
24   these document I send it to the accounting here.
25   Q    So you never look at that?
```

Page 30

```
1    A    No.
2    Q    You're the secretary of MF Nevada though; right?
3    A    Uh-huh.
4    Q    And you report to the board of directors of
5    MF Nevada with respect to certain matters, yes?
6    A    Uh-huh.
7    Q    Do you understand that part of your
8    responsibility as secretary is to be familiar with the
9    finances of MF Nevada?
10        MR. WOODS:  Object to that question.  I think that
11   mischaracterizes the -- mischaracterizes what she said.
12        You haven't laid a foundation about what her duties are.
13        You can answer the question.
14   BY MR. HRANITZKY:
15   Q    You can answer the question.
16   A    Oh, I didn't know he finished talking.
17        MR. WOODS:  Yes, if you understand it.
18        THE WITNESS:  (Through the interpreter)  Yes, I
19   understood it.
20        The job does not include the finances for MF.
21   I'm not good at finances.
22        (in English)  I give everything to a CPA who
23   work for us when we started.  He prepare everything.  I
24   give all the expense for every month and she prepare the
25   report for me to send it to the president of the company.
```

Page 31

1   Q   So if something is an error or something, they will find

2       out and they ask me probably; but the moment, so far so

3       good.

4   BY MR. HRANITZKY:

5   Q   You mentioned the president of the company. Who

6       was that?

7   A   Mrs. Imogene Wilson.

8   Q   Imogene?

9   A   Imogene Wilson.

10  Q   Wilson?

11  A   Yes.

12  Q   And where is Imogene Wilson located?

13  A   In Panama office.

14  Q   In the Panama office? The Panama office of

15      Mossack Fonseca?

16  A   I don't know. The address is Panama office,

17      where it is, but I don't know if she work for Panama

18      office.

19  Q   When you send documents to Imogene Wilson, do

20      you send it to --

21  A   I send it by E-mail.

22  Q   You send them by E-mail?

23  A   Yeah.

24  Q   What is Ms. Wilson's E-mail address?

25  A   I don't remember at this point.

Page 32

1   Q   How often do you send E-mails to Miss Wilson?

2   A   Probably once a month.

3   Q   But you don't remember her E-mail address?

4   A   I don't remember the E-mail address, no. I have

5       many E-mail address I send it to her.

6   Q   And she's the president of MF Nevada?

7   A   Uh-huh.

8   Q   Is that reflected in the Articles of

9       Incorporation of MF Nevada?

10  A   Yes. She's the person.

11  Q   And that appears in the Articles of

12      Incorporation?

13  A   In the list I believe. I don't know the

14      articles. In the list I believe she's the president.

15  Q   What list are you --

16  A   The annual list, the annual list.

17          (Through the interpreter) Annual list.

18  Q   The annual list provided to the Nevada Secretary

19      of State?

20  A   Uh-huh.

21  Q   Before when I was asking you about the bank

22      statements for MF Nevada's bank account in Panama --

23  A   Uh-huh.

24  Q   -- you said that you receive them but you don't

25      look at them and then you send them to somebody else. Is

Page 33

```
 1   that right?
 2        A    The CPA.
 3        Q    You send them to the CPA.  Who is the CPA?
 4        A    Sharples & Associates, Sharples & Associates.
 5        Q    Sharples?
 6        A    Sharples & Associates.
 7        Q    Sharpless?
 8        A    And Associates.
 9        Q    Are they based here in Nevada?
10        A    Yes.
11        Q    Do you send them to anybody else?
12        A    I think it's more people in the E-mail.  They
13   are part of the accounting or collection, but I don't
14   remember how many they are, but they are a part of people
15   they need to receive it.
16        Q    Who are those people?
17        A    They have the name of the company more
18   collection, collection, bookkeeper, another person work
19   for Sharples & Associates who is the bookkeeper for us.
20        Q    I see.  So collections and bookkeeping, are they
21   at Mossack Fonseca or the accounting?
22        A    My accounting here and Mossack Fonseca in
23   Panama, yes, someone.
24        Q    Okay.  So you send the bank statements to
25   various people at your Nevada accountant and also --
```

Page 34

```
 1        A    -- there's various people at Mossack Fonseca; is
 2        Q    -- there's various people at Mossack Fonseca; is
 3   that right?
 4        A    Yes.
 5        Q    Okay.  Who are those people at Mossack Fonseca?
 6        A    They are different department.  They're
 7   accounting or something accounting.
 8        Q    I see.  But you don't remember any of their
 9   names?
10        A    Well, the names I don't remember because I only
11   see the E-mail; and the E-mail, they are always not the
12   name.  You know, it's some -- so I don't remember
13   exactly.
14        Q    So it's like accounting@Mossack.com?
15        A    Yeah, or collection and another company.  So I
16   can't -- yeah, I don't remember exactly, yeah.
17        Q    Yeah, yeah, not person specific, yeah.
18        A    I see.  But it doesn't list any person?
19        Q    I see.
20        A    Controller or something.
21        Q    So you said that -- I asked you what your
22   position or positions are at MF Nevada and you said
23   you're the secretary to the board, you're the only
24   administrator, and you're the only employee; right?
25        A    Uh-huh.
```

Page 35

1    Q    But you mentioned before a woman named Imogene

2    who's the president of MF Nevada?

3    A    Uh-huh.

4    Q    You don't consider Imogene to be an employee of

5    MF Nevada?

6    A    I don't know if she's employee. She's not in my

7    payroll.

8    Q    I see. So you're in charge of the payroll?

9    A    Yes, here in this place. I don't know anything

10   about more than here.

11   Q    Do payroll checks get paid out of the account in

12   Panama --

13   A    No.

14   Q    -- or do they get paid out of an account here in

15   Nevada?

16   A    No. All our business coming in a bank account

17   here. All the bank account, they're running here.

18   Q    I see. So is money transferred from the bank

19   account in Panama to the bank account in Nevada

20   periodically?

21   A    Yes.

22   Q    And who is responsible for transferring that

23   money?

24   A    The collection department we pay because they

25   collect our invoices.

Page 36

1    Q    The collection department at Mossack Fonseca?

2    A    I don't know. I don't know if it's Mossack

3    Fonseca or a private company. I never speak with them.

4    Q    I see. So when --

5    A    The reason I know is because I get a bill from

6    them.

7    Q    I see. So if, as the person in charge of

8    payroll in Nevada, you see that MF Nevada needs funds to

9    meet its expenses, who do you call or E-mail to ask that

10   funds be transferred?

11   A    I send an E-mail --

12        (Through the interpreter)   I send an E-mail to

13   the person of the collection asking for payment of the

14   invoice for the jobs that we have done during that time.

15   Q    And who do you send that E-mail to?

16   A    To the collection department.

17   Q    All right. And who is that?

18   A    I think it's a name -- I don't know exactly the

19   name. I can give you wrong name. I don't know the name.

20   Q    But how often do you send E-mails of that

21   nature?

22   A    Normally I don't have to send much E-mail of

23   that because the sale and the payment of invoices is very

24   on time, but when we have to pay an extra something, we

25   request they go more straight to collect the money with

Page 37

```
1   the people they don't pay on time; like, you know,
2   sometime take later, pay after 30 days.
3        Q   But even though you said before that paying this
4   service is one of the expenses of MF Nevada that you're
5   responsible for and that you have to communicate with
6   them periodically to see that funds get transferred to
7   MF Nevada's account, you don't remember the name of that
8   collection service?
9        A   (Through the interpreter)  Okay.  What happens
10  is you speak to different people --
11       THE REPORTER:  Start again.  I didn't understand you.
12       THE INTERPRETER:  "What happens is you speak to
13  whoever is there, whoever happens to answer the phone."
14       THE WITNESS:  (In English)  Or I send an E-mail.
15  BY MR. HRANITZKY:
16       Q   Well, and I'm asking, when you send the E-mail,
17  who do you send the E-mail to?
18       A   Collection department or -- what is their name?
19  Can be accounting, but I don't -- I'm not sure.  I'm not
20  sure.  I need to -- I --
21       Q   Is that accounting and collections at Mossack
22  Fonseca or someplace else?
23       A   No.  It's -- I don't know.  I don't know.  It's
24  probably in Mossack Fonseca, but I don't know if they are
25  at Mossack Fonseca.
```

Page 38

```
1        Q   When you call, understanding that different
2   people answer the phone, are you calling to the Panama
3   country?
4        A   Yeah, I call the Panama country, yeah.
5        Q   Okay.  Do you recall the name of any of the
6   people that you speak to?
7        A   I have the feeling I speak more often with one
8   name they call Jodeli.  Jodeli, I think that's the name
9   of the person I been speaking, Jodeli.  I don't know even
10  how to spell it, Jodeli.
11       Q   Jodeli?
12       A   Jodeli.
13       Q   Is that a man or a woman?
14       A   A woman.
15       Q   A woman.
16       A   And I don't know her E-mail because it's in the
17  department.
18       A   Her proper name doesn't appear when you send the
19  E-mail?
20       A   Yeah.  The only thing I know is Jodeli, because
21  when I can -- it's the person I speak in the phone.
22       Q   I see, okay.  What are your responsibilities
23  with MF Nevada, your job responsibilities?
24       A   Since open the door in the morning --
25           (Through the interpreter)  Since I open the door
```

Page 39

```
1   in the morning --
2   Q    (In English) -- be in charge of all --
3        (Through the interpreter) I'm in charge of the
4   office operations, bring all the documents in front of
5   the Secretary of State of all the documents that we
6   receive.
7        (In English) We request, to incorporate
8   company, service of process for companies we're having
9   and comply with the regulation for the office in Nevada
10  and learn about jurisdiction of Nevada.
11       (Through the interpreter) If there has been any
12  change. If a change has been made, I have to make a
13  change so the business can run.
14  Q    So when you refer to "changes," you mean changes
15  in the laws and regulations --
16  A    Changes to the law and regulations.
17  Q    Just allow me to finish.
18  A    Yeah.
19  Q    Changes to the laws and regulations governing --
20       Governing.
21  Q    -- Nevada corporations?
22  A    (Through the interpreter)   Yes.
23  Q    So you can make sure that all of the Nevada
24  corporations that you're overseeing are in full
25  compliance with Nevada law?
```

Page 40

```
1   A    Correct, correct.
2   Q    And how do you learn about those changes?
3   A    (Through the interpreter) I'm involved with the
4   Secretary of State.
5        (In English)   We are a commercial registered
6   agent, so we get mail every week or every month if
7   something is changed, and also --
8        (Through the interpreter)  I participate as a
9   member of the associated agents of the state of Nevada,
10  registered agents association of the state of Nevada.
11  Q    And that organization provides some educational
12  functions?
13  A    They provide some education and they advise you
14  if there any change coming and they give you ahead of
15  time to prepare yourself and prepare your client. The
16  more important is to -- I need to inform Mossack Fonseca
17  what's going to change in order to prepare the document.
18  Q    Okay.  So you mentioned your job
19  responsibilities are to open the door in the morning, you
20  manage the office operations, you handle filing of
21  documents with the Nevada Secretary of State, sometimes
22  you arrange for service of process of documents.
23  A    Uh-huh.
24  Q    You're generally responsible for staying
25  informed of changes to Nevada laws and complying with
```

Page 41

```
 1   those Nevada laws.  Is there anything else?
 2        A    (Through the interpreter)  Yes.  We have a
 3   service between Mossack Fonseca and MF Nevada that in
 4   some cases we must sign documents for the purpose to
 5   legalize them in the state of Nevada, acting as a nominee
 6   service.
 7        Q    So if I understand correctly, in some instances
 8   you're granted Powers of Attorney to sign documents on
 9   behalf of various entities.  Is that right?
10        A    If the client requests signature to have
11   legalized in Nevada, they authorize me and they put on --
12   I act on behalf to sign it as nominee service.
13        Q    They authorize you by granting you a Power of
14   Attorney?
15        A    They grant me a Power of Attorney to sign this
16   specific document here when they need to legalize,
17   because otherwise it's no way to legalize document in
18   this country or by consulate.
19             THE REPORTER:  Or by?
20             THE INTERPRETER:  Consulate.
21   BY MR. HRANITZKY:
22        Q    Is part of your job to hold the position of
23   assistant secretary, deputy secretary, or some other
24   position in entities other than MF Nevada?
25        A    I was -- I was --
```

www.oasisreporting.com
Electronically signed by Ellen Goldstein (001-341-670-7457)
OASIS REPORTING SERVICES, LLC          702-476-4500
dc74a275-a377-447e-be82-fc4e6602d860

Page 42

```
 1             (Through the interpreter)  I was assigned to
 2   have the position of assistant secretary to other -- with
 3   other corporations, nominee corporations, nominee
 4   services, with the purpose to accelerate the process of
 5   an incorporation or a legalization, but not anymore, but
 6   I'm not doing that anymore.
 7        Q    On behalf of what entities did you perform that
 8   role at one time?
 9        A    In the past I sign a document.  I was -- signed
10   for Aidyne.
11             MR. HRANITZKY:  A-i-d-y-n-e.  You're going to hear
12   that one a lot.
13             THE WITNESS:  Plascot.
14   BY MR. HRANITZKY:
15        Q    Sorry.  What was that?
16        A    Plascot.
17        Q    Plascot?
18        A    I think I give you some paper in that.  I don't
19   remember right now.  You need to have --
20        Q    Plascot, P-l-a-s-c-o-t?
21        A    Uh-huh.
22        Q    Okay.  Any others?
23        A    I don't remember any other ones, but normally if
24   they need some specific on that company, they mention or
25   they change -- they put me as the secretary just to sign.
```

www.oasisreporting.com
Electronically signed by Ellen Goldstein (001-341-670-7457)
OASIS REPORTING SERVICES, LLC          702-476-4500
dc74a275-a377-447e-be82-fc4e6602d860

Page 43

```
1    but in the past I don't do it.  I resign it.
2        Q.  Okay.  Who asked you to take on that
3    responsibility?
4        A.  Well, Mossack Fonseca have agreement with
5    MF Corporate Service we need to provide the service.
6    It's part of the service we need to provide to them.
7        Q.  I see.  So but --
8        A.  They can sign, anybody in my office.  Because
9    the only one I am, I have to sign it, but if I have
10   another one, they will sign it too.
11       Q.  So where does the request come from?
12       A.  (Through the interpreter)  Usually it comes from
13   the client.
14       Q.  All right.  So it was the client that requested
15   that you be made assistant secretary to Aldyne in order
16   to sign documents on behalf of Aldyne?
17       A.  (Through the interpreter)  The customer request
18   Mossack Fonseca, and Mossack Fonseca uses the service
19   that is requested.
20       Q.  So how did you learn that it was requested that
21   you become assistant secretary for Aldyne?
22       A.  Since the beginning they told me I need to sign
23   document because this is part of the service, the
24   contract service they have in --
25   ///
```

Page 44

```
1        THE REPORTER:  In what?
2        THE INTERPRETER:  "In some occasions."
3        BY MR. HRANITZKY:
4        Q.  When did you become assistant secretary to
5    Aldyne?
6        A.  I have no idea.  I don't know because I never
7    have the document with me.
8        Q.  Did you have to sign any document in order to
9    become assistant secretary to Aldyne?
10       A.  I don't remember.  No, I don't remember.
11       Q.  But you've signed documents as assistant
12   secretary to Aldyne?
13       A.  Uh-huh, in the past, yeah.
14       Q.  How frequently?
15       A.  Depend how they need it.
16       Q.  But approximately, to the best of your
17   recollection, how often did that happen?
18       A.  In the past was more often than in the last
19   three or four year because they use this nominee more
20   often.
21       Q.  They used Aldyne more often?
22       A.  Uh-huh, for nominee services.
23       Q.  When you say "they," you mean Mossack Fonseca?
24       A.  The client or Mossack Fonseca.  I don't know
25   because I don't know who.  That's the instruction I don't
```

## Page 45

```
1    receive.  I have the instruction more often in the past.
2    Q     But when you received instructions that you
3    needed to sign documents as assistant secretary to
4    Aldyne, those came from Mossack Fonseca?
5    A     Yes.  All the document came from Mossack
6    Fonseca.
7          MR. HRANITZKY:  Okay.  Why don't we break for a
8    second so that the videographer can change the tape.
9          THE VIDEOGRAPHER:  This is the end of tape No. 1 in
10   the deposition of Patricia Amunategui.  Going off the
11   record at 9:47 a.m.
12         (Brief recess taken.)
13         (At this time the video record was terminated.
14   The following proceedings were recorded by stenography
15   only.)
16         MR. HRANITZKY:  So, Miss Amunategui and Kent, we
17   discussed over the break that we are no longer going to
18   use the videographer.
19         Q     So you understand that?
20         A     (Through the interpreter)  Yes, I understand.
21         Q     And that's okay with everybody?
22         MR. WOODS:  That's fine.
23         BY MR. HRANITZKY:
24         Q     Okay.  Just one follow-up question from before
25   the break:  You mentioned that MF Nevada has a bank
```

## Page 46

```
1    account in Panama.
2    A     Uh-huh.
3    Q     And you get the bank statements but you don't
4    really study them; correct?
5    A     No.  Correct, yes.
6    Q     What's the name of the bank?
7    A     I don't know.
8    Q     You get the bank statements and you don't
9    remember the name of the bank?
10   A     You ask me the name.  I need to have the paper
11   in my front to see the name.  I don't know, no.  I don't
12   remember at this point.
13   Q     How often do you get the bank statements?
14   A     Once a month.
15   Q     And yet you don't have any idea what the bank
16   is?
17   A     No.  I recognize the color of the paper, but I
18   don't remember at this time the name of the bank.
19   Q     Is it a Panamanian bank?
20   A     No, not Panamanian.
21   Q     Is it a U.S. bank with a branch in Panama?
22   A     Probably is a U.S. bank, but I'm not sure.  So,
23   no, I don't know the name.
24   Q     But it's not a Panama bank?
25   A     No.
```

Page 47

```
1    Q    But the account is in Panama?
2    A    Yes.
3    Q    And you just -- as you sit here now, you don't
4    have a clue what the name of the bank is?
5    A    (Shakes head.)
6    Q    Is that a "no"?
7         THE WITNESS:  If I give you a name, probably I give
8    you a wrong name.
9         BY MR. HRANITZKY:
10   Q    Well, I don't want you to give me a wrong name.
11   How about the bank that you use here in Nevada;
12   what's the name?
13   A    Bank of America.
14   Q    Bank of America, but the bank in Panama is not
15   Bank of America?
16   A    I don't think they have Bank of America in
17   Panama, but it's not Bank of America.
18   Q    Okay.  If you don't remember, you don't
19   remember.
20   A    It's not a simple name, so probably that's the
21   reason I don't remember.
22   Q    Is it an English name?
23   A    Probably.  I don't know.
24   Q    Is it a Spanish name?
25   A    No, not Spanish.
```

www.oasisreporting.com
Electronically signed by Ellen Goldstein (001-341-875-7437)
OASIS REPORTING SERVICES, LLC          702-476-4500
dc74d275-4a77-447e-ba82-fc4e6092d080

Page 48

```
1    Q    So you don't think it's a Latin American bank?
2    A    No.
3    Q    Okay.  I'd like you to look now at the second
4    page of your Employment Agreement, which is Exhibit 1.
5    Do you see paragraph No. 4?  Do you see at the end it
6    reads, "The existence and substance of this agreement
7    shall not be made known to anyone other than the
8    thereto and their professional advisors unless mutually
9    agreed"?
10   A    I think I'm lost.  I'm in the wrong page.
11        MR. WOODS:  Part of the problem is it starts on
12   page 4 -- or starts on one page and goes to the next.
13        MR. HRANITZKY:  Sure.
14   Q    Look at the second page of the contract.
15   A    This one (indicating)?
16        MR. WOODS:  Right.
17        BY MR. HRANITZKY:
18   Q    Yes, the paragraph No. 4.
19   A    Okay.
20   Q    Now, on the bottom of that page, that last line
21   it reads, "The existence and substance of this agreement
22   shall not be made known to anyone other than the parties
23   thereto and their professional advisors unless mutually
24   agreed."  Do you see that?
25   A    Yes.
```

www.oasisreporting.com
Electronically signed by Ellen Goldstein (001-341-875-7437)
OASIS REPORTING SERVICES, LLC          702-476-4500
dc74d275-4a77-447e-ba82-fc4e6092d080

Page 49

1  Q  Did I read that right?

2  A  Yes.

3  Q  Before today, do you recall reading that

4     provision?

5  A  No.

6  Q  Were you aware that that provision was in this

7     contract?

8  A  I was aware that they have some privacy on the

9     contract, but I was not aware of that, and I read the

10    contract with my attorney before I provide it to him.

11 Q  So you asked an attorney to review this

12    contract --

13 A  Uh-huh.

14 Q  -- before you signed it; is that right?

15 A  Yes, before, like many years ago.

16 Q  Who was the attorney?

17 A  Was one professor I have at the UNLV and I asked

18    him if he can -- that will be okay to sign this contract.

19    He say it look like it's fine and, yes, I sign it.

20 Q  Who was that?

21 A  Mr. Richard Linstrom.

22 Q  Linstrom?

23 A  Linstrom, yes.

24 Q  L-i-n-s-t-r-o-m?

25 A  Yeah. Was an attorney from UNLV.

Page 50

1  Q  I see.  Do you know if Richard Linstrom inquired

2     into how Mr. Mossack or Mr. Fonseca had authority to sign

3     the contract on behalf of MF Nevada?

4  A  No.  I only bring this as a draft and just to

5     give me an advice is it okay to sign this contract.

6  Q  Did the draft have Mr. Mossack and Mr. Fonseca's

7     names on the signature line?

8  A  No, no, no.  I only bring the draft before the

9     document was ready.

10 Q  So but just to be clear, I understand you showed

11    it to him before it was signed.

12 A  Yes.

13 Q  What I'm asking is if their names appeared below

14    the signature lines.

15 A  No.

16 Q  No?

17 A  No.

18 Q  So the document you showed Mr. Linstrom didn't

19    identify who would be signing on behalf of MF Nevada?

20 A  Uh-huh.

21 Q  And Mr. Linstrom thought that was fine?

22 A  Yeah.  They say that whatever the contract say

23    is fine, yeah.  I sign it and I send it back.

24 Q  Okay.  But before just today, you don't recall

25    ever seeing the language that we just went through at the

Page 51

```
 1   bottom of paragraph 4 --
 2   A.   No.
 3   Q.   -- is that right?
 4   A.   No.
 5   Q.   Do you have an understanding about whether it's
 6   okay for you to publicly disclose the fact that you work
 7   for MF Nevada?
 8   A.   I understand that if you have by the Court
 9   order, you need to disclose when they ask you.
10   Q.   No, I'm asking a different question.
11   A.   Oh.
12   Q.   Do you have an understanding as to whether
13   you're prohibited from disclosing publicly the fact that
14   you work for Mossack -- or work for MF Nevada?
15   A.   No.  This is the first time I realize that.
16   Q.   Okay.  Do you have an understanding about
17   whether you're prohibited from disclosing publicly that
18   you work sometimes with Mossack Fonseca?
19   A.   No, no.  I never work for Mossack Fonseca.
20   Q.   No, I didn't ask that.  I didn't say "work for."
21   I asked whether you have an understanding about
22   whether -- well, let me strike that.
23   A.   Yeah.
24   Q.   You've said that you don't work for Mossack
25   Fonseca?
```

Page 52

```
 1   A.   No, I don't.
 2   Q.   But you do work with Mossack Fonseca; correct?
 3   A.   I don't know what to say.  I feel like I work
 4   for this company, MF Corporate Services, and I work for a
 5   client called Mossack Fonseca.
 6   Q.   Okay.  So you do work with Mossack Fonseca?
 7   A.   As a client, yes.
 8   Q.   Okay.  Do you have an understanding about
 9   whether you have an obligation to keep the fact that you
10   work with Mossack Fonseca as a client confidential?
11   A.   Oh, yes, yes, we have a confidentiality.  Yes, I
12   do.  I have -- I mean I can't disclose that -- if I
13   decide don't work for them anymore, of course I can't
14   disclose anything.
15   Q.   All right.  But are you permitted to disclose
16   the fact that Mossack Fonseca is a client that you work
17   for?
18   A.   Say that again.
19        THE INTERPRETER:  Say it again.
20   BY MR. HRANITZKY:
21   Q.   Are you permitted to disclose the fact that
22   Mossack Fonseca is a client that you work for sometimes?
23   A.   I hope so, yeah.  I don't know.
24   Q.   You've never thought about that?
25   A.   I never thought about it.
```

Page 53

```
 1   Q   So you don't have any understanding of whether
 2   you're supposed to keep that confidential?
 3   A   No, I don't know.
 4   Q   So going back to the first page, the paragraph
 5   numbered 1, the final sentence it reads, "The employer
 6   shall direct and control all of the details of the
 7   employee's work and the employee shall report, with
 8   respect to her work assignments, to the employer."  Do
 9   you see that?
10   A   Uh-huh.
11   Q   Is that consistent with your understanding of
12   your Employment Agreement?
13   A   Uh-huh.
14   Q   Okay.  And the employer is ME Nevada; correct?
15   A   Yes.
16   Q   So who directs and controls all of the details
17   of your work?
18   A   Myself.  I mean I am my own boss.  I am
19   responsible for all the thing I need to do.
20   Q   So you give yourself instructions?
21   A   No, I don't give myself instructions, but I get
22   the instruction for my client what they need.
23   Q   But the contract says, "The employer shall
24   direct and control all of the details of the employee's
25   work."  Do you see that?
```

Page 54

```
 1   A   Uh-huh.
 2   Q   Okay.  So where do the directions come from?
 3   A   From the client request.
 4   Q   So the clients communicate directly to you their
 5   instructions?
 6   A   The only client we have.  We don't have multiple
 7   clients.  We have only one client.  They send instruction
 8   to us.
 9   Q   And that's Mossack Fonseca?
10   A   (Nods head.)
11   Q   Is that Mossack Fonseca & Company?
12   A   Mossack Fonseca is the only thing I know.
13   Q   So an entity called Mossack Fonseca & Co.,
14   that's what you're referring to by "Mossack Fonseca"?
15   A   Yes.  That's the only company I know.
16   Q   Okay.  And that's where you get the directions
17   from; right?
18   A   Uh-huh.  I get the direction for the Nevada sale
19   because --
20   Q   Probably better to do it in Spanish.
21   A   Yeah.  I get the direction for the office --
22   (Through the interpreter)  There's instructions.
23   I receive them from the department and the client, who
24   has specific instructions for the client in Nevada.
25   Q   Okay, sorry.  I'm sorry, I didn't understand
```

www.oasisreporting.com
Electronically signed by Ellen Goldstein (001-341-678-7497)
OASIS REPORTING SERVICES, LLC
dc7e4275-ad77-441e-be82-5c4d6d02d860
702-476-4500

## Page 55

```
 1   that answer.
 2        You get some directions and instructions from
 3   Mossack Fonseca; correct?
 4   A    (Nods head.)
 5   Q    Do you get directions and instructions from
 6   anybody else?
 7   A    Only for one department. They specify and
 8   attend clients buy Nevada companies.
 9   Q    I'm sorry. I don't understand the answer.
10   A    The only person I'm in contact for instruction
11   there are -- how do I explain -- department.
12   Q    Try it in Spanish and if -- let me suggest --
13   A    (Through the interpreter) The people, the
14   customers that are going to buy the companies in
15   Nevada --
16        (In English) They have assign to one person,
17   two person, in one small department from Mossack Fonseca.
18   This person are in contact with me to give me, "Check
19   this name," "Please incorporate this," "A client need a
20   company with this characteristic." That's the only
21   person that I in contact.
22   Q    So you're saying that your directions come from
23   one particular department within Mossack Fonseca?
24   A    (Through the interpreter) Sales.
25   Q    The sales department?
```

## Page 56

```
 1   A    Yes.
 2   Q    So to try to sum it up, all of your directions
 3   and instructions come from the sales department --
 4   A    Department.
 5   Q    -- at Mossack Fonseca?
 6   A    The sale department for the only product I sell,
 7   for Nevada.
 8   Q    The sales department for Nevada?
 9   A    Yeah.
10   Q    Okay. So all of your instructions and
11   directions come from the Mossack Fonseca sales department
12   for Nevada; is that right?
13   A    Oh, yes.
14   Q    And who is that?
15   A    Can be -- they change it many times, so it's not
16   always the same, but right now it's one person they call
17   Iris Vergara.
18   Q    Like Iris the flower?
19   A    Iris Vergara.
20   Q    Vergara?
21   A    Vergara.
22        THE INTERPRETER: V-e-r-g-a-r-a, Vergara.
23   BY MR. HRANITZKY:
24   Q    It's a funny last name.
25   A    In Chile we have a lot of those. Everybody
```

Electronically signed by Ellen Goldstein (001-341-678-7457)
www.oasisreporting.com
OASIS REPORTING SERVICES, LLC
702-476-4500
dc74d275-4a77-447e-ba82-fc4e602cb860

Page 57

```
 1   called Vergara.
 2   Q    Okay.  I'd like you to look now at paragraph
 3   No. 8 in Exhibit 1.
 4   A    We still in the contract; no?
 5   Q    Yes.
 6   A    Okay.
 7   Q    Do you see towards the end after the semicolon
 8   it reads, "It is understood that the employee" -- that's
 9   you -- "shall have all of her communication solely with
10   the employer and its representatives"?
11   A    Oh, yeah, okay.
12   Q    Do you see that?
13   A    Uh-huh.
14   Q    Is that consistent with your understanding of
15   your employment arrangement?
16   A    Yes.
17   Q    So you have all of your communications solely
18   with MF Nevada and its representatives?
19   A    Uh-huh.
20   Q    So the people in the Nevada sales office at
21   Mossack Fonseca are representatives of MF Nevada;
22   correct?
23   A    No, I don't think so they're representatives.
24   Q    But your employer is MF Nevada; right?
25   A    MF Corporate Nevada.
```

Page 58

```
 1   Q    Right.  And this provision in your employment
 2   contract says that you shall have all of your
 3   communications solely with the employer, MF Nevada, or
 4   its representatives; right?
 5   A    Maybe they are representatives.  They're not
 6   employees.
 7   Q    Okay.  Can you turn to paragraph 15.
 8   A    Fifteen?  The last one here?
 9   Q    Yes.  You see it says, "the employer reserves
10   the additional option to pay bonus compensations to the
11   employee at its discretion"?
12   A    Uh-huh.
13   Q    Have you ever been paid a bonus?
14   A    Yeah, sometimes.
15   Q    Do you decide on whether to pay yourself a bonus
16   or does somebody else make that decision?
17   A    The president of the company take the decision.
18   Q    And that's Imogene?
19   A    Imogene Wilson.
20   Q    Imogene Wilson?
21   A    Uh-huh.
22   Q    Have you ever spoken to Imogene Wilson about
23   getting paid a bonus since you've worked for MF Nevada?
24   A    No.  I never ask for it.  There's some Christmas
25   they sent me a letter with the option that I can get paid
```

Electronically signed by Ellen Goldstein (001-341-678-7457)
www.oasisreporting.com
OASIS REPORTING SERVICES, LLC
702-476-4500
dc74d275-4a77-447e-ba82-fc4e602cb860

**Page 59**

```
 1   bonus.
 2      Q    I see.  The option to be paid a bonus you said?
 3      A    Uh-huh.
 4      Q    So they asked you, "Would you like to be paid a
 5   bonus this year, Patricia," and you say "yes" or "no"?
 6      A    I will say yes of course.
 7      Q    Are there any strings attached?
 8      A    Sometimes they request if I recommendation on
 9   what I believe I deserve for bonus for Christmas or when
10   we have employees.  In the past we have employee working
11   for us.  Now we have Manpower temp, but they ask what
12   will be our recommendation, if we feel it, for Christmas.
13      Q    How often has that happened?
14      A    Not very often.
15      Q    Not very often?
16      A    Not very often.
17      Q    When was the last time MF Nevada had other
18   employees?
19      A    Let's see.  2011 probably, 2011 and '12
20   probably.  I'm not sure.  And after, with all this
21   inconvenient to hire and fire, we decide to use Manpower
22   temp.  It's more easy.
23      Q    How many other employees did MF Nevada have
24   during that time?
25      A    We used to have three, myself and two more.
```

**Page 60**

```
 1      Q    And what did the other two people do?
 2      A    Work office help.  When I'm very busy I can't do
 3   all the document by myself.  So they help to prepare
 4   Article of Organization, Excel with invoices, and all the
 5   other stuff, the office things we need.
 6      Q    So they did the same things that you do?
 7      A    Not all the same things but almost.  They're
 8   very well trained in almost the same but no signing of
 9   course; but they help me in all the office things, answer
10   the phone and prepare stuff and I sign.
11           MS. HRANITZKY:  You got the "pero" as a but.
12           THE WITNESS:  Oh.
13   BY MR. HRANITZKY:
14      Q    The court reporter picked that one up.  Believe
15   it or not, sometimes even I do that.
16      A    Really?
17      Q    Yeah.  There's something about "pero" that just
18   slides right off the tongue.
19      A    In the casino they call me Mrs. Pero because I
20   always say "pero."
21           MR. WOODS:  Because it uses the same parts of your
22   mouth.
23           THE WITNESS:  Yeah.
24           MR. HRANITZKY:  "But" sort of gets in the way and
25   "pero" just sort of slides.
```

Page 61

```
 1                                    THE WITNESS:  Perc slides.
 2      BY MR. HRANITZKY:
 3           Q    Could you look now at paragraph 16.
 4           A    That will be a good review of my contract.
 5           Q    It's always good to look at it again.
 6           A    It's always good, yeah.
 7           Q    You see there's a reference to commission
 8      compensation?
 9           A    Uh-huh.
10           Q    Do you ever receive commission compensation?
11           A    No, and I'm very mad.  No, never.
12           Q    Never?
13           A    No.
14           Q    Have you ever discussed the possibility of being
15      paid --
16           A    Yes.
17           Q    Being paid --
18           A    Yes, but never happened.
19           Q    Who did you discuss that with?
20           A    With the marketing department in one of my
21      presentation; and they say will be an option, but I never
22      have.
23           Q    Who in the marketing department?
24           A    I don't remember who was at that time because
25      it's a long time ago.  Probably is not there anymore, but
```

Page 62

```
 1      I requested and they say, "Well, maybe," and it never
 2      happen.
 3           Q    And that's the marketing department at Mossack
 4      Fonseca?
 5           A    Yes.
 6           Q    Are they based in Panama, that department?
 7           A    I believe so.
 8           Q    All right.  Could you look at paragraph 19,
 9      the second sentence.  It reads, "The employee shall be
10      provided the name of a contact person in the employer
11      organization regarding each assigned project."
12           A    Uh-huh.
13           Q    The "employer organization," does that refer to
14      Mossack Fonseca?
15           A    I don't know, but --
16           Q    But in practice that's the way it works; right?
17           A    I don't know.
18           Q    Well, when you get the name of a contact person
19      for each assigned project, you get it from somebody at
20      Mossack Fonseca; right?
21           A    With the only person I get --
22           THE REPORTER:  I'm sorry.  I didn't understand that.
23           THE WITNESS:  (Through the interpreter) The only
24      person that I have contact with for an assignment or job
25      instructions is Mrs. Vergara.
```

www.oasisreporting.com          OASIS REPORTING SERVICES, LLC          702-476-4500
Electronically signed by Ellen Goldstein (001-341-678-7457)          dc74d275-4a77-447a-ba82-fc4e6d02d80

www.oasisreporting.com          OASIS REPORTING SERVICES, LLC          702-476-4500
Electronically signed by Ellen Goldstein (001-341-678-7457)          dc74d275-4a77-447a-ba82-fc4e6d02d80

www.oasisreporting.com
OASIS REPORTING SERVICES, LLC                            702-476-4500
Electronically signed by Ellen Goldstein (001-341-678-7457)        dc74d275-a477-447c-ba82-fc4e6092b080

Page 63

```
 1   BY MR. HRANITZKY:
 2        Q    Iris Vergara?
 3        A    Iris Vergara.
 4        Q    So that's in practice --
 5        A    In practice.
 6        Q    -- the contact -- you receive the names of
 7   contact persons for each assigned project from Iris
 8   Vergara; correct?
 9        A    For all the incorporation, because --
10             (Through the interpreter)  The only instruction
11   that I receive daily is preparations for companies that
12   need to be incorporated.  You see what the client needs.
13   The other instructions I have on my own by myself.
14             (In English)  I manage the office.  I don't have
15   nobody give me instructions how I do.
16        Q    So but you don't give yourself the name of the
17   contact person at the client, do you?
18        A    No, no, no.  The only contact and instruction I
19   have daily is from the sale department.
20        Q    And Iris Vergara?
21        A    Iris Vergara or whatever is replacing her at
22   this point.  I don't remember name, but she is the person
23   who tell me, "This is the company we need.  Check,
24   please.  Give me a name and ability," or whatever,
25   whatever regarding sale.
```

Page 64

```
 1        Q    Do you ever get requests from people at Mossack
 2   Fonseca's affiliates in Uruguay or in Peru or in
 3   Switzerland?
 4        A    I probably get phone call from them to request
 5   something, but I need to -- I'm prohibited to accept
 6   instruction from them.  So I need to tell them go back
 7   and tell Iris give me the instruction.
 8        Q    So you never get E-mails from any of those
 9   places with requests for --
10        A    Probably I will do one time in the past.  I
11   don't remember, but if that happened, it's because
12   they -- the time sometimes.  They want to get the
13   information first to me and I need to forward to Iris
14   Vergara or the person in charge at that time.  I can't
15   respond them.
16        Q    But the standard practice is that the
17   instructions would come from Iris Vergara?
18        A    Yes.
19        Q    Could I ask you -- you see after the employment
20   contract in Exhibit 1 there's a letter --
21        A    Uh-huh.
22        Q    -- on MF Corporate Services Nevada Limited
23   letterhead?  Do you see that?
24        A    Uh-huh.
25        Q    And the letter is signed Katia Solano.
```

Page 65

1   A   Uh-huh.

2   Q   Who is Katia Solano?

3   A   Katia Solano was the person in human resource I

4   believe.

5   Q   Well, it says on the letter she's in human

6   resources and the letter is on MF Nevada letterhead.

7   A   Uh-huh.

8   Q   Does NF Nevada have a human resources

9   department?

10   A   No, not here, but in the contract agreement we

11   share some services with them, Mossack Fonseca.

12   Q   So Mossack Fonseca provides some back-office

13   services to MF Nevada?

14   A   Sometimes, yes.

15   Q   And one of those is human-resources support?

16   A   Uh-huh.

17   Q   Do you know where Katia Solano was based?

18   A   No, I can assume in Panama, but I don't know.

19   Q   Did you ever speak with Katia Solano on the

20   phone?

21   A   A couple time in my life, yes.

22   Q   How often?

23   A   Maybe two or three time in my entire life.

24   Q   Okay. Do you know who employed her?

25   A   No, no idea.

Page 66

1   Q   So if I could ask you to turn back to the first

2   page of the letter --

3   A   There (indicating)?

4   Q   Right there, right.

5   Do you see in the very first paragraph there's a

6   reference to "your letter dated July 1st, 2007"?

7   A   Yes.

8   Q   Did you write a letter on July 1st, 2007?

9   A   To her? Yes, I think so, yeah.

10   Q   And in the letter you were asking for a raise

11   and some other improvements to your compensation package;

12   correct?

13   A   Uh-huh.

14   Q   Is that "yes"?

15   A   Yes.

16   Q   Just for the benefit of the court reporter. I'm

17   not trying to be difficult.

18   A   No, no, no, yeah.

19   Q   Her job is challenging as is.

20   You see in the next sentence it says, "Please

21   find below the partners' response to the different

22   subjects"?

23   A   Yes.

24   Q   Who are "the partners"?

25   A   I don't know. I don't know.

Page 67

```
 1   Q   You have no idea?
 2   A   I don't know any idea.
 3   Q   Do you think it's the partners of Mossack
 4   Fonseca?
 5   A   No.  I probably believe that's the partner of
 6   MF Corporate Services.
 7   Q   Well, you're the secretary of MF Corporate
 8   Services; so if they had any partners, you would know
 9   about them, wouldn't you?
10   A   They have another company who is the
11   shareholder.
12   Q   What is that company?
13   A   I'm sorry, but I don't know exactly the name,
14   but Timberlane Associates or something.
15   Q   Timber?
16   A   Timberlane Associates.
17   Q   Timberlane Associates?
18   A   Timberlane Associates is all I remember.
19   Q   And you think the reference to "the partners" is
20   the partners in Timberlane Associates?
21   A   I think the partners of MF Corporate Services.
22   Q   But --
23        MR. WOODS:  We're going to do an objection.  I mean
24   she's said that she doesn't know what it means many
25   times.
```

Page 68

```
 1        MR. HRANITZKY:  And I'm challenging that and I'm
 2   going to continue to do that.
 3        MR. WOODS:  It's an objection.  I made my objection.
 4        MR. HRANITZKY:  I hear you.
 5   Q   So you're saying that, as secretary of MF Nevada
 6   for 13 years, you have no idea who the partners of
 7   MF Nevada are but you think they exist?
 8   A   Well, the only reason I know it's exist is
 9   because I have some document of MF Corporate Services,
10   not here but in the office, where I have the Article of
11   Organization and some information who is the shareholder,
12   but I don't have any other document.  So I assume that
13   partners are the shareholder.
14   Q   But the word here is "partner."  It's not
15   "shareholder"; right?
16   A   Well, I will tell you, the Spanish people, they
17   call "partner" everything.  So partner can be the
18   shareholder.  Partner can be the couple.  I understand
19   their vocabulary or they try to say.
20   Q   So your understanding of this letter is that
21   Ms. Solano meant shareholders --
22   A   Yeah.
23   Q   -- when she used the word "partners"?
24   A   Yeah, that's what I think so.
25   Q   And that would be the shareholders in MF Nevada
```

www.oasisreporting.com          OASIS REPORTING SERVICES, LLC          702-476-4500
dc74d275-ad77-447e-ba82-6c4d6092d860
Electronically signed by Ellen Goldstein (001-341-679-7457)

Page 69

```
1    listed in the Articles of Incorporation?

2       A    Not the Articles of Incorporation because I

3    believe they are not listed there.

4       Q    Listed in the document?

5       A    Whatever document they have.  I don't have any

6    document of that.  So they probably refer to any party.

7    I don't know.

8       Q    Well, you said a few minutes ago that you have a

9    document, not here but back in the office, that lists the

10   shareholders in MF Nevada; right?

11      A    Yeah.

12      Q    Didn't you just say that?

13      A    Uh-huh.

14      Q    So do you or do you not have that document back

15   at the office?

16      A    I have the name, but I don't have any documents,

17   documents.  I don't have any bylaw of this company on me.

18      Q    But you have the names?

19      A    But I have the name.

20      Q    And those names presumably are on a document,

21   yes?

22      A    No.  They are in the writing, not in a document.

23      Q    Well, if it's in a writing, that's a document,

24   isn't it?

25      A    Well --
```

Electronically signed by Ellen Goldstein (001-341-878-7437)
www.oasisreporting.com     OASIS REPORTING SERVICES, LLC     702-476-4500
dc74d275-a377-447e-be82-fc4e60f20890

Page 70

```
1       Q    Unless it's on a cassette tape; right?

2       A    No, no cassette tape.

3       Q    So there's a document with those names somewhere

4    back in your office?

5       A    Somewhere, yeah.

6       Q    And the names --

7       A    With the name of the company I tell you,

8    Timberlane Associates.  I don't remember even the name,

9    the correct name.

10      Q    And that document lists the names of the

11   shareholders in MF Nevada?

12      A    No, that document don't list any shareholders.

13   It's a name with a document with a company, that's all,

14   and lists who are the shareholders.  I don't know nothing

15   about it.  I know the name because that's what they say

16   in the little corporate kit I saw.  And I came to work

17   for this company after it was incorporated, after

18   everything was settled, so I don't have that information.

19   Never give it to me.

20      Q    Okay.  So when you said before that you have a

21   document that lists the names of the shareholders, you

22   didn't mean that.  Is that what you're saying?

23      A    Say that again, please.

24      Q    I said, when you testified before that you have

25   a document back in the office that lists the
```

Electronically signed by Ellen Goldstein (001-341-878-7437)
www.oasisreporting.com     OASIS REPORTING SERVICES, LLC     702-476-4500
dc74d275-a377-447e-be82-fc4e60f20890

Page 71

```
1   shareholders, you didn't mean that?
2       A    Yeah, no.
3       Q    You're changing your answer now?
4       A    Yeah, I change my answer.  I never have a
5   document with a list of the shareholders, never.  I only
6   know the name of the one, that one.
7       Q    That's Timberline?
8       A    Yeah, but I have no idea who are the name of
9   that company.
10      Q    You said you only have one and you identified
11  Timberline?
12      A    Well, Timberlane is the only company I familiar
13  with who is the shareholder.  If you ask me who own that
14  company, I don't have no idea.
15      Q    Are there any other shareholders besides
16  Timberline?
17      A    I don't have no --
18      Q    You don't know?
19      A    No, I don't know.
20      Q    But you're the secretary of MF Nevada?
21      A    Yes, I do.
22      Q    And you don't view that as being part of your
23  job as the secretary to the board of directors of
24  MF Nevada?
25      A    Probably was part of my job and I try to find
```

Page 72

```
1   it, but they never give it to me.
2       Q    Okay.  Could you look at paragraph 3 of this
3   letter.
4       A    Of this one?
5       Q    Yes.  It's the letter dated August 31st, 2007
6   that we've been talking about.
7       A    Uh-huh.
8       Q    You see paragraph 3?
9       A    Yeah.
10      Q    It refers to Mossfon International Retirement
11  Plan.
12      A    Uh-huh.
13      Q    So are you covered under the Mossfon
14  International Retirement Plan?
15      A    Well, I try to find my 401K or something here
16  and it was not convenient, and they say they have some in
17  Panama for the other employee, and voluntary I choose to
18  be in this one.
19      Q    So you're covered by the Mossfon International
20  Retirement Plan?
21      A    But my plan is separate.  It's a voluntary plan,
22  I mean not with the rest of them, because I'm not part of
23  Mossfon.
24      Q    I didn't ask you that.  I asked you are you
25  covered by the Mossfon International Retirement Plan?
```

## Page 73

```
 1        A   I have a different plan of retire in Panama.
 2   They don't call Mosson International Retirement Plan.
 3   They call different.
 4        Q   So this letter is wrong; is that what you're
 5   saying?
 6        A   I believe the letter is wrong because they
 7   probably offer the 4 percent of contribution to their
 8   international plan, but in myself, I'm in different plan
 9   with a 4 percent.  So I'm not employed with them, so I
10   have to be in separate plan.
11        Q   So where Ms. Solano from human resources says in
12   her very carefully written letter that Mosston will
13   contribute 4 percent of your salary as long as you save
14   the same amount, you're saying that she's just wrong.  Is
15   that right?
16        A   Probably she's wrong.
17        Q   Probably she's wrong?
18        A   Uh-huh.
19        Q   You're not sure?
20        A   I'm not sure because she called the retirement
21   plan different than the plan I have.
22        Q   Do you receive any statements or other
23   documents --
24        A   Yes, I receive my statements.
25        Q   -- from the retirement plan?
```

## Page 74

```
 1        A   Yeah.
 2        Q   Does it have sort of a name of a plan on the
 3   statement?
 4        A   Yeah.  It's called different.
 5        Q   Well, do you know where the 4 percent comes
 6   from?
 7        A   From my check.  I send it from my check.
 8        Q   But you give 4 percent and somebody else gives
 9   4 percent; right?
10        A   Mosston -- MF Corporate Service pay the
11   4 percent.
12        Q   So in this letter where Ms. Solano says Mosston
13   will contribute 4 percent of your salary as long as you
14   save the same amount, you're saying she's wrong?
15        A   She's probably wrong on this paragraph because
16   she mention the Mosston International Retirement Plan
17   when I have different plan.  The only thing is the amount
18   is correct.
19        Q   But it's not Mosston that contributes 4 percent?
20   That's what you're saying?
21        A   No, yeah.
22        Q   So you're saying she's wrong about that?
23        A   She's wrong about the name of the retirement
24   plan.
25        Q   But I'm not asking you that now.  You already
```

www.oasisreporting.com
Electronically signed by Ellen Goldstein (001-341-678-7457)
OASIS REPORTING SERVICES, LLC
702-476-4500
dc74a275-4a77-4d1e-ba82-fc4e6692d860

Page 75

```
1    said that.  Now I'm asking who contributes the other
2    4 percent to the retirement plan.
3        A    MF Corporate Service.
4        Q    Okay.  So when Ms. Solano says it's Mosston that
5    contributes 4 percent --
6        A    It's wrong.
7        Q    You're saying she's wrong?
8        A    Yeah.
9        Q    So Ms. Solano is wrong about a lot of things in
10   this letter.
11       A    Yeah.  Even the address of the letter is wrong
12   too.  We don't have an office in Nevada -- in Reno,
13   Nevada, never.  I never was in Reno, Nevada.
14       Q    How did you get this letter?
15       A    By E-mail.
16       Q    Could you look at the last paragraph of the
17   letter.
18       A    Uh-huh.
19       Q    Do you see it says, "The partners are very
20   pleased with your performance and commitment and count on
21   your assistance for many years to come"?
22       A    Uh-huh.
23       Q    You're saying that you have no idea who those
24   partners are.  Is that right?
25       A    Yeah.  I assume it's Timberline.
```

Page 76

```
1        Q    You think that it's Timberline is very pleased
2    with your performance and commitment and counts on your
3    assistance for many years to come?
4        A    Uh-huh.
5        Q    Have you ever met anyone from Timberline?
6        A    No.
7        Q    Then how could they possibly be very pleased
8    with your performance and commitment?
9        A    MR. WOODS:  Objection; that's obviously speculation.
10            THE WITNESS:  Well, because they believe how I manage
11   the company.  That's what I believe it is.
12            BY MR. HRANITZKY:
13       Q    Well, if you don't know who they are, how could
14   they possibly know how you manage the company?
15       A    They have -- I don't know.  I do a good
16   performance on the work and they probably know.
17       Q    But you don't know who they are?
18       A    No, I don't know who they are.
19       Q    And they're making the decisions about your
20   employment package?
21       A    Yes.
22       Q    And they're pleased with your performance?
23       A    Uh-huh.
24       Q    And your fate is in their hands, as it were, but
25   you have -- you don't have a clue who they are?
```

Page 77

1    A.   No.  I don't know where they are and I never

2    meet them.

3    Q.   Does that make you uncomfortable at all?

4    A.   Many times, yeah, I wish I know them, where they

5    are.

6    Q.   Do you ever read in the newspaper reports about

7    Mossack Fonseca being involved in money-laundering

8    activities?

9    A.   I don't read the newspaper for foreign, but I

10   get some information about it; but when I decide to get

11   hired for this work and they told me who will be the

12   client, I checked them and was a very prestigious law

13   firm.  So I really don't believe they are in any -- you

14   know, laundering money.

15   Q.   Okay.  Well, but you've read those allegations

16   in the news, have you not?

17   A.   Yeah.  I read many allegations about everything

18   and maybe I sometimes have to believe half of what they

19   say.

20   Q.   All right.  But you don't believe them even

21   though you don't really know who the people are; is that

22   right?

23   A.   Well, I know other people there and I know

24   they're very good attorneys when I go for my meeting.

25   So -- and I learn that their job they do and it's

---

Page 78

1    completely against to that, so they're very particular to

2    choose a client.

3         MR. HRANITZKY:  Why don't we take a break.

4         (Brief recess taken.)

5         (Plaintiff's Exhibits 2, 3, 4, 6, 7 and 8 were

6    marked for identification by the Certified Court

7    Reporter.)

8    BY MR. HRANITZKY:

9    Q.   Just a couple of quick follow-up questions from

10   before the break and then --

11   A.   So go back to the same paper?

12   Q.   No, you don't have to go back.

13   A.   Okay.

14   Q.   Do you know when MF Nevada was created?

15   A.   Probably May 2000 or 2001.  I'm not sure.

16   Q.   Not long before you started there?

17   A.   Uh-huh.

18   Q.   And one other question:  You said before that

19   you're currently the only employee of MF Nevada that you

20   know about?

21   A.   At the moment.

22   Q.   There were two others in 2011 and 2012?

23   A.   Yeah, and 25 and 26 before we got employees --

24        THE REPORTER:  I didn't understand you.

25        THE WITNESS:  (Through the interpreter)  During 2005

www.oasisreporting.com
Electronically signed by Ellen Goldstein (001-341-676-7457)          OASIS REPORTING SERVICES, LLC          702-476-4500
                                                                     dc74d275-a077-447e-ba52-fc4e6052d880

Page 79

1 or '6, that I don't recall.

2     (In English) I have -- we have more

3 Q   All right. And what did those employees do?

4 A   The same. They are assistant, like a clerk.

5 Q   Was there ever a time where you reported to

6 someone at MF Nevada who was an employee of MF Nevada?

7 A   (Through the interpreter) Can you please repeat

8 the question. Sorry.

9 Q   Was there ever a time when you reported to

10 another employee at MF Nevada?

11 A   (Through the interpreter) That I would have had

12 to report to another MF Nevada employee?

13 Q   Yes, another MF Nevada employee who was senior

14 to you at MF Nevada.

15 A   Yeah, I believe Nancy.

16 Q   At the very beginning?

17 A   At the very beginning, yeah, she was my direct

18 boss.

19 Q   And that was for a short time?

20 A   Yeah, that was for a short time, yeah.

21 Q   All right. So I'd like you to take a look at

22 the document that's been marked as Exhibit 2. I think

23 you have them out of order. You may have them out of

24 order.

25     Do you recognize Exhibit 2?

Page 80

1 A   I recognize my picture.

2 Q   Other than your picture, you've never seen this

3 document?

4 A   No. I see this document was in magazine at

5 UNLV.

6 Q   Did you speak to UNLV about this advertisement

7 before it was released?

8 A   Yes. They call me if I can help them to give my

9 story in order to promote paralegal course.

10 Q   The paralegal program at UNLV?

11 A   Uh-huh, and I say yes and I'm glad to do it, so

12 I speak with different -- two people in the phone I

13 believe. I don't remember many detail because that's

14 long time ago, and I give a little bit of my story, but a

15 lot of these thing, they're not true.

16 Q   Okay. When was that?

17 A   May 2010 or 2009. I don't remember.

18 Q   Did they take the picture for this or did you

19 give them a picture?

20 A   No. They take my picture. I have to go to a

21 special place to take the picture.

22 Q   It's a good picture.

23 A   Yeah. I keep it.

24 Q   But you think it was about 2009?

25 A   I don't remember. 2009 maybe. I don't

Page 81

```
 1    remember. Was like around Christmastime probably because
 2    I remember being very busy around that time.
 3         Q    Did you discuss the fact that you had been asked
 4    to agree to this advertisement with anyone at Mossack
 5    Fonseca before you --
 6         A    No.
 7         Q    -- said yes?
 8         A    No, no, I never discuss with them because I
 9    thought it was something personal of myself and I don't.
10    No, I didn't.
11         Q    Well, when you spoke to the people who prepared
12    this advertisement, did you mention Mossack Fonseca?
13         A    Maybe. I don't remember, but I mentioned there
14    I was working for MF Corporate Services and I provide
15    service for Mossack Fonseca maybe. I don't remember
16    exactly, but here is not right.
17         Q    So what in this advertisement do you believe is
18    mistaken?
19         A    Okay. The vice president and vice president for
20    MF Corporate Services; I was at that time, because now
21    I'm a secretary. And also, I didn't work for Mossack
22    Fonseca. I worked for MF Corporate Services when I was
23    vice president at that time and I provide service for a
24    very prestigious law, Mossack Fonseca International.
25         Q    You've never seen MF Nevada referred to as the
```

Page 82

```
 1    Nevada office of Mossack Fonseca?
 2         A    If you see my letter before, you see
 3    they calling --
 4         Q    You're talking about Exhibit 1?
 5         A    Talking about this.
 6         Q    At the end, the letter --
 7         A    They call Mossfon Nevada. Well, it's a big
 8    mistake.
 9         Q    I'm asking something different. I see that.
10    Let's put it back in order.
11    different.
12         The letter in Exhibit 1 dated August 31, 2007
13    refers to Mossfon Nevada and you say that's wrong?
14         A    That's very wrong.
15         Q    Okay. I'm asking you something different. I'm
16    asking you whether you've heard -- ever heard MF Nevada
17    referred to as the Nevada office of Mossack Fonseca?
18         A    Not from me.
19         Q    You've never heard it referred to that way?
20         A    I don't refer Nevada office of Mossack Fonseca.
21         MR. WOODS:  Just make sure you're answering the
22    question.
23    BY MR. HRANITZKY:
24         Q    I didn't ask you if you do. I asked you if you
25    had ever seen it referred to that way.
```

Page 83

```
 1            A    Not that I can remember, nor can I pay
 2   attention.
 3            Q    So you don't recall ever seeing that?
 4            A    Well, I don't pay attention probably, no.
 5            Q    You don't pay attention even though you're the
 6   secretary of MF Nevada?
 7            A    I am, but no.
 8            Q    You said that you used to be the vice president
 9   of MF Nevada?
10            A    Uh-huh, secretary and vice president.
11            Q    How long were you vice president?
12            A    Don't remember.  For a short period of time
13   because probably in the next renewal I changed.  I don't
14   like to be a vice president of anything, so I changed.
15            Q    All right.  But you said this letter or this
16   advertisement dates from around 2009?
17            A    Yeah.  So probably at that time probably I
18   changed after that.  You know, at that time I was vice
19   president of MF Corporate Service Nevada.
20            Q    Had you been vice president all the way from
21   2001 to the time that this advertisement came out?
22            A    Maybe.
23            Q    You don't remember?
24            A    I need to check.
25            Q    Were you vice president when you started at
```

Page 84

```
 1   MF Nevada?
 2            A    Yes.
 3            Q    And you were vice president when this
 4   advertisement came out?
 5            A    Probably.  I don't know, yeah.
 6            Q    Were you vice president and secretary at the
 7   same time?
 8            A    Yes.
 9            Q    Did you have any other titles?
10            A    No.  Just manager like I do now.
11            Q    So you had three titles, manager, secretary and
12   vice president?
13            A    Uh-huh, yes.
14            Q    And now you have two titles?
15            A    Yes.
16            Q    Manager and secretary?
17            A    Yes.
18            Q    And it was your decision to stop being vice
19   president?
20            A    Was not my decision, but the person hire me,
21   Nancy, she file the document with the Secretary of State
22   and she put that title; and then I decide -- I don't
23   remember when -- I decide it was too much title.  The
24   Secretary of State only asks you for secretary, president
25   and treasurer.  Why I want to use two titles?  Even I
```

Page 85

1 don't have space to put it in, so I decide to choose for
2 secretary.
3   Q   But it was your decision --
4   A   My decision.
5   Q   -- to stop being vice president?
6   A   Yes.
7   Q   And it was as simple as that. You just had too
8 many titles and you wanted a shorter title?
9   A   Yeah.
10  Q   Who did you discuss that with?
11  A   Don't remember that time. Probably with the
12 president at the time and I told him this look ridiculous
13 to have two title. In the Secretary of State file it's
14 not needed. And at that time told me, "Yes, go ahead,
15 change it."
16  Q   So you probably discussed it with the president
17 of MF Nevada?
18  A   Yeah. Probably I informed him I want to make
19 some change.
20  Q   And then you just did it?
21  A   And I did it, yeah.
22  Q   Did anyone else have to sign off --
23  A   No, no.
24  Q   -- or you just did it?
25  A   No, I have to sign it, but I informed them.

Page 86

1   Q   Okay. Could you look now at the document that's
2 been marked as Exhibit 3.
3       Sorry. One last question about Exhibit 2.
4   A   Uh-huh.
5   Q   Have you ever discussed this advertisement with
6 anyone at Mossack Fonseca?
7   A   No. No, I didn't. How would be any related? I
8 thought, you know, they're going to use -- I tried to
9 call in and correct that but say it's not that important.
10  Q   But as far as you know, does anyone at Mossack
11 Fonseca even know about that advertisement?
12  A   Probably not.
13  Q   Did you ever consider that mentioning Mossack
14 Fonseca in an advertisement like that might have been a
15 breach of paragraph 4 of your employment contract?
16      MR. WOODS:  I'm going to object. She testified
17 earlier she didn't know about the employment contract.
18      THE WITNESS:  I didn't pay attention probably. I
19 don't thought it was necessary, but --
20      BY MR. HRANITZKY:
21  Q   Okay. So Exhibit 3, Exhibit 3 is an E-mail from
22 you to "Nevada office MF" dated January 17, 2014, is that
23 right?
24  A   Can I ask you, when you refer to "MF," is
25 MF Corporate Services?

Page 87

1    Q    I'm reading from the top of the document itself.

2         A    Nevada office MF Corporate Services, yeah.

3         Q    It says "Nevada office MF."

4              Yeah.

5         Q    Right?

6         A    MF Corporate Services.

7         A    It doesn't say "MF Corporate Services." It says

8    "Nevada office MF."

9         A    Well, this is our domain name.

10        Q    Okay.  But the document says "Nevada office MF";

11   right?

12        A    Uh-huh.

13        Q    Okay.  Then next to it is an E-mail address,

14   Nevada@mfcorpserv.com.

15        A    Uh-huh.

16        Q    Do you see that?

17        A    Yes.  That's our domain name.

18        Q    So mfcorpserv.com is the domain name for

19   MF Nevada; right?

20        A    Yes.

21        Q    Does anyone other than MF Nevada use that domain

22   name?

23        A    Myself, because I use

24   pamunategui@mfcorpserv.com.

25             They mean MF Corporate Services Nevada.  That's

Page 88

1    just a short name of the company and the domain name.

2         Q    So who is Nevada@mfcorpserv.com?  Who is that?

3         Q    Whose E-mail address is that?

4         A    It's the general E-mail from MF Corporate

5    Service Nevada.  My secretary can see it and I can see

6    it, and difference of the other one what is my personal

7    E-mail.

8         Q    Who besides you and your secretary can see

9    E-mail that comes in to Nevada@mfcorpserv.com?

10        A    (Through the interpreter)  Incoming E-mails or

11   outgoing E-mails?

12        Q    Let me ask the question again.

13             Who besides you and your secretary has access to

14   E-mail that goes to Nevada@mfcorpserv.com?

15        A    Me and her.

16        Q    Nobody else?

17        A    Nobody else.

18        Q    Is there anyone besides you and then this

19   Nevada@mfcorpserv.com that has an E-mail address with the

20   mfcorpserv.com domain name?

21        A    No.

22        Q    Those are the only two E-mail addresses in the

23   world --

24        A    I have another E-mail address with the

25   mfcorpserv.com, but it's us two.

Page 89

```
 1    Q    So it's Famunategui@mfcorpserv.com and

 2    Nevada@mfcorpserv.com and that's it?

 3    A    No.  It's another one from my office in Wyoming.

 4    We have an office in Wyoming called

 5    Wyoming@mfcorpserv.com.

 6    Q    Wyoming@mfcorpserv.com?

 7    A    Uh-huh.

 8    Q    How long has the Wyoming office been around?

 9    A    Two or three year.

10    Q    Do you have a position with the Wyoming office?

11    A    Yeah, the same.  I'm running the office.  I'm

12    the head office of the Wyoming office.

13    Q    So you're the secretary of the --

14    A    No, because it's different company.  It's

15    different entity.

16    Q    Do you have a position with that entity?

17    A    I don't remember.  I don't think so.  Maybe,

18    maybe I'm the manager.  I don't know.  No, I don't have

19    any position.

20    Q    Okay.  But you said you're the manager?

21    A    Yeah, a manager.

22          (Through the interpreter)  I work as the

23    manager.  I also manage that office too.

24    Q    Is that managed -- is that office in Wyoming?

25    A    Yes, it is.
```

Page 90

```
 1    Q    So do you go to Wyoming for that?

 2    A    Uh-huh.

 3    Q    How often?

 4    A    Depend on how I need it.  Once a month or less

 5    than once a month.

 6    Q    Do you have a separate employment contract for

 7    that job?

 8    A    Not at all, no.

 9    Q    That's part of your overall job?

10    A    My overall.

11    Q    Okay.  And when you receive -- do you receive

12    directions or instructions on behalf of clients in your

13    job with the Wyoming entity?

14    A    Well, Wyoming is another product.  I sell it, so

15    I try --

16          THE REPORTER:  I'm sorry.  I'm not understanding.

17          THE WITNESS:  (Through the interpreter)  It is a

18    marketing product that I thought it would be useful; and

19    the effort to sell it, it's my own.  If someone asks a

20    company in Nevada, I also say why not offer them one in

21    Wyoming.

22          BY MR. HRANITZKY:

23    Q    Well, when you get -- do you ever get

24    instructions to set up a Wyoming corporation?

25    A    Yes.
```

Electronically signed by Ellen Goldstein (001-341-673-7457)

Page 91

```
 1    Q    Who do those come from?
 2    A    Same, Iris Vergara.
 3    Q    That's all I was asking.
 4    A    Same production or marketing.
 5    Q    Do you see at the bottom of Exhibit 3 it says,
 6   "Patricia Amunategui, head of Nevada office"?
 7    A    Uh-huh.
 8    Q    So I asked you before have you ever heard
 9   MF Nevada referred to as the Nevada office and you said
10   no.
11    MR.  WOODS:  I need to object.  I think that
12   mischaracterizes what you said before.  You asked
13   it had been referred to as the head of the Nevada office
14   of Mossack Fonseca, which is not the same question that
15   you just asked.
16    THE WITNESS:  I will respond this question.
17    I choose to bring all my signature "head of the
18   office Nevada" or "head of the office Wyoming" because it
19   better on marketing.  I don't want anybody in the
20   client thinks I'm the only person in the back.  You look
21   better if you put head of the office.
22   BY MR. HRANITZKY:
23    Q    So it was your decision to put "head of Nevada
24   office" --
25    A    Yes.
```

Page 92

```
 1    Q    -- under your signature on E-mails?
 2    A    Yeah.
 3    Q    Okay.  So you have seen MF Nevada referred to as
 4   the Nevada office?
 5    A    Yeah, but I don't mean to repeat on that.
 6   That's what he say.  I call head of the office because --
 7   I know there are more people under me, the president, but
 8   I want to know this is the head of this -- the people, I
 9   mean my -- I'm the only one work, so I want to look like
10   I have more people, look more professional.
11    Q    So you decided to do that so that it's not
12   obvious to people who receive these E-mails that you're
13   the only person working?
14    A    Yeah, yeah.
15    Q    I see.
16    A    I think look more professional.  It's a
17   marketing thing.
18    Q    I see.
19    A    (Through the interpreter)  I think the I.T.
20   person had proposed that to me and I thought it would be
21   a good idea.
22    Q    Okay.  Could you look now at Exhibit 4.
23    A    Okay.
24    Q    This is a -- have you seen Exhibit 4 before?
25    A    No.  I try to read it in that time.  This is the
```

Page 93

```
 1     first time I have this document in my hand.
 2  Q     Okay.  By the way, I forgot to ask, had you seen
 3     Exhibit 3 before I showed it to you?
 4  A     Yeah.  I provide that.
 5  Q     Okay.  So back to Exhibit 4, you've never seen
 6     Exhibit 4 before?
 7  A     No, never.
 8  Q     Do you see in the second paragraph -- you see
 9     there's a reference to a virtual client portal and the
10     client information portal?
11  A     Uh-huh.
12  Q     Do you know what that's talking about?
13  A     Something.  I'm not familiar, but I think
14     something.
15  Q     Well, so what do you think?
16  A     The client can pay invoices for whatever
17     their -- they buy in a portable thing so it's easy for
18     them to pay.
19  Q     So they could pay invoices online?
20  A     Online, yeah, something like this.  I never know
21     how is.  I don't have access to do it, but I think
22     something like this.
23  Q     Okay.  Then reading down, you see in the one,
24     two, three -- fifth paragraph there's a reference to
25     Mossfon Trust Corporation?
```

Page 94

```
 1  A     Okay.
 2  Q     Have you heard of Mossfon Trust Corporation?
 3  A     I heard the name, yes.
 4  Q     What is Mossfon Trust Corporation?
 5  A     I think it's another company.  They do different
 6     services, but I don't know.
 7  Q     Have you ever interacted with anyone --
 8  A     No.
 9  Q     -- at Mossfon Trust Corporation?
10  A     No.
11  Q     Have you ever been to Mossfon Trust Corporation?
12  A     No.
13     MR. WOODS:  Was that a "no"?
14     THE WITNESS:  No, no.  I know exist, but I don't
15     know.  I don't know even what they do.  I don't have no
16     idea what it is.
17  BY MR. HRANITZKY:
18  Q     Well, if you don't know what they do, it's
19     possible that you may have been there and not know it?
20  A     Well, maybe, but I don't know.  I don't deal
21     with this department.
22  Q     As far as you know?
23  A     As far as I know, yes.
24  Q     What about in the next paragraph, do you see the
25     reference to Mossfon Asset Management SA?
```

Page 95

```
1    A    Well, I believe it's another department and I
2  don't know either.  The same.
3    Q    You believe that's another department?
4    A    Sorry, another company.
5    Q    Another company?
6    A    Uh-huh.
7    Q    Do you know what Mossfon Asset Management does?
8    A    No, not even close.
9    Q    Have you ever interacted with anyone from
10  Mossfon Asset Management?
11   A    No.
12   Q    Okay.  We can move to Exhibit 6 and, by the way,
13  we're skipping Exhibit 5.
14   A    So no more here?
15   Q    Yeah, we're done with 4.  We're skipping 5,
16  so --
17   A    (Through the interpreter)  We're skipping 5?
18   Q    Yeah, we don't have a 5 because I'm not going to
19  use my 5.
20   A    Okay.
21   Q    So you see -- have you seen the document marked
22  as Exhibit 6 before today?
23   A    Uh-huh.
24   Q    You have seen this before today?
25   A    No.
```

Page 96

```
1    Q    Today is the first time you've seen this?
2    A    Today is the first time I see that, yes.
3    Q    Do you see it's called Trust Services?  Do you
4  see that?
5    A    Trust Services?  Oh, yeah, okay.
6    Q    I'm going to represent to you that this is a
7  document that's available on Mossack Fonseca's Web site.
8  I'm not asking you to agree.  I just want you to --
9    A    Yeah, yeah.
10   Q    I'll just represent to you that we found it
11  there.
12   Q    You see the -- under "Trust Services" first it
13  reads, "As part of the Mossack Fonseca Group, Mossfon
14  Trust Corporation is a fiduciary entity regulated by the
15  banking superintendence of Panama since 1993."  Do you
16  see that?
17   A    Yes.
18   Q    And then below it lists various services, trust
19  services --
20   A    Uh-huh.
21   Q    -- that that entity provides.
22   A    Uh-huh.
23   Q    And one of them is "corporate services."  Do you
24  see that?
25   A    Yes, uh-huh.
```