# EXHIBIT A

CRIMINAL COMPLAINT

TO THE PUBLIC PROSECUTOR:

Elisa Maria Avelina Carrio, Adrián Perez, Héctor Flores, Elisa Carca, Patricia Bullrich, Fernanda Gil Lozano, Fernanda Reyes, Fernando Iglesias, Elsa Siria Quiroz, Susana García, Fernando Sanchez, and Juan Carlos Morán, constituting domicile for purposes of this proceeding at Calle Rivadavia 1829 piso 4, Autonomous City of Buenos Aires, hereby appear before you and respectfully set forth as follows:

I.- SUBJECT:

That we hereby file a formal criminal complaint for purposes of investigation of the behavior of Messrs. Néstor Kirchner, Julio De Vido, Claudio Uberti, Rudy Ulloa Igor, Ricardo Jaime, Cristóbal Lopez, and Lázaro Báez for the probable perpetrating of the offenses characterized in Articules 210, 174, 248, 249, and 265 of the Penal Code and/or other possible acts of corruption by reason of the facts hereinafter set forth.

II.- FACTS:

The investigation requested, for the offenses of Criminal Conspiracy, Violation of the Duties of a Public Official, and Business Matters Incompatible with Public Office, characterized in Articles 210, 174, 248, 249, and 265 of the Penal Code, respectively, and/or the criminal classification that may be discovered in the investigation requested at the discretion of the Honorable Public Prosecutor, is related to the events that we shall describe below:

To introduce this complaint, it can be said that just as in the 1990s corruption was perpetrated through the banks and the financial system, in the era of Néstor Kirchner it is based on murky public works transactions perpetrated by him and persons close to him.

We shall describe a new matrix of transactions executed by the high authority of the Executive Branch from the end of 2003 to date and having three basic characteristics:

**- Corporate concentration in various sectors of the economy;**

**- Acquisition of strategic companies by entrepreneurs until then unknown and close to President Kirchner; and**

**- Presentation of said operations to the public as operations of a government that defends the State.**

Thus looting can be perpetrated by coopting of the apparatus of government by speculators and concentrated economic groups, many of them without business backgrounds or with obvious increases in assets starting in 2003 with the arrival of Kirchnerism in the government, circumstances that are evidenced herein by the production of financial reports of the companies in question.

According to Weber, this group of patterns, not embodied in law, is established in a new pattern of domination called Patrimonialism.

This pattern "impedes the rational economy because of the individuality of its management," since it "hinders the existence of rational provisions of law whose continued existence can be assumed, because of the typical absence of a formal professional administrative organization and the broad scope of material discretion and the purely personal discretional acts of the sovereign and the administrative body. Moreover, when renting of positions reigns, the official is immediately obligated, for purposes of profitable management of his capital, to employ any medium of exaction, including those that are most irrational in their effects."

In other words, persons holding positions of power rise to occupy roles in government, taking over the rights and assets of the State and transforming them into personal rights and assets.

This is the reason for the rise during the Kirchnerist management of what is called the "patrimonialization of the State," which involves this group of current patterns or political practices that conveniently erase or blur, as a general rule, the difference between public and private, permitting disposition of the former in complete disregard of the rules and laws established for the management of the *res publica*.

In December 2003 we complained in the investigation report on "La distribución de la Obra Publica-clientelismo o política de estado" [Awarding of Public Works Projects – Clientelism as State Policy] of how the administration of Néstor Kirchner and Julio de Vido benefitted friendly companies, with total indifference to good public administration practice, efficient administration of the public pocketbook, and compliance with the rules and regulations governing State procurement and contracting.

In this regard it has been shown that, as always, it is the same companies, functioning as holding companies, that impose prices, increasing considerably the costs of public investment, with total passivity on the part of the contracting State.

## 1- Establishment of the Ministry of Federal Planning, Public Investment, and Public Services

Decree No. 1.283 dated 24 May 2003 amended the Ministries Law and established the Ministry of Federal Planning, Public Investment, and Public Services.

In this context, the change of structure was presented to society as a fundamental aspect of the policy of Néstor Kirchner in the government. By means of this new stratum it would be possible to "...reflect with greater precision the measures of government established, particularly with respect to planning of public investment aimed at a balanced geographic development embodied in federalism..."

By means of various Decrees the former president transferred to the Ministry of Planning budgeting and competences held by other portfolios. This caused Julio De Vido to become the most powerful official after Kirchner, with authority over funds in excess of P$35,800 million, according to the 2008 budget.

Exemplifying these factors, the following table shows the growth of public investment during the Kirchner years:

Inversión Pública en obras - Obras por Rubro (En millones de pesos)

| MINPLAN | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | EJEC/TOT 2008 |
|---|---|---|---|---|---|---|---|---|
| TOTAL ANUAL | 759 | 1.877 | 3.924 | 8.160 | 10.770 | 12.927 | 17.913 | 100% |
| % DE CRECIMIENTO | | 147% | 109% | 108% | 32% | 20% | 39% | |
| OBRAS VIALES | 224 | 477 | 1.054 | 1.903 | 2.357 | 3.208 | 4.553 | 25,42% |
| OTRAS OBRAS DE ENERGÍA | | 131 | 423 | 447 | 756 | 1.821 | 3.476 | 19,40% |
| VIVIENDAS | 375 | 703 | 1.170 | 3.095 | 3.224 | 2.928 | 2.975 | 16,61% |
| OBRAS DE SANEAMIENTO | 8 | 20 | 77 | 103 | 481 | 626 | 1.158 | 6,46% |
| INV EN INFRAEST. FERROVIARIA | | | 68 | 565 | 311 | 451 | 1.021 | 5,70% |
| OBRAS HÍDRICAS | 45 | 237 | 311 | 476 | 638 | 687 | 847 | 4,73% |
| INVERSIÓN MINERA | | 0,04 | 0,23 | 19 | 217 | 161 | 161 | 724 | 4,04% |
| OBRAS DE INFRAEST. MUNICIPAL | | 48 | 37 | 121 | 302 | 368 | 577 | 3,22% |
| ESCUELAS | | | 4 | 105 | 247 | 329 | 550 | 3,07% |
| GASODUCTOS | | | | 35 | 383 | 440 | 493 | 2,75% |
| OCCOVI | | | | 29 | 251 | 340 | 481 | 2,68% |
| OTRAS OBRAS DE LA S.O.P. | 93 | 188 | 484 | 294 | 522 | 361 | 393 | 2,20% |
| LÍNEAS DE ALTA TENSIÓN | | | 91 | 445 | 628 | 765 | 226 | 1,26% |
| ARQUITECTURA | | 4 | 6 | 12 | 30 | 75 | 118 | 180 | 1,00% |
| OBRAS EN PUERTOS | | 7 | 29 | 18 | 38 | 130 | 92 | 125 | 0,70% |
| EMERGENCIAS INUNDACIONES | | 3 | 28 | 79 | 106 | 119 | 86 | 77 | 0,43% |
| UNIVERSIDADES | | | | | 14 | 41 | 41 | 40 | 0,22% |
| OTRAS OBRAS DE TRANSPORTE | | | 10 | 77 | 137 | 144 | 106 | 19 | 0,11% |

*Los montos del 2008 son estimados en base al presupuesto vigente al 31 de Mayo de 2008-Pagina oficial del Ministerio de Planificación Federal, Inversión Pública y Servicios Públicos.

[Left column, reading down:]

Total for year; % of growth; Roads and highways; Other energy projects; housing; sewerage; investments in railroad infrastructure; hydro-electric projects; mining investments; municipal infrastructure projects; schools; gas pipelines; highway

concessions regulatory agency; other Department of Public Works projects; high-tension lines; architecture; port installations; emergencies; floods; universities; other transport projects

[Caption:] The 2008 amounts are estimated on the basis of the budget in effect at 31 May 2008 – Official web page of the Ministry of Federal Planning, Public Investment, and Public Services

Along the same lines, the following chart reveals a phenomenal development of the budget:

**The budget does nothing less than reveal the operating method that the Kirchner government established for the portfolio held by Minister Julio De Vido. Since 2003 the Executive Branch has been presenting a false budget forecast that among other things contemplates continual re-allocations of funds by means of "super powers" or the delegation of powers**.

As an example we can mention the fact that during 2007, by means of Emergency and Necessary Decrees issued by Kirchner, or Administrative Decisions by Alberto Fernández, De Vido's coffers grew by P$10.084 million, 76.2% more than was approved by the Legislature for this period. It should be noted that these funds were distributed on the basis of a unilateral, arbitrary, and hegemonic decision by the aforementioned officials.


**2- Concentration of Economic Groups Involved in Public Works:**

In considering the complex operation of Argentine public works, we must recognize as a distinctive pattern the concentration of the economic groups involved.

As is shown and evidenced in the business reports annexed to this complaint, many of these groups have a fluid personal link with Néstor Kirchner and a visible business relationship with one another, which allows them to be partners and opponents, depending on the bids that they hope to win.

This system of business and friendship dates from the days when Néstor Kirchner was governor of the Province of Santa Cruz. It moved to the national level when he became president in May 2003.

When we consider the country as unit of evaluation, we see that during the Kirchner period the companies who have won the largest number of road and highway bids are the companies that operate in his province.

During the Kirchner administration, bids began to assume a pattern characterized by:

1. **Economic concentration;**
2. **Competition by the same corporate groups in bids; no new bidders;**
3. **Little difference in the prices offered by the companies;**
4. **Alternating awards;  overcharging.**

We find an example of this situation in the opening of the bid for the paving and repaving of the intersection of Provincial Route No. 5 and National Route No. 3. Three construction companies presented bids: Kank y Costilla P$ 8,984,206.80, GOTTI S.A. P$ 8,911,932.74, and Esuco P$ 9,112,398.58. GOTTI S.A. was awarded the bid.

Along the same lines, if we take roadwork projects as an example, we find that all the bids awarded were concentrated among seven companies. We explain later the percentage of participation of each company in the overall picture.

**Percentage by number of Projects in real numbers**

We find the same situation when we take as an example the execution of the Federal Housing Plan, managed by Ministro Julio De Vido.

The First Public Works Report prepared in 2004 by the undersigned and annexed hereto as documentary evidence used several indicators to show that the provincial and national governments, both under the influence of Kirchner, paid extremely high overcharges for work of lesser value.

In the report we showed that "Taking Río Gallegos as a base, and keeping in mind the fact that national official data provide for an original budget item of P$56,000 for housing and that ultimately the bid cost in the province totals more than P$100,000 and P$150,000 for low-cost housing. A decision was made to compare it with the real-estate market values in the city. Merely by way of example we found that a house with all the conveniences was priced at approximately P$800 per square meter. This situation is widely known, because it reveals more than 100% in major overcharges in the Federal Plan housing built by the Province. The current president of the Instituto de Desarrollo Urbano y Vivienda Provincial [Institute for Urban Development and Provincial Housing] is the Architect Carlos Santiago Kirchner, a cousin of the President…"

Subsequently, in November 2005, an updated report was presented, also annexed to this complaint, which reported steering and corporate concentration as customary practices of the Kirchner administration, via the following methodology:

1. The unit amount awarded exceeds the unit amount specified in the official budget;

2. Construction companies have been awarded bids even though because of their prior history they were not authorized to bid. One example is Gotti SA, which, because it is a debtor of the government, does not meet the requirements for suppliers to the government, a situation that is likewise evidenced in the annexed documentation;

3. Arbitrary allocation of public works by jurisdiction;

4. Absence of strategic public-investment planning.

**3. The relationships of Néstor Kirchner**

We list below the business and personal relationships of Néstor Carlos Kirchner, organizer and director of the possible conspiracy that we are asking be investigated.

**- Lázaro Báez:** It has been shown that his fabulous growth and economic expansion occurred after the start of his relationship with Néstor Kirchner, then Governor of Santa Cruz. He is his friend, partner, and cornerstone in the network of business transactions outlined in this complaint.

It has been shown that in 1990 the only tangible assets of Mr. Báez were a Ford Falcon '72 and a modest house in which he was living with his family in Río Gallegos, very different from the smart house in which Báez now lives, with voice-controlled lighting, 2,000 blue cedar trees for landscaping, and dozens of guards.

It was during the 1990s that Báez began a solid friendship with Néstor Carlos Kirchner.

According to newspaper articles, annexed hereto, Lázaro, a junior officer with Banco de Santa Cruz, and Kirchner, then in the Río Gallegos government, established a link of mutual interest. Báez passed provincial bank information on to Kirchner, and Kirchner introduced him to a world of important contacts, a key factor in business. The relationship prospered, and so did the bank accounts of both men.

Thus he began with provincial positions, moved on to million-peso public works, and ultimately to million-peso oil bids, and was catapulted into prominence as one of the most successful entrepreneurs of the past four years.

In 1991, with Kirchner newly elected as governor, Lázaro Báez was rewarded with the position of assistant manager of Banco de Santa Cruz, just one step below general manager level, and a position in which Báez held omnipotent power during the controversial privatization of Banco de Santa Cruz .

As general manager and strongman of the provincial bank, Báez carried out its privatization in a way that was profitable for entrepreneurs with good connections with Kirchner. On the one hand he transferred to the provincial government a debt of P$170 million that had originated in uncollectible loans made to various companies, including Gotti S.A. The principal beneficiary was Enrique Eskenazi, who ended up with a debt-free bank and who in addition continued to be the financial agent for the province.

Interestingly, it was in 2003 that Lázaro Báez established Austral Construcciones S.A., which opened for business on 8 April 2003 with stock capital of only P$12,000, according to the legal notice published in *Boletín Oficial de la Nación* N° 30.151.

Since its opening this company has already won bids totaling more than P$3,500 million.

As if this were not enough, already in August 2003 Austral Construcciones was awarded the concession for two oil fields in Formosa, and in February 2007 it was awarded three more in Santa Cruz. At the present time it owns an oil company with a daily output of more than 50 million cubic meters, and almost 10 million cubic meters of gas.

On 11 August 2003, the Ministry of Federal Planning authorized Benito Roggio e Hijos S.A. to transfer the CON-14 "El Chivil" and CON-7 "Surubí" oil fields to Misahar Argentina, one of the oil companies owned by Báez. (The other is EPSUR.) These

companies as well as Austral are domiciled at Calle Carabelas 241. Thereafter controversial bids were won, including the award of 15 oil fields in Santa Cruz, where Epsur was awarded Río Guenguel, Meseta Cerón Chico, and Sur Río Deseado.

On page 18 of the Minutes of Austral Contrucciones S.A., there is an entry indicating that "In the City of Buenos Aires, Capital of the Argentine Republic, at 9:00 a.m. on the 10th day of the month of June 2005, the Board of Directors of Austral Construcciones SA met for the purpose of establishing a trust of which Austral Construcciones is investor trustor, for the purpose of building ten functional horizontal units in the building owned by Néstor Carlos Kirchner …, within a period of 12 months starting from 1 July 2005, for an estimated investment of  P$700,000, with the understanding that upon completion the company will receive five functional units..."

Thus there is no doubt that during his term of office Néstor Kirchner had a commercial company with an entrepreneur that profited from public works of his government.

The sources reporting this action include in particular the newspaper *Perfil*, which describes a magic circle in which the central figure is Néstor Kirchner, and which includes "... a major corporate group that invoices in unison with and answers to a single person:  Lázaro Báez. These companies were named by the Administración Federal de Ingresos Públicos (AFIP) [Federal Administration of Public Revenues] and are being investigated for tax evasion and presumed payment of bribes."

According to what has been said in the preceding paragraphs,  Lázaro Báez of Austral Construcciones SA is the leader of the "corporate pool" that controls Palma SA, Gotti S.A., Gancedo S.A., Kank y Costilla S.A., and Badial SA.

All this is evidenced in the investigation carried out by the AFIP, which proved that P$500 million was invoiced by Gotti S.A. via phony invoices issued by shell companies, thereby relieving Gotti of the obligation to pay P$120 million in VAT. In addition to Gotti SA,  la General Tax Administration also determined that Austral Construcciones, Badial SA, Gancedo SA, all connected with Báez, and Cristóbal Lopez's Casino Club SA had used bogus invoices. All these companies lead to Nestor Kirchner.

According to the AFIP, Sergio Gotti, a minority shareholder in Austral, evaded payment of more than P$500 million, a charge that was paid by Gotti SA, the company that was founded by his family, and which went bankrupt but maintained the trade name and was absorbed by Invernes S.A, acidly referred to in the South as "Inversiones Nestor" [Néstor Investments] and controlled, at least on paper, by Guido Blondeau of the Báez Group.  Gotti, Austral, and Invernes share a registered office on the fifth floor of the building at Calle Carabelas 241 in Buenos Aires. All of them are under investigation in connection with the Skanska case and for tax crimes connected with apocryphal billings.

It is important to emphasize that Gotti S.A. participated in 53 bids for public-works contracts awarded between 2002 and 2007 for a total of P$627 million. Five of these contracts, totaling P$300 million, were let by the Highways Department of Santa Cruz province. The provincial Instituto de Desarrollo Urbano y Vivienda [Institute of Urban Development and Housing] commissioned 40 projects for $239 million, while eight

additional contracts totaling more than P$86 million were awarded by the Institute and approved by a sub-deparatment that reports to Minister Julio De Vido.

Lastly, it should be noted that many of the other projects were billed, as can be seen, to companies such as Austral Construcciones S.A, Palma (in the name of Diego Palleros, brother-in-law of Lázaro Báez), Gancedo, and Kank y Costilla S.A.

The foregoing is confirmed in the Minutes of Austral Construcciones, which reveal the range and the movements of the Báez companies, in which everything is interconnected. On more than one occasion, both Palma and Gotti assigned and waived contracts to the benefit of Austral Construcciones. Generally, the mechanism was used to prevent official confirmation that the projects were always awarded to one and the same company, and thereby to conceal the presumed payment of bribes. The same occurred with the collection fees for certifications of projects awarded to Gotti, which ultimately were collected by Austral.

**The cartelization of public works is evidenced by the following transcription, the documentation for which is annexed:**

• On page 11of the Minutes of Austral Construcciones, an entry states: "…on the 10th day of the month of February 2005 the Board of Directors of Austral Construcciones SA approved and formally signed the SUB-CONTRACT FOR EXECUTION OF PROJECT in which GOTTI SA contracted AUSTRAL CONSTRUCCIONES for the following projects: 1. Repaving of Ruta Provincial 5-Tramo Km 23; 2. Ruta Nacional 40-Tramo Cancha Carrera-Pte. Rio Turbio…"

• On page 11 of the Minutes of the Board of Directors meeting held on 14 February 2005, PALMA SA assigns to, transfers to, and waives in favor of Austral Construcciones the project contracts for  (a) 42 Viviendas [Housing Projects] Convivir and (b) Viviendas Convivir Sector 1

• On page 21 of the Minutes of the Board of Directors meeting at which Juan Felipe Gancedo SA assigns and transfers to Austral Construcciones the contract for Housing and Infrastructure Project No. 63 in the Sector Ejercito-Río Gallegos Sector.

The same operation appears in the project for paving of the second section of Provincial Route 7, a project that involved almost P$171 million and was awarded by [sic] "Sucesores de Adelmo  Biancalani," a company closely connected with the construction company of one of the partners of Kirchner, Lázaro Báez.  Biancalani sold 60% of his family company in a partnership with Báez, whose construction company, Austral, is managed by engineer Julio Mendoza, a native of Chaco.

According to market sources, this project as well was greatly overcharged.  The P$166,958,079.74 budgeted for its execution is exorbitant, given the purpose of the project: 57 kilometers of paving in this zone, plus the entrances and junctions for the highway. To take one example, P$42,318,634 was budgeted for the paving of 25 kilometers of Route 4, also in Chaco. The arithmetic is lapidary. The cost of one kilometer of asphalt for "the Kirchner route" was P$2,929,089.10 pesos. The same item on Route 4 costs P$1,692,745.36.

**- Cristóbal López:** We would not be mistaken if in describing Cristóbal López we associated him with Néstor Kirchner and Julio De Vido and with the same way of using power: manipulation and political corruption, economic concentration, disregard of rules and regulations, and exerting of pressure on circumstantial opponents or detractors.

For this reason we are complaining of and describing the complicity of  Néstor Kirchner in all aspects pertaining to the benefits, prerogatives, and privileges that his government has given to companies in the Cristóbal López group.

Thus we cannot avoid referring to the dizzying social mobility, rise, and economic enrichment of López in recent years.

At the age of 18 Cristóbal López was selling chickens and vegetables in Comodoro Rivadavia. Then the hands of Armando "Bombón" Mercado (ex-husband of Alicia Kirchner) and Diego Ibáñez touched him with the magic wand of public works and government concessions that enabled him to accumulate the fortune he now enjoys.

At the present time he owns casinos and slot-machine halls in 19 Argentine cities, breeds mixed-race horses, an oil company and a hydrocarbons transport company, a waste removal company, a tourist agency, and two passenger transport companies in the cities of  Neuquén and Comodoro Rivadavia. He manages a television channel, owns the newspaper *El Chubutense*, has technology and construction companies, and owns olive groves and large areas of land.

He got into the gaming business in 1992, in his native Chubut, during the administration of the radical Carlos Maestro, when he established the Casino Club together with Ricardo Benedicto, an entrepreneur related to the Kank y Costilla construction company, one of the principal beneficiaries of public works awards in Santa Cruz province and with proven links with Minister De Vido and Lázaro Báez. In Chubut, he has gaming halls in Trelew, Playa Unión, Rawson, Rada Tilly (where Cristóbal López lives), and Comodoro Rivadavia.  In Santa Cruz, during the Kirchner days, he had gaming halls in Río Gallegos, Caleta Olivia, and El Calafate.

His interests in the energy business are held mainly through two companies, Oil M&S, a provider of services chiefly to Repsol, and Clear S.A, operator of the Cerro Negro deposit.  Oil M&S started in the province of Chubut as a company providing complete solutions to the Argentine hydrocarbons and mining industry. Established only seven years ago (2001), its largest volume of business was done when Kirchner came to power. Its President is Cristóbal Manuel López, and its Directors are Carlos Fabián De Sousa, Muriel Lucia Sosa de López, and  José Antonio Tasca.

Detractors of López point out that in 2005 he accounted for less than 1% of the national hydrocarbons output. Those who prefer to take the long view call attention to the importance of having won a bid in Brazil in the past, and, looking to the future, his financial possibilities and his direct contact with the Kirchners.

On 17 November 2006 the Santa Cruz government called for national and international bids on 15 oil fields. This procedure was organized with a speed that was flagrant and unusual in events of this type:
a)  The envelopes containing the offers were opened only 23 business days later (both

the law and practice specify an average that should range between 60 and 90 days for preparation of offers, and the fact is that Repsol and Petrobras requested an extension, which was not granted to them), and the strange requirements of the call for bids were analyzed there, requirements that violated the principle of competition, fundamental in guaranteeing transparency in bids, thereby avoiding skewing of the requirements to benefit some bidders to the detriment of others;

b)  The successful bidder would have to have a minimum of 30% regional capital ("regional" meaning that the successful bidder would have to be established in Santa Cruz, Chubut, or Tierra del Fuego);

c)  In the pre-award formula, if the company had 100% regional capital, its points were increased in a way that could not be surpasssed by any competitor, even one offering an extremely high investment or large royalties;

d)  No objective parameter of technical evaluation was required. In other words, it did not matter if the successful bidder had extracted oil, loaded gasoline, or managed a general warehouse;

e)  The documentation was evaluated by a committee established for the purpose.

The scandal, described by Jorge Lanaga in his article "El pozo no quedó vacante" [The well didn't run dry], was so flagrant that in a discussion with industry representatives, Juan Bontempo, Provincial Minister of Economy, announced, "I'm taking the envelopes to Buenos Aires for De Vido to make the decision."

The transaction involved an investment of US$130 million for a return guaranteed for 25 years, since most of the fields were known to have oil.

Earlier,

> in January of 2006, at the close of Stage A, the government announced the names of the bidders that had passed the first-stage procedure: Oil M&S, Epsur, Misahar, Geopark-Costa, Inwell, and Estrella. When the second stage ended in February, Inwell and Estrella were out. And in March, when Envelope C was opened, it was clear that Oil M&S, Misahar, and Epsur (established on 2 December 2005 ) had won it all: three companies but only two persons, Cristóbal (López) and Lázaro (Báez). Well, not all: One field was voided, since good training indicates one should not lick one's plate afterwards....

A corollary of the foregoing is the employment relationship of López's oil company with Ezequiel Espinosa, fellow-traveler of Antonini Wilson and president of ENARSA, the state oil company, a relationship evidenced by pension contributions recorded in the records of the national pension system ANSES from the month of May 2007 until at least the month of November. It should be noted that Oil M&S S.A. is a private oil company that has presented offers in at least one of ENARSA's calls for bids, which could generate "conflicts of interest" between his private activity and his role as public official.

During the  Néstor Kirchner administration this entrepreneur was the beneficiary of:

• Concessions of natural resources by means of irregular steering procedures contrary to law;
• Extension of concessions outside of the terms and administrative proceedings specified;
• Use of government security forces as shock brigades available to the companies, in violation of law and the integrity of workers;
• Complicity with the head of the GCBA with respect to exercise of his jurisdiction in gaming matters given the trampling on autonomy on the part of the national government;
• Managed calls for bids and violation of the principle of competition;
• Absence of checks on companies belonging to the Cristóbal López group by government agencies, including the Ministry of Labor, the AFIP, the National Lottery, the Department of Energy, and ANSES, among others.

On 5 December 2007,  Néstor Kirchner performed one of his last and most resounding acts of government. He personally signed Decree No. 1851/07, which extended until 2032 the concession of the Hipódromo de Palermo operation to Cristóbal López.

The wording of the decree contains several features that are not only unlawful but which also casually reveal the intention of the government to benefit an entrepreneur above and beyond all rules, forms, and decorum.  As evidence, we shall transcribe several revealing points contained in the introductory paragraphs:

• The concession was awarded in 1992, for a term of 25 years. So it would have been in effect until 2017, had not Kirchner renewed it ten years before its expiration date;

• The success of the electronic machines that  Hipódromo de Palermo S.A. was authorized to install is fully quantifiable, in terms of both income and attendance of the gambling public;

•  It is thus evident that gaming generates funds that are then distributed by the Ministry of Social Development;

•  In relation to the preceding statement it is necessary to add that the undertaking authorized generated a large number of real jobs;

•  Lotería Nacional SA (LNSA) issued Resolution No. 31/07, which instructed the Palermo concessionnaire to increase the number of electronic machines, given the needs of the gaming market;

•  Hipódromo Argentino de Palermo SA expressed a series of considerations with respect to the short period of time remaining until the end of the concession awarded (ten years), which would allow it to amortize the losses it had suffered;

•  From the very nature of the business it can be deduced that the gaming operations must be operated in accord with the tastes of the gambling public, which are fickle;

•  In conformity with what has been said, the operation must be intensified, since at the current time demand exceeds supply.

From what has been said above, it is evident that Néstor Kirchner adopted as his own the self-contradictory arguments put forward by the company. This situation, together with the question of jurisdiction, could generate the conditions for requesting nullity of the decree, namely:

• President Kirchner renewed a concession for games of chance ten years early and in the closing days of his administration;

• One of the factors taken into account by Kirchner was the generating of jobs that he considered to be real jobs. This was done concomitant with departures of company workers who reported improper working conditions and labor harassment;

• In his decree the president instructed the company to purchase more game machines, thereby interfering in the company's business strategy and management and thus confounding the public with the private;

• The president adopted as his own the contention of the company that it had suffered losses, the argument on which the request for extension was based. Notwithstanding, immediately thereafter and in the same legal document, he urged the company to install more machines to meet the demand of gamblers, which in his understanding exceeded supply. Lastly, this is the same company that in its magazine *Casino Club* acknowledged its large profits, stating that "...the percentages of public attendance at the Casino Clubs in proportion to the number of inhabitants of each city also exceed those in most of the casinos of Europe and Latin America...;"

• In his decree the president also interprets the customs of slot machine gamblers in saying that the company must adopt to the changeable tastes of the clientele.

Thus Néstor Kirchner as president of all the Argentines based this juridical disruption on falacious arguments of a partner, arguments obviously unsuitable for the head of a country. The intervention of Casino Club in the Hipódromo de Palermo has nothing to do at this time with the horse-racing crisis in Argentina and is not in a state of emergency, inasmuch as the profits earned by the company from the start of operation to this date are known and are large.

This reveals the intention of Néstor Kirchner to generate the most favorable conditions aimed at increasing the value of the company for subsequent sale outside the country. Any type of concession has a specified value depending on the time remaining, and this extension, on the conditions already described, appears to accord with this strategy.

**Rudy Ulloa:** His relationship with Néstor Kirchner began when he was working as a junior member  in Kirchner's law office. Subsequently he became Kirchner's private secretary in the Río Gallegos regional government. Years later, when Nestor Kirchner was governor of the Province, he was named Director of the El Carmen Community Center that reported to the Ministry of Social Affairs, headed by Alicia Kirchner.

As is shown in the financing report of the ARI 2003 campaign, annexed hereto as evidence,  Rudy Ulloa together with Claudio Uberti and Julio De Vido became spokespersons and collectors for the campaign of the Kirchner – Scioli team.

A study of the documentation shows that Julio De Vido, making using of information concerning unlawful activities engaged in by CONARPESA when Espinosa was a member, requested through Ulloa extortion/financial collaboration of US$60,000 from Cacho Espinosa, owner of the Pesquera San Isidro fishery.

In exchange, Rudy Ulloa promised to obtain fishing permits for him, along with the operation of a Río Gallegos Urbana line. Ultimately the US$60,000 was paid in three installments, the first being paid to Ulloa and the others to Claudio Uberti.

Ulloa's social climb is dizzying, from his beginnings as a newspaper salesman to a 2001 report that he held, in his name, a fixed-term deposit of P$1,302,055.60 with Banco de Tierra del Fuego, money that Néstor Kirchner subsequently acknowledged was his.

The companies known to be his and in his name include provincial media with important national and provincial advertising accounts, including the periodical *Austral*, the El Carmen FM radio station, and the Cielo production company. He also operates the local signal of Channel 2 of Río Gallegos—the cable channel owned by Supercanal S.A.—the content for which is provided by his own production company. In 2005 he established two companies: CUMEHUE, which engages in financing operations and which has a starting capital of P$30,000, and EL PERIODICO, registered in the *Boletín Oficial*, issue number 3902 for 29 September 2005, which he owns together with Carlos Long, a lawyer who also has a close relationship with Néstor Kirchner.

This newspaper salesman, leader of the Frente para la Victoria political party, and secretary to Néstor Kirchner transformed himself, surprisingly, into an entrepreneur with sufficient economic power to make an offer of close to US$320 million for the purchase of TELEFE, at a time when Néstor Kirchner was dealing with the farm crisis and needed a presence in the communications media.

**- Claudio Uberti:** In Claudio Uberti we find the same common denominator that characterizes the other members of the Conspiracy complained of: humble origins, link-up with Néstor Kirchner, subsequent growth of net worth.

Uberti was born in the small village of Wheelwright in southern Santa Fé, close to the border of the city of Colón in the province of Buenos Aires. In the 1980s he moved to Santa Cruz province, where he formed a relationship with Julio De Vido.

In Río Gallegos he had a one-man construction company that installed ceramics and tiles. His friendship with the former presidential chauffeur Rudo Ulloa led him to become one of the Kirchner contribution collectors (the other, of course, was Rudy). His first connection with the government was, as usual, a call for bids, which he won, together with the husband of Silvia Esteban, a Santa Cruz provincial official and Frente para la Victoria party leader, to build a housing project named Cuatrocientos Departamentos. This was twenty-five years ago. The residents there still complain about defects in the project.

In 2003, Néstor Kirchner, by then President of the Republic, named Claudio Uberti to head the Órgano de Control de las Concesiones Viales (OCCOVI) [Regulatory Office for Road and Highway Concessions], the agency that supervises, inspects, audits, and monitors performance of contracts for the almost 10,000 kilometers of national

concession highways in the country, to ensure quality and proper providing of services and the protection of users and the public properties of the State. It is absolutely necessary to mention that at the time of his appointment Uberti possessed not the slightest suitability requisites that are required of of public officials, since he had neither relevant education nor relevant experience. Nevertheless, from the time of his arrival at the head of OCCOVI, Kirchner expanded the competences of the agency and issued Decree No. 1007/2003, which started a process of renegotiation of road and highway concessions.

In Decree No. 425/2003, subsequent to the appointment of Uberti, President Néstor Kirchner resolved to issue a call for bids for the road and highways awarded by concession pursuant to Decree No. 2039/90. It should be noted that a report issued by the national General Audit Office pointed out that the call for bids was viewed as irregular, particularly because of the selection and award procedure used.

In the bid the award criterion that connects "best offer" with "best price" was used. It was questioned in doctrine and legal precedent, based on the understanding that this does not always result in selection of the best supplier.

The design of the bid rules permitted modification of the bid packages and the wording of the contract during the bidding process. This does not accord with the principles of competition and equality that must govern any process of selection.  Additionally, changes were made in the Technical Specifications Offers subsequent to the award and the effective date of the concession contract. The changes, which originated in errors in the offers presented in the bid, whence the corrections,caused an economic and financial imbalance that could have made the offers unacceptable, changing the award decision.

Compliance with the eligibility condition required by the Bid Package and General Terms and Conditions and Decree No. 1023/2001 was not evaluated.

Lastly, in Decree No. 1915/2004, President Néstor Kirchner delegated to him and OCCOVI the contracting and execution of construction projects, work, and services of a public-works nature. This led to serious irregularities, also complained of by the national General Audit Office, the report of which is annexed.

As has been evidenced, Claudio Uberti is the party who promoted the link between the Argentine government and the Venezuelan government. His position in OCCOVI is functionally different from the work that he performs extra-officially. Thus, in its edition of 25 December 2005, the newspaper *Infobae* reported that Julio De Vido was promoting the candidacy of Uberti to represent our country at our embassy in Venezuela.

An example of Uberti's functions appears in the testimony of Antonini Wilson before the Courts of Miami, Florida. Wilson testified that it was Uberti who invited him on a plane ride from his country to Buenos Aires, where "we talked about the ENARSA gas pipelines." It should be noted that prior to August 2007 ENARSA had put out a call for bids for the construction of the northwest gas pipeline.
Additionally, it is proven that he played a role in the Trust agreement with Venezuela, established in 2004 and signed by Néstor Kirchner in connecton with the bilateral agreements, which will be discussed later.

This trust operates with the money that Argentina pays to Venezuela for the purchase of oil. CAMESA Compañía Administradora del Mercado Mayorista Eléctrico [Administrator of the Wholesale Electricity Market] deposited the payment for each sale in a New York account maintained by Bandes (the Banco de Desarrollo Económico y Social de Venezuela).

More than US$300 million circulates through this business. With this money, for example, the government of Venezuela purchases Argentine products, an operation that takes concrete form when signed by President Chávez.

According to the Trust regulations, 30% of the amount of the purchase is advanced to the company, which makes the transaction one hundred percent secure.  The newspaper *Perfil* for 25 February 2007 stated that the specialist who calms the anxiety caused by delays of months in the contracts is Claudio Uberti, the right-hand-man of De Vido and a key figure in the Venezuelan business. The Venezuelan counterpart of the nimble Uberti is Franklin Mendez, manager of  Bandes.  "What is outside the trust has its logic," a second-tier national government official told *Perfil*, "but what is in the trust is unmanageable. Claudio Uberti handles it all."

**4- Fake invoices and possible payment of bribes:**

The use of fake invoices is common to all the companies associated with Néstor Kirchner, De Vido, and Lázaro Baez. We need only recall the criminal action commenced against Kank y Costilla, another of the companies linked with these men, by the AFIP tax office of Comodoro Rivadavia, for large-scale tax evasion, an action in which Julio De Vido was directly involved as facilitator in the bidding procedures in Santa Cruz province.  This fact was not investigated by the Argentine courts, which almost as soon as Néstor Kirchner became president decided to acquit the members of the company upon confirmation of payment of the sum allegedly owed, without investigating the other offenses alleged in the case.

In the action, Estela Kank, one of the founders of the company, testifying as witness, confirmed that  Minister De Vido had a relationship with the Company.

This action also reveals how the company was plundered by means of forging of seals and invoices, acts that also may not have been investigated by the justice system.

It must be kept in mind that in the tax evasion maneuvers the injured shareholder was aware of a triangulation among the Comodoro Rivadavia, Río Gallegos, and Ushuaia branch of Banco de Tierra del Fuego.  This bank, previously reported for laundering of dollars, was where the accounts of the Kirchner family and Rudy Ulloa Igor were maintained.

The use of fake invoices to conceal illegal payments appears to be the circle closing a method of operation that was repeated, promoted, and concealed by means of trafficking of influences, abuse of power, and every type of pressure that Néstor Kirchner exercised on the AFIP officials who were endeavoring to investigate this type of unlawful acts. This is evidenced by numerous newspaper articles that point out that

> Some income tax offices have no confidence that the investigation will advance. At the House [the inspectors' name for the agency] various hypotheses were

considered with respect to the purpose of the companies in using phony invoices, but the most conclusive hypothesis is that the money was paid to shell companies to justify the payment of bribes...Since these are the companies that always obtain the awards of bids for public works and other business transactions outsourced by the State, in the south the hypothesis is growing that the invoices conceal the payment of bribes.

The circumstance discussed in the preceding paragraph ended abruptly with the transfer of career tax officials involved in the proceeding:

> ...the investigation into fake billing in public works and other services to the State in Santa Cruz and Chubut for a year and a half, until in May of this year the office of the president allegedly ordered a halt to the investigation begun in Comodoro Rivadavia by Norman Ariel Williams…. Then the Director of the General Tax Administration, Horacio Castagnola, ordered the immediate supervisor of Williams, Jaime Mecikovsky, the National Deputy Director of Tax Operations for the interior of the country, to "shut everything down."

Thereafter the Kirchner Government intervened in the hierarchical and administrative structures of the AFIP as follows:

• Replacement of the manager of the Comodoro Rivadavia AFIP, Norman Williams, who was investigating the Santa Cruz companies for the use of fake invoices, in a maneuver that gave rise to several legal actions involving large companies. Ultimately he presented his resignation, which was accepted on 3 June 2008 pursuant to AFIP communication No. 234/08;

• His replacement by Héctor Alejandro Sartal, acting supervisor of Taxation Division No. 4 of the Palermo Regional Office, pursuant to Communication No. 234/08;

• Jaime Mecicovsky, national Deputy Director of Tax Operations for the interior of the country, and ultimately Williams' supervisor, did not sign the appointment of Sartal, which had to be endorsed by Claudio Moroni, head of the AFIP starting on 1 August 2008;

• Both Jaime Mecicovsky and his immediate supervisor, Horacio Castagnola, head of the General Tax Administration, were removed from their posts and were reassigned to the AFIP Institute of Tax Studies;

• Castagnola was replaced by Angel Rubén Toninelli, according to sources very close to Minister Julio De Vido. There had been rumors that Castagnola was going to be replaced by Carlos Sánchez, legal adviser to Jorge Capitanich.

As a corollary of the foregoing, it should be noted that a court in the Principality of Liechtenstein investigated Austral Construcciones for money laundering. A Liechtenstein court of first instance blocked US$10 million of the company.

> The money went through Banco Macro Bansud and Sud Bank and Trust Ltd. of the Bahamas, and ended up in Hypo Investment Bank AG of Liechtenstein. The funds were deposited in an account opened by Trade 24 Ltd. of Victoria, capital

of the Republica of Seychelles, a country composed of about a hundred small islands in the Indian Ocean, northeast of Madagascar. This account was opened pursuant to an administrative requirement under international security regulations. According to this procedure, funds from the sale of heating systems were to be moved there, but ultimately the only funds that were moved were those of the Santa Cruz company. On 15 May 2006, US$10 million originating with Austral Construcciones SA of Argentina was deposited there, and the transaction did not comply with the international standards required for the operation…

The attention of the European court was called to the route taken by the money, including a purchase of securities during its passage through the Bahamas. The court investigation also focused on the reasons why the Austral Construcciones money was deposited in an account with which the Santa Cruz company did not appear to be directly involved …

It is important to emphasize that in connection with this investigation reports were requested from the Santa Fé government, which at that time was headed by Jorge Obeid, now a Frente para la Victoria  Deputy. It must be kept in mind that in the call for bids to provide bulldozers, P$51 million in major irregularities were found in connection with 140 Dinsheng Tiangong Chinese machines. In this operation Austral Construcciones through its accountant Fernando Butti established the source of the funds investigated in Liechtenstein.

The money went through Banco Macro Bansud and Sud Bank and Trust Ltd. of the Bahamas, and ended up in Hypo Investment Bank AG of Liechtenstein. The funds were deposited in an account opened by Trade 24 Ltd. of Victoria, capital of the Republica of Seychelles, a country composed of about a hundred small islands in the Indian Ocean, northeast of Madagascar. This account was opened pursuant to an administrative requirement under international security regulations. According to this procedure, funds from the sale of heating systems were to be moved there, but ultimately the only funds that were moved were those of the Santa Cruz company. On 15 May 2006, US$10 million originating with Austral Construcciones SA of Argentina was deposited there, and the transaction did not comply with the international standards required for the operation…

The attention of the European court was called to the route taken by the money, including a purchase of securities during its passage through the Bahamas. The court investigation also focused on the reasons why the Austral Construcciones money was deposited in an account with which the Santa Cruz company did not appear to be directly involved …

[sic – repetition of the two preceding paragraphs]

The hypotheses investigated as money-laundering operations included the purchase, through third parties, of securities or promissory notes involving companies of dubious reputation, which were deposited as collateral for genuine loans from banks operating legally. The maneuver made it possible to recover the money justified as legal

financing, when the collateral was money the origin of which cannot be justified in legal terms.

In view of these facts, it is noted that for the offense of fictitious invoicing the indicators of court efficiency are insignificant, since of 10,200 convictions recorded in our country in 2006, only 19 were for tax evasion, while of the total of 55,000 convictions in April 2007, only 74 involved tax evaders.

We present below the breakdown of fake invoices in the legal actions deriving from the Skanska case and originating with companies linked to Néstor Kirchner.

• Gotti has P$ 21,382,738  in possibly fake invoices, in which the shell companies are believed to be Wikan (P$8,889,836), La Nueva Argentina (P$11,664,478), and Triple T (P$828,420).

• Austral Construcciones was investigated by Judge Lopez Biscayart in one section of the case involving the invoices of the Sol Group.

• Eleprint, whose president is Gustavo Weiss, deputy treasurer of the Camara Argentina de la Construccion [Argentine Chamber of the Construction Industry], has invoices of La Nueva Argentina (P$105,209), Darom Construcciones (P$5,883,750), and Echo Argentina (P$132,139).

• Juan Felipe Gancedo SA. has P$3,030,800 in fake invoices involving the same shell companies as for Gotti S.A., including Wikan con (P$1,418,100), La Nueva Argentina (P$1,262,460), and Triple T (P$350,240).

• Petersen,Thiele & Cruz, of the Petersen group, headed by Enrique Ezquenazi, one of the maximum beneficiaries of Kirchnerism, has fake Echo Argentina invoices for P$1,524,435 and Acquasa for P$888,015, for a total of P$2,412,450.

**5. Cases of possible corruption involving Julio De Vido:**

To flesh out the facts described, it is necessary to provide a summary of various cases of corruption involving investigation into the payment of bribes during the Néstor Kirchner administration, within the sphere of the Ministry headed by Julio de Vido.

- The SKANSA case: Case No. 18.579/2006, known as the Skansa case, presents the same operating method of overcharges and evasion already described in the complaint about the business management of  Austral Construcciones.  In this action, in which Gotti SA was also mentioned, payment of bribes with fake invoices is under investigation.

It has been shown that Néstor Ulloa, general manager of Nación Fideicomisos, is involved as being allegedly the party that recommended that the Swedish company work with the Caliban-Infiniti Group, a shell company.  In the internal  memorandum for the "contracting" of Caliban-Infiniti, Gerlero wrote: ""The customer, through Fideicomiso Nación (accountant, Ulloa) recommended that for execution of the Detail Engineering and the various Manuals required by the bid package we contract people known to him, with the inevitable argument that this would be a way to acehive fluid

and unproblematic approval of the execution project." Some time later, Skanska admitted to the courts that the services of Caliban-Infiniti had been sought in order to launder "improper payments."

The first three operations of the trust took more than a year to implement, notwithstanding the fact that the US$91,300,000 involved had already been deposited in the fourth month. One of these transactions was executed by INVAP with the Philips company, a supplier of software. Another involved the Medics company, which supplied incubators for infants, and which at that time signed a contract for  US$25 million and had just finished working out an agreement for US$80 million. Still another involved the famous Ascensores Servas.

It should be noted that Ascensores Servas SA has been a supplier to the national government since 14 March 2002, and has offices in the lower concourse at Calle Alsina 909. Its balance sheet for 2004 is genuinely discouraging. It had P$5,028,640.26 in current assets and current liabilities of P$1,334,684.81; its sales totaled P$4,028,621.83; and it ended the year with a loss of P$95,260.35.

Its failures are also on record with the Oficina Nacional de Contrataciones [National Contracting Office]. On 14 January 2004 the director of the office of the Superintendent of Labor Risks suspended contracting for twelve months because of breach of contract. At the Ministry of Economy the contract was canceled when the Under-Secretary for Administration succeeded in proving that the company had forged a tax certificate of competence to contract.

The president of the distressed Servas SA is José Aizpun, the vice president is María de las Mercedes Primitiva Aizpun Noain, and its directors are Nely Gladys Dutruel, Marta de Pedro, and Cristina Romilda Aizpun Noain. Nely Dutruel is classified as "unrecoverable" by the credit rating agencies, and President Aizpun himself  has a long string  of bounced checks--3, 7, 14, and 19 December 2001, 4 and 8 January 2002,  7 and 8 February 2002, 11 March, 8 April, 7 May, and 7 June 2002—together with various loans made by Banco Nación and Banco de la Provincia de Buenos Aires.

An investigation of María de las Mercedes Primitiva Aizpun Noain, vice-president of the company, reveals that she has an extremely versatile corporate career. In addition to her position with the elevator manufacturing company, other activities for tax purposes include "retail sale of loungewear, hosiery, sleepwear and beachwear, including foundation garments, lingerie, hosiery except orthopedic hosiery, pyjamas, nightgowns and sleepsuits, bathrobes, bathing suits, etc." She too has been classified as "unrecoverable" by Banco Provincia and Citibank. Marta Elena de Pedro de Aizpun also had a  lengthy list of bounced checks in 2002.

It is at least suspect that, given these characteristics, the government of Néstor Kirchner would  introduce this company to Venezuela in the context of the Bolivarian trade agreements.

According to a Detailed Memorandum of the State of the Nation in 2005, José Aizpun, president of Servas SA, signed agreements with the Ministries of Trade and Health of Venezuela. The go-between was Uberti.

Both Uberti and the president of Servas, Aizpun, accompanied the president on his visit on 21 November 2005. At that time, according to the official agency Télam, "the gradual establishment of that Argentine company" in Venezuela was discussed.

The first stage of the agreement with Servas includes a contract for US$25 million; there is a second stage of US$30 million; and another agreement with the Ministry of Defense that includes installation of two elevators in the Miraflores Palace and in two military hospitals, for US$12 million.

- Antonini Wilson, the suitcases, and the relationship with Venezuela: Against this background, Claudio Uberti was on the flight on which Antonini Wilson tried to bring US$800,000 into the country without reporting it. Here again, Néstor Kirchner, Julio de Vido, and Uberti were involved. In the newspaper *La Nación* for 9 November, annexed hereto as evidence, Antonini Wilson relates that on the Sunday following the suitcase episode,

> Claudio Uberti came to the Sofitel Hotel around 6:00 or 6:30 in the evening. "I have good news and I have bad news," he said. I don't like it when he says this to me. "The bad news is that I can't have dinner with you because the President called me and I have to go to Olivos," he said. "But the good news is that everything is being taken care of." Uberti said that Kirchner had asked "What was the guy like?" or something like that. Uberti told me that he explained the situation, and that Kirchner added, "The guy's a whiz," or something like that, and that "since this guy has bankrolled us...we'll bankroll him until death." I thought, *'S - - t, now that the document's been signed* [the reference is to the document Wilson signed at the Aeroparque in which he said that the money in the suitcase was his] *we're disposable, and that's why we're not going to have dinner*.

> When he said that about Kirchner, I had the feeling he was saying it so that I'd feel part of the crime, you know? Him and me. But I insisted, "Are you sure this is being taken care of? You're sure?" Uberti repeated that I shouldn't worry about it, and told me, "Ask me for whatever you want. The President told me you can have a meat license." I was surprised. "A meat license?" "Look, do you remember the first time we talked?' I was surprised he remembered so much about that meeting.

> Claudio Uberti told me he could give me a meat license even though Argentina hadn't issued a license since  nineteen hundred god-knows-when. "First show me that everything's been resolved," I said to him. His answer was that the problem had to stay between us. "Alex, I want you to not say anything to Victoria," he said. "I'm not saying anything to her," I said. "It was Daniel who called her. He wanted to talk with you, or he wanted her to call on your behalf." But he said that Victoria was only a secretary and that we had to handle this between us. After we left the bar and were walking back to the hotel, he made another request. "Don't tell Diego," he said. "Why not?! He's Daniel's father! Why shouldn't he know?" And he answered that if we said anything, all the money would be cut off.

At one point I told Diego that Uberti had told me that everything was taken care of. But Diego's answer was that "We had a big problem. Things happened too fast." And he told me to go get the money.  "'Go today or tomorrow if you want. Go with the driver, take care of the business, and the rest is yours."

When we reached the hotel, I got a call from Marjorie on my cell phone. She told me to get ready because we were going to the Casa Rosada. she told me they'd pick me up in 20 minutes. Then I got a call from Victoria. "Ale!" she said—that's what she called me—"Ale, hurry up, we're arriving at the hotel." and while we were talking she came in with Marjorie and saw me at the bar and urged me to hurry. "Go just as you are, like that, in jeans! Let's go!" But I refused, and went up to change. We went to the Casa Rosada, but when we tried to drive in, they wouldn't let us through. Victoria rolled down the window, I was seated in the middle, and she showed something and said something, and they opened the gate. Before we got there Victoria telephoned while we were in the car. At the Casa Rosada I saw Uberti, De Vido, and the wife of the President, the new President [Cristina Fernández de Kirchner]. …The money was from the PDVSA party for Cristina's presidential campaign."

Question: Is it possible that the money was for bribes for Argentine officials for bilateral business deals, and not for the campaign?

Wilson: ...That's for you to analyze. But if the money was for some Mafioso, or was a bribe for Uberti, they'd have stopped me at Río de la Plata for less money than that. But I think that didn't happen to me because the owner of the money was somebody big. Why was I sent to that woman by María Cristina Gallini, Customs shift forewoman at the Aeroparque? Why were they so nice to me?

The illegal arrival of Antonini Wilson in the country is concomitant with the arrival of Hugo  Chávez to sign the liquid gas agreements for the construction of two plants at a price of US$400 million.

**The "strategic relationship" between Venezuela and Argentina is based on murky business transactions and grandiloquent statements:**

• Since May 2005 Venezuela has been buying Argentine Boden 2012 bonds. The transaction started with US$100 million, and in almost eighteen months 3,600 million Boden 2012 bonds and 400 million Boden 2015 bonds, attached to the Bono del Sur bond, have been bought. The purchase of Argentine bonds, which Chávez calls "Kirchner bonds," and which he claims are "a thousand times less risky than United States Treasury bonds," is used by the Venezuelans to get currencies out of the country. The dollar market in Caracas, theoretically controlled by the government, has a parallel pricing system. This past week  the official exchange rate was 2,100 bolívares to the dollar, the rate on the parallel market was 2,800. The Chávez government sells the Boden 2012 bonds to the banks at the official price, and then the banks turn around and sell them to their customers, but at the parallel rate. No one in Venezuela believes that the banks are the only beneficiaries of this business, and suspicions of government corruption are growing.

**6- Ricardo Jaime and the Department of Transport:** Another member of the possible conspiracy is Ricardo Jaime, appointed by Néstor Kirchner to head the national Department of Transport, which reports to the Ministry of Planning, Public Investment, and Services.

For tax purposes, Mr. Jaime declares three properties: an 81-square-meter house in Caleta Olivia, a 186-square-meter house in Córdoba, and a 49-square-meter house in Nueva Córdoba.

In *Hablen con Julio* [Talk with Julio], a work by Francisco Olivera and Diego Cabot, reference is made to an anecdote that shows how Jaime operates. They write:

> Jaime's management succeeded in modifying drastically the rules of the national transport game. Previously, the industry associations functioned merely as industry lobbies. Everything is changing. Since Jaime, the managers of each of the urban mass transit systems have in addition the obligation of going at least once a month to the association that represents them and paying what they call "the social share."

In the course of the past five years Jaime was questioned and reported for various episodes that accord with the operation described in the within complaint.

For example, Jaime was involved in presumed irregularities in the concession of railroad branch lines to the Unidad de Gestión Operativa de Emergencia Sociedad Anónima (UGOFE). According to a report by the national Office of the Attorney General in 2004, railroad concessions were awarded without call for bids and by direct railroad contract to Metrovías S.A., Ferrovías S.A.C., and Trenes de Buenos Aires S.A. Jaime is also in the sights of the Administrative Investigations Attorney (whose jurisdiction was restricted and cut back by the Kirchner government) for possible embezzlement in the form of payment of overcharges for the remodeling and rebuilding of 120 cars of the Ferrocarril Belgrano Norte railway.

A recent announcement concerned the US$850 million direct-contract purchase of subway cars from the Chinese company CITIC. The transaction covers 279 cars, which means that each car will cost slightly more than US$3 million. In this respect it is useful to mention that the State paid US$1 ½ million for each of the 96 subway cars that it purchased in the past for subway line D. Consequently, by direct contract, purchases were made and contracts were signed at the national Department of Transport that should be investigated for disregard of the overriding principles of public contracting, including economy, efficiency, transparency, competition and jurisdiction, proportion and reasonableness, and equality of treatment for bidders and parties concerned.

**Jaime's involvement in the Southern Winds case: dubious subsidies and the drug traffic**:

Southern Winds was established as a *sociedad anónima* [corporation] registered with the General Office of Justice under number 1610285. Its last registered domicile was Calle Suipacha 1111 piso 26 in the Federal Capital.

In 2000, BIXESARRI S.A., an off-shore company established in Montevideo, became a shareholder of Southern Winds. This company is believed to belong to Eduardo Eurnekián, owner of the Aeropuertos 2000 company, which contributed US$30 million to Southern Winds and then transferred these stock shares to a European company named Volare, also believed to be owned by Eurnekián.

Thus this entrepreneur held 30% of the stock of the airline through an off-shore company (Bixesarri S.A.), which was concealed behind a confidant of his, whom he placed on the Board of Directors of Southern Winds.

The difficult financial condition of Southern Winds is evident from an analysis of the company's financial statements for the fiscal years ended 30 June 2002 and 30 June 2003.

Concomitantly, in Decree No. 1654 dated 4 September 2002, the Executive Branch declared a State of Commercial Air Transport Emergency throughout Argentina for national operators subject to the jurisdiction of the national authority, for the effective term of Public Emergency and Currency Exchange System Law No. 25.561, together with other measures aimed at mitigating the acute crisis then being experienced by the industry.

Because of the shutdown of LINEAS AEREAS PRIVADAS ARGENTINAS SOCIEDAD ANÓNIMA (LAPA) and DINAR LINEAS AEREAS SOCIEDAD ANÓNIMA, and for the purpose of ensuring continuation of services to users going to various destinations, and protecting the job sources affected, the national government considered it timely to establish an air transport company. LAFSA, that would be temporarily subject until its privatization within the state orbit to the private-law system, via Decree No. 1238/03 dated 21 May 2003.

Lastly, Decree No. 1238/03 placed Julio de Vido and his Secretary of Transport, Ricardo Jaime, at the head of the company.

According to Minutes No. 1 of the Board of Directors of the company dated 30 July 2003, José Alberto Bidart, an engineer and political operative of the Minister and representative of the Ministry of Federal Planning, Public Investment, and Services, was named chairman; architect Julio De Vido was named Vice-President;  Brigadier Jorge Eduardo Baravalle, father-in-law of former Minister of Economy Roberto Lavagna,was designated by the Ministry of Economy; and, lastly, Nicolás Scioli, brother of former Vice-President Daniel Scioli, representing Intercargo, was appointed manager.

Given the stock composition of the company and the persons named to the Board, the connection and dependence between LAFSA and the national Executive Branch is in every way clear, close, and provable.

By Resolution No. 350/04 of the national Department of Transport, LAFSA was given a period of 180 days to start operations.

Subsequently, the company appeared before the Department of Transport to apply for international routes that, in some of the cases described in the drug traffic risk manuals, may be virtual distribution routes for illegal drugs. They include:

•Buenos Aires.- Asunción- Ciudad del Este (three times a week)
•Buenos Aires- Lima- Quito- Guayaquil- Caracas-Bogotá (twice a week)
•Buenos Aires-Santa Cruz de la Sierra-Caracas- Bogotá (four times a week)
•Buenos Aires-Lima-Quito-Guayaquil- Caracas-Bogotá-México-Los Angeles
(three times a week)
•Buenos Aires- Santa Cruz de la Sierra- La Paz-Caracas-Bogotá- México-
Los Ángeles (three times a week)

The company signed two sub-leases for aircraft to provide the service: one with
Southern Winds, signed on 24 November 2003, and another with Aero2000, signed on
24 March 2004.

Lastly, LAFSA signed a corporate cooperation agreement with Southern Winds, which
we shall describe later, for joint operation of the entire fleet, which in May 2004
consisted of eight Boeing 737 aircraft assigned to the domestic market and a Boeing
767 that was to cover the Madrid route.

• LAFSA-Southern Winds agreement

In mid-2003 the financial situation of Southern Winds as described and as indicated in
the financial statements was unsustainable. Given the imminence of cessation of its
operations, the "strategic" association wuth the recently created LAFSA was promoted
by, among other parties, Ricardo Jaime, national Secretary of Transport.

In mid-2003 President Néstor Kirchner took the political decision to keep Southern
Winds alive. This determination was embodied in the Corporate Cooperation
Agreement. An effort was made to conceal the political decision in a group of
statements that emphasized the healthy—and presumed—concern of the government
with maintenance of the sources of jobs represented by the former DINAR and LAPA
airlines and the intention to avoid a monopoly in the domestic aeronavigation market.

On this occasion President Néstor Kirchner said that "we are gambling on a good result;
we know the sceptics will be hoping it will fail, but we're persuaded that the quality of
the company and the quality of the employees will enable it to operate." Along the same
lines, Minister of Planning Julio De Vico claimed that "we are witnessing a
transcendental event in domestic air transport that is beginning to participate in
undertakings already experienced in other parts of the world, namely, corporate
cooperation alliances or agreements similar to this one, of which there are many in the
world."

As reported in the newspaper *La Unión*, "The President stated that despite questions
that may arise regarding the decision to subsidize the fuel of Southern Winds and the
salaries of the employees of the former LAPA and DINAR airlines that it is
incorporating can give rise to, he is giving preference to resolving the problem of 850
employees, and avoiding monopoly in an activity that requires competence." But the
facts and the contents of the agreements show that the association between Southern
Winds and LAFSA went much deeper than appeared, and went far beyond mere support
for the operation of Southern Winds.

In support of this statement we shall study the agreement:

The Corporate Cooperation Agreement between the govern-owned airline LAFSA and Southern Winds was signed on 3 September 2003, was ratified by Resolution No. 191/03 of the Department of Transport under Ricardo Jaime, and was published on page 16 of the *Boletín Oficial de la Nación* on 30 September 2003. The salient points of the agreement were that LAFSA undertook to pay the salaries of 1,000 employees of the former LAPA and DINAR airlines, 578 of whom were providing services to Southern Windows, and to pay P$3.2 million a month for fuel. This partnership, which is a poorly concealed subsidy, made it possible for Southern Windows to continue operating.

Given this situation, it is important to emphasize that the wording of the first article of the agreement indicates that the agreement goes far beyond this. The parties agree to "pool their efforts at providing aviation services and encourage distribution of the revenues produced by the effort, coordinating operating elements to improve its results by means of joint labor that will make it possible to retain staff and rehire those who are counting on the start-up of LAFSA."

Article Seven establishes an agency to coordinate the two companies, with one representative of Southern Winds, one representative of LAFSA, and on member of the Ministry of Federal Planning, Public Investment, and Services, who serves as chairman of the agency.

Thus it is clear that neither Minister De Vido nor the Secretary of Transport was unaware of the irregular operation in which the company was engaged, since they were at the head of the agency designated to coordinate adoption of joint decisions among the various participants in this corporate agreement.

As a corollary of the foregoing, we can unquestionably say that this case involved use of a company of dubious reputation, receiving subsidies approved by Kirchner and provided by Julio De Vido.

These factors prove that Kirchner's administration could not have been unaware of the characteristics and the situation of Southern Winds. The partnership was so close that it does not appear far-fetched to speak of a quasi-identity of the two companies, particularly since LAFSA had no aircraft.

The Southern Winds case is emblematic, because it not only proves the connection between the government and a company suspected of trafficking in drugs, but also because it demonstrates in perfectly clear manner how government officials made the controls on the company permeable.

The person placed in charge of this situation was Ricardo Echegaray, a confidant of Néstor Kirchner and partner of Rudy Ulloa. The appointment is evidenced in an edict published on 8 February 2001, reporting that pursuant to public instrument No. 242/00, Ricardo Echegaray, husband of Silvana Oviedo, had transferred his interest in the capital of Estación Del Carmen S.R.L, for the ludicrous sum of P$16,000, and that his wife would nevertheless continue working for the El Carmen district as the head of the Fundación Ayudemos a Mamá, which was part of the Community Center.

As in the case of Lázaro Baez, the activities indicated in Ricardo Echegaray's resumé include a stint with Banco de la Provincia de Santa Cruz, when it was a state-owned

bank. This was followed by employment with the Customs Administration, where his career leapfrogging was contrary to the provisions governing government careers, since he moved into varous positions without passing the competitive examinations, without performance evaluations, and without the necessary seniority.

In August 2004 he was appointed General Manager of Customs, a position in which he was responsible for Customs control throughout the country.

As we noted in respect of the isolating of the AFIP officials, Néstor Kirchner transferred Dr. Carballal, who had obtained her position with the Regional Office of Comodoro Rivadavia by competitive examination, and who was investigating CONARPESA, and replaced her with Dr. Echegaray.

Lastly, we note that he is the same official who acknowledged that in 2004 the Customs officials inspected Southern Winds aircraft only once.

The complicity of the officials in the case of drugs found in Spain is obvious, since clearly it is not possible to fill suitcases with drugs, explosives, or bacteriological material and bring them onto a plane, evading all controls, without the complicity of members of the government.

**The "Bullet Train"; Irregularities in the bid process:**

Very soon after taking office, by Decree No. 1261/04 Néstor Kirchner established the framework for the Plan for Reorganization, Restoration, and Modernization of the National Railroad System, within the sphere of the Ministry of Planning and the Department of Transport. In this decree the government took the decision to restore operation of the inter-jurisdictional Intercity Passenger Services, with the goal of repositioning railroads within the multi-modal transport system for the purpose of integrating the country and uniting its provinces and cities.

Subsequently, on 28 December 2005, in Decree No. 1.683, Kirchner approved the Program of Projects, Indepensable Work, and Acquisition of Goods. At the same time he promised funding for the execution of the infrastructure project and rolling stock, in accordance with schedules established for the railroad system.

However, almost four years after the implementation of this Plan, the previously existing service conditions remain unchanged, with overcharges, million-peso subsidies to concessionaires, deficient condition of tracks and units, high indicators of unsafety and deterioration of the infrastructure, all to the detriment of the quality of life of the users and the increase in the loss ratio.

Covered by the Decree mentioned above, Resolution No. 324/06 of Jaime issued on 8 May 2006 incorporated the "Complete electrification, civil engineering, roadbed infrastructure, signals and communications, and provision of rolling stock for High-Speed service in the Buenos Aires-Rosario-Córdoba corridor" project into Attachment II-Inter-jurisdictional Services of Decree No. 168305, approving the Bid Package and Terms and Conditions for the subsequent call for bids.

Article 6 of Resolution No. 900/06 of the Department of Transport provides that the offer will be made by single item and that the official budget is estimated, preliminary, and contingent upon the technical specificity of the offer and the financing offer, as follows:

a) US$1,350,000,000 for the complete High-Speed segment linking the Autonomous City of BUENOS AIRES — ROSARIO (SANTA FE province) — CORDOBA (CORDOBA province)

b) US$1,100,000,000 for the High-Speed segment linking the Autonomous City of BUENOS AIRES — ROSARIO (SANTA FE province) and the Express Service ROSARIO (SANTA FE province) — CORDOBA (CORDOBA province)

An analysis of the Bid Package reveals several features that render it discretionary, directive, and subject to changes in labor contract conditions:

• The purpose and scope of the project is not sufficiently specified. The national government delegates to bidders the performance of the engineering, feasibility, and environment studies, while the goverment has the power to specify the conditions, characteristics, and impact of the project. The absence of a special project prepared by the government makes it difficult to compare the various bidders, because a common model for comparison is not established. Thus, in the case indicated, two of the pre-qualified companies did not present an offer because of the lack of information need in order to determine the cost of the civil engineering, in addition to the tight deadline for development of an offer that complex.

• It was established that bidders would have to commit to financing not less than 50% of the total amount of the project.  This excessively ambitious requirement, used in the turnkey system, also limited and hindered participation by a variety of bidders. Consequently, one of the three bidders withdrew, citing impossibility to comply.

**In summary, of the three companies that were interested and whose presentations triggered the start of the public bidding procedure, only one met the requirements of the RFQ and was therefore able to push its project through. This is how the fiction of a call for bids that never materialized, involving companies that simulated offers but ultimately left the field free for the party that met all the Bid Package requirements, was generated. Companies close to the government participated in this scheme, already complained of by the ARI in previous investigations. The electrical engineering aspect offers one example.**

With respect to the financing, the Bid Package required bidders to specify their own and third-party sources of financing, and specified that letters of commitment formalizing and guaranteeing the proposed financing had to be submitted when the offer was presented. We should add in this connection, and shall discuss in greater detail subsequently, that on 12 July 2007 an agreement was by the Department of Transport with the bidder ALSTOM TRANSPORT SOCIEDAD ANONIMA - ALSTOM TRANSPORTE SOCIEDAD ANONIMA - ALSTOM ARGENTINA SOCIEDAD ANONIMA - IECSA SOCIEDAD ANONIMA - GRUPO ISOLUX CORSAN SOCIEDAD ANONIMA and EMEPA SOCIEDAD ANONIMA,  called GRUPO

VELOXIA, which linked the offer to financing by BANCO SOCIETE GENERALE, as part of the financing structure required by the Bid Package.

On 17 August 2007, Banco Societe Genérale presented the description of the financing structure, based on the financial markets and the conditions of the country, and Grupo Veloxia proposed financing of 80% for the electrical engineering section, provided by the bank at a rate of 5.2% per annum for a term of 16 years.

Subsequently, in Communication SF No. 236/07 dated 30 August 2007, the Department of Finance of the Ministry of Economy and Production established the requirements to be met for performance of the fnancing agreement prior to the signing of the project performance contract.

Article 2 of Decree No. 96/08, which approved the award, specified that by 26 March the Ministry of Economy and Production would have to approve the financing structure of the project, in conformity with the provisions of the memorandum of understanding signed on 12 July 2007 by the Ministry of Federal Planning, Public Investment, and Services/Department of Transport with Banco Société Générale.

This financing structure was formalized with a significant change of parties, which did not alter the intent of the government. The bank that had made the original commitment pulled out and was replaced by Banco Natixis. This event was noted in the introduction to Resolution No. 178/08 of the Ministry of Economy and Production, which stated that subsequent to the issuance of Decree No. 96/08 the Consortium that had been awarded the project replaced Banco Société Générale as financier with Banco Natixis, and through Banco Natixis presented a new financing-structure offer that expanded the term from 16 to 30 years and increased the interest rate to around 12% per annum, among other provisions.

Presumably the reasons for the withdrawal by Banco Société Générale from the operation were ascribable to the failure of Argentina to reach an agreement with the Club of Paris for cancelation or restructuring of its  US$6,500 million debt, in combination with the major crisis facing the French bank. In other circumstances, if Société Générale had advanced funds, the risk insurance for the operation would of necessity have had to be assumed by the French government through the General Treasury and Economic Policy Administration of the French Ministry of Economy, but the default by our country made it impossible for France to make the loan.

Thus, subsequent to the award the financing offer, hence one of the requirements of the offer, was modified when Société Générale withdrew and was replaced by Natixis. Thus it was a new offer, different in composition, from the offer taken into account during the process of consideration for its selection.

Doctrine is very clear on the question raised. It is understood that once the offer has been submitted and opened, effects that become duties and obligations are created for the bidder.

The opening of the bids allows the bidder to learn the identities of the other bidders and interested third parties, and the immediate consequence is that the offer cannot be

changed and there is a duty to maintain it. If the bidder does not perform these duties, it is guilty of pre-contract liability.

Thus, in contrast to what happens in civil contracting, in government contracts (and what we are analyzing here is government contracting, the contracting of public works) the rule is the opposite, since once offers have been presented they cannot be revoked, withdrawn, or changed.   This principle, which governs the bidding process, establishes the unchangeability of offers and their binding nature. It is understood to be a result of the administrative act of admittance, and is imposed on the bidders in order to protect the equality that the government must ensure for all parties involved in the bid (the bidders).

For these reasons it was improper to change the offers after the admission, because this act violates the principle of equality that must exist among bidders and must be guaranteed by the customer through the entire proceeding.

The change of the financial agent, the structure, and the terms and conditions of the financing is in our opinion a substantial modification of the offer, since this was an element required by the Bid Package, evaluated by the Administration in the pre-selection process and taken into account in the Decree approving the award (Decree No. 96/08).

By reason of the foregoing, we believe, based on the events already described, that there were various irregularities in the Bullet Train bid process, and that these irregularities affected basic principles of public contracting. Rights as equality before the law were restricted, the contract was steered to a single corporate group that was able to meet the requirements established, and the principle of competition that would have made it possible to compare various options and select the most appropriate was restricted.

Jaime's management with respect to the final price of the project was questionable. The average cost of bullet trains internationally ranges between 7 and 10 million euro per kilometer. Work was recently begun on the high-speed train linking Beijing and Shanghai. This project may require an investment of some US$21,900 million (13,740 million euro) for a stretch of 1,318 kilometers, that is, around 10 million euro per kilometer. The budget provided by Secretary Jaime is around 1.2 million euro per kilometer. This raises the suspicion that the initial price established for the offer cannot be met.

The project was awarded for a total of US$1,320,507,453 million. Ricardo Jaime tried to explain the cost of the work by saying that "...this is the cost of the project. Since we requested that it be financed, and we are talking about one to 15 years, the cost of the financing brings it to US$3,300 million. Thus, according to this questioned official, the total financing cost would triple the initial estimated cost of the project.

**Overcharges and irregularities in the performance and financing of the expansion of the high-tension transmission network, MEM-MEMSP interconnection**

- FONDO ELECTRICO DE LA PROVINCIA DE  SANTA CRUZ [Electrical Fund of Santa Cruz Province]

In 1989, Law No. 23.681 established a surcharge on the selling price of electricity. The surcharge was six per mil of the rates in effect in each period, and in each zone of the country was applied to end consumers, except those exempt from the energy taxes established by Laws Nos. 15.336, 15.574, and 19.287, and it was decided that companies that provided public electricity service would include the surcharge in their invoices to end consumers, establishing it on the total amount invoiced exclusive of any tax on electricity consumption. The companies were to act as collection agents for purposes of subsequent deposit in conformity with the regulations to be established by the Department of Energy.

The law also provided that the total proceeds of the surcharge would be allocated to Servicios Públicos Sociedad del Estado [government-owned company] of Santa Cruz province, for investment in the electrical sectors and reduction of the rates applied to electricity users served directly by the company, so that the rates would reach the average levels in the rest of the country and that when other companies or entities came into existence that provided direct services to end users and did not belong to Empresa Servicios Públicos Sociedad del Estado de Santa Cruz, Empresa Servicios Públicos would transfer the amounts collected pursuant to this law from those companies or entities, in the appropriate proportions. That is, Santa Cruz province benefitted from the six per mil surcharge up to its interconnection with the Sistema Interconectado Nacional (S.I.N.) [National Interconnected System].

The project was approved when Néstor Kirchner was mayor of Río Gallegos, two years after  his arrival in government.

That is, the spirit of the law was to subsidize the Santa Cruz electrical energy service and to invest in connection projects. The reason was that the Patagonian province was not connected with the Sistema Argentino de Interconexión (SADI) [Argentine Interconnection System], and consequently the inhabitants of Santa Cruz were paying a considerably higher amount for lighting.

While since that year millions of pesos (pesos and dollars until the 2001 devaluation) have been flowing into the province, and local users have been paying a lower price for the service, the cost of electrical energy continues to be a major expense for the people of Santa Cruz, often triple the charge paid in other parts of the country.

In November 2005 the Centro de Educación al Consumidor (CEC) [Consumer Education Center], a consumer association, complained to the courts that 483 million pesos of the Santa Cruz electrical fund had been diverted from their original purpose. This was money collected in the form of a surcharge on all Edenor, Edesur, and Edelap invoices. The plaintiffs pointed out that the money was being applied to subsidies when it was supposed to be used for projects. They also filed a criminal complaint against Secretary of Energy Daniel Cámeron. The CEC reported that "At that time (November 2005) the Department of Energy stated that in 15 years P$367 million would be collected, of which P$342 million would be returned to Santa Cruz. But the first contradiction occurs here, because the Department then said that they used an average of P$32.3 million per year, which adds up to P$483 million in 15 years."

The CEC also demanded that the Department of Energy supply detailed information on the matter. The Department failed to respond, and the CEC commenced an action for

failure to supply information. On 1st November the Department furnished a report. "The Department said that an average of P$32.3 million per year was used, but P$27.9 million per year was allocated to rate subsidies in Santa Cruz, and this was not the only objective of the law. The funds with specific allocations were used for other purposes."

Newspaper articles moreover indicated that a breakdown of the average of P$4.4 million per annum that the Department of Energy claimed it used for projects shows that the projects consisted of distribution centers, sub-stations, public lighting, and high-tension and medium-tension lines, and had nothing having to do with interconnection. There was only one project, involving 15 kilometers of high-tension lines, that could be considered to be within the purpose of the law.

At the present time the person in charge of the government-owned Servicios Públicos Sociedad del Estado (SPSE) is Julián Osorio, a former Kirchnerite candidate for the post of mayor of El Calafate. Meanwhile, the interconnection projects announced in 2001 were begun in 2005 and have advanced. On 05 January 2008 President Cristina Kirchner came to Pico Truncado to inaugurate the high-tension connection of the city of Puerto Madryn, the first Santa Cruz locality to be connected with the national line. The strange thing is that this was done 19 years after receipt of these contributions, and the Fund into which they went provided minimal funding that has no relation to the amount and does not accord with the real purpose of the funding.

The National Treasury contributed P$90,890,000 in 2004 and P$445 million to the project during 2005. These funds were transferred from jurisdiction item number ninety-one, corresponding to obligations of the Treasury to the Comité de Administración del Fondo Fiduciario para el Transporte Eléctrico Federal [Committee for the Management of the Trust Fund for Federal Electrical Transmission].

The establishing law, Law No. 23.681, already indicated that the contributions of all lighting users in Argentina had to be invested in projects. Decree No. 1378/01, the executive order for this law, provided that the surcharge established in Article 1 of Law No. 23.681 "shall remain in effect after the actual interconnection of Santa Cruz Province for the period necessary in order to cover the costs of the project connecting this Province with the Sistema Argentino de Interconexión (SADI) [Argentine Interconnection System].

This Decree states that this money "shall go into a trust fund the sole and exclusive purpose of which is to manage the allocations resulting from this project." But the projects were financed with contributions from the nation.

We consider it necessary to note that in recent months the electric-light rates have been increased.

Therefore, with respect to this latter point, we have to ask: Was reduction of Santa Cruz electricity rates not one of the purposes of the Fund established by Law No. 23.681?

**EL FONDO DE SANTA CRUZ A TRAVÉS DEL TIEMPO**

| | |
|---|---|
| 1989 | 65801 |
| 1990 | 3229397 |
| 1991 | 12741426 |
| 1992 | 29433058 |
| 1993 | 20270000 |
| 1994 | 23925572 |
| 1995 | 24373698 |
| 1996 | 23819897 |
| 1997 | 26414351 |
| 1998 | 26511377 |
| 1999 | 22808032 |
| 2000 | 26200000 |
| 2001 | 26200000 |
| 2002 | 23897002 |
| 2003 | 26199999 |
| 2004 | 26200000 |
| 2005 | 35000000 |
| 2006 | 35000000 |
| 2007 | 35000000 |
| **TOTAL** | **447.289.610** |

[The Santa Cruz Fund, 1989-2007]

In 1989 the law established only the percentage of the tax (0.6 per mil), Thereafter, however, Law No. 25.064 placed a ceiling of P$26,200,000 on the amount transferred to Santa Cruz. During the Néstor Kirchner administration the ceiling was increased to P$35,000,000.

The surplus went into the coffers of the National Treasury and were used for discretionary purposes. notwithstanding the fact that it was the responsibility of each Secretary of Energy, including the current Secretary Daniel Camerón, to manage the funds properly and appropriately. It should be noted that it was the Government Accounting Office that was supposed to intervene with respect to the Santa Cruz funds sent out of the county, and its activity was questioned while its composition, with most of its members being officials, may have been a determining factor.

The financing for the construction, operation, and maintenance of the 500 Kv Extra-High-Tension Line between Pico Truncado and Puerto Madryn is believed to have been financed by the Fondo Fiduciario para el Transporte Eléctrico [FederalTrust Fund for Federal Electrical Transmission] (96%), Santa Cruz (3%), and Chubut (1%).

FEDERAL ELECTRICAL ENERGY TRANSMISSION PLAN

The Federal Transmission Plan of June 2001 expanded the purpose of the Fondo Federal de Transmisión [Federal Transmission Fund]. The financing of projects important for the reliability of the Sistema de Transporte de Energía Eléctrica [Electrical Energy Transmission System] was therefore included.

Five lines that were eligible for full or partial financing by the Fondo Fiduciario para el Transporte Eléctrico Federal were announced for that date: Comahue-Cuyo, Noroeste-Noreste, Cuyo-NOA (Minera), MEM-MEMSP (Patagónica), and Región Atlántica-Buenos Aires, for a total initial length of 2,934 kilometers.

Additionally, the regulatory framework of the Federal Plan consisted in the system of open invitation to bid, which was to be respecified by the Department of Energy that same year in order to proceed with the negotiations.

In subsequent years the Transmission Plan underwent changes in both the consideration of the existing lines and the inclusion and elimination of others. In 2003 there were changes in the Patagónico System, because during the Néstor Kirchner administration a decision was taken (Resolution 831/03) to add another new line to the Plan between the Puerto Madryn and Pico Truncado transformer stations, to be financed with contributions by the Treasury.

In November 2003 Law No. 25.822 formally ratified the Federal Transmission Plan. It also provided that:
• Funds received by CAMMESA under the Federal Electricity Plan, and funds placed by Law No. 24.065 under the management of the Federal Council, had to be made available immediately to the Council;
•  The Department of Energy was authorized to take the regulatory measures necessary in order to start work on the Federal Transmission Plan, especially to anounce the 180-day notice of opening of bid for the Comahue-Cuyo line and the first section (Mendoza-San Juan) of the Minera line.

The process began in mid-2003 when the Department of Energy, using as benchmark the Federal Transmission Plan, instructed the Federal Electrical Energy Council to study and draft a "Schedule of Indispensable Projects for the 2004-2008 Five-Year Period" that would provide solutions for the Regional Electrical Transmission Systems.

As we have already pointed out, Resolution No. 831/03 of the Department of Energy incorporated into the 500 kV Federal Tranmission Plan the extra-high tension interconnection between the  Puerto Madryn and Pico Truncado Transformer Stations, thereby extending the Mercado Eléctrico Mayorista-Mercado Eléctrico Mayorista Sistema Patagónico (MEM-MEMSP) [Wholesale Electrical Market - PatagónicoWholesale Electrical Market] interconnection line to Pico Truncado. The resolution also indicated that subseqeuently it would be absolutely necessary to continue the extension to connect Río Gallegos and Río Turbio, both in Santa Cruz province.

It is also evident from the resolution that the project was not included in the 500 kV Federal Transmission Plan being financed with funds from the Trust Fund for Federal Electrical Transmission, and that its execution would be financed with contributions from the National Treasury and would be under the supervision of the Comité de

Administración del Fondo Fiduciario para el Transporte Eléctrico Federal (CAF) [Administrative Committee for the Trust Fund for Federal Electrical Transmission].

This being the case, the decision to include the MEM-MEMSP interconnection in the 500 kV Federal Transmission Plan is manifestly arbitrary.

It is manifestly arbitrary if we take into account the fact that the National Exploratory Office of the Sub-Department for Electrical Energy gave priority, in a report that it prepared in 2002, to the NOA NEA interconnection in its first stage (278 kilometers of 500 kV line). This project was evaluated as being the most beneficial, because it would solve in part the transmission problem that affects domestic demand, significantly reduce the need to call for mandatory generating, improve the use of installed capacity, and make it possible to use the excess supply available in the Norte Grande Chileno system (importing energy). For these reasons, execution of this interconnection in its entirety with Fondo Fiduciario para el Transporte Eléctrico Federal (FFTEF) funding was promoted.

It is therefore inexplicable that the Patagonian interconnection that connects the MEM with the MEMSP by means of the high-tension link of Choele Choel with Puerto Madryn was the first project to be executed with partial financing by the FFTEF, and that it was later decided to extend the Patagonian interconnection to Pico Truncado in Santa Cruz province.

It is obvious that with this decision the National Government ignored the National Exploratory Office recommendation for priorities and arbitrarily decided that the Patagonia region, and particularly Santa Cruz province, was to benefit from the execution of the projects, despite the fact that this interconnection was not included in the federal plan.

Based on this information, we repeat that the fact that the MEM-MEMSP interconnection was the first project financed by the FFTEF strikes one's attention.

- 500 kV FEDERAL TRANSMISSION PLAN

The map accords with official information published on the web page of the Consejo Federal de Energía Eléctrica (www.cfee.gov.ar). However, we point out that it has not been updated with respect to the Puerto Madryn- Pico Truncado segment, since this project was completed in November 2007.


FONDO FIFUCIARIO PARA EL TRANSPORTE ELECTRICO FEDERAL [Fiduciary Fund for Federal Electric Transmission]

In terms of financing, the most important tool was the establishment of the Fondo Fiduciario para el Transporte Eléctrico, which according to the decision taken was to be supplied with funds from the Fondo Nacional de la Energía Eléctrica [National Electrical Energy Fund], the principal source of specifically electrical-sector funds for all the provinces.

The National Electrical Energy Fund was established by Article 30 of Law No. 15.336 for the purpose of contributing to the financing of electrification plans.

Its funds were to come from:

I)      Contributions by the National Treasury, to be determined annually;
II)     A minimum of 50% of the proceeds from revenues of the National Energy Fund; the Executive Branch has the power to increase this percentage;
III)    Royalties from the use of hydro-energy sources;
IV)     The right to import electricity, in each case to be determined by the competent agencies;
V)      Surcharge of m$n 0.1 per kV/hour on the price of sale of electricity;
VI)     Proceeds from the negotiation of national debt securities issued as a charge to be paid with Fund moneys;
VII)    Revenue from repayment of and interest on loans made with Fund moneys;
VIII)   Donations, bequests, contributions, and other funds not specified above.

This law was amended in 1992 by Law No. 24.065, in which the Electrical Energy Fund was established by means of a surcharge of P$ 0.03 kW/hour on the rates paid by wholesale buyers (replaces item III above). Additionally, it was indicated that the Department of Energy could change this figure by +/- 20%. This law also provided that the Fund would be managed by the Consejo Federal de la Energía Eléctrica (CFEE), and that 60% of the fund would be used to create the Fondo Subsidiario para Compensaciones Regionales de Tarifas a Usuarios Finales (FTC) [Subsidiary Fund for Regional Compensations for Rates to End Users], and the remaining 40% would be used for the Fondo para el Desarrollo Eléctrico del Interior (FEDEI) [Fund for Electrical Development of the Interior]. That same year, Decree No. 1.398 provided that the Department of Electric Energy was to ensure that allocations from the Subsidary Fund for Regional Compensations were to be distributed to the provinces that had complied with the rate principles contained in said norm.

Resolution 657/99 increased the surcharge from P$2.40/MWh to P$3.00/MWh. The additional P$0.60 per MWh was to be deposited in the Fondo Federal de la Transmisión (FFTEF) [Federal Transmission Fund] that the national government could use for extension of the 500 kV transmission.

For the purpose of expanding the high-tension electrical energy transmission system designed to supply demand or for interconnection of electrical regions for improvement of quality and/or security of demand, and as provided in Article 70 of Law No. 24.065, the national Department of Energy issued Resolution No. 333/01 increasing the charge of the National Electrical Energy Fund to P$3.0384/MWh.

The Federal Electrical Energy Council (CFEE) was authorized to supervise the application of these funds and to establish the management criteria. Additionally, the CFEE was to approve percentage indices for distribution of funds among the beneficiary provinces.

Resolution No. 174/00 of the Department of Energy amended Resolution SE 657/99 in reference to the establishment of a Trust Fund for Federal Electrical Transmission, for purposes of participating in the financing of projects for the expansion of the high-

tension electrical energy transmission system, intended for the supplying of demand or for the interconnection of electrical regions for improvement of quality and/or security of demand.

The contract named as trustor the Consejo Federal de Energía Eléctrica [Federal Electrical Energy Council], an agency reporting to the Department of Energy and Mining of the Ministry of Economy. The trustee was Banco de la Nación Argentina. The beneficiary was to be the Board of Directors and the individuals or legal entities indicated by the Board as a consequence of the application of the Fund participation methodology. Lastly, the fideicommissary was the National Electrical Energy National Fund.

The resources of the trust are:

• Revenues resulting from the P$0.0006/kWh increase in the surcharge on rates that must be paid by buyers of electrical energy on the Wholesale Electrical Market;
• The financial income resulting from the management of these funds;
• Funds allocated by the national government and the provinces;.
• Donations;.
• Other funds obtained for the purposes specified in the Bylaws.

The MEM-MEMSP line was to be financed by the national government through the Trust Fund for Federal Electrical Transmission (69%), the Aluar company (15.5%), and the Hidroeléctrica Futaleufú company (15.5%).

MEM-MEMSP INTERCONNECTION PROJECT, PUERTO MADRYN-PICO TRUNCADO SEGMENT

The extension of the MEM-MEMSP interconnection to Pico Truncado in Santa Cruz was put out for bid in 2005. The contract was let by public bid No. 6/2005 and was awarded to the same company, Intesar S.A., for a total of P$460,905.301.98.

Separate bids were let for the conductors and the steel structures, awarded for P$31,523,172.44 and P$87,112,256, respectively. The total cost of the entire project was P$579,540,730.42.

These numbers are taken from the web page of the Federal Electrical Energy Council.

With respect to the execution of this project, a newspaper article in *la política online* dated 14 May 2008, annexed hereto, indicated the existence of suspected overcharges on the energy project for the extension of the Patagonia interconnection for the cities of Choele Choel and Puerto Madryn, and at the last moment and outside of the Federal Plan it  was decided to continue the extension to Pico Truncado. "Questions are circulating with respect to the costs that without visible pretext change, as always, upward," the newspaper article indicated.

Additionally and along these same lines, in a note published on 3 June 2008, which can be read on its web page (www.criticadigital.com) and in the copy that is annexed hereto because of its fundamental importance for the determination of the objective truth in the within action, the newspaper *Crítica* states that "Energy projects, overcharges, and the

Ministry of Planning compose a triptych that keeps repeating in the Kirchner administration."

In sum, the annexed newspaper articles indicate that the Audit found that the project was financed by the Trust Fund for Federal Electrical Transmission and that for this purpose the private sector was invided to participate in the financing. The articles point out that "the first contract for promotion of an expansion that was signed was signed with Aluar S.A., with a participation of 15.5% in the project, and Complejo Hidroeléctrico Futaleufú, with another 15.5%, with the Trust Management Committee financing the remaining 69%. Subsequently the "the COM (Construction, Operation, and Maintenance) contract of the Patagonia interconnection was awarded on 22 April 2004 to Integración Eléctrica Sur Argentino S.A. (Intesar S.A.) for a total of P\$159,661,815.15 plus VAT.

OVERCHARGES IN THE HIGH-TENSION NETWORK EXPANSION PROJECT, MEM-MEMSP (PATAGONICA) INTERCONNECTION, BETWEEN THE PUERTO MADRYN AND PICO TRUNCADO TRANSFORMER STATIONS

In this section we have just said that according to our calculations, and on the basis of the data published on the web page of the Federal Electrical Energy Council, there is a significant cost difference between the execution of the first segment, Choele Choel-Puerto Madryn (Chubut), of the MEM-MEMSP interconnection project, with respect to the Puerto Madryn-Pico Truncado segment.

The COM cost per kilometer of the Choele Choel-Puerto Madryn segment was P\$581,920; for the second segment, Puerto Madryn-Pico Truncado, P\$842,987.

This would indicate that Intesar S.A., which is in charge of the execution of both projects, and which belongs to Electroingeniería, collected an overcharge of close to 50%.

This per-kilometer price difference between the two projects is not related to the time elapsed between the execution of the first segment and the second, which was around 20 months.

At this point in the complaint, it should be mentioned that both projects are identical, since both of them are 500 kV High-Tension Electrical Lines, and they were carried out in the same territory (Patagonia) by the same company, in a period of economic stability.

We believe that maximum cost adjustments of 16% could have existed, as stated in newspaper articles, yet the proportional differences, as already indicated, are close to 50%.

Along the same lines, on 14 May 2008 an article in the newspaper *la política online*, annexed hereto, referring to the expansion of the high-tension line that was to link Choele Choel, Puerto Madryn, and Pico Truncado, points out that the cost of the line rose, for no reason, from P\$545,000 per kilometer to almost P\$850,000, since the expansion of the high-tension line in Patagonia is believed to have cost approximately P\$580 million. Additionally, a report by the National General Audit Office (AGN)

which still has not issued a final opinion, shows that the amount of the bid put out for the Choele Choel/Puerto Madryn project is P$545,736.71 per kilmeter, while the cost of the extension to Pico Truncado, signed in 2005 during the administration of Néstor Kirchner, rose to P$848,812.71 per kilometer, with only one year between the two bids, and without noteworthy reasons for size difference. According to the article, the report notes that "If conductors and metal structures are included, the difference in amounts is 48%, while according to the INDEC indices prices rose by close to 20%."

TRUST FUNDS WITH VENEZUELA: THE  KIRCHNER- UBERTI-DE VIDO-CHAVEZ CIRCLE

On 6 April 2004 the "Integral Agreement for Cooperation between the Argentine Republic and the Bolivarian Republic of Venezuela" was signed in Caracas. The agreement provided for establishment of a trust fund with the money that Argentine paid for the importing of the fuel used to produce electricity. These funds were to be used for the purchase of "petro-energetic" and "agricultural" Argentine industrial goods, according to the original provision.

A note signed by Cledis Caldelaresi in the newspaper *Página 12*, referring to the performance of this Agreement, mentions that

>...Argentina is selling products with high added value. According to Gabriel Hormilouge, advisor to the Sub-Department of Latin American Integration and Mercosur, and one of the local mentors of the trust fund managed by the Venezuelan bank Bandes, between the first payment on 9 August 2004 and the month of December 2006, slightly more than US$390 million had accumulated. According to the collaborator of Jorge Taiana, this sum was spent entirely on purchases of a wide variety of items not specified in the original agreement. The list includes hardware supplied by the government-owned company Invap for hospital equipment, the software sold for the same purpose by the local office of Philips, Medix incubators, Servas elevators, and electrical equipment and agricultural machinery, among other items.

In an article entitled  "Perros lindos, lobos feos"  [Pretty dogs, ugly wolves] in *Perfil* for 27 November 2005, Jorge Lanata makes reference to the US$90 million found missing from the trust fund and then replaced:

>...The case of the US$90 million caught everyone by surprise. On 26 January a cable from Alberto Sadous, at that time Argentine ambassador to Venezuela, arrived at the Foreign Ministry. The title of the cable was "Serious situation." Sadous, a career ambassador appointed to Venezuela by Duhalde, was reporting a genuinely serious event: the absence of ninety million dollars form the trust fund that Argentina and Venezuela maintain with UBS Bank in New York. The cable in question did not mince words. "This seriously affects the relationship," it read. The word "corruption" was mentioned at least twice. Sadous, who refused on several occasions to talk with *Perfil*, described in the report the financial engineering mechanism that may have been used: The 90 million left the trust fund, returned to Venezuela, were sold on the dollar black market, were repurchased on the official market, and someone pocketed the difference: US$13 million.

On the following day, according to what Foreign Minister Bielsa told this newspaper, the matter was reported to all the competent technical areas, and the Venezuelan ambassador in Buenos Aires was contacted.

General Freddy Balzán (Internationalist Combattant Medal awarded by Fidel, former *Prensa Latina* correspondent in Managua) sent to the Foreign Ministry, at 6:19 p.m. on 1st February, a genuinely strange reply in which he stated that, "Since we have no experience with trust funds, we withdrew all this money, unaware that we could not do so," and the sum then returned to its place of origin. Diplomatic sources close to Sadous contend that this "indiscretion" cost him his position.

The Foreign Ministry stated that Sadous had completed his assignment in the country, and had held meetings with leading opponents, and a change of the head of the delegation was preferred.

The "scoop"' of the change of ambassador was published in *Página/Oficial* by Martín Granovsky, current president of Télam, but the article made no mention of the temporary absence of the money.

We shall quote several paragraphs from Jorge Lanata's article in *Perfil* for 10 December 2006 :

**The "strategic relationship" between Venezuela and Argentina is based on murky business transactions and grandiloquent statements. Let's look at them one by one:**

* Since May 2005 Venezuela has been buying Argentine Boden 2012 bonds. The transaction started with US$100 million, and in almost eighteen months 3,600 million Boden 2012 bonds and 400 million Boden 2015 bonds, attached to the Bono del Sur bond, have been bought. The purchase of Argentine bonds, which Chávez calls "Kirchner bonds," and which he claims are "a thousand times less risky than United States Treasury bonds," is used by the Venezuelans to get currencies out of the country. The dollar market in Caracas, theoretically controlled by the government, has a parallel pricing system. This past week  the official exchange rate was 2,100 bolívares to the dollar, the rate on the parallel market was 2,800.

The Chávez government sells the Boden 1012 bonds to the banks at the official price, and then the banks turn around and sell them to their customers, but at the parallel rate. No one in Venezuela believes that the banks are the only beneficiaries of this business, and suspicions of government corruption are growing. "The real reason for the interest taken by investors in this new bond," according to Gustavo Bazzan's article in *Clarín* for 2 November, in a note on the Bono del Sur bond, is that it allows them to get currency out of Venezuela, as they are doing now with the Boden 2012, in which they are left with a difference of not less than 15%.

And referring to the agreement he says:

...Another of the very un-Bolivarian transactions with Venezuela concerns the mythic "trust." Within the framework of the bilateral agreements conventional trade (agricultural and livestock products, auto parts, powdered milk, oil and flour) co-exists with the Cooperative Trust established in 2004. The trust operates with the money that Argentina pays to Venezuela for the purchase of oil; the Compañía Administradora del Mercado Mayorista Eléctrico (CAMESA) [Management Company for the Electrical Wholesale Market] deposits the payment for each sale in an account maintained by Banco de Desarrollo Económico y Social de Venezuela (Bandes) in New York. The trust entity or fideicommissary is PDVSA. According to the Bandes web page, "A trust is a juridical relationship through which the founder of a trust transfers one or more assets to another person, the trustee, who undertakes to use it in favor of that party or a third party, called the beneficiary."

More than US$300 million circulates through this trust. With this money, for example, the Ministry of Health of Venezuela buys Argentine products, a transaction finalized with the signature of President Chávez, who endorses standing supply contracts. It is assumed that the procedure must not take more than 45 days, although in actuality it takes seven or eight months for each contract to be approved. According to the trust regulations, 30% of the value of the purchase is advanced to the company, which makes the transaction one hundred percent safe. Various sources told *Perfil* that the specialist who calms anxiety over the months of delay in the contracts is Claudio Uberti, the right-hand-man of De Vido and a key figure in the Venezuelan business, in addition to being the head of OCCOVI (Regulatory Agency for Road and Highway Concessions). Uberti knows how to "facilitate" procedures and, when requested, the companies have his management goodwill. The Venezuelan equivalent of the nimble Uberti is Franklin Mendez, manager of  Bandes.  "What is outside the trust has its logic," a second-tier national government official told *Perfil*, "but what is in the trust is unmanageable. Everything goes through Claudio Uberti."

**Concerning Ascensores Serva, mentioned in the *Página 12* article cited above, he says:**

UBERTI AND THE ELEVATORS

In the same *Perfil* panorama that included the scoop about the resignation of Lavagna on 27 November 2005, a section mentioned the famous Venezuelan trust and the "disappearance" of US$90 million.

The title of the cable was "Serious situation." Sadous, a career ambassador apopinted by Duhalde, was reporting a genuinely serious event: the absence of ninety million dollars from the trust fund that Argentina and Venezuela maintain with UBS Bank in New York. The cable in question did not mince words. "This seriously affects the relationship," it read. The word "corruption" was mentioned at least twice. Sadous, who refused on several occasions to talk with *Perfil*, described in the report the financial engineering mechanism that may have been

used: "The 890 million left the trust fund, returned to Venezuela, were sold on the dollar black market, were repurchased on the official market, and someone pocketed the difference: 13 million dollars." According to what Foreign Minister Bielsa told this newspaper, General Freddy Balzán (Internationalist Combattant Medal awarded by Fidel, former *Prensa Latina* correspondent in Managua) sent to the Foreign Ministry, at 6:19 p.m. on 1st February, a strange cable in which he stated that, "Since we have no experience with trust funds, we withdrew all this money, unaware that we could not do so." Diplomatic sources close to Sadous said that this "indiscretion" cost him his position.

The first three operations of the trust took more than a year to implement, notwithstanding the fact that the US$91,300,000 involved had already been deposited in the fourth month. One of these transactions was carried out by INVAP with the Philips company, a supplier of software. Another involved the Medics company, which supplied incubators for infants, and which at that time signed a contract for  US$25 million and had just finished working out an agreement for US$80 million. Still another involved the famous Ascensores Servas, which we shall discuss in greater detail below. The ninety-one million had in effect "disappeared," and the first task of Nilda Garré when she assumed the embassy position in Caracas was to cool the scandal.

Ascensores Servas SA has been a supplier to the national government since 14 March 2002, and has offices in the lower concourse at Calle Alsina 909. Its balance sheet for 2004 is genuinely somewhat discouraging. It had P$5,028,640.26 in current assets and current liabilities of P$1,334,684.81; its sales totaled P$4,028,621.83, and it ended the year with a loss of P$95,260.35.Its failures are also on record with the Oficina Nacional de Contrataciones [National Contracting Office]. On 14 January 2004 the director of the office of the Superintendent of Labor Risks suspended contracting for twelve months because of breach of contract. At the Ministry of Economy the contract was canceled when the Under-Secretary for Administration succeeded in proving that the company had forged a tax certificate of competence to contract. The president of the distressed Servas SA is José Aizpun, the vice president is María de las Mercedes Primitiva Aizpun Noain, and its directors are Nely Gladys Dutruel, Marta de Pedro, and Cristina Romilda Aizpun Noain. Obviously the progressivist bias that led Servas to staff its Board of Directors solely with women seems to be a distinguishing characteristic. On top of that, they are persons who are suffering the onslaughts of the economy: Nely Dutruel is classified as "unrecoverable" by the credit rating agencies, and President Aizpun himself  has a long string  of bounced checks--3, 7, 14, and 19 December 2001, 4 and 8 January 2002,  7 and 8 February 2002, 11 March, 8 April, 7 May, and 7 June 2002—together with various loans made by Banco Nación and Banco de la Provincia de Buenos Aires.

If references are sought for the vice-president of the company, it will be seen that María de las Mercedes Primitiva Aizpun Noain has an extremely versatile corporate career. In addition to her position with the elevator manufacturing company, other activities for tax purposes include "retail sale of loungewear, hosiery, sleepwear and beachwear, including foundation garments, lingerie,

hosiery except orthopedic hosiery, pyjamas, nightgowns and sleepsuits, bathrobes, bathing suits, etc."

She also maintains an excellent link with Banco Provincia, although she is now experiencing difficulties: She  has been classified as "unrecoverable" by Banco Provincia and Citibank. Marta Elena de Pedro de Aizpun also had a  lengthy list of bounced checks in 2002. And Cristina Aizpun Noain was also considered "unrecoverable" by Banco Provincia and Citi. This thriving Argentine small/medium company was introduced by the Néstor Kirchner administration to the Venezuelan government in the framework of the Bolivarian trade agreements. According to the 2005 Detailed Report on the State of the Nation, thanks to the work of the nimble Claudio Uberti,  José Aizpun, president of Servas SA, signed agreements with the Venezuelan Ministries of Trade and Health.

On the  ALBA (Alternativa Bolivariana para Nuestra América [Bolivarian Alternative for Our America]) Portal, under the title "Documentos suscriptos entre la República Argentina y la República Bolivariana de Venezuela" [Documents signed by the Argentine Republic and the Bolivarian Republic of Venezuela], there is a "Letter of Intent between the Ministry of Health and Social Development of the Bolivarian Republic of Venezuela and the Argentine company Ascensores Servas," the purpose of which is "to strengthen the hospital infrastructure by means of the installation of elevators in the Venezuelan hospital system."

Both Uberti and the president of Servas, Aizpun, accompanied the president on his visit on 21 November 2005, when according to the official agency Télam "the gradual establishment of this Argentine company" in Venezuela was discussed. The first phase of the agreement with Servas consists in a contract for US$25 million; there is a second phase of US$30 million; and another agreement with the Ministry of Defense that includes installation of two elevators in the Miraflores Palace and in two military hospitals, for US$12 million. Servas, with the help of Uberti, is—forgive us—moving up.

In another article in the newspaper *Perfil* for 25 February 2007, referring to this subject, Lanata says:

… On two occasions (see *Perfil* for 27 November 2005 and 10 December 2006) we have reported on warned of irregularities in the trust fund with Venezuela, warning of irregularities in the fund.  The trust operates with the money that Argentina pays to Venezuela for the purchase of oil; the Compañía Administradora del Mercado Mayorista Eléctrico (CAMESA) [Management Company for the Electrical Wholesale Market] deposits the payment for each sale in an account maintained by Banco de Desarrollo Económico y Social de Venezuela (Bandes) in New York. The trust entity or fideicomissary is PDVSA, and some US$300 million circulates through this trust. With this money the Venezuelan government buys Argentine products, in a procedure that is supposed to take no more than forty-five days but which now requires about seven months for each contract. For payment, the trust advances 30% of the payment to the supplier, which then prepares its first shipment. This is what is

called a secure transaction. So secure and desirable that during these seven months the real vice-consul, Uberti, takes a few hours to talk with each company and, when requested, "facilitates" the transaction with the approval of his Venezuelan counterpart, Franklin Méndez, manager of Bandes. As previously reported in these pages, US$91.3 million disappeared from this trust, but after the event became known it re-appeared. But above and beyond the missing amounts (is there anyone who has not at one time had a shortfall of a few million in his checking account?), the scandal of the trust fund with Venezuela has to do with two contracts, the Servas elevators contract and the contract with Faraday, a company without economic activity and with five employees who showed up to resolve the energy problems of the region.

*Fortune* Magazine also mentions the business transactions in this agreement:

According to estimates by the Cámara de Comercio Argentino-Venezolana (CCAV) [Argentine-Venezuelan Chamber of Commerce], trade relations between Venezuela and Argentina in 2007 totaled more than US$1,100 million, which is equivalent to 1,375 suitcases of the type that Guido Antonini Wilson was carrying this past 4 August. And while the *Washington Post* points out that "It has been well known for some time that the close relations between Venezuela and Argentina are not the result of mere ideological affinity," what is certain is that since 2004, thanks to the affinity between Néstor Kirchner and Hugo Chávez, trade between the two countries has increased by almost 800%. What is also true is that this strengthening of bonds is "stimulated by petrodollars," as the North American newspaper also points out. But to the disappointment of those who wave the flag of ideological closeness, none of the agreements with major Argentine companies announced by Chávez  has resulted in a major transaction since the start.

The winners in this joropo/tango-paced relationship are a thousand companies, most of them small and medium-sized, that have taken advantage of the trust established by Argentina and Venezuela in the Integral Cooperation Agreement signed on 6 April 2004 to export their products to the Caribbean country. This agreement permits the exchange of fuel oil, shipped by the Chávez government, for Argentine agroindustrial products. The trust operates with the money paid by Argentina to Venezuela for the purchase of the oil derivative, and Venezuela in turn must use the money to purchase Argentine farm technology and products. The trust is operated through the Venezuelan Banco Nacional de Desarrollo (Bandes), which pays the Argentine companies with checks drawn on accounts in the "imperial" city of New York.

However, the money of this trust and the purchases by the Venezuelan government do not account for the entirety of the exchange between the two companies. "Bilateral trade has grown beyond the Cooperation Agreement," says Jorge Eduardo Rastrelli, executive director of the CCAV. "The trust has been a great tool, but the private companies have done very good work to increase their exports to Venezuela." By October 2007, the exchange totaled US$1,013.5 million, 56.3% more than in the same period of 2006, and Argentine

sales to Venezuela accounted for US$995,494,285 of this amount, that is, close to 98% of the entire bilateral relationship.

In exchange, the business transactions announced by Chávez, which at the time provided the leading newspapers with headlines, are experiencing various difficulties in getting off the ground. The common denominator of these problems is Venezuelan government slowness in making payments, and the excessive bureaucracy with which companies have to struggle in order to obtain approval for projects and billings. Some typical cases include the SanCor loan and purchase of milk, the construction of two oil tankers by Astilleros Río Santiago, and the arrival in Argentina of PDVSA service stations. "The need now is to start making the bureaucracy more flexible. It's excessive, and it's unnecessary. One of the big problems is the Venezuelan currency exchange system when it comes time to issue payments. That's what most frightens companies," Rastrelli said.

BOATS WITHOUT ANCHORS. One of the first indications of the reinforced relationship between Venezuela and Argentina was the construction by Astilleros Río Santiago of four freighters for the PDVSA fleet. The agreement was signed in July 2004 by presidents Néstor Kirchner and Hugo Chávez, and specified that the first vessel would be built in 30 months, followed by three more.

After a delay of more than three years, the 30-month countdown began at the end of 2007. " Purchases of naval plate are no longer done through the Venezuelan DIANCA, they're handled directly by Río Santiago," explained Pablo Galeano, spokesperson for the Argentine shipbuilder.  Added to the extreme slowness of the Venezuelan government-owned company in supplying the material and making payments was the questionable decision by the Venezuelans to contract for the drafting of the plans with a Spanish company that went bankrupt, which meant starting from zero with a Brazilian company.  Bureaucracy is the principal obstacle facing the "Eva Perón," the name under which the freighter will put out to sea.  Astillero Río Santiago sources confirmed that to facilitate the dispatch of funds, during 2007 the president of the company, Julio César Urién, had to make at least one trip a month to Caracas.  Three PDV Marina (the PDVSA shipping company) have even been installed permanently at the central offices of the shipbuilder in Ensenada to move the processing along.

FAILURE. The rescue of SanCor and the purchase of milk represent other bi-national cooperation events. In November 2006, Alicia Castro, Argentine Ambassador to Caracas, surprised the Argentine corporate world by announcing that Venezuela was going to lend US$135 million to SanCor, US$80 million of which would be used to pay its international debts while US$55 million would be used for working capital. The basic idea was to avoid purchase of the company by foreign or domestic private capital, whether foreign or domestic.

Internal SanCor services have confirmed that the company is still waiting for the arrival of the money. The basic agreement was signed in December 2006, but the money had to wait until the final text was completed. By the end of January 2007 everything was ready for the trip to Caracas and the signing by Ítalo Gestaldi, vice-president of the cooperative, but apparently the text was not so final. The Chávez government not only wanted payment, in the form of powdered milk, it also wanted a transfer of technology

to set up plants in the country. Gestaldi's trip was postponed until a few days before the meeting of Kirchner and Chávez in the Venezuelan city of Puerto Ordaz in February of last year.

Three months after this meeting, SanCor received what has been so far the only funds sent: US$15 million. The company's balance with its international creditors therefore continues to be a debit balance.

NO SERVICE STATIONS. Once the first cooperation agreements between Venezuela and Argentina had been signed, the government of Hugo Chávez announced that PDVSA would enter the Argentine market to sell gasoline and lubricants directly to the end consumer. Now, almost five years after these announcements, PDVSA is operating only two service stations in all of Argentina, jointly with ENARSA, the government-owned oil company.

On 1st February 2005, Chávez himself, on a visit to Argentina to inaugurate one of the two service stations, said that PDVSA was interested in purchasing the Shell assets and that in that same year 600 similar stations would be opened throughout Argentina. Rafael Ramírez, Venezuelan Minister of Energy and Oil, even indicated that the price of the Shell package, which included 150 company-owned service stations, 750 service stations operated on a contract basis, and a refinery in Buenos Aires, were "under discussion." Ramírez even noted that the purchase would "probably" take place in the middle of 2005.

The last of the failed announcements about the arrival of the PDVSA service station was made last October, when the oil company revealed that it was interested in purchasing the Exxon assets in Argentina, which operate under the Esso trademark, and which include a refinery in Campana. In November the Board of Directors of Exxon informed PDVSA that "for corporate reasons" it was not possible to continue the negotiations. This left the road open for Petrobras.

### 9- Federal List of complaints. Focus on the Ministry of Planning

The following summary list of various complaints focuses on the Ministry of Federal Planning.

#### - Diversion of US$6 milion designed for recovery of the technical capacity of Atucha II:

Here the methodology may be similar to that of the Skanska case. The state-owned company Nucleoeléctrica Argentina Sociedad Anónima (NaSa), which reports to the Department of Energy (Ministry of Planning), and which is in charge of finalizing Atucha II, signed an agreement with the Comisión Nacional de Energía Atómica (CNEA) [National Atomic Energy Commission] covering technical training of the latter to provide sustainability for the restoration of the plant. However, this money is believed to have been diverted to the Dioxitek SA company for purchases whose purposes are believed to be incompatible with those of the Agreement. Therefore, in this case as well the same operation complained of exists: There is a trust, and an unauthorized company that presents "fake" invoices are presented as justification, all this under the eyes of the Ministry of Planning.

It should be noted that the Sindicatura General de la Nación (SIGEN) indicated that "In various purchases the needs, quantities, and reasons for the purchases and the reasonableness of the price paid were neither explained nor evidenced. There was also no analysis of other possibilities in order to meet the requirements. The files contained no studies of prices, quantities, and qualities offered on the domestic and international market."

**- Irregular calls for bids for prisons: Activities of Kirchner and De Vido**

Calls for bids Nos. 02/4 and 03/4 for prisons in the Agote Federal Complex, located in Mercedes, Buenos Aires province, and the Litoral Argentino Federal Penitenciary Center located in Coronda, Santa Fé province:
These calls for bids were put out early in 2004. The Enforcement Units of the Program are the Ministry of Justice, Security, and Human Rights and the Ministry of Federal Planning.

Competence to contract: As shown in the bid package, in order to participate in this call for bids the bidder must present an updated certificate evidencing its competence to contract, issued by the Register of Public Works Contractors. It must be kept in mind that Enrique Wagner, president of ESUCO, and other entrepreneurs, plays a role in this Register.

The "modus operandi" complained of was repeated in this call for bids, which was halted upon filing of a criminal complaint by Deputies Adrian Perez and Marcela Rodriguez, annexed hereto as evidence.

The three (SEE) calls for bids complained of herein have something in common: In a Necessity and Urgency Decree, the amounts of the original budgets were substantially increased by the National Executive Branch, ostensibly to bring them into line with the requests of the companies selected by the Mixed Commission established to evaluate offers.

As we shall see below, on 1 June 2005, by Decree No. 565/05, published in the *Boletín Oficial* for 3 June 2005, President Kirchner decided to incorporate into the Schedule Annex 12 of the Budget Law the construction and maintenance of the Salta, Mercedes, and Santa Fe prisons. Their budgets were allocated as follows:

Goods and Services, Total Amount

Construction of the Federal Prisoners Complex, Mercedes P$189,606,167
Construction of the Federal Center of the Northeast, Salta P$64,985,972
Construction of the Federal Center of the Litoral-Coronda-Santa Fe P$42,857,803
Maintenance of the Federal Prisoners Complex, Mercedes P$16,300,000
Maintenance of the Federal Center of the Northeast, Salta P$7,500,000
Maintenance of the Federal Center of the Litoral-Coronda-Santa Fe P$4,600,000

Total to be budgeted for 2005   P$74,869,862

The budget items established accord exactly with the requests made with the companies selected by the Mixed Commission, and they increased the costs for the national

government in a scandalous and arbitrary manner, manifestly with the sole aim of meeting corporate wishes, instead of pursuing the common weal that must guide any public call for bids. Let us look at the individual cases:

 On 15 March 2004,  Resolution No. 122/04 signed by Architect Julio De Vido approved the General Clauses Bid Package, the Special Clauses Bid Package, the Schedule of Technical Specifications and Needs, and other bid documentation for the Federal Penitentiary Center of the Northeast – Salta, File No. 0265120/03.

The official budget for the Project Phase and Execution was P$38,400,000. However, on 15 July 2004, the Ministry of Justice asked the Sub-Department of Public Works, without stating specific grounds, for a 25% increase in the budget, alleging increases in the construction costs and indicating that in order to perform the work approved only four months earlier a budget of P$48,000,000 was required, in place of the original P$38,400,000.

Subsequently, on 21 December 2004,  Act No. 8/04 of the Mixed Commission reported the consideration of the scores for Envelope No. 2 of the six technical offers presented. IECSA-SUPERCEMENTO was selected in the first round, with a score of 89.69.

Lastly, in Necessity and Urgency Decree No. 565/05, the National Executive Branch increased the specified budget not by the amount previously requested but by a much larger amount. The amount allocated was, precisely, the amount requested by the bidder first selected by the Mixed Commission: P$64,985,972, for an increase of 59%.

Additionally, Resolution No. 187/04 dated 20 April 2004, signed by Architect Julio De Vido, approved the General Clauses Bid Package, the Special Clauses Bid Package, the Schedule of Technical Specifications and Needs, and other bid documentation for the del Agote Penitentiary Complex – Mercedes – File No. 0041653/04.

The official budget for the Project Stage and Execution was P$124,800,000, corresponding to the Project Phase and Execution.

On 15 July 2004, the Ministry of Justice asked the Sub-Department of Public Works for a 25% increase in the budget, alleging increases in the construction costs and indicating that in order to perform the work approved only four months earlier a budget of P$156,000,000 was required.

Strangely enough, in the aforementioned Necessity and Urgency Decree, the National Executive Branch increased the specified amount requested initially by the Mixed Commission by 65% over the original budget, to P$189,606,167.

Lastly, with respect to the Federal Pententiary Center of the Litoral – Santa Fé – File No. 026431/03,  Resolution No. 1882/04 dated 20 April 2004, signed by Architect Julio De Vido, approved the General Clauses Bid Package, the Special Clauses Bid Package, the Schedule of Technical Specifications and Needs, and other bid documentation, with an official budget of  P$ 23,040,000, corresponding to the Project Phase and Execution.

Here again, on 15 July 2004, the Ministry of Justice asked the Sub-Department of Public Works, without indicating definite grounds, for a 25% increase in the budget,

alleging increases in the construction costs and indicating that in order to perform the work approved only four months earlier a budget of P$28,800,000 was required.

Again, in the aforementioned Necessity and Urgency Decree, the National Executive Branch increased the specified budget precisely by the amount requested by the bidder initially selected by the Mixed Commission, by 89.01% over the original budget, increasing it to P$42,857,803.39.

The three bids described had in common other irregularities in their procedures. They were held by means of the completed adjustment system, which requires invariability of project and price. The system is ineffective and anti-economical, since it requires all the bidders to execute a project, and thus the expenses of all the projects are ultimately paid by society, since they are contemplated in the prices.

Since there is no one single project, morover, competition of the bidders is not guaranteed, and the calls for bids look "loaded" to be won by the companies that were the winners.  Additionally, qualification is based on both corporate background (30%), and the technical offer (70%), and therefore the road and highway companies are always better qualified.

Lastly, as we have seen, Necessity and Urgency Decree No. 565 adjusted the budget to the offers presented, modifying considerably the Original Budget. This proves the "loading" of the bid procedures.


 By reason of the foregoing, we contend that:

I.  Néstor Kirchner is the superior of Julio De Vido, Rudy Ulloa, Lázaro Baez, Claudio Uberti, Cristóbal Lopez, and Ricardo Jaime. The net worth of all of them increased astronomically after they became acquainted with him, and they became wealthy.

II.  In all the cases set forth, former president Néstor Kirchner and the Ministry of Federal Planning are direct participants, since the agencies actively involved in the operations complained of herein report to the Ministry of Planning and are managed by officials who are designated by them and are their confidants.

III. In all the cases there are irregularities in the bid procedures and/or concessions, and repeated violations by the government of the rules and regulations that govern Public Contracts.

IV.  In all the cases there is repetition of the system complained of as being a capitalism of friends, in which companies close to the government are awarded bids for public works projects, whether through companies in their name or under their control, a system that involves a pipeline process.

V.  Public works project awards are steered to corporate friends who concentrate activity and impose prices. This practice is contrary to the Rules and Regulations governing Government Procurement and Contracting, and constitutes obvious non-compliance with the governing principles of public contracting, including efficiency,

transparency, competition and competence, proportionality and reasonableness, and equality of treatment of interested parties and bidders.

VI. Complicity and Inaction exist on the part of the officials involved, who make awards without verifying the capability and prior experience of the companies. This illegal practice, which allows a few parties to treat public works improperly and with overcharges, is promoted and is not punished.

VII.  There is an absence of government controls to verify compliance with contracting terms and conditions. This leads to certifications of projects that may not have been executed or which may not be in conformity with the contract because they do not meet its technical specifications. An example occurs when Austral Construcciones collects money for certifications of projects that it does not own.

VIII.  For possible payment of bribes some of the companies operate with fake documents of shell companies in order to justify expenses not incurred. Not only does this constitute a criminal offense, it may also explain irregular expenditures in the accounting records of these companies.

IX.  The Kirchner administration punished AFIP officials who discovered the maneuvers of these corporate friends, removed them from the investigation, and replaced them with officials connected with Julio De Vido.

X.  In all the cases the companies justified unlawful payments by means of fake invoices.

III.- CONSIDERATIONS WITH RESPECT TO THE OFFENSES FOR WHICH AN INVESTIGATION IS SOUGHT:

**a) Conspiracy:**

Article 210 of Chapter II of Title VIII of the Penal Code (Offenses against Public Policy) characterizes the action consisting in participation in an association or gang of three or more persons for the purpose of committing offenses. Following the teaching of Dr. David Elbio Dayenoff, it is appropriate to emphasize that the mere fact of belonging to an organization of this type constitutes perpetration of the characterized behavior.

This is a legal definition that requires a number of members and a group purpose.

In this case I presume the existence of an organization believed to be dedicated to committing this crime, inasmuch as it involves more than three persons who formed a large economic and corporate group that was identified by the Administración Federal de Ingresos Públicos (AFIP) [Federal Administration of Public Revenues], and which is under investigation by the Federal Courts for tax evasion and presumed payment of public-works bribes.

With respect to this type of offense, legal precedent has found that "The characteristic requirements for the existence of the offense of conspiracy are met by simple agreement, by the mere manifest intention to commit an indefinite number of criminal acts, and definite participation in the cooperation by three or more persons, even if none

of the acts is committed, since this is an offence of perfect activity." (SCBA, JA, 1983-I672)

- Aggravated Offense: As is well known to the Public Prosecutor, for leaders and organizers of the organization the offense of conspiracy is aggravated, in which case the minimum term of penalty or imprisonment is five years when that of the basic offense is three years.

I therefore request an investigation of the possible perpetrating by Néstor Kirchner of the offense defined in Article 210, last paragraph, of the Penal Code, since  he is the head and organizer of the presumed gang formed for the committing of the offenses for which the investigation is requested, by virtue of his position as former President of the Republic.

**b) Fraud in Public Administration:**

Article 174 (5) of Chapter IV of the Penal Code, entitled "Frauds and Other Fraudulent Acts," characterizes Fraud to the Detriment of Public Administration by a person who "...would commit fraud to the prejudice of any public administration."

In this  definition punishment is meted out for the behaviors described in the chapter mentioned in the preceding paragraph in those cases in which the victim of the offense is the public adminsitration, that is, "any agency that constitutes a direct national, provincial, municipal, or independent public administration" (ref. Breglia Arias and Gauna).

In the case at hand, the possible payment of bribes for the execution of public works would constitute the committing of the offense described in this paragraph.

**c) Abuse of office and violation of official duties:**

Article 248 of the Penal Code prescribes respect and compliance by public officials with the provisions of the constitution and the law. In the events for which I am requesting an investigation, this offense may have been committed by reason of the fact that Julio De Vido is currently Minister of Federal Planning, Public Investment, and Services, and Néstor Kirchner was President of the country during the period of 2003-2007.

The offense characterized by Article 248 of the Penal Code is an intentional crime that requires awareness of the illegality or arbitrariness of the act and the intent to perform it.

The perpetrator of this offense must be a public official currently in office. As Dr. Dayenoff points out, the legal meaning of the terms "public official and employee" used in the Penal Code designates any person who participates accidentally or permanently in performance of public duties, by reason whether of popular election or of appointment by a competent authority. Consequently, government public function can refer only to any activity that involves government purposes.

Article 249 provides that the characterized actions consist in non-performance of, refusal to perform, or delay of, any act of his/her office.

**d) Business Matters Incompatible with Public Office:**

As has been pointed out by Dr. Edgardo Alberto Donna in *Derecho Penal Parte Especial*, Vol. III, pp. 15 et seq., the section of the Penal Code that deals with offenses against the Public Administration "protects the public office understood as the regular, proper, and legal development of the functions of the three branches of government...but with the idea that it refers not only to the specific function of the branches of government but in addition to the typical administrative function of all of them. It aims to cover the conduct of public officials who in failing to perform the duties of their position impede this functional regularity, harming not only the position per se but also individuals. Thus the legally protected interest in Title XI is the preservation of the public function against attacks from the bureaucratic action of the government itself and its members as well as from individuals..."

As described in the teachings of Dr. Carlos Creus, the offense for which investigation of the Ministry of Federal Planning, Public Investment, and Services, Julio De Vido, and Néstor Kirchner, former president of the country is requested concerns the impartiality of officials in the taking of decisions strictly in relation to the public office that they hold, thereby preventing any type of improper interference or partiality foreign to the interest of public administration.

Thus, and without prejudice to what may result from the investigation, the qualification that arises therefrom, and the discretion of the Honorable Public Prosecutor, with respect to other characteristic actions that may relate to the conduct engaged in by the persons indicated, for the existence of the within offense it is not necessary that the public official obtain economic benefit therefrom:

In this respect, in Cfed. De Córdoba, Sala Crim., 20-8-80, "Arias, Restituto A, ", J.A. 1981-I-460, the Federal Court of Córdoba, Criminal Division, ruled:
"...for the existence of the offense of business activities incompatible with the performance of public duties, any private-interest motive other than those motives that should be centered exclusively on the acts is sufficient, regardless of the non-pecuniary nature of the interest, because the wording of the law protects not only the public property but also the prestige of the administration."

Additionally, in order for the type of offense to exist, it is not necessary that the act have caused injury, as is pointed out by Dr. Donna in his *Tratado de Derecho Penal*, Vol. III, page 318, Ed. Rubinsol Culzoni, ed. 2003, this is not a category of crime that results in legal injury.

IV.- EVIDENCE:

1.- DOCUMENTARY EVIDENCE:

- Let it be confirmed that the documentary evidence attached, in eight boxes, has been produced.

Without prejudice to the actions and measures that the Honorable Public Prosecutor may order, we take the liberty of suggesting the following evidentiary means:

1.  Let the General Office of Justice be required to produce the articles of incorporation/bylaws, financial statements, and any documentation in its possession in relation to the following companies, namely:Gotti S.A. , Austral Construcciones S.A., Badial S.A.,  Juan Felipe Gancedo S.A.  Casino Club,  S,A, Sucesores de Adelmo Biancalani, Kank y Costilla, Palma SA, EPSUR, MISAHAR ARGENTINA, and Invernes S.A.

2.  Let the Federal Administration of Public Revenues (AFIP) reveal the actions taken by it for presumed evasion by the companies Gotti S.A., Austral Construcciones S.A., Badial S.A., Gancedo S.A., Casino Club S.A., Sucesión de Adelmo Biancalani, Kank y Costilla, and Invernes S.A. It is appropriate to mention that under Article 101 of Law No. 11683, the data referring to default on payment of obligations due and payable are not covered by the confidentiality provisions governing tax matters.

3.  Let the Anti-Corruption Office be required to produce affidavits by  Néstor Kirchner, former president of the country, and Julio De Vido, Minister of Federal Planning, Public Investment, and Services, and by the officials Ricardo Jaime, Claudio Uberti, and Ricardo Echegaray for the years 2003, 2004, 2005, 2006, 2007, and 2008.

4.  Let the Ministry of Federal Planning, Public Investment, and Services produce the documentation that evidences the degree of compliance in relation to payment for the various stages in the execution of the Public Works Projects that were awarded to the companies  Gotti S.A., Austral Construcciones S.A., Badial S.A., Juan Felipe Gancedo S.A., Kank y Costilla, Palma SA, Sucesores de Adelmo Biancalani, and Invernes SA.

5.  Let the Ministry of Federal Planning, Public Investment, and Services and the national Ministry of Economy produce, for purposes of attachment, all the documentation containing information about the processing and payment for the operations deriving from the trusts with Venezuela mentioned herein.

6.  Let the offices of the Department of Transport produce, for attachment, the documentation referred to in the within complaint.

7.  Let the national General Accounting Office produce documentation for purposes of determining the amount and the beneficiary of the projects described herein.

8.  Let the offices belonging to  Lázaro Báez and located at Calle Carabelas 241 5 piso, produce, for purposes of attachment, documentation pertaining to this complaint.

9.  Let Letters Rogatory issue to the Courts of the State of Florida, USA, with respect to the businessman Franklin Duran.

10.  Let Letters Rogatory issue to the Courts of the Principality of Liechtenstein, where an investigation of Austral Construcciones, the company of Lázaro Báez, for money laundering is under way.

11.  Let the airlines Tango Sur, Mac Air, and Royal Class be examined for the purposes of evidencing flights chartered by the Argentine government.

12.  Let appraisers be appointed to determine the real value of the projects mentioned herein and suspected of overcharges.

13.  Let the national General Audit Office and the national Receivership Office produce copies of the reports mentioned herein, as well as the working papers that back up the findings described.

14.  Let the records of the Migration Office be produced for purposes of documenting the arrival and departure of officials involved herein from and to Venezuela from the Aeroparque and El Palomar Military Bases.

15.  Let the AFIP produce the files of the personnel assigned to different duties because of their investigation of the cases of corruption described herein.

16.  Let Criminal Tax Court No. 1 be instructed to remand case No. 1705/05.

17.  Let Federal Court No. 7 be instructed to remand case No. 18579/07.

18.  Let UCOFIN produce for purposes of attachment the files for the road and highway works complained of herein for possible overcharges referred to in these activities.

19.  Let the AFIP be required to produce the tax returns of Messrs. Néstor Kirchner, Julio De Vido, Claudio Uberti, Rudy Ulloa Igor, Ricardo Jaime, Cristóbal Lopez, and Lázaro Báez.  It is worthy of mention that under Article 101 of Law No. 11683, data referring to default on payment of obligations due and payable are not covered by confidentiality requirements.

20.  Let the offices of Dr. Néstor Carlos Kirchner, located at Calle Olga Cosentini 1553, Autonomous City of Buenos Aires, be ordered searched for purposes of attaching the documentation referring to these activies.

21.  Let the following persons be cited to appear as witnesses:

a) Roger Capella, former Venezuelan ambassador;
b) His Excellency Arévalo Enrique Mendez Romero, current Venezuelan ambassador;
c) Norman Williams, former official;
d) Jaime Mecicovsky, official;
e) Claudio Moroni, head of the AFIP;
f) Al funcionario de la AFIP Horacio Castagnola.Horacio Castagnola, AFIP official;
g) Angel Rubén Toninelli, AFIP official;
h) Alberto Abad, former AFIP official;
i)  Ms. Estela Kank.


22.  At the appropriate time let the parties complained of, namely, Néstor Kirchner, Julio De Vido, Claudio Uberti, Rudy Ulloa Igor, Ricardo Jaime, Cristóbal Lopez, and Lázaro Báez be cited to appear with respect to the events that have given rise to the within complaint.

V.- AUTHORIZATION:

We authorize Dr. Diego Martín Andisco, C.P.A.C.F. Vol. 76, page 198, and Dr. Paula Oliveto Lago, C.P.A.C.F.Vol. 77, page 476, to draft all the documentation necessary for the normal prosecution of this complaint.

VI.- PRAYER FOR RELIEF:

By reason of the foregoing, we pray the Honorable Public Prosecutor to:
1.- Deem filed the criminal complaint presented against Messrs. Néstor Kirchner, Julio De Vido, Claudio Uberti, Rudy Ulloa Igor, Ricardo Jaime, Cristóbal Lopez, and Lázaro Báez for probable perpetration of the offenses characterized in Articles 210, 174, 248, 249, and 265 of Article 2 of the Penal Code and concordant articles of Law No. 24.769;
2.- Investigate the within criminal complaint;
3.- If the offenses complained of are proven, and if unlawful economic benefit is found to have been obtained by the persons complained of, investigate the same;
4.- Deem the means of evidence suggested present.

To rule accordingly
 Will constitute Justice.

Jacqueline Dejou Considine
23 Normandy Terrace
Bronxville, NY 10708


Affidavit of Accuracy of Translation


Jacqueline D. Considine is a professional translator, fully conversant in the English and
Spanish languages.

That on or about July 15, 2009 she made the annexed English language translation of the
document entitled:

Criminal Complaint – Elisa Maria Avelina Carrio et al v. Messrs. Nestor Kirchner et al

To the best of her knowledge and belief, such translations are a true and correct English
rendering of the original documents in Spanish.

Her professional qualifications are as follows: formal studies in Spanish in both the USA
and in Europe, more than twenty (20) years experience as a translator and in international
business activities involving Spanish.


Jacqueline D. Considine


Notary

DONNA N. RUZZI
Notary Public, State of New York
No. 01RU5645337
Qualified in Rockland County
Commission Expires June 12, 20 11

FORMULA  DENUNCIA PENAL.

SEÑOR FISCAL:

Elisa Maria Avelina Carrio, Adrián Perez, Héctor Flores, Elisa Carca, Patricia Bullrich, Fernanda Gil Lozano, Fernanda Reyes, Fernando Iglesias, Elsa Siria Quiroz, Susana García, Fernando Sanchez y Juan Carlos Morán, constituyendo el domicilio procesal en la calle Rivadavia 1829 piso 4 de la Ciudad Autónoma de Buenos Aires, a V.S. se presenta y respetuosamente dice:

I.- OBJETO:

Que venimos a   interponer formal denuncia penal a los fines que se investigue la conducta de los Sres. Néstor Kirchner, Julio De Vido, Claudio Uberti, Rudy Ulloa Igor, Ricardo Jaime, Cristóbal Lopez y Lázaro Báez por la probable comisión de los delitos tipificados en los artículos 210, 174, 248, 249 y 265 del Código Penal y/u otros posibles actos de corrupción por los hechos que seguidamente se exponen.

II.- HECHOS:

Que la investigación que se solicita, por los delitos de Asociación Ilícita, Fraude a la Administración Pública, Abuso de Autoridad, Violación de los Deberes de Funcionario Público y Negociaciones Incompatibles con el Ejercicio de la Función Pública, tipificados en los artículos 210, 174, 248, 249 y 265 del Código Penal, respectivamente, y/o por el tipo penal que surja de la investigación que se peticiona el elevado criterio de V.S. esta relacionado con los hechos que pasamos a describir:

A modo de introducción de la presente es posible afirmar que así como en la década del 90 la corrupción se gestionó a través de los bancos y el sistema financiero, en la era de Néstor Kirchner se basa en los oscuros negocios que él y su entorno hacen de la obra pública.

Desde fines del 2003 hasta la fecha, comenzamos a describir una nueva matriz de negocios implementados desde la máxima autoridad del Poder Ejecutivo que cuenta con tres características básicas:

**- concentración empresaria en distintos sectores de la economía;**

**- adquisición de empresas estratégicas por medio de empresarios, hasta ese momento desconocidos, cercanos al presidente Kirchner; y**

**- presentación ante la opinión pública de que dichas operatorias  responden a un gobierno que defiende al Estado.**

Así, el comportamiento de saqueo puede advertirse mediante la cooptación del aparato Estatal por parte de los especuladores y grupos económicos concentrados, muchos de ellos, sin antecedentes comerciales o con crecimientos patrimoniales notorios a partir del 2003 con la llegada del Kirchnerismo al gobierno, circunstancias que se prueban en

la presente mediante el acompañamiento de los informes comerciales de las empresas de referencia.

Es así que este conjunto de patrones vigentes no consagrados jurídicamente se establecen, según Weber, en un nuevo esquema de dominación llamado patrimonialismo.

Este esquema "impide la economía racional por la peculiaridad de su administración" ya que "dificulta la existencia de disposiciones legales racionales, en cuya duración pueda confiarse, por la ausencia típica de un cuadro administrativo profesional formal, por el amplio ámbito del arbitrio material y de los actos discrecionales puramente personales del soberano y del cuadro administrativo. Mas aun, cuando impera el arriendo de cargos, el funcionario se encuentra inmediatamente obligado para la gestión beneficiosa de su capital, a emplear cualquier medio de exacción, aun los mas irracionales en sus efectos".

Dicho de otro modo, quienes detentan posiciones de poder ascienden a ocupar roles de gobierno apropiándose de los derechos y bienes del Estado, transformándolos en propios.

Por eso durante la gestión kirchnerista se produjo la denominada "patrimonialización del Estado" que supone ese conjunto de patrones vigentes o practicas políticas, que borran o confunden convenientemente, como regla general, la diferencia de lo publico y lo privado, permitiendo la disposición de lo primero con total omisión a las reglas y leyes establecidas para el manejo de "cosa publica".

En diciembre de 2003, denunciamos en el informe de investigación "La distribución de la Obra Publica-clientelismo o política de estado" como la gestión de Néstor Kirchner y Julio de Vido beneficiaba a empresas amigas con total desapego de las buenas practicas de la administración publica, el manejo eficiente del erario publico y el respeto a las normas que regulan las compras y contrataciones del Estado.

En ese orden, se ha evidenciado, como siempre, que son las mismas empresas que funcionando como holding, se presentan imponiendo el precio, subiendo considerablemente los costos de la inversión publica ante una total pasividad del Estado contratante.

**1- Creación del Ministerio de Planificación Federal, Inversión Pública y Servicios Públicos.**

Con fecha 24 de mayo de 2003, el Decreto 1.283 procedió a modificar la Ley de Ministerios creando el Ministerio de Planificación Federal, Inversión Pública y Servicios.

En ese contexto, el cambio de estructura fue presentada a la sociedad como un aspecto fundamental de la política de Néstor Kirchner en el Gobierno, pues mediante este nuevo estamento permitiría "... reflejar con mayor precisión las metas de gobierno fijadas, en especial en materia de planificación de la inversión pública tendiente a un equilibrado desarrollo geográfico que consolide el federalismo... "

Mediante distintos Decretos, el ex presidente, fue trasfiriéndole al Ministerio de Planificación, presupuesto y competencias que se encontraban en cabeza de otras carteras.  Esto convirtió a Julio De Vido en el funcionario con mayor poder, después de Kirchner, con un manejo de fondos superior a los  35.800 millones de  pesos, conforme el crédito vigente 2008.

A los fines de ejemplificar estos extremos, es que transcribimos el siguiente cuadro que detalla la evolución de la inversión pública durante los años del Kirchnerismo:

| Inversión Pública en obras - Obras por Rubro (En millones de pesos) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| MINPLAN | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | EJEC/TOT 2008 |
| TOTAL ANUAL | 759 | 1.877 | 3.924 | 8.160 | 10.770 | 12.927 | 17.913 | 100% |
| % DE CRECIMIENTO | | 147% | 109% | 108% | 32% | 20% | 39% | |
| OBRAS VIALES | 224 | 477 | 1.054 | 1.903 | 2.357 | 3.208 | 4.553 | 25,42% |
| OTRAS OBRAS DE ENERGÍA | | 131 | 423 | 447 | 756 | 1.821 | 3.476 | 19,40% |
| VIVIENDAS | 375 | 703 | 1.170 | 3.095 | 3.224 | 2.928 | 2.975 | 16,61% |
| OBRAS DE SANEAMIENTO | 8 | 20 | 77 | 103 | 481 | 626 | 1.158 | 6,46% |
| INV EN INFRAEST. FERROVIARIA | | | 68 | 565 | 311 | 451 | 1.021 | 5,70% |
| OBRAS HÍDRICAS | 45 | 237 | 311 | 476 | 638 | 687 | 847 | 4,73% |
| INVERSIÓN MINERA | 0,04 | 0,23 | 19 | 217 | 161 | 161 | 724 | 4,04% |
| OBRAS DE INFRAEST. MUNICIPAL | | | 48 | 37 | 121 | 302 | 368 | 577 | 3,22% |
| ESCUELAS | | | | 4 | 105 | 247 | 329 | 550 | 3,07% |
| GASODUCTOS | | | | | 35 | 383 | 440 | 493 | 2,75% |
| OCCOVI | | | | | 29 | 251 | 340 | 481 | 2,68% |
| OTRAS OBRAS DE LA S.O.P. | | 93 | 188 | 484 | 294 | 522 | 361 | 393 | 2,20% |
| LÍNEAS DE ALTA | | | | 91 | 445 | 628 | 765 | 226 | 1,26% |

| Inversión Pública en obras - Obras por Rubro (En millones de pesos) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| MINPLAN | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | EJEC/TOT 2008 |
| TENSIÓN | | | | | | | | |
| ARQUITECTURA | | 4 | 6 | 12 | 30 | 75 | 118 | 180 | 1,00% |
| OBRAS EN PUERTOS | | 7 | 29 | 18 | 38 | 130 | 92 | 125 | 0,70% |
| EMERGENCIAS INUNDACIONES | | 3 | 28 | 79 | 106 | 119 | 86 | 77 | 0,43% |
| UNIVERSIDADES | | | | | 14 | 41 | 41 | 40 | 0,22% |
| OTRAS OBRAS DE TRANSPORTE | | | 10 | 77 | 137 | 144 | 106 | 19 | 0,11% |

*Los montos del 2008 son estimados en base al presupuesto vigente al 31 de Mayo de 2008-Pagina oficial del Ministerio de Planificación Federal, Inversión Pública y Servicios Públicos.

En el mismo sentido, es que transcribimos el siguiente gráfico en donde se trasluce una fenomenal evolución presupuestaria:

**El tema presupuestario no es menor al exponer la operatoria que el gobierno de Kirchner fijó para la cartera a cargo de Julio De Vido.  Desde el 2003 hasta la fecha el Poder Ejecutivo envió una previsión presupuestaria falaz que, entre otras cosas, contempla que, mediante los "super poderes" o la delegación de facultades, se produzcan constantes reasignaciones de fondos.**

Como ejemplo podemos mencionar la circunstancia que durante el 2007 por medio de Decretos de Necesidad y Urgencia de Kirchner o Decisiones Administrativas de Alberto Fernández se incrementaron en $10.084 millones las arcas de De Vido, lo que representó un 76.2 % mas que lo aprobado por el Poder Legislativo para ese período. Adviértase que estos fondos fueron distribuidos con el único fundamento de una decisión unilateral, arbitraria y hegemónica de los mencionados funcionarios.

**2- Concentración de Grupos Económicos Intervinientes en la Obra Pública:**

Al abordar la compleja operatoria de la obra pública argentina, debemos reconocer como un patrón distintivo la concentración de los grupos económicos intervinientes.

Muchos de ellos, tal como se encuentra demostrado y acreditado en los informes comerciales que se acompañan a la presente, tienen una aceitada vinculación personal con Nestor Kirchner y  una evidente relación comercial entre ellos, lo que les permiten ser socios y contrincantes según se presente la licitación que aspiren conseguir.

Este esquema de negocios y amistad viene de la época en que Néstor Kirchner era gobernador de la Provincia  de Santa Cruz y fue trasladado al país a partir de su asunción presidencial en mayo de 2003.

Si consideramos el país como unidad de evaluación, durante el kirhnerismo las empresas con mayor cantidad de obras viales adjudicadas son las mismas que operan en su provincia.

Así, las licitaciones de la gestión Kirchner  comenzaron a configurar una  matriz caracterizada por:

**1. Concentración económica**
**2. Concurrencia de los mismos grupos empresarios a las licitaciones no surgiendo nuevos oferentes**
**3. Escasa diferencia en las cotizaciones ofrecidas por las empresas.**
**4. Alternancia en las adjudicaciones y sobreprecios.**

Un ejemplo de esto lo encontramos en la apertura de la licitación tendiente a la pavimentación y repavimentación de la intersección de la Ruta Provincial Nº 5 y la Ruta Nacional Nº 3. En la misma, se presentaron tres empresas constructoras y las ofertas fueron las siguientes: Kank y Costilla $ 8.984.206,80, GOTTI S.A. $ 8.911.932,74 y Esuco $ 9.112.398, 58, resultando adjudicataria GOTTI S.A..

En el mismo sentido, si tomáramos como ejemplo las obras viales encontramos que la totalidad de las adjudicadas en este rubro fueron concentradas siete empresas. Seguidamente se explicita la incidencia porcentual de participación de cada una ellas en el universo.

**Porcentaje por cantidad de Obras en números reales**

La misma situación encontramos si tomamos como ejemplo como se ejecuta el Plan Federal de Viviendas, gestionado por el Ministro Julio De Vido.

Así, adviértase que el Primer Informe de Obra Publica elaborado en el año 2004 por quién suscribe la presente, que se acompaña como prueba documental, mediante algunos indicadores demostraba como los Estados provincial y nacional, ambos bajo el poder de Kirchner, pagaban altísimos sobreprecios por obras de menor valor.

En aquella oportunidad acreditamos que "Tomando como base Río Gallegos y teniendo en cuenta que los datos oficiales nacionales disponen de un presupuesto original de 56.000 pesos por vivienda y que finalmente el costo licitado en la provincia asciende a más de $ 100.000 y $ 150.000, por vivienda tipo social. Se decidió cotejarla con los valores del mercado inmobiliario de la misma Ciudad, y a mero título de ejemplo encontramos que en una casa con todas las comodidades, el metro cuadrado se cotizaba a $ 800, aproximadamente. Esta situación que es notoria porque revela un importante sobreprecio en las viviendas del Plan Federal construidas por la Provincia de más del 100%. El actual presidente del Instituto de Desarrollo Urbano y Vivienda Provincial es el Arquitecto Carlos Santiago Kirchner, primo del Presidente…"

Posteriormente, en noviembre de 2005, se presentó una actualización de la investigación, que también se acompaña como prueba documental a la presente, que denuncia el direccionamiento y la concentración empresaria como práctica habitual de la gestión kirchnerista , confirmando así la siguiente metodología:

1. El monto unitario adjudicado se encuentra por encima del monto unitario según convenio o presupuesto oficial.

2. La existencia de empresas constructoras adjudicatarias de licitaciones que, por sus antecedentes, no se encontraban habilitadas para serlo. Tal es el caso de Gotti SA que, por ser deudor del Estado, no cumple con los requisitos necesarios para ser proveedor del mismo, situación que se también encuentra acreditada en la documentación acompañada a la presente.

3. Arbitraria distribución de la obra publica por jurisdicción

4. Ausencia de planificación estratégica en materia de inversión publica.

**3. Las Relaciones de Néstor Kirchner.**

A continuación, se realizará una enumeración de las relaciones comerciales y personales de Néstor Carlos Kirchner, organizador y jefe de la posible asociación ilícita que solicitamos se investigue.

**- Lázaro Báez:** se encuentra acreditado que su fabuloso crecimiento y expansión económica se produjo a partir de su relación con Néstor Kirchner en la época que este era Gobernador de Santa Cruz. Es su amigo, socio y pieza fundamental en la matriz de negocios que esta denuncia expone.

Según se encuentra acreditado, en el año 1990 el Sr. Báez tenía como únicos activos tangibles un Ford Falcon ´72 y una humilde vivienda que habitaba con su familia en Río Gallegos. Lejos estaba de la casa inteligente en la que mora Báez hoy en día, con luces que se prenden mediante comandos verbales, rodeada de 2.000 cedros azules y decenas de custodios.

Fue en los 90 donde Báez emprendió una sólida amistad con Néstor Carlos Kirchner.

Según refieren sendos artículos periodísticos, que se acompañan a la presente, Lázaro, en su carácter de cadete del Banco de Santa Cruz, y Kirchner, en ejercicio de la intendencia de Río Gallegos, consolidaron un lazo de mutuo interés. Báez le pasaba información del banco provincial a Kirchner, y éste le abría un mundo de contactos importantes, cuestión clave para los negocios. La relación prosperó, igual que las cuentas de ambos.

De esa manera, cargos provinciales al inicio, obra públicas millonarias después y por último millonarias licitaciones petroleras, lo catapultaron como uno de los empresarios más exitosos de los últimos cuatro años.

En 1991, apenas Kirchner fue electo como gobernador, Lázaro Báez fue beneficiado con el cargo de gerente adscripto del Banco Santa Cruz, ubicado apenas un escalón por debajo del gerente general. Un cargo que, durante la cuestionada privatización del Banco de Santa Cruz, el mismo Báez ocupó con un poder omnímodo.

Como gerente general y hombre fuerte del banco provincial, Báez condujo su privatización de modo fructífero para empresarios de buena llegada a Kirchner. Por un lado, transfirió al Estado provincial una deuda de $ 170 millones, originada en créditos incobrables que él mismo había otorgado a distintas empresas, entre las que se encontraba Gotti S.A.. De esta manera, el principal favorecido fue Enrique Eskenazi, quien se alzó con un banco libre de deudas, y que además siguió siendo el agente financiero de la provincia.

Sugestivamente fue a partir de 2003 cuando Lázaro Báez constituyó Austral Construcciones S.A., la que inició su actividad el 8 de abril de ese año, con un capital social de apenas $12.000, conforme se publicó en el Boletín Oficial de la Nación N° 30.151.

Desde su apertura esta compañía ya ganó licitaciones por más de $ 3.500 millones.

Como si ello no fuera suficiente, ya en agosto de 2003 Austral Construcciones fue favorecida con la concesión de dos áreas petroleras en Formosa, en febrero de 2007 con tres más en Santa Cruz. Actualmente, posee una petrolera cuya producción diaria supera los 50 millones de metros cúbicos, y la de gas llega a casi 10 millones de metros cúbicos.

El 11 de agosto del 2003,  el Ministerio de Planificación Federal autorizó a Benito Roggio e Hijos S.A. a ceder las áreas petroleras CON-14 "El Chivil" y CON-7 "Surubí" a Misahar Argentina, una de las petroleras de Báez. La otra es EPSUR.  Todas estas con domicilio en Carabelas 241, al igual que Austral.  A partir de ahí, fue ganando licitaciones cuestionadas como la de las 15 áreas petroleras en Santa Cruz, donde  Epsur se quedó con Río Guenguel, Meseta Cerón Chico y Sur Río Deseado.

Se encuentra registrado a fs. 18 del libro de Actas de Austral Contrucciones  S.A. que "En la Ciudad de Buenos Aires, Capital de la Republica Argentina, a los 10 días del mes de junio de 2005, siendo las 09.00 hs, el directorio de Austral Construcciones SA se reúne a fin de la constitución de su fideicomiso por el cual Austral Construcciones se constituye en inversor fideicomitente, a fin de llevar a cabo la construcción de 10 unidades funcionales en propiedad horizontal, en el inmueble propiedad de Néstor Carlos Kirchner (…), en un plazo de 12 meses a contar por a partir del 1 de julio de 2005, estimándose que la inversión rondara los $ 700.000, acordándose que la sociedad recibirá al finalizar el mismo, cinco unidades funcionales…".

Por lo tanto, no hay dudas que durante el ejercicio de su mandato,  Néstor Kirchner tuvo una sociedad comercial con un empresario beneficiado por la obra pública de su gobierno.

Asi, entre otras fuentes que abonan esta denuncia, se destaca el Diario Perfil , que describe  un  circulo virtuoso en el que la figura central es Néstor Kirchner, en el cual "…opera un gran grupo empresario que facturan al unísono y responden a un solo hombre: Lázaro Baez.  Estas empresas,  fueron señaladas por la Administración Federal de Ingresos Públicos (AFIP) y   son investigadas por evasión fiscal y presunto pago de sobornos".

De acuerdo a lo expresado en los párrafos anteriores, Lázaro Báez a cargo Austral Construcciones SA es la punta de lanza del "pool empresario", que tiene bajo su control a Palma SA, Gotti S.A., Gancedo S.A., Kank y Costilla S.A. y Badial SA.

Todo esto se encuentra acreditado en la investigación desarrollada por  la Administración Federal de Ingresos Públicos (AFIP)   que comprobó que 500 millones de pesos fueron facturados con boletas apócrifas a través de empresas fantasmas, por parte de Gotti S.A., evadiendo  120 millones de pesos del IVA.  Además de Gotti SA la DGI también aseguro que Austral Construcciones, Badial SA, Gancedo SA- todas vinculadas a Baez-y Casino Club SA de Cristóbal Lopez  habían utilizado facturas "truchas".  Todas estas compañías conducen a Nestor Kirchner

Por su parte, Sergio Gotti, que es el socio minoritario de Austral, según la AFIP evadió más de 500 millones de pesos.  Este quedó  a cargo de Gotti SA, la empresa que fundo su familia.  Esta compañía quebró, pero mantuvo la marca y fue absorbida por Invernes S.A, ácidamente conocida en el sur como "Inversiones Nestor" y comandada al menos en los papeles por Guido Blondeau del grupo Báez.  Tanto Gotti, como Austral e Invernes, comparten sede social: el quinto piso del edificio ubicado en Carabelas 241 de la Ciudad de Buenos Aires.  Todas son investigadas en las derivaciones del Caso Skanska y por delitos tributarios mediante facturación apócrifa.

Es importante destacar que Gotti S.A presentó 53 contratos de obra pública que se llevaron adelante desde 2002 a 2007 por unos 627 millones de pesos. Cinco de ellos los hizo la Dirección de Vialidad de la provincia de Santa Cruz por $ 300 millones.  El Instituto de Desarrollo Urbano y Vivienda de esa provincia encargó 40 obras por $ 239 millones, en tanto ocho contratos más fueron realizados por ese Instituto y refrendados por una Subsecretaría que depende del Ministro Julio De Vido. La cifra ascendió a más de $ 86 millones.

Finalmente, adviértase que gran parte de las obras restantes fueron facturadas, como se ve,  a una empresa como Austral Construcciones S.A, Palma (a nombre de Diego Palleros cuñado de Lázaro Báez), Gancedo y  Kank y Costilla S.A.

Confirma lo dicho el libro de actas de Austral Construcciones en el que queda al descubierto el radio de acción y movimientos de las empresas de Báez donde todo tiene que ver con todo.  En más de una ocasión, tanto Palma como Gotti cedieron y renunciaron a contratos para dejarle el beneficio a Austral Construcciones. El mecanismo, generalmente, es utilizado para evitar que, oficialmente, quede constancia que las obras son otorgadas siempre a una misma empresa y así esconder el presunto pago de coimas.  Lo mismo ocurre con los derechos de cobro de certificaciones de obras adjudicados a Gotti, que finalmente fueron cobrados por Austral.

**La cartelización de la obra pública se encuentra acreditada conforme la siguiente trascripción, cuya documentación se acompaña:**

• A fs. 11 del libro de actas de Austral Construcciones dice "(…) a los 10 días del mes de febrero de 2005 el directorio de Austral Construcciones SA aprueba y firma formalmente el SUBCONTRATO DE EJECUCION DE OBRA por el cual GOTTI SA contrató a AUSTRAL CONSTRUCCIONES para las obras 1- Repavimentación Ruta Provincial 5-Tramo Km 23, 2-Ruta Nacional 40-Tramo Cancha Carrera-Pte. Rio Turbio…".

• A fs. 11 del Acta del directorio del 14 de febrero de 2005 PALMA SA cede, trasfiere y renuncia a favor de Austral Construcciones los contratos de obra a) 42 Viviendas Convivir  y b) Viviendas Convivir Sector 1 – La cesión se realizo en forma gratuita y sin cargo alguno.

• A fs. 21 del Acta de Directorio por la cual Juan Felipe Gancedo SA cede y transfiere a Austral Construcciones el contrato de la obra 63 de Viviendas e Infraestructura en el Sector Ejercito-Río Gallegos.

Igual operatoria se advierte en la obra de  pavimentación de la segunda sección de la ruta provincial 7, un emprendimiento de casi 170 millones de pesos que  fue adjudicada por la empresa "Sucesores de Adelmo  Biancalani", la que se encuentra íntimamente vinculada con la constructora de uno de los socios de Kirchner, Lázaro Báez. Biancalani vendió el 60% de su empresa familiar asociándose con  Báez, que tiene como director de su constructora, Austral, al ingeniero Julio Mendoza, nacido en Chaco.

Esta obra también cuenta con un sobreprecio importante según fuentes del mercado. Los 166.958.079,74 pesos presupuestados para su realización son una cifra exorbitante para realizar los objetivos de la obra: 57 kilómetros de pavimento en esa zona, más los

accesos y empalmes a la ruta.   Por poner un ejemplo, la pavimentación de 25 kilómetros de la ruta 4, también en Chaco, está presupuestada en 42.318.634 pesos. La matemática es lapidaria. Un kilómetro de asfalto de la "ruta K" tiene un costo de 2.929.089,10 pesos. La misma extensión, pero en la ruta 4, sale 1.692.745,36 pesos.

**- Cristóbal López:** No nos equivocaríamos si al describir a Cristóbal López lo asociamos a Néstor Kirchner y Julio de Vido, y con ellos a una misma forma de manejar el poder: manipulación y corrupción  política, concentración económica, avasallamiento a las normas, aprietes y presión sobre sus circunstanciales oponentes o detractores.

Es por eso que denunciamos y describimos la complicidad de Néstor Kirchner en todo lo referido a los beneficios, prerrogativas y prebendas que su gobierno le ha dado a las empresas del grupo perteneciente a Cristóbal López.
Así, no puede soslayarse la vertiginosa movilidad social ascendente, y enriquecimiento económico de López en los últimos años.

A los 18 años de edad Cristóbal López vendía pollos y verduras en Comodoro Rivadavia, cuando de la mano de Armando "Bombón" Mercado (ex esposo de Alicia Kirchner) y Diego Ibáñez, lo toco la varita mágica de la obra pública y las concesiones con el Estado que le permitieron acumular la fortuna que hoy ostenta.

Actualmente, es propietario de casinos y salas con maquinas tragamonedas en 19 ciudades del país; cría caballos criollos, posee una empresa petrolera y otra dedicada al transporte de hidrocarburos, es dueño de una empresa recolectora de residuos, de turismo, otras dos operan el servicio de transporte colectivo de pasajeros en las ciudades de Neuquén y Comodoro Rivadavia, administra un canal de televisión, es dueño del diario El Chubutense, cuenta con empresas de tecnología, constructoras, posee olivares e importantes extensiones de tierras.

Se inició en el negocio del juego en 1992, en su Chubut natal bajo el gobierno del radical Carlos Maestro, mediante la constitución de Casino Club junto a Ricardo Benedicto empresario relacionado con la constructora Kank y Costilla, una de las principales beneficiarias de la adjudicación de obra publica en la Provincia de Santa Cruz y de probada vinculación con el Ministro De Vido y Lázaro Baez. En Chubut, cuenta con salas de juegos en Trelew, Playa Unión, Rawson, Rada Tilly (donde vive Cristóbal López) y Comodoro Rivadavia.  En la Santa Cruz de los tiempos de Kirchner, estrenaron salas en Río Gallegos Caleta Olivia y El Calafate.

Respecto de su participación en el negocio energético, la misma se desarrolla mediante dos empresas "Oil M&S" prestadora de servicios, principalmente a Repsol, y Clear S.A, explotadora del Yacimiento Cerro Negro.  Oil M&S inició sus actividades en la provincia de Chubut como una empresa proveedora de soluciones integrales para la industria hidrocarburifera y minera de la Republica Argentina. Constituida hace apenas 7 años (2001), su mayor volumen de negocios se produjo con la llegada de Kirchner al poder.  Su Presidente es Cristóbal Manuel López y sus Directores son: Carlos Fabián De Sousa, Muriel Lucia Sosa de López y José Antonio Tasca.

Los detractores de López señalan que en 2005 abarcó menos del 1% de la producción nacional de hidrocarburos. En cambio, quienes prefieren ver la película con una mirada futurista señalan hacia el pasado la importancia de haber ganado la licitación en Brasil y

hacia lo que viene, sus posibilidades financieras y la llegada directa a la pareja presidencial.

El 17 de noviembre de 2006 el gobierno de Santa Cruz llamó a licitación nacional e internacional de quince áreas petroleras. Este proceso contó con una celeridad llamativa y poco habitual en este tipo de asuntos, a saber:
a) La apertura de los sobres con las ofertas se realizó apenas veintitrés días hábiles más tarde (tanto la ley como la práctica indican un promedio que debe  oscilar entre los sesenta y noventa días para elaborar las ofertas, de hecho Repsol y Petrobras pidieron una prórroga que no les fue concedida) y se analizaron allí las curiosas exigencias del llamado, que atentan contra el principio de concurrencia, fundamental para garantizar la transparencia en las licitaciones, evitando así el direccionamiento en los requisitos para beneficiar a algunas en desmedro de otras.

b) El ganador debería tener un mínimo de treinta por ciento de capital regional (entendiendo por "regional" estar instalado en Santa Cruz, Chubut o Tierra del Fuego).

c) En la fórmula de preadjudicación, si la empresa tenía el ciento por ciento de capital regional, sus puntos subían de manera irremontable para cualquier competidor, aunque ofreciera una altísima inversión o importantes regalías.

d) No se exigió ningún parámetro objetivo de evaluación técnica; para decirlo de otro modo: no importaba que el ganador alguna vez hubiera extraído petróleo, cargado nafta o regenteado un almacén de ramos generales.

e) Los antecedentes fueron evaluados por una comisión constituida para dichos fines.

Tal ha sido el escándalo que Jorge Lanata describió en su artículo "El pozo no quedó vacante" que el Ministro de Economía Provincial Juan Bontempo, en dialogo con empresarios del sector enunció "Yo me voy con los sobres a Buenos Aires y esto lo decide De Vido".

El negocio es de U$S 130 millones de inversión para un retorno garantizado durante 25 años, ya que en la mayoría de las áreas está probada la existencia de petróleo.

Anteriormente, "en enero de 2006, al cerrarse la Etapa A, el gobierno informó quiénes pasaron la primera etapa: Oil M&S, Epsur, Misahar, Geopark-Costa, Inwell y Estrella. En febrero se cerró la segunda etapa, quedando afuera Inwell y Estrella. Y en marzo, al abrirse el sobre C, quedó claro que las empresas Oil M&S, Misahar y Epsur (constituida el 2/12/05 ) se habían quedado con todo: tres empresas pero sólo dos personas, Cristóbal (López) y Lázaro (Báez). Bueno, no con todo: un área quedó desierta, ya que la buena educación indica que no hay que terminar lamiendo el plato...".

Como corolario de lo expuesto, se encuentra la relación laboral de la petrolera de López con el compañero de viaje de Antonini Wilson y presidente de la petrolera estatal ENARSA, Ezequiel Espinosa, acreditada mediante aportes previsionales obrantes en la página de la ANSES desde el mes de mayo de 2007 al menos hasta el mes de noviembre próximo pasado. . Adviértase que la empresa "OIL M&S S.A." es una petrolera privada que se ha presentado en al menos una de las Licitaciones llamadas por ENARSA lo cual

podría generar "conflictos de intereses" entre su actividad privada y su rol de funcionario público.

Este empresario ha sido beneficiario durante el gobierno de Néstor Kirchner por intermedio de:

• Concesiones de recursos naturales mediante procedimientos irregulares, direccionados y contrarios a derecho.
• Prórroga de concesiones por fuera de los plazos y los procedimientos administrativos previstos.
• Utilización de las fuerzas de seguridad del estado, como grupo de choque, a disposición de las empresas, lesionando el derecho y la integridad de los trabajadores
• Complicidad con el Ejecutivo de la GCBA, respecto del ejercicio de su competencia en materia de juego ante el avasallamiento de la autonomía por parte del Gobierno Nacional.
• Licitaciones dirigidas y violación del principio de concurrencia
• Ausencia de controles por parte del Estado, en las empresas pertenecientes al grupo que comanda Cristóbal López: Ministerio de Trabajo, AFIP, Lotería Nacional, Secretaria de Energía, ANSES, entre otros.

Tanto es así que  5 de diciembre de 2007, el ex presidente Néstor Kirchner hizo uno de sus últimos y más resonantes actos de gobierno. Como un sello personal  firmó el Decreto 1851/07 otorgándole una prórroga hasta el 2032 de la concesión de la operatoria en el Hipódromo de Palermo a Cristóbal López.

Dicho decreto tiene algunas particularidades en su redacción que no sólo resultan antijurídicas sino revelan en forma desenfadada la voluntad del gobierno de beneficiar a un empresario afín, más allá de las reglas, más allá de las formas, más allá del decoro. Para dar prueba de ello, transcribiremos algunos puntos obrantes en los Considerandos de dicha norma y que resultan por demás ilustrativos, a saber:

• Que la concesión fue adjudicada en 1992 por un plazo de 25 años. Por tanto se hubiese encontrado vigente hasta el 2017, sino fuera porque Kirchner la renovó llamativamente10 años antes de su vencimiento.

• Que resulta ampliamente cuantificable el éxito obtenido, tanto en los montos de recaudación como en la asistencia del público apostador, por las máquinas electrónicas cuya instalación se le autorizara a la firma Hipódromo de Palermo S.A.

• Que de lo expuesto precedentemente surge que, dicho emprendimiento lúdico constituye un elemento generador de recursos propios que luego son distribuidos por el Ministerio de Desarrollo Social.

• Que de lo manifestado precedentemente resulta necesario agregar que el emprendimiento autorizado, generó un importante número de genuinos puestos de trabajos.

• Que Lotería Nacional SA (LNSA) ha dictado la Resolución Nº 31/07 mediante la cual se intima al concesionario de Palermo a incrementar el parque de máquinas electrónicas atento la necesidad del mercado lúdico

• Que Hipódromo Argentino de Palermo SA ha efectuado una serie de consideraciones respecto al escaso tiempo restante para la finalización de la concesión otorgada (10 años) lo cual le permitiría amortizar las perdidas sufridas.

• Que de las propias características de la actividad se desprende que las explotaciones lúdicas deben efectuarse conforme a los gustos del público apostador que resultan mutables.

• Que conforme lo expuesto se debe intensificar dicha explotación dado que actualmente existe una demanda superior a la oferta.

De lo transcripto precedentemente, se acredita que Néstor Kirchner hizo suyos los argumentos esgrimidos por la empresa y que resultan contradictorios entre sí. Esta situación, junto con la cuestión de la competencia, podrían generar las condiciones para solicitar la nulidad de dicho acto. A saber:

• El presidente Kirchner renueva diez años antes y en sus últimos días de gestión una concesión de juegos de azar.

• Uno de los elementos a tener en cuenta por Kirchner es la generación de puestos de trabajo que él define como genuinos. Esto se produjo concomitantemente  con marchas de trabajadores de las empresas que denunciaron irregulares condiciones de trabajo y hostigamiento laboral.

• El presidente mediante su Decreto intima a la empresa a que compre mas máquinas de juegos, entrometiéndose mediante esta norma en la estrategia comercial y el gerenciamiento de la firma, confundiendo así lo público con lo privado.

• El presidente hace suyas las palabras de la empresa que dice que la misma ha sufrido perdidas, argumento en el que se funda el pedido de prorroga. No obstante a renglón seguido y en el mismo cuerpo jurídico instó a la empresa a colocar mas máquinas para satisfacer la demanda de apostadores que, a su entender, superan la oferta. Finalmente, es la misma empresa en su revista "Casino Club" la que reconoce sus importantes ganancias al indicar que "…los porcentajes de afluencia de público en los Casino Club en relación a la cantidad de habitantes de cada ciudad, también son superiores a la mayoría de los casinos de Europa y Latinoamérica…"

• El presidente en su decreto también interpreta las costumbres de los apostadores de las maquinas tragamonedas al describir que deben adaptarse al gusto mutable del cliente.

Así, Néstor Kirchner como presidente de todos los argentinos fundamentó tal desarreglo jurídico mediante argumentos falaces propios de un socio y evidentemente inapropiados para quien ejerce la primera magistratura de un país.  La intervención de Casino Club en el Hipódromo de Palermo nada tiene que ver, actualmente, con la crisis del turf en la Argentina y poco tiene de emergencia por cuanto son reconocidas e importantes las ganancias obtenidas por la firma desde el inicio de la explotación a la fecha.

Ante esto queda revelada la intención de Néstor Kirchner de generar las condiciones más favorables tendientes a incrementar el valor de la empresa para una posterior venta al exterior.  Cualquier tipo de concesión tiene un valor determinado conforme sea el

tiempo que le quede para poder operarla y esta prorroga, en las condiciones ya enunciadas, parecería responder a esta estrategia.

**Rudy Ulloa:** Esta persona se relacionó con Nestor Kirchner desde que trabajó como cadete en su estudio de abogados. Posteriormente, se convirtió en su secretario privado en la intendencia de Río Gallegos, y años más tarde, con Nestor Kirchner como gobernador de la Provincia, fue designado como Director del Centro Comunitario El Carmen dependiente del Ministerio de Asuntos Sociales, a cargo de Alicia Kirchner.

Conforme se encuentra acreditado en el informe de financiamiento de campaña 2003 del ARI, que como prueba se acompaña a la presente, Rudy Ulloa junto a Claudio Uberti y Julio De Vido se constituyeron en voceros y recaudadores de la campaña de la fórmula Kirchner - Scioli.

Conforme surge de la compulsa de dicha documentación Julio de Vido - valiéndose de información que conocía de actividades ilícitas desarrolladas por CONARPESA cuando Espinosa la integraba- le solicitó, como extorsión / colaboración financiera U$S 60.000 al dueño de Pesquera San Isidro, Cacho Espinosa, a través de Ulloa.

En aquella oportunidad fue Rudy Ulloa quien le prometió a cambio favorecerlo con permisos de pesca y la operación de una línea Urbana de Río Gallegos. Finalmente el pago de los U$S 60.000 se hizo en tres cuotas, la primera se le abonó a Ulloa y las restantes a Claudio Uberti.

Es vertiginoso el ascenso social de Ulloa que va desde vendedor de diarios a ser denunciado, en el 2001, por tener un plazo fijo a su nombre de $ 1.302.055,60 del Banco de Tierra del Fuego, dinero que después Néstor Kirchner reconoció como propio.

De las empresas reconocidas y a su nombre se destacan medios provinciales con importante pauta publicitaria, nacional y provincial. Entre ellos, el periódico Austral, la radio FM El Carmen y la productora Cielo. Además, explota la señal local de Canal 2 de Río Gallegos -el cable propiedad de Supercanal S.A.-, cuyos contenidos son aportados por su propia productora. Durante el 2005 constituyo dos sociedades: CUMEHUE cuyo objeto son las explotaciones financieras y que contó con un capital inicial de $ 30.000 y EL PERIODICO inscripta en el BO 3902 del 29/09/05 que integra junto al abogado Carlos Long, también fuertemente relacionado con Nestor Kirchner.

De vendedor de diarios, puntero del Frente para la Victoria y Secretario de Nestor Kirchner se transformó, sorprendentemente, en un empresario con poder económico como para hacer una oferta para adquirir TELEFE cercana a los 320 millones de dólares, en momentos en que Nestor Kirchner necesitaba presencia en los medios de comunicación por estar enfrentado con el campo.

**- Claudio Uberti:** Respecto de Claudio Uberti, encontramos el mismo común denominador que con el resto de los miembros de la Asociación Ilicita denunciada, caracterizados por orígenes humildes hasta su vinculación con Néstor Kirchner y su posterior crecimiento patrimonial.

Uberti nació en un pequeño pueblo del sur santafesino –ubicado al límite de la frontera con la ciudad bonaerense de Colón–, llamado Wheelwright.  En los 80 Uberti se mudó a la Provincia de Santa Cruz donde se relacionó con Julio De Vido.

Tuvo en Río Gallegos una constructora unipersonal que se ocupaba de instalar cerámicos y azulejos, y su amistad con el ex chofer presidencial Rudy Ulloa lo llevó a convertirse en uno de los dos recaudadores K (el otro, claro, era el mismo Rudy). Su primer vínculo con el Estado fue, como siempre, una licitación: la que ganó junto al esposo de Silvia Esteban, funcionaria de la provincia de Santa Cruz y dirigente del Frente para la Victoria, para construir un barrio llamado Cuatrocientos Departamentos. Fue hace veinticinco años y aún hoy los vecinos aún se quejan por las deficiencias en el plan de obras.

En el año 2003, ya como Presidente de la República, Néstor Kirchner designó a Claudio Uberti al frente del Órgano de Control de las Concesiones Viales (OCCOVI), que es el organismo encargado de la supervisión, inspección, auditoría y seguimiento del cumplimiento de los contratos de los casi diez mil kilómetros de rutas nacionales concesionadas del país, a fin de asegurar la calidad y adecuada prestación de los servicios y la protección de los usuarios y los bienes públicos del Estado. Es indispensable mencionar que, al momento de su designación, Uberti no contaba con los requisitos mínimos de idoneidad que requieren los funcionarios públicos, puesto que no poseía titulo ni experiencia en la materia.  No obstante esto, desde su asunción al frente del Occovi,   Kirchner amplió las competencias del Ente e inició un proceso de renegociación de las concesiones viales por Decreto N° 1007/2003.

Mediante el Decreto 425/2003 , posterior a la designación de Uberti, el ex Presidente Kirchner resolvió licitar los corredores viales concesionados por el Decreto N° 2039/90. Adviértase que un informe de la Auditoria General de la Nación  señaló  que la  licitación fue observada como irregular, particularmente por el procedimiento de selección y adjudicación desarrollado.

En la compulsa se empleó el criterio de adjudicación que vincula la "mejor oferta" con "mejor precio". Ello ha sido cuestionado por la doctrina y la jurisprudencia por entender que no siempre asegura el mejor oferente.

El diseño de la normativa licitatoria posibilitó modificación a los pliegos y al texto del contrato durante el desarrollo del proceso licitatorio. Ello no se condice con los principios de concurrencia e igualdad que debe regir todo proceso de selección. Asimismo, se han realizado modificaciones a las Propuestas de Especificaciones Técnicas con posterioridad a la adjudicación y encontrándose vigente el contrato de concesión. Las modificaciones –originadas en errores en las ofertas presentadas en la licitación por cuanto las correcciones- provocaron un desequilibrio económico financiero que podría haber dejado fuera de aceptación las ofertas, alterando lo decidido en la adjudicación.

No se evaluó el cumplimiento del requisito de elegibilidad, exigido por el Pliego de Bases y Condiciones Generales y el Decreto N° 1023/2001.

Finalmente,  mediante el  Decreto N° 1915/2004, el ex Presidente Kirchner le delegó y otorgó  al Occovi las contrataciones y ejecuciones de construcciones, trabajos o

servicios que revistan el carácter de obra publica del que derivaron, asimismo, en serias irregularidades también denunciadas por la AGN, que se acompañan a la presente.

Como se encuentra acreditado, Claudio Uberti, es quien lleva adelante el enlace entre el Gobierno Argentino y el de Venezuela, siendo su cargo en el Occovi funcionalmente distinto a la labor que extraoficialmente desempeña. Tal es así que el Diario Infobae en su edición del 25/12/05 dio cuenta que Julio De Vido impulsaba la candidatura de Uberti a la embajada de nuestro país en Venezuela.

Un ejemplo de esto, lo observamos en el testimonio de Antonini Wilson ante los Tribunales de Miami, Florida cuando dice que fue Uberti quien lo invito a viajar en avión desde su país a Buenos Aires donde "hablamos de los tubos de gas de ENARSA". Adviértase que por agosto de 2007, estaba vigente la licitación, impulsada por ENARSA, para construir el Gasoducto del Noroeste.
Asimismo, se encuentra acreditada su participación en el Fideicomiso con Venezuela celebrado por Nestor Kirchner en el marco de los convenios bilaterales creado en 2004, el que posteriormente será referenciado.

Este fideicomiso opera con el dinero que Argentina le paga a Venezuela por la compra de petróleo. Por cada venta, CAMESA Compañía Administradora del Mercado Mayorista Eléctrico) depositó el pago en una cuenta que el Bandes (Banco de Desarrollo Económico y Social de Venezuela) tiene en Nueva York.
A través de este negocio circulan más de 300 millones de dólares. Con ese dinero, por ejemplo, el Gobierno de Venezuela compra productos argentinos, operación que se concreta con la firma del presidente Chávez.

Según el reglamento del Fideicomiso, se le adelanta a la empresa el 30% del valor de la compra, lo que vuelve el negocio ciento por ciento seguro. El Diario Perfil el 25/02/07 afirma que el especialista en calmar la angustia de los atrasos de meses en los contratos es Claudio Uberti, mano derecha de De Vido y personaje clave en los negocios venezolanos. El par venezolano del ágil Uberti es Franklin Mendez, director del Bandes. "Lo que está fuera del fideicomiso tiene su lógica –confesó a PERFIL un funcionario de segunda línea del Gobierno Nacional – pero lo que está por dentro del fideicomiso es inmanejable. Todo está bajo el aura de Claudio Uberti.".

**4- Facturas Apócrifas y Posible Pago de Coimas:**

Con relación a la utilización de facturas apócrifas, esta forma de operatoria se reitera en las empresas asociadas a Nestor Kirchner, De Vido y Lázaro Baez. Basta recordar que Kank y Costilla, otra de las empresas vinculada a estos, fue penalmente denunciada por la AFIP de Comodoro Rivadavia por una importante evasión fiscal, causa en la que se involucró directamente a Julio De Vido como facilitador en los procesos licitatorios en la Provincia de Santa Cruz. Este hecho no fue investigado por la Justicia, quien decidió sobreseer, apenas asumido el Presidente Kirchner, a los miembros de la empresa por haberse constatado el pago de la suma presuntamente adeudada sin investigar los demás delitos ventilados en el proceso.

En el citado juicio declaró como testigo Estela Kank, una de las fundadoras de la firma, quien ratificó la relación del Ministro De Vido con la Compañía.

En esa causa también se expone el vaciamiento de la firma, a través de falsificación de sellos y facturas, hechos que tampoco habrían sido investigados por la justicia.

Téngase presente que en las maniobras de evasión fiscal, la accionista damnificada da cuenta de una triangulación entre las sucursales Comodoro Rivadavia, Río Gallegos y Ushuaia del Banco de Tierra del Fuego. Esta entidad bancaria, denunciada oportunamente por lavado de dólares, fue donde se detectaron las cuentas de la familia Kirchner y de Rudy Ulloa Igor.

La utilización de facturas apócrifas para ocultar pagos ilegales parece ser el círculo que cierra un "modus operandi" que se reitera, se fomenta y se oculta mediante el tráfico de influencias, abuso de poder, y todo tipo de presiones que Néstor Kirchner ejerce sobre los funcionarios de la AFIP que pretendan investigar este tipo de ilícitos. Esto se acredita mediante sendos artículos periodísticos que señalan "En algunos despachos de la DGI desconfían que se avance sobre la investigación. En la Casa – como los inspectores llaman al organismo- se manejaban varias hipótesis sobre el objetivo de las empresas para utilizar facturas truchas, pero la mas contundente dice que el dinero que les pagan a empresas fantasmas es para justificar el pago de sobornos (…). Como este grupo de empresas son las que siempre consiguen las adjudicaciones de obras públicas y otros negocios tercerizados por el Estado, en el sur crece la hipótesis de que las facturas encubren el pago de coimas. ".

La circunstancia explayada en el párrafo precedente se expone brutalmente con el desplazamiento de funcionarios de carrera de la DGI que intervinieron en el procedimiento. A saber: "(…)la investigación sobre facturación apócrifa en la obra publica y otros servicios al Estado en Salta Cruz y Chubut duró un año y medio, hasta que en mayo de este año Presidencia habría ordenado que se frene la investigación iniciada en Comodoro Rivadavia por Norman Ariel Williams ( …. ) Entonces, el Director de la DGI, Horacio Castagnola le ordenó al jefe directo de Williams, el Subdirector Nacional de Operaciones Impositivas del Interior, Jaime Mecikovsky: "paren todo".

A partir de esto, desde el Gobierno de Kirchner se avanzó sobre las estructuras jerárquico- administrativas de la AFIP de la siguiente manera:

• Desplazamiento del jefe de la AFIP de Comodoro Rivadavia, Norman Williams, que investigaba a las empresas de Santa Cruz por el uso de facturas apócrifas, en una maniobra que dio lugar a varias causas judiciales que involucran a grandes compañías. Finalmente presentó su renuncia que le fuera aceptada el 3/JUN/08 por disposición 234/08 de la AFIP.

• Nombramiento en su reemplazo Héctor Alejandro Sartal, supervisor interino de la División Fiscalización Nº 4 de la Dirección Regional de Palermo mediante la Disposición 234/08.

• Jaime Mecicovsky, Subdirector Nacional de las Operaciones Impositivas en el Interior del país, y por ende jefe de Williams, no firmó la designación de Sartal, que tuvo que ser avalada por Claudio Moroni, titular de la AFIP el 1/AGO/2008.

• Jaime Mecicovsky, dependía de su inmediato superior Horacio Castagnola, Director de la DGI. Ambos fueron removidos de sus puestos y reubicados en el Instituto de Estudios Tributarios de la AFIP.

• Castagnola fue reemplazado por Angel Rubén Toninelli, según las fuentes muy allegado al Ministro Julio De Vido. Se había mencionado que Castagnola iba a ser reemplazado por Carlos Sánchez, asesor legal de  Jorge Capitanich.

Como corolario de lo expuesto, adviértase que  la justicia del principado de Liechtenstein investigó por lavado de dinero a  Austral Construcciones.  Un tribunal de primera instancia de ese principado europeo tiene bloqueados 10 millones de dólares de la empresa .

"El dinero pasó por el banco Macro Bansud y por el Sud Bank and Trust Ltd. de las Bahamas, para terminar en el Hypo Investment Bank AG de Liechtenstein. Los fondos fueron depositados en una cuenta abierta por Trade 24 Ltd. de Victoria, la capital de la república de Seychelles, conformada por más de un centenar de pequeñas islas ubicadas en el océano Indico, al noreste de Madagascar. Esa cuenta fue abierta bajo requerimiento administrativo de normas de seguridad internacionales; según ese trámite allí debían moverse fondos provenientes de la venta de sistemas de calefacción, pero los únicos recursos que finalmente se movieron fueron los de la empresa santacruceña.  El 15 de mayo de 2006 se depositaron 10 millones de dólares provenientes de Austral Construcciones SA de la Argentina, y que la transacción no cumplió con los estándares internacionales requeridos para la operación…".

"Al tribunal europeo le llama la atención el recorrido del dinero, que incluyó una maniobra de compra venta de títulos en su paso por Bahamas. La investigación judicial también ha puesto el ojo sobre las razones por las cuales el dinero de Austral Construcciones se depositó en una cuenta en la que la empresa santacruceña no aparecía comprometida directamente…"

Es importante destacar que con motivo de esta investigación se piden informes al Gobierno de Santa Fe, por ese entonces en cabeza del actual diputado del Frente para la Victoria Jorge Obeid.  Téngase presente que en la  licitación de provisión de maquinarias motoniveladoras se encontraron importantes irregularidades por el irrisorio monto de $ 51 millones por 140 máquinas chinas Dinsheng Tiangong.. En esta operación fundamenta Austral Construcciones, a través de su contador Fernado Butti, el origen de los fondos investigados en  Liechtenstein. "El dinero pasó por el banco Macro Bansud y por el Sud Bank and Trust Ltd. de las Bahamas, para terminar en el Hypo Investment Bank AG de Liechtenstein. Los fondos fueron depositados en una cuenta abierta por Trade 24 Ltd. de Victoria, la capital de la república de Seychelles, conformada por más de un centenar de pequeñas islas ubicadas en el océano Indico, al noreste de Madagascar.Esa cuenta fue abierta bajo requerimiento administrativo de normas de seguridad internacionales; según ese trámite allí debían moverse fondos provenientes de la venta de sistemas de calefacción, pero los únicos recursos que finalmente se movieron fueron los de la empresa santacruceña.  El 15 de mayo de 2006 se depositaron 10 millones de dólares provenientes de Austral Construcciones SA de la Argentina, y que la transacción no cumplió con los estándares internacionales requeridos para la operación…".

"Al tribunal europeo le llama la atención el recorrido del dinero, que incluyó una maniobra de compra venta de títulos en su paso por Bahamas. La investigación judicial también ha puesto el ojo sobre las razones por las cuales el dinero de Austral Construcciones se depositó en una cuenta en la que la empresa santacruceña no aparecía comprometida directamente…"

Entre las hipótesis que se investigaron como maniobras de lavado figura la compra -a través de terceros- de títulos o pagarés a empresas de dudosa reputación, que son depositados como garantía para tomar créditos reales en bancos que operan legalmente. La maniobra permite reingresar el dinero justificado como un financiamiento legal, cuando la garantía es dinero propio cuya procedencia no se puede justificar en términos legales.

Ante esto, adviértase que el delito de facturación apócrifa los índices de eficiencia judicial son insignificantes, ya que de 10.200 condenas que se registraron en nuestro país durante el año 2006 solo 19 fueron por evasión fiscal , ademas del total de 55 mil presos en abril del 2007 solo 74 eran evasores .

A continuación presentamos el detalle de facturas truchas en las causas derivadas del caso Skanska pertenecientes a las empresas vinculadas a Nestor Kirchner

• Gotti tiene  $ 21.382.738  en facturas posiblemente truchas, donde las empresas fantasmas serian Wikan con $ 8.889.836 , La Nueva Argentina con $ 11.664.478 y Triple T  con  $ 828.420

• Austral  Construcciones es investigada por el juez Lopez Biscayart en un tramo de la causa sobre las facturas de Sol Group

• Eleprint cuyo presidente es Gustavo Weiss, protesorero de la Camara Argentina de la Construccion  tiene facturas de La Nueva Argentina por $ 105.209, de la firma Darom Construcciones por $ 5.883.750 y Echo Argentina con $ 132.139

• Juan Felipe Gancedo SA. Tiene facturas truchas por $ 3.030.800 donde las empresas fantasmas serian serian las mismas que Gotti S.A. en donde se encuentran  Wikan con $ 1.418.100 , La Nueva Argentina con $ 1.262.460 y Triple T  con  $ 350.240

• Petersen ,THIELE & Cruz, del grupo Petersen  cuyo titular es Enrique Ezquenazi , uno de los maximos beneficiarios por el Kirchnerismo tiene facturas apocrifas de Echo Argentina por $ 1.524.435y de Acquasa por $ 888.015 siendo un total de $ 2.412.450

## 5. Casos de Posible Corrupción que Involucran a Julio De Vido:

Para abonar los hechos descriptos corresponde hacer una síntesis de distintos casos de corrupción donde se investiga el pago de sobornos durante el gobierno de Néstor Kirchner, en la órbita del Ministerio de Julio de Vido.

- El Caso SKANSA: La causa  N° 18.579/2006 denominada Skanska presentó la misma operatoria de sobreprecios y evasión ya descripta en oportunidad de denunciar la gestión de negocios de Austral Construcciones.  En esta causa, donde también se vio mencionada  GOTTI SA,  se investiga el pago de coimas con facturas apócrifas.

Se encuentra acreditado que Néstor Ulloa, gerente general de Nación Fideicomisos, está imputado por ser quien supuestamente le recomendó a la constructora sueca que operara con la empresa fantasma Caliban-Infiniti Group.   En el memorando interno de "contratación" de Caliban-Infiniti, Gerlero escribió: "El cliente, a través del Fideicomiso Nación (Contador Ulloa), nos recomendó la contratación de la ejecución de la Ingeniería de Detalle y de los distintos Manuales que solicita el pliego, a gente de su confianza, con el argumento inapelable de que sería la forma de conseguir una aprobación fluida y sin problemas del proyecto ejecutivo". Tiempo más tarde, Skanska admitió ante la Justicia que los servicios de Caliban-Infiniti habían sido solicitados para blanquear "pagos indebidos".

Las primeras tres operaciones del fideicomiso demoraron más de un año en llevarse adelante, pese a que los u$s. 91.300.000 que involucraban ya habían sido depositados desde el cuarto mes. Una de esas operaciones fue llevada a cabo por INVAP con la compañía de Philips como proveedor de software, otra fue de la empresa Medics, de incubadoras neonatales (que firmó en aquel momento un contrato de 25 millones de dólares y acaba de acordar uno nuevo por ochenta millones), y otra, la de los famosos Ascensores Servas.

Adviértase que Ascensores Servas SA es proveedora del Estado Nacional desde el 14 de marzo de 2002, y tiene oficinas en la planta baja de Alsina 909. Su balance de 2004 es realmente desalentador ya que tuvo 5.028.640,26 pesos de activos corrientes y un pasivo corriente de 1.334.684,81 pesos; vendió por 4.028.621,83 y perdió al final del año 95.260,35 pesos.

En la Oficina Nacional de Contrataciones figuran también sus faltas: el 14 de enero de 2004 el director de la Superintendencia de Riesgos del Trabajo suspendió la contratación por doce meses debido a incumplimiento. En el Ministerio de Economía le dieron de baja el contrato, ya que la Subsecretaría de Administración logró probar que había falsificado un certificado fiscal para contratar.

El presidente de la atribulada Servas SA es el señor José Aizpun, la vicepresidenta es María de las Mercedes Primitiva Aizpun Noain y sus directores son Nely Gladys Dutruel, Marta de Pedro y Cristina Romilda Aizpun Noain. Nely Dutruel está calificada como "irrecuperable" en las agencias de información de créditos y el propio presidente Aizpun tiene una larga ristra de cheques rechazados: el 3, 7, 14 y 19 de diciembre de 2001, el 4 y 8 de enero de 2002, el 7 y 8 de febrero de 2002, el 11 de marzo, 8 de abril, 7 de mayo y 7 de junio de 2002, junto a varios créditos otorgados por el Banco Nación y el de la Provincia de Buenos Aires.

Si se buscan referencias respeto a la vicepresidencia de la empresa, se verá que la señora María de las Mercedes Primitiva Aizpun Noain tiene una carrera empresaria verdaderamente versátil: a su función en una empresa de fabricación de ascensores agrega como actividad, a efectos fiscales, la de "venta al por menor de ropa interior, medias, prendas para dormir y para la playa, incluye corsetería, lencería, camisetas, medias excepto ortopédicas, pijamas, camisones y saltos de cama, salidas de baño, trajes de baño, etc.". También ha sido declarada como "irrecuperable" por el Banco Provincia y por el Citibank. Marta Elena de Pedro de Aizpun, por su parte, también registra otra extensa ristra de cheques voladores en 2002.

Resulta por lo menos sospechoso que, con estas características, el gobierno de Néstor Kirchner presentara a Venezuela a esta empresa, en el marco de los acuerdos comerciales bolivarianos.

Según la Memoria Detallada del Estado de la Nación 2005, a través de Uberti el señor José Aizpun, presidente de Servas SA, cerró acuerdos con los ministerios de Comercio y Salud de Venezuela.

En la gira del 21 de noviembre de 2005, tanto Uberti como el presidente de Servas, Aizpun, acompañaron al presidente y entonces, según la agencia oficial Télam, "se discutió la radicación gradual de esa firma argentina" en aquel país.

La primera etapa del convenio con Servas comprende un contrato de 25 millones de dólares, hay una segunda etapa de 30 millones y otro convenio con el Ministerio de Defensa que incluye instalar dos ascensores en el Palacio de Miraflores y en dos hospitales militares, por doce millones de dólares.

- Antonini Wilson, las valijas y la relación con Venezuela: Con todos estos antecedentes, Claudio Uberti estaba en el vuelo donde Antoninni Wilson pretendía ingresar al país 800.000 dórales sin declarar. Aquí nuevamente se encuentran involucrados Nestor Kirchner, Julio de Vido y Uberti.

Antonini Wison refiere en el Diario La Nación del 9 de noviembre , que como prueba se acompaña a la presente que, el domingo  posterior al episodio de "la valija, Claudio Uberti se presento al hotel Sofitel entre las 6 o 6.30 de la tarde y le refirió "Tengo buenas noticias y malas noticias". A mí no me gusta cuando me dicen eso. "La mala noticia es que no puedo cenar con ustedes porque me llamó el Presidente y tengo que ir a Olivos. Pero la buena noticia es que se están encargando de todo".  Uberti manifestó que Kirchner le preguntó por él "¿Cómo se portó el hombre?", o algo parecido. Uberti me dijo que él le explicó y que Kirchner agregó: "El hombre es un caballo" o algo así y que "como este hombre nos banqueó"...  "nosotros lo bancaremos hasta la muerte". Yo pensé: "Mierda, ahora que ya firmé el acta [se refiere al documento que firmó en Aeroparque en el que declaró que la valija con el dinero era suya] somos descartables, por eso no vamos a cenar".

Cuando dijo eso de Kirchner, la sensación que me dio es que lo decía para que me sintiera parte del crimen, ¿sabe? El y yo. Pero yo le insistía: "¿Está seguro de que se están encargando de esto? ¿Está seguro?". Uberti me repitió que no me preocupara por eso y me dijo: "Pídeme lo que quieras. El Presidente me dijo que puedes tener una licencia de carne". Yo estaba sorprendido: "¿Licencia de carne?". "Bueno, ¿recuerdas la primera vez que hablamos?". Y yo me sorprendí de que recordara tanto de esa reunión.

Claudio Uberti me dijo que me podía dar una licencia de carne aunque la Argentina no había entregado una licencia desde 1900 no sé cuántos. Yo le dije: "Primero muéstrame que todo se solucionó" .  Me respondió que teníamos que mantener el problema entre nosotros. "Alex, no quiero que le cuentes nada a Victoria". "No le estoy diciendo nada. El que la llamó a ella fue Daniel para hablar contigo o ella lo llama de tu parte". Pero él dijo que Victoria es sólo una secretaria y esto lo tenían que manejar entre nosotros. Cuando salimos del bar y volvíamos caminando al hotel, me pidió algo más: "No le

digas a Diego". "¡¿Qué?! ¡Es el padre de Daniel! ¿Por qué no debe saber?". Y él dijo que si le decíamos algo, todo el dinero se iba a cortar.

En un momento le dije a Diego que Uberti me había comentado que todo estaba solucionado, pero él me respondió que "teníamos un problema grave. Esta vaina ha cogido demasiado vuelo". Y me dijo que fuera a buscar el dinero: "Anda hoy o si quieres mañana, te vas con el chófer, coges esa vaina y el resto es tuyo".

"Estábamos en el hotel y recibí un llamado de Marjorie a mi celular. Me dijo que me preparara, que íbamos para la Casa Rosada. Me dijo que me pasaba a buscar en 20 minutos. Entonces recibí un llamado de Victoria. "¡Ale!", porque así me decía ella. "Ale, apúrate, estamos entrando al hotel", y mientras hablábamos, entró con Marjorie y me vio en el bar y me apuró. "¡Andá así nomás, así en jeans! ¡Vamos!". Pero les dije que no y subí a cambiarme. Fuimos a la Casa Rosada y cuando íbamos a pasar con el auto, nos dijeron que no. Victoria bajó la ventana, yo estaba sentado en el medio, y mostró algo y dijo algo y le abrieron la puerta.   Antes de estar Victoria Llamó mientras estábamos dentro del auto.   En la Casa Rosada vi  a Uberti, a De Vido] y a la esposa del Presidente, la nueva Presidenta [Cristina Fernández de Kirchner]. (…) El dinero era de PDVSA para la campaña presidencial de Cristina. A pregunta de si -¿Podría ser que el dinero fuera de coimas correspondientes a los funcionarios argentinos por negocios bilaterales pero no para la campaña?  Wilson  " …Eso es algo que tienen que analizarlo ustedes. Pero si el dinero fuera para algún mafioso o fuera una coima para Uberti, por menos de ese dinero me hubieran arrojado al Río de la Plata. Pero creo que eso no me pasó porque el dueño de ese dinero era alguien grande. ¿Por qué me enviaron a esa mujer [por María Cristina Gallini, jefa de turno de Aduanas en el Aeroparque? ¿Por qué eran tan amables conmigo?

La entrada irregular al país de Antonini Wilson es concomitante  a la llegada de Hugo Chávez para  cerrar los acuerdos sobre el gas licuado que implicaban la construcción de dos plantas por cuatrocientos millones de dólares.

**La "relación estratégica" entre Venezuela y Argentina está basada en negocios turbios y frases grandilocuentes:**

• Desde mayo de 2005 Venezuela le compra a Argentina Boden 2012. La operación comenzó con 100 millones de dólares y en casi dieciocho meses se adquirieron 3.600 millones de Boden 2012 y 400 millones de Boden 2015, anexados al denominado Bono del Sur. La compra de bonos argentinos, bautizados por Chávez como los "Bonos Kirchner", que son "mil veces menos riesgosos que los del Tesoro de los Estados Unidos", es utilizada por los venezolanos para poder sacar divisas del país. El mercado del dólar en Caracas, controlado teóricamente por el gobierno, tiene una cotización paralela. Dos mil cien bolívares por dólar en el cambio oficial o dos mil ochocientos en el paralelo, durante la semana pasada. El gobierno de Chávez vende a los bancos los Boden 2012 al precio oficial, y luego los bancos los vuelven a vender a sus clientes, pero al paralelo. Nadie cree en Venezuela que ese negocio sólo sea usufructuado por los banqueros, y las sospechas de corrupción estatal se multiplican.

**6- Ricardo Jaime y la Secretaría de Transporte:** Otro de los miembros de la posible asociación ilícita es Ricardo Jaime,  designado por Nestor Kirchner al frente de la

Secretaria de Transporte de la Nación dependiente del Ministerio de Planificación, Inversión Pública y Servicios.

A efectos impositivos, el Sr. Jaime declara tres inmuebles: una casa en Caleta Olivia de 81 metros cuadrados, una casa en Córdoba de 186 metros y otra en Nueva Córdoba de 49 metros cuadrados.

En "Hablen con Julio", un trabajo de Francisco Olivera y Diego Cabot, se refiere a una anécdota que retrata el modus operandi de Jaime: "La gestión de Jaime –escriben  logró modificar drásticamente las reglas de juego del transporte nacional. Antes, las Cámaras tenían sólo una función de lobby sectorial. Todo cambia. Después de Jaime, los responsables de cada una de las firmas de colectivos urbanos tienen, además, la obligación de pasar, por lo menos una vez al mes, por la Cámara que los representa. Es para pagar, dicen, "la cuota social".

A lo largo de estos cinco años Jaime fue cuestionado y denunciado por diferentes episodios que responden a  la operatoria que se describe en la presente denuncia.

De esta manera, Jaime fue involucrado por presuntas irregularidades en la concesión de ramales ferroviarios a la Unidad de Gestión Operativa de Emergencia Sociedad Anónima (UGOFE). Según un informe de la AGN en el año 2004 se concesionaron sin licitación y mediante contratación directa ferrocarriles a Metrovías S.A., Ferrovías S.A.C. y Trenes de Buenos Aires S.A.
También Jaime se encuentra en la mira del Fiscal de Investigaciones Administrativas - cuya competencia fue restringida y cercenada por el gobierno de Kirchner-  por la posible malversación de fondos públicos al pagar sobreprecios por la remodelación y reconstrucción de 120 vagones del Ferrocarril Belgrano Norte.

Recientemente, se anunció la compra de vagones de subterráneos a la empresa china CITIC en la suma de u$$ 850 millones mediante contratación directa. La transacción comprende 279 vagones circunstancia de la que surge que cada vagón costará poco más de 3 millones de dólares. Es dable mencionar al respecto que oportunamente el Estado pagó 1 millón y medio de dólares por cada vagón de los 96 que se adquirieron en su momento para la línea D de subterráneos. En consecuencia, mediante contratación directa, se realizaron compras y contrataciones en el ámbito de la Secretaría de Transporte de la Nación que deben ser investigadas en virtud de haberse incumplido con los principios superiores de la contratación pública como economía, eficiencia, transparencia, concurrencia y competencia, proporcionalidad y razonabilidad e igualdad de tratamiento para interesados y oferentes.

La gestión de Jaime en el caso el caso Southern Winds. Subsidios dudosos y la pista del narcotráfico:

Southern Winds fue constituida como una sociedad anónima inscripta en la Inspección General de Justicia bajo el número 1610285, con último domicilio registrado en Suipacha 1111 piso 26  de la Capital Federal.

Es en el año 2000, donde se integra como accionista de SW la empresa BIXESARRI S.A una sociedad off - shore constituida en Montevideo. Esta empresa, pertenecería a Eduardo Eurnekián, titular de la firma Aeropuertos 2000, quien hizo un aporte a SW de

30 millones de dólares para luego transferir esas acciones a una empresa europea denominada VOLARE que también sería propiedad de Eurnekián.

Así se advierte que este empresario, tenía mediante una sociedad "off shore" (Bixesarri S.A.) el 30% del paquete accionario de la línea aérea y que dicha sociedad fue ocultada mediante una persona de su confianza al que integró en el directorio de SW.

La difícil situación financiera de SW se verifica a través del análisis de los estados contables de la misma, correspondientes a los ejercicios finalizados el 30 de Junio de 2002 y el 30 de Junio de 2003.

En forma concomitante, a través del Decreto N° 1654 del 4 de septiembre de 2002, el Ejecutivo, había declarado el Estado de Emergencia del Transporte Aerocomercial en todo el territorio de la Nación Argentina, realizado por operadores nacionales sujetos a la competencia de la Autoridad Nacional, por el plazo de vigencia de la Ley N° 25.561 de Emergencia Pública y Régimen Cambiario, conjuntamente con otras medidas tendientes a paliar la aguda crisis por la que atravesaba el sector.

En virtud de la cesación de actividad de las empresas LINEAS AEREAS PRIVADAS ARGENTINAS SOCIEDAD ANÓNIMA (LAPA) y DINAR LINEAS AEREAS SOCIEDAD ANÓNIMA, y con el objeto de garantizar la continuidad de la prestación de los servicios a los usuarios, a los distintos destinos, y de conservar las fuentes de trabajo afectadas, el ESTADO NACIONAL consideró oportuna la creación de una empresa de transporte aéreo, que se encontraría transitoriamente y hasta su privatización en la órbita estatal, sujeta al régimen de derecho privado, a través del Decreto 1238/03, del 21 mayo de 2003.

Finalmente, el Decreto Nº 1238/03 pone a la empresa en cabeza de Julio de Vido y su Secretario de Transporte Ricardo Jaime.

Según consta en el Acta N°1 del Directorio de la S.A. de fecha 30 de julio de 2003, fueron designados como presidente el Ing. José Alberto Bidart (operador político del Ministro) en representación del Ministerio de Planificación Federal, Inversión Pública, a cargo del Arq. Julio De Vido, en calidad de Vicepresidente, el Brigadier Jorge Eduardo Baravalle por el Ministerio de Economía, sindicado como consuegro del ex Ministro de Economía Roberto Lavagna, y finalmente como director al Lic. Nicolás Scioli, en representación de Intercargo, hermano del ex Vicepresidente de la Nación, Daniel Scioli.

Visto la conformación accionaria de la empresa y las personas designadas en el directorio, la conexión y dependencia entre Lafsa y el poder Ejecutivo Nacional es a todas luces clara, estrecha y comprobable.

Por Resolución 350/04 de la Secretaría de Transporte de la Nación, se otorgó un plazo de 180 días a LAFSA , para dar inicio a sus operaciones .

Posteriormente, la firma se presentó ante la Secretaría de Transporte a solicitar rutas internacionales las que constituirían , en algunos de los casos descriptos en los manuales de riesgo de narcotráfico, como virtuales rutas de distribución de drogas ilegales.

Algunas de esas frecuencias se detallan a continuación:

•Buenos Aires.- Asunción- Ciudad del Este (3 frecuencias semanales)
•Buenos Aires- Lima- Quito- Guayaquil- Caracas-Bogotá (2 frecuencias
semanales)
•Buenos Aires-Santa Cruz de la Sierra-Caracas- Bogotá (4 Frecuencias
Semanales)
•Buenos Aires-Lima-Quito-Guayaquil- Caracas-Bogotá-México-Los Angeles
(3 frecuencias semanales)
•Buenos Aires- Santa Cruz de la Sierra- La Paz-Caracas-Bogotá- México-
Los Ángeles (3 frecuencias semanales)5

Para dar cumplimiento al servicio concesionado, suscribió dos contratos de sublocación
de aeronaves: uno con SW firmado el 24 de noviembre de 2003 y otro con Aero2000
suscripto el 24 de marzo de 2004.

Finalmente, LAFSA firma con SW un acuerdo de cooperación empresaria que
desarrollaremos posteriormente, para operar de manera conjunta la totalidad de su flota
que a mayo de 2004 consistía en ocho aeronaves Boeing 737 afectadas al mercado
doméstico y un Boeing 767 que cubría la ruta a Madrid.

• Acuerdo Lafsa-SW

A mediados de 2003 la situación financiera de SW tal como ya fuera descripto y en
virtud de los que surge de los estados contables, se hizo insostenible y, ante la
inminencia del cese de sus operaciones, apareció la asociación "estratégica" con la
recién creada LAFSA, promovida , entre otros por el Secretario de Transporte de la
Nación  Ricardo Jaime.

A mediados de 2003, el Presidente de la Nación Kirchner tomó la decisión política de
no dejar caer a SW. Esta determinación, se plasmó en el Acuerdo de Cooperación
Empresaria.. Ahora bien, la citada decisión política intentó ser disimulada en un cúmulo
de declaraciones que resaltaban la sana –y supuesta- preocupación del gobierno acerca
del mantenimiento de las fuentes de trabajo de las ex DINAR y LAPA y la intención de
evitar un monopolio en el mercado interno de la aeronavegación.

En esa ocasión el ex Presidente de la Nación afirmó que "apostamos a un buen
resultado; sabemos que los escépticos van a estar esperando que fracase, pero nosotros
estamos convencidos que la calidad empresaria y la calidad de los trabajadores permitirá
que esto pueda funcionar".  En la misma línea el Ministro de Planificación, Julio De
Vido sostuvo que "estamos asistiendo a un hecho trascendente del transporte aéreo
nacional que comienza a participar de emprendimientos ya experimentados en otras
partes del mundo, como son las alianzas o acuerdos de cooperación empresaria como
los de hoy, de los que hay muchos en el mundo".

Según reseñó el diario La Unión, "El Presidente aclaró que pese a los cuestionamientos
a la decisión de subvencionar el combustible de Southern Winds y los sueldos de los
empleados de la ex LAPA y Dinar que incorpore, puedan acarrearle, privilegia resolver
el problema de 850 trabajadores y evitar el monopolio en una actividad que requiere
competencia".  Pero los hechos y el contenido de los acuerdos demuestran que la

asociación entre SW y LAFSA era mucho más profunda de lo que se pretendía mostrar, y que excedía en mucho el carácter de mero soporte al funcionamiento de SW.

Para sostener esta afirmación entremos al estudio del citado acuerdo:

El 3 de septiembre de 2003 se firmó el Acuerdo de Cooperación Empresaria entre la Aerolínea estatal LAFSA y Southern Winds- ratificado por Resolución N° 191/03 de la Secretaría de Transporte a cargo de Ricardo Jaime y publicada en el Boletín Oficial de la Nación el 30 de Septiembre de 2003, página 16-. Los puntos salientes del acuerdo eran dos: LAFSA se comprometía a pagar el salario a 1000 empleados ex LAPA y DINAR, de los cuales 578 prestaban servicios en SW y 3,2 millones de pesos mensuales en combustible. Esta asociación –que es un subsidio poco encubierto- hizo posible que SW continuara operando.

Ante esto, es importante destacar que la propia letra del acuerdo en su cláusula primera marca que el mismo va mucho más allá de esto, al acordar las partes "poner en común sus esfuerzos respecto de la explotación de servicios aéreos y propiciar la distribución de los ingresos producidos por el mismo concertando los elementos operativos para mejorar sus resultados mediante una labor conjunta que permita la retención de empleados y la reincorporación de aquellos que dependen de la puesta en marcha de LAFSA".

Aún más, en la cláusula séptima se creó un órgano de coordinación entre ambas empresas, con un representante de SW, uno de LAFSA y un miembro del Ministerio de Planificación Federal, Inversión Pública y Servicios, ejerciendo este último la presidencia de tal cuerpo

Queda claro entonces, que ni el Ministro De Vido, ni el Secretario de Transporte estaban en desconocimiento de la operatoria irregular en la que estaba incursa la empresa pues tenían a su cargo la titularidad del órgano encargado de coordinar la adopción de las decisiones comunes entre los distintos participantes de ese acuerdo empresario.

Como corolario de lo expuesto, podemos sostener, sin lugar a dudas que en este caso se utilizo una sociedad signada por subsidios, aprobados por Kirchner y operados por Julio de Vido con una empresa de dudosa reputación.

Estos elementos evidenciarían que el Gobierno Nacional de Kirchner no podía desconocer las particularidades y la situación en que SW se encontraba. La asociación era tan estrecha que no parece aventurado afirmar que –más cuando LAFSA no tenia aviones- existía una cuasi-identidad entre ambas empresas.

El caso SW es emblemático, porque prueba no solo la sociedad entre el Gobierno y una empresa sospechada de narcotráfico, sino que expone en forma palmaria como funcionarios del Gobierno permeabilizaban los controles a la compañía.

La persona encargada de esto fue Ricardo Echegaray, hombre de confianza de Néstor Kirchner y socio de Rudy Ulloa, cuestión que se encuentra acreditada mediante edicto publicado con fecha 8/02/01 donde se informa que por escritura pública N° 242/00, Ricardo Echegaray casado con Silvana Oviedo, transfiere la cuota de capital que le

correspondiere de la Estación Del Carmen S.R.L, en la irrisoria suma de $ 16.000. No obstante esto, su esposa continuaría trabajando para la barriada El Carmen al frente de la Fundación Ayudemos a Mamá dependiente del Centro Comunitario.

Al igual que Lázaro Baez, entre sus actividades públicas su currículum da cuenta de su paso por el Banco de la Provincia de Santa Cruz, en su etapa estatal, para posteriormente incorporarse a la Aduana donde sus importantes y sucesivos ascensos fueron contrarios a lo establecido en la carrera administrativa, avanzando varios cargos sin concurso previo, sin evaluación de desempeño y sin la antigüedad necesaria .

En agosto de 2004, es nombrado finalmente, Director General de la Aduana, quedando bajo esta circunstancia con la responsabilidad del control aduanero en todo el Territorio Nacional.

Al igual que denunciáramos con el apartamiento de los funcionarios de la AFIP, el ex presidente Kirchner desplazó a la Dra. Carballal, titular por concurso de la Dirección Regional de Comodoro Rivadavia, quien se encontraba investigando CONARPESA, para ubicar allí al Dr. Echegaray.

Finalmente, recordemos que es el mismo funcionario quien reconoció que durante el año 2004 la aduana realizó un solo control sobre los aviones de la firma SW.

La complicidad de los funcionarios en el caso de drogas detectadas en España  es evidente, ya que es obvio que no  posible llenar valijas de drogas, explosivos o material bacteriológico y subirlos a un avión, evadiendo todo control, sin que exista la complicidad de miembros del Estado.

**El Denominado "Tren Bala". Irregularidades en la Licitación:**

A poco de asumir a la primera magistratura y  mediante el Decreto 1261/04, Néstor Kirchner estableció el marco del Plan de Reorganización, Recuperación y Modernización del Sistema Ferroviario Nacional. Todo ello, bajo la orbita del Ministerio de Planificación y  la Secretaria de Transporte. A través del mismo, el Estado Nacional había tomado la decisión de recuperar la operación de los Servicios Interurbanos de Pasajeros de carácter ínter jurisdiccional, con el objetivo de reposicionar al ferrocarril en el sistema multimodal de transporte, a efectos de  integrar el territorio, uniendo las provincias y ciudades que lo componen.

Posteriormente, el 28 de diciembre de 2005, mediante el Decreto N° 1.683  Kirchner aprueba el Programa de Obras, Trabajos Indispensables y Adquisición de bienes y a la vez que promete los fondos para la realización de las obras de infraestructura y para material rodante, de acuerdo a los programas que se establezcan para el sistema ferroviario.

Sin embargo, a casi cuatro años de la instrumentación de este Plan nos encontramos en iguales condiciones en la prestación del servicio que previo a éste.  Signado por sobreprecios, millonarios subsidios a las concesionarias, deficiente estado de la vías y unidades, altos índices de inseguridad y deterioro en la infraestructura, todo esto en desmedro de la calidad de vida de los usuarios y el incremento de la siniestralidad.

Amparada en el Decreto mencionado precedentemente, l a Resolución de Jaime N°
324/06 del 8/05/06 incorporó la obra "Electrificación integral, obra civil,
infraestructura de vías, señalamiento y comunicaciones y provisión de material rodante
para el servicio de Alta Velocidad en el corredor ferroviario Buenos Aires -Rosario-
Córdoba" al Anexo II –Servicios ínter jurisdiccionales del Decreto N° 1683/05 ,
aprobando el Pliego de Bases y Condiciones para el posterior llamado a licitación.

Según la Resolución N° 900/06 de la Secretaria de Transporte en su articulo 6
establece que la oferta se hará por ajuste alzado y que el presupuesto oficial es
estimado, preliminar y condicionado a la especificidad técnica de la propuesta, como así
también a la propuesta de financiamiento, estableciendo:

a) la suma de U$S 1.350.000.000. para la variante de Alta Velocidad integral Ciudad
Autónoma de BUENOS AIRES — ROSARIO (Provincia de SANTA FE) —
CORDOBA (Provincia de CORDOBA) .

b) la suma de U$S 1.100.000.000 para la variante de Alta Velocidad Ciudad
Autónoma de BUENOS AIRES — ROSARIO (Provincia de SANTA FE) de Alta
Prestación ROSARIO (Provincia de SANTA FE) — CORDOBA (PROVINCIA DE
CORDOBA

Del análisis del Pliego surgen algunas particularidades que lo hacen discrecional,
direccionado y pasible de modificaciones en las condiciones de contratación de la obra,
a saber:

• El objeto y el alcance del proyecto no esta suficientemente determinado. El Estado
Nacional delega en los oferentes la realización de estudios de ingeniería, factibilidad y
ambientales, relegando la Administración su facultad de determinar las condiciones,
características e impacto que pretende de dicha obra. La ausencia de un proyecto
específico elaborado por el Estado dificulta la compulsa entre los distintos oferentes,
porque no se establece un patrón común para la comparación. Tal es así que, en el caso
de referencia, dos de las tres empresas precalificadas desistieron de la presentación por
la ausencia de información para definir el costo de las obras civiles, además del poco
tiempo para desarrollar una oferta tan compleja.

• Respecto del financiamiento se determinó que los oferentes deberían comprometer un
financiamiento no inferior al 50% del monto total de la obra. Este requisito, por demás
ambicioso, amparado en el sistema de "llave en mano", también atenta y restringe la
participación de distintos oferentes. Consecuentemente, se baja de la compulsa uno de
los tres oferentes aduciendo su imposibilidad de cumplimiento.

**En síntesis, de las tres empresas interesadas y cuya presentación determinaron el
inicio del procedimiento de licitación pública sólo queda una que cumple con los
requisitos del PBC y que, por lo tanto, pudo imponer su proyecto. Así se generó la
ficción de una licitación que nunca se llegó a materializar, entre empresas que
simulan una compulsa pero que, finalmente, dejan libre el camino a aquella que
contaba con la totalidad de los requisitos contenidos en el Pliego. De este esquema,
ya denunciado por el ARI en anteriores investigaciones, participan empresas afines
al gobierno, tal es el caso de Electroingenieria.**

En cuanto al financiamiento, el Pliego obliga a los oferentes a precisar las fuentes de financiamiento propias y de terceros, determinando que al momento de la presentación de la oferta se acompañe las cartas de compromiso que formalice y garantice el financiamiento propuesto. Vale agregar, ante este punto y si bien se abundará posteriormente en el presente informe, que el 12 de julio de 2007 se suscribió un acuerdo entre la SECRETARIA DE TRANSPORTE y el oferente  ALSTOM TRANSPORT SOCIEDAD ANONIMA - ALSTOM TRANSPORTE SOCIEDAD ANONIMA - ALSTOM ARGENTINA SOCIEDAD ANONIMA - IECSA SOCIEDAD ANONIMA - GRUPO ISOLUX CORSAN SOCIEDAD ANONIMA Y EMEPA SOCIEDAD ANONIMA  denominado GRUPO VELOXIA, que vincula la propuesta al financiamiento del BANCO SOCIETE GENERALE, como parte de la estructura de financiación exigida  por el pliego  .

Así, el 17 de agosto de 2007, el Banco Societe Genérale presentó la descripción de la estructura financiera, en función de los mercados financieros y las condiciones del país y el Grupo Veloxia propuso el financiamiento del 80% para la parte electromecánica, otorgada por el ya mencionado Banco, con una tasa del 5,2 % anual y 16 años de plazo.

Posteriormente, tomando intervención mediante la Nota SF N° 236/07 del 30 de agosto del 2007, la Secretaría de Finanzas del Ministerio de Economía y Producción, determinó los requisitos a cumplimentar para ejecutar el acuerdo de financiamiento, previo a la suscripción del contrato para la ejecución de la obra.

Ahora bien, el articulo 2 del Decreto de 96/08, por el que se aprueba la adjudicación, establece que, el 26 de marzo, el Ministerio de Economía y Producción deberá aprobar la estructura de financiamiento de la obra, en  conformidad con las previsiones del memorando de entendimiento suscripto el 12 de julio de 2007 entre el MINISTERIO DE PLANIFICACION FEDERAL, INVERSION PUBLICA Y SERVICIOS — SECRETARIA DE TRANSPORTE— y SOCIETE GENERALE.

Esta estructura de financiamiento se formalizó con un cambio significativo de actores, sin que ello haya mellado la voluntad del gobierno: Se produce la salida del Banco comprometido originalmente e ingresa el Banco Natixis, el hecho se suscribe en los considerándos de la Resolución Nº 178/08 del  Ministerio de Economía y Producción, donde costa que con posterioridad al dictado del Decreto Nº 96/08 el Consorcio adjudicatario de la Obra reemplazó al Banco SOCIETE GENERALE como financiador por el Banco NATIXIS y presentó, a través de este último, una nueva propuesta en la estructura de financiamiento que, entre otras cosas, amplia el plazo de 16 a 30 años e incrementa la tasa de interés que rondaría  el 12%. Anual.

Se presume que las causas que originaron el retiro de la operación del Banco Societe Genérale se debieron a la falta de acuerdo de la Argentina con el Club de Paris para cancelar o reestructurar la deuda de U$S 6500 Millones, sumada a la grave crisis que atraviesa  el banco francés. En otras circunstancias, si el Banco  Societe Genérale anticipaba fondos, el seguro de riesgo de la operación debía ser obligatoriamente asumido por el Estado francés, a través de la Dirección General del Tesoro y de la Política Económica del Ministerio de Economía galo pero la situación de default de nuestro país imposibilita a Francia a asegurar el préstamo.

Así, con posterioridad a la adjudicación se modifica la propuesta de financiamiento, por lo tanto uno de los requisitos de la oferta, cuando se retira el SOCITE GENERALE y es reemplazado por el Natixis.   Por tanto, esta es una nueva propuesta, diferente por su composición,  a la tenida en cuenta al momento de ser considerada para su elección.

La doctrina es muy clara respecto de la cuestión planteada por cuento entiende que una vez presentada la oferta y habiéndose abierto la misma, se producen efectos para el oferente que devienen en deberes y obligaciones.-

Así, la apertura de las ofertas permite su conocimiento por el licitante, los otros oferentes y los terceros interesados y trae como consecuencia inmediata su inalterabilidad y el deber de mantenerla.  Si el proponente, no respeta estas cargas que le corresponden, incurre en responsabilidad de índole precontractual.

Por esto, a diferencia de lo que ocurre en la contratación civil, en la contratación administrativa, y la que esta en análisis lo es (contratación de obra pública) la regla es inversa, por cuanto una vez admitidas no pueden ser revocadas retractadas ni alteradas. Este principio que rige el proceso licitatorio, establece la inalterabilidad de las ofertas y su carácter vinculante.  Se lo entiende como un resultado del acto administrativo de admisión y le es impuesto al oferente con el fin de tutelar la igualdad que la Administración debe darle a todos los interesados en la compulsa (oferentes).

Es por lo expuesto, que no fue irregular modificar las propuestas después de la admisión, porque atenta contra el principio de  igualdad que debe existir entre los licitadores y que debe ser garantizada por el licitante en la totalidad del procedimiento.

El cambio del agente financiero ,  de la estructura y condiciones de financiamiento es, a nuestro entender una modificación sustancial a la oferta, por cuanto éste era un elemento requerido por el Pliego, evaluado por la Administración en el proceso de preselección y tenido en cuenta en el Decreto por el cual se aprueba la adjudicación (Decreto 96/08).

Es por lo expuesto que creemos  que conforme los hechos ya descriptos, el proceso de licitación del denominado "tren bala" incurrió en diversas irregularidades que afectan principios básicos de la contratación pública.  Se cercenaron derechos tales como el de la igualdad ante la ley, se direccionó la contratación a un solo grupo empresario que puede dar con los requisitos establecidos y se limitó el principio de concurrencia que hubiese permitido comparar distintas opciones y elegir la más conveniente.

Respecto al precio final de la obra la gestión de Jaime fue cuestionable. El costo promedio de los trenes balas en el mundo varia entre 7 y 10 millones de euros el Km. Recientemente se iniciaron las obras del tren de alta velocidad entre Pekín y Shanghai las que  requerirían de una inversión de unos 21.900 millones de dólares (13.740 millones de euros) para un trayecto de  1.318 kilómetros.  Es decir,  alrededor de 10 millones de euros el Km.  El presupuesto previsto por el Secretario  Jaime  es de alrededor de 1,2 millones de euros el Km, dejando la sospecha que el precio inicial con que se licitó es de valores irrealizables.

La obra fue adjudicada por una suma de 1.320.507.453  millones de dólares Ricardo Jaime trató de explicar el costo de la obra al indicar que "… este es el costo de la obra,

como nosotros lo hemos pedido con financiamiento y estamos hablando de 1 a 15 años el costo del financiamiento la lleva a 3.300 millones". Por tanto, a entender de este cuestionado funcionario el costo financiero total triplicaría el costo estimado inicial de la obra.

**Sobreprecios e irregularidades en la ejecución y financiamiento de las obras de ampliación de la red de transporte de alta tensión, interconexión MEM-MEMSP.-**

- FONDO ELECTRICO DE LA PROVINCIA DE SANTA CRUZ

En el año 1989 mediante la ley Nº 23.681se estableció un recargo sobre el precio de venta de la electricidad de seis por mil de las tarifas vigentes en cada período y en cada zona del país aplicadas a los consumidores finales, con la excepción de aquellos eximidos de tributar los gravámenes sobre la energía creados por las leyes 15.336, 15.574 y 19.287, y se determinó que las empresas prestatarias del servicio público de electricidad incluirían el recargo en la facturación que efectuaren a los consumidores finales, sobre el total facturado excluido todo recargo tributo que grave el consumo de electricidad, actuando como agentes de percepción a los efectos de su ulterior depósito de acuerdo a la reglamentación que establecerá la Secretaría de Energía.

Asimismo, dicha ley definió que el producto total de recargo fijado se destinaría a la Empresa Servicios Públicos Sociedad del Estado de la provincia de Santa Cruz, con el objeto de realizar inversiones en los sectores eléctricos y reducir el nivel de las tarifas aplicadas a los usuarios de electricidad que sean servidos directamente por la mencionada empresa, a los efectos de que las tarifas tiendan a alcanzar los niveles promedios del resto del país y que cuando existieren otras empresas o entidades que presten los servicios directos a usuarios finales, que no pertenezcan a la Empresa Servicios Públicos Sociedad del Estado de Santa Cruz, esta última transferirá los importes transferidos por el gravámen establecido por la presente ley a dichas empresas o entidades, en la proporción que les corresponda. Siendo, la provincia de Santa Cruz beneficiada por el gravámen del seis por mil hasta la interconexión de la misma con el Sistema Interconectado Nacional (S.I.N.).-

El proyecto fue aprobado cuando el ex presidente Néstor Kirchner era el intendente de Río Gallegos dos años después llegaría a la gobernación.

Es decir que el espíritu de la ley era subsidiar el servicio de energía eléctrica de Santa Cruz y a su vez invertir en obras para la conexión. Esto se debe a que la provincia patagónica no estaba conectada al Sistema Argentino de Interconexión (SADI), lo que conlleva que los habitantes santacruceños paguen una suma considerablemente mayor por el servicio de luz

Si bien desde ese año llegan a la provincia millones de pesos –eran pesos/dólares hasta la devaluación de 2001- y los usuarios locales comenzaron a pagar un precio menor por el servicio, el costo de la energía eléctrica siguió siendo un gasto importantísimo para el pueblo santacruceño. Muchas veces, triplicando el cargo que se paga en otras partes del país.

En noviembre del 2005 el Centro de Educación al Consumidor (CE) asociación de consumidores denunció ante la justicia que 483 millones de pesos del fondo eléctrico de

Santa Cruz fueron desviados de su destino original. Es dinero que se recauda con un recargo sobre todas las facturas de Edenor, Edesur y Edelap. Señalan que se aplicaron a subsidios cuando debían ser utilizados para obras. También presentaron una demanda penal contra el secretario de Energía Daniel Cámeron. Asimismo el CEC informo que "Según señalo la secretaría de Energía en su momento (noviembre del 2005)  que en 15 años recaudaron 367 millones de pesos, de los que giraron a Santa Cruz $ 342 millones, pero ahí surge la primera contradicción, porque luego dicen que utilizaron 32,3 millones promedio por año, y eso da 483 millones de pesos en 15 años",

Por otro lado el CEC reclamó a Energía información detallada sobre el tema. No obtuvieron respuesta, por lo que iniciaron una primera demanda por mora en la información. Así, el 1º de noviembre, la secretaría les giró un informe. "Allí aseguran que se han utilizado un promedio de 32,3 millones por año, pero ahí asignan $ 27,9 millones anuales a subsidios a la tarifa en Santa Cruz, y ese no era el único objetivo de la ley. Los fondos con afectación específica fueron utilizados para otros destinos".

Asimismo las versiones periodísticas han indicado que, de los 4,4 millones de pesos anuales, promedio, que Energía dice que se usaron para obras, resulta que al ver el desagregado se trata de centros de distribución, subestaciones, alumbrado público, líneas de alta tensión y media tensión; nada que ver con la interconexión. Sólo hay una obra de 15 kilómetros de líneas de alta tensión que podría estar encuadrado en el objeto de la ley.

Actualmente, quien controla la estatal Servicios Públicos Sociedad del Estado (SPSE) es Julián Osorio, ex candidato kirhcnerista a intendente de El Calafate.-
Mientras tanto las obras de interconexión anunciadas en el 2001 comenzaron el 2005 avanzaron y la propia presidenta Cristina Kirchner estuvo el día 1/05/08 en la localidad de Pico Truncado inaugurando la conexión de alta tensión de la ciudad de Puerto Madryn, la primera localidad santacruceña en conectarse a la línea nacional. Lo extraño, es que se hizo 19 años después de recibir esos aportes y el Fondo que los acumuló aportó un mínimo de recursos que no tienen relación con su cuantía y no cumplen con su verdadero objeto.-

Para dicha obra el Tesoro Nacional aportó en el año 2004 $ 90.890.000 y 445 millones durante 2005, transferidos de la jurisdicción noventa y uno, correspondiente a obligaciones a cargo del Tesoro al Comité de Administración del Fondo Fiduciario para el Transporte Eléctrico Federal.-

La ley de creación, la 23.681, ya advertía que los aportes de todos los usuarios de luz de la Argentina debían ser invertidos en obras. A su vez, el Dec.1378/01 reglamentó dicha ley, y estableció que el recargo previsto en el artículo 1° de la Ley N°23.681 se "mantendra vigente luego de la efectiva interconexión de la Provincia de SANTA CRUZ, durante el plazo que resulte necesario para cubrir los costos de la obra de interconexión de esa Provincia con el SISTEMA ARGENTINO DE INTERCONEXION (SADI)".

Este Decreto explica que ese dinero "se destinará a un fondo fiduciario, con la finalidad única y exclusiva de atender a las erogaciones que resulten de esa obra". Pero las obras se financiaron con aportes de la Nación.

Consideramos necesario remarcar qué en los últimos meses se aplicaron aumentos en las tarifas de luz.

Por lo tanto con respecto a este último punto señalado, cabe preguntarnos: ¿El objeto del Fondo creado por Ley N° 23.681 no era, entre otros, reducir el nivel de tarifas de electricidad en Santa Cruz?.-

### EL FONDO DE SANTA CRUZ A TRAVÉS DEL TIEMPO

| | |
|---|---|
| 1989 | 65801 |
| 1990 | 3229397 |
| 1991 | 12741426 |
| 1992 | 29433058 |
| 1993 | 20270000 |
| 1994 | 23925572 |
| 1995 | 24373698 |
| 1996 | 23819897 |
| 1997 | 26414351 |
| 1998 | 26511377 |
| 1999 | 22808032 |
| 2000 | 26200000 |
| 2001 | 26200000 |
| 2002 | 23897002 |
| 2003 | 26199999 |
| 2004 | 26200000 |
| 2005 | 35000000 |
| 2006 | 35000000 |
| 2007 | 35000000 |
| TOTAL | 447.289.610 |

La ley fijaba, en 1989, sólo el porcentaje del impuesto (0,6 por mil) pero luego, mediante la ley 25.064 se le puso un tope al monto de la transferencia a Santa Cruz de $26.200.000 . Durante la gestión de Néstor KIRCHNER se aumentó el tope a $35.000.000.

El excedente ingresa a las arcas del Tesoro Nacional y se usa a discreción, habiendo sido responsabilidad de cada uno de los secretarios de energía, incluido el actual Secretario Sr. Daniel Cameron, el adecuado y regular manejo de dichos fondos. Adviértase, que es el mismo Tribunal de Cuentas que debió intervenir respecto de los fondos de Santa Cruz enviados al exterior del país, y su actuación fue cuestionada en tanto que su constitución, con mayoría oficialista, habría sido determinante.-

La construcción, operación y mantenimiento de la Línea en Extra Alta Tensión de 500 Kv entre Pico Truncado y Puerto Madryn habría financiado, en un 96% por el Fondo Fiduciario para el Transporte Eléctrico Federal, Santa Cruz (3%) y Chubut (1%).-

PLAN FEDERAL DE TRANSMISIÓN DE ENERGÍA ELÉCTRICA.-

El Plan Federal de Transmisión  de junio de 2001 amplió el objeto del Fondo Federal de Transmisión. Debido a ello, se incluyó el financiamiento de obras de importancia para la confiabilidad del Sistema de Transporte de Energía Eléctrica.

Las líneas que serían financiables total o parcialmente por el Fondo Fiduciario para el Transporte Eléctrico Federal anunciadas para la fecha fueron cinco: Comahue-Cuyo,Noroeste-Noreste, Cuyo-NOA (Minera), MEM-MEMSP (Patagónica), Región Atlántica- Buenos Aires. Inicialmente, contaban con una longitud de 2.934 km.

Asimismo, el marco regulatorio del Plan Federal consistió en el sistema de convocatoria abierta, el cual debió ser reespecificado por la Secretaría de Energía ese mismo año para proceder con las negociaciones.

Durante los sucesivos años el Plan de Transmisión sufrió modificaciones tanto en la consideración de las líneas existentes, como la inclusión y eliminación de otras.
En el año 2003, dentro del Sistema Patagónico, ya durante el gobierno del ex presidente Néstor Kirchner se decidió agregar al Plan otra nueva línea (Res. 831/03) entre las estaciones transformadoras Puerto Madryn y Pico Truncado, que sería financiada con aportes del Tesoro.

En noviembre de 2003 la ley 25.822 ratificó formalmente el Plan Federal de Transmisión, y también resolvió que:
• Los recursos recibidos por CAMMESA que corresponden al Plan Federal de Electricidad, y los que la ley 24.065 puso bajo administración del Consejo Federal, deben ser puestos inmediatamente a disposición del Consejo Federal;
• Autorizó a la Secretaría de Energía a tomar las medidas regulatorias necesarias para comenzar los trabajos en el Plan de Transmisión Federal, especialmente notifica los 180 días de convocatoria abierta para la línea de Comahue-Cuyo y el primer tramo (Mendoza-San Juan) de la Línea Minera.

El proceso comenzó a mediados del año 2003 cuando la Secretaría de Energía, teniendo como marco de referencia el mencionado Plan Federal de Transporte, encomendó al Consejo Federal de la Energía Eléctrica el estudio y elaboración de un "Plan de Obras Imprescindibles para el quinquenio 2004-2008", que brindasen soluciones a los Sistemas Regionales de Transporte Eléctrico.

Como ya señalamos, mediante la Resolución de la Secretaria de Energía Nº831/03 se incorporó al Plan Federal de Transporte en Quinientos Kilovoltios la Interconexión en Extra Alta Tensión entre las Estaciones Transformadoras Puerto Madryn y Pico Truncado, extendiendo de este modo el trazado de la Interconexión MERCADO ELECTRICO MAYORISTA - MERCADO ELECTRICO MAYORISTA SISTEMA PATAGONICO (MEMMEMSP) hasta la localidad de Pico Truncado. Asimismo en dicha resolución se dejo manifestado que con posterioridad resultara imprescindible extender la prolongación hasta interconectar las localidades de RIO GALLEGOS y RIO TURBIO, todas ellas en la Provincia de SANTA CRUZ.-

A su vez, de la referida resolución, surge que la obra no estaba incluida dentro del PLAN FEDERAL DE TRANSPORTE EN QUINIENTOS KILOVOLTIOS (500 kV)

cuya ejecución se financio con los recursos del FONDO FIDUCIARIO PARA EL TRANSPORTE ELECTRICO FEDERAL,  indicando asimismo que su ejecución  sería financiada con aportes del Tesoro Nacional y  quedaría a cargo del Comité de Administración del FONDO FIDUCIARIO PARA EL TRANSPORTE ELECTRICO FEDERAL (CAF).

Así las cosas, resulta manifiestamente arbitraria, la decisión de incluir en el Plan Federal de Transporte en Quinientos Kilovoltios la Interconexión MEM-MEMSP.-.

Ello es así, si se tiene en cuenta que la Dirección Nacional de Prospectiva de la Subsecretaría de Energía Eléctrica pondero en un informe que realizó durante el año 2002, la prioridad de la interconexión NOA NEA, en su primera etapa  (278 km. de línea de 500 Kv), por encima de las demás. Esta obra se evaluó como la mas beneficiosa porque resolvería en parte el problema de transporte que afecta la demanda domestica, reduciría significativamente la necesidad de convocar generación forzada, mejoraría el uso de capacidad instalada y permitiría utilizar la sobreoferta disponible en el sistema "Norte Grande Chileno" (importando energía). Por tales motivos se promovió llevar a cabo esta interconexión, en un 100% con el Fondo Fiduciario para el Transporte Eléctrico Federal (FFTEF).-

Por ello, resulta inexplicable que la interconexión patagónica que une el MEM con el MEMSP mediante la vinculación en alta tensión de Choele Choel con Puerto Madryn fuere la primer obra que entró en ejecución con financiamiento parcial del FFTEF y que con posterioridad se decidiere extender la interconexión patagónica hasta Pico Truncado, Provincia de Santa Cruz.-

Es evidente que con esta decisión el Gobierno Nacional arbitrariamente decidió beneficiar con la realización de las obras a la región Patagónica, beneficiando específicamente a la Provincia de Santa Cruz, desoyendo la recomendación de prioridades que resulta incuestionable del informe ya citado de la Dirección Nacional de Prospectiva y a pesar de que esa interconexión no se encontraba incluida en el plan federal.-

En base a dicha información, reiteramos que llama poderosamente la atención que la interconexión MEM-MEMSP fuera la primer obra financiada por el FFTEF.-

- PLAN FEDERAL DE TRANSPORTE EN 500 KV

El mapa corresponde a información oficial publicada en la página Web del Consejo Federal de Energía Eléctrica ( www.cfee.gov.ar). Sin embargo, aclaramos que no se encuentra actualizada respecto del tramo Puerto Madryn- Pico Truncado, ya que esta obra ha finalizado en noviembre de 2007.-

FONDO FIFUCIARIO PARA EL TRANSPORTE ELECTRICO FEDERAL.-

Respecto del financiamiento, la herramienta más importante fue la formación del Fondo Fiduciario para el Transporte Eléctrico, decidiéndose que se alimentaría de recursos provenientes del Fondo Nacional de la Energía Eléctrica, principal fuente de los recursos específicos del sector eléctrico para todas las provincias.

El Fondo Nacional de la Energía Eléctrica fue creado, mediante la Ley 15.336 Art.30) con el fin de contribuir a la financiación de los planes de electrificación.

Se integraría con:

I) Aportes del Tesoro nacional que se fijarán anualmente;
II) El 50% como mínimo del producido de la recaudación del Fondo Nacional de la Energía, pudiendo el Poder Ejecutivo incrementar dicho porcentaje;
III)  Regalías sobre el uso de las fuentes hidráulicas de energía;
IV) El derecho de importación de la electricidad que en cada caso establezcan los organismos competentes;
V) Recargo de m$n 0.1 por Kv/hora sobre el precio de venta de la electricidad;
VI)  El producido de la negociación de títulos de deuda nacional que se emitan con cargo a ser servidos con recursos del Fondo;
VII) Recaudación por reembolso, y sus intereses, de los préstamos que se hagan de los recursos del Fondo;
VIII)  Donaciones, legados, aportes y otros recursos no especificados anteriormente.

Esta ley fue modificada por la Ley 24.065 en 1992, en donde el Fondo de Energía Eléctrica se constituye por un recargo de $ 0.03 kW/hora sobre las tarifas que paguen los compradores del mercado mayorista (sustituye ítem (III) anterior). Además, se indica que la Secretaría de Energía puede modificar este valor en +/- 20%. Esta Ley también resolvió que el Fondo sería administrado por el Consejo Federal de la Energía Eléctrica (CFEE), y se destinaría: 60% para crear el Fondo Subsidiario para Compensaciones Regionales de Tarifas a Usuarios Finales (FTC), y el 40% restante para el Fondo para el Desarrollo Eléctrico del Interior (FEDEI). Ese mismo año, mediante el decreto 1.398 se resuelve que la Secretaria de Energía Eléctrica debe controlar que la asignación del Fondo Subsidiario para Compensaciones Regionales de Tarifas a Usuarios Finales se distribuya entre las Provincias que se hayan adherido a los principios tarifarios contenidos en la citada norma.

La Resolución 657/99 aumentó la sobrecarga de $2.40/MWh a $3.00/MWh. La recaudación por el $0.60 adicional por MWh debía ser puesto en el Fondo Federal de la Transmisión (FFTEF) que el Gobierno Nacional podría utilizar para extender la transmisión de 500 kilovatios.

Con el objetivo de una ampliación del sistema de transporte de energía eléctrica en alta tensión destinada al abastecimiento de la demanda o a la interconexión de regiones eléctricas para mejora de calidad y/o seguridad de la demanda, La Secretaría de Energía de la Nación, y según lo dispuesto en el artículo 70 de la Ley 24.065, emitió la Resolución 333/01 incrementando el gravamen del Fondo Nacional de la Energía Eléctrica a 3,0384 $/MWh.[7]

El Consejo Federal de la Energía Eléctrica se encuentra facultado para reglamentar la aplicación de esos fondos y establecer los criterios de administración. Asimismo, es función del CFEE acordar los índices porcentuales para distribuir los recursos entre las provincias beneficiarias

La Resolución 174/00 de la Secretaría de Energía modificó la Resolución SE 657/99 referente a la constitución de un Fondo Fiduciario para el Transporte Eléctrico Federal,

a efectos de participar en el financiamiento de obras para la ampliación del sistema de transporte de energía eléctrica en alta tensión, destinada al abastecimiento de la demanda o a la interconexión de regiones eléctricas para mejora de calidad y/o seguridad de la demanda.

En el contrato se constituyó como fiduciante el Consejo Federal de Energía Eléctrica, órgano dependiente de la Secretaría de Energía y Minería del Ministerio de Enonomía, y el fiduciario fue el Banco de la Nación Argentina. En tanto el beneficiario sería el Comité de Administración y las personas físicas o jurídicas que este indique como consecuencia de la aplicación de la metodología de participación del Fondo. Por último, el fideicomisario lo constituye el Fondo Nacional de Energía Eléctrica.

Los recursos del citado fideicomiso son:

• Las recaudaciones provenientes del incremento del 0,0006 $/kwh en el valor del recargo sobre tarifas que deben pagar los compradores de energía eléctrica en el Mercado Eléctrico Mayorista.
• La renta financiera que produzca la administración de dichos fondos.
• Los recursos que le asigne el Estado Nacional y las provincias.
• Las donaciones.
• Otros recursos que se obtengan para los mismos objetivos previstos en el Estatuto.

El financiamiento de la línea MEM-MEMSP corrió por cuenta del Estado Nacional, a través del Fondo Fiduciario para el Transporte Eléctrico Federal, en un porcentaje del 69%, y las empresas Aluar, 15,5%, e Hidroeléctrica Futaleufú, cono el restante 15,5%..-

OBRA DE INTERCONEXION MEM-MEMSP TRAMO PUERTO MADRYN - PICO TRUNCADO

La prolongación de la interconexión MEM-MEMSP hasta Pico Truncado, en Santa Cruz, se licitó en 2005. El contrato se completó mediante licitación pública Nº6/2005 y resultó adjudicada a la misma firma, Intesar S.A., por un total de $460.905.301,98.-

En forma separada, se licitaron los conductores y las estructuras de acero, adjudicados por 31.523.172,44 y 87.112.256 pesos, respectivamente. Toda la obra costo un total de 579.540.730,42.

Tales números surgen de la página Web del Consejo Federal de Energía Eléctrica.-

Sobre la realización de esta obra, un artículo periodístico del diario la política online de fecha 14/05/2008, que adjuntamos, indicó que existen sospechas de sobreprecios en la obra energética que corresponde a la extensión de la interconexión patagónica de las ciudades de Choele Choel y Puerto Madryn, y que a último momento y por fuera del Plan Federal se decidió extender hasta Pico Truncado. Señalando que "las dudas giran en torno a los costos que sin excusa visible varían, como siempre, hacia arriba.

Asimismo, y en este mismo sentido, el diario Crítica, en una nota del día 3 de junio del corriente año, que se puede ver en su página web (www.criticadigital.com), y del cual acompañamos copia, atento su fundamental importancia para la averiguación de la

verdad objetiva en la presente causa,  sostiene que "Obras energéticas, sobreprecios y Ministerio de Planificación componen un tríptico que se repite en la administración K.".

En suma, los artículos periodísticos que acompañamos, indican que la Auditoria expresó que la obra se financió mediante el Fondo Fiduciario para el Transporte Eléctrico Federal y que para ello se convocó al sector privado para participar en dicho financiamiento y señalan que "el primer contrato de promoción de una ampliación que se celebró fue con las empresas Aluar S.A. –participando con el 15,5 por ciento en el proyecto- y Complejo Hidroeléctrico Futaleufú (otro 15,5 por ciento) siendo el Comité Administrador del Fideicomiso quien financió el 69 por ciento restante" y que con posterioridad "el contrato  COM (Construcción, Operación y Mantenimiento) de la interconexión patagónica fue adjudicado el 22 de abril de 2004 a la empresa Integración Eléctrica Sur Argentino S.A. (Intesar S.A.) por un total de 159.661.815,15 pesos más IVA.-

SOBREPRECIOS EN LA OBRA DE AMPLIACIÓN DE LA RED DE ALTA TENSION, INTERCONEXION MEM-MEMSP (PATAGONICA), ENTRE LAS ESTACIONES TRANSFORMADORAS DE PUERTO MADRYN Y PICO TRUNCADO.-

En el presente apartado, venimos a exponer que según nuestros cálculos, y basándonos en los datos publicados en la Web del Consejo Federal de Energía Eléctrica, existe una gran diferencia de costos, entre la realización del primer tramo Choele Choel- Puerto Madryn (Chubut) de la obra de interconexión MEM-MEMSP, con respecto al tramo Puerto Madryn- Pico Truncado.-

El tramo Choele Choel- Puerto Madryn tuvo un costo COM por Kilómetro de $581.920, en tanto el segundo tramo Puerto Madryn- Pico Truncado tuvo un Costo por Kilómetro de $842..987 por Km.-

Ello indicaría que la empresa Intesar S.A, a cargo de la realización de ambas obras, y que pertenece a Electroingeniería, cobró un sobreprecio cercano al  50 %.-

Tal diferencia de precio por Km, entre ambas obras no tiene relación con el  período de tiempo que trascurrió entre la realización del primer tramo y el segundo, que fue alrededor de 20 meses.-

A esta altura del relato, cabe mencionar que ambas obras son idénticas, ya que ambas son Lineas Electricas de Alta Tensión de  500 kV. Asimismo, fueron realizadas  en el mismo territorio (patagónico) y por la la misma empresa, y en un período de estabilidad económica.-

Creemos que pudo haber existido como máximo, ajustes de costos del 16 %, según resulta de versiones periodísticas, sin embargo las diferencias proporcionales, como ya indicamos,  son  cercanas al 50% .

En este mismo sentido, con fecha 14/05/2008 un artículo periodístico del diario la política online, que adjuntamos, al referirse a la ampliación de la línea de alta tensión que unirá a Choele Choel, Puerto Madryn y Pico Truncado, señala que el costo de la línea ascendió sin causa de 545 mil pesos por kilómetro a casi 850 mil ya que la

ampliación de la línea de alta tensión en la Patagonia costaría aproximadamente quinientos ochenta millones de pesos. Asimismo, destaca, que existe un informe de la Auditoría General de la Nación (AGN) que aún no tiene dictamen final, y que resalta cómo el valor licitado para la obra de Choele Choel/Puerto Madryn es de 545.736,71 pesos por kilómetro, mientras que el costo de la extensión hasta Pico Truncado, firmado en 2005 bajo el gobierno de Néstor Kirchner, asciende a 848.812,71 por kilómetro existiendo sólo un año de diferencia entre una y otra licitación y sin razones destacables para tamaña diferencia. Revelando que, del informe surge que "Si se incluyen conductores y estructuras metálicas la diferencia de valores es del 48 por ciento siendo la variación de precios según los índices del Indec cercana al 20 por ciento".

FIDEICOMISOS CON VENEZUELA: EL CIRCULO  KIRCHNER, UBERTI , DE VIDO, CHAVEZ.

El 6 de abril de 2004, se firmó en Caracas el "Convenio Integral de Cooperación entre la República Argentina y la República Bolivariana de Venezuela" por el que se dispuso crear un fideicomiso con el dinero que Argentina pagara por la importación de combustible que se usa para producir electricidad. Esos recursos deberían ser utilizados para la compra de bienes industriales argentinos, según la previsión original, "petroenergéticos" y "agrícolas".

El diario Página 12 en la nota firmada por Cledis Candelaresi  se refiere al desarrollo de este Convenio y menciona:  "…Argentina está vendiendo productos de alto valor agregado", se anima Gabriel Hormilouge, asesor de la Subsecretaría de Integración Latinoamericana y Mercosur y uno de los mentores locales de aquel fideicomiso administrado por el venezolano Bandes, que desde el primer pago, el 9 de agosto del 2004, y diciembre del 2006, acumuló algo más de 390 millones de dólares. Según da fe el colaborador de Jorge Taiana, esa suma se había gastado íntegra en compras de rubros muy diversos, no previstos en el acuerdo original. El listado incluye desde los hardware que la estatal Invap provee para equipamiento hospitalario, el software que para el mismo fin vendió la sede local de Philips, las incubadoras de Medix, los ascensores de Servas, hasta equipos electroenergéticos o maquinarias agrícolas, entre otros…"

Jorge Lanata en Perfil del27/NOV/05  "Perros lindos, lobos feos"  hace referencia a los u$s.90 millones que faltaron del fideicomiso y que luego fueron respuestos: "…El caso de los noventa millones tomó por sorpresa a todos: el 26 de enero llegó a la Cancillería un cable del entonces embajador argentino en Venezuela, Alberto Sadous. El título del cable era: "Grave situación". Sadous, embajador de carrera nombrado allí por Duhalde, informaba sobre un tema realmente grave: la falta de noventa millones de dólares el fideicomiso que Argentina y Venezuela mantienen en el banco UBS de Nueva York. El cable en cuestión no ahorraba metáforas: "Esto afecta seriamente la relación", decía, mencionando la palabra "corrupción" al menos en dos oportunidades. Sadous –quien en varias oportunidades se negó a dialogar con PERFIL– describía en el informe el mecanismo de ingeniería financiera que se habría utilizado: los 90 millones salieron del fideicomiso, volvieron a Venezuela, se vendieron en el mercado negro del dólar, se recompraron en el oficial, y alguien se quedó con la diferencia: 13 millones de dólares.

Al día siguiente, según manifestó el canciller Bielsa a este diario, trasladó el tema a todas las áreas técnicas competentes y se comunicó con el embajador venezolano en Buenos Aires.

El general Freddy Balzán (medalla de combatiente internacionalista entregada por Fidel, ex corresponsal de Prensa Latina en Managua) envió a la Cancillería, a las 18.19 hs. del 1º de febrero, una respuesta realmente curiosa, en la que manifestaba que, "como no tenemos experiencia en fideicomisos, retiramos todo ese dinero sin saber que no podíamos hacerlo", y la suma, luego, volvió a su lugar de origen. Fuentes diplomáticas cercanas a Sadous sostienen que aquella "indiscreción" le costó el puesto.

La Cancillería afirma que Sadous tenía vencido su período de permanencia en el país, había tenido reuniones con dirigentes opositores y se prefirió cambiar al titular de la delegación.

La "primicia" del cambio de embajador fue publicada en Página/Oficial por el actual presidente de Télam, Martín Granovsky, aunque en el artículo nada se mencionó sobre la ausencia temporaria del dinero..."

Citamos algunos párrafos del artículo de Jorge Lanata en Perfil del 10/12/2006 :

**La "relación estratégica" entre Venezuela y Argentina está basada en negocios turbios y frases grandilocuentes. Vamos por partes:**

* Desde mayo de 2005 Venezuela le compra a Argentina Boden 2012. La operación comenzó con 100 millones de dólares y en casi dieciocho meses se adquirieron 3.600 millones de Boden 2012 y 400 millones de Boden 2015, anexados al denominado Bono del Sur. La compra de bonos argentinos, bautizados por Chávez como los "Bonos Kirchner", que son "mil veces menos riesgosos que los del Tesoro de los Estados Unidos", es utilizada por los venezolanos para poder sacar divisas del país, algo que contrasta con el fuerte discurso nacionalista del presidente reelecto. El mercado del dólar en Caracas, controlado teóricamente por el gobierno, tiene una cotización paralela. Dos mil cien bolívares por dólar en el cambio oficial o dos mil ochocientos en el paralelo, durante la semana pasada.

El gobierno de Chávez vende a los bancos los Boden 2012 al precio oficial, y luego los bancos los vuelven a vender a sus clientes, pero al paralelo. Nadie cree en Venezuela que ese negocio sólo sea usufructuado por los banqueros, y las sospechas de corrupción estatal se multiplican. "El verdadero interés de los inversores en ese nuevo bono – escribió en Clarín el pasado 2 de noviembre Gustavo Bazzan, en una nota sobre el Bono del Sur– es que les pemitirá sacar divisas de Venezuela, tal como hoy lo hacen con el Boden 2012, quedándose en el acto con una diferencia no menor al 15%."

Y con referencia al convenio dice:
 "… Otro de los negocios poco bolivarianos con Venezuela se refiere al mítico "fideicomiso": en el marco de los convenios bilaterales convive el comercio convencional (de commodities agropecuarias, autopartes, leche en polvo, aceites y harinas) con el Fideicomiso Cooperativo creado en 2004. El fideicomiso opera con el dinero que Argentina le paga a Venezuela por la compra de petróleo; por cada venta, Camesa (Compañía Administradora del Mercado Mayorista Eléctrico) deposita el pago en una cuenta que el Bandes (Banco de Desarrollo Económico y Social de Venezuela) tiene en Nueva York. La entidad del fideicomisario, o comitente, es PDVSA. Según la página web del propio Bandes, "un fideicomiso es una relación jurídica a través de la

cual una persona llamada fideicomitente transfiere uno o más bienes a otra persona llamada fiduciario, quien se obliga a utilizarlo en favor de aquél o de un tercero llamado beneficiario".

A través de este fideicomiso circulan más de 300 millones de dólares. Con ese dinero, por ejemplo, el ministerio de Salud de Venezuela compra productos argentinos, operación que se concreta con la firma del presidente Chávez, que avala contratos por suministro definitivo. Se supone que el trámite no debe durar más de cuarenta y cinco días, aunque en la actualidad cada contrato demora unos siete u ocho meses para ser aprobado. Según el reglamento del fideicomiso, se le adelanta a la empresa el 30% del valor de la compra, lo que vuelve el negocio ciento por ciento seguro. Distintas fuentes aseguraron a PERFIL que el especialista en calmar la angustia de los atrasos de meses en los contratos es Claudio Uberti, mano derecha de De Vido y personaje clave en los negocios venezolanos, además de titular del Occovi (Organo Controlador de las Concesiones Viales). Uberti sabe cómo "agilizar" los trámites y, de solicitarlo, las empresas cuentan con su buena voluntad de gestión. El par venezolano del ágil Uberti es Franklin Mendez, director del Bandes. "Lo que está fuera del fideicomiso tiene su lógica –confesó a PERFIL un funcionario de segunda línea del Gobierno nacional– pero lo que está por dentro del fideicomiso es inmanejable. Todo está bajo el aura de Claudio Uberti."

**Respecto a Ascensores Serva, mencionado en el artículo de Página 12 arriba citado, dice:**

"UBERTI Y LOS ASCENSORES

En el mismo panorama de PERFIL en el que se anunció en exclusiva la renuncia de Lavagna, el 27 de noviembre de 2005, un apartado mencionaba el famoso fideicomiso venezolano y la "desaparición" de noventa millones de dólares: "El 26 de enero –decía el artículo– legó a la Cancillería un cable del entonces embajador argentino en Venezuela, Alberto Sadous.

El título del cable era 'Grave situación'. Sadous, embajador de carrera nombrado allí por Duhalde, informaba de un tema verdaderamente grave: la falta de noventa millones de dólares del fideicomiso entre Argentina y Venezuela. El cable en cuestión no ahorraba metáforas: "Esto afecta seriamente la relación", decía, mencionando la palabra "corrupción" al menos en dos oportunidades. Sadous –quien en varias oportunidades se negó a hablar con PERFIL– describía en el informe el mecanismo de ingeniería financiera que se habría utilizado: "Los 890 millones salieron del fideicomiso en Nueva York, volvieron a Venezuela, se vendieron en el mercado negro del dólar, se recompraron en el oficial y alguien se quedó con los trece millones de dólares de diferencia". Según manifestó el canciller Bielsa a este diario, el general Freddy Balzán (medalla al combatiente internacionalista entregada por Fidel, ex corresponsal de Prensa Latina en Managua) envió a las 18.19 del 1º de febrero un curioso cable a la Cancillería argentina, donde expresaba: "Como no tenemos experiencia en fideicomisos, retiramos todo ese dinero sin saber que podíamos hacerlo". Fuentes diplomáticas aseguraron que aquella "indiscreción" le costó el puesto a Sadous.

Las primeras tres operaciones del fideicomiso demoraron más de un año en llevarse adelante pese a que los 91.300.000 dólares que involucraban ya estaban depositados

desde el cuarto mes. Una de esas operaciones fue llevada a cabo por INVAP con la
compañía de Philips como proveedor de software, otra fue de la empresa Medics, de
incubadoras neonatales (que firmó en aquel momento un contrato de 25 millones de
dólares y acaba de acordar uno nuevo por ochenta millones), y otra, la de los famosos
Ascensores Servas, sobre la que abundaremos más adelante. Los noventa y un millones
en efecto estuvieron "desaparecidos" y la primera tarea de Nilda Garré cuando asumió
la Embajada en Caracas fue normalizar aquel escándalo.

Ascensores Servas SA es proveedora del Estado nacional desde el 14 de marzo de 2002,
y tiene oficinas en la planta baja de Alsina 909. Su balance de 2004 es realmente un
poco desalentador: tiene 5.028.640,26 pesos de activos corrientes y un pasivo corriente
de 1.334.684,81 pesos; vendió por 4.028.621,83 y perdió al final del año 95.260,35
pesos. En la Oficina Nacional de Contrataciones figuran también sus faltas: el 14 de
enero de 2004 el director de la Superintendencia de Riesgos del Trabajo suspendió la
contratación de doce meses por incumplimiento, y en el Ministerio de Economía le
dieron de baja el contrato, ya que la Subsecretaría de Administración logró probar que
había falsificado un certificado fiscal para contratar. El presidente de la atribulada
Servas SA es el señor José Aizpun, la vicepresidenta es María de las Mercedes
Primitiva Aizpun Noain y sus directores son Nely Gladys Dutruel, Marta de Pedro y
Cristina Romilda Aizpun Noain. Como se ve, el sesgo progresista que llevó a Servas a
integrar su directorio sólo con mujeres parece ser un distintivo. Y para colmo son
personas que sufren los embates de la economía: Nely Dutruel está calificada como
"irrecuperable" en las agencias de información de créditos y el propio presidente
Aizpun tiene una larguísima ristra de cheques rechazados: el 3, 7, 14 y 19 de diciembre
de 2001, el 4 y 8 de enero de 2002, el 7 y 8 de febrero de 2002, el 11 de marzo, 8 de
abril, 7 de mayo y 7 de junio de 2002, junto a varios créditos otorgados por el Banco
Nación y el de la Provincia de Buenos Aires.

Si se buscan referencias respeto a la vicepresidencia de la empresa, se verá que la señora
María de las Mercedes Primitiva Aizpun Noain tiene una carrera empresaria
verdaderamente versátil: a su función en una empresa de fabricación de ascensores
agrega como actividad, a efectos fiscales, la de "venta al por menor de ropa interior,
medias, prendas para dormir y para la playa, incluye corsetería, lencería, camisetas,
medias excepto ortopédicas, pijamas, camisones y saltos de cama, salidas de baño, trajes
de baño, etc.".

También mantiene un excelente vínculo con el Banco Provincia aunque ahora transita
por dificultades: ha sido declarada "irrecuperable" por ése y por el Citibank. Marta
Elena de Pedro de Aizpun, por su parte, también registra otra extensa ristra de cheques
voladores en 2002. Y Cristina Aizpun Noain también fue considerada "irrecuperable"
por el Banco Provincia y el Citi. Esta pujante pyme argentina fue presentada por el
gobierno de Néstor Kirchner al de Venezuela, en el marco de los acuerdos comerciales
bolivarianos. Según la Memoria Detallada del Estado de la Nación 2005, de la mano del
ágil Claudio Uberti el señor José Aizpun, presidente de Servas SA, cerró acuerdos con
los ministerios de Comercio y Salud de Venezuela.

En el Portal ALBA (Alternativa Bolivariana para Nuestra América), bajo el acápite
"Documentos suscriptos entre la República Argentina y la República Bolivariana de
Venezuela", figura la "Carta de intención entre el Ministerio de Salud y Desarrollo
Social de la República Bolivariana de Venezuela y la empresa argentina Ascensores

Servas", que "tiene por objeto fortalecer la infraestructura hospitalaria a través de la puesta en funcionamiento de ascensores en el sistema hospitalario venezolano".

En la gira del 21 de noviembre de 2005, tanto Uberti como el presidente de Servas, Aizpun, acompañaron al presidente y entonces, según la agencia oficial Télam, "se discutió la radicación gradual de esa firma argentina" en aquel país. La primera etapa del convenio con Servas comprende un contrato de 25 millones de dólares, hay una segunda etapa de 30 millones y otro convenio con el Ministerio de Defensa que incluye instalar dos ascensores en el Palacio de Miraflores y en dos hospitales militares, por doce millones de dólares. Servas, con la ayuda de Uberti –perdón–, se va para arriba."

En otro artículo de Lanata en el Diario Perfil del 25/02/2007  al referirse a este tema comenta : "…En dos oportunidades (ver PERFIL del 27/11/05 y del 10/12/06) nos hemos ocupado de informar sobre el fideicomiso con Venezuela, advirtiendo sobre las irregularidades en el mismo. El fideicomiso opera con el dinero que Argentina le paga a Venezuela por la compra de petróleo; por cada venta Camesa (compañía administradora del mercado mayorista eléctrico) deposita el pago en una cuenta que el Bandes (Banco de Desarrollo Económico y Social de Venezuela) tiene en Nueva York. La entidad del fideicomisario es PDVSA, y por ese fideicomiso circulan unos trescientos millones de dólares. Con ese dinero el Estado venezolano compra productos argentinos en un trámite que no debería durar más de cuarenta y cinco días pero que demanda hoy unos siete meses por cada contrato. Por reglamento, el fideicomiso adelanta un 30% del pago a la empresa proveedora que, así, prepara su primer envío. Es lo que se llama un negocio seguro. Tan seguro y pretendido que en esos siete meses el vicecónsul real Uberti se hace unas horas para conversar con cada empresa y, cuando se lo solicitan, "agiliza" el trámite con el visto bueno de su par venezolano, Franklin Méndez, director del Bandes. Del fideicomiso, como se informó en estas páginas en su momento, desaparecieron 91,3 millones de dólares que, luego de conocido el hecho, volvieron a aparecer. Pero más allá de los faltantes (¿quien no ha tenido alguna vez, en su cuenta corriente, un faltante de varios millones?) lo escandaloso del fideicomiso con Venezuela tiene que ver con dos contrataciones: la de ascensores Servas y la de Faraday, una empresa sin actividad económica y con cinco empleados que se presentó para solucionar los problemas energéticos de la región."

También la revista Fortuna  se refiere a los negocios dentro de este convenio: "Con un monto superior a los u$s 1.100 millones cerraron el 2007 las relaciones comerciales entre Venezuela y Argentina, según las estimaciones de la Cámara de Comercio Argentino-Venezolana (CCAV), lo que es equivalente a 1.375 valijas como la que trajo Guido Antonini Wilson el pasado 4 de agosto. Y aunque el Washington Post señala que "es bien sabido hace tiempo que las relaciones cercanas entre Venezuela y la Argentina no son el resultado de una mera afinidad ideológica", lo cierto es que desde 2004, y por la afinidad entre Néstor Kirchner y Hugo Chávez, el comercio entre ambos países se ha incrementado en casi 800%. Lo que también es verdad, es que este estrechamiento de lazos es "estimulado por los petrodólares", como igualmente señaló el diario norteamericano. Ahora bien, para disgusto de quienes levantan la bandera de la cercanía ideológica, ninguno de los convenios con grandes empresas argentinas anunciados por Chávez ha resultado un gran negocio desde el principio.

Las ganadoras en esta relación a ritmo de joropo y tango son cerca de mil empresas, en su gran mayoría PyMes, que han exportado sus productos al país caribeño

aprovechando en primera instancia el fideicomiso establecido por la Argentina y Venezuela en el Convenio Integral de Cooperación firmado el 6 de abril de 2004. Este convenio permite el intercambio del fuel oil, enviado por el gobierno de Chávez, por productos agroindustriales argentinos. El fideicomiso opera con el dinero que Argentina le paga a Venezuela por la compra de ese derivado de petróleo, y que, a su vez, debe ser utilizado por Venezuela para comprar productos y tecnología agraria argentina. El fideicomiso se maneja a través del venezolano Banco Nacional de Desarrollo (Bandes), que paga a las empresas argentinas con cheques de cuentas que están en la "imperial" ciudad de Nueva York.

Sin embargo, el dinero de este fideicomiso y las compras del Estado venezolano no representan el total del intercambio entre ambos países. "El comercio bilateral ha crecido más allá del Convenio de Cooperación. El fideicomiso ha sido una gran herramienta, pero las empresas privadas han hecho un muy buen trabajo para incrementar sus exportaciones hacia Venezuela", según explica el director ejecutivo de la CCAV, Jorge Eduardo Rastrelli. Hasta octubre de 2007, el monto del intercambio fue de u$s 1.013,5 millones, un 56,3% más que en el mismo período de 2006, y de ese total lo que la Argentina le vende a Venezuela suma u$s 995.494.285, es decir, cerca del 98% de toda las relación bilateral.

En cambio, los negocios anunciados por Chávez, que en su momento coparon las tapas de los principales diarios, tienen diversos problemas para desarrollarse. El denominador común de estos problemas es el retraso en los giros desde el gobierno venezolano, y la extrema burocracia con la que tienen que lidiar los empresarios para la aprobación de proyectos y la facturación. Algunos de los casos emblemáticos son el préstamo y la compra de leche a SanCor, la construcción de dos buques petroleros en Astilleros Río Santiago y la llegada a la Argentina de las estaciones de servicio de PDVSA. "La asignatura pendiente es empezar a flexibilizar la burocracia, que es excesiva e innecesaria. Uno de los grandes problemas es el sistema cambiario venezolano a la hora de emitirse los pagos. Eso es lo que más asusta a los empresarios", aseguró Rastrelli.

BARCOS SIN ZARPAR. Uno de los primeros anuncios de la potenciada relación entre Venezuela y la Argentina fue la construcción de cuatro buques cargueros para la flota de PDVSA por parte de Astilleros Río Santiago. El acuerdo se firmó en julio de 2004 entre los presidentes Néstor Kirchner y Hugo Chávez, y especificaba que se construiría un primer buque en 30 meses y, después, tres más.

Tras un retraso de más de tres años, recién a finales de 2007 empezó la cuenta de los mencionados 30 meses, tras resolverse el gran obstáculo del abastecimiento de la materia prima para la construcción de buques. "Las compras de chapa naval ya no se hacen a través de la venezolana DIANCA, sino que las hace directamente Río Santiago", explicó el vocero del astillero argentino, Pablo Galeano. A la lentitud extrema de la empresa estatal venezolana para proveer el material y hacer los pagos, se sumó la cuestionada decisión de los venezolanos de contratar para el diseño de los planos a una empresa española que fue a la quiebra, por lo que hubo que empezar desde cero con una compañía brasileña. El "Eva Perón", nombre con el que saldrá al mar el carguero, tiene como principal obstáculo a la burocracia. Fuentes del Astillero Río Santiago confirmaron que para agilizar el envío de recursos, el presidente de esta empresa, Julio César Urién, tuvo que hacer, por lo menos, un viaje por mes a Caracas en el recién finalizado 2007. Incluso, tres empleados de PDV Marina (empresa naviera de

PDVSA) se encuentran instalados permanentemente en las oficinas centrales del astillero en Ensenada, para que se puedan agilizar los trámites.

FALLIDO. El salvataje a SanCor y la compra de leche fue otra de las banderas de la cooperación binacional. En noviembre de 2006, la embajadora argentina en Caracas, Alicia Castro, sorprendió al mundo empresario argentino al señalar que Venezuela prestaría u$s 135 millones a SanCor, de los cuales 80 serían para que pagara sus deudas internacionales y 55 se dedicarían a capital de trabajo. La idea de fondo era evitar que la empresa fuera comprada por capitales privados, extranjeros o nacionales.

Fuentes internas de SanCor confirmaron que la empresa aún sigue esperando la llegada del dinero. El acuerdo marco se firmó en diciembre de 2006, pero el dinero debía esperar a que se finalizara con la letra chica del convenio. A finales de enero de 2007 estaba todo listo para el viaje a Caracas y la firma del vicepresidente de la cooperativa, Ítalo Gestaldi, pero al parecer la letra por definir no era tan chica. El Gobierno chavista no sólo quería la leche en polvo como forma de pago, sino que también pedía una transferencia de tecnología para instalar plantas en el país. El viaje de Gestaldi se retrasó hasta unos días antes del encuentro entre Kirchner y Chávez en la venezolana ciudad de Puerto Ordaz, en febrero del año pasado.

Tres meses después de ese encuentro, SanCor recibió lo que hasta ahora son los únicos recursos enviados : unos u$s 15 millones, por lo que su saldo con los acreedores internacionales sigue en rojo.

SIN ESTACIONES. Una vez establecidos los primeros convenios de cooperación entre Venezuela y Argentina, el gobierno de Hugo Chávez anunció que PDVSA entraría al mercado argentino para comercializar tanto nafta como lubricantes directamente al consumidor final. A casi cinco años de aquellos dichos, PDVSA sólo opera dos estaciones de servicio en toda la Argentina, en conjunto con la estatal petrolera Enarsa.

El 1º de febrero de 2005, el propio Chávez, de visita a la Argentina para inaugurar una de esas dos estaciones, aseguró que PDVSA estaba interesada en la compra de los activos de Shell y que ese mismo año abrirían 600 plazas similares en toda Argentina. Incluso, el ministro venezolano de Energía y Petróleo, Rafael Ramírez, señaló que el precio del paquete de Shell que incluía 150 estaciones de servicio propias, 750 controladas por contrato y una refinería en Buenos Aires, estaba "en plena discusión". Incluso, Ramírez advirtió que "probablemente" para mediados de ese año se iba a poder concretar la compra.

El último de los fallidos anuncios de la llegada de las estaciones de servicio de PDVSA ocurrió en octubre pasado, cuando la petrolera reveló que estaba interesada en comprar los activos de Exxon en la Argentina, que están bajo la marca Esso, y que incluyen una refinería en Campana. En noviembre el directorio de Exxon comunicó a PDVSA que "por cuestiones corporativas" no era posible seguir adelante con la negociación, lo que dejó el camino libre a Petrobras."

**9- Enumeración de Denuncias. Eje en el Ministerio de Planificación Federal.**

La breve enumeración de las distintas denuncias, que haremos a continuación establecen como eje central al Ministerio de Planificación Federal.

**- Desvío de 6 millones de dólares destinados a recuperar la capacidad técnica de Atucha II:**

Aquí la metodología resultaría similar al caso Skanska. La empresa estatal Nucleoeléctrica Argentina Sociedad Anónima (NaSa) dependiente de la Secretaría de Energía (Ministerio de Planificación) y encargada de finalizar Atucha II firmó un convenio con la CNEA (Comisión Nacional de Energía Atómica) a los fines de capacitar a ésta última técnicamente para darle sustentabilidad a la recuperación de la mencionada Central. Sin embargo, ese dinero habría sido desviado a la empresa Dioxitek SA, para compras cuya finalidad no serian compatibles con las del Convenio. Por tanto, en este esquema también se reitera la misma operatoria denunciada: existe un fideicomiso, una empresa no habilitada al efecto y presenta como justificativo facturas "truchas". Todo esto, bajo la orbita del Ministerio de Planificación .

Nótese, que Sindicatura General de la Nación (SIGEN) indicó que "En varias compras no se fundamentaron ni acreditaron: las necesidades, las cantidades y oportunidades de las compras, ni la razonabilidad del precio pagado. Tampoco existieron análisis de otras posibilidades para satisfacer los requerimientos. Ni se constataron en los expedientes los estudios de precios, cantidades y calidades que se ofrecían en el mercado nacional e internacional".

**- Licitacion Irregulares para carceles: Actuación de Kirchner y De Vido:**

Licitaciones N° 02/4 y 03/4 correspondientes a las cárceles del Complejo Federal Agote, sita en Mercedes Provincia de Buenos Aires y el Centro Federal penitenciario Litoral Argentino, sito en Coronda Provincia de Santa Fé.
Estas Licitaciones se iniciaron a principios del 2004. Las Unidades Ejecutoras del Programa son el Ministerio de Justicia, Seguridad y Derechos Humanos y el Ministerio de Planificación Federal.

Capacidad de la contratación: Conforme surge del pliego, para presentarse a esta licitación el Proponente debió presentar certificado acreditando su capacidad de contratación actualizada, expedido por el Registro de Constructores de Obra Pública. Téngase presente que entre otros empresarios, en este Registro opera Enrique Wagner presidente de ESUCO.

El "modus operando" denunciado se reitera en esta licitación que fue parada a instancias de una denuncia penal de los diputados Adrian Perez y Marcela Rodriguez, que como prueba se acompaña a la presente.

Las tres (VER) licitaciones cuyos procesos son aquí denunciados comparten una particularidad: a través de un decreto de necesidad y urgencia, los montos de los presupuestos originales fueron sustancialmente elevados por el Poder Ejecutivo Nacional, acomodándolos ostensiblemente a los requerimientos de las corporaciones elegidas por la Comisión Mixta de evaluación de ofertas.

Como veremos en el siguiente cuadro, el 1° de junio de 2005, mediante el Decreto N° 565/05, publicado en el Boletín Oficial el 3 de junio de 2005, el Presidente Kirchner decidió incorporar a la Planilla Anexa 12 de la Ley de Presupuesto, la construcción y el

mantenimiento de las cárceles de Salta, Mercedes y Santa Fe, asignando sus
presupuestos de la siguiente manera:

Bienes y Servicios Monto Total

Construcción Complejo Federal de  Condenados de Mercedes $ 189.606.167
Construcción Centro Federal del Noroeste Salta $ 64.985.972
Construcción Centro Federal del Litoral-Coronda-Santa Fe $ 42.857.803
Mantenimiento Complejo Federal de  Condenados de Mercedes $ 16.300.000
Mantenimiento Centro Federal del Noroeste Salta $7.500.000
Mantenimiento Centro Federal del Litoral-Coronda-Santa Fe $ 4.600.000

Total a devengar presupuesto 2005 $ 74.869.862

Los presupuestos fijados responden exactamente a las solicitudes planteadas por las
firmas elegidas por la Comisión Mixta, y aumentaron los costos para el Estado Nacional
de una manera escandalosa y arbitraria, con el manifiesto único fin de satisfacer los
deseos empresarios, en lugar de perseguir el bien común que debe guiar toda licitación
pública. Veamos los casos en particular:

El 15 de marzo de 2004, a través de la Resolución 122/04 suscripta por el Arq. Julio De
Vido, se aprobaron el Pliego de Cláusulas Generales, el Pliego de Cláusulas Especiales,
el Programa de Necesidades y Especificaciones Técnicas y demás documentación
licitatoria del Centro Federal Penitenciario del Noroeste-Salta- Expediente n°
0265120/03.

El presupuesto oficial correspondiente a la Etapa de Proyecto y Ejecución era de $
38.400.000.   Sin embargo, el 15 de julio de 2004, el Ministerio de  Justicia le solicitó a
la Subsecretaría de Obra Pública, sin fundamentación cierta, un incremento del 25% en
el presupuesto, argumentando incrementos en los costos de la construcción e indicando
que para afrontar las tareas aprobadas apenas 4 meses atrás, se requería un presupuesto
de $48.000.000, en lugar del original de $ 38.400.000.

Posteriormente, el 21 de diciembre de 2004, el Acta N° 8/04 de la Comisión Mixta
informó la consideración de los puntajes del sobre Nº 2 de las seis propuestas técnicas
presentadas: resultó elegido en primer término IECSA-SUPERCEMENTO, con un
puntaje de 89.69.

Finalmente, a través de Decreto de Necesidad y Urgencia Nº 565/05, el Poder Ejecutivo
Nacional elevó el presupuesto previsto, no en la cifra solicitada previamente, sino en
mucho más. Justamente el monto asignado fue el requerido por la proponente escogida
en primer lugar por la Comisión Mixta: $64.985.972, lo que importa un aumento del
59%.

Por otra parte, la Resolución 187/04 del 20 de abril de 2004, suscripta por el Arq. Julio
De Vido, aprobó el Pliego de Cláusulas Generales, el Pliego de Cláusulas Especiales, el
Programa de Necesidades y Especificaciones Técnicas y demás documentación
licitatoria del Complejo Penitenciario Agote - Mercedes- Expediente N° 0041653/04.

Su presupuesto oficial era de $ 124.800.000, correspondiente a la Etapa de Proyecto y Ejecución.

Con fecha 15 julio de 2004, el Ministerio de Justicia le solicitó a la Subsecretaria de Obra Pública un incremento del presupuesto del 25%, argumentando incrementos en los costos de la construcción, indicando que para afrontar las tareas aprobadas apenas 4 meses antes, se requería de un presupuesto de $ 156.000.000.

Curiosamente, a través del Decreto de Necesidad y Urgencia referido, el Poder Ejecutivo Nacional elevó el presupuesto previsto, justamente en la cifra requerida por la proponente escogida en primer lugar por la Comisión Mixta: un 65% respecto del presupuesto original, elevándolo a $189.606.167.

Por último, respecto del Centro Federal Penitenciario del Litoral-Santa Fe-  Expediente n° 026431/03-, la Resolución 1882/04 del 20 de abril de 2004, suscripta por el Arq. Julio De Vido, aprobó el Pliego de Cláusulas Generales, el Pliego de Cláusulas Especiales, el Programa de Necesidades y Especificaciones Técnicas y demás documentación licitatoria, con un presupuesto oficial de $ 23.040.000, correspondiente a la Etapa de Proyecto y Ejecución.

Aquí también, con fecha 15 de julio de 2004, el Ministerio de  Justicia le solicitó, sin fundamentación cierta, a la Subsecretaria de Obra Pública, un incremento del presupuesto del 25%, argumentando incrementos en los costos de la construcción, indicando que para afrontar las tareas aprobadas apenas 4 meses antes, se requería un presupuesto de $ 28.800.000.

Nuevamente, a través del Decreto de Necesidad y Urgencia mencionado el Poder Ejecutivo Nacional elevó el presupuesto previsto, justamente en la cifra requerida por la proponente escogida en primer lugar por la Comisión Mixta: un 89,01% respecto del presupuesto original, elevándolo a $ 42.857.803,39.

Las tres licitaciones de referencia presentaron otras irregularidades comunes en sus procedimientos: ellas se realizaron mediante el sistema de ajuste alzado, que requiere invariabilidad de la obra y del precio . El sistema es ineficaz y antieconómico, pues obliga a todos los oferentes a realizar un proyecto, y así, los gastos de todos los proyectos son pagados finalmente por la sociedad, ya que ellos se encuentran contemplados en los precios.

Al no existir un proyecto único, por otra parte, no se garantiza la concurrencia de los oferentes, y las licitaciones lucen "armadas" para que fueran ganadas por las empresas que resultaron ganadoras.  Por otra parte, la calificación obedece en un 30% a los antecedentes empresarios y en un 70% a la propuesta técnica, por lo que las empresas viales  resultan siempre mejor calificadas.

Finalmente, como hemos visto, el Decreto de Necesidad y Urgencia N° 565 adecuó el presupuesto a las ofertas presentadas, modificando considerablemente el Presupuesto Original, lo que evidencia el "armado" de los procesos licitatorios.


Por eso lo expuesto que entendemos que:

I. Nestor Kirchner es el jefe Julio De Vido, Rudy Ulloa, Lázaro Baez, Claudio Uberti, Cristóbal Lopez y Ricardo Jaime.  Todos ellos, incrementaron sideralmente  su patrimonio a partir de conocerlo, enriqueciéndose.

II. En todos los casos expuestos la participación del ex presidente Néstor Kirchner y el Ministerio de Planificación Federal resultan  directas ya que los organismos involucrados activamente en las operatorias denunciadas resultan ser dependencias del Ministerio de Planificación, gestionadas por funcionarios designados por éstos y pertenecientes a su círculo de confianza.

III. En todos los casos se evidencian irregularidades en las licitaciones y/o concesiones y violaciones reiteradas del Estado a las normas que regulan las Contrataciones Publicas.

IV. En todos los casos se reitera el esquema denunciado como capitalismo de amigos donde empresas cercanas al gobierno son adjudicatarias de las obras publicas, ya sea mediante sociedades a su nombre o bajo su control, lo que implica una carterizacion.

V. Direccionamiento en la adjudicación de obra publica a empresarios amigos que concentran la actividad e imponen el precio.  Esta practica es contraria al Reglamento de Compras y Contrataciones del Estado y configura un incumplimiento palmario a los principios rectores de la contratación publica tales como: eficiencia, transparencia, concurrencia y competencia, proporcionalidad y razonabilidad e igualdad de tratamiento para interesados y oferentes

VI. Complicidad e Inacción  de los funcionarios  intervinientes  que impulsan las adjudicaciones sin verificar la aptitud y antecedentes de las empresas. Se promueve y no se sanciona esta practica ilegal que permite que unos pocos manejen la obra publica en forma irregular y con  sobreprecios.

VII. Ausencia de controles del Estado respecto al cumplimiento de las condiciones de contratación.  Esto deriva en certificaciones de obras que no se encontrarían realizadas o que no se ajustarían al contrato por incumplir con las especificaciones técnicas de éste.  Un  ejemplo de esto se configuraría cuando Austral Construcciones cobra dinero mediante certificaciones de obra de las que no es titular.

VIII. Para el posible pago de sobornos o coimas algunas de las estas firmas se manejan con boletas apócrifas de compañías fantasmas, a efectos de  justificar gastos no realizados.  Esto, no solo configura un delito fiscal sino explicaría erogaciones irregulares en la contabilidad de dichas compañías.

IX. El gobierno de Kirchner sancionó a los funcionarios  de la AFIP que detectaron las maniobras de estas empresas amigas y los separó de la investigación. En su reemplazo se designaron funcionarios vinculados con Julio de Vido.

X. En todos los casos las empresas justificarían mediante facturas apócrifas pagos ilegales.

III.- CONSIDERACIONES SOBRE LOS DELITOS QUE SE SOLICITA SE INVESTIGUE:

**a) Asociación Ilícita:**

El Capítulo II del Título VIII del Código Penal (Delitos Contra el Orden Público) en su artículo 210 tipifica la acción consistente en tomar parte en una asociación o banda de 3 o más personas, destinada a cometer delitos. Es dable destacar, siguiendo las enseñanzas del Dr. David Elbio Dayenoff, que la conducta típica se consuma por el solo hecho de pertenecer a una organización de esa clase.

Es una figura dolosa que requiere el número de miembros y la finalidad del grupo.

En este caso presumo la existencia de una organización que se dedicaría a cometer este delito por tratarse de más de tres personas que han formado un gran grupo económico y empresario que fue señalado por la Administración Federal de Ingresos Públicos (AFIP), que es investigado por la Justicia Federal por evasión fiscal y presunto pago de sobornos en la obra pública.

La jurisprudencia sostuvo respecto de este tipo penal que "Las exigencias típicas del delito de asociación ilícita se satisfacen con el simple acuerdo, con la mera intención manifestada de cometer pluralidad indeterminada de actos delictivos, y cierta permanencia en la cooperación por parte de tres o más personas, sin que sea necesario que se cometa alguno de ellos, por tratarse de un delito de pura actividad" (SCBA, JA, 1983-I672).

- Figura Agravada: Como es de conocimiento de la vasta ilustración del Sr. Fiscal, el delito de asociación ilícita se agrava para los jefes u organizadores de la sociedad, en cuyo caso el tope mínimo de la pena o reclusión es de 5 años cuando el de la figura básica es de 3 años.

Solicito entonces, se investigue la posible comisión por parte de Néstor Kirchner del delito establecido en artículo 210 último párrafo del Código Penal por tratarse del jefe u organizador de la presunta banda formada para la comisión de los delitos que se solicita se indague. Ello en virtud de su carácter de ex Presidente de la República.

**b) Fraude a la Administración Pública:**

El Código Penal en su Capítulo IV titulado "Estafas y Otras Defraudaciones" tipifica en el artículo 174 inciso 5) el delito de Fraude en Perjuicio de la Administración Pública para aquella persona que "…cometiere fraude en prejuicio de alguna administración pública".

A través de esta figura se castigan las conductas descriptas en el capítulo referido en el párrafo anterior en aquellos casos en los que el sujeto pasivo sea la administración pública, es decir, "todo organismo que constituya una administración estatal directa, nacional, provincial, comunal o autárquica" (ref. Breglia Arias y Gauna).

En el caso que nos ocupa el posible pago de sobornos por la realización de obra pública constituiría la comisión del delito que se describe en este acápite.

**c) Abuso de Autoridad y Violación de los Deberes de Funcionario Público:**

El artículo 248 del Código Penal tutela el respeto y acatamiento, por parte de los de los funcionarios públicos, de las normas constitucionales y legales. En los acontecimientos que solicito se investiguen podría haberse cometido este delito en virtud de ser Julio De Vido el actual Ministro de Planificación Federal, Inversión Pública y Servicios y de haber sido Néstor Kirchner Presidente de la Nación en el período 2003-2007.

El tipificado por el artículo 248 del Código Penal es un delito doloso que exige la conciencia de la ilegitimidad o arbitrariedad del acto y la voluntad de llevarlo a cabo.

El sujeto activo de este delito debe ser un funcionario público en ejercicio de sus funciones. Tal como señala el Dr. Dayenoff, el sentido legal de los términos "funcionario y empleado públicos" utilizados en el Código Penal designa a toda persona que participa accidental o permanentemente del ejercicio de las funciones públicas ya sea por elección popular o nombramiento de autoridad competente. En consecuencia, por función pública estatal sólo cabe entender toda actividad que conlleve fines propios del Estado.

Por su parte, el artículo 249 determina que las acciones típicas consisten en omitir, rehusar hacer o retardar algún acto de su oficio. El elemento normativo esencial es la ilegitimidad de esas conductas.

**d) Negociaciones Incompatibles con el Ejercicio de la Función Pública:**

El Código Penal bajo el Título que trata sobre los delitos contra la Administración Pública y, como lo señala el Dr. Edgardo Alberto Donna (Derecho Penal Parte Especial Tomo III, pág. 15 sgtes.), "protege la función pública entendida como el regular, ordenado y legal desenvolvimiento de las funciones de los tres órganos del Estado…pero con la idea de que no sólo se refiere a la función específica de los poderes del Estado, sino además a la típica función administrativa de todos ellos. Se pretende asegurar la conducta de los funcionarios públicos, quienes con la inobservancia de los deberes a su cargo obstaculizan esa regularidad funcional, dañando no sólo a la función en sí, sino a los particulares. De modo que el bien jurídico en el Título XI es la preservación de la función pública, frente a los ataques que provienen, tanto de la propia organización burocrática del Estado y de sus miembros, como de los particulares…"

El delito por el cual se solicita se investigue al Ministro de Planificación Federal, Inversión Pública y Servicios Julio De Vido, y al ex Presidente de la Nación Néstor Kirchner, y siguiendo las enseñanzas del Dr. Carlos Creus, tutela la imparcialidad de los funcionarios en la toma de decisiones propias en estricta relación a la función pública que desarrollan, evitando así cualquier tipo de interferencia indebida o parcialidad ajenas al interés de la administración pública.-

Asimismo, y sin perjuicio de lo que resulte de la investigación, de la calificación que surja de la misma y del elevado criterio de V.S., en cuanto a otras tipicidades que puedan acarrear la conducta asumida por las personas señaladas, para la configuración del presente delito, no es necesario que el funcionario público obtenga un beneficio económico:

Al respecto, la Cfed. De Córdoba, Sala Crim., 20-8-80, "Arias, Restituto A, ", J.A.
1981-I-460, dijo:
"...para la configuración del delito de negociaciones incompatibles con el ejercicio de
funciones públicas, basta cualquier móvil de interés privado distinto a los que deben
gravitar exclusivamente sobre los actos, sin importar que el interés no sea pecuniario
porque el texto legal no tutela sólo la hacienda pública sino el prestigio de la
administración.".-

Asimismo, no es necesario para que se configure el tipo, que el acto haya causado
perjuicio, ya que como lo señala el Dr. Donna en su Tratado de Derecho Penal T° III,
pág. 318, Ed. Rubinsol Culzoni, ed. 2003, no es un delito de daño.-

IV.- PRUEBA:

1.- DOCUMENTAL:

- Se tenga por producida la prueba documental acompañada en 8 cajas.

Sin perjuicio de las diligencias o medidas que disponga V.S. nos tomamos el
atrevimiento de sugerirle los siguientes medios probatorios:

1. Se requiera a la Inspección General de Justicia, los estatutos, balances y toda
documentación que obre en su poder en relación a las siguientes sociedades, a saber:
Gotti S.A. , Austral Construcciones S.A., Badial S.A.,  Juan Felipe Gancedo S.A.
Casino Club,  S.A, Sucesores de Adelmo Biancalani, Kank y Costilla, Palma SA,
EPSUR, MISAHAR ARGENTINA, e  Invernes S.A. -

2. Se allane a la Administración Federal de Ingresos Públicos (AFIP) las actuaciones
llevadas a cabo por ese organismo por presunta evasión de las empresas Gotti S.A.,
Austral Construcciones S.A., Badial S.A., Gancedo S.A., Casino Club S.A., Sucesión de
Adelmo Biancalani, Kank y Costilla e Invernes S.A.. Es dable mencionar que no se
encuentran alcanzados por el secreto fiscal los datos referidos a la falta de pago de
obligaciones exigibles, de conformidad con lo preceptuado por el artículo 101 de la ley
11683. -

3. Se requiera a la Oficina Anticorrupción remita las declaraciones juradas del ex
Presidente de la Nación Néstor Kirchner y del Ministro de Planificación Federal,
Inversión Pública y Servicios Julio De Vido, y de los funcionarios Ricardo Jaime,
Claudio Uberti y Ricardo Echegaray correspondientes a los períodos 2003, 2004, 2005,
2006, 2007 y 2008.-

4. Se allane al Ministerio de Planificación Federal, Inversión Pública y Servicios de la
Nación remita la documentación que pruebe el grado cumplimiento en relación con el
pago de las diferentes etapas de la ejecución de la Obra Pública que fueron adjudicadas
las empresas Gotti S.A., Austral Construcciones S.A., Badial S.A., Juan Felipe Gancedo
S.A., Kank y Costilla , Palma SA , Sucesores de Adelmo Biancalani e Invernes SA.

5. Se allanen los Ministerio de Planificación Federal, Inversión Pública y Servicios y de
Economía de la Nación a los efectos de secuestrar toda la documentación en la que

consten los antecedentes de la tramitación y pago de las operaciones derivadas de los fideicomisos con Venezuela que se mencionan en la presente.

6. Se allane las oficinas pertenecientes a la Secretaria de Transporte para el secuestro de la documentación referida en los presentes actuados.

7. Se allane a la Contaduría General de la Nación a efectos de determinar el monto y el beneficiario de las obras enumeradas en la presente.

8. Se allane las oficinas pertenecientes a Lázaro Báez en Carabelas 241 5 piso, a efectos de secuestrar documentación pertinente a esta denuncia.

9. Líbrese exhorto a la Justicia del Estado de Florida EEUU, contra el empresario Franklin Duran

10. Librese exhorto a la Justicia del Principado de Lichtenstein donde tramita la investigación por lavado de dinero a Austral Construcciones de Lazaro Baez

11. Se allanen las empresas de transporte aereo: Tango Sur, Mac Air y Royal Class a efectos de comprobar viajes charteados por el Gobierno Argentino.

12. Se designen peritos a efectos de determinar el real valor de las obras sospechadas de sobreprecios, mencionadas en la presente

13. Se requiera a la Auditoria General de la Nacion y a la Sindicatura General de la Nacion, copia de los informes mencionados en la presente, así como los papeles de trabajo que avalan los hallazgos descriptos.

14. Se requieran los registros de la Oficina de Migraciones a efectos de documentar la entrada y salida de funcionarios involucrados en la presente hacia Venezuela desde las Base Militares de Aeroparque y El Palomar.

15. Se requiera a la AFIP los legajos del personal desplazado en sus funciones por investigar los casos de corrupción que se denuncian en la presente.

16. Se libre oficio al Juzgado en lo Penal Tributario N° 1 a los fines que remita la causa N° 1705/05.

17. Se libre oficio al Juzgado Federal N° 7 a los fines que remita la causa N° 18579/07.

18. Se allane UCOFIN a los efectos se secuestren los expedientes de las obras viales denunciadas por posibles sobreprecios que se encuentran referenciados en los presentes actuados.

19. Se requiera a la AFIP para que remite la declaración jurada de impuestos de los Sres. Néstor Kirchner, Julio De Vido, Claudio Uberti, Rudy Ulloa Igor, Ricardo Jaime, Cristóbal Lopez y Lázaro Báez. Es dable mencionar que no se encuentran alcanzados por el secreto fiscal los datos referidos a la falta de pago de obligaciones exigibles, de conformidad con lo preceptuado por el artículo 101 de la ley 11683.

20. Se allanen las oficinas del Dr. Néstor Carlos Kirchner ubicadas en la calle Olga Cosentini 1553 CABA a los efectos se secuestre la documentación referida a estas actuaciones.

21. Cítese  a las siguientes personas como testigos:

a) Ex embajador de Venezuela Sr. Roger Capella.
b) Al actual embajador de Venezuela S.E.  Arévalo Enrique Mendez Romero.
c) Al ex funcionario Sr. Norman Williams.
d) Al funcionario Sr. Jaime Mecicovsky.
e) Al titular de la AFIP Sr. Claudio Moroni.
f) Al funcionario de la AFIP Horacio Castagnola.
g) Al funcionario de la AFIP Angel Rubén Toninelli.
h) Al ex funcionario de la AFIP Sr. Alberto Abad.
i) A la Sra. Estela Kank.


22. Oportunamente se cite a los denunciados Néstor Kirchner, Julio De Vido, Claudio Uberti, Rudy Ulloa Igor, Ricardo Jaime, Cristóbal Lopez y Lázaro Báez a los fines que comparezcan respecto de los hechos que originan la presente

V.- FACULTAD DE DILIGENCIAMIENTO:

Autorizamos al Dr. Diego Martín Andisco, tomo 76, folio 198 y a la Dra. Paula Oliveto Lago, tomo 77, folio 476 del C.P.A.C.F. a diligenciar toda la documentación necesaria para el normal desarrollo del proceso.

VI.- PETITORIO:

Por todo lo expuesto a V.S. solicitamos:
1.- Tener por formulada denuncia penal contra Sres. Néstor Kirchner, Julio De Vido, Claudio Uberti, Rudy Ulloa Igor, Ricardo Jaime, Cristóbal Lopez y Lázaro Báez por la probable comisión de los delitos tipificados en los artículos 210, 174, 248, 249 y 265 del Código Penal, artículo 2 y concordantes de la ley 24.769
2.- Se investigue la misma.-
3.- De comprobarse los delitos denunciados y de surgir asimismo beneficio económico ilícito para las personas denunciada, se investigue los mismos.-
4.- Tener presente los medios de prueba sugeridos

Proveer de conformidad
Será Justicia.-