# EXHIBIT D

Buenos Aires, December 5, 2014

Madam President of the *Consejo de la Magistratura* [Judiciary Council] of the Argentine Nation

Dr. Gabriela Vázquez

Libertad 731, 2º piso, City of Buenos Aires

Hand-delivered.

Dear Madam:

I, Elisa María Avelina Carrió, in my capacity as national legislative deputy, with domicile for notification purposes at Rivadavia 1829, piso 4º, Autonomous City of Buenos Aires, come before you and state:

## I.  PURPOSE

I come before you to file a formal complaint for misconduct, under the terms of Article 53 of the National Constitution and Article 25 of Law 24937 of the Judiciary Council, with regard to the judge presiding over the *Juzgado Nacional en lo Criminal y Correccional Federal* [National Criminal and Correctional Court] No. 10, Dr. Julián Daniel Ercolini. I am also requesting that you order judicial impeachment proceedings to be initiated against Mr. Ercolini, order him suspended from the performance of his duties and file the relevant charges under the terms of Paragraph 5 of Article 114 of the National Constitution. Finally, I request the removal of the accused from his post, in due course, under the terms of Article 115 of the National Constitution.

1

## II. GROUNDS FOR REMOVAL

In that regard, there is convincing evidence to show that Dr. Ercolini has met the criteria for removal on grounds of misconduct and for committing unlawful acts in the exercise of his duties, as stipulated under Article 53 of the National Constitution, which refers to Article 115 of same. The grounds for misconduct are established on the basis of "inexcusable ignorance of the law" and "serious negligence in the performance of his duties," as provided under Article 25 of Law 24937, paragraphs 1 and 3, respectively, governing the Judiciary Council.

This has been the case throughout the course of his conduct in the cause titled "Kirchner, Néstor et al. re: Conspiracy," which is No. 15734/08 on the docket of the court over which he presides.

In fact, as we shall show below, Dr. Ercolini has "dismembered" the aforementioned cause for the presumable purpose of obstructing the investigation, thereby gaining immunity for the accused individuals. We say this because not only has the Judge failed to order any of the evidentiary measures proposed by the Prosecutor in the case, but also, each time an amendment has been filed to the original complaint providing new evidence associated with it, he would assign it to the usual court rotation as if it were a new independent complaint. This has led to the opening of new court cases that bear no relationship among them, with involvement by different courts. This clearly promotes the dispersion of investigative efforts, thereby making it impossible to arrive at the truth of the matter, which has guaranteed immunity over all these years for those named in the complaints.

As a consequence, we are now faced with a judge who has failed to comply adequately with the duties of his office in order to direct the investigation into the case in a reasonable fashion. In addition, he has clearly "erred" in his application of the law. On top of that, his conduct has constituted a coverup of the crimes alleged, since thanks to his method of proceeding, he has helped the accused to elude the investigations and escape the arm of the law.

In my view, these facts constitute sufficient grounds for his removal from his position as federal judge.

I shall set forth below the basis for my claims.

### III. GROUNDS

#### III.1. Complaint filed in 2008 by Elisa Carrió and other national legislative deputies

On November 12, 2008, together with other national legislative deputies, I filed a criminal complaint in order to launch an investigation into the conduct of Mssrs. Néstor Kirchner, Julio De Vido, Claudio Uberti, Rudy Ulloa Igor, Ricardo Jaime, Cristóbal López and Lázaro Báez for the possible commission of crimes defined under articles 174, 210, 248, 249 and 265 of the Criminal Code.

The principal basis for this filing lies in the crimes allegedly committed by said individuals since 2003, the year in which Néstor Kirchner took office as president, that were chiefly linked to public works contracts awarded by the State to a group of companies. This evidenced the fact that the public officials involved allegedly benefited "friendly companies," with disregard for good practices in public administration, the efficient management of public funds and respect for the rules governing government procurement and contracting.

In addition, we stated that the contracts mentioned displayed the following characteristics: economic concentration, offers on the tenders by the same business groups with no new bidders, scant differences in the quotes offered by the companies, revolving awards and overcharging.

In sum, we noted the existence of a web of businesses based on a commercial relationship between Néstor Kirchner and a group of "friendly" companies who appear to have blatantly enriched themselves since he came to hold office. This web had three key characteristics:

- Concentration of businesses in different sectors of the national economy.

- Acquisition of strategic businesses by entrepreneurs linked to former President Kirchner.

3

- A view of these techniques by the public and the mass media that their schemes were contrary to what constitutes a national government that defends the State.

In addition, in the aforementioned filing, I described the different areas in which irregularities could be perceived that met the definitions of the crimes set forth above. These areas are as follows:

1. Creation of the *Ministerio de Planificación Federal, Inversión Pública y Servicios Públicos* [Ministry of Federal Planning, Public Investment and Public Services].

On May 24, 2003, when Néstor Kirchner took office as president, he modified the Ministries Act by creating the Ministry of Federal Planning, Public Investment and Public Services that Julio De Vido would head up. Along the same lines, through successive decrees, he awarded the ministry in question a budget and powers belonging to other ministries, thereby turning Julio De Video into a "superminister."

This explanation is necessary because further on I will set forth the key role that said ministry would play in decision-making and in the web of businesses created.

2. Concentration of Economic Groups Involved in Public Works (Highway Projects and the *Plan Federal de Viviendas* [Federal Housing Plan])

At the time, in referencing the concentration of economic groups in the complex operations of public works, we described how the different actors involved would maintain a fluid personal and business relationship with former President Kirchner.

We also listed several indications that provincial governments and the national government (both under the Néstor Kirchner administration) would overpay for small scale public works.

With regard to contracts entered into by the national government for highway projects, I cited cases reflecting the schemes described above: business concentration that maintained business and personal relationships with the different members of the Néstor Kirchner government.

In the first place, as an example, I cited the fact that the paving project on the second section of Provincial Route 7 in the Province of Chaco,

4

awarded to a company purchased by Austral Construcciones SA, apparently made extremely high and excessive payments.

It is worth noting that Lázaro Báez, the head of Austral Construcciones SA, spearheaded the "business pool" and had under his control Palma SA, Gotti SA, Gancedo SA, Kank y Costilla SA and Badial SA.

Next, I also indicated involvement in highway project contracts by the company Juan Felipe Gancedo SA, which, in several news media outlets, was accused of allegedly using false invoices and overcharging. I also alleged that said company, after being awarded the contract to build a stretch of Route 23, unjustifiably increased the cost of the job to 90 million pesos from the agreed upon 39 million pesos.

Finally, with regard to irregularities in highway projects, at the time I referenced the fact that Gotti SA, a member of a business pool led by Austral Construcciones SA, was investigated for false invoices and overcharging, and was apparently hired by the *Dirección de Vialidad* [Highway Department] in Santa Cruz to perform five projects for a total sum of 300 million pesos.

With regard to the public works projects contracted by the national government under the Federal Housing Plan, I noted that countless irregularities were observed that evidenced overpayments, not as an isolated incident but rather always as part of a web of businesses that covered the political powers that be, headed by former President Kirchner and private actors. This was the basis for the aforementioned complaint filed.

In addition, attached to said complaint was evidence in the form of a 2004 public works report, and its updated version from 2005, which showed the overcharging. At that time we determined that, with regard to government contracts, there was overcharging by more than 100% on the housing units built by the province under the Federal Housing Plan. At the time the president of the *Instituto de Desarrollo Urbano y Vivienda Provincial* [Provincial Housing and Urban Development Institute] was Carlos Santiago Kirchner, a cousin of the former President of the Nation.

As evidenced by the updated report for the year 2005, favoritism and business concentration was alleged to be a habitual practice under the Kirchner administration. The following methodology was confirmed:

• The unit amount awarded was above the unit amount set forth in the agreement or the official budget.

- There were construction companies that were awarded bids that, based on their records, were not eligible to receive awards. This was the case for Gotti SA, which owed the government money, and therefore failed to meet the necessary requirements to serve as a supplier to the government, a fact that is established in the documentation attached to this filing.

- Arbitrary distribution of public works by jurisdiction.

- Lack of strategic public investment planning.

Moreover, with regard to the companies that ended up being awarded the public works mentioned, I noted that on more than one occasion both "Palma SA" and "Gotti SA" apparently transferred and withdrew from contracts in favor of "Austral Construcciones SA," and that the same allegedly occurred with payment of certifications on projects awarded to "Gotti SA," which were finally enjoyed by "Austral Construcciones SA." All this was done as a way to avoid leaving a trail showing that the jobs were always being awarded to a single company.

### 3. Oilfield Concessions

In the area of hydrocarbons, I indicated that, just as with the highway and housing projects, the concessions were reduced to a small group of companies in the hands of individuals associated with Néstor Kirchner. More specifically, to the entrepreneurs Lázaro Báez and Cristóbal López, with direct ties to the former president and with whom he maintained commercial relations as I stated in the filing at the time.

It is worth noting the case of Austral Construcciones SA, linked to Lázaro Báez, which began activities on April 8, 2003 with capital stock of 12,000 pesos, and in August of that year allegedly benefited from the concession of two oilfields in Formosa, and three more in Santa Cruz in February 2007. Moreover, at the time the complaint was filed, Austral Construcciones SA possessed an oilfield capable of a daily production of over 50 million cubic meters of oil and 10 million cubic meters of gas.

Another relevant point made in the submission was the exponential growth under the Kirchner presidency of the oil company "Oil M&S," which happened to be headed by Cristóbal López.

6

Finally, at that time I described the irregularities in the national and international tenders for 15 oilfields issued in 2006 by the Santa Cruz government.

## 4. Operation of Gaming Establishments

Within the complaint I also analyzed the involvement of Cristóbal López in the gaming business.

First, by Decree 1851/07, Néstor Kirchner resolved to award Casino Club (owned by López) an extension until 2032 on the Hipódromo de Palermo [racetrack] concession.

In that regard, I stated that this administrative act had been unlawful because its purpose was to benefit someone with whom he had personal ties, outside of all rules, formality and decorum, revealing the intent to generate more favorable conditions that would help increase the value of the company for its subsequent sale abroad.

In the second place, in an amendment to the complaint filed on December 16, 2008, I referred at the time, among other issues, to the alleged unlawful methods used by Cristóbal López to undertake and install his gaming businesses in different provinces and cities throughout the country. Thus, I alleged that the way López managed to gain an entry into the provinces apparently began through the involvement of Carlos Zannini, head of the *Secretaría Legal y Técnica de la Presidencia de la Nación* [Legal and Technical Secretariat of the Presidency], who apparently took care of asking governors and mayors to visit López's offices for a meeting. Moreover, I explained that once the meetings were set up, the businessman apparently offered the officials certain sums of money to finance their political campaigns in exchange for permits to install gaming businesses in their respective cities.

Finally, in that same context, I pointed out the existence of projects and agreements entered into between the *Lotería Nacional Sociedad de Estado* [State-Owned National Lottery Company] and the governments of the Autonomous City of Buenos Aires and the Province of Buenos Aires, respectively, aimed at allowing increased gaming activities within both districts through Cristóbal López's companies.

5. **Tenders Issued by the *Órgano de Control de Concesiones Viales* [Highway Concession Oversight Agency] (OCCOVI)**

On this point, I referred to the alleged irregularities committed by Claudio Uberti in the bidding processes he undertook while heading that agency.

In Decree 1915/2004, Néstor Kirchner delegated to and awarded OCCOVI  the contracts for construction, public works or public works-related service projects and their implementation, which ended up revealing serious irregularities also denounced by the AGN [*Auditoría General de la Nación* – Comptroller's Office], which at the time I attached to my complaint.

6. **Alleged Cases of Money Laundering Linked to Companies Involved in Public Works Contracts**

Basically, these cases refer to three companies that had contracting ties during the Néstor Kirchner administration: Austral Construcciones SA, Kank y Costilla SA and Gotti SA.

Regarding the first of the three, at the time the complaint was filed it was said that the courts of the Principality of Lichtenstein were investigating it for money laundering, and had ordered a freeze on 10 million dollars belonging to that company, since the deposit of that sum "did not meet the international standards required for the transaction."

The information associated with this matter was expanded upon in the filing made on November 27, 2008, which mentioned that the funds in question had been linked to irregularities in the concession of a public works contract, although at the time it was not clear whether this had occurred in the Province of Santa Cruz or Santa Fe.

With regard to "Kank y Costilla SA" and "Gotti SA," at the time the first amendment to the complaint was filed, the Court was informed of the existence of 11 new instances related to those companies that could also meet the definition of money laundering. Thus, it was explained that on December 21, 2007, the UIF [*Unidad de Información Financiera* – Financial Information Unit] filed suspicious transaction report 432/7 indicating unusual transactions performed by Mssrs. Emilio Marcelo Heredia and Raúl Eduardo Heredia, and by Mr. Fabían Carlos Figueroa in savings accounts at the Banco de Tierra del Fuego.

According to the UIF report, the aforementioned Heredias had checks deposited into their account from "Kank y Costilla SA" in the amount of AR$ 5,191,330.65, and from the "Kank y Costilla – Gotti SA" joint venture in the amount of AR$ 2,063,360. Once the funds were deposited, the account was debited for AR$ 5,839,086, which was credited to the accounts of Carlos Fabián Figueroa, who withdrew it that very day in cash. Mr. Figueroa in turn signed a notarized instrument authorizing Mssrs. Raúl E. Heredia, Marcelino Emilio Heredia and Sergio Arturo Delfino to withdraw funds, individually, from Figueroa's savings account at the Río Gallegos branch of the Banco de Tierra del Fuego.

In addition, on August 29, 2005, the Banco Provincia de Tierra del Fuego sent the UIF another suspicious transaction report evidencing that this financial entity reported Raúl Emilio and Ana Josefa Lamor, parents of the Heredias, as owners of a savings account into which several checks issued by "Kank y Costilla SA" were deposited. Finally, they explained that the same UIF report refers to the copy of the notarized instrument by which the Heredias transferred real estate located in the city of Río Gallegos, Province of Santa Cruz, to Sergio Gotti and Lázaro Báez. This seems to demonstrate the circulation of presumably laundered funds as well as the close ties, which go above and beyond the 12 companies and this situation, between Sergio Gotti and Lázaro Báez, as well as the ongoing link and business dealings with "Kank y Costilla."

### 7. Irregularities linked to the *Secretaría de Transporte de la Nación* [National Transportation Secretariat]

Another of those implicated in the complaint filed was Ricardo Jaime, appointed to head the National Transportation Secretariat, which is under the Ministry of Federal Planning, Public Investment and Services that was created by Néstor Kirchner, as I mentioned earlier, and is run by a man he trusts implicitly, Julio De Vido.

The irregularities and doubts raised in the submission were of the same nature as those described above. The following acts were alleged in detail:

a)    Cases of irregularities linked to trains and underground railways

In this regard, we set forth the irregularities that ensued from the concession of railway branch lines to UGOFE [*Unidad de Gestión Operativa Ferroviaria de Emergencia* – Emergency Railway Operations Management Unit], a concession that was awarded not through a bidding process

but instead through direct contracting of rail cars with the companies Metrovías SA, Ferrovías SA and Trenes de Buenos Aires SA. In the complaint I also alleged that overpayments were made for remodeling and rebuilding 120 cars on the Belgrano Norte branch line. There were also overpayments for the procurement of rolling stock for the underground railway in the direct contract process involving the company CITIC.

b)     The creation of LAFSA [*Líneas Aéreas Federales* – Federal Air Lines] and the agreement with Southern Winds

On this topic, the complaint showed the connections between the government and an airline suspected of being used for activities related to drug trafficking. This was achieved by the creation of LAFSA and the subsequent business cooperation agreement with SW [Southern Winds] airlines. The agreement had two salient points: LAFSA pledged to pay the salaries of 1000 employees of the former LAPA [*Líneas Aéreas Privadas Argentinas* – Argentina Private Air Lines] and DINAR [Air Lines], of whom 578 were working at SW; and 3.2 million pesos per month in fuel, which allowed SW to continue operating.

I also mentioned that the government made oversight of the company totally permeable by appointing Ricardo Echegaray as Director General of Customs in 2004. According to his own statements, that year Customs performed only one inspection of SW aircraft, which led us to assert that the government officials were complicit in the drug cases mentioned.

c)     The "Bullet Train" project

In addressing this matter, I described the irregularities present in the so-called "bullet train project." On the one hand, the Bid Terms and Conditions of the tender issued, which set forth requirements that only one particular company could meet, and on the other hand, the modification of the offer by the company after the award was made.

## 8. Electric Power Interconnection Projects

On this topic, the complaint filed set forth two issues: the diversion of the funds obtained through Law 23681, and the arbitrary extension of the interconnection between the *Mercado Eléctrico Mayorista* [Wholesale Electricity Market] and the Patagonian System Wholesale Electricity Market (MEM-MEMSP).

In that regard, I alleged overcharging in the project to expand the high voltage network for the MEM-MEMSP interconnection from Puerto Madryn to Pico Truncado.

### 9. Venezuela Trust Fund

On this point, at the time I alleged irregularities in the "*Convenio Integral de Cooperación entre la República Argentina y la República Bolivariana de Venezuela* [Comprensive Cooperation Agreement between the Argentine Republic and the Bolivarian Republic of Venezuela]" that can be illustrated by three specific cases set forth in my submission of November 2008.

a)   The case of the 90 million dollars temporarily withdrawn from the trust.

This issue was addressed in greater depth in the amendment to the complaint, where I explained that money would be deposited into and withdrawn from the trust fund account over just a matter of days. It was also revealed that the scheme consisted of withdrawing money from the trust in New York, playing the Caracas market and the parallel market against each other and ending up with a 15% profit. Claudio Uberti allegedly participated in these transactions. Moreover, this issue was detected by Ambassador Sadous, who issued a memo and was subsequently removed from that post.

b)   Venezuela's contracting of "Ascensores Servas SA" using the trust fund.

c)   Claudio Uberti's involvement in Venezuelan purchases of Argentine products using trust funds.

This issue was addressed in greater detail in the amendment to the complaint, in which I explained that the Argentine companies that wanted to export to Venezuela had to be qualified by the ministry headed by Julio De Vido in order to become eligible for payments from the trust fund. At the time, I charged that the qualification of the companies was allegedly conditional upon payment of 10% of the export price in Argentina and 15% upon receiving payment from the trust fund in Venezuela. In other words, there was a 25% bribe for export transactions.

### 10. Diversion of Funds Earmarked for Recovery of Technical Capacity at Atucha II

In my submission I referred to the irregularities that allegedly occurred under the agreement signed between the state-owned company Nucleoeléctrica Argentina

11

SA and the *Comisión Nacional de Energía Atómica* [National Atomic Energy Commission], the purpose of which was to provide technical training to the latter. However, as I stated at the time, that money was apparently diverted to the company "Dioxitek SA" for purchases unrelated to the purpose of the agreement. In that context, I based my complaint on Report 460/07 of the *Sindicatura General de la Nación* [National Receivership Entity].

### 11. Improper Jail Tenders

On this point, I questioned the propriety of the bids made for the construction and/or maintenance of the *Centro Federal Penitenciario* [Federal Penitentiary Facility] in Noroeste-Salta, the *Complejo Federal* [Federal Complex] in Agote and the Argentine Coastal Federal Penitentiary Facility.

The characteristic that these bids had in common was that through a decree characterized as necessary and urgent, the original budget amounts were apparently raised substantially by the National Executive Branch, ostensibly adapting them to the requirements of the corporations selected by the Mixed Commission in charge of evaluating the bids.

In fact, as evidenced in the complaint, the established budgets precisely reflected the bids submitted by the companies selected by the *Comisión Mixta* [Mixed Commission], and allegedly raised the costs to the national government, evidently for the sole purpose of satisfying the wishes of the entrepreneurs, evidencing once again the web of businesses set up by the national government.

### III.2. Request to Institute Probable Cause Proceedings by Prosecutor Gerardo D. Pollicita.   Judge Ercolini's Irregularities.

The Prosecutor in charge of the National Office of the Prosecutor for Federal Criminal and Correctional Matters No. 11, Gerardo D. Pollicita, brought the corresponding request to institute probable cause proceedings pursuant to Article 180 of the CPPN [*Código Procesal Penal de la Nación* - National Code of Criminal Procedure]. This implies that per the Office of the Prosecutor General, we have provided sufficient elements to consider *prima facie,* that the alleged facts could constitute public offenses that should be investigated.

In that regard, in the Prosecutor's document, he requested to adopt a series of evidentiary measures, with the purpose of moving forward with the investigation, and thus

get to the truth of the alleged facts. Among them are the following:

1. To obtain through the Corporate Records Office and corresponding provincial trade records, the remittal of bylaws, balances and all existing documentation regarding the charged companies.

2. To require the Federal Public Revenue Administration to remit the following elements with regard to the charged companies:

   – An itemization of filed tax and social security criminal complaints indicating filing date, reported issues and the allegedly evaded amounts;

   – An equity interest integration report, detailing the representation and management bodies of the periods from 2003-2007, as well as connections of any kind that arise in the AFIP [*Administración Federal de Ingresos Públicos* - Federal Public Revenue Administration] databases, whether by the professionals assisting them or by the information sent by financial institutions in compliance with relevant guidelines set forth by that body;

   – A report on the tax domiciles that were registered in the last five years;

   – A report on whether the AFIP was ordered to provide information by anybody from the Judiciary or of the Prosecutor General's Office and, where appropriate, to kindly disclose all the corresponding data to the respective cause.

3. To require the Legal and Technical Secretariat of the Presidency to remit Decree 1851/07 on the extension to grant the slot machines operation at the Hipódromo de Palermo.

4. To arrange the necessary means to hear the former mayor of Córdoba, Dr. Luis Juez' testimony, in order to issue it related to the facts that were made known with the amendment of the complaint dated December 16, 2008.

5. To issue letters rogatory to the Court of the Principality of Liechtenstein that is involved in the investigation of money laundering relating to "Austral Construcciones SA,"

13

in order to verify the processing of such proceedings and to obtain all information that may be useful.

6. To certify the investigation that the Office of the Prosecutor of Administrative Investigations is allegedly carrying out regarding the possible misuse of public funds to overpay for the renovation and reconstruction of 120 wagons of Ferrocarril Belgrano Norte.

7. To issue a production order to the Ministry of Federal Planning, Public Investment and Services, the Ministry of the Economy and Public Finance, and the Directorate General of Customs, in order to obtain all documentation containing the processing and payment history of transactions arising from the trusts with Venezuela.

8. To determine, through the National Immigration Office, Claudio Uberti's entries and exits to and from the Republic of Venezuela.

9. To take testimony from former Ambassador of Venezuela in our country [Argentina], Mr. Roger Capella; and to arrange the necessary means for the current Ambassador, Arévalo Enrique Méndez Romero, to testify on the same terms.

10. To summon the former Argentine Ambassador in Venezuela, Eduardo Alberto Sadous and the Trade Advisor of the Argentine Embassy in said country, Alberto Álvarez Tufillo, for their testimony

11. To order the Ministry of Foreign Affairs to remit the internal memo CAEVENE No. 10097 dated January 26, 2005, issued by former Argentine Ambassador in the Republic of Venezuela, Alberto Sadous.

12. To obtain an itemization of every Argentine company that participated in the sale of products to Venezuela in the framework of the trust entered into by both countries (Planning and/or Customs)

Nevertheless, <u>instead of ordering the evidentiary measures conducive to a timely investigation, Judge Ercolini **has proceeded with disturbing delay**, while able to produce the evidence suggested by the Office of the Prosecutor General to initiate a proper investigation and conduct the investigation accurately to determine truth, he decided to delay the process, dismembering the cause, and achieving its being "canceled."</u>

In this sense, we understand that if the Judge had been willing to move the investigation forward during all these years, the latter would have produced conclusive results: namely, several of the accused individuals would have at least been summoned to give a court statement and, most likely, many would have resulted in prosecution. Nevertheless, none of that has happened. On the contrary, the cause has been brought to a standstill and the accused are enjoying complete immunity (to the point that many of them still hold public office). This, we repeat, despite the fact that convincing evidence was produced in the main complaint.

For example, it is noteworthy that, as proposed by the Prosecutor, it would have been sufficient for the IGJ [Inspección General de Justicia - Corporate Records Office] to remit the bylaws and balance sheets of the charged companies —Austral Construcciones SA, Kank y Costilla SA, Gotti SA, among many others, integrated by Lázaro Báez and other entrepreneur "friends" of the government— and to subject them to the corresponding financial audits, so that the existing corporate and commercial links between them would have been evident, all with the sole purpose of avoiding the false certified copies in tenders, the reason for which the accused simulated them, violating the basic rules of public procurement, intentionally distorting administrative procedure and repeatedly and systematically undermining the public treasury.

Also, it would have been possible to see how these commercial companies increased their net assets exponentially from Néstor Kirchner's arrival to the national government, as well as the various laundering schemes carried out by them.

This also applies to the overcharging and undue payments for returns in the exploitation of gambling and oil concessions in favor of Cristóbal López and Lázaro Báez. By requesting affidavits from said individuals and the balance sheets of companies to which they belong, via the respective jurisdiction, it would have been possible to prove how they have enriched themselves illicitly.

In short, it would have not been difficult to prove the business matrix named herein, nor the unlawful association existing among the accused. In fact, it is public knowledge and very well-known that entrepreneurs with close ties to Néstor Kirchner — Lázaro Báez, Cristóbal López, Rudy Ulloa, to mention a few of them — and other related officials, have markedly increased their assets being that the companies they integrated always managed to get contracted by the State — national or provincial — for public works. Jointly, they integrate an

association intended for committing various crimes against the public administration and economic and financial order.

Consequently, if at present none of them was ever even investigated, it is because the Judge leading the cause deliberately intended to guarantee their immunity.

From the considerations above, we can deduce that Judge Ercolini's conduct evidences a serious breach of his duties as an official, to the detriment of the public and private interests entrusted to him as a judge, and of the prestige of the institutions. It is even possible to reasonably suspect that the Judge has acted to cover up the crimes that he should have investigated.

Below, with the information provided by Dr. Ercolini's Court being the source, we will describe in detail the processing of the cause in order to clearly evidence the Judge's irregular conduct.

### III.3. Dismemberment of Cause 15734/08. Filed Amendments

As I stated previously, the initial complaint was carried out to investigate the possible commission of crimes defined under articles 174, 210, 248, 249 and 265 of the Criminal Code, filed on November 12, 2008. After the corresponding court rotation, the cause was assigned to National Criminal and Correctional Court No. 10, presided over by Dr. Julián Ercolini. Said complaint was given file number 15734/08.

Despite the severity and clarity of the original complaint, as we moved forward with our own investigations on the topics that were charged in a timely manner, and in accordance with the various facts of common knowledge that occurred; both myself and other deputies continued to file information and items of evidence collected by way of "amendments to the complaint" in the same cause.

The purpose of the various amendments to the complaint that we filed was to inform the presiding Judge in the

16

investigation, in this case Dr. Ercolini, of the novelties of the events that we were observing in a timely manner, as well as to provide him with the best items for the proper administration of justice.

However, Dr. Ercolini, not only "stopped" the advancement of the initial cause, and dismembered it, but he deflected incorporating the various amendments that were filed, by means of repeated arguments of lack of jurisdiction, even when these expanded on points that had already been charged in the file in his custody.

For better understanding, I will describe below in chronological order the filings added to case file 15734/08, which expound Ercolini's decision to "dismember" and thus "take apart" the investigation. **Records that can be requested by that authority, to find the irregularities charged herein.**

As the information provided by the Court itself emerged, our filings were broken up as follows:

- **Dismemberment of the Original Complaint.**

1) On overcharging for highway projects and the Federal Housing Plan, the Judge gave rise to a new cause, which he processed under file number **1209/09**. In turn, said cause was also dismembered as detailed below:

   a. The investigation of overcharging in the paving project of Provincial Route 7 of Chaco, which was awarded to successors of Adelmo Biancalani (company bought by Austral Construcciones), was remitted for lack of jurisdiction to the Provincial Court of Chaco on 09/30/11, which was joined to cause 13487/08.

   However, Federal Court No. 6 claimed its lack of jurisdiction and remitted it back to the Court presided by Dr. Ercolini; ultimately it was filed in the Provincial Court of Chaco No. 09/2001, in accordance with the date of the information.

   b. The investigation of overcharging and false invoices in the paving project of 50 blocks in General Roca, carried out by Gancedo SA, was apparently archived.

c. The investigation of the unexplained increase from 39 to 91 million pesos for the construction of a section of National Route 23, after having awarded it to Gancedo, was apparently remitted for lack of jurisdiction.

d. The investigation of irregularities in the contracting of Gotti by the government of Santa Cruz to carry out five projects for 300 million was remitted for lack of jurisdiction to the Court of Santa Cruz in September 2011.

e. The investigation of irregularities in the Federal Housing Plan was remitted for lack of jurisdiction on 08/13/09 to Federal Court 2, Clerk's Office 4, in cause 12053/07.

2) On the alleged facts regarding oil concessions, the Judge gave rise to cause No. 1210/09, which was apparently archived.

3) On the alleged facts regarding gaming, the Judge gave rise to cause No. 1211/09, which was also apparently archived.

4) Cause No. 1217/09, which was initiated following the alleged facts connected to Atucha II, was remitted to Federal Court 1 for lack of jurisdiction on 10/07/09, for its connection to cause 10746/07.

5) Cause No. 1215/09, which was initiated as a result of the alleged facts relating to LAFSA, was remitted for lack of jurisdiction to Federal Court 12, Clerk's Office 24, for its connection to cause 2648/05.

6) Cause No. 1216/09, which was initiated as a result of the alleged facts on the connection between Electroingenieria and MEM-MEMSP, was remitted for lack of jurisdiction to Federal Court 4, Clerk's Office 8, for its connection to cause 16779/05.

7) Cause No. 1217/09, which was initiated as a result of the timely charging of the Trust with Venezuela, was allegedly being processed. The only news that we have is regarding the request made to BNA [*Banco Nación Argentina* - National Bank of Argentina], to report which accounts received money from the three accounts in the Trust.

8) As for cause 1219/09:

a. The investigation of the irregularities of awarding the railway line to UGOFE, as well as awarding METROVIAS SA, FERROVIAS SA and TRENES DE BUENOS AIRES SA without a bidding process and through direct contracting, the Judge finds a connection to cause 9778/07.

b. The investigation of the possible misuse of public funds in overcharging for remodeling and rebuilding of 120 wagons for the Belgrano Norte railroad was remitted for lack of jurisdiction to Federal Court 9, Clerk's Office 18, for its connection to cause 11645/04.

c. The investigation of the purchase of 279 train cars to Chinese company Citic for the Buenos Aires underground railroad was apparently being processed.

9) Cause 1220/09, which was initiated as a result of the facts connected to the Bullet Train, was remitted for lack of jurisdiction to Federal Court 12 on 04/29/09.

- **The (Mis) Fortune of the Filed Amendments.**

On 11/19/08 (pages 58-63), upon its ratification, I amended the complaint with regard to the following points: De Vido, Uberti and Kirchner's connections with the Venezuelan government for their illegal operation under the trust entered into by the two countries; the wrongful and systematic return orders in Argentine exports paid for by PDVSA [*Petróleos de Venezuela* - Petroleum of Venezuela] trust in New York; connections between Sergio Gotti, Lázaro Báez and the Kank y Costilla company used by the organization to commit pubic offenses "overpayments, returns and money laundering;" and connections between the accused Nestor Kirchner and Cristóbal López. (pages 58-63).

New amendments were filed subsequently (dated 11/27/08, which appears on pages 69-76; dated 12/16/08, which appears on pages 92-97; and dated 12/30/08, which appears on page 147; among which information was provided regarding the false balances

of *Aerolineas Argentinas* [Argentine Airlines] and the "changing relationship" observed between the government and Grupo Marsans. This last document was remitted for lack of jurisdiction to Investigative Court No. 27, on 10/15/09. That Court and National Criminal and Correctional Court of First Instance No. 8, Clerk's Office 16 blocked the matter. In this regard, testimonies were apparently remitted on 2/11 in cause No. 18492/06, which decided to partially accept jurisdiction over Aerolineas Argentinas' false balances and rejected the remaining facts.

Due to the changing relationship between the government and Aerolineas Argentinas, it was assigned to the court rotation and went to the National Criminal and Correctional Court of First Instance No. 2, Clerk's Office 4, which did not accept jurisdiction, although it was ultimately filed there under No. 3510/11.

- On 07/16/09 a new amendment to the complaint was filed (page 531). Copies of causes 1215/09 and 1219/09 were included; and due to new facts, the Prosecutor was served notice for Article 180 of the CPPN, whom regarding Nestor Kirchner's illicit enrichment, ordered to certify the cause belonging to Federal Court 5 and all [the causes] of the jurisdiction. Page 689 states the related actions with cause No. 9423/09 belonging to National Criminal and Correctional Court of First Instance No. 5 dated 08/13/09, was remitted for its connection to cause 9423/09 to Federal Court No. 5, Clerk's Office 9.

- On 07/31/09 a new amendment to the complaint was filed (on pages 600-611), based on Néstor Kirchner's operations of public land acquisition and other matters, which was dismembered as follows:

  a. The complaint regarding public lands acquired by Kirchner, was remitted for lack of jurisdiction to the Federal Court of Santa Cruz on 10/26/09, in case record 1873/08
  b. The complaint regarding public lands acquired by Lázaro Báez and the construction of Complejo Hidroeléctrico La Barrancosa - Condor Cliff [Hydroelectric Complex], has not been complied with.
  c. The complaint regarding public lands acquired by Cristóbal López at bargain values was remitted for lack of jurisdiction to the Federal Court of Chubut.

3. The complaint regarding Corredores Viales, beneficiaries being JCR and Electroingenieria, testimonies were remitted to the National Criminal and Correctional Court of First Instance No. 4, Clerk's Office 8, in cause 16679/05 pp. 787.

And the amendment by which new companies are included (Electroingeniería SA, Vialco SA, Vial 3 SA, and on the other hand, JCR SA, Rutas del Litoral SA, Rutas del Sur SA and UTE JCR-IEC SA), are apparently currently being processed.

Note that this amendment was made on the basis of resolutions 83/06 and 47/08 of the AGN and the SIGEN 2005 report, through which *"... a high level of corruption in highway management carried out by the Ministry of Planning and OCCOVI...,"* was observed; both in granting extensions for companies that violate contracts and in route maintenance projects. In effect, Vial 3 SA, member of the first financial group identified with Electroingeniería SA, owed 62%. The second group also allegedly benefited from the highway project award, rate reductions, suspicions of overcharging in the Córdoba-Rosario highway and the Piedra Buena-San Julián aqueduct.

4.  The complaint regarding business between N. Kirchner and Relats, on overpayments to N. Kirchner for the rental of Hotel Los Sauces, was apparently incorporated into file No. 14950 captioned "Relats J. C, Kirchner N. re: bus. Imcomp." National Criminal and Correctional Court of First Instance No. 10, Clerk's Office 19.

5.  The complaint regarding irregularities in the sales of properties arising from Kirchner's and Cristina Fernandez's affidavits, their connection with cause 9423/09 pp. 787 was established. On page 813, lack of jurisdiction arises for Federal Court of Santa Cruz for public land, in connection with cause 1873/08. In turn, the Federal Court of Chubut apparently rejected jurisdiction over public lands in Alto Río SENGUER and it was apparently sent to the Provincial Courts of Chubut: Cause 15910/09, captioned "Kirchner N and C. Lopez re: incompatible negotiations."

6.  The complaint regarding Máximo Kirchner's Investment and Financial Consulting Firm: El Chapel SA, the decision was to rotate as a new cause (page 807) and we have no records of what happened to it.

    -   On 11/26/09, a new amendment to the complaint was filed, giving rise to cause No. 14552/09 captioned "Kank y Costilla re: 278 CP," which was remitted for related actions to the Office of the Prosecutor General of Rio Gallegos, cause F667/08.

    -   On 03/30/10, the complaint was amended because of a 30 million peso advance on costs for highway projects to benefit, by order of Néstor Kirchner, companies belonging to Lázaro Baez, Austral Construcciones SA and Gotti SA, in the Rio Turbio works;

companies that had been named in the original cause. This amendment gave rise to cause No. 3994/10, which was joined to cause 1209. Lack of jurisdiction was claimed on 7/6/11, remitting it to the corresponding Investigative Court in Santa Cruz. The Prosecutor appealed the lack of jurisdiction and, ultimately, the Court confirmed it.

- On 04/20/10, an amendment to the complaint was filed by Deputy Morán, giving rise to cause 4973/10. The purpose of the court filing was to charge: the incompatible negotiations between Jaime and TBA [*Trenes de Buenos Aires* - Buenos Aires Trains] directors; the subsidies granted to Grupo Cirigliano; the connection between Jaime and Kirchner; the irregularities in the granting of subsidies by Jaime and De Vido; the subsidies in transportation during Jaime's period; and the gifts from Grupo Cirigliano and exemption of certain responsibilities. Despite being strongly connected to the original complaint, Ercolini's Court decided to assign it to the court rotation once again and it went to the National Criminal and Correctional Court of First Instance No. 2, Clerk's Office 3.

- On 05/05/10, deputies Carrió, Morán, Pérez and Comi filed an amendment to the complaint for misappropriation of assets in operations linked to a bilateral agreement signed with Ecuador. This gave rise to cause 5838/10, which was assigned to the rotation and went to the National Criminal and Correctional Court of First Instance No. 1.

- On 05/14/10, Deputy Morán filed a complaint amendment for Banco Nación's subsidies. This gave rise to cause 6429/10, which was assigned to the rotation and went to the National Criminal and Correctional Court of First Instance No. 3.

- On 06/01/10, Deputy Morán filed an amendment to the complaint against Ricardo Jaime, which gave rise to cause 4973/10. The purpose of said amendment was to report TBA subsidies. It was joined to cause 4973 and the Prosecutor was served notice for Article 180 of the CPPN. On 10/14/10, testimonies for fact 7 were remitted to Federal Court No. 12, Clerk's Office 23, in cause 10740/06. It is located in Federal Court No. 2, Clerk's Office 3.

- On 06/15/10, an amendment to the complaint was filed which gave rise to cause 7787/10. The aforementioned, filed by Deputy Morán, dealt with the irregularities in pre-awarding the *Central Eléctrica de Chiuido* [power plant] project (Cristóbal López' Electroingeniería and CPC and that forms UTE with Eisa-Oas-CPC), on the destination of the ANSES [*Administración Nacional de la Seguridad Social* - Federal Public Revenue Administration] funds and the financing of public works

that were suspected of overcharging. National Criminal and Correctional Court of First Instance No. 4, Clerk's Office 7 was assigned from the rotation.

-   On 16/06, Deputy Morán filed an amendment to the complaint which gave rise to cause 7852/10. It was against Cristóbal López and others for business in the province. It was assigned to the rotation and went to Federal Court No. 5, Clerk's Office 10.

-   On 07/12/10, Deputy Morán filed a complaint amendment for illicit enrichment and money laundering which gave rise to cause 8959/10. The new cause was assigned to the rotation and went to the same National Criminal and Correctional Court of First Instance No. 10, but it does not belong to the original cause No. 15734/08.

-   On 04/15/13, a new amendment to the original complaint was filed as a result of the facts reported in television program "Periodismo para Todos" [Journalism for All] related to money laundering; requesting that the following individuals provide their testimony: Elaskar, Fariña, Lázaro Baez, Martín Baez, Leandro Baez, Pérez Gadín and Rossi (PPT). However, said amendment was assigned to the rotation and went to National Criminal and Correctional Court of First Instance No. 7.

    Likewise, an amendment to the complaint was filed requesting the investigation of Ms. Miriam Quiroga's statements on the television program "Periodismo para Todos," aired on 05/05/13. However, said amendment was assigned to the rotation and went to National Criminal and Correctional Court of First Instance No. 9.

-   On 05/07/13, an amendment to the complaint was filed with the purpose of bringing former undersecretary of aeronautical transport, Ricardo Cirielli's statements, related to the accused Ricardo Jaime, to the attention of the Courts. In said statements he confirmed that *"Jaime left with bags that were supposedly full of money almost every night."* However, said amendment was assigned to the rotation and went to National Criminal and Correctional Court of First Instance No. 8.

-   On 05/20/13, an amendment to the complaint was filed with the purpose of bringing the offer to purchase 51% of Petrobras Argentina's shares by Cristóbal López and the source of the funds for such a transaction, to the attention of the Courts. However, once again the amendment was assigned to the rotation and

it went to National Criminal and Correctional Court of First Instance No. 11.

- On 09/10/13, an amendment to the complaint was filed bringing forth new facts related to the accused Cristóbal López and incumbent of the AFIP [Administración Federal de Ingresos Públicos - Federal Administration of Public Revenue], Ricardo Echegaray. On that occasion, we brought to the attention of the Courts that, as it would have been published, Cristóbal López apparently purchased Petrobras' assets in Argentina and allegedly *financed* its *holding* of companies with over 1.2 billion pesos in taxes that it failed to pay the AFIP. Furthermore, we expressed that said scheme had apparently taken place over the course of more than a year and that the tax debt was allegedly included in a 10-year payment plan. However, it was assigned to the rotation and went to National Criminal and Correctional Court of First Instance No. 2, Clerk's Office 3.

- On 09/10/13, I filed an amendment to the complaint bringing forth Mr. Horacio Quiroga's statements on "Periodismo para Todos" aired on 09/08/13, and in the magazine *Noticias*. In his statements, Mr. Quiroga said that in October 2010 he witnessed former President Kirchner sending close to 7 million dollars to the offices of Austral Construcciones SA, of Lázaro Báez.

Regarding these last amendments, we have nothing further.


## IV. Conclusions. The Legitimacy of Impeachment Proceedings

As noted by Gracieal [sic] Reiriz, *"the problem of state responsibility for the exercise of the judicial function is not exhausted in the event of erroneous judgments."* **Often, damages are caused by procedural acts that are not judgements; from the irregularity or deficiency by which these procedural acts are executed** [decrees for attachment or lifting precautionary measures; abductions; withdrawal of funds deposited in court, etc.][1] comprising a range of vague assumptions that, while not included in the concept of judicial error, concern the development of the judicial work.

Thus, although the damage will not always be the result of an act that is typically judicial, which is generally understood as the decision issued by an independent and impartial body that resolves a dispute between parties by force of the legal truth, what is certain is that all acts (and omissions)

---

[1] REIRIZ, María Graciela. "Responsabilidad del Estado" [State Resposibility], Eudeba, Buenos Aires, 1969, p. 77.

involved in the process, which ultimately lead to the eventual production of said act, are inextricably linked to it, and therefore it is fitting to frame them within the proper judicial function.

Meanwhile, it should be noted that unlike what happens with respect to judicial error, *"irregular functioning does not require prior ruling on the error..."*[2]

As set forth, it is possible to distinguish two aspects of state responsibility in the performance of its judicial activity, in jurisprudence of the Supreme Court: *"A first assumption results from the necessary presence of a judicial error, while the second requires the verification of a malfunction in the service of justice,"* on the latter assumption *"... using as the basis for state responsibility the doctrine developed around the concept of lack of service."*[3]

Hence why the doctrine has a strong inclination for the use of the notion of "lack of service" as a factor in allocating state responsibility and therefore, the gradual abandonment of the special notes that were traditionally observed on the topic of tort for the irregular functioning of the judiciary bodies.[4]

For some clarification, and following the developments reached in international headquarters (see Rulings 328:2056, "Simón", judg. of 14-VI-2005, particularly paragraphs 13 and 14 of Judge Boggiano's opinion), *"three factors should be taken into account to determine the reasonableness of the time in which the process unfolds: a) the complexity of the matter; b) the procedural activity of the interested party; c) the conduct of the judicial authorities [See among others, Eur. Court HR, Motta judgment of 19 February 1991, Series A no. 195-A, par. 30; Eur. Court H. R., Ruiz Mateos v. Spain judgment of 23 June 1993, Series A no. 262, par. 30]."*(IDH Court. *"Genie Lacayo vs. Nicaragua Case,* judg. of 29-I-1997, Series C, No. 30, par. 77). In the present case there was almost no procedural activity by the Court.

[2] CAPUTI, María Claudia. "Tendencias actuales en materia de responsabilidad del Estado por funcionamiento irregular de los órganos judiciales [el caso 'Amiano']" [Current Trends in State Responsibility from Irregular Functioning of the Judiciary Bodies (the "Amiano" Case)], LA LEY 2000-C, 750.

[3] MERTEHIKIAN, Eduardo. "La responsabilidad pública. Análisis de la doctrina y la jurisprudencia de la Corte Suprema" [Public Accountability. Analysis of the Doctrine and Jurisprudence of the Supreme Court], Ed. Ábaco, Ciudad de Buenos Aires, 2001, p. 336.

[4] see CAPUTI, María Claudia. "Tendencias actuales..." [Current trends ...], op. cit.

<u>And an adequate service of justice becomes strategic in a republican system, whereas in this case, the matter is none other than to identify possible irregularities in government acts, as well as criminal acts committed on the same occasion. That is why the utmost diligence is imposed to the judge in fulfilling his duty.</u>

In his book <u>The Spirit of the Laws</u>, Machiavelli said: *"It is necessary for power to stop power."* That phrase lays the foundations of modern constitutional law that finds in the republican form of government the most effective way to avoid abuse that would affect the public good, through the division of powers and control among them.

In this sense, the different Powers divide functions and monitor each other, constituting a real system of checks and balances designed to prevent the accumulation of power and the consequent violation of individual rights and guarantees. For that very reason, one of the main objectives of this system is to provide the institutional design with a guarantee against excessive concentration on the part of any of its bodies.

Ekmekdjian states that... "*Public control of expenditure and state fund resources is critical to the republican system.*"[5]

A feature of democracy as a political system is the existence of various forms of control of the governments. Ultimately, control over the governments is what distinguishes democracy from authoritarian or dictatorial regimes.

In this context, democracy can be defined as the political regime where governors have an obligation to account for their government acts. The various democratic controls are valid instruments to ensure that, one way or another, said commitment takes place.

Consequently, the controls are nothing but rules, structures and mechanisms created to bind and contribute to responsible and orderly exercise of Power. A responsible officer in the exercise of his mandate is one that abides by the norms, displays what he does and takes responsibility for the results.

---

[5] Ekmekdjian, Miguel Ángel. "Tratado de Derecho Constitucional" [Constitutional Law Treaty], T IV, ed. Depalma, Buenos Aires, pp. 467.

In a constitutional, democratic State, the government has two basic obligations: 1) to act within the framework of the current legislation; 2) to account for the management of public resources and expenditure management to the citizens.

The responsibility of public officials is a cornerstone of the republican system. Each member of the three branches of government should answer for their actions, providing appropriate responses to the obligations that arise from their positions (functional responsibility).

### Judicial Review of Government Acts:

Having said this, in a democracy that has established the division of powers as a form of enacting Republicans controls, according to our constitutional system, judges are the individuals who process filings made by citizens who have had their fundamental rights and guarantees affected.

Judicial function is an exclusive state power. Even within the restrictive concept of the state, it must provide and assure every citizen a service of conflict composition and guarantee of rights in all forms.

Thus, judges' life tenure and the inviolability of their remuneration should not be considered privileges but guarantees of good judicial functioning in order to safeguard the rights of the judicials, by passing judgments in accordance with the law and diligently delivering the service of justice.

### On the Establishment of Impeachment and Prosecution of Judges:

Article 53 of our Constitution establishes, in conjunction with Article 59 and 60, the very special process of impeachment. The purpose of this process is the immediate investigation of the charged official's conduct by Congress, to determine if there are grounds for removal; the immediate goal is to exercise one of the inter-sector political controls. In this case, the Legislative Power's control over the Executive Power.

Thus, Impeachment should be viewed as part of political control, for political purposes, promoted by political blame, whose status involves a political body. It is, then, a political institution and therefore not subject to strict norms of judicial nature. However, it should not be perceived as a failure of due process and legal defense.

Pertinent to the case, the provisions of Article 115 of the CN [*Constitución de la Nación Argentina* - National Constitution of Argentina], state that the judges of the lower courts of the Nation shall be removed on the grounds provided in Article 53, by a jury composed of legislators, judges and lawyers with federal registration.

Therefore it is said **that the purpose of Impeachment also applies in the case of prosecution of the judges, it intends to implement the principle of accountability of public officials and proceed with the dismissal of the "unworthy [civil] servant."** According Raúl Cárdenas *"... the legal nature of impeachment revolves around non-criminal acts and concludes with the removal and disqualification, where appropriate, of the senior civil servant who has lost public trust; therefore it is outside judicial activity."*

### Poor Performance in the Case:

In the case of impeachment or *prosecution* of Dr. Ercolini, **the poor performance proposes a political-institutional assessment in view of the results and consequences of his actions for institutions or for the public trust.** The grounds <u>allow for a broad assessment since it concerns not only the lack of professional or technical competence, but also moral, such as ineptitude, moral destitution, all of which determines a damage to the function, and therefore to the general interests of the Nation.</u>

The truth is that, from the circumstances described in the preceding paragraph, it appears that the main complaint that was assigned to the Judge's jurisdiction, and that gave rise to the criminal cause whose handling is in question, provided conclusive evidence that the criminal acts named therein actually occurred. Which were "credited" with new elements that were incorporated successively through the aforementioned amendments; but that were extracted by the Judge, in the previously detailed dismemberment of causes. Which has taken place with **an evident**

**intention to dilute the criminal responsibilities of the accused (especially what concerns conspiracy).**

In this regard, it is essential to note that among the crimes alleged and the numerous unlawful conducts recounted, the possible commission of the crime of conspiracy to commit crimes by the accused individuals becomes evident; this is an offense that despite having been named from the beginning as a "connecting" concept in the cause, has been systematically ignored by Dr. Ercolini. He has dealt with every event as a sealed and independent fact, ignoring the countless evidenced connections between the facts among each other.

Thus, as we already noted, over all the years that have passed, the Judge has not adopted the adequate and necessary evidentiary measures to adjudicate the truth of the alleged crimes that were reported, and that the Prosecutor requested to be investigated. Which I insist, have a hold fundamental gravity in the functioning of our republican system.

Therefore, it is clear that the conduct of Judge Ercolini implies a serious breach of his duties as an officer, and, I maintain, could even shape into the offense of concealment (Article 277 of the CP).

To bring this request, we have not failed to consider that removal is an act of transcendental gravity, which cannot be sustained purely on arguments about the way a cause was resolved; irregularities should appear "... *straight and concatenated together to establish the existence of any purpose other than that which pervades the administration of justice and exhibits a pattern of very negative and reprehensible conduct by the Judge. This Jury has maintained its approach in the sense that the content of the judgements is not a matter of their concern, and their examination may not be decisive for the removal of a judge...*" (Cause No. 15 "Mahdjoubián," Recital 38).

**In this regard, the grounds described in the preceding sections allow us to claim that the delay, omissions and "errors" made by Dr. Ercolini, which are the subject of this reproach, go beyond the "opinion" aspect of a judicial decision.** The aforementioned irregularities are indisputable evidence of his poor performance and, indeed, clearly appear to be

straight and concatenated together to establish the existence of any purpose other than that which pervades the administration of justice: in this case, having dismembered and delayed a court case in order to achieve immunity for the involved individuals.

We are before the actions of a judge who fails to act according to the law whenever he does not fulfill his duty to investigate and reach the material truth of the alleged facts. In general, one can say that poor performance is shaped when a judge has lost the necessary conditions to continue in the exercise of his function.  That is, he does not possess enough aptitude to hold office; conditions of aptitude being, among others, good personal conduct, physical health, psychological balance, independence, impartiality, integrity, etc.

In this regard, the Doctrine teaches us that *"Lack of contraction to work, breach of procedural deadlines, **not organizing judicial proceedings**, procedural irregularities in the processing of cases, etc., are some concrete examples of the lack of diligence due in performing the functions of a judge..."* (Rev. E.D. cit. Pag. 10- LL.133-962; JA., 968-II-493 - emphasis mine).

It is also appropriate to note that the commission of crimes is not necessarily required, and that the irregularity of judicial work carried out by the judge in the sense explained *ut supra* is sufficient to dismiss a judge from office.

In this regard, the Jury has set the following doctrine: *"... the acts of an officer may not fit the vocabulary of current criminal laws, may not be crimes or offenses as qualified by common law, yet may be "poor performance" because they harm the public service, dishonor the country or public investiture, hinder the exercise of the rights and guarantees of the Constitution, in which case it is sufficient to support the prosecution"* ("Brusa" case, Recital 32).

And what greater harm to the public service of justice, what greater dishonor to the country or public investiture, what greater hindrance to the proper exercise of the rights and guarantees of the Constitution, than having observed such obviously tendentious, malicious and irregular conduct.

30

In effect, the concept of poor performance gains a real dimension when the conduct of the judge in question violates one of the fundamental duties of judgeship: impartiality.

The judge's duty of impartiality is an ethical and legal imperative. In this regard, the Universal Charter of the Judge states that *"The judge must be and appear impartial and independent in the processing and disposition of cases..."* It is clear that the judge whose impeachment is hereby requested, stepped away from this mandate, acting on behalf of the officials and entrepreneurs "friends of the government" that he was supposed to investigate.

Therefore it is noteworthy that, notwithstanding that the commission of offenses is not necessary as grounds for removal, in the case that motivates this filing I understand that the Judge in question apparently also incurred the grounds of crime in the exercise of his duties. Since by means of this irregular proceeding aimed at benefiting the accused individuals for committing criminal acts, he apparently acted to conceal the accused, ensuring their immunity, whom to date, have not even been investigated for the purpose of providing relevant explanations for their behavior; despite the obvious irregularities.

Being that the grounds for the commission of a crime by the judge in his judicial capacity, his judgment is solely for the purposes of his removal.

For the reasons stated, I believe that Dr. Ercolini meets the constitutional grounds for poor performance of his functions and subsequent commission of an offense in the performance of his duties; therefore, in accordance with Articles 53 and 115 of the National Constitution, I request his removal from office.

With nothing further, my best regards.

31



April 23, 2015

I hereby certify that I am a professional translator, that I abide by the Code of Ethics and Professional Practice of the *American Translators Association*, that I am fluent in Spanish and English, that I have employed a team of professional translators, and that we have translated, to the best of our knowledge, the attached document entitled

**Complaint**

From Spanish into English

Signed,

Cathleen Waters

Founder, New World Medium

Translator of French, Spanish, Italian, Portuguese and English

American Translator's Association Membership no. 257918

Buenos Aires, 5 de diciembre de 2014.

Señora Presidente del Consejo de la Magistratura de la Nación Argentina

Dra. Gabriela Vázquez

Libertad 731, 2º piso Ciudad de Buenos Aires

S / D.

De nuestra consideración:

Elisa María Avelina Carrió, en mi carácter de diputada nacional, constituyendo domicilio en Rivadavia 1829, piso 4°, Ciudad Autónoma de Buenos Aires, me presento y digo:

## I.   OBJETO

Que vengo a formular formal denuncia por mal desempeño, en los términos de los artículos 53 de la Constitución Nacional y 25 de la ley N° 24.937 del Consejo de la Magistratura, respecto del señor juez a cargo del Juzgado Nacional en lo Criminal y Correccional Federal N° 10, Dr. Julián Daniel Ercolini. Asimismo, solicito se disponga, respecto del señor Ercolini, la apertura del procedimiento de remoción de magistrados, se ordene su suspensión en el ejercicio del cargo que desempeña y se formule la acusación correspondiente, en los términos del inciso 5º del artículo 114 de la Constitución Nacional. Por último, solicito la oportuna destitución del acusado, en los términos del artículo 115 de la Constitución Nacional.

1

## II. CAUSALES DE REMOCIÓN

En tal sentido, existen elementos contundentes para asegurar que el doctor Ercolini ha incurrido en las causales de remoción por mal desempeño y comisión de delitos en el ejercicio de sus funciones, previstas en el artículo 53 de la Constitución Nacional, que remite el artículo 115 de la misma. Esto, al configurarse las causales de mal desempeño por "desconocimiento inexcusable del derecho" y "la negligencia grave en el ejercicio del cargo", previstas por el artículo 25 de la ley de Consejo de la Magistratura N° 24.937, incisos 1° y 3°, respectivamente.

Ello, a lo largo de su actuación en la causa caratulada "Kirchner Néstor y otros s/ asociación ilícita", que lleva el N° 15.734/08 del registro del Juzgado a su cargo.

En efecto, —como desarrollaremos a continuación— el doctor Ercolini ha "desmembrado" la mencionada causa con el presunto fin de obstaculizar la investigación y, de este modo, lograr la impunidad de las personas imputadas. Ello así, pues, el Magistrado no solamente no ha ordenado las medidas conducentes propuestas por el Fiscal de la causa, sino que además, cada vez que se ha presentado una ampliación de la denuncia original, aportando nuevos elementos vinculados a ella, la remitía a sorteo como una nueva denuncia independiente; dando lugar a nuevas causas judiciales sin vinculación entre sí, con participación de distintos juzgados. Lo que claramente, contribuyó a la dispersión de la investigación y por ende, impidió el arribo a la verdad; garantizando impunidad a los denunciados, durante los años transcurridos.

En consecuencia, estamos frente a un magistrado que ha omitido cumplir con los deberes a su cargo adecuadamente, a fin de direccionar razonablemente la investigación del caso; quien además se "equivoca" manifiestamente al aplicar el derecho. Sumado a lo cual, con su conducta, ha incurrido en el encubrimiento de los ilícitos denunciados, en tanto gracias mediante su proceder, ha ayudado a los imputados a eludir las investigaciones y a sustraerse a la acción de la justicia.

Dichas circunstancias, configuran a mi entender, causal suficiente para su remoción del cargo del magistrado como juez federal.

Seguidamente, se detallan los fundamentos que permiten tal afirmación.

### III.  FUNDAMENTOS

### III.1. Denuncia presentada en el año 2008 por Elisa Carrió y otros señores diputados nacionales

El 12 de noviembre de 2008 presenté, junto con otros diputados nacionales, una denuncia penal con el fin de que se investigara la conducta de los señores Néstor Kirchner, Julio De Vido, Claudio Uberti, Rudy Ulloa Igor, Ricardo Jaime, Cristóbal López y Lázaro Báez por la posible comisión de los delitos tipificados en los artículos 174, 210, 248, 249 y 265 del Código Penal.

El fundamento principal de dicha presentación radica en los ilícitos que dichas personas habrían cometido desde el año 2003 —año en el que Néstor Kirchner asumió la presidencia—, vinculados principalmente a los contratos de obra pública llevados adelante desde el Estado con un grupo de empresas. Poniéndose en evidencia que los funcionarios públicos involucrados, habrían beneficiado a "empresas amigas"; con desapego de las buenas prácticas de la administración pública, el manejo eficiente del erario público y el respeto a las normas que regulan las compras y contrataciones del Estado.

Asimismo, manifestamos que los contratos mencionados presentaban las siguientes características: concentración económica, concurrencia de los mismos grupos empresarios a las licitaciones sin nuevos oferentes, la escasa diferencia en las cotizaciones ofrecidas por las empresas, la alternancia en las adjudicaciones y la existencia de sobreprecios.

En suma, advertimos la existencia de una matriz de negocios basada en una relación comercial entre Néstor Kirchner y un grupo de empresarios "amigos", quienes se habrían enriquecido notoriamente desde que aquel llegó al poder. Dicha matriz contaba con tres características distintivas:

- Concentración empresarial en distintos sectores de la economía nacional.

- Adquisición de empresas estratégicas por parte de empresarios ligados al ex Presidente Kirchner.

3

- Visualización de dichas medidas ante la opinión pública y los medios de difusión de que esas operatorias responden a la oposición de un gobierno nacional que defiende al Estado.

Asimismo, en la presentación efectuada describí los distintos ejes en los que se podían advertir irregularidades que podrían configurar los delitos previstos antes mencionados. Dichos ejes eran los siguientes:

1. **Creación del Ministerio de Planificación Federal, Inversión Pública y Servicios Públicos.**

El 24 de mayo de 2003, al asumir la presidencia Néstor Kirchner, modificó la ley de ministerios creando el Ministerio de Planificación Federal, Inversión Pública y Servicios Públicos que manejaría Julio De Vido. En el mismo sentido, mediante sendos decretos se fue dotando al Ministerio en cuestión de presupuesto y competencias de otros ministerios, convirtiendo a Julio De Vido en un "super ministro".

Esta aclaración resulta necesaria ya que más adelante se desarrollará el papel clave que jugara dicho ministro en la toma de decisiones y en la matriz de negocios instaurada.

2. **Concentración de Grupos Económicos Intervinientes en la obra pública (obras viales y Plan Federal de Viviendas)**

En su momento, al referirme a la concentración de los grupos económicos en la compleja operatoria de la obra pública, describimos como distintos actores intervinientes mantenían una fluida relación personal y comercial con el ex Presidente Kirchner.

Asimismo, manifestamos como mediante algunos indicadores los estados provinciales y el Estado nacional —ambos bajo la administración de Néstor Kirchner— pagaban sobreprecios por obras de menor cuantía.

En cuanto a los contratos celebrados por parte del Estado para la realización de obras viales, cité casos que respondían a las operatorias antes descriptas: concentración empresaria que mantenía relaciones comerciales y personales con los distintos integrantes del gobierno de Néstor Kirchner.

En primer lugar, señalé a modo de ejemplo, que en la obra de pavimentación de la segunda sección de la Ruta Provincial N° 7 de la Provincia de Chaco —

4

adjudicada a una empresa comprada por Austral Construcciones S.A— se habrían pagado altísimos sobreprecios.

Cabe destacar, que Lázaro Báez, a cargo Austral Construcciones S.A., era la punta de lanza del "pool empresario" que tenía bajo su control a Palma SA, Gotti S.A., Gancedo S.A., Kank y Costilla S.A. y Badial SA.

Seguidamente, también indiqué la participación en contratos de obras viales por parte de la empresa Juan Felipe Gancedo S.A, denunciada en los distintos medios periodísticos por la presunta utilización de facturas falsas y pago de sobreprecios. Asimismo, denuncié que dicha empresa, luego de ganar la adjudicación para la construcción de un tramo de la ruta 23, había aumentado injustificadamente el costo del trabajo de los 39 millones pactados a la suma 91 millones de pesos.

Por último, en relación a las irregularidades en materia de obras viales, hice oportunamente referencia a que la empresa Gotti S.A —parte de un pool empresario liderado por Austral Construcciones S.A— era investigada por facturas falsas y sobreprecios, y habría sido contratada por la Dirección de Vialidad de Santa Cruz para la realización de 5 obras por un monto total de 300 millones de pesos.

En cuanto a lo que se refiere a las obras publicas contratadas por el Estado Nacional en el marco del Plan Federal de Viviendas, señalé que se observaban infinidad de irregularidades que pondrían en evidencia el pago de sobreprecios, no como un hecho aislado sino siempre en función de una matriz de negocios entre el poder político, en cabeza del ex presidente Kirchner, y actores privados, lo cual fundamentó la presentación de la mencionada denuncia.

Asimismo, en la citada denuncia acompañé como prueba el informe de obra pública 2004 y su actualización del año 2005 que da cuenta de los sobreprecios. En aquella oportunidad acreditamos, en relación a los contratos estatales, un importante sobreprecio en las viviendas del Plan Federal construidas por la Provincia de más del 100%. Siendo el presidente del Instituto de Desarrollo Urbano y Vivienda Provincial, el Arquitecto Carlos Santiago Kirchner, primo del entonces Presidente de la Nación.

Tal como consta en la actualización del informe del año 2005, se denunció el direccionamiento y  la concentración empresaria como práctica habitual de la gestión kirchnerista, confirmando así la siguiente metodología:

· El monto unitario adjudicado se encuentra por encima del monto unitario según convenio o presupuesto oficial.

- La existencia de empresas constructoras adjudicatarias de licitaciones que, por sus antecedentes, no se encontraban habilitadas para serlo. Tal es el caso de Gotti SA que, por ser deudor del Estado, no cumple con los requisitos necesarios para ser proveedor del mismo, situación que se también encuentra acreditada en la documentación acompañada a la presente.

- Arbitraria distribución de la obra pública por jurisdicción

- Ausencia de planificación estratégica en materia de inversión pública.

Asimismo, en relación con las empresas que resultaron adjudicatarias de las obras en cuestión, observé que en más de una ocasión tanto "Palma S.A." como "Gotti S.A." habrían cedido y renunciado a contratos para dejarle el beneficio a "Austral Construcciones S.A."; y que lo mismo habría ocurrido con el cobro de certificaciones de obras adjudicadas a "Gotti S.A.", finalmente gozados por "Austral Construcciones S.A.". Todo ello, con el fin de evitar dejar constancia de que las obras eran otorgadas siempre a una misma empresa.


### 3. La concesión de áreas petroleras

En relación al área de hidrocarburos, señalé que, al igual que con las obras de vialidad y de vivienda, las concesiones se reducían a un pequeño grupo de empresas en manos de personas relacionados a Néstor Kirchner. Más precisamente a los empresarios Lázaro Báez y Cristóbal López, de vínculo directo con el ex mandatario y con los cuales mantenía relaciones comerciales tal como lo manifesté en la presentación efectuada.

Cabe destacar el caso de Austral Construcciones S.A, vinculada a Lázaro Báez, que tal como afirmé, inició sus actividades el 8 de abril de 2003 con un capital social de 12.000 pesos, y que en agosto de ese año habría sido favorecida con la concesión de dos áreas petroleras en Formosa, ocurriendo lo propio en febrero de 2007 con tres más en Santa Cruz. Asimismo, al momento de la presentación de la denuncia, Austral Construcciones S.A poseía una petrolera cuya producción diaria superaba los 50 millones de metros cúbicos de petróleo y los 10 millones de metros cúbicos de gas.

Otro de los puntos relevantes de la presentación fue el exponencial crecimiento de la petrolera "Oil M&S", bajo la presidencia de Kirchner, que casualmente presidía Cristóbal López.

6

Por último, oportunamente describí las irregularidades en la licitación nacional e internacional de 15 áreas petroleras convocada en el año 2006 por el gobierno de Santa Cruz.

### 4. La explotación de juegos de azar.

En el marco de la denuncia analicé también la participación del empresario Cristóbal López en el negocio de los juegos de azar.

En primer lugar, mediante el decreto 1851/07, Néstor Kirchner resolvió otorgarle a Casino Club —de propiedad de López— una prorroga hasta el año 2032 de la concesión de la operatoria en el Hipódromo de Palermo.

Al respecto afirmé que dicho acto administrativo habría resultado antijurídico por cuanto su objeto fue beneficiar a un empresario afín, más allá de las reglas, de las formas y del decoro, quedando revelada la intención de generar las condiciones más favorables tendientes a incrementar el valor de la empresa para una posterior venta al exterior.

En segundo lugar, en la ampliación de denuncia de fecha 16 de diciembre de 2008 me referí oportunamente, entre otros puntos, a la supuesta metodología ilícita implementada por Cristóbal López para emprender e instalar sus negocios vinculados al juego en las distintas provincias y ciudades del país. Así, denuncié que el mecanismo de ingreso del nombrado en las provincias comenzaría con la intervención del titular de la Secretaría Legal y Técnica de la Presidencia de la Nación, Carlos Zannini, quien se encargaría de solicitarle a los gobernadores e intendentes que se dirigiesen a las oficinas de López para mantener una reunión. Asimismo, expliqué que una vez concertados los encuentros, el empresario les ofrecería a los funcionarios concurrentes, a cambio del permiso para instalar los negocios del juego en las respectivas ciudades, determinadas sumas de dinero para financiar las campañas políticas.

Por último, en el contexto descripto, destaqué la existencia de proyectos y convenios celebrados con Lotería Nacional Sociedad del Estado por los gobiernos de la Ciudad Autónoma de Buenos Aires y de la Provincia de Buenos Aires, respectivamente, destinados a permitir el incremento de las actividades de los juegos de azar, a través de las empresas de Cristóbal López, en los territorios de ambos distritos.

7

**5.   Las licitaciones promovidas por el órgano de control de concesiones viales (OCCOVI)**

En este punto, me referí a las presuntas irregularidades llevadas a cabo por Claudio Uberti en los procesos licitatorios llevados a cabo por su persona al frente del organismo.

Néstor Kirchner, mediante el decreto 1915/2004 delegó y otorgó al Occovi las contrataciones y ejecuciones de construcciones, trabajos o servicios que revistan el carácter de obra pública del que derivaron, asimismo, en serias irregularidades también denunciadas por la AGN, que oportunamente acompañé en mi denuncia.

**6.   Los presuntos casos de lavado de dinero vinculados a las empresas intervinientes en los contratos de obra pública**

Básicamente, los casos se refieren a tres empresas que mantuvieron vínculos contractuales durante el gobierno de Néstor Kirchner: Austral Construcciones S.A, Kank y Costilla S.A y Gotti S.A.

En relación a la primera, refirieron que la justicia del principado de Liechtenstein al momento de presentada la denuncia estaba investigando por lavado de dinero, habiéndose ordenado el bloqueo de 10 millones de dólares de dicha empresa, en razón de que el depósito de ese capital "no cumplió con los estándares internacionales requeridos para la operación".

La información vinculada a este asunto fue ampliada a través de la presentación que realizara el 27 de noviembre de 2008, donde se mencioné que los fondos en cuestión habrían estado relacionados con irregularidades en la concesión de un contrato de obra pública, sin que quede claro aún si fue en la provincia de Santa Cruz o en Santa Fe.

En lo que se refiere a "Kank y Costilla S.A." y "Gotti S.A.", al momento de presentar la primera ampliación de denuncia, se puso en conocimiento del Tribunal sobre la existencia de nuevos actos 11 vinculados a dichas empresas que también podrían configurar el delito de lavado de dinero. Así, se explicó que el 21 de diciembre de 2007, la UIF presentó el informe N° 432/7 donde señala como operación sospechosa de lavado de dinero a transacciones inusuales efectuadas por los señores Emilio Marcelo Heredia y Raúl Eduardo Heredia y por el señor Fabián Carlos

Figueroa en cajas de ahorro del Banco de Tierra del Fuego.

8

Según el dictamen de la UIF, los nombrados Heredia recibieron en su cuenta cheques de la firma "Kank y Costilla S.A.", por valor de $ 5.191.330.65 y de la UTE "Kank y Costilla – Gotti S.A.", por la suma de $ 2.063.360. Una vez depositados los fondos, debitaron de su cuenta $ 5.839.086 que se acreditaron en las cuentas de Carlos Fabián Figueroa, quien el mismo día los retiró en efectivo. A su vez, el Sr. Figueroa autorizó mediante escritura pública a los Sres. Raúl E. Heredia, Marcelino Emilio Heredia y Sergio Arturo Delfino para que cualquiera de ellos pudiera extraer fondos de la caja de ahorro de Figueroa en la sucursal Río Gallegos del Banco de Tierra del Fuego.

Asimismo, el día 29 de agosto de 2005 el Banco Provincia de Tierra del Fuego remitió a la UIF un nuevo reporte de operación sospechosa, donde consta que la citada entidad crediticia reportó a los padres de los señores Heredia, Raúl Emilio y Ana Josefa Lamor, como titulares de una caja de ahorro, en la que varios de sus depósitos tenían origen en cheques emitidos por la firma "Kank y Costilla S.A.".Finalmente, explicaron que el mismo informe de la UIF se refiere a la copia de la escritura pública donde los señores Heredia transfirieron a Sergio Gotti y a Lázaro Báez el inmueble sito en la ciudad de Río Gallegos, provincia de Santa Cruz, lo cual demostraría la circulación de dinero sospechosa de lavado de dinero como los estrechos lazos, más allá de las 12 empresas y la situación, entre Sergio Gotti y Lázaro Báez, además de la vinculación permanente y de negocios con "Kank y Costilla".

7.   **Casos de irregularidades vinculados a la Secretaria de Transporte de la Nación**

Otro de los implicados en la denuncia realizada es Ricardo Jaime, designado al frente de la Secretaria de transporte de la Nación, dependiente del Ministerio de Planificación Federal, Inversión Pública y Servicios creado por Néstor Kirchner como antes mencione y a cargo de un hombre de su extrema confianza, Julio De Vido.

Las irregularidades y cuestionamientos realizados en la presentación eran de la misma naturaleza que los antes descriptos. Puntualmente fueron denunciados los siguientes hechos:

a)   Casos de irregularidades vinculadas al sector de trenes y subterráneos

En relación a este punto, desarrollamos las irregularidades que se produjeron en la concesión de ramales ferroviarios a UGOFE, la concesión sin licitación y

9

mediante contratación directa de ferrocarriles a las empresas Metrovías S.A, Ferrovias S.A y Trenes de Buenos Aires S.A. También denuncié el supuesto pago de sobreprecios por la remodelación y reconstrucción de 120 vagones del ramal Belgrano Norte. Asimismo el pago de sobreprecios para la adquisición de material rodante para el subterráneo mediante la contratación directa con la empresa CITIC.

     b)    La creación de LAFSA y el acuerdo con Southern Winds

En relación a este tópico, en la denuncia demostré la conexión entre el Estado y la línea aérea sospechada de ser funcional a actividades vinculadas al narcotráfico. Todo ello, mediante la creación de LAFSA y su posterior acuerdo de cooperación empresaria con la línea SW. Los puntos salientes del acuerdo eran dos: LAFSA se comprometía a pagar el salario a 1000 empleados de la ex LAPA y DINAR (de los cuales 578 prestaban servicios en SW) y 3,2 millones pesos mensuales en combustible, lo cual hizo posible que SW continuara operando.

Asimismo, hice mención de que el gobierno permeabilizaba los controles a la compañía, mediante el nombramiento de Ricardo Echegaray como Director General de Aduanas en 2004; pues, según los propios dichos de éste, durante ese año la Aduana había realizado un solo control sobre los aviones de SW; todo lo cual llevó a afirmar la complicidad de los funcionarios en el caso de drogas mencionados.

     c)    El proyecto "Tren Bala"

Al ocuparme de este asunto, describí las irregularidades en el denominado "proyecto tren bala" las cuales se refieren, por un lado, al Pliego de Bases y Condiciones del llamado a licitación —que exigía requisitos que sólo podría cumplir una empresa determinada—, y, por otro, a la modificación de la oferta por parte de la empresa después de la admisión.

**8.    Las obras para la interconexión eléctrica**

En lo referido a este tema, en la denuncia presentada desarrollé dos cuestiones: el desvío de los fondos obtenidos en virtud de la ley n° 23.681 y la extensión arbitraria de la interconexión Mercado Eléctrico Mayorista – Mercado Eléctrico Mayorista Sistema Patagónico.

Asimismo, en relación al último punto, denuncié los sobreprecios en la obra de ampliación de la red de alta tensión, interconexión MEM-MEMSP en el tramo Puerto Madryn – Pico Truncado.

9.      **Fideicomiso con Venezuela**

En relación a este punto, oportunamente denuncié irregularidades en el marco del "Convenio Integral de Cooperación entre la República Argentina y la República Bolivariana de Venezuela" que pueden ejemplificarse con tres casos puntuales relatados en mi presentación efectuada en noviembre de 2008.

a)      El caso de los 90 millones de dólares retirados transitoriamente del fideicomiso.

Esta cuestión fue profundizada en la ampliación de la denuncia, en la que expuse que entraba y salía plata de las cuentas del fideicomiso con intermedio de días. Así quedó revelada que la operatoria consistía en retirar dinero del fideicomiso de Nueva York, haciendo un juego entre el mercado de Caracas y el paralelo, logrando así una diferencia del 15%. En dichas operaciones habría participado Claudio Uberti. Asimismo, esta cuestión fue detectada por el embajador Sadous, lo que propició un memorando y su posterior retiro del destino.

b)      La contratación por parte de Venezuela—en el marco del fideicomiso—de la empresa "Ascensores Servas S.A"

c)      La intervención de Claudio Uberti  en las compras realizadas por Venezuela, con los fondos del fideicomiso, de productos argentinos

Este tema, fue tratado con mayor detalle en la ampliación de la denuncia donde relaté que las empresas argentinas que querían exportar a Venezuela, debían ser habilitadas para ser imputadas al pago del fideicomiso por el Ministerio a cargo de Julio De Vido. En dicha instancia, denuncié que la habilitación de las empresas estaba supuestamente condicionada al pago del 10% de la exportación  en Argentina y del 15% al cobro del fideicomiso en Venezuela. Es decir, a un 25% de coima por operación de exportación.


10.      **El desvío de fondos destinados a recuperar la capacidad técnica de Atucha II**

En mi presentación, me referí a las irregularidades que se habrían suscitado en el marco del convenio firmado entre la empresa estatal Nucleoeléctrica Argentina

Sociedad Anónima  y la Comisión Nacional de Energía Atómica, que tenía como fin capacitar técnicamente a esta última parte. Sin embargo, ese dinero —tal como oportunamente lo expuse— se habría desviado a la empresa "Dioxitek S.A" para compras incompatibles con la finalidad del Convenio. En el mismo sentido, fundé mi denuncia en el informe n° 460/07 de la Sindicatura General de la Nación.

### 11.    Licitaciones irregulares para cárceles

En relación a este punto, cuestioné la regularidad de las licitaciones para la construcción y/o mantenimiento del Centro Federal Penitenciario del Noroeste-Salta, del Complejo Federal Agote y del Centro Federal Penitenciario Litoral Argentino.

Dichas licitaciones, compartían como característica común que a través de un decreto de necesidad y urgencia, los montos de los presupuestos originales habrían sido elevados sustancialmente por el Poder Ejecutivo Nacional acomodándolos ostensiblemente a los requerimientos de las corporaciones elegidas por la Comisión Mixta de evaluación de ofertas.

En efecto, según consta en la denuncia realizada, los presupuestos fijados responderían exactamente a las solicitudes planteadas por las firmas elegidas por la Comisión Mixta, y habrían aumentado los costos para el Estado Nacional con el manifiesto único fin de satisfacer los deseos empresarios, evidenciando una vez más la matriz de negocios instaurada por el gobierno nacional.

### III.2. Requerimiento de Instrucción del señor fiscal Gerardo D. Pollicita. Irregularidades del juez Ercolini.

El Fiscal a cargo de la Fiscalía Nacional en lo Criminal y Correccional Federal N° 11, Gerardo D. Pollicita, efectuó el correspondiente requerimiento de instrucción en virtud del art. 180 CPPN. Ello implica que para el Ministerio Público, hemos aportado elementos suficientes para considerar *prima facie*, que los hechos denunciados podrían constituir delitos de acción pública que deben investigarse.

En tal sentido, el Fiscal, en su escrito, solicitó que se adopten una serie de medidas probatorias, con la finalidad de que se avance con la investigación y, de este

modo, se pueda llegar a la verdad de los hechos denunciados. Entre ellas se encuentran las siguientes:

1. Se obtenga, a través de la Inspección General de Justicia y de los registros de comercio provinciales correspondientes, la remisión de los estatutos, balances y toda documentación existente en relación a las sociedades denunciadas.

2. Se requiera a la Administración Federal de Ingresos Públicos que remita, en relación a las empresas denunciadas, los siguientes elementos:

   - Un detalle de denuncias penales tributarias o previsionales ya interpuestas, con indicación de fecha de presentación, conceptos denunciados y montos presuntamente evadidos;
   - Un informe sobre la integración de la participación accionaria, indicando además de manera detallada los órganos de representación y administración en los períodos 2003 a 2007, así como las vinculaciones de cualquier orden que surgen de las bases de datos de la AFIP, fuere por los profesionales que las asisten o por informaciones remitidas por las entidades financieras en cumplimiento de las normas pertinentes emanadas de ese órgano;
   - Un informe sobre los domicilios fiscales registrados en los últimos cinco años;
   - Un informe respecto de si fue requerida información a la AFIP por algún órgano del Poder Judicial o del Ministerio Público y, en su caso, tenga a bien hacer saber la totalidad de los datos correspondientes a la respectiva causa.

3. Se requiera a la Secretaría Legal y Técnica de la Presidencia de la Nación, la remisión del decreto 1851/07 de prórroga de la concesión de la operatoria de máquinas tragamonedas en el Hipódromo de Palermo.

4. Se arbitren los medios necesarios para que se escuche en declaración testimonial al ex intendente de la ciudad de Córdoba, Dr. Luis Juez, a los fines de que se expida en relación a los hechos puestos en conocimiento en la ampliación de la denuncia de fecha 16 de diciembre de 2008.

5. Se libre exhorto al tribunal del principado de Liechtenstein interviniente en la investigación por lavado de dinero relativa a "Austral Construcciones S.A.",

13

a los efectos de certificar el trámite de tales actuaciones y obtener todos los datos que puedan resultar de utilidad.

6. Se certifique la investigación que estaría llevando a cabo la Fiscalía de Investigaciones Administrativas por la posible malversación de fondos públicos al pagar sobreprecios por la remodelación y reconstrucción de 120 vagones del Ferrocarril Belgrano Norte.

7. Se libre orden de presentación a los Ministerios de Planificación Federal, Inversión Pública y Servicios y de Economía y Finanzas Públicas de la Nación y a la Dirección General de Aduanas, a los efectos de obtener la totalidad de la documentación en la que consten los antecedentes de tramitación y pago de las operaciones derivadas de los fideicomisos con Venezuela.

8. Se establezcan a través de la Dirección Nacional de Migraciones las entradas y salidas de Claudio Uberti, desde y hacia la República de Venezuela.

9. Se le reciba declaración testimonial al ex embajador de Venezuela en nuestro país, Sr. Roger Capella; y se arbitren los medios necesarios para que exponga en iguales términos el embajador actual, Arévalo Enrique Méndez Romero.

10. Se convoque a prestar declaración testimonial al ex embajador argentino en Venezuela, Eduardo Alberto Sadous; y al Consejero Comercial de la Embajada Argentina en dicho país, Alberto Álvarez Tufillo.

11. Se requiera a la Cancillería la remisión del cable interno CAEVENE N° 10097, de fecha 26 de enero de 2005, emitido por el ex embajador argentino en la República de Venezuela, Alberto Sadous.

12. Se obtenga un detalle de todas las empresas argentinas que participaron en la venta de productos a Venezuela en el marco del fideicomiso celebrado entre ambos países (Planificación y/o Aduana).

Sin embargo, el Juez Ercolini, lejos de ordenar medidas probatorias conducentes para la investigación en tiempo y forma, **ha procedido con preocupante morosidad en la investigación**, en tanto, teniendo la posibilidad de producir la prueba sugerida por el Ministerio Público para iniciar una adecuada investigación, y en base a la misma dirigir la investigación en forma certera a la averiguación de la verdad, decidió dilatar el proceso, desmembrando la causa, y logrando su "vaciamiento".

14

En tal sentido, entendemos que si el juez hubiera tenido voluntad de avanzar en la pesquisa a lo largo de todos estos años, esta última hubiera arrojado resultados contundentes: a saber, varias personas imputadas hubieran sido, al menos, citadas a prestar declaración indagatoria y, seguramente, muchas hubieran resultado procesadas. Sin embargo, nada de eso ha ocurrido. Por el contrario, la causa se encuentra paralizada y los imputados gozando de total impunidad (tal es así que muchos de ellos siguen ocupando cargos públicos). Ello así, —reiteramos— a pesar de que en la denuncia principal se aportaron pruebas contundentes al respecto.

A modo de ejemplo, cabe destacar que bastaba, tal como propuso el Fiscal, con que la IGJ hubiera remitido los estatutos y los balances de las sociedades denunciadas —Austral Construcciones S.A., Kank y Costilla S.A., Gotti S.A., entre tantas otras, integradas por Lázaro Báez y otros empresarios "amigos" del poder— y que los mismos hubieran sido sometidos a las respectivas pericias contables, para que quede en evidencia las vinculaciones comerciales y societarias existentes entre ellas, todo ello, con el único objetivo de evitar la falsa compulsa en las licitaciones por las cuales los imputados simulan las mismas, violando las normas básicas de la contratación pública, violentando dolosamente el procedimiento administrativo y perjudicando reiterada y sistemáticamente al erario público.

Asimismo, se hubiera podido comprobar como dichas sociedades comerciales aumentaron exponencialmente su patrimonio a partir de la llegada al gobierno nacional de Néstor Kirchner, así como también las distintas maniobras de lavado de activos por ellas efectuadas.

Lo mismo ocurre con los sobreprecios y el pago de retornos indebidos en la explotación de juegos de azar y en las concesiones petroleras a favor de Cristóbal López y Lázaro Báez. Solicitando las declaraciones juradas de dichas personas y los balances de las sociedades que ellos integran, a través de la pericia respectiva, se hubiera podido probar como se han enriquecido ilícitamente.

En suma, no hubiera resultado difícil probar la matriz de negocios denunciada, así como la asociación ilícita existente entre los denunciados. En efecto, es de público y notorio conocimiento como empresarios de estrecha relación con Néstor Kirchner — Lázaro Báez, Cristóbal López, Rudy Ulloa, por citar algunos de ellos— y demás funcionarios, afines han aumentado notoriamente su patrimonio gracias a que las empresas por ellos integradas siempre resultaban contratadas por el Estado — nacional o provincial— para efectuar obra pública. Integrando todos ellos, una

15

asociación destinada a cometer diversos delitos en contra de la administración pública y el orden económico y financiero.

En consecuencia, si en la actualidad ninguno de ellos resultó siquiera indagado, es porque hubo una deliberada voluntad del magistrado que lleva la causa de garantizarles impunidad.

De las consideraciones expuestas precedentemente se desprende que la conducta del Juez Ercolini evidencia un grave incumplimiento de sus deberes como funcionario, en perjuicio de los intereses públicos y privados confiados a su custodia como magistrado, y del propio prestigio de las instituciones. Pudiéndose llegar incluso, a sospechar razonablemente, que el magistrado ha actuado a fin de encubrir los delitos que debió investigar.

A continuación, tomando como fuente información proporcionada por el Juzgado del Dr. Ercolini, describiremos detalladamente la tramitación de la causa para que, de este modo, pueda evidenciarse con claridad la actuación irregular del magistrado.

### III.3. El desmembramiento de la causa 15734/08. Ampliaciones realizadas

Tal como expuse anteriormente, la denuncia inicial fue efectuada para que se investigue la posible comisión de los delitos previstos en los arts. 174, 210, 248, 249 y 265 del Código Penal, presentada el 12 de noviembre de 2008. Luego de efectuado el sorteo correspondiente, la causa fue asignada en el Juzgado Nacional de Primera Instancia en lo Criminal y Correccional Federal N° 10, a cargo del Dr. Julián Ercolini. Dicha denuncia, obtuvo el número de expediente 15734/08.

A pesar de la contundencia y claridad de la denuncia original, conforme fuimos avanzando en nuestras propias investigaciones sobre los temas oportunamente denunciados, y en concordancia con los diversos hechos de público conocimiento que fueron aconteciendo; tanto la suscripta como otros diputados, fuimos presentando la información y elementos de prueba colectados, a modo de "ampliaciones de denuncia" en la misma causa.

Es así que las diversas ampliaciones de denuncia que oportunamente presentamos, tuvieron como fin, poner en conocimiento al Juez interviniente en la

16

investigación —en este caso el Dr. Ercolini—, de las novedades sobre los hechos que oportunamente fuéramos advirtiendo, así como dotarlo de mejores elementos para el correcta administración de justicia.

Sin embargo, el Dr. Ercolini, no solo "frenó" el avance de la causa inicial, y la desmembró, sino que ante las diversas ampliaciones que le fueran presentadas, evitó incorporarlas a la misma haciendo uso de reiterados planteos de incompetencia, aún cuando desarrollaban puntos ya denunciados en el expediente a su cargo.

Para lograr una mayor comprensión, a continuación expondré cronológicamente las presentaciones realizadas en el expediente 15734/08 que exponen la decisión de Ercolini de "desmembrar" y así "desarticular" la investigación. **Antecedentes que podrán ser solicitados por esa autoridad, a fin de constatar las irregularidades aquí denunciadas.**

Conforme surge de <u>información brindada por el propio Juzgado</u>, nuestras presentaciones fueron desarticuladas del siguiente modo:

- **El desmembramiento de la denuncia original.**

1) Sobre la existencia de sobreprecios en obras viales y en el Plan Federal de Viviendas, el magistrado dio origen a una nueva causa, que tramitó bajo el número de expediente **1209/09**. A su vez, dicha causa también fue desmembrada, tal como detallaremos a continuación:

   a) La investigación sobre los sobreprecios en la obra de pavimentación de la Ruta provincial 7 de Chaco, adjudicada a sucesores de Adelmo Biancalani (empresa comprada por Austral Construcciones), se remitió por incompetencia a la justicia provincial de instrucción del Chaco el día 30/09/11, la cual se acumuló a la causa 13487/08.

   Sin embargo, el Juzgado Federal 6 se declaró incompetente y la remitió nuevamente al tribunal a cargo del doctor Ercolini, aunque finalmente quedó radicada en la justicia provincial de Chaco. 09/2001, en virtud de la fecha del requerimiento fiscal.

   b) La investigación sobre sobreprecios y facturas apócrifas en la obra de pavimentación de 50 cuadras en General Roca efectuada por Gancedo S.A., se abría archivado.

17

c) La investigación sobre el aumentó sin explicación alguna del costo de 39 a 91 mil pesos de la construcción de un tramo de la Ruta Nacional 23, luego de la adjudicación a Gancedo, se habría remitido por incompetencia.

d) La investigación sobre las irregularidades en la contratación de Gotti por parte de la gobernación de Santa Cruz, para la realización de 5 obras por 300 millones, se remitió por incompetencia a la Justicia de Instrucción de Santa Cruz en septiembre de 2011.

e) La investigación sobre las irregularidades en el Plan Federal de Viviendas, el día 13/08/09 fue remitida por Incompetencia al Juzgado Federal 2, Secretaría 4, en la causa 12053/07.

2) Sobre los hechos denunciados en relación a las Concesiones petroleras, el Juez dio origen a la causa N° 1210/09, la que se habría archivado.

3) Sobre los hechos denunciados en relación a los juegos de Azar, el magistrado dio origen a la causa N° 1211/09, la que también fuera archivada.

4) La causa N° 1217/09, iniciada a raíz de los hechos denunciados vinculados a Atucha II, fue remitida por incompetencia al Juzgado Federal 1 el día 7/10/09, por conexidad con la causa 10746/07.

5) La causa N° 1215/09, iniciada como consecuencia de los hechos denunciados vinculados a LAFSA, fue remitida por incompetencia al Juzgado Federal 12, Secretaria 24, por conexidad con la causa 2648/05.

6) La causa N° 1216/09, iniciada como consecuencia de los hechos denunciados sobre la conexión entre Electroingenieria y MEM-MEMSP, fue remitida por incompetencia al Juzgado Federal 4, Secretaría 8, por conexidad con la causa 16779/05.

7) La causa N° 1217/09, iniciada a raíz del Fideicomiso con Venezuela oportunamente denunciado, se encontraría en trámite. La única novedad que nos fuera informada es respecto de la solicitud al BNA, para que informe a qué cuentas ingresó el dinero proveniente de las 3 cuentas del Fideicomiso.

8) En cuanto a la causa 1219/09:

18

a. La investigación sobre las irregularidades en la presunta concesión de ramales a la UGOFE, como así también a la concesión sin licitación y mediante contratación directa a METROVIAS S.A, FERROVIAS S.A y TRENES DE BUENOS AIRES S.A., para el magistrado encuentra conexidad con la causa 9778/07.

b. La investigación sobre la posible malversación de fondos públicos por sobreprecios en remodelación y reconstrucción de 120 vagones de ferrocarril Belgrano Norte, fue remitida por incompetencia al Juzgado Federal 9, secretaría 18, por conexidad con la causa 11645/04.

c. Se encontraría en trámite la investigación relativa a la compra de 279 vagones a la empresa china Citic, para los subterráneos de Bs. As.

9) La causa 1220/09, iniciada como consecuencia de los hechos vinculados al Tren Bala, fue remitida por incompetencia al Juzgado Federal 12 el día 29/04/09.

- **La (mala) suerte de las ampliaciones presentadas.**

En fecha 19/11/08 (fojas 58/63), al momento de ratificar la denuncia, amplié la misma en lo referido a los siguientes puntos: Las relaciones de De Vido, Uberti y Kirchner con el gobierno venezolano sobre la operatoria ilícita desarrollada por éstos en virtud del fideicomiso celebrado entre ambos países; los pedidos de retornos indebidos y sistemáticos, en las exportaciones argentinas pagadas por el fideicomiso PDVSA en Nueva York; las vinculaciones entre Sergio Gotti, Lázaro Báez y la empresa Kank y Costilla utilizadas por la organización para la comisión de delitos de acción púbica "pagos de sobreprecios, retornos y lavado de dinero"; y los nexos entre los denunciados Néstor Kirchner y Cristóbal López. (fojas 58/63).

Luego se presentaron nuevas ampliaciones (de fecha 27/11/08, obrante a fojas 69/76; de fecha 16/12/08, obrante a fojas 92/97; y de fecha 30/12/08, obrante a fojas 147; entre las que se aportó información respecto de las falsedades de los balances

de Aerolíneas Argentinas y del "cambio de relación" observado entre el gobierno y el Grupo Marsans. Este último escrito fue remitido por incompetencia al Juzgado de Instrucción N° 27, el 15/10/09. Ese Juzgado y el Juzgado Nacional de Primera instancia en lo Criminal y Correccional Federal N° 8, Secretaría 16 trabaron la cuestión. Al respecto, habría testimonios remitidos el 11/02 en la causa N° 18492/06, en los que se resolvió aceptar parcialmente la competencia respecto de las falsedades de los balances de Aerolíneas Argentinas y se rechazó por el resto de los hechos.

Por el cambio de relación entre el gobierno y Aerolíneas Argentinas, se remitió a sorteo y recayó en el Juzgado Nacional de Primera Instancia en lo Criminal y Correccional Federal N° 2, Secretaría N° 4, que no se aceptó competencia, aunque finalmente quedó radicada allí con el N° 3510/11.

- En fecha 16/07/09 se presentó nueva ampliación de denuncia (fojas 531). Se agregaron copias en las causas 1215/09 y 1219/09; y por nuevos hechos, se corrió vista al Fiscal por el artículo 180 CPPN, quien en lo referente al Enriquecimiento ilícito de Néstor Kirchner, ordenó certificar causa del Juzgado Federal 5 y todas las del fuero. A fojas 689 se declaró la conexidad con la causa del Juzgado Nacional de Primera Instancia en lo Criminal y Correccional Federal n° 5 N° 9423/09 y con fecha 13/08/09, se remitió por conexidad a la causa 9423/09 al Juzgado Federal N° 5, Secretaría 9.

- En fecha 31/07/09 se presentó una nueva ampliación de denuncia (a fojas 600/611), basada en la operatoria de adquisición de tierras fiscales por Néstor Kirchner y otras cuestiones, la que fue desmembrada de este modo:

a. Lo denunciado respecto a tierras fiscales adquiridas por Kirchner, fue remitido por incompetencia al Juzgado Federal Santa Cruz en fecha 26/10/09, en los autos 1873/08

b. Lo denunciado respecto a tierras fiscales adquiridas por Lázaro Báez y la construcción Complejo Hidroeléctrico La Barrancosa - Condor Cliff, no se han observado medidas.

c. Lo denunciado respecto a tierras fiscales adquiridas por Cristóbal López a valores irrisorios, fue remitido por incompetencia al Juzgado Federal de Chubut.

3. Lo denunciado respecto a Corredores Viales, beneficiarios JCR y Electroingenieria, se remitieron testimonios al Juzgado Nacional de Primera Instancia en lo Criminal y Correccional Federal ° 4 Secretaria 8 en causa 16679/05 fs. 787.

20

Y la ampliación mediante la cual se incluyen nuevas empresas (Electroingeniería S.A., Vialco S.A., Vial 3 S.A., y por el otra lado, JCR S.A., Rutas del Litoral S.A., Rutas del Sur S.A. y UTE JCR-IEC S.A., en la actualidad se encontraría en trámite.

Cabe destacar que dicha ampliación fue realizada tomando como base las resoluciones 83/06 y 47/08 de la AGN y el informe SIGEN 2005, a través del cual se observó un *"...alto nivel de corrupción en la gestión vial llevado a cabo por el Ministerio de Planificación y el OCCOVI..."*, tanto en prorrogas para empresas que incumplen contratos como en obras mantenimiento de ruta. En efecto, Vial 3 S.A., integrante del primer grupo económico identificado con Electroingeniería S.A., debía 62%. El segundo grupo también habría sido beneficiado con el otorgamiento de obra vial, rebaja de tarifas, sospechas de sobreprecios en la autopista Córdoba – Rosario y el acueducto Piedra Buena – San Julián.

4. Lo denunciado respecto a negocios entre N. Kirchner y Relats, sobre pagos sobrevaluados a N. Kirchner por el alquiler del Hotel Los Sauces, habría sido incorporado al expediente N° 14950 caratulada "Relats J. C, Kirchner N. s/ negoc. Imcomp.".Juzgado Nacional de primera instancia en lo Criminal y Correccional Federal n° 10 Secretaria 19.

5. Lo denunciado respecto a las irregularidades en las ventas de inmuebles que surgieran de las declaraciones juradas de Kirchner y Cristina Fernández, se estableció su conexidad con causa 9423/09 fs. 787. A fojas 813 surgirían incompetencias a Juzgado Federal de Santa Cruz por tierras fiscales, por conexidad con causa 1873/08. A su vez, el Juzgado Federal de Chubut, habría rechazado la competencia respecto de tierras fiscales en alto rio SENGUER y se habría enviado a la Justicia Ordinaria de Chubut: Causa 15910/09, caratulada "Kirchner N y C. Lopez S/ negociaciones incompatibles".

6. Lo denunciado respecto a la Consultora sobre inversión y financiera de Máximo Kirchner: el Chapel S.A., se decidió sortear como nueva causa (fojas 807) y no tenemos registros sobre qué ocurrió con la misma.

- En fecha 26/11/09, se presentó una nueva ampliación de denuncia, dando origen a la causa N° 14552/09 caratulada "Kank y Costilla s/278 CP", que se remitió por conexidad, a Fiscalía General de Rio Gallegos, causa F667/08.

- En fecha 30/3/10, se amplió la denuncia por un anticipo de gastos por 30 millones de pesos en obras viales para beneficiar por orden de Néstor Kirchner, a las empresas Austral Construcciones S.A. y Gotti S.A. de Lázaro Baez, en la obra de Rio Turbio;

21

empresas que habían sido denunciadas en la causa original. Dicha ampliación dio origen a la causa N° 3994/10, la que se acumuló a la causa 1209. Con fecha 6/7/11 se dictó incompetencia remitiéndose al Juzgado de Instrucción en turno Santa Cruz. El fiscal apeló la incompetencia y, finalmente, la Cámara la confirmó.

- En fecha 20/4/10, se presentó una ampliación de la denuncia por parte del diputado Morán, dando origen a la causa 4973/10. La presentación judicial tenía por objeto denunciar: las negociaciones incompatibles entre Jaime y directivos de TBA; los subsidios otorgados al Grupo Cirigliano; la vinculacion entre Jaime y Kirchner; las irregularidades en el otorgamiento de subsidios por parte de Jaime y De Vido; los subsidios en el área de transporte en el período que estuvo Jaime; y las dadivas por parte del Grupo Cirigliano y la eximición en ciertas obligaciones. A pesar de estar fuertemente vínculada  con la denunciar original, el Juzgado a cargo de Ercolini decidió remitirla nuevamente a sorteo y recayó en Juzgado Nacional de primera instancia en lo Criminal y Correccional Federal n° 2 Secretaria 3.

- En fecha 05/05/10, se presentó una ampliación de denuncia de los diputados Carrió, Moran, Pérez y Comi por Malversación de bienes en operaciones vinculadas con un convenio bilateral firmado con Ecuador. La misma dio origen a la causa 5838/10,  la cual se elevó a sorteo y recayó en el Juzgado Nacional de Primera Instancia en lo Criminal y Correccional Federal n°1.

- En fecha 14/05/10, se presentó una ampliación de la denuncia por parte del Diputado Morán por Subsidios del Banco Nación. La misma dio origen a  la causa 6429/10, se elevó a sorteo y recayó en el Juzgado Nacional de Primera Instancia en lo Criminal y Correccional Federal n° 3..

- En fecha 1/06/10, se presentó una ampliación de denuncia del Diputado Morán contra Ricardo Jaime que dio origen a la causa 4973/10. Dicha ampliación tenía por objeto denunciar los subsidios en TBA. Se acumuló a la causa 4973 y se corrió vista al fiscal por artículo 180 CPPN.  Con fecha 14/10/10 se remitieron testimonios por hecho 7 al Juzgado Federal N° 12, Secretaría 23, en la causa 10740/06. Se encuentra en Juzgado Federal N° 2, Secretaría 3.

- En fecha 15/06/10, se presentó una ampliación de denuncia que dio origen a  la causa 7787/10. La misma, realizada por el Diputado Morán, versaba sobre las irregularidades en la Pre adjudicación de la obra Central Eléctrica de Chiuido (Electroingeniería y CPC de Cristóbal López y que conforma UTE con Eisa-Oas-CPC), sobre el destino de los fondos de la ANSES y el financiamiento de las obras públicas

22

sospechadas de sobreprecios. Resultó desinsaculado el Juzgado Nacional de Primera Instancia en lo Criminal y Correccional Federal n° 4, Secretaría 7.

- En fecha 16/06, se presentó una ampliación de denuncia realizada por el Diputado Morán que dio origen a la causa 7852/10. La misma era contra Cristóbal López y otros por negocios de la provincia. Se remitió a sorteo y recayó en Juzgado Federal N° 5, secretaría 10.

- En fecha 12/07/10, el Diputado Morán presentó una ampliación de denuncia por enriquecimiento ilícito y lavado de activos, que dio origen a la causa 8959/10. La nueva causa fue a sorteo y recayó en el mismo Juzgado Nacional de Primera Instancia en lo Criminal y Correccional Federal n° 10, pero no forma parte de la causa original n° 15734/08.

- En fecha 15/04/13 se presentó una nueva ampliación de la denuncia original, como consecuencia de los hechos denunciados en el programa de televisión "Periodismo para Todos" vinculados al lavado de activos; solicitando que se les tome declaración testimonial a las siguientes personas: Elaskar, Fariña, Lázaro Baez, Martín Baez,Leandro Baez, Pérez Gadín y Rossi (PPT). Sin embargo, dicha ampliación fue remitida a sorteo y recayó en el Juzgado Nacional de primera instancia en lo Criminal y Correccional Federal N° 7.

Asimismo, se presentó una ampliación de la denuncia solicitando que se investigue las declaraciones efectuadas por la señora Miriam Quiroga en el programa televisivo "Periodismo para Todos", emitido el día 05/05/13. Sin embargo, dicha ampliación fue remitida a sorteo y recayó en el Juzgado Nacional de primera instancia en lo Criminal y Correccional Federal N° 9.

- En fecha 07/05/13, se presentó una ampliación de la denuncia inicial con el fin de poner en conocimiento de la justicia las declaraciones del ex subsecretario de transporte aeronáutico Ricardo Cirielli, relacionadas con el imputado Ricardo Jaime. En dichas declaraciones afirmó que *"casi todas las noches Jaime se llevaba bolsos donde supuestamente había dinero". Sin* embargo, dicha ampliación fue remitida a sorteo y recayó en el Juzgado Nacional de primera instancia en lo Criminal y Correccional Federal N° °8.

- En fecha 20/05/13, se presentó una ampliación de la denuncia inicial con el fin de poner en conocimiento de la justicia la oferta de compra del 51% de las acciones de Petrobras Argentina que Cristóbal López habría realizado y el origen de los fondos para tal operación. Sin embargo, nuevamente la ampliación se remitió a sorteo y

23

recayó en el Juzgado Nacional de primera instancia en lo Criminal y Correccional Federal N° 11.

- En fecha 10/09/13, se presentó una ampliación aportando nuevos hechos vinculados al imputado Cristóbal López y al titular de la AFIP Ricardo Echegaray. En aquella oportunidad pusimos en conocimiento de la justicia que, tal como fuera publicado, Cristóbal López habría comprado los activos de Petrobras en la Argentina y habría *fondeado* su *holding* de compañías con más de 1200 millones de pesos en impuestos que dejó de pagar a la AFIP. Asimismo, manifestamos que dicha maniobra la habría llevado a cabo durante más de un año y luego habría incluido la deuda tributaria en un plan de pagos a 10 años. Sin embargo, se remitió a sorteo y recayó en el Juzgado Nacional de primera instancia en lo Criminal y Correccional Federal N° 2, secretaría 3.

- En fecha 10/09/13, realicé una ampliación de denuncia, poniendo en conocimiento las declaraciones vertidas por el Sr. Horacio Quiroga en el programa "Periodismo para Todos" en su emisión del 8/09/13 y en la revista Noticias. En sus declaraciones, el Sr. Quiroga dijo que en octubre de 2010 presenció como el ex presidente Kirchner envío cerca de 7 millones de dólares a las oficinas de Austral Construcciones S.A de Lázaro Báez.

Sobre estas últimas ampliaciones, no contamos con novedades informadas.

### IV.- Conclusiones. La procedencia del juicio político

Como lo advierte Gracieal Reiriz, *"el problema de la responsabilidad estatal por ejercicio de la función judicial no se agota en el supuesto de las sentencias erróneas.* ***Muchas veces, los daños son provocados por actos procesales que no son sentencias; por la irregularidad o deficiencia con que son ejecutados dichos actos procesales*** *[decretos de embargo o de levantamiento de medidas precautorias; secuestros; extracciones de fondos depositados judicialmente, etc.]*[1], comprendiendo una variada gama de supuestos de contornos difusos que, sin estar incluidos en el concepto de error judicial, atañen al desenvolvimiento de la labor jurisdiccional. –

De tal modo, si bien la causa de los daños no será siempre consecuencia de un acto típicamente jurisdiccional, entendido –en general– como aquella decisión, emanada de órgano imparcial e independiente, que resuelve una contienda entre partes con fuerza de verdad legal, lo cierto es que todos los actos (y las omisiones)

---

[1] REIRIZ, María Graciela. "Responsabilidad del Estado", Eudeba, Buenos Aires, 1969, p. 77.

24

vinculados al proceso, que en definitiva tienden a la producción eventual de dicho acto, se encuentran indisolublemente ligados al mismo, y por ello corresponde encuadrarlos dentro de la función propiamente jurisdiccional. –

Corresponde aclarar, por su parte, que a diferencia de lo que sucede con respecto al error judicial, *"el funcionamiento irregular no requiere un pronunciamiento previo sobre el error…"*.[2]

Conforme a lo expuesto, es posible distinguir dos aspectos de la responsabilidad del estatal en el ejercicio de su actividad jurisdiccional, en la jurisprudencia de la Corte Suprema: *"Un primer supuesto está dado por la necesaria presencia de un error judicial, en tanto que el segundo exige que se verifique un mal funcionamiento del servicio de justicia"*, en éste último supuesto *"…aplicando como fundamento de la responsabilidad del Estado la doctrina desarrollada alrededor del concepto de la falta de servicio"*.[3]

De allí que la doctrina afirme una fuerte tendencia en el empleo de la noción de "falta de servicio" como factor de atribución de responsabilidad estatal y, por ende, un progresivo abandono de las notas excepcionales que tradicionalmente se observaban en materia de responsabilidad extracontractual por irregular funcionamiento de los órganos judiciales.[4]

A fin de alcanzar algunas precisiones, y siguiendo los desarrollos alcanzados en sede internacional (conf. Fallos 328:2056, "Simón", sent. del 14-VI-2005, especialmente considerandos 13 y 14 del voto del juez Boggiano), *"se deben tomar en cuenta tres elementos para determinar la razonabilidad del plazo en el cual se desarrolla el proceso: a) la complejidad del asunto; b) la actividad procesal del interesado; y c) la conducta de las autoridades judiciales [Ver entre otros, Eur. Court H.R., Motta judgment of 19 February 1991, Series A no. 195-A, párr. 30; Eur. Court H.R., Ruiz Mateos v. Spain judgment of 23 June 1993, Series A no. 262, párr. 30]."* (Corte IDH. *"Caso Genie Lacayo vs. Nicaragua*, sent. del 29-I-1997, Serie C, Nro. 30, párr. 77). En el caso que nos ocupa hubo una casi nula actividad procesal por parte del tribunal.

---

[2] CAPUTI, María Claudia. "Tendencias actuales en materia de responsabilidad del Estado por funcionamiento irregular de los órganos judiciales [el caso 'Amiano']", LA LEY 2000-C, 750.
[3] MERTEHIKIAN, Eduardo. *"La responsabilidad pública. Análisis de la doctrina y la jurisprudencia de la Corte Suprema"*, Ed. Ábaco, Ciudad de Buenos Aires, 2001, p. 336.
[4] conf. CAPUTI, María Claudia. *"Tendencias actuales…"*, ob. cit.

Y una adecuada prestación del servicio de justicia se torna estratégica en un sistema republicano, cuando como en el caso, se trata nada menos que de determinar posibles irregularidades en los actos de gobierno, así como ilícitos penales cometidos en ocasión de los mismos. Por eso, se le impone al magistrado la máxima diligencia en el cumplimiento de su deber.

*"Es necesario que el poder detenga al poder"* decía Maquiavello en su obra "El espíritu de las leyes". Esa frase sienta las bases del derecho constitucional moderno que encuentra en la forma republicana de gobierno la forma más eficaz para que mediante la división de poderes y el control entre ellos se eviten abusos afecten el bien público.

En este sentido, los diferentes poderes dividen funciones y se controlan mutuamente, constituyendo un verdadero sistema de frenos y contrapesos destinado a evitar la acumulación de poder y la consecuente violación de derechos y garantías individuales. Precisamente, uno de los objetivos principales de este sistema es dotar al diseño institucional de garantía contra la excesiva concentración por parte de alguno de sus órganos.

Así afirma Ekmekdjian que,... *"el control público de los gastos y recursos de los dineros del Estado es fundamental para el sistema republicano"*[5] .

Una característica de la democracia como régimen político es la existencia de diversas formas de control de los gobiernos.   En definitiva, el control sobre los gobiernos es lo que diferencia a la democracia de los regimenes autoritarios o dictatoriales.

En ese contexto, la democracia puede ser definida como aquel régimen político donde los gobernantes tienen la obligación de rendir cuenta de sus actos de gobierno. Los diversos controles democráticos constituyen instrumentos validos a fin de garantizar que, de una u otra forma, se produzca la mencionada rendición.

Asi, los controles no son otra cosa que reglas, estructuras y mecanismos ideados para obligar y contribuir al ejercicio responsable y ordenado del Poder. Un funcionario responsable en el ejercicio de su mandato es aquel que se sujeta a la norma, muestra lo que hace y se hace cargo de sus resultados.

---

[5]  Ekmekdjian, Miguel Ángel. "Tratado de Derecho Constitucional", T IV, ed. Depalma, Buenos Aires, página 467.

En un Estado constitucional y democrático el gobierno tiene dos obligaciones básicas: 1) actuar dentro del marco de la legalidad vigente; 2) rendir cuentas a los ciudadanos sobre el manejo de los recursos públicos y la administración del gasto.

La responsabilidad de los funcionarios públicos es una pieza fundamental del sistema republicano. Cada uno de los integrantes de los tres poderes del Estado debe responder por sus actos, dando respuestas adecuadas a las obligaciones que emergen de sus cargos (responsabilidad funcional).

**El control judicial de los actos de gobierno:**

Por lo dicho, en una democracia que ha consagrado la división de poderes como forma de establecimiento de los controles republicanos, de acuerdo a nuestro régimen constitucional, son los Jueces quienes hacen lugar a presentaciones impulsadas por los ciudadanos que ven afectados sus derechos y garantías fundamentales.

La función judicial es una atribución estatal exclusiva. Aún en la concepción restrictiva del Estado, este debe prestar y asegurar a todos los ciudadanos un servicio de composición de conflictos y garantía de los derechos en todas las formulaciones.

Así pues, <u>la inamovilidad de los jueces como la intangibilidad de sus remuneraciones no deben considerarse privilegios sino garantías del buen funcionamiento judicial a fin de resguardar los derechos de los judiciales</u>, mediante el dictado de sentencias ajustadas a derecho y una diligente prestación del servicio de justicia.

**De la institución Juicio Político y el enjuiciamiento de magistrados:**

El artículo 53 de nuestra Carta Magna establece, junto con el artículo 59 y 60, el proceso excepcionalísimo de juicio político. La finalidad de este proceso consiste en la inmediata investigación por parte del Congreso de la conducta del funcionario denunciado a fin de determinar si el mismo incurrió en alguna de las causales previstas para la remoción; el objetivo inmediato es el ejercicio de uno de los controles políticos interróganos. En este caso, el efectuado por el Poder Legislativo sobre el Poder Ejecutivo.

27

Así debe entenderse al Juicio Político como parte del control político, con propósitos políticos, promovido por culpas políticas, cuya consideración incumbe a un cuerpo político. Se trata, entonces, de una institución política y por ende no se encuentra sujeta a normas estrictas de carácter judicial. Aunque no debe entenderse como una omisión del debido proceso y la defensa en juicio.

Resultando de aplicación al caso, lo dispuesto por el artículo 115 de la CN, que establece que los jueces de los tribunales inferiores de la Nación serán removidos por las causales expresadas en el Artículo 53, por un jurado de enjuiciamiento integrado por legisladores, magistrados y abogados de la matrícula federal.

Por ello se dice que **la finalidad del Juicio Político, aplicable también al caso de enjuiciamiento a los jueces, se dirige a hacer efectivo el principio de responsabilidad del funcionario público y proceder a la separación del cargo del "servidor indigno".** Según Raúl Cárdenas *"... la naturaleza jurídica del juicio político, gira sobre hechos no delictuosos y concluye con la separación e inhabilitación, en su caso, del alto funcionario público que ha perdido la confianza pública; por lo tanto es ajeno a la actividad judicial".*

**El mal desempeño configurado en el caso:**

En el caso de juicio político o *enjuiciamiento* al Dr. Ercolini, **el mal desempeño supone una valoración político institucional teniendo a la vista los resultados y consecuencias de su obrar para las instituciones o para la confianza pública.** Esta causal permite una valoración amplia pues se trata de la falta de idoneidad no solo profesional o técnica, sino también moral, como la ineptitud, la insolvencia moral, todo lo cual determina un daño a la función, o sea a los intereses generales de la Nación.

Lo cierto es que de las circunstancias expuestas en el apartado precedente, se desprende que la denuncia principal que recayera bajo la competencia del magistrado —y que dio origen a la formación de la causa penal cuya tramitación estamos cuestionando— aportó elementos contundentes que darían cuenta que los hechos delictivos denunciados efectivamente habrían ocurrido. Los que fueran "abonados" con nuevos elementos que fueron incorporados sucesivamente, mediante las referidas ampliaciones; pero que fueron sustraídos por el magistrado, en el desmembramiento de causas relatado precedentemente. El que ha sido realizado con **una ostensible**

28

intención de diluir las responsabilidades penales de los imputados (especialmente a lo que la asociación ilícita se refiere).

Al respecto, resulta fundamental advertir que de entre los delitos denunciados y de las innumerables conductas ilícitas relatadas, surge como evidente, la posible comisión del delito de asociación ilícita para cometer delitos, por parte de las personas denunciadas; delito que pese a haber sido denunciado desde el inicio como figura "conectora" de la causa, ha sido sistemáticamente obviada por el Dr. Ercolini. Quien ha tratado cada suceso como hecho estanco e independiente, haciendo caso omiso a las innumerables conexiones evidenciadas entre todos los hechos entre sí.

De este modo, como ya lo advertimos, en todos los años transcurridos, el magistrado no ha adoptado las medidas probatorias adecuadas y necesarias para poder determinar judicialmente la verdad de los hechos presuntamente delictivos, que fueran denunciados y que el Fiscal pidió se investigaran. Los que insisto, tienen una gravitación fundamental en el funcionamiento de nuestro sistema republicano.

Por todo ello, resulta evidente que la conducta del magistrado Ercolini implica un grave incumplimiento de sus deberes como funcionario, e incluso, insisto, podría configurar la comisión del delito de encubrimiento (art. 277 CP).

Para impulsar el presente pedido no se ha omitido considerar que la remoción es un acto de trascendental gravedad, que no puede estar sustentado meramente en consideraciones respecto de la forma en que se resolvió una causa , toda vez que las irregularidades deben aparecer *"...enderezadas y concatenadas entre sí para acreditar la existencia de alguna finalidad distinta de aquélla que impregna la administración de justicia y que muestre un patrón de conducta disvalioso y censurable en la conducta del magistrado. Este Jurado ha mantenido su criterio en el sentido de que el contenido de las sentencias no es materia de su incumbencia, ni su examen puede ser determinante de la remoción de un magistrado..."* (Causa n° 15 "Mahdjoubián", considerando 38).

**En tal sentido, las causales descriptas en los acápites precedentes permiten asegurar que la mora, las omisiones y "errores" cometidos por el doctor Ercolini que son objeto del presente reproche, van más allá del aspecto "opinable" de una resolución jurisdiccional.** Las referidas irregularidades son prueba indiscutible de su mal desempeño y, en efecto, <u>aparecen claramente</u>

29

enderezadas y concatenadas entre sí para acreditar la existencia de alguna finalidad distinta de aquélla que impregna la administración de justicia: en este caso, desmembrar y dilatar una causa judicial con el fin de lograr la impunidad de los sujetos involucrados.

Estamos frente a la actuación de un juez que omite actuar conforme a derecho, toda vez que ha incumplido con su deber de investigar para alcanzar la verdad material de los hechos denunciados.

En general, se puede decir que se configura el mal desempeño cuando un magistrado ha perdido las condiciones necesarias para continuar en el ejercicio de su función. Es decir que no cuenta con la idoneidad suficiente para mantener el cargo, entendiendo como condiciones de idoneidad, entre otras, la buena conducta personal, salud física, equilibrio psicológico, independencia, imparcialidad, integridad, etc.

Al respecto la Doctrina nos enseña que *"La falta de contracción al trabajo, el incumplimiento de los plazos procesales, **el no ordenar diligencias procesales**, las irregularidades procesales en la tramitación de las causas, etc., son algunos ejemplos concretos de esta falta de diligencia debida en la realización de las tareas propias de un juez..."* (Rev. E.D. cit. Pag. 10- LL.133-962; JA., 968-II-493 –las negritas me pertenecen-).

Asimismo, es oportuno destacar que no exige, necesariamente, la comisión de delitos sino que es suficiente para separar del cargo a un magistrado la irregularidad de la tarea judicial llevada adelante por el magistrado en el sentido explicado *ut supra*.

Al respecto, ese Jurado ha sentado la siguiente doctrina: *"...pueden los actos de un funcionario no ajustarse al vocabulario de las leyes penales vigentes, no ser delitos o crímenes calificados por la ley común, pero sí constituir "mal desempeño" porque perjudiquen al servicio público, deshonren al país o a la investidura pública, impidan el ejercicio de los derechos y garantías de la Constitución, en cuyo caso bastan para promover el enjuiciamiento"* (caso "Brusa", Considerando 32).

Y qué mayor perjuicio al servicio público de la justicia, qué mayor deshonra al país o a la investidura pública, qué mayor impedimento para el correcto ejercicio de los derechos y garantías de la Constitución, que el haber observado tan evidente conducta tendenciosa, maliciosa e irregular.

En efecto, la figura del mal desempeño adquiere su real dimensión cuando la conducta del juez cuestionado resulta violatoria de uno de los deberes fundamentales de la magistratura, cual es el de su imparcialidad.

El deber de imparcialidad del juez es un imperativo ético y legal. Al respecto, el estatuto universal del Juez señala que "El juez debe ser y parecer imparcial e independiente en la tramitación y resolución de las causas…". Resulta evidente que el magistrado cuyo juicio político aquí solicito, se apartó de tal mandato, actuando en beneficio de los funcionarios y empresarios "amigos del poder" que debía investigar.

Por ello, cabe destacar que sin perjuicio de no ser necesaria la comisión de delitos como causal de remoción, en el caso que motiva esta presentación, entiendo que el magistrado cuestionado también habría incurrido en la causal de delito en el ejercicio de sus funciones. Puesto que mediante ese proceder irregular, dirigido a beneficiar a las personas denunciadas por la comisión de ilícitos penales, habría actuado con el fin de encubrir a los imputados –procurando la impunidad de los mismos, que hasta el día de la fecha, ni siquiera han sido indagados a los fines de prestar las explicaciones pertinentes de sus conductas; pese a las evidentes irregularidades observadas-.

Siendo que respecto de la causal de comisión de delito del juez en el ejercicio de sus funciones, su juzgamiento es solamente a los fines de la remoción.

Por los fundamentos expuestos, considero que el Dr. Ercolini ha incurrido en la causal constitucional de mal desempeño de sus funciones y eventual comisión de delito en el ejercicio de sus funciones; en consecuencia, de conformidad con lo dispuesto en los artículos 53 y 115 de la Constitución Nacional, solicito la remoción de su cargo.

Sin otro particular, saluda a Uds. atentamente.

31