# EXHIBIT F

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

Buenos Aires, May 22, 2013.

Attached please find the aforementioned reports, to which the proceedings undertaken with the participation of the *Secretaría de Investigaciones Penales* [Bureau of Criminal Investigations] will be added.

### BACKGROUND AND SUMMARY OF THIS OPINION:

In this case, and through its representatives, a Joint Stock company by the name of SGI reported having been ordered by the AFIP [*Administración Federal de Ingresos Públicos* — Federal Public Revenue Administration] to explain a mortgage-backed *mutuum* loan that was not recorded in its books.

However, in its complaint, the aggrieved firm recognized that Federico Elaskar, the person representing SGI in the document, had been effectively linked to the company since its inception, [and] was in the capacity of chairman at the time of his alleged separation[1] in July 2011.

The offense brought before this criminal jurisdiction late last year appeared to relate to possible illegal activities in SGI's administration (art. 173, para. 7 of the Criminal Code), it being alleged that this included operations involving not only the diversion or theft of the aggrieved party's assets, but also equally dishonest acts that illegally obligated it, or rather compromised, concealed or falsified its net assets and the true nature of its business. In other words, although the funds were not part of the company's financial operations, the resultant calculations nonetheless gave rise to losses of a value equal to or greater than that of the unknown operation, as explained in the witness statement by the AFIP inspector responsible for the preliminary investigation.[2]

Now, since its initial submission, the *querella** itself has revealed that the relevant facts were not limited to an isolated instance of the December 2007 phantom mortgage.  Once its legal representatives became aware of the possible existence of other illegal acts,

* [Translator Note: A *querella* is a document submitted by a private party to the court alleging criminal conduct; if it is accepted by the court, the private party joins in the prosecution of said conduct.]

---

[1] Both the initial complaint, signed by Gustavo Fernández as Chairman of SGI Argentina (page 3 verso of the case file) and the subsequent one in which the company was named as party to the prosecution via legal representative Federico Pinto, page 31 of the case file, state that Federico Elaskar disposed of all of his shares on July 18, 2011, when, as we shall see, and as appears in the same document offered in support of that fact — the regular shareholders' meeting convened, contained in Annex IV of the case documentation and on pages 282–283 — **this is untrue**. The minutes in question say nothing of the shares, only recording the removal of Elaskar as chairman. The issue is broached in board meeting number 50 of July 4, 2011, when nothing is recorded or reported of the sale of the entirety of the stock he held, but only of half, 2,350 registered, non-endorsable shares that henceforth appear under SERNORTE HOLDING S.A. This firm which, as we shall see, was a phantom company since it concealed the involvement of a third party, appears in the share register of the regular shareholders' meeting held on July 18, transcribed by Scian the notary on page 228 (the share register was not added to the copy of the meeting on page 282–283) represented by Jorge Chueca, DNI [National Identity Document] 10,112,391, with the same domicile as his principal at Paraguay 1225, floor 11, City of Buenos Aires.

[2] Inspector Fernando Gabriel Salas, pages 432–433.

they also claimed there was a serious underlying conflict involving criminal liability against Federico Elaskar for threats made against current directors of the company.[3]

In addition, and as a second component in this broader and fuller overview of the events, shortly after the investigations began, mutual accusations came to light between Elaskar and his former partners and colleagues who held positions of authority at SGI. In this case, it was in the form of a public accusation made on the television program "Periodismo para todos" ["Journalism for All"], broadcast last April 14 on Channel 13. This program reported the extortionate manner in which Federico Elaskar had been stripped of his shares and forced to resign from his executive responsibilities at the company, as well as the subsequent stripping of company assets.

On the basis of full knowledge of this matter, it should first be stated that the issues uncovered were clearly of legal import, deriving as they did from further ramifications and new circumstances relating to the possible fraudulent administration of the company, as well as verification of the concept of extortion contained in article 168 of the Criminal Code. Moreover, and this is the most important point, his intimate connection and the need to investigate all of the facts became evident, without limiting the inquiry to the isolated episode contained in the document, a copy of which can be found on pages 10–24.

Ultimately, as the same *querella* has pointed out, the arbitrary administration that Elaskar may have exercised with respect to SGI assets and operations should be recognized as an indivisible cause and effect with respect to the actual establishment of the company in question and the actions carried out by him with respect to his management from that time to the present, including the claims brought against those who eventually appropriated the company.

It is on the basis of this overall perspective that we have proceeded with the first part of our inquiries and, in the same vein, must inform the overseeing Judge of the requirements necessary *for the provision of investigative measures exclusive to the court and for the study and resolution of the initial claims regarding the crime of extortion. Necessarily, those actions involving federal crimes such as bribery and other dishonest acts that could reach the level of the national authorities, and possible money-laundering activities, lie beyond the scope of our competency.* This is without prejudice to the possible usefulness to this investigation of the

---

[3] Case filed with Magistrate Court number 19, cited in the two documents in the complaint, on pages 1–3 and 27–29. Registered under number 44982/2011, requested of the Court in question in a letter dated February 4, reiterated on April 16. Following this, a response was requested by telephone until such time as the Judge made it known that s/he would not agree to the submission of the case file nor photocopies of same, meaning that the certification was performed in the court itself (see page 550 and 625–627 notes).

National Public Prosecutor's Office   [stamp] [initials]                    [stamp] [initials]

evidence we have uncovered in order to identify all of the implicated parties and to establish the extent of the fraud and extortion in this case. It is therefore necessary for us to submit *records of all proceedings to the Prosecutor involved in the current case before the court of exceptional jurisdiction.*[4]

In short, based on the evidence that we shall describe below and the grounds that I shall outline in the next section, aside from the evidence pending with respect to the illegal administration of the company and the possible appropriation of the assets and interests of third parties,[5] *in this opinion we will charge those who in 2011 stripped Federico Elaskar of his shares in the company under duress, obliging him also to resign from the executive positions he held in it, conduct which we believe extended to violence perpetrated against the aforementioned individual in order to force him to retract the public accusation he made last April 14.*

<u>EVIDENCE AND GROUNDS FOR THE ACCUSATION.</u>

**1.** In this case, SGI filed its complaint on September 27, 2012, represented by Gustavo Fernández; on November 14, 2012, [SGI] was named a party to the prosecution. In brief, it stated therein that AFIP had asked the company to explain a mortgage-backed *mutuum* loan. Following initial investigations, it was established that this involved a mortgage dated December 11, 2007 in the amount of 265,000 dollars entered into for the purchase price of an apartment with garage[6] in a building at calle Juana Manso 1490, known as the "Hotel Faena." Participating in representation of SGI in the document in question, which was drawn up by Notary Martín D. Gutman, was Federico Elaskar[7] — whose name and other identifying information can be seen inserted in an erasure that, although preserved by the notary, has prompted a judicial attachment order with respect to the original protocol — who invoked his capacity as chairman of the company, providing, as proof of his standing, the company's January 10, 2007 bylaws, together with the minutes of the general meeting and of the June 15, 2007 meeting of the board, electing individuals to it and designating the various offices, which background information has been added to the minutes.

The debtor is listed as Fernando Jack Janin, the stated purchaser of the aforementioned unit by means of a sale effected in a deed of that

---

[4] As stated by the AFIP in its reply on pages 164–168 (on which I shall comment at the end of this opinion, since it clearly implies an act of defiance against the administration of justice, analogous to that of the *Inspección General de Justicia* [Corporate Registry Office] in case numbers 3017, 3021, 3101 and 3024 in the Federal Criminal and Correctional Court number 7.

[5] See point 14 of the *parte dispositiva*.

[6] Unit 198 on the 6th floor is "assigned for residential purposes" and unit 109 on underground level 1 for parking purposes.

[7] Who states as his domicile Azucena Villaflor 350 (no further details) in the City of Buenos Aires.

same date by an owner specified as "Equity Trust Company (Argentina S.A.)." The mortgage grants a special power of attorney to Gustavo Damián Faena, DNI 20-493-082, so that he may collect all or part of the interest and the principal, as well as issue documents of receipt on behalf and as a representative of SGI.

Once the directors of SGI appeared before the administrative body and obtained a copy of the deed, as they reported in the answer attached as Annex II of the documentation,[8] they did not find any corroboration whatsoever in the company's books and balance statements. They therefore distanced themselves from that operation and suggested the possibility that Elaskar had defrauded the company or had otherwise invoked his status in a private business transaction or matter for reasons that the *querella* claims not to know. The representative left open the possibility that other similar instances may have occurred.[9]

With respect to Elaskar's connection with SGI, in the documents on pages 1–3 and 27–29 of the case file, Cesar Gustavo Fernández and the attorney Federico Pinto restricted themselves to stating that the former *"had resigned as chairman of the company on July 18, 2011, and disposed of the shares of which he had hitherto been the holder."* However, they provided no evidence of this, nor did they so much as mention the key relationship the accused party had with the company and the evidence of a drastic modification of the board of directors and the share package in mid-2011, more than a year prior to the filing of the *querella*. They did, however, inform the representatives of the filing of a complaint against Federico Elaskar before Magistrate Court number 19 for the crime of making threats, a case they wielded as proof that there "were several difficulties after Elaskar left the company."

Now, this terse reference to the background of the matter, together with developments in the company toward the end of last year, the role played by Elaskar, as well as other elements necessary to understand what took place along with the relevant circumstances, was complemented to a significant degree by the documents accompanying the *querella*, even if only for the purpose of establishing legal standing. We can therefore see from Annex 1 that the company in question was incorporated as "SGI Argentina

---

[8] Copy on pages 260–261, with the participation of Alejandro Ons Costa, together with Gustavo César Fernández, another of the survivors of the board of directors that included Federico Elaskar.

[9] Page 7 of the case file, statement made on October 24, 2012, by César Gustavo Fernández. We will later see that Elaskar had returned to Argentina just three days earlier after a lengthy year-long absence. He had departed Ezeiza on Sunday, October 23, 2011 (information from Immigration, on page 89 of the same file— copy of case file 17133/2013 *"promoción de oficio*"*) at 9:50 PM, a little more than 24 hours after being forced to give up his shares and relinquish his rights to the chain of private documents that lead to Helvetic Services Group and whose signature Notary Diego Asenjo certified in a proceeding on Friday, October 21 (pages 628–635 and 1708–1719).

* [Translator Note: *Promocion de oficio* refers to those cases the prosecutor is obliged to undertake even if there is no *querella*, a concept not provided for in English. This footnote 9 appears to be a citation to an accompanying case that is being brought *de oficio* and not, as in our case *de querella*.]

National Public Prosecutor's Office   [stamp] [initials]         [stamp] [initials]

S.A." on January 10, 2007, in a document signed before Notary Andrea N. Molczaj. It initially consisted of Alejandro Héctor Veloso, DNI 23-463-947, domiciled at Directorio 86, Ground Floor, apartment C, and Diego Alberto Güerri, DNI 20-619-328, domiciled at Avenida Santa Fe 1675. Its corporate purpose was stated to be financial activities, broadly described, and excluding those provided for in the law for entities specializing in this sector. Share capital was set at 50,000 pesos, represented by 50 registered non-endorsable shares at a nominal value of one thousand pesos each and the right to one vote per share. The company dispensed with an audit committee and the owners underwrote the entirety of the capital within the charter, Güerri doing so with 40 shares (80%) and Veloso with 10 (20%); they constituted 25% of the total, establishing that the rest of the capital would be made up within the legally required periods, with the Chairman of the Board, Diego Alberto Güerri, receiving the remaining 25,000 pesos, while Alejandro Héctor Veloso became alternate Chairman. The corporate domicile was established at Azucena Villaflor 350 100 "A" (textual) in the Federal Capital.[10]

At this point, we must digress in order to make clear that the investigation was not at that stage in possession of copies of the documents, minutes and meetings of SGI Argentina S.A. for the period extending from the corporate charter dated January 10, 2007 (included in the *querella*) until the next document contained in the annex, these being the documents and minutes recording the events that occurred between May and July 2011, to which I shall refer later on. An attempt was made to remedy this omission with repeated requests to the Corporate Registry Office, beginning with a certificate issued on April 18 of this year. To date the aforementioned body has neither answered nor provided any explanation for its delay.[11] We can report that a similar situation has occurred with both AFIP and the *Dirección Nacional de Migraciones* [National Immigration Bureau],[12] made more serious in the latter case by the sudden and surprising disconnection of its service for direct searches through the National Public Prosecutor's Office data system (FiscalNet).

Nevertheless, this omission was partially remedied at the outset thanks to a number of circumstances uncovered in the official gazette of the Republic of Argentina which, as we shall see, include the final notices published with respect to modifications in the capital and shareholding of SGI. These I transcribe below:

---

[10] In another of his many inconsistencies, César Gustavo Fernández, Elaskar's successor to the chairmanship of SGI, states in his testimony on page 7 that he was the founder of the company, whereas he is not even mentioned in the corporate charter.

[11] See correspondence on page 38 and correspondence on pages 493, 494, 496, 538, 1168 and 1539.

[12] The latter finally answered on pages 3041–3065.

Date: 07/10/2007
SGI ARGENTINA S.A. At the Regular Meeting of 6/15/07 the resignations of DIEGO ALBERTO GUERRI and ALEJANDRO HECTOR VELOSO were accepted from the offices of Chairman and Alternate Chairman respectively, with FEDERICO ELASKAR being elected as substitute Chairman and Diego Alberto Güerri as substitute Alternate Chairman, all with special domicile at Azucena Villaflor 350 100 Office A, Federal Capital. Chairman elected at the Regular Meeting held on 6-15-07. Chairman (President) Federico Elaskar. Notarized by: Andrea N. Molozaj. Registration No.: 88. Entry No. 4779. Dated: 6/28/2007. Minute No.: 152. Book No.: 10. Issued: 07/10/2007. No. 6836 issued 07/10/2007. Source: Official Gazette of the Republic of Argentina, No.: 31192 of 07/10/07.

Date: 7/15/2009
SGI ARGENTINA S.A. SUMMONS Shareholders of SGI Argentina S.A. are hereby summoned to a Regular General Meeting to be held on August 7, 2009, at 6:30 PM for the first summons and 7:30 PM for the second summons, both to be held at the company headquarters located on Azucena Villaflor* 350, floor 1, Office "100-A" in the City of Buenos Aires, with the following AGENDA: l) Reasons for convening an unscheduled Regular General Meeting. 2) Discussion of the documentation required under art. 234, para. 1 of Law 19,550 for the Fiscal Year ending December 31, 2008. 3) Discussion of the performance of the Board of Directors during the Fiscal Year ending December 31, 2008. Board of Directors compensation. 4) Determining the number of Directors. Appointment of a new Board of Directors. 5) Application of the profits for the Fiscal Year ending December 31, 2008. Federico Elaskar appointed Chairman of SGI Argentina S.A. in Meeting Minute number 5 of 07/17/2008. Chairman: Federico Elaskar Notarized by: David Scian, Registration No.: 1674. Entry No.: 4096. Date: 7/7/2009. Minute No.: 21. Book No.: 083. Issued: 07/15/2009. No. 58620/09 verified 07/21/2009.

Date 7/20/2009
SGI ARGENTINA S.A. SUMMONS Shareholders of SGI Argentina S.A. are hereby summoned to a Regular General Meeting to be held on August 7, 2009, at 6:30 PM for the first summons and 7:30 PM for the second summons, both to be held at the company headquarters located on Azucena Villaflor 350, floor 1, Office "100-A" in the City of Buenos Aires, with the following AGENDA: l) Reasons for convening an unscheduled Regular General Meeting. 2) Discussion of the documentation required under art. 234, para. 1 of Law 19,550 for the Fiscal Year ending December 31, 2008. 3) Discussion of the performance of the Board of Directors during the Fiscal Year ending December 31, 2008. Board of Directors compensation. 4) Determining the number of Directors. Appointment of a new Board of Directors. 5) Application of the profits for the Fiscal Year ending December 31, 2008. Federico Elaskar appointed Chairman of SGI Argentina S.A. in Meeting Minute number 5 of 07/17/2008. Chairman: Federico Elaskar Notarized by: David Scian, Registration No.: 1674. Entry No.: 4096. Date: 7/7/2009. Minute No.: 21. Book No.: 083. Issued: 07/15/2009. No. 58620/09 verified 07/21/2009.

Date 7/14/2010
18 SGI ARGENTINA S.A. *Hereby announces* that by Resolution of the Board of Directors dated 04.07.10 it was resolved to transfer the company headquarters of *SGI Argentina S.A.* from calle Azucena Villaflor 350, floor 1, apartment "100-A" in the Autonomous City of Buenos Aires [C.A.B.A.] to calle Juana Manso 555, floor 7, office "C" C.A.B.A. Federico Elaskar appointed chairman of *SGI Argentina S.A.* by Assembly Minute No. 7 of 08.07.09. Chairman: Federico Elaskar Notarized by: David Scian, Registration No.: 1674. Entry No.: 4098. Date: 7/1/2010. Minute No.: 040 Book No.: 087. Issued: 07/14/2010. No. 77962/10 verified 07/14/2010.

Date 1/7/2011
SGI ARGENTINA S.A. *Hereby announces* that by Meeting Resolution dated 11.19.10 it was resolved to increase Share Capital by $ 2,000,000, raising this amount to $ 5,000,000, by issuing 2,000 registered non-endorsable shares at a nominal value of $ 1,000 each and the right to one vote per share. Alejandro Ons Costa appointed Vice Chairman of *SGI Argentina S.A.* by Assembly Minute No. 7 dated 08.07.09 to exercise the office of Chairman by Minute No. 34 of the Board of Directors of 11.05.10. Vice Chairman acting as chairman Alejandro Ons Costa. Notarized by: David Scian. Registration

* [Translator Note: Highlighted as the original.]

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

No.: 1674. Entry No.: 4098. Date: 1/3/2011. Minute No.: 144 Book No.: 089. Issued: 01/07/2011. No. 1817/11 verified 01/07/2011.

Date 06/1/2011
SGI ARGENTINA S.A. SUMMONS Shareholders of SGI Argentina S.A. are hereby notified of a Regular General Meeting to be held on June 15, 2011, at 12:00 PM for the first summons and 1:00 PM for the second summons at the company headquarters located on calle Juana Manso 555, floor 7, office "C," Federal Capital, for the purposes of discussing the following AGENDA: I) Appointment of two shareholders to sign the minutes. 2) Reasons for convening and holding a meeting outside of the schedule established in Art. 234, final paragraph of Law 19,550, for the Fiscal Year ending December 31, 2008. 3) Discussion of the General Balance Sheet and other complementary accounting documentation as provided in Art. 234, para. 1 of Law 19,550, for the Fiscal Year ending December 31, 2010. 4) Discussion of the profits for the Fiscal Year ending December 31, 2010, and their application. 5) Discussion of the performance of the Board of Directors during the Fiscal Year ending December 31, 2010. 6) Discussion of Board of Directors compensation. NOTE: Shareholders are reminded that in order to attend the Meeting they must send notice of their attendance to the company headquarters located on calle Juana Manso 555, floor 7, office "C," Federal Capital for this to be recorded in the Share Deposit Book and the Meeting Attendance Register not less than three (3) days prior to the date set for the Meeting. Shareholder services will be available from Monday through Friday between 12:00 and 2:00 PM at the company headquarters located on calle Juana Manso 555, floor 7, office "C", Federal Capital.   Signed: Federico Elaskar Chairman appointed by Meeting Minute No. 7 of August 7, 2009 and by Minute No. 28 of the Board of Directors dated July 3, 2009. Chairman: Federico Elaskar Notarized by: David Scian, Registration No.: 1674. Entry No.: 4096. Date: 05/20/2011. Minute No.: 117. Book No.: 091. Issued: 05/27/2011. No. 61713/11 verified 06/02/2011.

From this series of publications we first deduce that within a few months of the incorporation of the company in June 2007, the chairman and the alternate chairman resigned, with Federico Elaskar replacing Diego Alberto Güerri and the latter replacing Alejandro Héctor Veloso as alternate chairman; the latter does not reappear in the documents we have available. In addition, we have also verified that Elaskar had served as Chairman of SGI Argentina S.A., without interruption, from his first appointment until at least June 2011 (regular meetings of June 15, 2007, July 17, 2008, and August 7, 2009).

Moreover, just as in April 2010, the company headquarters moved to calle Juana Manso 555, floor 7, office "C" in this city, a few blocks from the previous headquarters but in the same Puerto Madero neighborhood, another key detail emerges from the official gazette published on November 19, 2010. On that day, by decision of the shareholders meeting, it was resolved to increase share capital from 3,000,000 to 5,000,000 pesos, issuing 2,000 shares of the same type as the original ones — registered non-endorsable shares at a nominal value of 1,000 pesos and the right to one vote per share. This means that in some prior act, the publication of which we could not locate in the official gazette, nor has it been submitted as part of the *querella*, the share capital was significantly increased from the original 50,000 pesos to the

3,000,000 of which it consisted by the end of 2010. It is probable that the prior modification was contemporaneous with the changes effected in the composition of the board of directors since, as can be seen in the transcripts of the publications in the official gazette, the notification of the new increase in share capital from 3,000,000 to 5,000,000 was entrusted to an individual who appears as Vice Chairman appointed by the meeting on August 7, 2009. I am referring to Alejandro Ons Costa, who also exercised the office of Chairman of the Board of Directors, according to a resolution issued by that body dated November 5, 2010.

Thereafter, we know nothing of the matters that occupied the Chairman, Federico Elaskar, between the minutes of November 2010 and the publication of the new expansion of share capital notarized by Scian on January 3, 2011.[13] However, it can be stated that from the beginning of that year, SGI entered a period characterized by the objective fact that its share capital increased by a factor of ONE HUNDRED in barely four years, 40% of which — no less than 2,000,000 pesos — was added during the previous November. It is important to bear this fact in mind, because a full overview of what occurred at SGI and the circumstances surrounding it point to the start of a critical period that, despite the evidence apparently provided by the aforementioned growth, ended a few months later with an effective takeover of the company by third parties and the removal of Federico Elaskar, marked by evidence of violence and extortion.

Having provided this account, which ends with the summons issued by the Board of Directors presided over by Elaskar *of the regular general meeting of June 15, 2011*, during which a number of matters in connection with Fiscal Year 2010 were voted on, we are able to retrace the history based on the evidence contained in the documents submitted as part of the *querella* to support the power of attorney granted to César Gustavo Fernández to file it (Annex 1, power of attorney issued on November 8, 2012). On the basis of the only published minutes, the exercising of the office of chairman by Fernández himself after a four-year tenure by Elaskar was a complete novelty. The power of attorney mentions the resolution taken at the shareholder meeting during which the officers were elected and offices distributed on July 18, 2011, and the resolution of the Board of Directors dated October 25, 2012, by which it was decided to file the action that has prompted the present proceedings. The power of attorney in question is complemented by the notarial document that immediately follows it in Annex 1; it refers to a document issued by notary David Scian to report

---

[13] Based on the last search of Bureau of Immigration records that it was possible to make using the FiscalNet system, between April 17 and 18, evidence exists of a number of trips made by Federico Elaskar to several destinations on the dates mentioned, a period between late 2010 and mid-2011, which was one of significant activity and apparent growth of the company. See pages 135–137.

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

the changes made to SGI during the month of July 2011 to the Corporate Registry Office,[14] though apparently so hastily prepared as to commit the manifest chronological error of reporting, in a notarial document dated July 4, 2011, on the occurrence and results of a regular general meeting that was in fact to be held on the 18th of that same month.

The confusion is all the greater when we bear in mind that, as we have seen, the final minutes published in the official gazette on June 1, 2011, contained the summons to the regular general meeting for June 15, 2011, made by the board of directors of SGI, probably as a consequence of the decision taken by that body on May 20 of that same year (see the publication in the official gazette in which that date is indicated for the notarization) or on some earlier day. Therefore, *what occurred between the May summons to the regular general meeting on June 15, 2011, and the meeting of the same type eventually dated July 18, 2011?*

We now know that during those days Federico Elaskar was threatened and forced to resign from his position and give up his shares in the company. However, the existence of serious events underlying the partial statement made in the *querella* can be inferred from a review of the documentation. In effect, on June 16, 2011, the day following that on which the regular scheduled meeting should have been held for the purposes of approving the previous fiscal year, setting compensation for the board of directors and other ordinary issues, we find Minute number 49 of the Board of Directors[15] in which this drastic step is taken without any mention whatsoever of the occurrence and results of the meeting that should have taken place the previous day, with a summons issued for a new regular meeting for July 18 stating "the reorganization of the board of directors" as the sole agenda item.

<u>MINUTE No. 49 OF THE BOARD OF DIRECTORS</u>

[watermark: TRUE COPY]

In the City of Buenos Aires, on the 16th day of the month of June 2011, at 5:00 PM, in the company headquarters of SGI Argentina S.A., calle Juana Manso 555, floor 7, office "C" in this City, the Directors met, all of whom sign these presents, under the chairmanship of Mr. Federico Elaskar. Having established the existence of a quorum, the Chairman stated that it was sufficient for this to be a valid session. The Chairman then opened for discussion the first and only Agenda Point, which reads as follows: Reorganization of the Board of Directors: The Chairman stated that, as those present were aware, consideration had been given to the possibility of making a few modifications to the Board of Directors that implied a reorganization of the latter. Therefore, he proposed convening a Shareholders Meeting to address this point. The proposal was unanimously approved, in consequence of which it was resolved to convene a Regular General Shareholders Meeting for July 18, 2011, at 12:00 PM for the first convocation and 1:00 PM for the second convocation at the company headquarters in order to address the following Agenda:

1. Appointment of two shareholders to sign the minutes jointly with the Chairman.
2. Reorganization of the Board of Directors. Determination of the number of Titular and Alternate Directors and their election.

There being no further issues to discuss, the session ended at 5:30 PM.

[signature]                                    [signature]
Federico Elaskar                          Alejandro Ons Costa
Chairman                                     Vice-Chairman

---

[14] Copy on pages 227–233.
[15] Copy on page 241.

As further evidence of the state of agitation characterizing the company's management, Minute number 50 of the board of directors[16] was inserted immediately following, dated July 4, 2011, which broke definitively with managerial continuity. Here we see that Federico Elaskar, then Chairman of SGI, lost on a total change of course since having convened the regular general meeting (the definitive outcome of which we do not know),[17] proceeded without further notice or explanation to report that three days earlier he had disposed of half of his shareholdings of approximately 95% and that he proposed the replacement and issuance of new share capital.

<u>MINUTE No. 50 OF THE BOARD OF DIRECTORS</u>

[watermark: TRUE COPY]

In the City of Buenos Aires, on the 4th day of the month of July 2011, at 5:00 PM, in the company headquarters located at calle Juana Manso 555, floor 7, office "C" in the Autonomous City of Buenos Aires, the entire board of directors of *SGI Argentina* met. The Chairman Mr. Federico Elaskar addressed the first Agenda Item: a) *Discussion of the transfer of shares made by shareholder Federico Elaskar*. It was then stated that on July 1, 2011, Mr. Federico Elaskar had communicated to the Company the fact that he had transferred part of his shareholdings, consisting of 2,350 ordinary registered non-endorsable shares at a nominal value of $ 1,000 each and the right to one vote per share, to *SERNORTE HOLDING S.A.*, representing 47% of the share capital and votes of the Company. As a consequence, the board of directors unanimously resolved to do as follows: 1) CANCEL shareholdings No. 9, 10, 11 and 12 currently in circulation. 2) ISSUE the following certificates as replacement for shareholdings No. 9, 10, 11 and 12 on the date of the present minute: *Share Certificate No. 013* in the name of Federico Elaskar, representing 2,350 ordinary registered non-endorsable shares at a nominal value of $ 1,000 each and the right to one vote per share; *Share Certificate No. 014* in the name of SERNORTE HOLDING S.A., representing 2,350 ordinary registered non-endorsable shares at a nominal value of $ 1,000 each and the right to one vote per share; *Share Certificate No. 015* in the name of César Gustavo Fernández, representing 100 ordinary registered non-endorsable shares at a nominal value of $ 1,000 each and the right to one vote per share; *Share Certificate No. 016* in the name of Alejandro Ons Costa, representing 100 ordinary registered non-endorsable shares at a nominal value of $ 1,000 each and the right to one vote per share; *Share Certificate No. 017* in the name of Juan Carlos Guichet, representing 100 ordinary registered non-endorsable shares at a nominal value of $ 1,000 each and the right to one vote per share; and 3) TAKE note of the transfer, cancellation and issuance provided for in the company's Share Register Book. There being no further issues to discuss, the session ended at 5:30 PM following the reading, approval and signing of the present note.

[signature]                                                    [signature]
Federico Elaskar                                      Alejandro Ons Costa
Chairman                                                   Vice-Chairman

From the above minutes we can observe that a power group appeared on the scene and was showing itself openly for the first time, one which, as we shall see, had in fact arrived at SGI between late 2010 and the first months of 2011.  We thus observe that the shares that Federico Elaskar states having disposed of on July 1 were issued in the name of **SERNORTE HOLDING S.A.** The minutes provide no further details on the entity in question. Following this, the next record disclosed in the *querella* is Minute number 11 of the regular general meeting of July 18, 2011,[18] in which the formal change of leadership in the company is completed and Federico Elaskar is replaced by **Cesar Gustavo Fernández**. It is also worth including

---

[16] Copy on page 242.
[17] At the time this part of the investigation ended, the events of the Regular Meeting of June 15 remain unknown, these presumably having been recorded in the missing Minute number 10.
[18] Copy on page 282

National Public Prosecutor's Office   [stamp] [initials]                    [stamp] [initials]

a copy of this document since it contains elements of considerable relevance to the investigation.

[Illegible minutes follow]

[Illegible minutes continue]

We can see that in addition to the change of chairman, affecting an individual who had been part of the company for some time as a director and minority shareholder,[19] there was the appearance of two hitherto unknown individuals. I am referring to **Jorge Norberto Cerrota** and to **Eduardo Guillermo Castro**, whose relationship to the matter and actual duties we shall address later.[20] Despite the statements made in the documents that form part of the *querella*, nothing is said in the minutes in question as to the change in share ownerships and the appearance of Ser Norte S.A. or of the new majority shareholder on an equal footing with outgoing Chairman Federico Elaskar. However, as indicated above,[21] among the documents included in the *querella*

---

[19] In addition to the office of Vice Chairman, assumed by **Alejandro Ons Costa**, another of those who remain in the company as a minority shareholder and member of the board of directors.

[20] We have proven based on information submitted by the Banco Central de la República Argentina [Central Bank of the Republic of Argentina] that the aforementioned **Jorge Cerrota** and **Guillermo Castro** simultaneously performed the functions of "Trustees" of the Banco Privado de Inversiones S.A. owned by the Banco Macro and its majority shareholders **Jorge Brito** and **Delfín Carballo**; it is noteworthy that both assumed and resigned their office on the same dates, April 26, 2001, and September 20, 2010, respectively. In addition, it is worth noting that on February 15, 2007, Cerrota assumed the position of Director of the Banco Provincia de Tierra del Fuego, was quickly promoted to Vice Chairman, and then on July 10, 2007, was finally appointed as Chairman. Clearly, he discharged all these offices simultaneously with his role as Trustee of the Banco Privado de Inversiones, which resulted in criminal charges being brought against him before the courts of Tierra del Fuego. In addition to this, Cerrota also acted as the "Trustee" of the financial entity *"Tutelar Compañía Financiera S.A."* from February 1, 2005, to October 25 of that same year. Moreover, it has been established that Jorge Cerrota was also registered as an employee of the state entity Energía Argentina S.A. (ENARSA), which appears in his business profile in the *NOSIS* database. For more information, see pages 410, 426–427, 1242–1245, 1295–1296 and 2313–2322.

[21] See footnote number 1.

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

as part of Annex 1 of its documentation (pages 227–231), notary Scian also transcribed the records of the actions taken in the meeting in which we can see that the company in question was represented by **Jorge Oscar Chueco**, with the same domicile as his principal at Paraguay 1225, floor 11, City of Buenos Aires.

Bearing firmly in mind the facts submitted as part of the *querella*, the evidence of a violent takeover at SGI is rounded off by a notable absence, since the public and visible life of the company practically ended with Federico Elaskar's final acts in his capacity of chairman; from June 2011 to the present time, SGI Argentina S.A. has not reported any relevant events or decisions of any type taken by its governing bodies. What we see is an interruption at what appears to have been its peak growth period that had even prompted its directors to establish a permanent base in the Republic of Panama, as can be seen from Minute number 48 of the Board of Directors[22] which I insert below.

<u>MINUTE No. 48 OF THE BOARD OF DIRECTORS</u>

[watermark: TRUE COPY]

In the Autonomous City of Buenos Aires, on the 23rd day of the month of May 2011, at 10:00 AM, in the company headquarters of SGI Argentina S.A., located at calle Juana Manso 555, floor 7, office "C" in this City, the Directors met, all of whom sign these presents, under the chairmanship of Mr. Federico Elaskar. The Chairman opened the first and only Agenda Item for discussion, which states as follows:
**Opening of a bank checking account in the Republic of Panama:**
Mr. Elaskar stated that the Company had been analyzing the possibility of opening a bank checking account in the Republic of Panama at Banco Banesco S.A., which would be beneficial to the Company. After a series of deliberations in this regard, the Board of Directors unanimously resolved to request the opening of a bank checking account at Banco Banesco S.A., with the following persons being appointed as signatories: Federico Elaskar, with passport No. 31-675-104; César Gustavo Fernández, with passport No. 14-309-809; Juan Ignacio Pisano Costa, No. 29-319-731; and Fabián Virgilio Rossi, with passport No. 16-974-032, interchangeably; the Chairman was empowered to sign the documentation necessary for that purpose. There being no further issues to discuss, the meeting was declared closed at 10:35 AM.

As noted in the introduction, the *querella* itself added a third set of evidence to the company turmoil that could be glimpsed through the entries discussed and the drastic interruption of daily operations at SGI Argentina.  These concern the violent episodes claimed by Cesar Gustavo Fernández himself in late October 2011, before Magistrate Court No. 19. The extensive

---

[22] These are, paradoxically, the minutes immediately prior to those in which Federico Elaskar appears, on June 16, 2011, to convene the extraordinary meeting in which his expulsion from the firm was to be finalized.  Copy on page 241.

certification, although made in the absence of a direct investigation or copies of the file,[23] confirms that Federico Elaskar's estrangement did not happen under peaceful or friendly circumstances. At this point I will not give an opinion on the merits of the charge filed against Elaskar; in any event this will be part of the complete study I must perform regarding the facts and the several versions and allegations in existence relating to what occurred. Whether the threats were actually made by the former president of SGI, or whether everything was a plot hatched by his former board members, what is certain is that the violence and tension between those involved had begun to spread from mid- to late 2011.

My intention is to highlight another proven falsehood perpetrated by Elaskar's former partners, who made sure to accuse him not only of threats but also of having concealed the sale of his shares in SGI. This is not simply a casual aside. On November 8, 2011, César Gustavo Fernández claimed that Federico Elaskar had disposed of the last shares in his possession twenty days earlier (which is to say around October 21) without duly notifying the company. However, we have discovered that it was precisely on that day when the last stage of the extortion was completed and Federico Elaskar was forced to give up his shares and relinquish his rights at the same time that SGI Argentina was surreptitiously transferred to Helvetic Services Group.[24] César Gustavo Fernández and *Juan Ignacio Pisano Costa* -who then joined in the complaint[25]- were perfectly aware of those acts carried out by their new employers and partners, and it is quite probable that their accusations may have been aimed at reinforcing the intimidation that appears to have forced Federico Elaskar to leave in exile the night of October 23, 2011, and return to the country exactly one year later.

Nor does it appear to be a harmless matter that this *querella* was filed by current SGI representatives and agents (César Gustavo Fernández himself and the attorney Federico Pintos) during the days prior to and immediately following Federico Elaskar's return to Argentina.[26] Perhaps their true intentions are explained by the apparently sluggish progress of the file pending in Magistrate Court No. 19, as well as by the vague and belated accusation with which this case was initiated, aimed at showing the potential damage

---

[23] See note No. 3.
[24] We will return to this matter below, in part as indicated in note 8.
[25] As part of the changes that took place in July of 2011, he came on board as Deputy Director of SGI.
[26] The complaint was filed on September 27, ratified on October 24 and then instituted as a *querella* on November 14, 2012. Federico Elaskar returned to the country on October 21, 2011 at 7:02 am – see information from Immigration on pages 135-137 of this case, and pages 89-91 of the concurrent proceedings – copies of file 17,133/2013.

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

that Elaskar's actions, as president of SGI, may have caused the partnership through a business dealing apparently beyond the scope of SGI's line of business. Clearly, in the worst of cases, it would have involved a loan both returned and executed by the entity holding 95% of the capital.[27]

**2.** However, all these indications and direct evidence that made it possible to perceive the appropriation of SGI Argentina by a group of powerful individuals, aware of their impunity, were confirmed publicly by Federico Elaskar on the "Periodismo para todos" television broadcast last April 14.

In fact, the connections were already apparent from the parallels between the historical episodes we have highlighted based un the background of the case and the story written by the journalist Jorge Lanata[28] covering the first contacts with Federico Elaskar and Leonardo Fariña up to the point when their statements were recorded and filmed. There is no doubt that the first interviews, which took place mid-2011, coincide fully with the SGI crisis as outlined by their own corporate authorities, along with its apparent resolution toward the end of that same year. Following this, the hiatus lasting until the interviews in late 2012 and early 2013 coincide with Federico Elaskar's return to the country and the accused's formal statement given in Magistrate Court No. 19 last March 21, less than a month after the program went on the air.

Regarding Federico Elaskar's story itself, of which we believe all relevant alleged facts were confirmed by the evidence we shall outline in the next section, we feel it is worth repeating here in order to show that this opinion stands on its own merits. It involves two segments, a filmed segment broadcast on the television program on April 14, and a recording, made with permission, as was the case for the television program, included in the broadcast of "Periodismo para todos" on April 21, 2013.

*Transcript of interview filmed and broadcast April 14*
*(references: NW: Nicolas Wiñaski; L: Lanata; E: Elaskar)*

NW: How long did you have business dealings with Fariña?
E: Five months.
NW: How much cash did Fariña manage during that time?

---

[27] In the case records we have delved more deeply into understanding the circumstances surrounding the mortgage in question, and we are also in the process of compiling a considerable part of SGI Argentina's historical line of business based on the legal and business proceedings in which they have been involved (see measures outlined on pages 347 and 448). With respect to the mortgage, the notary involved has submitted the entirety of the relevant background information, including the deed of cancellation. We have received testimony from the debtor that confirmed the operation, and from the AFIP inspector who investigated the matter and verified that there is no evidence regarding the loan in question in the records of SGI Argentina – a corporation which, in any event, in his opinion, could not support its alleged position as a third party not involved in the contract. To summarize, the background information makes clear the availability to Elaskar – and likewise to SGI, of which he owned 95% - of money "off the books."
[28] See the records to the concurrent proceedings – copies of file 17,133-2013-.

E: Approximately 50, 60 million dollars.

NW: What was Fariña's job description?

E: A millionaire gofer for Lázaro Báez.

L: What's your name?

E: Federico Elaskar, Jorge.

L: What do you do?

E: Right now I am unemployed, but I am a financier.

L: When did you set up your finance company?

E: I began to plan my finance company in June 2006...

L: Does it operate in this building?

E: It operates in this building.

L: We are in the Madero Center...

E: We are in the Madero Center. In 2007 I began at the "Azucena Villaflor House," about 10 blocks from here, with three people, then later, well, sustained growth for years with complete and total capital reinvestment we became an operation with 22 people here in Madero Center, a stockbroker agency, a trust company and a leasing company. The financing company had branches in Mendoza, Panamá and correspondent banks in the United States.

L: How did this all begin? When you met whom?

E: When I met Leonardo Fariña, in January 2011.

L: ¿Fariña? Jelinek's husband?

E: Exactly.

L: And was he Jelinek's husband at that time?

E: No, no.

L: Ah.

E: He got married months later. I met him in January 2011 through a couple of operations where he needed financial assistance that we facilitated, between some people from other countries with people from here in Argentina, and throughout 2011, which was actually the first half of the year, I had several operations for and on behalf of Leo's client, who was Lázaro Báez.

L: During those 6 months you managed ... how much money?

E: Approximately 55 million euros.

L: Was it normal for you to manage euros in your business?

E: No, it was not normal. In fact it is not normal to see 500-euro bills in the financial market.

L: Do you know why I am asking you this? Because some of the modus operandi of government corruption precisely uses euros because, as I am sure you know better than me, they are smaller; there are bills with high denominations and so are easier to move.

E: They are smaller, well, in fact you can carry 50 thousand euros in a money belt.

L: And Fariña, when he came he told you the money was his?

E: I asked him and he told me the money was his, that he had earned some royalties from restructuring some liabilities in "national trust" for Austral Construcciones.

L: Lázaro Báez's company?

E: Lázaro Báez's company.

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

E: And the first thing he did was to invest a million dollars in foreign stocks through a stock exchange located abroad. And then, well, several transfers were also made on his behalf in which we acted as intermediaries, introducing him to the service provider in which he was essentially able to do that using us. He sent tens of millions dollars and euros abroad to companies that were directly related to Lázaro Báez, Martín Báez and Leandro Báez.

L: Did Fariña ask you to put together companies in order to channel the money?

E: What Fariña asked me to do was put together structures where they could receive a certain amount of money in a certain amount of time, and well, that way they could send money out of the country.

L: How many companies were set up?

E: Between 40 and 45 "off short" [sic] companies were founded in Belize, Panama, the Seychelles and BVI, different taxes havens that have very little regulation.

L: In general Panama was used as a destination...

E: In general Belize was used with bank accounts in the Lombard Odien [sic] bank in Switzerland. That was a structure that was well oiled by the consultants that we have abroad. That is, what really happened was that Leo would come, Leo would ask for a certain number of structures to be put together, information was sent on to an accounting firm abroad as to who were beneficiaries. This foreign accounting firm that was in Panama took care of forming the companies and then putting up the capital that they needed in each company.

L: Who managed the cash in Panama?

E: Fabián Rossi.

L: Fabián Rossi, the...

E: Iliana Calabró's husband.

L: Iliana Calabró's husband?

E: Right.

L: Did you know him before?

E: Yes, yes because in fact Rossi worked with me.

L: So Rossi worked in your finance company?

E: Rossi worked in SGI Argentina, the Argentina branch.

L: What is SGI?

E: SGI Argentina is my financial company that over the years became SGI Financial Group. Fabián Rossi had many ties in Panama, through a friendship with Ambassador Arguindegui, which quickly facilitated certain operations that had to be performed outside of the country.

L: OK, so the money would come to you and then that money was sent outside the country...

E: The money was transferred out of the country.

L: They would set up companies abroad to receive that money...

E: Correct.

L: And the person who received that money abroad was Rossi?

E: The person who collected it, sent it on its way, and ended up carrying out the financial transfer operations was Fabián Rossi.

L: You knew about those companies because you were obviously transferring funds to them. How many companies were set up?

E: Well ... approximately 45 to 50 companies were formed.

NW: And the end beneficiary of those companies, who was that?

E. According to my information, Martín Báez, Leandro Báez and Lázaro Báez.

NW: The sons of Lázaro Báez?

E: He and his sons.

L: Was Fariña known to you? Or did he come out of nowhere?

E: No, he came out of nowhere. In fact the wealthy people of Argentina or Buenos Aires who knew me would ask me about him. Since he also lived in Madero Center, my company was very convenient for him because he would cross under the building, would come up and do nothing other than carry out the daily operations sent to him by Lázaro from the south.

L: Did you ever meet Lázaro Báez?

E: No.

L: His son?

E. I met Leandro and I met Martín... well "I met him." I saw Martín once in my office when he came in with Leonardo, I don't know what for, and I saw Leandro on the Pasaje Carabelas in the Austral offices.

L: Why is it that today your office is not yours?

E: Well, because throughout all of 2011 I acted as intermediary in operations that evidently Leonardo Fariña was carrying out in such a way that his boss did not close the books on him – at the end of the year or halfway through the year – [and] you can see that he was audited or something, he began to see what he was doing with the money.

L: Last year I ran into Fariña and Fariña said that some was missing.

E: But he had the part that was missing. You see Jorge -- if you are going to spend 2 million dollars on a party in Punta del Este, rent two private planes, rent three hotels, bring Lola Ponce to sing and drink up two hundred bottles of Cristal, then the money isn't going to last very long, nor is it if you are going to spend 250,000 dollars with American Express in Val Halvor [sic – Bal Harbor] in one weekend.  If you are going to spend 200,000 dollars on a private flight to Miami three times a month at a cost of 159 thousand dollars to rent the plane from Matias Garfgunkel [sic] it's not going to last very long either.

NW: And how did you know all that?

E: Because I made the payments on his behalf. Because he came with bags full of dozens and dozens of euros. So anything that was missing, which really had existed, was missing [because] he spent it.

NW: When you asked Fariña where he got the money, what did he say?

E: Well, that it was his. At the beginning, when it was *quote unquote* reasonable amounts, but that the money was his.

L: The guy appears with twelve million euros, obviously they weren't his.

E. No, no, obviously not.

L: So over time he made it clear to you that the cash was Lázaro's...

E: Yes of course, yes, yes.

L: And how did he tell you?

E: Well, I asked him. I said, "Leo, whose money is this?" – about Lázaro.

NW: You heard him talking to him (Lázaro)

National Public Prosecutor's Office   [stamp] [initials]              [stamp] [initials]

E: Yes.

NW: And how did he address him?

E. "Sir."

L: Ah, he was very formal.

E: Yes, yes, he would stop doing whatever he had been doing, he would shut off all the noise, he would pay attention and I don't know ... it was a perfect ceremonial protocol. I remember that I cut all ties of all kinds with Leonardo in May, June when he appeared on the Susana Giménez program. I remember that that was the day that I said, enough.

L: Why?

E: Because he was bringing me totally negative publicity, because he liked to brag about everything he had. So if he suddenly made multimillions on transactions with my firm, he liked to say that, and in the financial sector that is very bad.

NW: And before that, how would he bring his money to your company?

E: Well he would pick up the money using planes or he would bring it from La Plata, from his father's house.

NW: So he would bring cash.

E: Exactly.

NW: Cash...

E: Yes, it came in cash.

NW: And how did it get there? In what? In bags? How many bags?

E. Bags, backpacks, it depended on the amount, Nico. For example, if he had to bring 10 million and the 10 million did not fit in 2 bags then he used 3. That's the truth.

NW: And he actually brought 10 million euros to your financial company?

E: I think the maximum was 12.

L: 12 million?

E: Yes.

L: So the money that arrived always had to leave right away.

E: Exactly, yes, yes. Before the money arrived it already exit instructions.

L: You said that the money arrived in cash or in bags, in backpacks, or whatever. But how did it arrive here in Buenos Aires?

E: How did it get here, to Buenos Aires? By plane.

L: From where?

E: From Rio Gallegos. The plane was "Lima Victor Zulu Sierra Zulu" LV-ZSZ, that was its registration number.

L: That was Lázaro's plane?

E. That's was Lázaro's plane. The plane arrived in San Fernando early in the morning with no advance monitoring of any kind.

NW: And Fariña went back and forth up there in the plane?

E: Sometimes Fariña went in the plane, sometimes the plane went empty to wherever it had to go and then returned.

NW: How did the money leave? Or if you know, did that money leave the country and go to some company?

E: Look, the structures that were created abroad were created specifically to hold that money. The structures were formed of two parts: the company and the banking institution. You could choose a jurisdiction where you could set up

the company and a jurisdiction where you could keep the funds from that company. In other words, a Panamanian company does not have to have a bank account in Panama, you understand. So the companies were set up and incorporated in Belize and the bank accounts were opened in Switzerland. So the funds were actually held on account by a Swiss bank, but all the operations that took place were through an "off short" [sic] company that did not pay taxes of any kind, as it was exempt.

NW: We have documentation from one of those companies, Teegan.

E: Teegan Inc.  Exactly.  Teegan Inc. was incorporated in Belize and has an account with one and a half million dollars in Lombard de Orien [sic] in Switzerland, and several companies like that were requested.

NW: And that offshore company is in the name of one of Báez's children.

E: The shares are in the name of Martín Antonio Báez.

L: Well the thing is that at a given moment, people pressured you to sell ...

E. When they went looking for him (Fariña) because Lázaro detected some money was missing, he began to point at a lot of people; what a lot of people obviously did was just close their blinds and those people were told to go back from where they came. One of the people who unfortunately could not do that was me. Because I was scared, inexperienced, not used to dealing with that kind of people, more than anything because of the threats they made to me.

L: What kind?

E: One of them, very clearly, it was very clear that if I didn't want to end up like Sebastián Forza then I had to sign a transfer of my share package in all the companies.

NW: And at that time you, why didn't you file a complaint with the authorities? For example.

E: Because they threatened to kill me, and with the impunity those guys operate with every day, one of whom you see every day.

NW: But who was it who told you they were going to kill you or you're going to end up like Forza?

E: Daniel Pérez Gadín.

NW: Who is he?

E: He is an operator who came to fix the scams run by Leo on behalf of Lázaro and, well, I recall that in June or July he contacted me after having communicated with Fariña.  Fariña contacted me that same day and told me that somebody was going to call me to fix my accounts. So this Pérez Gadín called me and told me that I had money belonging to a client of his. I told him that unfortunately I didn't know him nor did I know who his client was. He told me then, "my client is Leonardo Fariña," and I told him, "well look, for anything that I may have to do with Leonardo I'll deal with Leonardo and not with you. So if you want to talk to me, I will send you to my lawyer." "That's not in your best interest you stupid shit because this will end up badly for all of us. You either deal with me today or I blow you away Monday." That was on a Friday afternoon, I was talking to him in my office. When I talked to him in my office he presented himself as the *capo* that was going to fix the mess left by Fariña, and said his clients were really worse than Colombians. That was what he told me when I asked him,

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

"So, who is your client?" "My clients are worse than Colombians and it's not in your best interest to upset them." In other words, when they told me, "either you let us in to the company or we will destroy you on Monday," I had to let two people in, Mr. Jorge Cerrota and Mr. ... Well, I don't remember his name right now, but those were the names of the two people sent by Daniel Pérez Gadín who were accountants who actually had something to do with the accounts managed by Leonardo Fariña for his client Lázaro.

L: So it was like an audit by them.

E: Exactly, an audit by them. They stayed around two months, audited everything. After those two months they said, "Look Federico, the truth is that we are going to make you an offer because you have to get out of here. You know a lot of information. A lot of money went through here, there is money missing and you have to sign this because if you don't, well, you know what the consequences are." And no, the truth is that I did not know the consequences. That's when they began calling me even more intensely, pressuring me, sending me intimidating emails, sending me photos of my wife, telling me that if I didn't want any problems for myself or for my wife, [then I would have to] give in, sign, agree to it.

NW: When they said that their clients are worse than drug dealers (Colombians), did you attempt to find out who they were?

E: No, imagine that at that moment your head just fills with questions and the last thing you want is to know the details.

NW: And did they at any time tell you who they were?

E: Yes, yes of course, after the meeting was over and I had agreed that they could come in they confessed that yes, genuinely it was Lázaro Báez.

*Transcript of the interview recorded and broadcast April 21.*
*(References, N: Nicolas Wiñasky, F: Federico Elaskar)*

N: Say who you are.

F: Me? Federico Elaskar.

N: and [your] DNI ...

F: 31-675-104

N: It's recording, right?

F: I don't know.

N: Hello, hello. Yes.

F: Federico Elaskar DNI 31-675-104.

N: Fariña arrived at your office with a lot of money?

F: Leo Fariña arrived at my office with bags and bags of 500-euro bills.

N: How much money?

F: Ehhh, in total? The first half of 2011 it was over 55, 60 million.

N: Euros?

F: Euros.

N: And then?

F: Well, Leo carried out multiple operations with that money, he would leave the money in the office, he would leave the money in foreign accounts, he would leave the money in

safe deposit boxes that we held, and he told us how to manage that money.

N: And who did that money belong to?

F: Lázaro Báez.

N: He would just say it like that?

F: He would say openly that his boss was Lázaro Báez.  He would flaunt his friendship with Martín Báez. In fact he came to my companies one time with Martín Báez, for some structures that were created on their behalf which dealt with the creation and administration of companies abroad. In fact I also once saw Leandro Báez on Pasaje Carabelas together with the director of my company, Gustavo Fernández, for an operation for the father's company, Austral Construcciones.

1:44

F: Well, they would show up with the money. Once they brought the money we would take care of performing the process of financial intermediation; many times we would clear it through third-party accounts, meaning we would borrow a third party's account that had funds, offset by one in Argentina held by a colleague.  Other times we would offset it ourselves, when you have liquid funds abroad and you keep the capital here and then end up exchanging and arbitrating it with somebody who needed to import their own money.

N: And how was that operation of use to Báez?

F: He was able to move money out of the country and to be able ...

N: Money on which no taxes were ever paid...

F: Exactly, no taxes were paid because we advised on how to set up companies that were tax-exempt because they engaged in no commercial activity in their location. That could be in Belize, could be Panama, could be Luxembourg, Saint Lucia, the Cayman Islands,

3:00

F: He would physically go pick up the money, he would pick it up in La Plata or he would pick it up in Río Gallegos.

N: On airplanes.

F: On a private plane. Two. Lima Victor Zulu Sierra Zulu and November 955 HelGolf. The latter was acquired under lease by my company precisely when there was a growing demand and we had a lot of work, we saw that it was much more efficient, cost-beneficial, to have our own aircraft. We paid a leasing fee of 20 thousand dollars per month and travelled with a lot more peace of mind than by renting a plane or using Báez's plane to transport the money, [because] that's actually a very delicate matter.

8:52

N: And how did he (Leo) find you?

F: How did he come to find me... he came to me through a third party, the son of an Argentine businessman.

N: You don't want to give his name.

F: I don't want to kill him right now ... It's not important. What is important is that they in fact brought him and they brought him in good faith. What Leo needed was somebody to solve his financial problems. A lot of money and not knowing what to do, many operations at the request of his boss and without knowing

National Public Prosecutor's Office   [stamp] [initials]           [stamp] [initials]

how to execute them, so he didn't just come to me. Leo approached me as well as three or four others.

N: Other financiers, do you know their names?

F: Yes, but I can't give you those either.

AUDIO 2

2:23

F: They didn't give me any chance to negotiate, in fact when I told him (Pérez Gadín) that I wasn't going to accept his boss's offer and I would like to negotiate, he told me, "Idiot, there's nothing to negotiate here. If you tell me no then we whack you on Monday. You want to negotiate? Go knock on the door at Balcarce 50."

N: La Casa Rosada [the "Pink House," the Executive Mansion of Argentina].

F: Exactly, so how could you not be scared? And then on top of that, they're sent by Lázaro Báez, when at the beginning they told me that their clients were Mexicans who are worse than Colombians. That's why I had to cooperate unless I wanted to end up ...

N: Insinuating that they were drug traffickers...

F: Insinuating that they were drug traffickers in order to scare me. When I had always suspected that it was Lázaro Báez's money and the problem was because of Lázaro Báez.

6:23

N: What was the name of the Swiss company that bought you?

F: Helvetic Services Group S.A.

N: And who does that company belong to?

F: Lázaro Báez.

N: It's Lázaro's company?

F: Yes, it's Lázaro's. I can't prove it to you, but it is his.

N: You have a feeling that it is his?

F: No I don't have a feeling, I know. I know it, but I can't prove it to you, that's different. But I know.

7:46

F: I don't know why Lázaro Báez does what he does. I believe he should have kept better watch over his money, because Leo Fariña leased two Pluna Charter planes in January to throw a party, which involved spending more than one and a half million dollars. Where 150 bottles of Cristal were drunk, where Lola Ponce sang and where Thomas Phenton came from London to play. They rented two hotels, took almost 16 private flights on Mac Air and ... I wasn't at the party.

10:20

F: I was a damned wuss.  I did not stand up to them as I should have.

N: And now?

F: And now what am I?

N: No, and now would you stand up to them?

F: Yes. Yes, face to face, yes, with no problem.

   **3.** Federico Elaskar's statements undoubtedly answered a good many of the questions that we ourselves posed when reviewing the evidence in our case and the evidence already shown regarding a violent change in leadership at SGI in mid-2011. These background accounts, and the

consistency among them, would been sufficient to charge the businessman *Lázaro Báez*, his alleged accountant *Daniel Rodolfo Pérez Gadín*, and at least one of the "auditors" that the former two sent to the Juana Manso 555 building (Jorge Norberto Cerrota), with extortion and to summon them to give a statement as part of the investigation. Nevertheless, the work undertaken has allowed us to go far beyond these evidence-based assumptions, advancing thoroughly and completely to a confirmation of the facts and to the unequivocal identification of all those involved. In fact, we find ourselves in a position to request that the presiding Court order measures to preserve capital resources as well as the preventive measures necessary to interrupt the consummation of the criminal conduct investigated, and to prevent the use and laundering of the assets obtained by the perpetrators.

First of all, Federico Elaskar's entire account related to the origin and scope of his businesses is to a large extent corroborated by the evidence mentioned in the first sections of this opinion. We have proven that the company SGI existed and was constituted in the form and under the circumstances stated by him, including Elaskar's principal role, its successive legal domiciles, and the positive evolution of its line of business and assets from 2007 to 2011. We have added the publications and other company entries that reveal the creation of SGI's various forms, including the creation of foreign branches,[29] as recounted by Elaskar.

With regard to the crucial events spanning the end of 2010 to the end of 2011, several facts contained in interviews between Elaskar and reporters are consistent with everything set forth in the first section of this reasoned presentation of the evidence. We have already said that the confirmed spike in the firm's business and capital was evident at the beginning of 2011, a period that, according to Elaskar, marked the beginning of the relationship with Leonardo Fariña and the intense and frenetic activity aimed at receiving and securing abroad the millions that were handled on behalf of Lázaro Báez. Moreover, fully supporting the account Elaskar provided regarding these preliminary matters and despite the care he took to keep from naming the "son of a businessman" who acted as the link between Fariña and Lázaro Báez, we have managed to identify him beyond any doubt. This is none other than Matías Molinari, son of Carlos Molinari, a businessman who in several public appearances revealed former ties with those involved in these then-notorious episodes. His statements, as well as those previously made by Elaskar, which uphold them, are confirmed by the proven association between

---

[29] See regarding corporations formed in the USA by Elaskar and the foreign entities of SGI in the report on pages 1106-1122.

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

Matias Molinari and Federico Elaskar in one of SGI's American affiliates.[30]

There is still much more evidence related to these facts;[31] we have even uncovered a vast network of business and analogous maneuvers going back to the end of 2002, which have come into focus right before our eyes with every step taken to verify the events of late 2010. I will return to this when addressing the elements we found when we were finally able to prove the ties between SGI and Helvetic Services Group. Suffice it to say for the moment that there is an orderly and precise continuity over a decade in the way money was handled and in the creation, management and structuring of a monumental web of companies that practically circle the globe. And in these activities, we find two periods that are distinct but linked by common denominators that have remained unchanged. The first of these runs with absolute precision from a few days before the call for national elections in August 2002[32] until the end of 2010, after the death of former president Néstor Kirchner. The second period extends from then until today.

I repeat, this is an entire world of people and events that has been revealed to us, as our knowledge deepens regarding the individuals and companies involved in the underhanded acts and extortion to which this investigation is presently limited. Consequently, unless essential to proving the facts that concern us and that fall within the framework of this investigation, we have not exhaustively investigated the businesses and funds channeled through each of the more than two hundred links detected. The latter is a matter for the judges and public prosecutors of the court of exceptional jurisdiction who are investigating money laundering and corruption allegedly connected with those funds. Without a doubt our progress will be of use to them and we will send them a copy of all of these proceedings.

I return to the summary of the circumstances reflected in the statements made by Elaskar and their confirmation by the evidence that we produced and collected. I will not linger over the detail and scope of the activities performed through SGI in managing the business dealings of Lázaro Báez; as in the case of the "macro" structure underlying those matters and to which I referred in the above paragraphs, these are

---

[30] Page 1122.
[31] These are again related to Molinari and the common denominator of Helvetic Services Group, and especially with the Italian-Argentine Nestor Marcelo Ramos.
[32] See PEN [National Executive Branch] decrees numbered 1398 and 1399 of August 5, 2002.

facts which must be determined in federal courts. With our attention directed to the illegal management of SGI and the stripping of Federico Elaskar's assets, what fundamentally interests us here is confirming the existence of circumstances consistent with the money laundering alleged in the complaint, as part of the activity which we have undertaken to confirm the different periods reflected in the statements made by Federico Elaskar, which are highly incriminating in and of themselves. In that regard we have incorporated into the proceedings not only the statements in which Jorge Lanata attests to the account given in his presence by Leonardo Fariña,[33] but also other similarly relevant elements, such as the coincidence between Fariña and Elaskar's immigration records and the flights made by the Learjet with registration LV-ZSZ,[34] or the corporate records confirming the opening of an SGI affiliate in Panama and at least one account held in that jurisdiction, at the Venezuelan bank Banesco, in the name of the same company. In both cases we find the involvement of Fabián Virgilio Rossi, the subject noted in the aforementioned statements as the person responsible for managing these affairs in that country. No doubt many more aspects related to this matter, which is tangential to the facts we must address herein, will result from the certification of the proceedings being conducted in the federal courts; we have at all times sought to avoid overshadowing those efforts and will avoid doing so in the future.

Other evidence also deserving of mention confirms the statements made by Federico Elaskar with regard to the ties between Lázaro Báez and these events. Those elements include the conduct of Daniel Rodolfo Pérez Gadín, who identifies himself in his CV published on the Internet as an accountant for several companies belonging to the Lázaro Báez family,[35] as well as evidence of trips to Spain by Pérez Gadín together with one of the children of the businessman from Santa Cruz[36] and the purchase of land in the Republic of Uruguay through the offices of the aforesaid Pérez Gadín y Osvaldo Gutux, his partner in the company known as Organización de Asesoramiento y Consultoría Internacional S.A. (OACI) and financial manager of the firm Valle Mitre S.A., administrator of the hotels held by the Báez family.

Other items of interest can be found in the statements recorded on other episodes of the "Periodismo para todos" [television] program, describing very similar movements involving the occupation and appropriation of

---

[33] See pages 10-13 of the concurrent proceedings —copies of case number 17,133/20 3 [sic].
[34] See immigration information on pages 135-137 and flight records published in the media and included as a copy on page 2738.
[35] See copy of the CV on pages 338-339, showing the companies Austral Construcciones S.A., Epsur S.A., Grupo Valle Mitre, Hotel Alto Calafate as clients.
[36] See detail of Pérez Gadín's flight to Spain, accompanied by Martín Báez, published in the note attached to page 2908.

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

companies and businesses by Lázaro Báez and his followers, analogous to charges leveled by Federico Elaskar[37]. In any event, with regard to the link itself, that is, the actual relationship between Lázaro Báez individually and SGI, as separate from the details regarding the businesses attempted and consummated on that continent, there is more than enough evidence relevant to the events most closely tied to the extortion being investigated and to the possible fraudulent management of the interests of the company and of third parties. I will address this evidence below.

In summary, and as Federico Elaskar has stated, it is completely true that an individual named Rodolfo Pérez Gadín was involved in the management and the very omnipresence of SGI.  There are also numerous and consistent pieces of evidence, both direct and circumstantial, that confirm his relationship with Lázaro Báez. Early on, a quick search of the telephone book was sufficient to prove that two subscribers registered in the name of the *Organización de Asesoramiento* and *Consultoría Internacional* S.A. (OACI)[38] were located at Juana Manso No. 555, 7th floor, "C" and "B," SGI's domicile.  Based on that information, we turned to the investigations being conducted in the concurrent proceedings, where we had already discovered that Rodolfo Pérez Gadín registered bounced checks drawn on the account of said company. Finally, we included a copy of the Articles of Incorporation showing that Pérez Gadín is one of the partners of that firm, together with Oscar Osvaldo Gutux.[39]

Upon requesting more information from Telecom, not only was the information found in the telephone book confirmed, but the detail of a contact number for leasing the [telephone] lines was also added, which turned out to be a cell phone in the name of the company in question.[40] Another relevant item emerged from these records showing that the lines were leased on February 23, 2011. This coincides with the account given by Federico Elaskar when he cited three occasions involving intervention by Pérez Gadín and the others who accompanied him in arriving at SGI and subsequently appropriating it. The first of these coincides with the lease contract for [telephone] lines for the offices in sections "B" and "C" on the 7th floor of the building, and the reference made by Elaskar regarding the very early mandate given by Lázaro Báez to Pérez Gadín to control the way in which Leonardo Fariña used his funds in SGI. The second period was also identified by

---

[37] Statements by one of the Private Secretaries of Néstor Kirchner, Miriam Quiroga, and by Estela Kank, member of the families from whom the firm Kank and Costilla was seized (pages 2829).
[38] See reports on pages 426-427 and 379-384.
[39] See pages 713-726.
[40] See pages 541-548 and 2185-2193.

Elaskar himself and linked to the events of June/ July 2011 which we have seen reflected in the company records summarized in the first section. Apparently Leonardo Fariña's mismanagement [of funds], accompanied by his growing public exposure in the media, had reached such a level that the "arrival" became an "occupation." Here again the statements by Elaskar tie in perfectly with the objective evidence. In the interviews, he affirmed that in June of that year, Pérez Gadín informed [Elaskar] that he must allow SGI to be infiltrated by "auditors" who would review the fate of Lázaro Báez's funds. It was at this point that the initial period of general control by Pérez Gadín, with the acquiescence of Elaskar, became extortion pure and simple.

I will not repeat here the criminal threats and warnings recounted by Elaskar; those details were transcribed above in his statements. I will just point out the logical relationship between those statements and the evidence that we presented in the first section regarding the violent change in direction evidenced in the management of the company. In light of Elaskar's account, we understand and see the reason behind the fact that in less than one day, he went from submitting fiscal year 2010 reports for approval, an accounting period that ended during his chairmanship, to disappearing completely from the board of directors and reporting the sale of half of his shares under tenuous and murky circumstances. This second period provides another categorical confirmation of the Elaskar statement; I refer to the pair of auditors inserted by Pérez Gadín and who were barely mentioned as "Cerrota" and another individual whose name he did not remember. Those two are none other than Jorge Norberto Cerrota and Eduardo Guillermo Castro, whose appearance we saw earlier in the sudden minutes of the regular meeting held July 18, 2011 in which they were appointed, with no previous background or notice, as full members of the board of directors of SGI Argentina S.A.

In other words, as Elaskar said, from July forward not only had he been removed from his position in SGI, but he had also been forced to tolerate the intervention of the auditors sent by Pérez Gadín and Lázaro Báez in the company in which he still held a 47% share. This confirms the truth of the third period of iron-fisted management by Pérez Gadín, which Elaskar refers to as extending until the "audit" was concluded, and when he was forced, under threats against him and his family, to separate himself completely from the company because, among other reasons popular among mafia circles, by then "he knew too much."   To confirm this third and last period of the seizure, we have finally managed to unravel the details of the two occasions when Elaskar was stripped of his shares, an incident

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

that was found to be linked to other equally relevant and incriminating circumstances, as we will see below.

Those two occasions were verified and were consistent with the statement given by Elaskar: the first occurred in the midst of the frenetic company changes of June 16 through July 18, 2011, and the second on October 21, 2011, just a few hours before Federico Elaskar departed, only to return barely one year later. The initial sale or forced transfer of half of the shares, although neither published nor identified by instrument, and certainly not reported to the appropriate authorities,[41] was at least recorded in the bizarre July 4, 2011 board of directors meeting number 50, in the form of a terse note that Elaskar had effected the transfer on July 1, *which was that very same Friday.* This makes the evidence even more consistent with the victim's account and its particular emphasis [handwritten illegible mark] on the severe warning from Pérez Gadín. Remember that it was on a Friday that he was supposed to give in to the orders of Lázaro Báez or else [handwritten mark] suffer the inevitable consequences of his possible defiance the following Monday.

On this point, the evidence that we possessed with regard to the transfer of Elaskar's shares presented a logical flaw. His version of a complete divestiture was contradicted by the fact that corporate documents showed only the sale of half of the shares as of July 1. In fact, for this period the appearance of SERNORTE HOLDING S.A. as the alleged new shareholder contrasted with the account given by Federico Elaskar, who said that he had been forced to transfer his shares to a company owned by Lázaro Báez and known as HELVETIC SERVICES GROUP. It was when we attempted to untangle this knot that we finally found evidence of the transfer of all Elaskar's shares and his waiver of all his rights.

At the beginning, we requested all information on SER NORTE HOLDING S.A. from the Corporate Registry Office, with the hope of finding Helvetic Services Group as a shareholder. However, the Articles of Incorporation, included on pages 438-446, only confirmed involvement in the matter by Attorneys Jorge Oscar Chueco and Cristian Martín Deli Quadri, the only partners in that entity. We then requested that the notary public who had certified the document send all prior related documents, especially those in the

---

[41] At least nothing whatsoever appears to have been published in the Official Gazette regarding SGI since May 2011 – the summons to the thwarted or failed special meeting given June 15 –; I do not rule out the possibility that the SGI file may have been fattened and enriched during the full three months that it took the Corporate Registry Office to answer my request.

notary's record book, which contains notarizations of signatures on private documents. In this way we first identified a notarization of signatures dated October 21, 2011 on an agreement to transfer the shares of Ser Norte Holding S.A., and finally the shares held by said company in SGI Argentina S.A. The parties appearing therein include, in addition to Chueco and Del Quadri, obviously participating as partners in the transferee company, a man known as **_Néstor Marcelo Ramos,_** identified with Italian passport number B612924.

Based on this we proved that said Ramos was mentioned in the records consulted as a director of Helvetic Services Group,[42] precisely the company to whom Elaskar was allegedly forced to transfer his shares. Once that was accomplished, we searched for the history of a company by that name in Argentina, and this inquiry served as the starting point for the vast world of companies and businesses that we mentioned earlier, and whose relevance and implications for this investigation and those being pursued in other jurisdictions merit a brief mention in the following section.

4.  First I would note that in accordance with the fundamental role that Helvetic Services Group played in the matter of interest here, we set out to establish not merely precise data on its location and incorporation, but also the identity of its principals, shareholders or partners and, to the extent possible, its line of business; since it involves the use of the proceeds of the extortion being investigated, these must be the object of duly effective preventive measures and other interdictions provided by law.[43]

The first sign of the Helvetic Service Group that we found in the records of our country were in the following publication of the Official Gazette of the Republic of Argentina of December 11, 2007.

EYDEN GROUP LLC

SPV. Country of Origin: United States of America. Limited liability corporation. Legal representative according to minutes of 10/19/2006 Levita Edgardo Raúl. Domicile shown as Montes de Oca 1530 - Federal Capital. Parent company Helvetic Service Group S.A. Registered as No. 547 Book 58 Volume B of aliens holding 100% of the shares according to the minutes of 10/31/2007. Legal representative according to minutes of 2/20/2006 Horacio E. De Bonis. Domicile shown as Jose M. Moreno 1925 – Federal Capital.

Attorney - Horacio F. De Bonis

Legalization issued by: Public Bar Association of the Federal Capital. Date: 12/6/2007. Volume: 80. Page: 529.

issued 12/11/2007 N° 105,167 verified 12/11/2007

---

[42] See report on pages 757-784.
[43] Articles 23 and 29 of the Criminal Code, 518 of the CPP. [Code of Criminal Procedure] and PGN [Office of the Public Prosecutor] Resolution 129/2009.

National Public Prosecutor's Office   [stamp] [initials]        [stamp] [initials]

It is relevant to note, that this is first a statement of a business relationship, undoubtedly made with the thought of engaging in business or legal acts in Argentina, to be undertaken shortly after the publication in question.   Helvetic Service Group appears listed in the Corporate Registry Office (number 547, book 58, volume B of foreign corporations). According to the minutes of an entity whose nature is not stated, but presumably minutes of a shareholders meeting dated February 20, 2006, it is represented by *Horacio E. De Bonis*, domiciled at José María Moreno 1925 in the Federal Capital.   The same Horacio F. De Bonis, a lawyer, was responsible for this publication and its legalization by the Bar Association on December 6, 2007.   What was declared therein was 100% ownership by HSG of the shares of the "special purpose vehicle" named *EYDEN GROUP LLC*.   Also, according to this same publication, *Edgardo Raúl Levita*, domiciled at Montes de Oca 1530 in the Federal Capital, was named legal representative of the US corporation EYDEN GROUP LLC.

The second appearance in the official Gazette of "Helvetic Service Group" is dated January 21, 2008; it is complementary to the previous one.

EYDEN GROUP LLC

Complementary to the notice published 12/11/07.  Record 105,167.  Country of origin: United States.  According to the Corporate Charter, it was registered on 9/29/06 under N. E07377620060.  Resident representative MF Corporate Service (Nevada) Limited.  Physical domicile: 520 S. 7th. Street, Suite C, Las Vegas City, Nevada, Postal Code: 89101.  The company is managed by a director whose name is: Aldyne Ltd. Domicile: Suite 13, 1st floor, Oliaji Trade Francis Rachel St. Victoira City: Mahe-State: Seychelles.  Its purpose in Argentina will be undertaking investment activities in personal and real property pursuant to its corporate purpose. Sole member: HELVETIC SERVICE GROUP S.A., with 100% share ownership.  Legal representative Levita Edgardo Raúl. Special domicile and corporate headquarters: Av. Montes de Oca 1530 Federal Capital. Parent Corporation: HELVETIC SERVICE GROUP S.A., corporation under Swiss law domiciled at Via alla Sguancia 23, 6900 Pazzallo, Switzerland.  Founded 11/14/05 listed in the Swiss business registry at number CH 1430296615.  Total share value is set at 100,000 (one hundred thousand) Swiss Francs.  Pursuant to the act dated 11/08/06 the following are shareholders of the same: Marcelo Ramos, holding 33%, and Varena Fontana, with 67%.  Legal representative: Horacio F. De Bonis – lawyer.  Special domicile and corporate headquarters: Av. José M. Moreno 1925, Federal Capital. Horacio F. De Bonis. Legal registration issued by the Federal Capital Bar Association: 01-16-2008. Authorized by act of 2-20-2006.

Horacio De Bonis.

Legalization issued by the Federal Capital Bar Association. Date: 01/16/2008. Volume: 80. Page: 529. issued 01/21/2008 N. 73,997 verified 01/21/2008

In this second publication, quite probably intended to satisfy the requirements of the Corporate Registry Office regarding foreign companies, there appears further information regarding the registration of Eydeen Group (registered on – 9/29/06 with

N. 0737762006-0 in the State of Nevada, with resident agent there [source truncated] *MF Corporate Service Limited*, domiciled in Las Vegas, 520 S. [source truncated]th Street, Suite Postal Code: 89101), as well as information on a new corporation, in this case a "Holding Company," called *Aldyne Ltd*, domiciled in the well-known offshore tax haven of the Seychelles Islands, Suite 13, 1st floor, Oliaji Trade Francis Rachel St. Victoria.  Helvetic Service Group S.A. is again mentioned as the only partner, with 100% of Eydeen's shares (it does not say whether it is also the head of the Aldyne Ltd holding company), as well as its Swiss domicile at Sguancia 23, 6900 Pazzallo, and which was incorporated on November 14, 2005 with the Swiss registry number CH 143029661, with share value set at 100,000 Swiss Francs and its shareholders are *Marcelo Ramos*, with 33% of the capital, and *Verena Fontana*, with 67%.

The third and final official gazette publication linked to Helvetic Services Group is dated September 16, 2010, a date close to the business activities centered on SGI that were begun at the end of that year and the first half of 2011.  It reads:

> Notice: Helvetic Services Group S.A., incorporated November 14, 2005 and listed in the Swiss Commercial Registry, domiciled at Via Alla Sguancia 23, Pazzallo 6912, Lugano, Switzerland, whose headquarters in the Argentine Republic are at Conesa 1970, piso 14°, CABA [Autonomous City of Buenos Aires], pursuant to the Assembly resolution of February 19, 2010, has resolved to designate Mr. Javier Martín Vanella, DNI 31-449-618, of Argentine nationality, born March 8, 1985, unmarried, with a Bachelor's Degree in Business Administration, Master's in Finance, domiciled at calle Canesa 1970, piso 14°, in the Autonomous City of Buenos Aires, son of Carlos Javier Vanella and María Rosana Ramos, as the legal representative of the Corporation, pursuant to the terms of Art. 123 of Law 19,550, for an unlimited term.  At the same meeting, the resignation of Mr. Horacio Francisco de Bonis, DNI 10-137-303, was accepted and formally ratified.  Corporate headquarters and legal domicile in the Argentine Republic: Conesa 1970, piso 14°, Autonomous City of Buenos Aires.  Closing date of fiscal year: December 31 of each year.  Dr. Guillermo A. Federico Authorized by the Legal Representative by private instrument dated August 18, 2010.  Dr. Guillermo A. Federico, Authorized. Attorney "Guillermo A. Federico, Legalized by: Public Bar Association of the Federal Capital.  Date: 09/13/2010. Volume: 71. Page: 282 issued 09/16/2010 No. 107727/10 verified 09/16/2010."

First, a search for the corporate registries of Eyden Group LLC was begun, based on information from the three publications shown above.  It was established that, in addition to appearing registered in Argentina with the CUIT [Tax ID number] of 30-71080910-7, the address information in the State of Nevada, USA, appeared, along with information resulting

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

from other investigations, in the May 7 report.[44]   Once this was accomplished, in addition to confirming the role of the offshore firm Aldyne as administrator or "manager" of the firm Eyden Group LLC, the search of the official registry of the aforementioned North American jurisdiction enabled the identification of *another 148 companies created in the same place, each one with the same domicile and managed by the same corporation located in the Seychelles Islands* – one of the tax havens mentioned by Federico Elaskar in his statements.

Moreover, a review of the entire group of more than one hundred corporations revealed that the group began with the creation of the firm "Lake County LLC," whose founding act is dated July 30, 2002, just six days before the decrees were signed by which the Presidential primary and national elections were ordered held the following year.   On the other hand, the process of opening corporations was drastically interrupted on October 15, 2010, when a case file was opened on the company ANGRAIN LLC, one week before the death of the former President of the Nation, Néstor Kirchner.   There are virtually no signs of subsequent creation in any of the 148 companies, except for the isolated forming of the final corporation in this group, which occurred on February 15, 2011.[45]

Regarding the rest of the information in the official gazettes associated with Helvetic Services Group S.A., the search later began to focus on *Edgardo Raúl Levita*, who appears in the first publication as legal representative of Eyden Group LLC, domiciled at Montes de Oca 1530.   From there he was found to be a member of the board of directors of LUJAN VILLAGE S.A. (August 10, 2009), together with *Carlos Juan Molinari*, to whom we have referred above as a person linked publicly to Fariña and Federio Elaskar.   There are several publications in which the aforenamed Molinari, who appears as a businessman and vice-gubernatorial candidate on a ticket with the mayor of José C. Paz*, Mario Ichi, is interviewed and explains the link between his son *Matias Molinari* and Fariña and Elaskar.   He said he was, among other things, the person who paid for Fariña's highly visible wedding reception in the Palermo Racetrack.   In the December 1, 2005 official gazette, there appears another corporation comprised of which Levita and Molinari, called ADG, Administración, Desarrollo, y Gestión de Emprendimientos S.A.   [*Administration, Development and Management Ventures S.A.*]

---

[44] Pages 1106-1122.
[45] MC PIRDON INVESTMENTS FUND LTD.
*[Translator Note:  José C. Paz is a city, the capital of José Clemente Paz Partido, Buenos Aires Province, Argentina.]

ADG ADMINISTRACION, DESARROLLO Y GESTION DE EMPRENDIMIENTOS CORPORATION

1) Notarized document 11/09/05. 2) Carlos Juan Molinari, Argentine, 11/3/50, divorced, businessman, DNI 8-382-612, Av. Del Libertador 6746, p. 7 dto. A, Sector Libertador, Capital; Mario Daniel Gragllena, Argentine, divorced, businessman, DNI 8-489-881, Pte. Perón 476, p. 9 dto. B, Lomas de Zamora. Prov. of Bs. As.; and Héctor Guillermo Villar, Argentine, 12/8/45, divorced, Bachelors' degree in economics. ID 4-541-781, Elizalde 52, P.B, Avellaneda, Prov. of Bs. As. 3) ADG ADMINISTRACION, DESARROLLO Y GESTION DE EMPRENDIMIENTOS S.A. 4) Legal and special domicile on calle Sarmiento 539, Piso 3, Capital. 5) Duration 99 years. 6) The purpose of the corporation is to undertake, on its own behalf or that of others or associated with others, domestically or abroad, the following activities: Building Construction: the execution of projects, direction, management, consulting, and related to construction, for the purpose of undertaking public and private projects, property development, public works; architecture and/or engineering, infrastructure and urban equipment, sanitation, and environmental protection projects; include road, water, port, and electrical projects; the construction of neighborhoods, individual and collective housing, housing complexes, urban developments and the development of urban communities; surveys, division of lots and provision of services; public or private projects in general; purchase, sale, transfer, lease, sublease, division, recondition, construction, and development of urban and/or rural real estate; including all activities comprised within the Condominium Law. Commercial: Purchase, sale, distribution, import, export, the representation and distribution of all kinds of material for the construction industry. Industrial: Manufacture, fabrication, transformation and processing of metallurgical, wood, plastic, electric, and mechanical materials, and other products related to construction. For said purpose, any type of construction. For said purpose, the corporation has full legal authority to acquire rights, assume obligations, and undertake every type of activity related to its corporate purpose. Additionally, activities that require it shall be undertaken by professionals with appropriate valid credentials. 7) $25,000. 8) Board of Directors: 1 to 7. Duration: 3 terms. Chairman: Juan Carlos Molinari. Vice Chairman: Diego Molinari. Director: Mario or Daniel Gragitena. Director: Mario Edgardo Raúl Levita. Alternate Director: Juan Esteban Villar. Legal and special domicile calle Sarmiento 539, Piso 3, Capital. 9) No audit committee. 10) Chairman and Vice Chairman jointly. 11) December 31 of each year. Authorized by Notarized document No. 438 of 11/9/05 page 2192 record 1742.

Attorney – Carolina J. Vega

Notarized by: Alfredo M. Soares Gache. Record No. 1742. License: 3473. Date: 11/25/05. Minute No. 113. Book No: 31. No. 78,424.

This proven link between Levita and Molinari forms a sort of bridge between the labyrinth of corporations from the first period, from late 2002 until late 2010, characterized by the constant presence of Helvetic Services Group S.A. acting behind Aldyne LTD in creating more than one hundred Nevada corporations, and from then until the present, when Helvetic Services Group S.A. reappears only to absorb SGI and integrate the company, its directors or shareholders, comprising some fifty companies around the world.  In addition to the aforesaid regarding the link between Levita and Molinari, there is more regarding the aforementioned continuity between the two periods, that is, evidence in the first period of the utilization of a financial entity that fell into disgrace as a consequence of the investigation launched into the fraud connected with the "Sueños Compartidos" ["Shared Dreams"] housing program run by the Fundación Madres de Plaza de Mayo. This is the corporation called *MONETIZACIÓN S.A.* managed by **Fernando Caparros Goméz** and which, apparently, was dissolved after the raids ordered by the Federal Court involved in that case.  The information to which we refer in our reports indicates that Monetización's activities continued at another location under the name of a firm called LEBE S.A., belonging to Edgardo Raúl Levita.  It is worth adding that that corporation appears in the records of ANSES [the National Social Security Administration] as the employer of the aforementioned Fernando Caparros Gómez.

Returning to the evidence uncovered regarding the activities of Helvetic Group in the Argentine Republic, we find a third publication, related to the acquisition of a firm listed on the Stock Exchange.[46]

---

[46] http://www.mergersnews.com.ar/n34/fusiones.htm

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

> **05.09.08**: Supplementing the communication of the 6[th], **Continental Urbana SA Inversora** announces the acquisition of all of the shares owned by **Jorge Horacio Brito** and **Delfin Jorge Caballo**, who each owned 23.64% of the Corporation, on behalf of the following persons: **Isaac Salvador Kiperszmid**, 941,115 shares (14.94% the total capital); **DYPSA Desarrollos y Proyectos SA**, 606,630 shares (9.53%); **Pershing LLC**, 772,669 shares (11.55%); **Ernesto Gualterio Dolhare** 252,000 shares (4%); and on the MERVAL [exchange], 198,562 shares (3.15%).  The change in control resulted in a change in the Corporation's officers.  Source: Bs. As. Stock Exchange.

As a result of this information, we began a fruitful line of investigation that permitted us to obtain, for the first time, clear facts and authorized documents from Helvetic Services Group, S.A.; we even managed to identify the primary assets of the firm in the Argentine Republic.[47]   We successively communicated with the Stock Exchange; Continental Urbana S.A., the corporation whose assets were the subject of the operation; Caja de Valores [the Securities Depositary]; and the stockbrokers involved.  In summary, we managed to determine that Helvetic Services Group S.A. not only acquired the shares valued at 1,372,820 dollars, paid half each to **Jorge Horacio Brito** and **Delfín Jorge Caballo** by means of transfers made to accounts held in the names of the aforesaid at Standard Chartered Bank of New York,[48] but that it also acquired three units in the Renoir Towers of Puerto Madero, by means of nine transfers from a source until now identified only as payment orders from the "Federal Reserve Bank,"[49] into an account opened by **Isaac Salvador Kiperszmid (Dypsa Desarrollos y proyectos S.A.)** at the Offices of Banco Santander Central Hispano Internacional in Miami.[50]

In these operations between Buenos Aires and Switzerland, **Néstor Marcelo Ramos**, identifying himself with the same Italian passport with which we see him appearing in the aforementioned sale of SER NORTE S.A. and SGI ARGENTINA S.A. shares on October 21, 2011, participated on behalf of Helvetic Services Group, both personally and indirectly, although in the complete corporate documentation incorporated into the formalization of these transactions, he is named as having been born in the Republic of Argentina.[51]

---

[47] Reports from the Caja de Valores, Continental Urbana and Sociedad De Bolsa Amirante-Galitis, on pages 1304-1425, 1760-1963, 2183-2184B, 2251-2261, 3032-3036, 3037-3040.
[48] See page 1323.
[49] See pages 1931-1946.
[50] See page 1951.
[51] His DNI number is the one with which the National Immigration Office reports he registered at the time of his last exit from the Republic of Argentina on April 7, 2013, barely one week before the announcement of the first program of the current season of "Periodismo Para Todos."  A study of the records reveals that the individual spends a great deal of the year in our country or traveling between Argentina, Uruguay, Panama, and Peru, in addition to periodic returns to Europe.  Uruguay and Panama, as we have seen, are destinations closely related to the flow of funds and the creation of the companies that Elaskar mentioned in his statements, in which he is surely referring to Helvetic Services Group, and to the

Surely these facts will be of interest to the investigation open under federal jurisdiction; take note, among other circumstances, that the origin and the very fact of some of these transfers – such as those supposedly directed to Brito and Carballo – remain murky, in addition to the fact that the proven amounts never exceed one million dollars nor do the partial payments [exceed] one hundred thousand dollars.  Regarding the Continental Urbana shares, we were informed that Helvetic Services Group, still represented by the lawyer Horacio Debonis,[52] transferred them in 2009 to a phantom entity named HUSTON SLL, identified in the records of the Caja de Valores and the documents provided by the Sociedad de Bolsa Amirante-Galatis, brokerage, with a CUIT number of a natural person who, according to the remainder of the documents, was the representative of the shares' recipient; I am referring to Carlos Alberto Catania.

*Now, it is true that just like Eyden Group LLC, Huston Management LTD turned out to be another of the 148 corporations that we have identified as created between 2002 and 2010 in Nevada and run by Aldyne LTD of the Seychelles Islands, with the latter, in turn, controlled by Helvetic Services Group* which, once again, appears as the owner of 100% of the shares of the "special purpose vehicle."  In brief, the shares bought by Helvetic Services Group S.A. and transferred as a pure show to the corporation of which it was the sole shareholder, remained unchanged subsequent to the acts summarized above, and are in fact the only clearly identified asset of the corporation that benefitted from the extortion efforts.   For that reason, we request their immediate attachment.

The events described in the paragraph above are complemented by other transactions consistent with the laundering of the money that this group of 148 offshore companies may have received, the actual scope of which must concern the federal authorities.  To these I add the operations and records detected in our country in the case of the firms *Balmont Holding ltd,*[53] *Blue Dreams SRL*[54] and *Ground LLC,*[55] *Ingelec Group*

---

occupation of Néstor Marcelo Ramos, when he mentions Swiss consultants and the solid resources they possessed in that country, where most of the money was sent, in order to launder the bags of money received from Lázaro Báez.  See Immigration Report on page 3054-3064.

[52] He would be replaced in 2010, according to the third publication in the official gazette, by Martín Javier Vanella, nephew of Juan Carlos Ramos – see the reports sent by the National Register of Persons and the Argentine Federal Police on pages – [sic].

[53] Purchase of an enormous lot in Lomas de San Isidro Tomkinson 2175 in Beccar – see pages 1295-1296 – and information pending before Commercial Court 4, Secretariat number 7.

[54] Registered in Argentina and enrolled in AFIP, see pages 1290-1292.

[55] Registered in Argentina, see pages [sic].

National Public Prosecutor's Office   [stamp] [initials]            [stamp] [initials]

*LLc*,[56] *Coreley Properties NC*,[57] *Trenton Propierties [sic] LTD*,[58] and the revealing operation involving the sale of military replacement parts that the firm *Galway Scott Trading Ltd* undertook on November 8 and December 13, 2007, with the Navy of the Republic of Peru.[59]

Once it was confirmed that Helvetic Services Group had appeared as the nerve center of these activities, this very investigation moved on to the corporations created by that firm or the individuals linked to it during the second period of corporation-creating and money-moving. Thus, in addition to SGI Argentina, controlled together with its affiliates by Helvetic Services Group since July 2011, in a short period of time from late 2010 until mid-2011, we have ascertained the creation or takeover of 18 corporations located in England, eight in Ireland, nine in Spain, 10 in Switzerland, one in Luxembourg, two in Panama, three in Uruguay, and two in New Zealand.  According to the details specified in the reports on pages 2622-2652 and pages 3421-3426, Helvetic Services Group participated in the majority of these as the sole shareholder or administrator, while in some cases the directors included *Néstor Marcelo Ramos*, his nephew *Javier Martín Vanella* or, in a development unique to this second phase, *Daniel Rodolfo Pérez Gadín* himself, or his intimates such as Jorge Oscar Chueco and Osvaldo Gutux.

From these corporations of the second period, until today – and whose full elucidation will be the subject of money laundering investigations by the federal government – we have detected the return of activity in this area in the form of transfers in the name of the firm *Swiss Hotels Limited*,[60] located in England, and the firm *Nactus Investors S.A.*,[61] located in Luxembourg, both registered in the foreign corporation registry of the Province of Buenos Aires, in addition to the acquisition of extensive and costly farmland in the Republic of Uruguay with the participation of the firms *Traline Corporation S.A.* and *Jumey S.A.*,[62] located in said country, and the vast operations of buying and selling corporations, in which the firm *Vansomatic Suisse S.A.*,[63] located in Switzerland, has been involved.

---

[56] Pages 2622-2652.
[57] Registered in Argentina, see page 1289.
[58] Pages 2622-2652.
[59] Pages 2622-2652.
[60] Report on pages 3439-3443.
[61] Report on pages 3354-3383.
[62] Report on pages 2233-2243.
[63] Report on pages 3439-3443.



Leyden Group LLC...............Registered in Arg.
Huston Management LTD...Receives shares in
"Continental Urbana" (Brito and Carballo)
Fairmont Holding ltd...........Registered, buys real
estate in Lomas de San Isidro.
Blue Dreams SRL.................Registered in Arg.
Ground LLC........................Registered in Arg.
Engelec Group LLC .............Commercial activ. in
Argentina, Bolivia, Chile and Argentina
Coreley Properties INC........Registered in Arg.
Trenton Propierties [sic] LTD........... Purchases
shares of Grunbaun, Rico & Dacourt
Galway Scott Trading Ltd..... Sells spare parts to
the Peruvian Navy

Swiss Hotels Limited........Registered in Prov. Bs. As
Nactus Investors S.A.........Registered in Prov. Bs. As.
Traline Corporation S.A....Buys farmland in
Uruguay
Jumey S.A............................Participates with Traline
Corporation S.A.
Vansomatic Suisse S.A.......Sale of soccer passes in
Argentina, Peru, Uruguay and Switzerland

Inflows with records
and activities in
Argentina

Inflows with records
and activities in
Argentina

148 corporations in
Nevada USA

Corporations in Uruguay, Peru, USA, Panama,
England, New Zealand, Ireland, Spain, Switzerland,
and Luxembourg

ALDYNE LTD
(Seychelles Islands)

SGI Argentina S.A.

Néstor Marcelo Ramos
Javier Martín Vanella
Daniel Rodolfo Pérez Gadin
Oscar Osvaldo Gutux

HELVETIC S.G.
Néstor Marcelo Ramos
Edgardo Raúl Levita
Horacio De Bonis
Carlos Alberto Catania

HELVETIC S.G.

July 2002-October 2010.

Since late 2010

**5.** Having completed this digression in the investigation regarding the line of business of Helvetic Services Group and the persons linked to it while holding proceeds of the extortion suffered by Elaskar and the dismantling of SGI Argentina S.A., we can return to the second stage of the acts by which that individual was completely stripped of his shares and forced to relinquish his rights.

This is a complete description of the events of October 21, 2011, obtained using the new information provided by the notary's registry of the notary holding license 4827 of the Federal Capital.  It shows that on that day, not only were the signatures notarized, those ratifying the transfer of Ser Norte Holding S.A.'s shares to Néstor Marcelo Ramos, shareholder of Helvetic Services Group (pages 1708-1709), but so also were those of a

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

"Waiver" by Federio Elaskar[64] (1714-1715) and two share transfers from the latter to Eduardo Guillermo Castro (pages 1716-1717) and Néstor Marcelo Ramos (pages 1718-1719)[65].  Since then and independently of the shareholding entity that Castro the "auditor" appears to have obtained for himself, SGI, its affiliates and subsidiaries – among them, possibly several of the corporations created during the frenetic first half of 2011 – came to be managed by Helvetic Services Group and the enigmatic front man Néstor Marcelo Ramos.

Given the foregoing;

I ORDER:

I.  Send correspondence to the honorable prosecutor Guillermo Fernando Marijuán, the head of the 9th Criminal and Federal Corrections Prosecutor's Office, attached to a copy of the present opinion, and let him know that all work performed in this office is available to him for his consultation and use in the money laundering investigation that is being pursued under his leadership.

II.  Send this document to Magistrate's Court number 42, Secretariat 106, requesting that the Honorable presiding Judge of that Court:

1.  *Take statements* from *Lázaro Báez, Daniel Rodolfo Pérez Gadín, Jorge Norberto Cerrota, Eduardo Guillermo Castro, César Gustavo Fernández, Alejandro Ons Costa, Juan Ignacio Pisano Costa, Jorge Oscar Chueco, Cristian Martín Delli Quadri and Néstor Marcelo Ramos* regarding the extortion suffered by Federico Elaskar.

2.  *Order, for the purpose of seizing documents, files, and stored digital information* linked to Helvetic Services Group and its related companies, including its subsidiaries, such as Huston Management Ltd, Eyden Group LLC, and the remainder [of the companies] mentioned in this opinion and included in the case files, as well as the share transfer contracts of Ser Norte Holding S.A. and SGI Argentina S.A. and any of its affiliates and subsidiaries, such as SGI Bursatil Sociedad de Bolsa, Vanquish S.A., SGI Inversiones y Participaciones S.A., Latin Minds S.R.L. and ATC Argentina Trust Company S.A. Ser Norte Holding S.A., *searches of the following domiciles*: that of *Edgardo Raúl Levita*, Montes de Oca 1526/1530 and Pasaje Carabelas 281, piso 6to, Departamento "G", Federal Capital; *Horacio De Bonis*, José María Moreno 1919/1925, Federal Capital; *Carlos Alberto Catania*, Avenida Córdoba 996, piso 3ro F, Federal Capital; *Javier Martín Vanella*, Conesa 1970, piso 14, Federal Capital, and,

---

[64] Foreshadowing his impending uprooting, in all of the notarized signatures of October 21, Frederico Elaskar states as his domicile the law office of Jorge Oscar Chueco at Paraguay 1225, piso 11.

[65] It is worth pointing out that the notarizations of the signatures found in said notary's registry included in the case record, Pérez Gadín states SGI's domicile at Juan Manso 555, 7mo "B" as his own – pages 1742-1747.

by judicial request, Rondeau 471, piso 6to, Nueva Córdoba, City and Province of Córdoba; *Jorge Osear Chueca*, Paraguay 1255, piso 11, Federal Capital; *Lázaro Báez*, Pasaje Carabelas 241, piso 6to and, by judicial request, Villariño 126, town of Guer Aike, Río Gallegos, Santa Cruz Province; *Daniel Rodolfo Pérez Gadín*, Reconquista 715, 10mo C and Hortiguera 1480, Federal Capital; Jorge Norberto Cerrota, Country Maschwitz, ruta 9, kilómetro 44,5 fracción 1, lotes 46 y 47, Ingeniero Maschwitz, Buenos Aires Province; *Eduardo Guillermo Castro*, Avenida Montes de Oca 710, piso 11, departamento A; *Gustavo César Fernández*, Asunción 4645, Federal Capital; *Alejandro Ons Costa*, Arias 2539, Federal Capital; *Juan Ignacio Pisano Costa*,Vicente Lopez 1710 8vo A; and *Néstor Marcelo Ramos*, Sol de Mayo 350, piso 2do B, Torre A, Córdoba City.

3.   *Order the procurement of documentation* from AFIP[66] and the Corporate Registry Office using the order on page 38 and correspondence on pages 451, 452, 454, 538, 1168 and 1539, *requiring that the head of each organization submit said documents to the Court within 24 hours.*

4.   For the purpose of gathering further evidence regarding the relationships and commonality of efforts expended on the aforementioned events, obtain lists of incoming and outgoing calls for the period from the October 1, 2010 through October 31,2011, and from April 1, 2013 until the present, from the telephone lines installed in the offices of Juana Manso 555, 7th floor, offices A, B, C, and D in Puerto Madero, Federal Capital — 115775-0445, 115775-1119, 114312-7474, 114312-5050, 114312-7171, 114312-8700, 114312-8706, 114312-6604, 114312-8707, 114312-7070, 114312-5056, and 114312-5040, 114312-6600, 114312-6612, 114313-7966, 114313-1053, 114313-4096[67] — and cellular and landlines belonging to Federico Elaskar, 1526338244[68] and 1561310000[69]; Leonardo Fariña, 1136702190 and 0221154638921[70]; Daniel Rodolfo Pérez Gadín, 1563757272 and 1556205200[71]; Jorge Oscar Chueco, 1544043791 and 48166038[72]; César Gustavo Fernández, 1568356600[73]; and Néstor Marcelo Ramos,[74] 03516565355 and 41795072180-.

---

[66] On pages 1964-1968, the Afip Deputy Director for Institutional Technical Coordination, Guillermo Michel, evidenced clear defiance of the present administrator of Justice and the Prosecutor's Office's attempt to enforce the laws by refusing to answer questions asked of him and invoking the taxpayer's privilege, even though in this very case – and in every other one in which I can remember participating – it worked in the very opposite manner, in performing the search from page 8.

[67] Information from pages 379-384 and 541-547.

[68] See pages 3439-3443.

[69] See pages 625-627.

[70] See pages 3439-3443.

[71] Pages 541 verso through 542 verso – cellular contact number for Pérez Gadín's firm OACI, and 2027-2028.

[72] Page 2028.

[73] See pages 625-627.

[74] Pages 2019 and 2025 Provided by RENAPER and page 1960, cellular provided by Isaac Kiperszmid.

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

5. Order the attachment of Huston Managmet [sic] LTD's assets, 100% owned by Helvetic Services Group, deposited in the Caja de Valores individual account number 3075, depositor 132 Amirante-Galitis[75], for the purposes provided by Criminal Code articles 23 and 29 and article 518, paragraph 3 of the CPP [Code of Criminal Procedure].

6. For the same purposes, order a blanket freeze on all assets located in the Argentine Republic belonging to all the accused whose statements are to be taken, as well as those of SGI ARGENTINA S.A. and its subsidiaries and affiliates, and of all other identified companies involved in this matter and mentioned in this opinion as linked to the accused, namely: [illegible handwritten note in margin] (**INCOPORATED IN THE STATE OF NEVADA, UNITED STATES**) LAKE COUNTY LLC; ITELSA SERVICES LLC; GUDSON GROUP LLC; POLYCHEM GROUP LTD.; T.H.I.- TOWER HOUSE INTERNATIONAL LLC; M.P.I.- MAYWARD PROPERTIES INTERNATIONAL LLC; KUMAR HOLDINGS LLC; BUTLER TRADING LLC; MEDINVEST LLC; VILLETTE ASSOCIATES LLC; ACE STAR INTERNATIONAL LLC; BILLBROOK PROPERTIES LLC; ITELCO HOLDINGS LLC; OCEANIS GROUP LLC; VANEGGIA HOLDINGS LTD.; ESTRIVELA LLC; HALLKYN GROUP LLC; BALMAR DEVELOPMENT LLC; HEALY HOLDINGS LTD.; JUNIPER TRADING LTD.; NEXSA TRADING LTD.; HEMINGWAY INVESTMENTS LLC; OLDEMAR TRADING LLC; OLDEMAR TRADING LLC [sic]; INTEG SERVICES LLC; NEXTON INTERNATION.AL LLC; MOTIVA MEDIA LLC; COTIONEX LIMITED; JUNO GROUP LLC; BALMAIN TRADING LTD.; COMTECH INTERNATIONAL GROUP LLC; CONSOLIDATED CONSULTANTS GROUP LLC; BUXTON INVESTMENTS LLC; CALYPSSO GROUP LLC; LITTLE BAY LLC; CONCORD HILL LLC; ARISTON HOLDINGS LC; FINTECH HOLDINGS LLC; ETCO HOLDINGS LLC; BANFORD PROPERTIES LLC; ROYAL GAMES LLC; MOCHICA ENTERPRISES .LLC; FERRETTI CORPORATION LIMITED; GROUND LLC; OCEANDRIVE INVESTMENTS LLC; BEST WORLD SUPPLIES LTD; GD SOCCER MANAGEMENT LLC; ISER HOLDINGS LTD; JURDAN ENTERPRISES LTD; ARDEN GLOBAL LLC; ARISA BUSINESS LLC; JUSTIN INVEST LTD; PHILLIPS GROUP LLC; CARVELLE GROUP LLC; CITRONE OVERSEAS LLC; HAZE MANAGEMENT LLC; WOODSTAR SERVICES LLC; DILLAN ATLANTIC LLC; BRIGHT LIGHT GROUP LLC; ABILENE TRADE LLC; FALCONWOOD SERVICES LLC; PRIEMOR GROUP LLC; BIO HEALTH INTERNATIONAL INC LLC; WESTLEY HOUSE LLC; CAMBRIDGE HOUSE LLC; EXETER HOUSE LLC; REDFORD HOUSE LLC; SERENA TRADING LLC; ABEHART CONSULTANTS LLC; OVILLE GROUP LLC; EXTON INTERNATIONAL LLC; EVERINA HOLDINGS LTD; YALE HOLDINGS LTD; SUNGLOW INVESTMENT LLC; OVANO GROUP LLC; NEYMAR

---

[75] Reports from the Caja de Valores, Continental Urbana, and Sociedad de Bolsa Almirante-Galitis, on pages 1714-1963, 2183-2184B, 2251-2261, 3062-3066, 3067-3070,

INVESTMENTS LLC; LYNTON TRADING LTD; STEPNEY INTERNATIONAL LLC; ESTRIDGE OVERSEAS LC; COSMETECH LC; TRENTON PROPERTIES LTD; ARIUS INVEST LLC; AGROGLOBE EQUITY LLC; MULTINVEST LLC; GALDOR ENTERPRISES LLC; DILMOND ENTERPRISES LTD; BALMONT HOLDINGS LTD LACEWOOD INVESTMENTS LLC; LAMBERTI TRADING LLC; JET TRADE LTD; IVY LANE GROUP LLC; HUSTON MANAGEMENT LTD; FERREX DEVELOPMENT LLC; GREEN FIELD CONSULTANTS LLC; CORELEY PROPERTIES INC. LLC; ABBLE HOLDING LLC; PIXI INCORPORATED LLC; THE INGELEC GROUP LLC; HUTA HOLDINGS LLC; QUANTUM BAY LIMITED; EYDEN GROUP LLC; BUWAN MARKETING LTD; BUTIERFIELD CONSULTANTS LLC; ESSEX HOLDINGS GROUP LLC; GALWAY SCOTT TRADING LTD; ESTIVAL INTERNATIONAL LTD; IZALCO TRADING LLC; MAFINSA LLC; RAFINA TRADING LLC; INVESTMENT, SPORT & WEBS LLC; METAL FIRST LLC; GULF SUPPORT SERVICES LLC; MELCO MARITIME LLC; KORMAN INTERNATIONAL LLC; NORTEX TRADING LLC; SMART STEEL LLC; RELCOVE LIMITED LLC; EUROGRANIT LLC; RGS STEEL LLC; MURRIEL TRADING LLC; PERMANEL INVESTMENT LIMITED; PENNYROYAL ASSOCIATES LLC; GLADSTONE COSMETICS LLC; STEEL PRODUCT SERVICES LLC; BLUE DREAMS REAL ESTATE INVESTMENTS LTD; DYNAMIC FITINESS LLC; RYDER MANAGEMENT SERVICES LTD; TREVER WELDING INDUSTRY LLC; BINDER CHEMICALS LLC; AYCHI INTERTRADING LLC; AGROCOMTRA USA LLC; MEL SEA LLC; DOLFIN TRADING LLC; THUNDER OVERSEAS TRADING LLC; ALHAMBRA LLC; MERCURY CONSULTANTS LLC; AMERICAN TRADE & PACKING LTD; CAVALAGH COMMODITIES LLC; NET MARITIME LLC; EASTFER INTERNATIONAL LLC; ANGRAIN LLC; MC PIRDON INVESTMENTS FUND LTD; **(INCORPORATED IN THE STATE OF FLORIDA, UNITED STATES)** CONWAY GLOBAL LLC; DIVINA VOLUNTAD LLC; DUNAMIS UNA SOCIEDAD DE RESPONSABILIDAD LIMITADA; SGI FINANCIAL SERVICES LLC; SGI NORTE AMERICA LLC; SGI VENTURES LLC; **(INCORPORATED IN SPAIN)** WODSON INTERNATIONAL SL; SAMBERS HANTAREX SPAIN SL; ARSETEX PROMOCIONES SL; ADVANCE CHEMICAL SOLUTIONS SL; IPSEL INVEST SL (EX ADVANCE CHEMICAL SOLUTIONS); SERVEL TRADE SRL; MIRAVILIA INTERNACIONAL SL; FELSAN GLOBAL INVESMENT SL; TUSALETA SERVICIOS Y GESTIONES SL; **(INCORPORATED IN LUXEMBOURG)** NACTUS INVESTORS SA; **(INCORPORATED IN URUGAY)** TRALINE SA; DONYSTAR SA; JUMEY SA; **(INCORPORATED IN THE UNITED KINGDOM)** DERMAINE LIMITED; FEDAVIE LIMITED; NILESITE LIMITED; PARTLITE LIMITED; RESTRIM LIMITED; ROOKSTORE LIMITED; SARLEAF LIMITED; VENDERBROOK; BARGETIDE LIMITED; BLAKE & HAMILTON LIMITED; BARNES & MILES LIMITED; ABBLE HOLDINGS LIMITED; LORENTI CONSULTING LIMITED; GASTROAD LIMITED; POPLEY PHARMA LIMITED; MYERS TRADING LIMITED; SWISS HOTELS LTD;

National Public Prosecutor's Office   [stamp] [initials]          [stamp] [initials]

ASSURE INVESTMENTS LIMITED; **(INCORPORATED IN IRELAND)** BIODYNAMICS MEDICAL TRADING LIMITED; GAINSTIME LIMITED; DEMTREE LIMITED; CLYDESGATE LIMITED; CLARIGALL INVESTMENTS LIMITED; GRAFENO TECH TRADING LIMITED; DELL OFFICE LIMITED; ASSURE INVESTMENTS LIMITED; **(INCORPORATED IN NEW ZEALAND)** MAPLE VIEW LIMITED; SWISSER AG TRUSTEE NZ LIMITED; **(INCORPORATED IN SWITZERLAND)** COGEMAR INVESTMENTS PROJECTS SA; INMOBILIARE ALENIA AS; VANSOMATIC SUISSE AS; GRAFENO TECH SA; SWICCER AG; HELVETIC SERVICES GROUP SA; EN-SUISSE SA; BIODYNAMICS SA; FONDAZIONE FEDERICO ZICHY THYSSEN; VENTA SRL; **(INCORPORATED IN PANAMA)** SGI ARGENTINA SA; SOLUTIONS GROUP INVESMENT INC; SOLUTIONS GROUP MARKETING INC.

7.  Issue international judicial requests to countries and jurisdictions in which the foreign corporations mentioned in the previous paragraph are located, for the purpose of obtaining a complete list of their shareholders, bank accounts, and assets held.

8.  In the case of Helvetic Services Group, extend the request to include a request to the judicial authorities of Switzerland to freeze its assets.

9.  In the case of SGI Argentina S.A. and its subsidiaries and affiliates, the Court should appoint an auditor in order to put an end to the effects of the crimes investigated and to safeguard the corporation's assets.

10. In response to the requests presented here, *revoke* the status of SGI Argentina S.A. as complainant in the *querella* represented by the lawyer Federico Pinto.

11. As the provisions of articles 41 and 42 of the CPP are applicable, and as there are mutually exclusive accounts of the same facts set forth herein – in connection with the same crisis and a single corporate conflict – which all must be studied and resolved as one and the same action, send correspondence to Magistrate's Court 19 requesting that its presiding Judge *quash case number 44892/2011*[76], opened by a complaint against Federico Elaskar for coercive threats.

12. For the same reasons set forth in the preceding paragraph, *add to this case file all complaints filed* by Lázaro Báez in this jurisdiction against Federico Elaskar and Leonardo Fariña, pending notarization.[77]

13. *Broad certification* of any relevant records of proceedings ongoing before Federal Court 7

---

[76] Certification on pages 625-627.
[77] It is unclear, from the information made known by journalists, whether the complaints were lodged in Correctional Courts 12 and 14 or in Magistrates' Courts 12 and 14 – page 2835.

regarding the crime of money laundering – and especially, of documents seized in searches that have become public knowledge.

14. For the purpose of completing the information held on the status of SGI Argentina S.A.'s assets, and those of its subsidiaries and affiliates, from the time it began activities until the moment Federico Elaskar was disempowered, and from that point until now, and also to identify the third parties whose assets may have been caught up in the firm's activities and may have, as a result, suffered damages due to the appropriations undertaken by the accused, authorize the Prosecutor's Office to request from the Post Office and any other business authorized to send letters, documents, or collated telegrams *any documentation regarding any exchange of correspondence of said type that may have come from or been addressed to the premises at Juana Manso 555, 7th floor, offices A, B, C, and D.*

15. Order the seizure of the files of Notary Public Martín Diego Gutman containing the original December 11, 2007, mortgage for 265,000 dollars for the purchase price of an apartment and garage in the building at Juan Manso 1490, known as "Hotel Faena," document number 638. Following this, order a forensic examination intended to verify the writing that is clearly visible beneath the erasures on the document.

III. Take heed and, with a copy of this opinion, undertake all actions that are appropriate in order to execute its provisions.

Before me: [signed and stamped Jose Maria Campagnoli, Prosecutor, and Ignacio Rodriguez Varela, Secretary]

Carried out on the very same date. I ATTEST.
[Illegible signature, illegible stamp]

[Illegible stamp]



September 11, 2014

I hereby certify that I am a professional translator, that I abide by the Code of Ethics and Professional Practice of the *American Translators Association*, that I am fluent in Spanish and English, that I have employed a team of professional translators, and that we have translated, to the best of our knowledge, the attached document entitled

**Campagnoli Opinion**

From Spanish into English

Signed,

Cathleen Waters

Founder, New World Medium

Translator of French, Spanish, Italian, Portuguese and English

American Translator's Association Membership no. 257918

*Ministerio Público Fiscal de la Nación*

José María Campagnoli
FISCAL

IGNACIO RODRIGUEZ VARELA
SECRETARIO

Buenos Aires, 22 de mayo de 2013.

Ténganse presentes los informes que anteceden y acumúlense las actuaciones labradas con la intervención de la Secretaría de Investigaciones Penales a la presente causa.

## ANTECEDENTES Y RESUMEN DE ESTE DICTAMEN:

En la causa, y a través de sus representantes, una Sociedad Anónima denominada S.G.I, denunció haber sido intimada por la A.F.I.P para justificar una operación de mutuo con garantía hipotecaria que no se encontraba registrada en sus libros

Sin embargo, en su propia denuncia, la firma damnificada reconoció que Federico Elaskar, la persona que representaba en el documento a S.G.I, estaba efectivamente vinculado a la sociedad desde sus orígenes, e incluso la presidía al tiempo de su supuesta desvinculación[1] en julio de 2011.

El agravio traído a este fuero criminal a fines del año pasado, parecía dirigirse a una posible administración fraudulenta de S.G.I (art. 173, inciso 7mo del Código Penal), supuesto éste en el que encuentran modelo legal tanto las maniobras por las que se desvían o sustraen bienes de la víctima como los actos igualmente infieles que la obligan abusivamente, o bien comprometen, ocultan o falsean su patrimonio y la realidad de sus negocios. Es decir que, aunque los fondos no integraran el giro de la sociedad, la simulación resultante habría implicado de todas maneras un perjuicio de valor igual o superior al del monto de la operación desconocida, tal como lo ha explicado en su declaración testimonial el inspector de la A.F.I.P encargado de la investigación preliminar[2].

Ahora bien, desde su primera presentación, la propia querella dejó entrever que los hechos relevantes no se limitaban al aislado episodio de la hipoteca fantasma de diciembre de 2007. Así como advirtieron sus apoderados sobre la posible existencia de otros actos fraudulentos,

---

[1] Tanto en el escrito inicial de denuncia, firmado por Gustavo Fernandez como presidente de SGI Argentina (fojas 3 vuelta del principal) como en el posterior por el que se constituyó a la sociedad en parte querellante a través del apoderado Federico Pinto, fojas 31 del principal, se afirma que Federico Elaskar se desprendió de todas sus acciones el 18 de julio de 2011 cuando, como hemos de ver y surge del documento mismo invocado en respaldo de tal circunstancia –Asamblea general ordinaria de ese día, obrante en el anexo IV de documentación de la causa y a fojas 282/283–, *se trata de una falsedad*. En el acto en cuestión, nada se dice de las acciones –se limita a documentar el desplazamiento de Elaskar de la presidencia–, cuestión esta abordada en la reunión de directorio número 50, del 4 de julio de 2011, donde no se documenta o informa la venta del total de las acciones que detentaba sino de la mitad, 2350 acciones nominativas no endosables que aparecen desde entonces en cabeza de SERNORTE HOLDING S.A. Esta firma, veremos que fantasmal porque oculta la intervención de una tercera, aparece en el registro de acciones de la asamblea ordinaria del 18 de julio, transcripto por el escribano Scian a fojas 228 –en la copia de la asamblea a fojas 282/283 no se agregó el registro de acciones–, representada por Jorge Chueco, DNI 10.112.391, con el mismo domicilio que su representada en Paraguay 1225, piso 11 Ciudad de Buenos Aires.

[2] Inspector Fernando Gabriel Salas, fojas 432/433.

también se ocuparon de informar sobre un grave conflicto subyacente, que incluía reproches penales contra Federico Elaskar por amenazas formuladas contra los actuales directivos de la sociedad[3].

Por otra parte, y en segundo complemento de esta visión más amplia y completa de lo ocurrido, a poco de iniciarse las primeras averiguaciones se tomó conocimiento de las acusaciones cruzadas que Elaskar dirigió a sus antiguos socios y colegas en el comando de S.G.I. En este caso, se trató de una denuncia pública realizada en el programa de televisión "Periodismo para todos", emitido el pasado 14 de abril por Canal 13. Allí se dio cuenta del modo extorsivo por el cual Federico Elaskar fue despojado de sus acciones y obligado a abandonar sus cargos ejecutivos en la sociedad, así como del posterior vaciamiento de la empresa.

Como consecuencia del conocimiento integral del asunto, debe decirse en primer lugar que los tramos develados cobraron evidente significación jurídica, sea por derivarse de ellos una mayor extensión y nuevas circunstancias en torno a la posible administración fraudulenta de la sociedad anónima, como por la verificación de la figura de extorsión del artículo 168 del Código Penal. Por otra parte, y esto es lo más importante, se hizo patente su íntima vinculación y la obligación de investigar los hechos en conjunto, sin limitar la pesquisa al episodio aislado de la escritura cuya copia luce a fojas 10/24.

En definitiva, como la misma querella lo ha señalado, el manejo arbitrario que Elaskar pudiera haber hecho de los bienes y el giro de S.G.I, reconoce como antecedente y secuencia indivisible, la constitución misma de la sociedad en cuestión y los actos realizados en derredor de su gestión desde entonces hasta el presente; incluyendo los eventuales reproches a formular contra los que se apropiaron de la sociedad.

Con esta visión integral es que hemos avanzado en la primera parte de nuestra pesquisa y, con el mismo alcance, hemos de realizar a la Señora Juez interviniente los requerimientos necesarios *para la provisión de medidas de prueba exclusivas de la jurisdicción y el estudio y resolución de los primeros reproches por el delito de extorsión*. Quedarán, obviamente, *fuera de nuestra pretensión, las conductas abarcadas por los delitos de competencia federal, como los cohechos y demás actos infieles que podrían involucrar autoridades nacionales y el posible lavado de activos*. Ello sin perjuicio de la utilidad que pudiera tener para esas investigaciones, la

---

[3] Causa radicada en el Juzgado de Instrucción número 19, citada en los dos escritos de la querella a fojas 1/3 y 27/29. Registrada con el número 44982/2011, fue solicitada al Tribunal en cuestión mediante oficio del 4 de febrero, reiterado el 16 de abril. Luego de esto se requirió la respuesta por conducto telefónico hasta que el titular del Juzgado hizo saber que no habría de acceder a la remisión del expediente ni a extraer fotocopias, por lo que la certificación se hizo en la sede del tribunal (ver notas de fojas 550 y 625/627).

*Ministerio Público Fiscal de la Nación*
José María Campagnoli
FISCAL

IGNACIO RODRIGUEZ VARELA
SECRETARIO

prueba que hemos producido en orden a la individualización de todos los implicados y la determinación del alcance de los fraudes y la extorsión que nos ocupa. De ahí que hemos de enviar *testimonios de todo lo actuado al Fiscal que interviene en la causa en trámite ante el fuero de excepción[4]*.

En suma, con el sostén de pruebas que hemos de reseñar y los motivos que habré de exponer en el próximo apartado, independientemente de las pruebas pendientes en relación a la administración fraudulenta de la sociedad y la posible afectación de bienes e intereses de terceros[5], *en este dictamen acusaremos a los que en el año 2011 despojaron bajo amenaza a Federico Elaskar de sus acciones en la compañía, obligándolo además a abandonar los cargos directivos que en ella ejercía, tramo éste que hemos de considerar extendido a las violencias ejercidas contra el nombrado para forzarlo a retractarse de la denuncia pública realizada el pasado 14 de abril.*

### PRUEBAS Y FUNDAMENTOS DE LA ACUSACIÓN.

**1.** En esta causa, S.G.I interpuso su denuncia el 27 de septiembre de 2012, representada por Gustavo Fernández; el 14 de noviembre de 2012, se constituyó en parte querellante. Allí se señaló, en resumidas cuentas, que la AFIP había intimado a la sociedad a justificar una operación de mutuo hipotecario. Que, practicadas las primeras averiguaciones, tomaron conocimiento que se trataba de una hipoteca del 11 de diciembre de 2007 por 265.000 dólares, celebrada por el saldo del precio de la compraventa de un departamento y cochera[6] del edificio de la calle Juan Manso 1490, conocido como "Hotel Faena". En el documento en cuestión -labrado por el Escribano Martín D. Gutman- intervino en representación de SGI Federico Elaskar[7] —cuyo nombre y demás datos personales se advierten insertados sobre un raspado que, aunque salvado por el notario, ha *De* motivar la solicitud de secuestro del protocolo original-, quien invocó su carácter de presidente de la sociedad, señalándose en prueba de su personería el estatuto social del 10 de enero de 2007 y actas de asamblea y directorio del 15 de junio de 2007 de elección y distribución de cargos —antecedentes estos insertados en el acta por interlineado-.

Como obligado aparece Fernando Jack Janin, declarado comprador de la citada unidad funcional por venta realizada según escritura de ese

---

[4] Como informa la AFIP en su respuesta de fojas 164/168 —sobre la que me he de pronunciar al final del dictamen ya que implica un liso y llano alzamiento a la administración de justicia, análogo al de la Inspección General de Justicia-, causas números 3017, 3021, 3101 y 3024 del Juzgado Criminal y Correccional Federal número 7.

[5] Ver punto 14 de la parte dispositiva.

[6] Unidad Funcional 198 del 6to piso "destinada a vivienda" y la unidad funcional 109 del 1er subsuelo, destinada a chochera.

[7] Aporta domicilio en Azucena Villaflor 350 —sin más datos- de la Ciudad de Buenos Aires.

mismo día por el propietario que se individualiza como "Equity Trust Company (Argentina S.A)". En la hipoteca se otorga poder especial a favor de Gustavo Damián Faena, DNI 20.493.082 para que en nombre y representación de SGI perciba· total o parcialmente los intereses y· el capital y otorgue los documentos de cancelación.

Habiendo los directivos de SGI comparecido al organismo administrador y obtenido copia de la escritura, tal como informaron en el descargo agregado en el anexo II de la documentación[8], no hallaron correspondencia alguna con los libros y balances de la sociedad. Postularon, en consecuencia, su ajenidad en relación a la operación, aventurando la posibilidad de que Elaskar hubiese defraudado a la sociedad o bien hubiese invocado tal personería en un negocio o asunto privado, por razones que la querella dice desconocer. Dejó abierta el representante la posibilidad de que existieran hechos semejantes[9].

En relación al vínculo de Elaskar con SGI, en los escritos de fojas 1/3 y 27/29 del principal, Cesar Gustavo Fernandez y el apoderado Federico Pinto, se limitaron a señalar que aquél *"renunció a la presidencia de la sociedad el día 18 de julio de 2011 y se desprendió de las acciones que hasta entonces titularizaba"*. Sin embargo, ninguna precisión aportaron al respecto, ni mencionaron siquiera la medular relación del imputado con la sociedad y la evidencia de una drástica modificación del directorio y del paquete accionario a mediados de 2011, más de un año antes de la promoción de la querella. Sí, en cambio, informaron los representantes sobre la radicación de una denuncia contra Federico Elaskar en el Juzgado de Instrucción número 19 por el delito de amenazas, sumario este que traen a cuento como prueba de que "existieron diversos inconvenientes luego de que Elaskar se alejara de la empresa".

Ahora bien, esta escueta referencia a los antecedentes del asunto, como el desenvolvimiento de la sociedad hasta fines del año pasado, el rol cumplido por Elaskar y demás elementos necesarios para conocer lo ocurrido con todas sus circunstancias relevantes, en buena medida pudo ser complementada con la documentación· acompañada por la querella, aunque lo fuera al sólo efecto de acreditar personería. Es así que del anexo 1 surge que la sociedad en cuestión se constituyó como "S.G.I Argentina

---

[8] Copia a fojas 260/261, interviene allí Alejandro Ons Costa, otro de los supervivientes, junto a Gustavo César Fernandez, del directorio que integraba Federico Elaskar.

[9] Fojas 7 del principal, declaración del 24 de octubre de 2012 de César Gustavo Fernández. Veremos más adelante que, apenas tres días antes, Elaskar había regresado a la Argentina luego de una larga ausencia de un año. Había despegado de Ezeiza el domingo 23 de octubre de 2011 (información de Migraciones, a fojas 89 del legajo que corre por cuerda –copia del expediente 17133/2013 "promoción de oficio"-) a las 21:50 horas, a poco más de 24 horas de ser obligado a ceder sus acciones y renunciar a sus derechos en la cadena de documentos privados que conducen a Helvetic Services Group y cuya firma el escribano Diego Asenjo certificó en un trajinado viernes 21 de octubre (fojas 628/635 y 1708/1719).

S.A" el 10 de enero de 2007 por escritura pasada ante la escribana Andrea N. Molczaj. La integraron en un principio Alejandro Héctor Veloso, DNI 23.463.947, domiciliado en Directorio 86, Planta Baja, departamento C, y Diego Algerto Güerri, DNI 20.619.328, domiciliado en la Avenida Santa Fe 1675. El objeto social fue fijado en actividades financieras, con amplia descripción y exclusión de las comprendidas en la ley de entidades específicas del ramo. El capital social fue fijado en 50.000 pesos, representado por 50 acciones ordinarias nominativas no endosables, de valor nominal de mil pesos cada una y con derecho a un voto por acción. Prescindió la sociedad de la sindicatura y los asociados suscribieron el total del capital en el acto mismo de la constitución, haciéndolo Güerri por 40 acciones (el 80%) y Veloso por 10 (el 20%); integraron el 25% del monto, estableciendo que se completaría el capital de acuerdo a los plazos legales, recibiendo quien asumió como Presidente del Directorio, Diego Alberto Güerri, los 25.000 pesos resultantes, al tiempo que Alejandro Héctor Veloso asumió como Director suplente. El domicilio social fue establecido en Azucena Villaflor 350 100 "A" –textual- de Capital Federal[10].

Debe hacerse aquí un paréntesis. Es para señalar que no se contaba por entonces en la causa con copias de las escrituras, actas y asambleas de S.G.I Argentina S.A para el período que corre desde el contrato constitutivo del 10 de enero de 2007 –aportado por la querella-, hasta el siguiente documento obrante en la documentación anexa, me refiero a las escrituras y actas que documentan hechos ocurridos entre mayo y julio de 2011, a los que me he de referir más adelante. Esta falencia intentó ser remediada con los reiterados requerimientos realizados a la Inspección General de Justicia desde la cédula librada el 18 de abril de este año. Hasta la fecha, el citado organismo no ha contestado ni otorgado razón ni explicación de su demora[11]. Veremos que ha ocurrido otro tanto con la A.F.I.P y con la Dirección Nacional de Migraciones[12], con el agravante en el caso de esta última de la súbita y sorpresiva desconexión de su servicio directo de consulta desde el sistema informático del Ministerio Público Fiscal de la Nación (FiscalNet).

Sin perjuicio de ello, este vacío pudo ser en un principio parcialmente despejado con algunas contingencias halladas en el boletín oficial de la República Argentina que, como hemos de ver, incluyen las últimas noticias públicas sobre modificaciones en el capital y la tenencia accionaria de S.G.I. Las transcribo a continuación:

---

[10] En otra de las varias inconsistencias de César Gustavo Fernandez, sucesor de Elaskar en la presidencia de SGI, señala al nombrado en su testimonio de fojas 7 como fundador de la compañía, cuando no es ni siquiera mencionado en el contrato constitutivo.

[11] Ver oficios de fojas 38 y los oficios de fojas 493, 494, 496, 538, 1168 y 1539,

[12] Esta última contestó finalmente a fojas 3041/3065.

Fecha:10/07/2007
SGI ARGENTINA SA Por Asamblea Ordinaria del 15/6/07 se aceptaron las renuncias de DIEGO ALBERTO GUERRI y ALEJANDRO HECTOR VELOSO a los cargos de Director Titular y Director Suplente respectivamente, eligiéndose en reemplazo Director Titular a FEDERICO ELASKAR y Director Suplente a Diego Alberto Guerri Todos con domicilio especial en Azucena Villaflor 350 100 OF. A, Cap. Fed. Director Titular electo en Asamblea Ordinaria del 15-6-07.- Director Titular (Presidente) – Federico Elaskar Certificación emitida por: Andrea N. Molozaj. N° Registro: 88. N° Matrícula: 4779. Fecha: 28/6/ 2007. N° Acta: 152. Libro    N°:    10.    e.    10/07/2007    N°    6836    v.    10/07/2007
Fuente: Boletín Oficial de la República Argentina – Nro: 31192 del 10/07/07

Fecha: 15/7/2009
S.G.I. ARGENTINA S.A. CONVOCATORIA Convócase a Asamblea Gral Ordinaria de accionistas de S.G.I. Argentina S.A. para el día 7 de agosto de 2009, a las 18:30 hs., en primera convocatoria y 19:30 hs. en segunda convocatoria, ambas a celebrarse en la sede social sita en Azucena Villaflor 350, piso 1° Oficina "100-A" de la Ciudad de Buenos Aires, con el siguiente: ORDEN DEL DIA: 1°) Razones que motivan la Convocatoria de la Asamblea General Ordinaria fuera de término. 2°) Consideración de la documentación requerida por el art. 234, inciso 1° de la Ley 19.550, correspondiente al Ejercicio Económico finalizado el 31 de diciembre de 2008. 3°) Consideración de la gestión del Directorio durante el ejercicio finalizado el 31 de diciembre de 2008. Remuneración al Directorio. 4°) Fijación del número de Directores. Designación de nuevo Directorio. 5°) Destino del resultado del Ejercicio Económico finalizado el 31 de diciembre de 2008. Federico Elaskar designado Presidente de S.G.I. Argentina S.A. por Acta de Asamblea número 5 del 17/07/2008. Presidente " Federico Elaskar Certificación emitida por: David Scian. N° Registro: 1674. N° Matrícula: 4096. Fecha: 7/7/2009. N° Acta: 21. N° Libro: 083. e. 15/07/2009 N° 58620/09 v. 21/07/2009

Fecha 20/7/2009
S.G.I. ARGENTINA S.A. CONVOCATORIA Convócase a Asamblea Gral Ordinaria de accionistas de S.G.I. Argentina S.A. para el día 7 de agosto de 2009, a las 18:30 hs., en primera convocatoria y 19:30 hs. en segunda convocatoria, ambas a celebrarse en la sede social sita en Azucena Villaflor 350, piso 1° Oficina "100-A" de la Ciudad de Buenos Aires, con el siguiente: ORDEN DEL DIA: 1°) Razones que motivan la Convocatoria de la Asamblea General Ordinaria fuera de término. 2°) Consideración de la documentación requerida por el art. 234, inciso 1° de la Ley 19.550, correspondiente al Ejercicio Económico finalizado el 31 de diciembre de 2008. 3°) Consideración de la gestión del Directorio durante el ejercicio finalizado el 31 de diciembre de 2008. Remuneración al Directorio. 4°) Fijación del número de Directores. Designación de nuevo Directorio. 5°) Destino del resultado del Ejercicio Económico finalizado el 31 de diciembre  de 2008. Federico Elaskar designado Presidente de S.G.I. Argentina S.A. por Acta de Asamblea número 5 del 17/07/2008. Presidente " Federico Elaskar Certificación emitida por: David Scian. N° Registro: 1674. N° Matrícula: 4096. Fecha: 7/7/2009. N° Acta: 21. N° Libro: 083. e. 15/07/2009 N° 58620/09 v. 21/07/2009

Fecha 14/7/2010
18 S.G.I. ARGENTINA S.A. *Comunica* que por Acta de Directorio del 07.04.10 se resolvió trasladar la sede social de *S.G.I. Argentina S.A.* de la calle Azucena Villaflor 350, piso 1° departamento "100 A" C.A.B.A a la calle Juana Manso 555, piso 7°, oficina "C" C.A.B.A. Federico Elaskar designado presidente de *S.G.I. Argentina S.A.* por acta de Asamblea Nro. 7 del 07.08.09 Presidente " Federico Elaskar Certificación emitida por: David Scian. N° Registro: 1674. N° Matrícula: 4098. Fecha: 1/7/2010. N° Acta: 040. Libro N°: 087. e. 14/07/2010 N° 77962/10 v. 14/07/2010

Fecha 7/1/2011
S.G.I. Argentina S.a. Comunica que por Acta de Asamblea del 19.11.10 se resolvió aumentar el Capital Social de la Sociedad en la suma de $ 2.000.000, llevando el mismo a la suma de $ 5.000.000, emitiéndose 2.000 acciones ordinarias nominativas no endosables, de valor nominal $ 1.000 cada una y con derecho a 1 voto por acción. Alejandro Ons Costa designado vicepresidente de *S.G.I. Argentina S.A.* por acta de Asamblea Nro. 7 del 07.08.09, en ejercicio de la presidencia por acta de Directorio Nro. 34 del 05.11.10. Vicepresidente en ejercicio de la presidencia Alejandro Ons Costa Certificación emitida por: David Scian. N°

JOSE _____
FISCAL

MARTIN RODRIGUEZ VARELA
SECRETARIO

Registro: 1674. N° Matrícula: 4098. Fecha: 3/1/2011. N° Acta: 144. N° Libro: 089. e. 07/01/2011 N° 1817/11 v. 07/01/2011

Fecha 1/6/2011
S.G.I. ARGENTINA S.A. CONVOCATORIA Convoca a los señores accionistas a Asamblea General Ordinaria a celebrarse el día 15 de junio de 2011 a las 12:00 horas en primera convocatoria y a las 13:00 horas en segunda convocatoria en la sede social sita en la calle Juana Manso 555, piso 7, oficina "C", Capital Federal, a los efectos de considerar el siguiente: ORDEN DEL DIA: 1°) Designación de dos accionistas para suscribir el acta. 2°) Causales de la convocatoria y celebración de la asamblea fuera del término establecido en el Art. 234, último párrafo de la Ley 19.550. 3°) Consideración del Balance General y demás documentación contable complementaria prevista en el Art. 234 Inc. 1) de la Ley 19.550 correspondiente al ejercicio finalizado el 31 de diciembre de 2010. 4°) Consideración del resultado del ejercicio económico finalizado el 31 de diciembre de 2010 y su destino. 5°) Consideración de la gestión del Directorio por el ejercicio finalizado el 31 de diciembre de 2010. 6°) Consideración de la Remuneración del Directorio. NOTA: Se recuerda a los Sres. accionistas que para asistir a la Asamblea deberán, cursar comunicación de asistencia en la sede social sita en la calle Juana Manso 555, piso 7, oficina "C", Capital Federal, para su registro en el Libro de Depósito de Acciones y Registro de Asistencia a Asambleas, con no menos de (3) días de anticipación a la fecha fijada para la Asamblea. La atención se realizará de lunes a viernes en el horario de 12:00 a 14:00 horas, en la sede social sita en la calle Juana Manso 555, piso 7, oficina "C", Capital Federal. Fdo: Federico Elaskar - Presidente designado por Acta de Asamblea N° 7 de fecha 7 de agosto de 2009 y Acta de Directorio N° 28 de fecha 3 de julio de 2009. Presidente - Federico Elaskar Certificación emitida por: David Solari. N° Registro: 1674. N° Matrícula: 4096. Fecha: 20/05/2011. N° Acta: 117. N° Libro: 091. e. 27/05/2011 N° 61713/11 v. 02/06/2011

De esta seguidilla de publicaciones derivamos, en primer lugar, que a los pocos meses de la constitución de la sociedad, en junio de 2007, renunciaron el presidente y el director suplente de la sociedad, asumiendo Federico Elaskar en el lugar de Diego Alberto Guerri y este, como director suplente en lugar de Alejandro Héctor Veloso; este último no volvería a aparecer en los documentos de los que disponemos. Asimismo, también comprobamos que Elaskar se habría desempeñado de manera ininterrumpida como presidente de S.G.I Argentina S.A.desde su primera designación hasta, al menos, el mes de junio de 2011 (asambleas ordinarias del 15 de junio de 2007, 17 de julio de 2008 y 7 de agosto de 2009).

Por otra parte, así como en abril de 2010 se trasladó la sede social a la calle Juana Manso 555, piso 7°, oficina "C" de esta ciudad -a unas cuadras de la sede anterior pero dentro del mismo barrio de Puerto Madero-, de las publicaciones del boletín oficial surge otro hecho trascendental ocurrido el 19 de noviembre de 2010. Ese día, por decisión de la asamblea de accionistas se habría resuelto aumentar el capital social de 3.000.000 a 5.000.000 de pesos, emitiéndose 2.000 acciones de la misma especie que las originales —ordinarias nominativas no endosables y por valor nominal de 1.000 pesos y derecho a un voto por acción-. Quiere decir que en algún acto previo cuya publicación no pudimos encontrar en el boletín oficial, ni ha sido aportado por la querella, el capital social fue aumentado de manera significativa de los 50.000 pesos originales a los

3.000.000 que lo conformaban para fines de 2010. Es probable que esa modificación anterior fuese contemporánea a los cambios producidos en la composición del directorio toda vez que, como puede leerse en las publicaciones transcriptas del boletín oficial, la comunicación de la nueva ampliación del capital de 3.000.000 a 5.000.000, estuvo a cargo de quien aparece como Vicepresidente designado por asamblea del 7 de agosto de 2009, me refiero a Alejandro Ons Costa, en ejercicio además de la presidencia del directorio por acta de dicho cuerpo del 5 de noviembre de 2010.

Nada sabíamos por entonces de las cuestiones que entretuvieron al Presidente, Federico Elaskar, desde aquellos actos de noviembre de 2010 hasta la publicación de la nueva ampliación del capital por certificación del escribano Scian de 3 de enero de 2011[13]. Pero puede decirse que S.G.I iniciaba ese año un período signado por el dato objetivo de un capital aumentado CIEN VECES en apenas cuatro años; el 40%, nada menos que 2.000.000 de pesos, en noviembre del anterior. Conviene tener presente este hecho, porque la visión integral de lo ocurrido con la sociedad SGI y las circunstancias que lo rodearon, da cuenta del inicio de un período crucial que, a pesar de lo que parecía exhibir el mentado crecimiento, habría de terminar a los pocos meses con una verdadera ocupación de la empresa por terceras personas y el alejamiento de Federico Elaskar, signado por la evidencia de actos violentos y extorsivos.

Hecha esta reseña, que concluye con la convocatoria realizada por el directorio presidido por Elaskar *a la asamblea general ordinaria del 15 de junio de 2011* en la que se votarían los asuntos corrientes vinculados al ejercicio 2010, podemos retomar la historia con lo que surge de los documentos aportados por la querella para dar respaldo al poder extendido a César Gustavo Fernández para promoverla (anexo 1, poder extendido el 8 de noviembre de 2012). A la vista de los únicos actos publicados, el ejercicio mismo por Fernández de la presidencia de la sociedad, al cabo de cuatro años de gestión de Elaskar, era toda una novedad. Se mencionan en el poder el acta de asamblea de elección de autoridades y distribución de cargos del 18 de julio de 2011 y el acta de directorio del 25 de octubre de 2012 por la que se decidió la presentación judicial que da inicio a esta causa. El poder en cuestión se complementa con la escritura que le sigue inmediatamente en el anexo 1; se trata del acta labrada por el escribano David Scian para informar en la Inspección

---

[13] De la última consulta que pudo hacerse desde el sistema Fiscalnet –entre el 17 y el 18 de abril- a los registros de la Dirección de Migraciones surgen viajes de Federico Elaskar con diversos destinos en las fechas señaladas, tiempo este, de fines de 2010 a mediados de 2011 cuando se registra un período de notable actividad y aparente crecimiento de la sociedad. Ver fojas 135/137.

*Ministerio Público Fiscal de la Nación*

José María Campagnoli IGNACIO RODRIGUEZ VARELA
FISCAL                    SECRETARIO

General de Justicia los cambios producidos en SGI en el mes de julio de 2011[14], al parecer confeccionada tan de apuro que incurre en el anacronismo manifiesto de dar cuenta, por escritura del 4 de julio de 2011, de la celebración y el resultado de una asamblea general ordinaria que recién habría de realizarse el 18 de ese mismo mes.

La confusión es mayor si se tiene en cuenta que, como hemos visto, el último acto publicado en el boletín oficial -1ro de junio de 2011- había sido la convocatoria a asamblea general ordinaria del 15 de junio de 2011, realizada por el directorio de SGI, al parecer en razón de lo decidido por ese cuerpo el 20 de mayo de ese año –ver publicación del boletín oficial donde se señala esa fecha para la certificación del escribano- o en algún día cercano anterior. Entonces *¿Qué ocurrió entre la convocatoria en mayo a asamblea general ordinaria para el 15 de junio de 2011 y la asamblea del mismo carácter finalmente fechada el 18 de julio de 2011?*.

Hoy sabemos que en esos días Federico Elaskar fue amenazado y obligado a renunciar a sus cargos y a ceder sus acciones en la compañía. Sin embargo, la existencia de graves acontecimientos subyacentes al enunciado parcial que realizó la querella, podía intuirse a partir de la documentación reseñada. En definitiva, el 16 de junio de 2011, un día después de aquél en el que debía realizarse la usual asamblea ordinaria destinada a aprobar el ejercicio del año anterior, fijar la remuneración del directorio y demás cuestiones comunes, aparece insertada el acta de directorio número 49[15] donde, drásticamente y sin que tengamos noticia alguna de la celebración y el resultado de la que debiera haber tenido lugar el día anterior, se pasó a convocar a una nueva asamblea ordinaria para el 18 de julio, señalándose como único punto del orden del día "la recomposición del directorio".

ACTA DE DIRECTORIO N° 49

En la Ciudad de Buenos Aires, a los 16 días del mes de Junio de 2011, siendo las 17 horas, en la sede social de SGI Argentina S.A., sita en Juana Manso 555, piso 7, oficina "C" de esta Ciudad, se reúnen los señores Directores, que firman la presente, bajo la presidencia del Señor Federico Elaskar. Toma la palabra el Sr. Presidente, quien luego de corroborar la existencia de quórum, informa que el mismo es suficiente para sesionar válidamente. Acto seguido, el Sr. Presidente pone a consideración el primer y único punto del Orden del Día, que dice así: Recomposición del Directorio: El Sr. Presidente manifiesta que, como es de conocimiento de los presentes, se viene analizando la posibilidad de hacer algunas modificaciones en el Directorio que implicarían una recomposición del mismo. Por consiguiente, propone convocar a Asamblea de Accionistas para tratar este punto. La propuesta es aprobada por unanimidad, por lo que se resuelve convocar a Asamblea General Ordinaria de accionistas para el día 18 de Julio de 2011 a las 12 horas, en primera convocatoria, y 13 horas en segunda convocatoria, en la sede social, a fin de tratar los siguientes puntos del Orden del Día:

1.- Designación de dos accionistas para suscribir el acta conjuntamente con el Sr. Presidente;
2.- Recomposición del Directorio. Fijación del número de Directores Titulares y Suplentes y su elección.
No habiendo más asuntos que tratar, se levanta la sesión siendo las 17,30 horas.

Federico Elaskar
Presidente

Alejandro Oms Costa
Vicepresidente

---

[14] Copia a fojas 227/233
[15] Copia a fojas 241

Como una evidencia más de la conmoción en la que se hallaba la gestión de la sociedad, inmediatamente después se insertó el acta de directorio número 50[16], fechada el 4 de julio de 2011, donde la continuidad administrativa se quebró definitivamente. Allí aparece Federico Elaskar, entonces presidente de SGI, sumido en un cambio total de rumbo ya que, de la convocatoria ordinaria cuya suerte definitiva desconocemos[17], pasó sin noticias ni novedades a la vista, a informar que se había desprendido tres días antes de la mitad de su paquete accionario cercano al 95% y a proponer el reemplazo y emisión de nuevos títulos de la sociedad.



En el acta que arriba insertamos, entra en escena y se manifiesta por primera vez de manera abierta un grupo de poder que, como hemos de ver, había en realidad desembarcado en SGI entre fines de 2010 y los primeros meses de 2011. Se observa así que las acciones de las que dice Federico Elaskar haberse desprendido el 1ro. de julio, son emitidas a nombre de *SERNORTE HOLDING S.A.* Del ente en cuestión, no consigna el acta ningún otro dato. Luego de esto, la siguiente constancia arrimada por la querella es el acta de asamblea ordinaria número 11, del 18 de julio de 2011[18], donde se completa el formal cambio de manos de la sociedad y Federico Elaskar es reemplazado por *Cesar Gustavo Fernandez.* Vale la

---

[16] Copia a fojas 242.

[17] Hasta el final de este tramo de la investigación, permanece ignorada la suerte corrida por la Asamblea Ordinaria del 15 de junio, que debió haber sido documentada con el acta faltante número 10.

[18] Copia a fojas 282

*Ministerio Público Fiscal de la Nación*
José María Campagnoli
FISCAL

IGNACIO RODRIGUEZ VARELA
SECRETARIO

pena insertar también la copia de ese documento, porque contiene elementos muy relevantes para la investigación.



Vemos que al cambio de presidente, en definitiva realizado en cabeza de una persona que era desde antaño parte de la sociedad como directivo y accionista minoritario[19], se sumó la aparición de dos individuos hasta el momento desconocidos. Me refiero a *Jorge Norberto Cerrota* y a *Eduardo Guillermo Castro*, sobre cuyas relaciones con el asunto y verdaderos cometidos hemos de ocuparnos más adelante[20]. En cuanto a la modificación en la tenencia accionaria y la aparición de Ser Norte S.A, el nuevo accionista mayoritario en pie de igualdad con el presidente saliente Federico Elaskar, nada se dice en el acta en cuestión a pesar de lo manifestado por la querella en sus escritos. Sin embargo, como lo hemos adelantado más arriba[21], en la escritura que la querella acompañó como

---

[19] Además del cargo de Vicepresidente asumido por *Alejandro Ons Costa*, otro de los que permanecieron en la empresa como accionista minoritario y parte del directorio.

[20] Hemos comprobado a partir de la información remitida por el Banco Central de la República Argentina, que los nombrados *Jorge Cerrota* y *Guillermo Castro* cumplieron funciones –en forma simultánea- como "Síndicos titulares" del Banco Privado de Inversiones S.A, propiedad del Banco Macro y sus accionistas mayoritarios *Jorge Brito y Delfín Carballo*, con la particularidad de que ambos asumieron y cesaron en el cargo el mismo día, respectivamente, el 26 de abril de 2001 y el 20 de septiembre de 2010. Asimismo, cabe señalar que Cerrota asumió el 15 de febrero de 2007 como Director Titular del Banco Provincia de Tierra del Fuego, fue rápidamente promovido a Vicepresidente y, ya el 10 de julio de 2007, finalmente designado como presidente de dicha entidad bancaria. Lógicamente, todos estos cargos los ejerció en forma simultánea con su rol de Síndico del Banco Privado de Inversiones, lo cual motivó que se instruyera una causa penal en su contra ante la Justicia de Tierra del Fuego. Sumado a ello, Cerrota actuó -también- como "Síndico Titular" de la entidad financiera *"Tutelar Compañía Financiera S.A."* desde el 1° de febrero de 2005 al 25 de octubre de ese mismo año. Por otra parte, se corroboró que Jorge Cerrotta, está inscripto como empleado -además- de la empresa estatal Energía Argentina S.A. (ENARSA), lo cual se desprende de su perfil comercial de la base de datos *NOSIS*. Para mayor ilustración, véase fs. 410; 426/427; 1242/1245; 1295/1296; y 2313/2322.

[21] Ver nota al pie número 1.

parte del anexo 1 de la documentación -fojas 227/231-, el escribano Scian transcribió también las constancias del registro de acciones de la asamblea, donde se puede leer que la sociedad en cuestión fue representada por **Jorge Oscar Chueco**, con el mismo domicilio que su representada en Paraguay 1225, piso 11 Ciudad de Buenos Aires.

Siempre a la vista de los elementos de juicio aportados por la querella, los indicios de un violento golpe de timón en SGI se completan con una ausencia notable. Porque con los últimos actos de Federico Elaskar en ejercicio de la presidencia, prácticamente se terminó la vida pública y visible de la compañía; desde junio de 2011 hasta nuestros días, SGI Argentina S.A no informó nunca más sobre acontecimientos relevantes o decisiones de ningún tipo de sus órganos de gobierno. Se interrumpió, en lo que parecía ser su apogeo, un aparente crecimiento que había llevado incluso a sus directivos a establecer una base firme en la República de Panamá, como puede derivarse del acta de directorio número 48[22], que inserto a continuación.

ACTA DE DIRECTORIO N° 48

En la Ciudad Autónoma de Buenos Aires, a los 23 días del mes de Mayo de 2011, siendo las 10 horas, en la sede social de SGI Argentina S.A., sita en Juana Manso 555, piso 7, oficina "C", de esta Ciudad, se reúnen los señores Directores que firman la presente, bajo la presidencia del Señor Federico Elaskar. Toma la palabra el Sr. Presidente, quien pone a consideración el primer y único punto del Orden del Día, que dice así: Apertura de cuenta corriente bancaria en la República de Panamá. El Sr. Elaskar manifiesta que la Sociedad viene analizando la posibilidad de abrir una cuenta corriente bancaria en la República de Panamá en el Banco Banesco S.A. lo cual resulta beneficioso para la Sociedad. Luego de una acto de deliberaciones al respecto, el Directorio por unanimidad resuelve solicitar en el Banco Banesco S.A. la apertura de una cuenta corriente bancaria, designando como firmantes a las siguientes personas: Federico Elaskar con pasaporte N° 31.675.104, César Gustavo Fernández con pasaporte N° 14.309.809, Juan Ignacio Pisano Costa N° 29.319.731 y Fabián Virgilio Rossi con pasaporte N° 16.974.032, en forma indistinta, facultándose a al Sr. Presidente a suscribir la documentación necesaria a tal fin. No habiendo más asuntos que tratar, se da por finalizada la reunión siendo las 10:35 horas.-

Como lo hemos dicho en la introducción, a las turbulencias societarias que dejan entrever los asientos comentados y la drástica interrupción de los cotidianos aconteceres de SGI Argentina S.A, la propia querella sumó un tercer conjunto de pruebas. Se trata de los violentos episodios denunciados por el propio Cesar Gustavo Fernández a fines de octubre de 2011 en el Juzgado de Instrucción número 19. La extensa

---

[22] Se trata, paradójicamente, del acta inmediata anterior a aquella en la que Federico Elaskar aparece, el 16 de junio de 2011 convocando a la asamblea extraordinaria por la que se habría de formalizar su expulsión de la empresa. Copia a fojas 241

certificación practicada a falta de estudio directo o copias del expediente[23], confirma que el alejamiento de Federico Elaskar no se consumó en un ambiente amistoso ni pacífico. No voy a pronunciarme ahora sobre el mérito de la acusación formulada allí contra Elaskar; esto será en todo caso parte del estudio integral que he de propiciar sobre los hechos y las diversas versiones y alegatos que existen sobre lo ocurrido. Sea que las amenazas hubiesen sido efectivamente realizadas por el ex presidente de SGI o que se hubiese tratado todo de una maquinación de sus antiguos compañeros de directorio, lo cierto es que la violencia y la tensión entre los involucrados se había extendido desde mediados a fines de 2011.

Pretendo subrayar otra comprobada falsedad de los ex socios de Elaskar, quienes se preocuparon por acusar a aquél, además de las amenazas, de haber ocultado la venta de sus acciones en SGI. No se trata de un apunte casual. César Gustavo Fernández denunció el 8 de noviembre de 2011 que Federico Elaskar se había desprendido veinte días antes de las acciones que le quedaban —es decir alrededor del 21 de octubre- sin dar debida noticia a la sociedad. Sin embargo, hemos descubierto que fue precisamente ese día cuando se consumó el último tramo de la extorsión y Federico Elaskar fue obligado a ceder sus acciones y renunciar a sus derechos al mismo tiempo en el que SGI Argentina era subrepticiamente transferida a la firma Helvetic Services Group[24]. Cesar Gustavo Fernandez y *Juan Ignacio Pisano Costa* -que se sumó enseguida a su denuncia[25]-, estaban perfectamente al tanto de esos actos ejecutados por sus nuevos patrones y socios, y es muy probable que sus acusaciones hubieran estado dirigidas a reforzar la intimidación que parece haber llevado a Federico Elaskar a exiliarse en la noche del 23 de octubre de 2011 para volver al país exactamente un año después.

No parece tampoco inocente que esta querella hubiese sido promovida por los actuales representantes y apoderados de SGI  -el propio Cesar Gustavo Fernández y el abogado Federico Pintos- entre los días previos y los inmediatamente posteriores al regreso a la Argentina de Federico Elaskar[26]. Quizás expliquen estas verdaderas intenciones tanto el letargo en el que parece encontrarse el expediente en trámite en el Juzgado de Instrucción número 19, como la difusa y tardía acusación con la que se ha iniciado esta causa, encaminada a los potenciales perjuicios que

---

[23] Ver nota número 3.

[24] Más adelante volveremos sobre este asunto en parte adelantado en la nota 8

[25] En los cambios de julio de 2011 asumió como Director Suplente de SGI.

[26] La denuncia fue presentada el 27 de septiembre, ratificada el 24 de octubre y promovida como querella el 14 de noviembre de 2012. Federico Elaskar volvió al país el 21 de octubre de 2011 a las 7:02 horas —ver información de Migraciones a fojas 135/137 de esta causa y 89/91 de las actuaciones que corren por cuerda —copias del expediente 17.133/2013.

*Ministerio Público Fiscal de la Nación*
José María Campagnoli
FISCAL.  IGNACIO RODRIGUEZ VARELA
SECRETARIO

a la sociedad pudo haber causado la actuación de Elaskar como presidente de SGI en un negocio aparentemente ajeno a su giro comercial -en definitiva, se habría tratado en el peor de los casos de un préstamo devuelto y realizado por quien detentaba el 95% del Capital[27].

**2.**Ahora bien, todos estos indicios y pruebas directas que permitían intuir la apropiación de SGI Argentina S.A por un grupo de individuos poderoso y consciente de su impunidad, fueron confirmados públicamente por Federico Elaskar en la emisión del programa de televisión "Periodismo para todos" del pasado 14 de abril.

Incluso, las concordancias surgen ya de las coincidencias entre los tramos históricos que hemos reseñado a partir de los antecedentes de la causa y el relato que hizo el periodista Jorge Lanata[28] desde los primeros contactos con Federico Elaskar y Leonardo Fariña, hasta la grabación y filmación de sus testimonios. No hay duda de que las primeras entrevistas, ubicadas a mediados de 2011, coinciden plenamente con la crisis en SGI delatada por sus propios asientos societarios y su aparente resolución a fines de ese mismo año; luego de esto, el compás de espera hasta las entrevistas de fines de 2012 y principios de 2013 se corresponden con el regreso al país de Federico Elaskar y la declaración indagatoria que se le recibió en el Juzgado de Instrucción número 19 el pasado 21 de marzo, a menos de un mes de emitido el programa.

En cuanto al relato mismo de Federico Elaskar, todos cuyos extremos relevantes consideramos haber confirmado en la prueba que reseñaremos en el próximo apartado, vale la pena reproducirlo en miras a la autosuficiencia de este dictamen. Se trata de dos tramos, una filmación emitida en el programa de televisión del 14 de abril y una grabación, consentida al igual que la anterior, incluida en la entrega de "Periodismo para todos" del 21 de abril de 2013.

*Transcripción de la entrevista filmada y emitida el 14 de abril.*
*(referencias: NW: Nicolas Wiñaski, L: Lanata, E: Elaskar)*
NW: ¿durante cuánto tiempo tuviste relaciones comerciales con Fariña?
E: cinco meses.
NW: ¿cuánta plata manejo Fariña en ese tiempo?

---

[27] Hemos profundizado en autos el conocimiento de las circunstancias vinculadas a la hipoteca cuestionada, así como nos hallamos aun en curso de relevar, a través de los procesos civiles y comerciales en los que ha sido parte, un tramo considerable del giro comercial histórico de SGI Argentina (ver medidas dispuestas a fojas 347 y 448). En el caso de la Hipoteca, el escribano interviniente ha remitido la totalidad de los antecedentes vinculados, incluyendo la escritura de cancelación. Hemos recibido declaración testimonial al deudor que confirmó la operación y al inspector de la AFIP que investigó el asunto y ratificó que no existen del crédito en cuestión constancias en los asientos de SGI Argentina, sociedad esta que, de todas formas y a su juicio, difícilmente pueda sostener su alegada posición de tercero ajeno al contrato; que, en suma, los antecedentes ponen en evidencia la disponibilidad por parte de Elaskar –y a la sazón SGI que le pertenecía en un 95%- de dinero "en negro".

[28] Ver fojas de las actuaciones que corren por cuerda –copias del expediente 17.133/2013-.

E: aproximadamente 50, 60 millones de dólares.

NW: ¿de que trabajaba Fariña?

E: un cadete millonario de Lázaro Báez.

L: ¿cómo te llamas?

E: Federico Elaskar, Jorge.

L: ¿a qué te dedicas?

E: en este momento estoy desempleado pero soy financista.

L: ¿tu financiera cuando la pusiste?

E: mi financiera la empecé a planificar en junio de 2006…

L: ¿funciona en este edificio?

E: funciona en este edificio.

L: estamos en madero center…

E: estamos en el madero center. En 2007 empecé en la casa "Azucena Villaflor", a unas 10 cuadras de aquí con tres personas, después bueno, un crecimiento sostenido durante los años por reinversión de capital total y absoluta llegamos a tener una estructura con 22 personas acá en madero center, una sociedad de bolsa, una sociedad fiduciaria una empresa de leasing a la financiera sucursales en Mendoza, Panamá y corresponsalías en Estados Unidos.

L: ¿cómo empieza esta historia? ¿cuando vos conoces a quién?

E: cuando conozco a Leonardo Fariña, en enero de 2011.

L: ¿Fariña? ¿El esposo de Jelinek?

E: exactamente.

L: ¿ya en esa época era el esposo de Jelinek?

E: no, no.

L: Ah.

E: él se casó meses más tarde, yo lo conocí en enero de 2011 por un par de operaciones en las cuales el necesitaba asistencia financiera en la cual intermediamos, entre gente del extranjero y gente de acá de la argentina y durante todo el año 2011 que en realidad fue el primer semestre me dedique a hacer varias operaciones por cuenta y orden de leo para su cliente que era Lázaro Báez.

L: durante esos 6 meses vos manejas que cantidad de cuánta plata.

E: aproximadamente 55 millones de euros.

L: ¿era normal q vos en tu trabajo manejaras euros?

E: no, no era normal, de hecho no es normal en el mercado financiero ver euros de 500.

L: sabes porque te pregunto esto, porque algunos de los modus operandi de corrupción del gobierno, justamente son los euros por que, vos lo debes saber mejor que yo pero, son más chicos, hay billetes de alta numeración y son más fáciles de trasladar.

E: son más chicos, bueno de hecho en un fajita llevas 50 mil euros.

L: ¿y fariña cuando viene te dice q la plata es de él?

E: yo le pregunto me dice que la plata es de el, que había ganada unas regalías por restructurar unos pasivos en "nación fideicomisos" sobre austral construcciones.

L: ¿la empresa de Lázaro Báez?

E: la empresa de Lázaro Báez.

E: y lo primero que hace él es una inversión de un millón de dólares en acciones en el extranjero, mediante una sociedad de bolsa que se hallaba en el exterior, después bueno se realizaron varias transferencias también por cuenta y orden de él donde nosotros actuábamos como intermediarios presentándole a la empresa proveedora del servicio en la cual el netamente intermediaba a partir de nosotros, el envió de decenas de millones de dólar y euros al extranjero a sociedades que estaban vinculadas directamente a Lázaro Báez, Martin Báez y Leandro Báez.

L: ¿Fariña te pide que vos armes empresas para poder canalizar la guita?

E: Fariña lo que me pide es el armado de estructuras donde puedan ellos recibir cierta cantidad de dinero en cierta cantidad de tiempo y bueno de esa manera poder hacer que el dinero salga del país.

L: cuantas empresas se armaron

E: se armaron entre 40 y 45 sociedades "off short" en Belice, Panamá, Seychelles y BVI, distintos paraísos fiscales que realmente están poco regulados.

L: en general se usaba Panamá como destino...

E: en general se utilizaba Belice con cuentas de banco en el de lombard de odien en Suiza era una estructura que estaba bastante aceitada por los consultores que nosotros tenemos afuera. O sea, lo que se hacía en realidad era, venia leo, leo pedía que se armen cierta cantidad de estructuras, se pasaba la información de quienes eran los beneficiarios a un estudio contable del extranjero. Este estudio contable del extranjero que estaba en Panamá se encargaba de conformar las sociedades, y luego bueno de integrar el capital que ellos necesitaban en cada sociedad.

L: quien manejaba en Panamá la guita

E: Fabián Rossi

L: Fabián Rossi, el...

E: el marido de Iliana Calabro

L: ¿el marido de Iliana Calabro?

E: correcto.

L: ¿vos a él lo conocías de antes?

E: si, si, porque de hecho Rossi trabajaba conmigo.

L: ¿Rossi laburaba en tu financiera?

E: Rossi trabajaba en SGI Argentina, sucursal Argentina.

L: ¿qué es SGI?

E: SGI argentina es mi financiera que después con los años se denominó SGI grupo financiero y Fabián Rossi tenía muchos vínculos en Panamá, por amistad con el embajador Arguindegui entonces eso facilitaba de repente ciertas operatorias que se tenían que realizar fuera del país.

L: bien, a vos te llegaba la plata y esa plata se mandaba al exterior...

E: la plata se giraba al exterior.

L: ellos armaban sociedades en el exterior para cobrar esa plata...

E: correcto.

L: y el que cobraba esa plata en el exterior era Rossi

E: el que cobraba, triangulaba y terminaba de realizar las operaciones financieras de transferencias era Fabián Rossi.

L: vos tenías conocimiento de esas sociedades porque obviamente girabas hacia esas sociedades ¿Cuantas sociedades se armaron?

E: y... se armaron aproximadamente entre 45 y 50 sociedades.

NW: y el beneficiario final de esas sociedades ¿quién era?

E. según mi información Martin Báez, Leandro Báez y Lázaro Báez

NW: ¿Los hijos de Lázaro Báez?

E: los hijos y el.

L: ¿Fariña era un tipo conocido para vos o salió de la nada?

E: no, salió de la nada y de hecho la gente de alto poder adquisitivo de la argentina o de la city porteña que me conocían me preguntaban por él. Como él también vivía en madero center a él le quedaba muy cómoda mi empresa por que el cruzaba por el subsuelo, subía y no hacia otra cosa más que realizar las operaciones cotidianas que le mandaba a hacer desde el sur Lázaro.

L: ¿llegaste a conocer a Lázaro Báez ?

E: no.

L: ¿a su hijo?

E. a Leandro lo conocí y a Martin lo conocí... bueno "lo conocí", lo vi a Martin una vez en mi oficina que vino con Leonardo no sé a qué, y lo vi a Leandro en pasaje carabelas en las oficinas de Austral.

L: ¿y por qué hoy tu oficina no es tuya?

E: bueno porque durante todo el 2011 yo me encargue de intermediar en operaciones que evidentemente Leonardo Fariña realizo de cierta forma la cual a su jefe no le cerro la caja a final del año o a mitad de año se ve que lo audito o se ve que no se, empezó a ver que hacía con el dinero.

L: yo me encontré el año pasado con Fariña y Fariña lo que dice es que hubo un faltante.

E: y pero el faltante lo tiene él. A ver Jorge, si vos te vas a gastar 2 millones de dólares en una fiesta en punta del este, alquilar dos aviones privados, alquilar tres hoteles, llevar a Lola Ponce a cantar y gastar doscientas botellas de cristal no te va a durar mucho la plata o si te vas a gastar 250 mil dólares en American Express en Van Halvor en un fin de semana tampoco, si vas a gastarte 200 mil dólares en un vuelo privado a Miami tres veces en un mes gastando 159 mil dólares alquilando el avión de Matias Garfgunkel tampoco te va a durar.

NW: ¿y vos como sabias todo eso?

E: porque yo hacia los pagos por cuenta y orden de él. Porque él venía con bolsos con decenas y decenas de euros. Entonces el faltante que estaba, que realmente existía, era un faltante que se gastó el.

NW: ¿Cuándo le decís a Fariña de donde sacaba la plata que te contestaba?

E: no, que era del él. Al principio cuando eran montos razonables entre comillas, pero que el dinero era de él.

L: el tipo te aparece con doce palos en euros obviamente no era de el

E. no, no, obviamente que no.

L: ahora el con el tiempo te deja claro que esa guita era de Lázaro...

E: si por supuesto, si, si.

L: ¿y cómo te lo dice?

E: no, le pregunte, le pregunte "leo de quien esta plata" -de Lázaro.

NW: lo escuchaste hablar con él (lazaro)

*Ministerio Público Fiscal de la Nación*

José María Campagnoli
FISCAL

IGNACIO RODRIGUEZ VARELA
SECRETARIO

E: si.

NW: ¿y como lo trataba?

E. Señor.

L: ah, era como muy ceremonioso.

E: si, si, dejaba de hacer lo que estaba haciendo, cortaba todo tipo de sonido, atendía y no se... era un protocolo ceremonial perfecto. Recuerdo que yo corte todo tipo de vínculo con Leonardo allá por mayo, junio cuando el aparece en el programa de Susana Giménez, recuerdo que ese día fue el día que yo dije, basta.

L: ¿por qué?

E. porque me traía una publicidad completamente negativa porque a él le gustaba alardear con todas las cosas que tenía, entonces, si el de repente realizaba transacciones multimillonarias con mi firma, le gustaba decirlo, y eso es algo que en el rubro financiero está muy mal.

NW: ¿y antes de eso cómo llevaba él la plata a tu financiera?

E: bueno el dinero se iba a buscar en aviones o lo traía el desde la plata de la casa del padre

NW: o sea, lo traía "cash".

E: Exactamente.

NW: en efectivo...

E: si venia cash.

NW: ¿y cómo era, en que, en bolsos cuantos bolsos?

E. bolsos, mochilas, depende la cantidad nico a ver si se tiene que traer 10 millones y los 10 millones no entran 2 bolsos bueno, se utilizan 3, es la realidad.

NW: ¿y el llego a llevar 10 millones de euros a tu financiera?

E: creo que lo máximo fueron 12.

L: ¿12 millones?

E: si.

L: o sea, siempre la plata que llegaba tenía que salir ya.

E: exactamente, si, si. La plata antes de llegar ya tenía instrucción de salida.

L: vos decías que la plata llegaba en efectivo físico o en bolsos en mochilas, o en lo que sea. Ahora ¿cómo llegaba acá a Buenos Aires?

E: ¿cómo llegaba acá, a Buenos Aires? en avión.

L: ¿desde donde?

E: desde Río Gallegos, el avión era el "lima Víctor sulu sierra sulu" LV-ZSZ, esa es la matricula del avión.

L: ¿ese es avión de Lázaro?

E. ese es el avión de Lázaro. El avión llegaba a San Fernando a altas horas de la madrugada sin ningún tipo de control previo.

NW: ¿y Fariña iba y venía arriba en el avión?

E: Fariña a veces iba en el avión, a veces el avión iba vacío hacia lo que tenía que hacer y volvía.

NW: ¿Como salía la plata? o si sabes, ¿esa plata salía del país a alguna empresa?

E: mira, las estructuras que se generaban en el extranjero eran justamente para alojar ese dinero. Las estructuras estaban compuesta de dos partes, la societaria y la bancaria, vos podes elegir una jurisdicción en donde radicar una

sociedad y una jurisdicción donde radicar los fondos de esa sociedad. O sea, no hace falta que una sociedad panameña tenga cuenta de banco en Panamá, tamos claros. Entonces la sociedades se hacían y se incorporaban en Belice y las cuentas de bancos se hacían en Suiza. O sea, que la tenencia de los fondos estaba hecha por cuenta y orden de un banco suizo, pero todas las operaciones quedaban encuadradas dentro de una compañía "off short" la cual no tributa ningún tipo de impuesto expuesto por estar exenta

NW: nosotros tenemos documentación de una de esas compañas que es teegan.

E: Teegan inc. Exactamente, Teegan inc se incorporó en Belice tiene una cuenta de un millón y medio de dólares en el lombard de orien en Suiza y de esas empresas se pidieron varias.

NW: y esa "off shore" está a nombre de uno de los hijos de Báez.

E: las acciones están a nombre de Martin Antonio Báez.

L: bueno cuestión que en un momento los tipos te aprietan para que vendas...

E. cuando a él lo van a buscar (Fariña) porque Lázaro detecta un faltante, le empieza a señalar a mucha gente, muchas personas obviamente lo que hicieron fue, bajaron las persianas y le dijeron a esta gente que se vayan por donde vinieron. Una de las personas que lamentablemente no pudo hacer eso fui yo. Por miedo, por inexperto, por no estar acostumbrado a lidiar con este tipo de gente y más que nada por las amenazas que ellos profanaron ante mí.

L: ¿de que tipo?

E: Una de ellas, muy clara, muy clara fue que si yo no quería terminar como Sebastián Forza tenía que estar obligado a firmar la transferencia del paquete accionario de todas las empresas

NW: y en ese momento, vos ¿por qué no haces una denuncia judicial? por ejemplo.

E: Porque me amenazaron con matarme, y la verdad con la impunidad que se manejan estos tipos que uno lo ve todos los días.

NW: ¿pero quien fue el que te dijo te vamos a matar o vas a terminar como Forza?

E: Daniel Pérez Gadin

NW: ¿quién es?

E. es un operador que vino a arreglar los chanchullos que hizo leo por parte de Lázaro y bueno recuerdo que en el mes de junio o julio él se comunica conmigo cuando previamente se había comunicado Fariña, Fariña se comunica conmigo ese mismo día y me dice te va a llamar una persona para arreglar mis cuentas entonces me llama este Pérez Gadin y me dice que yo tengo plata de un cliente de él, le dijo que yo lamentablemente no lo conozco que tampoco sé quién es su cliente y me dice en ese momento mi cliente es Leonardo Fariña y le dijo bueno mira cualquier cosa que yo tenga ver con Leonardo la voy a ver con Leonardo y no con vos porque si vos querés hablar conmigo, te voy a mandar a hablar con mi abogado. No te conviene hacer eso pendejo de mierda porque vamos a terminar todos muy mal o me atendés hoy o el lunes te reviento. Esto fue un viernes a la tarde bueno, lo atiendo en mi oficina, cuando lo atiendo en mi oficina se presenta como la cabeza que iba a ordenar el despelote que dejó Fariña y que sus clientes en realidad eran peores que colombianos, eso fue lo que me dijo el cuándo yo le pregunte

*Ministerio Público Fiscal de la Nación*

IGNACIO RODRIGUEZ VARELA
SECRETARIO

José María Campagnoli
FISCAL

bueno, ¿quién es tu cliente?. Mi clientes son peores que colombianos y no te conviene molestarlos. O sea cuando ellos me dicen o nos dejar entrar a la empresa o te hacemos mierda el lunes esa, yo tenía que dejar entrar a dos personas, el señor Jorge Cerrota y el señor... bueno no recuerdo ahora el nombre eran dos personas que los enviaba Daniel Pérez Gadin que eran contadores que tenían que ver en realidad las cuentas que manejo Leonardo Fariña por cuenta y orden de su cliente Lázaro.

L: es decir como una auditoria de ellos.

E: exactamente, una auditoria de ellos. Se quedan como dos meses  auditan todo, después de esos dos meses me dicen mira Federico la verdad es que te vamos a dar una oferta por que te tenés que ir de acá, sabés mucha información, acá se manejó mucha plata, hay plata que está faltando y tenés que firmar esto porque si no firmas esto, bueno vos ya sabes cuales son las consecuencias. Y no, yo la verdad que las consecuencias no las sabia, ahí es cuando empiezan ellos ya de manera más ardua a llamarme, a apretarme, a mandarme correos intimidatorios, a mandarme fotos de mi pareja a decirme que si yo no quería tener problemas y mi pareja tampoco, ceda, firme, acceda a eso.

NW: cuando ellos te dicen que sus clientes son peores que los narcos (colombianos) vos ¿intentaste indagar para saber quiénes eran?

E: no imagínate q en ese momento se te llena la cabeza de preguntas y lo que menos que querés saber es detalles.

NW: ¿y en algún momento te dijeron quiénes eran?

E: si, si claro después que la reunión termina y yo accedo a que ellos pueden venir me confiesan que si genuinamente, es Lázaro Báez.

*Transcripción de la entrevista grabada y emitida el 21 de abril.*
*(Referencias, N: Nicolas Wiñasky, F: Federico Elaskar)*

N: Decí quién sos vos

F: Yo? Federico Elaskar.

N: DNI tanto...

F: 31675104

N: Está grabando, no?

F: No lo sé.

N: Hola, hola. Sí.

F: Federico Elaskar DNI 31675104

N: Fariña llegaba a tu oficina con mucha plata?

F: Leo Fariña llegaba con bolsos y bolsos de billetes de 500 euros a mis oficinas.

N: Cuànta plata?

F: Ehhh, en total? El primer semestre de 2011 superior a unos 55, 60 millones

N: de euros?

F: De euros

N: Y después?

F: Bueno, Leo con ese dinero realizaba múltiples operaciones, dejaba el dinero en la oficina, dejaba el dinero en cuentas en el extranjero, dejaba el dinero en

cajas de seguridad que poseíamos nosotros y él nos decía cómo darle la administración a ese dinero.

N: Y de quién era ese dinero?

F: Lázaro Báez.

N: El lo decía así?

F: Él lo decía abiertamente que su jefe era Lázaro Báez, él ostentaba ser amigo de Martín Báez, de hecho a mis empresas en una oportunidad vino con Martín Báez, por una estructuras las cuales se realizaron por cuenta y orden de ellos que fue la creación y la administración de sociedades en el extranjero. Asimismo también a Leandro Báez yo lo ví en Pasaje Carabelas en una oportunidad junto al director de mi Compañía Gustavo Fernández por una operación para la empresa del padre Austral Construcciones.

1:44

F: Bueno ellos venían con el dinero, una vez que venía el dinero nosotros nos encargábamos de hacer el proceso de intermediación financiera, muchas veces compensábamos con cuentas de terceros que es pedir prestada la cuenta de otro que tenga fondos y una compensa dentro de la Argentina con su colega. En otras oportunidades lo que se realiza es una compensación propia cuando uno tiene fondos líquidos en el extranjero y se queda con el capital acá y después lo termina cruzando y arbitrando contra alguien que necesite traer el dinero.

N: Y esa operación para qué le servía a Báez?

F: Para poder sacar el dinero del país y para poder

N: Dinero que después no pagaba impuestos allá...

F: Exactamente no pagaba impuestos porque nosotros lo asesorábamos en la gestión del armado de sociedades que estaban excentas de impuetos porque no realizaban actividad comercial alguna en la plaza, esto puede ser Belize, puede ser Panamá, puede ser Luxemburgo, Santa Lucía, islas Caimán,

3:00

F: Físicamente el dinero se lo iba a buscar, se lo iba a buscar a La Plata o se lo iba a buscar a Río Gallegos

N: En aviones

F: En avión privado. Dos. Lima Víctor Zulú Sierra Zulú y November 955 HelGolf. El último fue adquirido en modalidad de leasing por mi empresa. justamente como la demanda era creciente y estábamos con mucho trabajo vimos que era mucho más eficiente, costo beneficio, tener una aeronave propia, la cual se pagaba un alquiler de 20 mil dólares por mes y hacer los viajes con más tranquilidad, que estar alquilando un avión o utilizando el avión de Báez era hacer transporte de dinero, cuando en realidad es algo muy sensible.

8:52

N: Y él (Leo) como llegó a vos?

F: El cómo llega a mí... él llega a mí por una persona interpósita, es el hijo de un empresario argentino

N: No querés decir el nombre

F: No tengo ganas de matarlo en este momento... No viene al caso. viene al caso que en realidad lo trajeron y lo trajeron de buena fe. Leo lo que estaba necesitando era alguien que le solucione sus cuestiones financieras. Mucha plata sin saber qué hacer, muchas operaciones a pedido de su jefe y sin saber

*Ministerio Público Fiscal de la Nación*

José María Campagnoli IGNACIO RODRIGUEZ VARELA
FISCAL SECRETARIO

cómo ejecutarlas, entonces no es que nada más vino a mí. Leo vino a mí y fue también a tres o cuatro más

N: Otras financieras, sabés los nombres?

F: Sí pero no te los puedo decir tampoco.

AUDIO 2

2:23

F: A mí no me dieron chance a negociar, de hecho cuando yo le dije (a Pérez Gadín) que no aceptaba la oferta de su jefe y que me gustaría negociar me dijo "pendejo acá no hay nada que negociar, si me decís que no te rompemos el lunes, querés negociar? Andá a golpear la puerta a Balcarce 50.

N: La Casa Rosada.

F: Exactamente, entonces cómo no te vas a asustar. Cuando encima vienen ellos enviados de Lázaro Báez, que encima al principio me dijeron que sus clientes eran mexicanos, que eran peores que colombianos y que por eso yo debía colaborar, si no quería terminar... .

N: Dándote a entender que eran del narcotráfico...

F: Dándome a entender que eran del narco para qué, para meterme miedo. Cuando yo tenía siempre mi suposición de que era dinero de Lázaro Báez y el problema venía por Lázaro Báez.

6:23

N: Cómo se llama la empresa suiza que te compró?

F: Helvetic Services group Sociedad Anónima

N: Y de quién es?

F: De Lázaro Báez.

N: La empresa es de Lázaro?

F: Sí, es de Lázaro. No te lo puedo demostrar, pero es de él.

N: Intuís que es de él?

F: No, no intuyo. Lo sé. Lo sé, no te lo puedo demostrar que es distinto. Pero lo sé.

7:46

F: Yo no sé por qué Lázaro Báez hace lo que hace. Creo que debería haber mirado mejor dónde estaba su dinero porque Leo Fariña sacó dos aviones de Pluna Charter alquilados en el mes de enero para hacer una fiesta en la cual gastó más de un millón y medio de dólares. En donde se tomaron 150 botellas de Cristal, cantó Lola ponce y vino Tomás Phenton desde Londres a tocar. Alquilaron dos hoteles, sacaron casi 16 vuelos privados por Mac Air y... yo en esa fiesta no estuve.

10:20

F: Fui un cagón de mierda. Yo no me les planté como debería haberlo hecho

N: Y ahora?

F: y ahora qué soy?

N: No, y ahora te les plantás?

F: Sí. sí: cara a cara sí, sin ningún problema.

**3.** Los testimonios de Federico Elaskar, sin duda daban respuesta a buena parte de los interrogantes que nos planteamos al reseñar la prueba de nuestra causa y la señalada evidencia de un violento cambio de timón en SGI a mediados de 2011. Con esos antecedentes y su mutua

concordancia hubiese sido suficiente para acusar por extorsión y convocar a prestar declaración indagatoria al empresario *Lázaro Baez*, a su supuesto contador *Daniel Rodolfo Perez Gadín* y al menos a uno de los "auditores" que los dos anteriores enviaron al edificio de Juana Manso 555 -Jorge Norberto Cerrota-. Sin embargo, la labor realizada ha permitido superar largamente tales presupuestos probatorios, avanzando de manera profunda y completa en la confirmación de los hechos y en la fehaciente identificación de todos los involucrados. Incluso, nos hallamos en condiciones de requerir al tribunal interviniente las medidas de resguardo patrimonial y cautela real necesarias para interrumpir el acabamiento de las conductas delictivas investigadas e impedir el aprovechamiento y blanqueo de los beneficios obtenidos por sus autores.

En primer lugar, todo el relato de Federico Elaskar vinculado al origen y extensión de sus negocios se encuentra en extenso corroborado con las pruebas comentadas en los primeros apartados de este dictamen. Hemos probado que la sociedad SGI existía y que fue conformada en el modo y las circunstancias señaladas por aquel, incluyendo el protagonismo de Elaskar, sus sucesivos domicilios y la evolución positiva de su giro comercial y su patrimonio desde 2007 hasta 2011. Hemos agregado las publicaciones y demás asientos societarios que dan cuenta de la constitución de las versiones alternativas de SGI, incluyendo la creación de filiales extranjeras[29], tal como ha sido ello reseñado por Elaskar.

En cuanto a los hechos cruciales que van de fines de 2010 a fines de 2011, se corresponden las diversas contingencias contenidas en las entrevistas de Elaskar y los periodistas con todo lo reseñado en el primer apartado de esta exposición fundamentada de la prueba. Hemos dicho ya que era evidente el salto verificado en los negocios y el capital de la firma a principios de 2011, tiempo en el que, según Elaskar, se verificó el inicio de la relación con Leonardo Fariña y la nutrida y frenética actividad encaminada a recibir y asegurar en el extranjero las millonarias sumas de dinero manejadas por cuenta de Lázaro Baez. Más aún, en pleno respaldo del relato que hizo sobre esos prolegómenos y a pesar de que se cuidó Elaskar de mencionar al "hijo de un empresario" que sirvió de nexo con Fariña y Lázaro Baez, nos hemos ocupado de identificarlo fehacientemente. No se trata sino de Matías Molinari, hijo de Carlos Molinari, empresario este que, a través de varias apariciones públicas, dio cuenta de sus antiguos vínculos con los involucrados en estos episodios tan mentados por estos días. Estos dichos, y los anteriores de Elaskar en los que se sostienen, se ven confirmados por la comprobada asociación entre

---

[29] Ver sobre las ssociedades en EE UU integradas por Elaskar y las versiones extranjeras de SGI el informe de fojas 1106/1122.

*Ministerio Público Fiscal de la Nación*

José María Campagnoli
FISCAL

IGNACIO RODRIGUEZ VARELA
SECRETARIO

Matías Molinari y Federico Elaskar, en una de las filiales estadounidenses de SGI[30].

Todavía hay mucha más prueba vinculada a estos principios[31]; hemos ido incluso develando una vasta red de negocios y maniobras análogas que se remontan a fines de 2002, que ha ido surgiendo ante nuestros ojos en cada paso dado para verificar lo ocurrido a partir de fines de 2010. Volveré sobre esto al comentar los elementos encontrados cuando, finalmente, conseguimos probar la vinculación entre SGI y la sociedad Helvetic Services Group. Basta con decir ahora que existe una ordenada y precisa continuidad de una década en el manejo de dinero y el armado, gestión y estructuración de una monumental trama de sociedades que prácticamente dan vuelta al globo; y que en tales menesteres se advierten dos tramos marcados pero vinculados por denominadores comunes que se han mantenido inalterables. El primero de ellos corre, con precisión milimétrica, desde unos días antes de la convocatoria a elecciones nacionales de agosto de 2002[32] hasta fines de 2010, luego de la muerte del ex presidente Néstor Kirchner. El segundo tramo va desde entonces hasta nuestros días.

Insisto, se trata de un panorama de hechos y personas que se nos ha descubierto al profundizar el conocimiento de los individuos y las sociedades involucradas en los actos infieles y la extorsión a los que se limita de momento el objeto de nuestra causa. En consecuencia, salvo en la medida de lo imprescindible para la prueba de los extremos que nos preocupan y ocupan en el marco de esta pesquisa, no nos hemos aplicado a agotar las indagaciones en torno a los negocios y los dineros canalizados a través de cada uno de los más de dos centenares de eslabones detectados. Esto último es asunto de los jueces y fiscales que están investigando, en el fuero de excepción, el lavado de activos y los actos de corrupción de los que supuestamente provienen los fondos. Sin duda les serán útiles nuestros avances y les enviaremos copia de todas estas actuaciones.

Regreso a la reseña de circunstancias contenidas en los testimonios de Elaskar y su confirmación a través de las pruebas que producimos y recogimos. No me voy a detener en el detalle y extensión de las actividades realizadas a través de SGI en la gestión de los negocios de Lázaro Baez; como en el caso de la "macro" estructura que subyace a tales asuntos y a la que me he referido en los párrafos anteriores, se trata de

---

[30] Fojas 1122

[31] Que se relacionan nuevamente con Molinari y el denominador común de Helvetic Services Group y, especialmente, el Italo/argentino Nestor Marcelo Ramos.

[32] Ver decretos del PEN números 1398 y 1399 del 5 de agosto de 2002.

hechos en cuya determinación debe trabajar el fuero federal. Con el norte en el manejo fraudulento de SGI y el despojo sufrido por Federico Elaskar, nos interesa aquí, someramente, la ratificación de la existencia de circunstancias compatibles con el lavado de activos denunciado, como parte de la actividad en la que nos hemos aventurado para ratificar los diversos tramos de los dichos de Federico Elaskar, de por sí ya harto incriminantes. En ese sentido, hemos incorporado a la causa, además del testimonio a través del cual Jorge Lanata da fe del relato hecho en su presencia por Leonardo Fariña[33], otros elementos relevantes en el sentido indicado, como la correspondencia entre los registros de migraciones de Fariña y Elaskar y los vuelos realizados por el avión Learjet, matrícula LV-ZSZ[34], o las constancias societarias que confirman la apertura de una filial de SGI en Panamá y al menos una cuenta radicada en esa jurisdicción a nombre de la misma compañía en el Banco venezolano Banesco. En ambos casos interviene Fabián Virgilio Rossi, sujeto señalado en los testimonios mencionados como la persona encargada del manejo de tales asuntos en aquel país. Muchos más elementos relacionados con esta cuestión tangencial a los hechos que nos competen, sin duda van a surgir de la certificación de lo realizado en el fuero federal, hemos procurado en todo momento no superponer esfuerzos y no hacerlo tampoco a futuro.

Merecen destacarse otras pruebas que ratifican lo dicho por Federico Elaskar acerca de la vinculación de Lázaro Baez con estos hechos. Entre esos elementos se cuenta con la actuación de Daniel Rodolfo Perez Gadín, quien se identifica a sí mismo en su curriculum publicado en internet como contador de varias de las sociedades de la familia de Lázaro Baez[35], así como la evidencia de los viajes realizados a España por Perez Gadín junto a uno de los hijos del empresario de Santa Cruz[36] y la compra del campo en la República Oriental del Uruguay con la intervención del citado Perez Gadin y Osvaldo Gutux, socio de aquél en la sociedad Organización de Asesoramiento y Consultoría Internacional S.A (OACI) y gerente financiero de la firma Valle Mitre S.A, administradora de los Hoteles regentados por los Baez.

También aportan indicios de interés, los testimonios recogidos en otras emisiones del programa "Periodismo para todos", en los que se describen maniobras muy similares de ocupación y apropiación de

---

[33] Ver fojas 10/13 de las actuaciones que corren por cuerda –copias de la causa número 17.133/20 3.

[34] Ver información de migraciones de fojas 135/137 y constancia de vuelos publicada por la prensa e incorporada en copia a fojas 2738.

[35] Ver copia del curriculum a fojas 338/339, allí aparecen como sus clientes las sociedades Austral Construcciones S.A, Epsur S.A, Grupo Valle Mitre, Hotel Alto Calafate.

[36] Ver detalle de vuelos a España de Perez Gadin, acomañado de Martín Baez, publicado en la nota agregada a fojas 2908.

*Ministerio Público Fiscal de la Nación*

IGNACIO RODRIGUEZ VARELA
SECRETARIO

sociedades y giros comerciales por Lázaro Baez y su entorno, análogas a las denunciadas por Federico Elaskar[37]. De todas formas, en lo que hace al vínculo mismo, es decir a la realidad de la relación entre la persona de Lázaro Baez y SGI, independientemente del detalle de los negocios intentados y consumados con ese continente, es sobreabundante la prueba a la que me voy a referir a continuación, vinculada a los hechos más estrechamente ligados a la extorsión investigada y al posible manejo fraudulento de los intereses de la sociedad y de terceros.

En definitiva, es también rigurosamente cierto, como lo ha dicho Federico Elaskar, que en la gestión y hasta en la ubicuidad misma de SGI se vio involucrado un individuo llamado Rodolfo Pérez Gadín. También son numerosos y concordantes los elementos de juicio directos e indicios que confirman su relación con Lázaro Baez. En un principio, fue suficiente la temprana consulta a la guía telefónica para comprobar que en Juana Manso número 555, piso 7mo. "C" y "B", domicilio de SGI, se hallaban instalados dos abonados registrados a nombre de la sociedad Organización de Asesoramiento y Consultoría Internacional S.A (OACI)[38]. A partir de este dato, recurrimos a las averiguaciones realizadas en el expediente que corre por cuerda, donde habíamos descubierto ya que Rodolfo Perez Gadín registraba cheques rechazados extendidos por cuenta de dicha compañía. Finalmente, incorporamos copia del contrato social de donde surge que Perez Gadín es uno de los socios de esa firma, junto con Oscar Osvaldo Gutux[39].

Al requerir mayor información a Telecom, no sólo se confirmaron las constancias de la guía sino que también se sumó el dato de un número de contacto para la contratación de las líneas, que resultó ser un teléfono celular a nombre de la empresa en cuestión[40]. De estas constancias surgió otro elemento relevante ya que las líneas fueron contratadas el 23 de febrero de 2011. Esto coincide con el relato de Federico Elaskar cuando da cuenta de tres tiempos de la intervención de Perez Gadín y el resto de los que lo acompañaron en el desembarco en SGI y su posterior apropiación. El primero de ellos se corresponde con esta contratación de líneas para las oficinas de los apartados "B" y "C" del 7mo piso del edificio y la referencia realizada por Elaskar acerca del tempranero mandato hecho por Lázaro Baez a Perez Gadín para controlar la aplicación que Leonardo Fariña hacía de sus dineros en SGI. El segundo tramo también fue diferenciado por el

---

[37] Testimonios de quien fuera una de las Secretarias Privadas de Nestor Kirchner, Miriam Quiroga, y de Estela Kank, integrante de las familias que fueron despojadas de la firma Kank y Costilla (fojas 2829).
[38] Ver informe de fojas 426/427 y 379/384.
[39] Ver fojas 713/726.
[40] Ver fojas 541/548 y 2185/2193.

propio Elaskar y se vincula con los episodios de junio a julio de 2011 que hemos visto reflejados en los asientos societarios reseñados en el primer apartado. Al parecer, los desmajes de Leonardo Fariña, a la par de su creciente exposición en los medios, habían llegado a tal punto que el desembarco debía transformarse en una ocupación. Aquí se vincula nuevamente al milímetro el testimonio de Elaskar con las pruebas objetivas. En las entrevistas afirmó que en junio de aquel año, Perez Gadín le informó que debía permitir que SGI fuera infiltrada por "auditores" que revisarían la suerte corrida por los dineros de Lázaro Baez. Es entonces cuando el tramo inicial de control general por Perez Gadín, con la anuencia de Elaskar, se transformó en una lisa y llana extorsión.

No voy a reiterar aquí las criminales amenazas y advertencias que relató Elaskar; para ese detalle he transcripto más arriba sus testimonios. Sólo voy destacar la relación lógica que existe entre tal enunciado y la evidencia que reseñamos en el primer apartado acerca del violento cambio de timón verificado en la gestión de la compañía. A la luz del relato de Elaskar, se comprende y encuentra razón de ser el hecho de que aquel pasara, en menos de un día, de presentar para su aprobación el ejercicio de 2010, cuarto concluido bajo su presidencia, a desaparecer por completo del directorio y dar cuenta de la venta de la mitad de sus acciones en precarias y obscuras circunstancias. Con este segundo tramo se relaciona otra categórica confirmación del relato de Elaskar; me refiero al dúo de interventores introducido por Perez Gadín, y a los que aquel apenas mencionó como "Cerrota" y otro individuo cuyo nombre no recordaba. Estos dos no son sino Jorge Norberto Cerrota y Eduardo Guillermo Castro, a quienes hemos visto ya aparecer en la repentina acta de asamblea ordinaria del 18 de julio de 2011 en la que fueron designados, sin ningún antecedente ni noticia previa, como directores titulares de SGI Argentina S.A.

Es decir que, tal como lo dijo Elaskar, desde el mes de julio en adelante, no sólo había sido despojado de sus cargos en SGI, sino que había sido forzado a tolerar la intervención de los auditores de Perez Gadín y Lázaro Baez en la compañía de la que aún participaba con el 47% de las acciones. Esto confirma la realidad de aquel tercer período en la gestión de hierro de Perez Gadín, a la que alude Elaskar como extendida hasta que se dio por terminada la "auditoría" y se lo obligó bajo amenazas hacia su persona y su familia a desprenderse por completo de la sociedad, entre otras razones mafiosas por aquella consabida de que a esa altura "sabía ya demasiado". En orden a la confirmación de este tercer y postrer tramo del despojo, hemos conseguido finalmente desentrañar los dos tiempos en los que se produjo el desprendimiento por Elaskar de sus acciones, extremo

*Ministerio Público Fiscal de la Nación*

José María Campagnoli   IGNACIO RODRIGUEZ VARELA
FISCAL                           SECRETARIO

este que se ha visto vinculado con otras circunstancias igualmente relevantes e incriminantes, como hemos de ver en adelante.

Esos dos tiempos se verificaron, en coincidencia con el relato de Elaskar, el primero en medio de los frenéticos cambios sociales del 16 de junio al 18 de julio de 2011 y el segundo el 21 de octubre de 2011, pocas horas antes de que Federico Elaskar se embarcara para volver recién un año después. La venta o forzosa cesión inicial de la mitad de las acciones, si bien no fue publicada, instrumentalizada individualizada ni, seguramente, informada a las autoridades de contralor[41], al menos aparece asentada en la rocambolesca reunión de directorio número 50, del 4 de julio de 2011; allí se consigna lacónicamente que Elaskar había concretado la transferencia el 1ro de julio, *que fue justamente viernes*, con lo que se acercan las pruebas una vez más al relato de la víctima y el especial hincapié hecho sobre la severa advertencia de Perez Gadín. Recuérdese que debía allanarse un viernes a las órdenes de Lázaro Baez, o bien aguantarse el lunes siguiente las funestas consecuencias de su eventual rebeldía.

En este punto, la evidencia con la que contábamos acerca de la cesión de las acciones de Elaskar, presentaba una fisura lógica. Su versión sobre un despojo total se contradecía con el hecho de que en los documentos de la sociedad aparecía sólo la venta de la mitad de las acciones el 1ro de julio. Incluso, en relación a ese tramo, la aparición como supuesto nuevo accionista de la empresa SERNORTE HOLDING S.A, contrastaba con el relato de Federico Elaskar, quien afirmaba haber sido obligado a ceder sus acciones a una sociedad propiedad de Lázaro Baez llamada HELVETIC SERVICES GROUP. Fue al tratar de desentrañar este punto cuando, finalmente, conseguimos también las pruebas de la cesión completa de las acciones y la renuncia misma de Elaskar a todos sus derechos.

En principio, solicitamos a la Inspección General de Justicia los datos de SER NORTE HOLDING S.A, con la esperanza de ver aparecer a Helvetic Services Group como accionista. Sin embargo, el contrato constitutivo incorporado a fojas 438/446, sólo sirvió para confirmar la intervención en el asunto de los abogados Jorge Oscar Chueco y Cristian Martín Deli Quadri, únicos socios de aquella entidad. Requerimos entonces a la escribanía que había labrado la escritura, que enviara todos los antecedentes vinculados con ella, especialmente las constancias del libro

---

[41] Al menos nada se habría publicado, en absoluto, en el Boletín oficial acerca de SGI desde mayo de 2011 —convocatoria a la frustrada o fracasada asamblea extraordinaria del 15 de junio-; no descarto que, en todo el tiempo que se está tomando la Inspección General de Justicia para contestar mi requerimiento de hace casi tres meses, el legajo de SGI se vea engordado y emprolijado.

de requerimientos en el que se registran las certificaciones de firmas en actos privados. De esta manera, individualizamos primero una certificación de firmas del 21 de octubre de 2011 en un contrato de cesión de las acciones de Ser Norte Holding S.A -y, por ende, de la tenencia accionaria de dicha sociedad en SGI Argentina S.A-. Como partes aparecían, además de Chueco y Del Quadri, obviamente interviniendo como socios de la firma cedida, un hombre llamado *Néstor Marcelo Ramos*, identificado con el pasaporte Italiano número B612924.

A partir de este dato comprobamos que el tal Ramos era mencionado en los registros consultados como directivo de Helvetic Services Group[42], justamente la sociedad a la que decía Elaskar haber sido obligado a ceder sus acciones. Logrado esto, buscamos los antecedentes en la Argentina de una sociedad con tal denominación, averiguaciones estas que sirvieron de punto de partida de aquel vasto panorama de sociedades y negocios al que hemos hecho alusión más arriba y que merece, por su relevancia e implicancias para esta investigación y aquellas que se tramitan en los otros fueros, ser someramente expuesta en el siguiente apartado.

4. Advierto, a modo preliminar, que en atención al rol fundamental que le cupo en el asunto que aquí nos interesa, nos propusimos establecer no sólo los datos precisos de radicación y constitución de Helvetic Services Group sino también la identidad de sus responsables, la de sus socios o accionistas y, en la medida de lo posible, el giro de sus negocios que, en tanto supone el aprovechamiento de los frutos de la extorsión investigada, deben ser objeto de las debidas cautelas reales y demás interdicciones previstas por la ley[43].

La primera huella de Helvetic Service Group en los registros de nuestro país, la hemos encontrado en la siguiente publicación del Boletín Oficial de la República Argentina del 11 de diciembre de 2007.

EYDEN GROUP LLC

Sociedad vehículo. País de origen: Estados Unidos. Sociedad de responsabilidad limitada. Representante legal según acta del 19/10/2006 Levita Edgardo Raúl. Domicilio const. Montes de Oca 1530 - Capital Federal. Sociedad controlante Helvetic Service Group S.A. inscripta con n 547 libro 58 tomo B de extranjeras poseedora del 100% de las acciones según acta del 31/10/2007. Representante legal según acta del 20/02/2006 Horacio E De Bonis. Domicilio const. José M. Moreno 1925 - Capital Federal.

Abogado - Horacio F. De Bonis

Legalización emitida por: Colegio Público de Abogados de la Capital Federal. Fecha: 6/12/2007. Tomo: 80. Folio: 529.

e. 11/12/2007 Nª 105.167 v. 11/12/2007

---

[42] Ver informe de fojas 757/784.

[43] Artículos 23 y 29 de Código Penal, 518 del C.P.P y resolución PGN 129/2009.

*Ministerio Público Fiscal de la Nación*

José María Campagnoli
FISCAL

IGNACIO RODRIGUEZ VARELA
SECRETARIO

Como datos relevantes, en primer lugar se trata de una declaración de vinculación societaria, seguramente realizada en miras a un negocio o acto jurídico en la Argentina, a ser ejecutado en fechas cercanas a la publicación en cuestión. Aparece Helvetic Service Group como inscripta en la Inspección General de Justicia (número 547, libro 58, tomo B de sociedades extranjeras), representada, por acta cuya entidad no se menciona pero se supone se trata de acta de asamblea de accionistas del 20 de febrero de 2006, por *Horacio E. De Bonis*, con domicilio en José María Moreno 1925 de Capital Federal. El propio Horacio F. De Bonis, abogado, se ocupa de esta publicación y de la legalización por el Colegio Público de abogados el 6 de diciembre de 2007. Lo que se declara es la tenencia, por parte de HSG, del 100% de las acciones de la "sociedad vehículo" denominada *EYDEN GROUP LLC*. Oficia, siempre según esta publicación, como representante legal de la sociedad constituida en EE.UU, EYDEN GROUP LLC, *Edgardo Raúl Levita*, con domicilio en Montes de Oca 1530 de Capital Federal.

La segunda aparición en el Boletín oficial de "Helvetic Service Group" la encontramos el 21 de enero de 2008; es complementaria de la anterior.

**EYDEN GROUP LLC**

Complementaria del aviso publicado el 11/12/07. Factura 105.167. País de origen: Estados Unidos. Según el Estatuto Organizativo la sociedad fue registrada el 29/9/06 con el N E0737762006-0. Representante residente MF Corporate Service (Nevada) Limited. Domicilio físico: 520 S 7th. Street, Suite C- Ciudad Las Vegas-Nevada-Código Postal: 89101. La compañía es administrada por el gerente cuyo nombre es: Aldyne Ltd. Domicilio: Suite 13, 1st floor, Oliaji Trade Francis Rachel St. Victoria Ciudad Mahe-Estado: Seychelles. El objeto a desarrollar en Argentina será realizar actividades de inversión en bienes muebles e inmuebles conforme a su objeto social. Único socio: HELVETIC SERVICE GROUP S.A. con una participación accionaria del 100%. Representante legal Levita Edgardo Raúl. Domicilio especial y sede social: Av. Montes de Oca 1530 Capital Federal. Sociedad controlante: HELVETIC SERVICE GROUP S.A., compañía de derecho suizo con domicilio en Vía alla Sguancia 23, 6900 Pazzallo, Suiza. Constituida el 14/11/05 ante el registro de empresas suizas con el número CH 143029661-5. El capital accionario se estableció en Francos Suizos 100.000.- (cien mil). Según acta del 08/11/06 son accionistas de la misma: Marcelo Ramos con el 33% del capital y Varena Fontana con el 67%. Representante legal Horacio F. De Bonis. Domicilio especial y sede social: Av. José M. Moreno 1925- Capital Federal. Horacio F. De Bonis- Abogado. Legalización emitida por Colegio de Abogados Capital Federal el: 16-01-2008. Autorizado por acta del 20-2-2006.

Horacio De Bonis

Legalización emitida por: Colegio Público de Abogados de la Capital Federal. Fecha: 16/01/2008. Tomo: 80. Folio: 529.
e. 21/01/2008 N° 73.997 v. 21/01/2008

En esta segunda publicación, encaminada muy probablemente al cumplimiento de las exigencias de la Inspección General de Justicia vinculadas con las sociedades constituidas en el extranjero, aparecen más datos de inscripción de Eydeen Group (registrada el — 29/9/06 con el N

0737762006-0 en el Estado de Nevada, con representante residente allí gura *MF Corporate Service Limited*, y domicilio en Las Vegas, calle 520 S th. Street, Suite Código Postal: 89101), así como los datos de una nueva ociedad, en este caso la "Administradora", denominada *Aldyne Ltd*, con un domicilio en el muy mentado paraíso Fiscal de la Islas Seychelles, Suite 13, 1st floor, Oliaji Trade Francis Rachel St. Victoria. Se vuelve a señalar que Helvetic Service Group S.A es único socio con 100% de las acciones de Eydeen –no precisa si también es titular de la administradora Aldyne ltd-, así como que su domicilio en Suiza es en Sguancia 23, 6900 Pazzallo y que fue constituida el 14 de noviembre de 2005 con el registro Suizo CH 143029661, el capital accionario es de 100.000 Francos Suizos y sus accionistas *Marcelo Ramos* con el 33% del capital y *Verena Fontana* con el 67%.

La tercer y última publicación del boletín oficial vinculada a Helvetic Services Group data del 16 de septiembre de 2010, fecha está cercana a los negocios iniciados a fines de ese año y el primer semestre de 2011 con epicentro en SGI. Allí se lee:

> Se informa que Helvetic Services Group S.A. Sociedad constituida el 14 de Noviembre de 2005 e inscripta en el Registro de Comercio Suizo, con domicilio en Vía Alla Sguancia 23, Pazzallo 6912, Lugano, Suiza, cuya sede social en la República Argentina es en Conesa 1970, piso 14°, CABA, según resolución de Asamblea del 19 de Febrero de 2010 se resolvió designar representante legal de la Sociedad en los términos del art. 123 Ley 19.550 al Sr. Javier Martín Vanella, D.N.I. 31.449.618, de nacionalidad argentino, nacido el 8 de Marzo de 1985, estado civil soltero, profesión Licenciado en Administración de Empresas, Magíster en Finanzas, con domicilio en la calle Conesa 1970, piso 14°, de la Ciudad Autónoma de Buenos Aires, hijo de Carlos Javier Vanella y María Rosana Ramos, por plazo indeterminado. Asimismo en la misma reunión se acepta la renuncia del Sr. Horacio Francisco de Bonis, DNI 10.137.303, ratificando toda su actuación. Sede Social y domicilio legal en la República Argentina: Conesa 1970, piso 14°, Ciudad Autónoma de Buenos Aires. Fecha de cierre de ejercicio económico: 31 de Diciembre de cada año. Dr. Guillermo A. Federico Autorizado por el Representante Legal por instrumento privado de fecha 18 de agosto de 2010. Dr. Guillermo A. Federico Autorizado. Abogado " Guillermo A. Federico Legalización emitida por: Colegio Público de Abogados de la Capital Federal. Fecha: 13/09/2010. Tomo: 71. Folio: 282. e. 16/09/2010 N° 107727/10 v. 16/09/2010".

Con los datos de las tres publicaciones reseñadas, se inició en primer lugar una búsqueda de registros societarios de Eyden Group LLC. Se comprobó que, además de aparecer inscripta en la Argentina con el CUIT 30-71080910-7, le corresponden los datos de radicación en el estado de Nevada EE.UU que fueron consignados, junto al resultado de otras

*Ministerio Público Fiscal de la Nación*

José María Campagnoli
FISCAL

IGNACIO RODRIGUEZ VARELA
SECRETARIO

averiguaciones, en el informe del 7 de mayo[44]. Hecho esto, además de confirmarse el rol de la firma "offshore" Aldyne cómo administradora o "manager" de la firma Eyden Group LCC, la consulta del registro oficial de la citada jurisdicción norteamericana permitió individualizar *otras 148 compañías creadas en ese mismo lugar, todas ellas con el mismo domicilio y manejadas por la misma sociedad de las Islas Seychelles*, uno de los paraísos fiscales mencionados por Federico Elaskar en sus testimonios.

Más aún, del estudio de toda la serie de más de un centenar de sociedades, se advierte que su creación se inicia con la firma "Lake County LLC", cuyo expediente se forma el 30 de julio de 2002, apenas seis días antes de la firma de los decretos por los que se convocó a elecciones internas y elecciones nacionales para la Presidenciales celebradas al año siguiente. En el otro extremo, los trámites de apertura de sociedades se interrumpen drásticamente el 15 de octubre de 2010, cuando se inicia el expediente de la compañía ANGRAIN LLC; una semana antes de la muerte del ex Presidente de la Nación Néstor Kirchner. No se detecta , en estas 148 compañías, prácticamente ningún trámite de creación posterior, a excepción de la aislada constitución de la última sociedad de esta serie, el 15 de febrero de 2011[45].

En cuanto al resto de los datos del boletín oficial asociados a Helvetic Services Group S.A, la búsqueda se concentró luego en *Edgardo Raúl Levita*, quien aparece en la primera publicación como apoderado de Eyden Group LLC, con domicilio en Montes de Oca 1530. Es así que se lo encontró integrando el directorio de LUJAN VILLAGE S.A -10 de agosto de 2009- junto a *Carlos Juan Molinari*, a quien nos hemos referido más arriba como a una persona vinculada públicamente con Leonardo Fariña y Federico Elaskar. Existen varias publicaciones donde el citado Molinari, señalado como empresario y candidato a vicegobernador en una fórmula con el intendente de José C. Paz, Mario Ichi, se presta a entrevistas y explica el vínculo de su hijo *Matias Molinari* con Fariña y Elaskar. Dijo ser, entre otras cosas, quien pagó la muy mentada fiesta de casamiento de Fariña en el Hipódromo de Palermo. Del boletín oficial del 1ro de diciembre de 2005, surge otra sociedad más integrada por Levita y Molinari, denominada ADG, Administración, Desarrollo y Gestión de Emprendimientos S.A.

---

[44] Fojas 1106/1122.

[45] MC PIRDON INVESTMENTS FUND LTD.

ADG ADMINISTRACION, DESARROLLO
Y GESTION DE EMPRENDIMIENTOS

SOCIEDAD ANONIMA

1) Esc. del 09/11/05. 2) Carlos Juan Molinari, argentino, 3/11/50, divorciado, empresario, DNI 8.382.872, Av. Del Libertador 6746, p. 7 dto. A, Sector Libertador, Capital; Mario Daniel Graglena, argentino, divorciado, empresario, DNI 8.489.881, Pte. Perón 476, p. 9 dto. B, Lomas de Zamora, Pcia. de Bs. As.; y Héctor Guillermo Villar, argentino, 8/12/45, divorciado, lic. en economía, LE 4.541.781, Eizalde 52, PB, Avellaneda, Pcia. de Bs. As. 3) ADG ADMINISTRACION, DESARROLLO Y GESTION DE EMPRENDIMIEN-

TOS S.A. 4) Domicilio legal y especial calle Sarmiento 930, Piso 3, Capital. 6) Duración 99 años. 6) La sociedad tiene por objeto realizar por cuenta propia, de terceros o asociada a terceros, en el país o en el extranjero, las siguientes actividades: Constructora Inmobiliaria: La ejecución de proyectos, dirección, administración, asesoramiento y realización de obras públicas y privadas, desarrolladora inmobiliaria, obras civiles, obras de arquitectura y/o ingeniería, de infraestructura y equipamiento urbano, de saneamiento y protección del medio ambiente; incluso obras viales, hidráulicas, portuarias y eléctricas; la edificación de barrios, viviendas individuales y colectivas; complejos habitacionales, conjuntos urbanos y desarrollo de urbanizaciones; mensuras, locación de obra y servicios; concesiones públicas o privadas en general; compraventa, permuta, arrendamiento, intermediación, loteos, refacción, construcción y explotación de inmuebles urbanos y/o rurales; incluso todas las operaciones comprendidas en la Ley de Propiedad Horizontal. Comercial: Compra, venta, distribución, importación, exportación, repre-

sentación y distribución de todo tipo de materiales para la industria de la construcción. Industriales: Fabricación, elaboración, transformación e industrialización de materiales metalúrgicos, madereros, plásticos, eléctricos, mecánicos y demás productos relacionados con la construcción, destinados a todo tipo de construcciones. A tal fin, la sociedad tiene plena capacidad jurídica para adquirir derechos, contraer obligaciones y realizar toda clase de actos, contratos y operaciones que se relacionen con el objeto social. Asimismo, las actividades que lo requieran serán ejercidas por profesionales con título habilitante. 7) $ 25.000. 8) Directorio: 1 a 7. Plazo de Duración: 3 ejercicios. Presidente: Carlos Juan Molinari. Vicepresidente: Diego Molinari. Director Titular: Mario Daniel Graglena. Director Titular: Edgardo Raúl Levita. Director Suplente: Juan Esteban Villar. Domicilio especial y legal: Sarmiento 930, Piso 3, Capital. 9) Presidente de sindicatura. 10) Presidente y Vicepresidente en forma conjunta. 11) 31 de diciembre de cada año. Autorizada por Esc. N° 438 del 9/11/05 folio 2102 registro 1742.

Abogada – Carolina J. Vega

Certificación expedida por: Alfredo M. Soares Gache, 1° Registro: 1742, N° Matrícula: 3473. Fecha: 25/11/05, N° Acta: 113, Libro N°: 31.

N° 78.424

Este comprobado vínculo entre Levita y Molinari, oficia como una suerte de puente entre los entramados societarios del primer período de fines de 2002 a fines de 2010, caracterizado por hallarse siempre Helvetic Services Group S.A actuando por detrás de Aldyne LTD hasta constituir más de una centuria de sociedades en Nevada, y la era inaugurada desde entonces hasta nuestros días, donde vuelve a aparecer Helvetic Services Group S.A fagocitándose el giro de SGI e integrando ella misma, sus directivos o sus accionistas cerca de cincuenta sociedades por todo el mundo. A lo dicho sobre la vinculación entre Levita y Molinari puede agregarse en orden a la señalada continuidad entre los dos períodos, que existe evidencia de la utilización en el primero de ellos de una financiera que cayó en desgracia como consecuencia de la investigación iniciada por los fraudes vinculados con el programa de viviendas "Sueños Compartidos" gestionado por la Fundación Madres de Plaza de Mayo. Se trata de la sociedad denominada *MONETIZACIÓN S.A*, manejada por — **Fernando Caparros Goméz** y, al parecer, disuelta luego de los allanamientos ordenados por el Juzgado Federal que interviene en esa causa. Las referencias de las que damos cuenta en nuestros informes, señalan que el giro de Monetización habría continuado en otro domicilio bajo el nombre de la firma LEBE S.A, de Edgardo Raúl Levita. Cabe agregar que en los registros del ANSES, esa sociedad figura como empleadora del nombrado Fernando Caparros Gómez.

Regresando a las constancias halladas en torno a la actividad de Helvetic Group en la República Argentina, encontramos una tercer publicación, relacionada con la adquisición de acciones de una sociedad que cotiza en la Bolsa de Comercio[46]

---

[46] http://www.mergersnews.com.ar/n34/fusiones.htm

*Ministerio Público Fiscal de la Nación*

IGNACIO RODRIGUEZ VARELA
SECRETARIO

José María Campagnoli
FISCAL

**09.05.08:** Ampliando lo informado el día 6, **Continental Urbana SA Inversora** comunicó la adquisición de la totalidad de las acciones de Jorge **Horacio Brito** y **Delfín Jorge Carballo,** quienes ostentaban cada uno el 23,64% de la Sociedad, por parte de las siguientes personas: **Isaac Salvador Kiperszmid,** 941.115 acciones (14,94% del capital); **DYPSA Desarrollos y Proyectos SA,** 600.630 acciones (9,53%); **Pershing LLC,** 727.669 acciones (11,55%); **Ernesto Gualterio Dolhare,** 252.000 acciones (4%); **Helvetic Service Group SA,** 259.151 acciones (4,11%); y negociado en el MERVAL, 198.562 acciones (3,15%). El cambio de control derivó en un cambio de autoridades de la Sociedad. Fuente: Bolsa de Comercio BsAs

A partir de estos datos, iniciamos una fecunda línea de investigación, que nos permitió obtener, por primera vez, datos certeros y documentos autenticados de Helvetic Services Group S.A; incluso, conseguimos individualizar los primeros activos de dicha firma en la República Argentina[47]. Así, oficiamos sucesivamente a la Bolsa de Comercio, a la sociedad cuyas acciones eran objeto del negocio –Continental Urbana S.A-, a la Caja de Valores y a los Agentes de bolsa involucrados. En resumidas cuentas, logramos establecer que Helvetic Services Group S.A no solo adquirió las acciones por un monto total de 1.372.820 dólares, pagados por mitades a *Jorge Horacio Brito* y *Delfín Jorge Carballo* merced a transferencias realizadas a las cuentas de los nombrados en el Standard Chartered Bank de New York[48], sino que también adquirió tres unidades en las Torres Renoir de Puerto Madero, a través de nueve transferencias realizadas desde un origen hasta el momento individualizado sólo como órdenes de pago del "Federal Reserve Bank"[49], hacia una cuenta abierta por *Isaac Salvador Kiperszmid (Dypsa Desarrollos y proyectos S.A)* en las Oficinas del Banco Santander Central Hispano Internacional de Miami.[50]

En estas operaciones, tanto personalmente o de manera indirecta entre Buenos Aires y Suiza, por cuenta de Helvetic Services Group intervino siempre *Nestor Marcelo Ramos,* quien se identificó con el mismo pasaporte italiano con el que lo vemos aparecer en la comentada cesión de las acciones de SER NORTE S.A y SGI ARGENTINA S.A del 21 de octubre de 2011, aunque en la completa documentación societaria incorporada a los antecedentes de estas adquisiciones, es señalado como nacido en la República Argentina[51].

---

[47] Informes de la Caja de Valores, Continental Urbana y la Sociedad de Bolsa Amirante-Galitis, a fojas 1304/1425, 1760/1963, 2183/2184bis, 2251/2261, 3092/3036/3037/3040.

[48] Ver fojas 1323

[49] Ver fojas 1931/1946

[50] Ver fojas 1951

[51] El DNI que le corresponde es el , con el que la Dirección Nacional de Migraciones informó que registró su última salida de la República Argentina el 7 de abril de 2013, apenas una semana antes de la emisión del primer programa del actual ciclo de "Periodismo Para Todos". Del estudio de ese registro se advierte que el nombrado pasa buena parte del año en nuestro país o de viaje entre la Argentina, Uruguay,

Seguramente estos datos serán de interés para la investigación abierta en el fuero Federal; nótese, entre otras circunstancias, que el origen y la realidad misma de alguna de estas transferencias —como las supuestamente dirigidas a Brito y Carballo- permanecen en una nebulosa, además de no superar nunca los montos comprobados el millón de dólares ni los pagos parciales los cien mil dólares. En cuanto a las acciones de Continental Urbana, nos fue informado que Helvetic Services Group, representada todavía en este negocio por el abogado Horacio Debonis[52], las transmitió en 2009 a una fantasmal entidad denominada HUSTON SLL, identificada en las constancias de la Caja de Valores y en los documentos aportados por la Sociedad de Bolsa Amirante-Galatis, con un número de CUIT de una persona física que, según el resto de los documentos, oficiaba como representante de la destinataria de las acciones; me refiero a Carlos Alberto Catania.

*Ahora bien, al igual que Eyden Group LLC, Huston Managment LTD resultó ser otra de las 148 sociedades que hemos individualizado como constituidas entre 2002 y 2010 en Nevada y manejadas por Aldyne LTD de las Islas Seychelles y esta, a su vez, controlada por Helvetic Services Group* que, nuevamente, aparece como titular del 100% de las acciones de la "sociedad vehículo". Del resumen de cuenta surge que las acciones compradas por Helvetic Services Group S.A y transmitidas en una mera simulación a la sociedad de la que es única accionista, permanecen inmovilizadas desde los actos reseñados y constituyen el único activo perfectamente individualizado de la sociedad que se benefició con los frutos de la extorsión. Por esta razón hemos de requerir su embargo inmediato.

Lo señalado en el párrafo anterior se complementa con otros movimientos compatibles con el blanqueo de los dineros que habría recibido ese contingente de 148 sociedades "off shore", sobre cuya real extensión deberán aplicarse los magistrados federales. Aquí agrego las operaciones y registro detectados en nuestro país en el caso de las firmas *Balmont Holding ltd[53], Blue Dreams SRL[54]* y *Ground LLC[55], Ingelec Group*

---

Panamá y Perú, además de sus cíclicos retornos a Europa. Uruguay y Panamá, como hemos visto, son destinos que guardan relación con los movimientos de fondos y armado de sociedades a los que aludió Elaskar en sus testimonios donde seguramente se refiere a Helvetic SErvices Group y a los oficios de Nestor Marcelo Ramos cuando se refiere a los consultores Suizos y a los sólidas recursos con los que contaban en ese país, destino mayoritario del dinero, para blanquear los bolsos de dinero recibidos de Lázaro Baez. Ver informe de Migraciones a fojas ▓▓▓▓/▓▓▓▓

[52] Sería reemplazado en 2010, según la tercera de las publicaciones del boletín oficial, por Martín Javier Vanella, sobrino de Juan Carlos Ramos –ver informes remitidos por el Registro Nacional de las Personas y la Policía Federal Argentina a fojas -

[53] Compra de un enorme terreno en Las Lomas de San Isidro Tomkinson 2175 de Beccar –ver fojas 1295/1296- e información pendiente del Juzgado Comercial 4, Secretaría número 7.

[54] Registrada en la Argentina e inscripta en la AFIP, ver fojas 1290/1292.

*Ministerio Público Fiscal de la Nación*

José María Campagnoli
FISCAL

IGNACIO RODRÍGUEZ VARELA
SECRETARIO

**LLc**[56], **Coreley Properties INC**[57], **Trenton Properties LTD**[58] y la sugestiva operación de venta de repuestos militares que la firma **Galway Scott Trading Ltd.** habría celebrado el 8 de noviembre y el 13 de diciembre de 2007 con la Marina de Guerra de la República del Perú[59].

Esta misma investigación se trasladó, una vez confirmada la aparición de Helvetic Services Group como centro neurálgico de estos negocios, a las sociedades constituidas por esa misma firma o las personas con ella vinculadas en el segundo período del entramado de sociedades y movimientos de dinero. Así, además de SGI Argentina controlada junto a sus filiales por Helvetic Services Group desde julio de 2011, en un corto período que va desde fines de 2010 hasta mediados de 2011, hemos comprobado la constitución o toma de dominio de 18 sociedades radicadas en Inglaterra, 8 en Irlanda, 9 en España, 10 en Suiza, una en Luxemburgo, un par en Panamá, 3 en Uruguay y 2 en Nueva Zelanda. De acuerdo al detalle realizado en los informes de fojas 2622/2652 y fojas 3421/3426, en la mayoría de ellas interviene Helvetic Services Group como única accionista o administradora, o bien aparecen como directivos **Néstor Marcelo Ramos,** su sobrino **Javier Martín Vanella** o, en algo propio de este segundo tramo, el mismísimo **Daniel Rodolfo Perez Gadín** o sus allegados como Jorge Oscar Chueco y Osvaldo Gutux.

De estas sociedades del segundo período, hasta el momento -en otro extremo cuya íntegra dilucidación será asunto de la investigación por lavado de activos de la justicia federal- hemos detectado retornos de actividad por estas pampas en operaciones a nombre de la sociedad radicada en Inglaterra **Swiss Hotels Limited**[60] y la sociedad radicada en Luxemburgo **Nactus Investors S.A.**[61] ambas inscriptas como sociedades extranjeras en la Provincia de Buenos Aires, además de la adquisición de un extenso y costoso campo en la República Oriental del Uruguay con la intervención de las sociedades radicadas en ese mismo país **Traline Corporation S.A** y **Jumey S.A**[62] y la vasta operatoria en la compra y venta de sociedades en las que aparece interviniendo en Argentina, Uruguay y Peru, la sociedad radicada en Suiza **Vansomatic Suisse S.A.**[63]

---

[55] Registrada en la Argentina, ver fojas
[56] Fojas 2622/2652.
[57] Registrada en la Argentina, ver fojas 1289
[58] Fojas 2622/2652.
[59] Fojas 2622/2652.
[60] Informe de fojas 3439/3443
[61] Informe de fojas 3354/3383
[62] Informe de fojas 2233/2243
[63] Informe de fojas 3439/3443



den Group LLC.......................Registrada en Arg.
uston Managment LTD...........Recibe acciones de
Continental Urbana" (Brito y Carballo).
almont Holding ltd...................Registrada, compra
inmueble en Lomas de San Isidro.
lue Dreams SRL........................Registrada en Arg.
iround LLC..................................Registrada en Arg.
ngelec Group LLC......................Activ comerciales en
Argentina, Bolivia, Chile y Argentina..
Coreley Properties INC.............Registrada en Arg.
Trenton Propierties LTD...........Compra acciones de
Grunbaun, Rico & Dacourt
Galway Scott Trading Ltd.........Vende repuestos a la
Armada del Perú

Swiss Hotels Limited.................Registrada en PBA
Nactus Investors S.A...................Registrada en PBA
Traline Corporation S.A.............Compra campo en
Uruguay.
Jumey S.A....................................Participa con Traline
Corporation S.A
Vansomatic Suisse S.A..............Mercado de pases de
futbolistas en Argentina, Perú, Uruguay y Suiza.

Retornos con registros
y actividades en
Argentina

Retornos con registros
y actividades en
Argentina

148 sociedades en
Nevada EE.UU

Sociedades en Uruguay, Perú, EE.UU, Panamá,
Inglaterra, Nueva Zelanda, Irlanda, España, Suiza, y
Luxemburgo

ALDYNE LTD (Islas
Seychelles)

SGI Argentina SA.

Nestor Marcelo Ramos
Javier Martín Vanella
Daniel Rodolfo Perez Gadin
Oscar Osvaldo Gutux

HELVETIC S. G.
Nestor Marcelo Ramos
Edgardo Raúl Levita
Horacio De Bonis
Carlos Alberto Catania

HELVETIC S. G.

Julio 2002/octubre 2010.

Desde fines de 2010

**5.**Hecho este paréntesis con la investigación en torno al giro de Helvetic Services Group y las personas a ella vinculadas en tanto depositaria de los beneficios de la extorsión sufrida por Elaskar y el desmantelamiento de SGI Argentina S.A, podemos regresar al segundo tramo de actos merced a los cuales el nombrado fue despojado por completo de sus acciones y obligado a renunciar a sus derechos.

Se trata de la visión íntegra de lo ocurrido el 21 de octubre de 2011, lograda con un nuevo aporte de constancias del libro de requerimientos del escribano titular de la matrícula 4827 de la Capital Federal. De allí surge que ese día, no sólo se certificaron las firmas de la cesión de acciones de Ser Norte Holding S.A a Néstor Marcelo Ramos, accionista de Helvetic Services Group –fojas 1708/1709-, sino también las de una

*Ministerio Público Fiscal de la Nación*

José María Campagnoli
FISCAL

IGNACIO RODRIGUEZ VARELA
SECRETARIO

"Renuncia" de Federico Elaskar[64] -1714/1715- y dos cesiones de acciones del nombrado a favor de Eduardo Guillermo Castro –fojas 1716/1717- y Néstor Marcelo Ramos –fojas 1718/1719-[65]. Desde entonces, e independientemente de la entidad de la tenencia accionaria que parece haber conseguido para sí el "auditor" Castro, la sociedad SGI, sus filiales y controladas, –entre ellas, posiblemente varias de las entidades creadas en el frenético primer semestre de 2011- pasaron a ser manejadas a través de Helvetic Services Group y el enigmático testaferro Néstor Marcelo Ramos.

Por todo lo expuesto;

**DISPONGO:**

**I.** Librar oficio al Señor Fiscal Guillermo Fernando Marijuán, a cargo de la Fiscalía en lo Criminal y Correccional Federal número 9 para acompañar copia de este dictamen y hacer saber que todo lo actuado en esta sede se encuentra a su disposición para su consulta y el aprovechamiento en la investigación por lavado de activos que se sigue adelante con su intervención.

**II.** Remitir el presente sumario al Juzgado de Instrucción número 42, Secretaría 106, requiriendo a la Señora Jueza a cargo del Tribunal que:

**1.** *Ordene la declaración indagatoria*, en orden a la extorsión sufrida por Federico Elaskar, de ***Lázaro Baez, Daniel Rodolfo Perez Gadín, Jorge Norberto Cerrota, Eduardo Guillermo Castro, César Gustavo Fernandez, Alejandro Ons Costa, Juan Ignacio Pisano Costa, Jorge Oscar Chueco, Cristian Martín Delli Quadri y Néstor Marcelo Ramos.***

**2.** *A fin de secuestrar la documentación, archivos y soportes informáticos y digitales* vinculados a la firma Helvetic Services Group y su giro comercial, incluyendo las sociedades por ella controladas como Huston Managment Ltd, Eyden Group LLC y el resto de las mencionadas en este dictamen e incluidas en los informes de la causa, como así también los contratos de cesión de acciones de Ser Norte Holding S.A y SGI Argentina S.A y cualquiera de sus filiales y sociedades controladas, como SGI Bursatil Sociedad de Bolsa, Vanquish S.A, SGI Inversiones y Participaciones S.A, Latin Minds S.R.L y ATC Argentina Trust Comany S.A Ser Norte Holding S.A, *se ordene el registro de los domicilios* de *Edgardo Raúl Levita* –Montes de Oca 1526/1530 y Pasaje Carabelas 281, piso 6to, Departamento "G", de Capital Federal-, *Horacio De Bonis* –José María Moreno 1919/1925 Capital Federal-, *Carlos Alberto Catania* –Avenida Córdoba 996, piso 3ro F Capital Federal-, *Javier Martín Vanella* –Conesa 1970, piso 14 de Capital Federal y,

---

[64] Como primicia de su cercano desarraigo, en todas estas certificaciones de firmas del 21 de octubre, Federico Elaskar informa como domicilio el del estudio de Jorge Oscar Chueco en Paraguay 1225, piso 11.

[65] Vale la pena señalar que en las certificaciones de firmas registradas en el mismo libro de requerimientos agregadas a fojas, Perez Gadín señala como domicilio propio el de SGI en Juana Manso 555, 7mo "B" –fojas 1742/1747-



exhorto mediante, de Rondeau 471, piso 6to de Nueva Córdoba, Ciudad y Provincia de Córdoba-, *Jorge Oscar Chueco* —Paraguay 1255, piso 11, Capital Federal-, *Lázaro Baez* —Pasaje Carabelas 241, piso 5to y, exhorto mediante, Villariño 126, localidad de Guer aike de Rio Gallegos, Provincia de Santa Cruz-, *Daniel Rodolfo Perez Gadín* —Reconquista 715, 10mo C y Hortiguera 1480 de Capital Federal-, *Jorge Norberto Cerrota* —Country Maschwitz, ruta 9, kilómetro 44,5 fracción 1, lotes 46 y 47, Ingeniero Maschwitz, Provincia de Buenos Aires- *Eduardo Guillermo Castro* —Avenida Montes de Oca 710, piso 11, departamento A-; *Gustavo César Fernández* — Asunción 4645 de Capital Federal-, *Alejandro Ons Costa* —Arias 2539 de Capital Federal-, Juan Ignacio Pisano Costa —Vicente Lopez 1710 8vo A- y *Nestor Marcelo Ramos* —Sol de Mayo 350, piso 2do B, Torre A de Córdoba Capital-.

3. *Se ordene el secuestro de la documentación* requerida a la AFIP[66] y a la Inspección General de Justicia mediante la cédula de fojas 38 y los oficios de fojas 451, 452, 454, 538, 1168 y 1539, *intimando a sus titulares a presentar en 24 horas tales antecedentes en el Tribunal.*

4. A fin de profundizar la prueba de la relación y concierto de voluntades dirigidos a los hechos de marras, se obtengan listados de llamadas entrantes y salientes del 1ro de octubre de 2010 al 31 de octubre de 2011 y del 1ro de abril de 2013 hasta el día de la fecha, de las líneas telefónicas instaladas en las oficinas de Juana Manso 555, piso 7mo, oficinas A, B, C y D de Puerto Madero, Capital Federal -115775-0445, 115775-1119, 114312-7474, 114312-5050, 114312-7171, 114312-8700, 114312-8706, 114312-6604, 114312-8707, 114312-7070, 114312-5056, y 114312-5040, 114312-6600, 114312-6612, 114313-7966, 114313-1053, 114313-4096[67]- y los celulares y líneas comunes pertenecientes a Federico Elaskar -1526338244[68] y 1561310000[69]-, Leonardo Fariña -1136702190 y 0221154638921[70]-, Daniel Rodolfo Perez Gadín -1563757272 y 1556205200[71]-, Jorge Oscar Chueco -1544043791 y 48166038-[72], César Gustavo Fernández -1568356600[73]-,   y Nestor Marcelo Ramos[74] -03516565355 y 41795072180-.

---

[66] A fojas 1964/1968, el Subdirector General de Coordinación Técnico Institucional de la Afip, Guillermo Michel, consumó un liso y llano alzamiento a esta administración de Justicia y a la intervención del Ministerio Público en arreglo a las leyes al negarse a contestar lo requerido y oponer el secreto fiscal, a pesar de que en esta misma causa —y en todas las que he intervenido desde que tengo memoria- había obrado de manera opuesta al evacuar la consulta de fojas 8.

[67] Información de fojas 379/384 y 541/547.

[68] Ver informe de fojas 3439/3443

[69] Ver informe de fojas 625/627

[70] Ver informe de fojas 3439/3443

[71] Fojas 541vuelta a 542 vuelta -celular de contacto a nombre la firma OACI de Perez Gadín- y 2027/2028.

[72] Fojas 2028

[73] Ver informe de fojas 625/627.

*Ministerio Público Fiscal de la Nación*

José María Campagnoli                    IGNACIO RODRIGUEZ VARELA
FISCAL                                              SECRETARIO

5. Se ordene el embargo de las acciones depositadas a nombre de la sociedad Huston Managmet LTD, propiedad en el 100% de Helvetic Services Group, en la cuenta comitente número 3075 de la Caja de Valores, depositante 134 Amirante-Galitis[75] a los fines previstos en los artículos 23 y 29 del Código Penal y 518, párrafo 3ro del C.P.P.

6. Se ordene, a los mismos fines, la inhibición general de bienes en la República Argentina de todos los imputados cuya declaración indagatoria se requiere, así como también de SGI ARGENTINA S.A y sus controladas y filiales y del resto de las sociedades individualizadas en la causa y mencionadas en este dictamen como vinculadas a los imputados, a saber: **(CONSTITUIDAS EN EL ESTADO DE NEVADA, ESTADOS UNIDOS)** LAKE COUNTY LLC; ITELSA SERVICES LLC; GUDSON GROUP LLC; POLYCHEM GROUP LTD.; T.H.I.- TOWER HOUSE INTERNATIONAL LLC; M.P.I.- MAYWARD PROPERTIES INTERNATIONAL LLC; KUMAR HOLDINGS LLC; BUTLER TRADING LLC; MEDINVEST LLC; VILLETTE ASSOCIATES LLC; ACE STAR INTERNATIONAL LLC; BILLBROOK PROPERTIES LLC; ITELCO HOLDINGS LLC; OCEANIS GROUP LLC; VANEGGIA HOLDINGS LTD.; ESTRIVELA LLC; HALLKYN GROUP LLC; BALMAR DEVELOPMENT LLC; HEALY HOLDINGS LTD.; JUNIPER TRADING LTD.; NEXSA TRADING LTD.; HEMINGWAY INVESTMENTS LLC; OLDEMAR TRADING LLC; OLDEMAR TRADING LLC; INTEG SERVICES LLC; NEXTON INTERNATIONAL LLC; MOTIVA MEDIA LLC; COTTONEX LIMITED; JUNO GROUP LLC; BALMAIN TRADING LTD.; COMTECH INTERNATIONAL GROUP LLC; CONSOLIDATED CONSULTANTS GROUP LLC; BUXTON INVESTMENTS LLC; CALYPSSO GROUP LLC; LITTLE BAY LLC; CONCORD HILL LLC; ARISTON HOLDINGS LC; FINTECH HOLDINGS LLC; ETCO HOLDINGS LLC; BANFORD PROPERTIES LLC; ROYAL GAMES LLC; MOCHICA ENTERPRISES LLC; FERRETTI CORPORATION LIMITED; GROUND LLC; OCEANDRIVE INVESTMENTS LLC; BEST WORLD SUPPLIES LTD; GD SOCCER MANAGEMENT LLC; ISER HOLDINGS LTD; JURDAN ENTERPRISES LTD; ARDEN GLOBAL LLC; ARISA BUSINESS LLC; JUSTIN INVEST LTD; PHILLIPS GROUP LLC; CARVELLE GROUP LLC; CITRONE OVERSEAS LLC; HAZE MANAGEMENT LLC; WOODSTAR SERVICES LLC; DILLAN ATLANTIC LLC; BRIGHT LIGHT GROUP LLC; ABILENE TRADE LLC; FALCONWOOD SERVICES LLC; PRIEMOR GROUP LLC; BIO HEALTH INTERNATIONAL INC LLC; WESTLEY HOUSE LLC; CAMBRIDGE HOUSE LLC; EXETER HOUSE LLC; REDFORD HOUSE LLC; SERENA TRADING LLC; ABEHART CONSULTANTS LLC; OVILLE GROUP LLC; EXTON INTERNATIONAL LLC; EVERINA HOLDINGS LTD; YALE HOLDINGS LTD; SUNGLOW INVESTMENT LLC; OVANO GROUP LLC; NEYMAR

---

[74] Fojas 2019 y 2025 Aportado por el RENAPER y fojas 1960, celular aportado por Isaac Kiperszmid.

[75] Informes de la Caja de Valores, Continental Urbana y la Sociedad de Bolsa Amirante-Galitis, a fojas 1714/1963, 2183/2184bis, 2251/2261, 3062/3066, 3067/3070,



INVESTMENTS LLC; LYNTON TRADING LTD; STEPNEY INTERNATIONAL LLC; ESTRIDGE OVERSEAS LC; COSMETECH LC; TRENTON PROPERTIES LTD; ARIUS INVEST LLC; AGROGLOBE EQUITY LLC; MULTINVEST LLC; GALDOR ENTERPRISES LLC; DILMOND ENTERPRISES LTD; BALMONT HOLDINGS LTD; LACEWOOD INVESTMENTS LLC; LAMBERTI TRADING LLC; JET TRADE LTD; IVY LANE GROUP LLC; HUSTON MANAGEMENT LTD; FERREX DEVELOPMENT LLC; GREEN FIELD CONSULTANTS LLC; CORELEY PROPERTIES INC. LLC; ABBLE HOLDING LLC; PIXI INCORPORATED LLC; THE INGELEC GROUP LLC; HUTA HOLDINGS LLC; QUANTUM BAY LIMITED; EYDEN GROUP LLC; BUWAN MARKETING LTD; BUTTERFIELD CONSULTANTS LLC; ESSEX HOLDINGS GROUP LLC; GALWAY SCOTT TRADING LTD; ESTIVAL INTERNATIONAL LTD; IZALCO TRADING LLC; MAFINSA LLC; RAFINA TRADING LLC; INVESTMENT, SPORT & WEBS LLC; METAL FIRST LLC; GULF SUPPORT SERVICES LLC; MELCO MARITIME LLC; KORMAN INTERNATIONAL LLC; NORTEX TRADING LLC; SMART STEEL LLC; RELCOVE LIMITED LLC; EUROGRANIT LLC; RGS STEEL LLC; MURRIEL TRADING LLC; PERMANEL INVESTMENT LIMITED; PENNYROYAL ASSOCIATES LLC; GLADSTONE COSMETICS LLC; STEEL PRODUCT SERVICES LLC; BLUE DREAMS REAL ESTATE INVESTMENTS LTD; DYNAMIC FITTNESS LLC; RYDER MANAGEMENT SERVICES LTD; TREVER WELDING INDUSTRY LLC; BINDER CHEMICALS LLC; AYCHI INTERTRADING LLC; AGROCOMTRA USA LLC; MEL SEA LLC; DOLFIN TRADING LLC; THUNDER OVERSEAS TRADING LLC; ALHAMBRA LLC; MERCURY CONSULTANTS LLC; AMERICAN TRADE & PACKING LTD; CAVALAGH COMMODITIES LLC; NET MARITIME LLC; EASTFER INTERNATIONAL LLC; ANGRAIN LLC; MC PIRDON INVESTMENTS FUND LTD; **(CONSTITUIDAS EN EL ESTADO DE FLORIDA, ESTADOS UNIDOS)** CONWAY GLOBAL LLC; DIVINA VOLUNTAD LLC; DUNAMIS UNA SOCIEDAD DE RESPONSABILIDAD LIMITADA; SGI FINANCIAL SERVICES LLC; SGI NORTE AMERICA LLC; SGI VENTURES LLC; **(CONSTITUIDAS EN ESPAÑA)** WODSON INTERNATIONAL SL; SAMBERS HANTAREX SPAIN SL; ARSETEX PROMOCIONES SL; ADVANCE CHEMICAL SOLUTIONS SL; IPSEL INVEST SL (EX ADVANCE CHEMICAL SOLUTIONS); SERVEL TRADE SRL; MIRAVILIA INTERNACIONAL SL; FELSAN GLOBAL INVESMENT SL; TUSALETA SERVICIOS Y GESTIONES SL; **(CONSTITUIDAS EN LUXEMBURGO)** NACTUS INVESTORS SA; **(CONSTITUIDAS EN URUGUAY)** TRALINE SA; DONYSTAR SA; JUMEY SA; **(CONSTITUIDAS EN EL REINO UNIDO)** DERMAINE LIMITED; FEDAVIE LIMITED; NILESITE LIMITED; PARTLITE LIMITED; RESTRIM LIMITED; ROOKSTORE LIMITED; SARLEAF LIMITED; VENDERBROOK; BARGETIDE LIMITED; BLAKE & HAMILTON LIMITED; BARNES & MILES LIMITED; ABBLE HOLDINGS LIMITED; LORENTI CONSULTING LIMITED; GASTROAD LIMITED; POPLEY PHARMA LIMITED; MYERS TRADING LIMITED; SWISS HOTELS LTD;

*Ministerio Público Fiscal de la Nación*

ASSURE INVESTMENTS LIMITED; **(CONSTITUIDAS EN IRLANDA)** BIODYNAMICS MEDICAL TRADING LIMITED; GAINSTIME LIMITED; DEMTREE LIMITED; CLYDESGATE LIMITED; CLARIGALL INVESTMENTS LIMITED; GRAFENO TECH TRADING LIMITED; DELL OFFICE LIMITED; ASSURE INVESTMENTS LIMITED; **(CONSTITUIDAS EN NUEVA ZELANDA)** MAPLE VIEW LIMITED; SWISSER AG TRUSTEE NZ LIMITED; **(CONSTITUIDAS EN SUIZA)** COGEMAR INVESTMENTS PROJECTS SA; INMOBILIARE ALENIA AS; VANSOMATIC SUISSE AS; GRAFENO TECH SA; SWICCER AG; HELVETIC SERVICES GROUP SA; EN-SUISSE SA; BIODYNAMICS SA; FONDAZIONE FEDERICO ZICHY THYSSEN; VENTA SRL; **(CONSTITUIDAS EN PANAMA)** SGI ARGENTINA SA; SOLUTIONS GROUP INVESMENT INC; SOLUTIONS GROUP MARKETING INC.

**7.** Se libren exhortos internacionales a los países y jurisdicciones en los que fueron radicadas las sociedades extranjeras del punto anterior, a fin de que aporten la nómina completa de sus accionistas, cuentas bancarias y bienes detentados.

**8.** En el caso de Helvetic Services Group, se agregue al exhorto a enviar a las autoridades judiciales de Suiza la solicitud de inhibición general de sus bienes.

**9.** En el caso de SGI Argentina S.A y sus controladas y filiales, designe el Tribunal un interventor judicial a fin de hacer cesar los efectos de los delitos estudiados y poner a resguardo el patrimonio de la sociedad.

**10.** En razón de las peticiones aquí formuladas, *se revoque* la constitución de SGI Argentina S.A como parte querellante en la representación ejercida por el abogado Federico Pinto.

**11.** Por resultar de aplicación lo dispuesto en los artículos 41 y 42 del C.P.P y consistir en versiones contrapuestas sobre los mismos hechos -vinculados a la misma crisis y a un único conflicto societario-, que deben ser estudiadas y resueltas en un mismo expediente, se libre oficio al Juzgado de Instrucción número 19 solicitando a su titular que *se inhiba en la causa número 44892/2011*[76], instruida por denuncia formulada contra Federico Elaskar por amenazas coactivas.

**12.** Por las mismas razones expuestas en el punto anterior, previa certificación, *se acumulen al presente sumario las denuncias* que Lázaro Baez habría radicado en esta jurisdicción contra Federico Elaskar y Leonardo Fariña[77].

**13.** Se practique una *amplia certificación* de las constancias de interés de los sumarios en trámite ante el Juzgado Federal número 7 en

---

[76] Certificación a fojas 625/627.

[77] No queda claro, de los trascendidos periodísticos, si las denuncias quedaron radicadas en los Juzgados Correccionales 12 y 14 o en los Juzgados de Instrucción 12 y 14 -fojas 2835-

orden al delito de lavado de activos y, especialmente, de la documentación secuestrada en los allanamientos cuya realización ha tomado estado público.

14. A fin de completar la información sobre la situación patrimonial de SGI Argentina S.A, sus filiales y controladas desde el inicio de su actividad hasta el momento del desapoderamiento sufrido por Federico Elaskar y desde entonces hasta estos días, así como para individualizar a los terceros cuyos fondos se hubiesen captado en el giro de la sociedad y pudieran haber resultado damnificadas por la apropiación consumada por los acusados, se autorice a la Fiscalía a requerir al Correo Argentino y al resto de las empresas autorizadas para tramitar cartas documento o telegramas colacionados, *la remisión de todas las constancias de intercambio epistolar de ese tipo que hubiese provenido o hubiese estado dirigido al domicilio de Juana Manso 555, piso 7mo oficinas A, B, C y D.*

15. Se ordene el secuestro del protocolo del Escribano Martín Diego Gutman en el que obre el original de la hipoteca del 11 de diciembre de 2007 por 265.000 dólares, celebrada por el saldo del precio de la compraventa de un departamento y cochera del edificio de la calle Juan Manso 1490, conocido como "Hotel Faena", escritura número 638. Hecho esto, se ordene un peritaje tendiente a establecer las escrituras subyacentes a los raspados que a simple vista presenta el documento.

III. Tómese razón, y fórmese con copia de este dictamen actuaciones complementarias para continuar con la instrucción.

Ante mí:

JOSE MARIA CAMPAGNOLI
FISCAL

IGNACIO RODRIGUEZ VARELA
SECRETARIO

En la misma fecha se dio cumplimiento. CONSTE.

IGNACIO DE RODRIGUEZ VARELA
SECRETARIO