# EXHIBIT T

**AMENDED. REQUEST TO INVESTIGATE THE ALLEGED COMMISSION OF THE CRIME OF MONEY LAUNDERING BY MEMBERS OF THE CONSPIRACY**

Your Honor:

We, Juan Carlos Morán, Adrián Pérez, Carlos Comi and Horacio Piemonte, on our own behalf and in our capacity as national legislative deputies, with domicile established at calle Rivadavia 1829 Piso 4° of this Federal Capital, do state to Your Honor in Cause No. 15734/08:

## I.- PURPOSE

Regarding the brief timely filed by Dr. Elisa María Avelina Carrio and others, the complaint entitled ""KIRCHNER NÉSTOR ET AL re: CONSPIRACY AND OTHER [CRIMES] (Cause No. 15734/08), in which we denounce the unlawful conduct of Messrs. Kirchner Néstor Carlos, Jaime Ricardo, De Vido Julio, Ulloa Igor Rudy, López Cristóbal, Báez Lázaro, Juan Carlos Relats and Cristina Fernández de Kirchner by conspiracy, among other crimes, we are seeking that competent action be taken to investigate those defendants in this conspiracy case, for the possible offense of money laundering under Article 278 of the *Código Penal* [Criminal Code], in particular Dr. Cristina Elisabet Fernández de Kirchner, National Identity Card No. 10-433-615, and Dr. Néstor Carlos Kirchner, National Identity Card No. 5-404-911, in consideration of the facts set forth below.

## II.- FACTS

**LEGAL FRAMEWORK OF THE ALLEGED FACTS.**

We believe that the defendants have not only increased their net worth illegally while holding public office, but have also committed the crime of money laundering, based on various events that we have reported in this cause and that could be framed as offenses against public administration, all as members of the alleged conspiracy.

That is to say that we consider it appropriate, following the last sworn affidavit filed by the President of the Nation with the *Oficina Anticorrupción* [Anticorruption Office], and of course the information arising from the above statements, to investigate whether Cristina Fernández de Kirchner and Néstor Kirchner committed the crime of money laundering, based on crimes related to the activities of the alleged conspiracy through which various offenses against the public sector, such as fraud, bribery, influence peddling, misappropriation of public funds, and illicit enrichment of officials and employees, were allegedly committed.

It should be noted that money laundering involves a process through which one tries to hide, disguise and conceal the illegal origin of certain property or the proceeds of criminal activities in order to convert them into other property or activities that have the appearance of being lawful.

It has also been defined as the process by which property obtained through criminal activity is incorporated into the legal economic system with the appearance of having been lawfully obtained.

The main purpose, therefore, is the laundering of assets and monetary sums obtained through illegal operations.

And in this case we filed a complaint to have investigated the change of more than 700% from 2004 to date in the financial situation of Néstor Kirchner. This increase allegedly concealed a process through which entrepreneurs benefited from big business deals with the State which then returned their illicit profits as private assets, that is, by incorporating corrupt money into the actual economic system with the appearance of having lawfully obtained it.

Similarly, it has been said that today, "money laundering in the world has an increasingly direct relationship with the fight against corruption and the international demand for greater transparency in public administration. It has to adopt a lawful form, even if the activity that has given rise to it is not, in order that such monies may flow back into the formal economy. The insertion of illegal money into the formal economy is carried out through a mask that raises no suspicion as to its origin through a mechanism of simulation and penetration into the financial markets. We may say that the process of money laundering is in itself an ongoing process of simulation of legality." ("*Lavado de dinero-Delito Transnacional*" ["Money Laundering-Transnational Crime"], Author: Dr. Luis E. Sánchez Brot; Date 07/07/01).-

Regarding this issue, the *Ministerio de Justicia, Seguridad, Derechos Humanos y de la Nación* [Ministry of Justice, Security, Human Rights and the Nation], when referring to money laundering on its website, states that "prosecuting money laundering is especially important because it is the mechanism through which illegally produced property attempts to gain a lawful profile. This appearance of lawfulness that money launderers seek is necessary when exploiting those assets in the legal channels, and thus the state should focus on all nodes where this mechanism could occur. Combatting money laundering guarantees that:

•     The domestic economy reflects legal and formal values.

•     The crime linked to the money laundering is met with enough difficulty in legalizing its assets such that it is increasingly difficult to do so, thereby rendering the associated crime(s) less profitable.

- The economic and legal standards of the Nation enjoy the level required for national and international credibility."

It is worth remembering that in this conspiracy case, and foreseeing the possible commission of the crime of money laundering by its alleged members, Dr. Carrió amended the complaint in late 2008 when Néstor Kirchner sponsored the *Ley de Blanqueo de Capitales* [Money Laundering Act], the provisions of which include the possibility of inserting money into legal channels without justifying its origin.

In turn, it should be noted that by that date Cristina Fernandez de Kirchner replaced the director of AFIP [*Administración Federal de Ingresos Públicos* — Federal Public Revenue Administration], placing her own man there along with another alleged member of the Conspiracy who is now also suspected in a case for alleged payment of bribes in the ONCCA [*Oficina Nacional de Control Comercial* – National Trade Oversight Office].

Thus, the conduct that led to us to file a complaint would come under Art. 278 paragraph 1), which states that money laundering occurs when "... money or other property deriving from a crime in which it had not been involved is converted, transferred, managed, sold, encumbered or applied in any other manner, with the possible consequence that the original or derived property acquires the appearance of a lawful origin, and in all cases when its value exceeds the sum of fifty thousand pesos (AR$50,000), either in a single act or in repeated incidents linked together."

It should be noted that the offense is punishable with a term of imprisonment of 2 to 10 years and a fine of 2 to 10 times the amount of the transaction, and that for its part Art. 278 paragraph b) states that "The minimum penalty shall be five (5) years of imprisonment when the perpetrator commits the act habitually or as a member of an association or group formed for the ongoing commission of crimes of this nature."

In turn, Article 278 paragraph 4) of the Criminal Code establishes that the property or items which are the object of money laundering may be confiscated.

Finally, Article 279 paragraph 3) of the Criminal Code states that "when the perpetrator of the acts described in Article 277, paragraphs 1 to 3, or in Article 278, paragraph 1, is a civil servant who committed the act while holding public office or working in the public sector he shall be furthermore be barred from public office for three (3) to ten (10) years. The same penalty shall be imposed for someone whose conduct occurred while carrying out the duties of his office or practicing a profession requiring special authorization."

As reported in one article in the newspaper *La Nación* dated 07/07/10 and titled "*Creció casi $ 10 millones la fortuna de los Kirchner* [The Kirchner fortune grew by nearly AR$10 million]", according to the sworn statements filed by Cristina

Fernandez with the Anticorruption Office, her assets and those of Néstor Kirchner have apparently increased 20.65%, since they went from 46 to 55.5 million pesos.

It also indicates that "unlike previous years, in 2009 the increase in the Kirchners' net worth was not in the form of the purchase of properties or an increase in their bank deposits, but, above all, by paying off millions [of pesos] of debt and the valuation of the shares of two of their three companies. The couple was able to meet those obligations thanks to revenues of AR$16.5 million, most of which was earned from rent and interest on fixed term deposits. The debts owed by the couple went from AR$19.2 million in 2008 to AR$6.2 million 2009. Net worth is the sum of assets and credits minus debts. The most significant obligations that they paid off include the one for the construction of the Hotel Los Sauces (AR$8,329,596) and the one held with Banco de Santa Cruz ($8,834,369), owned by Grupo Eskenazi. The fluctuation by more than $3 million in the value of the shares of the companies Los Sauces SA (owner of the hotel by the same name, located in El Calafate) and Hotesur SA (owner of the Alto Calafate hotel in the same city) explains the rest of the increase in net worth. Therefore we ask that the material truth of these operations be investigated, particularly what it has to do with the "accrued non-receivable debt for building construction" to the company AUSTRAL CONSTRUCCIONES belonging to Lázaro Báez; we also request all supporting documentation for the payoff of the debt with the Banco de Santa Cruz for more than eight million pesos that appears in the 2009 sworn statement.

The aforementioned newspaper article also noted that "the shares in Los Sauces, a company of which Máximo Kirchner (the couple's son) is also a shareholder, went from being worth AR$2,312,862 in 2008 to AR$3,205,440 in 2009. The Hotesur shares went from AR$5,399,926 to AR$7,654,029. This fluctuation in the value of the shares is recorded in the President's sworn statement but not in the one given by Néstor Kirchner before the *Cámara de Diputados* [Chamber of Deputies]. Therein lays a large part of the difference of more than $4 million between the two statements, sworn only 21 days apart."

"Besides the debts to the builder of the Hotel Los Sauces and to the Banco de Santa Cruz, the Kirchners eliminated obligations that they held in the form of leases received in advance (AR$1,359,371) and guarantee deposits for lease contracts (AR$679,430) and with AFIP (AR$51,273)."

In this sense we believe it is essential to ask the *Inspección General de Justicia* [Corporate Records Office] for all balance sheets, by-laws and any existing documentation on the company "Panatel SA" that manages the Hotel Panamericano and the Hotel Los Sauces, and Rutas del Litoral S.A. belonging to Juan Carlos Relats. The purpose of the suggested measure is to see whether Your Honor can verify whether the balance sheets for 2008 and 2009 for some of these companies include rents received in

advance and guarantee deposits for relevant lease contracts, as well as requesting supporting documentation listing form of payment, amounts and dates.

They further added two receivables for AR$4 million. The most significant of these is with Los Sauces for AR$3,968,322; the other is with AFIP for AR$544,570. But they assumed three new debts, again as stated in their last sworn statement. The most significant [of these], for AR$5,542,779 is with Hotesur SA."

"The income of the Kirchner couple increased slightly: in 2008 they earned AR$13.8 million and in 2009 it exceeded AR$16.5 million. Of that figure, 10,358,435 pesos came from income on leases, AR$5,659,071 from interest on bank deposits and AR$536,383 from the salary of the President and the pension received by the former President." As a result of this we ask Your Honor to take several evidentiary measures (which will be listed as informational evidence in the relevant chapter) regarding the supporting documentation for [establishing] the material truth of the transactions referenced above.

Furthermore, it has also been said that Lázaro Báez is once again one of the couple's debtors.

**With respect to the increase in holdings of the aforementioned, we believe that it would not only constitute the crime of illicit enrichment but also that it proves the crime of money laundering, for which we filed a complaint.**

**In this sense, we would like to point out that the unusual increase in the holdings of Cristina Fernández y Néstor Kirchner in recent years, while both almost continuously performed different public duties, is the proof of the crime of money laundering.**

Moreover, in regard to those activities that have benefited the couple financially, such as those related to the hotel chains Los Sauces SA and Hotesur SA, it is fitting to mention here what was stated in a document that has already been decided by Dr. Luis E. Sánchez Brot, where he holds, in the section entitled "Most Appropriate Places and Activities," that "Activities that handle large sums of cash are the ones that are best suited for carrying out money laundering operations because of the ease with which reality can be distorted by declaring higher revenues that what was actually earned. Let's think about large hotel developments built in resort areas on land abutting existing hotels that have been operating there for decades. These hotel chains may have been built with laundered money by bringing into the formal economy monies received from foreign investors. When they begin to operate, their goal is to generate the highest amount of revenue possible so as to be able to justify new illegal money, even if they have to set below-market prices to fully substantiate their activity, competing with other hotels that have earned their initial investment through lawful means, or by showing full capacity throughout the entire year even though in reality that has not been the case."

"We must recognize that companies owning these types of assets, which allow them to justify new amounts of money through their activity, are very efficient in complying with their fiscal obligations, paying all taxes pertaining to their activities on time and in full.".-

"We also have examples of casinos that have quadrupled their declared activity in recent years. The reason is to justify, while paying all applicable taxes, new entries of funds that are obtained illegally and laundered through this activity.".-

## INFORMATION OBTAINED FROM THE 2008 AND 2009 SWORN STATEMENTS OF PRESIDENT CRISTINA FERNÁNDEZ AND NESTOR KIRCHNER.

As we stated in our complaint in Case No. 9423/2009 captioned "Kirchner, Néstor and Fernández de Kirchner, Christina re: Illicit Enrichment," in the first year after leaving office, Néstor C. Kirchner's net worth grew by 158%. He increased his net worth significantly through various maneuvers, the most common being the acquisition of state-owned land at very low prices and their subsequent sale at market prices.

All of this was obtained from the sworn statements given by Cristina Fernández before the OA [*Oficina Anticorrupción* – Anticorruption Office].

The sworn statement given by President Cristina Fernández de Kirchner covering fiscal year 2009, shows that the Kirchner couple's net worth is comprised of real estate holdings (12 apartments, six houses, six parcels of land and four commercial properties); titled personal property (a 2009 Honda CRV automobile); an ownership stake in the corporations "Los Sauces SA," "CO.MA SA," and "HOTESUR SA"; bank deposits of AR$21,499,973; cash of AR$25,001; credit balances of AR$4,531,194; and debts of AR$6,222,983. We would point out that the DDJJ [*declaraciones juradas* – sworn statements] for fiscal year 2008 showed credit balances of AR$377,036 and debts of AR$19,254,039.

A mere perusal of the aforesaid statement shows that the former President of the Nation, Néstor Kirchner, and the former Senator for the Province of Santa Cruz and current President of the Nation, Cristina Fernández de Kirchner, have become notoriously wealthy after leaving their offices, and, in the case of the President, during her current term as well.

With regard to the credit balances, there is one for AR$3,968,322 and another for the sum of AR$544,570 with AFIP.

As for the unjustified, in our opinion, increase in net worth, Creus holds that, referring to the crime of unjust enrichment, *"what must not*

*be justifiably explained is an appreciable gain in wealth after assuming office; in other words, an increased net worth (growth of assets or decrease in liabilities) that is noticeable when it becomes significant compared to the financial standing of the actor at the time of assuming the post, and is not in line with his normal likelihood of financial gain during the time he holds the office or in the period subsequent to duly relinquishing the position...".*

## OVER 95% OF THE ENRICHMENT IS EXPLAINED THROUGH TRANSACTIONS WITH FOUR BUSINESSMEN YEAR AFTER YEAR.

In regard to the events that we believe could have generated the money belonging to Cristina Fernández and Néstor Kirchner and that of the other defendants in this cause, and that they would later attempt to launder, thereby committing the crime of money laundering defined in Art. 278 and 279 of the National Criminal Code, we would have to delve into the events listed below, which we have already denounced in this brief.

In 2008, the couple's net worth grew by 158% (from 17 to 45 million pesos) and had four extraordinary sources of income: a) rental income of over AR$10,300,000 paid by Juan Carlos Relats for the Hotel Los Sauces; 2) interest on deposits of over AR$4,000,000 in the Banco de Santa Cruz; 3) the sale of a 20,000 m$^2$ state-owned property to the CENCOSUD group for AR$6,300,000; and 4) the sale of the Río Gallegos residence for more than AR$3,000,000 to a company linked to Lázaro Báez. These account for nearly 100% of the Kirchner's enrichment in 2008. What we were astonished to see on the 2009 sworn statement is that it once again uses the "successful business" conducted with three of the businessmen listed above to explain over 90% of the increase in net worth —from 45 to 55 million pesos.

### *JUAN CARLOS RELATS*

The payment made by Juan Carlos Relats for rental of the hotel complex belonging to Hotel Los Sauces in El Calafate, which is owned by former President Néstor Kirchner, was revealed in the sworn statements made by Cristina Fernández de Kirchner.

We had already complained that the increased spike in the price of the rental payment from the year 2007 to 2008 was without justification, because hotel activity declined during that period.

Between 2008 and 2009, Juan Carlos Relats paid Néstor Kirchner AR$20,716,870 for rental of the Hotel Los Sauces. The hotel has 38 rooms and is operable for just 8 months of the year.

Note that said businessman, at the same time and in those very years, did

very profitable business with the government of Néstor and Cristina Kirchner. Namely, he has received highway contracts with the company Rutas del Litoral, in which he obtained a special rate schedule through Decree No. 902 dated June 2008, signed by the President of the Nation herself. In the last 60 days he has received additional highway contracts, now through a UTE [*Unión Transitoria de Empresas* – Temporary Joint Venture] that includes the company JCR SA, and where, in particular, there was a sizeable increase in compensation and subsidies over what the Ministry of Planning had proposed a priori in the bid documents for that highway corridor. This businessman is also building highway 9 from Rosario to Córdoba through JCR SA. It is worth remembering that the aforementioned bidding processes, as well as the latter public works project, are being investigated by the courts for irregularities and inflated pricing. Moreover, Juan Carlos Relats has benefited from provincial governments that are Kirchner allies: with Casino licenses through his company Casinos Tresor; oil-producing areas in Salta and Jujuy, through his company Pecon SA; and tax breaks for some of his agricultural companies.

Which brings us to money laundering because, as we said earlier, the transactions with these businessmen that figure in Néstor Kirchner's sworn statements may be hiding money that comes from corruption and defrauding the public treasury.

Therefore, and particularly in reference to transactions conducted with said businessman, in the evidence section we will request a series of measures aimed at obtaining supporting documentation for private and public transactions in order to be able to arrive at the material truth of the facts.

### BANCO DE SANTA CRUZ

Banco de Santa Cruz is paying Néstor Kirchner for his deposits, both in dollars and in pesos, at preferential interest rates that are very difficult to justify. In fact, between 2008 and 2009, the Bank paid him 9,844,511 pesos in interest. In other words, it accounts for 26% of Kirchner's enrichment over the last two years. Furthermore, according to the 2009 tax return, the writing off of a debt at that Bank for AR$8,834,369 had a significant impact on the 10 million pesos of increase in net worth. The Kirchners earned AR$4,185,440 in interest in 2008 and AR$5,659,071 in 2009 on banking deposits of AR$21,499,973.

The hardest to explain is the interest they received in 2009 on a deposit of over in dollars, 2 million dollars, at that bank, for which they earned nearly 25% interest.

Let us recall that Banco de Santa Cruz is owned by the same Mr. Eskenazi whom Kirchner forced to purchase a 15% stake in YPF in a stunning deal with practically none of his own money down and paying the installments with the oil company's own income. In addition, the Petersen group owned by that businessman does business with

the Government and in recent months has won the highway 8 corridor, for which, to finalize the six-year concession contract, the Ministry of Planning raised the subsidies and compensation that were being offered a priori in the bid documents.

Because of this, we will seek the evidentiary measure of conferring with the *Superintendencia de Entidades Financieras* [Examiner's Office for Financial Entities] about Banco de Santa Cruz compliance with Chapter 9 of Law 21526 on Financial Entities, regarding "Prohibited and Limited Transactions," of which Article 28 provides that "entities covered by this law may not: (…) paragraph d) conduct transactions with their directors, administrators or with companies or persons related to them, under conditions that are more favorable that those ordinarily afforded to their clientele."

This request is even more justified if we consider that said Bank's balance statements as of December 2007, December 2008 and September 2009, prepared by auditor Guillermo J. Díaz of the firm Pistrelli, Henry Martin and Asociados SRL, have been called into question. This information is in the BCRA and is attached as documentary evidence. We point out that the text states literally that the report for the close of the fiscal year "ends with comments to the balance sheet due to certain facts."

For its part, in the BCRA report, table IX-I-II-II. Interest Rate on BCRA Monetary and Financial Deposits/ Interest Rate on non-financial Private Sector Deposits broken down by monthly serial amounts extracted in an annual nominal percentage[,] [t]he *Banco Central* [Central Bank] suggested annual interest rates ranging from 0.67 to 2.59% for 2009 term deposits of over one million dollars (see attached breakdown in the documentary evidence).

Therefore, one cannot help but think that an interest rate of over 24% in dollars on one of the 2009 deposits to Mr. Néstor Kirchner is suspicious.

The paradox of this government is that it placed eleven billion pesos or 2,800,000 million [*sic*] dollars in ANSES [*Administración Nacional de la Seguridad Social* – National Social Security Administration] deposits in various banks that never pay more than 13% interest in pesos, while their private deposits close on contracts at a preferential rate that is twice that amount, and in dollars.

Based on the above, we seek the evidentiary measures set forth in the corresponding chapter in order to view the supporting documentation for that businessman's respective transactions, both public and private, to be able to arrive at the material truth of the facts.

### GRUPO CENCOSUD

One of the vehicles they allegedly adopted in order to enrich themselves is acquiring state-owned lands at low prices and then selling them at market prices to make an unjustified windfall. These transactions are often

performed in their names and at other times through transactions with front men, a matter that we have denounced in this cause on repeated occasions.

The vehicle used by several of the accused, whereby they would acquire state-owned lands at low prices and then sell them at market prices, would yield an unjustified windfall. The transaction was often done directly by the accused and other times it was through intermediaries.

In particular there was the acquisition of cheap state-owned land that was made available to them by Governor Méndez. Specifically, inquiries should be made into Néstor Kirchner, Lázaro Báez and Cristóbal López.

Grupo Cencosud purchased a 20,000 $m^2$ state-owned property from Néstor Kirchner for AR$6,300,000 in 2008. Based on real estate market values, that property was barely worth 8 to 10% of the amount of the transaction.

Bear in mind that Grupo Cencosud is the owner of a chain of Hipermercados that is moving into the Santa Cruz province and, while also being a "profitable business" for Néstor Kirchner, it would also have received donated, or very inexpensive, land in good locations in cities such as Caleta Olivia. That businessman also held public and widely known meetings in 2007 with Nestor Kirchner himself, and with the Secretary of Commerce, Guillermo Moreno, at the Casa Rosada, in an effort to reach price accords with the supermarket industry.

Because of this, we have asked for a series of evidentiary proceedings and sought supporting documentation for the various public and private transactions in order to arrive at the material truth of the facts.

### LÁZARO BÁEZ

According to the 2009 sworn statement, this businessman is one of the major reasons for the AR$10,000,000 enrichment declared by the couple. That statement includes the writing off of a debt of AR$8,329,526 owed by Néstor Kirchner to Lázaro Báez's construction firm. Also, the 2008 sworn statement shows an overvalued sale to a company linked to [Báez] for the Kirchner's Río Gallegos residence at calle Maipú 225, for over three million pesos. There is suspicion that a stamp tax on just 30% of the amount of the sale was paid on this transaction and, furthermore, that the price of the property, according to the real estate market in the area, is just one-quarter of the amount shown on the statement.

Let us recall that Lázaro Báez is implicated in several court cases and has also, through his companies, performed 92% of the public works projects in the province of Santa Cruz over the past few years, as shown in the attached report.

Because of this, in the evidence section, we have asked for a series of measures to verify the supporting documentation for the various public and private transactions conducted by that businessman in order to arrive at the material truth of the facts alleged herein.

We can draw several conclusions from this analysis of the Kirchner's accumulation of wealth. Since 2003, when they rose to the highest office in the country, [their wealth] has grown by 700%. The largest increase —from 17 million to over 55 [million]— occurred in 2008 and 2009. But when we go to the sources of the income: rents, interest, leases, wages or retirement savings, we can see that in the last two years, just 2.5% can be attributed to the job as president and its retirement contributions, whereas 97.5% is attributed to matters linked to financial speculation that generates no employment.

**PURCHASE OF TWO MILLION DOLLARS IN OCTOBER 2008.**

To our knowledge, at that moment the crime defined in Art. 268 (I) of the National Criminal Code was committed, because it was then that Cristina Fernández de Kirchner possessed information about the value of US currency in relation to the national currency, information that she had by virtue of her position, and which she used to profit from for the benefit of herself and her spouse, Néstor C. Kirchner. We believe that the crime is obvious in this case, because when Néstor Kirchner obtained an economic advantage through that transaction, someone who definitely is enriched is Madam President Cristina E. Fernández de Kirchner, since the profit gained is a communal asset within the marriage. The conduct fits squarely within the act described by Art. 268 (I) of the National Criminal Code, which punishes the "public official who, for his own profit or for that of a third party, uses confidential information or data of which he had knowledge by virtue of his position." Therefore, the crime would have been committed by the President of the Nation herself, through Néstor C. Kirchner and with his consent, from the time he purchased the two million dollars based on privileged information provided to him by [Madam] President.

**All of the facts listed above could apply to [bring] several crimes against the administration, such as fraud, bribery, influence peddling, misappropriation of public funds, and illicit enrichment by officials and employees.**

**REPORT REVEALING IRREGULARITIES IN THE INCREASED NET WORTH**

<u>OF CRISTINA FERNÁNDEZ AND NÉSTOR KIRCHNER.</u>

Other documentation that must be taken into account during the course of this investigation is the 12/23/09 report prepared by FIA [*Fiscalía de Investigaciones Administrativas* – Office of the Prosecutor for Administrative Investigation] experts under cause No. 9423/2009, wherein it highlights the following issues with regard to the increase in net worth of Cristina Fernández and Néstor Kirchner, among others:  1) the FIA experts had previously participated in the investigation of documentation included in FIA Case 24967 and "issued a report on April 16, 2008, which showed a series of inconsistencies that, to our knowledge, have not been resolved to date" and which referred to the increased net worth of Mr. Néstor C. Kirchner and Mrs. Cristina E. Fernández de Kirchner between 01/01/04 and 12/11/07, which was linked to the [report] filed with the *Justicia Federal y Correccional Federal* [Federal Court and Federal Correctional Department] under cause No. 1388/08, and that also investigated their unlawful enrichment during that period, and they indicate that "it was ordered set aside – but [it was] not a dismissal of the parties under investigation."  2) The period covering the year 2004 "was apparently excluded from judicial investigations," as was "the period of time from 12/11/07 to 12/21/07."

Moreover, experts from the Office of the Prosecutor for Administrative Investigations, in their analysis of the expert accounting performed in Case No. 9423/2009, found numerous mistakes, including:

1) For affidavits analyzed with a focus on income, personal property and value added taxes, the FIA experts estimated that in the expert report dated 12/15/09 in case No. 9423/2009, "the accompanying forms would not be the ones that are actually needed to conduct a full analysis with the rigor warranted by the expert testimony that was analyzed, because it would only involve "summary" or "caption" forms of the sworn statements on income and personal property taxes."

They also cite the numerous documents that have not been requested from AFIP for analysis of the increased net worth of the accused.

2) The expert report states that the sworn statements were "compared," but beyond alluding to some difficulty in the comparison, it does not say anything about the results of that comparison.-

3) They point out that they do not agree with "the experts' averrals that commercial books do not need to be kept," on the grounds that Mr. Néstor Kirchner holds the standing of a "Registered Party" for the value added tax since the month of June, 2005."-

4) They stress that point f) of page 342 in the expert accounting report states, "For assets accrued prior to the year 2008, there was no supporting asset acquisition documentation, since that effort was based on variations in the year 2008 and on the documentation mentioned by Your Honor," and on that basis they conclude that "the analysis was clearly performed on a basis regarding which there is no certainty about its integrity and reasonability." (Point 5 of the 12/23/09 report by FIA experts).

5) "The analysis performed did not address the increased net worth (and the explanation for it) of the other members of the family group, at least the immediate relatives of the accused." (Point 1.B of the report dated 12/23/09 by the FIA experts).

The FIA experts also performed a separate, thorough analysis of the expert report in the file on Cristina E. Fernández and Néstor C. Kirchner.

In addition, in point 6.c) they indicate that "the experts make no mention of Mrs. Fernández's shares in Chapel SA (45%) as of 12/31/2008, valued at AR$11,250.00, according to the public statement submitted to the Anticorruption Office, which is being investigated in another cause.

They finally point out that "there has been no concrete determination of what, among other things, would be a justifiable amount of increased net worth."-

In analyzing the sworn statements provided by the country's former President, Dr. Néstor C. Kirchner, FIA experts brought up the following issues, among others: A) "In regard to the bank balances on deposit as of 12/31/2007, they are only listed in the original currency, without converting foreign currencies to pesos at the rate (1 dollar = 3.109) reported by accountant Manzanares himself." B) "On page 345, the experts report that a 'term deposit' of US$222,575.00 was included in 2007; it had been omitted from the sworn public statement but revised later. Note that there is no mention of the documentary source that made it possible to identify that omission and the origin neither of the funds in question, nor of the document or date when the revision was later reported." C) "The experts completely disregard the Remark contained in the 2007 annual sworn statement filed with the Anticorruption Office... which states, verbatim, [']The balance of the checking account at Banco de Santa Cruz SA as of 12/11/07 that was reported in the initial sworn statements was AR$869,477, whereas on 12/31/07 it is reported in the annual sworn statement as AR$1,442,211.['] The discrepancy that occurred in that item can be attributed to the 12/26/07 Datanet banking credit of AR$1,260,000.–which was received from the sale of the El Calafate property, and which was finalized through a conveyance deed dated 1/12/08 which is also reported as a

debt shown as received." In referring to that, the FIA experts opine that "this explanation would not be convincing, because if the balance was AR$869,477 on 12/11/07 and the 12/26/07 credit amount should be added to it, NOT the AR$1,442,211 that has not been analyzed by professional auditors involved in the expert testimony and which, if a reasonable explanation is not forthcoming, would change the initial balance for that item, and have a direct impact on what occurred in 2008."-

Additionally, as mentioned on another occasion, there is a clear lack of transparency and justification about the origin of the deposits held by the accused.-

The FIA experts thus highlighted in their report the fact that at the time of the audit report, they were unable to "review any type of documentation that might establish the length of the terms involved, the principal amount (and currency) of each of them, or their maturity date,["] leading those same experts to conclude that **"without such data, it is impossible to determine, with any certainty, what amount (and in what currency) of interest was generated during the year 2008 from those fixed term deposits that were there on 12/31/2007 and whose maturity dates occurred during the year in question."**-

Thus, the sum of AR$4,185,440.057 from interest earned on fixed-term deposits in dollars and pesos is left unexplained.-

The expert opinion points to the duplication in 2008 of the amount of AR$332,137.00 representing the  former President's pension income, as it is listed once under "Income" and again under "Other Income."-

They also note that the expert report on file in the cause for enrichment does not mention the sum of AR$1,291,481.00 that was declared to the Anticorruption Office in the year 2008 under "Other Income" as a "certificate of deposit in foreign currency." According to the FIA auditors, this means that *"there is no explanation of the origin of these funds and their supporting documentation or, in their absence, of the reasons that led the experts to exclude those funds from the analysis conducted in the expert testimony."*

Another point to underscore is that in the year 2007, a debt amount of AR$8,329,596.00 was declared as "an earned non-receivable debt for building construction." One might point out that that amount remains the same in the year 2008, which would indicate that the payment was not made nor was any interest earned, despite the sizeable sum of the loan.  Such a circumstance makes the transaction suspicious because, as the auditors warn in their report, it "defies all market-based commercial logic regarding loans between independent parties."-

Likewise, it is significant to note that Manzanares' report in case No. 9423/2009 mentions income of AR$1,291,481.01 from an "exchange rate discrepancy." On the sworn statement filed with the Anticorruption Office, it is not declared as such, but rather under the heading of "Other Income – Certificates of Deposit in Foreign Currency."-

### III- <u>SUGGESTED EVIDENCE</u>

In order to elucidate the facts for which we have come to file a complaint, and without prejudice to the items that Your Honor may deem appropriate, the following evidence is suggested:

<u>INFORMATIONAL EVIDENCE</u>: May the following written requests be sent:

1) To the Anticorruption Office, to submit the sworn statements by the former President of the Nation Néstor Kirchner and President of the Nation Cristina Kirchner, for to the periods 2003, 2004, 2005, 2006, 2007 and 2008, 2009.-

2) Request that AFIP submit the sworn tax returns from Néstor Kirchner.

3) Request that AFIP submit the sworn tax returns for Cristina E. Fernández de Kirchner.

4) Request that AFIP submit the sworn tax returns for Máximo Kirchner.

5) Request that AFIP submit the sworn tax returns for Juan Carlos Relats.

6) Request that AFIP submit the sworn tax returns for Lázaro Báez.

7) Request that AFIP submit the results of the monitoring and money laundering for 2008, which showed various inconsistencies in the Region of Comodoro Rivadavia.

8) To the Central Bank of the Argentine Republic, to report whether Néstor Kirchner, Cristina Elizabeth Fernández and Máximo Kirchner have a checking account, savings account or fixed-term deposits, as well as a breakdown of the expenses incurred by them using credit cards, which is information that it must request from the various banks.

9) Request that the *Comisión Nacional de Valores* [National Securities Commission] report whether Néstor Kirchner, Cristina Elizabeth Fernández and Máximo Kirchner possess government securities, shares or bonds and/or any other financial assets.

10) Request in writing that the *Registro de la Propiedad del Automotor* [Motor Vehicle Registry] report on the property registered in the name of Cristina E. Fernández de Kirchner.-

11) Request in writing that the Motor Vehicle Registry report on the property registered in the name of Néstor Kirchner.-

12) Request in writing that the Motor Vehicle Registry of the Province of Santa Cruz report on the property registered in the name of Néstor Kirchner.-

13) Request in writing that the *Registro de la Propiedad Inmueble* [Register of Real Property] of the Province of Santa Cruz report on the property registered in the name of Cristina E. Fernández de Kirchner.-

14) Request in writing that the Register of Real Property of the Province of Santa Cruz report on the assets registered in the name of Máximo Kirchner.-

May the following written requests be sent in order to verify the actual veracity of the land and residence sales transactions in Río Gallegos:

15) Request in writing that the relevant civil-law notary office of the City of Río Gallegos provide an authenticated copy of the notarial deed or deeds by which Mr. Néstor Carlos Kirchner transferred ownership to Cencosud SA of the stated-owned land located in Calafate, in the Province of Santa Cruz, whose ownership is registered in the Register of Real Property of the Province of Santa Cruz under the corresponding registration numbers.

Similarly, please provide an authenticated copy of the following documentation related to the notarial deed(s) in question:

16) Registered certificates of ownership of the properties and identifying information on the endorsers;

17) Certificates attesting to the existence of debts for taxes, fees and contributions on the properties;

18) Certificates attesting to the tax assessment of the properties;

19) Documentary evidence of title searches;

20) Sworn Statement attesting to [payment] of the Stamp Duties on the transaction(s) and proof of payment of said duties for each transaction;

21) Sworn Statement and proof of payment of the Property Transfer Taxes or Income Taxes by means of the "SICORE" system (*Sistema de Control de Retenciones –* Withholdings Verification System) of AFIP;

22) Proof of submission of the "CITI" (*Cruzamiento Informático de Transacciones Importantes –* Digital Cross-referencing for Major Transactions) submitted to AFIP;

23) Documentation from the acquiring Company attesting to the proper identity of the agent involved and to the Company's decision to acquire or transfer

the properties;

24) Authorizing documents issued by the assignors (powers of attorney, minutes of meetings of the Board of Directors, etc.);

25) Private legal instruments by which the properties were transferred.

Request in writing that the Register of Real Property of the Province of Santa Cruz report on:

26) The date of registration of the legal instrument(s) by which the property referenced in point 15) was transferred, In all cases, please enclose an authenticated copy of all of the register entries made for each of the registrations.

27) The request dates for the certificates of ownership for the specified properties, with explicit indication of the number and owner of the Notarial Register for which they were issued, along with authenticated copies of the register entries showing the required information.

28) Request in writing that the *Subsecretaría de Recursos Tributarios* [Undersecretariat of Taxation Revenues] of the Province of Santa Cruz report on all of the sworn statements attesting to [payment of] stamp duties, both original and corrected, submitted by the aforementioned Notary, along with an authenticated copy of these, and reporting whether the payments made by said Notary, in his/her capacity as withholding agent for the stamp duties, match the amounts declared on the aforementioned sworn statements, listing whether the payments were made in full, in part or on account for the tax in question with the various amounts paid and the deposit dates.

29) Request in writing that the Undersecretariat of Taxation Revenues of the Province of Santa Cruz report on the existence of legal instruments reflecting the transfer of ownership, in exchange for payment, of the properties located in the city of El Calafate (in the city of Río Gallegos) starting from (the date the lands were purchased by Kirchner) until December 31, 2009, indicating, in each case, the land register data, the registration numbers, surface area, transaction price, tax assessment and the notary involved. In all cases, the documentary evidence attesting to the above must be enclosed.

30) Request in writing that the *Dirección General de Personas Jurídicas* [General Office for Legal Entities] of the Province of Santa Cruz and the Corporate Records Office provide an authenticated copy of the balance sheets for fiscal years 2007, 2008 and 2009 of the following commercial enterprises: Cencosud SA.; Austral Construcciones.

31) Request in writing that the *Colegio de Martilleros y Corredores de Comercio* [Association of Sales Agents and Auctioneers] of the Province of Santa Cruz report on three (3) appraisals of

the properties involved in the transactions under investigation.

For the rental transactions performed involving the HOTEL LOS SAUCES:

32) Request in writing that the company Panatel S.A. provide an authenticated copy of the rental agreement for the business establishment it runs under the trade name "Hotel Los Sauces" in El Calafate, in the Province of Santa Cruz. Similarly, it must report whether the rent payments were made in cash, by check, deposit or wire transfer or by another method, indicating, in each case, the dates and amounts and enclosing the documentation attesting to the information reported.

33) Request in writing that the company that operates the Hotel provide an authenticated copy of the guest check-in/check-out register of the Hotel Los Sauces in El Calafate, from the start date of the first rental agreement up to the present date.

34) Request in writing that the National Tourism Secretariat be requested to submit the annual reports on the occupancy of the Hotel Los Sauces in the vicinity of El Calafate, in the Province of Santa Cruz, for the years 2007 and 2008, including the documentation in its possession which attests to the information provided.

Other items of informational evidence with regard to the Banco de Santa Cruz:

35) Request audit reports from the BCRA for the Banco de Santa Cruz for the balance sheets from 2004 through 2009.

36) Request that the Banco de Santa Cruz submit bank statements with the credit and debit transactions for all deposits from the year 2004 to the present date for Néstor Kirchner and/or Cristina Fernández.

37) Request that the Banco de Santa Cruz provide copies of contracts and/or agreements with Néstor Kirchner and/or Cristina Fernández regarding the preferred interest rate granted on each of the deposits in pesos or in dollars from 2004 to the present date.

38) Request that the Banco de Santa Cruz submit bank statements and contracts or agreements regarding preferential rates on all deposits of over one million dollars from clients during 2008 and 2009. Listing showing of ownership, total deposited, term and interest.

39) Request that the Banco de Santa Cruz submit documentation or certifications with the date, amount and method of payment attesting to the settlement of the debt of AR$8,834,369 to this bank in 2009.

Other items of informational evidence:

40) Request from the IGJ [*Inspectoría General de Justicia* – Corporate Records Office] a balance sheet for Hotesur SA to verify entry in 2009 of a loan to Néstor Kirchner for $5,542,779.

41) Request that the accused submit the supporting documentation for the debt contracted with Hotesur SA.

42) Request that Aerolíneas Argentinas submit the agreements signed with the Hotel Los Sauces.

43) Request that the *Ministerio Planificación Federal* [Federal Planning Ministry] submit a list of public works on which the company JCR SA is performing construction.

44) Request that the Federal Planning Ministry submit a list of public works on which the companies belonging to Lázaro Báez are performing construction.

45) Request that the *Secretaría de Energía* [Energy Secretariat] submit a list of the oil-producing areas of the company belonging to Juan Carlos Relats.

46) Request that the Energy Secretariat submit a list of the oil-producing areas of the company belonging to Lázaro Báez.

47) Request that OCCOVI [*Organo de Control de Concesiones Viales* – Highway Concessions Oversight Agency] submit a list of road construction contracts awarded to JCR SA.

48) Request that OCCOVI submit a list of road construction contracts awarded to Rutas del Litoral SA.

49) Request that OCCOVI submit a list of road construction contracts awarded to Petersen SA.

**50) Request a report from the National Prosecutor's Office for Administrative Investigations by expert accountant Blanco Alvarez dated December 23, 2009 and its appendix dated December 28, 2009, on the analysis of the sworn statement of assets by Kirchner for 2008.**

<u>DOCUMENTARY EVIDENCE:</u>

1) Executive ("PEN") Decree No. 902/08.

2) Santa Cruz Public Works Report.

3) Newspaper articles:

    a) Diario Perfil, "Los Kirchner vendieron su casa en…" ["The Kirchners sold their house in…"]

    b) Diario Perfil, "Por una triangulación, la casa que vendió Kirchner…" ["Because of a triangulation, the house that Kirchner sold…"],

c) Diario La Nación, "Creció casi 10 millones de pesos la fortuna de los Kirchner" ["Kirchner fortune grows by almost 10 million pesos"], of July 7, 2010

d) Diario Clarín, "Declaración Jurada de los Kirchner:...", "Sworn statement by the Kirchners:..."] of July 8, 2010.

e) Diario Clarín, "En el mundo de los ricos...", ["In the world of the wealthy..."] of July 8, 2010.

4) BCRA reports on dollar deposit interest rates.

5) Complete Sworn Statement of Assets of a public nature for the year 2008 by Cristina Elisabet Fernández.

6) Law No. 21526 on Financial Institutions.

<u>EXPERT EVIDENCE:</u>

<u>EXPERT AUDITOR:</u> Appoint an expert auditor to report to Your Honor on the following, based on the sworn statements entered as evidence in this case and other relevant documentation: 1) The composition of the assets of former President Néstor Kirchner at the time he took office. 2) The composition of the assets of President of the Nation Cristina E. Fernández de Kirchner at the time she took office. 3) The composition of the assets of the accused at the time he left office, in the case of Néstor Kirchner, at the end of his term as President and in the year 2008, and for the accused Cristina Fernández de Kirchner, at the end of her term as Senator and for the two subsequent years. 4) Provide a monthly itemization of the incomes and expenditures of the accused during the period under investigation. 5) Determine whether, in the period in question, the accused experienced a significant increase in assets not attributable to the income acquired.

## IV - <u>PETITION</u>

For the foregoing reasons, and those determined by the distinguished judicial discretion of Your Honor, I pray that you:

1) Consider the amendment of the complaint formally submitted.

2) Admit this document and order the investigation set forth therein.

3) Receive promptly the confirmation of this complaint and have it sent to the Public Prosecutor's Office in accordance with Art. 180 of the C.P.P.N. [*Código Procesal Penal Nacional* – Argentine Code of Criminal Procedure].

MAY JUSTICE BE DONE.

**AMPLIAN. SOLICITAN SE INVESTIGUE LA PRESUNTA COMISIÓN DEL DELITO DE LAVADO DE ACTIVOS POR PARTE DE LOS INTEGRANTES DE LA ASOCIACIÓN ILÍCITA-**

Señor Juez:

:Juan Carlos Morán, Adrián Pérez, Carlos Comi y Horacio Piemonte, por derecho propio, y en nuestro carácter de diputados nacionales, manteniendo el domicilio constituido en la calle Rivadavia 1829 Piso 4° de esta Capital Federal, decimos en la Causa N° 15734/08 a V.S. decimos:

**I.- OBJETO.**

En relación al escrito con el que oportunamente fue promovida por la Dra. Elisa Maria Avelina Carrio y otros la denuncia caratulada "KIRCHNER NESTOR Y OTROS S/ ASOCIACION ILICITA Y OTROS" (Causa N° 15734/08) , en la que denunciamos conductas antijurídicas en relación a los Señores Kirchner Néstor Carlos, Jaime Ricardo, De Vido Julio, Ulloa Igor Rudy, López Cristóbal, Báez Lázaro , Juan Carlos Relats y Cristina Fernández de Kirchner por asociación ilícita, entre otros delitos, venimos a solicitar tome la intervención para la que resulta competente, a fin de que se investigue a los denunciados en la presente causa como integrantes de una asociación ilícita, por la posible comisión del delito de lavado de activos previsto en el artículo 278 del Código Penal, en particular a la Dra. Cristina Elisabet Fernández de Kirchner, DNI 10.433.615 y al Dr. Néstor Carlos Kirchner, DNI 5.404.911, en consideración a los hechos que seguidamente se exponen.-

**II.- HECHOS**

**ENCUADRE JURÍDICO DE LOS HECHOS DENUNCIADOS.-**

Creemos que los denunciados no solo han incrementado su patrimonio ilícitamente durante el desempeño de sus cargos públicos, sino que también han cometido el delito de lavado de activos a raíz de los distintos hechos que hemos denunciado en la presente causa y que podrían encuadrar en delitos contra la administración pública, todo ello como integrantes de la asociación ilícita denunciada.-

Es decir que consideramos pertinente que a raíz de la última declaración jurada presentada por la Presidente de la Nación ante la Oficina Anticorrupción, y por supuesto también de los datos que surgen de las declaraciones anteriores, se investigue si Cristina Fernández de Kirchner y Néstor Kirchner cometieron el delito de lavado

de activos, provenientes de delitos relacionados con las actividades de la asociación ilícita denunciada a través de la cual se habrían cometido distintos delitos contra la administración tales como fraude, cohecho, tráfico de influencias, malversación de causales públicos, y enriquecimiento ilícito de funcionarios y empleados.-

Recordemos que el lavado de activos implica un procedimiento a través del cual se pretende ocultar, disimular y encubrir el origen ilícito de determinados bienes o el producto de actividades delictivas con la finalidad de convertirlos en otros bienes u actividades que resultan aparentemente lícitas.

También se lo ha definido como el proceso mediante el cual los bienes de origen delictivo se integran al sistema económico legal con apariencia de haberse obtenido en forma lícita

Por lo tanto la principal finalidad es el blanqueo de bienes y sumas monetarias obtenidas a través de operaciones ilícitas.-

Y en este caso que venimos a denunciar que se investigue la evolución patrimonial de Néstor Kirchner de más de un 700% desde 2004 a la fecha. Este incremento ocultaría un proceso mediante el cual empresarios beneficiados con grandes negocios con el Estado le retornan a su patrimonio privado beneficios ilícitos, es decir, integran al sistema económico real dinero de corrupción con apariencia de obtenerlo en forma lícita.

Se ha dicho asimismo que en la actualidad "el lavado de dinero tiene en el mundo una relación cada vez más directa con la lucha contra la corrupción y la exigencia que internacionalmente existe sobre una mayor transparencia en la gestión pública. De tal modo que para que el dinero pueda circular nuevamente en la economía formal tiene que adoptar una forma lícita aun cuando la actividad que le ha dado origen no lo sea. La inserción del dinero ilegal en la economía formal se lleva a cabo mediante una máscara que permita no sospechar de su procedencia mediante un esquema de simulación y penetración en los mercados financieros. Podemos decir que el proceso de lavado de dinero es en sí mismo un proceso de simulación de licitud en forma permanente." ("Lavado de dinero-Delito Transnacional", Autor: Dr. Luis E. Sánchez Brot; Fecha 7/07/01).-

En lo que respecta al tema el Ministerio de Justicia, Seguridad Derechos Humanos y de la Nación de al referirse en su página web al lavado de dinero señala que "la persecución del delito de Lavado de Dinero es especialmente importante porque constituye la bisagra por la cual los bienes producidos de manera ilegal intentan formalizarse. Esta pretensión de formalidad que buscan los lavadores es necesaria a la hora de hacer valer esos activos en el circuito legal, por lo que el Estado debe focalizarse en todos los nodos donde ese mecanismo podría presentarse. El combate contra el Lavado de Dinero es garantía de:

•    Que la economía nacional esté conformada por valores legales y formales.

• Que el delito vinculado al Lavado de Dinero tenga la dificultad suficiente para formalizar sus activos tal que cada vez sea más difícil hacerlo y, por lo tanto, menos redituable realizar los delito que los componen.

• Que los estándares económicos y legales de la Nación gocen del nivel necesario para la credibilidad nacional e internacional.".-

Vale la pena recordar que dentro de la causa por asociación ilícita -y previendo la posible comisión del delito de lavado por parte de los presuntos integrantes- la Dra. Carrió amplió la denuncia a fines de 2008 cuando Néstor Kirchner impulsó la Ley de Blanqueo de Capitales que en su articulado preveía la posibilidad de incorporar dinero al circuito legal sin justificar su origen.

A su vez, recordemos asimismo que para esa fecha Cristina Fernández de Kirchner cambió al titular de AFIP poniendo a su hombre de confianza y otro presunto integrante de la Asociación Ilícita que hoy está también imputado en una causa por presunto cobro de coimas en el ONCCA.

Por lo tanto la conducta que venimos a denunciar encuadraría en la acción tipificada por el Art. 278 cuyo inciso 1) dispone que el lavado de activos se configura cuando se "...convirtiere, transfiriere, administrare, vendiere, gravare o aplicare de cualquier otro modo dinero u otra clase de bienes provenientes de un delito en el que no hubiera participado con la consecuencia posible de que los bienes originarios o los subrogantes adquieran la apariencia de un origen lícito y siempre que su valor supere la suma de cincuenta mil pesos ($ 50.000), sea en un solo acto o por la reiteración de hechos diversos vinculados entre sí".-

Recordemos que dicho delito es reprimido con pena de prisión de 2 a 10 años y multa de 2 a 10 veces el monto de la operación y que por su parte el inc b) del Art. 278 establece que "El mínimo de la escala penal será de cinco (5) años de prisión, cuando el autor realizare el hecho con habitualidad o como miembro de una asociación o banda formada para la comisión continuada de hechos de esta naturaleza".-

A su vez el inciso 4) del artículo 278 del Código Penal establece que los bienes o cosas objeto del delito de lavado de dinero podrán ser decomisados.-

Por último el Art. 279 del Código Penal en su inc. 3) dispone que "cuando el autor de alguno de los hechos descriptos en el artículo 277, incisos 1 ó 3, o en el artículo 278, inciso 1, fuera funcionario público que hubiera cometido el hecho en ejercicio u ocasión de sus funciones sufrirá además pena de inhabilitación especial de tres (3) a diez (10) años. La misma pena sufrirá el que hubiera actuado en ejercicio u ocasión de una profesión u oficio que requirieran habilitación especial.".-

Como señala un artículo publicado en el diario la nación con fecha 7/07/ 10 titulado "Creció casi $ 10 millones la fortuna de los Kirchner", conforme surge de la DDJJ presentada ante la Oficina Anticorrupción por Cristina Fernandez, el patrimonio

de la misma y de Néstor Kirchner se habría incrementado un 20,65 %,ya que paso de 46 millones de pesos a 55,5 .-

Asimismo indica que "a diferencia de años anteriores, en 2009 el incremento patrimonial de los Kirchner no se plasmó en la compra de propiedades ni en el aumento de sus depósitos bancarios, sino, antes que nada, en la cancelación de deudas millonarias y en la valorización de las acciones de dos de sus tres empresas. El matrimonio pudo cumplir con esos compromisos gracias a que tuvo ingresos por $ 16,5 millones, la mayor parte, en concepto de alquileres y de intereses por depósitos a plazo fijo. La pareja pasó de tener deudas por $ 19,2 millones en 2008 a $ 6,2 millones en 2009. El patrimonio neto resulta de sumar los bienes y las acreencias y restar las deudas. Entre los compromisos más importantes que canceló figuran el que tenía por la construcción del hotel Los Sauces ($ 8.329.596) y el que registraba con el Banco de Santa Cruz ($ 8.834.369), propiedad del grupo Eskenazi. La variación de más de $ 3 millones en el valor de las acciones de las empresas Los Sauces S.A. (dueña del hotel del mismo nombre, situado en El Calafate) y Hotesur S.A. (dueña del hotel Alto Calafate, en la misma ciudad) explica el resto del incremento patrimonial. Por eso pedimos que se investigue la verdad material de estas operaciones, particularmente lo que tiene que ver con la "deuda devengada no exigible por construcción de inmueble" con la empresa AUSTRAL CONSTRUCCIONES de Lázaro Báez como así también se solicite toda la documentación respaldatoria de la cancelación de la deuda con el Banco de Santa Cruz por más de ocho millones de pesos que figura en la declaración jurada de 2009.

Asimismo el artículo periodístico mencionado consigna "los títulos de Los Sauces, empresa de la que también es accionista Máximo Kirchner (hijo de la pareja), pasaron de valer $ 2.312.862 en 2008 a $ 3.205.440 en 2009. Las acciones de Hotesur se fueron de $ 5.399.926 a 7.654.029. Esa variación en el valor de las acciones quedó registrada en la declaración jurada que presentó la Presidenta, pero no en la que hizo Néstor Kirchner ante la Cámara de Diputados. Allí radica gran parte de la diferencia de más de $ 4 millones entre ambas declaraciones, cerradas con sólo 21 días de distancia."

"Además de las deudas con la constructora del hotel Los Sauces y con el Banco de Santa Cruz, los Kirchner eliminaron obligaciones que mantenían en concepto de alquileres percibidos por adelantado ($ 1.359.371) y depósitos en garantía por contratos de alquileres ($ 679.430) y con la AFIP ($ 51.273)".

En este sentido creemos que es fundamental solicitarle a la Inspección General de Justicia todos los balances, estatutos y documentación que allí hubiere sobre la empresa "Panatel S.A." que administra el Hotel Panamericano y el Hotel Los Sauces, y de Rutas del Litoral S.A. de Juan Carlos Relats. La medida sugerida tiene como objetivo que vuestra Señoría pueda verificar si en los balances correspondientes a 2008 y 2009 de alguna de estas empresas figuran los alquileres percibidos por adelantado

y los depósitos en garantía por contratos de alquileres pertinentes, como así también solicitando la documentación respaldatoria que detalle forma de pago, monto, fechas.

Sumaron, además, dos acreencias por $ 4 millones. La más importante de ellas es con Los Sauces, por $ 3.968.322; la otra, es con la AFIP, por $ 544.570. Pero contrajeron tres nuevas deudas, siempre según lo consignado en su última declaración jurada. La más importante, por $ 5.542.779, es con Hotesur S.A.".-

"Los ingresos del matrimonio Kirchner tuvieron una leve alza: mientras que en 2008 ascendían a $ 13,8 millones, en 2009 superaron los $ 16,5 millones. De esa cifra, 10.358.435 pesos provienen de ingresos por alquileres, $ 5.659.071 de intereses por depósitos bancarios y $ 536.383 que surgen de la suma del sueldo de la Presidenta y de la pensión que recibe el ex presidente". Debido a esto le pedimos a VS que se tomen varias medidas de prueba (que serán detalladas como prueba informativa en el capítulo pertinente) sobre la documentación respaldatoria de la verdad material de las operaciones mencionadas en los párrafos anteriores.-

Por otra parte hace referencia a que nuevamente Lázaro Báez resulta ser uno de los deudores del matrimonio.-

**Con relación al aumento patrimonial de los mencionados, creemos que el mismo no solo podría configurar el delito de enriquecimiento ilícito sino también que es la prueba del delito de lavado de activos que venimos a denunciar.-**

**En este sentido queremos señalar que el incremento inusual del patrimonio de Cristina Fernández y Néstor Kirchner en los últimos años, en los cuales ambos ejercieron casi de manera continua distintos cargos en la función pública, es la prueba del delito de lavado de dinero.-**

Asimismo y en relación a cuáles son las actividades que al matrimonio le han sido beneficiosas económicamente, tales como las relacionadas a las empresas hoteleras Los Sauces S.A y Hotesur S.A., resulta apropiado hacer mención a lo señalado en un documento ya dictado del Dr. Luis E. Sánchez Brot en el cual se sostiene en el apartado "Actividades y lugares más apropiados" que "Las actividades que manejan grandes sumas de efectivo son las más apropiadas para llevar a cabo el lavado de dinero, por la facilidad de deformar la realidad declarando ingresos superiores a los efectivamente obtenidos. Pensemos en grandes desarrollos hoteleros construidos en zonas veraniegas en terrenos linderos a hoteles ya existentes que vienen operando en el lugar desde hace décadas. Estas cadenas hoteleras pueden haberse construido con dinero lavado mediante el ingreso en la economía formal de aportes recibidos de inversores extranjeros. Al comenzar a operar, su objetivo es generar la mayor cantidad de ingresos posibles para poder justificar nuevos dineros ilegales, aunque tenga que fijar precios inferiores a la media del mercado para justificar su actividad a pleno, compitiendo con otros hoteleros que han obtenido su inversión inicial legalmente, o registrando una capacidad plena durante todo el año aunque en la realidad tal situación no se haya

llevado a cabo".-

        "Debemos reconocer que las empresas propietarias de este tipo de bienes que les permite justificar nuevos montos de dinero a través de su actividad son muy eficientes en el cumplimiento de los deberes fiscales pagando en tiempo y forma la totalidad de los impuestos que afectan su actividad.".-

        "Tenemos también ejemplos de casinos que han multiplicado cuatro veces sus movimientos declarados en los últimos años. El motivo justificar, aunque pagando todos los impuestos que correspondan, nuevas partidas de fondos obtenidos ilegalmente y blanqueados a través de esta actividad.".-

## DATOS DERIVADOS DE LAS DECLARACIONES JURADAS DE 2008 Y 2009 DE LA PRESIDENTA CRISTINA FÉRNANDEZ Y DE NESTOR KIRCHNER.-

        Como ya hemos denunciado en el Expte. Nº: 9423/2009 caratulado "Kirchner Néstor y Fernández de Kirchner, Cristina s/ Enriquecimiento Ilícito", durante el primer año posterior al cese de sus funciones Néstor C. Kirchner ha incrementado su patrimonio en un 158 %. El mismo aumentó su patrimonio de manera apreciable, a través de distintas maniobras, siendo la más utilizada la adquisición de tierras fiscales a precios muy bajos y su posterior venta a precios de mercado.

        Todo lo cual surge de las declaraciones juradas efectuadas por de Cristina Fernández ante la OA.-

        De la declaración jurada realizada por la Presidenta Cristina Fernández de Kirchner y que corresponde al periodo fiscal del año 2009 surge que el patrimonio del matrimonio Kirchner se compone de bienes inmuebles (12 departamentos, seis casas, seis terrenos y cuatro locales), bienes muebles registrables (auto Honda CVR modelo 2009), participación en las S.A "Los Sauces S.A", CO.MA S.A", y "HOTESUR S.A", depósitos bancarios por $ 21.499.973, dinero en efectivo por $ 25.001, acreencias por $ 4.531.194 y deudas por $ 6.222.983. Respecto a ello queremos señalar que de la DDJJ correspondiente al período 2008 las acreencias eran de $377.036 y deudas por $19.254.039.-

        Con solo observar la declaración mencionada resulta evidente que el ex Presidente de la Nación Néstor Kirchner y la ex Senadora por la Provincia de Santa Cruz y actual Presidenta de la Nación Cristina Fernández de Kirchner, se han enriquecido notoriamente con posterioridad al cese de sus cargos y en el caso de la Presidenta también durante su actual mandato.-

        En lo que respecta a las acreencias surge una por $ 3.968.322 y otra por la suma de $ 544.570 con la AFIP.-

        Con relación al incremento patrimonial a nuestro entender injustificado Creus sostiene al referirse al delito de enriquecimiento ilícito que " *lo que no se debe*

*poder justificar es un enriquecimiento patrimonial apreciable posterior a la asunción del cargo; es decir, el incremento patrimonial (aumento del activo o disminución del pasivo), que será apreciable cuando resulte considerable con relación a la situación económica del agente en el momento de asumir el cargo y que no esté de acuerdo con las posibilidades de evolución normal de aquella durante el tiempo de desempeño de la función o en el período ulterior a su cese anterior a la producción del requerimiento...".-*

## MAS DEL 95 % DEL ENRIQUECIMIENTO SE EXPLICA EN OPERACIONES REALIZADAS CON CUATRO EMPRESARIOS AÑO TRAS AÑO.

En relación a los hechos que creemos que podrían haber generado el dinero de Cristina Fernández y Néstor Kirchner como así el de otros de los denunciados en la presente causa, y que con posterioridad los mismos intentarían blanquear cometiendo el delito de lavado de activos tipificado en el Art. 278 y 279 del Código Penal de la Nación habría que considerar los hechos que a continuación enumeramos y que ya hemos denunciado en el presente expediente.-

Durante el 2008, el matrimonio creció en su patrimonio un 158 % (de 17 a 45 millones de pesos) y tuvo cuatro fuentes extraordinarias de ingresos: 1) El alquiler de más de $10.300.000 que le paga Juan Carlos Relats por el Hotel Los Sauces; 2) los intereses por depósitos por más de $4.000.000 del banco de Santa Cruz; 3) la venta de un terreno fiscal de 20.000 m2 al grupo CENCOSUD por $6.300.000 y 4) la venta de la residencia de Río Gallegos a una empresa vinculada a Lázaro Báez por más de $3.000.000. Esto explicó casi el 100 % del enriquecimiento de los Kirchner en 2008. Lo que hemos observado con asombro es que en la declaración jurada de 2009 vuelve a justificar más del 90 % de su crecimiento patrimonial -de 45 a 55 millones de pesos- en los "buenos negocios" con tres de los empresarios ya mencionados.

### *JUAN CARLOS RELATS.*

El pago efectuado por Juan Carlos Relats en concepto de alquiler por el complejo hotelero al cual pertenece el Hotel Los Sauces, en El Calafate, que es propiedad del ex Presidente Néstor Kirchner, conforme surge de las declaraciones juradas efectuadas por Cristina Fernández de Kirchner.-

Ya habíamos denunciado que resultaba injustificado el incremento del aumento de precio en el pago de alquiler del año 2007 al año 2008 ya que actividad hotelera habría descendido en ese período.

Juan Carlos Relats, durante 2008 y 2009 le pagó a Néstor Kirchner en concepto de alquiler del Hotel Los Sauces $ 20.716.870. Dicho hotel posee 38 habitaciones y se encuentra operable solo 8 meses al año.

Obsérvese que éste empresario al mismo tiempo y en los mismos años hace muy

buenos negocios con el gobierno de Néstor y Cristina Kirchner. A saber, ha recibido concesiones viales con la empresa Rutas del Litoral en las cuales ha obtenido un régimen tarifario especial por Decreto N° 902 de junio de 2008 firmado por la misma Presidenta de la Nación. En los últimos 60 días ha recibido más concesiones viales, ahora a través de una UTE que integra la empresa JCR SA, en donde particularmente se le aumentaron en forma muy considerable las compensaciones y subsidios que el Ministerio de Planificación proponía a priori en el pliego de licitación de ese corredor vial. También este empresario, con la empresa JCR SA construye la autovía 9 de Rosario a Córdoba. Vale recordar que estos procesos de licitación mencionado como también esta última obra está siendo investigada en la justicia por irregularidades y sobreprecios. Asimismo, Juan Carlos Relats ha sido beneficiado por gobiernos provinciales afines al Kirchnerismo con licencias de Casino a través de su empresa Casinos Tresor; áreas petroleras en Salta y Jujuy, con su empresa Pecon SA, y desgravaciones impositivas en algunas de sus empresas agropecuarias.

Entonces hablamos de lavado de dinero porque como dijimos al comienzo las operaciones con estos empresarios que figuran en las declaraciones juradas de Néstor Kirchner podrían esconder dinero proveniente de la corrupción y defraudación a la administración pública.

Debido a esto y particularmente en lo que se refiere a las operaciones realizadas con este empresario en el capítulo de pruebas solicitaremos una serie de medidas que tienen que ver con lograr la documentación respaldatoria de las operaciones privadas y públicas para poder llegar a la verdad material de los hechos.

### BANCO DE SANTA CRUZ

El Banco de Santa Cruz le paga a Néstor Kirchner por sus depósitos, tanto en dólares como en pesos, tasas preferenciales de interés muy difíciles de justificar. En efecto, entre 2008 y 2009 este Banco le pagó 9.844.511 pesos en concepto de intereses. Es decir, explica el 26 % del enriquecimiento de Kirchner de los últimos dos años. Además, según la Declaración Jurada 2009, sobre los 10 millones de pesos de enriquecimiento patrimonial influye sustancialmente la cancelación de una deuda en dicho Banco por $ 8.834.369. Los Kirchner recibieron de interés en 2008 $ 4.185.440 y en 2009 $ 5.659.071 por depósitos bancarios por $ 21.499.973.

Lo más difícil de explicar es el interés recibido en 2009 por un depósito en dólares en este banco por más de 2 millones de dólares, habiendo recibido de interés casi un 25 %.

Recordemos que el Banco de Santa Cruz es propiedad del Señor Eskenazi al cuál Kirchner le hizo comprar el 15 % de acciones de YPF en un negocio espectacular prácticamente sin poner dinero propio y pagando las cuotas con la misma renta petrolera. A su vez, el grupo Petersen de este empresario hace negocios con el Estado y en los últimos meses se ha quedado con el corredor vial 8, al cuál para cerrar el

contrato de concesión por seis años, el Ministerio de Planificación le aumentó los subsidios y compensaciones que a priori se ofrecían en el pliego de la licitación.

A causa de esto, solicitaremos como medida probatoria que se consulte a la Superintendencia de Entidades Financieras respecto del cumplimiento por parte del banco de Santa Cruz del Capítulo 9 de la Ley 21.526 de Entidades Financieras, referido a "Operaciones prohibidas y limitadas", que en el artículo 28 dispone que "las entidades comprendidas en esta ley no podrán: (…) inc. d) operar con sus directores, administradores y con empresas o personas vinculadas con ellas, en condiciones más favorables que las acordadas de ordinario a su clientela."

Este pedido se encuentra aún más justificado si tenemos en cuenta que los balances del mencionado Banco a diciembre de 2007, a diciembre de 2008 y a septiembre de 2009, del auditor Guillermo J. Díaz de la firma Pistrelli, Henry Martin y Asociados SRL, han sido cuestionados. Esta información está en el BCRA y se adjunta como prueba documental. Cabe destacar que la misma consigna textualmente que el informe correspondiente al cierre del ejercicio "cierra con observaciones el balance por hechos determinados".

A su vez, en el informe del BCRA del cuadro IX – I – II – II. Tasa de interés por depósitos monetarios y financieros BCRA/ Tasa de interés por depósitos del Sector Privado no financiero desagregado por extracto de montos serie mensual en porcentaje nominal anual. El Banco Central sugirió por depósitos a plazo fijo de más de un millón de dólares en 2009 tasas que alternaron entre el 0, 67 y 2,59 % anual (ver detalle adjunto en prueba documental).

Por lo tanto, no se puede dejar de pensar que una tasa de interés en dólares de más del 24 % por uno de los depósitos en 2009 al señor Néstor Kirchner es sospechosa.

La paradoja de este gobierno es colocar once mil millones de pesos o 2.800.000 millones de dólares en depósitos de ANSES en distintos bancos que nunca pagan más del 13 % de interés en pesos y al mismo tiempo en sus depósitos privados cerrar contratos a tasa preferencial al doble de tasa y en dólares.

Por lo antes señalado solicitamos las medidas de prueba que se consignan en el capítulo correspondiente para ver la documentación que respalde las operaciones correspondientes, privadas y públicas de este empresario para poder llegar a la verdad material de los hechos.

**GRUPO CENCOSUD.**

Una de las maniobras que habrían efectuado a fin de enriquecerse es la adquisición de terrenos fiscales a bajos precios y su posterior venta a precio de mercado para obtener una ganancia injustificada. Tal operatoria muchas veces la

han llevado a cabo nombrados directamente y otras a través de personas interpuestas, hecho que hemos denunciado en la presente causa en reiteradas oportunidades.-

La maniobra realizada por varios de los denunciados mediante la cual adquirían terrenos fiscales a bajos precios y su posterior venta a precio de mercado, obteniendo de este modo una ganancia injustificada. Operación que muchas veces la han llevado a cabo los denunciados directamente y otras a través de personas interpuestas.

En particular, la adquisición de las tierras fiscales a bajos precios que les fueron entregadas por intendente Méndez. Debiendo investigarse al respecto específicamente a Néstor Kirchner, Lázaro Báez y Cristóbal López.-

El Grupo Cencosud le compró un terreno fiscal de 20.000 m2 a Néstor Kirchner por $6.300.000 en 2008. Según los valores del mercado inmobiliario este terreno valdría apenas entre el 8 y 10 % del valor en que figura la operación.

Recordemos a su vez que el Grupo Cencosud es titular de una cadena de Hipermercados que se está instalando en la provincia de Santa Cruz y que al mismo tiempo de generarle este "buen negocio" a Néstor Kirchner habría recibido terrenos donados o a muy bajo precio y con muy buena ubicación en ciudades como Caleta Olivia. Además ha sido público y notorio las reuniones que este empresario tuvo durante 2007 con el propio Nestor Kirchner y el Secretario de Comercio Guillermo Moreno en la Casa Rosada en la búsqueda de acuerdos de precios con los supermercadistas.

Debido a esto hemos pedido una serie de diligencias de prueba y solicitado la documentación respaldatoria de las distintas operaciones públicas y privadas para llegar a la verdad material de los hechos.

**LÁZARO BÁEZ.**

Este empresario según la declaración jurada 2009 es uno de los causantes importantes del enriquecimiento de $ 10.000.000 que declara el matrimonio. Figura en dicha declaración la cancelación de una deuda de Néstor Kirchner a la constructora de Lázaro Báez por $ 8.329.526. A su vez, según la declaración jurada de 2008, existe una venta sobrevaluada a una empresa vinculada a este empresario de la residencia de Kirchner de la calle Maipú 225 de Río Gallegos por más de tres millones de pesos. Se sospecha que en esta operación se habría pagado impuesto de sellos solo por el 30 % del valor de la venta y a su vez que el precio de dicha propiedad según el mercado inmobiliario de la zona es apenas de una cuarta parte del valor que figura en la declaración jurada.

Recordemos que el empresario Lázaro Báez está imputado en distintas causas judiciales y que además, según el informe que adjuntamos, en los últimos años, a través de sus empresas ha construido el 92 % de la obra pública de la provincia de Santa Cruz.

Debido a esto, en el capítulo correspondiente a prueba solicitamos una serie de medidas a fin de verificar la documentación respaldatoria de las operaciones públicas y privadas llevadas a cabo por este empresario a fin de alcanzar la verdad material de los hechos aquí denunciados.

Es así como del análisis del enriquecimiento de los Kirchner podemos llegar a algunas conclusiones. Desde el año 2003 a la fecha que ocupan la primer magistratura del país han crecido un 700 %. El mayor crecimiento – de 17 millones a más de 55- se ha dado en 2008 y 2009. Pero cuando vamos a las fuentes de ingresos: rentas, intereses, alquileres, sueldos o ingresos previsionales, podemos ver que en estos dos últimos años sólo un 2,5 % responde a su trabajo como presidente y a la jubilación correspondiente, y el 97,5 % responde a conceptos vinculados a especulaciones financieras sin generación de puestos de trabajo.

**COMPRA DE DOS MILLONES DE DÓLARES EN OCTUBRE DE 2008.**

A nuestro entender en ese momento se cometió el delito tipificado en el Art. 268 (1) del Código Penal de la Nación ya que en esa ocasión Cristina Fernández de Kirchner poseía información que tenía respecto al valor de la divisa estadounidense en relación a la moneda nacional, información que tenía en virtud de su cargo y que utilizó con fines de lucro para sí y para su cónyuge, Néstor C. Kirchner. Consideramos que en ese caso el delito resulta evidente, ya que al lograr Néstor Kirchner un beneficio económico con dicha operación, quien en definitiva se enriquece es la Sra. Presidenta Cristina E. Fernández de Kirchner, por ser la ventaja lucrativa obtenida un bien ganancial del matrimonio. La conducta encuadraría en la acción tipificada por el Art. 268 (1) del Código Penal de la Nación que castiga al "funcionario público que con fines de lucro utilizare para sí o para un tercero informaciones o datos de carácter reservado de los que haya tomado conocimiento en razón de su cargo".-Por lo tanto el delito habría sido consumado por la propia Presidenta de la Nación a través de Néstor C. Kirchner y con su consentimiento, desde el momento en que él mismo y conforme a la información privilegiada que la Presidenta le brindaba fue quien realizó la compra de dos millones dólares.-

**Todos estos hechos señalados podrían encuadrar en distintos delitos contra la administración tales como fraude, cohecho, tráfico de influencias, malversación de causales públicos, y enriquecimiento ilícito de funcionarios y empleados.-**

**INFORME QUE REVELA IRREGULARIDADES EN LA EVOLUCIÓN**

**PATRIMONIAL DE CRISTINA FÉRNANDEZ Y NÉSTOR KIRCHNER.-**

Otra documentación que deberá tenerse presente durante el curso de la presente investigación es el informe de fecha 23/12/09 elaborado por los peritos de la F.I.A, en el marco de la causa Nº: 9423/2009 en el cual se señala respecto de la evolución patrimonial de Cristina Fernández y Néstor Kirchner, entre otras cuestiones, que 1) Con anterioridad los expertos de la F.I.A habían participado en la investigación de la documentación que obraba en el Expediente 24.967 de la F.I.A, "emitiendo un informe de fecha 16 de abril del año 2008, en el cual se señalaban una serie de inconsistencias que, entendemos, no han sido aclaradas hasta la fecha" y que se referían a la evolución patrimonial del Sr. Néstor C Kirchner y de la Sra. Cristina E. Fernández de Kirchner entre el 01/01/04 y el 11/12/07, que tenía vinculación con el que tramitó ante la Justicia Federal y Correccional Federal con el número de causa Nº 1388/08 y que asimismo investigaba el enriquecimiento ilícito de los mencionados en dicho período de tiempo, e indican respecto del mismo que "se dispuso su archivo – no el sobreseimiento de las investigadas". 2) Que el período correspondiente al año 2004 "aparentemente ha quedado fuera de las investigaciones judiciales", así como "el período comprendido entre el 11/12/07 y el 21/12/07".

Asimismo los expertos de la Fiscalía de Investigaciones Administrativas, al realizar el análisis de la pericia contable efectuada en el Expediente Nº 9423/2009 encontraron numerosas falencias en la realización de la misma, entre ellas han indicado que:

1) Respecto de las declaraciones juradas analizadas sobre el impuesto a las ganancias, sobre los bienes personales y del impuesto al valor agregado, los expertos de la FIA estimaron que en la pericia de fecha 15/12/09 efectuada en el expediente Nº 9423/2009 "los formularios acompañados no serían los que realmente se necesitan para hacer un análisis completo y con el rigor que amerita la experticia analizada, ya que se trataría únicamente de los formularios "resumen" o "cabeza" de las declaraciones juradas del impuesto a las ganancias y sobre los bienes personales".

Asimismo señalan la numerosa documentación que no ha sido solicitada a la Afip para el análisis de la evolución patrimonial de los denunciados.

2) "En el informe pericial se habla de que las declaraciones juradas fueron "cotejadas", pero más allá de expedirse sobre cierta dificultad en la comparación, nada se dice respecto de los resultados de dicho cotejo.-

3) Señalan que no coinciden con lo "manifestado por los peritos en cuanto a que no deben llevar libros de comercio", en virtud de que el Sr. Néstor Kirchner reviste la calidad de "Responsable Inscripto" frente al impuesto al valor agregado, desde el mes de junio de 2005".-

4) Destacan que en el punto f) de fs. 342 de la pericia contable indica que "Para los bienes ingresados con anterioridad al año 2008 no se constató su documentación de ingreso al patrimonio, pues ese trabajo se basó en las variaciones del año 2008 y en la documentación mencionada por V.S" y a raíz de ello concluyen que "queda claro que el análisis efectuado ha partido de una base respecto de la cual no se tiene certeza sobre su integridad y razonabilidad". (Punto 5 del informe de fecha 23/12/09 efectuado por los peritos de la FIA).-

5) "El análisis realizado no ha tenido en cuenta la evolución patrimonial (y su debida justificación) del resto de los integrantes del grupo familiar, al menos directo, de los investigados".- ( Punto 1.B del informe de fecha 23/12/09 efectuado por los peritos de la FIA).-

Asimismo los peritos de la FIA hicieron un análisis separado y detallado del informe pericial del expediente en relación a Cristina E. Fernandez y Néstor C. Kirchner.-

Asimismo señalan en el punto 6.c) que "los peritos no hacen ninguna mención a la participación accionaria que tiene la Sra. Fernandez en el Chapel SA (45%) al 31/12/2008, valuada en $ 11.250,00, conforme la declaración pública presentada ante la O.A. que está siendo investigada en otra causa.

Señalando por último que "no se ha determinado concretamente cual es, entre otras cosas, el importe del incremento patrimonial que se encontraría justificado".-

Al analizar la DDJJ efectuada por el ex Presidente de la Nación Dr. Néstor C. Kirchner, los expertos de la FIA indicaron entre otras cuestiones que: A) "Respecto de los saldos de depósitos bancarios al 31/12/2007 sólo se exponen en su moneda de origen, sin efectuar la conversión a pesos de aquellos que se declaran en moneda extranjera, de acuerdo a la cotización (1 dólar = 3, 109), informada por el propio contador Manzanares". B) "Los peritos informan a fs. 345 que se incorpora un "depósito a plazo fijo" en el año 2007 de u$s 222.575,00, que había sido omitido en la declaración jurada pública y rectificado con posterioridad. Al respecto se advierte que no se especifica cuál es la fuente documental que permitió determinar esta omisión y el origen de los fondos en cuestión, así como tampoco a través de qué documento y en qué fecha se habría informado, con posterioridad, dicha rectificación". c) "Los peritos no hacen ninguna mención a la Observación plasmada en la declaración jurada Anual 2007 presentada ante la Oficina Anticorrupción ... que dice textualmente" El sdo. En cta. Cte. De Bco. de Sta. Cruz SAal 11/12/07 que fue consignado en la ddjj iniciales de $869.477 mientras que al 31/12/07 que es consignado en esta ddjj anual es de $1.442.211.- La variación ocurrida en este rubro obedece a la acreditación del 26/12/07 bancaria datanet de $ 1.260.000. –recibida a cuenta por venta inmueble El Calafate, que fue perfeccionada mediante escrit. Traslativa de dominio de fecha 12/1/08 que asimismo se informa en

deudas en concepto seña recibida". Y en referencia a ello los peritos de la FIA sostienen que "dicha explicación no resultaría congruente, ya que si el saldo al 11/12/07 era de $869.477 y a él debe adicionársele la acreditación de fecha 26/12/07 y NO de $1.442.211 que no ha sido analizada por los profesionales intervinientes en la experticia y que, de no tener una explicación razonable, modificaría el saldo inicial de este rubro, con la incidencia directa en lo acontecido durante el año 2008".-

Asimismo como ya hemos mencionado en otra oportunidad resulta clara la falta de claridad y justificación del origen de los depósitos de los denunciados.-

De este modo los peritos de la FIA resaltaban en dicho informe que al momento de hacerse el peritaje que no se tuvo "a la vista ningún tipo de documentación que permita establecer a qué cantidad de plazos se refiere, cual es el monto de capital (y la moneda) de cada uno de ellos, ni su vencimiento., concluyendo los mencionados peritos que **" sin estos datos resulta imposible determinar, en forma fehaciente, que cantidad (y en que moneda) de intereses se generaron durante el año 2008, producto de aquellos plazos fijos que existan al 31/12/2007 y cuyos vencimientos se fueron dando al periodo del referido año".-**

Es así como no logra explicarse el monto de $4.185.440,057 provenientes de intereses obtenidos por los plazos fijos en dólares y pesos.-

Por otra parte en el dictamen pericial se expone en forma duplicada para el año 2008 el importe de $ 332.137,00 correspondiente a Ingresos por pensión Ex Presidente, ya que se lo menciona dentro del rubro "Ingresos" y, nuevamente, en el rubro "Otros Ingresos".-

Asimismo señalaban que no se menciona en el informe pericial obrante en la causa por enriquecimiento el importe de $1.291.481,00 que se declara ante la Oficina Anticorrupción en el año 2008 dentro del rubro "Otros Ingresos" como "certificado de plazo fijo en moneda extranjera". Según los auditores de la FIA esto significa que *"no existe ninguna explicación del origen de estos fondos y su respaldo documental o, en su defecto, de los motivos que llevaron a los peritos a excluir estos fondos del análisis realizado en la expertisia."*

Otro punto a resaltar es que en el año 2007 se declaró una deuda de $8.329.596,00 como "deuda devengada no exigible por construcción de inmuebles". Es dable destacar que este importe se mantiene igual para el año 2008, lo que indicaría que no se habría generado el pago o el devengamiento de ningún tipo de interés, pese al abultado monto del préstamo. Tal circunstancia hace que dicha transacción resulte sospechosa ya que, como advierten los auditores en el informe, la misma se encuentra "fuera de toda lógica comercial imperante en el mercado con relación a préstamos entre partes independientes.".-

A su vez cabe señalar que en el informe de Manzanares que obra en el expediente N° 9423/2009 se menciona un ingreso por "diferencia de cambio" de $1.291.481,01. En la DJ ante la OA no se declara bajo ese concepto sino bajo el concepto "Otros ingresos – Certificados de Plazos Fijos en Moneda Extranjera". -

### III- PRUEBA SUGERIDA-

A fin de esclarecer los hechos que venimos a denunciar y sin perjuicio de las medidas que V.S estime adecuadas, se sugiere como prueba la siguiente:

INFORMATIVA: Se ordene librar los siguientes oficios:

1) A la Oficina Anticorrupción a fin de que remita las declaraciones juradas del ex Presidente de la Nación Néstor Kirchner y de la Presidenta de la Nación Cristina Kirchner correspondientes a los períodos 2003, 2004, 2005, 2006, 2007 y 2008, 2009.-

2) Se solicite a la AFIP que remita la declaración jurada de impuestos de Néstor Kirchner.

3) Se solicite a la AFIP que remita la declaración jurada de impuestos de, Cristina E. Fernández de Kirchner.

4) Se solicite a la AFIP que remita la declaración jurada de impuestos de Máximo Kirchner.

5) Se solicite a la AFIP que remita la declaración jurada de impuestos de Juan Carlos Relats.

6) Se solicite a la AFIP que remita la declaración jurada de impuestos de Lázaro Báez.

7) Se solicite a la AFIP que remita los resultados de monitoreo y blanqueo del año 2008 que arrojaron como resultado distintas inconsistencias en la Región de Comodoro Rivadavia.-

8) Al Banco Central de la República Argentina a efectos de que informe si Néstor Kirchner, Cristina Elizabeth Fernández y Máximo Kirchner poseen cuenta corriente, caja de ahorro o plazo fijo, así como el detalle de los gastos realizados con tarjetas de crédito que los mismos hayan efectuado, información que deberá solicitar a los distintos bancos.

9) Solicitar a la Comisión Nacional de Valores que informe si Néstor Kirchner, Cristina Elizabeth Fernández y Máximo Kirchner poseen títulos públicos, acciones o bonos y/o cualquier otro activo financiero.

10) Se libre oficio al Registro de la Propiedad del Automotor a efectos de que informe cuáles son los bienes registrados a nombre de Cristina E. Fernández de Kirchner.-

11) Se libre oficio al Registro de la Propiedad del Automotor a efectos de que informe cuáles son los bienes registrados a nombre de Néstor Kirchner.-

12) Se libre oficio al Registro de la Propiedad Inmueble de la Provincia de Santa Cruz a efectos de que informe cuáles son los bienes registrados a nombre de Néstor Kirchner.-

13) Se libre oficio al Registro de la Propiedad Inmueble de la Provincia de Santa Cruz a efectos de que informe cuáles son los bienes registrados a nombre de Cristina E. Fernández de Kirchner.-

14) Se libre oficio al Registro de la Propiedad Inmueble de la Provincia de Santa Cruz a efectos de que informe cuáles son los bienes registrados a nombre de Máximo Kirchner.-

Se libre los siguientes oficios a fin de verificar la verdad material de las operaciones de venta de terrenos y residencia de Río Gallegos:

15) Se libre oficio a la escribanía correspondiente de la Ciudad de Río Gallegos a los fines de que se sirva remitir copia autenticada del acto o los actos notariales por medio de los cuales, Don Néstor Carlos Kirchner, transfirió el dominio a favor de Cencosud SA, del terreno fiscal ubicado en Calafate, Provincia de Santa Cruz cuyos dominios se hallan inscriptos en el Registro de la Propiedad de la Provincia de Santa Cruz en las matrículas correspondientes.

Asimismo, sírvase remitir copia autenticada de la siguiente documentación vinculada con el ó los actos notariales motivo del presente:

16) Certificados registrales de dominio de los inmuebles y de anotaciones personales de los transmitentes;

17) Certificados que acrediten la existencia de deudas por impuestos, tasas y contribuciones de los inmuebles;

18) Certificados que acrediten la valuación fiscal de los inmuebles;

19) Constancia de estudios de títulos antecedentes;

20) Declaración Jurada del Impuesto de Sellos de la ó las operaciones y comprobantes de pago del referido impuesto para cada operación;

21) Declaración Jurada y comprobantes de pago del Impuesto a la Transferencia de Inmuebles ó Impuesto a las Ganancias, a través del SICORE (Sistema de Control de Retenciones) de la AFIP;

22) Comprobantes de la presentación del CITI (Cruzamiento Informático de Transacciones Importantes) ante la AFIP;

23) Documentación de la Sociedad adquirente en la cual se acredite la representación invocada y la decisión societaria de adquisición ó transferencia de

inmuebles;

24) Documentos habilitantes de los otorgantes (poderes, actas de directorio, etc.);

25) Actos jurídicos bajo forma privada a través de los cuales se transfirieron los inmuebles.

Se libre oficio a la Dirección del Registro de la Propiedad Inmueble de la Provincia de Santa Cruz, a los fines de que se sirva informar:

26) La fecha de registración del ó los actos jurídicos por medio de los cuales se transfirió el inmueble consignado en el punto 15). En todos los casos, sírvanse adjuntar copia autenticada de la totalidad de las registraciones efectuadas sobre cada una de las matrículas;

27) Las fechas de solicitud de certificaciones de dominio sobre los inmuebles detallados, con expresa mención del número y titular del Registro Notarial para el cual fueron expedidos, adjuntándose las respectivas copias autenticadas de los asientos registrales en los cuales conste la información requerida.

28) Se libre oficio a la Subsecretaría de Recursos Tributarios de la Provincia de Santa Cruz a los fines de que se sirvan informar la totalidad de las declaraciones juradas de impuestos de sellos, originales y rectificativas, presentadas por el Notario mencionado, agregando copia autenticada de las mismas e informando si los pagos efectuados por el referido notario, en calidad de agente de retención del impuesto de sellos, coinciden con los valores declarados en las referidas declaraciones juradas, detallando la existencia de pagos totales, parciales o a cuenta del referido tributo con los distintos montos abonados y las fechas de depósito.

29) Se libre oficio a la Subsecretaría de Recursos Tributarios de la Provincia de Santa Cruz a los fines de que se sirvan informar sobre la existencia de actos jurídicos de transmisión de dominio a título oneroso respecto de inmuebles situados en la ciudad de El Calafate (en la ciudad de Río Gallegos), desde (fecha de la compra de los terrenos por parte de Kirchner hasta el 31 de diciembre de 2009, indicando en cada caso, los datos catastrales, números de matrículas, superficie, precio de la operación, valuación fiscal, notario interviniente. En todos los casos, deberán adjuntarse las constancias documentales que acrediten lo expuesto.

30) Se libre Oficio a la Dirección General de Personas Jurídicas de la Provincia de Santa Cruz y a la Inspección General de Justicia de la Nación, a los fines de que se sirvan remitir copia autenticada de los balances correspondientes a los ejercicios 2007, 2008 y 2009 de las siguientes sociedades comerciales: Cencosud SA.; Austral Construcciones.

31) Se libre Oficio al Colegio de Martilleros y Corredores de Comercio de la Provincia de Santa Cruz, a fin de que se sirvan informar tres (3) tasaciones de los

inmuebles a que se refieren las operaciones investigadas.

Sobre las operaciones de alquiler realizadas con el HOTEL LOS SAUCES:

32) Se libre oficio a la empresa Panatel S.A. a fin de que se adjunte copia autenticada del contrato de locación del fondo de comercio que gira bajo el nombre comercial "Hotel Los Sauces" de la localidad de El Calafate, Provincia de Santa Cruz; asimismo deberá informar si los pagos de los alquileres se efectuaron en dinero efectivo, mediante cheques, depósitos o transferencias bancarias ó de qué otro modo, indicando en cada caso las fechas y montos y adjuntando la documentación que acredite lo informado.

33) Se libre oficio a la empresa que explota el Hotel a fin de que se sirva remitir copia autenticada de los registros de ingresos y egresos de huéspedes del Hotel Los Sauces de El Calafate, desde la fecha de inicio del primer contrato de alquiler hasta la actualidad.

34) Se libre oficio a la Secretaría de Turismo de la Nación a los fines de que se sirva remitir informe anual de ocupación del Hotel Los Sauces de la localidad de El Calafate, Provincia de Santa Cruz, durante los años 2007 y 2008, adjuntando la documentación obrante en su poder que acredite lo informado.

Otras medidas de prueba informativa referidas al Banco de Santa Cruz:

35) Solicitar al BCRA informes de auditorías del Banco de Santa Cruz de los balances 2004 al 2009 inclusive.

36) Solicitar al Banco de Santa Cruz extractos bancarios de operaciones de crédito y débito de todos los depósitos del año 2004 a la fecha de Néstor Kirchner y/o Cristina Fernández.

37) Solicitar al Banco de Santa Cruz copia de los contratos y/o acuerdos con Néstor Kirchner y/o Cristina Fernández por la tasa de interés preferencial otorgada en cada uno de los depósitos en pesos o en dólares desde 2004 a la fecha.

38) Solicitar al Banco de Santa Cruz extractos bancarios y contratos o acuerdos por tasa preferencial de todos los depósitos de más de un millón de dólares de clientes durante 2008 y 2009. Detallando titularidad, monto depositado, plazo e interés.

39) Solicitar al Banco de Santa Cruz documentación o certificaciones con fecha, monto y forma de pago que acredite la cancelación de la deuda de $8.834.369 a ese banco en 2009.

Otras medidas de prueba informativa:

40) Solicitar a la IGJ balance de Hotesur SA para verificar el registro en 2009 de un crédito a Néstor Kirchner por $ 5.542.779.

41) Solicitar al denunciado la documentación respaldatoria de la deuda contraída con Hotesur SA.

42) Solicitar a Aerolíneas Argentinas los contratos firmados con el Hotel Los Sauces.

43) Solicitar al Ministerio Planificación Federal un listado de obras públicas que construye la empresa JCR SA.

44) Solicitar al Ministerio Planificación Federal un listado de obras públicas que construye las empresas de Lázaro Báez.

45) Solicitar a la Secretaría de Energía el listado de áreas petroleras de la empresa perteneciente a Juan Carlos Relats.

46) Solicitar a la Secretaría de Energía el listado de áreas petroleras de la empresa perteneciente a Lázaro Báez.

47) Solicitar al OCCOVI listado de concesiones viales otorgadas a JCR SA.

48) Solicitar al OCCOVI listado de concesiones viales otorgadas a Rutas del Litoral SA.

49) Solicitar al OCCOVI listado de concesiones viales otorgadas a Petersen SA.

**50) Pedir informe a la Fiscalía de Investigaciones Administrativas del perito contador Blanco Alvarez de fecha 23 de diciembre de 2009 y su anexo del día 28 de diciembre de 2009 sobre el análisis de la declaración jurada patrimonial de Kirchner de 2008.**

DOCUMENTAL:

1) Decreto PEN Nº 902/08.
2) Informe sobre Obra Pública de Santa Cruz.
3) Artículos periodísticos:
   a) Diario Perfil, "Los Kirchner vendieron su casa en…"
   b) Diario Perfil, "Por una triangulación, la casa que vendió Kirchner…",
   c) Diario La Nación, "Creció casi 10 millones de pesos la fortuna de los Kirchner", del 7 de julio de 2010
   d) Diario Clarín, "Declaración Jurada de los Kirchner:…", del 8 de julio de 2010.
   e) Diario Clarín, "En el mundo de los ricos…", del 8 de julio de 2010.
4) Informes del BCRA sobre tasas de interés de depósitos en dólares.
5) Declaración Jurada Patrimonial Integral de carácter público del año

2008 de Cristina Elisabet Fernández.

6 ) Ley N° 21.526, de Entidades Financieras.

PERICIAL:

PERICIAL CONTABLE: Se designe perito contable para que en base a las declaraciones juradas que consten en autos y la restante documentación pertinente , informe a V.S. sobre los puntos que siguen: 1) Como se encontraba conformado el patrimonio del ex Presidente Néstor Kirchner al momento de asumir el cargo. 2) Como se encontraba conformado el patrimonio de la Presidenta de la Nación Cristina E. Fernández de Kirchner al momento de asumir el cargo.3) Cómo se hallaba conformado el patrimonio de los denunciados al momento del cese de sus cargos, en el caso de Néstor Kirchner al terminar su mandato como Presidente y en el año 2008; y en el caso de la denunciada Cristina Fernández de Kirchner el momento del cese de su cargo como Senadora  y en los dos años posteriores. 4) Informar el detalle mensualizado de los ingresos y egresos de los denunciados durante el periodo analizado. 5) Determinar si en el período en cuestión existió por parte de los denunciados un incremento patrimonial apreciable no justificable con los ingresos obtenidos.-

## IV - P E T I T O R I O -

Por las razones expuestas, y las que suplirá el más elevado criterio de V.S., solicito:

1) Se tenga por efectuada formalmente la ampliación de denuncia.-

2) Se de curso a la misma ordenándose la investigación.

3) Reciba con carácter urgente la ratificación de la presente denuncia y remita al representante del Ministerio Público Fiscal en los términos del art.180 del C.P.P.N.

Proveer de conformidad, que

SERÁ JUSTICIA.-



October 2, 2014

I hereby certify that I am a professional translator, that I abide by the Code of Ethics and Professional Practice of the *American Translators Association*, that I am fluent in Spanish and English, that I have employed a team of professional translators, and that we have translated, to the best of our knowledge, the attached document entitled

**Complaint**

From Spanish into English

Signed,

Cathleen Waters

Founder, New World Medium

Translator of French, Spanish, Italian, Portuguese and English

American Translator's Association Membership no. 257918