# EXHIBIT X

—————————TRANSCRIBED FROM DIGITAL RECORDING—————————

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4  NML CAPITAL, LTD.,                  )
                                       )
5                    Plaintiff,        )  Case No. 2:14-cv-00492-RFB-VCF
                                       )  Las Vegas, Nevada
6          vs.                         )  Monday, March 9, 2015
                                       )  1:10 p.m.
7  THE REPUBLIC OF ARGENTINA,          )
                                       )  MOTIONS HEARING
8                    Defendant.        )
                                       )
9  ————————————————————————————————————

10

11

12
                   REPORTER'S TRANSCRIPT OF PROCEEDINGS
13
                     THE HONORABLE CAM FERENBACH,
14                 UNITED STATES MAGISTRATE JUDGE

15

16

17

18  APPEARANCES:            See Next Page

19  DIGITALLY RECORDED:     Liberty Court Recorder
                            1:10 p.m.
20

21  TRANSCRIBED BY:            PATRICIA L. GANCI
                               (702) 385-0670
22

23  Proceedings recorded by electronic sound recording, transcript
    produced by mechanical stenography and computer.
24

25

2

————————TRANSCRIBED FROM DIGITAL RECORDING————————

1  APPEARANCES:

2  For the Plaintiff:
                              **NIKKI L. BAKER, ESQ.**
3                             BROWNSTEIN HYATT FARBER SCHRECK, LLP
                              100 North City Parkway, Suite 1600
4                             Las Vegas, Nevada 89106
                              702-382-2101
5
                              **DENNIS H. HRANITZKY, ESQ.**
6                             **COLLIN HESSNEY, ESQ.**
                              **LINDSEY B. COHAN, ESQ.**
7                             DECHERT LLP
                              1095 Avenue of the Americas
8                             New York, New York 10036
                              212-698-3500
9

10  For MF Corporate Services (Nevada) and Patricia Amunategui:
                              **KENT P. WOODS, ESQ.**
11                            WOODS ERICKSON & WHITAKER, LLP
                              1349 W. Galleria Drive, Suite 200
12                            Henderson, Nevada 89014
                              702-434-0615
13

14  For Val de Loire, LLC:
                              **JASON M. WILEY, ESQ.**
15                            **DANIEL S. CEREGHINO, ESQ.**
                              KOLESAR & LEATHAM
16                            400 SOUTH RAMPART BLVD., Suite 400
                              Las Vegas, Nevada 89145
17                            792-362-9472

18
    For Jorge Lanata and Center for Investigative Journalism in the
19  Americas:
                              **MARC RANDAZZA, ESQ.**
20                            **TERESA HAAR, ESQ.**
                              RANDAZZA LEGAL GROUP
21                            3625 S. Town Center Drive, Suite 150
                              Las Vegas, Nevada 89135
22                            702-437-7662

23

24

25

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1          LAS VEGAS, NEVADA; MONDAY, MARCH 9, 2015; 1:03 P.M.

2                              --oOo--

3                    P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  Please rise.  Thank you.

5    Please be seated.

6          NML Capital versus Republic of Argentina,

7    3:14-cr-492-RFB-CF.  This comes before the Court on motions

8    Docket No. 1, 10, 14, and 60.  Counsel, appearances please.

9          MR. HRANITZKY:  Your Honor, Dennis Hranitzky from

10   Dechert LLP on behalf of NML Capital.  I'm joined by my

11   colleagues, Colin Hessney and Lindsey Cohan, and also by Nikki

12   Baker from the Brownstein Hyatt Firm.

13         THE COURT:  All right.  Thank you, Mr. Hranitzky.  Good

14   afternoon.

15         MR. WILEY:  Good afternoon, Your Honor.  Jason Wiley

16   and Daniel Cereghino from Kolesar & Leatham on behalf of

17   nonparty Val de Loire, LLC.

18         THE COURT:  Okay.

19         MR. WOODS:  Your Honor, Kent Woods on behalf of M.F.

20   Nevada and Patricia Amunategui.

21         MR. RANDAZZA:  Your Honor, Marc Randazza.  I'm here

22   also with my colleague, Teresa Haar, on behalf of nonparty Jorge

23   Lanata.

24         THE COURT:  All right, Mr. Randazza.  All right.  I

25   think we need to take up a couple of things before we get into

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

──── TRANSCRIBED FROM DIGITAL RECORDING ────

1  the main focus of today.  The filings addressed in my order of

2  Thursday, last Thursday, No. 95, are still sealed which I think

3  is the right thing to do right now because I directed the

4  parties to do the same type of redacting that we did with

5  Ms. Amunategui's deposition transcript, although I didn't really

6  spell out in there how that was going to happen.  And I just

7  wondered, does anyone have a suggestion on what the most

8  efficient way -- there are a number of sealed documents here.

9      I mean, if there -- if everyone agrees there's nothing

10  in there that would require sealing such as Ms. Amunategui's

11  Social Security number, other personal information covered under

12  Rule 5.2, her future travel plans, personal contact information,

13  and the -- her immigration status.  I mean, those are the only

14  things I said still needed to remain sealed.

15      Is any of that in any of these still-sealed documents?

16      MR. WOODS:  Your Honor, the answer to that question is

17  yes.

18      THE COURT:  Okay.

19      MR. WOODS:  Both in my filings and Mr. Hranitzky's

20  filings.  Several motions attached full columns of her

21  deposition.

22      THE COURT:  Oh, okay.

23      MR. WOODS:  And so those -- those are entirely

24  unredacted.  So I'm not sure what the best way to go about it

25  is, unless he just wants to refile everything, substituting the

—TRANSCRIBED FROM DIGITAL RECORDING—

1   redacted deposition for the exhibits that were previously

2   sealed.

3            THE COURT:  Yeah.  Mr. Hranitzky?

4            MR. HRANITZKY:  We have no objection to that.

5            THE COURT:  Okay.  Well, that makes sense.  You know,

6   in a way, I say it's kind of a shame to keep having multiple

7   versions of the redacted deposition, but this is all electronic

8   anyway so it's not like we're killing a lot of trees to do that.

9   So, yeah, why don't we do that then.  Then it will be easy.

10  Wherever anybody is they'll have all of their exhibits.  So why

11  don't I give you a week to do that.  Each party that filed

12  something that's now under seal that has attached to it the

13  Amunategui -- am I pronouncing that right?  Amunategui?

14           MR. WOODS:  She says it "Amoonotagee."

15           THE COURT:  Amunategui.

16           MR. WOODS:  For the sake of this hearing, that's fine.

17           THE COURT:  All right.  Amunategui.  Well, I always try

18  to pronounce names right.  Amunategui.

19           Okay.  Ms. Amunategui's deposition just refiled with

20  the proper redactions, and then all of that will be cleaned up.

21  Okay.

22           Now, we did get this UBS letter today.  I assume

23  everyone saw.  We filed it, I believe the Court, in the docket.

24  So I guess I have first a question for you, Mr. Hranitzky.  Is

25  this really just a 5.2 issue again here where we're talking --

—————————— TRANSCRIBED FROM DIGITAL RECORDING ——————————

 1  under Rule 5.2 that we're talking about account numbers and

 2  things of that nature or -- if you know, or are there other --

 3  you know, the phrase they use is detailed nonpublic information

 4  about critical client banking information.  What is that?

 5           MR. HRANITZKY:  Your Honor, the exhibit that UBS is

 6  referring to.

 7           THE COURT:  Right.

 8           MR. HRANITZKY:  And we have similar spreadsheets that

 9  we received from Standard Charter, from Bank of America, and

10  from one other bank.  It will come to me in a minute.  HSBC.

11  None of which have filed --

12           THE COURT:  Right.

13           MR. HRANITZKY:  It's a spreadsheet with records of

14  electronic funds transfers and there are a number of fields.  I

15  think there's something like 30 fields of information:

16  originating institution, originator, account number origination,

17  date of transaction, amount of transaction, like, things of that

18  nature.

19           THE COURT:  Right.

20           MR. HRANITZKY:  The ones that are of interest to us and

21  the reason that we submitted these spreadsheets with our papers

22  is because many of them document electronic funds transfers that

23  are -- appear to be exactly what Mr. Campagnoli was referring to

24  and what Mr. Lascar was referring to testifying about fund

25  transfers.  So they're relevant for that purpose.

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1          It's up to Your Honor to determine whether those

2   records are deserving of confidential treatment.

3          THE COURT:  All right.  Well -- so, I'm trying to think

4   here.  I'm looking at 5.2.  See, a financial account number is

5   one of the things that parties are not supposed to file with the

6   Court because once it comes in on our docket it's up on Pacer

7   and, you know, it's on the Internet.  But it does say that, you

8   know, they can include only the last four digits of the

9   financial account number.  That's the way you solve that

10  problem.

11         There's one of two ways to go here.  I mean, if that's

12  the only issue, the solution's obvious, but if that's not the

13  only issue, then I'm going to have to ask UBS to come in here

14  and file something and explain to me what they mean by detailed

15  nonpublic information about critical client banking information.

16  I just have no idea what they mean in their letter.

17         MR. HRANITZKY:  Well, Your Honor, I don't know that

18  this will work.

19         THE COURT:  Okay.

20         MR. HRANITZKY:  But I could reach out to UBS's counsel

21  to see whether a proposal along the lines of what Your Honor

22  described, redacting the account numbers, all but the last four

23  digits --

24         THE COURT:  Right.

25         MR. HRANITZKY:  -- would address their concerns.

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1      THE COURT:  If that will do it, then that's an easy

2  solution, just whoever's got the thing on their computer, and

3  regenerate it blanking out those last numbers, and be sure to --

4  I've learned.  We had an issue about if you file an electronic

5  document that metadata can remain.  I'm not sure if everybody's

6  aware of that.  The person who is the expert in our court about

7  this stuff tells me that if you flatten the document, whatever

8  that means, that eliminates the metadata.  So, I mean, you might

9  suggest that to the bank, for what it's worth.

10      But yeah.  Okay.  Well, why don't we do that?  But if

11  for some reason that doesn't solve the problem, then could you

12  -- this is really weird.  I guess we'll enter an order saying,

13  as part of this whole order when this is over, that you're going

14  to undertake that, but if it's not resolved by March 23rd, then

15  they need to file a brief explaining what they mean by detailed

16  nonpublic information about critical client banking information.

17  And then I'll give anyone else here that's in -- that's of

18  interest to file something by the 30th and they can have a reply

19  by the 3rd.  And I'll sort it out on the pleadings, unless this

20  more informal solution works.  All right?  Everybody good with

21  that?  Okay.  Good.

22      Last item is, of course, how these pending issues are

23  going to affect the argument today.  Now, is anybody planning on

24  referring to things that I've ordered sealed during the argument

25  today?

—TRANSCRIBED FROM DIGITAL RECORDING—

1          MR. HRANITZKY:  No, Your Honor.

2          MR. WOODS:  Not from us, Your Honor.

3          THE COURT:  All right.  Well, then there's no problem.

4   All right.

5          So, you know, the hearing today NML, as I see it, has

6   the burden of establishing, you know, whether you use the

7   federal standard or the state standard or whether they're

8   different, but essentially reasonable suspicion to believe that

9   the relevant financial transactions were not in good faith.  I

10  think that's the central burden.  There are a lot of other

11  issues.

12         So what I'd like to do is have NML go first, even

13  though the other side filed the motions to quash first and there

14  were counter motions to compel.  I think it makes more sense for

15  NML to go first.  Then I'll hear from all of the oppositions.

16  And then, you know, NML will get a reply.  And, you know, as

17  people who have been before me, I'm usually flexible.  Things

18  come up in the reply you think need to be fleshed out, that's

19  fine.

20         So anyone have any other issues with that?  That seems

21  to make sense.

22         MR. HRANITZKY:  Not an issue with that, Your Honor,

23  just a housekeeping matter.

24         THE COURT:  Okay.

25         MR. HRANITZKY:  Mr. Pablo Maggio, who is the expert in

——TRANSCRIBED FROM DIGITAL RECORDING——

1  Argentine criminal law whose affidavit we submitted with some of

2  our papers in connection with these pending motions, has come to

3  Las Vegas to join us from Argentina.

4          THE COURT:  Okay.

5          MR. HRANITZKY:  And he is here in the courtroom.

6          THE COURT:  All right.

7          MR. HRANITZKY:  And we brought him along --

8          THE COURT:  Good afternoon, sir.

9          MR. HRANITZKY:  We brought him along in case Your Honor

10  felt that it might be useful or appropriate to hear from

11  Mr. Maggio or counsel for Val de Loire or M.F. Nevada to

12  cross-examine him.  That being the case, I just wanted to

13  disclose the fact to Your Honor in case Your Honor had an issue

14  with him being present in the courtroom during our --

15          THE COURT:  Well, I don't have an issue.  Does anyone

16  else have an issue with him being here?

17          MR. WILEY:  Well, Your Honor, I guess we would object

18  in the use of Mr. Maggio based upon a number of --

19          THE COURT:  Oh, no, no.  I'm not saying objection to

20  having an evidentiary hearing.  I got to tell you, I'm not

21  planning on having an evidentiary hearing today without notice

22  to the other side and everything, but I'm just saying for him

23  sitting here today during the argument.

24          MR. WILEY:  No, that's fine.

25          THE COURT:  Yeah, I think that's all that's going to

─TRANSCRIBED FROM DIGITAL RECORDING─

 1  happen today.  That's fine.

 2         MR. HRANITZKY:  And, frankly, Your Honor, we weren't

 3  contemplating -- we're not pushing an evidentiary hearing.

 4         THE COURT:  Right.

 5         MR. HRANITZKY:  We just brought him along in case Your

 6  Honor had questions for him.

 7         THE COURT:  Well, and, you know, I guess if the other

 8  side for some reason wants to bring something up, he's sitting

 9  here and he's available, so that's fine.

10         All right.  Hear from NML.

11         MR. HRANITZKY:  One last thing, Your Honor.  I -- as we

12  all know, NML intends to refer to some demonstrative exhibits

13  during the course of the argument.

14         THE COURT:  Right.

15         MR. HRANITZKY:  We have them loaded up to appear on the

16  screen, but I also have binder hard copies for Your Honor.

17         THE COURT:  Right.

18         MR. HRANITZKY:  Together with the underlying evidence.

19         THE COURT:  Great.

20         MR. HRANITZKY:  The other side has objected to

21  foundation for a number of the statements in the demonstratives.

22  And so we've assembled for evidentiary foundation -- if I may

23  approach Your Honor.

24         THE COURT:  Sure.  Yeah.  Now, these things aren't

25  going to be filed.  They're just going to be, you know, kept as

—TRANSCRIBED FROM DIGITAL RECORDING—

1  exhibits for the hearing, but I'm not going to file them in the

2  docket.  All right?

3         All right.  Thank you.  I got two of these.

4         MR. HRANITZKY:  I had two in case the Court wanted to

5  make one a Court Exhibit.

6         THE COURT:  Here, Chris.  That's my law clerk.

7         MR. HRANITZKY:  So, Your Honor, I'd like to start with

8  the motions relating to the subpoenas served on Val de Loire or

9  the subpoena served on Val de Loire.

10        THE COURT:  Okay.

11        MR. HRANITZKY:  Which I would add also implicates

12 discovery or a subpoena that we served on M.F. Nevada which

13 seeks information pertaining to Val de Loire which I understand

14 from M.F. Nevada's counsel, M.F. Nevada did have responsive

15 information, but they have held that they've been withholding it

16 pending the outcome of or the disposition of these motions.

17 But -- so that's where I'd like to start.

18        THE COURT:  Okay.

19        MR. HRANITZKY:  And I'll cover three points.  I'll

20 start with the legal standard because, among other things,

21 that's where Your Honor asked us to start.  Once we've gone

22 through that, I'd like to go through the subpoena itself to

23 examine what actually NML asked Val de Loire for and does it

24 satisfy the legal standard.  And then, finally, has NML tied Val

25 de Loire to discoverable information?  In other words, have we

————TRANSCRIBED FROM DIGITAL RECORDING————

1  made the threshold showing indicating that Val de Loire may have

2  responsive information?

3           Starting with the legal standard.  Your Honor, as we've

4  said in our papers, it's NML's view that Your Honor had it right

5  in your August 11th opinion when Your Honor ruled that -- could

6  I have Slide No. 60?

7           Looking at the second bullet.  First, you have the

8  choice between state law or federal common law.  And under

9  federal common law, judgment creditor seeking post-judgment

10 discovery must show either the necessity and relevance of the

11 discovery sought or that the relationship between the judgment

12 debtor and nonparty is sufficient to raise a reasonable doubt

13 about the bona fides of the transfer of assets.  That was an

14 either or formulation.  All right.

15          And I understand that it's Val de Loire's position that

16 Your Honor was wrong about point 1, that it's not sufficient

17 merely to show necessity and relevance.  We think that Your

18 Honor had that right, but for the sake of argument today and not

19 conceding the issue, we will accept Val de Loire's version of

20 the legal standard and look at whether we've satisfied it.

21          There's actually two kinds of information I believe

22 that Val de Loire concedes would be relevant post-judgment

23 discovery sought from a third party.  One of them is information

24 about transfers, if there's an indication that the third party

25 was involved in the transfer, but the other is information about

─TRANSCRIBED FROM DIGITAL RECORDING─

1  the debtor's own assets which we haven't focussed on heretofore

2  in the argument.

3          And if Your Honor will turn to Tab No. 53 in the

4  binder, this is the subpoena that NML served on Val de Loire.

5          THE COURT:  Okay.

6          MR. HRANITZKY:  And let's look at what NML actually

7  asked for.  In fact, all of this information is -- every one of

8  these requests seeks information about assets of Argentina.  We

9  don't ask for any personal financial information of Val de Loire

10  at all.  And the reason for that is because, as Your Honor has

11  found, a thief acquires no title to that which he steals.  And

12  so we've asked for information about transfers, relationships,

13  accounts, other financial information involving the entities

14  that Prosecutor Campagnoli has associated with this alleged Baez

15  embezzlement scheme.

16          Those individuals and entities are listed in Attachment

17  C, which you see like, No. 1, Lazaro Baez; No. 2, Martin Baez,

18  his son; No. 3, Leandro, another son; just going on and on.  And

19  then second category is the entities about which we seek

20  information.  All of these entities are named in -- were named

21  in DeNunzio's criminal complaints that Your Honor is familiar

22  with because they've been the subject of motion practice for a

23  while before Your Honor.

24          All right.  So going back to the requests themselves.

25  No. 1, All documents concerning your relationship with those

───────TRANSCRIBED FROM DIGITAL RECORDING───────

 1  persons.  This is like to determine sort of what do you know

 2  about these people.  No. 2, Documents concerning the transfer of

 3  funds or other property from, to, or among any of the persons

 4  identified in Attachment C.  That's not even asking for

 5  information about Val de Loire.  This is asking about transfers

 6  among the entities that are implicated in the scheme.

 7         And so I won't go through every one of the requests in

 8  the subpoena, but the point, Your Honor, is that we're asking

 9  about assets of the debtor.  We're not asking for Val de Loire's

10  personal financial information.

11         So -- and the point there, Your Honor, is that we've

12  satisfied the legal standard even under their version of the

13  standard.

14         The second prong or the second way that Val de Loire

15  contends one can obtain post-judgment discovery from a third

16  party is if there's some evidence to suggest that a transfer of

17  assets involving the third party was fraudulent.  And I would

18  submit that under that standard -- the same analysis would apply

19  under that standard because if Val de Loire has information

20  about these things, with respect to these entities, then Val de

21  Loire has some kind of relationship with the entities.  And the

22  entities are alleged to be part of an embezzlement scheme

23  involving misappropriated Argentine state assets.

24         Now, I concede that that second argument is more

25  convoluted than the first.  And, frankly, it's a lot simpler

—TRANSCRIBED FROM DIGITAL RECORDING—

1   simply to approach it from what are we asking about.  These are

2   Argentina's stolen assets.  And that should be the end of the

3   analysis from our perspective, Your Honor.

4           So that takes us through the legal standard and have we

5   complied with the legal standard in terms of what we asked for

6   in the subpoena.  My third point, Your Honor also found in your

7   August 11th opinion, and I don't believe that Val de Loire

8   contests this, that NML has to make a threshold showing

9   connecting Val de Loire to information about all of this.  All

10  right.

11          And so for this point I would like to refer to the

12  organization chart slides that by now everybody is familiar

13  with.  So if I could get slide -- sorry.  Can I get the first

14  slide?  Here we go.

15          So Val de Loire has been connected by Argentine -- so

16  the discovery we seek from Val de Loire --

17          THE COURT:  Which slide number is that?

18          MR. HRANITZKY:  Sorry.  This is Slide No. 4.

19          THE COURT:  Four.  Okay.  Got it.

20          MR. HRANITZKY:  These group of slides I'm going to show

21  Your Honor now show connections between -- or reasons we think

22  that Val de Loire may have information about the Lopez scheme.

23  So we start with who is Cristobal Lopez.  Your Honor probably

24  knows much of this by this point, but he is an energy and

25  gambling magnet.  He has long-standing ties to the Kirchners who

—TRANSCRIBED FROM DIGITAL RECORDING—

1   run Argentina.  He's been accused of inappropriately benefiting

2   from government energy concessions, and two of his Argentine

3   casino businesses, Casino Club and Hipodromo de Palermo, are

4   being investigated for fraud.

5        He's personally the subject of two Argentine

6   criminal -- pending criminal investigations.  They are not, by

7   the way, the two that Mr. Maggio referred to in his affidavit.

8   We learned this morning that there's an Argentine criminal

9   investigation that we didn't know about when Mr. Maggio

10  submitted his affidavit.  And we learned last week, after

11  reading Val de Loire's papers to quash the demonstrative

12  exhibits, that one of the two criminal investigations that had

13  been pending against Mr. Lopez has since been dismissed.  So

14  there's still two.  It's just not the same two.

15       THE COURT:  Still two.

16       MR. HRANITZKY:  And then finally his flagship firm,

17  Casino Club, is part of a joint venture with Hipodromo, which is

18  -- a spin-off of which is an entity called Correon.  And Val de

19  Loire owns 35 percent of the equity in Correon.  Could I have

20  the next slide?

21       So this slide just illustrates the connection between

22  Lopez and Casino Club.  Next slide.  All right.  And Casino Club

23  and Hipodromo are part of the joint venture.  So this slide

24  deals with Hipodromo and Casino Club.  Hipodromo operates a

25  racetrack and casino and is owned by Cristobal Lopez and various

─TRANSCRIBED FROM DIGITAL RECORDING─

 1  partners.  And, by the way, we've included citations to the --

 2          THE COURT:  I see that.

 3          MR. HRANITZKY:  -- underlying evidence.  I'm not going

 4  to go through all of that because it would take forever, but

 5  it's there for Your Honor to consult if Your Honor has questions

 6  about the foundations for any of these statements.

 7          Hipodromo is the subject of a federal investigation for

 8  tax evasion in Argentina.  Lopez is a director and shareholder

 9  of Casino Club which is an entity which is also the subject of

10  criminal complaints in Argentina.  Lopez and Casino Club are

11  being investigated for fraud against the public sector and

12  various other offenses.  And documents produced to NML by M.F.

13  Nevada reveal that Val de Loire itself appears to have engaged

14  in a loan agreement with Hipodromo.  So we have a contractual

15  privity between Val de Loire and Hipodromo which is one of the

16  targets of these ongoing investigations within Argentina.  Next

17  slide, please.

18          All right.  So this just -- Correon is a spin-off of

19  Hipodromo.  Next slide.  And as I said before, Val de Loire owns

20  35 percent of the equity in Correon.  Next slide.  Same point.

21  Next slide.  So focus for a minute on Val de Loire.

22          Val de Loire is a Nevada company.  It was organized by

23  M.F. Nevada and by Ms. Amunategui or I'm going to pronounce --

24  I'm going to mispronounce that, but I'm just not going to try to

25  get it right right now, Your Honor, because I'll spend all day.

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1           Through Correon, Val de Loire has an indirect ownership

2    interest in several casino projects in Argentina alongside

3    Cristobal Lopez.  Documents produced -- different documents

4    produced by M.F. Nevada to NML show that Val de Loire engaged in

5    at least one transaction each with Baez entities.  One of the

6    Baez entities is called Balmont Holding.  The other Baez entity

7    is called Fintech.  So now we have contractual privity again

8    this time between Val de Loire and two of the Baez entities

9    connecting it to that whole matter.

10          And then finally, as I said before, documents we

11   received from M.F. Nevada also show Val de Loire appears to have

12   engaged in a loan agreement with the Hipodromo.  Next slide.

13          Now, we come to Edmund Ward.  Edmund Ward is the

14   manager of Val de Loire.  In fact, Edmund Ward submitted an

15   affidavit in connection with the motions that we put before Your

16   Honor.  Next slide.

17          He's the legal representative of Val de Loire.  He

18   appears to be the former brother-in-law of Mossack Fonseca,

19   founder of Ramon Fonseca.  He's either the brother-in-law or the

20   stepson or the son -- I'm sorry -- the son-in-law of Roman

21   Fonseca.  We're not entirely sure, but we've found genealogy --

22   genealogical information online that suggests that he has one of

23   those two connections.  So here's another connection between --

24   here's a connection between Val de Loire and Mossack Fonseca.

25          Through Val de Loire, Mr. Ward appears to have engaged

——————TRANSCRIBED FROM DIGITAL RECORDING——————

1  in transactions with the two Baez entities, Balmont and Fintech.

2  The documents indicate a connection there.  And this directly

3  contradicts a statement in Mr. Ward's October 30th affidavit

4  where he said that Val de Loire has engaged in no business with

5  any of these entities.

6        Next slide.  So I covered this point.  Next slide.

7  Okay.  So Slide 15, this introduces J.P. Damiani and Asociados.

8  J.P. Damiani and Asociados is a law firm in Uruguay that appears

9  to have served as counsel for Val de Loire in various

10  transactions.  Next slide.

11        Damiani -- Juan Pedro Damiani owns the firm that bears

12  his name as well as a related brokerage firm.  According to a

13  suspicious activity report issued by a Seychelles government

14  authority, Damiani's law firm participated in the formation of

15  at least a dozen companies in Nevada that Argentine prosecutors

16  have linked to the Baez scheme.  The same suspicious activity

17  report ties the Damiani firm to Aldyne.

18        Now, unfortunately, we don't have a copy of this

19  suspicious activity report itself because I understand that that

20  document is confidential.  We've tried to obtain one.  We just

21  haven't been able to.  So in this instance we're relying on news

22  reports.  I concede that.  All right.  But I don't believe that

23  anybody has suggested that the news reports are wrong or

24  inaccurate and that that suspicious activity report didn't

25  actually -- doesn't actually exist and say these things.

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1          Mr. Damiani has multiple business dealings with Mossack

2    Fonseca, and as I said before, he appears to have served as

3    counsel for Val de Loire and its principals.  Next slide.

4          Mr. and Mrs. -- we have documents that we received from

5    M.F. Nevada that indicate that the Damiani firm was involved in

6    setting up some of the Baez entities.  Next slide.

7          This just -- we've covered this point already.  Next

8    slide.

9          We've covered this point already.  Val de Loire ties --

10   connected to the Baez entities.  Next slide.

11         And we've covered this as well, although here Your

12   Honor can find references to the underlying evidence that shows

13   that Val de Loire had business dealings with these two Baez

14   entities.  This is Slide 20.  Next slide.

15         All right.  And then finally Ms. Amunategui is M.F.

16   Nevada's sole employee and was involved, as these documents

17   show, in setting up Val de Loire.  Next slide.

18         This slide shows she's the sole employee of M.F.

19   Corporate Services.  Her job, as she testified at deposition, is

20   to register companies in Nevada acting on instructions by

21   person -- personnel from Mossack Fonseca, and she was involved

22   in setting up Val de Loire.

23         So this is the end of the slides on -- that relate to

24   Mr. Lopez and that -- that set of criminal investigations, but,

25   Your Honor, the point I'm trying to make is that we have -- we

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1  have satisfied the threshold requirements of tying Val de Loire

2  to potentially discoverable information in spades because there

3  are all kinds of connections that we've seen between Val de

4  Loire and individuals and entities that are under investigation

5  or somehow involved in these two schemes.

6       And because this is discovery, we don't have the burden

7  of proving that any of these things happened.  We don't have to

8  prove that funds were embezzled.  We don't have to prove that

9  funds were misappropriated.  We don't -- we don't have to prove

10 any of these things.  We just have to come forward with some

11 evidence that suggests that Val de Loire may have discoverable

12 information.  And we have -- I would submit, we have more than

13 done so, Your Honor.

14       So at this point I'm kind of done on the Val de Loire

15 motions.  I don't know how Your Honor wants to do this.

16       THE COURT:  What I'd like to do is for you to sit down

17 and let's hear from the Val de Loire side maybe.  Yeah, that

18 makes sense.

19       MR. HRANITZKY:  Okay.

20       THE COURT:  Stay focussed.  Thank you.

21       Mr. Wiley.

22       MR. WILEY:  Thank you, Your Honor.  Your Honor, you've

23 already thrown me for a loop a little bit in that I thought I'd

24 be teeing off here.  I may be a little bit duplicative of

25 Mr. Hranitzky's arguments, but I would like a little bit of

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1  latitude.

2          THE COURT:  Absolutely.  No.  That's fine.  Go ahead.

3          MR. WILEY:  Your Honor, I don't think it's questioned

4  at all that in determining the merits of VDL's motion to quash

5  this Court needs to employ a two-step process.  And it's first

6  whether or not NML has demonstrated a legal basis for issuing

7  its subpoena to VDL pursuant to Rule 69.  If there's no such

8  legal basis, the Court's analysis is over and the subpoena must

9  be quashed.

10         VDL asserts and an argument will be provided that that

11 is the exact issue in the present matter.  We don't get passed a

12 Rule 69 analysis.  However, if this Court does find that there's

13 enough of an nexus between the parties, as required by Rule 69,

14 which of course VDL says there is not, then the Court must

15 analyze whether the subpoena complies with Rule 45 which governs

16 nonparty discovery.  And VDL will provide argument that NML's

17 subpoena runs afoul of Rule 45 as well.

18         Your Honor's order from March 5th cuts through all of

19 the hyperbole and all of the ancillary matters that have been

20 raised by the parties.  And the order expressly and

21 unequivocally provides that, and I quote, The question before

22 the Court is whether reasonable suspicion exists to question the

23 good faith transfer of an asset between the judgment debtor, in

24 this case Argentina, and the third party.  Now, this is the

25 adopted standard pursuant to Rule 69 in determining how and why

———TRANSCRIBED FROM DIGITAL RECORDING———

1   a judgment creditor can propound discovery on nonparties.

2          Now, in so ordering, this Court is adopting a holding

3   in Rock Bay, Rock Bay, LLC.  And that opinion clearly and

4   unequivocally provides that the Court concluded that discovery

5   of a nonparty's assets under Rule -- under Nevada Rule of Civil

6   Procedure 69 is not permissible absent special circumstance,

7   which include, but are not limited to, those in which the

8   relationship between the judgment debtor and the nonparty raises

9   reasonable suspicion as to the good faith asset transfers

10  between the two.

11         And that's the key, "between the two."

12         THE COURT:  Well, okay, but let me just -- I thought

13  about that.  Of course, overriding all of NML's arguments are

14  that if this money is traceable to being -- belonging to the

15  Republic of Argentina, then it doesn't matter who the

16  transaction's going back and forth from.  That is the judgment

17  debtor's assets.  They're chasing the assets of the Republic of

18  Argentina, right?

19         MR. WILEY:  Granted, Your Honor.  They are chasing the

20  assets of Argentina.

21         THE COURT:  Okay.  Then maybe I don't understand where

22  you're going.

23         MR. WILEY:  But the fact of the matter is there is no

24  evidence that has been provided whatsoever that VDL has anything

25  to do with the transfer of assets from Argentina to VDL.

———————— TRANSCRIBED FROM DIGITAL RECORDING ————————

1        THE COURT:  Right, but you're saying "from Argentina."

2   So you're focusing on the part that says the transaction has to

3   be with the judgment debtor.

4        MR. WILEY:  Correct.

5        THE COURT:  But isn't it enough if there's reasonable

6   suspicion to believe that the assets are assets of the judgment

7   debtor being shuffled between third parties?

8        MR. WILEY:  Absolutely, Your Honor, but we don't

9   even --

10       THE COURT:  Okay.

11       MR. WILEY:  -- have that in front of Your Honor at this

12  time.

13       THE COURT:  Well, that's what they're arguing, I think.

14       MR. WILEY:  Well, we have allegations.

15       THE COURT:  Right.

16       MR. WILEY:  We have nothing concrete.

17       THE COURT:  Well, but it's reasonable suspicion, right?

18  I mean, you know, like I do search warrants and arrest warrants.

19       MR. WILEY:  Sure.  Sure.

20       THE COURT:  The standard for that is probable cause.  I

21  think probable cause has to be higher than reasonable suspicion,

22  right?

23       MR. WILEY:  Your Honor, as you will see, as has been

24  set forth in all of the cases, that there has to be a direct

25  link --

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1          THE COURT:  Direct link.

2          MR. WILEY:  -- between VDL and the Republic of

3   Argentina or, on the contrary, there has to be a determination

4   of an alter ego.  And there's been no showing, there's been

5   no -- nothing to provide that VDL is somehow the alter ego of

6   VDL -- or of the Republic of Argentina.

7          THE COURT:  All right.  Sorry, didn't mean to interrupt

8   you.

9          MR. WILEY:  No, that's fine.  Any time you have a

10  question, feel free to interject.

11         The Rock Bay case then further goes on and says, you

12  know, Reasonable suspicion exists if there are specific

13  articulable facts.  It's important the inference that the asset

14  transfers were not made in good faith, and that piggybacks on

15  Your Honor's previously inquiry because we have no specific

16  articulable facts that show any transfer of assets from

17  Argentina or any of the entities that are listed.

18         Mostly, there's no specific articulable facts with

19  respect to a transfer of Argentina's assets, i.e., the judgment

20  debtor with Val de Loire.  There's whimsey.  There's conjecture.

21  There's speculation, but there's nothing specific and there's

22  nothing articulable.  And that's what Rock Bay requires.

23         And this has been demonstrated by the demonstrative

24  exhibits that NML seeks to use and has provided this Court in

25  conjunction with today's hearing.  This Court need look no

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1  further than the initial pages of the demonstrative exhibits,

2  page 1, Connections between Mossack Fonseca and the Lopez and

3  Baez schemes.  This demonstrative shows an intricate

4  interweaving of lines and contacts, but notably absent from page

5  1 in this demonstrative exhibit is any reference to Argentina.

6          Now, in order to comply with the holding in Rock Bay,

7  there should only be two entities listed in the demonstrative if

8  the NML is going to comply with Rule 69.  It should be Argentina

9  on one side and that should be VDL on the other side.  And there

10  should be a direct line evidencing specific articulable facts of

11  a transfer of assets from Argentina to VDL.  Quite simply,

12  there's not.

13          So a review of the other demonstratives sets forth

14  evidence of the same.  There's no transfer of assets between

15  Argentina and VDL.  Instead, we have a number of unsupported and

16  unsubstantiated claims that are for purposes of today irrelevant

17  to Rule 69 analysis.

18          I hate to keep harping on this, but as the Court's

19  order from four days ago clearly provided, the question before

20  the Court is whether there's a reasonable suspicion that exists

21  to question the good faith transfer of assets between the

22  judgment debtor and the third party.  But simply there hasn't

23  been that.  So that naturally begs the question, how did we get

24  here?

25          Well, as Mr. Hranitzky alluded to, there are four

———————TRANSCRIBED FROM DIGITAL RECORDING———————

1   documents which NML relies upon in issuing the subpoena to VDL.

2   The first is an e-mail which makes a request of M.F. Nevada, as

3   registered agent, to organize a new entity similar to VDL.  Now,

4   that's Exhibit R to NML's response.  The second purportedly

5   evidences a loan transaction between VDL and Balmont Holding.

6   That was Exhibit Q in the response.  The third, as Mr. Hranitzky

7   stated, purportedly evidences a loan transaction between VDL and

8   Hipodromo.  And the fourth is a correspondence from M.F. Nevada

9   for a bid to execute a loan on behalf of VDL.

10          THE COURT:  Let me ask you something for a second.  So

11  you're referring to M.F. Nevada?

12          MR. WILEY:  Correct.

13          THE COURT:  What's the full name of that company?

14          MR. WILEY:  It's, I believe, because I don't represent

15  that entity, I believe it's M.F. Corporate Services (Nevada).

16          THE COURT:  Okay.  M.F. Corporate Services (Nevada).

17          MR. WILEY:  That's the legal name, according to the

18  Nevada Secretary of State.  Don't hold me to that, Your Honor.

19          THE COURT:  No, I just wondered because sometimes

20  people say M.F. Corporate Services.  Sometimes they say M.F.

21  Nevada, but that's the same thing.

22          MR. WILEY:  Yeah.  I think if we're --

23          THE COURT:  Maybe Mr. Woods can help me out here.  Sir?

24          MR. WOODS:  I certainly can.  The full name is M.F.

25  Corporate Services, then in parentheses, Nevada, Limited.

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1      THE COURT:  Okay.  And that's all the same entity?

2  Whether you're calling it M.F. Corporate Services or M.F.

3  Nevada, You're talking about the same entity?

4      MR. WOODS:  Right.  A long time ago Mr. Hranitzky and I

5  agreed to call it M.F. Nevada in the pleadings, and that's what

6  it's been called.  Sometimes it's called M.F. Corporate

7  Services.  It's all the same.

8      THE COURT:  I just wanted to make sure.  Okay.  Thank

9  you.

10      MR. WILEY:  Review of the actual subpoena that was

11  issued further underscores the Rule 69 issues that exist.  The

12  subpoena, as we know, calls for VDL to provide a litany of

13  documents concerning the relationship, the transfer of funds,

14  the communications, the ownership, the financing information,

15  and assets of 17 individuals and six companies that are alleged

16  to be part of some grand asset shielding scheme.  A couple of

17  Baezes are listed.  There's a couple of Kirchners and a slew of

18  other individuals and six entities, but notably absent again is

19  the judgment debtor, Argentina.  And we will see in a couple of

20  minutes why this is -- this is germane for purposes of today.

21      The subpoena does not request any information or

22  documents in VDL's possession with respect to Argentina.  So,

23  again, there are no specific articulable facts which call into

24  question the assets transferred between Argentina and VDL.

25      Now, NML attempts to substantiate the subpoena by

——TRANSCRIBED FROM DIGITAL RECORDING——

1  including the background information section.  And review of

2  this section illustrates the issues that NML has with respect to

3  Rule 69.  The background information section provides NML, and

4  I'm quoting here, believes that Cristobal Lopez may have had an

5  elicit relationship with current and former Argentine president

6  which may have allowed Lopez to abscond with Argentine assets.

7  Again, this is pure speculation.  There are no specific

8  articulable facts.

9         Now, Mr. Lopez is one of four shareholders in an entity

10  called Casino Club.  VDL possesses a 35 percent interest and is

11  one of four shareholders in an entity called Correon S.A.  Now,

12  the only link -- we have Casino Club on one side.  We got

13  Correon on the other.  They're both shareholders in this

14  separate company called Bingo Pinamar S.A.  So there's no

15  evidence of any transfer of assets from Argentina to Casino Club

16  to Correon to Bingo -- to Bingo Pinamar or any other entity, but

17  most importantly there's no evidence of any transfer of assets

18  from Argentina to VDL.

19         Mr. Hranitzky set forth that there's two parallel

20  tracks.  He's got the Lopez side and the Baez side, but, again,

21  there's nothing specific that ties Mr. Lopez or Mr. Baez or any

22  of their entities to VDL.  The fact that they partner in with

23  certain entities that are affiliated with Mr. Baez and Mr. Lopez

24  are of no consequence.

25         Review of NML's pleadings further illustrates the issue

──────── TRANSCRIBED FROM DIGITAL RECORDING ────────

1   of the subpoena and, perhaps, most telling is the following

2   excerpt which is set forth in NML's response on page 2, and I

3   quote, The subpoena does not, as Val de Loire suggests, seek

4   every Val de Loire document that relates to every individual or

5   entity whose name pops up on a Google search for Argentina and

6   Kirchner.  Instead, the subpoena asks for information relating

7   to just 18 individuals:  Lopez, Baez, the Kirchners, and a

8   handful of their family members and business associates and six

9   companies, all connected to Lopez or Baez.  For those persons

10  and entities the subpoena seeks discrete types of information,

11  principally information about fund transfers, business

12  operations, and assets.

13          So, again, NML readily admits that it's not seeking

14  information between VDL and Argentina, but instead VDL and

15  non-judgment debtors which there has been no determination that

16  they are an alter ego of Argentina.

17          And I guess where VDL has the most issue with the

18  subpoena and the request is it appears that NML's working

19  backwards in trying to assert some alter ego theory.  Here, NML

20  seeks to subpoena the low hanging fruit.  VDL is a Nevada

21  entity, and it's easy for NML to subject VDL to American laws

22  and jurisprudence.

23          And in so doing, NML issues a subpoena to VDL in the

24  hopes to wiggle its way into some alleged elaborate

25  alter-ego-asset-hiding scheme that will ultimately lead to the

32

————TRANSCRIBED FROM DIGITAL RECORDING————

1   Republic of Argentina.  Now, this is backwards.

2         Instead, in the alter ego scheme, if it truly exists,

3   what NML needs to do is connect the dots from Argentina first

4   and then flow downhill from there.  If there's a -- if there's a

5   fraudulent transfer from Argentina to any entity or individual,

6   then that's fair game.  Then after that if there's a second

7   fraudulent asset transfer from Mr. Lopez or Mr. Baez to one of

8   the entities, then that would be fair game, but here --

9         THE COURT:  So your argument is that it has to start

10  with Argentina.

11        MR. WILEY:  It does have to --

12        THE COURT:  An actual transaction.

13        MR. WILEY:  Absolutely.  It has to flow that way.

14  That's the only way that there can be a determination that

15  there's been any fraudulent transfers or at least there has to

16  be evidence of a fraudulent transfer.  Here --

17        THE COURT:  But, yeah, the -- I mean, this quote -- and

18  I notice you had it in Document 94, your response to the limited

19  supplemental brief.  You quote the language from the -- I think

20  this is the state law case, right?  Judgment debtor -- *such*

21  *discovery should only be permitted when the relationship between*

22  *the judgment debtor and the nonparty is sufficient to raise a*

23  *reasonable doubt about the bona fides of the transfer of the*

24  *asset between them.*  Is that the ...

25        MR. WILEY:  That's the federal.

33

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1      THE COURT:  That's the federal rule.  Okay.  So it
2 doesn't say there has to be a transfer between the judgment
3 debtor and the nonparty.  It says there has to be a
4 relationship.
5      MR. WILEY:  No, but the -- there has to be a
6 relationship, but there has to be an issue as to the bona fides
7 of the transfer.
8      THE COURT:  Well, right, both, but --
9      MR. WILEY:  But we don't have that.
10      THE COURT:  All right.  But your argument isn't that
11 relationship means -- to satisfy a relationship you have to show
12 an actual transfer from the -- or a taking, I guess, as alleged
13 here somehow proof that it was stolen Argentine money.
14      MR. WILEY:  Well, there has -- first of all, yes.
15      THE COURT:  That has to come first.
16      MR. WILEY:  Necessitated first is what they transfer.
17 And if it is a legitimate transfer, with respect to Mr. Lopez, I
18 know that he has a number of -- he's involved in a number of
19 entities that he has governmental contracts.  So even if there
20 was a transfer of funds because -- from Argentina to Mr. Lopez's
21 entity, then that's immaterial.
22      THE COURT:  Unless it was a fraudulent transfer or a
23 theft.
24      MR. WILEY:  Right.  First of all, determine if there
25 was a transfer and then, second of all, determine the fraudulent

——————TRANSCRIBED FROM DIGITAL RECORDING——————

1  nature of it.

2          THE COURT:  I understand your position.

3          MR. WILEY:  And there's a long line of cases, Your

4  Honor, that provide that you go to the debtor first and then

5  work your way down.  And those cases were cited in our moving

6  papers, the Tyvek case, the Brooks case, and the Caisson

7  Corporation case.

8          So the arguments set forth in NML's response are

9  similarly without merit.  In the response NML asserts that this

10 Court's previous order in the 123 entities matter substantiates

11 the subpoena and that the case law cited in VDL motion is of no

12 consequence.

13         Well, first with respect to this Court's previous

14 order, NML looks at the 123 entities matter and the instant

15 proceedings as apples to oranges.  As Your Honor will recall, in

16 the 123 entities matter any Rule 69 issue was raised at the

17 third and final hearing by Your Honor.  And it was -- it was our

18 position on behalf of the 123 entities that because those

19 entities had provided responses to the subpoena initially that

20 they had no standing to argue --

21         THE COURT:  They waived it.

22         MR. WILEY:  Yeah, Rule 69.  So that's why it wasn't

23 brought up this time.  Here, we're out in front of the matter.

24 We're filing our motion to quash in a timely fashion.  VDL has

25 been represented from the onset.  And it's our position that,

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

1  you know, Rule 69 is germane here obviously and it needs to be

2  addressed accordingly.

3          Second, with respect to the case law cited, VDL urges

4  this Court to examine the Northern District of California's

5  order from February 2013.  There, the Court denied NML's motion

6  to compel discovery seeking to have Chevron produce documents

7  related to a number of companies and entities.  The Court held

8  that no alter ego theory existed as NML failed to provide enough

9  evidence of such a showing.

10          The Court further provided that disclosure concerning

11  the assets of a nonparty is generally not contemplated by Rule

12  69 and that discovery should only be permitted when the

13  relationship between the judgment debtor and the nonparty is

14  sufficient to raise a reasonable doubt of the bona fides of the

15  transfer between them.

16          THE COURT:  See, I have a problem with that.  I read

17  that.  And Rule 69(a)(2) says, *Obtaining discovery.  In aid of*

18  *the judgment or execution, the judgment creditor or a*

19  *successor-in-interest whose interest appears of record may*

20  *obtain discovery from any person, including the judgment debtor.*

21          MR. WILEY:  That has been --

22          THE COURT:  So I don't see how Rule 69 would say you

23  got to do some alter ego showing or something.  I can see under

24  this, you know, reasonable suspicion argument maybe, but --

25          MR. WILEY:  But, yeah, the Courts have defined between

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1  what's set forth in Rule 69 and what's required.  It's not just

2  carte blanche hoping to get any and every entity to allow for

3  discovery in aides of collection on a judgment.  Again, both the

4  state rule and the federal rule clearly require that there has

5  to be a transfer of asset between the judgment debtor and the

6  nonparty.

7        THE COURT:  Well, it says relationship.  There has to

8  be a relationship.

9        MR. WILEY:  Well, there's -- there's a relationship

10 between the judgment debtor and the nonparty is sufficient to

11 raise a reasonable doubt about the bona fides of the transfer of

12 assets between them.  The key word being "them."  There has to

13 be a transfer of assets between --

14       THE COURT:  Well, but couldn't that be understood if

15 you -- you know, if you have a situation where someone has set

16 up a bunch of different companies and they're moving money from

17 company to company to hide it, you know, money laundering is

18 essentially what it's called, then, you know, if I applied a

19 rule that narrowly, there's no way to trace the money, right?

20       MR. WILEY:  Well, sure, there is.

21       THE COURT:  How's that?  You got to start with

22 Argentina.

23       MR. WILEY:  You have to start with the judgment debtor.

24 You take the -- let's assume that all of the proceedings

25 occurred here in Nevada.  It would be very easy for NML to take

──────── TRANSCRIBED FROM DIGITAL RECORDING ────────

 1  the judgment debtor exam of the judgment debtor.

 2          THE COURT:  Yeah, but we can't, right?

 3          MR. WILEY:  But that doesn't alleviate the fact that we

 4  have to follow the rules.

 5          THE COURT:  I see.

 6          MR. WILEY:  Just because it's hard for NML to go take

 7  Mr. Kirchner or, excuse me, Mrs. Kirchner's deposition or

 8  whoever is the person most knowledgeable of Argentina or

 9  Mr. Lopez or Mr. Baez, that doesn't allow us just to do an end

10  run and start with what I call the low hanging fruit, i.e., Val

11  de Loire, a United States entity, and work your way upwards.

12          THE COURT:  Okay.  I understand your position.

13          MR. WILEY:  And I think the most important thing to

14  take from the proceedings today with respect to analysis under

15  Rule 69 is the argument asserted by NML filed in their

16  supplement here late February wherein it alleged that the Second

17  Circuit Court of Appeals recently entered an order which would

18  reject VDL's argument as set forth in our motion to quash.  And

19  closer examination of that order and the subpoena it relates

20  needs to be discussed.

21          Yes, NML is absolutely correct.  The Second Circuit

22  affirmed the District Court's granting of NML's motion to compel

23  and denial of Argentina's motion to quash.  And in so doing, the

24  Second Circuit entered an order which provided, *Even if an*

25  *entity is not an alter ego and, thus, is not liable for*

─────────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────────

1   *Argentina's debts, it may nevertheless hold attachable assets on*

2   *behalf of Argentina.*

3           *Furthermore, an entity that is closely tied to, but*

4   *legally distinct from Argentina may possess information about*

5   *Argentina's assets, even if it does not own or hold those assets*

6   *itself.*

7           VDL agrees wholeheartedly.  The Second Circuit got it

8   right.  But what was the underlying request?  That's what the

9   issue is.

10          The Court needs to look at the subpoena that was at

11  issue, and that was attached as Exhibit 3 to NML's supplemental

12  brief.  And there's two categories of documents that were to be

13  provided by the certain financial institutions that were subject

14  to the subpoena.  First of all, it was all documents concerning

15  any transfer in which you, the financial institution, had any

16  involvement and within the relevant time period of any moneys or

17  financial instruments to, from, or through accounts owned or

18  controlled by Argentina.  That's the key, the judgment debtor.

19          The second category of documents set forth in those

20  subpoenas were documents sufficient to identify all property,

21  assets, or accounts of any type held by you, the financial

22  institution, during the relevant time period, including the

23  current value, account owners, and cosigners of interest of such

24  property, assets, or accounts for which Argentina is in whole or

25  in part the owner, beneficiary, or signatory.

———TRANSCRIBED FROM DIGITAL RECORDING———

1          So, there, subpoenas were issued for financial

2   information as to whether or not they had any information

3   pertaining to the judgment debtor.

4          In the present matter, the subpoenas, as noted, made

5   zero request of VDL related to Argentina.  It is to 17

6   individuals.  It is to six companies.  Now, if NML issued a

7   subpoena to VDL requesting information and documents related to

8   Argentina, there would still be grounds to object pursuant to

9   Rule 69 since there's no showing of the transfer of assets, but

10  at least NML would be closer in the ballpark there.

11         And I'm sure VDL would probably respond if the subpoena

12  requested documents in VDL's possession with respect to

13  Argentine assets, sure.  That fruit -- that would be applicable.

14  That would apply.  But to try to do the end around and come in

15  and flow upstream and attempt to finally get to the prize of

16  Argentina and their assets can't be done at this level.  And,

17  accordingly, the motion to quash should be granted for Rule 69

18  matters.

19         Now, with respect to Rule 45, I'll touch on it briefly.

20         THE COURT:  Okay.

21         MR. WILEY:  First, as noted, NML has to satisfy the

22  threshold inquiry in Rule 69.  We allege that that did not

23  occur, but even if this Court does find that NML has satisfied

24  Rule 69, it must now turn to Rule 45 with respect to the duty of

25  a subpoenaed party.

──────────── TRANSCRIBED FROM DIGITAL RECORDING ────────────

1    Now, VDL argues that this Court cannot compel a

2  representative from VDL to attend a deposition in Nevada.  In so

3  doing, VDL relies upon the language of Rule 45 which provides, *A*

4  *subpoena may command a person to attend a deposition within 100*

5  *miles of where the person resides, is employed, or regularly*

6  *transacts business*.  VDL has provided declarations that no such

7  person exists.

8    In response, NML directs this Court to the case law

9  it's previously relied upon and the Court's order from August.

10    THE COURT:  Right.

11    MR. WILEY:  And that can be distinguished on both

12  fronts.  First of all, with respect to the case law that's been

13  cited, the Great American case and the Wultz case, in both of

14  those matters the subpoenaed party had an informed presence

15  which opened the door for the Court to compel compliance.  You

16  know, most notably, the Court expressly stated in Wultz that it

17  could not compel anyone to travel from Israel to New York for

18  depositions, but since the subpoenaed party had an informed

19  presence, it could order the party to educate a witness to

20  provide testimony in New York because that Israeli company had

21  presence and branches within New York state.  Here, as we noted,

22  VDL has no presence.

23    NML's reliance on this Court's previous order is also

24  misplaced on two fronts.  First, in August this Court's order

25  relied on the determination that the 123 entities were shell

——TRANSCRIBED FROM DIGITAL RECORDING——

1  companies and fraudulent in purpose in ordering that a

2  representative from the company must appear for deposition.

3  Well, by definition a shell company is a company which serves as

4  a vehicle for business transactions without itself having any

5  significant assets or operations.

6      Based upon the documentation that's been provided by

7  NML, VDL is not a shell company.  It entered into a transaction,

8  including a loan transaction, with Hipodromo, another

9  transaction with Balmont Holding, and a loan transaction

10  documented by M.F.  VDL is a viable entity and it's ongoing.

11      And this Court's own language also provides that VDL is

12  an ongoing entity and has legitimately -- this Court has

13  legitimized VDL's operations based upon its holding or -- excuse

14  me -- its order in the Lanata matter.  And that is that there is

15  no fraud with respect to a shell company if the company was

16  formed for tax and regulatory purposes.  And that's exactly why

17  VDL was formed, and this Court's order provides so in Docket No.

18  82.

19      And, again, we would direct the Court's attention to

20  the Posner decision that I relied upon in August, and Judge

21  Posner specifically and expressly carved out that for tax

22  regulatory purposes shell companies can provide a legitimate

23  business purpose.

24      So on the firsthand, VDL is an ongoing entity.  It is

25  not a shell corporation.  Even if it was a shell corporation, it

————TRANSCRIBED FROM DIGITAL RECORDING————

 1   was formed for tax and regulatory purposes and as such isn't

 2   fraudulent in nature.

 3          So based upon those matters, this Court cannot compel a

 4   deposition of a representative from VDL pursuant to Rule 45.  If

 5   Your Honor has any questions --

 6          THE COURT:  No, that was very helpful.  Thank you,

 7   Mr. Wiley.

 8          I'll hear from Mr. Hranitzky on VDL.  And maybe we'll

 9   take a break before we do NML.

10          MR. HRANITZKY:  Your Honor, I will be very, very brief.

11   I want to start with the Rock Bay decision.

12          THE COURT:  Right.

13          MR. HRANITZKY:  Your Honor's relied on Rock Bay.  Val

14   de Loire has relied on Rock Bay.  We've relied on Rock Bay.  I

15   just want to focus on some of the language in Rock Bay.  I'm

16   reading from the very beginning of the decision.  Judge Hardesty

17   writes:  *In this opinion, we must determine when discovery of a*

18   *nonparty's assets*, of a nonparty's assets, not the debtor's

19   assets, *a nonparty's assets is permissible under Rule 69(a)*

20   *which permits post-judgment discovery in aid of execution of the*

21   *judgment.*

22          Judge Hardesty goes onto write:  *We conclude that*

23   *discovery of a nonparty's assets under Rule 69(a) is not*

24   *permissible absent special circumstances, which include, but are*

25   *not limited to, those in which the relationship between the*

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1  *judgment debtor and the nonparty raises reasonable suspicion as*

2  *to the good faith of asset transfers between the two, or in*

3  *which the nonparty is the alter ego of the judgment debtor.*

4          I stress this language for two reasons.  One, it's not

5  talking about discovery about assets of the debtor here, and

6  that's what we're looking for.  We want information about assets

7  of the debtor in the hands of entities which are alleged to be

8  involved in this scheme where misappropriated Argentine state

9  assets have been embezzled.  That's the first point.

10         But the second point is I believe I heard counsel for

11  Val de Loire correctly say a moment ago that the only

12  circumstance under which you can obtain information about the

13  nonparty's own assets is when there's reasonable suspicion

14  that -- sorry -- the relationship between the judgment debtor

15  and the nonparty raises reasonable suspicion as to the good

16  faith of asset transfers.  And that's not what the Nevada

17  Supreme Court said.  The Nevada Supreme Court said, You can get

18  that kind of discovery under specific circumstances, which

19  include, but are not limited to, that circumstance.

20         So I would submit that even though that's not the --

21  like, the basis that we're stressing, Your Honor, even if we --

22  even if we weren't relying on the fact that we're seeking

23  information about the debtor's own assets, Rock Bay still

24  wouldn't give Val de Loire what they claim that it gives them.

25         THE COURT:  Because of the "included, but not limited

44

———TRANSCRIBED FROM DIGITAL RECORDING———

 1 | to" language?

 2 |      MR. HRANITZKY:  That's correct, Your Honor.

 3 |      THE COURT:  All right.

 4 |      MR. HRANITZKY:  Secondly --

 5 |      THE COURT:  So let me just ask.  Your position is,

 6 | No. 1, we are going after the judgment debtor's assets based on

 7 | our theory that if it's stolen from the debtor, it's the

 8 | debtor's assets.  But, No. 2, even if we weren't, the Rock Bay

 9 | case is open-ended.  It says "including, but not limited to."

10 | It's not saying that's the only way you can make that inquiry.

11 |      MR. HRANITZKY:  That's right, Your Honor.

12 |      THE COURT:  Okay.

13 |      MR. HRANITZKY:  The second point, and very briefly on

14 | the Second Circuit's decision in the Aurelius case.

15 |      THE COURT:  Right.

16 |      MR. HRANITZKY:  Second -- I'm quoting again from the

17 | decision.  Actually -- and I don't have it in front of me, but

18 | Second Circuit said that discovery was permissible if there's

19 | reason to believe that the third party may possess information

20 | about Argentina's assets.  Again, that's what we're looking for

21 | here.  So there's nothing inconsistent in the Second Circuit's

22 | decision with the arguments that we're advancing here.  In fact,

23 | Second Circuit's decision, as we argued in our supplemental

24 | brief, supports what we're doing here.

25 |      THE COURT:  Well, but do you agree that the subpoena in

───────── TRANSCRIBED FROM DIGITAL RECORDING ─────────

1   the Second Circuit decision was asking for Argentina assets?

2           MR. HRANITZKY:  It was asking for information about

3   transfers.  That's correct, Your Honor.

4           THE COURT:  All right.

5           MR. HRANITZKY:  I keep thinking it was a long time ago,

6   but I think I drafted that.

7           THE COURT:  I figured that maybe you did.

8           MR. HRANITZKY:  But, no, that's correct, Your Honor.

9   It was asking for different things.

10          THE COURT:  Right.

11          MR. HRANITZKY:  But -- and the -- what we were

12  principally interested in in that subpoena was asset transfers.

13          THE COURT:  Right.

14          MR. HRANITZKY:  Right.  But the Second Circuit's

15  opinion fully endorsed the notion that it's fine to seek

16  discovery from a third party about Argentina's assets.

17          Last point I'll make just very briefly is that I think

18  I understood Mr. Wiley correctly to concede that, in fact, Val

19  de Loire did enter into transactions with Hipodromo and Balmont

20  and Fintech.  And all of those three entities have been

21  implicated by Argentine prosecutors in these various

22  embezzlement schemes.

23          So we have evidence to show contractual relationships

24  with these entities, and I believe we have Val de Loire's

25  concession that that evidence is accurate.  So we've got a

—TRANSCRIBED FROM DIGITAL RECORDING—

1  direct link.  I mean, that more than satisfies the threshold

2  showing requirement.  That's all.

3            THE COURT:  All right.  Mr. Wiley, you got anything to

4  add?

5            MR. WILEY:  Your Honor, I think we ...  I don't think

6  we need to belabor the point.  I think Mr. Hranitzky admitted

7  that in the Second Circuit there's a direct request for the

8  assets of Argentina.  With respect to the other transactions

9  that are at issue, the Balmont, the Hipodromo, again, even if --

10 assuming that there was a transaction between VDL, which there

11 is nothing suggesting as such, other than a document --

12 documentation --

13           THE COURT:  Well, I guess the point is he said you

14 weren't disputing it because you were relying on it to show that

15 it was an actual operating entity.

16           MR. WILEY:  It's an ongoing entity, but, again, there

17 is no direct showing of any transfer of assets between any of

18 those entities and Argentina.

19           THE COURT:  Okay.  That's fine.

20           MR. WILEY:  That's all I have.

21           THE COURT:  Okay.  Thank you.

22           Does anybody else want to address the VDL issue here

23 today that we just did?  Okay.  I'm going to take just like a

24 five-minute break here just to stretch my legs, and we'll take

25 up NML after the break.

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1          (Whereupon recess was taken.)

2          THE COURT:  Please be seated.

3          COURTROOM ADMINISTRATOR:  All right.  We are reconvened

4  in the matter of NML Capital, Limited versus Republic of

5  Argentina, 2:14-cr-492-RFB-VCF.

6          THE COURT:  Before we start, my clerk tells me I got to

7  remind everybody the local rules of this Court don't allow any

8  photography in the courtroom or, of course, any video or audio

9  recordings.  Please act accordingly.  Thank you.

10         Okay.  Well, are we going to do the NML motion now,

11  Mr. Hranitzky?

12         MR. HRANITZKY:  Thank you, Your Honor.  Okay.  So onto

13  what I'll call the Mossack Fonseca subpoena motions.

14         THE COURT:  Okay.

15         MR. HRANITZKY:  Which relate to the subpoena that NML

16  served on M.F. Nevada, as we contend, the alter ego of Mossack

17  Fonseca.  And those motions I believe raised two principal

18  issues.  One of them is, of course, has NML met its burden of

19  showing that M.F. Nevada is the alter ego of Mossack Fonseca.

20  And then the second issue is, assuming that it has, was the

21  subpoena itself proper which would apply similar analysis to

22  what we discussed before the break.

23         So starting with the alter ego issue.  There's a

24  dispute between M.F. Nevada and NML over what the governing

25  legal standard is.  Your Honor, in our view, the answer is clear

———TRANSCRIBED FROM DIGITAL RECORDING———

1   as it could be from the Nachman and the Geanacopulos decisions.

2   Those cases make very clear that the alter ego analysis is

3   different for purposes of determining whether you can attribute

4   the jurisdictional contacts of the alleged alter ego to its

5   principal than when what you're trying to do is hold the alleged

6   alter ego liable.

7        THE COURT:  Yeah, pierce the corporate veil.

8        MR. HRANITZKY:  Excuse me?

9        THE COURT:  Pierce the corporate veil.

10        MR. HRANITZKY:  Exactly, exactly.

11        THE COURT:  Right.

12        MR. HRANITZKY:  Right.  And the standard for

13   attributing the alter ego jurisdictional contacts to the

14   principal is much more relaxed.

15        But, you know, just for the sake of argument, and again

16   without conceding the issue, just as we did during the Val de

17   Loire argument, let's assume that M.F. Nevada has the legal

18   standard right.  All right.  What then?

19        So M.F. Nevada relies on the Nevada Supreme Court

20   decision in North Arlington Building, the cite is 86 Nevada 515,

21   as the definitive articulation of the standard.  And in that

22   case the Nevada Supreme Court identifies three requirements.

23   First, corporation must be overwhelmingly influenced and

24   governed by the principal.  Second, there must be such unity of

25   interest and ownership that one is inseparable from the other.

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

49

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1   And the third is that adherence to the fiction of a separate

2   entity would under the circumstances sanction a fraud or promote

3   injustice.  So let's take those one by one.

4          First, is M.F. Nevada influenced and governed by

5   Mossack Fonseca?  Your Honor, with all due respect, this is a

6   no-brainer.  Everything substantive -- and I don't mean turning

7   on the air-conditioner, opening the blinds, going to Office

8   Depot to buy Post-its or deciding what hour to open the office

9   on a holiday.  I mean the real substantive business of M.F.

10  Nevada is completely directed by Mossack Fonseca.  And we have

11  that from Ms. Amunategui's own testimony.

12         What is M.F. Nevada's business?  Well, we learned from

13  Ms. Amunategui that M.F. essentially does three things.  It sets

14  up Nevada LLCs for Mossack Fonseca's clients.  Ms. Amunategui

15  bent over backwards at her deposition to stress that these are

16  not M.F. Nevada's clients.  These are Mossack Fonseca's clients.

17  M.F. Nevada's only client is Mossack Fonseca.

18         Second thing M.F. Nevada does is file paperwork

19  necessary to keep these Nevada LLCs in good standing.  And then

20  finally it accepts service, although I guess in the last few

21  months it's sort of taken on a fourth obligation of defending

22  against subpoenas served on Mossack Fonseca, but that's not part

23  of its ordinary business.  But all of that comes from

24  Ms. Amunategui's own testimony.

25         And while Ms. Amunategui's testimony is not a model of

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

50

───── TRANSCRIBED FROM DIGITAL RECORDING ─────

 1   clarity on the point, I think when you read it and study it

 2   carefully, it becomes pretty obvious that she's clear in

 3   performing these substantive functions, again not buying

 4   Post-its, but these substantive functions, M.F. Nevada takes all

 5   of its direction in Mossack Fonseca.  So if I could get Slide

 6   No. 2?

 7             I'm looking for the exhibit.

 8             By the way, Your Honor asked at the last hearing

 9   whether in response to NML's request that it be given the

10   opportunity to cross-examine Ms. Amunategui under oath and the

11   Court have an opportunity to question Ms. Amunategui.

12             THE COURT:  Right.

13             MR. HRANITZKY:  That we would first need to identify

14   any disputed issues of fact and then Your Honor would make a

15   determination.

16             THE COURT:  Right.

17             MR. HRANITZKY:  Frankly, Your Honor, I don't view this

18   as a disputed issue of fact, but I gather -- I believe that M.F.

19   Nevada views it differently.  So if Your Honor agrees with M.F.

20   Nevada on that, then this would be a very good candid.

21             THE COURT:  Okay.  Uh-oh.  It says no signal there.

22             MR. HRANITZKY:  All right.  Well, Your Honor, then I

23   won't belabor this.

24             THE COURT:  Well, I have it here.  Oh.  Excellent.

25             MR. HRANITZKY:  I can't read the screen.  So I'm going

———————— TRANSCRIBED FROM DIGITAL RECORDING ————————

1   to ...  Oh, there we go.

2           Can we just pull it up a little so I can see the

3   question?

4           All right.  So *Question:  Going back to the first page*

5   *of Ms. Amunategui's employment agreement, paragraph No. 1, the*

6   *final sentence reads:  The employer shall direct and control all*

7   *of the details of the employee's work and the employee shall*

8   *report with respect to her work assignments to the employer.  Do*

9   *you see that?*

10          *Yes.*

11          *Is that consistent with your understanding of your*

12  *employment agreement?*

13          *Yes.*

14          *Okay.  And the employer is M.F. Nevada, correct?*

15          *Yes.*

16          Go down.

17          *So who directs and controls all the details of your*

18  *work?*

19          *Answer:  Myself.  I mean, I'm my own boss.  I'm*

20  *responsible for all the things I need to do.*

21          *Question:  So you give yourself instructions?*

22          *Answer:  No.  I don't give myself instructions, but I*

23  *get instruction from my client what they need.*

24          *Question:  But the contract says:  The employer shall*

25  *direct and control all of the details of the employee's work.*

——————TRANSCRIBED FROM DIGITAL RECORDING——————

1   *Do you see that?*

2          *Answer:  Yes.*

3          *Question:  Okay.  So where do the directions come from?*

4          *Answer:  From the client request.*

5          *Question:  So the clients communicate directly to you*

6   *their instructions?*

7          *Answer:  The only client we have.  We don't have*

8   *multiple clients.  We have only one client.  They send*

9   *instruction to us.*

10          *Question:  And that's Mossack Fonseca?*

11          *Answer:  (Nods affirmatively.)*

12          *Question:  Is that Mossack Fonseca and Company?*

13          *Answer:  Mossack Fonseca is the only thing I know.*

14          *Question:  So an entity called Mossack Fonseca and*

15   *Company, that's what you're referring to by Mossack Fonseca?*

16          *Answer:  Yes.  That's the only company I know.*

17          *Question:  Okay.  And that's where you get the*

18   *directions from, right?*

19          *Answer:  Yes.  I get directions for the Nevada sale*

20   *because* -- and then we go into Spanish -- *yes, I get the*

21   *directions from the office.  There's instructions.  I receive*

22   *them from the department and client who has specific*

23   *instructions for the client in Nevada.*

24          *Question:  Okay.  Sorry.  I didn't understand that*

25   *answer.  You get directions and instructions from Mossack*

———TRANSCRIBED FROM DIGITAL RECORDING———

 1  *Fonseca, correct?*

 2          *(Nods affirmatively.)*

 3          *Do you get directions and instructions from anyone*

 4  *else?*

 5          *Answer:  Only one department.  They specify and attend*

 6  *clients by Nevada companies.*

 7          *Question:  I'm sorry.  I didn't understand that answer.*

 8          *Answer:  The only person I'm in contact for instruction*

 9  *there are -- how do I explain -- department ...*

10          I won't go on, Your Honor, but it's clear, like, from

11  the ensuing testimony that all of the substantive instructions

12  with respect to the Nevada LLCs come from Mossack Fonseca.

13          THE COURT:  So, roughly, what page is it you're reading

14  there?

15          MR. HRANITZKY:  We are reading from -- oh, it's page

16  53, line 14 through page 58, line 5.

17          THE COURT:  Thank you.

18          MR. HRANITZKY:  And I made it almost all the way to the

19  end.

20          Okay.  So it's also undisputed that Mossack Fonseca's

21  M.F. Nevada's only client and it has been for years and that

22  it's M.F. Nevada's only source of revenue.  And even if, as

23  Ms. Amunategui claims, M.F. Nevada collects its receivables from

24  Mossack Fonseca through a collection agency, she also speculated

25  that that collection agency was located in Mossack Fonseca's own

—TRANSCRIBED FROM DIGITAL RECORDING—

1  office.  That's at pages 27 and 28 and page 37 of

2  Ms. Amunategui's deposition testimony.

3       And, in fact, although we're not relying on this as

4  evidence, Your Honor, we now know through a confidential source

5  we've been working through that this collection agency is

6  actually Mossack Fonseca's sales office, but we're not relying

7  on that.  So I'm just sort of adding that as atmosphere.

8       But, again, if the fact that it -- the question of

9  whether M.F. Nevada takes all of its instruction from Mossack

10 Fonseca is a contested issue, we don't see that it is, but if

11 Your Honor agrees with M.F. Nevada that it is, then this would

12 also be an appropriate area about which Ms. Amunategui might be

13 examined under oath, including by Your Honor.

14      But can I get the Mossack Fonseca/M.F. Nevada slide?

15      So, Your Honor, I won't go through all of the points

16 here now because I covered most of them already, but this slide

17 is also in Your Honor's binder.  So we sort of summarize each of

18 the points showing that Mossack Fonseca -- M.F. Nevada's

19 controlled by Mossack Fonseca, including with citations to the

20 evidence in the binder that we've also provided Your Honor.

21      But in short, I don't think there's a genuine dispute

22 that Mossack Fonseca influences and governs M.F. Nevada which is

23 the first requirement under M.F. Nevada's articulation of the

24 alter ego standard.

25      Second requirement, is there a unity of interest and

——TRANSCRIBED FROM DIGITAL RECORDING——

1  ownership between M.F. Nevada and Mossack Fonseca?  I concede,

2  Your Honor, this point is not as clear as the first one, but,

3  again, the answer is yes.  Mossack Fonseca appears not to own

4  M.F. Nevada directly.  Instead, it owns it indirectly through an

5  entity called Tornbell and Associates.  All right.  But -- but

6  Mossack Fonseca itself is behind Tornbell.  And how do we know

7  that?  Because every one of the five directors of Tornbell is an

8  employee of Mossack Fonseca.

9          Can I get Slide No. 62?

10         Your Honor, Slide No. 62 is new.  We prepared this one

11 today.  I freely acknowledge that.  However, the point that we

12 made we also made in our briefs.  So it is not a new argument.

13 It's just a new slide.

14         So Tornbell Associates has five individual directors,

15 and, you know, we've provided a web link to a document that can

16 be found online that lists the five directors of Tornbell.

17 Those directors are Katia Solano who actively promotes herself

18 on her LinkedIn profile as human resources director of Mossack

19 Fonseca.  We have Marta Edghill and Vianca Scott.  Both of whom

20 are described in SEC filings as employed by Mossack Fonseca.  We

21 have Leticia Montoya who we know is employed by Mossack Fonseca,

22 and then we have Francis Perez who serves as the director of

23 Mossack Fonseca Partners Corp. in Panama.  So all five of the

24 directors of Tornbell are Mossack Fonseca personnel.

25         It's also material to the -- to the unity of interests

---TRANSCRIBED FROM DIGITAL RECORDING---

1   and ownership analysis that all of M.F. Nevada's business and

2   revenue comes from Mossack Fonseca.  In fact, Mossack Fonseca

3   markets setting up Nevada LLCs as part of its own product

4   offering on its website.

5          The bottom line is that M.F. Nevada has no interest at

6   all apart from the interests of Mossack Fonseca because M.F.

7   Nevada would have no business.  It would have no existence.  It

8   would have no revenue.  It has nothing.  It would have no

9   directors without Mossack Fonseca.

10          So I submit, Your Honor, there's clearly a unity of

11  interest and ownership between Mossack Fonseca and M.F. Nevada.

12          And, finally, can we show that fraud or injustice would

13  result from recognizing the separation between the two?  Again,

14  the answer is yes.

15          Now, when you read the cases that talk about the fraud

16  or injustice requirements, they all discuss it in the context of

17  liability.  We've not found a single case that discusses the

18  fraud or injustice requirement in the context of attributing

19  jurisdictional contacts to an alter ego.  So in -- to a limited

20  extent we're just going to have to argue by analogy to the

21  jurisdictional contacts and it begs the question whether that

22  requirement should even be a requirement here, but, again, we're

23  assuming for the sake of argument that it is.

24          Here, the evidence shows that Mossack Fonseca enjoys

25  all the benefits of operating in Nevada through M.F. Nevada,

———TRANSCRIBED FROM DIGITAL RECORDING———

1  which it controls.  And at the same time it can skirt the

2  accompanying responsibilities, including being subject to legal

3  process and discovery in Nevada.  Mossack Fonseca is no low

4  hanging fruit, Your Honor.  As a result it can profit from

5  offering its client corporate services in Nevada and keep all of

6  the underlying client information in Panama where heretofore

7  cannot be discovered even if its clients are, as alleged by

8  Campagnoli or others, are using Nevada vehicles to engage in

9  unlawful conduct.

10        Your Honor, to my mind, that constitutes injustice.  So

11  those are the three requirements for establishing alter ego, and

12  I would submit that we have satisfied them in spades.

13        M.F. Nevada spends a lot of time in their papers

14  focusing on the fact that we've not attempted to show a

15  commingling of assets between M.F. Nevada and Mossack Fonseca or

16  that M.F. Nevada is undercapitalized.  And they claim that

17  without making those two showings our motion has to fail, but

18  that's not the law.

19        First, I mean, this is kind of like a fraud or

20  injustice in a way in that it doesn't really fit in the

21  jurisdictional analysis because when you think about it,

22  undercapitalization and commingling of assets, they're really

23  intended to deal with a situation where, say, you're doing

24  business -- you're, in fact, doing business with the parent de

25  facto.  However, technically your counterparty is an affiliate

—TRANSCRIBED FROM DIGITAL RECORDING—

 1  of the parent.  And let's say the parent maintains no assets

 2  within the affiliate.  Things go wrong.  You sue.  You can only

 3  sue the affiliate because the affiliate's your contractual

 4  counterparty.  You get a judgment, and because the parent has

 5  drained the affiliate of any assets, you've got -- you can't

 6  collect on your judgment.

 7          Well, that would be unfair.  And so, therefore, we have

 8  a whole body of case law that sort of says that you can under

 9  certain circumstances pierce the veil.

10          It's in that context that the Courts have developed

11  this notion that undercapitalization is relevant to the alter

12  ego analysis.  It doesn't really apply.  Doesn't make any sense

13  in the context of -- of attributing jurisdictional contacts to

14  an alleged alter ego.

15          But in any case, even in the liability cases, the law

16  is clear that undercapitalization and commingling of assets are

17  not absolute requirements.  Veil piercing is inherently an

18  equitable doctrine, i.e., it's not governed by bright line

19  rules.  The Soule v. High Rock Holding case which was decided

20  just this past year by Judge Du of this court, actually, it

21  provides a very good analysis.  I'm not going to go into all of

22  the facts of the case here.  I imagine that Your Honor's

23  probably already read it, but if Your Honor hasn't, then it's a

24  case Your Honor might find interesting.

25          But in this case Judge Du, among other things, wrote

——————TRANSCRIBED FROM DIGITAL RECORDING——————

1    that:  *Imposing bright line rules could result in the opposite*

2    *of the alter ego doctrine's intended effect causing courts to*

3    *overlook an injustice where the controlling entity is*

4    *sophisticated enough to pull a fast one.*

5          So, Your Honor, that deals with the have we established

6    the alter ego relationship between the two entities part of my

7    argument.  Second part of my argument is, does our subpoena pass

8    muster assuming that we've satisfied or we've established alter

9    ego?  So for that I'd like to pull up or refer to Exhibit 54 in

10   your binder.

11         THE COURT:  An exhibit or a slide?

12         MR. HRANITZKY:  Yeah, the Exhibit 54.

13         All right.  I need to turn this.  Somehow the first

14   page of Exhibit 54 is a check.  I'm not sure how that happened,

15   but go behind the check and we have the subpoena.  We have to

16   flip back to page 5 to get to the request for documents.

17         Now, this subpoena that Mossack Fonseca -- it breaks

18   into two kind of broad categories of information.  First

19   category of information is sort of about -- like, seeks

20   information about the relationship between M.F. Nevada and

21   Mossack Fonseca.  And the reason that we asked for that is

22   because we want to know how much access M.F. Nevada actually has

23   to documents located within Mossack Fonseca.  The second

24   category is far, far and away the largest category of requests.

25   As with the Val de Loire subpoena, it seeks information about

60

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1   the embezzlement trails.

2          So request No. 1 falls into that first category about

3   the relationship between M.F. Nevada and Mossack Fonseca.

4   Second falls plainly into the second category.  It seeks

5   documents concerning funds or other property transferred by

6   one -- either, one, by one or the following persons to another

7   person or, two, one of the following persons by another person.

8   And then it contains a list of entities which includes all 123

9   of the Baez entities, plus a number of entities that we've

10  identified as being affiliated with Aldyne which, as Your Honor

11  knows, Campagnoli has also found to be implicated in the Baez

12  deal.

13         So Your Honor may ask, Geez, this is a very long list

14  of entities.  How can we justify including such a long list of

15  entities here?  And, Your Honor, that's the nature of the money

16  laundering business.  It's a -- if this was a -- if the people

17  that we're sort of dealing with in Argentina were engaged in

18  legitimate business, then it wouldn't be necessary to play a

19  shell game organizing literally hundreds of corporations so that

20  you can -- like I said, that you have to sift through in order

21  to find the ball.  But in this instance that's the way the game

22  is played.  All right.  And so if we want the actual

23  information, we have to ask about all these entities.

24         But, again, each one of these entities is tied to

25  either one of the Baez entities which Campagnoli has already

61

───────── TRANSCRIBED FROM DIGITAL RECORDING ─────────

 1  linked to the Baez scheme or it's directly affiliated with

 2  Aldyne which in turn has been linked by Campagnoli to the Baez

 3  scheme.

 4         All right.  I won't go through all of the other

 5  requests, Your Honor, but they fall right down into the same

 6  categories.  Most of them -- far and away most of them are

 7  looking for information to trace assets in the Lopez or the Baez

 8  schemes.  And as I argued in connection with the Val de Loire

 9  motion, because that is seeking information about assets of the

10  debtor, in our view it's appropriate.

11         So, Your Honor, the last point -- and I -- I don't have

12  to do this.  I'll sort of be guided by Your Honor, see if Your

13  Honor thinks it's useful, but we all -- finally, we have to make

14  the showing that Mossack Fonseca is linked to entities which are

15  under investigation in connection with these Lopez and Baez

16  schemes.  And I have a number of slides that do that.  Maybe

17  I'll go through a few of them.

18         THE COURT:  All right.

19         MR. HRANITZKY:  If it gets to be too much, then Your

20  Honor can let me know.

21         THE COURT:  All right.  Do a couple of them so I get an

22  idea of what you have in mind.

23         MR. HRANITZKY:  Sure.  So can I get first Slide 1?

24         Okay.  So Slide No. 1, this shows Mossack Fonseca in

25  the center, obviously.  The entities shaded in gold are

———————— TRANSCRIBED FROM DIGITAL RECORDING ————————

1  associated with the Lopez scheme, and then the entities shaded

2  in purple are associated with the Baez scheme.  And then you

3  see -- so we've -- this illustrates connections among those

4  entities and then also their links directly to Mossack Fonseca.

5       Slide No. 2, this just shows all of that for the Lopez

6  scheme, and then Slide No. 3, same thing, but only the Baez

7  scheme.

8       THE COURT:  So what's the significance of the double

9  black line?

10      MR. HRANITZKY:  The double black lines are links to

11  Mossack Fonseca.

12      THE COURT:  So on the -- oh, I see.  Okay.  Got it.

13      MR. HRANITZKY:  And I'm going to focus on that now.  So

14  if we can go to Slide No. 53.  Okay.  So this is just --

15      THE COURT:  Okay.

16      MR. HRANITZKY:  This is just the links to Mossack

17  Fonseca.  This shows all of them.  Next slide.  First, we have

18  M.F. Nevada which obviously we contend is directly controlled by

19  Mossack Fonseca, and it set up, among other things, the 123

20  entities which are under investigation by Prosecutor Campagnoli

21  in connection with the Baez scheme.

22      Next slide.  M.F. Lugano and Andrea De Grandi.  M.F.

23  Lugano is an affiliate of Mossack Fonseca.  It was formerly run

24  by Andrea De Grandi which when I get to kind of the organization

25  chart slides later, if I get there, Your Honor will see is also

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1    implicated in the Baez scheme under investigation by

2    Ms. Campagnoli.

3            Next slide.  Patricia Amunategui, as we discussed

4    before, takes all of her instructions from Mossack Fonseca.

5    Next slide.  The Baez entities were all set up by M.F. Nevada at

6    the direction of Mossack Fonseca.  Next slide.  Val de Loire is

7    linked to Mossack Fonseca through Edmund Ward.  Next slide.  And

8    Aldyne appears to -- actually, doesn't appear to -- I now bend

9    to Mossack Fonseca's office in the Seychelles.  And I know for a

10   fact that Aldyne operates out of Mossack Fonseca's office in the

11   Seychelles and serves or served as manager to nearly all of the

12   Baez entities as well as it appears literally thousands, if not

13   tens of thousands, of other entities located around the world.

14           So these are -- are there any more slides on this?

15   That's it.  Okay.

16           So, Your Honor, the next series of slides, and there

17   are a lot of them, actually shows links among the various actors

18   involved in the Baez scheme.  It is a little more attenuated for

19   the purposes of today.

20           THE COURT:  Yeah, I don't think we need to go through

21   those.

22           MR. HRANITZKY:  So maybe I'll skip over that, and then

23   Your Honor has them.

24           THE COURT:  Right.

25           MR. HRANITZKY:  If Your Honor thinks it may be useful

——————TRANSCRIBED FROM DIGITAL RECORDING——————

1  to look them through.

2          So those are the two parts of my argument.  We've

3  satisfied alter ego.  We've more than made our threshold showing

4  linking Mossack Fonseca to information about both of these

5  schemes.  Under the governing legal standard that's sufficient.

6  Your Honor, we respectfully submit that Mossack Fonseca should

7  be compelled to comply with the subpoena.

8          THE COURT:  All right.  Thank you, Mr. Hranitzky.

9          Mr. Woods.

10          MR. WOODS:  Well, Your Honor, this argument has been a

11  long time coming.

12          THE COURT:  Right.

13          MR. WOODS:  I started off this whole show a long time

14  ago by filing that motion to quash.

15          THE COURT:  Right.

16          MR. WOODS:  The reason why we filed the motion to quash

17  is I think instructive on our response to the rest -- to the

18  rest of Mr. Hranitzky's arguments, and that is there have been

19  eight subpoenas served on M.F. Nevada.  We've responded or

20  otherwise complied with seven of the eight.  We've -- M.F.

21  Nevada has produced thousands of pages of documents, somewhere

22  in the neighborhood of six to 8,000.

23          And M.F. Nevada is -- and those documents are

24  consistent with its role as a commercial resident agent service.

25  They're precisely the types of documents we'd expect to see from

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1  a commercial resident agent like CSC or CT Corporation.

2          And so at some point having produced thousands of pages

3  of documents, having responded to seven subpoenas, there comes a

4  point where the Court needs to draw a line.  And the line I

5  think ends somewhere before, Well, Judge, reach past this entity

6  through another one and all the way to Panama to bring somebody

7  back here to testify and to produce documents.

8          THE COURT:  "Through another one," you mean the

9  Tornbell?

10          MR. WOODS:  Tornbell.

11          THE COURT:  Tornbell.  Okay.

12          MR. WOODS:  So the line needs to be drawn at some point

13  ahead of that.  And I want to walk through all of the arguments

14  that we've made, but I think realistically NML needs to prove

15  victorious on each and every single one of these in order to get

16  a motion compelling Mossack Fonseca, a non-Nevada entity, a

17  Panamanian entity that is not a shell company, to come here, a

18  thousand miles away, and participate in a deposition and give

19  documents.

20          So as -- I don't think this is a subject to a good

21  faith dispute, but M.F. Nevada is a one-woman shop.  A single

22  worker performs a routine clerical function, same sort of

23  function that functionaries at CT Corporation or CSC perform.

24  She receives instructions from a client.  The client says, We

25  need a company that satisfies these criteria.  Please prepare

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1  articles of the corporation and file them.  And that's what she

2  does.  She conducts reviews to make sure that those companies

3  stay in good standing, and that's really about it.

4         There's -- there's -- but that -- that is not the least

5  bit extraordinary.

6         THE COURT:  You agree the only client is Mossack

7  Fonseca?

8         MR. WOODS:  Historically the answer to that question is

9  no.  They had other clients, small amounts, and then in recent

10  years, you know, Mossack Fonseca requires a lot of business of

11  them.  And that takes up the vast majority of Patricia

12  Amunategui's capability to process documents.

13         THE COURT:  What does the M.F. stand for?

14         MR. WOODS:  Your Honor, I wasn't involved in the

15  organization of the company.

16         THE COURT:  All right.  So you don't know.

17         MR. WOODS:  The Secretary of State says M.F. Corporate

18  Service of Nevada.

19         THE COURT:  And you don't know what M.F. stands for?

20         MR. WOODS:  I don't.  Patricia testified that she

21  didn't know.

22         THE COURT:  Okay.

23         MR. WOODS:  So it's not -- it's not our position that

24  NML is not entitled to discovery, but to the contrary, M.F.

25  Nevada has complied with its discovery requirements, has

67

──────── TRANSCRIBED FROM DIGITAL RECORDING ────────

 1   produced thousands of pages of documents.  The only question is
 2   whether it can pull through the companies all the way to Panama
 3   and drag somebody back here.
 4           So in order to prevail on the argument, first M.F. --
 5   or NML needs to demonstrate that M.F. Nevada is an alter ego of
 6   Mossack Fonseca.  Like Mr. Hranitzky, I will accept for the sake
 7   of argument his standard for alter ego.
 8           THE COURT:  So you got to go with the jurisdictional
 9   standard?
10           MR. WOODS:  Excuse me?
11           THE COURT:  You got to go with the jurisdictional
12   standard?
13           MR. WOODS:  Only for the sake of argument.
14           THE COURT:  Yeah, that's what I'm saying.  That's it.
15   So he's arguing your standard and you're going to argue his.
16   That's great.
17           MR. WOODS:  Exactly.
18           THE COURT:  Thank you.
19           MR. WOODS:  But in order to get there, in order to
20   accept his argument, first you would need to be ignoring
21   Nevada's strong caution about the corporate forum.  And there's
22   no argument that the corporate forum isn't satisfied here.  M.F.
23   Nevada has employees.  It has agents.  It has professionals.  It
24   has bank accounts.  It has tax returns.
25           THE COURT:  Well, it has an employee.

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1          MR. WOODS:  You're correct.  It has an employee, but it

2    also hires -- it also hires temporary help.

3          THE COURT:  Oh, okay.

4          MR. WOODS:  It has service providers.  It has tax

5    returns.  It has its own domain name.  It has its own e-mail

6    servers.  It has its own document servers that it used in

7    responding -- used -- that it culled in responding -- in

8    responding to the subpoenas.

9          It's not enough, though, under the arguments that

10   Mr. Hranitzky has provided that there just be mere -- that it

11   just be a mere instrumentality or that NML needs to show more

12   than there's just substantial influence.  Okay.

13         In this -- Mr. Hranitzky quoted from Patricia's

14   deposition testimony that she -- that she gets her instructions

15   from a singular department inside Mossack Fonseca, which again

16   is not the least bit extraordinary.  If my firm wants to form a

17   company in Delaware, we would contact CSC and give them all of

18   our instructions about that company.  That's not the least bit

19   extraordinary.

20         THE COURT:  Let me ask you.  This might help me.  Why

21   don't you articulate the jurisdictional alter ego standard and

22   then address it, if that works for you?  Because it's a

23   different standard, right?

24         MR. WOODS:  I'm not saying that it works for me.  I'm

25   saying --

————TRANSCRIBED FROM DIGITAL RECORDING————

1          THE COURT:  No, no.  I understand.

2          MR. WOODS:  My argument is much -- I think Nevada --

3  Nevada's standard --

4          THE COURT:  Yeah.

5          MR. WOODS:  -- for piercing the corporate veil under

6  any circumstances is much higher than the -- than the

7  instrumentality and the -- and the office or outpost argument

8  that Mr. Hranitzky has cited.

9          THE COURT:  Okay.  So I just -- I'm trying to

10  straighten it out because you said -- I mean, Mr. Hranitzky

11  said, which I think is correct, there's some factors to consider

12  if you're going to pierce the corporate veil for liability

13  purposes.  There's another set of factors if it's just a

14  jurisdictional inquiry.  You agree?

15          That's his argument.  I know you don't agree with that,

16  but then I thought you said you were going to argue it off of

17  his jurisdictional factors?

18          MR. WOODS:  I think I am.  Perhaps, I'm using different

19  words.

20          THE COURT:  Okay.  Well, what are the factors that you

21  see as the jurisdictional factors?

22          MR. WOODS:  The factors that I see as the

23  jurisdictional factors?

24          THE COURT:  Yeah, I know you're not conceding that's

25  the right test, but just so I can follow your argument.

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1          MR. WOODS:  Just for the sake of this argument?

2          THE COURT:  Yes, yes.

3          MR. WOODS:  His argument is essentially that M.F.

4    Nevada is an outpost or office of Mossack Fonseca.  So under

5    his -- the first -- the first piece of his argument is that

6    there's common ownership.

7          THE COURT:  Common ownership.  Okay.

8          MR. WOODS:  And under the common ownership standard,

9    there is no common ownership here.  Okay.  The people that own

10   Mossack Fonseca don't own M.F. Nevada.  We've got -- there's the

11   Tornbell company that owns -- that owns M.F. Nevada, and if --

12   and there are directors of Tornbell who help oversee the

13   operations, not the day-to-day operations, but the corporate

14   form --

15         THE COURT:  Right.

16         MR. WOODS:  -- of M.F. Nevada.

17         THE COURT:  So who owns Tornbell?

18         MR. WOODS:  Who owns Tornbell?

19         THE COURT:  Right.

20         MR. WOODS:  Your Honor, I don't know the answer to

21   that.

22         THE COURT:  Okay.

23         MR. WOODS:  And neither does Mr. Hranitzky evidently or

24   else he would have said so.

25         THE COURT:  Right.  Okay.

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1          MR. WOODS:  But the Second Circuit which is the -- in

2     the Jazini case, which Mr. Hranitzky cited in his brief, is --

3     calls the common ownership essential to this test.  There is --

4     there is some overlap in personnel, but that does not make

5     common ownership.

6          The second piece of his argument is financial

7     dependence, and it is true that M.F. Nevada's -- that M.F.

8     Nevada's revenue stream comes from Mossack Fonseca, but that

9     doesn't mean that they're financially dependent on one another.

10    M.F. Nevada could -- M.F. Nevada could go out and get other

11    clients.  It hasn't been able to.  There's no -- there's no

12    structural limitation on --

13         THE COURT:  So they're permitted to do that?

14         MR. WOODS:  Correct.

15         THE COURT:  Yeah.

16         MR. WOODS:  There are confidentiality concerns that

17    have been raised and the truth is she has to -- she has to get

18    clearance from Mossack Fonseca before she takes on other

19    clients, but she has taken on other clients in the past and it's

20    possible that she could do so again.

21         THE COURT:  Okay.

22         MR. WOODS:  In his -- in his briefs Mr. Hranitzky

23    glossed over the actual language of the jurisdictional test with

24    regard to financial dependency.  The question is not whether

25    Mossack Fonseca exerts control over his employees.  Under the

————TRANSCRIBED FROM DIGITAL RECORDING————

1  Jazini case which he cited the question is the degree to which

2  the parent corporation interferes with the selection of

3  assignments, subsidiaries, executive personnel, and fails to

4  observe corporate formalities.

5       Now, Mr. Hranitzky has pointed out that the people who

6  are in charge of Tornbell are -- are agents of Mossack Fonseca,

7  but that doesn't speak to the relationship -- doesn't speak to

8  the executive personnel of M.F. Nevada which is the actual

9  question under tis test.

10      And the other portion, the last phrase in the Jazini

11  Court's requirement, is the question of whether it fails to

12  observe corporate formalities.  And there is no question either

13  in Mr. Hranitzky's argument or his briefs or anything else that

14  the corporate forum is not obeyed here.  Once again, M.F. Nevada

15  has its own bank accounts, employee, service providers, tax

16  returns, assets.  You name it, M.F. Nevada has it.  Corporate

17  forum is respected.

18      Finally, in that same Jazini case the Court raises the

19  question of whether there is -- the extent to which Mossack

20  Fonseca, under this hypothetical, has control over the marketing

21  or operational policies of M.F. Nevada.  Now, Ms. Amunategui

22  testified in her deposition that Mossack Fonseca doesn't have

23  word one to say about the operational policies of M.F. Nevada.

24  All they do is send instructions on what corporations to form.

25  We need -- the word she uses in her deposition are that they

—TRANSCRIBED FROM DIGITAL RECORDING—

 1   say, We need -- we need a company that meets these criteria, and

 2   she prepares the articles of organization and files them.

 3            And Mr. Hranitzky made great hay in his argument about

 4   the fact that Mossack Fonseca prepares the operating agreements,

 5   but, again, that's not the least bit extraordinary.  In any

 6   commercial resident agent service, that's the case.  The lawyers

 7   prepare the operating agreement.  The corporation service

 8   company prepares articles of incorporation and files them and

 9   receives service of process and forwards it back to the lawyers.

10   That's the structure of this entire cottage industry that exists

11   in the legal market.

12            So that -- I think that ends the analysis on the

13   jurisdictional piece.

14            THE COURT:  Okay.

15            MR. WOODS:  The next argument that NML must win in

16   order to compel Mossack Fonseca to appear at a deposition is

17   that Mossack Fonseca has been served with a subpoena, and that

18   isn't the case here.  If we accept their argument as true,

19   pretend that there's no corporate veil whatsoever, that there

20   was an office down on South Pecos where Ms. Amunategui works

21   that says Mossack Fonseca Nevada headquarters.  Let's pretend

22   that that's the case.  If that's the case, she's not the type of

23   person who can receive service of process for this company.

24            The test under the Ninth Circuit is whether somebody

25   has -- whether somebody's a managing or a general agent and

-TRANSCRIBED FROM DIGITAL RECORDING-

1   whether -- or whether service is on an individual who holds a

2   position that indicates authority within the organization.

3         Okay.  Under Patricia's testimony, under

4   Mr. Hranitzky's argument, and under the reality of the

5   situation, Patricia has nothing to say, no insight, into the

6   operations of Mossack Fonseca.  There aren't lawyers at her

7   office.  This isn't an outpost where there's somebody who has

8   knowledge about the operations or the internal policies of

9   Mossack Fonseca.  She's simply put not the kind of person that

10  has -- that is so integrated with the organization, which is the

11  case that the Northern District of California used in the

12  Gregory Bender case to decide whether somebody is -- has

13  sufficient authority to receive service of process.

14        THE COURT:  Is there someone with sufficient authority

15  to receive service of process for M.F. Nevada?

16        MR. WOODS:  She is certainly capable of receiving

17  service of process for M.F. Nevada.

18        THE COURT:  Right.

19        MR. WOODS:  For Mossack Fonseca, no, because Mossack

20  Fonseca doesn't have an office here.

21        THE COURT:  I misunderstood your argument.  I thought

22  you were arguing that if they get service on M.F. Nevada, that's

23  good enough because of the alter ego.

24        MR. WOODS:  Well, then I think you still -- I think the

25  requirements of Rule 4 for service of process are still in

—TRANSCRIBED FROM DIGITAL RECORDING—

 1 force.

 2          THE COURT:  Okay.

 3          MR. WOODS:  Okay.  So, once again, there's been nothing

 4 produced in the -- Mr. Hranitzky's arguments, papers, or the

 5 deposition that suggests that Patricia has the type of authority

 6 that is sufficient to make her a managing or general agent.

 7          THE COURT:  Of M.F. Fonseca?

 8          MR. WOODS:  Of Mossack Fonseca.

 9          THE COURT:  I mean of Mossack Fonseca.  Right.  Okay.

10          MR. WOODS:  At the best, if we accept everything they

11 say as true, she is a low-level clerical worker, the same as if

12 you had given it to a legal secretary at General Electric.

13          THE COURT:  I see your argument.

14          MR. WOODS:  I don't think that's sufficient.

15          THE COURT:  Okay.

16          MR. WOODS:  Finally -- or not finally.

17          THE COURT:  You're excited.

18          MR. WOODS:  Penultimately, this raises the question of

19 if you accept service has been made and you accept that there is

20 an alter ego jurisdiction issue here, the question then becomes

21 whether the subpoena is not overly broad and unduly burdensome.

22          THE COURT:  Right.

23          MR. WOODS:  Which it clearly is.  Now, Mr. Hranitzky

24 declined to walk through this subpoena and he highlighted what I

25 think are relatively legitimate requests because they are tied,

—TRANSCRIBED FROM DIGITAL RECORDING—

1  as Mr. Wiley's pointed out today, to assets of a judgment

2  debtor, but the subpoena goes on for another nine pages.  I

3  mean, look at -- if we look at request No. 5, it requests all

4  documents concerning any communications between you, meaning

5  Mossack Fonseca, and M.F. Nevada.  There's no limitation on

6  time.

7          THE COURT:  Hold on.  Okay.

8          MR. WOODS:  No limitation on time or subject matter or

9  anything else.  Look at request No. 6, Documents sufficient to

10 identify the beneficial owners and the organizational structures

11 of each of the persons.  That doesn't relate to assets at all.

12         No. 7, Documents sufficient to describe the business

13 and operations for all of those persons.  Again, that doesn't

14 relate to assets of the judgment debtor in the least.  They just

15 want general information about these companies, which is not --

16 which is not permitted under the admissible rules.

17         No. 8, Documents sufficient to identify all persons

18 authorized to give instructions.  Same problem, not about assets

19 at all.

20         No. 11, Documents sufficient to identify services

21 provided by Mossack Fonseca or M.F. Nevada to any of those

22 persons.  Again, not related to assets at all; related to what

23 otherwise could be legitimate activities.

24         No. 12, Documents sufficient to identify any persons

25 acting on behalf of Mossack Fonseca or M.F. Nevada to perform

77

—TRANSCRIBED FROM DIGITAL RECORDING—

1  those services.  Again, not related to assets at all.

2          We look at -- get to No. 14 it becomes an invasive

3  inquiry into the operations of Mossack Fonseca and M.F. Nevada.

4  Documents sufficient to show the identity, responsibilities, and

5  lines of reporting structure for each employee, agent, or

6  principal of M.F. Nevada.  That's not a legitimate request

7  because it does not relate in any way to the judgment debtor.

8  It only relates to the internal operations of M.F. Nevada, not

9  even Mossack Fonseca which they claim is the target of their

10 inquiry.

11         Again, 15, All documents concerning the relationship

12 between Mossack Fonseca and M.F. Nevada.  Same problem.

13         16, 17, 18, and 19, All documents concerning the

14 relationship between certain entities and M.F. Nevada or Mossack

15 Fonseca.  Again, not related to assets in the least.

16         So, Your Honor, if we look at the -- we've -- M.F.

17 Nevada has gone well above and beyond to make sure that most --

18 that NML receives the documents it has.  M.F. Nevada has not

19 held back any documents.  We've produced them, except for those

20 related to VDL, but there's a client issue there, and pending

21 the result of your decision there, we'll either release them or

22 put them back in the file.

23         But the -- what the -- so we understand that NML has a

24 legitimate interest in seeking out the assets of its judgment

25 debtor.  What we're contending is that this is a -- this is an

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1   unbounded inquiry, which is not what the rules permit.  M.F.

2   Nevada and Mossack Fonseca to that end are a third party -- are

3   third parties to this litigation, and Rule 45 requires that

4   steps be made to accommodate them.

5          Furthermore, the -- there are plenty of cases in

6   California, the Convolve case, for instance, that says that

7   there are -- that there are limits on what a third party or

8   what -- there are limits to a third-party subpoena.  You

9   can't -- they say that there is no -- there's no entity in the

10  world that would allow an unbounded fishing expedition through

11  its records, which is precisely what this is.

12         Once again, if these were questions about assets, the

13  inquiry might be different, but these aren't questions about

14  assets.  They are questions about the internal policies and

15  operations of Mossack Fonseca and M.F. Nevada.

16         So, I think even a cursory review of the -- of the

17  subpoena suggests that it ought to be quashed on the grounds

18  that it is unduly broad and burdensome.

19         Finally, Your Honor, if you're convinced that M.F.

20  Nevada and Mossack Fonseca are alter egos, if you're convinced

21  that Mossack Fonseca was appropriately served, and if you're

22  convinced that the documents subpoena is proper under Rule 45,

23  you still have the question about grabbing somebody from Panama

24  and bringing them all the way back to Nevada.  This is a very

25  different situation even than the VDL arguments that Mr. Wiley

—————————TRANSCRIBED FROM DIGITAL RECORDING—————————

1  made earlier.

2          VDL is at least a Nevada company.  Mossack Fonseca is

3  not.  Mossack Fonseca is a law firm in Panama.  M.F. Nevada is

4  an appropriate target for inquiry and to that end it complied

5  with the subpoenas, but if we refer back to your order from the

6  middle of last year, there's -- this isn't a case where we have

7  a shell company.  There's no shell companies involved here.

8  M.F. Nevada has employee -- has an employee.  It has assets.  It

9  has records.  It has everything that it's required to have.

10  Mossack Fonseca, I don't know much about Mossack Fonseca, but it

11  has all -- I'm sure it has all manner of things down there in

12  Panama.

13          So the -- what we have here is NML's attempt to do an

14  end run around the international rules that govern -- that

15  govern foreign depositions and requests for information.  Rule

16  28 provides what that -- how that's supposed to work, but,

17  instead, they would rather have you extend your territorial

18  jurisdiction thousands of miles away.

19          And simply because something is difficult under the

20  laws of Panama doesn't make it right for this Court to ignore

21  what the federal rules have to say about it.

22          I want to touch on one thing Mr. Hranitzky raised in

23  his argument, and that is that somehow forming M.F. Nevada, and

24  again accepting what he says as the gospel, forming M.F. Nevada

25  deprives legitimate inquiries in -- deprives legitimate

---------TRANSCRIBED FROM DIGITAL RECORDING---------

 1   inquirers from their due service -- due process.  Once again,

 2   M.F. Nevada has produced thousands of pages of documents.  This

 3   isn't a case where we -- where M.F. Nevada has --

 4           THE COURT:  You're talking about his equitable

 5   argument.  Is that what you're responding?

 6           MR. WOODS:  Well, he maintained that there is -- that

 7   there is harm to the system --

 8           THE COURT:  Oh.

 9           MR. WOODS:  -- if we disregard -- if we're not willing

10   to disregard M.F. Nevada because then judgment debtors would be

11   unduly deprived of their opportunity to get documents and

12   information.

13           THE COURT:  Right.

14           MR. WOODS:  And that's just not the case.  We've

15   produced thousands of pages of documents, thousands.  And they

16   are all the types of documents that you would expect to see from

17   a commercial resident agent.

18           Now, there are -- there are two other issues.  The

19   entirety of Mr. Hranitzky's argument about the relationship

20   between M.F. Nevada and Mossack Fonseca comes down to three

21   sources.  The first is the deposition, which Your Honor is able

22   to read.  If you want to attach -- you want to look at Exhibit 1

23   to our response to the cross motion to compel, we have a table

24   that lists -- that supports all of the areas of disagreement on

25   interpretation of the testimony, I guess I'll use charitably.

────────── TRANSCRIBED FROM DIGITAL RECORDING ──────────

1          The other two documents are the following, an

2   employment agreement between Patricia and M.F. Nevada, not

3   Mossack Fonseca.  It says M.F. Nevada on it.

4          Now, it's not a secret at this point that that document

5   was signed by Mr. Mossack and Mr. Fonseca, but that document is

6   15 years old.  It doesn't have a relationship to the -- to the

7   operations of the company now when Ms. Amunategui testified in

8   her deposition that she doesn't have any contact with

9   Mr. Mossack and Mr. Fonseca.  She didn't have any contact with

10  them then.

11         THE COURT:  But that's the still operative agreement.

12         MR. WOODS:  It governs the relationship, yes, but it's

13  15 years old.  So it's not telling -- it's not conclusive as to

14  the operations now.  The better evidence is what's testified to

15  in the deposition.

16         THE COURT:  Okay.

17         MR. WOODS:  The second -- the last document on which

18  they rely is a publication in UNLV which, you know, Patricia

19  maintains she was misquoted.  I don't consider it to be very

20  good evidence.  The deposition is the only real evidence here.

21  And I think if you'll look at the chart which is attached as

22  Exhibit 1, that you'll conclude as we did that M.F. Nevada is a

23  legitimate, small company.  Yes, it has one client.  Yes, it

24  receives instructions, but that's not unusual.  The corporate

25  forum is respected here.

82

1          NML has other options.  It can -- it can attempt to

2   proceed under Rule 28 against Mossack Fonseca.  It can do

3   whatever it is that's required in Panama, I'm not a Panamanian

4   law expert, to get documents from Mossack Fonseca, but I don't

5   think that that justifies reaching -- this Court reaching down

6   thousands of miles to grab somebody else back.

7          And even if the Judge were inclined to say that M.F. --

8   that Patricia can be instructed, as the case out of New York

9   said, that it's just simply not the case.  Patricia testified.

10  I'll note for the record that in 210 pages of deposition there

11  were only 40 lines that even addressed anything remotely related

12  to these companies, but the -- so -- but she's already -- she's

13  already given her information.  She's not a knowledgeable person

14  about the operations of Mossack Fonseca.  So I don't see how she

15  could reasonably be instructed on the operations of a company

16  thousands of miles away over which she has no say or control or

17  really any information.

18          THE COURT:  Okay.  Thank you, Mr. Woods.

19          MR. WOODS:  Thanks.

20          THE COURT:  Anyone else over on the right here want to

21  comment on this?  Nope?  Oh, Mr. Randazza.  Just a minute,

22  Mr. Hranitzky.  Let me hear from the intervener.

23          MR. RANDAZZA:  Your Honor, I won't take up a lot of

24  your time.

25          THE COURT:  Okay.

─────────TRANSCRIBED FROM DIGITAL RECORDING─────────

1          MR. RANDAZZA:  We are here only on a very limited

2    issue.

3          THE COURT:  Right.

4          MR. RANDAZZA:  And that is the issue of some of these

5    exhibits that have been filed under seal.  I think that Your

6    Honor's order prior to this limited the amount of information

7    that could be kept out of the public eye.

8          THE COURT:  Right.

9          MR. RANDAZZA:  These parties want to use this

10   courtroom.  This courtroom belongs to the people.  And,

11   therefore, anything that they want to use in support of their

12   cases should be open to the people's eyes.  When it does come to

13   particularized items such as Patricia's Social Security number,

14   her definite travel plans, not just speculative travel plans,

15   those of course we concede should be redacted, but we would like

16   to have any item that has been submitted so far to be only

17   redacted to that extent and then the complete documents put into

18   the Court record.

19         THE COURT:  All right.

20         MR. RANDAZZA:  Thank you, Your Honor.

21         THE COURT:  Well, I think that is the Court's order

22   right now.  They just need to work out some details on the

23   redactions, right?

24         MR. RANDAZZA:  We would ask that we -- you know, if the

25   parties don't mind, if we could participate in that to, perhaps,

84

—TRANSCRIBED FROM DIGITAL RECORDING—

 1   limit any motion practice, unless that is the exact precise

 2   amount of information that's going to be kept out of the record.

 3          THE COURT:  Right.  Well, okay, let me check with -- do

 4   any of the parties have a problem with consulting with the

 5   intervener on the final resolution of the redactions?  All

 6   right.  I'm sure you wouldn't.  So it's okay?  Great.  Thank

 7   you.

 8          Okay.  Sorry.  I thought he had something to say about

 9   this motion, but go ahead, Mr. Hranitzky.

10          MR. HRANITZKY:  Just on that point, Your Honor.  There

11   is one document or set of documents that -- I guess that it's

12   unclear as to the status in terms of making them public.

13          THE COURT:  Right.

14          MR. HRANITZKY:  And that is the demonstratives which --

15          THE COURT:  Yeah.  Well, those -- okay.  I thought

16   about that.  I mean, I'm not planning on putting these in the

17   docket.  All right.  I mean, to me, demonstrative evidence, it's

18   not really evidence.  It's more like demonstrative charts or

19   exhibits.  It's just to help me follow the argument.  And so,

20   you know, you put them up during a trial or a hearing and the

21   clerk will hang onto copies of them, but I don't put them --

22   they don't go into the public record.

23          MR. HRANITZKY:  No, I understand that, Your Honor.

24          THE COURT:  Okay.

25          MR. HRANITZKY:  But in both Val de Loire and M.F.

85

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

 1  Nevada's motions to suppress the demonstratives?

 2          THE COURT:  Right.

 3          MR. HRANITZKY:  They expressed concerns about the

 4  demonstratives being shared with the press, and because of

 5  that --

 6          THE COURT:  Yeah.

 7          MR. HRANITZKY:  -- we have not shared them with the

 8  press.

 9          THE COURT:  All right.

10          MR. HRANITZKY:  So it's that issue with respect to

11  which I'm seeking some clarification.

12          THE COURT:  Well, you know, I mean, I'm not about to

13  impose a gag order on anybody about what's going on in this

14  case.  This is a delicate area.

15          In my experience when I was practicing, you know, you

16  have a litigation privilege, of course, for whatever you say in

17  court, but you turn around as a lawyer and start giving stuff to

18  the press, the privilege doesn't necessarily apply to that, as I

19  understand it.  So, I mean, there could be consequences if

20  attorneys or parties put something out and it turns out to be

21  allegedly actionable or something like that.

22          And the Court's not going to get involved.  As far as

23  I'm concerned, you know, I permitted the use of the

24  demonstrative evidence here in the hearing.  What happens

25  outside this courtroom, parties have to govern their conduct

86

—TRANSCRIBED FROM DIGITAL RECORDING—

 1  appropriately.

 2          MR. HRANITZKY:  Okay.  Thank you, Your Honor.

 3          So just briefly, in brief response to M.F. Nevada.

 4  First, I meant to say this during the argument on the Val de

 5  Loire motions and then I -- I didn't get to it at the end or it

 6  was an oversight, but with respect to the requests for

 7  depositions in both of these subpoenas, Your Honor's ruled on

 8  the appropriateness of bringing somebody from Panama to appear

 9  for a deposition in Nevada.  Your Honor -- in the context of

10  different motions, but Your Honor has made a ruling on that.

11  That ruling is subject to an objection.

12          THE COURT:  Right.

13          MR. HRANITZKY:  It is fully submitted before Judge

14  Boulware.

15          THE COURT:  Right.

16          MR. HRANITZKY:  Your Honor, I'm sure, noticed that we

17  said nothing about the depositions in -- during argument today.

18  We said very little about the depositions in our briefs, and

19  that is because under the circumstances it seems the appropriate

20  course is just to wait to see what Judge Boulware does with that

21  issue.  And then, you know, if Judge Boulware agrees with the

22  other side, well, then from our perspective that would probably

23  end the issue.  If Judge Boulware agrees with Your Honor, well,

24  then at that point we can pursue the issue hopefully

25  consensually with the other side, and only if that doesn't work

──────TRANSCRIBED FROM DIGITAL RECORDING──────

1   out do we bring it to Your Honor.

2            THE COURT:  All right.  Well, okay, does anybody --

3   have you, the other side who this pertains to, thought about

4   this?  Does that make sense to you or would you rather handle it

5   differently?

6            MR. WILEY:  No, I think that we can definitely

7   get-together and be able to hammer something out, provided

8   however the objection's ruled.

9            THE COURT:  Right, I think that makes sense.  I mean,

10  there are efficiencies of having a magistrate judge handle some

11  things and the district judge handle other things, but there can

12  be inefficiencies, too, and we'll just have to wait on that.  I

13  think that we need to focus on the documents for now.

14  Fortunately, if you're going to get the documents, you want to

15  get those first anyway before you take the deposition.  So it

16  really shouldn't materially delay things.  I'm sure Judge

17  Boulware will get to this in the appropriate time.

18           MR. HRANITZKY:  All right.  Well, then that was our

19  view, Your Honor.

20           THE COURT:  All right.

21           MR. HRANITZKY:  In no particular order, but close to

22  the end of Mr. Woods' arguments he made the point that there was

23  only 40 pages in the transcript of Ms. Amunategui's deposition

24  where she was asked about the Baez entities.  Well, there's a

25  good reason for that; because when I did ask her about the Baez

——————TRANSCRIBED FROM DIGITAL RECORDING——————

1  entities, she said she didn't know anything about it.  So there

2  would have been really no point in my going on for more than 40

3  pages asking her questions about that.

4        To Mr. Woods' point about common ownership, if I

5  understand Mr. Woods' argument correctly, he's saying that under

6  the jurisdictional alter ego standard that we've advanced we

7  have to demonstrate that both M.F. Nevada and Mossack Fonseca

8  are owned by the same common third party.  Your Honor, that is

9  not what the cases say.

10        Common ownership means common interest of ownership.

11  In most cases you've got like a parent dominating a subsidiary

12  which owns the subsidiary, and it's -- and under those facts,

13  and if you look at the cases I think -- I mean, it's the case in

14  essentially every one of the cases that it's a parent owning a

15  subsidiary, not some third party commonly owning both.

16        THE COURT:  Mr. Woods says nobody knows who owns

17  Turnbell or Tornbell.

18        MR. HRANITZKY:  Well, it's correct that we don't have a

19  document that actually evidences ownership of Tornbell, but we

20  know that all five directors of Tornbell are employees of

21  Mossack Fonseca.  So I think --

22        THE COURT:  You think that's sufficient.

23        MR. HRANITZKY:  -- there's strong circumstantial

24  evidence that the owner of Tornbell is actually Mossack Fonseca.

25        THE COURT:  All right.

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1          MR. HRANITZKY:  On the point about proper service, we

2    cite these cases in my -- in our brief.  And so I won't belabor

3    them, but I'll just sort of -- I'll refer to them again now.

4    All the cases I'm about to list stand for the proposition that,

5    you know, if you serve an authorized representative of the alter

6    ego and you establish alter ego, then that constitutes proper

7    service on the entity, the veil of which you've pierced:  BPA

8    International versus Kingdom of Sweden, 281 F. Supp. 2d 73;

9    Akzona Inc. v. E.I. du Pont de Nemours Company, 607 F. Supp.

10   227; and Mirrow v. Club Med, 118 F.R.D. 418.  Again, I won't

11   belabor the facts of those cases, but they all stand for that

12   general proposition which I would submit is a commonsense

13   proposition.

14          And, finally, on the point about M.F. Nevada -- M.F.

15   Nevada not having like -- customers other than Mossack Fonseca,

16   it is uncontested that M.F. Nevada's only customer is Mossack

17   Fonseca and has been that way for a very long time.

18   Ms. Amunategui also testified that when M.F. Nevada had other

19   customers, those other customers only -- never constituted more

20   than 5 percent of its business.

21          And, finally, I would refer to page 139 of her

22   deposition transcript where she testified that if M.F. Nevada

23   wanted to take on another customer, they'd have to get Mossack

24   Fonseca's permission.  It's not that M.F. Nevada can just go out

25   and work for anybody that it wants to.  It's dominated by

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

1    Mossack Fonseca.  Mossack Fonseca tells it who it can do work

2    for.

3              THE COURT:  All right.

4              MR. HRANITZKY:  That's all, Your Honor.

5              THE COURT:  Thank you.  Anyone else have any follow-up

6    or anything else to add?

7              All right.  Well, you know what?  This has been a bit

8    of a saga here.  I appreciate everybody's hard work.  We'll do

9    our best to get an order out next week, and thank you.

10             (Whereupon proceedings concluded at 3:24 p.m.)

11                          --oOo--

12   I, Patricia L. Ganci, court-approved transcriber, certify that

13   the foregoing is a correct transcript transcribed from the

14   official electronic sound recording of the proceedings in the

15   above-entitled matter.

16

17    /s/ PATRICIA L. GANCI          MARCH 18,2015
          Patricia L. Ganci                Date
18

19

20

21

22

23

24

25