# EXHIBIT C

Office of the National Public Prosecutor

PLEADINGS CONCERNING EVIDENCE PRODUCED. FUNDS PLACED BY LÁZARO
BÁEZ IN SGI/HELVETIC SERVICES GROUP RETURNED TO ARGENTINA BETWEEN
DECEMBER 2012 AND APRIL 2013 AND WERE DEPOSITED IN AN ACCOUNT OF
AUSTRAL CONSTRUCCIONES S.A.

To the Honorable Judge:

**José María Campagnoli**, head of Investigation Proceeding No. 19, in respect of indictment
registered under number 26131/2013 in the computer register of the National Supreme Court of
Justice and assigned to Office No. 106 of the Court under your supervision, respectfully appears
before you and sets forth:

The evidence received, all of which is in the possession of the Court, has made it possible to
reconstruct a series of circumstances that are extremely relevant for the accusations made in this
national court, and which are certainly useful for the resolution of the accusations made in the
federal court.

I refer to a remarkable finding: **Between 24 December 2012 and 8 April 2013, approximately
US$65,000,000 was brought into the country, which the accused extortionists negotiated in
hectic transactions of sovereign debt instruments of the Argentine Republic**.

As we have recently noted,[1] **the sum in question is equivalent to approximately EUR
50,000,000.** This represents a new correspondence between the events evidenced in the action
and the complaint made in public by Federico Elaskar to journalist Jorge Lanata. It should be
kept in mind that in the filmed and recorded testimony aired in the broadcasts of the program
"Periodismo Para Todos" [Journalism for Everyone] on 14 and 21 April 2013, Elaskar talked
about the handling and placement, in various transactions and for account of Lázaro Báez, of a
sum ranging between EUR 50,000,000 and 55,000,000.

Research done by the Department of Criminal Investigation revealed the return to Argentina
(whatever the intermediate transformation and the contingencies of the route taken by the
money) of a sum close to EUR 50,000,000 and originating, beyond reasonable doubt, in the
circuit of money-handling and companies organized after the dismissal of Elaskar.

It must be kept in mind that between the end of 2010 and the beginning of 2011, Lázaro Báez
and his collaborators needed to channel funds via SGI, a company owned and managed by
Federico Elaskar, who also held 95% of the stock shares. For reasons that we set forth in our
report dated 22 May 2013, the group in question soon decided to take possession via various
actions by the finance company, initially by dismissing supervisors and auditors, and ultimately
by taking complete control of the company between July and October 2011, dismissing Elaskar

---

[1] Pages 844-859 of supplemental proceedings of section II of the report of 22 May, information furnished by the
Central Securities Depository on 29 May 2013,

from his position and taking over his stock shares. This process ended with an epilog that we discovered and have documented all too well; it concerns the appearance of HELVETIC SERVICES GROUP S.A., represented by its manager and shareholder Néstor Marcelo Ramos.

We also explained that the company, and Ramos himself, seemed to be resuming or continuing a project begun years earlier. Helvetic Service Group is one of the common denominators of two clearly distinguished periods. In the first period, 150 companies were established in the State of Nevada, USA, all having the same domicile in the city of Las Vegas, with Aldyne Ltd., a Seychelles Islands company, as director. This structure coincided with various changes or laundering of money in operations in Argentina, including the purchase of the stock shares (now attached) of Continental Urbana S.A. The second period was characterized by the sudden breakup of this chain of companies and the operation of Aldyne Ltd. at the end of 2010 and the reviewed history of the use and appropriation of SGI. However, the end of this period involves a return to the previous period, with control of the money and the companies once again in the hands of Helvetic Service Group and Néstor Marcelo Ramos after 21 October 2011.

Ramos and his immediate collaborators very probably spent the subsequent months reorganizing and imposing order on the apparent disorder in the handling of the money brought in for SGI. Moreover, we also find it logical (and it will be confirmed by the evidence and indications to which we shall refer later) that the use and purpose of these funds, totaling around EUR 50,000,000 according to the calculation by Federico Elaskar, were supposed to be concealed from him.

It is important to note that at the end of his forced one-year absence, Elaskar returned to Argentina in October 2012. Based on what he said in front of the journalists' cameras and recorders, and because of the amount involved in the complaints filed by his previous partners with investigating courts numbers 19 and 42,[2] we know that he did not accept the situation and that he was ready to report the criminal maneuvers that he had witnessed and allowed. According to statements made by Jorge Lanata, and the rest of the information uncovered in his television program broadcasts, Elaskar had contacted or was preparing to contact journalists. Very probably this picture can be expanded with other possibilities not yet fully known to us, such as the

---

[2] The complaint of Investigation Court Number 19 was filed on 8 November 2011; that of Investigation Court Number 42, in which these pleadings are presented, was filed on 27 September 2012, the beginning and ending points of the forced exile of Elaskar, on the one hand, and his disturbing (for the parties concerned) return. The events to which we refer in these pleadings begin immediately thereafter, with the first statements and consultations connected with the opening of the account with Financial Net Sociedad de Bolsa dating from 4 and 5 December 2012. In his testimony, journalist Jorge Lanata positions the first meetings between his staff and Elaskar at the start of 2013. The contact was a lawyer, probably the one supposedly consulted by Elaskar, who identifies him as "Mariano Cuneo," as reported in the contacts revealed in the last broadcasts of the television program. In our pleadings dated 11 June, we asked the court to include the media used for these communications—e-mails and "whatsapp" system messages—since they were presented publically by the journalists. The reference to the lawyer in question is related to the information in the proceeding before the Corrections Court, where Elaskar was charged with the offense of unlawful actions. According to the police official who questions and transcribes phonetically in his documents, Elaskar stated that his attorney is "Julio Libarona," which appears to be a reference to the family name of the Cuneo Libarona attorneys, whose firm did in fact defend him, pursuant to retainer of Dr. Mariano Cuneo Libarona, on pp. 51-67 of the supplementary proceedings. This is yet another demonstration of the truthfulness and spontaneity of the statements made by Federico Elaskar and recorded and filmed by the journalist of the program  Journalism for Everyone.

warnings that the victim was able to transmit to Lázaro Báez, Pérez Gadín, Fernández and company concerning the steps that he was prepared to take in order to recover what he had lost.

In sum, it cannot be denied that the news was alarming for both the persons concerned with the fate of the EUR 50,000,000 and the persons who were supposed to be keeping this fortune intact. **These events constitute a perfect explanation and the logical meaning of the events that we shall now describe**.

According to the information provided by the Central Securities Depository,[3] the purchase of Continental Urbana stock shares and their subsequent transfer to Huston Management Ltd. was not the only transaction recorded for account of Helvetic Services Group S.A. Thanks to the new findings uncovered, we were able to show that the said company was involved in another series of transactions, this time as principal of the agent Financial Net Sociedad de Bolsa S.A., for a total negotiated value of **US$65,794,950 in Argentine public debt instruments**. As can be seen in the table included in this report, the credit entries (that is, the entry or recording of the instruments in principal account 1255 of Helvetic Services Group, deposit account 650 of the securities agent) were executed on 13, 18, 19, 21, 26, 27, 28, and 31 December 2012 and 2 January, 13, 14, and 15 February, and 26 March 2013. The debits, that is, the negotiation, transfer, or liquidation of the bonds correspond in all cases with transactions executed immediately thereafter. Thus, after the last transfers of securities on 5 and 8 April 2013, and the collection in cash of dividends for the remaining instruments on 3 April 2013, the account of Helvetic Services Group showed a balance of zero.


[Pages 1 and 2 of Statement of Transactions, 12 December 2012-27 May 2013]


It was not difficult to associate this sum of US$65,794,950 with the EUR 50,000,000 said to have been placed by Lázaro Báez in SGI. When we looked at one of the public websites showing current dollar/euro exchange rates, we obtained the following result:

[The Money Converter table, showing US$65,794,950 = Euro 50,724,616.70]

This approximate calculation can be adjusted for the date of each transaction, but it will not change substantially, and nothing needs to be added to the evidence of this new correspondence between the evidence collected and the public complaint that triggered this section of our investigation.

But the comparison with the other elements collected does not end with the total amount involved. Among other evidence that we have to cite, the movements of securities and cash coincide with the information about the arrival of Néstor Marcelo Ramos in Argentina. According to the records provided by the Migrations Office,[4] his stay in our country coincides

---

[3] Memorandum and documents filed on 29 May 2013, annexed on pages 844-858 of the supplementary proceedings submitted to the Court.

[4] Pp. 3037-3060.

exactly with the transfer by Elaskar of his stock shares on 21 October 2011 and the trips related to the transactions during the intervening period, to which we shall refer later.[5]   Ramos reappears as arriving from the United States on 17 December 2012,  then vanishes, possibly in Uruguay (not shown in the migrations record, as happened between April and May of 2012, see preceding footnote), and returns on 4 January 2013 from Uruguay to spend only six hours on Argentine soil, after which he returns to Uruguay. Thereafter, the record omission corresponds to his entry, because the migrations table shows him once again departing for a return to the United States on 7 January 2013. Still in genuine correspondence with the movements of securities and especially with their liquidation and payment by means of checks issued by the securities agent, as we shall later see in detail, Ramos returned to Argentina from Italy on 21 March 2013 and stayed until 7 April 2013, with the usual visits to Uruguay (on 21 and 31 March). This correlates precisely with the last bond sales or liquidation transactions. Since then, more than two months have gone by and he has not returned to Argentina.

| Family & given names | Departure or arrival | Departure/arrival date recorded | Time recorded | Origination point/destination | Border crossing point | Company | Vehicle |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

[5] Elaskar left on 23 October 2011, and Ramos left on the following date on one of his usual flights to France. Ramos returned on 21 April 2012, on the flight in the opposite direction from  Germany; then, at the end of one of the ghostly departures that are not recorded, he certainly went to Uruguay, from which he returned n 16 May, via Jorge Newbery Airfield. He left for Germany on 19 May 2013, returning to Argentina from Colombia on 23 August 2012. On that same day he departed by ferry for Uruguay, where he remained for less than 24 hours. He again crossed the river on 27 August and 6 September, staying for 2 and 7 days, respectively, in Uruguay. He flew to Germany on a return trip on 16 September 2012. It was precisely between April and May, on the one hand, and between August and September of last year, on the other hand, that **Martín Antonio Báez**, son of **Lázaro Báez**, made his trips to Switzerland in the company of **Daniel Rodolfo Pérez Gadín**, **Jorge Oscar Chueco**, and, as we recently discovered, **Julio Enrique Mendoza**, president of Austral Construcciones S.A. We shall have more to say on this subject later, but it is worth noting here that the first trip was made by Báez and Mendoza via France between 5 and 12 May; that is, they coincide with Ramos, who left four days later for Argentina. The second trip was made between 26 May and 5 June via Spain; this time. Martín Antonio Báez, Pérez Gadín, and Chueco traveled together (migrations sequence 225, 226, and 227 of Aerolineas Argentinas flight 1132) for Switzerland one week after Ramos return to Europe. The third trip by Báez to Europe in 2012, this time with Pérez Gadín and Mendoza and again via France, was made between 23 September and 10 October, that is, once again it began one week after the return of Ramos to his center of business operations on 16 September 2012, and at the end of two extensive parallel trips to various places in South America (Ramos arrived from Colombia and visited Uruguay three times, while Báez, practically on the same dates, traveled to Chile between 11 and 30 July and to Panama on 5 August, returning from Paraguay on 8 August. Lastly, he flew to Paraguay on 28 August, one day after the second visit by Ramos to Uruguay, returning on 31 August. He left for Bolivia on 01 September, and returned to Argentina on 5 September 2012, one day before the third and last visit by Ramos to Uruguay. Thereafter, as we said earlier, Ramos left for Europe on 16 September , and was followed one week later by Báez, Pérez Gadín, and Mendoza, all seated together in the same plane.

In addition, all these hectic transactions for the total of the funds that we are tracking in turn accord with and occur during the time frame of the production and broadcast on 14 April 2013 of "Journalism for Everyone." Only one week earlier, the parties involved completed the laundering of the money that rendered inoperative the inconvenient knowledge Federico Elaskar had had of it until then. They thus maintained their impunity and the slowness of the judicial investigations that could have begun after the public report, by then practically irreversible.

Paradoxically, they made our work easier. Once we had the key (concealed behind straw men and clandestine transfers), the activity of Helvetic Services Group and the ubiquitous Néstor Marcelo Ramos, we did not need to complete the information about the entire intermediate framework of accounts opened and established by SGI—on average, hundreds of companies in Panama and Belize. Instead, we needed only to determine the identity of the ultimate recipients of the stock shares of SGI and the consequent handling of the funds it negotiated. It also was not necessary to trace the movements of funds of the equally vast range of companies established by the managers of Helvetic Services Group to serve as recipients of the funds recovered and used for Lázaro Báez and Company. The parties themselves, **certainly in obedience to an order to repatriate the funds and avoid the inconvenient revelations by Elaskar**, provided us with the tracks and the evidence of what they did with the money, at least until a few months ago.

As we said earlier, once Elaskar returned from his exile, between November and December 2012, events appeared to accelerate. The information furnished by securities agent Financial Net S.A. shows that the only reason for the bond business was to eliminate the traces of the transactions executed with the participation of Federico Elaskar, secure the money, and conceal the responsibility of Lázaro Báez and his accomplices in the extortion and unlawful handling of assets. Ultimately, the application for opening or registration of principal account 1255 in the name of "Helvetic Services Group S.A." was filed on 10 December 2012. It bore the signatures of Néstor Marcelo Ramos and Jorge Oscar Chueco as "holders or legal representatives." Full authorization by the Swiss company in favor of Chueco for operation of the account was issued on 4 December 2012.[6]  Here we can indicate the first of a lengthy series of irregularities that emphasize the need for speed by the parties involved and the complicity of the parties assisting them. First, because on 10 December 2012 Néstor Marcelo Ramos was not in Argentina; we have seen that he flew to Germany on 16 September 2012 and returned on 17 December 2012. Second, because power of attorney had not yet been granted to Chueco. Written power of attorney was issued (Notarial Instrument of the Swiss Confederation, Republic and Canton of

---

[6] On the following day, 5 December 2012, consultations were held by the stock exchange company concerning the financial and business activity of Jorge Chueco. The last part of the Documentation of Helvetic Services Group, submitted by the stock exchange agent , was certified on 3 December 2012; this documentation includes copies of the corporate articles and bylaws that bear the seal of the trade register of the Canton of Ticino and, constituting the ultimate factor in the sudden repatriation of funds, **they were closed on 22 October 2012, one day after the return of Federico Elaskar to Argentina**. This confirms yet again the fact that the parties concerned began to carry out the transactions that we are outlining immediately after the imminent return of the victim of their extortion (see memo and annexed documentation of Financialnet S.A. dated 4 June 2013).

Ticino) on 12 December 2012. This document, aside from its strangeness[7] and based on the date of the accompanying consular certifications, could not be filed in Argentina until the beginning of January 2013. This is very probably the reason why the first five checks issued by Financial Net Sociedad de Bolsa in favor of Helvetic Services Group S.A. for the liquidation of the bonds (that is, issued on 28 December 2012 and paid on 2 January 2013) were delivered against a receipt signed by both Jorge Oscar Chueco and Néstor Marcelo Ramos. It also emphasizes, on the other hand, the curious acceptance by the banks of the deposit endorsements of the nine checks, signed by Chueco alone.

To illustrate what has been said to date, we insert a table showing that the information about the status of the account of Helvetic Services Group, furnished by the Central Securities Depository, is systematized and arranged chronologically. We see that the sequence of deposits and subsequent debits consists in nine links of successive credits, which shows the intelligent division –including the alternating negotiation of three different types of bonds--of what constitutes only a single transaction of liquidation of securities and consequent laundering of assets. We have also inserted information about the nine checks issued by the securities agent in payment of the liquidations in favor of Helvetic Services Group.

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

---

[7] All the powers of attorney that we have seen issued by Helvetic Services Group pursuant to Swiss law, as is the case of those incorporated into the proceeding and issued in favor of Claudio Giovanni Fontana, Néstor Marcelo Ramos, or Horacio De Bonis and Javier Martín Vanella, copies of which are in the documentation produced by Financialnet, are always issued pursuant to resolution of the general meeting of partners. In the case of the special power of attorney issued to Chueco, it was executed by Ramos himself, as "member of management." The instrument bears certifications dated 2 January 2013, and the supplementary documentation, such as financial statements and balance sheets, bears apostilles (The Hague Convention) dated 4 March and certification by the Argentine *notario* dated 21 March 2013. The sworn statement by Jorge Chueco on the condition (non-existent in his case) of "person exposed politically" dates from 26 March.

|  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

Up to this point we have created a summary recapitulation and advanced the discovery of the entrance into the country of money and securities that would be close to the total amount indicated in the complaints voiced by Federico Elaskar. The next phase of the investigation having been completed, this is the time to reveal that **the proceeds from the liquidation of the bonds on the local market by Helvetic Services Group between December 2012 and April 2013 was deposited in the account of <u>Austral Construcciones S.A.</u> with Banco Nación, Plaza de Mayo Branch**. As we have said, this involves nine checks for a total of ARD 208,840,276.65, issued by Financial Net Sociedad de Bolsa in favor of Helvetic Services Group S.A. Five checks were issued against its current account No. 3003-40629-5 with HSBC Bank, and four checks were issued against account number 3-302-094091784-1 with Banco Macro. The nine checks were endorsed by lawyer Jorge Chueco, representing the Swiss company, and were deposited by Austral Construcciones in Banco Nación.[8]

We reproduce the checks below, in the order in which they were issued and deposited.


[Screen shots of nine checks, front and back]


As can be seen from the endorsements, while the nine checks were deposited in Banco Nación by Austral Construcciones, represented by its authorized representatives Claudio Bustos and Eduardo C. Larrea—only the instruments issued in the HSBC account of  Financial Net show the current account number, 3003-40629-5. Banco Nación has not yet furnished additional information.[9]

As we said earlier, the sequence that appears complex in the Central Securities Depository summary becomes clear if we establish a chronological order to replace the individual security or "type" postings, to use stock-exchange terminology. This case concerns three types of bonds (BODEN 2015, BONAR X, and BONAR VII) used in nine transactions or sequences that start with one or more credits and end with liquidation in the Rosario local securities market, and the payment made by the stock market agent to Helvetic Services Group S.A. via one or more

---

[8] Memorandum and documentation produced by Banco Macro and HSBC Bank on 6 and 7 June 2013.

[9] Requested on 11 June and on various other occasions by telephone.

checks. There are nine of these checks; however, one individual check does not necessarily cover one individual liquidation of each delivery of securities is not necessarily issued, because, as we shall see, on some occasions more than one check is issued to cover the final liquidation of a single bond credit, or, conversely, a single check covers several credits or deposits of securities. Appendix II annexed to this opinion contains an expanded version of the above record of credits and debits of securities and their counterparty in the liquidation and the issuance of the checks. We have also included information about the involvement of and payments by the three presumed counterparties, indicated by Financial Net S.A. to be Global Equity Sociedad de Bolsa S.A., Mariva Bursátil Sociedad de Bolsa S.A., and Facimex Bursátil Sociedad de Bolsa S.A.[10] Respectively, the three of them supposedly issued in favor of Financial Net S.A. checks for ARD 31,630,516.40, ARD 40,604,900, and ARD 153,173,727, for a difference of ARD 13,173,090 above the gross amount reported by Financial Net S.A. With respect to this difference, we must analyze the features of the simulation that we suspect underlies these purchases of securities.

|  | Counterparty payments | Gross according to Financial Net | Difference |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  | 225,409,144 | 212,236,054 | 13,173,090 |

As we have learned from the Central Securities Depository,[11] **at the end of the time-frame we find a single origin for all these securities whose liquidation ended in the accounts of**

---

[10] According to the said information furnished by Financial Net S.A., Global Equity Sociedad de Bolsa S.A. purchased for its principal number 2601; Mariva Bursátil Sociedad de Bolsa S.A. for its principal number 2164; and Facimex Bursátil Sociedad S.A. for its principal 2577. We are awaiting additional information of the Central Securities Depository, requested by memo dated 6 June 2013.

[11] We are awaiting additional information concerning the deposit account in the Euro Clear system (the account in the name of J. Safra Bank of Geneva, Switzerland,. The principal is unknown, but is believed to be Helvetic Services Group S.A., seen in the account shown in the initial list as depositor 13305, principal 808347. In the memorandum of the Central Securities Depository dated 3 June, the account is shown as "Citibank N.A. Account N2/Euroclearbank," and is used by that bank as local agent of the Euroclear clearing house. *This accords with what we deduced and explained in the reports on pp. 990-991 and 1011 of the supplementary proceedings, in which we*

**Austral Construcciones S.A**. It concerns transactions initiated with the transfer to the account of Helvetic Services Group S.A. (in its role as principal number 1255 of depository account number 695, Financial Net) of securities originating in another country. As can be seen from the table inserted at the beginning, this is done through the Euroclear clearing system, which in Argentina is used by an account managed by Citibank, as we explain in the footnote. This allowed us to determine the origin and the identity of the depositor of the bonds, that is, the entity that operated through Euroclear to transfer the bonds to Helvetic Services Group in Argentina, although the system of global deposit of securities and instruments that governs in Europe prevents us from determining, from our country, the identity of the client or principal.

In any case, this preliminary information, which can be expanded by the Argentine judges via Letters Rogatory, speaks volumes. Because **the depositor in all cases was J. SAFRA BANK of Geneva, Switzerland**. Here is the information contained on one of its official websites.

[Screen shot of English-language page from website of  J. Safra Sarasin Bank Ltd., Geneva, Switzerland]

The bank is thus in the same jurisdiction where Helvetic Services Group S.A. was legally established. Without prejudice to the aim of the Letters Rogatory, it will not be difficult for the prosecutor contacted by *Diputada* [Representative] Graciela Ocaña[12] to complete his investigation of the Swiss end of the matter. But it can be guessed that the bonds come from one or more accounts of that company, one of its controlled companies, or the companies that it manages under the attentive eye of its concealed Argentine shareholders. In other respects, we have seen that with the goal of this repatriation or ultimate laundering of the funds, in December 2012 lawyer Jorge Oscar Chueco was named authorized representative of Helvetic Services Group S.A. This reinforces the indications already existing in the case with respect to responsibility for events, as in the case of Ramos, of the two other shareholders and executives of the company, all of them acting as necessary participants in the extortion under investigation. I am referring to **Úrsula Verena Fontana** and **Claudio Giovanni Fontana**.[13]  We base this

---

include and document information about proceedings initiated by the National Securities Commission because of irregularities in this of transactions that involved the use of that account and the activity of several stock exchange agents, including Global Equity S.A.*

[12] I indicated this in the various charges that we added to the indictment and in its formal presentation on 3 May in the proceeding requesting data from the companies involved.

[13] Incorporated into the proceeding are various copies of the articles and bylaws and the charter of Helvetic Services Group S.A., as well as other corporate documents including financial statements, balance sheets,  powers of attorney, and minutes of general meetings of members of the company and the Board, certificates issued at the request of this Office of the Public Prosecutor by Continental Urbana S.A., its President Isaac Kipersmidt, and Amriante Galitis S.A. and Financial Net S.A.
[Screen shot of Extract from Trade Register]
All this information, especially the most recent version  (extract above) of the Trade Register entries, shows the shareholder role of Ramos and the two Fontanas at the start of the history of the company, subsequently maintained alone by Néstor Marcelo Ramos and Verena Fontana, while Claudio Giovanni Fontana continued to perform in such executive function serving as president since at least 22 October 2012.

contention not only on their actual and positive involvement in the management acts and the general meeting of shareholders produced in the proceeding, but also on the obvious consensus and acceptance that existed among these visible members of Helvetic Services Group S.A.with respect to the activities carried out in its name, although in general Néstor Marcel Ramos appears as executing party. This indicator presupposes another link: I am referring to the necessary knowledge of the unlawful machinery used to conceal and launder funds originating in the activities of Lázaro Báez, his group, and his partners, as well as the violence in which they engaged when they found it appropriate, as is the case of the dispossession suffered by Federico Elaskar, and the analogous pressures experienced by Alejandro Maximiliano Acosta.[14]

This is why in this report we are requesting, in addition to a series of supplementary measures, investigatory testimony by Verena Fontana and Claudio Giovanni Fontana. This being said, I am taking advantage of the reference to the abundant information previously furnished by Helvetic Services Group to open the stock market account used in this new scheme of the funds of Báez and company in order to call attention to the information contained in the financial statements and other account statements produced in the proceeding. In addition to confirming some of the transactions detected in Argentina on the part of companies established in other countries,[15] they include the statement that most of their assets outside our country **were based in or consisted in investments in private financial institutions or companies in Panama**.[16]

This is one more confirmation of the information disclosed by Elaskar before the cameras and recorders of journalist Jorge Lanata and his collaborators. Helvetic Services Group S.A. itself, or—what is the same thing—Lázaro Báez and his partners, facilitated, with their own acknowledgment, our search for and laborious evidencing of the opening and management from Switzerland of the companies established in Panama and other tax havens, to which Elaskar alluded. It is clear that, as we have pointed out as the central claim of this report, they also engaged in facilitating proof of the exchange or ultimate laundering of these funds.

Let us return to the explanation of the sequence of transfer and liquidation of securities. The bonds thus originate with one or more accounts of J. Safra Bank of Geneva, Switzerland. This movement triggers two different sequences in the records of the Central Securities Depository: one consisting in the Euroclear statement of account or the reflection of the European clearing house in its Argentine counterpart (last series of statements of the Central Securities Depository, where the bonds are indicated as types 44524, 44565, and 44586), although this "Euroclear credit" ultimately concerns the first movement recorded in our country, as can be seen in the

---

[14] This is why we commenced the criminal proceeding and called for investigatory statements is our report dated 13 June 2013.

[15] Including the business activities of Vansomatic Suisse S.A., Swisswer AG, Wodson International S.A., Continental Urbana S.A.—although with omission of the use of Houston Management Ltd., one of the 150 Nevada companies, used as vehicle—Empros Inversiones S.A., Lavalle and Agüero S.A.—composed, as we state in the report on page 1011 of the supplementary proceedings, of Jorge Antonio Galitis, one of the partners of Amirante Galitis S.A.—including its interest recognized in the study by J.P. Damiani & Asociados of Montevideo, Uruguay.

[16] Assets reported in 2005 totaled ARD 23,833,560.69, cited in the financial statements at 31 December 2011 and 2012, respectively, as financial investments (*investimenti finanziari*), in the amounts of FRS 107,871,888.77 and 135,019.475.71. See documentation furnished by Financialnet S.A. and previously by Continental Urbana S.A. and Amirante Galitis S.A., commented on and cited in the report dated 22 May 2013.

complete version in Appendix I of this report. **So it is not difficult to see that the sum total of US\$65,794,950 is composed of two mirror account postings**[17] **of US\$32,800,000**[18] **each** in nominal value of the securities. Thus the first three series of statements reflect the credits and debits in order of deposits and liquidation of the bonds received by Financial Net for account of Helvetic Services Group.

When the Central Securities Depository was asked for information pertaining to the principals' accounts recorded there, it reported that what appears in the creditor columns is always the Euroclear Account in which Helvetic Services Group briefly participates, while the debits columns show three accounts belonging to the Stock Market Agent, 695/999999, 695/1001, and 695/3.[19] This would reflect the processing of the securities by Financial Net up to the time of their negotiation on the Rosario Securities Market immediately after each credit. We shall look more closely at this aspect of the affair at another time, after we received additional information from the Central Securities Depository.[20]

But we can say here and now that **there is one case in which the principal's account that appears in the debits is not one of the three accounts allocated to Financial Net internal management. I am referring to principal's account number 695/1251, which, according to the information reported by the Central Securities Depository, belongs to Roberto Porcaro and his wife Patricia Sirvente.**[21] **The following extract shows the transfer on 27 December 2012 of US\$1,000,000 in BONAR VII bonds**.


[Screen shot of excerpt from account statement]


In the annexed report, the Department of Criminal Investigations has collected various data and references pertaining to Roberto Porcaro, most of them pertaining to associations and party activities about which nothing need be said here. On the other hand, because of its temporal correspondence with the transfer in question and the investigations that will certainly have to be undertaken with respect to this party in connection with the investigation under way in federal court, it calls attention to reports of an alleged purchase, early in 2013, of a piece of property in Necochea, Province of Buenos Aires, for the reported amount of US\$600,000.

---

[17] The total sum should include the portion representing the US\$194,950 paid on 3 April 2013 as dividends.

[18] US\$22,295,000 in Boden 2015, type 5433 or, in Euroclear, type 44524; US\$7,665,000 in Bonar VII, type 5435 or, in Euroclear, type 44565; and US\$2,840,000 in Bonar X, type 5436 or, in Euroclear, 44586.

[19] Memorandum of the Central Securities Depository dated 3 June 2013.

[20] See footnote number 10.

[21] See table inserted on page 9 of this report and information furnished by the Central Securities Depository in its memo dated 3 June 2013. The ID number 5.524.549 shown in the Central Securities Depository information is in fact that of **Roberto Florentino Porcaro**; other information about him and preliminary investigations have been included in Report number 21 of the S.I.P.E. annexed hereto with this request. We shall return to some of this information later.

This transfer was reported only by the Central Securities Depository, and is absent from the documentation and information furnished by the securities agent, where the same debit of US$1,000,000 on 27 December 2012 is ascribed to other purchasers.[22] It is yet another proof of the concealment of the nine series of transactions and the activity of Financial Net in the matter. The same can be said about the participation of its three supposed counterparties, that is, the counterparties that the securities company itself has indicated as purchasers of the bonds of Helvetic Services Group S.A. I am referring to Global Equity Sociedad de Bolsa S.A., Mariva Bursátil Sociedad de Bolsa S.A., and, to a greater extent since payment of ARD 153,173,727 is attributed to it on a gross total of ARD 225,409,144,[23] Facimex Bursátil S.A.

With respect to Global Equity, it can be said that the relationship with or proximity to Financial Net that we have seen so far is physical, because the company is installed on the upper floor of a building on Calle Reconquista 144, where both entities are located, even though this operation was formalized, by name, in the Rosario securities market. The case of Facimex Bursátil S.A. is similar. We have reported on its possible ownership or purchase, like Global Equity, by economic groups named in various publications as being related to Lázaro Báez and his partners, including the owner of Banco Macro, Jorge Brito, and the entrepreneur Cristóbal López.[24] Other indications of concealment include the precise division of the operation, with an artistic alternation of securities that begins with a delivery of Bonar X bonds followed seven times by the Boden 2015 and Bonar VII bond deliveries, always for total amounts that never reach US$6,000,000 and in general total slightly less than US$3,000,000. These indicators are mentioned as general guidelines by the rules that govern the activity of the Financial Information Unit (FIU),[25] whose activity in this matter, like that of the Report of Suspect Transaction

---

[22] As can be seen in the breakdown of the list annexed as Appendix I, the debit in question seems to be covered in duplication, in another irregularity and indicator of simulation, by the counterparties Mariva Bursátil and Facimex, without any reference to Porcaro and the account shown only in the summaries of the Central Securities Depository.

[23] See table on page 15 of this report and the last part of the list in Annex I.

[24] See report on pp. 990-991 of the supplementary proceedings.

[25] Resolution 121/2011 of the Financial Information Unit (executive order of Law No. 25.246, amended by Laws Nos. 26.087, 26.119, 26.268, and 26.683, and Decree No. 290/07 and its amendments and supplements of UIF Resolution No. 37/2011):
"**Article 29**.-Report of Suspect Transactions. Obligated Parties must report to the FINANCIAL INFORMATION UNIT, pursuant to the provisions established in Articles 20 *bis*, 21 b), and 21 *bis* of Law No. 25.246 and amending laws, unusual transactions that according to the suitability required on the basis of the activities they perform and the analysis performed  said Obligated Parties suspect constitute Laundering of Assets or Financing of Terrorism.
**"The following circumstances, indicated merely by way of illustration, must be evaluated in particular**:
"a) Amounts, rates, frequency, and nature of the transactions executed by clients that have no relationship with the previous transactions and economic activity of said clients;
"b) **Unusually large amounts**, complexity, and unusual modalities of the transactions executed by clients;
"c) When transactions of similar nature, amount, modality, or simultaneous execution **lead to a presumption that it is a transaction divided for the purpose of avoiding application of detection procedures and/or reporting of transactions**;
"d) Continuous profits or losses in transactions executed repeatedly between the same parties;
"e) When clients refuse to provide data or documents required by entities, or when changes in the information supplied by clients has visibly been changed;
"f) **When the client is not in compliance with this Resolution or other pertinent applicable rules**;

(R.O.S.) required of the parties involved, are striking because of their absence. Added to this is the fact that the rate at which the bonds are liquidated, always very close to the historical value of the unofficial or free-market dollar, is indicated by Financial Net in most of the cases as "individual  rate," while the counterparties always refer to "continuous range" transactions and to transactions agreed upon within the customary range of the Rosario securities market.

Moreover, in the case of the successive debits and supposed purchases of bonds, the division multiples the sequence and breaks up the transaction into sums that barely exceed US$2,500,000 in nominal value. The investment of the counterparties thereby becomes impossibly precise, at least as transactions supposedly executed on the stock market. Including the fact that, as we have indicated at the end of the table that we are annexing as Appendix I, the amounts paid by the three counterparties exceed by ARD 13,173,090 the sum total of the gross amounts  of the transactions. In the case of the debit indicated as 4.2 above, dated 27 December 2011, for the nominal amount of US$1,000,000, the duplicate payment by Mariva Bursátil and Facimex Bursátil is recorded. And to make matters worse, this concerns securities that the Central Securities Depository does not record as having been transferred, not to any of the three supposed counterparties but rather to the personal account of Roberto Florentino Porcaro and his wife. With respect to the documentation of the payments of the counterparties, the norm is the complete absence of data. This is yet another evidence of the concealment of these transactions. It should be noted that the supposed payment by Facimex of a total of ARD 153,173,727 is documented as having been made by means of nine checks, all designated as "number 1. Banco de Valores."

As we have said, in addition to the cases in which the liquidation checks appear to have been issued even before the transfer of the securities, as is the case for the bonds covered by credit number 7 for ARD 2,480,000 in Bonar VII bonds, another major indication of the concealed nature of these liquidations is provided by the precise assembly and artificial correspondence between the acts ascribed to the various protagonists. All this tends to support, like the obvious and objective information about the nominal laundering of US$32,800,000 or about EUR 22,000,000, the strong suspicion of a self-sale or self-purchase of securities. According to this hypothesis, the same group of persons that transferred the bonds from Switzerland may also have acted to conceal their purchase in the local market, using for these transactions unlawful funds in Argentina or sums brought into the country outside the lawful channels, as reported by Federico Elaskar, and it has been proven that this was done by Lázaro Báez and his partners on other

---

"g) When there are indications concerning source, handling, or unlawful purpose of the funds used in the transactions for which the obligated party **does not have an explanation**;

"h) **When the client shown an unusual lack of concern with respect to the risks that he is assuming**, and/or the costs of the transactions are incompatible with the economic profile of the client;

"i) **When the transactions involve countries or jurisdictions that are considered to be "tax havens" or which are identified as not cooperative with the International Financial Action Group**;

"j) **When there is a single domicile for several legal entities, or when the same individuals appear as authorized parties in different legal entities**, and there is no economic or legal reason for this situation, **with special attention being paid when some of the companies or organizations are located in tax havens and their principal activity involves off-shore transactions.**

"Article 30. – Duty to provide background information for the Report. The Report of Suspect Transactions must provide detailed information and must contain a description of the circumstances constituting grounds for the transaction to be considered suspect."

occasions.[26] This accounts for the sum of US$65,600,000 that in the statement inserted at the beginning results from double recording of the same US$32,800,000 transferred from Switzerland, could also be recovered because of a double channel for laundering of assets, the first channel being the ARD 208,840,000 deposited in the account of Austral Construcciones S.A. under cover of liquidation of the securities brought in the name of Helvetic Services Group S.A., and the other change, in the same value as these bonds, in the event that they may have remained in the possession of the parties involved thanks to the pretense of their purchase.

This is not the jurisdiction in which to study this phase in depth. We shall in any case pay attention to what may result from the information about the three clients or principals who were indicated by Global Equity, Mariva Bursátil, and Facimex as presumed purchasers.[27] In the meantime we can add, as yet another indication of the artificial appearance of these purchases, the discovery that Financial Net closed its account with HSBC on 5 February 2013, slightly more than one month after the last transactions connected with this liquidation of bonds.[28]

While these parallel transactions have not been verified, in any case it is suggestive that the considerable sum of money actually liquidated and deposited in the accounts of the flagship company of Lázaro Báez accords with the almost surgically precise one-half of the funds at one time entrusted to Federico Elaskar. Another hypothesis that we suggested at the time to the parties investigating the offense of money-laundering **could be a possible divorce among long-time partners**, reflected in a partial exchange of one-half of the money and its laundering in the name of Lázaro Báez. Or the joint company may have remained intact, that is, with Lázaro de Báez and his people acting as figureheads for the portion belonging to their concealed partners,

---

[26] See previous reports produced in the proceeding, including references to the investigations of the entrance into Argentina and the depositing to accounts of Badial S.A. of US$1,800,000 originating in Uruguay and brought into Argentina in suitcases. This was acknowledged by Lázaro Báez himself in his statements to the AFIP, reproduced in the memoranda incorporated into the report on pp. 1057-1077.

[27] See footnote number 10.

[28] Memorandum of HSBC dated 7 June, which includes a summary of the account for the preceding six months. The account was opened on 12 September 2007, and the deposit of ARD 16,566,400, compatible with the gross amount of the fifth check in the series, a purchase ascribed in Facimex, dated 2 January 2013, is the last pertinent credit. **The investigation by the federal court officials will be able to include, among other aspects, the source of the transfers and deposits shown in this account summary**, in which it is easy to identify the amounts that accord with the gross amounts involved in the transactions liquidated with the five HSBC checks. See the following table, which can be used in a search for the source of the funds deposited in the Financial Net account.

Data of summary of account No. 3003-40629-5

| DATE | REFERENCE | ACCOUNT No. | COUNTERPARTY | AMOUNT |
|------|-----------|-------------|--------------|--------|
|      |           |             |              |        |
|      |           |             |              |        |
|      |           |             |              |        |
|      |           |             |              |        |
|      |           |             |              |        |
|      |           |             |              |        |
|      |           |             |              |        |
|      |           |             |              |        |

that is, the sums deposited in the accounts of Austral Construcciones S.A. or the one-half that may have remained in one of the networks of companies and accounts outside the country. This latter possibility includes the more recent phase of the seeming "reorganization" with which Daniel Rodolfo Pérez Gadin, Jorge Oscar Chueco, Martín Antonio Báez, Julio Enrique Mendoza, and Néstor Marcelo Ramos may have been occupied continuously and without interruption, once Elaskar was expelled from SGI.

Returning to the general evaluation of the events and the evidence collected to date, it should be kept in mind what was said in the report of 22 May 2013 on the reflection that the drastic break in the management of SGI had on the company documents. Elaskar changed from promoting a prosperous and promising business to suddenly resigning from his position and disposing of his stock shares.[29] Based on this evidence of a situation that does not in any way resemble peaceful negotiation of stock shares that was emphasized in those days,[30] we must evaluate the analogous trackings of the movements and the deployment of the parties involved. With this objective, we prepared Appendix I, in which we compare the records of migrations and flights of all these persons with the dates of the bond negotiations that we have described. The first thing that we see is a virtual disappearance of Federico Elaskar, similar to his disappearance from the corporate records, with a sequence of movements drastically interrupted in June 2011. At the same time, there is an increase in the travel undertaken by Daniel Rodolfo Pérez Gadin, Jorge Oscar Chueco, Fabián Virgilio Rossi, César Gustavo Fernández, Alejandro Ons Costa, and Juan Ignacio Pisano Costa; their trips become more frequent with the approach of the time of return and the contacts of Elaskar with the journalists.

Already at the beginning of 2011, and still more after the arrival of Pérez Gadin in the offices in Calle Juana Manso at the end of February 2011, the parties involved travel ceaselessly in all the countries in which we have discovered the network of companies and accounts, including Panama, Uruguay, Spain, the United States, and Switzerland, the latter reflected in flights via France, Germany, and Italy. There is also an obvious correspondence between the trips taken by the individuals of greater importance and responsibility, including Pérez Gadín, Chueco, and Martín Antonio Báez, and the establishment of companies that indicate these persons as executives or of which they are certainly concealed shareholders. This can be said, at least as a very probable hypothesis, in the case of Martín Antonio Báez, whose trips multiply; in addition, in yet another confirmation of his father's link with all these persons and transactions, he begins to make these trips in the company of Chueco, Pérez Gadín, and, in one of our more recent discoveries, the president of Austral Construcciones S.A., **Julio Enrique Mendoza**.[31]

[Flow chart – translation of boxes (in alphabetical order of Spanish text):]

---

[29] See the pertinent statements made by SGI personnel before Federal Court Number 7, in S.I.P.E. report number 20, filed with the court in pleadings dated 13 June 2013.

[30] In the pleadings of 22 (request for investigation) and 24 and 28 May (requests for telephone activities), we discussed an extortion situation that continues to date. Its reflection can also be seen in the behavior of Federico Elaskar and in the violence suffered a short time ago by Alejandro Maximiliano Acosta.

[31] See the statements made in footnote number 5, explaining the concordance between the movements of Néstor Marcelo Ramos and Martín Antonio Báez.

| Bonos: USD… | Bonds: USD 32,800,000 |
|---|---|
| Cheques librados… | Checks issued in favor of Helvetic Services Group for $208,840,276.65 |
| Cuenta de … Financial Net | Account of Helvetic Services Group with Financial Sociedad de Bolsa |
| Deposito en la cuenta… | Deposit to account of AUSTRAL CONSTRUCCIONES S.A. with Banco Nación: $208,840,276.65 |
| Dinero ingresado… | Money received by Lázaro Báez in SGI late in 2010/beginning of 2011: approx. €50,000.00 |
| Euroclear | Euroclear |
| HELVETIC SERVICES GROUP S.A. | HELVETIC SERVICES GROUP S.A. |
| J. Safra Bank de Ginebra, Suiza | J. Safra Bank of Geneva, Switzerland |
| Octubre 2012 a Abril 2013… | October 2012 to April 2013: assembly of funds (approx. EUR 25,000,000) and purchase of Argentine debt instruments |
| Pago bruto… | Gross payment: $225,409,144 |
| Posible auto-compra… | Possible proprietary purchase of bonds (approx. EUR 25,000,000) entering or existing in Argentina |
| Posible simulación… | Possible simulation: Global Equity, Mariva Bursátil, Facimex Bursátil |
| Sociedades y cuentas… | Companies and accounts known to Federico Elaskar |
| Transferencias fraccionadas… | Fractional transfers to Euroclear/Argentina account; total, USD 32,800,000 |

To demonstrate to a greater extent the eloquence of the travel records, always with consideration of the information assembled in Appendix II, we have made several calculations and comparisons. In 2010 the persons in question recorded a total of 70 trips, which increased to 141 in 2011 and to 179 in 2012. If we arrange and analyze them in order of destination, we find, first, ten trips to Germany: four by Ramos, who usually traveled via Lufthansa to Frankfurt; four by Lázaro Báez and his son Martín Antonio, and two by Fernández, the latter in the final, crucial phases late in March and at the beginning of April of 2013, when this group appeared to maximize its efforts with respect to the ninth and last deposit of bonds from Switzerland and the possible obtaining of funds to procure these securities or, as we have maintained in this report, to purchase them themselves in the simulated purchases on the Rosario market.

A trip from Australia is recorded for the return of Chueco on 24 April 2011, although he had started this trip in South Africa on 16 April.  These destinations are remote, but on the other hand each one is close to two of the places where we have located corporate networks, including the Seychelles Islands and New Zealand.  Based on his credit-card statements, we have shown that between the departure and arrival dates Jorge Oscar Chueco was in fact in New Zealand,[32] where he is shown making purchases between 19 and 23 April 2011. When pertinent, we have to return

---

[32] The company MAPLE VIEW LIMITED was established in New Zealand in February 2011, two months before Chueco's visit to that country, with Javier Martín Vanella as manager. The company SWISSER AG TRUSTEE NZ LIMITED was established by the group in November 2012, with the same domicile:  Office 2, Level 3, 56 Victoria Street, Wellington, with Javier Martín Vanella and Marcelo Néstor Ramos as managers.

to this credit-card information for Chueco and also for Pérez Gadín,[33] since this information has allowed us to confirm that the passage via Switzerland is a necessary stop and the reason for practically all the trips to Europe made by the group, although the immediate destination of the list of migrations was Spain, France, Germany, or Italy. This evidence, which also covers the trips made in their role as concealed shareholders by Martín Antonio Báez, his father Lázaro Báez, his brother Leandro Báez, and the president of Austral Construcciones S.A., Julio Enrique Mendiza, accords precisely with the public report by Federico Elaskar and the other indicators collected concerning the handling of corporate structures and bank accounts by Helvetic Services Group S.A.

|  |  |  |  |  |
|--|--|--|--|--|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Martín Antonio Báez travelled to Bolivia in 2012. He also made frequent trips to Chile. On the other hand, most of the thirteen trips to Brazil were made by Jorge Oscar Chueco starting in 2010, with a trip in August 2011 in the company of Pérez Gradín. In November 2011 Gustavo César Fernández and Fabián Rossi also traveled together to Brazil. In total, thirteen trips were recorded with Chile as point of origination or destination. Practically all of them were made by the Báez family, including one of the only two departures by Lázaro since 2010. Among these movements it is interesting to note the coincidence of the trip to Chile on 11 July 2012 by auditor Eduardo Guillermo Castro—installed by Lázaro Báez and Pérez Gadín in SGI—and Martín Antonio Báez. Martín Antonio Báez went to Chile again in March 2013, a few days before flying together with his father to Germany—their destination very probably being Switzerland—during the time when the parties involved appeared desperate to bring back a large part of the money that had left during the tenure and with the knowledge of Federico Elaskar.

Only two persons in the group traveled to Colombia, Rossi, in February 2012, and the mysterious Néstor Marcelo Ramos, who often went to various places in South America. One trip to Cuba is recorded, made by Jorge Norberto Cerrota, coinciding with the start of the "Journalism For Everyone" program broadcasts; he left on 13 April and returned on 27 April 213, w**hen the ninth and last checks was issued and close to be paid and the principal parties appeared to have agreed to spend a few days out of the country**. The first person to return on the morning of 14 April was Lázaro Báez, accompanied by his son. This is related to the imputation

---

[33] Expenditures outside the country were reported. For Martín Antonio Báez: Visa S.A./Banco Macros, entries on 11 and 13 June. By Daniel Rodolfo Pérez Gadín, Banco de Galicia/Mastercard, entry and documentation dated 10 June, and American Express, documentation and entry 10 June. For Jorge Oscar Chueco: Visa/Santander Río, documentation and entry 10 June, and American Express, documentation and entry 10 June.

concerning removal of the contents of the safe deposit boxes of one of his residences. Here is an excerpt from Appendix II covering the trips around the time of the program broadcast of 14 April.

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

Spain, with more than thirty migration records, is one of the principal destinations of the group in this analysis of movements of the past three years. The "mother country" became a necessary site for them, as did Uruguay, Panama, the United States, and Switzerland, in exact concordance with the information collected on the management of companies[34] that began to be used to hold the funds once Elaskar was out of the picture and control of SGI had been transferred to Pérez Gadín, Chueco, and Ramos. It should be noted that in 2010 none of the persons who would later become protagonists traveled to Spain; the only record indicates an early entry from Spain into Argentina by the nephew of Ramos and the representative of Helvetic Services Group, Javier Marín Vanella, between August and November 2010. But as soon as Pérez Gadín and his people arrived at SGI in March of 2011, most of these agents of Lázaro Báez traveled via Spain, a practice inaugurated by his sons Martín Antonio and Leandro between March and April of 2011. This trip, which we now know also included Julio Enrique Mendoza, president of Austral Construcciones S.A.,[35] is a symbol of a time that was then coming to an end. We are saying this because Federico Elaskar had not yet been dismissed from SGI and, as indicated by the sequence of migrations, it coincides with this move toward Europe, the destination definitely being Switzerland, with Leonardo Fariña, Néstor Marcelo Ramos, Martín Báez, and Mendoza.

---

[34] See the reports in the proceeding on the companies established in Spain, including Mirabilia LS, Felsan Global Investment, and Tusaleta Servicios y Gestiones. Chueco and Pérez Gadín appear as managers in all three, in the first two said companies effective from 7 December 2011 and in the third company on 9 December 2011. Serbel Trade SL and Wodson International SL , with the same domicile as these three companies, belong to Helvetic Services Group, as sole member.

[35] We did not include Leandro Báez in Appendix II because the information about his participation in this trip became known only after a review study following receipt of the information about the Air France flights.

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Between 8 and 15 July 2011, Chueco and Pérez Gadín traveled together to Spain. We have not received from Iberia any information about intermediate stop-overs, the above-mentioned American Express credit-card charges of Chueco constitute credible evidence of the passage of these agents of Lázaro Báez through Switzerland and, logically, the registered office of Helvetic Services Group S.A.

The following trip to Spain inaugurates an entire series of records that add up to numerous proofs of the close relationship and obvious complicity of Lázaro Báez and his son Martín Antonio Báez with Jorge Oscar Chueco and Daniel Rodolfo Pérez Gadín in everything done since early 2011 around the offices at Calle Juana Manso 555. Pérez Gadín and Chueco departed together on 11 September 2011; they were followed by Martín Antonio Báez on 24 September. The three men returned to Argentina barely one day apart, between 21 and 22 September.

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

As can be seen in the excerpt of the record, within a few days of the return of Chueco, Pérez Gadín, and Báez from Europe, Néstor Marcelo Ramos arrived in Argentina from Peru. At the beginning of this report[36] I pointed out the exact correspondences between the movements and trips of Martín Báez and Ramos, Martín Báez as principal agent of his father and evasive holder of cash and securities, and Ramos as manager, operating from Helvetic Services Group, of the business affairs that Lázaro Báez and his partners had long since transferred to another country. Here I need only add that, once again, the Mastercard charges of Pérez Gadín and the American Express credit-card charges of Chueco confirm the passage of the group through Switzerland and the meetings that may have preceded the trip by Ramos to Argentina.

In the next trip to Spain, nothing is concealed and the three men, Chueco, Pérez Gadín, and Martín Antonio Báez left and returned for the first time at the same plane on an eleven-day trip between 29 November and 10 December 2011.

---

[36] Footnote number 5.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

As in the case of the two earlier trips, here it is the charges on the two credit cards of Pérez Gadín that confirm the obligatory stop-over of the group in Switzerland. The conviction that all these proofs made possible with respect to the role ascribed by Federico Elaskar in his public report to Helvetic Services Group[37] is largely confirmed when we show that the management by the executives of the companies spread throughout the world enabled them in a few days to assemble, transfer to Argentina, and liquidate in the accounts of Austral Construcciones a large part of the securities delivered.

Chueco, Pérez Gadín and Martín Antonio Báez once again traveled to Spain between 26 May and 5 June 2012. The stop-over in Switzerland is again evidenced by the Mastercard charges of Pérez Gadín and the fact that the Aerolíneas Argentinas ticket shows a stop-over in that country.[38]

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

In addition, aside from Chueco, Pérez Gadín, and Martín Antonio Báez, of the dozen or so individuals whose movements we have monitored, the most recent trip to Spain occurred in July 2012 and was made by Gustavo César Fernández, certainly to complete in Spain or in Switzerland one of the prior actions taken by his new bosses.

What has been said in relation to Spain applies even more to the United States, with some sixty trips to or from the USA. Once again, this striking number accords exactly with the pertinence that we have seen in our earlier presentations of the role placed by the USA in the corporate network and their corresponding bank accounts. It must be kept in mind that in the US we found no fewer than 150 companies managed from one and the same domicile and the common denominator of their management by the Seychelles Islands company Aldyne Ltd. and the interest held by Helvetic Services Group. This is in addition to a multitude of other business

---

[37] Apparently the party referred to in the reference to the group of "consultants" in Switzerland, with a "greased" structure that included the management of the companies and the handling of their accounts.

[38] To date, Aerolíneas Argentinas has not responded to the request for reports on these flights. The investigations into the Switzerland stop-over included in these tickets became publicly known, including with displays of the tickets in the broadcast of the "Journalism for Everyone" program on Sunday, 16 June.

activities and transactions already referred to and including more recent companies established since the end of 2010, for example companies held by Ramos, Elaskar himself, Pérez Gadín, SGI Argentina, Matías Molinari, and various other persons in this network. This is why, in contrast to Spain, in 2011 business trips by the group to the USA did not start, they accelerated. Only three or six trips were recorded in 2010, and another in 2012, plus the eight segments that include the trips made by Néstor Marcelo Ramos, Jorge Oscar Chueco, Daniel Rodolfo Pérez Gadín, and Juan Ignacio Pisano Costa in the hectic days between the last transfers of securities and the possible assembly of the funds with which they allegedly repurchased the bonds in this market, and the days immediately following the broadcast of Jorge Lanata's program on 14 April 2013.

In this system of destinations chosen to create a logical sequence and facilitate the understanding of the results of the study of the migratory movements and flights, trips to France were the next step. As in the case of Spain, Germany, and Italy, a large number of the records reflect travel with stop-overs in Switzerland, in all cases via Air France flights AF-4147 and AF-418. This is why throughout 2010, only Néstor Marcelo Ramos and Javier Vanella used this service, depending precisely on their individual or work domiciles.

The first of the other parties to take this route to France and Switzerland is Federico Elaskar. This again reveals the exact correspondence between his public complaint and the information we have collected from a beginning in our case. He traveled this route in the time frame indicated in his report, between the beginning and middle of 2011, before his dismissal from SGI. The first trip took place between 31 March and 5 April, and the second between 23 May and 5 June 2011. This was to be his last trip to France; the regular general meeting of shareholders of SGI that sealed his fate was held only one week later. Elaskar disappeared from the scene and was replaced by Fabian Virgilio Rossi, who traveled to France and possibly to Switzerland between 3 and 14 August 2011. After Rossi, the travel via France for the payments of Helvetic Services Group was done by Martín Antonio Báez, for the first time between 5 and 12 May 2012, in the company of his brother Leandro and Julio Enrique Mendoza.

We should note parenthetically here that it is only from information provided by Air France[39] that we know of the participation in these strips by Mendoza. The airline reported that the trips by Julio Mendoza and the Báez brothers had been paid for in cash at the Escalatur Agency, located at Calle Alberdi No. 3 in Río Gallegos. Based on this information, we prove that **he has the President of Austral Construcciones S.A. since 2005**, as can be seen in the following notices published in the Official Gazette of the Argentine Republic.

30 March 2012

AUSTRAL CONSTRUCCIONES S.A. The Regular General Meeting of Shareholders held on 28 May 2011 resolved to appoint **Julio Enrique Mendoza** for one business year as Regular Manager and President, and as alternate Leandro Antonio Báez, Both appointees constituted special domicile at Pasaje Carabelas 241, 5th floor, Autonomous City of Buenos Aires. Ceased to be alternate manager because of expiration of appointment: Emilio Carlos Martín. Matías José Hierro Oderigo. Notary, authorized by Document No. 39 dated 29 March 2012, page 207, Notarial Register 2485 of the Autonomous City of Buenos Aires. Attorney at Law. Matías J. Hierro Oderigo. Notary authorized by Document No. 39 of 29

---

[39] Documentation and memo of 12 June 2013.

March 2012, page 1070, Notarial Register 1485 of the Autonomous City of Buenos Aires. Attorney at Law. Matías J. Hierro Oderigo 30 August 2012 No. 38721/12 v. 30 August 2012.


## 2 December 2010

AUSTRAL CONSTRUCCIONES S.A. The Regular General Meeting of Shareholders held on 04 May 2010 resolved to appoint **Julio Enrique Mendoza** for one business year as Regular Manager and President, and as alternate Emilio Carlos Martín. Both appointees constituted special domicile at Pasaje Carabelas 241, 5th floor, Autonomous City of Buenos Aires. Matías José Hierro Oderigo. Notary, authorized by Document No. 39 dated 29 March 2012, page 207, Notarial Register 2485 of the Autonomous City of Buenos Aires. Attorney at Law. Matías J. Hierro Oderigo. Notary authorized by Document No. 181 of 30 November 2010, page 438, Notarial Register 1485 of the Autonomous City of Buenos Aires. Notary. Matías J. Hierro Oderigo 02 December 2010 No. 149969/10 v. 02 December 2010.


## 6 September 2005

AUSTRAL CONSTRUCCIONES SOCIEDAD ANONIMA. At the Regular and Special General Meeting of Shareholders held on 26 August 2005, the company unanimously: (1) Appointed a director for one business year, the sole regular manager and President being **Julio Enrique Mendoza**, the alternate being Silvia Mónica Davis. Special domicile: Both managers constitute domicile at Pasaje Carabelas 241, 5th Floor, Autonomous City of Buenos Aires. (2) Change in corporate purpose: 1. Construction of buildings; engineering work and private roads. Purchase and sale, marketing, brokering, management, and operation of real properties whether company-owned or owned by third parties, and machinery, replacement parts, and accessories intended for the performance of its corporate purpose or connected therewith. 2, Import and export. 3. Financing with company funds of the operations included in this article, with or without real guarantee, whether short-term or long-term; contributions of funds for business activities realized or under way; investment in companies of any kind in the form  of establishment of stock companies, entrepreneurial collaboration groups, joint ventures, temporary association of companies, consortia, and any type of association permitted by pertinent current law and in which the company can participate; secured and unsecured cash loans, with or without establishment and transfer of real rights; and in general the purchase and sale of securities, stock shares, chattels, and credit instruments of any system or modality established or to be established. Transactions subject to the Financial Entities Law are excluded. Claudio Moreyra, ID No. 27.279.201, authorized pursuant to power of attorney embodied in instrument No. 369 dated 30 August 2005, page 1,048, Notarial Register No. 289 of the Autonomous City of Buenos Aires. Claudio Moreyra. Certificate issued by María Cecilia Zucchino. Registration No. 289. Matric. No. 2445. Date: 5 September 2005. Certificate No. 65. Book No. 85. No. 73,250.

In the notice published in the Official Gazette of 29 October 2007, Julio Enrique Mendoza appears together with Lázaro Báez and Fernando Javier Butti in Austral Atlántica S.A., which has the same domicile as Austral Construcciones S.A., at Pasaje Carabelas 241, 5th floor, in the Federal Capital.


[Screen shot of notice published in Official Gazette]

Various notices published and newspaper stories describe him as the "right-hand man" of Lázaro Báez, to the point that some automobiles found in a recent search ordered by Federal Court in a building in Rio Gallegos, Province of Santa Cruz, are apparently registered in his name.[40] Mendoza's participation in these trips, along with Daniel Rodolfo Pérez Gadín, constitutes an extremely relevant milestone in the common denominator of the appearance of Austral Construcciones S.A. in the events under investigation. This company had been named by Federico Elaskar in his public statements. Leonardo Fariña himself did the same in most of his testimony in open court after the broadcast of the program of Journalism for Everyone on 14 April 2013. He also stated that the link with Lázaro Báez began with organizing the accounts and transactions of Austral Construcciones S.A.  If we add to this the direct involvement of its president, and lastly, the return to his accounts of the millions obtained with the liquidation of the bonds of Helvetic Services Group, there can be no reasonable doubt about the source of at least part of the funds brought into SGI between the end of 2010 and the beginning of 2011.

These items of evidence also confirm the nature of the criminal maneuvers that could constitute the source of  the money, as well as the possible payments for rigging of public works contracting, or tax evasion or "creative accounting" recently alluded to,[41] all under investigation by the special court.

Let us now return to the Air France trip of 5-12 May 2012, which provides an interesting piece of information. The airline informed us that the code number for the BUE-PAR-BUS-PAR-BUE tickets indicates as final destination the city of Beijing, China. Probably this news of the visit to China by the Báez brothers and the president of Austral Construcciones is connected with the reports of a partnership of the entrepreneur Lázaro Báez with a view to a bid under way for the construction of a large dam on the Santa Cruz river. With an explicit stop this time in Geneva, Switzerland, China ends up being the most distant point of the trip taken via Air France in September 2012 by Martín Báez, Julio Enrique Mendoza, and Daniel Rodolfo Pérez Gadín.[42]

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

---

[40] Newspaper *La Nación*, print edition of 2 June 2013, item entitled: "The business activities of  power. The 'black fleet' of Lázaro Báez is estimated at more than $2,000,000. The entrepreneur has five top-of-the-line automobiles imported between 2006 and 2012."

[41] See item in *La Nación* for 28 June 2013 headed "Business activities and power: Lázaro Báez accused of tax evasion in a proceeding paralleling that of money-laundering; targets Austral accounts." The indictment in question is being proceeding before the Court of Criminal Economic Affairs, under Judge Ezequiel Berón de Astrada.

[42] The tickets, including the ticket for Pérez Gadín, were paid by the Escalatur Agency in Río Gallegos.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

As can be seen in this excerpt from Appendix I, the trip by Báez, Pérez Gadín, and Mendoza to Switzerland and China coincides with the start of numerous trips by the parties to Europe, beginning with the return of Néstor Marcelo Ramos to the European continent. These are the trips that preceded the return of Federico Elaskar from his exile on 21 October 2012, an event that in view of the records that we are studying caused a one-month halt in the flights. The lack of movement continues practically until the organization and execution, pursuant to a decision made by some executive, of the laundering of funds through the transfers and liquidations of securities that continued until 8 April 2013.

The trips to France by this armada of travelers and front-men ended with the return of Rossi to France during the hectic days of mid-January and end of February 2013, when they all seem to have left to get the securities and cash for the final bond liquidations. During this period Lázaro Báez himself had to fly to Germany with his sons,[43] perhaps as a last recourse to execute the final transactions for some 30 million pesos,[44] when only six days remained for the first edition of the television program Journalism for Everyone.

After the few entries and exits from Great Britain, dominated by the Europeanized Javier Martín Vanella, member in the United Kingdom of a large number of companies together with Ramos, this study of travel by destination leads us to Italy. Almost absolute take-over of AZ-680 and A2-681, usually used by Néstor Marcelo Ramos, reveals the reason common to all these trips, which include stop-overs n Switzerland, for which we have provided irrefutable proof. After the eight records in the name of Ramos in 2010, Jorge Chueco began the trips to Italy, starting on 21 May 2011 and returning on 3 June 2011. This took place a few days before his appearance as recipient–through the straw company SER NORTE S.A.—of half of Elaskar's stock shares in SGI. Chueco is believed to have returned to Italy, and very probably in both cases to Switzerland as well,[45] in September 2012 and in May 2013. By then the repatriation of funds channeled through SGI during the time of Elaskar had been completed, and the public scandal surrounding these criminal maneuvers had occurred. It is very probable that Chueco took advantage of this subsequent trip to agree with Marcelo Ramos and his partners in Helvetic Services Group SA. on common strategies for dealing with the investigations under way in Argentina.

---

[43] Lufthansa, in a memo dated 6 June 2013, and on 10 June 2013 the travel agency Tije Travel, both reported by the tickets for Lázaro Antonio Báez, his children Martín, Leandro, and Melina, and several individuals (about whom we have no pertinent information) by the names of Marcelo Mariano Nieto, Carlos Agustín Laplace, Gustavo Rubio, and Jorge Salgado were paid for with VISA credit card No. 493763010965260 ARD 60,593), VISA card No. 4937638001310272 (ARD 31,328), and AMEX card No. 376457783901000 (ARD 31,927), against invoice issued I the name of Patricio Palmero S.A., CUIT [Taxpayer ID] No. 30-531489086, client number 23726, with domicile at Ruta Panamericana Kilómetro 3 (1615), Grand Bourg, Province of Buenos Aires.

[44] Check No. 9 for $29,918,618.40, ultimately issued by Financial Net against its account with Banco Marco , for payment on 8 April 2013.

[45] At least in the second trip, in May 2013, the Switzerland stop-over  is completely proven by the expenditures on his AMEX credit card. See table in this report.

With thirty-five records, Panama occupies in this system of trips and migratory records a role similar to that noted by Federico Elaskar in his public complaint, another aspect of which here again has been confirmed. In addition to the confirmation achieved thanks to access to the corporate documentation of Helvetic Services Group and the discovery that the bulk of its capital is reports as consisting of corporate investments in Panama,[46] the story of the hundreds of companies established in that jurisdiction and managed from the office in Switzerland is confirmed by the data analyzed here. In 2010 Panama was a destination known in the history of SGI before the arrival of Lázaro Báez, as was also stated by Federico Elaskar in his revelations to the journalists. During this time we see five trips in 2010 by Fabián Virgilio Rossi, a monopoly that was to continue in the following year. However, the first person to travel in 2011, once he assumed his position as auditor of SGI, was Eduardo Guillermo Castro, between 23 and 31 July, immediately after the dismissal of Elaskar from the financial position.

After completion of the crime that we are investigating, after the final dismissal of their former boss in November 2011, Rossi and Gustavo César Fernández returned to Panama eight more times, twice in November and December 2012, when the parties involved appeared to be collecting money from the four directions of the earth. Martín Antonio Báez himself traveled to Panama on 5 August 2012 and returned via Paraguay three days later, certainly after completion of his work as evasive shareholder. This reference indicates that Martín Antonio Báez was the only member of the group who made trips to Paraguay, where he remained for a large part of August 2012. The only travel recorded in Peru was done by Ramos, in connection with the companies that we found to be connected with him in that country. Our protagonists also occasionally went to the Dominican Republic, limited to one trip there, at the end of June 2012, by Fabián Vigilio Rossi, Gustavo César Fernández, and Daniel Rodolfo Pérez Gadín.

**Uruguay, with one hundred fifty records for seventy-four trips, more than dominates the locations where the business dealings of the group are concentrated, and seems to be the place where they spent most of their time.** This is another of the convincing supports for the public complaint by Federico Elaskar, where our neighbor country plays a role analogous to the proportion of trips by the persons involved . There is no doubt that here is where most of their funds and resources are located, not so much with respect to corporate networks but especially with respect to funds and securities. It must be kept in mind that the story told by Federico Elaskar concerning the transfer and inflow of funds from or to that country, always involving people who have confessed that they engaged in such tasks, accords completely with the constant coming and going of the parties concerned, via air, over bridges, or across the river. We emphasis once again that Lázaro Báez supposedly admitted to the Federal Administration of Public Income (AFI) the existence of this inflow of money from Uruguay, in bags or in bulk, outside the law.

In light of all these new elements, we believe that these illegal movements have been proven. **At least in part, these funds may have been used to launder more than ARD 208,000,000 deposited in the accounts of Austral Construcciones S.A.** Thank to this ingenious resource, and still within the hypothesis that must be looked at in greater depth by the Federal Court, the parties concerned are believed to have succeeded in repatriating half of the EUR 50,000,000 in Argentine debt instruments, while the other hand is believed to have laundered by using for the

---

[46] See footnote number 16.

purchase of these securities funds brought into the country in a clandestine manner, or the unreported funds existing in Argentina.

**In any case, it is an objective fact that at least one-half of the funds that Lázaro Báez and his partners removed from Argentina with the participation of Federico Elaskar returned and were laundered via transfers of securities from Switzerland and their subsequent liquidation and deposit of the resulting sums in accounts of Lázaro Báez or, what is the same thing, the accounts of Austral Construcciones S.A.**

By reason of the foregoing,

I PRAY THIS HONORABLE COURT TO:

1. Deem the within pleadings to have been filed in relation to the evidence produced and incorporate into the proceeding the annexed reports and tables, of all of which we have to submit official copies to the office of the Public Prosecutor in Federal Criminal and Corrections  Court No. 9, hearing indictment 300000000017/2013;

2. Order that investigation testimony be taken from Verena Úrsula Fontana, Claudio Giovanni Fontana, and Martín Antonio Báez concerning their participation in the extortion under investigation;

3. Order sequestration of the nine checks issued by Financial Net in favor of Helvetic Services Group S.A. against its accounts with HSBC and Macro Bank, all deposited in the accounts of Austral Construcciones S.A. with Banco Nación;

4. Order Banco Nación to furnish all data for the accounts in which the said checks were deposited, and a summary of their movements from 01 November 2012 to date;

5. Identify the destination and application of the ARD 208,840,276.65 liquidated, and order a preventive attachment of said sum of the bank and stock accounts of Austral Construcciones S.A.;

6. Order precautionary attachment of the securities transferred by the parties involved from Switzerland, or order attachment of the same nominal amount from the global accounts which they may have been deposited.


Investigation Office No. 10, 19 June 2013.

Juris Services International
Translation Studio
23 Normandy Terrace
Bronxville, NY 10708
Tel: 212 759-5400 Fax: 212 401-8125

## CERTIFICATE OF ACCURACY

State of New York          )
Village of Bronxville   : ss.:
County of Westchester     )

This is to certify that the attached translation from SPANISH into ENGLISH of the document entitled/described below is a true and accurate rendition of the original Spanish document:

Ministerio Público Fiscal de la Nación.

ALEGA SOBRE LA PRUEBA PRODUCIDA. LOS DINEROS INTRODUCIDOS POR LAZARO BÁEZ EN
……………………………………………………………………………………………………
……………………………………………………………………………………………………
**6**. Se decrete el embargo preventivo de los títulos transferidos por los imputados

desde Suiza, o bien se decrete el embargo, por el mismo monto nominal, sobre las

cuentas globales en los que pudieran hallarse depositados.

Fiscalía de Instrucción número 10, 19 de junio de 2013.

John E. Considine
President

Date: 20 July 2013

Ministerio Público Fiscal de la Nación.

ALEGA SOBRE LA PRUEBA PRODUCIDA. LOS DINEROS INTRODUCIDOS POR LAZARO BÁEZ EN SGI/HELVETIC SERVICES GROUP VOLVIERON A LA ARGENTINA ENTRE DICIEMBRE DE 2012 Y ABRIL DE 2013 Y SE DEPOSITARON EN UNA CUENTA DE AUSTRAL CONSTRUCCIONES S.A.

Señora Juez:

  **José María Campagnoli**, a cargo de la Fiscalía de Instrucción número 10, en el sumario número 26.131/2013 del registro informático de la C.S.J.N asignado a la Secretaría número 106 del Tribunal a vuestro digno cargo, a V.S respetuosamente me dirijo y digo:

  Que las pruebas recibidas, obrantes todas en el Juzgado, han permitido reconstruir una serie de circunstancias de suma relevancia en orden a los reproches ventilados en esta justicia nacional y, seguramente, de utilidad para la resolución de los que se discuten en el fuero federal.

  Me refiero a un hallazgo notable: ***entre el 14 de diciembre de 2012 y el 8 de abril de 2013, se registró el ingreso al país de aproximadamente 65.000.000 de dólares que los extorsionadores acusados en autos negociaron en frenéticas transacciones de bonos de la deuda soberana de la república Argentina***.

  Como lo hemos hecho constar recientemente[1], *la **suma en cuestión ronda los cincuenta millones de euros**.* Se trata de una nueva correspondencia entre los hechos acreditados en la causa y la denuncia pública realizada por Federico Elaskar al periodista Jorge Lanata. Cabe recordar que en los testimonios filmados y grabados, puestos al aire en las emisiones del programa "Periodismo Para Todos" del 14 y 21 de abril del corriente año, el nombrado se refirió al manejo y colocación, en diversas operaciones y por cuenta de Lázaro Báez, de una suma de entre 50 y 55 millones de euros.

  Merced a la pesquisa de la Secretaría de Investigaciones Penales (SIPE), pudo detectarse el regreso a la Argentina -cualquiera hubiese sido el devenir intermedio y las contingencias del camino del dinero- de una suma cercana a los cincuenta millones de euros y proveniente, sin lugar a duda razonable, del circuito de manejo de fondos y sociedades organizado luego de la expulsión de Elaskar.

  Debe recordarse que entre fines de 2010 y principios de 2011, Lázaro Báez y sus colaboradores se vieron en la necesidad de canalizar fondos a través de la firma SGI, sociedad presidida por Federico Elaskar, dueño éste además, del 95% de las acciones. Al poco tiempo el grupo en cuestión, por las razones que hemos expuesto en nuestro dictamen del pasado 22 de mayo, resolvió apoderarse en varios actos de la financiera, desembarcando

---

[1] Fojas 844/859 de las actuaciones complementarias del apartado III del dictamen del 22 de mayo, información remitida por la Caja de Valores el 29 de mayo de 2013.

primero quienes oficiaron como interventores y auditores para, finalmente, tomar completo control de la entidad entre julio y octubre de 2011 y despojar a Elaskar de sus cargos y acciones. Este proceso cerró con un epílogo que hemos descubierto y documentado sobradamente; se trata de la aparición de HELVETIC SERVICES GROUP S.A, representada por su directivo y accionista Néstor Marcelo Ramos.

Explicamos también que la citada sociedad, y el propio Ramos, parecían estar retomando o continuando una labor iniciada años antes. Helvetic Service Group es uno de los comunes denominadores entre dos períodos bien marcados; en el primero de ellos se destaca la constitución de unas 150 sociedades en el Estado de Nevada EEUU, todas con el mismo domicilio en la ciudad de Las Vegas y la sociedad ALDYNE LTD de las Islas Seychelles como administradora. Esta estructura se vio correspondida con diversos retornos o blanqueos de dineros en operaciones en la Argentina, como la compra de las acciones hoy embargadas de Continental Urbana S.A. La segunda etapa se caracteriza por la súbita interrupción de aquella cadena de sociedades –y de la operación de ALDYNE LTD- a fines de 2010 y la reseñada historia del empleo y apropiación de SGI. Sin embargo, el final de ese tramo implica un retorno al anterior, con las riendas del dinero y las sociedades nuevamente en manos de HELVETIC SERVICE GROUP y Néstor Marcelo Ramos desde el 21 de octubre de 2011.

Ahora bien, es muy probable que Ramos y sus inmediatos colaboradores se hubiesen dedicado los meses siguientes a ordenar y sanear los aparentes desaguisados en el manejo de los dineros ingresados al giro de SGI. Más aún, encontramos también lógico –y lo veremos confirmado por las pruebas e indicios a los que nos vamos a referir más adelante- que esos fondos de alrededor de cincuenta millones de euros, según el cálculo de Federico Elaskar, debieran ser puestos a resguardo del conocimiento que este último tenía de su empleo y destino.

Es importante recordar que, al cabo de su forzada ausencia de un año, Elaskar volvió a la Argentina en octubre de 2012. Por lo que ha dicho frente a las cámaras y los grabadores de los periodistas, así como por el aporte implicado en las denuncias que sus anteriores socios radicaron en los Juzgados de Instrucción números 19 y 42[2], sabemos que no

---

[2] La denuncia del Juzgado de Instrucción número 19 fue realizada el 8 de noviembre de 2011,mientras que la del Juzgado de instrucción número 42, en la que se realiza esta presentación, fue realizada el 27 de septiembre de 2012, ambos extremos del forzado exilio de Elaskar, por un lado, y su inquietante –para los imputados- retorno por el otro. Los sucesos a los que nos referimos en este dictamen se disparan inmediatamente después, ya que las primeras notas y consultas vinculadas con la apertura de la cuenta en la Sociedad de Bolsa Financial Net datan del 4 y 5 de diciembre de 2012. En su testimonio, el periodista Jorge Lanata sitúa los primeros encuentros entre sus colaboradores y Elaskar a inicios de 2013, habiendo oficiado de vínculo un abogado. Se trata éste, probablemente, del letrado con el que Elaskar habría consultado, citándolo como "Mariano Cuneo", tal como se informa en los contactos revelados en las últimas emisiones del programa de televisión. En nuestro dictamen del 11 de junio solicitamos al tribunal la incorporación de los medios utilizados para esas comunicaciones - correos electrónicos y mensajes del sistema "whatsapp"-, ya que fueron ofrecidos públicamente por los periodistas. La referencia al abogado en cuestión, guarda relación con lo recogido en la causa de trámite por ante el fuero Correccional, donde Elaskar fue imputado por el delito de lesiones leves. Allí, según el personal

Ministerio Público Fiscal de la Nación.

aceptaba la situación y que se hallaba dispuesto a denunciar las maniobras delictivas que había presenciado y sufrido. De acuerdo a lo declarado por Jorge Lanata y el resto de la información volcada en las emisiones de su programa de televisión, por entonces Elaskar se había puesto en contacto con los periodistas, o se disponía a hacerlo. Es muy probable que este panorama pueda ser enriquecido con otras contingencias sobre las que no hemos reunido hasta el momento mayores certezas, como las advertencias que nuestra víctima pudo haber transmitido a Lázaro Báez, Pérez Gadín, Fernández y compañía acerca de los pasos que estaba dispuesto a dar para recuperar lo perdido.

En suma, no puede negarse que las noticias eran alarmantes tanto para los que se preocupaban por la suerte de esos cincuenta millones de euros, como para aquéllos que debían velar por mantener esa fortuna intacta. ***En estos antecedentes encuentran perfecta explicación y significado lógico los hechos que venimos ahora a develar***.

Según ha informado la Caja de Valores[3], la operación de compra de acciones de Continental Urbana y su posterior cesión a Huston Magnament LTD no fue la única registrada por cuenta de HELVETIC SERVICES GROUP S.A. Merced a las nuevas constancias arrimadas, pudimos comprobar que la firma citada había intervenido en otra serie de transacciones, esta vez como comitente del agente "Financial Net Sociedad de Bolsa S.A" y por un volumen total negociado de ***65.794.950 dólares en títulos de la deuda pública argentina***. Como puede verse en la planilla que he de insertar en este dictamen, los asientos de créditos –es decir del ingreso o anotación de los títulos en la cuenta comitente 1255 de Helvetic Services Group, cuenta depositante 695 del agente de bolsa- fueron realizados el 14, 18, 19, 21, 26, 27, 28 y 31 de diciembre de 2012 y 2 de enero, 13, 14 y 15 de febrero y 26 de marzo de 2013. Los débitos, es decir la negociación, transferencia o liquidación de los bonos, se corresponden en todos los casos con operaciones realizadas inmediatamente después de las anteriores. De esta manera, luego de las últimas transferencias de títulos de los días 5 y 8 de abril de 2013, y el cobro en efectivo de dividendos por el saldo de títulos al 3 de ese mes, la cuenta de Helvetic Services Group quedó en cero.

---

policial que previno y transcribe fonéticamente en sus actas, informó Elaskar a viva voz que su letrado era "julio libarona", lo que parece aludir al apellido de los abogados Cuneo Libarona, cuyo estudio efectivamente intervino luego en la defensa de nuestro damnificado, como lo demuestra la constitución en tal calidad del Dr Mariano Cuneo Libarona –fojas 51/67 de las actuaciones complementarias -. Se trata ésta de una muestra más de la veracidad y espontaneidad de los testimonios de Federico Elaskar, grabados y filmados por los periodistas del programa Periodismo Para Todos.
[3] Nota y documentos remitidos el 29 de mayo de 2013, agregados a fojas 844/858 de las actuaciones complementarias remitidas al tribunal.



```
                    Listado de Saldos y Movimientos (con contraparte)                    Página:    1
                              Depósito Colectivo                         Emisión:  28/05/2013   06:00
CAJA DE                     Per?odo: 12/12/2012 a 27/05/2013
VALORES  Depositante: 695 - FINANCIAL NET SOCIEDAD DE BOLSA S.A.        Expediente:        0957
                                                                        Pedido:        35499/1
```

Comitentes solicitados: 1255
Especies solicitadas:   TODAS

| Descripción del movimiento | Contraparte | Fecha | Débitos | Créditos | Saldo |
|---|---|---|---|---|---|

Comitente 1255

Especie 5433 - B.GOB.NAC.7% U$S V.3/10/2015(BODEN 2015)

| | | | | | |
|---|---|---|---|---|---|
| Saldo inicial | | | | | 0,0000000 |
| TRANSFERENCIA RECEPTORA | 1305/ | 808347 18/12/2012 | | 5.575.000,0000000 | 5.575.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 999999 18/12/2012 | 3.000.000,0000000 | | 2.575.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 999999 18/12/2012 | 2.575.000,0000000 | | 0,0000000 |
| TRANSFERENCIA RECEPTORA | 1305/ | 808347 21/12/2012 | | 2.750.000,0000000 | 2.750.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 999999 27/12/2012 | 2.750.000,0000000 | | 0,0000000 |
| TRANSFERENCIA RECEPTORA | 1305/ | 808347 28/12/2012 | | 2.750.000,0000000 | 2.750.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 999999 28/12/2012 | 2.750.000,0000000 | | 0,0000000 |
| TRANSFERENCIA RECEPTORA | 1305/ | 808347 14/02/2013 | | 5.650.000,0000000 | 5.650.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 999999 14/02/2013 | 4.040.000,0000000 | | 1.610.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 999999 14/02/2013 | 1.000.000,0000000 | | 610.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 999999 14/02/2013 | 2.000,0000000 | | 608.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 999999 15/02/2013 | 608.000,0000000 | | 0,0000000 |
| TRANSFERENCIA RECEPTORA | 1305/ | 808347 26/03/2013 | | 5.570.000,0000000 | 5.570.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 999999 05/04/2013 | 1.350.000,0000000 | | 4.220.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 1001 08/04/2013 | 4.220.000,0000000 | | 0,0000000 |
| Saldo final | | | | | 0,0000000 |
| Variación total de la especie | | | 22.295.000,0000000 | 22.295.000,0000000 | 0,0000000 |

Especie 5435 - B.GOB.NAC.U$S 7% V.12/09/2013 BONAR VII

| | | | | | |
|---|---|---|---|---|---|
| Saldo inicial | | | | | 0,0000000 |
| TRANSFERENCIA RECEPTORA | 1305/ | 808347 19/12/2012 | | 2.685.000,0000000 | 2.685.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 999999 19/12/2012 | 2.685.000,0000000 | | 0,0000000 |
| TRANSFERENCIA RECEPTORA | 1305/ | 808347 26/12/2012 | | 2.500.000,0000000 | 2.500.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 1251 27/12/2012 | 1.000.000,0000000 | | 1.500.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 999999 27/12/2012 | 1.500.000,0000000 | | 0,0000000 |
| TRANSFERENCIA RECEPTORA | 1305/ | 808347 02/01/2013 | | 2.480.000,0000000 | 2.480.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 999999 02/01/2013 | 2.480.000,0000000 | | 0,0000000 |
| Saldo final | | | | | 0,0000000 |
| Variación total de la especie | | | 7.665.000,0000000 | 7.665.000,0000000 | 0,0000000 |

Especie 5436 - BONO NAC. ARG. U$S 7% V.2017(BONAR X)

| | | | | | |
|---|---|---|---|---|---|
| Saldo inicial | | | | | 0,0000000 |
| TRANSFERENCIA RECEPTORA | 1305/ | 808347 14/12/2012 | | 2.840.000,0000000 | 2.840.000,0000000 |
| TRANSFERENCIA EMISORA | 695/ | 951699 17/12/2012 | 2.840.000,0000000 | | 0,0000000 |
| Saldo final | | | | | 0,0000000 |
| Variación total de la especie | | | 2.840.000,0000000 | 2.840.000,0000000 | 0,0000000 |

Especie 10000 - DOLARES

| | | | | | |
|---|---|---|---|---|---|
| Saldo inicial | | | | | 0,0000000 |
| CR.P/DIVIDENDO (OE) | | 03/04/2013 | | 194.950,0000000 | 194.950,0000000 |
| DEBITO AUT.ACREENCIAS EFECTIVO 695/ | | 3 03/04/2013 | 194.950,0000000 | | 0,0000000 |
| Saldo final | | | | | 0,0000000 |
| Variación total de la especie | | | 194.950,0000000 | 194.950,0000000 | 0,0000000 |

Especie 44524 - B.GOB.NAC. 7 % U$S V.3/10/15(BODEN 2015)

| | | | | | |
|---|---|---|---|---|---|
| Saldo inicial | | | | | 0,0000000 |
| CREDITO EUROCLEAR/CEDEL | | 18/12/2012 | | 5.575.000,0000000 | 5.575.000,0000000 |
| DEBITO EUROCLEAR/CEDEL | | 18/12/2012 | 5.575.000,0000000 | | 0,0000000 |
| CREDITO EUROCLEAR/CEDEL | | 21/12/2012 | | 2.750.000,0000000 | 2.750.000,0000000 |
| DEBITO EUROCLEAR/CEDEL | | 21/12/2012 | 2.750.000,0000000 | | 0,0000000 |
| CREDITO EUROCLEAR/CEDEL | | 28/12/2012 | | 2.750.000,0000000 | 2.750.000,0000000 |
| DEBITO EUROCLEAR/CEDEL | | 28/12/2012 | 2.750.000,0000000 | | 0,0000000 |
| CREDITO EUROCLEAR/CEDEL | | 13/02/2013 | | 5.650.000,0000000 | 5.650.000,0000000 |
| DEBITO EUROCLEAR/CEDEL | | 14/02/2013 | 5.650.000,0000000 | | 0,0000000 |
| CREDITO EUROCLEAR/CEDEL | | 26/03/2013 | | 5.570.000,0000000 | 5.570.000,0000000 |
| DEBITO EUROCLEAR/CEDEL | | 26/03/2013 | 5.570.000,0000000 | | 0,0000000 |
| Saldo final | | | | | 0,0000000 |
| Variación total de la especie | | | 22.295.000,0000000 | 22.295.000,0000000 | 0,0000000 |

Especie 44565 - B.GOB.NAC. U$S 7% V.12/09/2013 BONAR VII

| | | | | | |
|---|---|---|---|---|---|
| Saldo inicial | | | | | 0,0000000 |
| CREDITO EUROCLEAR/CEDEL | | 19/12/2012 | | 2.685.000,0000000 | 2.685.000,0000000 |
| DEBITO EUROCLEAR/CEDEL | | 19/12/2012 | 2.685.000,0000000 | | 0,0000000 |

Ministerio Público Fiscal de la Nación.



No nos costó nada asociar esos 65.794.950 dólares con los ya míticos 50.000.000 de euros que se dicen introducidos por Lázaro Báez en SGI. Recurriendo entonces a uno de los sitios públicos con el servicio de conversión a valores actuales de la relación dólar y euro, obtuvimos el siguiente resultado:



Este cálculo de mera aproximación puede ser ajustado a la fecha de cada operación, pero no ha de variar substancialmente y nada ha de agregar a la evidencia de esta nueva correspondencia entre las pruebas recogidas y la denuncia pública que diera inicio a este tramo de nuestra investigación.

Pero el confronte con el resto de los elementos recogidos no se termina con el monto total involucrado. Entre otras comprobaciones que hemos de citar, los movimientos de valores y dineros coinciden con los datos del ingreso de Néstor Marcelo Ramos a la Argentina. Así, de acuerdo a los registros proporcionados por la dirección de migraciones[4], luego de su paso por nuestro país en exacta coincidencia con la cesión que debió hacer Elaskar de sus acciones el 21 de octubre de 2011, y de los viajes que guardan relación con los negocios del tiempo intermedio a los que nos hemos de referir más adelante[5], Ramos vuelve a aparecer procedente de Estados Unidos el 17 de diciembre de 2012, para esfumarse con posible destino a Uruguay -omitido por los registros de migraciones como había ocurrido entre abril y mayo del mismo año, ver anterior nota al pie- y regresar el 4 de enero de 2013 desde Uruguay, país al que vuelve el mismo día al cabo de apenas 6 horas en suelo argentino. Luego de esto, la omisión de registro corresponde a su entrada, porque la planilla de migraciones lo muestra en una nueva salida de regreso a Estados Unidos el pasado 7 de enero. Siempre en fiel correspondencia con los movimientos de títulos y, especialmente, con su liquidación y pago mediante los cheques librados por el agente de bolsa, como hemos de

---

[4] Fojas 3037/3060

[5] Elaskar parte el 23 de octubre de 2011, y Ramos al día siguiente con uno de sus usuales vuelos a Frankfurt. Luego de esto Ramos vuelve el 21 de abril de 2012, mediante el vuelo en sentido contrario desde Alemania; seguidamente, y al cabo de una de las fantasmales salidas que no quedan registradas, seguramente a Uruguay, figura su reingreso desde ese mismo país el 16 de mayo –vía aeroparque Jorge Newbery-, para partir hacia Alemania el 19 de mayo de 2013. Lo vemos regresar a estas pampas, esta vez desde Colombia, el 23 de agosto de 2012, para partir ese mismo día por Buquebus a Uruguay de donde vuelve en menos de 24 horas; cruzará nuevamente el charco el 27 de agosto y el 6 de septiembre, con estadías respectivas de 2 y 7 días en la república oriental para volar a Alemania en viaje de vuelta el 16 de septiembre de 2012.  Ahora bien, es justamente entre abril y mayo, por un lado, y entre agosto y septiembre del año pasado, por el otro, que *Martín Antonio Báez*, hijo de *Lázaro Báez*, realiza sus viajes a Suiza en compañía de *Daniel Rodolfo Pérez Gadín*, *Jorge Oscar Chueco* y, como hemos descubierto recientemente, del presidente de Austral Construcciones S.A *Julio Enrique Mendoza*. Más adelante hemos de ampliar al respecto, pero vale la pena señalar aquí que el primer viaje lo realizan Báez y Mendoza, vía Francia, entre el 5 y el 12 de mayo; es decir que coinciden con Ramos, quien parte cuatro días después para la Argentina. El segundo es realizado entre el 26 de mayo y el 5 de junio, vía España, cuando son esta vez Martín Antonio Báez, Pérez Gadín y Chueco los que parten bien juntitos (orden de migraciones 225, 226 y 227 del vuelo 1132 de Aerolíneas Argentinas) camino a Suiza una semana después de regresado Ramos a Europa. El tercer viaje de Báez al viejo continente en 2012, -esta vez junto a Pérez Gadín y Mendoza y nuevamente vía Francia-, transcurre entre el 23 de septiembre y el 10 de octubre, es decir que se inicia nuevamente a una semana del regreso de Ramos a la sede de sus negocios –el 16 de septiembre de 2012- y al cabo de dos extensas giras paralelas por distintos puntos de América del Sur (Ramos llega desde Colombia y visita tres veces Uruguay, mientras que Báez, prácticamente en las mismas fechas, viaja a Chile entre el 11 y el 30 de julio y a Panamá el 5 de agosto, con regreso desde Paraguay el 8. Finalmente, vuela a Paraguay el 28 de agosto –un día después de la segunda visita de Ramos a Uruguay- para volver el 31 de agosto y partir con destino a Bolivia el 1ro de septiembre. De allí volvería a la Argentina el 5 de septiembre de 2012, un día antes de la tercera y última visita de Ramos a Uruguay. Luego de esto, como dijimos antes, parte Ramos para Europa el 16 de septiembre y lo siguen sentados juntos en el mismo avión, una semana después, Báez, Pérez Gadín y Mendoza.

Ministerio Público Fiscal de la Nación.

ver luego en detalle, Ramos vuelve a la Argentina, procedente de Italia, el 21 de marzo, permaneciendo por estos lares, con las usuales visitas a Uruguay –el 21 y 31 de marzo-, hasta el 7 de abril de 2013, en preciso correlato con las últimas operaciones de venta o liquidación de los bonos. Desde entonces, y han pasado ya más de dos meses, no ha vuelto a la Argentina.

| APELLIDO Y NOMBRE | SALIDA O ENTRADA | FECHA CRUCE | HORA CRUCE | PROC./DEST | PASO CRUCE | EMPRESA | VEHICULO |
|---|---|---|---|---|---|---|---|
| RAMOS NESTOR MARCELO | ENTRADA | 17/12/2012 | 12:12:00 p.m. | ESTADOS UNIDOS | AERO EZEIZA | AMERICAN AIRLINES | AA-953 |
| RAMOS NESTOR MARCELO | ENTRADA | 04/01/2013 | 06:23:00 p.m. | URUGUAY | GUALEGUAYCHU- FRAY BENTOS | PARTICULAR | KMA1609 |
| RAMOS NESTOR MARCELO | SALIDA | 04/01/2013 | 11:12:00 p.m. | URUGUAY | GUALEGUAYCHU- FRAY BENTOS | PARTICULAR | KMA1609 |
| RAMOS NESTOR MARCELO | SALIDA | 07/01/2013 | 09:55:00 p.m. | ESTADOS UNIDOS | AERO EZEIZA | AMERICAN AIRLINES | AA-908 |
| RAMOS NESTOR MARCELO | ENTRADA | 21/03/2013 | 09:01:00 a.m. | ITALIA | AERO EZEIZA | ALITALIA | AZ-680 |
| RAMOS NESTOR MARCELO | SALIDA | 21/03/2013 | 11:32:00 a.m. | URUGUAY | BUQUEBUS | BUQUEBUS CIP-BELT SA | 67290-BLT- ATLANTIC IIII |
| RAMOS NESTOR MARCELO | ENTRADA | 25/03/2013 | 03:29:00 p.m. | URUGUAY | GUALEGUAYCHU- FRAY BENTOS | PARTICULAR | LAL5225 |
| RAMOS NESTOR MARCELO | SALIDA | 31/03/2013 | 03:55:00 a.m. | URUGUAY | GUALEGUAYCHU- FRAY BENTOS | PARTICULAR | LAL5225 |
| RAMOS NESTOR MARCELO | ENTRADA | 03/04/2013 | 09:57:00 a.m. | URUGUAY | AERO JORGE NEWBERY | AUSTRAL LINEAS AEREAS | AU-2215 |
| RAMOS NESTOR MARCELO | SALIDA | 07/04/2013 | 12:32:00 p.m. | ITALIA | AERO EZEIZA | ALITALIA | AZ-681 |

Por otra parte, todas estas frenéticas operaciones por el total de los dineros que estábamos rastreando, a su vez se corresponden y comparten epílogo temporal con la producción y la emisión de "Periodismo para todos" del pasado 14 de abril. Apenas una semana antes, los involucrados terminaron de lavar el dinero, colocándolo fuera del inoportuno conocimiento que tenía, hasta entonces, Federico Elaskar. Perseguían de esta manera su impunidad y el entorpecimiento de las investigaciones judiciales que pudieran haberse iniciado luego de la denuncia pública, por entonces prácticamente irreversible.

Paradójicamente, consiguieron facilitarnos el trabajo. Lograda la llave –oculta tras personas de paja y cesiones clandestinas- de la intervención de Helvetic Services Group y del ubicuo Néstor Marcelo Ramos, no hemos necesitado completar los datos de todo el entramado intermedio de cuentas y sociedades abiertas y montadas desde SGI –como el medio centenar de firmas en Panamá y Belice- sino que fue suficiente con conocer la identidad de los destinatarios finales de las acciones de SGI y del consecuente manejo de los fondos en ella negociados. Tampoco ha sido necesario rastrear los movimientos de fondos del igualmente vasto abanico de sociedades abiertas por los responsables de Helvetic Services Group para servir de recipiente de los fondos recuperados y emprolijados para Lázaro Báez y Compañía. Han sido los propios imputados, *seguramente en obediencia a una orden apremiante para repatriar los fondos y evitar las inoportunas denuncias de Elaskar*, quienes nos proporcionaron las pistas y las pruebas de lo que hicieron con el dinero, al menos hasta hace un par de meses.

Como lo hemos dicho antes, una vez regresado Elaskar de su exilio, entre los meses de noviembre y diciembre de 2012 todo parece acelerarse. La información remitida por el agente de bolsa Financial Net S.A pone en evidencia que la negociación de bonos no tuvo otra razón de ser que borrar los rastros de las operaciones realizadas con intervención

de Federico Elaskar, asegurar el dinero y ocultar la responsabilidad de Lázaro Báez y sus cómplices en la extorsión y el manejo ilegal de activos. En definitiva, la solicitud de apertura o de registro de la cuenta comitente 1255 a nombre de "Helvetic Services Group S.A" fue presentada el 10 de diciembre de 2012 con firmas de Néstor Marcelo Ramos y Jorge Oscar Chueco como "titulares o representantes legales", mientras que data del 4 de diciembre una amplia autorización de la sociedad suiza a favor de Chueco para manejar la cuenta[6]. Aquí pueden señalarse las primeras de una larga serie de notas irregulares, que subrayan el apuro de los involucrados –y la complicidad de quienes los auxilian-. En primer lugar, porque al 10 de diciembre del año pasado, Néstor Marcelo Ramos no estaba en la Argentina; hemos visto que se había ido en vuelo a Alemania el 16 de septiembre y que recién volvería el 17 de diciembre. En segundo lugar, porque aún no había sido otorgado el poder a Chueco, lo que recién ocurre por escritura   –"acta notarial de la Confederación Suiza. República y Cantón de Ticino"- del 12 de diciembre, documento éste que, independientemente de su singularidad[7] y de acuerdo a la fecha de las certificaciones consulares con las que fue acompañado, recién habría podido ser presentado en la Argentina a principios de enero de 2013. Es muy probable que sea ésa la razón por la cual los primeros cinco cheques extendidos por Financialnet Sociedad de Bolsa a favor de Helvetic Services Group S.A por la liquidación de los bonos -es decir hasta el librado el 28 de diciembre de 2012 y cobrado el 2 de enero de 2013-, fueron entregados bajo recibo firmado tanto por Jorge Oscar Chueco como por Néstor Marcelo Ramos. También destaca, por contraste, la extraña aceptación que en los bancos tuvieron los endosos de depósito de los nueve cheques, firmados sólo por Chueco.

Para ilustrar lo dicho hasta aquí, insertamos un cuadro en el que la información del estado de la cuenta de Helvetic Services Group, remitida por la Caja de Valores, ha sido sistematizada y ordenada cronológicamente, con lo que puede advertirse que la secuencia de depósitos y posteriores débitos se encuentra conformada por 9 eslabones de créditos sucesivos, donde se hace evidente el inteligente fraccionamiento

---

[6] Del día siguiente, 5 de diciembre de 2012, datan las consultas que la sociedad de bolsa realiza sobre las finanzas y desempeño comercial de Jorge Chueco. Asimismo, el 3 de diciembre de 2012 se encuentra fechada la certificación de la última parte de la documentación de Helvetic Services Group remitida por el agente de bolsa, de la que forman parte copias de los estatutos sociales que llevan sello del registro de comercio del Cantón Ticino y, en lo que constituye el extremo temporal remoto de esta súbita repatriación de los fondos, *se encuentran fechados el 22 de octubre de 2012, el día siguiente del regreso de Federico Elaskar a la Argentina*. Esto confirma, una vez más, que los imputados comenzaron a gestar las operaciones que estamos explicando, inmediatamente después del amenazante regreso de la víctima de su extorsión (ver nota y documentación adjunta  de Financialnet S.A del 4 de junio de 2013).

[7] Todos los poderes que hemos visto otorgados por Helvetic Services Group de acuerdo a las leyes Suizas, como es el caso de los incorporados a la causa y extendidos a favor de Claudio Giovanni Fontana, del propio Néstor Marcelo Ramos, o bien de Horacio De Bonis o Javier Martín Vanella -copia de los cuales obran también en la documentación remitida por Financialnet-, son extendidos siempre con intervención de la asamblea de socios. En el caso del poder especial a Chueco, es el propio Ramos en su calidad de "miembro del directorio" el que lo otorga. La escritura del poder presenta certificaciones del 2 de enero de 2013 y la documentación complementaria, como estados contables y balances exhiben apostillas –Convención de la Haya- del 4 de marzo y certificación de notario argentino del 21 de marzo de 2013; del 26 de marzo data la declaración jurada de Jorge Chueco sobre la condición –no verificada en su caso- de "persona expuesta políticamente"

Ministerio Público Fiscal de la Nación.


–incluyendo la negociación alternada de tres tipos de bonos distintos- de lo que no constituye sino una sola operación de liquidación de títulos y consecuente blanqueo de activos. Hemos insertado también el dato de los nueve cheques librados por el agente de bolsa en pago de las liquidaciones a favor de Helvetic Services Group.

| | | | | | |
|---|---|---|---|---|---|
| **1er credito** | | 14/12/2012 | | ESPECIE 5436/Bonar X | **2.840.000,00 USD** | Cuenta 695/1255 Helvetic en Financial Net (Vía Euroclear Suiza) |
| DEBITO 1.1 | | 17/12/2012 | | ESPECIE 5436/Bonar X | 2.840.000,00 USD | Cuenta 695/999999, interna de liquidación de Financial Net. |
| 1er cheque | HSBC | 17/12/2012 | | | 15.502.821,60 $ | |
| **2do credito** | | 18/12/2012 | | ESPECIE 5433/Boden 2015 | **5.575.000,00 USD** | Cuenta 695/1255 Helvetic en Financial Net (Vía Euroclear Suiza) |
| DEBITO 2.1 | | 18/12/2012 | | ESPECIE 5433/Boden 2015 | 3.000.000,00 USD | Cuenta 695/999999, interna de liquidación de Financial Net. |
| DEBITO 2.2 | | 18/12/2012 | | ESPECIE 5433/Boden 2015 | 2.575.000,00 USD | Cuenta 695/999999, interna de liquidación de Financial Net. |
| 2do cheque | HSBC | 19/12/2012 | | | 33.024.516 $ | |
| **3er credito** | | 19/12/2012 | | ESPECIE 5435/Bonar VII | **2.685.000,00 USD** | Cuenta 695/1255 Helvetic en Financial Net (Vía Euroclear Suiza) |
| DEBITO 3.1 | | 19/12/2012 | | ESPECIE 5435/Bonar VII | 2.685.000,00 USD | Cuenta 695/999999, interna de liquidación de Financial Net. |
| 3er cheque | HSBC | 19/12/2012 | | | 17.721.483,3 $ | |
| **4to credito** | | 21/12/2012 | | ESPECIE 5433/Boden 2015 | **2.750.000,00 USD** | Cuenta 695/1255 Helvetic en Financial Net (Vía Euroclear Suiza) |
| **5to credito** | | 26/12/2012 | | ESPECIE 5435/Bonar VII | **2.500.000,00 USD** | Cuenta 695/1255 Helvetic en Financial Net (Vía Euroclear Suiza) |
| DEBITO 4.1 | | 27/12/2012 | | ESPECIE 5433/Boden 2015 | 2.750.000,00 USD | Cuenta 695/999999, interna de liquidación de Financial Net. |
| DEBITO 4.2 | | 27/12/2012 | | ESPECIE 5435/Bonar VII | 1.000.000,00 USD | Cuenta 695/1251 "Porcaro, Roberto y/o Pat. Sirvente DUS.524.549" |
| DEBITO 4.3 | | 27/12/2012 | | ESPECIE 5435/Bonar VII | 1.500.000,00 USD | Cuenta 695/999999, interna de liquidación de Financial Net. |
| **6to credito** | | 28/12/2012 | | ESPECIE 5433/Boden 2015 | **2.750.000,00 USD** | Cuenta 695/1255 Helvetic en Financial Net (Vía Euroclear Suiza) |
| DEBITO 4.4 | | 28/12/2012 | | ESPECIE 5433/Boden 2015 | 2.750.000,00 USD | Cuenta 695/999999, interna de liquidación de Financial Net. |
| 4to cheque | HSBC | | | | 49.143.420 $ | |
| **7mo credito** | | 02/01/2013 | | ESPECIE 5435/Bonar VII | **2.480.000,00 USD** | Cuenta Helvetic en Financial Net (Vía Euroclear Suiza) |
| DEBITO 5.1 | | 02/01/2013 | | ESPECIE 5435/Bonar VII | 2.480.000,00 USD | Cuenta 695/999999, interna de liquidación de Financial Net. |
| 5to cheque | HSBC | | | | 16.301.337,6 $ | |
| **8vo crédito** | | 13/02/2013 | | ESPECIE 5433/Boden 2015 | **5.650.000,00 USD** | Cuenta 695/1255 Helvetic en Financial Net (Vía Euroclear Suiza) |
| DEBITO 6.1 | | 14/02/2013 | | ESPECIE 5433/Boden 2015 | 4.040.000,00 USD | Cuenta 695/999999, interna de liquidación de Financial Net. |
| DEBITO 6.2 | | 14/02/2013 | | ESPECIE 5433/Boden 2015 | 1.000.000,00 USD | Cuenta 695/999999, interna de liquidación de Financial Net. |
| DEBITO 6.3 | | 14/02/2013 | | ESPECIE 5433/Boden 2015 | 2.000.000,00 USD | Cuenta 695/999999, interna de liquidación de Financial Net. |
| DEBITO 6.4 | | 15/02/2013 | | ESPECIE 5433/Boden 2015 | 608.000,00 USD | Cuenta 695/999999, interna de liquidación de Financial Net. |
| 6to cheque | MACRO | | | | 33.752.365,06 $ | |
| 7mo cheque | MACRO | | | | 4.070.642,69 $ | |
| **9no credito** | | 26/03/2013 | | ESPECIE 5433/Boden 2015 | **5.570.000,00 USD** | Cuenta 695/1255 Helvetic en Financial Net (Vía Euroclear Suiza) |
| DEBITO 7.1 | | 05/04/2013 | | ESPECIE 5433/Boden 2015 | 1.350.000,00 USD | Cuenta 695/999999, interna de liquidación de Financial Net. |
| DEBITO 7.2 | | 08/04/2013 | | ESPECIE 5433/Boden 2015 | 4.220.000,00 USD | Cuenta 695/1001 interna Financial Net. |
| 8vo cheque | MACRO | | | | 9.405.072 $ | |
| 9no cheque | MACRO | | | | 29.918.618,4 $ | |

Hasta aquí hemos hecho una sumaria recapitulación y adelantamos el descubrimiento del ingreso al país de dineros y valores que se acercarían al monto total involucrado en las confesiones de Federico Elaskar. Es ahora momento de revelar, habiendo completado el siguiente tramo de investigaciones, que *el producido de la liquidación de los bonos introducidos al mercado local por Helvetic Services Group, entre diciembre de 2012 y abril de 2013, fue depositado en la cuenta del Banco Nación, sucursal Plaza de Mayo, de Austral Construcciones S.A*. Se trata, como hemos dicho, de nueve cheques por un total de 208.840.276,65 pesos librados por Financial Net Sociedad de Bolsa en beneficio de Helvetic Services Group S.A, cinco contra su cuenta corriente en el banco HSBC, número 3003-40629-

5, y cuatro contra la del banco Macro, número 3-302-0940971784-1. Los nueve cheques fueron endosados por el abogado Jorge Chueco en representación de la sociedad Suiza y depositados por Austral Construcciones en el Banco Nación[8].

A continuación los reproduzco en el orden en el que fueron librados y depositados.

**1er cheque**.



**2do cheque.**



---

[8] Notas y documentación remitidas por el Banco Macro y el Banco HSBC del 6 y 7 de junio de 2013.

Ministerio Público Fiscal de la Nación.

**3er cheque.**



**4to cheque.**



5to cheque.



6to cheque.



Ministerio Público Fiscal de la Nación.

**7mo cheque.**



**8vo cheque.**



**9no cheque.**





Según puede leerse en los endosos, si bien los nueve cheques fueron depositados por Austral Construcciones -representada por sus apoderados Claudio Bustos y Eduardo C. Larrea- en el Banco Nación, sólo en los documentos librados en la cuenta de Financial Net del HSBC se consigna el número de cuenta corriente número 3003-40629-5. Hasta la fecha el Banco Nación no ha aportado la información complementaria[9].

Como lo hemos dicho más arriba, la secuencia que parece compleja en el resumen de la Caja de Valores, se aclara si establecemos un orden cronológico en lugar de la contabilidad individual según el título o "especie", de acuerdo a la terminología bursátil. Se trata en este caso de tres tipos de bonos (BODEN 2015, BONAR X y BONAR VII), con los que se realizan nueve operaciones o secuencias que se inician con uno o más créditos y concluyen con la liquidación en plaza local –mercado de valores de Rosario- y el pago que el agente de bolsa realiza a Helvetic Services Group S.A a través de uno o más cheques. Estos últimos también son nueve, aunque no necesariamente se libra un cheque por la liquidación de cada remesa de títulos porque, como veremos, en ocasiones se paga con más de un cheque la liquidación final de un solo crédito de bonos. O bien, a la inversa, varios créditos o depósitos de títulos se pagan con un solo cheque. Acompañamos como Anexo I de este dictamen una versión ampliada del registro arriba insertado de los créditos y débitos de

---

[9] Requerida el 11 de junio y reclamada en varias oportunidades por conducto telefónico.

Ministerio Público Fiscal de la Nación.

títulos y su contrapartida en la liquidación y el libramiento de los cheques; hemos agregado también la información sobre la intervención y los pagos de las 3 supuestas contrapartes, individualizadas por Financial Net S.A como *Global Equity Sociedad de Bolsa S.A*, *Mariva Bursátil Sociedad de Bolsa S.A* y *Facimex Bursatil Sociedad de Bolsa S.A*[10]. Respectivamente, las tres habrían librado a favor de Financial Net S.A cheques por 31.630.516, 40.604.900 y 153.173.727 pesos, lo que implica una diferencia por sobre el monto bruto informado por Financial Net S.A de 13.173.090 pesos. Sobre esta discordancia hemos de volver al analizar las notas propias de la simulación que sospechamos subyace a estas operaciones de compra de títulos.

|  | Pagos contras partes | bruto según Financial Net | Diferencia |
|---|---|---|---|
| Mariva | 15.754.900 | 15.754.900 | |
| Mariva | 18.060.000 | 18.060.000 | |
| Facimex | 15.501.500 | 15.501.500 | |
| Facimex | 18.009.637,50 | 18.009.637,50 | |
| Facimex | 23.082.840 | 16.582.500 | |
| Facimex | 16.632.750 | 6.700.000 | |
| Facimex | 16.610.000 | 16.610.000 | |
| Mariva | 6.790.000 | 10.050.000 | |
| Facimex | 16.566.400 | 16.566.400 | |
| Global Equity | 4.136.832 | 4.136.832 | |
| Global Equity | 27.493.684 | 27.493.684 | |
| Facimex | 6.807.500 | 6.807.500 | |
| Facimex | 9.558.000 | 9.558.000 | |
| Facimex | 30.405.100 | 30.405.100 | |
| | 225.409.144 | 212.236.054 | 13.173.090 |

Ahora bien, tal como lo hemos averiguado por intermedio de la Caja de Valores[11], *en el extremo temporal más remoto encontramos un único origen para la totalidad de estos títulos cuya liquidación fue a parar a las cuentas de Austral Construcciones S.A.* Se trata de operaciones iniciadas con la transferencia a la cuenta de Helvetic Services Group S.A (en su rol de comitente número 1255 del depositante número 695, Financial Net) de títulos provenientes del extranjero. Esto es realizado, como puede verse en la planilla insertada al inicio, a través del sistema de caja compensadora Euroclear, que utiliza en la Argentina una cuenta administrada por el Citibank, tal como lo explicamos en la nota al pie. Esto nos ha permitido conocer el origen y la identidad del depositante de

---

[10] Según la citada información de Financial Net S.A, Global Equity Sociedad de Bolsa S.A compra para su comitente número 2601; Mariva Bursátil Sociedad de Bolsa S.A para su comitente número 2164 y Facimex Bursatil Sociedad de Bolsa S.A para su comitente 2577. Se encuentra pendiente la información complementaria de la Caja de Valores, reclamada mediante nota del 6 de junio pasado.

[11] Información complementaria pendiente sobre la cuenta depositante en el sistema Euroclear (ésta es la que se encuentra a nombre J.SAFRA BANK de Ginebra, Suiza, aunque se desconoce el comitente, supuestamente Helvetic Services Group S.A) que es extremo en el extranjero de la cuenta que figura en la planilla insertada al inicio como depositante 1305, comitente 808347, que en la nota del 3 de junio de la Caja de Valores *-tal como lo habíamos deducido y explicado en los informes de fojas 990/991 y 1011 de las actuaciones complementarias, donde incluso consignamos y documentamos datos de sumarios iniciados por la Comisión Nacional de Valores por irregularidades en este tipo de operaciones que involucraban el uso de esa cuenta y la intervención de varios agentes de bolsa, entre ellos Global Equity S.A-*, es individualizada como "Citibank N.A Cuenta N2/Euroclearbank" y es utilizada por la citada entidad bancaria como agente local de la caja compensadora Euroclear.

los bonos, es decir de la entidad que operó a través de Euroclear para transferir los bonos a Helvetic Services Group en la Argentina, aunque el sistema de depósito global de títulos y valores que rige en Europa impide conocer, desde nuestro país, la identidad del cliente o comitente.

De todas formas, este dato preliminar, que podrá ser profundizado por los jueces argentinos por el camino del exhorto, es bastante elocuente. Porque *el depositante en todos los casos fue el J. SAFRA BANK de Ginebra, Suiza*; he aquí sus datos en uno de los sitios oficiales.



El banco se encuentra, entonces, en la misma jurisdicción donde ha sido constituida legalmente Helvetic Services Group S.A. No será difícil, sin perjuicio de la apuntada vía del exhorto, que el fiscal contactado por la Diputada Graciela Ocaña[12] complete la indagación sobre lo que queda del extremo suizo del asunto. Pero puede adivinarse que los bonos provienen de una o más cuentas de aquella sociedad, de alguna de sus controladas, o de las que administra bajo la atenta mirada de sus ocultos accionistas argentinos. Por lo demás, hemos visto que con el objetivo de esta repatriación o blanqueo final de los fondos, en diciembre de 2012 el abogado Jorge Oscar Chueco fue designado apoderado de Helvetic Services Group S.A. Este apunte refuerza los indicios ya existentes en la causa en torno a la responsabilidad en los hechos, a la par de Ramos, de los otros dos accionistas y directivos de la sociedad, todos ellos como partícipes necesarios en la extorsión investigada. Me refiero a *Úrsula Verena Fontana* y *Claudio Giovanni Fontana*[13]. Esto lo

---

[12] Así lo hizo saber en las diversas denuncias que hemos agregado al sumario y en su presentación formal del 3 de mayo pasado en la causa solicitando datos de las sociedades involucradas.

[13] Se hallan incorporadas a la causa varias copias de los estatutos y del contrato social de Helvetic Services Group S.A, así como de otros documentos societarios como ser estados contables, balances, poderes y actas de

Ministerio Público Fiscal de la Nación.

sostenemos no solo a partir de su efectiva y positiva intervención en las actas de directorio y asamblea de accionistas agregadas a la causa, sino también por el evidente consenso y aceptación que ha existido en estas caras visibles de Helvetic Services Group S.A frente a las actividades desplegadas en su nombre, aunque por lo general se vea aparecer como ejecutor a Néstor Marcelo Ramos. Este indicio supone otro conexo, me refiero al necesario conocimiento de la ilegal maquinaria desplegada para ocultar y lavar fondos provenientes de las actividades de Lázaro Báez, su grupo y sus socios, así como de la violencia desplegada cuando ello les resultó conveniente, como es el caso del despojo sufrido por Federico Elaskar, o los apremios análogos con los que mortificaron a Alejandro Maximiliano Acosta[14].

Es por ello que he de requerir en este dictamen, además de una serie de medidas complementarias, la declaración indagatoria de Verena Fontana y de Claudio Giovanni Fontana. Dicho esto, aprovecho la referencia a los nutridos antecedentes aportados por Helvetic Services Group para abrir la cuenta bursátil utilizada en este nuevo enjuague de los dineros de Báez y compañía, para subrayar la información obrante en los balances y el resto de los estados de cuenta que se han ido agregando a la causa. Allí surgen, además de la confirmación de varios de los negocios detectados en la Argentina por parte de las compañías formadas en el extranjero[15], la declaración de que la mayoría de sus activos fuera

---

asamblea de socios y de directorio; constancias remitidas a requerimiento de este Ministerio Público por la firma Continental Urbana S.A, su Presidente Isaac Kipersmidt y las sociedades de Bolsa Amirante Galitis S.A y Financial Net S.A.



De todos estos antecedentes, especialmente de la última versión de la minuta de la sociedad arriba insertada, se deriva el rol de accionistas de Ramos y los dos Fontana al inicio de la historia de la sociedad, manteniendo luego sólo por Néstor Marcelo Ramos y Verena Fontana, al tiempo que Claudio Giovanni Fontana se ha venido desempeñando siempre en algún cargo directivo, haciéndolo como presidente al menos al 22 de octubre de 2012.

[14] Hecho este por el que hemos impulsado la acción penal y requerido declaraciones indagatorias mediante dictamen del 13 de junio pasado.

[15] Como los negocios de las sociedades Vansomatic Suisse S.A, Swisswer AG, Wodson International S.A, Continental Urbana S.A –aunque omita el uso como vehículo de Houston Managmente LTD, una de las 150 sociedades de Nevada-, Empros Inversiones S.A, Lavalle y Agüero S.A –integrada, según lo consignamos en el informe de fojas 1011 de las actuaciones complementarias, por Jorge Antonio Galitis uno de los socios de la bursátil Amirante Galitis S.A- incluso de su participación reconocida en el estudio J.P Damiani  & Asociados de Montevideo, Uruguay.

de nuestro país *estaban radicados o consistían en participaciones en sociedades o instituciones financieras privadas en Panamá*[16].

Se trata este dato de una confirmación más de la versión confesada por Elaskar ante las cámaras y grabadores del periodista Jorge Lanata y sus colaboradores. La propia Helvetic Services Group S.A o, lo que es lo mismo, Lázaro Báez y sus socios, nos han facilitado con su propio reconocimiento la búsqueda y trabajosa prueba de la apertura y administración desde Suiza de las sociedades armadas en Panamá y otros paraísos fiscales, a las que había aludido Elaskar. Claro que, como lo hemos señalado como asunto central de este dictamen, también se han ocupado de facilitar la prueba del retorno o el lavado final de esos dineros.

De regreso a la explicación de la secuencia de transferencia y liquidación de títulos, los bonos provienen entonces de una o varias cuentas del Banco J. SAFRA de Ginebra, Suiza. Este movimiento provoca en los asientos de la Caja de Valores, dos series diferenciadas, una consiste en el estado de cuenta Euroclear o del reflejo de la caja compensadora europea en su par de la Argentina (última serie de las planillas de la Caja de Valores, donde los bonos son señalados como especies 44524, 44565 y 44586), aunque este "crédito euroclear" se trate, en definitiva, del primer movimiento registrado en nuestro país, como puede verse en la versión completa volcada en el anexo I de este dictamen. *De ahí que no sea difícil advertir que la suma total señalada de 65.794.950 dólares, se encuentra compuesta por dos contabilidades gemelas*[17] *que suman un total cada una de 32.800.000 dólares*[18] en valor nominal de los títulos. Las primeras tres series de las planillas entonces, reflejan los créditos y débitos a medida que se van depositando y liquidando los bonos que recibe, por cuenta de Helvetic Services Group, el agente de bolsa Financial Net.

Al requerir a la Caja de Valores la información relativa a las cuentas comitentes allí consignadas, informó que la que aparece en los renglones de créditos se trata siempre de la cuenta Euroclear en la que fugazmente participa Helvetic Services Group, mientras que en los renglones de los débitos se consignan tres cuentas pertenecientes al propio Agente de Bolsa números 695/999999, 695/1001 y 695/3[19]. De esta manera se reflejaría el manejo de los títulos por Financial Net hasta el momento en el que los negocia en el Mercado de Valores de Rosario inmediatamente después de cada crédito. Hemos de profundizar en otra

---

[16] En el año 2005 se daba cuenta de activos por 23.833.560,69, que en los estados contables a 31 de diciembre de 2011 y 2012 se citan, respectivamente, como inversiones financieras ("investimenti Finanziari") por 107.871.888,77 y 135.019.475,71 francos suizos. Ver documentación aportada por Financialnet S.A y, anteriormente por Continental Urbana S.A y la bursátil Amirante Galitis S.A, comentada y citada en el dictamen del pasado 22 de mayo.

[17] Debe restarse a la suma total, la parte que corresponde a los 194.950 dólares pagados el 3 de abril de 2013 en concepto de dividendos.

[18] 22.295.000 dólares de Boden 2015 –especie 5433 o, en euroclear, especie 44524-, 7.665.000 dólares de Bonar VII –especie 5435 o, en euroclear, especie 44565- y 2.840.000 de Bonar X –especie 5436 o, en euroclear, 44586-.

[19] Nota de la Caja de Valores del 3 de junio de 2013.

Ministerio Público Fiscal de la Nación.

oportunidad este extremo del asunto, a cuyo respecto resta el envío de información complementaria por parte de la Caja de Valores[20].

Pero puede decirse ahora que *existe un sólo caso en el que la cuenta comitente que aparece en los débitos no se trata de alguna de las tres atribuidas al manejo interno de Financial Net. Me refiero a la cuenta comitente número 695/1251 que pertenece, según lo ha informado la Caja de Valores, a Roberto Porcaro y a su esposa Patricia Sirvente[21]. Allí se transfieren el 27 de diciembre del año pasado 1.000.000 de dólares en BONAR VII.*



En el informe que adjunto, la Secretaría de Investigaciones Penales ha recogido diversos datos y referencias vinculadas a Roberto Porcaro, en su gran mayoría relacionadas con filiaciones y actuación partidaria sobre lo que no cabe aquí realizar ninguna consideración. Destaco en cambio, en razón de su correspondencia temporal con la transferencia en cuestión y las indagaciones que en torno al nombrado habrán seguramente de promoverse en el marco de la investigación en trámite ante la justicia federal, las noticias que dan cuenta de una supuesta compra a principios de 2013 de una propiedad en la localidad de Necochea, Provincia de Buenos Aires por un valor allí señalado de 600.000 dólares.

Esta transferencia sólo informada por la Caja de valores y ausente en la documentación y los antecedentes remitidos por el agente de bolsa, donde el mismo débito de 1.000.000 de dólares del 27 de diciembre de 2012 se atribuye a otros compradores[22], es una evidencia más del carácter simulado que domina las nueve series de operaciones y la intervención misma de Financial Net en el asunto. Lo mismo puede afirmarse de la participación de sus tres supuestas contrapartes, es decir aquellas que la propia bursátil ha señalado como compradoras de los bonos de Helvetic Services Group S.A, me refiero a Global Equity Sociedad de Bolsa S.A, Mariva Bursátil Sociedad de Bolsa S.A y, en mayor medida ya

---

[20] Ver nota al pie número 10

[21] Ver gráfico insertado en la página 9 de este dictamen e información de la Caja de Valores en nota del 3 de junio de 2013. El DNI consignado en la información de la Caja de valores, numero 5.524.549, pertenece efectivamente a **Roberto Florentino Porcaro**, cuyos demás datos y averiguaciones preliminares han sido consignadas en el informe número 21 de la S.I.P.E, que se adjunta con este requerimiento, y sobre alguna de cuyas noticias he de volver más adelante.

[22] Como puede verse en el detalle de la planilla que se compaña como Anexo I, el débito en cuestión aparece cubierto por duplicado, en una nueva irregularidad e indicio de simulación, por las contrapartes Mariva Bursatil y Facimex, sin ninguna referencia a Porcaro y a la cuenta delatada sólo en los resúmenes de la Caja de Valores.

que se le atribuye el pago de 153.173.727 sobre un total en bruto de 225.409.144 pesos[23], la sociedad Facimex Bursátil S.A.

Sobre la primera, puede decirse que la relación o cercanía que hemos detectado por ahora con Financial Net es física, porque se trata de una sociedad instalada en el piso de arriba del edificio de la calle Reconquista 144. Allí se encuentran ambas entidades radicadas aunque esta operación se haya concretado, llamativamente, en el mercado de valores de Rosario. Similar es el caso de Facimex Bursátil S.A, sobre la que hemos consignado ya informes sobre su posible pertenencia o adquisición, al igual que Global Equity, a grupos económicos señalados en diversas publicaciones como afines a Lázaro Báez y sus socios, como los del titular del Banco Macro, Jorge Brito y el empresario Cristóbal López[24]. A los indicios de simulación puede agregarse el preciso fraccionamiento de la operación, con una artística alternancia de títulos que se inicia con una partida de Bonar X y luego se intercalan siete veces las de los Boden 2015 y los Bonar VII, siempre en montos totales que no alcanzan nunca los seis millones de dólares y, por lo general, se limitan a poco menos de tres millones. Estos indicios son señalados como pautas generales por las normas que rigen la actuación de la U.I.F[25] (Unidad de Información Financiera) cuya intervención en este asunto, al igual que

---

[23] Ver gráfico insertado en la página 15 de este dictamen y en la parte final de la planilla que se acompaña como Anexo I.

[24] Ver informe de fojas 990/991 de las actuaciones complementarias.

[25] Resolución 121/2011 de la Unidad de Información Financiera (reglamentaria de la Ley Nº 25.246, modificada por las Leyes Nº 26.087, Nº 26.119, Nº 26.268 y Nº 26.683 y del Decreto Nº 290/07 y sus modificaciones y complementaria de la Resolución UIF Nº 37/2011):

*"Art. 29. — Reporte de Operaciones Sospechosas. Los Sujetos Obligados deberán reportar a la UNIDAD DE INFORMACION FINANCIERA, conforme lo establecido en los artículos 20 bis, 21 inciso b) y 21 bis de la Ley Nº 25.246 y modificatorias, aquellas operaciones inusuales que, de acuerdo a la idoneidad exigible en función de la actividad que realizan y el análisis efectuado, consideren sospechosas de Lavado de Activos o Financiación del Terrorismo.*

***Deberán ser especialmente valoradas, las siguientes circunstancias*** *que se describen a mero título enunciativo):*

*a) Los montos, tipos, frecuencia y naturaleza de las operaciones que realicen los clientes que no guarden relación con los antecedentes y la actividad económica de ellos.*

*b) **Los montos inusualmente elevados**, la complejidad y las modalidades no habituales de las operaciones que realicen los clientes.*

*c) Cuando transacciones de similar naturaleza, cuantía, modalidad o simultaneidad, **hagan presumir que se trata de una operación fraccionada a los efectos de evitar la aplicación de los procedimientos de detección y/o reporte de las operaciones**.*

*d) Ganancias o pérdidas continúas en operaciones realizadas repetidamente entre las mismas partes.*

*e) Cuando los clientes se nieguen a proporcionar datos o documentos requeridos por las entidades o bien cuando se detecte que la información suministrada por los mismos se encuentre alterada.*

*f) **Cuando el cliente no da cumplimiento a la presente Resolución** u otras normas de aplicación en la materia.*

*g) Cuando se presenten indicios sobre el origen, manejo o destino ilegal de los fondos utilizados en las operaciones, respecto de los cuales el sujeto obligado **no cuente con una explicación**.*

*h) Cuando el cliente exhibe una inusual despreocupación respecto de los riesgos que asume y/o costos de las transacciones incompatible con el perfil económico del mismo.*

*i) **Cuando las operaciones involucren países o jurisdicciones considerados "paraísos fiscales" o identificados como no cooperativos por el Grupo de Acción Financiera Internacional**.*

*j) **Cuando existiera el mismo domicilio en cabeza de distintas personas jurídicas o cuando las mismas personas físicas revistieren el carácter de autorizadas y/o apoderadas en diferentes personas de existencia ideal**, y no existiere razón económica o legal para ello, **teniendo especial consideración cuando alguna de las compañías u organizaciones estén ubicadas en paraísos fiscales y su actividad principal sea la operatoria "off shore"**.*

Ministerio Público Fiscal de la Nación.

los R.O.S (Reporte de Operación Sospechosa) debidos por los involucrados, brillan por su ausencia. A ello se agrega el hecho de que la cotización a la que se liquidan los bonos, siempre muy cercana al valor histórico del dólar marginal o libre, es señalada por Financial Net en la mayoría de los casos como de "arancel propio", mientras que las contrapartes se refieren siembre a supuestas operaciones de "rueda continua", lo que remitiría al valor de mercado y a transacciones concertadas dentro de la rueda habitual del mercado de valores de rosario.

Por otra parte, en el extremo de los sucesivos débitos y supuestas adquisiciones de bonos, el fraccionamiento multiplica la secuencia y dispersa la operación en sumas que apenas superan los dos millones y medio de dólares de valor nominal, por lo que la participación de las contrapartes adquiere una precisión imposible, al menos como supuestas operaciones realizadas en el recinto de la bolsa. Incluso, como lo hemos consignado al pie de la planilla que acompañamos como Anexo I, los montos pagados por las tres contrapartes superan en 13.173.090 pesos la suma de los importes brutos de las operaciones. En el caso del débito que hemos individualizado más arriba como 4.2, del 27 de diciembre de 2011 por la suma nominal de 1.000.000 dólares, se registra el pago duplicado por Mariva Bursátil y Facimex Bursátil. Y se trata, para agravar el asunto, de los títulos que la Caja de Valores no registra como transferidos a ninguna de las tres supuestas contrapartes sino a la cuenta personal de Roberto Florentino Porcaro y su esposa. En cuanto al modo en el que se encuentran documentados los pagos de las contrapartes, la norma es la ausencia total de datos. Se trata de otra prueba de la simulación de estas operaciones; nótese que el supuesto pago de Facimex de una suma total de 153.173.727 pesos se documenta como realizada mediante nueve cheques que se individualizan, todos ellos, como "número 1. Banco de Valores".

Como hemos dicho, además de los casos en los que los cheques de la liquidación aparecen librados incluso antes de la transferencia de los títulos –como es el caso de los bonos del crédito número 7 por 2.480.000 en Bonar VII-, otro indicio de peso en relación a la naturaleza simulada de estas liquidaciones lo aporta el preciso ensamble y artificial correspondencia entre los actos atribuidos a los distintos protagonistas. Todo esto conduce a sostener, a la par del dato evidente y objetivo del lavado nominal de 32.800.000 dólares –o unos veinticinco millones de Euros-, la firme sospecha de una suerte de auto venta o auto compra de títulos. Según esta hipótesis, el mismo grupo de imputados que transfirió los bonos desde Suiza, se habría ocupado de simular también su compra en la plaza local, destinando a tales operaciones tenencias de dinero en negro en la Argentina o bien sumas ingresadas al país por fuera de los canales legales, tal como lo ha denunciado Federico Elaskar y se ha comprobado que lo han hecho Lázaro Báez y sus socios en otras

---

*Art. 30. — Deber de Fundar el Reporte. El Reporte de Operaciones Sospechosas debe ser fundado y contener una descripción de las circunstancias por las cuales se considera que la operación detenta tal carácter."*

oportunidades[26]. De ahí que a la suma total de 65.600.000 dólares, que en la planilla insertada al inicio resultan del doble registro de los mismos 32.800.000 dólares transferidos desde Suiza, podría igualmente arribarse en razón de un doble canal de lavado de activos. El primero constituido por los 208.840.000 pesos depositados en la cuenta de Austral Construcciones S.A bajo la cobertura de la liquidación de los títulos traídos a nombre de Helvetic Services Group S.A, y el restante, en el valor mismo de esos bonos en el caso de que hubieran permanecido en poder de los imputados merced a la simulación de su compra.

No es en esta jurisdicción donde corresponde profundizar este tramo; estaremos de todas formas atentos a lo que pueda resultar de la información sobre los tres clientes o comitentes que fueron señalados por Global Equity, Mariva Bursátil y Facimex como supuestos compradores[27]. Puede mientras tanto agregarse, como un indicio más de la apariencia artificiosa de esas compras, el hecho de haberse detectado que Financial Net cerró su cuenta en el HSBC el 5 de febrero de 2013, a poco más de un mes de las últimas operaciones vinculadas con esta liquidación de bonos[28].

De no haberse verificado tales operatorias en paralelo, resulta de todas maneras sugestivo que la considerable suma de dinero efectivamente liquidada y depositada en las cuentas de la nave insignia del grupo económico de Lázaro Báez, se corresponda con la mitad casi quirúrgica de los dineros alguna vez confiados a Federico Elaskar. Otra hipótesis que sugerimos entonces a los que se están ocupando de investigar el delito de lavado de activos, **podría ser la de un posible divorcio entre viejos socios**, reflejado en un retorno parcial de la mitad del dinero y su blanqueo a nombre de Lázaro Báez. O bien que la empresa

---

[26] Ver informes anteriores agregados a la causa, incluyendo las referencias a las investigaciones a las que diera lugar el ingreso a la argentina y depósito en cuentas de Badial S.A de 1.800.000 dólares provenientes de Uruguay e introducidos en valijas. Así lo habría reconocido el propio Lázaro Báez en su descargo ante la AFIP, reproducido en las notas incorporadas al informe de fojas 1057/1077.

[27] Ver nota al pie número 10.

[28] Nota del HSBC del 7 de junio, que incluye resumen de los últimos seis meses de la cuenta –abierta el 12 de septiembre de 2007-, donde el depósito de 16.566.400 pesos, compatible con el bruto del 5to cheque de la serie –compra atribuida a Facimex-, del 2 de enero de 2013, resulta ser el último crédito relevante. **La investigación por los funcionarios del fuero federal podrá dirigirse, entre otros tramos, al origen de las transferencias y depósitos consignados en este resume de cuenta**, en el que no es difícil identificar los montos que se corresponden con las sumas brutas involucradas en las operaciones liquidadas con los cinco cheques del HSBC. Véase el siguiente gráfico del que podrá partirse para buscar el origen de los dineros depositados en la cuenta de Financial Net:

datos del resumen de la cuenta 3003-40629-5

| FECHA | REFERENCIA | N° CUENTA | contraparte | MONTO |
|---|---|---|---|---|
| 17/12/2012 | TRANSF. 40/90 34465952/1 | *254 | MARIVA | 15.754.900 |
| 18/12/2012 | TRANSF. 40/90 34472470/1 | *198 | FACIMEX | 15.501.500 |
| 18/12/2012 | TRANSF. 40/90 34472539/1 | *254 | MARIVA | 18.060.000 |
| 19/12/2012 | TRANSF. 40/90 34481086/1 | *198 | FACIMEX | 18.009.637,50 |
| 27/12/2012 | TRANSF. 40/90 34511379/1 Y TRANSF. 40/90 34 511378 | *198 | FACIMEX | 3.082.840 20.000.000 |
| 27/12/2012 | TRANSF. 40/90 34510657 | *254 | MARIVA | 6.790.000 |
| 28/12/2012 | TRANSF. 40/90 34520124/1 | *198 | FACIMEX | 16.610.000 |
| 28/12/2013 | TRANSF. 40/90 34514148/1 | *285 | FACIMEX | 16.632.750 |
| 02/01/2013 | TRANSF. 40/90 34528541/1 | *198 | FACIMEX | 16.566.400 |

Ministerio Público Fiscal de la Nación.

común se hubiese mantenido intacta, es decir con Lázaro Báez y su gente oficiando de testaferros de la parte que pertenece a sus socios ocultos, sea de las sumas depositadas en las cuentas de Austral Construcciones S.A, o de la mitad que pueda haber permanecido en alguno de los entramados de sociedades y cuentas en el extranjero. Esto último incluye el tramo más reciente del aparente "saneamiento" al que se habrían aplicado de manera constante y sin pausa, Daniel Rodolfo Pérez Gadín, Jorge Oscar Chueco, Martín Antonio Báez, Julio Enrique Mendoza y Néstor Marcelo Ramos, una vez expulsado Elaskar de SGI.

De regreso a la valoración general de los hechos y a la prueba recogida hasta ahora, cabe recordar lo dicho en el dictamen del 22 de mayo sobre el reflejo que la drástica ruptura en la gestión de SGI había tenido en los documentos de la sociedad. Elaskar pasaba de llevar adelante un negocio próspero y promisorio a deshacerse repentinamente de sus cargos y acciones[29]. En orden a esta evidencia de una situación que en nada se parece a la pacífica negociación de acciones sobre la que se ha insistido por estos días[30], deben valorarse los rastros análogos de los movimientos y el despliegue de los involucrados. Con ese objetivo hemos confeccionado el anexo II en el que cruzamos los registros de migraciones y vuelos de todos ellos con los datos de los negocios de bonos que hemos reseñado. Lo primero que salta a la vista es una virtual desaparición de Federico Elaskar, similar a la que exhiben los registros societarios, con una secuencia de movimientos interrumpida drásticamente en junio de 2011. En paralelo, se multiplican los viajes de Daniel Rodolfo Pérez Gadín, Jorge Oscar Chueco, Fabián Virgilio Rossi, César Gustavo Fernández, Alejandro Ons Costa y Juan Ignacio Pisano Costa, cuya frecuencia se va acelerando a medida que se acerca el tiempo del regreso y de los contactos de Elaskar con los periodistas.

Ya desde principios de 2011, y más aún desde el desembarco de Pérez Gadín en las oficinas de la calle Juana Manso a fines de febrero de ese año, se verifica una incesante circulación de los involucrados por todos los países en los que hemos detectado el entramado de sociedades y cuentas como Panamá, Uruguay, España, Estados Unidos y Suiza, esto último reflejado en vuelos vía Francia, Alemania e Italia. Incluso, existe una evidente correspondencia entre los viajes encarados por los individuos de mayor peso y responsabilidad, como Pérez Gadín, Chueco y el propio Martín Antonio Báez, y la constitución de sociedades que exhiben a éstos como directivos, o bien los tienen, seguramente, como accionistas ocultos. Puedo esto último afirmarlo, al menos como hipótesis muy probable en el caso de Martín Antonio Báez, quien no sólo aumenta sus viajes sino que, en una confirmación más del vínculo de su padre con todas estas personas y

---

[29] Véase lo agregado en ese sentido con las declaraciones del personal de SGI ante el Juzgado Federal número 7, en el informe número 20 de la S.I.P.E, remitido al Tribunal mediante dictamen del pasado 13 de junio.

[30] En los dictámenes del 22 –requerimiento de indagatorias- y del 24 y 28 de mayo –solicitudes de intervenciones telefónicas-, advertimos sobre una situación extorsiva mantenida hasta estos días, cuyo reflejo puede también encontrarse en la conducta de Federico Elaskar y en las violencias hasta hace poco sufridas por Alejandro Maximiliano Acosta.

negocios, comienza a realizarlos en compañía de Chueco, Pérez Gadín y, en uno de nuestros descubrimientos más recientes, del presidente de Austral Construcciones S.A, *Julio Enrique Mendoza*[31].



Para exponer en mayor medida la elocuencia de los registros de viajes, siempre a la vista de los datos reunidos en el anexo II, hemos hecho algunos cálculos y comparaciones. Así, la decena de individuos en cuestión, registra en 2010 un total de 70 viajes, que pasan a ser 141 en 2011 y 179 en 2012. Si los ordenamos y analizamos según el destino, en primer lugar encontramos los diez registros de migraciones por viajes a Alemania, repartidos entre los cuatro de Ramos, quien suele volver en vuelo de Lufthansa a Frankfurt, los cuatro tramos que de los viajes de Lázaro Báez y su hijo Martín Antonio y los dos registros de un viaje de Fernández. Este último lo realiza en los tramos finales y cruciales de fines de marzo y principios de abril de este año, cuando este grupo pareció extremar sus esfuerzos en torno al 9no y último depósito de bonos desde Suiza y la posible obtención de los dineros para conseguir esos títulos o bien, como lo hemos sostenido en este dictamen, para comprarlos ellos mismos en las simuladas operaciones de compra en el mercado de Rosario.

Se registra un viaje desde Australia por el regreso de Chueco el 24 de abril de 2011, aunque había iniciado ese tour por Sudáfrica el 16 de abril, destinos estos lejanos pero a su vez próximos cada uno a dos de los lugares donde hemos individualizado entramados societarios como las Islas Seychelles y Nueva Zelanda. De hecho, hemos comprobado, en

---

[31] Ver lo adelantado en la nota a pie número 5 , al explicar la correspondencia entre los movimientos de Néstor Marcelo Ramos y Martín Antonio Báez

Ministerio Público Fiscal de la Nación.

razón de sus gastos de tarjeta de Crédito, que entre las fechas de salida y llegada, Jorge Oscar Chueco efectivamente estuvo en Nueva Zelanda[32], donde aparece realizando compras entre el 19 y el 23 de abril de 2011. Hemos de volver, cuando resulte pertinente, sobre esta información de gastos de tarjetas de crédito de Chueco y también de Pérez Gadín[33], ya que nos ha permitido confirmar que el paso por Suiza es tanto una escala obligada como la razón de ser de prácticamente todos los viajes que el grupo realiza a Europa, aunque el destino inmediato de las planillas de migraciones sea España, Francia, Alemania o Italia. Esta evidencia, que se traslada también a los viajes que realizarían en su rol de accionistas encubiertos Martín Antonio Báez, su padre Lázaro Báez, su hermano Leandro Báez y el presidente de Austral Construcciones S.A, Julio Enrique Mendoza, guarda precisa relación con la denuncia pública de Federico Elaskar y el resto de los indicios recolectados sobre el manejo de estructuras societarias y cuentas bancarias desde Helvetic Services Group S.A.

|  | Tarjeta | Gasto | fecha | Se corresponde con viaje | compañeros de viaje |
|---|---|---|---|---|---|
| Jorge Oscar Chueco | American Express | en Nueva Zelanda | 19, 22 y 23 de abril de 2011 | Salida a Sudáfrica    16/4/2011 Entrada de Australia 24/4/2011 |  |
|  | American Express | Victorinox, Ginebra | 11 de julio de 2011 | Salida a España    8/7/2011   Entrada de España 15/7/2011 | Daniel Rodolfo Perez Gadin |
|  | American Express | Scudelac S.A, Ginebra, | 18 de septiembre de 2011 | Salida a España    11/9/2011   Entrada de España 22/9/2011 | Daniel Rodolfo Perez Gadin en mismo vuelo; Martín Antonio Baez viaja a España entre el 14/9/2011 y el 21/9/2011 |
|  | American Express | Hotele Le Richemond, Suiza, | 16 de mayo de 2013 | Salida a Italia 16/5/2013    Entrada de EEUU el 27/5/2013 | Daniel Rodolfo Perez Gadin |
| Daniel Rodolfo Perez Gadin | Visa/Santander Rio | H&M Suiza | 11 de julio de 2011 | Salida a España    8/7/2011   Entrada de España 15/7/2011 |  |
|  | American Express | "Boulevard Du Vin, Ginebra" | 7 de diciembre de 2011 | Salida a España 29/11/2011 Entrada de España 10/12/2011 | Jorge Oscar Chueco      Martin Antonio Baez |
|  | American Express | Globus Geneve | 30 de mayo de 2012 | Salida a España 26/5/2012 Entrada de España 5/06/2012 | Jorge Oscar Chueco      Martin Antonio Baez |
|  | Mastercard/Galicia | Renta Car en Italia y Suiza | septiembre de 2011 | Salida a España    11/9/2011   Entrada de España 22/9/2011 | Jorge Oscar Chueco en mismo vuelo; Martín Antonio Baez viaja a España entre el 14/9/2011 y el 21/9/2011 |
|  | Mastercard/Galicia | Boulevard Du Vin en Suiza | 6 de diciembre de 2011 | Salida a España 29/11/2011 Entrada de España 10/12/2011 | Jorge Oscar Chueco      Martin Antonio Baez |
|  | Mastercard/Galicia | "Globus Geneve"  Suiza | 30 de mayo 2012 | Salida a España 26/5/2012 Entrada de España 5/06/2012 | Jorge Oscar Chueco      Martin Antonio Baez |

A Bolivia viaja en 2012 Martín Antonio Báez, quien a su vez registra viajes frecuentes a Chile. Por otra parte, la mayoría de los trece viajes a Brasil los realiza Jorge Oscar Chueco desde 2010, aunque en agosto de 2011 se traslada a ese país en compañía de Pérez Gadín; también viajan juntos a Brasil, en noviembre de 2011, Gustavo César Fernández y Fabián Rossi. En total, son trece los viajes registrados con Chile como origen o destino. Prácticamente son acaparados por los Báez, incluyendo una de las dos únicas salidas de Lázaro desde 2010. Entre esos movimientos resulta interesante la coincidencia en la salida hacia Chile realizada el 11 de julio de 2012 por el Auditor Eduardo Guillermo Castro -colocado por Lázaro Báez y Pérez Gadín en SGI- y Martín Antonio Báez. Este vuelve a ir a Chile en marzo de 2013, pocos días antes de salir junto a su padre en vuelo a Alemania –muy probablemente con destino a Suiza-, en esos días en los que parecían los involucrados

---

[32] En Nueva Zelanda fue constituida en febrero de 2011, dos meses antes del paso de Chueco por ese país, la sociedad MAPLE VIEW LIMITED, con Javier Martín Vanella como director. En Noviembre de 2012, con el mismo domicilio en Office 2, Level 3, 56 Victoria Street, Wellington, el grupo inscribió la sociedad SWISSER AG TRUSTEE NZ LIMITED, en la que asumieron como directores Javier Martin Vanella y Marcelo Néstor Ramos.

[33] Han informado gastos en el exterior de *Martín Antonio Báez*: Visa S.A/Banco Macro –notas del 11 y 13 de junio-, de *Daniel Rodolfo Pérez Gadín*: Banco de Galicia/Mastercard –nota y documentación del 10 de junio- y American Express –documentación y nota del 10 de junio-; y de *Jorge Oscar Chueco*: Visa/Santander Rio – documentación y nota del 10 de junio- y American Express –documentación y nota del 10 de junio-.

desesperados por traer de vuelta todo o buena parte del dinero que había salido bajo los oficios y el conocimiento de Federico Elaskar.

Sólo dos personas del grupo viajan a Colombia: uno es Rossi, quien registra un viaje en febrero de 2012, y el otro es el misterioso Néstor Marcelo Ramos, quien suele tocar varios puntos de América del Sur. Se registra un solo viaje a Cuba, realizado por Jorge Norberto Cerrota en coincidencia con el inicio de las emisiones del programa "Periodismo Para Todos" -sale el 13 y vuelve el 27 de abril de 2013-, **cuando los principales imputados, librado y próximo a ser cobrado el 9no y último cheque, parecen haberse puesto de acuerdo para tomarse unos días fuera del país**. El primero en volver, el mismo 14 de abril a la mañana, fue Lázaro Báez en compañía de su hijo, lo que guarda relación con la imputación que se le ha formulado por haber desmantelado las cajas de seguridad de una de sus viviendas. Inserto un corte del anexo II por los viajes que tienen como epicentro la emisión del programa del 14 de abril.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| BAEZ LAZARO ANTONIO | SALIDA | 06/04/2013 02:10:39 p.m. | ALEMANIA | AERO EZEIZA | | LUFTHANSA | LH-511 |
| BAEZ MARTIN ANTONIO | SALIDA | 06/04/2013 02:11:07 p.m. | ALEMANIA | AERO EZEIZA | | LUFTHANSA | LH-511 |
| RAMOS NESTOR MARCELO | SALIDA | 07/04/2013 12:32:00 p.m. | ITALIA | AERO EZEIZA | | ALITALIA | AZ-681 |
| 9no cheque | MACRO | cobrado el 8/04/2013 | | | 29.918.618,4 $ | | |
| PEREZ GADIN DANIEL RODOLFO | SALIDA | 09/04/2013 08:03:31 p.m. | ESTADOS UNIDOS | AERO EZEIZA | | AEROLINEAS ARGENTINAS | AR-1302 |
| CERROTA JORGE NORBERTO | SALIDA | 13/04/2013 11:03:59 a.m. | CUBA | AERO EZEIZA | | CUBANA DE AVIACION | CU-361 |
| BAEZ MARTIN ANTONIO | ENTRADA | 14/04/2013 07:37:46 a.m. | ALEMANIA | AERO EZEIZA | | LUFTHANSA | LH-510 |
| BAEZ LAZARO ANTONIO | ENTRADA | 14/04/2013 07:42:45 a.m. | ALEMANIA | AERO EZEIZA | | LUFTHANSA | LH-510 |
| 14 DE ABRIL DE 2013, 22:00 HS, primera emisión 2013 del programa PERIODISMO PARA TODOS | | | | | | | |
| PEREZ GADIN DANIEL RODOLFO | ENTRADA | 16/04/2013 05:06:58 a.m. | ESTADOS UNIDOS | AERO EZEIZA | | AEROLINEAS ARGENTINAS | AR-1305 |
| CERROTA JORGE NORBERTO | ENTRADA | 27/04/2013 02:33:58 a.m. | CUBA | AERO EZEIZA | | CUBANA DE AVIACION | CU-360 |
| CHUECO JORGE OSCAR | SALIDA | 07/05/2013 09:51:09 a.m. | URUGUAY | AERO JORGE NEWBERY | | AUSTRAL LINEAS AEREAS | AU-2232 |
| CHUECO JORGE OSCAR | ENTRADA | 07/05/2013 06:53:30 p.m. | URUGUAY | AERO JORGE NEWBERY | | AUSTRAL LINEAS AEREAS | AU-2219 |
| CHUECO JORGE OSCAR | SALIDA | 08/05/2013 11:56:35 a.m. | ITALIA | AERO EZEIZA | | ALITALIA | AZ-681 |
| CHUECO JORGE OSCAR | ENTRADA | 16/05/2013 08:15:34 a.m. | ITALIA | AERO EZEIZA | | ALITALIA | AZ-680 |
| CHUECO JORGE OSCAR | SALIDA | 27/05/2013 06:23:37 a.m. | ESTADOS UNIDOS | AERO EZEIZA | | AEROLINEAS ARGENTINAS | AR-1304 |
| CHUECO JORGE OSCAR | ENTRADA | 30/05/2013 05:50:10 a.m. | ESTADOS UNIDOS | AERO EZEIZA | | AEROLINEAS ARGENTINAS | AR-1305 |

España, con más de treinta registros de migraciones, es uno de los destinos principales del grupo en este análisis de movimientos de los últimos tres años. La "madre patria" se convirtió en un sitio obligado para ellos, como ocurrió también con Uruguay, Panamá, Estados Unidos y Suiza, en exacta correspondencia con la información recogida sobre la gestión de sociedades[34] con las que se comenzó a dar continente a los dineros una vez desalojado Elaskar y trasladado el control de SGI a Pérez Gadín, Chueco y Ramos. Nótese que en 2010 ninguno de los que serían luego protagonistas viaja a España, sólo se verifica un tempranero ingreso desde allí a la Argentina por el sobrino de Ramos y representante de Helvetic Services Group S.A, Javier Martín Vanella, entre agosto y noviembre de 2010. Pero enseguida después de desembarcado Pérez Gadín y su gente en SGI, en marzo del año siguiente, la mayoría de estos mandatarios de Lázaro Báez pasa por España, costumbre inaugurada por sus hijos Martín Antonio y Leandro entre marzo y abril de 2011. Este viaje, en el que hoy sabemos que se hallaba presente también Julio Enrique Mendoza, el presidente

---

[34] Véase los informes de la causa sobre las sociedades constituidas en España, entre ellas se encuentran las firmas Mirabilia LS, Felsan Global Investment y Tusaleta Servicios y Gestiones. En las tres aparecen como directivos Chueco y Pérez Gadín, quienes ingresan a las primeras dos el 7 y a la restante el 9 de diciembre de 2011. Con el mismo domicilio que las tres citadas, a Helvetic Services Group pertenecen, como único socio, las firmas Serbel Trade SL y Wodson International SL.

Ministerio Público Fiscal de la Nación.

de Austral Construcciones S.A,[35] es todo un símbolo de un tiempo que se agotaba. Lo decimos porque Federico Elaskar no había sido aún expulsado de SGI y, como indica la secuencia de migraciones, lo vemos coincidir en este paso por Europa, seguramente con destino a Suiza, con Leonardo Fariña, Nestor Marcelo Ramos, Martín Báez y Mendoza.

| BAEZ MARTIN ANTONIO | SALIDA | 28/03/2011 | 08:28:18 p.m. | ESPAÑA | AERO EZEIZA | AEROLINEAS ARGENTINAS | AR-1132 |
| MENDOZA JULIO ENRIQUE | SALIDA | 28/03/2011 | 20:29:27 | ESPAÑA | AERO EZEIZA | AEROLINEAS ARGENTINAS | 1132 |
| RAMOS NESTOR MARCELO | SALIDA | 30/03/2011 | 12:51:00 p.m. | ITALIA | AERO EZEIZA | ALITALIA | AZ-681 |
| ELASKAR FEDERICO | SALIDA | 31/03/2011 | 16:12:06 | FRANÇA | AERO EZEIZA | AIR FRANCE | 20/02/1901 |
| BAEZ MARTIN ANTONIO | ENTRADA | 01/04/2011 | 05:26:18 a.m. | ESPAÑA | AERO EZEIZA | AEROLINEAS ARGENTINAS | AR-1133 |
| MENDOZA JULIO ENRIQUE | ENTRADA | 01/04/2011 | 05:26:32 | ESPAÑA | AERO EZEIZA | AEROLINEAS ARGENTINAS | 1133 |
| ELASKAR FEDERICO | ENTRADA | 05/04/2011 | 08:10:43 a.m. | FRANÇA | AERO EZEIZA | AIR FRANCE | 21/02/1901 |

Entre el 8 y el 15 de julio, los que viajan juntos a España son Chueco y Pérez Gadín. Aunque no hemos recibido de la empresa Iberia información sobre escalas intermedias, por los gastos antes apuntados de Chueco con su tarjeta de crédito American Express, se encuentra acreditado el paso de estos mandatarios de Lázaro Báez por Suiza y, por lógica derivación, por la sede de Helvetic Services Group S.A.

El siguiente viaje a España inaugura toda una serie de registros que se suman a las numerosas pruebas de la estrecha relación y evidente complicidad de Lázaro Báez y su hijo Martín Antonio Báez con Jorge Oscar Chueco y Daniel Rodolfo Pérez Gadín en todo lo realizado desde principios de 2011 en derredor de las oficinas de Juana Manso 555. Aunque Pérez Gadín y Chueco salen juntos el 11 de septiembre de 2011, Martín Antonio Báez va enseguida tras ellos el 14 de ese mes, regresando los tres a la Argentina con apenas un día de diferencia entre el 21 y 22 de septiembre.

| PEREZ GADIN DANIEL RODOLFO | SALIDA | 11/09/2011 | 10:28:37 a.m. | ESPAÑA | AERO EZEIZA | AIR EUROPA | UX-044 |
| CHUECO JORGE OSCAR | SALIDA | 11/09/2011 | 10:28:38 a.m. | ESPAÑA | AERO EZEIZA | AIR EUROPA | UX-044 |
| BAEZ MARTIN ANTONIO | SALIDA | 14/09/2011 | 11:59:10 a.m. | ESPAÑA | AERO EZEIZA | IBERA | IB-6842 |
| BAEZ MARTIN ANTONIO | ENTRADA | 21/09/2011 | 08:31:12 p.m. | ESPAÑA | AERO EZEIZA | IBERA | IB-6845 |
| CHUECO JORGE OSCAR | ENTRADA | 22/09/2011 | 09:03:39 a.m. | ESPAÑA | AERO EZEIZA | AIR EUROPA | UX-041 |
| PEREZ GADIN DANIEL RODOLFO | ENTRADA | 22/09/2011 | 09:04:24 a.m. | ESPAÑA | AERO EZEIZA | AIR EUROPA | UX-041 |
| RAMOS NESTOR MARCELO | ENTRADA | 10/10/2011 | 05:21:00 a.m. | PERU | AERO CORDOBA | LAN PERU | LP-2425 |

Como puede observarse en la secuencia insertada, a los pocos días de regresar Chueco, Pérez Gadín y Báez de Europa, aparece en la Argentina Néstor Marcelo Ramos, procedente de Perú. He señalado al iniciar este dictamen[36], las precisas correspondencias en los movimientos y viajes de Martín Báez y Ramos; el primero como mandatario principal de su padre y solapado titular de dineros y valores, y el otro como gestor desde Helvetic Services Group de los negocios que Lázaro Báez y sus socios trasladaron desde antaño al extranjero. Sólo he de agregar ahora que, una vez más, los gastos de Pérez Gadín con su tarjeta Mastercard y Chueco con su American Express, nos confirman el paso del grupo por Suiza y los encuentros que habrían precedido el posterior traslado de Ramos a la Argentina.

Al siguiente viaje a España, ya no ocultan nada y los tres, Chueco, Pérez Gadín y Martín Antonio Báez van y vienen por primera vez en el mismo avión en un viaje de once días entre el 29 de noviembre y el 10 de diciembre de 2011.

---

[35] No lo hemos incluido a Leandro Báez en el Anexo II ya que la noticia de su participación en este viaje recién se conoció al realizarse un estudio de revisión luego de ser recibida la información de los vuelos de Air France.
[36] Nota al pie número 5.

| CHUECO JORGE OSCAR | SALIDA | 29/11/2011 | 08:25:40 p.m. | ESPAÑA | AERO EZEIZA | IBERIA | IB-6844 |
|---|---|---|---|---|---|---|---|
| PEREZ GADIN DANIEL RODOLFO | SALIDA | 29/11/2011 | 08:26:21 p.m. | ESPAÑA | AERO EZEIZA | IBERIA | IB-6844 |
| BAEZ MARTIN ANTONIO | SALIDA | 29/11/2011 | 08:26:22 p.m. | ESPAÑA | AERO EZEIZA | IBERA | IB-6644 |
| PEREZ GADIN DANIEL RODOLFO | ENTRADA | 10/12/2011 | 10:34:42 a.m. | ESPAÑA | AERO EZEIZA | IBERIA | IB-6843 |
| BAEZ MARTIN ANTONIO | ENTRADA | 10/12/2011 | 10:35:56 a.m. | ESPAÑA | AERO EZEIZA | IBERA | IB-6843 |
| CHUECO JORGE OSCAR | ENTRADA | 10/12/2011 | 08:25:40 p.m. | ESPAÑA | AERO EZEIZA | IBERIA | IB-6843 |

De manera análoga a los dos viajes anteriores, son esta vez los gastos de Pérez Gadín con sus dos tarjetas de crédito los que nos confirman la obligada escala del grupo en Suiza. El convencimiento que todas estas pruebas permitieron en orden al rol que Federico Elaskar había atribuido en su denuncia pública a Helvetic Services Group[37], se vio luego confirmado cuando comprobamos que la gestión que hacían sus responsables de las sociedades dispersas por el mundo, les permitió en pocos días reunir, transferir a la Argentina y liquidar en las cuentas de Austral Construcciones una parte considerable de los valores confiados.

Chueco, Pérez Gadín y Martín Antonio Báez volvieron a viajar juntos a España entre el 26 de mayo y el 5 de junio de 2012. El traslado a Suiza lo ratifican esta vez tanto los gastos de Pérez Gadín con su tarjeta Mastercard, como el hecho de que el pasaje de Aerolíneas Argentinas incluía la escala en ese país[38].

| PEREZ GADIN DANIEL RODOLFO | SALIDA | 26/05/2012 | 07:12:08 p.m. | ESPAÑA | AERO EZEIZA | AEROLINEAS ARGENTINAS | AR-1132 |
|---|---|---|---|---|---|---|---|
| CHUECO JORGE OSCAR | SALIDA | 26/05/2012 | 07:12:25 p.m. | ESPAÑA | AERO EZEIZA | AEROLINEAS ARGENTINAS | AR-1132 |
| BAEZ MARTIN ANTONIO | SALIDA | 26/05/2012 | 07:13:33 p.m. | ESPAÑA | AERO EZEIZA | AEROLINEAS ARGENTINAS | AR-1132 |
| PEREZ GADIN DANIEL RODOLFO | ENTRADA | 05/06/2012 | 03:59:10 a.m. | ESPAÑA | AERO EZEIZA | AEROLINEAS ARGENTINAS | AR-1161 |
| CHUECO JORGE OSCAR | ENTRADA | 05/06/2012 | 03:59:28 a.m. | ESPAÑA | AERO EZEIZA | AEROLINEAS ARGENTINAS | AR-1161 |
| BAEZ MARTIN ANTONIO | ENTRADA | 05/06/2012 | 04:00:03 a.m. | ESPAÑA | AERO EZEIZA | AEROLINEAS ARGENTINAS | AR-1161 |

Por lo demás, fuera de Chueco, Pérez Gadín y Martín Antonio Báez, de la decena de individuos cuyos movimientos hemos monitoreado, el último viaje a España lo realizó en julio de 2012 Gustavo César Fernández, seguramente para complementar en ese país o en Suiza alguna de las gestiones previas de sus nuevos jefes.

Vale para EEUU lo dicho en relación a España; a la que supera incluso largamente con cerca de sesenta viajes hacia o desde el país del norte. Nuevamente, esta notable proporción, guarda exacta correspondencia con la relevancia que hemos visto en nuestras presentaciones anteriores que tienen los EEUU en la enramada societaria y sus correspondientes cuentas bancarias. Debe recordarse que en ese país descubrimos radicadas nada menos que 150 sociedades manejadas desde un mismo domicilio y el común denominador de su administración por la firma Aldyne LTD de las Islas Seychelles y la propiedad detentada por Helvetic Services Group. Esto además de una multitud de otros negocios y operaciones sobre los que hemos hecho ya referencia y que incluyen sociedades más modernas formadas en el período iniciado a fines de 2010, como las integradas por

---

[37] A la que parece haberse referido cuando menciona al grupo de "consultores" con el que contaban en Suiza, con una estructura "aceitada" que incluía la gestión de las sociedades y el manejo de sus cuentas.

[38] Hasta el día de hoy, Aerolíneas Argentinas no ha contestado el requerimiento de informes sobre estos vuelos; las averiguaciones en torno a la escala en Suiza incluida en estos pasajes, tomó estado público, con exhibición incluso de los tickets, en la emisión del programa "Periodismo Para Todos" del domingo 16 de junio.

Ministerio Público Fiscal de la Nación.


Ramos, el propio Elaskar, Pérez Gadín, SGI Argentina S.A, Matías Molinari y varios personajes más de esta trama. Es por ello que, a diferencia de España, el año 2011 no inaugura los viajes de negocios del grupo a EEUU sino que los acelera. De los apenas tres viajes o seis registros de 2010, se pasa a veintitrés en 2011 y otro tanto en 2012, a lo que cabe agregar los ocho tramos que integran los viajes realizados  por Néstor Marcelo Ramos, Jorge Oscar Chueco, Daniel Rodolfo Pérez Gadín y Juan Ignacio Pisano Costa en los febriles días que van entre las últimas transferencias de títulos -y la posible reunión de los dineros con los que se los habría recomprado en esta plaza- y los días inmediatos posteriores a la emisión del programa de Jorge Lanata del 14 de abril pasado.

En esta sistemática por destinos, elegida para dar secuencia lógica y facilitar la comprensión de los resultados del estudio de los movimientos migratorios y vuelos, siguen los viajes a Francia. Como ocurre con España, Alemania e Italia, buena parte de los registros corresponde a tramos con escala en Suiza, en todos los casos a través de los vuelos AF-417 y AF-418 de Air France. Es por ello que, en todo 2010, sólo Néstor Marcelo Ramos y Javier Vanella utilizaron este servicio, en exacta relación con sus domicilios particulares o laborales.

El primero del resto de los imputados en viajar por esta vía a Francia y a Suiza es Federico Elaskar. Puso así nuevamente en evidencia la fidelidad entre su denuncia pública y los elementos de juicio que hemos recogido desde un principio en nuestra causa. Lo hizo en el tiempo señalado en su relato, entre principios y mediados de 2011, cuando no había sido aún desalojado de SGI. La primera vez entre el 31 de marzo y el 5 de abril y la restante entre el 23 de mayo y el 6 de junio de 2011. Sería ése su último viaje a Francia; apenas una semana después debía celebrarse la asamblea ordinaria de SGI en la que se selló su destino. Desaparecido Elaskar del escenario, enseguida fue reemplazado por Fabian Virgilio Rossi, quien viajo a Francia, y posiblemente a Suiza, entre el 3 y el 14 de agosto de 2011. Luego de Rossi, la peregrinación a los pagos de Helvetic Services Group, vía Francia, la realiza el propio Martín Antonio Báez. La primera vez entre el 5 y el 12 de mayo de 2012, en compañía de su hermano Leandro y Julio Enrique Mendoza.

Conviene hace aquí un breve paréntesis para explicar que fue recién a partir de la información remitida por Air France[39] que conocimos la participación en estos viajes del último de los nombrados. La aerolínea informó que los pasajes de Julio Mendoza y los hermanos Báez habían sido pagados en efectivo en la misma agencia –Escalatur- de Alberdi número 2 de Rio Gallegos. A partir de este dato comprobamos que el **nombrado es el Presidente de la empresa Austral Construcciones S.A desde el año 2005**, tal como puede verse en las siguientes publicaciones del Boletín Oficial de la República Argentina.

30 de marzo de 2012

---

[39] Documentación y nota del 12 de junio de 2013.

AUSTRAL CONSTRUCCIONES S.A. La Asamblea Gral. Ordinaria del 28/05/2011 resolvió designar por 1 ejercicio como Director Titular y Presidente a *Julio Enrique Mendoza* y como suplente a Leandro Antonio Báez, ambos constituyeron domicilio especial en Pasaje Carabelas 241 piso 5 de C.A.B.A. Cesa en su cargo de director suplente por vencimiento de mandato: Emilio Carlos Martin. Matías José Hierro Oderigo escribano autorizado por Esc. 39 del 29/03/2012, folio 107 Registro Notarial 1485 de C.A.B.A. Abogado - Matías J. Hierro Oderigo e. 30/03/2012 N° 33721/12 v. 30/03/2012.

### 2 de diciembre de 2010

AUSTRAL CONSTRUCCIONES S.A. La Asamblea Gral. Ordinaria del 04/05/2010 resolvió designar por 1 ejercicio como Director Titular y Presidente a *Julio Enrique Mendoza*  y como suplente a Emilio Carlos Martín, ambos constituyeron domicilio especial en Pasaje Carabelas 241 piso 5 de C.A.B.A. Matías José Hierro Oderigo escribano autorizado por Esc. 181 del 30/11/2010, folio 438 Registro Notarial 1485 de C.A.B.A. Escribano Matías J. Hierro Oderigo e. 02/12/2010 Nº 149969/10 v. 02/12/2010

### 6 de septiembre de 2005

AUSTRAL CONSTRUCCIONES SOCIEDAD ANÓNIMA. Conste que: por Asamblea Gral. Ordinaria y Extraordinaria Unánime del 26.08.2005, la sociedad: 1 ) Designó Directorio por 1 ejercicio: Único Direc tor Titular y Presidente: *Julio Enrique Mendoza*, Director Suplente: Silvia Mónica Davis. Domicilio Especial : ambos directores lo constituyen en Pasaje Carabelas 241 , piso 5to., C.A.B.A. 2) Reformó Objeto Social: 1 . Construcción de inmuebles, y realización de obras de ingeniería y como privadas. Compraventa, comercialización, intermediación, administración y explotación de bienes inmuebles, propios o de terceros; y de maquinarias, repuestos y accesorios destinados al desarrollo de su objeto social, o vinculados con el mismo. 2. Importación y Exportación. 3. Financiación con dinero propio de las operaciones comprendidas en el presente artículo, con o sin garantía real, a corto o largo plazo; aportes de capitales para negocios realizados o en vía de realización; participación en empresas de cualquier naturaleza mediante la creación de sociedades por acciones, agrupaciones de colaboración empresaria, joint ventures, uniones transitorias de empresas, consorcios, y de cualquier tipo de asociación prevista en la legislación vigente en la materia y de la cual pueda participar la sociedad; préstamos en dinero con o sin garantías, con o sin la constitución y transferencia de derechos reales; y en general compraventa de títulos, acciones, valores mobiliarios y papeles de crédito en cualquiera de los. sistemas o modalidades creados o a crearse. Se excluyen las operaciones comprendidas en la Ley de Entidades Financieras. Claudio Moreyra, DNI 27.279.201, apoderado según poder otorgado en escritura 369 del 30/08/2005, pasada al folio 1 048, registro notarial 289 de C.A.B.A. Claudio Moreyra. Certificación emitida por: María Cecilia Zucchi- no. N° Registro: 289. N° Matrícula: 2445. Fecha: 5/ 9/05. N°Acta: 65. Libro N°85. N "73.250

En la publicación del Boletín Oficial del 29 de octubre de 2007, Julio Enrique Mendoza aparece asociado a Lázaro Báez y Fernando Javier Butti en la firma Austral Atlántica S.A, que posee el mismo domicilio que Austral Construcciones S.A en Pasaje Carabelas 241, piso 5to de Capital Federal.

Ministerio Público Fiscal de la Nación.

**AUSTRAL ATLANTICA**

SOCIEDAD ANONIMA

Por escritura 611 folio 2041 del 11/10/2007 registro notarial 289 de C.A.B.A.: 1) Lázaro Antonio BÁEZ, nacido el 11/02/1956, DNI 11.309.991, domiciliado en Villarino 126 Río Gallegos, Pcia. de Santa Cruz; Fernando Javier BUTTI, nacido el 13/08/1976, DNI 25.133.740, domiciliado en Comodoro Py 66, Río Gallegos, Pcia. de Santa Cruz, ambos empresarios; Julio Enrique MENDOZA, nacido el 30/12/1954, DNI 11.653.724, ingeniero, domiciliado en Pasaje Carabelas 241 piso 5 de C.A.B.A., todos argentinos y casados. 2)AUSTRAL ATLÁNTICA S.A. 3) Pasaje Carabelas 241 piso 5 de C.A.B.A. 4) Realizar por cuenta propia, de terceros y/o asociada a terceros, dentro del país o en el extranjero, las siguientes actividades. Construcción de inmuebles y realización de obras de ingeniería y arquitectura en general, tanto públicas como privadas. Compraventa, comercialización, intermediación, administración y explotación de bienes inmuebles, propios o de terceros, inclusive los comprendidas en el régimen de propiedad horizontal, así como también todas clase de operaciones inmobiliarias, incluyendo el fraccionamiento y posterior loteo de parcelas destinadas a vivienda, urbanización, clubes de campo, explotaciones agrícolas o ganaderas y parques industriales. Financiación con dinero propio de las operaciones comprendidas en el presente artículo, con o sin garantía real, a corto o largo plazo; aportes de capitales para negocios realizados o en vía de realización; participación en empresas de cualquier naturaleza mediante la creación de sociedades por acciones, agrupaciones de colaboración empresaria, joint ventures, uniones transitorias de empresas, consorcios y cualquier tipo de asociación prevista en la legislación vigente en la materia y de la cual pueda participar la sociedad; préstamos en dinero con o sin garantías, con

Lunes 29 de octubre de 2007

o sin la constitución y transferencia de derechos reales; y en general compraventa de títulos, acciones, valores mobiliarios y papeles de crédito en cualquiera de los sistemas o modalidades creados o a crearse. Se excluyen las operaciones comprendidas en la ley de entidades financieras. A tales fines la sociedad tiene plena capacidad para adquirir derechos, contraer obligaciones, y ejercer los actos que no sean prohibidos por las leyes o el estatuto. 5) 99 años. 6) $ 50.000. 7) Administración: Directorio compuesto por 1 a 5 directores por un ejercicio. Designados: Titular: Julio Enrique Mendoza. Suplente: Lázaro Antonio Báez, quienes aceptaron los cargos y constituyeron domicilio especial en Pasaje Carabelas 241 piso 5 de C.A.B.A. 8) Representante: Presidente del Directorio: Julio Enrique Mendoza. 9) 30 de junio. Matías José Hierro Odriogo autorizado por escritura n° 611 del 11/10/2007, folio 2041, registro 289 de Capital Federal.

Certificación emitida por: María Cecilia Zucchino, N° Registro: 289. N° Matrícula: 2445. Fecha: 17/10/2007. N° Acta: 161. Libro N°. 103. e. 29/10/2007 N° 69.328 v. 29/10/2007

Por lo demás, son varias las publicaciones y crónicas periodísticas que lo señalan como "mano derecha" de Lázaro Báez, al punto de hallarse registrados aparentemente a su nombre algunos autos encontrados en un reciente allanamiento ordenado por la Justicia Federal en un galpón de Río Gallegos, Provincia de Santa Cruz[40]. La intervención de Mendoza en estos viajes, que también ha compartido con el propio Daniel Rodolfo Pérez Gadín, aporta un hito de suma relevancia en el denominador común de la aparición de Austral Construcciones S.A en los hechos investigados. Esta empresa había sido nombrada por Federico Elaskar en sus denuncias públicas. Lo propio hizo Leonardo Fariña en la mayoría de los testimonios a cámara abierta con posterioridad a la emisión del programa Periodismo Para Todos del pasado 14 de abril; incluso ha afirmado que el vínculo mismo con Lázaro Báez se inició para ordenar las cuentas y negocios de Austral Construcciones S.A. Si a esto agregamos el protagonismo directo de su presidente y, finalmente, el regreso a sus cuentas de las millonarias sumas de dinero obtenidas con la liquidación de los bonos de Helvetic Services Group, no puede caber duda razonable sobre el origen de al menos parte de los fondos introducidos en SGI entre fines de 2010 y principios de 2011.

Confirman también estas pruebas la naturaleza de las maniobras delictivas de las que los dineros podrían provenir, como los posibles pagos por actos infieles en la contratación de obra pública, o bien la evasión impositiva o "contabilidad creativa" a la que se ha aludido por estos días[41], figuras todas ésas en estudio ante el fuero de excepción.

Regresamos ahora al viaje de Air France del 5 al 12 de mayo de 2012, que exhibe una nota singular: la aerolínea nos ha hecho saber que el código de los pasajes BUE-

---

[40] Diario La Nación, edición impresa del 2 de junio de 2013, nota titulada *"Los negocios del poder. La 'flota negra' de Lázaro Báez está valuada en más de $ 2 millones El empresario tiene cinco automóviles de alta gama, que fueron importados entre 2006 y 2012."*

[41] Ver nota de Lanación del 18 de junio de 2013, titulada "Negocios y poder, Lázaro Báez, acusado por evasión fiscal. Es en una causa paralela a la de lavado; apunta a cuentas de Austral"; el sumario en cuestión se encontraría en trámite ante el Juzgado en lo Penal Económico a cargo del Doctor Ezequiel Berón de Astrada.

PAR-BJS-PAR-BUE señala, como destino final, la ciudad China de Beijing. Es probable que esta noticia del paso por China de los hermanos Báez y del presidente de Austral Construcciones se vincule con aquéllas que dan cuenta de una asociación del empresario Lázaro Báez en miras a una licitación en curso para la construcción de una importante represa en el Río Santa Cruz. Con una escala expresa esta vez en Ginebra, Suiza, China vuelve a ser el punto más remoto del viaje encarado, vía Air France, en septiembre del mismo año por Martín Báez, Julio Enrique Mendoza y Daniel Rodolfo Pérez Gadín[42].

| RAMOS NESTOR MARCELO | SALIDA | 16/09/2012 | 04:24:00 p.m. | ALEMANIA | AERO EZEIZA | LUFTHANSA | LH-511 |
|---|---|---|---|---|---|---|---|
| CHUECO JORGE OSCAR | SALIDA | 19/09/2012 | 08:22:30 p.m. | ITALIA | AERO EZEIZA | AEROLINEAS ARGENTINAS | AR-1140 |
| ONS COSTA ALEJANDRO | SALIDA | 23/09/2012 | 11:19:54 a.m. | ITLAIA | AERO EZEIZA | ALITAUA | AZ-681 |
| BAEZ MARTIN ANTONIO | SALIDA | 23/09/2012 | 03:30:42 p.m. | FRANCIA | AERO EZEIZA | AIR FRANCE | AF-417 |
| PEREZ GADIN DANIEL RODOLFO | SALIDA | 23/09/2012 | 03:31:00 p.m. | FRANCIA | AERO EZEIZA | AIR FRANCE | AF-417 |
| MENDOZA JULIO ENRIQUE | SALIDA | 23/09/2012 | 15:30:15 | FRANCIA | AERO EZEIZA | AIR FRANCE | 417 |
| CHUECO JORGE OSCAR | ENTRADA | 30/09/2012 | 05:15:32 a.m. | ITALIA | AERO EZEIZA | AEROLINEAS ARGENTINAS | AR-1141 |
| BAEZ MARTIN ANTONIO | ENTRADA | 10/10/2012 | 08:56:47 a.m. | FRANCIA | AERO EZEIZA | AIR FRANCE | AF-418 |
| PEREZ GADIN DANIEL RODOLFO | ENTRADA | 10/10/2012 | 08:57:11 a.m. | FRANCIA | AERO EZEIZA | AIR FRANCE | AF-418 |
| MENDOZA JULIO ENRIQUE | ENTRADA | 10/10/2012 | 08:55:59 | FRANCIA | AERO EZEIZA | AIR FRANCE | 418 |
| ONS COSTA ALEJANDRO | ENTRADA | 14/10/2012 | 07:46:44 a.m. | ITALIA | AERO EZEIZA | ALITAUA | AZ-680 |
| ELASKAR FEDERICO | ENTRADA | 21/10/2012 | 07:02:46 | ESTADOS UNIDOS | AERO EZEIZA | LAN ARGENTINA | 17/05/1912 |

Como puede advertirse del tramo del anexo II arriba insertado, la partida de Báez, Pérez Gadín y Mendoza a Suiza y a China, coincide con una muy nutrida salida de los imputados en dirección común a Europa, inaugurada con el regreso de Néstor Marcelo Ramos al viejo continente. Se trata de los viajes que precedieron al retorno de Federico Elaskar de su exilio el 21 de octubre de 2012, hecho éste que, a la vista de los registros que estamos estudiando, provoca una suerte de parálisis de un mes en los vuelos. El inmovilismo se mantiene prácticamente hasta el momento en el que, decisión de algún responsable mediante, comienza a organizarse y ejecutarse el lavado de los fondos a través de las transferencias y liquidaciones de títulos que se extendieron hasta el 8 de abril de 2013.

Por lo demás, los viajes a Francia de esta armada de valijeros y testaferros de Lázaro Báez y sus socios, se cierran con el retorno al país galo de Rossi, en medio de los frenéticos días de mediados de enero y fines de febrero de 2013, cuando todos parecen haber partido a hacerse de títulos y dineros para las últimas liquidaciones de bonos. Por esos días, incluso, habría de partir en vuelo a Alemania el mismísimo Lázaro Báez en compañía de sus hijos[43], quizás como último recurso para liberar la transacción final por cerca de 30 millones de pesos[44], cuando faltaban apenas seis días para la primera edición del programa de televisión Periodismo Para Todos.

---

[42] Los pasajes, incluyendo el de Pérez Gadín, volvieron a ser pagados por la agencia Escalatur de Río Gallegos.

[43] La firma Lutfhansa, mediante nota del 6 de junio de 2013 y la agencia de turismo Tije Travel de 10 de junio pasado, informaron que los pasajes de Lázaro Antonio Báez, sus hijos Martín, Leandro y Melina y unos individuos llamados Marcelo Mariano Nieto, Carlos Agustín Laplace, Gustavo Rubio y Jorge Salgado –de quienes no hemos recogido información relevante-, fueron pagados con tarjetas de crédito VISA 493763010965260 (60.593 pesos), VISA 4937638001310272 (31.328 pesos) y AMEX 376457783901000 (31.927 pesos) contra factura extendida a nombre de Patricio Palmero S.A, CUIT 30-531489086, cliente número 23726, domicilio en Ruta Panamericana Kilómetro 3 (1615) Grand Bourg, Provincia de Buenos Aires.

[44] Cheque número 9 por $ 29.918.618,40, finalmente librado por Financial Net contra su cuenta del Banco Macro para ser cobrado el 8 de abril de 2013.

Ministerio Público Fiscal de la Nación.

Al cabo de los escasos ingresos o egresos desde Gran Bretaña, dominados por el europeizado Javier Martín Vanella, integrante en el Reino Unido de un buen número de sociedades junto a Ramos, este estudio de viajes según el destino llega a Italia. El dominio casi absoluto de los servicios AZ-680 o AZ-681, a los que suele recurrir Néstor Marcelo Ramos, denuncia el motivo común de todos estos viajes, en tanto continentes de tramos a Suiza sobre los que hemos hallado prueba irrefutable. Luego de los ocho registros a nombre de Ramos de 2010, es Jorge Chueco el que inaugura los viajes a Italia partiendo el 21 de mayo para regresar el 3 de junio de 2011. Esto tuvo lugar pocos días antes de su aparición como receptor –a través de la sociedad de paja SER NORTE S.A- de la mitad de las acciones de Elaskar en SGI. Chueco habría de regresar a Italia -y muy probablemente, en ambos casos, también a Suiza[45]- en septiembre de 2012 y en mayo de 2013. Se había consumado por entonces la repatriación de fondos canalizados a través de SGI en tiempos de Elaskar y producido el escándalo púbico por estas maniobras delictivas. Es muy probable que se hubiese valido Chueco de este postrero viaje para acordar con Marcelo Ramos, y sus socios en Helvetic Services Group S.A, estrategias comunes de cara a las investigaciones en curso en nuestro país.

Con treinta y cinco registros, Panamá ocupa en esta sistemática de viajes y constancias migratorias un protagonismo semejante al que le otorga Federico Elaskar en su denuncia pública, relato este que ha visto, aquí también, nuevamente confirmado otro de sus extremos. Además de la ratificación que nos ha brindado el acceso a la documentación societaria de Helvetic Services Group y el descubrimiento de que la enorme mayoría de su capital se denuncia como conformado por participaciones societarias en Panamá[46], la versión del medio centenar de firmas armadas en esa jurisdicción y manejadas desde el estudio de Suiza se vuelve a confirmar con los datos que aquí analizamos. Panamá era ya en 2010 un destino conocido en la historia de SGI previa a la irrupción de Lázaro Báez, tal como lo ha dicho también Federico Elaskar en sus testimonios ante los periodistas. En ese tiempo lo vemos viajando cinco veces en 2010 a Fabián Virgilio Rossi, monopolio este que seguirá teniendo al año siguiente. Sin embargo, el primero que viaja en 2011, una vez ocupado su cargo de auditor en SGI, es Eduardo Guillermo Castro entre el 23 y el 31 de julio, inmediatamente después de desalojado Elaskar de la financiera.

Consumado el delito que estamos investigando, recién al cabo del alejamiento definitivo de su ex jefe, en noviembre de 2011, vuelven a Panamá Rossi y Gustavo César Fernández ocho veces más. Dos de ellas tienen lugar en noviembre y diciembre de 2012, cuando los imputados parecían estar recolectando dinero desde los cuatro puntos cardinales. Hasta el propio Martín Antonio Báez viaja a Panamá el 5 de agosto de 2012 y

---

[45] Al menos en el segundo viaje, de mayo de este año, el paso por Suiza se encuentra perfectamente acreditado con los gastos de su tarjeta de crédito AMEX –ver cuadro insertado en este dictamen-.
[46] Ver nota al pie número 16.

regresa vía Paraguay tres días después, cumplidos seguramente sus trámites de solapado accionista. Vale esta referencia para señalar que es el citado Martín Antonio Báez el único del grupo que registra viajes a Paraguay, sitio éste donde permaneció buena parte del mes de agosto del año pasado. El único tramo registrado con Perú corresponde a Ramos, en correspondencia con las sociedades que hemos detectado que integra en ese país, mientras que también es ocasional el paso de nuestros protagonistas por la República Dominicana, limitado a un viaje en el que coincidieron allí, para fines de junio de 2012, Fabián Virgilio Rossi, Gustavo Cesar Fernández y Daniel Rodolfo Pérez Gadín.

*Uruguay, con ciento cincuenta registros o setenta y cuatro viajes, más que dominar los sitios donde se concentran los negocios de este grupo parece ser el lugar donde pasan la mayor parte del tiempo*. Éste es otro de los contundentes respaldos a la denuncia pública de Federico Elaskar, donde nuestro vecino país tiene un protagonismo análogo a la proporción de viajes de los personajes de la trama. No cabe duda de que allí se encuentra buena parte de sus medios y recursos, no tanto en lo que respecta a entramados societarios sino, especialmente, en lo atinente a los fondos y valores. Debe recordarse que la versión de Federico Elaskar sobre el traslado e ingreso de dineros desde o hacia ese país -siempre tratándose de gente que ha confesado que se dedicaba a tales menesteres-, guarda perfecta relación con el constante ir y venir de los imputados por el aire, los puentes o el río. Nuevamente destaco que el mismo Lázaro Báez habría reconocido ante la AFIP tal ingreso de dineros en bolsos o a granel desde el Uruguay, fuera de la ley.

A la luz de todos estos nuevos elementos, consideramos que esos movimientos ilegales se han vuelto a verificar. *Al menos en parte, tales dineros habrían sido aplicados para lavar los más de doscientos ocho millones de pesos depositados en las cuentas de Austral Construcciones S.A.* Merced a este ingenioso recurso, siempre dentro de la hipótesis que deberá ser profundizada por la justicia federal, los imputados habrían conseguido repatriar la mitad de los tan mentados 50 millones de euros en títulos de la deuda argentina, mientras que la otra mitad habría sido blanqueada empleando en la compra de esos mismos títulos los dineros ingresados al país de manera clandestina, o bien destinando a tal fin sumas de dinero en negro existentes en la Argentina.

De todas maneras, es un dato objetivo que, *al menos la exacta mitad de los fondos que Lázaro Báez y sus socios sacaron de la Argentina con la participación de Federico Elaskar, regresaron y se lavaron en operaciones de transferencia de títulos desde Suiza y su posterior liquidación y depósito de las sumas resultantes en cuentas del propio Lázaro Báez o, lo que es lo mismo, en las de Austral Construcciones S.A*.

Por todo lo expuesto, a V.S,

REQUIERO:

**1**. Se tenga presente lo aquí alegado en relación a la prueba producida y se incorporen a la causa los informes y gráficos acompañados, de todo lo cual hemos de remitir

Ministerio Público Fiscal de la Nación.

copia por oficio a la Fiscalía en lo Criminal y Correccional Federal número 9 que interviene en el sumario 3017/2013.

**2**. Se ordene la declaración indagatoria de Verena Úrsula Fontana, Claudio Giovanni Fontana y Martín Antonio Báez por su participación en la extorsión investigada.

**3**. Se ordene el secuestro de los nueve cheques librados por la sociedad Financial Net a favor de Helvetic Services Group S.A contra sus cuentas en los bancos HSBC y Macro, todos ellos depositados en las cuentas de Austral Construcciones S.A en el Banco Nación.

**4**. Se intime al Banco Nación a aportar todos los datos de las cuentas en las que los cheques señalados fueron depositados, así como un resumen de sus movimientos desde el 1ro de noviembre de 2012 hasta la fecha.

**5.** Se procure individualizar el destino y aplicación de los 208.840.276,65 pesos liquidados y se decrete un embargo preventivo por esa suma sobre las cuentas bancarias y bursátiles de la sociedad Austral Construcciones S.A.

**6**. Se decrete el embargo preventivo de los títulos transferidos por los imputados desde Suiza, o bien se decrete el embargo, por el mismo monto nominal, sobre las cuentas globales en los que pudieran hallarse depositados.

Fiscalía de Instrucción número 10, 19 de junio de 2013.